**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

STEVES AND SONS, INC., )
                  Plaintiff, )
)
        v. )            Civil Action No. 3:16-CV-00545-REP
)
JELD-WEN, INC., )
                  Defendant. )
)

**PLAINTIFF STEVES AND SONS, INC.'S MEMORANDUM IN
OPPOSITION TO DEFENDANT JELD-WEN, INC.'S MOTION
TO DISMISS COUNT ONE OF THE COMPLAINT**

**REDACTED VERSION FILED PUBLICLY**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ..................................................................................4

I.    THE JUSTICE DEPARTMENT CHALLENGED A NEARLY IDENTICAL
MERGER IN 2001 TO ENSURE THE EXISTENCE OF A COMPETITIVE
DOORSKIN SUPPLY. .....................................................................................5

II.    THE VARIOUS DOORSKIN SUPPLIERS COMPETED FOR BUSINESS
BETWEEN 2002 AND 2012. ............................................................................6

III.   JELD-WEN'S ACQUISITION OF CRAFTMASTER HAS SUBSTANTIALLY
LESSENED COMPETITION, CAUSING HARM TO COMPETITION AND TO
STEVES AND OTHER DOOR MANUFACTURERS. .....................................7

ARGUMENT .........................................................................................................10

I.    STEVES HAS ADEQUATELY ALLEGED "INJURY" IN THE MARKET FOR
INTERIOR MOLDED DOORS. ......................................................................14

II.    STEVES HAS ALLEGED THAT THE 2012 MERGER WAS A "MATERIAL
CAUSE" OF ITS INJURIES AS A PURCHASER OF DOORSKINS..........................19

III.   DIVESTITURE IS AN AVAILABLE REMEDY BASED ON THE
ALLEGATIONS IN THE COMPLAINT. ......................................................24

      A.    The Validity of JELD-WEN's Laches Defense Is Not Properly Addressed
at the Motion to Dismiss Stage. ...........................................................25

      B.    Steves' Claim for Injunctive Relief Is Presumptively Timely...........................28

CONCLUSION......................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Abbyy USA Software House, Inc. v. Nuance Commc'ns, Inc.*,
  2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) ........................................................19

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*,
  988 F.2d 1157 (Fed. Cir. 1993)...........................................................................25

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
  910 F.2d 139 (4th Cir. 1990) ...............................................................................20

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
  183 F.3d 568 (7th Cir. 1999) ..........................................................................12, 20

*Am. Steamship Owners v. Dann Ocean Towing*,
  756 F.3d 314 (4th Cir. 2014) ...............................................................................25

*Blue Shield of Virginia v. McCready*,
  457 U.S. 465 (1982)..............................................................................................20

*BRFHH Shreveport, LLC v. Willis Knight Medical Center*,
  ___ F. Supp. 3d ___, 2016 WL 1271075 (W.D. La. Mar. 31, 2016).....................23

*California v. Am. Stores Co.*,
  495 U.S. 271 (1990).............................................................................3, 10, 11, 24

*Chi. Bridge & Iron Co. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) ...............................................................................11

*City of Pittsburgh v. West Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998).................................................................................24

*Cmty. Publishers, Inc. v. Donrey Corp.*,
  892 F. Supp. 1146 (W.D. Ark. 1995)...............................................................11, 23

*Continental Airlines v. United Airlines*,
  120 F. Supp. 2d 556 (E.D. Va. 2000) ..............................................................14, 17

*Delaware Health Care, Inc. v. MCD Holdings Co.*,
  893 F. Supp. 1279 (D. Del. 1995).........................................................................16

*E.I. DuPont Nemours v. Kolon Indus., Inc.*,
  688 F. Supp. 2d 443 (E.D. Va. 2009) ...................................................................17

*Eastern Shore Markets v. JD Associates Ltd.*,
    213 F.3d 175 (4th Cir. 2000) ......................................................25

*In re Evanston Nw. Healthcare*,
    2008 WL 2229488 (N.D. Ill. May 29, 2008) ....................................11

*Francisco v. Verizon South*,
    2010 WL 2990159 (E.D. Va. July 29, 2010) ....................................25

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ...........................................1, 12, 13

*FTC v. St. Luke's Health Sys.*,
    2014 WL 272339 (D. Idaho 2014), *aff'd* 778 F.3d 775 (9th Cir. 2015) ..............11

*In re Gabapentin Patent Litig.*,
    649 F. Supp. 2d 340 (D.N.J. 2009) ...............................................22

*Garabet v. Autonomous Tech. Corp.*,
    116 F. Supp. 2d 1159 (C.D. Cal. 2000) ......................................26, 27

*Ginsburg v. InBev NV/SA*,
    623 F.3d 1229 (8th Cir. 2010) ...............................................26, 27

*Ginsburg v. InBev NV/SA*,
    649 F. Supp. 2d 943 (E.D. Mo. 2009)............................................27

*Goodman v. Praxair, Inc.*,
    494 F.3d 458 (4th Cir. 2007) (en banc) .........................................26

*Goulmamine v. CVS Pharmacy, Inc.*,
    138 F. Supp. 3d 652, 664 (E.D. Va. 2015) (Payne, J.) .........................26

*HTI Health Servs. v. Quorum Health Grp*,
    960 F. Supp. 1104 (S.D. Miss. 1997).......................................16, 17

*Int'l T&T Corp. v. Gen.T&E Corp.*,
    518 F.2d 913 (9th Cir. 1975). ..................................................28

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ............................................20

*Lee-Moore Oil Co. v. Union Oil Co.*,
    599 F.2d 1299 (4th Cir. 1979) ..................................................17

*Lektro-Vend Corp. v. Vendo Co.*,
    660 F.2d 255 (7th Cir. 1981) ....................................................1

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*,
573 F. Supp. 2d 1125 (E.D. Ark. 2008) ................................................................28

*Lyons Partnership, LP v. Morris Costumes, Inc.*,
243 F.3d 789 (4th Cir. 2001) ...............................................................................28

*In re Neurontin Antitrust Litig.*,
2009 WL 2751029 (D.N.J. Aug. 28, 2009) ..........................................................22

*In re Niaspan Antitrust Litigation*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) .....................................................................25

*O.K. Sand & Gravel v. Martin Marietta Technologies*,
36 F.3d 565 (7th Cir. 1994) ..................................................................................18

*Polypore Int'l, Inc. v. FTC*,
686 F.3d 1208 (11th Cir. 2012) ............................................................................11

*Port Dock & Stone Corp v. Oldcastle Northeast, Inc.*,
507 F.3d 117 (2d Cir. 2007)............................................................................22, 23

*ProMedica Health Sys. v. FTC*,
749 F.3d 559 (6th Cir. 2014) ................................................................................11

*Rochester Drug Co-Op., Inc. v. Braintree Labs.*,
712 F. Supp. 2d 308 (D. Del. 2010).....................................................................22

*Sprint Nextel Corp. v. AT&T, Inc.*,
821 F. Supp. 2d 308 (D.D.C. 2011) ..............................................15, 17, 18, 20

*Taleff v. Southwest Airlines Co.*,
828 F. Supp. 2d 1118 (N.D. Cal. 2011) ...............................................................27

*United States v. Baker Hughes Inc.*,
908 F.2d 981 (D.C. Cir. 1990) ..........................................................................1, 12

*United States v. Bazaarvoice, Inc.*,
2014 WL 203966 (N.D. Cal. 2014) ......................................................................11

*United States v. E.I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961).............................................................................................3, 24

*United States v. H & R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011).............................................1, 6, 12, 13

*Zenith Radio Corp. v. Hazeltine*,
395 U.S. 100 (1969).................................................................................19, 20, 22

**REGULATORY CASES**

*In the Matter of Applications of Comcast Corp., Gen. Elec. Co. & NBC Universal*,
   26 F.C.C. Rcd. 4238 (2011)................................................................15

**FEDERAL STATUTES**

15 U.S.C. § 18a ...........................................................................................11

Clayton Act § 4, 15 U.S.C. § 15 ............................................................11, 19

Clayton Act § 7, 15 U.S.C. § 18 ............................................................ passim

Clayton Act § 16, 15 U.S.C. § 26 .........................................................11, 19

**FEDERAL RULES OF CIVIL PROCEDURE**

Rule 12 .......................................................................................................27

Rule 12(b)(6)...........................................................................................25, 26

**OTHER AUTHORITIES**

Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (Aug. 19, 2010)................. passim

