

FILED

MAY 17 2017

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

STEVES AND SONS, INC.,

    Plaintiff,

v.

                    Civil Action No. 3:16cv545

JELD-WEN, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT JELD-WEN, INC.'S MOTION FOR LEAVE TO AMEND ANSWER TO ADD COUNTERCLAIMS AGAINST STEVES & SONS, INC. (ECF No. 101). For the reasons set out below, the Court finds that the counterclaims are permissive, not compulsory, and the DEFENDANT JELD-WEN, INC.'S MOTION FOR LEAVE TO AMEND ANSWER TO ADD COUNTERCLAIMS AGAINST STEVES & SONS, INC. (ECF No. 101) will be granted. However, the claims and the permissive counterclaims will be severed as outlined below.

## BACKGROUND FACTS

Steves and Sons, Inc. ("Steves") is a door manufacturer that purchases interior molded doorskins from JELD-WEN, Inc. ("JELD-WEN").[1] Interior molded doorskins make up the front and

---

[1] The Background Facts are recited as alleged in the Complaint. The facts giving rise to JELD-WEN's defenses and counterclaims

back of interior molded doors. An interior molded door is made by sandwiching a wood frame and a hollow or solid core between two doorskins. Interior molded doors are significantly less expensive than solid wood doors. Steves currently does not make doorskins. JELD-WEN is a manufacturer of interior molded doorskins and also uses doorskins to make its own doors (i.e. JELD-WEN is vertically integrated). On May 1, 2012, the parties entered into a Long-Term Supply Agreement ("Supply Agreement"), whereby Steves agreed to purchase its doorskins from JELD-WEN for eight years. (Compl. ¶ 17).

After the Supply Agreement was signed, JELD-WEN merged with another doorskin manufacturer, Craftmaster. The merger left JELD-WEN as a vertically integrated company manufacturing and using its own doorskins. At that time, Masonite was another vertically integrated company that also manufactured, and used its own doorskins.[2] On June 25, 2014, Masonite announced that it would no longer be selling interior molded doorskins; rather, it would only be manufacturing doorskins solely for its use.

---

are presented as alleged in JELD-WEN's proffered Amended Answer and Counterclaims (ECF Nos. 102-1, 106). For the purpose of deciding the pending motion, the Court considers the allegations of fact.

[2] The presence of two vertically integrated companies that control a market share of an item, in this case doorskins, is known as a duopoly.

(Compl. ¶ 23).³  As a result, JELD-WEN allegedly has a monopoly over the doorskin market.

In September 2014, JELD-WEN gave Steves written notice of the termination of the Supply Agreement.  (Compl. ¶ 82).  JELD-WEN takes the position that the agreement will expire in December 2019.  Steves contends that is 21 months earlier than allowed.  (Compl. ¶ 82).

On June 29, 2016, Steves filed this action alleging that the merger between JELD-WEN and Craftmaster violated Section 7 of the Clayton Act, 15 U.S.C. § 18 (Count One).  Steves also alleged that JELD-WEN had breached the Supply Agreement by providing inadequate doorskins and canceling the contract early (Count Two) and that JELD-WEN had breached an express warranty in the Supply Agreement and the implied warranty of merchantability (Count Three).  In Count Four, Steves sought a declaratory judgment on several Supply Agreement issues.  In Count Five, Steves sought specific performance of the Supply Agreement throughout its specified term.  Finally, in Count Six, Steves asserted a claim for Trespass to Chattels because JELD-WEN had defaced Steves' products during an inspection permitted

---

³ Based on JELD-WEN's arguments at the hearing on its Motion to Amend, JELD-WEN contests Steves' allegation that Masonite no longer publicly sells interior molded doorskins.

3

by the Supply Agreement. JELD-WEN filed its Answer (ECF No. 30) but raised no counterclaims.

Following an initial pretrial conference, on October 19, 2016, the case was set for jury trial to begin on June 12, 2017 (ECF No. 65). On November 10, 2016, an agreed upon schedule was set for the conduct of discovery, the filing of summary judgment motions, and the conduct of proceedings in preparation for the Final Pretrial Conference to be held on June 5, 2017 (ECF No. 70). Discovery commenced and, inter alia, documents were produced.

By ORDER entered on February 7, 2017 (ECF No. 90), all proceedings herein were stayed until March 8, 2017 to allow the parties to pursue settlement discussions under the auspices of Magistrate Judge Novak. That stay was subsequently extended until March 27, 2017 to allow a last effort to settle the case (ECF No. 95). After settlement efforts failed, JELD-WEN filed its DEFENDANT JELD-WEN, INC.'S MOTION FOR LEAVE TO AMEND ANSWER TO ADD COUNTERCLAIMS AGAINST STEVES & SONS, INC. (ECF No. 101) based on documents that Steves had produced in discovery before settlement negotiations failed.

