UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| STEVES AND SONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:16-CV-00545-REP |
| | ) | |
| JELD-WEN, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT JELD-WEN, INC.'S AMENDED ANSWER TO PLAINTIFF STEVES AND SONS, INC.'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, DAMAGES, AND SPECIFIC PERFORMANCE AND JELD-WEN'S COUNTERCLAIMS**

**<u>REDACTED VERSION FILED PUBLICLY</u>**

Defendant JELD-WEN, Inc. ("JELD-WEN"), by and through its undersigned counsel, answers Plaintiff Steves and Sons, Inc.'s ("Steves") Complaint filed on June 29, 2016 ("Complaint") (ECF No. 5), as follows:

## ANSWER

The "preamble" to the Complaint is conclusory and contains speculation and legal conjecture. To the extent that a response is required, JELD-WEN admits that Steves states that this is an action raising claims based in antitrust, contract, breach of warranty, and tort.

JELD-WEN admits that it manufactures and sells, among other products, interior molded door skins, as well as finished doors. JELD-WEN also admits that Steves has purchased door skins from JELD-WEN. JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in the second paragraph of the preamble to the Complaint.

JELD-WEN admits that in June 2012, it announced an acquisition of a manufacturer of doors and door skins. JELD-WEN admits that in May 2012, JELD-WEN and Steves entered into a long-term door skin supply agreement. The assertions in the third paragraph of the preamble to the Complaint that the sale of door skins and doors constitute "markets" are legal conclusions as to which no response is required. However, to the extent that a response is required, JELD-WEN denies that "door skins" and "doors" constitute relevant markets for antitrust purposes. JELD-WEN denies the remaining allegations contained in the third paragraph of the preamble to the Complaint.

JELD-WEN admits that Steves purports to seek in this Complaint an injunction requiring JELD-WEN to divest assets, as well as monetary damages, declaratory relief, and specific performance. JELD-WEN denies that JELD-WEN has damaged Steves and that Steves is entitled to any damages. The assertions in the fourth paragraph of the preamble to the Complaint

2

that the sale of door skins and doors constitute "markets" are legal conclusions as to which no response is required.  However, to the extent that a response is required, JELD-WEN denies that "door skins" and "doors" constitute relevant markets for antitrust purposes.

1. Denies.

2. Denies.

3. Denies.

4.  JELD-WEN admits that Steves has over time manufactured and supplied doors. JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 4 and, on that basis, denies them.

5.  JELD-WEN admits that molded door skins are facings that are typically molded from synthetic materials.  JELD-WEN further admits that two door skins may be put together over a wooden frame to make a hollow core or solid door.  JELD-WEN admits that Steves asserts that flush door skins are not part of this lawsuit.  JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 5 and, on that basis, denies them.

6.  JELD-WEN admits that production of door skins requires manufacturing facilities and may require certain capital investments.  JELD-WEN denies that those factors constitute high barriers to a company's ability to enter the business of manufacturing door skins.  The assertion in Paragraph 6 that the sale of door skins constitutes a "market" is a legal conclusion to which no response is required.  However, to the extent that a response is required, JELD-WEN denies that "door skins" constitute a relevant market for antitrust purposes.   JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 6 and, on that basis, denies them.

3

7.  JELD-WEN is without information sufficient to form a belief as to the truth of the allegation contained in Paragraph 7 and, on that basis, denies it.

8.  JELD-WEN admits that prior to 2012, JELD-WEN, Masonite, and CraftMaster sold door skins in the United States.  JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 8 and, on that basis, denies them.

9.  JELD-WEN admits that it manufactures both door skins and finished doors.  JELD-WEN also admits that certain customers to whom JELD-WEN sells door skins also sell finished doors.  JELD-WEN denies the allegations in the third and fourth sentences of Paragraph 9.  The assertions in Paragraph 9 that the sale of door skins and doors constitute "markets" are legal conclusions as to which no response is required.  However, to the extent that a response is required, JELD-WEN denies that "door skins" and "doors" constitute relevant markets for antitrust purposes.  JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 9 and, on that basis, denies them.

10.  JELD-WEN admits that as of May 2012, CraftMaster sold both door skins and finished doors.  JELD-WEN also admits that CraftMaster owned a door skin manufacturing plant in Towanda, Pennsylvania.  JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 10 and, on that basis, denies them.

11.  JELD-WEN admits that in 2002, it sold both door skins and finished doors.  JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 11 and, on that basis, denies them.

12.  JELD-WEN admits that Paragraph 12 purports to quote from a Department of Justice Competitive Impact Statement, a written document the contents of which speak for themselves.  To the extent that Paragraph 12 characterizes or contradicts the contents of that Competitive

Impact Statement, JELD-WEN denies those allegations.   JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 12 and, on that basis, denies them.

13.   JELD-WEN admits that in 2012, it acquired CraftMaster and its Towanda plant that Masonite had owned until the 2001-2002 divestiture.   The assertions in Paragraph 13 that the sale of door skins and doors constitute "markets" are legal conclusions as to which no response is required.   However, to the extent that a response is required, JELD-WEN denies that "door skins" and "doors" constitute relevant markets for antitrust purposes.   JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 13 and, on that basis, denies them.

14.   JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 and, on that basis, denies them.

15.   JELD-WEN admits that it began negotiating a new supply agreement with Steves in 2011.   JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 15 and, on that basis, denies them.

16.   JELD-WEN admits that it was aware that Steves was in discussions with other door skin manufacturers.   JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 and, on that basis, denies them.

17.   JELD-WEN admits that it entered into a new supply agreement with Steves on May 1, 2012 that was substantially similar to the supply agreement that the parties had in place since 2003, and that a copy of that agreement is attached to this Complaint as Exhibit A ("Supply Agreement") (ECF No. 5-1).   The remainder of Paragraph 17 purports to describe the Supply Agreement, a written document the contents of which speak for themselves.   To the extent

Paragraph 17 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.

18.  JELD-WEN admits that it announced its deal with CraftMaster on June 18, 2012, and that, prior to that date, JELD-WEN along with others (including Steves), had been engaged in a bidding process for CraftMaster.   JELD-WEN denies the remaining allegation contained in Paragraph 18.

19.  JELD-WEN admits that the CraftMaster acquisition closed on October 24, 2012. The assertions in Paragraph 19 that the sale of door skins and doors constitute "markets" are legal conclusions as to which no response is required.  However, to the extent that a response is required, JELD-WEN denies that "door skins" and "doors" constitute relevant markets for antitrust purposes.  JELD-WEN admits that after the acquisition it and Masonite continued to sell doors and that both continued to manufacture door skins.  JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 19 and, on that basis, denies them.

20.  Denies.

21.  JELD-WEN admits that the Supply Agreement entered into prior to the 2012 merger

███████████████████████████████████████████████████████████████

████████████████.  JELD-WEN denies the remaining allegations contained in Paragraph 21.

22.  Denies.

23.  JELD-WEN admits that Masonite announced at some point in 2014 that it would cease selling door skins to "competition."   JELD-WEN admits that the third sentence in Paragraph 23 purports to describe a communication between JELD-WEN and Steves, a written document the contents of which speak for themselves.  To the extent Paragraph 23 characterizes

or contradicts the contents of that communication, JELD-WEN denies those allegations. The assertion in Paragraph 23 that the sale of door skins constitutes a "market" is a legal conclusion as to which no response is required. However, to the extent that a response is required, JELD-WEN denies that "door skins" constitute a relevant market for antitrust purposes. JELD-WEN denies the remaining allegations contained in Paragraph 23.

24. JELD-WEN admits that it has given Steves ███████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████. JELD-WEN is without information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 24 regarding Steves' costs and profits and, on that basis, denies them. JELD-WEN denies the remaining allegations contained in Paragraph 24.

25. JELD-WEN admits that both before the CraftMaster acquisition and after it, JELD-WEN sold door skins to independent door manufacturers with which it competed at times and in certain areas of the world for certain door business. Paragraph 25 asserts legal conclusions that do not require a response. To the extent that a response is required, JELD-WEN denies those allegations. The assertions in Paragraph 25 that the sale of doors constitutes a "market" is a legal conclusion as to which no response is required. However, to the extent that a response is required, JELD-WEN denies that "doors" constitute a relevant market for antitrust purposes. JELD-WEN denies the remaining allegations contained in Paragraph 25.

