**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

FILED
SEP 13 2017
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

STEVES AND SONS, INC.,

    Plaintiff,

v.                      Civil Action No. 3:16cv545

JELD-WEN, INC.,

    Defendant.

### MEMORANDUM OPINION

This matter is before the Court on PLAINTIFF STEVES AND SONS, INC.'S MOTION TO DISMISS JELD-WEN INC.'S SECOND, SIXTH, AND SEVENTH COUNTERCLAIMS (ECF No. 267). For the reasons set forth below, the motion will be granted.

### BACKGROUND

On May 22, 2017, after the Court granted DEFENDANT JELD-WEN, INC.'S MOTION FOR LEAVE TO AMEND ANSWER TO ADD COUNTERCLAIMS AGAINST STEVES & SONS, INC. (ECF No. 101), JELD-WEN filed an Amended Answer and Counterclaims.[1] JELD-WEN asserts the following counterclaims: FIRST COUNTERCLAIM FOR RELIEF, Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836; SECOND COUNTERCLAIM FOR RELIEF, Conspiracy to Violate Defend

---

[1] DEFENDANT JELD-WEN INC.'S AMENDED ANSWER TO PLAINTIFF STEVES AND SONS, INC.'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, DAMAGES, AND SPECIFIC PERFORMANCE AND JELD-WEN'S COUNTERCLAIMS (ECF No. 252) (Under Seal).

Trade Secrets Act, 18 U.S.C. § 1832(a)(5); THIRD COUNTERCLAIM FOR RELIEF, Violation of the Texas Uniform Trade Secret Act, Texas Civil Practice & Remedies Code Annotated §§ 134A.001–134A.008; FOURTH COUNTERCLAIM FOR RELIEF, Tortious Interference with Contract Under Texas Common Law; FIFTH COUNTERCLAIM FOR RELIEF, Tortious Interference with Contract Under Texas Common Law; SIXTH COUNTERCLAIM FOR RELIEF, Breach of the Implied Covenant of Good Faith and Fair Dealing Under Delaware Law; and SEVENTH COUNTERCLAIM FOR RELIEF, Breach of Contract.

On June 19, 2017, Steves and Sons Inc. ("Steves") moved, under Fed. R. Civ. P. 12(b)(6) to dismiss the SECOND, SIXTH, and SEVENTH COUNTERCLAIMS.[2] The factual allegations pertaining to the three counterclaims challenged in the motion to dismiss are as follows and must be taken as true for purposes of this motion.

According to JELD-WEN, "John Pierce ('Pierce') is a former Senior Executive Vice President of defendant/counter-claimant JELD-WEN. Pierce worked for JELD-WEN from June 4, 1979 until June 29, 2012. In his role as Senior Executive Vice President, Pierce oversaw JELD-WEN's entire molded door skins operations." JELD-WEN'S COUNTERCLAIMS ("CC") ¶ 4 (ECF No. 252).

On January 1, 1988, Pierce and JELD-WEN entered into a Management Employment Contract which provided that Pierce would

---

[2] PLAINTIFF STEVES AND SONS, INC.'S MOTION TO DISMISS JELD-WEN, INC.'S SECOND, SIXTH, AND SEVENTH COUNTERCLAIMS (ECF No. 267).

2

be exposed to "matters of confidence relating to manufacturing processes, costs, customer information and pricing, JELD-WEN policies and procedures and financial data," which "JELD-WEN regards [as] confidential and in many cases as trade secrets." Id. ¶ 5. "On January 27, 2006, Pierce and JELD-WEN entered into a second Management Employment Contract." Id. ¶ 6. "During Pierce's employment at JELD-WEN, Steves purchased door skins from JELD-WEN. At various times during his employment, Pierce worked directly with Steves CEO Edward Steves and with other Steves employees regarding these purchases." Id. ¶ 8. "Pierce retired from JELD-WEN on June 29, 2012." Id. ¶ 9.

"On or before February 26, 2015, Steves contacted Pierce, with knowledge of Pierce's former position at JELD-WEN, and entered into an agreement with Pierce pursuant to which Pierce would by surreptitious means acquire JELD-WEN trade secrets and other confidential information relating to JELD-WEN's door and door skin businesses and deliver that information to Steves. Steves and Pierce signed a Mutual Confidentiality and Non-Disclosure Agreement on March 15, 2015." Id. ¶ 10. "Steves agreed to pay Pierce at the rate of $800 per day, plus travel expenses, to travel to JELD-WEN facilities and to communicate with JELD-WEN employees for the purpose of eliciting confidential information about JELD-WEN operations and passing that information to Steves. Pursuant to that agreement, Pierce

3

traveled to several JELD-WEN door skin plants and obtained trade secret and other confidential information from JELD-WEN employees." Id. ¶ 12. "Pierce acknowledged that he sold to Steves confidential financial information, and confidential information about primer costs, JELD-WEN's future plans for a primer facility in Towanda, and manufacturing process and plans for a new door adhesive, that Pierce learned through those trips." Id. ¶ 13. "The Steves brothers and Pierce discussed that Steves was buying confidential JELD-WEN information from Pierce" and "[o]n March 12, 2015, Pierce suggested to Edward and Sam Steves II that they keep Pierce's upcoming visit to Steves headquarters in San Antonio, Texas confidential." Id. ¶ 19.

