# EXHIBIT A

**EXHIBIT A: STEVES' PROPOSED JURY INSTRUCTIONS**

**TABLE OF CONTENTS**

**Page**

I.    GENERAL INSTRUCTIONS AT BEGINNING OF TRIAL..............................................1

    Ins. No. 1 – Opening Instructions ..........................................................................1

    Ins. No. 2 – Order of Trial ......................................................................................4

    Ins. No. 3 – Province of Judge and Jury ................................................................5

    Ins. No. 4 – Judge's Questions of Witnesses .........................................................6

    Ins. No. 5 – Bench Conferences..............................................................................7

    Ins. No. 6 – Evidence in the Case ...........................................................................8

II.   GENERAL INSTRUCTIONS AT END OF TRIAL........................................................10

    Ins. No. 7 – Province of the Court ........................................................................10

    Ins. No. 8 – Province of the Jury ..........................................................................11

    Ins. No. 9 – All Persons Equal Before the Law ...................................................12

    Ins. No. 10 – Judging the Evidence .....................................................................13

    Ins. No. 11 – Objections and Rulings ..................................................................14

    Ins. No. 12 – Court's Comments to Counsel .......................................................15

    Ins. No. 13 – Court's Questions to Witness.........................................................16

    Ins. No. 14 – Evidence in Case – Stipulations – Judicial Notice –
    Inferences Permitted ............................................................................................17

    Ins. No. 15 – Use of Depositions as Evidence .....................................................18

    Ins. No. 16 – Inferences from the Evidence.........................................................19

    Ins. No. 17 – Circumstantial Evidence ...............................................................20

    Ins. No. 18 – Consideration of the Evidence – Corporate Party's Agents
    and Employees......................................................................................................21

    Ins. No. 19 – Jury's Recollection Controls.........................................................22

Ins. No. 20 – Credibility of Witnesses – Discrepancies in Testimony .................23

Ins. No. 21 – Credibility of Witnesses – Inconsistent Statement .........................24

Ins. No. 22 – Opinion Evidence – The Expert Witness ........................................25

Ins. No. 23 – Opinion of Non-Expert ...................................................................26

Ins. No. 24 – Number of Witnesses ......................................................................27

III.     OVERVIEW OF CLAIMS ..............................................................................28

Ins. No. 25 – Multiple Claims ..............................................................................28

Ins. No. 26 – List of Claims .................................................................................29

Ins. No. 27 – Burden of Proof ..............................................................................30

IV.     CLAYTON ACT CLAIM – COUNT 1 ...........................................................31

Ins. No. 28 – Overview ........................................................................................31

Ins. No. 29 – Private Party Section 7 Claim .........................................................32

Ins. No. 30 [ALTERNATIVE VERSION 1] – Elements of a Clayton Act
Claim....................................................................................................................33

Ins. No. 30 [ALTERNATIVE VERSION 2] – Elements of a Clayton Act
Claim....................................................................................................................34

Ins. No. 31 – Market Definition............................................................................35

Ins. No. 32 – Expert Testimony Regarding Market Definition .............................36

Ins. No. 33 – Relevant Product Market.................................................................37

Ins. No. 34 – Relevant Geographic Market ..........................................................39

Ins. No. 35 – Parties' Contentions Regarding Relevant Market............................40

Ins. No. 36 – Lessening of Competition Overview ...............................................41

Ins. No. 37 – Unilateral Effects ...........................................................................42

Ins. No. 38 – Coordinated Effects.........................................................................43

Ins. No. 39 – Weight Of Post-Challenge Conduct By JELD-WEN .....................44

Ins. No. 40 – Failing Firm....................................................................................45

Ins. No. 41 – Present And Future Anticompetitive Effects ...................................46

Ins. No. 42 – Burden-Shifting Approach ...............................................................47

Ins. No. 43 – Burden-Shifting, Step 1:  Steves' Initial Showing.........................49

Ins. No. 44 – Burden-Shifting, Step 2:  JELD-WEN's Rebuttal ..........................52

Ins. No. 45 – Burden-Shifting, Step 3:  Weighing The Evidence.........................53

Ins. No. 46 – Ease Of Entry ..................................................................................54

Ins. No. 47 – Definition Of Timely.......................................................................56

Ins. No. 48 – Definition Of Likely........................................................................57

Ins. No. 49 – Definition of "Sufficient In Its Magnitude, Character, And
Scope To Counteract A Merger's Anticompetitive Effects..................................58

Ins. No. 50 – Injury And Causation ......................................................................59

Ins. No. 51 – Breach Of Contract And/Or Warranty And Antitrust Injury ..........61

Ins. No. 52 – Damages...........................................................................................62

Ins. No. 53 – Double Recovery Not The Province Of The Jury ...........................64

Ins. No. 54 – No Offsetting Of Damages...............................................................65

Ins. No. 55 – Basis For Calculating Damages .......................................................66

Ins. No. 56 – Speculation About Other Forms Of Relief......................................67

Ins. No. 57 – Future Lost Profits...........................................................................68

Ins. No. 58 – Timeliness Of Lawsuit ....................................................................70

V.      BREACH OF CONTRACT AND WARRANTY – COUNTS 2 AND 3 .......................71

Ins. No. 59 – Contract ...........................................................................................71

Ins. No. 60 – Breach of Contract Defined .............................................................72

Ins. No. 61 – Stipulation Regarding Existence And Validity Of Supply
Agreement...............................................................................................................73

Ins. No. 62 – Express Warranty .............................................................................74

Ins. No. 63 – Implied Warranty of Merchantability ..............................................75

Ins. No. 64 – Damages – Breach of Contract Or Warranty – General .................76

Ins. No. 65 – Steves and Sons' Breach Of Contract Claims.................................77

Ins. No. 66 – Steves and Sons' Breach Of Warranty Claims ...............................79

## I.   GENERAL INSTRUCTIONS AT BEGINNING OF TRIAL

### Ins. No. 1 – Opening Instructions

Members of the jury, we are about to begin the trial.  Before the trial begins, I am going to give you instructions that will help you to understand what will be presented to you and how you should conduct yourself during the trial.

During the trial you will hear me use a few terms that you may not have heard before. Let me briefly explain some of the most common to you.  The party who files an action is called the plaintiff.  The plaintiff in this action is Steves and Sons, Inc.  The party against whom the action is filed is called the defendant.  The defendant in this action is JELD-WEN, Inc.

You will sometimes hear me refer to "counsel."  "Counsel" is another way of saying "lawyer" or "attorney."  I will sometimes refer to myself as the "Court."

When I "sustain" an objection, I am excluding that evidence from this trial for a good reason.  When you hear that I have "overruled" an objection, I am permitting that evidence to be admitted.

When I say "admitted into evidence" or "received in to evidence," I mean that the particular statement or the particular exhibit may be considered by you in making the decisions you must make at the end of the case.

By your verdict, you will decide disputed issues of fact.  I will decide all questions of law that arise during the trial.  Before you begin your deliberation at the close of the case, I will instruct you in more detail on the law that you must follow and apply.

Because you will be asked to decide the facts of this case, you should give careful attention to the testimony and evidence presented.  Keep in mind that I will instruct you at the end of the trial about determining the credibility or "believability" of the witnesses.  During the trial, you should keep an open mind and should not form or express any opinion about the case

1

until you have heard all of the testimony and evidence, the lawyers' closing arguments and my instructions to you on the law.

While the trial is in progress, you must not discuss the case in any manner among yourselves or with anyone else.  In addition, you should not permit anyone to discuss the case in your presence.  You should avoid reading any news articles that might be published about the case.  You should also avoid watching or listening to any television or radio comments about the trial.

From time-to-time during the trial, I may make rulings on objections or motions made by the lawyers.  It is a lawyer's duty to object when the other side offers testimony or other evidence that the lawyer believes is not admissible.  You should not be unfair or partial against a lawyer or the lawyer's client because the lawyer has made objections.  If I sustain or uphold an objection to a question that goes unanswered by the witness, you should not draw any inferences or conclusions from the question.  You should not infer or conclude from any ruling or other comment I may make that I have any opinions on the merits of the case favoring one side or the other.  I do not favor one side or the other.

The trial lawyers are not allowed to speak with you during this case.  When you see them at a recess or pass them in the halls and they do not speak to you, they are not being rude or unfriendly; they are simply following the law.

During the trial, it may be necessary for me to talk with the lawyers out of your hearing about questions of law or procedure.  Sometimes, you may be excused from the courtroom during these discussions.  I will try to limit these interruptions as much as possible, but you

should remember the importance of the matter you are here to determine and should be patient even though the case may seem to go slowly.[1]

---

[1] 3 Kevin F. O'Malley, Ja E. Grenig, & Hon. William C. Lee, *Federal Jury Practice & Instructions (Fed. Jury Prac. & Instr.),* § 101.01 (5th Ed. 2000).

**Ins. No. 2 – Order of Trial**

The case will proceed as follows:

First, the lawyers for each side may make opening statements.  What is said in the opening statements is not evidence, but is simply an outline to help you understand what each party expects the evidence to show.  A party is not required to make an opening statement.

After the opening statements, the plaintiffs, Steves and Sons, will present evidence in support of their claims, and the defendant's lawyers may cross-examine the witnesses.  At the conclusion of Steves and Sons' case, the defendant may introduce evidence, and Steves and Sons' lawyers may cross-examine the witnesses.  The defendant is not required to introduce any evidence or to call any witnesses to contradict the plaintiff's claims.  If the defendant introduces evidence to contradict Steves and Sons' claims, Steves and Sons may then present rebuttal evidence.

After the evidence is presented, the parties' lawyers will make closing arguments explaining what they believe the evidence has shown.  What is said in the closing arguments is not evidence.

Finally, I will instruct you on the law that you are to apply in reaching your verdict.  You will then decide the case.[2]

---

[2] 3 *Fed. Jury Prac. & Instr.,* § 101.02 (5th Ed. 2000).

