# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

STEVES AND SONS, INC.,

    Plaintiff,

v.                              Civil Action No. 3:16-cv-545

JELD-WEN, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the INDIVIDUAL COUNTER-DEFENDANTS' MOTION FOR LEAVE TO INTERVENE (ECF No. 591) and JOHN G. PIERCE'S MOTION FOR LEAVE TO INTERVENE (ECF No. 606). For the reasons set forth below, the motions will be granted.

## BACKGROUND

Steves and Sons, Inc. ("Steves") initiated this action on June 29, 2016, asserting several antitrust and contract claims against JELD-WEN, Inc. ("JELD-WEN") related to JELD-WEN's 2012 acquisition of CraftMaster Manufacturing, Inc., as well as JELD-WEN's alleged breach of a 2012 long-term doorskin supply agreement between Steves and JELD-WEN ("the Supply Agreement"). After the matter was set for trial, the Court implemented a detailed schedule for pretrial proceedings, pursuant to which the parties engaged in extensive discovery. ECF No. 65.

On March 27, 2017, JELD-WEN sought leave to amend its Answer and to add counterclaims against Steves. JELD-WEN

asserted that the counterclaims were based on its recent detection, from documents produced by Steves during discovery, of "Steves' theft of JELD-WEN trade secrets and confidential information." ECF No. 101 at 1-2. In relevant part, the counterclaims alleged that Steves—through its principal officers, Edward Steves and Sam Steves II ("the Steves Brothers")—and two former JELD-WEN employees, John Pierce ("Pierce") and John Ambruz ("Ambruz"), had engaged in a conspiracy and had stolen trade secrets from JELD-WEN concerning how to build and operate a doorskin plant that could produce the type of doorskins that Steves was buying from JELD-WEN under the Supply Agreement.

Based on those allegations, JELD-WEN asserted the following proposed counterclaims: FIRST COUNTERCLAIM FOR RELIEF, Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836; SECOND COUNTERCLAIM FOR RELIEF, Conspiracy to Violate Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(5); THIRD COUNTERCLAIM FOR RELIEF, Violation of the Texas Uniform Trade Secret Act, Texas Civil Practice & Remedies Code Annotated §§ 134A.001 – 134A.008; FOURTH COUNTERCLAIM FOR RELIEF, Tortious Interference with Contract Under Texas Common Law, relating to Pierce's employment contract with JELD-WEN; FIFTH COUNTERCLAIM FOR RELIEF, Tortious Interference with Contract Under Texas Common Law, relating to Ambruz's employment contract with JELD-WEN; SIXTH COUNTERCLAIM

2

FOR RELIEF, Breach of the Implied Covenant of Good Faith and Fair Dealing Under Delaware Law; and SEVENTH COUNTERCLAIM FOR RELIEF, Breach of Contract. ECF No. 106 (Under Seal) ¶¶ 41-78. Steves opposed the addition of the counterclaims, arguing that they should have been brought in San Antonio, Texas, where Steves, the Steves Brothers, Pierce, and Ambruz could be sued in a single forum.[1] On May 17, 2017, the Court granted JELD-WEN's request, and JELD-WEN filed the counterclaims. Counterclaims (ECF No. 252) (Under Seal) ¶¶ 41-78. However, the Court also ordered that the trade secrets counterclaims be tried separately from the antitrust and contract claims. ECF Nos. 239-240. Trial for the counterclaims was set to begin on February 12, 2018. ECF No. 261.

On June 19, 2017, Steves moved to dismiss the Second, Sixth, and Seventh Counterclaims for failure to state a claim. The Court granted the motion on September 13, 2017, dismissing those counterclaims with prejudice. ECF Nos. 353-354. Shortly thereafter, counsel for both Steves and JELD-WEN asked the Court to move the trial of the trade secrets counterclaims to April 2018 because they said that the same lawyers would be involved extensively in the trial of the antitrust claims in January

---

[1] The parties agree that the Court did not have personal jurisdiction over the Steves Brothers and Pierce when JELD-WEN sought to file its counterclaims. That lack of jurisdiction is now moot, of course, as those individuals have consented to the Court's jurisdiction by seeking to intervene here.

