

FEB - 6 2018

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

STEVES AND SONS, INC.,

    Plaintiff,

v.                         Civil Action No. 3:16cv545

JELD-WEN, INC.,

    Defendant.


## MEMORANDUM OPINION

This matter is before the Court on PLAINTIFF STEVES AND SONS, INC.'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OR ARGUMENT THAT CMI WOULD HAVE EXITED THE DOORSKIN MARKET HAD IT NOT BEEN ACQUIRED BY JELD-WEN (ECF No. 499). For the reasons set forth below, the motion will be granted.

## BACKGROUND

Steves & Sons, Inc. ("Steves") alleged that JELD-WEN, Inc. ("JELD-WEN") violated Section 7 of the Clayton Act when it acquired CraftMaster Manufacturing, Inc. ("CMI") in 2012. Compl. (ECF No. 5) (Under Seal) ¶¶ 175-78. To prevail on that claim, Steves must show that "the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18.

JELD-WEN asserts that it will argue that the CMI acquisition could not have substantially lessened competition

because CMI's "weakened competitive condition" at the time of the acquisition made it "unlikely to be able to compete as effectively as a seller of doorskins, whether or not it remained in business." Def. Opp. (ECF No. 654) (Under Seal) at 2.

> In particular, JELD-WEN will show through fact witnesses, including Bob Merrill [("Merrill")], the CEO of CMI at the time of the Acquisition, as well as JELD-WEN's experts, that CMI was in severe financial distress when its owners decided to sell the assets. CMI's financial distress was a direct result of the catastrophic housing market crash in 2007. CMI had lost money every year since 2008 and that had been kept afloat by a $36 million loan from the two families who owned it. In 2010, CMI suffered a net loss of $8.9 million. In 2011, it lost $11.9 million. As of March 30, 2012, CMI owed an additional $16.7 million under third party loan agreements that were set to expire in October of that year, with no commitments from any of its lenders to refinance those borrowings. As a result, CMI's own independent auditors reported that these debts, combined with the fact that "business has been negatively impacted by the prolonged downturn in the U.S. homebuilding industry . . . raise substantial doubt about [CMI]'s ability to continue as a going concern."

Id. at 2-3 (alteration in original) (internal citations omitted). Steves moves to exclude at trial: (1) any evidence or argument that CMI "would have exited the market" had it not been acquired by JELD-WEN; and (2) any evidence or argument that CMI

"would not have continued to be an effective competitor" absent any merger. Pl. Mem. (ECF No. 502) (Under Seal) at 2, 10.

JELD-WEN also says that:

> JELD-WEN . . . will show the jury that there is no likelihood of anticompetitive effects, because CMI would not likely have remained an effective competitor absent the Acquisition. JELD-WEN is entitled to present evidence to the jury that would permit the jury to find that CMI would not have remained an effective seller of doorskins in competition with JELD-WEN absent the Acquisition, even if CMI somehow found a way to survive as an independent entity.

Id. at 5. Similarly, it argues that:

> JELD-WEN's economist, [Edward] Snyder [("Snyder")], put the question squarely at issue, critiquing Professor [Carl] Shapiro [("Shapiro")] for failing to give this important evidence proper economic consideration. E. Snyder Rep. at ¶¶ 117-121 . . . (explaining how the substantial evidence of CMI's weakness rebuts Professor Shapiro's analysis of anticompetitive effects) . . . . In short, Professor Shapiro was fully aware of the evidence and the competitive implications of CMI's weakened financial state and inability to compete that was developed during fact discovery in this case; he simply chose not to address it other than to say it did not satisfy the failing firm defense. . . .
>
> It was the choice of Steves and its expert, not JELD-WEN, to have Dr. Shapiro ignore the merits of CMI's inability to effectively compete. He (and Steves) must live with his failure to address the issue.

Def. Response to Pl. Suppl. Brief (ECF No. 887) at 5-6.

As the arguments progressed on the issue, JELD-WEN took the view that Snyder's evidence is really only to show that Shapiro's analysis is flawed because he did not factor in CMI's financial difficulties when he assumed that, absent the merger, the market would continue in the way it was in 2012. So, as things now stand, that is the predicate for JELD-WEN's use of CMI's weakened financial condition.