M. Sean Royall & Adam J. Di Vincenzo, *When Mergers Become a Private
   Matter: An Updated Antitrust Primer*, 26 ANTITRUST 41 (2012)...............................................8

Michael H. Riordan & Steven C. Salop*, Evaluating Vertical Mergers: A Post-
   Chicago Approach*, 63 ANTITRUST L.J. 513 (1995).................................................15

*United States v. Premdor Inc.*,
   No. 01-1696, Complaint (D.D.C. Aug. 3, 2001) .............................................5, 22

*United States v. Premdor Inc.*,
   No. 01-1696, Competitive Impact Statement (D.D.C. Aug. 3, 2001) ...................................5, 6

Wright & Miller, FEDERAL PRACTICE & PROCEDURE (3d ed. 2007) ...........................................26

## INTRODUCTION

Defendant JELD-WEN, Inc.'s ("JELD-WEN") Motion to Dismiss fails to articulate any legitimate grounds for dismissal of the antitrust claim (Count One) asserted in the Complaint filed by Steves and Sons, Inc. ("Steves").  JELD-WEN's motion relies on a highly selective reading of the Complaint, disregarding many of Steves' specific allegations, and inexplicably faulting Steves for not including sufficient allegations regarding an affirmative defense, laches, as to which the burden of proof is on JELD-WEN, not Steves.  The Complaint clearly and with great specificity alleges facts showing a violation of Section 7 of the Clayton Act and resulting harm to Steves of exactly the type that Section 7 is intended to prevent.

Specifically, the Complaint alleges facts showing that JELD-WEN violated Section 7 when it merged with Craftmaster in 2012.  Compl. ¶¶ 74-116.  That merger left only two U.S. suppliers of doorskins—JELD-WEN and Masonite—each with a huge share of the market.  The resulting market shares establish a legal presumption that the merger has had and will continue to have anticompetitive effects.[1]  These effects include higher prices for doorskins, lower quality for doorskins, reduced output of doorskins, and increased coordination between the two remaining doorskin suppliers.

The merger has *already* caused these anticompetitive effects, harming Steves, other door manufacturers, and consumers.[2]  These anticompetitive effects and harms are expressly alleged

---

[1] *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001) (holding that a showing of concentration above certain levels establishes a presumption that the merger will substantially lessen competition); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 50 (D.D.C. 2011)

[2] In a case under Section 7 of the Clayton Act, the anticompetitive effects of the challenged merger are "judged at the time of trial."  *See Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 276 (7th Cir. 1981).  Thus, "proof of post-acquisition anticompetitive effects cements the plaintiff's case."  *Id.*

in detail in the Complaint, along with allegations showing how the 2012 merger was the principal cause.[3]  Yet JELD-WEN's motion ignores nearly all of those specific allegations.

Although JELD-WEN begins its brief with the pronouncement that this "is not an antitrust case," its arguments suggest something far different.  It does not argue that its merger with Craftmaster did not violate Section 7 of the Clayton Act.  Instead JELD-WEN argues:  (1) that the Complaint does not allege that the anticompetitive merger harmed Steves in the "interior molded doors" market, (2) that the harms Steves suffered in the "doorskins" market were not caused by the merger, and (3) that the Complaint fails to allege why the remedy of divestiture is not barred by the doctrine of laches.  Not one of these arguments suggests that this is "not an antitrust case."  Indeed, none of these arguments even disputes that the JELD-WEN/Craftmaster merger substantially lessened competition, and therefore violated the Clayton Act.  Most importantly, each argument is wrong.

*First*, JELD-WEN devotes citation after citation to a legal principle not in dispute:  that increased prices for a product (here, interior molded doors) do not harm competitors who sell that same product.  Steves does not dispute this principle.  JELD-WEN then inexplicably argues that, once this rule is applied, "Steves does not allege that it suffered *any* injury in [the interior molded doors] market."  In fact, the Complaint expressly explains how the merger is

---

[3] *See, e.g.*, Compl. ¶¶ 1, 3, 9, 21 ("After the 2012 Merger, JELD-WEN had an incentive to raise prices for doorskins to Steves, despite the existence of the Supply Agreement, and it did so."); *id.* ¶ 24 ("Knowing that Steves has no other source for doorskins, JELD-WEN has refused to honor the terms of the Supply Agreement. For example, JELD-WEN has charged higher prices than those established by the Supply Agreement and refused to issue refunds for defective products as required by the Supply Agreement."); *id.* ¶ 25 ("As a result of the merger, JELD-WEN has an incentive to coordinate to restrict the supply of doorskins to independent door manufacturers while also coordinating to raise the price of doors.  Both have occurred, with the result of restricting doorskin supply and raising prices in the doors market."); *id.* ¶¶ 32, 81-83, 84 ("JELD-WEN's actions have had the practical effect of reducing the usable output of the doorskins it is contractually bound to provide to Steves"); *id.* ¶¶ 85-88, 93-101.

"significantly hampering [Steves'] ability to compete in the market for interior molded doors." Compl. ¶ 105.  Among other things, the merger has increased Steves' costs and reduced the quality of doorskins sold to Steves, making it more difficult for Steves to compete for the sale of doors. *Id*. Intro. & ¶¶ 1, 2, 24, 86, 92, 102-06, 177.  The merger has also reduced the supply of doorskins to Steves, further impairing Steves' ability to compete in the downstream doors market in various ways. *Id*. ¶¶ 2, 15-16, 24, 25, 86, 88, 102-06, 177.  Gradually, the 2012 merger will allow JELD-WEN to completely foreclose Steves from competing in the doors market, allowing JELD-WEN to drive Steves out of business. *Id*. ¶¶ 2, 106.

*Second,* JELD-WEN argues that Steves' ills are solely the result of the contract it entered into with JELD-WEN, and that Steves has not alleged "a causal connection" between the 2012 merger and Steves' alleged injuries.  This entirely ignores key aspects of the Complaint that clearly allege that the 2012 merger—by eliminating one of only three suppliers, enhancing JELD-WEN's market power, and increasing the ability of JELD-WEN and Masonite to coordinate—has caused increased costs, reduced quality and reduced output of doorskins available to Steves. *Id*. ¶¶ 20, 24, 83, 84, 92, 96, 102, 120.  Moreover, many of JELD-WEN's actions have been in *breach* of the Supply Agreement, *id*. ¶¶ 3, 140-41, 148-50, 158-62, 168-71, thus JELD-WEN cannot claim that the existence of the agreement shields its conduct.

*Third*, JELD-WEN complains that Steves failed to allege facts sufficient to *disprove* the validity of JELD-WEN's laches defense, even though JELD-WEN, not Steves, bears the burden of proof on JELD-WEN's affirmative defenses.  The Supreme Court has called divestiture the "most important of antitrust remedies," *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 329-31 (1961), and "the remedy best suited to redress the ills of an anticompetitive merger," *California v. Am. Stores Co.*, 495 U.S. 271, 281 & 285 (1990).  It is not unavailable to

Steves merely because JELD-WEN has declared it so.  A plaintiff has no obligation to predict and plead facts contrary to affirmative defenses a defendant may choose to assert.  And, in any event, there are facts alleged in the Complaint—and more that will be proved at trial—showing that the laches defense is meritless.  Accordingly, the viability of the laches defense should not be decided at the motion to dismiss stage.

For these reasons, set forth more fully below, JELD-WEN's motion should be denied.

## FACTUAL BACKGROUND

In 1866, Edward Steves founded a lumberyard in San Antonio, Texas.  Compl. ¶ 4. Today, that business is run by Mr. Steves' great-great-great grandsons, Edward and Sam Steves. *Id*.  Over the years, the business evolved from a lumberyard to a manufacturer of doors.  Today, a substantial majority of Steves' business is manufacturing interior molded residential doors, the most popular type of interior door sold in the United States.  *Id*. ¶ 41.  The principal component of an interior molded door is the doorskin—a molded board produced with different designs, sizes, and textures—which makes up the front and back of an interior molded door.  *Id*. ¶¶ 37-39. The doorskin represents approximately 70% of the cost of materials that go into an interior molded door.  *Id*. ¶ 40.