The genesis of the proposed amendment lies in that Steves and Sons produced documents to JELD-WEN during the discovery period before it was stayed. JELD-WEN alleges that several of the emails produced by Steves show that Steves paid John Pierce

("Pierce"), a former employee at JELD-WEN, to sell to Steves JELD-WEN's trade secrets and other confidential information relating to JELD-WEN's doors and doorskins.  JELD-WEN alleges that the emails also show that Pierce and Steves knew that their conduct was wrong because it violated Pierce's employment agreement with JELD-WEN and that the parties sought to conceal their wrongful conduct.

JELD-WEN first became aware of these documents on January 4, 2017.  On January 5, 2017, JELD-WEN contacted Steves' outside counsel and demanded that Steves cease and desist any use of the trade secrets and confidential information that Steves had received from Pierce.  JELD-WEN was prepared to file this motion on February 3, 2017; however, the parties were in the midst of a settlement meditation and had agreed to a stay.

On January 12, 2017, JELD-WEN issued a Rule 45 subpoena to Pierce, requesting that he produce documents and communications relating to his work with Steves.  On January 23, Pierce provided a handful of documents related to his travel on behalf of Steves.  On January 27, 2017, Steves supplemented its production of relevant documents and produced a July 20, 2016 email from Sam Steves' assistant, showing that John Ambruz, another former JELD-WEN employee, was serving as a consultant to Steves.  The email included an attachment entitled "Proposal for Expansion of Molded Skin Production Capacity Submitted by John

Pierce, 1 May 2006," a document that JELD-WEN claims it had sent, in confidence, to the Antitrust Division at the Department of Justice ("DOJ") in the summer of 2012, in contemplation of its acquisition of Craftmaster. Ambruz, who, in 2012, was a JELD-WEN employee, was copied on the email because he was working with JELD-WEN's lawyers in responding to the DOJ investigation. JELD-WEN's counsel questioned Steves' counsel as to how the document was obtained by Steves. Steves' counsel provided that the Steves brothers did not recall receiving the document.

On January 12, 2017, JELD-WEN issued a Rule 45 subpoena to Ambruz. JELD-WEN received additional discovery pursuant to that subpoena which, according to JELD-WEN, "confirm[s] that Steves is poised to enter the doorskin market despite all of its allegations of insurmountable barriers to entry." (ECF No. 187-1). The new production contained documents which JELD-WEN alleges is "new evidence [that] explicitly ties John Ambruz's work to that of Pierce, and the JELD-WEN trade secrets he stole." Id.

This factual backdrop provides the basis for, and the context of, DEFENDANT JELD-WEN, INC.'S MOTION FOR LEAVE TO AMEND ANSWER TO ADD COUNTERCLAIMS AGAINST STEVES & SONS, INC. (ECF No. 101).

## DISCUSSION

Fed. R. Civ. P. 13 governs the filing of counterclaims. It delineates counterclaims as compulsory or permissive. Fed. R. Civ. P. 13 provides that a claim is compulsory if it "(A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13 provides that a permissive counterclaim is "any claim that is not compulsory." The pretrial order entered in this case and Fed. R. Civ. P. 16 govern the time for filing counterclaims in this case.

### A.    Motion to Amend Made With Good Cause

A motion to amend at this stage of the litigation must be supported by a showing of good cause. JELD-WEN has met that standard because it was unaware of the information that gives rise to its proffered amendment until it reviewed the documents provided by Steves during discovery. Upon learning of the information, JELD-WEN immediately made preparations to file the motion. Had the stay not been in place, JELD-WEN would have filed the motion earlier. Although Steves makes several arguments in opposition to JELD-WEN's motion, Steves does not assert that JELD-WEN has failed to meet the good cause standard.

## B. Permissive or Compulsory Counterclaims

In determining whether leave to amend is proper, the Court must determine whether JELD-WEN's proposed counterclaims are permissive or compulsory. In assessing whether a claim is compulsory, the Fourth Circuit asks the following questions: (1) Are the issues of fact and law raised by the claim and the counterclaim largely the same; (2) Would res judicata bar a subsequent suit on the counterclaims, absent the compulsory counterclaim rule; (3) Will substantially the same evidence support or refute the claim as well as the counterclaim; and (4) Is there any logical relation between the claim and the counterclaims. See Sue & Sam Mfg. Co. v. B-L-S Const. Co., 538 F.2d 1048, 1051 (4th Cir. 1976).[4]

### 1. Sue & Sam Factors (1) and (3): The Issue of Fact and Law Raised by Steves' Claim and JELD-WEN's Counterclaims and the Presence of Substantially Overlapping Evidence

One way to assess Sue & Sam factors (1) and (3) is to examine the elements of Steves' claim and JELD-WEN's counterclaims in perspective of the evidence pertinent to each. That process helps to assess whether there are common issues of

---

[4] "A court need not answer all these questions in the affirmative for the counterclaim to be compulsory." Painter v. Harvey, 863 F.2d 329, 331 (4th Cir. 1988). "Rather, the tests are less a litmus, more a guideline." Id.