26. JELD-WEN admits that, in the Complaint, Steves purports to seek injunctive relief, damages, declaratory relief, specific performance, and compensatory damages. JELD-WEN denies that Steves is entitled to any of that relief. The assertions in Paragraph 26 that the sale of door skins and doors constitute "markets" are legal conclusions as to which no response is

required.  However, to the extent that a response is required, JELD-WEN denies that "door skins" and "doors" constitute relevant markets for antitrust purposes.

27.  JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 and, on that basis, denies them.

28.  JELD-WEN admits that Steves owns a door manufacturing plant in Henrico County, Virginia and that Steves purchases door skins from JELD-WEN for delivery to that plant.  JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 28 and, on that basis, denies them.

29.  JELD-WEN admits that Steves owns door manufacturing plants in San Antonio, Texas and Lebanon, Tennessee and that Steves purchases door skins from JELD-WEN for use in those plants.  JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 29 and, on that basis, denies them.

30.  JELD-WEN admits the allegations in the first and second sentences of Paragraph 30. The remainder of Paragraph 30 asserts a legal conclusion that does not require a response.

31.  Admits.

32.  JELD-WEN admits that it engages in activities involving interstate commerce. JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in the first sentence of Paragraph 32 and, on that basis, denies them. JELD-WEN denies the allegations in the second sentence of Paragraph 32.

33.  Paragraph 33 asserts legal conclusions that do not require a response.

34.  Paragraph 34 asserts legal conclusions that do not require a response.

35.  Paragraph 35 asserts legal conclusions that do not require a response.

36.  Paragraph 36 asserts legal conclusions that do not require a response.

37.  Admits.

38.  Admits.

39.  Admits.

40.  Admits.

41.  Admits.

42.  JELD-WEN admits that as of September 30, 2000, it manufactured both interior door skins and interior molded doors.  JELD-WEN admits that Premdor sold, among other things, doors and door skins at that time.  JELD-WEN admits that Masonite sold, among other things, door skins at that time.  The assertion in Paragraph 42 that the sale of door skins constitutes a "market" is a legal conclusion as to which no response is required.  However, to the extent that a response is required, JELD-WEN denies that "door skins" constitute a relevant market for antitrust purposes.  JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 42 and, on that basis, denies them.

43.  Paragraph 43 contains legal conjecture and hypothetical speculation.  Because it contains no factual allegations, no response is required.

44.  Paragraph 44 contains legal conjecture and hypothetical speculation.  Because it contains no factual allegations, no response is required.

45.  Admits.

46.  JELD-WEN is without information sufficient to form a belief as to the truth of the allegation in Paragraph 46 and, on that basis, denies it.

47.  JELD-WEN admits that Paragraph 47 purports to refer to statements that the United States made in a complaint, a written document the contents of which speak for themselves.  To

the extent Paragraph 47 characterizes or contradicts the contents of those statements in the complaint, JELD-WEN denies those allegations.

48. Admits.

49. Admits.

50. JELD-WEN admits that Steves has regularly purchased door skins from JELD-WEN over the years. JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 50 and, on that basis, denies them.

51. JELD-WEN admits the allegations in Paragraph 51, except that JELD-WEN is without information sufficient to form a belief as to the truth of the allegation in Paragraph 51 that, as of 2009, Steves purchased "substantial quantities of door skins from other manufacturers" and, on that basis, denies it.

52. JELD-WEN admits that it negotiated at some point with Steves on a supply agreement. JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 52 and, on that basis, denies them.

53. Admits.

54. JELD-WEN admits that Paragraph 54 purports to quote from the Supply Agreement between JELD-WEN and Steves, a written document the contents of which speak for themselves. To the extent Paragraph 54 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.

55. JELD-WEN admits that Paragraph 55 purports to quote from the Supply Agreement between JELD-WEN and Steves, a written document the contents of which speak for themselves. To the extent Paragraph 55 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.

56. Denies.

57. Admits.

58. JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 58 and, on that basis, denies them.

59. JELD-WEN denies that it has breached the Supply Agreement. JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 59 and, on that basis, denies them.

60. JELD-WEN admits that the Department of Justice reviewed its proposed acquisition of CraftMaster and did not seek to enjoin it. The remaining allegations contained in Paragraph 60 relate to communications with the Department of Justice that are considered confidential under, *inter alia*, Section 7A(h) of the Clayton Act, 15 U.S.C. § 18a(h).

61. JELD-WEN admits that its acquisition of CraftMaster closed on or about October 24, 2012, and that as part of that acquisition it acquired CraftMaster's plant in Towanda, Pennsylvania. The assertion in Paragraph 61 that the sale of door skins constitutes a "market" is a legal conclusion as to which no response is required. However, to the extent that a response is required, JELD-WEN denies that "door skins" constitute a relevant market for antitrust purposes. The remaining allegations in Paragraph 61 contain legal conjecture and hypothetical speculation. Because they contain no factual allegations, no response is required.

62. Denies.

63. JELD-WEN admits that interior molded door skins display various patterns, and that inexpensive flat door skins do exist. JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 63 and, on that basis, denies them.

11

64.   Paragraph 64 asserts legal conclusions that do not require a response.  To the extent that a response is required, JELD-WEN denies the allegations contained in Paragraph 64.

65.   JELD-WEN admits that many interior molded door skins that are purchased by U.S. manufacturers are produced in the United States.  The remainder of Paragraph 65 asserts a legal conclusion that does not require a response.  To the extent that a response is required, JELD-WEN denies that allegation contained in Paragraph 65.

66.   JELD-WEN admits that interior molded door skins manufactured outside of the United States are used in the United States.  JELD-WEN denies the remaining allegations contained in Paragraph 66.

67.   JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 67 and, on that basis, denies them.

68.   Denies.

69.   Denies.

70.   Denies.

71.   Paragraph 71 asserts legal conclusions that do not require a response.  To the extent that a response is required, JELD-WEN denies the allegations contained in Paragraph 71.

72.   Paragraph 72 asserts legal conclusions that do not require a response.  To the extent that a response is required, JELD-WEN denies the allegations contained in Paragraph 72.  JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 72 and, on that basis, denies them.

73.   Denies.

74.   JELD-WEN admits that prior to 2012, Masonite, JELD-WEN and CraftMaster, among others, supplied interior molded door skins in the United States.  JELD-WEN denies the remaining allegations contained in Paragraph 74.

75.   JELD-WEN admits that following the 2012 merger, Masonite and JELD-WEN both sold interior door skins, and that at some point, Masonite announced that it would no longer sell door skins to "competition."  JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 75 and, on that basis, denies them.

76.   The assertion in Paragraph 76 that the sale of door skins constitutes a "market" is a legal conclusion as to which no response is required.  However, to the extent that a response is required, JELD-WEN denies that "door skins" constitute a relevant market for antitrust purposes. JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 76 and, on that basis, denies them.

77.   JELD-WEN admits that prior to 2012, Masonite, JELD-WEN, CraftMaster, Steves, Haley Brothers, and Lynden sold interior molded doors.  JELD-WEN denies the remaining allegations contained in Paragraph 77.

78.   JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78 and, on that basis, denies them.

79.   The assertion in Paragraph 79 that the sale of doors constitutes a "market" is a legal conclusion as to which no response is required.  However, to the extent that a response is required, JELD-WEN denies that "doors" constitute a relevant market for antitrust purposes. JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 79 and, on that basis, denies them.

80.   Denies.

81. Denies.

82. ████████████████████████████████████████████████████

████████████████████████████. The remaining allegations in Paragraph 82 assert legal conclusions that do not require a response. To the extent that a response is required, JELD-WEN denies those allegations.

83. Denies.

84. Denies.

85. JELD-WEN admits that it has informed Steves that it will ship door skins only to the locations set forth in the Supply Agreement.

86. JELD-WEN denies the allegations in the first sentence of Paragraph 86. The assertion in Paragraph 86 that the sale of doors constitutes a "market" is a legal conclusion as to which no response is required. However, to the extent that a response is required, JELD-WEN denies that "doors" constitute a relevant market for antitrust purposes. JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 86 and, on that basis, denies them.

87. Admits.

88. JELD-WEN admits that it notified Steves and others that it is discontinuing a prefinished white product line, and informed them that they could continue to purchase that line as long as inventory was available.

89. JELD-WEN makes all of its pricing decisions unilaterally. Accordingly, JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 89 and, on that basis, denies them. JELD-WEN does admit, however, that due in large part to the housing crisis, prices for interior molded doors decreased or remained flat for

several years, and that, therefore, JELD-WEN's announced price increase in June 2014 was likely one of the largest price increases since the housing market collapsed. JELD-WEN denies that it was able to realize the full amount of that announced price increase.