Furthermore, says JELD-WEN, "John Ambruz is a former Executive Vice President of Corporate Development for defendant/counter-claimant JELD-WEN. Ambruz worked for JELD-WEN from April 16, 2012, until March 12, 2014." Id. ¶ 24. JELD-WEN also had an employment contract with Ambruz, beginning April 18, 2012, which indicated that Ambruz would be exposed to confidential matters. Id. ¶ 25. "After the termination of his employment with JELD-WEN, on April 21, 2014, Ambruz signed a declaration certifying that he had returned and delivered to JELD-WEN all materials embodying any confidential information," and "he acknowledged his ongoing duty to maintain as

confidential any confidential information he acquired during his employment." Id. ¶¶ 27-28.

"Following his departure from JELD-WEN, Ambruz started a consulting firm called Global Strategic Partners ('GSP')." Id. ¶ 29. "Steves retained Ambruz, through GSP, as a consultant on or around July 8, 2015. Steves admits that it retained Ambruz to help it evaluate the feasibility, logistics and economics of financing and developing its own molded door skin plant." Id. ¶ 30. "On information and belief, Steves provided to Ambruz confidential JELD-WEN information that JELD-WEN had provided to Steves pursuant to the confidentiality provisions of the parties' [Long Term] Supply Agreement." Id. ¶ 31.

JELD-WEN alleges that, "[o]n information and belief, Steves has planned to use, and will continue to use, JELD-WEN's trade secrets and confidential information to assess whether it is feasible for the company to develop a door skin manufacturing operation in direct competition with JELD-WEN. The information stolen from JELD-WEN provides Steves a roadmap to develop a door skin manufacturing operation." Id. ¶ 39.

These facts form the predicate for JELD-WEN's SECOND counterclaim and also are integral to JELD-WEN's SIXTH and

SEVENTH counterclaims.[3] The SIXTH and SEVENTH counterclaims purport to be based on contract provisions that will be discussed fully in considering whether those two counterclaims are subject to dismissal.

## ANALYSIS AND APPLICATION OF LAW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of a complaint. Jordan v. Alternative Resources Corp., 458 F.3d 332, 338 (4th Cir. 2006). When deciding a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in favor of the plaintiff." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009). While the court "will accept the pleader's description of what happened" and "any conclusions that can be reasonably drawn therefrom," the court "need not accept conclusory allegations encompassing the legal effects of the pleaded facts." **Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure** § 1357 (3d ed. 1998); Chamblee v. Old Dominion Sec. Co., L.L.C., No. 3:13CV820, 2014 WL 1415095, at *4 (E.D. Va. 2014). The court is not required to accept as true a legal conclusion unsupported by factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).

---

[3] The same facts are the predicate for JELD-WEN's FIRST, THIRD, FOURTH, and FIFTH counterclaims, none of which are the subject of Steve's motion to dismiss.

In the SECOND Counterclaim, JELD-WEN alleges that Steves combined and conspired with Pierce or Ambruz, or both, in violation of 18 U.S.C. § 1832(a)(5). CC ¶ 50. In the SIXTH Counterclaim, JELD-WEN alleges that Steves breached the implied covenant inherent in the parties Long Term Supply Agreement. "Steves [had] agreed to purchase 80% of its door skin requirements from JELD-WEN from January 1, 2012 through December 31, 2019." Id. ¶ 71. "By unlawfully stealing JELD-WEN's confidential and secret information in order to develop its own interior molded door skin manufacturing capability, Steves unreasonably deprived JELD-WEN of its expectation under the contract that Steves would purchase 'the maximum volume [of door skins] possible' from JELD-WEN for the duration of the contract." Id. ¶ 73. As to the SEVENTH Counterclaim for breach of contract, JELD-WEN alleges that "Steves breached the confidentiality provision of the [Long Term] Supply Agreement by providing JELD-WEN's commercially sensitive information to Ambruz without JELD-WEN's prior and express approval." Id. ¶ 77.

## A. SECOND COUNTERCLAIM: Conspiracy to Violate Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(5)

In the SECOND Counterclaim, JELD-WEN alleges that Steves combined and conspired with Pierce or Ambruz, or both, in violation of 18 U.S.C. § 1832(a)(5). Id. ¶ 50. Steves seeks dismissal because Section 1832 "does not establish a private

7

cause of action, and private citizens simply do not have the right to enforce criminal statutes." Opening Brief at 6. [4]

JELD-WEN argues that whether the amendment of the Espionage Act permits a private cause of action under 18 U.S.C. § 1832 is an issue of first impression, but that the statutory scheme supports its interpretation. According to JELD-WEN, under 18 U.S.C. § 1836(b)(2), an individual can apply for a civil seizure order, which may be entered if the applicant is likely to succeed in showing that the information is a trade secret, and the order can be directed against a person who "conspired to use improper means to misappropriate the trade secret of the application." And, according to JELD-WEN, "[h]ow would you get a civil seizure order based on the likelihood of success of showing a conspiracy if you didn't have a private right of conspiracy. It would make no sense otherwise." In other words, the SECOND counterclaim is based on the theory that Section 1836(b)(2) permits the inference that Section 1832(a)(5) creates a private right of action.