**Ins. No. 3 – Province of Judge and Jury**

After all of the evidence has been heard, and arguments and instructions are finished, you will meet to make your decision.  You will determine the facts from all of the testimony and other evidence that is presented.  You are the sole and exclusive judge of the facts, and you should determine for yourself the weight of the evidence.

Your job is to determine the facts, not the law.  Consequently, you are required to accept the rules of law that I give you, whether or not you agree with them.[3]

---

[3] 3 *Fed. Jury Prac. & Instr.,* § 101.10 (5th Ed. 2000).

**Ins. No. 4 – Judge's Questions of Witnesses**

During the trial, I may sometimes ask a witness questions.  Please do not assume that I have any opinions about the subject matter of my questions.[4]

---

[4] 3 *Fed. Jury Prac. & Instr.,* § 101.30 (5th Ed. 2000).

**Ins. No. 5 – Bench Conferences**

From time to time, it may be necessary for me to talk to the lawyers out of your hearing. The purpose of these conferences is to decide how certain matters are to be treated under the rules of evidence.  The lawyers and I will do what we can to limit the number and length of these conferences.[5]

---

[5] 3 *Fed. Jury Prac. & Instr.,* § 101.31 (5th Ed. 2000).

**Ins. No. 6 – Evidence in the Case**

The evidence in the case will consist of the following:

1.      The sworn testimony of the witnesses, no matter who called a witness.

2.      All exhibits received in evidence, regardless of who may have produced the exhibits.

3.      All facts that I tell you that you must take as true for purposes of this case.

Depositions may also be received in evidence.  Depositions contain sworn testimony, with the lawyers for each party being entitled to ask questions.  In some cases, a deposition may be played for you on videotape.  Deposition testimony may be accepted by you, subject to the same instructions that apply to witnesses testifying in open court.

Statements and arguments of the lawyers are not evidence in the case, unless made as an admission or stipulation of fact.  A "stipulation" is an agreement between both sides that certain facts are true or that a person would have given certain testimony.  When the lawyers on both sides stipulate or agree to the existence of a fact, you must, unless otherwise instructed, accept the stipulation as evidence, and regard that fact as proved.

I may take judicial notice of certain facts or events.  When I declare that I will take judicial notice of some fact or event, you must accept that fact as true.

If I sustain an objection to any evidence or if I order evidence stricken, that evidence must be entirely ignored.

Some evidence is admitted for a limited purpose only.  When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other purpose.

You are to consider only the evidence in the case.  But in your consideration of the evidence you are not limited to the statements of the witness.  In other words, you are not limited

8

solely to what you see and hear as the witnesses testify.  You may draw from the facts that you find have been proved such reasonable inferences or conclusions as you feel are justified in light of your experience.

At the end of the trial you will have to make your decision based on what you recall of the evidence.  You will not have a written transcript to consult, and it is difficult and time consuming for the reporter to read back lengthy testimony.  I urge you to pay close attention to the testimony as it is given.[6]

---

[6] 3 *Fed. Jury Prac. & Instr.,* § 101.40 (5th Ed. 2001).

## II.      GENERAL INSTRUCTIONS AT END OF TRIAL

### Ins. No. 7 – Province of the Court

Members of the Jury:

Now that you have heard the evidence and the argument, it becomes my duty to give you instructions regarding the law applicable to this case.

It is your duty as jurors to follow the law as stated in the instructions, and to apply the rules of law in these instructions to the facts as you find them from the evidence in the case.

Counsel have quite properly referred to some of the governing rules of law in their arguments.  If, however, any difference appears to you between the law as stated by counsel and that stated by the Court in these instructions, you of course are to be governed by the Court's instructions.

You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole.

Neither are you to be concerned with the wisdom of any rule of law stated in these instructions.  Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any view of the law other than that given in these instructions; just as it would be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything but the evidence in the case.[7]

---

[7] 3 Devitt, Blackmar & Wolff, *Federal Jury Practice and Instructions*, § 71.01 (4th ed. 1987).

**Ins. No. 8 – Province of the Jury**

You are to perform this duty without bias or prejudice against any party.  The law does not permit jurors to be governed by sympathy, prejudice, or public opinion.  The parties and the public expect that you will carefully and impartially consider all the evidence in the case, follow the law as stated by the Court and reach a just verdict, regardless of the consequences.[8]

---

[8] 3 Devitt, Blackmar & Wolff, *Federal Jury Practice and Instructions*, § 71.01 (4th ed. 1987).

**Ins. No. 9 – All Persons Equal Before the Law**

This case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth, and holding the same or similar stations of life. A corporation is entitled to the same fair trial at your hands as is a private individual. All persons, including corporations, stand equal before the law, and are to be treated as equals.[9]

---

[9] 3 Devitt, Blackmar & Wolff, *Federal Jury Practice and Instructions*, § 71.04 (4th ed. 1987).

**Ins. No. 10 – Judging the Evidence**

There is nothing particularly different in the way that a juror should consider the evidence in a trial from that in which any reasonable and careful person would treat any very important question that must be resolved by examining facts, opinions, and evidence.  You are expected to use your good sense in considering and evaluating the evidence in the case for only those purposes for which it has been received and to give such evidence a reasonable and fair construction in the light of your common knowledge of the natural tendencies and inclinations of human beings.[10]

---

[10] 1 Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 12.02 (4th ed. 1992).

### Ins. No. 11 – Objections and Rulings

It is the sworn duty of the attorney on each side of a case to object when the other side offers testimony or exhibits which that attorney believes is not properly admissible.  Only by raising an objection can a lawyer request and obtain a ruling from the court on the admissibility of the evidence being offered by the other side.  You should not be influenced against an attorney or his or her client because the attorney has made objections.

Do not attempt, moreover, to interpret my rulings on objections as somehow indicating to you what I believe the outcome of the case should be.[11]

---

[11] 1 Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 11.03 (4th ed. 1992).

14

**Ins. No. 12 – Court's Comments to Counsel**

It is the duty of the court to admonish an attorney who, out of zeal for his or her cause, does something which the court feels is not in keeping with the rules of evidence or procedure.

You are to draw absolutely no inference against the side to whom an admonition of the court may have been addressed during the trial of this case.[12]

---

[12] 1 Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 11.04 (4th ed. 1992).

**Ins. No. 13 – Court's Questions to Witness**

During the course of a trial, I have occasionally asked questions of a witness.  Do not assume that I hold any opinion on the matters to which my questions related.  The court may ask a question simply to clarify a matter – not to help one side of the case or hurt another side.[13]

---

[13] 1 Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 11.05 (4th ed. 1992).

**Ins. No. 14 – Evidence in Case – Stipulations – Judicial Notice – Inferences Permitted**

The evidence in the case consists of the sworn testimony of the witnesses, regardless of who may have called them; and all exhibits received in evidence, regardless of who may have produced them; and all facts which have been admitted or stipulated; and all facts and events which may have been judicially noticed.

When the attorneys on both sides stipulate or agree as to the existence of a fact, however, you must, unless otherwise instructed, accept the stipulation as evidence, and regard that fact as proved.

The court may take judicial notice of certain facts or events.  When the court declares it will take judicial notice of some fact or event, you may accept that court's declaration as evidence, and regard as proved the fact or event which has been judicially noticed, but you are not required to do so since you are the sole judge of the facts.

Statements, arguments, questions and objections of counsel are not evidence in the case.  Any evidence as to which an objection was sustained by the court, and any evidence ordered stricken by the court, must be entirely disregarded.

Anything you may have seen or heard outside the courtroom is not evidence, and must be entirely disregarded.

You are to consider only the evidence in the case.  But in your consideration of the evidence, you are not limited to the bald statements of the witnesses.  In other words, you are not limited solely to what you see and hear as the witnesses testify.  You are permitted to draw, from facts which you find have been proved, such reasonable inferences as you feel are justified in the light of experience.[14]

---

[14] 1 Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 11.11 (3rd ed. 1977), and 3 Devitt, Blackmar & Wolff, *Federal Jury Practice and Instructions*, § 71.08 (4th ed. 1987).

17

**Ins. No. 15 – Use of Depositions as Evidence**

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by one or more of the attorneys for the parties to the case.  Such testimony is entitled to the same consideration and is to be judged as to credibility, and weighed, and otherwise considered by you, insofar as possible, in the same way as if the witness had been present and had testified from the witness stand.[15]

---

[15] 31 *Fed. Jury Prac. & Instr.,* § 105.02 (5th Ed. 2001)(modified).

**Ins. No. 16 – Inferences from the Evidence**

Inferences are simply deductions or conclusions which reason and common sense lead the jury to draw from the evidence received in the case.[16]

---

[16] 1 Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 12.05 (4th ed. 1992).

**Ins. No. 17 – Circumstantial Evidence**

There are two types of evidence from which you may find the truth as to the facts of a case — direct and circumstantial evidence.  Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness; circumstantial evidence is proof of a chain of facts and circumstances indicating a fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  Nor is a greater degree of certainty required of circumstantial evidence in the case.[17]

---

[17] 1 Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 15.02 (3rd ed. 1977).

**Ins. No. 18 – Consideration of the Evidence – Corporate Party's Agents and Employees**

When a corporation is involved, of course, it may act only through natural persons as its agents or employees, and, in general, any agent or employee of a corporation may bind the corporation by his acts and declarations made while acting within the scope of his authority delegated to him by the corporation, or within the scope of his duties as an employee of the corporation.[18]

---

[18] 3 Devitt, Blackmar & Wolff, *Federal Jury Practice and Instructions*, § 71.09 (4th ed. 1987).

**Ins. No. 19 – Jury's Recollection Controls**

If any reference by the court or by counsel to matters of evidence does not coincide with

your own recollection, it is your recollection which should control during your deliberations.[19]

---

[19] Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 15.05 (1977).

**Ins. No. 20 – Credibility of Witnesses – Discrepancies in Testimony**

You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves.