2018. ECF No. 352. Based on these representations, the Court moved the trial of JELD-WEN's counterclaims to April 9, 2018. ECF No. 374.

On September 26, 2017, JELD-WEN filed an action in Texas state court, alleging the following trade secrets and related claims against the Steves Brothers and Pierce: COUNT 1, Violation of the Texas Uniform Trade Secrets Act, CPRC § 134A, against all defendants; COUNT 2, Conspiracy to Violate Texas Uniform Trade Secrets Act, CPRC § 134A, against all defendants; COUNT 3, Breach of Contract, against Pierce; COUNT 4, Tortious Interference with Contract, against the Steves Brothers; COUNT 5, Tortious Interference, against Pierce; COUNT 6, Breach of Fiduciary Duty, against Pierce; and COUNT 7, Aiding and Abetting Breach of Fiduciary Duty, against the Steves Brothers. ECF No. 403-1 ¶¶ 53-70. Those claims are based on virtually identical factual allegations to those underlying JELD-WEN's counterclaims in this action.

Then, on October 23, 2017, JELD-WEN voluntarily moved to dismiss its counterclaims in this case. ECF No. 457. In response, Steves indicated that the Steves Brothers and Pierce would consent to personal jurisdiction in this forum so that JELD-WEN could assert all its claims in one court. Steves' counsel reiterated this position at oral argument. However, JELD-WEN declined to accept that offer, instead persisting with

its motion. After briefing on that motion had been completed, JELD-WEN filed an amended complaint in the Texas case that removed several claims from the original complaint: namely, Count 1, Count 2, and Count 4. Amended Texas Petition (ECF No. 607-1) ¶¶ 53-58. As a result, the sole remaining claims in the Texas case are breach of contract (against Pierce), tortious interference with contract (against Pierce), breach of fiduciary duty (against Pierce), and aiding and abetting breach of fiduciary duty (against the Steves Brothers). See id.[2]

The Court denied JELD-WEN's voluntary dismissal motion on November 27, 2017. ECF No. 579. It found that the trade secrets case had advanced to a stage where dismissal would prejudice the parties, and that the only apparent explanation for JELD-WEN's motion—the Court's earlier dismissal of three of JELD-WEN's counterclaims—was insufficient to justify disrupting the parties' extensive trial preparation efforts. Memorandum Opinion (ECF No. 734) ("Voluntary Dismissal Op.") at 7-10. Moreover, the Court observed that, given the similarity between the pending counterclaims here and the remaining claims in the Texas case, "there is likely substantial overlap between the evidence relevant to those Texas claims and the documents already produced during discovery on the counterclaims in this case. The

---

[2] PLAINTIFF'S FIRST AMENDED PETITION AND JURY DEMAND (ECF No. 607-1) renumbers these four counts as Counts 1-4, respectively.

parties should therefore need little, if any, additional discovery for the new claims." Id. at 10-11.

Shortly thereafter, the Steves Brothers and Pierce (collectively, "the Intervenors") filed these motions to intervene as counter-defendants to certain counterclaims. The Steves Brothers seek to intervene in all remaining counterclaims: the First, Third, Fourth, and Fifth Counterclaims. Pierce, however, seeks to intervene in only the First and Third Counterclaims, which concern trade secrets misappropriation under the federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act, respectively.

## DISCUSSION

Both Intervenors have moved to intervene under Federal Rule of Civil Procedure 24(b). Under that provision, a court may, "[o]n timely motion," permit intervention by anyone who "has a claim or defense that shares with the main action a common question of law or fact."[3] Fed. R. Civ. P. 24(b)(1)(B). "In exercising its discretion [under that rule], the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Id. 24(b)(3).

---

[3] Rule 24(b) also allows permissive intervention where the party seeking intervention "is given a conditional right to intervene by a federal statute." Fed. R. Civ. P. 24(b)(1)(A). Neither Intervenor cites any federal statute granting such a right here, so Rule 24(b)(1)(B) provides the only possible grounds for intervention.