## DISCUSSION

Assessing a Section 7 claim involves a three-step burden-shifting framework, an understanding of which provides helpful context for the admissibility of this evidence. First, the plaintiff must establish a prima facie case that a merger is anticompetitive. Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd., 778 F.3d 775, 783 (9th Cir. 2015). To do so, the plaintiff "must (1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive," FTC v. Penn State Hershey Med. Ctr., 838 F.3d 327, 337-38 (3d Cir. 2016), which typically involves statistical analysis of market concentration and market share before and after the merger, United States v. Anthem, Inc., 855 F.3d 345, 349 (D.C. Cir. 2017). Second, if the plaintiff shows a prima facie case, the defendant must rebut the presumption—either by "provid[ing] sufficient evidence that the

4

prima facie case inaccurately predicts the relevant transaction's probable effect on future competition," or by "sufficiently discredit[ing] the evidence underlying the initial presumption" (the market share evidence offered by the plaintiff). Id. (internal quotations omitted). Third, if that rebuttal is successful, "the burden of production shifts back to the [plaintiff] and merges with the [plaintiff's] ultimate burden of persuasion." Saint Alphonsus, 778 F.3d at 783 (internal quotations omitted).

Two similar defenses available to rebut the prima facie case are relevant to the arguments made here. The first, the "failing company" defense, applies where "the resources of [a] company [a]re so depleted and the prospect of rehabilitation so remote" that its acquisition could not substantially lessen competition under Section 7. Citizen Publ'g Co. v. United States, 394 U.S. 131, 137 (1969) (emphasis added) (citing Int'l Shoe Co. v. FTC, 280 U.S. 291, 302 (1930)). A defendant invoking this defense, here JELD-WEN, bears the burden of showing three elements to succeed. See id. at 138-39. First, it must establish that the merging firm faces "a grave probability of a business failure." United States v. Gen. Dynamics Corp., 415 U.S. 486, 507 (1974) (emphasis added); see also Dr. Pepper/Seven-Up Cos., Inc. v. FTC, 991 F.2d 859, 864 (D.C. Cir. 1993) (requiring

5

showing that acquired company "is in imminent danger of failure"). The "most important factor" in considering this element is "whether the firm is insolvent or on the brink of insolvency either in the bankruptcy sense, that the firm has no net worth, or in the equity sense, that the firm is unable to meet its debts as they come due." California v. Sutter Health Sys., 130 F. Supp. 2d 1109, 1133 (N.D. Cal. 2001). Second, it must show that the prospects for reorganization under the bankruptcy laws are "dim or nonexistent," Citizen Publ'g, 394 U.S. at 138, such that successful reorganization is "no[t] realistic,"[1] Dr. Pepper/Seven-Up Cos., 991 F.2d at 865. Third, JELD-WEN must establish that the merging firm has "tried and failed to merge with a company other than the acquiring one." Gen. Dynamics, 415 U.S. at 506. As a corollary to that requirement, the defendant must show that "the company that acquires the failing company . . . is the only available

---

[1] Not all courts agree that this is "an actual requirement of the failing company defense." Sutter Health Sys., 130 F. Supp. 2d at 1135. The evidence here seems to be that the owners of CMI did not want to reorganize because, in bankruptcy, the loans that they made to the company would not be recoupable. The record does not show that bankruptcy was not available. However, as discussed below, whether that requirement is met here is immaterial to the admissibility of JELD-WEN's evidence.

purchaser." <u>Citizen Publ'g</u>, 394 U.S. at 138.[2] Given these strict requirements, the leading antitrust treatise has observed that the defense "rarely succeeds." 4A Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 953 (4th ed. 2016).