Steves does not manufacturer its own doorskins.  *Id*. ¶ 7.  The production of doorskins requires a complex and expensive factory that could cost between 100 and 150 million dollars to build and outfit, and take four years to construct.  *Id*. ¶¶ 107-108.  For many years prior to JELD-WEN's acquisition of Craftmaster in 2012, Steves and other door manufacturers relied on three different suppliers of doorskins.  *Id*. ¶¶ 8, 12.  The head-to-head competition among the three doorskin suppliers was essential to ensure that Steves and other door manufacturers could purchase doorskins to compete in the market for interior molded doors.

I.   **THE JUSTICE DEPARTMENT CHALLENGED A NEARLY IDENTICAL MERGER IN 2001 TO ENSURE THE EXISTENCE OF A COMPETITIVE DOORSKIN SUPPLY.**

In 2000, there were only three significant manufacturers of doorskins:  JELD-WEN, Premdor, and Masonite.  *Id.* ¶ 42; *see also* Complaint, *United States v. Premdor Inc.*, No. 01-1696, ¶ 1 (D.D.C. Aug. 3, 2001) ("DOJ Complaint").[4]  JELD-WEN was vertically integrated, that is, it manufactured both doorskins and doors.  Premdor manufactured doors, and, according to the Antitrust Division of the United States Department of Justice ("Antitrust Division"), was also a small but significant manufacturer of doorskins.  Compl. ¶ 42.  Masonite manufactured doorskins, but not doors, and supplied doorskins to Steves, Premdor, and other American manufacturers of interior molded doors (but not to JELD-WEN).  *Id.*  In late 2000, Premdor announced its intention to acquire Masonite, which would result in the vertical integration of Premdor's door manufacturing and Masonite's doorskin manufacturing, eliminating the only non-vertically integrated doorskin manufacturer in the United States—Masonite.  *Id.* ¶ 45.

The Antitrust Division challenged the proposed merger, finding that it would substantially lessen competition in the "upstream market" for the production of interior molded doorskins and the "downstream market" for interior molded doors.  *Id.* ¶¶ 46-47; *DOJ Complaint* ¶¶ 30-41.[5]  The stated concern of the Antitrust Division was that the proposed merger would reduce the number of doorskin manufacturers from three to two, with the remaining two also competing in the downstream doors market.  Compl. ¶ 14.  In the Antitrust Division's view, that reduction in competition would provide the combined Premdor/Masonite "with the incentive to

---

[4] The filings by the Antitrust Division are available at https://www.justice.gov/atr/case/us-v-premdor-inc-et-al.

[5] *See also United States v. Premdor Inc.*, No. 01-1696, Competitive Impact Statement, at 2 & 6-9 (D.D.C. Aug. 3, 2001) ("DOJ Competitive Impact Statement").

raise doorskins prices and/or restrict doorskin sales to non-vertically integrated firms, thereby increasing the benefits to [Premdor/Masonite] and [JELD-WEN] of coordinated interaction." Compl. ¶ 47 (quoting *DOJ Complaint* ¶ 35).[6]

To resolve the Antitrust Division's concerns, Premdor and Masonite agreed to divest Masonite's doorskin manufacturing plant in Towanda, Pennsylvania, along with any intellectual property or other assets needed, so that a new company could enter the market as a "viable doorskin manufacturer." *See DOJ Competitive Impact Statement* at 2; Compl. ¶ 48. That new company was Craftmaster. Compl. ¶ 49. The required divestiture to Craftmaster ensured that Steves and other doors manufacturers would have the benefit from meaningful competition among at least three different doorskin suppliers.

## II. THE VARIOUS DOORSKIN SUPPLIERS COMPETED FOR BUSINESS BETWEEN 2002 AND 2012.

For a decade following the divestiture of the Premdor/Masonite assets to Craftmaster, the three suppliers of doorskins (Masonite, Craftmaster, and JELD-WEN) competed head-to-head. *Id.* ¶ 50. Steves regularly purchased doorskins from each of them during that time period. *Id.* With such a reliable supply of doorskins from three sources, Steves was able to purchase quality doorskins at reasonable and competitive prices. *Id.* ¶ 51.

---

[6] One of the most well-recognized anticompetitive effects from a merger that leaves just two remaining firms in the market is the likelihood that those two will engage in increased coordination, either by actual agreement or otherwise, on prices and/or output. This includes express coordination (*e.g.*, the type of price-fixing agreements condemned by Section 1 of the Sherman Act), as well as the type of tacit collusion on prices and/or output that may be beyond the reach of Section 1 but nevertheless harms competition and consumers. *See H&R Block*, 833 F. Supp. 2d at 77 (explaining "coordinated effects" of a merger); U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*, at 24-26 (Aug. 19, 2010) ("*Merger Guidelines*") (explaining the various types of anticompetitive "coordinated effects" that may result from a merger).

In mid-2010, Steves decided that it would be in its best interest to secure a new long-term supply agreement with one manufacturer, and Steves embarked on discussions with each doorskin manufacturer to obtain the most favorable terms.  *Id*. ¶ 52.  The three doorskin manufacturers competed vigorously with each other to offer Steves the most attractive prices and other terms.  *Id*. ¶¶ 16, 52.  Steves ultimately decided to enter a long-term supply agreement with JELD-WEN on May 1, 2012.  *Id*. ¶ 53 (the "Supply Agreement").

The Supply Agreement provides that it will be effective through ████████████, and ████████████████████████████████████████ unless terminated by either party in accordance with the provisions of the Agreement.  *Id*. ¶¶ 53-55.  If JELD-WEN decides to terminate, the Supply Agreement requires it to give Steves written notice ██████████ before the termination is to take effect.  *Id*. ¶¶ 56, 153-57.  ████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████.  *Id*. ¶¶ 155-57.  These terms were intended to provide Steves with a reliable and predictable supply of doorskins, as well as adequate time to secure an alternative source of doorskins in the event that JELD-WEN ever decided to terminate.  *Id*. ¶ 56.

**III.  JELD-WEN'S ACQUISITION OF CRAFTMASTER HAS SUBSTANTIALLY LESSENED COMPETITION, CAUSING HARM TO COMPETITION AND TO STEVES AND OTHER DOOR MANUFACTURERS.**

Just six weeks after the Supply Agreement was executed, JELD-WEN announced its intention to acquire Craftmaster.  *Id*. ¶ 57 (the "2012 Merger").  Given the timing, it is reasonable to assume that when JELD-WEN executed the Supply Agreement, it already knew that it would be acquiring Craftmaster.  *Id*. ¶ 18.  In light of the Antitrust Division's challenge to the nearly identical Premdor/Masonite transaction just 10 years earlier, it is likely that JELD-WEN entered into long-term supply agreements with Steves and other door manufacturers in an attempt to dissuade the Antitrust Division from challenging its acquisition of Craftmaster.  *Id*.

¶¶ 18, 60.[7]  Given its reasonable, albeit mistaken, belief that JELD-WEN would comply with the newly inked Supply Agreement and that Masonite would remain an alternative source of doorskins, Steves did not object to JELD-WEN's proposed acquisition of Craftmaster.  *Id*. ¶ 59.

When the 2012 Merger closed in October 2012, the effect was to create a duopoly in the production of interior molded doorskins with JELD-WEN having approximately 52% market share and Masonite approximately 48% market share.  *Id*. ¶¶ 74-75.  The result in the market for interior molded doors was similar:  JELD-WEN and Masonite each had a dominant position, with each controlling more than 40%, while Steves and a few other door manufacturers shared the remainder of the market.  *Id*. ¶¶ 77-78.

Unfortunately, the Supply Agreement provided Steves with no protection from the anticompetitive behavior enabled by the enhanced market power JELD-WEN gained through the 2012 Merger.  For example,

- JELD-WEN has insisted that Steves pay significantly more for doorskins than the Supply Agreement permits.  *Id*. ¶¶ 3, 21, 24, 81, 105, 140-50, 171.  JELD-WEN has demanded that Steves agree to ████████████████ that would raise doorskin prices substantially.  *Id*. ¶¶ 24, 99, 158-62.