8

fact and law and the extent to which, if at all, the evidence will overlap.

### (a) Steves' Count One: Antitrust Claim

To prove its antitrust claim, Steves will have to show that the JELD-WEN/Craftsman merger had the effect of substantially lessening competition in a relevant product and geographic market or tended to create a monopoly. The evidence about that claim will involve proof of the product and geographic markets, proof of concentration in those markets caused by the merger, and the anticompetitive effect of the merger. The evidence, from both sides, therefore will focus on economic and business issues in the doorskin industry.

There can be evidence as well on Steves' conduct that could affect the requested remedy of divestiture. However, that evidence is heard by the Court, not the jury, because divestiture is an equitable remedy. That issue is reached only if the jury returns a liability verdict in favor of Steves.

### (b) Steves' Counts Two Through Five: Breach of Contract, Breach of Warranty, Declaratory Judgment and Specific Performance

Count Two is a claim for breach of the Supply Agreement for JELD-WEN's refusal to abide by the contracts pricing terms, JELD-WEN's supply of defective doorskins, JELD-WEN's refusal to give Steves credit for defective products, and for JELD-WEN's attempt to terminate the Supply Agreement early. Count Three is

a claim for breach of implied warranty of merchantability by supplying defective doorskins. Counts Four and Five seek certain remedial measures related to Counts Two and Three.

To establish the breach of contract claim there will be proof of a contract, a breach, and damages. The breach of warranty claim requires some of the same proof as the breach of contract claim as well as proof of warranty.

### (c) Steves' Count Six: Trespass to Chattels

Count Six is a tort claim based on damage done to Steves' products by JELD-WEN representatives. The proof there will be that JELD-WEN's employees damaged the product while performing an inspection allowed by the Supply Agreement.

### (d) JELD-WEN's Counterclaims

#### (i) The First, Second and Third Counterclaims: JELD-WEN's Trade Secrets Counterclaims

To recover under these counts, JELD-WEN will have to prove that JELD-WEN owned trade secrets and that Steves misappropriated the trade secrets by improper means. There must also be proof as to the resulting damage.

A simple comparison of the elements of JELD-WEN's trade secret counterclaims and the elements of Steves' claims shows that there are no common issues of fact or law. The same comparison shows that the JELD-WEN's trade secrets counterclaims

will not be supported by substantially the same evidence as that
to be used in support of any of Steves' claims.

> **(ii) The Fourth and Fifth Counterclaims:**
> **JELD-WEN's    Tortious    Interference    With**
> **Contract**

In these two counterclaims, JELD-WEN charges that, in
misappropriating its trade secrets, Steves wrongfully interfered
with the employment contracts between JELD-WEN and its former
employees, Pierce and Ambruz.  In particular, the charge is that
Steves' interfered with the confidentiality provisions of the
employment contracts between JELD-WEN and Pierce and Ambruz.
These claims require proof of the employment contracts, Steves'
knowledge of the confidentiality provisions in them, Steves'
conduct interfering therewith, and resulting damage.

Again, a comparison of the elements of the Fourth and Fifth
Counterclaims (tortious interference with employment contracts)
with the elements of Steves' claims demonstrates the absence of
common fact and legal issues between the Fourth and Fifth
counterclaims and any of Steves' claims.  Nor can it be said
that there is a substantial overlap in evidence as respects the
proof for those claims.

> **(iii) The Sixth Counterclaim: JELD-WEN's Breach of**
> **Implied Covenant of Good Faith and Fair**
> **Dealing**

In its Sixth Counterclaim, JELD-WEN alleges that the theft
of trade secrets through Pierce and Ambruz is a breach of the

covenant of good faith and fair dealing in the performance of the purchase provisions of the Supply Agreement. In particular, the theory is that, in acquiring (by way of the stolen trade secrets) the ability to make doorskins, Steves deprived JELD-WEN of its expectation that Steves would buy the majority of its doorskin requirements from JELD-WEN.

Assuming for the moment that Count Six states a claim on which relief could be granted, the proof to make out the claim is essentially proof of the trade secrets theft and its consequences. There is certainly no common issue of fact or law nor any substantially overlapping proofs as between the Sixth Counterclaim and any of Steves' claims.

### (iv) Seventh Counterclaim: Breach of Contract

In the Seventh Counterclaim, JELD-WEN charges that Steves breached the Supply Agreement by providing commercially sensitive information (not trade secrets) to Ambruz in violation of the confidentiality provisions set out in paragraph 3(a)(1) of the Supply Agreement. Again, JELD-WEN has identified no common issue of fact and law between the Seventh Counterclaim and any of Steves' claims. Nor has any substantially overlapping evidence been pointed out. And, the Court is unable to find any.