90. JELD-WEN admits that Paragraph 90 contains a chart which Steves purports shows JELD-WEN's and Masonite's announced price increases for interior molded doors since the 2012 merger, and that Steves asserts that the chart is based on announcements attached to the Complaint. JELD-WEN denies that interior molded door prices actually increased by the announced amounts.

91. Paragraph 91 is improper because it relates to an inadmissible communication between JELD-WEN and Steves made in connection with attempting to resolve their commercial disputes. Accordingly, no response is required.

92. Denies.

93. JELD-WEN admits that Paragraph 93 purports to quote from a Department of Justice complaint, a written document the contents of which speak for themselves. To the extent Paragraph 93 characterizes or contradicts the contents of that complaint, JELD-WEN denies those allegations.

94. Denies.

95. JELD-WEN admits that Paragraph 95 purports to quote from a June 25, 2014 Masonite presentation to industry analysts. To the extent Paragraph 95 characterizes or contradicts the contents of the statements made in that presentation, JELD-WEN denies those allegations.

96. Denies.

97.  JELD-WEN admits that Paragraph 97 purports to quote from a JELD-WEN letter to Steves, a written document the contents of which speak for themselves.  To the extent Paragraph 97 characterizes or contradicts the contents of that letter, JELD-WEN denies those allegations.

98.  JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 98 and, on that basis, denies them.

99.  JELD-WEN admits the allegation in the first sentence of Paragraph 99.  JELD-WEN denies the remaining allegations contained in Paragraph 99.

100.  Denies.

101.  Denies.

102.  Denies.

103.  Denies.

104.  JELD-WEN admits that Paragraph 104 purports to quote from a June 22, 2016 analyst report, a written document the contents of which speak for themselves.  To the extent Paragraph 104 characterizes or contradicts the contents of that analyst report, JELD-WEN denies those allegations.

105.  Denies.

106.  Denies.

107.  JELD-WEN admits that Paragraph 107 purports to quote from a Masonite investor presentation, the contents of which speak for themselves.  To the extent Paragraph 107 characterizes or contradicts the contents of statements made in that presentation, JELD-WEN denies those allegations.  JELD-WEN denies the remaining allegations contained in Paragraph 107.

108. JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 108 and, on that basis, denies them.

109. JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 109 and, on that basis, denies them.

110. The assertion in Paragraph 110 that the sale of doors constitutes a "market" is a legal conclusion as to which no response is required. However, to the extent that a response is required, JELD-WEN denies that "doors" constitute a relevant market for antitrust purposes. JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 110 and, on that basis, denies them.

111. Paragraph 111 contains legal conjecture and hypothetical speculation. Because it contains no factual allegations, no response is required.

112. JELD-WEN admits that Paragraph 112 purports to quote from a JELD-WEN filing with the United States Securities and Exchange Commission, a written document the contents of which speak for themselves. To the extent Paragraph 112 characterizes or contradicts the contents of that filing, JELD-WEN denies those allegations.

113. JELD-WEN admits that Paragraph 113 purports to quote from a Masonite filing with the United States Securities and Exchange Commission, a written document the contents of which speak for themselves. To the extent Paragraph 113 characterizes or contradicts the contents of that filing, JELD-WEN denies those allegations.

114. JELD-WEN admits that it has patents on certain of its door skin products. JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 114 concerning Masonite and, on that basis, denies them. JELD-WEN denies the remaining allegations contained in Paragraph 114.

115.  JELD-WEN admits that Paragraph 115 purports to quote from various third-party reports and studies, written documents the contents of which speak for themselves.  To the extent Paragraph 115 characterizes or contradicts the contents of those reports and studies, JELD-WEN denies those allegations.

116.  Paragraph 116 contains hypothetical speculation.  Because it contains no factual allegations, no response is required.

117.  Denies.

118.  JELD-WEN admits that Paragraph 118 purports to quote from the Supply Agreement, a written document the contents of which speak for themselves.  To the extent Paragraph 118 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.

119.  Paragraph 119 asserts a legal conclusion that does not require a response.

120.  Denies.

121.  Admits.

122.  JELD-WEN denies that of the tens of millions of door skins it has shipped to Steves since 2012, "substantial amounts" of them are defective.  JELD-WEN admits that on the occasions ██████████████████████████████████████████████████████████
████████████████.  Paragraph 122 asserts legal conclusions that do not require a response.  To the extent a response is required, JELD-WEN denies those allegations.  JELD-WEN denies the remaining allegations contained in Paragraph 122.

123.  JELD-WEN admits that on the occasions in which it has provided Steves with refunds, it has refunded Steves the amounts it actually paid JELD-WEN.  JELD-WEN denies that Steves has been damaged.

124.   JELD-WEN admits that in certain but not all instances, ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ .

JELD-WEN admits that at times in the past it has been delayed in making certain inspections of products at Steves' facilities, but denies that Steves has incurred damages as a result.

125.  Denies.

126.  JELD-WEN is without information sufficient to form a belief as to the truth of the allegation in Paragraph 126 and, on that basis, denies it.

127.  Denies.

128.  JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 128 and, on that basis, denies them.

129.  JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 129 and, on that basis, denies them.

130.  Denies.

131.  Denies.

132.   JELD-WEN admits that in those instances where Steves was shipped a defective door skin, JELD-WEN has reimbursed Steves for the cost of that defective door skin.  JELD-WEN denies the remaining allegations contained in Paragraph 132.

133.  JELD-WEN admits that Paragraph 133 purports to describe the terms of the Supply Agreement, a written document the contents of which speak for themselves.  To the extent Paragraph 133 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.

134.   JELD-WEN admits that Paragraph 134 purports to describe the terms of the Supply Agreement, a written document the contents of which speak for themselves.   To the extent Paragraph 134 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.

135.   JELD-WEN admits that Paragraph 135 purports to describe the terms of the Supply Agreement, a written document the contents of which speak for themselves.   To the extent Paragraph 135 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.

136.   JELD-WEN admits that Paragraph 136 purports to describe the terms of the Supply Agreement, a written document the contents of which speak for themselves.   To the extent Paragraph 136 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.

137.   JELD-WEN admits that Paragraph 137 purports to describe the terms of the Supply Agreement, a written document the contents of which speak for themselves.   To the extent Paragraph 137 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.

138.   JELD-WEN admits that Paragraph 138 purports to describe the terms of the Supply Agreement, a written document the contents of which speak for themselves.   To the extent Paragraph 138 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.

139.   JELD-WEN admits that Steves asserts that ███████████████████████████

████████████████████████████████████████████████████████████████████████

███. JELD-WEN denies the remaining allegation contained in Paragraph 139.

140. JELD-WEN admits that Steves asserts that in November 2013, it was notified that prices would be reduced. JELD-WEN admits that Paragraph 140 purports to describe a spreadsheet JELD-WEN provided to Steves, a written document the contents of which speak for themselves. To the extent Paragraph 140 characterizes or contradicts the contents of that spreadsheet, JELD-WEN denies those allegations. JELD-WEN denies the remaining allegations contained in Paragraph 140.

141. Denies.

142. Paragraph 142 is improper because it relates to an inadmissible communication between JELD-WEN and Steves made in connection with attempting to resolve their commercial disputes. Accordingly, no response is required.

143. Paragraph 143 is improper because it relates to inadmissible communications between JELD-WEN and Steves made in connection with attempting to resolve their commercial disputes. Accordingly, no response is required.

144. Paragraph 144 is improper because it relates to inadmissible communications between JELD-WEN and Steves made in connection with attempting to resolve their commercial disputes. Accordingly, no response is required.

145. Paragraph 145 is improper because it relates to inadmissible communications between JELD-WEN and Steves made in connection with attempting to resolve their commercial disputes. Accordingly, no response is required.

146. Paragraph 146 is improper because it relates to inadmissible communications between JELD-WEN and Steves made in connection with attempting to resolve their commercial disputes. Accordingly, no response is required.

147.   Paragraph 147 is improper because it relates to inadmissible communications between JELD-WEN and Steves made in connection with attempting to resolve their commercial disputes.  Accordingly, no response is required.

148.   Denies.

149.   Denies.

150.   JELD-WEN admits that it has not sought to raise prices to Steves in 2016.  JELD-WEN denies the remaining allegations contained in Paragraph 150.

151.   JELD-WEN denies that ████████████████████████████████████████████.  JELD-WEN denies the remaining allegations contained in Paragraph 151.