To assess that argument, it is appropriate briefly to examine the statutory scheme of the ECONOMIC ESPIONAGE ACT OF 1996, Title 18, Chapter 90, 18 U.S.C. §§ 1831-39 ("Chapter 90").

---

[4] STEVES AND SONS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS JELD-WEN, INC.'S SECOND, SIXTH, AND SEVENTH COUNTERCLAIMS (ECF No. 272) (Under Seal)("Opening Brief").

Chapter 90 proscribes economic espionage and theft of trade secrets as federal crimes and provides certain mechanisms to prosecute those crimes and to allow certain limited civil proceedings to help address those crimes. Section 1832(a), a part of Chapter 90, makes certain trade secret thefts punishable as federal crimes. Section 1832 does not provide for a private right of action to redress the trade secret thefts that it proscribes.

Both parties agree that Chapter 90 does provide a civil private right of action in Section 1836, which authorizes civil proceedings in two circumstances. First, Section 1836(a) allows the Attorney General to initiate "a civil action" to "obtain appropriate injunctive relief against any violation of this chapter [which includes Section 1832(a)]." That is quite clearly not a private right of action because only the Attorney General is given the right.

Second, effective May 2016, Congress enacted the Defend Trade Secrets Act ("DTSA"), which amended Chapter 90 by creating a private right of action for civil seizure of "property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action." 18 U.S.C. § 1836(b)(2)(A). Section 1836(b)(1) provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is

related to a product or service used in, or intended for use in, interstate or foreign commerce." "In a civil action brought under this subsection with respect to the misappropriation of a trade secret," the Court may award "damages for actual loss caused by the misappropriation of the trade secret," and "damages for any unjust enrichment caused by the misappropriation." 18 U.S.C. § 1836(b)(3)(B)

And, following the 2016 amendment, district courts have recognized a private right of action under 18 U.S.C. § 1836(b)(1). For instance, in Molon Motor & Coil Corp. v. Nidec Motor Corp., No. 16 C 03545, 2017 WL 1954531, at *1 (N.D. Ill. May 11, 2017), Molon sued Nidec Motor Corporation for, among other things, violation of the DTSA. The court held that: "[t]he D[TSA] allows '[a]n owner of a trade secret that is misappropriated . . . [to] bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.' 18 U.S.C. § 1836(b)(1)." See also Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp., No. CV 16-2499, 2017 WL 1105648, at *3 (E.D. Pa. Mar. 24, 2017) ("Brand's federal claims are under the recently enacted D[TSA], 18 U.S.C. § 1832, et seq."); Mission Measurement Corp. v. Blackbaud, Inc., 216 F. Supp. 3d 915, 920-22 (N.D. Ill. 2016) (finding that plaintiff had adequately pleaded claim under DTSA).

However, JELD-WEN has cited no decision holding that there is a private right of action under Section 1832(a). Rather, JELD-WEN takes the view that, by authorizing the civil seizure of property necessary to prevent the propagation or dissemination of trade secrets (the theft of which is prohibited by Section 1832(a)(5)), and by allowing a district court to award damages for actual loss (or unjust enrichment)[5] caused by misappropriation of those trade secrets, Section 1836(b) implicitly creates a private right of action, under Section 1832(a), for conspiracy to engage in the theft of trade secrets. And, for support of that view, JELD-WEN points to Section 1836(b)(2)(A)(IV)(bb)(BB), which provides that the order of seizure could be based, inter alia, on a finding that the applicant for the seizure order likely could show that the person who stole the trade secret "conspired to use improper means to misappropriate the trade secrets of the applicant."

JELD-WEN'S position presents a question of statutory interpretation. "When interpreting a statute, we begin with the statute's plain language". Sijapati v. Boente, 848 F.3d 210, 215 (4th Cir. 2017). "We are obliged to look at the statutory language as a whole, construing each section in harmony with every other part or section, because 'Act[s] of Congress . . .

---

[5] 18 U.S.C. § 1836(b)(3)(B).

should not be read as a series of unrelated and isolated provisions.'" Id. (quoting Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 570 (1995)).

Nowhere in Section 1832(a) does the statutory text mention a private right of action to redress violations of its prohibitory terms. Nor does the remedial section of Section 1832(a) permit the inference that a private civil action is to be implied in Section 1832(a). See 18 U.S.C. § 1832(a)(5) ("Whoever, with intent to convert a trade secret . . . conspires with one or more other persons to commit any offense. . . shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both."). Those penal remedies are drastically different than the civil remedies provided under Section 1836.