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief.  Consider each witness's intelligence, motive and state of mind, and demeanor and manner while on the stand.  Consider the witness's ability to observe the matters as to which he or she has testified, and whether the witness impresses you as having an accurate recollection of these matters.  Consider also any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause the jury to discredit such testimony.  Two or more persons witnessing an incident or a transaction may see or hear it differently; and innocent misrecollection, like failure of recollection, is not an uncommon experience.  In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

After making your own judgment, you will give the testimony of each witness such credibility, if any, as you may think it deserves.[20]

---

[20] 1 Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 17.01 (3rd ed. 1977).

**Ins. No. 21 – Credibility of Witnesses – Inconsistent Statement**

The testimony of a witness may be discredited or, as we sometimes say, impeached by showing that he or she previously made statements which are different than or inconsistent with his or her testimony here in court.  The earlier inconsistent or contradictory statements of a witness not a party to the action are admissible only to discredit or impeach the credibility of the witness and not to establish the truth of these earlier statements made somewhere other than here during this trial.  It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has made prior inconsistent or contradictory statements.

Where, however, the witness is a party to the case, and by such statement, or other conduct, admits some fact or facts, then such statement or other conduct, if knowingly made or done, may be considered as evidence of the truth of the fact or facts so admitted by such party, as well as for the purpose of judging the credibility of the party as a witness.

### Ins. No. 22 – Opinion Evidence – The Expert Witness

The rules of evidence ordinarily do not permit witnesses to testify as to their own opinions or their own conclusions about issues in the case.  An exception to this rule exists as to those witnesses who are described as "expert witnesses".  An "expert witness" is someone who, by education or by experience, may have become knowledgeable in some technical, scientific, or very specialized area.  If such knowledge or experience may be of assistance to you in understanding some of the evidence or in determining a fact, an "expert witness" in that area may state an opinion as to relevant and material matter in which he or she claims to be an expert.

You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. You should consider the testimony of expert witnesses just as you consider other evidence in this case. If you should decide that the opinion of an expert witness is not based upon sufficient education or experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you should conclude that the opinion is outweighed by other evidence, including that of other expert witnesses, you may disregard the opinion in part or in its entirety. As I have told you several times, you – the jury – are the sole judges of the facts of this case.[21]

---

[21] 1 Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 14.01 (4th ed. 1992).

**Ins. No. 23 – Opinion of Non-Expert**

A non-expert witness may also give an opinion if it is based on his or her personal knowledge and is rationally based on his or her perception.  If you find that an opinion of a non-expert witness is based on personal knowledge and is rationally based on the witness' perception, you may consider it and give it such weight as you consider appropriate.

**Ins. No. 24 – Number of Witnesses**

The weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or nonexistence of any fact. You may find that the testimony of a small number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

The test is not which side brings the greater number of witnesses or takes the most time to present its evidence, but which witnesses and which evidence appeal to your minds as being most accurate and otherwise trustworthy.[22]

---

[22] 3A *Fed. Jury Prac. & Instr.,* § 104.54 (5th Ed. 2001)(modified).

III.    **OVERVIEW OF CLAIMS**

**Ins. No. 25 – Multiple Claims**

Steves and Sons has alleged several claims in this lawsuit.  You must consider each claim separately based on the evidence and the instructions that I give you on each claim.

**Ins. No. 26 – List of Claims**

You must resolve the following claims that Steves and Sons brings in this lawsuit:

- Count 1:        Violation of Section 7 of the Clayton Act;

- Count 2:        Breach of Contract;

- Count 3:        Breach of Warranty;

**Ins. No. 27 – Burden of Proof**

Steves and Sons has the burden of proof in this case by a preponderance of the evidence, with the exception discussed in the next paragraph.   Proof by a preponderance of the evidence means proof that something is more likely than not.   It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not.   If the evidence on any particular point is evenly balanced, the party having the burden of proof has not proved that point by a preponderance of the evidence, and you must find against the party on that point.

While Steves has the burden of proof in this case by a preponderance of the evidence, on certain issues pertaining to Steves' antitrust claim, the burden may be on JELD-WEN to rebut Steves' showing or establish that one or more defenses applies in this case.   In my instructions to you regarding Steves' antitrust claim, I will tell you when JELD-WEN bears this burden.

In deciding whether any fact has been proved by a preponderance of the evidence, you may, unless I tell you otherwise, consider the testimony of all witnesses regardless of who called them, and all exhibits received into evidence regardless of who produced them.[23]

---

[23] Del. P.J.I. Civ. § 4.1 (2000) (citing *Reynolds v. Reynolds*, Del. Supr., 237 A.2d 708, 711 (1967)(defining preponderance of the evidence); *McCartney v. Peoples Ry. Co.*, Del. Super., 78 A. 771, 772 (1911)(same); *Oberly v. Howard Hughes Medical Inst.*, Del. Ch., 472 A.2d 366, 390 (1984)(same).  *See also* 3 Devitt & Blackmar, Federal Jury Practice and Instructions, §72.01 (4th ed. 1987)).

## IV.    CLAYTON ACT CLAIM – COUNT 1

### Ins. No. 28 – Overview

In Count 1, Plaintiff Steves & Sons alleges that Defendant JELD-WEN's acquisition of Craftmaster Manufacturing (also sometimes described as "the merger") violated Section 7 of the Clayton Antitrust Act of 1914 (which we will just call the "Clayton Act").   JELD-WEN denies this allegation.

Section 7 of the Clayton Act prohibits one company from acquiring or merging with a second company if that merger or acquisition is likely to substantially lessen competition or tend to create a monopoly.   The Clayton Act is concerned about the lessening of competition because our antitrust laws generally presume that customers benefit from having competition so they can choose from among multiple suppliers seeking to obtain their business.[24]

---

[24] 15 U.S.C. § 18; Horizontal Merger Guidelines § 1; ABA Model Jury Instructions in Civil Antitrust Cases (2016), at 5; *Brown Shoe Co. v. United States*, 370 U.S. 294, 313-15 (1962); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963); *California v. American Stores Co.*, 495 U.S. 271, 286-87 (1990); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 571 (6th Cir. 2014); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001).

**Ins. No. 29 – Private Party Section 7 Claim**

Section 7 of the Clayton Act allows private parties injured by the anticompetitive effects of a merger to challenge it.   Private-party challenges to anticompetitive mergers play an important role in the enforcement of federal antitrust law.   They are an integral part of Congress's plan in the Clayton Act for protecting competition.[25]

---

[25] 15 U.S.C. § 15; *California v. American Stores Co.*, 495 U.S. 271, 284 (1990); *Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 318 (1965); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664 (7th Cir. 2002); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 749 F. Supp. 2d 542, 556 (E.D. Ky. 2010), *aff'd*, 697 F.3d 387 (6th Cir. 2012), *aff'd*, 134 S. Ct. 1377 (2014); *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 575 (7th Cir. 1999).

**Ins. No. 30 [ALTERNATIVE VERSION 1] – Elements of a Clayton Act Claim**

*[NOTE:  This version of this instruction presumes the Court has determined that, based on the evidence presented, Steves has carried its burden as a matter of law in establishing a relevant product market and a relevant geographic market.  Note that this instruction, if given, would eliminate the need for Instructions 31 through 35.]*

I instruct you that, based on the evidence presented in this case, Steves has established that interior molded doorskins used in the United States is the relevant market in this case.

In order to prevail on its claim under Section 7 of the Clayton Act, Steves must establish each of the following three additional elements:

(1) That JELD-WEN's acquisition of Craftmaster has substantially lessened competition or tended to create a monopoly in the relevant market, or is likely to do so in the future.  This element is discussed in Instructions 36 through 49.  Please note that to avoid using this entire long phrase every time I describe this element, I will refer to it simply as "substantially lessen competition," but you should remember that Steves can satisfy this element *either* by showing that the merger has already substantially lessened competition *or* tended to create a monopoly in the relevant market (or both), *or* that it is likely to do one or both of these things in the future.

(2) That JELD-WEN's acquisition of Craftmaster has caused antitrust injury to Steves.  This element is discussed in Instructions 50 and 51.

(3) That Steves has suffered monetary damages as a result of the acquisition.  This element is discussed in Instructions 52 through 58.[26]

---

[26] 15 U.S.C. § 18; Horizontal Merger Guidelines § 1; *St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713–15 (D.C. Cir. 2001); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011).

**Ins. No. 30 [ALTERNATIVE VERSION 2] – Elements of a Clayton Act Claim**

*[NOTE: This version of this instruction presumes the Court has determined that, based on the evidence presented, Steves has not carried its burden as a matter of law in establishing a relevant product market and a relevant geographic market. Therefore, this version of the instruction presents those issues to the jury.]*

In order to prevail on its claim under Section 7 of the Clayton Act, Steves must establish each of the following five elements:

(1) A relevant product market. This element is discussed in Instruction 33 (with other relevant information in Instructions 31, 32, and 35).

(2) A relevant geographic market. This element is discussed in Instructions 34 (with other relevant information in Instructions 31, 32, and 35).

(3) That JELD-WEN's acquisition of Craftmaster has substantially lessened competition or tended to create a monopoly in the relevant market, or is likely to do so in the future. This element is discussed in Instructions 36 through 49. Please note that to avoid using this entire long phrase every time I describe this element, I will refer to it simply as "substantially lessen competition," but you should remember that Steves can satisfy this element *either* by showing that the merger has already substantially lessened competition *or* tended to create a monopoly in the relevant market (or both), *or* that it is likely to do one or both of these things in the future.

(4) That the acquisition has caused antitrust injury to Steves. This element is discussed in Instructions 50 and 51 below.

(5) That Steves has suffered monetary damages as a result of the acquisition. This element is discussed in Instructions 52 through 58 below.[27]

---

[27] 15 U.S.C. § 18; Horizontal Merger Guidelines § 1; *St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713–15 (D.C. Cir. 2001); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011).

**Ins. No. 31 – Market Definition**

To prevail on its claim under Section 7 of the Clayton Act, Steves must show by a preponderance of the evidence that JELD-WEN's acquisition of Craftmaster is likely to lessen competition in a relevant market.

Defining the relevant market is necessary because you are required to make a judgment about the effect on competition of JELD-WEN's acquisition of Craftmaster not in the abstract or in the U.S. economy as a whole, but in a particular part of the economy.