The threshold requirement for any permissive intervention motion is whether that motion is "timely." See id. 24(b)(1). To determine whether a motion to intervene is timely, the Court must "assess three factors: first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." Alt v. U.S. EPA, 758 F.3d 588, 591 (4th Cir. 2014). Among these factors, "the most important . . . is the prejudice caused to the other parties by the delay." Hill Phoenix, Inc. v. Systematic Refrigeration, Inc., 117 F. Supp. 2d 508, 514 (E.D. Va. 2000) (citing Spring Const. Co., Inc. v. Harris, 614 F.2d 374, 377 (4th Cir. 1980)). "The determination of timeliness is committed to the [Court's] sound discretion," which is "'wide'" in this context. Alt, 758 F.3d at 591 (quoting Gould v. Alleco, Inc., 883 F.2d 281, 286 (4th Cir. 1989)).

Assuming that a motion to intervene is timely, the Court's "decision whether to grant permissive intervention is a matter 'within [its] sound discretion.'" In re Rivada Networks, 230 F. Supp. 3d 467, 472 (E.D. Va. 2017) (quoting Smith v. Pennington, 352 F.3d 884, 892 (4th Cir. 2003)). "'[L]iberal intervention is desirable to dispose of as much of the controversy involving as many apparently concerned persons as is compatible with efficiency and due process.'" Liberty Mut. Fire Ins. Co. v. Lumber Liquidators, Inc., 314 F.R.D. 180, 183 (E.D. Va. 2016)

(alteration in original) (quoting <u>Feller v. Brock</u>, 802 F.2d 722, 729 (4th Cir. 1986)).

There is no dispute that the Steves Brothers and Pierce both share with Steves common defenses to the counterclaims in which they would intervene, or that common factual questions connect those parties. Although the counterclaims are asserted against Steves, they are based on the Steves Brothers' and Pierce's own steps—as principal officers of Steves and a former employee of JELD-WEN—to steal JELD-WEN's trade secrets and use them for Steves' benefit. Indeed, JELD-WEN has simultaneously asserted similar claims against the Intervenors in the Texas proceeding that are based on identical subject matter. Thus, "the nexus between the underlying claims and [the Intervenors' individual actions to misappropriate trade secrets] is irrefutable." <u>Id.</u> at 187. Given that the Intervenors can easily satisfy this requirement, the Court must now address whether their motions are timely, and if so, whether any other factors weigh against intervention here.

## I. Timeliness of the Intervenors' Motions

A review of the three <u>Alt</u> factors reveals that the Intervenors' motions to intervene are both timely.[4] There is

---

[4] The motions were filed within one day of each other, so the factors can be applied identically to each motion, except where otherwise noted.

little dispute that the first factor—the degree of progress in the case—weighs against intervention here. Both the Steves Brothers and Pierce concede that the case has "reached an advanced stage." Steves Bros. Mem. (ECF No. 592) at 4; Pierce Mem. (ECF No. 607) at 7. The Court recognized as much when it denied JELD-WEN's request to voluntarily dismiss its counterclaims, noting that the parties had engaged in extensive fact discovery, with the close of expert discovery and summary judgment soon approaching.[5] See Voluntary Dismissal Op. at 7-8, 12. This action has thus progressed far beyond the "early stages," unlike in other cases where permissive intervention was granted. Students for Fair Admissions, 319 F.R.D. at 494; see also United States v. Virginia, 282 F.R.D. 403, 405 (E.D. Va. 2012). Rather, the "relatively advanced stage" of the litigation is a reason to deny intervention. Alt, 758 F.3d at 591 (affirming denial of permissive intervention where defendant's motion to dismiss had been fully briefed and denied, scheduling order had been extended twice, and summary judgment briefing had commenced); see also Scardelletti v. Debarr, 265 F.3d 195, 202

---

[5] In fact, expert discovery has now closed, and summary judgment motions will be filed on January 24, 2018. ECF No. 374. This change does not affect the Intervenors' motions, however, since the timeliness factors "'must be appraised in light of the posture of the case at the time the motion is made.'" Students for Fair Admissions Inc. v. Univ. of N.C., 319 F.R.D. 490, 494 (M.D.N.C. 2017) (quoting R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 584 F.3d 1, 7-8 (1st Cir. 2009)); see also Alt, 758 F.3d at 591.