The second relevant defense, the so-called "'weakened competitor'" argument, is "'probably the weakest ground of all for justifying a merger.'" <u>ProMedica Health Sys., Inc. v. FTC</u>, 749 F.3d 559, 572 (6th Cir. 2014) (quoting <u>Kaiser Aluminum & Chem. Corp. v. FTC</u>, 652 F.2d 1324, 1339 (7th Cir. 1981)). Courts generally "credit such a defense only in rare cases, <u>when the defendant makes a substantial showing that the acquired firm's weakness, which cannot be resolved by any competitive means, would cause that firm's market share to reduce to a level that would undermine the [plaintiff]'s prima facie case</u>." <u>FTC v. Univ. Health, Inc.</u>, 938 F.2d 1206, 1221 (11th Cir. 1991) (emphasis added); <u>see also</u> Areeda & Hovenkamp, <u>supra</u>, ¶ 963a3

---

[2] The Horizontal Merger Guidelines impose substantially similar requirements, not "credit[ing] claims that the assets of the failing firm would exit the relevant market unless all of the following circumstances are met: (1) the allegedly failing firm would be unable to meet its financial obligations in the near future; (2) it would not be able to reorganize successfully under Chapter 11 of the Bankruptcy Act; and (3) it has made unsuccessful good-faith efforts to elicit reasonable alternative offers that would keep its tangible and intangible assets in the relevant market and pose a less severe danger to competition than does the proposed merger." U.S. Dep't of Justice & Fed. Trade Comm'n, <u>Horizontal Merger Guidelines</u> § 11 (2010); <u>see also</u> <u>FTC v. Arch Coal, Inc.</u>, 329 F. Supp. 2d 109, 154 (D.D.C. 2004).

("[F]inancial difficulties should not be a defense to an otherwise objectionable merger <u>unless it is reasonably clear that (1) if unresolved, they would cause the firm's market share to decline to a level that would make the merger permissible</u>; and (2) there is <u>no competitively preferable alternative</u> for resolving them.") (emphasis added). This defense is derived from <u>General Dynamics</u>, in which the Supreme Court held that the market share statistics introduced by the government were "insufficient to sustain its case because, by failing to take into account the acquired firm's long-term contractual commitments, the statistics overestimated the acquired firm's ability to compete in the relevant market in the future." <u>Univ. Health</u>, 938 F.2d at 1220 (citing <u>Gen. Dynamics</u>, 415 U.S. at 500-04); <u>see also</u> <u>FTC v. H.J. Heinz Co.</u>, 246 F.3d 708, 715 n.7 (D.C. Cir. 2001). Thus, a defendant's showing on rebuttal of "[a] weak financial condition, or limited reserves, may mean that a company will be a far less significant competitor than current market share, or production statistics, appear to indicate." <u>Arch Coal</u>, 329 F. Supp. 2d at 153.

Whatever theory is used to introduce evidence, it must be relevant to be admissible. <u>See</u> Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact

is of consequence in determining the action." Id. 401. This standard is a "low barrier to admissibility"; to satisfy it, "evidence need only be worth consideration by the jury, or have a plus value." United States v. Leftenant, 341 F.3d 338, 346 (4th Cir. 2003) (internal quotations omitted). In addition, even if evidence is relevant, the Court can still exclude it if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Steves explicitly seeks exclusion only under Rule 403, but its arguments first require analysis under Rule 401.

## I.   Rule 401

Steves contends that JELD-WEN should not be able to introduce evidence that CMI might have exited the market if it had not been acquired by JELD-WEN because JELD-WEN has not alleged a failing firm defense, and its experts' testimony did not implicate that defense. Moreover, Steves argues, JELD-WEN cannot show that CMI: (1) faced a "grave probability" of business failure; (2) ever contemplated the possibility of reorganization under Chapter 11; or (3) could not have merged with any other company besides JELD-WEN. Similarly, Steves claims that the evidence does not show that CMI had no

9

alternatives other than being acquired by JELD-WEN or that CMI's market share would have decreased enough to undermine Steves' market share calculations without the acquisition, both prerequisites for a weakened competitor defense. Consequently, because JELD-WEN has neither alleged, nor could establish, a failing firm or weakened competitor defense, evidence of CMI's financial condition should be excluded.