- JELD-WEN has reduced the quality of its doorskins by, among other things, making the doorskins thinner and decreasing the protective packaging used to

---

[7] Antitrust practitioners often advise a merging party to enter into long-term supply contracts with principal customers before announcing a merger, because these contracts can then be used to quell the most likely source of objections (those same customers).  *See* M. Sean Royall & Adam J. Di Vincenzo, *When Mergers Become a Private Matter:  An Updated Antitrust Primer*, 26 ANTIRUST 41 (2012) (entering or extending the terms of supply contracts "may help deflect arguments" that existing supply arrangements "will be affected by the merger and allay any third party concerns about the merger when it is announced").  *See also Merger Guidelines* at 5 (discussing customers of the merging parties as one of the most common sources of valuable information about the merger's likely competitive effects).

ship the doorskins, causing increased instances of damage during shipping to Steves. *Id*. ¶¶ 22, 83, 92.  JELD-WEN has refused to issue refunds for defective products, *id*. ¶¶ 120-126, and to credit Steves when a defective doorskin has caused the return of an entire door.  *Id*. ¶¶ 128-132.  JELD-WEN has also refused to acknowledge that tens of thousands of doorskins are defective, claiming, for example, that damage below eye level does not justify a refund.  *Id*. ¶ 122.

- JELD-WEN has refused to sell Steves a certain style of doorskin unless Steves agrees to pay twice the price set forth in the Supply Agreement.  *Id*. ¶¶ 24, 168-170.  JELD-WEN also informed Steves that it will no longer supply Steves with a particular doorskin product line, while simultaneously telling Steves' customers that they could obtain the line directly from JELD-WEN.  *Id*. ¶¶ 88, 172.

These actions by JELD-WEN have increased the prices, lowered the quality, and reduced the output of doorskins to Steves.  This has significantly impaired Steves' ability to compete in the doors market.  *Id*. ¶¶ 2, 9, 24, 86, 105, 171-172.  Moreover, these actions are a stark contrast to JELD-WEN's behavior before the 2012 Merger, and certainly were not expected by Steves at the time that it entered the Supply Agreement in May 2012.  *Id*. ¶¶ 52, 59.

The harms to Steves from the 2012 Merger will increase in the future.  Following the 2012 Merger, Masonite announced that it would no longer supply doorskins to other door manufacturers, including Steves.  *Id*. ¶¶ 23, 75.  That decision effectively made JELD-WEN a monopolist in the supply of doorskins to other door manufacturers.  *Id*. ¶ 75.  JELD-WEN immediately used Masonite's decision—sending a copy of Masonite's announcement to Steves—as leverage to coerce Steves into agreeing to amend the Supply Agreement in ways that would threaten Steves' ability to remain in business.  *Id*. ¶¶ 23, 160.  With no alternative supplier

9

of doorskins, Steves has no recourse for combatting JELD-WEN's destructive exercise of its

market power. *Id.* ¶¶ 24, 171.

In the ultimate threat to Steves' survival, JELD-WEN now has notified Steves of its

intention to terminate the Supply Agreement. *Id.* ¶¶ 82, 153-57. The Supply Agreement

provides that "JELD-WEN may terminate . . . ████████████████████████████████████."

*See* Compl. Ex. A, ¶ 3(a)(2)(b). JELD-WEN ████████████████████████████████████

████████████████████████████████████████████. *Id.* ¶¶ 153-157.

Unless the competition that thrived before the 2012 Merger is restored, JELD-WEN eventually

will drive Steves from the doors business. *Id.* ¶¶ 2, 23, 190.

## ARGUMENT

JELD-WEN does not argue that Steves has not sufficiently alleged that the 2012 Merger

violated Section 7 of the Clayton Act. Instead, JELD-WEN argues for dismissal of Count One

because Steves supposedly has not plausibly alleged (a) that it was injured in the market for

interior molded doors, (b) that its injury in the market for doorskins was caused by the 2012

Merger, and (c) that its request for divestiture is not barred by laches. Before addressing why

these arguments are without merit, it is necessary to dispel the misconceptions in JELD-WEN's

papers regarding the substance and enforcement of Section 7.

Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of

commerce or in any activity affecting commerce in any section of the country, the effect of such

acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15

U.S.C. § 18 (1996). *See California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) ("Section 7

itself creates a relatively expansive definition of antitrust liability: To show that a merger is

unlawful, a plaintiff need only prove that its effect 'may be substantially to lessen

competition.'"). Section 7 may be enforced by the Antitrust Division, the Federal Trade

10

Commission, or private plaintiffs. *See, e.g.*, *id*. at 280-82. Regardless of whether a merger is challenged by the government, the Clayton Act "manifest[s] *a clear intent to encourage vigorous private litigation against anticompetitive mergers*." *Id*. at 284 (emphasis added). "Private enforcement of [Section 7] was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition." *Id*.[8]

An action under Section 7 by the government or a private plaintiff may be brought before or after a merger has been consummated.[9] To provide the government an opportunity to challenge some mergers before consummation, the Hart-Scott-Rodino Act (enacted in 1976) requires parties to a merger with a value above specified thresholds to notify the government before closing the transaction. *See* 15 U.S.C. § 18a. Significantly, however, a decision by the government not to file a challenge does not constitute "approval" or provide "immunity" from future challenge. *See* 15 U.S.C. § 18a(i)(1) (government decision not to take action prior to consummation "shall not bar any proceedings or any action with respect to such acquisition at any time"). Moreover, because "federal regulators will not necessarily challenge every potentially troublesome merger," the courts give no weight, in a suit by a private plaintiff, to the

---

[8] A private plaintiff may challenge a merger under Section 7 through the cause of action for monetary damages provided in Section 4, 15 U.S.C. § 15, or Section 16, 15 U.S.C. § 26, for injunctive relief. Steves asserts claims for relief under both sections. *See* Compl. ¶¶ 177-178.

[9] For example, there have been numerous recent Section 7 challenges to consummated mergers. *See, e.g.*, *ProMedica Health Sys. v. FTC*, 749 F.3d 559 (6th Cir. 2014); *FTC v. St. Luke's Health Sys.*, 2014 WL 272339 (D. Idaho 2014), *aff'd* 778 F.3d 775 (9th Cir. 2015); *United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. 2014); *Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208 (11th Cir. 2012); *Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410 (5th Cir. 2008); *In re Evanston Nw. Healthcare*, No. 07-4446, 2008 WL 2229488 (N.D. Ill. May 29, 2008); *Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146 (W.D. Ark. 1995).

fact that the government decided not to challenge the merger. *See AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 575 (7th Cir. 1999).[10]

Whether a Section 7 challenge is brought by the government or a private plaintiff, the substantive legal standards are the same and follow a familiar framework. *See Baker Hughes*, 908 F.2d at 982. The principal considerations in a Section 7 case are:

Market Shares and Concentration. The plaintiff bears the initial burden to show "that the merger would produce 'a firm controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of firms in that market.'" *H&R Block*, 833 F. Supp. 2d at 71 (quoting *Heinz*, 246 F.3d at 715). If the plaintiff makes this showing, using the standard and authoritative Herfindahl-Hirschmann Index ("HHI"), there is a *presumption* that the merger violates Section 7.[11] *Id.* Here, Steves alleges facts showing that JELD-WEN's acquisition of Craftmaster is presumptively unlawful based on the relevant market shares. *See* Compl. ¶¶ 74-75, 77-78; *H&R Block*, 833 F. Supp. 2d at 71; *Merger Guidelines* at 18-19. Indeed, the Complaint alleges post-merger market shares that far exceed the applicable thresholds to trigger a presumption that the merger will substantially lessen competition. *See H&R Block*, 833 F. Supp. 2d at 71.[12]

---

[10] For these reasons, JELD-WEN's suggestion that the Antitrust Division determined that the 2012 Merger "did not raise antitrust concerns" (J-W Br. at 4) is wrong and misleading, and certainly is not a fact alleged in the Complaint.

[11] "The HHI is calculated by summing the squares of the individual firms' market shares, and thus gives proportionately greater weight to the larger market shares." *Merger Guidelines* at 18.

[12] If the HHI of a market exceeds 2,500, it is classified as a "highly concentrated market." *Merger Guidelines* at 19. If a merger increases the HHI of a "highly concentrated market" by more than 200 points, the merger "will be presumed to be likely to enhance market power." *Id.* Here, Steves' allegations show that the 2012 Merger far exceeds these thresholds: the post-acquisition HHI for doorskins is 5,018 with an increase of about 850; and the post-acquisition HHI for doors is above 4,000 with an increase of over 550.