Therefore, factors (1) and (3) of the Sue & Sam guideline simply have not been shown to exist.

### 2. Sue & Sam Factors (2) and (4)

Steves has promised that it will not assert *res judicata* elsewhere. In any event, JELD-WEN has not explained how that factor would apply here. And, given the material difference between Steves' claims and JELD-WEN's claims, it is inconceivable that a bar of *res judicata* could be interposed with the possible exception of the Sixth and Seventh Counterclaims.

Even that possibility has not been demonstrated by JELD-WEN, and Steves' promise not to raise the bar effectively precludes resolving this point in JELD-WEN's favor. Finally, the Court can discern no logical relation between any of JELD-WEN's counterclaims and Steves' claims. Thus, JELD-WEN has not satisfied Sue & Sam Factors (2) and (4).

In sum, none of the factors that the Fourth Circuit looks to as predicates for compulsory counterclaims are present.

### 3. The Asserted Connection Between JELD-WEN's Counterclaims and Its Defenses to Steves' Claims

JELD-WEN's motion presents another way to assess whether the proffered counterclaims are compulsory. That is because the principal contention made by JELD-WEN in support of its view that its counterclaims are compulsory is that some of the evidence in support of its counterclaims also is evidence in support of some of its defenses to Steves' claims. Therefore,

13

says JELD-WEN, the overlap in the evidence necessitates a decision that its counterclaims are compulsory. In particular, JELD-WEN asserts that the evidence in support of its trade secrets counterclaims will also be offered in establishing its antitrust defenses of unclean hands and the absence of barriers to entry. Also, JELD-WEN takes the view that its contract-based counterclaims will be proved by some of the same evidence that will prove some of its defenses to Steves' claims.

Steves contends that, as a matter of law, the trade secrets counterclaims provide no defense to the antitrust claim. Steves also argues that there is no real overlap between its claims and the evidence to which JELD-WEN points to as a response to Steves' breach of contract claims. On both scores, Steves is correct.

### 4. JELD-WEN's Defenses to Steves' Antitrust Claim

JELD-WEN asserts that its counterclaims based on Steves' misappropriation of its trade secrets serve as a defense to Steves' antitrust claim. JELD-WEN argues that the jury will hear about Steves' misconduct as to the misappropriation by Steves' of JELD-WEN's trade secrets because that evidence establishes JELD-WEN's defense of unclean hands against Steves' antitrust claim.

14

**(a) This Circuit Does Not Recognize the Defense of Unclean Hands as a Bar to Recovery in an Antitrust Case**

Relying on California v. American Stores Co., 495 U.S. 271, 296 (1990) ("equitable defenses such as laches, or perhaps 'unclean hands,' may protect consummated transactions from belated attacks by private parties."), JELD-WEN contends that unclean hands can serve as a defense to an antitrust violation. Steves claims that the defense of unclean hands is not a recognized defense to an antitrust violation.[5]

JELD-WEN's argument is unpersuasive. First, the language on which JELD-WEN relies from Americans Stores Co. is dicta. In American Stores Co., the Supreme Court considered whether a private party could obtain divestiture in an action filed under § 16 of the Clayton Act challenging a merger. The Supreme Court approved the remedy of divestiture, but explained that the mere fact that the Clayton Act authorizes that kind of relief, "does not, of course, mean that such power should be exercised in every situation in which the Government would be entitled to such relief . . . ." Id. at 294. In explaining that observation as it might relate to a case in which a private litigant sought the equitable remedy of divestiture, the Supreme Court said:

---

[5] See PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT JELD-WEN, INC.'S MOTION FOR LEAVE TO AMEND ANSWER (ECF No. 117).

> Moreover, equitable defenses such as laches,
> or perhaps 'unclean hands,' may protect
> consummated transactions from belated
> attacks by private parties when it would not
> be too late for the Government to vindicate
> the public interest.

California v. American Stores Co., 495 U.S. at 296. It is this

statement on which JELD-WEN relies for the proposition that the

equitable doctrine of unclean hands can provide a defense to an

antitrust claim under the Clayton Act. However, in the very

next sentence, the Supreme Court observed that "[s]uch

questions, however, are not presented in this case." Id. Quite

clearly then, the comment on which JELD-WEN relies is dicta.

Moreover, the law in the Fourth Circuit is that unclean

hands is not a defense to an antitrust claim. Specifically, in

Burlington Indus. v. Milliken & Co., 690 F.2d 380, 388 (4th Cir.

1982) the Fourth Circuit held that, if a plaintiff's misconduct

"other than direct participation in the antitrust conspiracy is

asserted as a defense, defendants can only be understood as

raising the equitable defense of unclean hands. It is well

settled that unclean hands is no bar to antitrust recovery."