152.   JELD-WEN denies that it breached the Supply Agreement.   The assertion in Paragraph 152 that the sale of door skins constitutes a "market" is a legal conclusion as to which no response is required.  However, to the extent that a response is required, JELD-WEN denies that "door skins" constitute a relevant market for antitrust purposes.   JELD-WEN denies the remaining allegations contained in Paragraph 152.

153.   Admits.

154.   Denies.

155.   Admits.

156.   JELD-WEN admits that Paragraph 156 purports to quote from the Supply Agreement, a written document the contents of which speak for themselves.   To the extent Paragraph 156 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.   Paragraph 156 also asserts legal conclusions that do not require a response.  To the extent that response is required, JELD-WEN denies the allegations contained in Paragraph 156.

157.   JELD-WEN admits that Paragraph 157 purports to quote from ███████ ████████████████, a written document the contents of which speak for themselves.  To the extent Paragraph 157 characterizes or contradicts the contents of that ████, JELD-WEN denies those allegations.   Paragraph 157 also asserts legal conclusions that do not require a response.   To the extent that a response is required, JELD-WEN denies the allegations contained in Paragraph 157.

158.   Denies.

159.   JELD-WEN admits that on or about April 21, 2014, it met with Steves to discuss commercial disputes that had arisen between the parties.  JELD-WEN admits that Paragraph 159 purports to quote from an April 22, 2014 letter from JELD-WEN to Steves, a written document the contents of which speak for themselves.   To the extent Paragraph 159 characterizes or contradicts the contents of that letter, JELD-WEN denies those allegations.

160.   JELD-WEN admits that Paragraph 160 purports to quote from a Masonite investor presentation and a letter from JELD-WEN to Steves, written documents the contents of which speak for themselves.  To the extent Paragraph 160 characterizes or contradicts the contents of those documents, JELD-WEN denies those allegations.

161.   JELD-WEN admits that it met with Steves in August 2014.   JELD-WEN admits that at that meeting there was a discussion about a potential new contract between the parties, and in connection with that subject, the parties had discussions concerning a capital charge.

162.   Paragraph 162 contains legal conjecture and hypothetical speculation.   Because it contains no factual allegations, no response is required.

163.   JELD-WEN admits that at various points in time it has had discussions with Steves concerning the terms of the Supply Agreement, and that during some of those discussions each

party has suggested clarifications to the Supply Agreement. JELD-WEN denies the remaining allegations contained in Paragraph 163.

164. JELD-WEN admits that on or about May 15, 2015, during a confidential settlement negotiation and in accordance with the terms of the Supply Agreement, it supplied Steves with JELD-WEN's new standard terms and conditions. The terms and conditions make clear that in the event they conflict in any way with the Supply Agreement, the Supply Agreement controls. JELD-WEN denies the remaining allegations contained in Paragraph 164.

165. Admits.

166. JELD-WEN admits that Paragraph 166 purports to compare portions of the Supply Agreement with certain "terms and conditions," written documents the contents of which speak for themselves. To the extent Paragraph 166 characterizes or contradicts those documents, JELD-WEN denies those allegations. Paragraph 166 also asserts legal conclusions that do not require a response.

167. JELD-WEN admits that Paragraph 167 purports to quote from a July 30, 2015 letter from Steves to JELD-WEN, a written document the contents of which speak for themselves. To the extent Paragraph 167 characterizes or contradicts the contents of that letter, JELD-WEN denies those allegations.

168. JELD-WEN admits that Paragraph 168 purports to quote from the Supply Agreement, a written document the contents of which speak for themselves. To the extent Paragraph 168 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations. Paragraph 168 also asserts legal conclusions that do not require a response. To the extent that a response is required, JELD-WEN denies the allegations contained in Paragraph 168.

169.  JELD-WEN admits that it offers the Monroe door skin design for sale to customers. JELD-WEN admits that it has informed Steves that the Monroe design is not covered by the Supply Agreement.  JELD-WEN denies the remaining allegations contained in Paragraph 169.

170.  JELD-WEN denies that any term of the Supply Agreement covers pricing for the Monroe door skin.  Paragraph 170 asserts legal conclusions that do not require a response.  To the extent a response is required, JELD-WEN denies those allegations.

171.  Denies.

172.  Denies.

173.  JELD-WEN admits that Paragraph 173 purports to describe the terms of the Supply Agreement, a written document the contents of which speak for themselves.  To the extent Paragraph 173 characterizes or contradicts the contents of that Supply Agreement, JELD-WEN denies those allegations.

174.  JELD-WEN admits that the parties have held at least two internal conferences and an unsuccessful mediation.

175.  JELD-WEN reasserts and incorporates by reference its foregoing responses.

176.  Denies.

177.  Denies.

178.  Denies.

179.  JELD-WEN reasserts and incorporates by reference its foregoing responses.

180.  Paragraph 180 asserts legal conclusions that do not require a response.

181.  Denies.

182.  Denies.

183.  JELD-WEN reasserts and incorporates by reference its foregoing responses.

25

184. Paragraph 184 asserts legal conclusions that do not require a response.

185. Denies.

186. Denies.

187. Denies.

188. JELD-WEN reasserts and incorporates by reference its foregoing responses.

189. JELD-WEN admits that Steves asserts that there is an actual controversy between the parties concerning the effective termination date of the Supply Agreement, and that Paragraph 189 purports to present the parties' respective positions on the issue. Paragraph 189 also asserts legal conclusions that do not require a response.

190. JELD-WEN admits that Paragraph 190 purports to present Steves' contentions regarding the termination provision of the Supply Agreement. JELD-WEN denies the remaining allegations contained in Paragraph 190.

191. Paragraph 191 asserts legal conclusions that do not require a response.

192. Denies.

193. JELD-WEN reasserts and incorporates by reference its foregoing responses.

194. Paragraph 194 asserts legal conclusions that do not require a response.

195. Denies.

196. Denies.

197. Paragraph 197 asserts a legal conclusion that does not require a response. To the extent a response is required, JELD-WEN denies the allegations in Paragraph 197.

198. Paragraph 198 asserts a legal conclusion that does not require a response. To the extent a response is required, JELD-WEN denies the allegations in Paragraph 198.

199. Denies.

200.  Denies.

201.  JELD-WEN reasserts and incorporates by reference its foregoing responses.

202.  Denies.

203.  Denies.

204.  Denies.

205.  Denies.

206.  Denies.

Steves' Prayer for Relief contains no factual allegations and, therefore, does not require a response.  To the extent that a response is required, JELD-WEN denies that Steves is entitled to any relief.

## GENERAL DENIAL

JELD-WEN denies every allegation of the Complaint not expressly admitted in this Answer.

## AFFIRMATIVE DEFENSES

JELD-WEN expressly reserves the right to plead additional affirmative and other defenses should discovery reveal any such defenses in this case.

JELD-WEN asserts the following defenses without assuming the burden of proof as to any issue that would otherwise rest upon Steves.

## FIRST AFFIRMATIVE DEFENSE

### (Statute of Limitations)

Steves' claims are barred, in whole or in part, by the applicable statute(s) of limitations.

## SECOND AFFIRMATIVE DEFENSE

### (Unclean Hands)

Steves' claims are barred in whole or in part because of Steves' conduct and unclean hands.

## THIRD AFFIRMATIVE DEFENSE

### (Terms of Contract)

Steves' claims are barred in whole or in part because the conduct alleged adheres to the terms of the parties' contract.

## FOURTH AFFIRMATIVE DEFENSE

### (Lawful Conduct)

Steves' claims are barred in whole or in part because the claims are based on lawful conduct.

## FIFTH AFFIRMATIVE DEFENSE

### (Good Faith)

Steves' claims are barred in whole or in part because the claims are based on conduct undertaken in good faith.

## SIXTH AFFIRMATIVE DEFENSE

### (Waiver, Estoppel and/or Laches)

Steves' claims are barred, in whole or in part, by the doctrine of waiver, good faith, estoppel, and/or laches.

## SEVENTH AFFIRMATIVE DEFENSE

### (Mitigation of Risk)

Steves' claims are barred in whole or in part by Steves' failure to take adequate measures to mitigate damages.

## EIGHTH AFFIRMATIVE DEFENSE

### (Course of Performance, Couse of Dealing, Usage of Trade)

Steves' claims are barred in whole or in part by the doctrines of course of performance, course of dealing, and usage of trade.  Additionally, Steves failed to reject the alleged defective door skins and, having "accepted" the door skins, failed timely to give notice of the defects.  Del. Code Ann. tit. 6, §§ 2-602, 2-605-607, 2-714.

## JELD-WEN'S COUNTERCLAIMS

### Jurisdiction and Venue

1.     This Court has subject matter jurisdiction over the federal Defend Trade Secrets Act claim pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.