Where, as here, a criminal statute establishes what is a crime and specifies the punishment for committing the crime, it is not enforceable in a private civil action unless Congress specifically so provides. See Doe v. Broderick, 225 F.3d 440, 447-48 (4th Cir. 2000). That is because private citizens do not have the right to enforce federal criminal statutes absent specific authority from Congress. Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973); Lopez v. Robinson, 914 F.2d 486, 494 (4th Cir. 1990); Zegato Travel Solutions, LLC v. Bailey, No. TDC-14-3808, 2014 WL 7365807, at *2 (D. Md. Dec. 22, 2014). Thus, it is

unsurprising that, before the 2016 amendment to Chapter 90, courts rather uniformly held that Section 1832(a) does not provide a private right of action for redress of the criminal conduct that it prohibits. See, e.g., Super Chefs, Inc. v. Second Bite Foods, Inc., No. CV 15-00525, 2015 WL 12914330, at *4 (C.D. Cal. June 15, 2015); Auto-Opt Networks, Inc. v. GTL USA, Inc., No. 3:14-CV-1252, 2014 WL 2719219, at *10 (N.D. Tex. June 16, 2014); Anderson v. Google Inc., No. 12-cv-06573, 2013 WL 2468364, at *2 (N.D. Cal. June 7, 2013); Masoud v. Suliman, 816 F. Supp. 2d 77, 80 (D.D.C. 2011); Cooper Square Realty Inc. v. Jensen, No. 04 Civ. 01011(CSH), 2005 WL 53284, at *2 (S.D.N.Y. Jan. 10, 2005). Furthermore, even after the enactment of the DTSA, plaintiffs who asserted claims for trade secrets misappropriation under the DTSA have relied on state law to present conspiracy claims. That rather strongly suggests that the DTSA is not generally seen as creating a private right of action pertaining to all of the conduct prohibited by Section 1832(a). See, e.g., Kuryakyn Holdings, LLC v. Ciro, LLC, 242 F. Supp. 3d 789, 2017 WL 1026025, at *1, 5 (W.D. Wis. 2017); Neopart Transit, LLC v. Mgmt. Consulting, Inc., No. CV 16-3103, 2017 WL 714043, at *2 (E.D. Pa. Feb. 23, 2017); VBS Distribution, Inc. v. Nutivita Labs., Inc., No. SACV 16-01553-CJC(DFMx), 2016 WL 9024809, at *2 (C.D. Cal. Dec. 1, 2016).

Nor can Section 1836(b) be read to imply that a private right of action lies for redress of Section 1832. Although Section 1836 permits a limited right to bring private civil actions for limited purposes, the right is confined to a "civil action under this subsection." 18 U.S.C. § 1836(b)(2). That subsection is Section 1836(b), which is entitled "Private civil actions." The civil action permitted is the "Civil seizure" identified in Section 1836(b)(2) which allows a court to issue:

> an order providing for the seizure of property necessary to prevent the proposition or dissemination of the trade secret that is subject of the action.

Id. § 1836(b)(2)(A)(i). That is the only civil action permitted by Section 1836(b)(2), and that language does not impliedly provide a private right under Section 1832(a)(5).[6] Nor, contrary to JELD-WEN's view, can Section 1836(b)(2)(A)(IV)(bb)(BB) be reasonably read to create a private right of action. That subsection merely provides a way for seizure to occur if a person who stole the trade secret "conspired to use improper means" to do so. While that text makes it easier to secure a seizure order, it does not create a private right of action under Section 1832(a). To read that section to have such an

_____

[6] Although Sections 1836(b)(2)(B), (C), and (D) go on at length about the kind of seizure order that can be issued and the "elements" of that order, nowhere does Section 1836(b)(2) mention any other type of civil proceeding other than seizure.

14

effect is to place too great burden on the phrase "conspired to do so."

It also is significant that, in authorizing civil injunction actions by the Attorney General under Section 1836(a), Congress allowed such actions involving "any violation of this chapter," which of course includes Section 1832(a). On the other hand, Congress restricted private rights of action to the seizure order process specified in "this subsection," i.e., Section 1836(b)(2). Where, as here, Congress has made such a clear demarcation, it is not for the courts to change that line by implying what Congress did not see fit to provide. And, the Court declines JELD-WEN's invitation to amend Section 1836 by judicial gloss.

## B.   SIXTH COUNTERCLAIM: Breach of the Implied Covenant of Good Faith and Fair Dealing Under Delaware Law

Steves and JELD-WEN entered a Long Term Supply Agreement by which JELD-WEN was to supply, and Steves was to buy, doorskins. In its SIXTH counterclaim, JELD-WEN alleges that Steves breached the implied covenant of good faith and fair dealing that is implied in the Long Term Supply Agreement. It is settled that:

> Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract. As such, a party to a contract has made an implied covenant to interpret and to act reasonably upon contractual language that is on its face reasonable. This implied covenant is a judicial convention designed

to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain. It requires the Court to extrapolate the spirit of the agreement from its express terms and based on that "spirit," determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose. The Court then implies the extrapolated term into the express agreement as an implied covenant and treats its breach as a breach of the contract. The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract.