There are two aspects you must consider in determining whether Steves has met its burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market. Instruction 33 provides more detail what a "product market" is, and Instruction 34 provides more detail about what a "geographic market" is.[28]

---

[28] 15 U.S.C. § 18; Horizontal Merger Guidelines § 4; ABA Model Jury Instructions in Civil Antitrust Cases (2016), at 106; *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 618 (1974); *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957); *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).

**Ins. No. 32 – Expert Testimony Regarding Market Definition**

In determining whether Steves has established a relevant product market and geographic market, you should give significant weight to the testimony of expert witnesses. Because these topics often require complex economic analysis, the testimony of expert economists is often especially helpful.

Steves' expert witness, Dr. Carl Shapiro, has testified that the relevant product market is interior molded doorskins, and the relevant geographic market encompasses interior molded doorskins used in the United States. JELD-WEN's expert witness, Dr. Edward Snyder, has not identified a relevant product market or relevant geographic market in his testimony.[29]

---

[29] *Morgan, Strand, Wheeler, & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991); *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., Inc.*, 672 F. Supp. 1489, 1512 n.25 (D.S.C. 1987); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002); *Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73689, at *10 n.13 (N.D. Cal. Jan. 5, 2008).

**Ins. No. 33 – Relevant Product Market**

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other form the buyer's point of view; that is, the products compete with each other.   In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other.   Products need not be identical or precisely interchangeable as long as they are reasonable substitutes.   Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, economists apply a test called the "hypothetical monopolist test."   You should give significant weight to the testimony of the expert witnesses regarding the application of the hypothetical monopolist test, because it is a specialized test used by expert economists.   The test is used to identify a set of products that are reasonably interchangeable with a product sold by one of the merging firms. Under this test, an economist analyzes whether a small but significant and non-transitory (*i.e.*, not just brief or temporary) increase in the price of a first product would result in enough customers switching from that product to another, second product such that the price increase would not be profitable.   In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn?

Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors.   If you find that customers would switch to a second, alternative product in the face of a 5 percent price increase such that the price increase for the first product would not be profitable, then you must conclude that the first product and the second, alternative product are in the product market.   If, on the other hand,

you find that customers would not switch, then you must conclude that the products are not in the product market.   Again, you may rely on the testimony of the parties' expert witnesses to determine what (if any) relevant product market exists in this case.

If you find that Steves has proven a relevant product market, then you should continue to evaluate the remainder of Steves' Clayton Act Section 7 claim.   However, if you find that Steves has failed to prove such a market, you must find in favor of JELD-WEN on this claim.[30]

---

[30] 15 U.S.C. § 18; Horizontal Merger Guidelines § 4.1; ABA Model Jury Instructions in Civil Antitrust Cases (2016), at 108-09; *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 718 (D.C. Cir. 2001).

**Ins. No. 34 – Relevant Geographic Market**

The relevant geographic market is the area in which JELD-WEN faces competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases. When analyzing the relevant geographic market, you should consider whether changes in prices or product offerings in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

In determining whether Steves has met its burden and demonstrated that its proposed geographic market is proper, you may consider several factors, including:

- The geographic area to which doorskin customers turn for supply of the product;

- The geographic area to which customers have turned in the past or have seriously considered turning;

- The transportation cost difference between areas;

- The geographic areas that suppliers view as potential sources of competition; and

- Whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

If you find that Steves has proven a relevant product market, then you should continue to evaluate the remainder of Steves' Clayton Act Section 7 claim. However, if you find that Steves has failed to prove such a market, you must find in favor of JELD-WEN on this claim.[31]

---

[31] 15 U.S.C. § 18; Horizontal Merger Guidelines § 4.2; ABA Model Jury Instructions in Civil Antitrust Cases (2016), at 113; *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 619-23 (1974); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016); *St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015).

**Ins. No. 35 – Parties' Contentions Regarding Relevant Market**

In this case, Steves contends that the relevant product market is interior molded doorskins, and the relevant geographic market encompasses interior molded doorskins used in the United States.  JELD-WEN asserts that Steves has failed to carry its burden of establishing that interior molded doorskins constitute a relevant product market and the relevant geographic market encompasses interior molded doorskins used in the United States.  JELD-WEN has not identified an alternative relevant product market or geographic market.

### Ins. No. 36 – Lessening of Competition Overview

In order to prevail on its Clayton Act Section 7 claim, Steves bears the burden of establishing *either* (1) that JELD-WEN's acquisition of Craftmaster has already substantially lessened competition in the relevant market, *or* (2) that it is likely to do so in the future. Steves need not establish both of these things, although it may do so.

Section 7 prohibits mergers that have already substantially lessened competition at the time of the lawsuit, but it also prohibits mergers that are *likely* to do so in the future. This requires you, the jury, to make a prediction, based on the evidence presented in this case, about what is likely to happen in the future. If, however, you find that the merger has *already* substantially lessened competition in the relevant market, then it is unnecessary for you to do decide whether it is likely to do so in the future, because no prediction is required.

A lessening of competition may appear in several different ways. For instance, a merger or acquisition may lead to higher prices, reduced output, or lower product quality. Or the merger may reduce innovation or the range of product choices available to customers.

A merger may substantially lessen competition through two different types of effects: unilateral effects and coordinated effects. These are discussed in the next two instructions. Steves has the burden of establishing that at least one of these two types of effects either has occurred as a result of the merger *or* is likely to do so in the future. Steves need not establish that both types of effects have occurred as a result of the merger or are likely to do so in the future, although it may do so.[32]

---

[32] 15 U.S.C. § 18; Horizontal Merger Guidelines § 2; ABA Model Jury Instructions in Civil Antitrust Cases (2016), at 5; *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 588-89 (1957); *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962); *St. Alphonsus Med. Ctr.– Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565, 571 (6th Cir. 2014); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011).

## Ins. No. 37 – Unilateral Effects

Unilateral effects are effects on competition that a single company causes on its own. The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition. These effects are called "unilateral" effects because they result from the unilateral post-merger actions of the newly merged firm.

Unilateral effects may appear in a variety of different ways. For example, the newly merged firm may raise prices or reduce output. It may reduce its investments in innovation and product variety. The firm may leave capacity idle, refrain from building or obtaining capacity that would have been obtained absent the merger, or eliminate pre-existing production capabilities. The elimination of competition between the two merging firms may make these strategies profitable for the newly merged company, whereas they would not have been profitable prior to the merger when the two firms competed against each other.

Unilateral effects are especially likely to occur in a market with few other competitors, where the two merging firms previously competed against each other in that market but cease to do so after the merger.

In this case, Steves contends that JELD-WEN's acquisition of Craftmaster caused JELD-WEN to take actions resulting in unilateral effects constituting a substantial lessening of competition. JELD-WEN denies this.[33]

---

[33] Horizontal Merger Guidelines § 6; *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 569 (6th Cir. 2014); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 216 (D.D.C. 2017); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 81 (D.D.C. 2011); *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 365 (S.D.N.Y. 1995).

### Ins. No. 38 – Coordinated Effects

Coordinated effects refers to a merger's reduction of competition by enabling or encouraging post-merger coordinated interaction among the remaining firms in the relevant market.  Coordinated interaction involves conduct by multiple firms that is profitable for each of them only as a result of the reactions of the others.  These reactions can remove or reduce a firm's incentive to offer customers better deals or higher-quality products. They also can increase a firm's incentive to raise prices or reduce quality, by assuaging the fear that such a move would lose customers to rivals.

Coordinated effects are more likely to occur and harm consumers where there are few (or no) other rival firms remaining in the relevant market after the merger.  Coordinated effects need not occur through overt collusion between firms (although that is possible).  Coordinated effects may also occur as a result of implicit understanding between firms.  For example, two gas stations located across the street from another in a remote area might set their prices at the same level in order to maximize their profits, even without overtly agreeing to do so.  This coordinated activity benefits the two gas stations, while harming consumers, because there are no competing gas stations able to attract the customers' business by offering a better price.

In this case, Steves contends that the elimination of Craftmaster as a third competitor in the interior molded doorskins market made it more likely that JELD-WEN and Masonite would increase doorskin prices and reduce sales of doorskins to Steves and other independent door manufacturers, even without any formal agreement to do so.[34]  JELD-WEN denies this.

---

[34] Horizontal Merger Guidelines § 7; *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568-69 (6th Cir. 2014); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 215-16 (D.D.C. 2017); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 77 (D.D.C. 2011); *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 363-64 (S.D.N.Y. 1995).

**Ins. No. 39 – Weight Of Post-Challenge Conduct By JELD-WEN**

In determining whether JELD-WEN's acquisition of Craftmaster has substantially lessened competition in the relevant market or is likely to do in the future, you should give limited weight to JELD-WEN's conduct while this lawsuit was threatened or pending. This is because it is easy for a company, after a merger, to manipulate its behavior in response to a threatened or pending lawsuit to make the merger appear less threatening to competition, only to begin or renew anticompetitive conduct once the lawsuit is over.[35]

---

[35] *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 504 (1974); *United States v. Continental Can Co.*, 378 U.S. 441, 463 (1964); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 276 (7th Cir. 1981); *Coleman v. Cannon Oil Co.*, 849 F. Supp. 1458, 1471-72 (M.D. Ala. 1993).

**Ins. No. 40 – Failing Firm**

*[NOTE:  This instruction should be given only if the Court denies Steves' motion in limine to exclude evidence and argument regarding a failing firm defense.]*

In this case, JELD-WEN argues that the merger has not substantially lessened competition, and is not likely to do so in the future, because Craftmaster would have gone out of business and its assets would have exited the interior molded doorskin market had it not been acquired by JELD-WEN.  This is known as a "failing firm" defense to a Clayton Act Section 7 claim.  JELD-WEN bears the burden of establishing that the failing firm defense applies in this case.  This defense is narrow and applies only where the following elements all are met.

First, JELD-WEN must show that Craftmaster would have been unable to meet its obligations in the near future at the time of the merger.