(4th Cir. 2001), rev'd on other grounds sub nom. Devlin v. Scardelletti, 536 U.S. 1 (2002) (timeliness requirement intended "to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal" (internal quotations omitted)). Nonetheless, "the point to which the suit has progressed . . . is not solely dispositive. Timeliness is to be determined from all the circumstances." Nat'l Ass'n for Advancement of Colored People v. New York, 413 U.S. 345, 365-66 (1973); see also Hill v. W. Elec. Co., 672 F.2d 381, 386 (4th Cir. 1982) ("[I]n ruling on motions for intervention mere passage of time is but one factor to be considered in light of all the circumstances." (internal quotations omitted)). Those other circumstances are particularly important here because, as detailed below, the Intervenors' failure to file their motions until this late stage has more to do with JELD-WEN's tactics than the Intervenors' own actions.

The second factor—prejudice to the parties—seems at first glance to also weigh against intervention. Under normal circumstances, adding two groups of intervening parties would "necessarily complicate the discovery process and consume additional resources of the court and the parties." Stuart v. Huff, 706 F.3d 345, 355 (4th Cir. 2013) (quotation marks omitted); see also British Airways Bd. v. Port Auth. of N.Y. and N.J., 71 F.R.D. 583, 585 (S.D.N.Y. 1976) ("Additional parties

always take additional time. Even if they have no witnesses of their own, they are the source of additional questions, objections, briefs, arguments, motions and the like . . . ." (internal quotations omitted)). Imposing this burden at the current stage of the trade secrets case would tax the parties' time and resources and thus prejudice their ability to complete thorough summary judgment briefing and prepare for trial. This type of prejudice does not necessarily impede intervention where it can be avoided by, for instance, "a reasonable modification of the trial schedule." Hill Phoenix, 117 F. Supp. 2d at 514-15. The Court would be amenable to a slight modification of the trial schedule. But, neither JELD-WEN nor Steves are amenable to any modification, and, under that circumstance, the Court is not inclined to further delay a trial that has already been postponed once.

Any potential prejudice is minimized, however, by the Intervenors' agreement to: (1) follow the existing pretrial and trial schedule in this case; and (2) not oppose any motion by JELD-WEN to amend its counterclaims to add claims against the Intervenors based on the same underlying facts as the pending counterclaims. Steves Bros. Mem. at 3; Pierce Mem. at 4. These limitations would be proper even if the Intervenors did not expressly consent to them; intervenors "must generally 'take the case as [t]he[y] find[] it,'" and "[i]ntervention may be subject

11

to [further] conditions based on the particular case." <u>Liberty</u> <u>Mut. Fire Ins.</u>, 314 F.R.D. at 187 (quoting <u>Newport News</u> <u>Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n</u>, 646 F.2d 117, 122 (4th Cir. 1981)). Prohibiting the Intervenors from engaging in further discovery or opposing JELD-WEN's potential motion to amend its counterclaims would help to avoid the prejudicial delays outlined above. That the Intervenors have already proposed and agreed to such limiting conditions saves the Court and the parties from having to spend unnecessary time resolving that issue.

JELD-WEN, however, contends that the Intervenors' conditions do not fully cure the prejudice it will suffer, as it would need additional discovery to fully litigate its claims against those individuals. JELD-WEN argues that, had the Intervenors been counter-defendants when JELD-WEN first asserted its counterclaims, its litigation strategy would have been completely different: it "would have served interrogatory and other discovery requests . . ., it would have been entitled to more expansive discovery of them, it would have pursued different strategies in depositions, and it would have altered the damages assessments and other opinions in its already-served expert reports." Def. Opp. (ECF No. 704) at 9. Consequently, JELD-WEN says, the Court must allow it to serve discovery requests on the Intervenors, file any necessary discovery

motions, take additional depositions based on newly-discovered information, seek any appropriate spoliation sanctions, and file supplemental expert reports incorporating new information. This extended discovery could take several months, which would require postponing the trial date yet again and thereby frustrate the parties' expectations of an imminent resolution to this dispute.