In response, JELD-WEN concedes that it has not alleged a failing firm defense, and it acknowledges that it lacks the evidence to establish that position. However, in its brief, JELD-WEN asserts that evidence of CMI's inability to compete effectively in the doorskin market beyond 2012—consisting primarily of testimony by Merrill and JELD-WEN's experts—is relevant for two different reasons. First, it says, such evidence will undermine the assumption made by Shapiro, Steves' expert on antitrust liability, that CMI would have remained an effective competitor in the absence of any acquisition, such that Steves will be unable to establish its prima facie case.[3] Second, JELD-WEN argues that, even if Steves could establish its prima facie case, CMI's circumstances are analogous to those of

---

[3] At the Final Pretrial Conference ("FPTC"), JELD-WEN restated this position in different form, arguing that this evidence would expose Shapiro's testimony as unreliable because Shapiro's market share calculations did not account for non-statistical evidence of CMI's financial weakness.

the weakened company in General Dynamics, so JELD-WEN can present rebuttal evidence that would allow the jury to find that CMI would not have remained an effective competitor after 2012. Although JELD-WEN states these arguments as two separate grounds for relevance, it does not explain how they are distinct. Indeed, both arguments rely on the same core assertion: that the market share statistics that Steves will use to establish its prima facie case are unreliable because they overstate CMI's future ability to compete given its weak financial condition. In other words, JELD-WEN is relying on the weakened competitor theory to show the relevance of this evidence. See Gen. Dynamics, 415 U.S. at 508; ProMedica Health Sys., 749 F.3d at 572; Univ. Health, 938 F.2d at 1221.

The evidence identified by JELD-WEN is not relevant on a failing firm theory. In its prima facie case, Steves only must show a likelihood of anticompetitive effects, which it can do by examining market concentration before and after the merger. Anthem, 855 F.3d at 349. The events preceding the merger that affected CMI's financial condition are not relevant to this showing, which depends on statistical calculations, but may be relevant on rebuttal to the extent that JELD-WEN will attempt to establish a failing firm defense. See United States v. Phillips Petroleum Co., 367 F. Supp. 1226, 1258–59 (C.D. Cal. 1973),

11

aff'd sub nom. Tidewater Oil Co. v. United States, 418 U.S. 906 (1974) ("[U]nless the seller objectively comes within the 'failing company' doctrine, it is irrelevant why one corporation sells its assets to another.[4] The issue in an antitrust case is not a determination of the reasons for selling, but only the anticompetitive effect of the sale."). JELD-WEN, however, asserts that it will not make any such attempt, so its evidence cannot be relevant in that sense.

JELD-WEN's discussion of the weakened competitor theory holds more weight. Evidence of "[t]he weakness of the acquired firm is only relevant if the defendant demonstrates that this weakness undermines the predictive value of the [plaintiff]'s market share statistics." Univ. Health, 938 F.2d at 1221 (emphasis added). Consequently, to establish the relevance of CMI's weak financial condition, JELD-WEN must be able to show that Steves' market share statistics overestimate CMI's ability to compete in the doorskin market if JELD-WEN had never acquired it. JELD-WEN argues that it has made such a showing because it has introduced evidence that, as in General Dynamics, CMI was in

---

[4] This case preceded the Supreme Court's decision in General Dynamics, upon which the weakened competitor defense is based. See Univ. Health, 938 F.2d at 1221. The Phillips Petroleum court would therefore have had no reason to consider that separate basis for the relevance of financial weakness when it made this statement about the irrelevance of such information.

a precarious financial position in 2012 that was different from preceding years. Accordingly, CMI's "past production does not . . . necessarily give a proper picture of [it]s future ability to compete." General Dynamics, 415 U.S. at 493.