Competitive Effects.  Because the JELD-WEN/Craftmaster merger creates a presumption of enhanced market power, JELD-WEN will have the burden of producing sufficient evidence to rebut the presumption of enhanced market power and harm to competition.  *See Heinz*, 246 F.3d at 715.  This entails consideration of *"coordinated effects"* (the increases in the ability of the remaining firms to coordinate their conduct to increase prices or restrict output) and *"unilateral effects"* (the increases in the incentives and ability of the merged firm to unilaterally raise prices or restrict output).  *See generally H&R Block, Inc.*, 833 F. Supp. 2d at 77-81; *Merger Guidelines* at 20-27.  JELD-WEN and Masonite engaged in extensive coordination after the 2012 Merger to increase prices and restrict output of doorskins and doors.  Compl. ¶¶ 89-99.  The elimination of competition from the 2012 Merger increased JELD-WEN's ability unilaterally to increase prices, reduce quality, and restrict output of doorskins.  *Id.* ¶¶ 81-88.

Barriers to Entry.  Whether the market-share statistics accurately reflect a merger's effect on competition may also depend on the ease with which new firms could enter to replace the lost competition.  New entry must be "timely . . . and sufficient in magnitude, character, and scope to deter or counteract the competitive effects of concern" from the merger.  *See H&R Block, Inc.*, 833 F. Supp. 2d at 73 (quoting *Merger Guidelines* at 27-28).  Here, there are high barriers to entry into the production of doorskins because the construction of a new manufacturing facility would be expensive ($100-150 million) and take an extremely long time (over four years).  Compl. ¶¶ 6, 107-10.  In addition, the threat of intellectual property litigation by JELD-WEN and Masonite presents a further barrier to entry.  *See id.* ¶¶ 111-116.

In sum, the heart of this case is an antitrust violation, not a contract dispute.  The contract dispute itself is powerful evidence of the insidious anticompetitive effects that have followed in the wake of the 2012 Merger.  The Complaint comprehensively illustrates those anticompetitive

13

effects, along with the actual and threatened harms to Steves and other door manufacturers caused by the 2012 Merger.  Those harms are precisely the types of injuries that Section 7 was enacted to prevent.  Accordingly, none of JELD-WEN's arguments warrant dismissal of Steves' claims for monetary and injunctive relief.

## I.  STEVES HAS ADEQUATELY ALLEGED "INJURY" IN THE MARKET FOR INTERIOR MOLDED DOORS.

JELD-WEN's first argument relies on its mischaracterization of the Complaint as alleging that Steves was injured only by higher prices for interior molded doors.  *See* Def. JELD-WEN, Inc.'s Mem. In Supp. Of Its Motion to Dismiss Count One, Docket Item 21, at 6-8 (E.D. Va. Aug. 5, 2016) ("J-W Br.").  To be sure, the 2012 Merger has allowed JELD-WEN to increase prices of interior molded doors, both unilaterally and in coordination with Masonite. Those price increases have harmed consumers, Compl. ¶ 1, and "represent a manifestation of the anticompetitive effects of [the 2012 Merger]," *Continental Airlines v. United Airlines*, 120 F. Supp. 2d 556, 569-70 (E.D. Va. 2000), but they are not the actionable harm to *Steves* in the interior molded doors market that is alleged in significant detail throughout the Complaint.

The Complaint explains how Steves' *ability to compete* in the interior molded doors market has been substantially impaired as a result of the 2012 Merger.  Compl. ¶¶ 2, 9, 24, 86, 105, 171-172.  Steves does not dispute here the legal principle set forth in JELD-WEN's papers: that a competitor cannot show antitrust injury from a merger that merely results in higher prices for a product that it sells.  The flaw in JELD-WEN's argument is that it ignores altogether the actual allegations in the Complaint.  In short, JELD-WEN's main argument has merely slain a straw man.

JELD-WEN insists that Steves has not alleged any *other* basis for an antitrust injury in the market for interior molded doors.  But even a perfunctory review of the Complaint reveals

that JELD-WEN is quite wrong.  The Complaint describes a variety of injuries to Steves in the interior doors market.  Each alone is sufficient to satisfy the antitrust injury requirement, and each goes entirely unmentioned by JELD-WEN.

Because JELD-WEN is a supplier of doorskins and also a competitor in the downstream doors market, the 2012 Merger increased JELD-WEN's incentives and ability to harm Steves' ability to compete in the downstream doors market by raising prices, reducing quality, restricting supply, or withholding supply entirely of doorskins to Steves.  Compl. ¶¶ 9, 24-25, 102-06.  The resulting injury to Steves—increased price or foreclosure of a necessary input for downstream competition—is well recognized as a type of harm from a merger that the antitrust laws were intended to prevent.[13]  JELD-WEN's intention has been not only to extract more money from Steves through higher prices for doorskins, which might be the case if JELD-WEN was only a supplier of doorskins, but also to make it more difficult for Steves to compete with JELD-WEN in the separate but closely related market for interior molded doors.  *Id*. ¶¶ 2-9.  This serves

---

[13] *See, e.g.*, *Sprint Nextel Corp. v. AT&T, Inc.*, 821 F. Supp. 2d 308, 321 (D.D.C. 2011) (cognizable "theory of competitor harm" under the antitrust laws exists where it is alleged that a "rival's anticompetitive acts will result in its paying more for necessary inputs"); *In the Matter of Applications of Comcast Corp., Gen. Elec. Co. & NBC Universal*, 26 F.C.C. Rcd. 4238, 4254 (2011) (applying federal antitrust laws and stating that Comcast's merger with NBC would give "Comcast an increased ability to disadvantage some or all of its video distribution rivals by exclusion, causing them to become less effective competitors"); Michael H. Riordan & Steven C. Salop*, Evaluating Vertical Mergers:  A Post-Chicago Approach*, 63 ANTITRUST L.J. 513, 528 (1995) ("Input foreclosure refers to exclusionary conduct by the upstream division of an integrated firm with the purpose of excluding rivals from access to important inputs or raising their costs of such inputs. . . .  In these cases, if downstream rivals' costs are raised, the integrated firm may be able to effect an exercise of market power in the downstream market, either unilaterally or through coordination with its competitors.").

JELD-WEN's ultimate goal of driving Steves out of the door business and thereby increasing JELD-WEN's ability to further drive up the prices of interior molded doors.  *Id*. ¶¶ 2, 25, 106.

JELD-WEN has harmed Steves in the interior molded door market in a number of ways:

*First*, due to its enhanced market power, JELD-WEN has refused to sell doorskins to Steves at the prices JELD-WEN agreed to when it signed the Supply Agreement, "thus significantly hampering [Steves'] ability to compete in the market for interior molded doors."  *Id*. ¶ 105; *see also id*. ¶¶ 3, 21 24, 81, 140-50, 171.  JELD-WEN also reduced the quality of the doorskins supplied to Steves, making Steves pay more even though the product has gotten *worse*. The anticompetitive logic behind JELD-WEN's actions is simple:  if Steves pays more for its inputs, it must then charge its customers more.  The result is harm to Steves' ability to compete with JELD-WEN.  *See supra* n.13; *Delaware Health Care, Inc. v. MCD Holdings Co.*, 893 F. Supp. 1279, 1291 (D. Del. 1995) (finding sufficient allegations that, among other things, defendant used its power in one market to harm competition in another market, resulting in "increased costs, loss of employees, and loss of profits").

*Second*, the 2012 Merger has ensured that Steves cannot acquire doorskins from any alternative supplier.  Prior to the 2012 Merger, JELD-WEN had no incentive to restrict the supply of doorskins to Steves, because Steves could have acquired doorskins from Craftmaster or Masonite, as it had done in the past.  Compl. ¶¶ 15-16, 25.  The 2012 Merger eliminated Craftmaster as a potential doorskin supplier, enabling JELD-WEN to coordinate its actions with Masonite to squeeze Steves' doorskin supply.  *Id*. ¶¶ 2, 24-25, 99.  This, too, is a traditional antitrust injury.  *See HTI Health Servs. v. Quorum Health Grp*, 960 F. Supp. 1104, 1114 (S.D. Miss. 1997) (finding injury where the merger "foreclose[ed] a competitor from a key source of supply that, absent the merger, would otherwise be open to it").

*Third*, JELD-WEN has restricted or eliminated Steves' access to certain doorskin styles demanded by Steves' door customers.  Compl. ¶¶ 86, 88, 172.  JELD-WEN, for example, refused to sell Steves the "Monroe" style doorskin unless Steves paid twice the price set forth in the Supply Agreement.  *Id*. ¶¶ 86, 168-170.  "Because consumers demand, and Steves' competitors offer, this design, Steves is forced to purchase it at the price JELD-WEN demands . . . [but] the increased price of this doorskin hampers Steves' ability to compete downstream in the market for interior molded doors."  *Id*. ¶ 86; *see also HTI*, 960 F. Supp. at 1114.