Id. That is the law of this circuit and it is not displaced by

the dicta from American Stores.[6]

---

[6] Burlington was decided two years before American Stores. That
makes no difference, however, because a clear holding from the
Court of Appeals is binding and, if dicta from the Supreme Court

JELD-WEN has provided no decisional law from this Circuit to the contrary. JELD-WEN correctly asserts that, since American Stores Co., the equitable defense of laches has been used to bar antitrust claims in other circuits.[7] However, those decisions do not, indeed cannot, alter the law of this Circuit that the defense of unclean hands is not available in an antitrust case except in circumstances not present here. And, of course, to be in laches and to have unclean hands are quite different equitable principles that are pertinent, not to liability issues in an antitrust case, but to the matter of remedy. Indeed, in American Stores, the Supreme Court decided that a defense of laches could foreclose the relief of

---

is to change that precedent, it is the Supreme Court or the Fourth Circuit that must make that change.

[7] See, e.g. Ginsberg v. InBev NV/AB, 623 F.3d 1229, 1235 (8th Cir. 2010) (rejecting plaintiffs' request for a divestiture of an already-consummated merger of two beer companies, declaring that "the hardship and competitive disadvantage resulting from forced divestiture would be both dramatic and certain"); Midwestern Mach. Co., Inc. v. Northwest Airlines, Inc., 392 F.3d 265, 277 (8th Cir. 2004) (denying plaintiffs' request for divestiture of 11 year old merger because doing so was barred by laches and would unduly prejudice defendant); Taleff v. Southwest Airlines Co., 828 F. Supp. 2d 1118, 1122-25 (N.D. Cal. 2011) (holding that the remedy of divestiture of two merged airlines was unavailable to plaintiffs because they filed their complaint on the day the merger closed); Garabet v. Autonomous Tech. Corp., 116 F. Supp. 2d 1159, 1172-23 (C.D. Cal. 2000) (doctrine of laches barred private plaintiffs' request for divestiture of merger between suppliers of equipment for laser eye surgeries because plaintiff filed suit two days after the merger's consummation and failed to take any steps to challenge the merger before consummation).

divestiture in a private party suit. Thus, the most that could be said of the dicta in American Stores is that, in the remedy phase of an antitrust case, the doctrine of unclean hands (to quote the Supreme Court) "perhaps" might be available to foreclose the remedy of divestiture sought by a private party.

Even if JELD-WEN could demonstrate that the dicta in American Store Co. permitted a defense of unclean hands, JELD-WEN must show that the unclean hands defense is related to the antitrust violation. That is because a defendant raising the defense of unclean hands must show "a close nexus between a party's unethical conduct and the transactions on which that party seeks relief." In re Uwimana, 274 F.3d 806, 810 (4th Cir. 2001)abrogated by Bullock v. BankChampaign, N.A., 133 S. Ct. 1754, 185 L. Ed. 2d 922 (2013). Therefore, assuming that Steves wrongfully misappropriated trade secrets through Ambruz and Pierce, JELD-WEN would have to show a "close nexus" between the misappropriation of trade secrets in 2015-2016 and the allegedly illegal merger consummated in 2012 and whose effects were felt into in 2014.[8] And, JELD-WEN has not made that showing yet.

---

[8] The parties dispute whether the merger as consummated in 2012 was a violation of the Clayton Act, or whether the effects of the merger, after withdrawal of Masonite from the market in 2014, serve as the basis for the claim. This will surely come up during the course of the litigation; however, the Court need not, and does not, resolve the dispute for purposes of deciding the Motion to Amend.

**(b) Jeld Wen's Trade Secret Misappropriation Counterclaims are not Related to the Barriers to Entry Defense**

JELD-WEN explains that "barriers to entry" is a central defense to Steves' antitrust claim.[9] If sufficient entry into the applicable markets is likely to occur in a timely fashion, argues JELD-WEN, its acquisition of Craftmaster cannot violate the Clayton Act. And, says JELD-WEN, the evidence of trade secret theft is pertinent to prove the absence of barriers to entry in the relevant product market.

Of course, it is correct that "[c]ourts have held that likely entry or expansion by other competitors can counteract anticompetitive effects that would otherwise be expected." United States v. H & R Block, Inc., 833 F. Supp. 2d 36, 73 (D.D.C. 2011). "According to the Merger Guidelines, entry or expansion must be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern." Merger Guidelines § 9." Id. at 73. Once the Plaintiff has shown a prima facie case, "the defendants carry the burden to show that ease of expansion is sufficient to fill the competitive void that will result if

---

[9] See JELD-WEN, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO AMEND ANSWER TO ADD COUNTERCLAIMS AGAINST STEVES & SONS, INC. (ECF No. 102).

[defendants are] permitted to purchase their acquisition target." Id. at 73. (internal citations omitted).