2.     This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(a) because the amount in controversy on each such claim exceeds $75,000.00, exclusive of interest and costs, and the parties are citizens of different states.  This Court also has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.     This Court has personal jurisdiction over Steves, and venue in this Court is proper, because Steves owns a plant in Henrico County, Virginia and regularly transacts business in this judicial district.

**Steves' Misappropriation Of JELD-WEN Trade Secrets And Confidential
Information Through John Pierce**

4.      John Pierce ("Pierce") is a former Senior Executive Vice President of

defendant/counter-claimant JELD-WEN.  Pierce worked for JELD-WEN from June 4, 1979 until

June 29, 2012.  In his role as Senior Executive Vice President, Pierce oversaw JELD-WEN's

entire molded door skins operations.

5.      On January 1, 1988, Pierce and JELD-WEN entered into a Management

Employment Contract ("1988 Pierce Employment Contract").   Section 10 of the 1988

Employment Contract acknowledges that Pierce would be exposed to "matters of confidence

relating to manufacturing processes, costs, customer information and pricing, JELD-WEN

policies and procedures and financial data," which "JELD-WEN regards [as] confidential and in

many cases as trade secrets."  By signing the contract, Pierce agreed that, both during his

employment and after leaving JELD-WEN's employ, he would treat the information as

confidential and not discuss or disclose the information to any outside party under any

circumstances whatsoever.

6.      On January 27, 2006, Pierce and JELD-WEN entered into a second Management

Employment Contract ("2006 Pierce Employment Contract").  Section 9(A) of the 2006 Pierce

Employment Contract acknowledges that Pierce would be exposed to "confidential matters,

including without limitation, matters relating to cost data, formulas, patterns, compilations,

programs, devices, methods, techniques, processes, manufacturing processes, business strategy

and plans, customer information, pricing, JELD-WEN policies and procedures and other

financial data."  As Section 9(A) of the 2006 Pierce Employment Contract further explains,

"JELD-WEN regards all such information as confidential and in many cases as trade secrets,"

and with his signature Pierce agreed that "the unauthorized disclosure or release of such information in any form would irreparably harm JELD-WEN."

7.      By signing the 2006 Pierce Employment Contract, Pierce agreed to keep all such information confidential during his employment and, should his employment with JELD-WEN end, "continue in perpetuity or for the longest duration allowed by law to treat such information as strictly confidential and as trade secrets and not discuss or disclose any such information to any outside party under any circumstances whatsoever, except as required by law."

8.      During Pierce's employment at JELD-WEN, Steves purchased door skins from JELD-WEN.  At various times during his employment, Pierce worked directly with Steves CEO Edward Steves and with other Steves employees regarding these purchases.

9.      Pierce retired from JELD-WEN on June 29, 2012.  At the time of his retirement, the 2006 Pierce Employment Contract governed his employment and survived his retirement to the extent stated in its terms.  The 2006 Pierce Employment Contract expressly provided that Pierce's duty to protect the confidentiality of JELD-WEN material continued after he left JELD-WEN "in perpetuity or for the longest duration allowed by law."

10.      On or before February 26, 2015, Steves contacted Pierce, with knowledge of Pierce's former position at JELD-WEN, and entered into an agreement with Pierce pursuant to which Pierce would by surreptitious means acquire JELD-WEN trade secrets and other confidential information relating to JELD-WEN's door and door skin businesses and deliver that information to Steves.  Steves and Pierce signed a Mutual Confidentiality and Non-Disclosure Agreement on March 15, 2015.

11.      Steves' objective in entering into its agreement with Pierce was to obtain JELD-WEN trade secrets and confidential information to assess its ability to enter the door skin

business in direct competition with JELD-WEN by potentially constructing and operating its own door skin facility.

12.     Steves agreed to pay Pierce at the rate of $800 per day, plus travel expenses, to travel to JELD-WEN facilities and to communicate with JELD-WEN employees for the purpose of eliciting confidential information about JELD-WEN operations and passing that information to Steves.  Pursuant to that agreement, Pierce traveled to several JELD-WEN door skin plants and obtained trade secret and other confidential information from JELD-WEN employees. Pierce communicated the purloined information to Steves.  Steves paid Pierce for his theft of JELD-WEN trade secrets and confidential information in accordance with their agreement.

13.     Steves compensated Pierce for multiple discussions with employees of JELD-WEN's Klamath Falls facility, a visit with an employee of JELD-WEN's coatings division in Seattle, and travel to JELD-WEN's Louisiana plant, to collect trade secrets and confidential information from JELD-WEN.  During the course of his efforts, Pierce communicated directly by email with Steves' senior management to report on the status of his efforts to steal confidential information.  Pierce acknowledged that he sold to Steves confidential financial information, and confidential information about primer costs, JELD-WEN's future plans for a primer facility in Towanda, and manufacturing process and plans for a new door adhesive, that Pierce learned through those trips.

14.     Steves purchased *at least* the following trade secrets and confidential information from Pierce:

  a.  Information regarding JELD-WEN's manufacturing processes, methods and techniques, including the placement and installation of dies used to manufacture door skins, and for applying resin and primer to door skins;

  b.  Information and financial data regarding JELD-WEN's manufacture of primer used for door skins, including the ingredients of the primer and the costs to manufacture such primer;

32

c.   Information regarding strategy and plans for making future improvements to JELD-WEN door skin plants;

d.   Information regarding JELD-WEN's research and development plans and strategies related to its manufacturing processes, including making door adhesive;

e.   Information regarding JELD-WEN's processes, strategies and plans for making product improvements;

f.   Information regarding confidential challenges and risks JELD-WEN faced, processes, methods and techniques JELD-WEN had tried but had determined were not viable; and

g.   Additional confidential JELD-WEN financial data, including information about input suppliers and input costs for the manufacture of door skins.

15.   As to each category of information described above in Paragraph 14, Pierce's transmission of JELD-WEN trade secret or confidential information to Steves is documented in an email communication.

16.   JELD-WEN considers information concerning its manufacturing processes, methods and techniques, its materials and input costs, the details of its supply contracts, its research and development efforts, its financial performance data, and its business strategies to be trade secrets, since they derive independent economic value from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from the disclosure or use of the information.   This includes information regarding business process, methods and techniques that JELD-WEN has determined are not viable.   JELD-WEN rigorously protects the confidentiality of this information and derives economic benefit from that confidentiality because it allows JELD-WEN to compete in the manufacture of door skins and doors, and gives JELD-WEN a competitive advantage by not being generally known.

17.   At all relevant times, JELD-WEN took reasonable steps to keep these categories of information secret.   Among other things, JELD-WEN protected and continues to protect this

information by limiting its dissemination to certain employees, prohibiting non-employees from entering JELD-WEN door skin plants, requiring employees to sign non-disclosure agreements, and providing ongoing education designed to reinforce the importance of protecting the confidentiality of proprietary information.

18.    The 2006 Pierce Employment Agreement explicitly barred Pierce from disclosing the categories of information described above in Paragraphs 14 and 16 to outsiders, including Steves.  Much of the confidential information misappropriated by Steves through its arrangement with Pierce is JELD-WEN trade secrets.

19.    The Steves brothers and Pierce discussed that Steves was buying confidential JELD-WEN information from Pierce.  On March 12, 2015, Pierce suggested to Edward and Sam Steves II that they keep Pierce's upcoming visit to Steves headquarters in San Antonio, Texas confidential.  Pierce explained that "[i]n the last three days I've spent a lot of time talking to my former plant managers, and a couple other folks at JELD-WEN" because he sought to "have the most current information for you."   During the visit, Pierce planned to share "confidential information about finances" that he had learned from current JELD-WEN employees.  Pierce worried that "[i]f they were to find our [sic] that I am then working to help Steves Doors, they might not want to share anything with me in the future."  *Id*.  Edward Steves agreed to "keep the visit on the QT."  *See* STEVES-000056766-68, attached as Ex. 1.  On information and belief, Pierce met with the Steves brothers in San Antonio on March 16, 2015.

20.    In an April 7, 2015 email, Pierce acknowledged to Edward and Sam Steves II that their company was purchasing confidential JELD-WEN information, and made reference to the violation of his non-disclosure agreement with JELD-WEN.  Pierce proposed that he and the Steves brothers "talk[]…some more about the chance that JW might try to make trouble for us if

34

they find out I'm assisting you. What trouble could they make under the guise of non-disclosure rather than rather than non-compete?" He suggested that Steves "speak with [its] attorney about that." STEVES-000053666, attached as Ex. 2.