Chamison v. HealthTrust, Inc.--Hosp. Co., 735 A.2d 912, 920-21 (Del. Ch. 1999), aff'd sub nom. Healthtrust, Inc.-Hosp. Co. v. Chamison, 748 A.2d 407 (Del. 2000). "Moreover, rather than constituting a free floating duty imposed on a contracting party, the implied covenant can only be used conservatively 'to ensure the parties' "reasonable expectations" are fulfilled.'" Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 888 (Del. Ch. 2009). It is settled that: "'[i]n order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contract obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" Anderson v. Wachovia Mortgage Corp., 497 F. Supp. 2d 572, 581-82 (D. Del. 2007)

16

(quoting Fitzgerald v. Cantor, No. C.A. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

To assure that the implied covenant does not become a free floating duty, it is necessary to tether the covenant to a specific contract obligation, and, also "allege how the violation of that obligation denied the plaintiff the fruits of the contract." Kuroda, 971 A.2d at 888. Only if this linkage is pleaded will a complaint satisfy the first element of a claim for breach of the implied covenant of good faith and fair dealing.

In its SIXTH counterclaim, JELD-WEN seeks to satisfy the first element by alleging that:

> Steves [had] agreed to purchase 80% of its door skin requirements from JELD-WEN from January 1, 2012 through December 31, 2019. . . . By unlawfully stealing JELD-WEN's confidential and secret information in order to develop its own interior molded door skin manufacturing capability, Steves unreasonably deprived JELD-WEN of its expectation under the contract that Steves would purchase 'the maximum volume [of door skins] possible' from JELD-WEN for the duration of the contract.

CC ¶¶ 71-73 (second alteration in original). In other words, JELD-WEN's effort to plead the first element is the contention that Steves, by attempting to acquire (by way of the stolen trade secrets) the ability to make doorskins, deprived JELD-WEN of its contractual expectation (under Section 4 of the Long Term

Supply Agreement) that Steves would buy the majority (80%) of its doorskin requirements from JELD-WEN. The counterclaim puts it this way: the "intent and spirit" of the Long Term Supply Agreement was for Steves to purchase the "maximum volume possible" from JELD-WEN. Id. ¶ 73; see also Long Term Supply Agreement (ECF No. 5-1) ¶ 4.[7] At oral argument, JELD-WEN's counsel said that "maximum volume possible" meant 100%. August 9, 2017 Transcript (ECF No. 350) ("Aug. 9 Transcript") at 35:3-5. However, the contract contains no such provision.

To successfully plead a legally sufficient breach of implied covenant claim, JELD-WEN must identify specific contract obligations that provide, or from which it could plausibly be found, that, had the parties considered it, they would have agreed that Steves could not explore the option of developing an alternative source of supply: (1) for the 20% of its doorskin needs that, under the Long Term Supply Agreement, Steves was not required to buy from JELD-WEN; or (2) for the supply of doorskins after the expiration or termination of the Long Term Supply Agreement, or both. JELD-WEN makes no such allegation. In fact, the Long Term Supply Agreement demonstrates that no such allegation could have been made.

---

[7] The agreement was attached to the Complaint, there is no dispute as to its authenticity, and it is referred to and quoted in this counterclaim and the briefs. Anand v. Ocwen Loan Servicing LLC, 754 F.3d 195, 198 (4th Cir. 2014).

To begin, the agreement explicitly provides that Steves "has the right to purchase from other sources." Long Term Supply Agreement ¶ 4. And, the agreement clearly provides that Steves could buy 20% of its requirements from sources other than JELD-WEN. See id. These provisions foreclose a finding that the implied covenant of good faith and fair dealing requires Steves to purchase all of its requirements, or even the "maximum volume possible," from JELD-WEN.

Second, the contract allows JELD-WEN to terminate its obligation to sell doorskins to Steves. In fact, JELD-WEN exercised that right on September 10, 2014. Clearly, if Steves was to stay in business, it would have to have another source of doorskins and would be entitled to explore its options to that end. And, one of those options was to build its own plant to supply its own needs. The contract certainly does not provide otherwise.

To imply, under the guise of the covenant of good faith and fair dealing, an obligation that forecloses Steves from pursuing those options would write into the Long Term Supply Agreement terms that clearly are not there, and which the express terms of the Agreement do not at all indicate that the parties would have agreed to had they negotiated the issue. Indeed, the contract demonstrates that the parties agreed that Steves could pursue alternate sources of supply (above 20%, if JELD-WEN's price

exceeded specified levels and JELD-WEN declined to match the alternate purchase price), even if it would mean a plant to supply just those needs. See id. And, nothing in the Long Term Supply Agreement prohibits Steves from arranging alternate sources of supply that would be available if JELD-WEN exercised its right of termination.