Second, JELD-WEN must show that Craftmaster would not have been able to reorganize successfully under Chapter 11 of the Bankruptcy Act.

Third, JELD-WEN must show that Craftmaster made unsuccessful good-faith efforts to elicit reasonable alternative offers that would have kept its assets in the interior molded doorskins market—for instance, by being acquired by a different company that would have continued to manufacture interior molded doorskins.[36]

---

[36] Horizontal Merger Guidelines § 11; *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 138 (1969); *Dr. Pepper/Seven-Up Cos., Inc. v. FTC*, 798 F. Supp. 762, 778 (D.D.C. 1992), *rev'd in part on other grounds*, 991 F.2d 859 (D.C. Cir. 1993)

**Ins. No. 41 – Present And Future Anticompetitive Effects**

If you find that JELD-WEN's acquisition of Craftmaster has *already* resulted in either unilateral or coordinated effects (or both) that have substantially lessened competition in the relevant market, you must find that Steves has satisfied the "lessening of competition" element of its Clayton Act Section 7 claim, and you should go on to the next element of this claim, beginning with Instruction 50.   In other words, if you find that JELD-WEN's acquisition of Craftmaster has *already* resulted in either unilateral or coordinated effects (or both) that have substantially lessened competition in the relevant market, you need not engage in the "burden shifting" and "ease of entry" analyses described in Instructions 42 through 49 to determine whether the acquisition is likely to substantially lessen competition in the future.

If you find that the acquisition has *not yet* resulted in unilateral or coordinated effects that have substantially lessened competition in the relevant market, you should go on to Instructions 42 through 49 to determine whether the acquisition is likely to substantially lessen competition in the future.[37]

---

[37] 15 U.S.C. § 18; Horizontal Merger Guidelines § 2; *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 607 (1957); *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001); *St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015).

### Ins. No. 42 – Burden-Shifting Approach

To determine whether the acquisition is likely to substantially lessen competition in the future, you, the jury, should apply what lawyers call a "burden shifting" approach to evaluate Steves' claim under Section 7 of the Clayton Act.  The phrase "burden shifting" refers to a three-step process in which Steves has the burden to make an initial showing that the merger is likely to substantially lessen competition; if Steves does so, JELD-WEN then has the burden to produce evidence rebutting that showing; and then (if JELD-WEN can rebut Steves' initial showing) Steves has a final opportunity to demonstrate that the merger is likely to substantially lessen competition.  Instructions 43 through 45 will describe each of the three steps of the "burden shifting" framework in more detail.

**[ALTERNATIVE ADDITION]:**  *[This alternative addition assumes that the Court has determined that, as a matter of law, Steves has carried its burden at the first step based on the evidence in the record regarding market shares before and after the merger.  If this alternative addition is given, Instruction 43, regarding Step 1 of the burden-shifting analysis, should be omitted.]*  I instruct you that, based on the evidence presented in this case, Steves has carried its burden of making an initial showing that the merger is likely to substantially lessen competition.  Accordingly, you should presume that the merger will substantially lessen competition.  This presumption is because of the evidence presented regarding the market shares in the market for interior molded doorskins used in the United States.  Based on that evidence, JELD-WEN's acquisition of Craftmaster caused a sufficiently large and significant increase in the concentration of the market for interior molded doorskins used in the United States that you must presume that the merger is likely to substantially lessen competition.  You should go on to

Instruction 44 to determine whether JELD-WEN has presented evidence rebutting this presumption.[38]

---

[38] *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963); *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975); *St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015); *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001); *United States v. H & R Block, Inc.*, 883 F. Supp. 2d 36, 49-50 (D.D.C. 2011).

**Ins. No. 43 – Burden-Shifting, Step 1:  Steves' Initial Showing**

*[NOTE:  This instruction should only be given if the Court does not give the "Alternative Addition" in the second paragraph of Instruction 42 above.]*

The  first  step  of  the  burden-shifting  framework  requires  Steves  to  make  an  initial showing that the merger is likely to substantially lessen competition.  This initial step ordinarily is focused on the market shares of the companies operating in the relevant market—*i.e.*, what percentage of the sales in the market each company accounts for.  The fewer companies there are and the higher their market shares are, the more "concentrated" the market is said to be.  At this initial  step,  the  question  is  whether  the  merger  or  acquisition  changes  the  market  shares  of companies in the relevant market to produce a market that is too concentrated.

To determine whether Steves has made an initial showing that JELD-WEN's acquisition of Craftmaster has led (or likely will lead) to too much concentration in the market for interior molded doorskins, you may use a tool called the Herfindahl–Hirschman Index (which is named after  two  economists;  we  will  call  it  "HHI"  for  short).   The  HHI  is  a  measure  of  how concentrated a particular market is.  You need not calculate the HHI for yourself; instead, you may rely on the testimony of the parties' expert witnesses regarding that issue.

The first step in calculating the HHI of a particular market is identifying how many firms compete in the market, and what each of their market shares is.  The HHI is simply the sum of the squares of the market shares (in percentages) of all the companies in a particular market.  For instance, suppose there is a market with three competitors, whose market shares are 50 percent, 30 percent, and 20 percent, respectively.  The HHI of this market is:  $50^2 + 30^2 + 20^2$.  Doing the math, that equals 2500 + 900 + 400, which equals 3800.

In this case,  Steves' expert, Dr. Carl Shapiro, has testified that JELD-WEN's acquisition of Craftmaster caused the HHI in the market for interior molded doorskins used in the United

States to increase from 3820 to 5033 (an increase of 1213).  JELD-WEN's expert, Dr. Edward Snyder, has not testified regarding the HHI increased caused by the merger and has not conducted any calculations of any HHI figures.

As a general guide, if the HHI of a particular market is below 1500, that market is deemed to be "unconcentrated."  If the HHI is between 1500 and 2500, that market is deemed to be "moderately concentrated."  And if the HHI is above 2500, that market is deemed to be "highly concentrated."

To evaluate the effects of a merger or acquisition, you may compare the HHI of the relevant market before the merger with the HHI of the relevant market after the merger.  This is a way to calculate the effect of the merger on the concentration in the relevant market.  Again, as a general guide, you may presume that:

- If a merger increases the HHI in a particular market by more than 200 points, and results in a post-merger HHI above 2500 (*i.e.*, a "highly concentrated" market), then the plaintiff has met its burden of making an initial showing that the merger is likely to substantially lessen competition.

- If a merger either (1) increases the HHI in a particular market by between 100 and 200 points and results in a post-merger HHI above 2500 (*i.e.*, a "highly concentrated" market), or (2) increases the HHI in a particular market by more than 100 points and results in a post-merger HHI of between 1500 and 2500 (*i.e.*, a "moderately concentrated" market), then the merger potentially raises significant competitive concerns and warrants scrutiny to determine whether it is likely to substantially lessen competition.  In this situation, you should consider other evidence presented by

Steves at trial in determining whether to presume that the merger is likely substantially to lessen competition.

- If a merger increases the HHI in a particular market by 100 points or less, or results in a post-merger HHI of below 1500 (*i.e.*, an "unconcentrated" market), then you may presume that the merger is *not* likely to substantially lessen competition.

If you determine, based on the HHIs before and after the merger in this case and any other relevant evidence, that Steves has made its initial showing that the merger is likely to substantially lessen competition, you should proceed to the next step of the burden-shifting analysis.  If you conclude that Steves has *not* made its initial showing, you must conclude that JELD-WEN's acquisition of Craftmaster is not likely to substantially lessen competition in the future. [39]

---

[39] Horizontal Merger Guidelines, § 5.3; *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963); *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 346-47 (3d Cir. 2016); *St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 786 (9th Cir. 2015); *ProMedica Health Sys. v. FTC*, 749 F.3d 559, 568 (6th Cir. 2014); *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001).

## Ins. No. 44 – Burden-Shifting, Step 2:  JELD-WEN's Rebuttal

At this step, the burden shifts to JELD-WEN to present evidence rebutting the presumption described above that the merger is likely to substantially lessen competition.  To do this, JELD-WEN must demonstrate that the market-share statistics upon which the presumption is based do not give an accurate representation of the likelihood that the merger will substantially lessen competition.  You should consider the evidence presented by the parties to determine whether JELD-WEN has carried its burden of rebutting the presumption that the merger will substantially lessen competition.

If you determine that JELD-WEN has met its burden of rebutting Steves' initial showing, you should proceed to the next step of the burden shifting analysis.  If you determine that the evidence presented by JELD-WEN is insufficient to rebut Steves' initial showing—in other words, if you determine that the evidence presented in the case confirms the presumption that the merger is likely to substantially lessen competition—then you must find that Steves has satisfied this element of its Clayton Act Section 7 claim.[40]

---

[40] *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963); *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 347, 352 (3d Cir. 2016); *St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015); *ProMedica Health Sys. v. FTC*, 749 F.3d 559, 571 (6th Cir. 2014); *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990).

## Ins. No. 45 – Burden-Shifting, Step 3:  Weighing The Evidence

If you determine that JELD-WEN has successfully rebutted Steves' initial showing, the burden then shifts back to Steves to produce evidence in addition to evidence regarding market share concentration to show that the merger is likely to substantially lessen competition.  For instance, you may consider whether Steves has offered evidence that JELD-WEN has increased its prices for interior molded doorskins, reduced the quality of doorskins, coordinated its behavior with other manufacturers of interior molded doorskins in a way that harms consumers, or restricted the supply of interior molded doorskins to customers (or plans to do so in the future).

At this step of the analysis, you should weigh all of the evidence in the record—including both the evidence suggesting that the merger *is* likely to substantially lessen competition y, as well as the evidence suggesting that the merger *is not* likely to substantially lessen competition. You should then determine whether Steves has satisfied its burden of showing, by a preponderance of the evidence, that the merger is likely to substantially lessen competition  If you find that Steves has satisfied this burden, you must find in favor of Steves on its claim under Section 7 of the Clayton Act.  If, by contrast, you find that Steves has *not* satisfied this burden, you must find in favor of JELD-WEN on this claim.[41]

---

[41] *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 347 (3d Cir. 2016); *St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015); *ProMedica Health Sys. v. FTC*, 749 F.3d 559, 571 (6th Cir. 2014); *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990).