These broad arguments mostly ring hollow. As the Intervenors note, JELD-WEN's contentions are vague. JELD-WEN does not specify the interrogatories it would serve on the Intervenors, or even the topics that those interrogatories would cover; it does not elaborate on the different deposition strategies it would use if the Intervenors were parties to the litigation; and it does not explain how the Intervenors' status as counter-defendants rather than witnesses would affect its experts' opinions or its damages assessments. Moreover, many of JELD-WEN's assertions appear inconsistent with the discovery record in this case, given that most fact discovery directly implicated or involved the Intervenors. For example, JELD-WEN deposed each of the Steves Brothers three times, and Pierce two times; demanded and received document production from the Steves Brothers' personal phones and devices; received documents from Pierce in response to a subpoena; and received interrogatory responses addressing the Intervenors' individual actions, some

of which were verified by Sam Steves II. Considering this substantial amount of discovery obtained directly or indirectly from the Intervenors, the Court cannot credit JELD-WEN's generalized assertions that it could have gotten more or different discovery had the Intervenors been counter-defendants from the start of the case. See Am. Humanist Ass'n v. Md.-Nat'l Capital Park & Planning Comm'n, 303 F.R.D. 266, 271 (D. Md. 2014) (rejecting plaintiffs' vague statements about prejudice where they did "not explain how the proceedings would be delayed" or "what extra effort they would have to expend in litigating" case if organization allowed to intervene as defendant). To the contrary, the significant overlap between the Intervenors' defenses and the legal and factual issues litigated at length in this case shows that the Intervenors' earlier presence here would likely not have "unduly expand[ed] the scope of any discovery." Carcaño v. McCrory, 315 F.R.D. 176, 179 (M.D.N.C. 2016). This is particularly true with respect to the Steves Brothers, who—as Steves' principal officers—have been intimately involved in this action since Steves first asserted its antitrust and contract claims in June 2016. See Am. Humanist Ass'n, 303 F.R.D. at 271. As a result, it does not appear that allowing the Steves Brothers to intervene would meaningfully prejudice JELD-WEN or Steves.

The analysis as to Pierce is not as clear cut. As JELD-WEN notes, Pierce initially produced only 51 pages of documents in response to JELD-WEN's subpoena and did not consent to JELD-WEN's request to collect documents from his personal e-mail account or to conduct forensic imaging of his electronic devices. Although JELD-WEN acknowledges that it could have sought to compel Pierce to produce certain documents or to surrender his devices for imaging, it claims that it did not do so because a higher burden applies to discovery sought from non-parties. See In re Am. Med. Sys., Inc., MDL No. 2325, 2016 WL 6666890, at *4 (S.D. W. Va. Nov. 10, 2016); Tucker v. Am. Int'l Grp., Inc., 281 F.R.D. 85, 92 (D. Conn. 2012). Allowing Pierce to intervene after fact discovery has been completed would effectively preclude JELD-WEN from compelling any production from Pierce or forensic imaging of his devices, which it could have attempted to do had Pierce intervened earlier.

This incomplete discovery would be concerning, but JELD-WEN's discussion omits key information needed to contextualize its efforts to obtain discovery from Pierce. Indeed, JELD-WEN's counsel asserted in a letter to Pierce's counsel that courts have permitted forensic examination and mirror imaging of third-party devices "where the information sought goes to the heart of the litigation—i.e., trade secrets stolen from JELD-WEN and provided to Steves." ECF No. 722-1 at 3 (citing Chevron Corp. v.