Although JELD-WEN relies on General Dynamics almost exclusively in support of admissibility, that case is inapposite here. The district court there had found that an acquisition challenged under Section 7 did not substantially lessen competition after considering evidence relating to: (1) fundamental changes in the structure of the coal industry, from producing coal for spot purchases in the open market to distributing coal under long-term supply agreements; and (2) the acquired company's depleted coal reserves at the time of the acquisition. Gen. Dynamics, 415 U.S. at 501-06. Given those industry shifts, the company's past production figures based on spot sales inaccurately reflected the company's future ability to distribute coal under long-term supply agreements, which was limited by its depleted reserves. See id. The government contended on appeal that defendant could not rely on evidence of those depleted reserves because it had not established a failing company defense. Id. at 506. The Supreme Court, however, held that such evidence was relevant to

an entirely different point. Rather than
showing that [the acquired company] would
have gone out of business but for the
merger . . ., the finding of inadequate
reserves went to the heart of the
Government's statistical prima facie case
based on production figures and
substantiated the District Court's
conclusion that [the acquired company], even
if it remained in the market, did not have
sufficient reserves to compete effectively
for long-term contracts.

Id. at 508. In other words, the "unique economic circumstances
[of the coal industry] . . . undermine[d] the predictive value
of the government's statistics" because those economic factors
showed that the statistics were based on a flawed methodology.
H.J. Heinz, 246 F.3d at 715 n.7; see also Univ. Health, 938 F.2d
at 1218.

JELD-WEN's attempts to compare this case with the unique
situation in General Dynamics are unsuccessful. The evidence of
CMI's financial condition only shows that "Steves pulled its
doorskin volume from CMI," and that "CMI was hemorrhaging money
and had no plan to pay off or refinance its debts." Def. Opp. at
8. By JELD-WEN's own admission, these facts pertain to CMI's
"financial wherewithal and . . . available customer base," not
its resources. Id. Indeed, as Steves points out, CMI was fully
able to continue manufacturing doorskins at the time of the 2012
merger, and there is no evidence that the doorskin industry was

experiencing the same fundamental changes around 2012 as the coal industry in General Dynamics. Given these factual distinctions, JELD-WEN cannot rely on General Dynamics alone to show the relevance of this evidence.

However, under the broader weakened competitor theory that has developed from that case, evidence of an acquired company's financial weakness may be probative of the lack of anticompetitive effects from a merger. See Univ. Health, 938 F.2d at 1221 ("The acquired firm's weakness . . . is one of many possible factors that a defendant may introduce to rebut the [plaintiff]'s prima facie case."). Indeed, "several courts have relied on the weak and worsening position of the proposed acquired company as a significant factor in declining to enjoin a proposed merger." Arch Coal, 329 F. Supp. 2d at 153 (citing Lektro-Vend Corp. v. Vendo Co., 660 F.2d 255, 276 (7th Cir. 1981) (discussing district court's reliance on evidence of acquired firm's "deteriorating market position prior to the acquisition" in affirming judgment in defendant's favor on Section 7 claim); FTC v. Nat'l Tea Co., 603 F.2d 694, 699-700 (8th Cir. 1979) (district court properly relied on evidence of "the imminent departure of [acquired firm] from the relevant market and the increased concentration that would result" in finding that acquired firm's "present market share was an

15

inaccurate reflection of its future competitive strength")); see

also United States v. Int'l Harvester Co., 564 F.2d 769, 773

(7th Cir. 1977) ("In responding to a statistical showing of

concentration and in concluding that Section 7 was not violated,

[district court] properly considered evidence of [acquired

firm]'s 'weakness as a competitor.'" (quoting Gen. Dynamics, 415

U.S. at 503)).[5] Such evidence is only relevant, though, in the

limited circumstances noted above—that is, where the "weakness

undermines the predictive value of the [plaintiff]'s market

share statistics." Univ. Health, 938 F.2d at 1221 (emphasis

added); see also Arch Coal, 329 F. Supp. 2d at 154 ("[T] the

evidence of financial or other weakness must genuinely undercut

---

[5] JELD-WEN seemed to assert at the FPTC that it is not seeking to introduce evidence of CMI's condition under the weakened competitor defense, but instead only to undermine Shapiro's analysis. This contention relies selectively on older case law that did not clearly define the weakened competitor theory: Kaiser Aluminum, International Harvester, Lektro-Vend, and National Tea. More recent cases have universally recognized that those older cases, even if they did not specifically mention the weakened competitor defense, were in reality discussing that defense when they examined the principles derived from General Dynamics. See ProMedica Health Sys., 749 F.3d at 572; Univ. Health, 938 F.2d at 1221; United States v. Aetna Inc., 240 F. Supp. 3d 1, 92 (D.D.C. 2017); Arch Coal, 329 F. Supp. 2d at 153-54. JELD-WEN cannot avoid the requirements of the defense by ignoring these newer cases and rephrasing its argument.