*Finally*, JELD-WEN told Steves that a particular doorskin product line has been discontinued, while telling Steves' customers that the finished doors made with that doorskin would be available directly from JELD-WEN.  Compl. ¶ 88.  Because of the 2012 Merger, Steves cannot acquire similar product lines elsewhere and thus has no opportunity to sell this product to customers it previously won through rigorous competition.  Instead, those customers turn to JELD-WEN, because Steves has been excluded from competing for those sales.  *See E.I. DuPont Nemours v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 460 (E.D. Va. 2009) ("the antitrust injury requirement is sufficiently pled where plaintiff alleges that he was excluded from participation in a particular market, and the result was a decrease in competition in that market."); *Lee-Moore Oil Co. v. Union Oil Co.*, 599 F.2d 1299, 1304 (4th Cir. 1979) (noting that lost "opportunity to deal" is cognizable antitrust injury).

JELD-WEN ignores all of these facts in the Complaint even though they allege harms from anticompetitive conduct—lost market share, lost sales, and lost opportunities to compete— all of which constitute "classic antitrust injur[ies]."  *Continental Airlines*, 120 F. Supp. 2d at 569.

None of the cases cited by JELD-WEN suggest a different conclusion.  *Sprint Nextel* is a great example of how JELD-WEN's argument misses the mark.  JELD-WEN cites *Sprint Nextel*

for the proposition that increased prices do not cause competitors selling in the affected market any "antitrust injury," an unremarkable proposition which, as noted, Steves does not dispute. But the court also identified several other aspects of the challenged transaction that *did* create antitrust injuries, which JELD-WEN entirely ignores. *Sprint,* 821 F. Supp. 2d . at 320-37. Those injuries include some of particular relevance here. For example, the court found allegations that the proposed merger of AT&T and T-Mobile would harm their downstream rivals' (Sprint and Cellular South) access to necessary inputs sufficiently alleged a threatened "antitrust injury" from the merger: "[w]here a defendant, by means of anticompetitive conduct, restricts or forecloses a competitor plaintiff's access to a necessary input, courts have found that the resulting loss is injury of the type that the antitrust laws were designed to prevent." *See id.* (collecting cases). The restriction of a "necessary input" (doorskins) is exactly what the challenged merger has permitted JELD-WEN to do and is exactly what has harmed Steves in the doors market.

     *O.K. Sand & Gravel v. Martin Marietta Technologies*, 36 F.3d 565 (7th Cir. 1994), also cited by JELD-WEN, is at best irrelevant. As explained above, Steves has alleged injury from much more than JELD-WEN's increased prices for doors. *See id.* at 573. Notably, however, the court in *O.K. Sand & Gravel* stated that a purchaser alleging "higher prices or restrictions in output due to an unlawful combination," as Steves alleges here, would have "the 'type' of injury the antitrust laws intend to prevent." *Id.* The court rejected other alleged injuries, but only because the party asserting them was unable to prove their existence at summary judgment. *See id.* Needless to say, Steves is not required to offer such proof now; its allegations of a variety of

competitive injuries—all remediable under Clayton Act Sections 4 and 16—are sufficient at the motion to dismiss stage.[14]

Of course, the ultimate harm to Steves has yet to come. JELD-WEN has already declared its intention ███████████████████████████████████████████████████████ ███████████████████████████████████████████████. Compl. ¶¶ 82, 153-157. If left unchecked, JELD-WEN, as a result of its enhanced market power from the 2012 Merger, will force Steves out of the interior molded door business altogether. *Id.* ¶ 2. While Section 4 of the Clayton Act allows a plaintiff to recover monetary damages for actual injury, Section 16 provides for injunctive relief in circumstances where the plaintiff faces "a significant threat of injury from an impending violation of the antitrust laws." *Zenith Radio Corp. v. Hazeltine*, 395 U.S. 100, 130 (1969). JELD-WEN's first argument makes no mention of Steves' request for injunctive relief and JELD-WEN never challenges the presence of a "significant threat" (*i.e.*, Steves' extinction) alleged in the Complaint. *See* Compl. ¶¶ 2, 178. Although JELD-WEN is wrong that the Complaint fails to show actual injury to Steves, JELD-WEN's arguments would not dispose of the antitrust claims regarding the market for interior molded doors either way.

## II. STEVES HAS ALLEGED THAT THE 2012 MERGER WAS A "MATERIAL CAUSE" OF ITS INJURIES AS A PURCHASER OF DOORSKINS.

JELD-WEN's second argument is that Steves, as a major direct purchaser of doorskins, has not sufficiently alleged a causal connection between its injuries and the 2012 Merger. As with its first line of attack, this disregards many of the allegations in the Complaint.

---

[14] Similarly, *Abbyy USA Software House, Inc. v. Nuance Commc'ns, Inc.*, No. C 08-01035JSW, 2008 WL 4830740 (N.D. Cal. Nov. 6, 2008), has no import here because the court simply concluded that the plaintiff had not adequately pled antitrust injury where the only injury alleged was that its competitors raised prices. *See id.* at *3-4 ("Although direct purchasers of the software would have standing to allege a price-fixing claim, as pled, Abbyy does not have standing to allege injury from having its competitors agree to raise prices.").

"[A] plaintiff must show a reasonably probable causal link between the antitrust violation and a business loss of the sort the antitrust laws were designed to prevent." *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 149 (4th Cir. 1990).  The alleged antitrust violation need only be a "material cause" of the alleged injury; a plaintiff is not required to "exhaust all possible alternative sources of injury." *Zenith*, 395 U.S. at 114 n.9 .  Thus, a plaintiff need not "allege (or dispose of) all alternative theories of causation to survive a motion to dismiss." *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 535 (D.N.J. 2004).

Here, Steves comprehensively alleges multiple types of antitrust injury as a purchaser of doorskins that were caused by the substantial lessening of competition from the 2012 Merger and JELD-WEN's resulting enhanced market power.  The types of antitrust injury alleged by Steves—higher prices, reduced quality, and restricted output of doorskins—are precisely the types of antitrust harm that flow from a merger that enhances market power and that Section 7 is intended to prevent.  *See, e.g.*, *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 482-83 (1982) ("an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which [Section] 4 potentially offers redress"); *Merger Guidelines* at 2 ("A merger enhances market power if it is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives.").  Steves' alleged harm from the 2012 Merger is similar to—and in many ways far more direct and compelling than—the circumstances in which courts have previously held that a plaintiff had established sufficient antitrust injury to challenge a merger under Section 7.  *See, e.g.*, *Sprint Nextel*, 821 F. Supp. 2d at 333 (Cellular South established standing as a *purchaser* of roaming services where challenged merger would reduce the number of suppliers and thus "threaten[ed] it with paying higher roaming prices"); *Allied*

20

*Signal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 576 (7th Cir. 1999) (plaintiff sufficiently established antitrust standing as a *purchaser* of landing gear).

Steves plainly alleges that those injuries were caused by and are directly traceable to the 2012 Merger. *See, e.g.*, Compl. ¶¶ 1-3, 8-9, 19-24, 81-88, 96-99, & 102-106. JELD-WEN does not bother to address the actual allegations by Steves—its entire causation argument refers to only two paragraphs of the Complaint, *see* J-W Br. at 9. Instead, JELD-WEN argues that it was the Supply Agreement entered into before the 2012 Merger that allowed it to raise doorskin prices to Steves, not the effects of the 2012 Merger. *See* J-W Br. at 9-12. Regardless of whether the Supply Agreement allowed JELD-WEN to ███████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████. Compl. ¶¶ 3, 21, 81, 86, 143, 171. Moreover, JELD-WEN's argument regarding the Supply Agreement does not address Steves' allegations regarding harm from the reduced quality of doorskins, *id*. ¶¶ 22, 83, 122, JELD-WEN's refusal to supply Steves with specific styles of doorskins, *id*. ¶¶ 88, 105, or even JELD-WEN's declared intention to ██████████████ ██████████████ *id*. ¶¶ 82, 153-57.[15]

---

[15] JELD-WEN argues that it should not matter that the 2012 Merger eliminated an alternative supplier of doorskins because the Supply Agreement ████████████████████████████ ███████████████████████████ J-W Br. at 11. ████████████████████████ as a result of the 2012 Merger. More importantly, JELD-WEN fails to acknowledge the obvious point that Steves has been left with no alternative supply of doorskins. Notwithstanding JELD-WEN's repeated and material breaches of the Supply Agreement, it would have been suicidal for Steves to terminate the Supply Agreement for cause. JELD-WEN states that Steves has not alleged that it could have terminated the Supply Agreement for cause, but that is because such a termination would leave Steves unable to meet its doorskins needs, and thus Steves did not exercise its right to terminate for cause.