JELD-WEN argues that, in putting on its barriers to entry defense, evidence that Steves misappropriated its trade secrets will inevitably come up. In particular, JELD-WEN argues that a feasibility report that Steves received from Ambruz "concluded that Steves could quickly and effectively enter the doorskin market successfully." Although Steves rejected that conclusion and did not ever rely on it, JELD-WEN takes the view that the evidence about the feasibility report shows that Ambruz is a credible witness who will testify that "[i]t is highly feasible to build and operate a new [doorskin] facility."

JELD-WEN, however, has not explained how the Ambruz feasibility study will come into evidence. Steves says it will not introduce the report (and, in fact, will object to its use). JELD-WEN says it will not be using Ambruz as an expert to testify on feasibility, but that it will use the report to impeach one or both of the Steves brothers. How that can be done is hard to fathom. In any event, JELD-WEN does not explain how all of its trade secret misappropriation evidence could come in as part of its barrier to entry defense even if it can use the Ambruz feasibility report to cross-examine one of the Steves. Nor has JELD-WEN identified any decisions that allows impeachment evidence to qualify as overlapping evidence in

deciding whether a counterclaim is compulsory. Moreover, even if JELD-WEN is able to introduce some evidence that relates to the trade secret misappropriation claim, it is clear that JELD-WEN need not, indeed cannot, prove each of the elements for the trade secret misappropriation claim in order to properly make use of the barrier to entry defense.[10]

### 5. JELD-WEN's Defense to Steves' Breach of Contract Claim

JELD-WEN also argues that its contract counterclaims are tied to the defenses that it will present against Steves' claim that JELD-WEN breached the Supply Agreement. JELD-WEN asserts that the following counterclaims are related to Steves' breach of contract claim: Breach of Contract (Seventh Counterclaim); Breach of the Implied Covenant of Good Faith and Fair Dealing Under Delaware Law (Sixth Counterclaim); and Tortious Interference with Contract Under Texas Common Law (Fourth and Fifth Counterclaims). JELD-WEN's contract counterclaims, which arise out of the same contract Steves' alleges JELD-WEN breached, may relate to or support, in part, a defense to Steves' breach of contract claim; however, the counterclaims are

---

[10] The Court has not yet heard motions in limine. As this issue will likely come up, the holding here does not dispose of the issue respecting what evidence related to the theft of trade secrets can be admitted in the trial of the antitrust claim.

not compulsory and the defense of unclean hands is not available.

### (a)  Steves' Breach of Contract

In the Seventh Counterclaim, JELD-WEN alleges that Steves' breached the Supply Agreement because Steves provided to Ambruz and Pierce confidential JELD-WEN information that JELD-WEN had provided to Steves pursuant to a confidentiality provision, paragraph 22, in the Supply Agreement JELD-WEN argues that this breach demonstrates that Steves did not perform under the terms of the contract; therefore, according to Steves, the claim is a compulsory counterclaim to Steves' contract claim.

Although the Seventh Counterclaim asserted by JELD-WEN against Steves for breach of contract and Steves' breach of contract claim against JELD-WEN (Steves' Count Two) are based on the same Supply Agreement, there is no relation between the contract breaches alleged by Steves of JELD-WEN's refusal to abide by the contracts pricing terms, JELD-WEN's supply of defective doorskins, JELD-WEN's refusal to give Steves credit for defective products, and JELD-WEN's attempt to terminate the Supply Agreement early and the breach alleged by JELD-WEN, of Steves' breach of the Supply Agreement by providing commercially sensitive information to former JELD-WEN employees. Nor, contrary to JELD-WEN's view, would the alleged breach by Steves (providing confidential documents to Pierce and Ambruz) excuse

22

the breaches by JELD-WEN alleged in Steves' Count Two. <u>See</u> <u>Mitsubishi Power Sys. Americas, Inc. v. Babcock & Brown</u> <u>Infrastructure Grp. US, LLC</u>, No. CIV.A. 4499-VCL, 2010 WL 275221 (Del. Ch. Jan. 22, 2010)("Because the purchaser breached the contract before the seller's performance was due, it could not be argued that the seller's performance gave rise to a material breach of the contract resulting in a forfeiture of contractual rights.") The only logical relationship between the claim and counterclaim is that they arise from the same Supply Agreement; however, that alone is insufficient to a finding of a compulsory counterclaim. Thus, it cannot be said that the Seventh Counterclaim for breach of contract is compulsory.

### (b) Steves' Breach of the Implied Covenant of Good Faith and Fair Dealing

JELD-WEN also argues that, by misappropriating its trade secrets, Steves breached the covenant of good faith and fair dealing implied in the Supply Agreement. JELD-WEN also believes that this claim, like the breach of contract claim, serves as a direct defense to Steves' breach of contract claim.

"Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract. As such, a party to a contract has made an implied covenant to interpret and to act reasonably upon contractual language that is on its face reasonable." <u>Chamison v. HealthTrust--Hosp. Co.</u>, 735 A.2d 912,

920-21 (Del. Ch. 1999), aff'd sub nom. Healthtrust-Hosp. Co. v. Chamison, 748 A.2d 407 (Del. 2000). "The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract. Despite these restrictions, Delaware courts apply this legal theory only in narrow circumstances." Id. Further, while the Delaware Supreme Court "has recognized the occasional necessity of implying contract terms," such action should be taken only "'rare[ly]' and cautiously." Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005).