21.     Pierce stated in a separate April 7, 2015, email to Edward and Sam Steves that the "financial information" and information about non-stick coating applied to dies for door skins that he had supplied to Steves were JELD-WEN trade secrets. He proposed destroying or altering their communications to reduce the risk that JELD-WEN could file suit against him and Steves for misappropriating trade secrets. He proposed that they "[d]elete from all of our email servers, programs, and folders all copies of every email and document we have exchanged to this point, including every copy that is in the "SENT" email folder." Pierce also offered to "re-compose all of the information that [he had] sent to [Steves] to remove indications that any of it is verified current information." Pierce commented that, if the conspiracy between him and the Steves came to light during the discovery process in any subsequent litigation, it "might cause us trouble." As he explained "[t]hese ways, perhaps we could comply with any such [discovery] request with reasonable documents that might not be incriminating to anyone. This way also, you can still have the data and information for your reference—and still comply with the discovery order." Pierce went on to say that "[w]e can't unring a bell, but perhaps we can replace the bell with one that's more attractive to Steves Doors, and less attractive to JW." STEVES-000051327, attached as Ex. 3.

22.     Pierce took actions to hide communications with Steves' principals that almost certainly contained details of his wrongful conduct. JELD-WEN issued a subpoena to Pierce in connection with this civil action on January 12, 2017. In a written response to the subpoena,

Pierce stated that he had deleted or destroyed all communications with Steves, and all documents and information that he provided to Steves, save one document.

23.     In addition to Pierce's destruction of documents, Steves and Pierce took other steps to prevent the discovery of their arrangement, and of the activities conducted pursuant to their arrangement, by JELD-WEN.  Pierce and Steves explicitly agreed to keep their meetings secret so that Pierce could continue to procure "confidential information" from current JELD-WEN employees.  Edward Steves and Pierce also sought to keep their communications secret by communicating through text messages.  STEVES-000051425, attached as Ex. 4.  Additionally, and possibly in direct response to Pierce's April 7, 2015 email, Edward Steves requested that Pierce communicate with him and Sam Steves II only by telephone.  Further, in November 2015, Edward Steves and Pierce discussed paying for at least some of Pierce's work in cash, as opposed to check.

### Additional Misappropriation Of JELD-WEN Trade Secrets And Confidential Information

24.     John Ambruz is a former Executive Vice President of Corporate Development for defendant/counter-claimant JELD-WEN.  Ambruz worked for JELD-WEN from April 16, 2012, until March 12, 2014.

25.     On April 18, 2012, Ambruz and JELD-WEN entered into a Management Employment Contract ("Ambruz Employment Contract").   Section 8(A) of the Ambruz Employment Contract acknowledges that Ambruz would be exposed to "confidential matters, including without limitation, matters relating to cost data, formulas, patterns, compilations, programs, devices, methods, techniques, processes, manufacturing processes, business strategy and plans, customer information, pricing, JELD-WEN policies and procedures and other financial data."  As Section 8(A) of the Ambruz Employment Contract further explains, "JELD-

WEN regards all such information as confidential and in many cases as trade secrets," and with his signature Ambruz agreed that "the unauthorized disclosure or release of such information in any form would irreparably harm JELD-WEN."

26.     By signing the Employment Contract, Ambruz agreed to keep all such information confidential during his employment and, should his employment with JELD-WEN end, "continue in perpetuity or for the longest duration allowed by law to treat such information as strictly confidential and as trade secrets and not discuss or disclose any such information to any outside party under any circumstances whatsoever, except as required by law."

27.     After the termination of his employment with JELD-WEN, on April 21, 2014, Ambruz signed a declaration certifying that he had returned and delivered to JELD-WEN all materials embodying any confidential information.  In this declaration, Ambruz specifically declared that he had destroyed any confidential information found on his personal computer by non-recoverable data erasure of computerized data, and he acknowledged his ongoing duty to maintain as confidential any confidential information he acquired during his employment.

28.     Additionally, on February 3, 2015, Ambruz signed a Severance Agreement with JELD-WEN confirming that "the provisions of your Management Employment Agreement regarding Intellectual Property, Confidentiality and Proprietary Information remain in full effect and are incorporated herein.  You acknowledge that you will keep confidential all proprietary and/or confidential information obtained by you during the course of your employment (including but not limited to, as set forth in the Management Employment Agreement that you may have previously entered into with the Company, e.g., the section addressing Confidentiality and Trade Secrets), and that you have continuing obligations to the Company to do so.  You

hereby acknowledge and expressly reaffirm these obligations in exchange for the consideration provided to you under this Agreement." ("Ambruz Severance Agreement")

29.     Following his departure from JELD-WEN, Ambruz started a consulting firm called Global Strategic Partners ("GSP").  At the time of GSP's formation, and at all times following his departure from JELD-WEN, Ambruz has remained under a continuing duty to protect JELD-WEN's trade secrets and confidential information as provided for in the Ambruz Employment Contract and Ambruz Severance Agreement.

30.     Steves retained Ambruz, through GSP, as a consultant on or around July 8, 2015. Steves admits that it retained Ambruz to help it evaluate the feasibility, logistics and economics of financing and developing its own molded door skin plant.

31.     On information and belief, Steves provided to Ambruz confidential JELD-WEN information that JELD-WEN had provided to Steves pursuant to the confidentiality provisions of the parties' 2012 Supply Agreement.

32.     During Ambruz's tenure at JELD-WEN, the Antitrust Division of the Department of Justice conducted an investigation into JELD-WEN's potential acquisition of CraftMaster, Inc.  Ambruz, who was a JELD-WEN employee in 2012, was copied on a JELD-WEN confidential communication to the Antitrust Division enclosing a report entitled "Proposal for Expansion of Molded Skin Production Capacity Submitted by John Pierce, 1 May 2006" because he was assisting O'Melveny & Myers, JELD-WEN's lawyers at the time, in responding to the Antitrust Division's investigation.  That report included JELD-WEN trade secrets and confidential information about its manufacturing capacity and processes for door skins

33.     On July 20, 2016, Sam Steves II's assistant, Leticia Villareal, sent a copy of that report to Ambruz.  The copy of the report sent by Villareal, on behalf of Sam Steves II, to

Ambruz included marginal handwritten questions regarding information in the report.  Steves had no proper or legal means by which to obtain a copy of the JELD-WEN report, and on information and belief, the report was delivered to Steves by Ambruz.

34.     Given the steps taken by Steves, Pierce and Ambruz to conceal the misappropriation of JELD-WEN trade secrets and confidential information and the admitted destruction of evidence by Pierce, it is likely that Steves misappropriated through Pierce, Ambruz, and potentially other sources, additional JELD-WEN trade secrets and confidential information that are not evidenced in the currently available documents, but that may come to light in discovery.  By virtue of the loss of at least some probative evidence, JELD-WEN may never know the full extent of the trade secrets and other confidential information that Steves stole from JELD-WEN.

### JELD-WEN's Discovery Of Steves' Misappropriation Of JELD-WEN's Trade Secrets And Confidential Information

35.     JELD-WEN's outside counsel in this civil action, Latham & Watkins, LLP, discovered the first evidence of Steves' misappropriation on or about January 4, 2017, while reviewing documents that Steves produced in response to three sets of document requests that JELD-WEN had served upon Steves.

36.     Upon the discovery of the facts detailed above, JELD-WEN immediately demanded that Steves cease and desist from making any use of the confidential JELD-WEN information that Pierce had sold to Steves.

37.     In response to JELD-WEN's demand, Steves did not deny that it had purchased JELD-WEN trade secrets and confidential information.  Steves did not agree to cease and desist from using the stolen information, including use of the information in this civil action against JELD-WEN.

38.     JELD-WEN could not have discovered the misappropriation of its trade secrets and confidential information by Steves any earlier through the exercise of reasonable diligence because Steves, Pierce and Ambruz successfully concealed Steves' misappropriation of JELD-WEN's trade secrets and confidential information.

39.     On information and belief, Steves has planned to use, and will continue to use, JELD-WEN's trade secrets and confidential information to assess whether it is feasible for the company to develop a door skin manufacturing operation in direct competition with JELD-WEN. The information stolen from JELD-WEN provides Steves a roadmap to develop a door skin manufacturing operation.  Steves either has used or may use this information to develop such an operation, and/or to determine whether it wants to make the investment necessary to build a door skin plant itself, or partner with another firm to do so.

40.     On information and belief, Steves has used, and will continue to use, JELD-WEN's own trade secrets and confidential information, which it illegally misappropriated from JELD-WEN, in the prosecution of this civil action against JELD-WEN.