In sum, the contract provision to which JELD-WEN's implied good faith and fair dealing claim is tethered simply provides no basis for animating the implied covenant of good faith and fair dealing, for it cannot be said that the purpose of Section 4 of the Long Term Supply Agreement is frustrated by the development of an alternate source of supply. Unless that can be said, it makes no difference how that alternate source was pursued.

Moreover, Section 4 does not address "how" Steves can develop an alternate source of supply, and to imply such a term would be to add a free floating duty that has no attachment to the contract. That, of course, would violate the fundamental precepts that, under Delaware law, restrict the application of the implied covenant of good faith and fair dealing.[8]

---

[8] The "how" theory (how Steves can develop an alternative supply source) is not pleaded in the SIXTH counterclaim. It first appeared in JELD-WEN's response brief as an argument of counsel. Thus, it really has no place in assessing whether the counterclaim can pass muster under Rule 12(b)(6). At oral argument, JELD-WEN took the view that it would amend to add its "how" theory. However, there has been no motion for leave to

JELD-WEN argues that, in Dieckman v. Regency GP LP, 155 A.3d 358 (2017), the Supreme Court of Delaware supplanted all its previous decisions respecting the implied covenant of good faith and fair dealing and that, thusly read, Dieckman compels the denial of Steves' motion to dismiss the SIXTH counterclaim.[9] A reading of Dieckman discloses that it does no such thing.

First, in Dieckman, the Supreme Court of Delaware did not say that it was jettisoning previously well-settled Delaware law, and surely the court would have said so if the Delaware law on this topic was, as JELD-WEN contends, "outdated." More importantly, the Supreme Court of Delaware actually recited those well-established principles (that JELD-WEN says are outdated) and decided the case by applying them to the Delaware Revised Uniform Partnership Act. See Dieckman, 155 A.3d at 366-68.

Second, Dieckman is not persuasive, much less controlling, here because the implied covenant claimed in that case was

---

amend. And, in any event, the theory would be futile for the reasons set forth above, so any such amendment would fail for futility. See Foman v. Davis, 371 U.S. 178, 182 (1962); Anand, 754 F.3d at 200 (proposed amendment fails for futility if it is "'clearly insufficient . . . on its face'" (quoting Johnson v. Oroweat Foods Co., 785 F.2d 503, 510 (4th Cir. 1986))).

[9] JELD-WEN called "outdated" the precedents cited previously in the opinion and relied on by Steves. JELD-WEN, INC.'S MEMORANDUM IN OPPOSITION TO STEVES AND SONS, INC.'S MOTION TO DISMISS JELD-WEN, INC.'S SECOND, SIXTH, AND SEVENTH COUNTERCLAIMS (ECF No. 282) (Under Seal) ("Response Brief") at 10.

specifically tethered to two contract provisions (the safe
harbor provision and the shareholder approval provision). And,
because of that tether, the implied covenant claim was found to
have been well-pleaded. See id. For the reasons set forth above,
JELD-WEN's pleaded tether (Section 4) simply cannot serve as the
predicate for the implied covenant claim that is presented in
the SIXTH counterclaim or for the related "how" theory newly
raised in JELD-WEN's response brief.

Finally, the SIXTH counterclaim, whether based on Section 4
or the related "how" theory, fails to satisfy the second and
third elements of a breach of a legally sufficient implied
covenant claim, for it does not plead (much less plausibly so) a
deprivation of JELD-WEN's reasonable expectation under Section 4
(i.e., a breach of Steves' implied obligation) or "resulting
damage to the plaintiff." Anderson, 497 F. Supp. 2d at 582
(internal quotations omitted). And, in fact, neither a
deprivation of reasonable expectation under Section 4 nor
resulting damage tethered to Section 4 (or the related "how"
theory) could be plausibly pleaded because there is no
allegation that Steves has ever purchased less than the quantity
of doorskins that it agreed to purchase under Section 4.

For the foregoing reasons, to the extent that the SIXTH
counterclaim is tethered to Section 4 (or the related "how"
theory), it fails as a matter of law.

In its response brief, JELD-WEN argues for the first time that its breach of the implied covenant of good faith and fair dealing claim is tethered to Section 21 of the Long Term Supply Agreement. Section 21 provides:

> The Parties agree that compliance with certain provisions of this Agreement may require good faith verification of certain facts, figures or other relevant matters by either or both of the Parties. This will include provisions in sections 4, 6, 8, 11 and 20 of this Agreement. The Parties agree that any such requested verification shall be by affidavit, subject to independent verification by the other Party. If, however, after such efforts further verification is requested by a Party (the "Requesting Party"), the other Party (the "Complying Party") agrees to make available to the Requesting Party at the expense of the Requesting Party, all such information, business records, data, and back-up documentation necessary for the Requesting Party to determine the Complying Party's compliance to secure the requested verification.