**Ins. No. 46 – Ease Of Entry**

In this case, JELD-WEN argues that the merger is not likely to substantially lessen competition in the future because new suppliers may enter the relevant market, ameliorating any anticompetitive effects of the merger.  Instructions 46 through 49 discuss this issue.

JELD-WEN bears the burden of demonstrating ease of entry into the relevant market. Ease of entry is relevant only to the question of whether the merger is likely to substantially lessen competition in the future.  It is not relevant to the question of whether the merger has *already* substantially lessened competition in the relevant market.

If there is sufficient ease of entry, enough firms can enter to compete with the merged firms, undercutting any of the likely anticompetitive effects of the merger.  In other words, entry is one way in which post-merger pricing can be forced back down to competitive levels.  Firms that would rapidly and easily enter the market in response to price increases or other anticompetitive effects resulting from JELD-WEN's merger are to be considered market participants.

Determining whether there is ease of entry hinges upon an analysis of barriers to new firms entering the market or existing firms expanding into new regions of the market.  Barriers to entry can include, but are not limited to:  costs for plant construction, product development, and marketing; difficulties developing the necessary technology to compete in the industry; barriers posed by government regulations; and declining sales opportunities for new entrants due to other market forces.  Reputation also can be a considerable barrier to entry where customers and suppliers emphasize the importance of reputation and expertise.

Recent examples of entry, whether successful or unsuccessful, generally provide the starting point for identifying the elements of a new firm's practical entry efforts.  They also can be informative regarding the scale necessary for an entrant to be successful, the presence or

absence of entry barriers, the factors that influence the timing of entry, the costs and risk associated with entry, and the sales opportunities realistically available to entrants.

The prospect of entry into the relevant market will alleviate concerns about adverse competitive effects only if such entry will deter or counteract any competitive effects of concern so the merger will not substantially harm customers. A merger is not likely to enhance market power if entry into the market is so easy that the merged firm and its remaining rivals in the market, either unilaterally or collectively, could not profitably raise price or otherwise reduce competition compared to the level that would prevail in the absence of the merger. In other words, JELD-WEN can rebut Steves' case only if it can prove that, after the merger, JELD-WEN could not raise prices or otherwise reduce competition because another firm could rapidly and easily enter the market in a way that would constrain those price increases or other anticompetitive effects.

Entry into the market is "easy" if it would be (1) timely, (2) likely, and (3) sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern. The higher the barriers to entry, the less likely it is that the "timely, likely, and sufficient" test can be met. JELD-WEN bears the burden of establishing all three of these components of ease of entry. These three components of ease of entry are defined further in Instructions 47 through 49.[42]

---

[42] 2010 Horizontal Merger Guidelines § 9; *United States v. Anthem, Inc.*, Civil Action No. 16-1493 (ABJ), 2017 WL 68556, at *38 (D.D.C. Feb. 21, 2017); *United States v. Aetna, Inc.*, Civil Action No. 16-1494 (JDB), 2017 WL 325189, at *37 (D.D.C. Jan. 23, 2017); *FTC v. ProMedica Health System, Inc.*, No. 3:11 CV 47, 2011 WL 1219281, at *34 (N.D. Ohio Mar. 29, 2011); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 170-71 (D.D.C. 2000); *FTC. v. Cardinal Health*, 12 F. Supp. 2d 34, 56 (D.D.C 1998).

### Ins. No. 47 – Definition Of Timely

To be sufficiently "timely" to deter the anticompetitive effects of a merger, entry by a new competitor must be rapid enough to make unprofitable overall the actions causing those effects and thus leading to entry, even though those actions would be profitable until entry takes effect.

The impact of new entrants in the relevant market must be rapid enough that customers are not significantly harmed by the merger, despite any anticompetitive harm that occurs prior to the entry.

For example, entry by a new competitor must be rapid enough to have an effect on prices that would prevent JELD-WEN from continuing to profitably sell its product at increased price levels.  Or, entry by a new competitor must be rapid enough to have an effect on product quality that would prevent JELD-WEN from continuing to profitably sell its product at a lesser quality.[43]

---

[43] 2010 Horizontal Merger Guidelines § 9.1; *United States v. Anthem, Inc.*, Civil Action No. 16-1493 (ABJ), 2017 WL 68556, at *38 (D.D.C. Feb. 21, 2017).

### Ins. No. 48 – Definition Of Likely

To be "likely," entry must be profitable, accounting for the assets, capabilities, and capital needed and the risks involved, including the need for the entrant to incur costs that would not be recovered if the entrant later exits.  Entry is likely only where the entrant could make a profit after accounting for all of the upfront costs needed to enter the market, including whether the potential entrant could afford to lose those upfront costs if it later exited the market.

Whether entry into a market requires significant upfront investment is relevant to whether entry is likely.  All things equal, entry into a market is less likely if it requires significant upfront investment, and more likely if it does not require significant upfront investment.

The history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future.  In other words, where the history shows that new firms enter the relevant market frequently and successfully, that suggests entry in the future may be likely.  By contrast, where the history shows that few or no new firms enter the relevant market, that suggests entry in the future may be unlikely.[44]

---

[44] 2010 Horizontal Merger Guidelines §§ 9.2, 9; *United States v. Anthem, Inc.*, Civil Action No. 16-1493 (ABJ), 2017 WL 68556, at *38 (D.D.C. Feb. 21, 2017); *Federal Trade Commission v. Sysco Corporation*, 113 F. Supp. 3d 1, 80 (D.D.C. 2015); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 171 (D.D.C. 2000); *FTC. v. Cardinal Health*, 12 F. Supp. 2d 34, 56 (D.D.C 1998).

**Ins. No. 49 – Definition of "Sufficient In Its Magnitude, Character, And Scope To Counteract A Merger's Anticompetitive Effects**

To have the "magnitude, character, and scope to counteract a merger's anticompetitive effects," a new firm's entry must fill the competitive void that will result if the merger proceeds. Even where timely and likely, entry may not be sufficient to deter or counteract the competitive effects of concern, such as by reducing pricing to pre-merger levels.

Entrants must be significant enough to compete effectively, i.e., affect pricing, and be of a sufficient scale to compete on the same playing field as the merged firm. In other words, entry by firms who are unable to match the scale of the merged firm it is replacing lack the magnitude, character, and scope to counteract the merger's impact on pricing or its other anticompetitive effects.

For example, entry may be insufficient because the products offered by entrants are not close enough substitutes to the products offered by the merged firm to render a price increase by the merged firm unprofitable. Entry may also be insufficient due to constraints that limit new entrants' competitive effectiveness, such as limitations on the capabilities of the firms best placed to enter or reputational barriers to rapid expansion by new entrants.[45]

---

[45] 2010 Horizontal Merger Guidelines § 9.3; *United States v. Anthem, Inc.*, Civil Action No. 16-1493 (ABJ), 2017 WL 68556, at *38 (D.D.C. Feb. 21, 2017); *United States v. Aetna, Inc.*, Civil Action No. 16-1494 (JDB), 2017 WL 325189, at *37 (D.D.C. Jan. 23, 2017); *FTC v. ProMedica Health System, Inc.*, No. 3:11 CV 47, 2011 WL 1219281, at *34 (N.D. Ohio Mar. 29, 2011).

**Ins. No. 50 – Injury And Causation**

If you find that JELD-WEN has violated Section 7 of the Clayton Act, then you must decide if Steves in entitled to recover damages from JELD-WEN.

Steves is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:

1. Steves was in fact injured as a result of JELD-WEN's alleged violation of the antitrust laws;

2. JELD-WEN's alleged illegal conduct was a material cause of Steves' injury; and

3. Steves' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as an "injury in fact" or "fact of damage."  For Steves to establish that it is entitled to recover damages, it must prove that it was injured as a result of JELD-WEN's alleged violation of the antitrust laws.  Proving the fact of damage does not require Steves to prove the dollar value of its injury.  It requires only that Steves prove that it was in fact injured by JELD-WEN's alleged antitrust violation.

Steves must also offer evidence that establishes by a preponderance of the evidence that JELD-WEN's alleged illegal conduct was a material cause of Steves' injury.  This means Steves must have proved that some damage occurred to it as a result of JELD-WEN's alleged antitrust violation, and not some other cause.  Steves is not required to prove that JELD-WEN's alleged antitrust violation was the sole cause of its injury; nor need Steves eliminate all other possible causes of injury.  It is enough if Steves has proved that the alleged antitrust violation was a material cause of its injury.

Finally, Steves must establish that its injury is the type of injury that the antitrust laws were intended to prevent.  This is sometimes referred to as "antitrust injury."  If Steves' injuries

were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Steves' injuries are antitrust injuries.

In summary, if Steves can establish that it was in fact injured by JELD-WEN's conduct, that JELD-WEN's conduct was a material cause of Steves' injury, and that Steves' injury was the type that the antitrust laws were intended to prevent, then Steves is entitled to recover damages for the injury to its business or property.[46]

---

[46] ABA Model Jury Instructions in Civil Antitrust Cases (2016), at 300-01; 15 U.S.C. § 15; *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334-46 (1990); *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 122 (1986); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 65-67 (2d Cir. 2012).

**Ins. No. 51 – Breach Of Contract And/Or Warranty And Antitrust Injury**

In this case, Steves contends both that JELD-WEN's acquisition of Craftmaster violated the Clayton Act and also that JELD-WEN has breached a contract and warranties with Steves. A breach of contract or warranty may cause a party antitrust injury, though not all breaches of contract or warranty will do so. A breach of contract or warranty causes antitrust injury if it results in type of injury that the antitrust laws were intended to prevent, such as an increase in prices, a reduction in quality, or a restriction of supply, resulting from fewer choices being available to purchasers. If a breach of contract or warranty does not result in this sort of harm, then it is not a source of antitrust injury.[47]

---

[47] *Blue Shield of Va. v. McCready*, 457 U.S. 465, 468 n.2 (1982); *Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 419 (4th Cir. 1986); *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 739 (3d Cir. 2004); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992).