15

E-Tech Int'l, No. 10CV1146-IEG (WMC), 2011 WL 13182855 (S.D. Cal. Feb. 11, 2011); Legacy Data Access, LLC v. MediQuant, Inc., NO. 3:17-mc-00069-FDW-DSC, 2017 U.S. Dist. LEXIS 75469 (W.D.N.C. May 17, 2017); Legacy Data Access, LLC v. Mediquant, Inc., No. 3:17-mc-00069-FDW-DSC, 2017 U.S. Dist. LEXIS 77883 (W.D.N.C. May 22, 2017)). The cases cited by JELD-WEN in its brief here similarly acknowledge that discovery of third-party electronic documents, including forensic imaging, is permissible, even if JELD-WEN must satisfy a higher burden to obtain such discovery. See In re Am. Med. Sys., 2016 WL 6666890, at *5 ("In the context of a non-party, particular consideration should be given to the intrusiveness, undue burden, and costs associated with mirror imaging."); Tucker, 281 F.R.D. at 91 ("[A]lthough the permissible scope of discovery from a non-party is generally the same as that applicable to discovery sought from parties, the burden on the party from which discovery is sought must . . . be balanced against the need for the information sought." (internal quotations and alterations omitted)). Nonetheless, after sending that letter to Pierce's counsel, JELD-WEN made no attempt to compel any production from Pierce. Based on this record, it is difficult to accept JELD-WEN's argument that Pierce was insulated from necessary discovery simply because he was a third party rather than a counter-defendant, because that assertion effectively disclaims the opposite position taken by JELD-WEN in

the letter. In reality, JELD-WEN chose to remain idle with respect to Pierce between the time it sent the letter in late September 2017 and the close of fact discovery in late October 2017, apparently deciding that it would be more likely to compel the same discovery from Pierce in the Texas case. These facts show that any failure to obtain full discovery from Pierce is attributable to JELD-WEN's inaction, not Pierce's delayed motion to intervene. Therefore, any prejudice related to discovery from Pierce should not influence the timeliness analysis much, if at all. As a result, this factor weighs in the Intervenors' favor given their consent to be bound by the existing schedule.

Finally, the third factor—the basis for the tardy filing of the motions—weighs in favor of intervention. JELD-WEN argues that the Steves Brothers and Pierce knew of JELD-WEN's counterclaims as early as March 2017 and May 2017, respectively, yet inexplicably did not seek to intervene until months later. In response, the Intervenors assert that JELD-WEN—confronted in March 2017 with the choice of suing all defendants in Texas, or suing only Steves in this Court—chose the latter option. Consequently, the Intervenors say, they concluded that they would not be sued individually for their conduct underlying JELD-WEN's counterclaims. Intervention was therefore unnecessary until it became clear, roughly six months later, that JELD-WEN

would also seek to recover against the Intervenors in the Texas proceeding.

JELD-WEN's reference to March and May 2017 as the most appropriate dates for intervention is misleading. After JELD-WEN sought leave to add its counterclaims in late March, it litigated those counterclaims vigorously in this Court for nearly six months before initiating the Texas case against the Intervenors. Those counterclaims centered on allegations of wrongdoing by the Steves Brothers and Pierce, yet at no point before September 2017 did JELD-WEN seek to hold those individuals liable, instead preferring to attack Steves alone in this forum. That JELD-WEN suddenly filed the Texas petition less than two weeks after the Court dismissed several of its counterclaims here, and then moved to voluntarily dismiss all the remaining counterclaims, strongly suggests that JELD-WEN changed its litigation strategy primarily to avoid the Court's adverse ruling, and not because it had intended to sue the Intervenors in Texas all along.

These circumstances are starkly different from those in In re CEI, LLC, No. 1:15-CV-00172-MOC, 2016 WL 3556606 (W.D.N.C. June 29, 2016), in which an individual seeking to intervene "waited until the completion of discovery and the commencement of settlement negotiations to file her Motion, and offer[ed] no reason for this delayed action." Id. at *3. Given the length of

time between JELD-WEN's introduction of the counterclaims in this action and its filing of the Texas case, as well as JELD-WEN's continued interest in litigating its counterclaims here even after the Court dismissed several counterclaims, the Intervenors could have reasonably concluded that JELD-WEN would never sue them in any forum. There was no need for them to intervene between March and May 2017 because they believed that they had no interests to protect.[6] When JELD-WEN changed course and sued the Intervenors in Texas in late September 2017, they moved to intervene two months later, and only a few days after the Court denied JELD-WEN's motion to voluntarily dismiss its counterclaims (which, if granted, would have precluded the filing of any intervention motions).[7] Thus, it is not the case that the Intervenors "gambled and lost in the execution of [their] litigation strategy." Alt, 758 F.3d at 591. Far from sitting by and waiting for the right moment in the litigation to intervene, the Intervenors filed their motions shortly after