the statistical showing of anticompetitive market concentration." (emphasis added)).[6]

Based on the evidence that JELD-WEN has offered as the predicate for admissibility, JELD-WEN could not meet this standard here. Indeed, JELD-WEN's proffered evidence does not show that CMI's market share in the absence of the merger—if it correctly accounted for the effect of CMI's alleged weakness on its competitive ability—would "reduce to a level that would undermine" Steves' prima facie case, or that CMI's poor condition could not "be resolved by any competitive means."

_____

[6] Steves also argued at the FPTC that the weakened competitor defense is an affirmative defense, so JELD-WEN's evidence could not possibly be relevant here because JELD-WEN never pleaded that defense in its Answer. It is true that a defendant must make a certain showing to establish that defense. See ProMedica Health Sys., 749 F.3d at 572; Univ. Health, 938 F.2d at 1221. But some courts have used the terms "defense" and "argument" interchangeably when discussing the weakened competitor theory, suggesting that it is only a rebuttal argument that a defendant can develop throughout litigation and present evidence in support of at trial. See ProMedica Health Sys., 749 F.3d at 572; Aetna, 240 F. Supp. 3d at 92. Moreover, the only court to have addressed this argument directly has rejected it. See Kaiser Aluminum, 652 F.2d at 1340 ("Characterization of the defense in General Dynamics as an 'affirmative defense' is wrong. General Dynamics does not require the defendant to present a defense upon which he bears the burden of proof in the sense of ultimately persuading the trier of fact that he is entitled to relief. General Dynamics requires the defendant to come forward with evidence to rebut the government's prima facie case of substantial lessening of competition through statistics showing increase in market share and concentration in relevant product markets."). JELD-WEN's failure to plead this defense is therefore not dispositive of the relevance question.

Univ. Health, 938 F.2d at 1221. The evidence of CMI's decline therefore appears to fall far short of the "imminent, steep plummet" required to make a "substantial showing" of statistical unreliability. FTC v. ProMedica Health Sys., Inc., No. 3:11 CV 47, 2011 WL 1219281, at *58 (N.D. Ohio Mar. 29, 2011) (noting that defendant would need to show that market share dropped "from 11.5 percent to less than 2 percent for GAC services and from 9.3 percent to less than 1.3 percent for OB services" to establish weakened competitor defense).

At the same time, JELD-WEN is right that the cases discussed above do not require the exclusion of evidence merely because a defendant has a weak claim to the defense.[7] Rather, courts have needed to weigh evidence of the acquired firm's weakened condition to determine if that defense is persuasive. See Aetna, 240 F. Supp. 3d at 92; Arch Coal, 329 F. Supp. 2d at 153-57. Those cases imply that such evidence is admissible where

---

[7] Although University Health stated that "[t]he weakness of the acquired firm is only relevant if the defendant demonstrates that this weakness undermines the predictive value of the government's market share statistics," that case was discussing the showing needed to "credit such a defense" at trial, not the showing needed to have such evidence admitted in the first place. See 938 F.2d at 1221 (emphasis added). Indeed, requiring a defendant to provide sufficient evidence of the acquired firm's weakness before even considering that evidence would be contrary to general principles of evidence, under which individual pieces of evidence are admitted or excluded based on each piece's relevance to the issues in the case. See Fed. R. Evid. 401.

it is relevant to a defendant's theory that the statistical evidence underlying the plaintiff's prima facie case gives an inaccurate account of the acquired firm's future market share. Here, JELD-WEN's liability expert, Snyder, claimed that Shapiro's market share statistics were flawed because they did not account for CMI's financial weakness at the time of the merger in 2012. Consequently, evidence of CMI's weak financial state could conceptually be probative of an argument that JELD-WEN may make in rebuttal to Steves' prima facie case.