JELD-WEN also argues that Steves does not allege that JELD-WEN had any involvement in Masonite's decision to stop selling doorskins to third parties. *See* J-W Br. at 12. But Steves' allegations show that Masonite's decision was part of the anticompetitive coordination made possible only because of the 2012 Merger.[16]  Indeed, Masonite's decision would have made little sense—as reflected by Masonite's past willingness to supply Steves with doorskins, *see* Compl. ¶¶ 50, 58—if the 2012 Merger had not eliminated one of the three doorskin manufacturers and if Masonite did not expect JELD-WEN to follow course.  Regardless of whether JELD-WEN was directly involved (an issue that awaits investigation in discovery), even total lack of direct involvement in Masonite's decision would not preclude Steves from demonstrating that the 2012 Merger was a "material cause" of its alleged injuries.  *See Zenith*, 395 U.S. at 114 n.9.  In any event, the courts have repeatedly rejected motion-to-dismiss arguments based on causation issues where the defendant, like JELD-WEN here, merely points to another factor that may have contributed to the plaintiff's alleged injuries.  *See, e.g.*, *Rochester Drug Co-Op., Inc. v. Braintree Labs.*, 712 F. Supp. 2d 308, 318 (D. Del. 2010); *In re Gabapentin Patent Litig.*, 649 F. Supp. 2d 340, 356-57 (D.N.J. 2009); *In re Neurontin Antitrust Litig.*, No. 02-1390, 2009 WL 2751029, at *12 (D.N.J. Aug. 28, 2009).

JELD-WEN relies on the Second Circuit's decision in *Port Dock & Stone Corp v. Oldcastle Northeast, Inc.*, 507 F.3d 117 (2d Cir. 2007), but that case involved different circumstances, and also fully supports the sufficiency of Steves' alleged antitrust injuries here. The plaintiff's alleged injury in *Port Dock*—termination as a distributor—had nothing to do with

---

[16] The Antitrust Division explained exactly this type of anticompetitive coordinated interaction in challenging the 2001 Premdor/Masonite merger. *See DOJ Complaint* ¶ 35 ("Post-merger . . . Premdor would have the incentive to raise doorskin prices and/or restrict doorskin sales to non-vertically integrated firms, thereby increasing the benefits to Premdor and the non-party firm of coordinated interaction.").  The "non-party firm" in that context was JELD-WEN.

the enhanced market power from the merger, but rather the defendant's decision to vertically integrate, which was something it "could have just as well done without" the merger.  507 F.3d at 123.  Whereas "the rationale for condemning a merger lies in its potential for supracompetitive pricing," the plaintiff in *Port Dock* did not allege "injury from increased prices" or any other harm attributable to the defendant's enhanced market power.  *Id*.

Here, Steves is not alleging harm because it was terminated as a distributor as a result of JELD-WEN's decision to vertically integrate.  JELD-WEN already was vertically integrated.  Steves instead is alleging harm directly traceable to JELD-WEN's enhanced market power resulting from the 2012 Merger.  This is exactly the type of harm (*e.g.*, higher prices and lower quality) that the Second Circuit found would establish standing to challenge a merger:  "those who would suffer from the defendant's exercise of monopoly power would be the dealers or consumers who were forced to buy at higher prices (or inferior quality) because the defendant had acquired the market power to charge monopoly prices."  *Id*. at 123-24.  *See also BRFHH Shreveport, LLC v. Willis Knight Medical Center*, ___ F. Supp. 3d ___, 2016 WL 1271075, at *14 (W.D. La. Mar. 31, 2016) ("Unlike the injuries alleged by the plaintiff in *Port Dock* and the like, [the defendant] requiring high reimbursement rates [*i.e.*, charging higher prices] is the type of injury that flows from [its] market power because [it] could not have demanded what were effectively higher prices without market power").  Moreover, a plaintiff can show antitrust injury where, as Steves alleges here, the challenged merger increased the defendant's incentives to terminate an existing supply agreement.  *See Community Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1166-67 (W.D. Ark. 1995), *aff'd sub nom*. 139 F.3d 1180 (8th Cir. 1998) (the "agreement is terminable-at-will, but the fact remains that [the acquisition] creates an

23

anticompetitive reason to terminate the agreement where none existed before.  This creates the requisite threat of antitrust injury.").

JELD-WEN's reliance on the Third Circuit's decision in *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998), is also misplaced.  That case involved clearly inapposite circumstances of a merger involving two companies that "were never competitors," where "the regulatory scheme mandated that they not compete," and thus "any injury suffered by the [plaintiff] did not flow from the defendants' conduct, but, rather from the realities of the regulated environment."  *Id.* at 265.  Here, Steves clearly alleges that, and illustrates how, the 2012 Merger eliminated direct competition between JELD-WEN and Craftmaster, yielding the loss in competition that has caused Steves' injuries.

## III. DIVESTITURE IS AN AVAILABLE REMEDY BASED ON THE ALLEGATIONS IN THE COMPLAINT.

"Divestiture has been called the most important of antitrust remedies.  It is simple, relatively easy to administer, and sure.  It should always be in the forefront of a court's mind when a violation of [Section] 7 has been found."  *United States v. E.I. Du Pont De Nemours & Co.*, 366 U.S. 316, 331 (1961) (footnote omitted).  And the Supreme Court has expressly held that divestiture is an available remedy provided by Section 16 to a private plaintiff alleging that a merger violated Section 7.  *Am. Stores*, 495 U.S. at 285.  Here, one form of relief requested by Steves is injunctive relief in the form of the divestiture by JELD-WEN of such assets "sufficient either to enable the creation of a separate, distinct, and viable competing firm" or "otherwise to restore competition."  Compl., Prayer for Relief, at 45, ¶ 1.  Yet JELD-WEN now asks this Court to hold that the remedy is not available, *as a matter of law*, on account of the potential for affirmative defenses that JELD-WEN would have to prove.

**A.** **The Validity of JELD-WEN's Laches Defense Is Not Properly Addressed at the Motion to Dismiss Stage.**

To prevail on the affirmative defense of laches, JELD-WEN must prove "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Am. Steamship Owners v. Dann Ocean Towing*, 756 F.3d 314, 318 (4th Cir. 2014). JELD-WEN has not proven any of that. Indeed, it pled not a single fact in support of this (or any other) affirmative defense in its Answer. *See* Answer, Sixth Affirmative Defense.[17] JELD-WEN nonetheless asks this Court to rule that Steves' pleading is deficient for failure to allege that "divestiture would not wreak havoc on JELD-WEN"—a fact potentially relevant to this litigation only because JELD-WEN must later prove its inverse to maintain a laches defense.

JELD-WEN has this issue entirely backwards. "A Rule 12(b)(6) motion . . . does not generally invite an analysis of potential defenses to the claims asserted in the complaint." *Eastern Shore Markets v. JD Associates Ltd.*, 213 F.3d 175, 185 (4th Cir. 2000). Exceptions to this arise only when facts *establishing* the defense are pleaded in the complaint. For example, in *In re Niaspan Antitrust Litigation*, 42 F. Supp. 3d 735 (E.D. Pa. 2014), the district court explained that "the Court need not decide this [laches] issue at this time because 'facts evidencing unreasonableness of the delay, lack of excuse, and material prejudice to the defendant[s]' are not clearly set forth in plaintiffs' Complaint." *Id.* at 749-50 (quoting *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993) ("the

---

[17] There is significant doubt that JELD-WEN's conclusory pleading sufficiently alleges an affirmative defense, like laches, for which JELD-WEN bears the burden of proof. *See Francisco v. Verizon South*, No. 3:09cv737, 2010 WL 2990159, at *8 (E.D. Va. July 29, 2010) (holding that affirmative defenses are subject to heightened pleading standard, collected concurring and dissenting caselaw). Here, JELD-WEN is turning pleading requirements on their head by arguing that the party who has the burden of proof on laches (JELD-WEN) need say nothing more in its Answer than the word "laches," but the party without the burden of proof (Steves) somehow must plead details to refute a laches defense.

strictures of Rule 12(b)(6) . . . are not readily applicable to a determination of laches")).  *See also* Wright & Miller, Federal Practice & Procedure § 1277 (3d ed. 2007) ("[A] complaint seldom will disclose undisputed facts clearly establishing the defense of laches and a motion to dismiss generally is not a useful vehicle for raising the issue.").