JELD-WEN argues that, by stealing its trade secrets, Steves' breached the implied covenant in the Supply Agreement between the parties. According to JELD-WEN, in paragraph 22 of the contract, the parties specifically discussed the subject of confidentiality respecting certain commercially sensitive (not trade secrets) documents given by JELD-WEN in connection with the Supply Agreement and agreed on an express provision to cover that matter. Thus, says JELD-WEN, they would have agreed that stealing each other's trade secrets would be forbidden as well.

That is a big stretch of Delaware law, one that is highly doubtful as Steves argues. However, at this stage of the litigation, it is not necessary to decide whether the breach of the implied covenant allegedly committed by Steves is a plausible claim that can be read into the contract. Rather, the

Court only considers whether the contract counterclaim relates to Steves' original breach of contract claim. At best, there is only a peripheral connection and, a distant one at that. The implied covenant of good faith and fair dealing counterclaim, if valid, is unrelated in time to the breach of contract claim alleged by Steves. Further, the issues of fact required to prove the counterclaim as compared to the original breach of contract claim may both derive from the Supply Agreement, but apart from that similarity, the claims greatly differ. For those reasons, the counterclaim is not compulsory.

### (c) The Defense of Unclean Hands is Not Applicable to Steves' Contract Claim

Finally, JELD-WEN asserts that the defense of unclean hands (by way of trade secret misappropriation) also serves as a defense to Steves' breach of contract claim. The defense of unclean hands is an equitable one and Steves' claim for Specific Performance of part of the Supply agreement seeks an equitable remedy, therefore unclean hands may be a proper defense to that particular remedy. See Virginia Elec. & Power Co. v. Broe Growth Capital LLC, 2007 WL 2071726, at *2 (E.D. Va. July 17, 2007) ("If a full remedy at law is available, then one based on equitable principles is barred."). But, JELD-WEN has not pointed to any close nexus (substantially or temporally) between the alleged trade secret misappropriation and the breaches of

contract for which Specific Performance is sought by Steves. Nor can the Court perceive any such connection. See In re Uwimana, 274 F.3d 806, 810-11 (4th Cir. 2001) abrogated by Bullock v. BankChampaign, N.A., 133 S. Ct. 1754, 185 L. Ed. 2d 922 (2013) ("A court can deny relief under the doctrine of unclean hands only when there is a close nexus between a party's unethical conduct and the transactions on which that party seeks relief.").

For the foregoing reasons, JELD-WEN's counterclaims are not compulsory.

## C.   JELD-WEN's Permissive Counterclaims

However, the same analysis also teaches that all of the counterclaims asserted by JELD-WEN are permissive.   Under Fed. R. Civ. P. 13(b), "a pleading may state as a counterclaim any claim that is not compulsory."   Each of JELD-WEN's counterclaims meet that test.   And, under Fed. R. Civ. P. 13(e), the Court "may permit a party to file a supplemental pleading asserting a counterclaim that matured or was acquired by the party after serving an earlier pleading."   All of JELD-WEN's counterclaims meet the test of Rule 13(e) because JELD-WEN learned of the counterclaims only as a result of documents provided in this case by Steves.   Accordingly, DEFENDANT JELD-WEN, INC.'S MOTION FOR LEAVE TO AMEND ANSWER TO ADD COUNTERCLAIMS AGAINST STEVES &

SONS, INC. (ECF No. 101) will be granted to permit JELD-WEN to file all of its counterclaims as permissive.

## D.    Severance

However, the interests of justice and, indeed, judicial efficiency necessitates that the trial of the permissive counterclaims be severed from the trial of Steves' claims. Fed. R. Civ. P 42 provides that a court may separate a trial "[f]or convenience, to avoid prejudice, or to expedite and economize" trial "of one or more separate issues, claims, crossclaims, [or] counterclaims . . .." "The decision whether to sever or to consolidate whole actions or sub-units for trial is necessarily committed to trial court discretion." Arnold v. E. Air Lines, Inc., 681 F.2d 186, 192 (4th Cir. 1982), on reh'g, 712 F.2d 899 (4th Cir. 1983).

The challenge in this case is how to exercise that discretionary authority. In making the decision to sever the trial into three parts, the Court considers each of the factors described above, convenience, prejudice, expedition and judicial economy. See Arnold v. E. Air Lines, Inc., 681 F.2d 186, 194 (4th Cir. 1982) (finding that the district court made its ruling against severance "on the basis of a sound assessment of the proper factors, hence well within the bounds of the discretion committed to it."). For the reasons that follow, the avoidance of prejudice and the ability to expedite proceedings and the

27

interest of economy call for the claims and counterclaims to be served into three components.