## FIRST COUNTERCLAIM FOR RELIEF

### (Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)

41.     JELD-WEN realleges and incorporates by reference each and every allegation contained in paragraphs 1-40 as if such allegation were fully set forth herein.

42.     The Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §1836(b) provides a private civil action for any owner of a trade secret that is misappropriated if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. Steves violated the Defend Trade Secrets Act by misappropriating JELD-WEN's trade secrets.

40

43.     JELD-WEN sells door skins, doors and other products in interstate commerce across the United States.

44.     JELD-WEN is the "owner" of the trade secrets misappropriated by Steves because JELD-WEN has rightful legal or equitable title to, or license in, the trade secrets.  18 U.S.C. §1839(4).

45.     The information that Steves misappropriated constitutes "trade secrets" under the DTSA because they are "financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes."  The information that Steves stole "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. §1839(3).

46.     The information misappropriated by Steves was at all times the subject of reasonable efforts by JELD-WEN to maintain its secrecy.  18 U.S.C. §1839(3).

47.     Steves "misappropriated" JELD-WEN's information because Steves knew or had reason to know that the suppliers of that information acquired the trade secrets through improper means.  Steves also used JELD-WEN's trade secrets without JELD-WEN's express or implied consent when at the time of the use Steves used improper means to acquire knowledge of the trade secrets, and knew or had reason to know that its knowledge of the trade secrets derived from or through a person who used improper means to acquire the trade secrets, and owed a duty to JELD-WEN to maintain the secrecy of the trade secrets or limit the use of the trade secrets.  18 U.S.C. §1839(5).  The "improper means" of acquiring the trade secrets included, but is not

41

limited to, "breach or inducement of a breach of a duty to maintain secrecy."   18 U.S.C. §1839(6).

48.     As a direct result of Steves' misappropriation of JELD-WEN's trade secrets, JELD-WEN has been damaged in an amount to be determined at trial.

## SECOND COUNTERCLAIM FOR RELIEF

### (Conspiracy to Violate Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(5))

49.     JELD-WEN realleges and incorporates by references each and every allegation contained in paragraphs 1-48 as if such allegations were fully set forth herein.

50.     Steves combined and conspired with Pierce or Ambruz, or both, in violation of 18 U.S.C. §1832(a)(5) to commit the offense set forth in the First Counterclaim for relief.

51.     Steves, Pierce and Ambruz, individually performed the acts fully described above to effect the object of their conspiracy.

52.     As a direct and proximate result of actions taken by Steves and its co-conspirators to achieve the object of their conspiracy, JELD-WEN has suffered injury and has been damaged in an amount to be determined at trial.

## THIRD COUNTERCLAIM FOR RELIEF

### (Violation of the Texas Uniform Trade Secret Act, Texas Civil Practice & Remedies Code Annotated §§134A.001 – 134A.008)

53.     JELD-WEN realleges and incorporates by reference each and every allegation contained in paragraphs 1-52 as if such allegations were fully set forth herein.

54.     Steves violated the Texas Uniform Trade Secret Act, Texas Civil Practice & Remedies Code Annotated §§ 134A.001-134A.008, by misappropriating JELD-WEN's trade secrets.

55.     The information and financial data that Steves misappropriated are "trade secrets" under Texas law because (1) JELD-WEN took reasonable efforts under the circumstances to maintain the secrecy of the information; and (2) the information that Steves stole "derives independent economic value, actual or potential, from not being generally known to the public, and not readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use." TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6).

56.     Steves "misappropriated" the information because Steves knew or had reason to know that the trade secrets were acquired by improper means.  Steves also used JELD-WEN's trade secrets without JELD-WEN's express or implied consent.  Finally, Steves knew or had reason to know that its knowledge of the trade secrets was derived from or through a person who used improper means to acquire the trade secrets and owed a duty to JELD-WEN to maintain the secrecy of the trade secret or limit the use of the trade secrets.  TEX. CIV. PRAC. & REM. CODE ANN. §§ 134A.002(3).  The "improper means" of acquiring the trade secrets included, but is not limited to, "breach or inducement of a breach of a duty to maintain secrecy." TEX. CIV. PRAC. & REM. CODE ANN. §§ 134A.002(2).

57.     As a direct result of Steves' misappropriation of JELD-WEN's trade secrets, JELD-WEN has been damaged in an amount to be determined at trial.

## FOURTH COUNTERCLAIM FOR RELIEF

### (Tortious Interference with Contract Under Texas Common Law)

58.     JELD-WEN realleges and incorporates by reference each and every allegation contained in paragraphs 1-57 as if such allegations were fully set forth herein.

59.     Steves unlawfully and tortiously interfered with JELD-WEN's 2006 Pierce Employment Contract.

60.     Steves engaged in willful and intentional acts of interference with the 2006 Pierce Employment Contract by knowingly inducing and paying Pierce to violate the sections of that contract that forbade him from divulging JELD-WEN's trade secrets and confidential information.

61.     Pursuant to his arrangements with Steves, Pierce breached the obligations of confidentiality imposed on him by the 2006 Pierce Employment Contract.

62.     These willful and intentional acts of interference by Steves induced Pierce to breach his contractual obligations to JELD-WEN and proximately caused injury to JELD-WEN by providing trade secrets and confidential information to Steves.

63.     JELD-WEN has suffered actual damages or loss resulting from Steves' tortious acts in an amount to be determined at trial.

## FIFTH COUNTERCLAIM FOR RELIEF

### (Tortious Interference with Contract Under Texas Common Law)

64.     JELD-WEN realleges and incorporates by references each and every allegation contained in paragraphs 1-63 as if such allegations were fully set forth herein.

65.     Steves unlawfully and tortiously interfered with JELD-WEN's Ambruz Employment Contract and Ambruz Severance Agreement.

66.     Steves engaged in willful and intentional acts of interference with those contracts by knowingly inducing and paying Ambruz to violate the sections of those contracts that forbade Ambruz from divulging JELD-WEN's trade secrets and confidential information.

67.     Pursuant to his arrangements with Steves, Ambruz breached the obligations of confidentiality imposed on him by the Ambruz Employment Contract and the Ambruz Severance Agreement.

44

68.     These willful and intentional acts of interference by Steves induced Ambruz to breach his contractual obligations to JELD-WEN, and proximately caused injury to JELD-WEN by providing trade secrets and confidential information to Steves.

69.     JELD-WEN has suffered actual damages or loss resulting from Steves' tortious act in an amount to be determined at trial.

### SIXTH COUNTERCLAIM FOR RELIEF

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Under Delaware Law)**

70.     JELD-WEN realleges and incorporates by reference each and every allegation contained in paragraphs 1-69 as if such allegations were fully set forth herein.

71.     On May 1, 2012, Steves and JELD-WEN entered into a Supply Agreement whereby Steves agreed ███████████████████████████████████████████ ████████████████████████████████. The contract provides that it should be interpreted under the laws of Delaware.

72.     A covenant of good faith and fair dealing is implied in every contract under Delaware law.  A party is liable for breaching the covenant when its conduct frustrates the overarching purpose of the contract.

73.     Steves' theft and misappropriation of JELD-WEN's trade secrets and confidential information violated the covenant of good faith and fair dealing implied by Delaware law in the 2012 Supply Agreement.  By unlawfully stealing JELD-WEN's confidential and secret information in order to develop its own interior molded door skin manufacturing capability, Steves unreasonably deprived JELD-WEN of its expectation under the contract that Steves would purchase "██████████████████████████████" from JELD-WEN for the duration of the contract.  Steves' theft and misappropriation allowed it to determine the designs

45

of door skins that it should purchase from foreign manufacturers versus the designs that it should attempt to manufacture itself or continue purchasing from JELD-WEN.   Steves therefore unreasonably deprived JELD-WEN of its expectation that Steves would ███████████████ ████████████████████████████████████.

74.    JELD-WEN has been damaged by that violation in an amount to be determined at trial.

## SEVENTH COUNTERCLAIM FOR RELIEF

### (Breach of Contract)

75.    JELD-WEN realleges and incorporates by reference each and every allegation contained in paragraphs 1-74 as if such allegations were fully set forth herein.

76.    The terms of the 2012 Supply Agreement prohibit Steves from disclosing JELD-WEN's commercially sensitive information without the prior and express approval of JELD-WEN.

77.    Steves breached the confidentiality provision of the 2012 Supply Agreement by providing JELD-WEN's commercially sensitive information to Ambruz without JELD-WEN's prior and express approval.  This violation is a breach of the 2012 Supply Agreement pursuant to Paragraph 3(a)(1) of that Agreement.