Long Term Supply Agreement ¶ 21. JELD-WEN's argument is that Steves hired a former JELD-WEN employee, Pierce, to obtain the so-called input costs that are used in verifying the cost component of JELD-WEN'S prices for doorskins sold to Steves under the Long Term Supply Agreement, thereby frustrating JELD-WEN's expectations under Section 21. As JELD-WEN's counsel put it at oral argument:

> Steves' theft of the input costs which is
> this John Pierce adventure, constitutes a
> breach of the implied covenant and that
> relates to [S]ection 21.
>
> * * *
>
> So, Steves hired John Pierce to get around
> the verification provision of [S]ection 21.
> And that frustrated J[ELD]-[WEN]'s
> reasonable expectation that if there was a
> problem with the key input cost, this is how
> it would be resolved.

Aug. 9 Transcript at 41:23-25, 42:21-25.

The first problem with this theory is that it is not pleaded in the SIXTH counterclaim. The Counterclaims do not mention Section 21 of the Long Term Supply Agreement anywhere. JELD-WEN, at oral argument, tried to relate this new theory to certain paragraphs in the Counterclaims, but those paragraphs simply do not connect Section 21 and the implied covenant of good faith and fair dealing.

The reason given by JELD-WEN at oral argument for that pleading deficiency is that the new theory is based on newly discovered information. But as Steves showed, the so-called new information is not new at all. Indeed, it has been known for many months.

In any event, JELD-WEN has not moved for leave to amend to add Section 21 as a contractual tether to its implied covenant claim. And, the mere assertion of a new theory in briefs or oral

argument does not serve as a motion for leave to amend.[10] See New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 295 n.8 (4th Cir. 2005).

More importantly, any amendment to add this new contractual tether would be futile because JELD-WEN cannot satisfy the third element of an implied covenant claim: the damage component. The brief (where the theory was first raised) asserted no damages and the oral argument confirmed that the alleged breach of Section 21 caused no cognizable damage.

At oral argument, JELD-WEN's counsel represented that its damages under the Section 21 theory are "litigation costs" in the form of "investment of management time in attempting to contest the evidence that Steves is putting forward on t[his] issue." Aug. 9 Transcript at 43:4-9, 45:6-8. JELD-WEN cites no authority that investment of management time is a recoverable damage in a case such as this. And, the Court could find no such authority.

In any event, JELD-WEN has not alleged, or even argued, how the fact that it has invested management time in the litigation has frustrated its legitimate expectations under Section 21. And, the Court cannot envision a plausible assertion of the

---

[10] Of course, the importance of such a motion is that it affords the opposing party an opportunity to oppose amendment. And, at this stage of this case, that is an important right.

frustration of those expectations. Without that critical underpinning in the SIXTH counterclaim's allegations, there is no claim for a breach of the implied covenant of good faith and fair dealing tethered to Section 21.

Finally, Steves is entitled to JELD-WEN's cost input data under the last sentence of Section 21. Thus, the putative claim under the new theory amounts, at best, to the contention that JELD-WEN's expectations as to the process provided in the first three sentences of Section 21 were frustrated when Steves got the information from Pierce instead of from JELD-WEN under the last sentence of Section 21. Even if that is so, JELD-WEN has not pointed to any damages it incurred, apart from its litigation costs which are not cognizable damages.

## C.   SEVENTH COUNTERCLAIM: Breach of Contract

Under Delaware law, a successfully pleaded breach of contract claim requires allegations of:   (1) the existence of the contract; (2) the breach of an obligation imposed by that contract; and (3) the resultant damage to the plaintiff. See VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003). And, in federal court, the pleading, here the SEVENTH Counterclaim, must satisfy the requirements of Twombly and Iqbal. See Iqbal, 556 U.S. at 677-79.

26

The contractual provision that was allegedly breached was Section 22 of the Long Term Supply Agreement, which provides that:

> The Parties recognize that information has passed or will pass between them that is not in the public domain and that such information may be designated by either Party . . . as commercially sensitive. Upon receipt of such designation, the receiving Party will not communicate such commercially sensitive information to anyone without the prior and express approval of the designating Party.

The SEVENTH counterclaim alleges that "Steves breached the confidentiality provision of the [Long Term] Supply Agreement by providing JELD-WEN's commercially sensitive information to Ambruz without JELD-WEN's prior and express approval." CC ¶ 77.

Notably, there is nothing in the SEVENTH counterclaim that identifies the allegedly "commercially sensitive information" that Steves supposedly provided to Ambruz. And, in its opening brief, Steves acknowledged just that—"[i]t is unclear which factual allegations are intended to support JELD-WEN's Seventh Counterclaim."[11] Opening Brief at 14. For that reason, Steves rightly argued the SEVENTH counterclaim failed to satisfy the

---

[11] On April 27, 2017, JELD-WEN's counsel argued that the SEVENTH counterclaim alleges that "Steves gave our contract and schedules to Mr. Ambruz and Mr. Pierce." April 17, 2017 Transcript (ECF No. 208) at 83:7-8. However, counsel admitted that counterclaim "doesn't describe that specifically." Id. at 8-9. And, indeed, it does not.

pleading principles set by <u>Twombly</u> and <u>Iqbal</u>. Thus, the SEVENTH counterclaim fails for the reason that it is conclusory and alleges no factually plausible claim for breach of contract. <u>See</u> <u>Iqbal</u>, 556 U.S. at 678-79.