**Ins. No. 52 – Damages**

If you find that JELD-WEN violated the antitrust laws and that this violation caused injury to Steves, then you must determine the amount of damages, if any, Steves is entitled to recover.  The fact that I am giving you instructions concerning the issue of Steves' damages does not mean that I believe Steves should, or should not, prevail in this case.  If you reach a verdict for JELD-WEN on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

If you find that JELD-WEN violated the antitrust laws and that Steves was injured by that violation, Steves is entitled to recover for such injury that was the direct result or likely consequence of the unlawful acts of JELD-WEN.  To recover damages on its Clayton Act Section 7 claim, Steves bears the burden of showing that its injuries were caused by JELD-WEN's antitrust violation.

Steves contends that it has suffered damages both as a result of JELD-WEN's unlawful acquisition of Craftmaster and JELD-WEN's breach of contract and warranties.  JELD-WEN denies this.  For purposes of calculating damages for Steves' Clayton Act Section 7 claim, your only task is to determine whether Steves' damages were caused by JELD-WEN's unlawful acquisition of Craftmaster.  You should award Steves the full amount of these damages.  It is irrelevant whether some or all of these damages were *also* caused in part by JELD-WEN's breach of contract or warrtanty.  For example, if you conclude that Steves suffered a certain amount in damages from JELD-WEN's breach of contract or warranty but that the breach of contract or warranty was itself a result of JELD-WEN's acquisition of Craftmaster, you should award that full amount to Steves as damages on its Clayton Act Section 7 claim.

If you conclude either that Steves has not suffered any damages or that any damages Steves has suffered were caused only by a breach of contract or warranty—and that the breach of

contract or warranty was not a result of JELD-WEN's acquisition of Craftmaster—then you should not award Steves any damages on its Clayton Act Section 7 claim.

Any damages you award for Steves' antitrust claims are intended to be only compensatory, meaning their only purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred.  The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future.  Furthermore, you are not permitted to award to Steves an amount for attorneys' fees or the costs of maintaining this lawsuit.[48]

---

[48] ABA Model Jury Instructions in Civil Antitrust Cases (2016), at 304, 310-11; 15 U.S.C. § 15; *J. Truett Payne Co v. Chrysler Motors Corp.*, 451 U.S. 557, 565-66 (1981); *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997); *Jackson v. Taylor*, 539 F. Supp. 593, 596 (D.D.C. 1982).

### Ins. No. 53 – Double Recovery Not The Province Of The Jury

It is also not your role to concern yourself with the prospect of a recovery by Steves of the same damages on its antitrust, contract, and warranty claims.  Your job is to determine whether or not Steves has met its burden of proving damages on each of its three claims, using the instructions I give you.  It is my job to enter a judgment that is consistent with the law, using the decisions you give me.  I will use the information you give me to ensure that Steves does not doubly recover the same damages on its antitrust, contract and warranty claims.

As I have explained to you, a breach of contract or warranty may cause a party antitrust injury, though not all breaches of contract or warranty will do so.  Part of Steves' alleged antitrust damages in this case are that JELD-WEN's alleged breach of contract and warranty would not have taken place if not for what Steves says is JELD-WEN's illegal lessening of competition.  Steves therefore claims that it has suffered antitrust damages as a result.  Your job is to determine whether or not Steves has met its burden of proving this theory of damages using the instructions I have given you.  In a moment I will give you instructions for considering Steves' contract and warranty damages claims.

## Ins. No. 54 – No Offsetting Of Damages

If you find that Steves is entitled to recover damages, Steves is entitled to recover the full amount of the damages it has suffered as a result of JELD-WEN's unlawful conduct, regardless of whether some portion of these damages were passed on to downstream customers.  For instance, even if you determine that Steves raised its prices for doors in the years following the merger, you should not subtract from its damages the amount of any price increase it passed on to customers.[49]

---

[49] ABA Model Jury Instructions in Civil Antitrust Cases (2016), at 304; *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977); *Paper Systems v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632-34 (7th Cir. 2002); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 17 (D.D.C. 2001).

**Ins. No. 55 – Basis For Calculating Damages**

You are permitted to make just and reasonable estimates in calculating Steves' damages. You are not required to calculate damages with mathematical certainty or precision. However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. Steves must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that Steves has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

If you find that Steves has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages.[50]

---

[50] ABA Model Jury Instructions in Civil Antitrust Cases (2016), at 307; *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *J. Truett Payne Co v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946); *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1299 (9th Cir. 1983).

### Ins. No. 56 – Speculation About Other Forms Of Relief

Your role as the jury in resolving Steves' antitrust claim is limited to (1) determining whether JELD-WEN's acquisition of Craftmaster violated Section 7 of the Sherman Act, and (2) determining what damages, if any, Steves is entitled to recover as a result of that violation.  It is not your role as the jury to speculate about what other remedies or relief, if any, the court might order or might be appropriate if you find that JELD-WEN's acquisition of Craftmaster violated Section 7 of the Sherman Act.  I instruct you that you should not consider the possibility of other remedies or relief, and any speculation regarding other remedies or relief should play no role in your deliberations regarding Steves' Clayton Act Section 7 claim.[51]

---

[51] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 481 (1977); *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 680 (9th Cir. 1976); *Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 831 F. Supp. 1516, 1530 (D. Colo. 1993); *Ciena Corp. v. Corvis Corp.*, 352 F. Supp. 2d 526, 529 (D. Del. 2005).

### Ins. No. 57 – Future Lost Profits

Steves claims that it was harmed because, had it not been for JELD-WEN's alleged antitrust violation, Steves would have earned additional profits in the future.  If you find that JELD-WEN committed an antitrust violation and that this violation caused injury to Steves, you now must calculate the future profits, if any, that Steves has lost, or that Steves predictably will suffer in the future, as a result of JELD-WEN's alleged antitrust violation.  You may rely on the testimony of expert witnesses in determining what amount, if any, Steves is entitled to recover for compensation for future lost profits.

To calculate future lost profits, you must make a reasonable estimate of (1) the amount of profits, if any, that Steves would have earned in future years, and (2) the length of time for which it would have earned those profits.  In making this calculation, you are not required to calculate future lost profits with absolute mathematical certainty or precision, but you must not engage in guesswork or speculation.  In making this determination, you must consider the various factors that could affect the future success of Steves' business, such as general market or economic conditions, lawful competition Steves would face in the future, Steves' management of business, changes in technology or other business conditions, and other factors affecting Steves' future performance.

Your determination of future lost profits must have a reasonable basis in the evidence and cannot be speculative.  If there is no evidence from which you can make a reasonable estimate of lost future profits, you may not award damages for future lost profits.

In calculating future lost profits, you must calculate net profit.  In simple terms, net profit is gross revenues minus all of the costs and expenses that would be necessary to produce those revenues.

68

If you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable.  This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today—this is known as the time value of money.  For example, if you had a choice to receive $1,000 today or a year from now, you would be better off receiving the money today and earning interest on it for a year—you would then have something more than $1,000 in a year from now.  Similarly, if you had a right to $1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower amount, reflecting the value that could be earned on that money over the next year.  This lower amount is known as an amount discounted to present value.[52]

---

[52] ABA Model Jury Instructions in Civil Antitrust Cases (2016), at 317-18; *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338-40 (1971); *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 858 (5th Cir. 1981); *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1374 (9th Cir. 1986); *St. Louis Sw. Ry. Co. v. Dickerson*, 470 U.S. 409, 412 (1985).

## Ins. No. 58 – Timeliness Of Lawsuit

Steves' claim under Section 7 of the Clayton Act has a four-year statute of limitations. That means that it allows for recovery of damages for any injuries sustained by Steves since June 29, 2012 (*i.e.*, four years before the date on which Steves filed its complaint in this case). Therefore, you should award damages for all injuries suffered by Steves since June 29, 2012.

For purposes of determining whether Steves' suit is timely, the only relevant question is whether Steves' alleged injuries occurred before or after June 29, 2012.  It is irrelevant whether they occurred (for instance) in 2013 or 2016.  It is also irrelevant whether you believe Steves could or should have filed this lawsuit earlier than it did.[53]

---

[53] ABA Model Jury Instructions in Civil Antitrust Cases (2016), at 331; 15 U.S.C. § 15b; *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 961 (2017); *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1977; *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 604 (6th Cir. 2014); *Complete Ent'mt Resources LLC v. Live Nation Ent'mt, Inc.*, 2016 WL 3457177, at *1-2 (C.D. Cal. May 11, 2016).

## V.        BREACH OF CONTRACT AND WARRANTY – COUNTS 2 AND 3

I am now going to instruct you on the law as it relates to Steves and Sons' claims for breach of contract and breach of warranty.   The contract at issue here is the May 1, 2012 Doorskin Product Agreement, often called the Supply Agreement, that you have heard testimony about.

### Ins. No. 59 – Contract

A contract is a legally binding agreement between two or more parties.   Each party to the contract must perform according to the agreement's terms.   A party's failure to perform a contractual duty constitutes breach of contract.   If a party breaches the contract and that breach causes injury or loss to another party, then the injured party may claim damages.[54]

---

[54]  Excerpt from Del. P.J.I. Civ. § 19.1 (2000) (citing <u>Generally</u>:   *Leeds v. First Allied Connecticut Corp.*, Del. Ch., 521 A.2d 1095, 1101-02 (1986); *Norse Petroleum A/S v. LVO International, Inc.*, Del. Super., 389 A.2d 771, 773 (1978)).