---

[6] It is unreasonable to imply, as JELD-WEN does, that the Intervenors should have moved to intervene earlier given the possibility that they would be sued in another forum. Although that possibility existed when JELD-WEN first sought leave to amend its answer in March 2017, the prospect of individual liability diminished with each month that JELD-WEN litigated its counterclaims here.

[7] In addition, even though the Intervenors did not formally move to intervene until late November 2017, they made their interest in doing so clear as early as October 30, 2017, when Steves opposed JELD-WEN's motion to voluntarily dismiss its counterclaims. See ECF No. 462 at 3 & n.4.

JELD-WEN's strategies implicated their individual interests for the first time. Therefore, the Intervenors' explanation for their delay in seeking to intervene is compelling, and weighs in favor of intervention.

Exercising its discretion, the Court concludes that the Intervenors' motions are timely under the circumstances discussed above. Notwithstanding the advanced stage of the trade secrets case, the Intervenors have a reasonable explanation for the delayed filing of their motions, and have agreed to be bound by the agreed-upon pretrial and trial schedule, reducing any prejudice to JELD-WEN and Steves.

## II. Other Relevant Factors

Although the Intervenors' motions are timely, the Court must still consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). The Court may also consider "concerns of judicial economy and need for guidance" in deciding whether permissive intervention is appropriate here. In re Sierra Club, 945 F.2d 776, 779 (4th Cir. 1991).

The Court has already explained why intervention will not likely cause prejudice to Steves and JELD-WEN, but undue delay in this context presents slightly different considerations that are not part of the timeliness inquiry. It is important that Rule 24(b) mentions only undue delay; normal delay does not

20

require denying intervention, because "[a]dding parties to a case almost always results in some delay . . . . In determining whether extra time would be an undue delay, the court must balance the delay threatened by intervention against the advantages promised by it." Ohio Valley Envtl. Coal., Inc. v. McCarthy, 313 F.R.D. 10, 30 (S.D. W. Va. 2015) (citing 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Proc. § 1913 (3d ed. 2005)); see also Lee v. Va. Bd. of Elections, No. 3:15CV357-HEH, 2015 WL 5178993, at *4 (E.D. Va. Sept. 4, 2015) (courts should consider whether "undue delay exists without a corresponding benefit to the process, the litigants, or the court, especially where an existing party zealously pursues the same ultimate objectives as a movant" (citing Stuart, 706 F.3d at 355)).

Here, intervention will benefit the judicial process by allowing the Steves Brothers and Pierce to assert arguments based on their individual interests and avoid "inconsistent rulings" between this case and the Texas proceeding. Liberty Mut. Fire Ins., 314 F.R.D. at 187. Pierce points out that, given the substantial factual similarity between this case and the Texas action, any judgment on the counterclaims here "could have a preclusive effect under res judicata doctrines" in Texas. Pierce Mem. at 5. JELD-WEN contends that this argument is mistaken because its counterclaims have "no overlap" with the