But, the record does not take JELD-WEN beyond the conceptual. Instead, the manner in which JELD-WEN proposes to use Snyder's testimony is actually a backdoor into the weakened competitor defense, the components of which JELD-WEN simply has not satisfied. Furthermore, even if that were not so, and Snyder's evidence is regarded as relevant only for its value to impeach Shapiro, the relevance is marginal.

## II. Rule 403

Under Rule 403, evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The probative value of CMI's financial circumstances, as advanced by Snyder and as principally argued by JELD-WEN, is

a thinly disguised, watered-down version of the weakened competitor defense. That theory of defense has been called "the Hail-Mary pass of presumptively doomed mergers" because an acquired company's weakness is "'probably the weakest ground of all for justifying a merger.'" ProMedica Health Sys., 749 F.3d at 572 (quoting Kaiser Aluminum, 652 F.2d at 1339). Because JELD-WEN cannot sustain a weakened competitor defense, evidence of CMI's financial difficulties would not be tethered to the issues of anticompetitive effects that the jury must decide. Thus, that evidence would be left afloat, and the jury would be left to speculate as to its significance.

And, for the evidence to be used to measure the validity of Shapiro's method of analysis (i.e., for impeachment purposes), it would be necessary to get fully into the weakened competitor defense, thereby making the impeachment value of CMI's financial condition substantially more prejudicial than probative.

The cases cited by JELD-WEN provide no guidance on the admissibility of its evidence under Rule 403. Those cases involved bench trials or judicial hearings, so that rule was not even implicated. See Lektro-Vend, 660 F.2d at 262; Nat'l Tea, 603 F.2d at 695-96; Int'l Harvester, 564 F.2d at 772. Moreover, the acquired firms in those cases were in much more dire financial positions than CMI in 2012, having lost money for

several years, or their financial conditions continued to decline _after_ the mergers at issue. See Lektro-Vend, 660 F.2d at 276; Nat'l Tea, 603 F.2d at 699; Int'l Harvester, 564 F.2d at 774-76. This evidence of financial weakness was thus highly probative of the validity of market share statistics, and the risk of misleading the jury nonexistent. Therefore, those cases are inapplicable to the unique procedural circumstances here.

JELD-WEN appears to be correct that courts have not previously excluded this type of evidence on Rule 403 grounds. However, in this particular case, the absence of precedent speaks more to the procedural novelty of this case, which involves a Section 7 claim that will be tried to a jury—a point that JELD-WEN's counsel has made repeatedly. Furthermore, courts have excluded evidence under Rule 403 where defendants appeared to have ulterior motives in presenting the evidence. See Devine v. Pittsburgh Bd. of Pub. Educ., No. 2:13-CV-220, 2015 WL 7871059, at *3 (W.D. Pa. Dec. 3, 2015) (evidence relating to plaintiff's previously-rejected retaliation claim excluded where plaintiff attempted to present retaliation theory "through the back door" by conflating evidence of that theory with racial discrimination claim); Transamerica Life Ins. Co. v. Lincoln Nat. Life Ins. Co., 597 F. Supp. 2d 897, 907 (N.D. Iowa 2009) (evidence that was inadmissible to show patent invalidity could

not be introduced for purpose of rebutting defendant's arguments about prior art because of potential for confusing jury). Similarly, JELD-WEN seems to want the jury to decide the anticompetitive effects question based primarily on the evidence of CMI's financial condition, even though JELD-WEN is aware that it likely cannot establish—indeed, has not even pled—a failing firm or weakened company defense. Here the risk of jury confusion is high. This is a complex case, and evidence of marginal relevance cannot be used if it tends to confuse the jury. As a result, the risk of jury confusion from evidence about defenses not even pled, or minimally argued, substantially outweighs any marginal relevance the evidence would have.

### CONCLUSION

For the foregoing reasons, PLAINTIFF STEVES AND SONS, INC.'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OR ARGUMENT THAT CMI WOULD HAVE EXITED THE DOORSKIN MARKET HAD IT NOT BEEN ACQUIRED BY JELD-WEN (ECF No. 499) will be granted.

It is so ORDERED.

_____  /s/ _____
Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: February 5, 2018