JELD-WEN does not claim that Steves' allegations are sufficient to establish laches. Instead, JELD-WEN claims that Steves should have pleaded facts showing that JELD-WEN's affirmative defense is *not* established.  J-W Br. at 14.  A plaintiff has no obligation to affirmatively plead facts denying affirmative defenses that may or may not be raised in a later answer.  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007) (en banc) ("To require otherwise would require a plaintiff to plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised."); *accord Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 664 (E.D. Va. 2015) (Payne, J.) ("[G]enerally, a petitioner need not plead facts to negate an affirmative defense, and . . . generally affirmative defenses are not a ground to grant a motion to dismiss.").

Nothing JELD-WEN cites puts these conclusions in doubt.  *Garabet* involved a motion for summary judgment and was not, as JELD-WEN claims, "at the pleading stage."  *See Garabet v. Autonomous Tech. Corp.*, 116 F. Supp. 2d 1159, 1160 (C.D. Cal. 2000) ("On June 30, 2000, Defendants filed the instant Motion for Summary Judgment.").  Both *Garabet* and *Ginsburg* also focused heavily on the fact that the plaintiffs, unlike Steves here, were not "customers" or "competitors" of the merging parties.  *Garabet*, 116 F. Supp. 2d at 1173 n.13; *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1234 (8th Cir. 2010) ("Never has a federal court ordered divesture at the request of a private party who was neither a customer nor a competitor of the merging parties.").  Thus, reasoned the *Garabet* and *Ginsburg* courts, it was unclear that the plaintiffs would have

obtained *any* benefit from divestiture. *Ginsburg*, 623 F.3d at 1235 ("[T]he price benefit beer drinkers would gain from divestiture is unclear. . ."); *Garabet*, 116 F. Supp. 29 at 1173 ("[I]t is not clear what *direct* benefit Plaintiffs would gain from the break-up of these two companies."). [18]

*Taleff v. Southwest Airlines Co.*, 828 F. Supp. 2d 1118 (N.D. Cal. 2011), is similar. While *Taleff* involved customers of the merging parties, the court observed that the plaintiffs had failed to show what benefit they would achieve from divesture, noting that they failed to allege "how often [they] used air travel or how their plans for the future conceivably could be affected by the merger." *Id.* at 1123 n.8 (internal quotation marks and ellipses omitted), while the defendants had made a substantial showing as to the hardship to them that would result from divestiture. *Id.* JELD-WEN has made no such showing here.

Steves bears little similarity to the unharmed plaintiffs in *Garabet*, *Ginsburg*, and *Taleff*. Steves was a customer of both JELD-WEN and Craftmaster. Compl. ¶ 50. The Complaint explains how divestiture would benefit Steves and restore the competition lost as a result of the 2012 Merger: an increase in competition in the doorskins market will not only reduce the price of interior molded doorskins, but will have the added effect of forcing JELD-WEN to comply with its contractual agreements. Without divestiture, JELD-WEN will be able to continue to

---

[18] In both *Garabet* and *Ginsburg*, the courts "balance[d] the equities" and determined that the potential prejudice to the defendants outweighed the benefit to plaintiffs. *Garabet*, 116 F. Supp. 29 at 1173 ("Under these circumstances, the Court is inclined to balance the equities in favor of the Defendants."); *Ginsburg*, 623 F.3d at 1236 ("In these circumstances . . . the remedial equities balance overwhelming in favor of denying this remedy."). Such a fact-based balancing of equitable factors would rarely, if ever, be appropriate at the Rule 12 stage. Indeed, while the district court in *Ginsburg* granted a motion for judgment on the pleadings, it did so on the basis that the complaint failed to allege a substantive antitrust claim. *Ginsburg v. InBev NV/SA*, 649 F. Supp. 2d 943 (E.D. Mo. 2009). The district court decision makes no mention of divestiture or laches.

leverage its monopoly power against doorskin customers, such as Steves, harming Steves in both the doorskins and interior molded doors markets.

### B. Steves' Claim for Injunctive Relief Is Presumptively Timely.

Even if it were proper to consider laches on a motion to dismiss, it would be wrong to apply it here.  In considering laches, courts "look to the statute of limitations relating to actions at law of like character and usually act or refuse to act in comity with such statutes." *Int'l T&T Corp. v. Gen.T&E Corp.*, 518 F.2d 913, 926 (9th Cir. 1975), *overruled in part on other grounds by Am. Stores*, 495 U.S. at 278; *Lyons Partnership, LP v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001) ("When federal courts . . . consider laches, they are guided by the limitations period that they would borrow for actions at law and presume that if an equitable claim is brought within the limitations period, it will not be barred by laches."); *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1151 (E.D. Ark. 2008) ("Some courts have said that the [Clayton Act's] four-year statute of limitations for damage actions should be used as a guideline in considering whether claims for equitable relief are barred.") (collecting cases). The statute of limitations for Steves' damages claim is four years.  Steves brought suit well within that period and thus its claim for injunctive relief is presumptively timely.

And, even if Steves did bear the burden on laches that JELD-WEN has constructed, it would be satisfied.  The Complaint explains that JELD-WEN has actually *closed* two doorskin plants since the merger.  Compl. ¶ 87.  It is difficult to imagine how divestiture of a closed plant, or even two of them, sitting idle, could possibly "wreak havoc" on JELD-WEN, or even how divestiture of an active plant would "wreak havoc" where idle plants are available.  Divestiture of a single doorskin plant is exactly what the Antitrust Division required when Premdor purchased Masonite in 2001.  Steves also alleges that JELD-WEN signed the Supply Agreement as a tactic to lull Steves into a false sense of security so that Steves would not complain to the

Antitrust Division about the 2012 Merger.  Compl. ¶ 59.  Steves further alleges that JELD-WEN

used the existence of the Supply Agreement with Steves, and similar long-term contracts with

others, to convince the Antitrust Division that the divestures it had required in 2001 with the

nearly identical Premdor/Masonite merger were not necessary.  *Id*. ¶ 60.  JELD-WEN will have

to face these and other factual issues after discovery.  The ample case law cited above shows

why Steves should not be burdened at the pleading stage with the task of rebutting an affirmative

defense.[19]

## CONCLUSION

For the foregoing reasons, Steves respectfully requests that the Court deny Defendant

JELD-WEN's Motion to Dismiss in its entirety.  In the alternative, should the Court grant any

portion of the Motion to Dismiss, Steves respectfully requests leave to amend the Complaint to

address any deficiencies therein.

Respectfully submitted,

STEVES AND SONS, INC.

By:  /s/Lewis F. Powell III
Lewis F. Powell III (VSB No. 18266)
John S. Martin (VSB No. 34618)
John E. Beerbower (VSB No. 83644)
Alexandra L. Klein (VSB No. 87711)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

---

[19] JELD-WEN attacks only the specific form of injunctive relief that would require divestiture.
Even if JELD-WEN were correct and divestiture were not available, Steves' claims for other
forms of injunctive relief should survive.

lpowell@hunton.com
martinj@hunton.com
jbeerbower@hunton.com
aklein@hunton.com

Richard A. Feinstein (admitted pro hac vice)
Nicholas A. Widnell (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER, LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237 6131

Glenn D. Pomerantz (to be admitted pro hac vice)
Kyle W. Mach (to be admitted pro hac vice)
Gregory M. Sergi (to be admitted pro hac vice)
MUNGER, TOLLES & OLSON LLP
355 S. Grand Avenue, 35th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-9132
Facsimile:  (213) 683-5161

*Attorneys for Plaintiff*

Marvin G. Pipkin
Kortney Kloppe-Orton
PIPKIN LAW
10001 Reunion Place, Suite 6400
San Antonio, TX 78216
Telephone:  (210) 731-6495
Facsimile:  (210) 293-2139

*Of Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2016, the foregoing document was served electronically on counsel of record through the Court's CM/ECF system and by email.

By /s/Lewis F. Powell III

Lewis F. Powell III

31