As respects the prejudice factor, "[t]he risks of prejudice and possible confusion [are] obvious ones which in the exercise of a sound judicial discretion the district court [is] obliged to weigh. See Molever v. Levenson, 539 F.2d 996 (4th Cir. 1976)." Arnol, 681 F.2d at 193. As discussed above, there is no real congruence between the elements of Steves' claims and JELD-WEN's counterclaims. The elements are materially different and consequently the evidence to prove them will be different. The same is true for JELD-WEN's defenses to Steves' claims. Therefore, even though, as JELD-WEN argues, many of the same witnesses will testify in respect of the claims, counterclaims, and defenses, the testimony will address different topics and different times. Thus, the fact that the same witnesses will testify is of no real moment.

Moreover, the differences in the elements as between the claims and the counterclaims and the defenses and the evidence related to them are so disparate that a jury is certain to be so confused that the trial will be unfair to both sides. One only has to think of the trial management problems and the difficulty in presenting understandable instructions to see how confusing a single trial of all claims and counterclaims will be. Indeed, that difficulty is proven, even now, by the pleadings and

arguments made in support of the motion. It was difficult for the Court to keep straight the issues and the evidence presented about them. Fifty years of private practice and twenty-five years on the bench have presented nothing like the difficulty of trying the claims and counterclaims in this case together.

Moreover, Steves argues that the trial of its antitrust claims would be prejudiced by trying the trade secret claims at the same time. Indeed, Steves argues that is the real motive behind JELD-WEN's insistence that the cases be tried together. Wholly apart from JELD-WEN's motivation, the prejudice to a fair trial on the antitrust claim exists if the claim were to be tried with the trade secrets counterclaim. That prejudice does not arise from the proffered proofs of Steves' conduct (consequences with which Steves will rightly have to live). It comes from how the jury will be confused by having to sort through the complex proofs of two complex claims - antitrust and trade secrets. And, that is particularly true where, as here, the antitrust economic issues are complex in one way and the trade secret issues are complex in other ways. Moreover, the sheer volume of trade secrets asserted by JELD-WEN (some 54 trade secrets)(ECF No. 185) presents the certainly that the complex antitrust evidence will be forgotten or distorted by the end of a trial involving the antitrust claims and the trade secret counterclaims.

The contract claims and counterclaims are also quite complex, albeit not as much as the antitrust and trade secret claims. Steves' contract claims and JELD-WEN's contract counterclaims arise out of entirely different parts of the Supply Agreement and trying all those contract issues along with the antitrust and trade secret issues is a formula for a trial debacle of major propositions.[11]

The simple fact is that this case presents three different cases: an antitrust case; a trade secrets case; and a contract/breach of warranty case. Each of these, under the forecast facts and the known legal principles applicable to each, is complex in its own right. The way to assure that the parties will receive a fair trial on each case is to sever the trials so that there will be three trials.

As respects the factors of expediency and economics, "the purely logistical factors-time, expense, [and] travel burdens" likely militate in favor of one trial. Arnold, 681 F.2d at 193. It appears that JELD-WEN's defenses will involve some evidence that might play a role in two or all three cases. Likewise, some of Steves' evidence likely will be present in both the antitrust trial and the contract/breach of warranty trial. But, it will be somewhat different in each case, as will JELD-WEN's

---

[11] The breach of warranty claims further complicate the problem by introducing yet another construct of legal theory.

evidence. In a trial involving Steves' claim and JELD-WEN's counterclaims, the task of limiting evidence to the issues to which it pertains will be exceedingly difficult, if not impossible. However, that task will be made markedly easier by severance into three cases. Thus, the Court may make a "pragmatic assessment, one frequently made by federal courts, see, e.g., Tallant Transfer Co. v. Bingham, 216 F.2d 245, 247 (4th Cir. 1954), that under the specific circumstances of this case", severance is necessary. Id.

Of course, the severance into three trials, of necessity, will lead to some inefficiency, but that is a small price to pay for establishing a structure in which a jury can give each side a fair trial on very different cases, each of which is of great significance to both sides. Moreover, severance will effectuate efficiencies in trial presentation and case management that will offset any inefficiency created by having three trials.

How to schedule discovery henceforth and how to manage the separate trials are matters about which counsel will be consulted. But, common sense, fairness to the parties, and fairness to the jury call for severance.

**CONCLUSION**

For the foregoing reasons, DEFENDANT JELD-WEN, INC.'S MOTION FOR LEAVE TO AMEND ANSWER TO ADD COUNTERCLAIMS AGAINST STEVES & SONS, INC. (ECF No. 101) is granted so that JELD-WEN can file its permissive counterclaims. There will be separate trials as outlined above.

It is so ORDERED.

_____ /s/ ʌɛρ

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date:  May _17_ , 2017