78.    JELD-WEN has been injured as a proximate result of Steves' breach of the 2012 Supply Agreement and has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Defendant/Counter-Claimant JELD-WEN requests that the Court grant it the following relief:

1.      A declaration that Steves' theft and misappropriation of JELD-WEN's trade secrets violate the Defend Trade Secrets Act, the Texas Uniform Trade Secrets Act, and Texas tort law;

2.      A declaration that Steves' violation of the covenant of good faith and fair dealing implied in 2012 Supply Agreement breached the 2012 Supply Agreement pursuant to Paragraph 3(a)(1) of that Agreement;

3.      A declaration that Steves' breach of the confidentiality provision contained in Paragraph 22 of the 2012 Supply Agreement breached that agreement pursuant to Paragraph 3(a)(1);

4.      An order striking any pleadings made in Steves' Complaint that are based on trade secrets and confidential information stolen and misappropriated from JELD-WEN, including Steves' claim for damages from its alleged inability to build a door skin plant and inability to obtain door skins from others;

5.      With regard to the First, Second and Third Counterclaims for Relief, that it award damages for JELD-WEN's actual loss caused by Steves' misappropriation of JELD-WEN's trade secrets, and damages for Steves' unjust enrichment caused by its misappropriation of JELD-WEN's trade secrets that are not addressed in computing damages for actual loss, in an amount to be determined at trial;

6.      In the alternative, with regard to the First, Second and Third Counterclaims for Relief, that the Court award damages in an amount of a reasonable royalty for Steves' past use of JELD-WEN's misappropriated trade secrets, in an amount to be determined at trial;

7.     With regard to the First, Second and Third Counterclaims for Relief, that the Court award exemplary damages two times the amount of damages awarded for Steves' misappropriation of JELD-WEN's trade secrets;

8.     With regard to the First, Second and Third Counterclaims for Relief, that the Court enter an order  (1) enjoining Steves and its agents from acquiring any additional JELD-WEN trade secrets and confidential information from any source; (2) enjoining Steves and its agents from using in any manner, including in the prosecution of the action against JELD-WEN, any JELD-WEN trade secrets acquired from any source; (3) requiring Steves and its agents to conduct and complete a thorough search of all records in its possession, custody or control, wherever located and including all locations where electronic information is stored by it or on its behalf, and identify all documents or information containing or reflecting JELD-WEN's trade secrets and confidential information acquired from any source, and deliver to JELD-WEN a copy of each document located as a result of the search, along with a written certification given under oath stating that the materials delivered to JELD-WEN constitute a true and complete copy of the entire set of documents identified as a result of the search and/or that all additional copies of such materials that are not delivered to JELD-WEN have been destroyed; and (4) placing Steves and its agents under a continuing obligation, should they locate any JELD-WEN trade secrets, to identify such information, promptly deliver a copy to JELD-WEN, and to certify destruction of all copies of records containing such information;

9.     In the alternative, with regard to the First, Second and Third Counterclaims for Relief, to the extent that this Court determines that a prohibitory injunction against future use of JELD-WEN's trade secrets by Steves is inequitable or impracticable, that the Court enter an

injunction conditioning any future use of the trade secrets by Steves on the payment of a reasonable royalty to JELD-WEN;

10.     With regard to the Fourth and Fifth Counterclaims for Relief, that the Court award actual damages resulting from Steves' tortious interference with the employment contracts in an amount to be determined at trial;

11.     With regard to the Fourth and Fifth Counterclaims for Relief, that the Court award exemplary damages two times the amount of damages awarded for Steves' tortious interference with the employment contracts, or $200,000, whichever is greater;

12.     With regard to the Sixth Counterclaim for Relief, that the Court award actual damages resulting from Steves' violation of the implied covenant of good faith and fair dealing present in the 2012 Supply Agreement;

13.     With regard to the Seventh Counterclaim for Relief, that the Court award actual damages resulting from Steves' violation of the confidentiality provision present in the 2012 Supply Agreement;

14.     That the Court award JELD-WEN's reasonable attorneys' fees and costs for the prosecution of the counterclaims and for defense of the lawsuit brought by Steves;

15.     That the Court award pre-judgment and post-judgment interest;

16.     That the Court award any other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

JELD-WEN demands a trial by jury for all issues triable by a jury.

Dated:  May 22, 2017                    Respectfully submitted,

                                        JELD-WEN, Inc.

                                        By counsel


                                        /s/ Craig T. Merritt
                                        Michael W. Smith (VSB #01125)
                                        Craig T. Merritt (VSB #20281)
                                        R. Braxton Hill, IV (VSB # 41539)
                                        Harrison M. Gates (VSB #80385)
                                        Christian & Barton, L.L.P.
                                        909 East Main Street, Suite 1200
                                        Richmond, Virginia 23219-3095
                                        (804) 697-4100 –  Tel.
                                        (804) 697-4112 – Fax
                                        msmith@cblaw.com
                                        cmerritt@cblaw.com
                                        bhill@cblaw.com
                                        hgates@cblaw.com

                                        Margaret M. Zwisler (pro hac vice)
                                        Allyson M. Maltas (pro hac vice)
                                        Latham & Watkins LLP
                                        555 Eleventh Street, N.W., Suite 1000
                                        Washington, D.C., 20004
                                        (202) 637-2200 – Tel.
                                        (202) 637-2201 – Fax
                                        margaret.zwisler@lw.com
                                        allyson.maltas@lw.com

                                        Alfred C. Pfeiffer (pro hac vice)
                                        Latham & Watkins LLP
                                        505 Montgomery Street, Suite 2000
                                        San Francisco, CA 94111
                                        (415) 391-0600 – Tel.
                                        (415) 395-8095 – Fax
                                        al.pfeiffer@lw.com

                                        Lawrence E. Buterman (pro hac vice)
                                        Latham & Watkins LLP
                                        885 Third Avenue
                                        New York, NY 10022
                                        (212) 906-1200 – Tel.
                                        (212) 751-3864 – Fax

50

lawrence.buterman@lw.com

*Attorneys for Defendant*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of May, 2017, counsel of record have been served by

electronic mail with a true and correct copy of the foregoing, including:

Lewis F. Powell III
John S. Martin
Alexandra L. Klein
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Broad Street
Richmond, VA 23219
(804) 788-8200 – Tel.
(804) 788-8218 – Fax
lpowell@hunton.com
martinj@hunton.com
aklein@hunton.com

John E. Beerbower
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037
(202) 955-1500 – Tel.
(202) 778-2201 – Fax
jbeerbower@hunton.com

Ted Dane
Glenn Pomerantz
Gregory Sergi
Munger, Toiles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9288 – Tel.
(213) 683-4088 – Fax
ted.dane@mto.com
glenn.pomerantz@mto.com
gregory.sergi@mto.com

Kyle Mach
Joshua Patashnik
Munger, Toiles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000 – Tel.
(415) 512-4077 – Fax

kyle.mach@mto.com
josh.patashnik@mto.com

Richard A. Feinstein
Nicholas A. Widnell
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C. 20015
(202) 237-2727 – Tel.
(202) 237-6131 – Fax

*Attorneys for Plaintiff*

Marvin G. Pipkin
Kortney Kloppe-Orton
Pipkin Law
10001 Reunion Place, Suite 6400
San Antonio, TX 78216
(210) 731-6495 – Tel.
(210) 293-2139 - Fax

*Of Counsel*

/s/ Craig T. Merritt
Michael W. Smith (VSB #01125)
Craig T. Merritt (VSB #20281)
R. Braxton Hill, IV (VSB # 41539)
Harrison M. Gates (VSB #80385)
Christian & Barton, L.L.P.
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
(804) 697-4100 –  Tel.
(804) 697-4112 – Fax
msmith@cblaw.com
cmerritt@cblaw.com
bhill@cblaw.com
hgates@cblaw.com

Margaret M. Zwisler *(pro hac vice)*
Allyson M. Maltas (*pro hac vice*)
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C., 20004
(202) 637-2200 – Tel.
(202) 637-2201 – Fax
margaret.zwisler@lw.com
allyson.maltas@lw.com

Alfred C. Pfeiffer (*pro hac vice*)
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600 – Tel.
(415) 395-8095 – Fax
al.pfeiffer@lw.com

Lawrence E. Buterman *(pro hac vice)*
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200 – Tel.
(212) 751-3864 – Fax
lawrence.buterman@lw.com

*Attorneys for Defendant*