In its opening brief, Steves nonetheless sought to discern from the allegation of the counterclaim, as a whole, what JELD-WEN intended. That effort reasonably led Steves to paragraph 31 of the Counterclaims, in which JELD-WEN alleged that: "Steves provided to Ambruz confidential JELD-WEN information that JELD-WEN had provided to Steves pursuant to the confidentiality provisions [Section 22] of the" Long Term Supply Agreement. CC ¶ 31. In the next two paragraphs, JELD-WEN amplified what was alleged in paragraph 31. Indeed, those paragraphs specifically identify the information that allegedly was provided by Steves to Ambruz. Specifically, it is alleged that:

> 32. During Ambruz's tenure at JELD-WEN, the Antitrust Division of the Department of Justice conducted an investigation into JELD-WEN's potential acquisition of CraftMaster, Inc. Ambruz, who was a JELD-WEN employee in 2012, ws copied on a JELD-WEN confidential communication to the Antitrust Division enclosing a report entitled 'Proposal for Expansion of Molded Skin Production Capacity Submitted by John Pierce, 1 May 2006' because he was assisting O'Melveny & Myers, JELD-WEN's lawyers at the time, in responding to the Antitrust Division's investigation. That report included JELD-WEN trade secrets and confidential information about its

manufacturing capacity and processes for door skins.

33. On July 20, 2016, Sam Steves II's assistant, Leticia Villareal, sent a copy of the report to Ambruz. The copy of the report sent by Villareal, on behalf of Sam Steves II, to Ambruz included marginal handwritten questions regarding information in the report. Steves had no proper or legal means by which to obtain a copy of the JELD-WEN report and on information and belief, the report was delivered to Steves by Ambruz.

However, as Steves accurately points out, there is no allegation that the 2006 Report, the information allegedly given by Steves to Ambruz, was ever passed to Steves by JELD-WEN. At oral argument, counsel for JELD-WEN addressed that point, saying that:

Ambruz had a copy of the [2006] report in his basement at home. He brought it to [Steves in] San Antonio. He had Villareal . . . . scan it, and e-mail it back to him, and he left a copy with Sam Steves . . . .

Aug. 9 Transcript at 53:18-22. In other words, according to JELD-WEN, Steves got the 2006 Report from Ambruz. Id. at 53:11-54:8. Quite clearly, that scenario alleges no breach of Section 22.

In its response brief, JELD-WEN argued that the SEVENTH counterclaim is not tethered to paragraphs 31-33, involving the 2006 report. Instead, says JELD-WEN, what was passed by Steves

to Ambruz was JELD-WEN "prices" and "capacity utilization."
Response Brief at 17; Aug. 9 Transcript at 54:10-13. At oral
argument, JELD-WEN's counsel acknowledged that, although the
SEVENTH counterclaim depends on paragraph 31, the pleading "does
[not] say that," and offered to "amend [it] to say that." Aug. 9
Transcript at 57:13-15.

That offer must be viewed in perspective of JELD-WEN's
acknowledgement that the SEVENTH counterclaim, as it would be
amended, is "that what Steves did is provide[] Ambruz with the
information that John Pierce stole." Id. at 51:20-22. And, the
information allegedly stolen by Pierce was the "pricing
schedules and products specific schedules." Id. at 51:11-12. In
other words, the allegedly confidential documents that were
passed by Steves to Ambruz were not passed by JELD-WEN to Steves
and thus did not fall within the scope of the clear text of
Section 22 of the Long Term Supply Agreement. Accordingly, the
proposed amendment would be futile. See Anand, 754 F.3d at 200.

Of course, if what JELD-WEN says is correct, and it can
prove that Pierce gave Steves trade secrets and that Steves gave
them to Ambruz, JELD-WEN can present that evidence in the trial
of the trade secrets case. What JELD-WEN cannot do is assert a
trade secrets claim in the garb of a breach of contract claim.
The SEVENTH counterclaim is legally insufficient and the

insufficiency cannot be cured by amendment. It will be dismissed.

## CONCLUSION

For the foregoing reasons, PLAINTIFF STEVES AND SONS, INC.'S MOTION TO DISMISS JELD-WEN INC.'S SECOND, SIXTH, AND SEVENTH COUNTERCLAIMS (ECF No. 267) will be granted, and JELD-WEN's SECOND, SIXTH and SEVENTH counterclaims will be dismissed with prejudice.

It is so ORDERED.

/s/     REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September 13, 2017