**Ins. No. 60 – Breach of Contract Defined**

Because Steves and Sons was a party to the contract at issue, Steves and Sons would be entitled to recover damages from JELD-WEN for any breach of the Supply Agreement. To establish that JELD-WEN is liable to Steves and Sons for breach of contract, Steves and Sons must prove that one or more terms of Steves and Sons' Supply Agreement with JELD-WEN have not been performed and that Steves and Sons has sustained damages as a result of JELD-WEN's failure to perform.[55]

---

[55] Del. P.J.I. Civ § 19.20 (2000); *Ridley Inv. Co. v. Croll*, Del. Supr., 192 A.2d 925, 926-27 (1963); *Hudson v. D&V Mason Contractors, Inc.*, Del. Super., 252 A.2d 166, 169-70 (1969); *Emmett S. Hickman Co. v. Emelio Capaldi Developer, Inc.*, Del. Super., 251 A.2d 571, 572-73 (1969); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

72

**Ins. No. 61 – Stipulation Regarding Existence And Validity Of Supply Agreement**

Steves and Sons and JELD-WEN have agreed that the May 1, 2012 Doorskin Product Agreement executed between them is a valid contract.  Accordingly, in this case, you will take it as a proven fact that the Supply Agreement between Steves and Sons and JELD-WEN imposes contractual obligations.

**Ins. No. 62 – Express Warranty**

Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

Steves and Sons has alleged that JELD-WEN made an express warranty in the Supply Agreement that its product was "of a quality satisfactory to Steves, meeting JELD-WEN's specifications, fit for the intended purpose, and subject to JELD-WEN's standard written warranty applicable to the Product."

Steves and Sons has further alleged that JELD-WEN supplied it with doorskins that did not meet this express warranty.[56] If you find that JELD-WEN supplied doorskins to Steves that were not of a quality satisfactory to Steves, meeting JELD-WEN's specifications, fit for the intended purpose, and subject to JELD-WEN's standard written warranty applicable to the Product, then you must find that JELD-WEN breached its express warranty.

---

[56] Del. P.J.I. Civ § 9.12 (2000); DEL. CODE ANN. tit. 6, " 2-313, 2A-210 (1999); *Bell Sports, Inc. v. Yarusso*, Del. Supr., 759 A.2d 582, 592 (2000); *Pack & Process, Inc. v. Celotex Corp.*, Del. Super., 503 A.2d 646, 658-69 (1985); *Southern States Coop. v. Townsend Grain & Feed Co.*, D. Del., 163 Bankr. 709 (1994).

74

**Ins. No. 63 – Implied Warranty of Merchantability**

The Supply Agreement is a contract for the sale of goods.  In every contract for the sale of goods, there is an implied promise that the goods are merchantable.  In order to be merchantable, the goods must:

- be fit for the ordinary purposes for which the goods are used; and

- be, within the variations permitted by the contract, of even kind, quality, and quantity within each unit and among all units involved; and

- be adequately contained, packaged, and labeled as the contract requires; and

- conform to the factual promises or affirmations, if any, made on the container or label.

Steves and Sons has alleged that JELD-WEN supplied it with doorskins that did not meet this implied warranty.  If you find that any one of the above elements did not exist for the goods in this contract, then you must find that JELD-WEN breached its implied promise that the goods would be merchantable.[57]

---

[57] Del. P.J.I. Civ § 9.16 (2000); DEL. CODE ANN. tit. 6, 2-314 (1999); *Reybold Group, Inc. v. Chemprobe Technologies, Inc.*, Del. Supr. 721 A.2d 1267, 1269 (1998) (plaintiff must prove defect); *Johnson v. Hockessin Tractor, Inc.*, Del. Supr., 420 A.2d 154, 157 (1980) (holding breach of warranty is necessarily a breach of the sales contract).  *See also* 6 *Del. C.* " 2A-210 to 2A-216 (implied warranties include goods offered in leases or bailments); *Neilson Bus. Equip. Ctr., Inc. v. Monteleone*, Del. Supr., 524 A.2d 1172, 1174-75 (1987).

### Ins. No. 64 – Damages – Breach of Contract Or Warranty – General

A party that is harmed by a breach of contract or warranty is entitled to damages in an amount calculated to compensate it for the harm caused by the breach.  The compensation should place the injured party in the same position it would have been in if the contract or warranty had been performed.[58]

You should award Steves the full amount of damages necessary to compensate it for any breach of contract or warranty by JELD-WEN.  As I instructed you above, it is not your job to ensure that Steves does not receive a double recovery for the same injury on its antitrust, contract, and warranty claims.  It is my job to ensure this does not occur, based on the information you will provide me.

---

[58] Del. P.J.I. Civ § 22.24 (2000); *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 446 (Del. 1996); *Pierce v. Int'l Insurance Co. of Illinois*, 671 A.2d 1361, 1367 (Del. 1996); *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 394 A.2d 1160, 1163-64 (Del. 1978) (loss of profits); *American General Corp. v. Continental Airlines*, 622 A.2d 1, 11 (Del. Ch. 1992), *aff'd*, 620 A.2d 856 (Del. 1992); *Farny v. Bestfield Builders, Inc.*, 391 A.2d 212, 214 (Del. Super. Ct. 1978); *Gutheridge v. Pen-Mod, Inc.*, 239 A.2d 709, 714 (Del. Super Ct. 1967) (nominal damages); *J.J. White, Inc. v. Metropolitan Merchandise Mart*, 107 A.2d 892, 894 (Del. Super. Ct. 1954).

**Ins. No. 65 – Steves and Sons' Breach Of Contract Claims**

Under Count 2, Steves and Sons alleges that JELD-WEN breached the contract between them in three ways:

- Steves and Sons alleges that JELD-WEN breached the Supply Agreement by charging a price for doorskins that was higher than the price calculated in accordance with the pricing formula in the Supply Agreement.  If you find that JELD-WEN charged a price for doorskins that was higher than the price calculated in accordance with the pricing formula in the Supply Agreement and that Steves and Sons has sustained damages as a result of JELD-WEN's failure to perform, then you must find that JELD-WEN breached the Supply Agreement.

- Steves and Sons alleges that JELD-WEN breached the Supply Agreement by taking the position that Madison-style doorskins were not covered by the pricing formula in the Supply Agreement and charging prices that were calculated without regard to that formula.  If you find that Madison-style doorskins were covered by the pricing formula in the Supply Agreement, that JELD-WEN charged a price for Madison-style doorskins that was higher than the price calculated in accordance with the pricing formula in the Supply Agreement, and that Steves and Sons has sustained damages as a result of JELD-WEN's failure to perform, then you must find that JELD-WEN breached the Supply Agreement.

- Steves and Sons alleges that JELD-WEN breached the Supply Agreement by taking the position that Monroe-style doorskins were not covered by the pricing formula in the Supply Agreement and charging prices that were calculated without regard to that formula.  If you find that Madison-style doorskins were covered by the pricing formula in the Supply Agreement, that JELD-WEN

77

charged a price for Monroe-style doorskins that was higher than the price calculated in accordance with the pricing formula in the Supply Agreement, and that Steves and Sons has sustained damages as a result of JELD-WEN's failure to perform, then you must find that JELD-WEN breached the Supply Agreement.

**Ins. No. 66 – Steves and Sons' Breach Of Warranty Claims**

Under Count 3, Steves and Sons alleges that JELD-WEN breached an express warranty and an implied warranty of merchantability:

- Steves and Sons alleges that JELD-WEN breached an express warranty in the Supply Agreement and/or an implied warranty of merchantability by supplying doorskins that were not of the quality required by the express or implied warranties and by not issuing refunds for defective doorskins that Steves and Sons never used to make completed doors.  If you find that JELD-WEN supplied doorskins that did not meet the express warranty in the Supply Agreement or the implied warranty of merchantability and that Steves and Sons has sustained damages as a result of JELD-WEN's failure to perform, then you must find that JELD-WEN breached its express or implied warranties.

- Steves and Sons alleges that JELD-WEN breached an express warranty in the Supply Agreement and/or an implied warranty of merchantability by supplying doorskins that were not of the quality required by the express or implied warranties, which doorskins were used to manufacture completed doors, and by not compensating Steves and Sons for refunds Steves and Sons had to give its own customers when those customers returned doors that were made with defective doorskins.  If you find that JELD-WEN supplied doorskins  used to manufacture completed doors that did not meet the express warranty in the Supply Agreement or the implied warranty of merchantability and that Steves and Sons has sustained damages as a result of JELD-WEN's failure to perform, then you must find that JELD-WEN breached its express or implied warranties.

Dated:  January 10, 2018                    Respectfully submitted,

                                            **STEVES AND SONS, INC.**

                                            By:   /s/Lewis F. Powell III
                                            Lewis F. Powell III (VSB No. 18266)
                                            John S. Martin (VSB No. 34618)
                                            Maya M. Eckstein (VSB No. 41413)
                                            Alexandra L. Klein (VSB No. 87711)
                                            HUNTON & WILLIAMS LLP
                                            Riverfront Plaza, East Tower
                                            951 East Byrd Street
                                            Richmond, Virginia 23219-4074
                                            Telephone:  (804) 788-8200
                                            Facsimile:   (804) 788-8218
                                            lpowell@hunton.com
                                            martinj@hunton.com
                                            meckstein@hunton.com
                                            aklein@hunton.com

                                            Glenn D. Pomerantz (*pro hac vice*)
                                            Ted Dane (*pro hac vice*)
                                            Kyle W. Mach (*pro hac vice*)
                                            Emily C. Curran-Huberty (*pro hac vice*)
                                            Gregory M. Sergi (*pro hac vice*)
                                            MUNGER, TOLLES & OLSON LLP
                                            350 S. Grand Avenue, 50th Floor
                                            Los Angeles, CA 90071
                                            Telephone:  (213) 683-9132
                                            Facsimile:  (213) 683-5161

                                            *Attorneys for Plaintiff*

                                            Marvin G. Pipkin
                                            Kortney Kloppe-Orton
                                            PIPKIN LAW
                                            10001 Reunion Place, Suite 6400
                                            San Antonio, TX 78216
                                            Telephone:     (210) 731-6495
                                            Facsimile:      (210) 293-2139

                                            *Of Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2018, I caused a copy of the foregoing to be electronically filed using the CM/ECF system, which will send notification to counsel of record of such filing by operation of the Court's electronic system.  Parties may access this filing via the Court's electronic system.

By  /s/ Lewis F. Powell III
        Lewis F. Powell III