claims against Pierce in the Texas case, and Pierce is not in privity with Steves. Def. Opp. at 13. However, JELD-WEN itself has stated that the allegations underlying the counterclaims "directly implicate" Pierce, ECF No. 722-1 at 1, and those allegations form the basis for the claims against Pierce in the Texas case. Moreover, a comparison of the operative complaint in Texas and the counterclaims here shows significant similarities. Thus, there is a clear overlap between the counterclaims and the Texas claims, even if those claims are aimed at different parties. In addition, whether Pierce is, in fact, in privity with Steves is not the relevant issue. Privity appears to be required for either res judicata or collateral estoppel to apply against Pierce in the Texas case, see Sysco Food Servs., Inc. v. Trapnell, 890 S.W.2d 796, 802 (Tex. 1994); Barr v. Resolution Tr. Corp. ex rel. Sunbelt Fed. Sav., 837 S.W.2d 627, 630 (Tex. 1992), but the Texas court would need to resolve that issue, and it would be premature for the Court to do so here. For purposes of resolving Pierce's motion, it is enough that the issues decided in this case might well have preclusive effect in the Texas case given the identical underlying allegations. Cf. In re Rivada Networks, 230 F. Supp. 3d at 472-473 ("[T]here is no question that the requested information might be used against [intervenor] in the contemplated civil and other judicial

proceedings in Mexico arising from [the same subject matter] . . . ." (quotation marks omitted)).

JELD-WEN claims that intervention will be inefficient because JELD-WEN will continue to litigate its individual claims against the Intervenors in the Texas case, which has not been stayed. This argument is predicated on the belief that the primary basis for the Intervenors' motions is to defend against JELD-WEN's claims in this Court rather than in Texas. But even if that statement is accurate, JELD-WEN fails to explain why that motivation is problematic where, as here, the intervention motions are timely and intervention will not unduly delay or prejudice the adjudication of Steves' and JELD-WEN's rights. There is no dispute that JELD-WEN is "the master of [its] complaint," both here and in Texas, Lincoln Prop. Co. v. Roche, 546 U.S. 81, 91 (2005) (internal quotations omitted), and it can continue litigating its claims in Texas notwithstanding the Intervenors' addition as counter-defendants here. That JELD-WEN might have to prosecute similar claims at the same time in different courts is a situation of its own making. In any event, permitting intervention here will bring all implicated parties together in one forum and help avoid inconsistent rulings between this Court and the court presiding over the Texas case, so intervention serves the goals of judicial economy.

For these reasons, intervention would not unduly delay or prejudice the adjudication of Steves' and JELD-WEN's rights, and the Intervenors' motions will therefore be granted.

## III. Conditions Requested by JELD-WEN

JELD-WEN requests that the Court impose two conditions on the Intervenors in the event that it grants their motions. First, it argues that the Intervenors should not be allowed to expand the scope of the issues beyond those that presently exist in this case. Second, it asserts that the Court should allow it to serve the Intervenors with discovery, file any necessary discovery and sanctions motions, and supplement its expert reports, but the Court should prevent the Intervenors and Steves from taking any additional discovery. The Intervenors oppose these conditions on the grounds that they unnecessarily limit the Intervenors' ability to defend the case and give JELD-WEN an improper advantage in the litigation.

The Court will not grant either of JELD-WEN's requests. As noted, courts may impose conditions on intervention that account for the particular circumstances of a case. See Liberty Mut. Fire Ins., 314 F.R.D. at 187. But the Intervenors have already agreed to abide by the existing pretrial and trial schedule, which is a significant limitation given the advanced stage of the case. With respect to the scope of the issues, it is unclear what additional issues the Intervenors could insert into the

24

litigation, consistent with the schedule, beyond those that already exist. If any such issues arise, the Court can consider them upon the request of the Steves Brothers or Pierce. With respect to discovery, the Court has already found that additional discovery should not be necessary given the discovery that has already been obtained. However, if (particularly as to Pierce) JELD-WEN can show a particularized need for discovery, the parties can discuss it, and the Court can entertain it upon a proper showing. And, in that event, whether Steves should be permitted to take discovery can be assessed in perspective of a record respecting specific circumstances and needs.

## CONCLUSION

For the foregoing reasons, the INDIVIDUAL COUNTER-DEFENDANTS' MOTION FOR LEAVE TO INTERVENE (ECF No. 591) and JOHN G. PIERCE'S MOTION FOR LEAVE TO INTERVENE (ECF No. 606) will be granted.

It is so ORDERED.

/s/     REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: January 19, 2018

25