UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

|  |  |  |
|---|---|---|
| STEVES AND SONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:16-cv-545-REP |
| v. | ) | |
| | ) | |
| JELD-WEN, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## JELD-WEN, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW

Steves and Sons, Inc. ("Steves") has had a full opportunity to present its case and to introduce all the evidence it has in support of its claims against JELD-WEN, Inc. ("JELD-WEN"). It is now clear that JELD-WEN is entitled to judgment as a matter of law under Fed. R. Civ. P. 50.

Judgment as a matter of law is appropriate where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "Such a motion is properly granted 'if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof.'" *Wheatley v. Wicomico Cty., Md.*, 390 F.3d 328, 332 (4th Cir. 2004) (citation omitted); *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 391 (4th Cir. 2014). Applying that standard here, this Court must grant judgment as a matter of law in JELD-WEN's favor. Steves' complete failure to offer *any* evidence on multiple elements of its antitrust, breach of contract and breach of warranty claims prevents a verdict in their favor.

***First***, the Court must enter judgment for JELD-WEN on Steves' antitrust claim under Section 4 of the Clayton Act because Steves has failed to introduce any evidence of what it would

have paid or received "but for" the acquisition. Steves presented evidence to the jury of the difference between the price that Steves paid under the contract and the price that it says that it should have paid, under the contract. Trial Tr. 1237:10-15 (Feb. 7, 2018). It also presented evidence of the difference between the quality-related reimbursements it received, and the reimbursements to which it claims it was entitled under the contract. Id. at 1199:2-1202:2. However, that evidence does not demonstrate impact or constitute a cognizable measure of damages under Section 4 of the Clayton Act. Steves has presented no methodology that this jury could use to find that the merger caused Steves harm, nor to award antitrust, as opposed to breach of contract, damages for the alleged overcharges and under-reimbursements under the contract.

*Second,* the Court must enter judgment for JELD-WEN on Steves' claim for future lost profits under Section 4 of the Clayton Act for similar reasons. The only evidence Steves presented to the jury regarding future lost profits was based, by the admission of its own expert witness, on the assumption that Steves would have earned profits that reflected the acquisition of CMI by JELD-WEN. That measure of damages cannot constitute damages under Section 4 of the Clayton Act, because it does not constitute damages compared to the profits Steves would have earned had the challenged merger not taken place. Steves has presented no other methodology that this jury could use to award antitrust damages under a future lost profits theory.

*Third*, if a claim for future lost profits is submitted to the jury, then Steves cannot be entitled to any additional *equitable* remedy under its Section 7 claim, because Steves thereby has an adequate remedy at law for its claim of future harm. Thus, JELD-WEN is entitled to judgment as a matter of law on Steves' equitable claim for divestiture under Section 16 of the Clayton Act.

*Fourth,* JELD-WEN is entitled to judgment as a matter of law on Steves' Section 4 claims because Steves has presented no evidence from which the jury may reasonably conclude that

Steves suffered antitrust injury that coincides with any public harm resulting from the merger, nor has it established that its injury was causally connected to the merger.

*Fifth*, Steves' Section 7 claims fail as a matter of law because Steves has not presented evidence sufficient to support its market definition, nor has it adduced any evidence rebutting the procompetitive effects of the merger.

*Finally*, Steves has put forth ***no*** evidence to support its claims for breach of contract relating to doorskins defects and breach of the implied warranty.

## ARGUMENT

**I.** **JELD-WEN IS ENTITLED TO JUDGMENT ON STEVES' ANTITRUST CLAIM UNDER SECTION 4 OF THE CLAYTON ACT BECAUSE THE EVIDENCE THAT STEVES PRESENTED TO THE JURY DOES NOT ESTABLISH THAT THE MERGER CAUSED STEVES' CLAIMED INJURY NOR THAT IT MEASURED ANTITRUST DAMAGES**

An antitrust plaintiff must present evidence of the alleged antitrust violation, impact to itself, and damages to get to a jury. *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 (4th Cir. 1977). The elements of impact (injury to the plaintiff) and damages are closely related; to prove impact, the plaintiff must prove that it paid a price higher than it would have paid absent the antitrust volation. *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 507 (N.D. Cal. 2008) ("*GPU*") ("[I]n order to satisfy Section 4 of the Clayton Act, plaintiffs must demonstrate that they paid a higher price for their graphics card or computer than they otherwise would have paid in the absence of a conspiracy"); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) (showing of injury requires proof "that the plaintiff paid more than the price that would have existed 'but for' the alleged conspiracy"). In an antitrust case, proof of impact must always include proof of a competitive baseline that shows that the plaintiff paid higher prices than it would have paid in the absence of the conduct alleged to violate the antitrust laws. *See Robinson v. Tex. Auto.*

*Dealers Ass'n*, 387 F.3d 416, 422 (5th Cir. 2004) (to demonstrate impact a plaintiff must prove a "purchase at a price higher than the competitive rate").

Thus, to recover damages under Section 4 of the Clayton Act that results from that impact, an antitrust plaintiff must present evidence of the difference between the price that it paid to the defendant and the price that would have obtained in a market unaffected by the antitrust violation. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (to establish antitrust impact, plaintiffs are "required to construct a hypothetical market, a 'but-for' market, free of the restraints and conduct alleged to be anticompetitive") (citation omitted); *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 236 (E.D. Pa. 2017) (when recreating a but-for world to establish antitrust damages, a plaintiff must create a world "characterized by the absence of the ... challenged practices") (internal quotations and citation omitted); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 165 (C.D. Cal. 2007) (the "but-for" world must be "characterized by the absence of the ... challenged practices"). Even Steves' liability expert, Professor Shapiro, agreed that merger analysis requires constructing a but-for world to compare whether there would have been more competition if the merger had never happened:

> Q: Okay. Now, it's correct to say that merger analysis requires an assessment of what will likely happen if a merger proceeds as compared to what will likely happen if it does not proceed, right?
>
> A: That sounds more framed for a merger that hasn't happened yet. But I take the basic idea.
>
> Q: And that basic idea is what's referred to often as a but-for analysis, right?
>
> A: You could use that term. I think I know what you mean.
>
> Q: Yeah. It's sometimes referred to as constructing a but-for world?
>
> A: Yes. I'm familiar with that term.

> THE COURT: Are you saying that's what you do for a merger that hasn't happened yet or does it apply for a merger that has happened?
>
> THE WITNESS: No. Either way. I think if you're asking how the merger affected competition, you want to compare the competition with and without the merger. And you're not going to see both of those. So you see one maybe and you try to figure out with the other one, and you're comparing. If the merger hasn't happened yet, you don't know what's going to happen with the merger. You don't know what's going to happen without the merger. So it's even harder. Here we see what happened with the merger, but we're wondering would there have been more competition without it.

Trial Tr. 1064:11-1065:12 (Feb, 6, 2018).

Steves did not present such evidence to the jury. Instead, Steves' expert, Mr. Tucker, presented evidence of the damages that, he testified, JELD-WEN owes because JELD-WEN breached the pricing provisions of the contract, the quality provision, and the provision requiring JELD-WEN to sell its new products to Steves under the pricing formula in the contract. As a result, Steves claims that it was overcharged for doorskins, and that it was under-reimbursed for defective doorskins, relative to what the parties' *contract* required. This evidence does not establish that the merger actually caused Steves' claimed injuries, as Steves has conceded. Trial Tr. 810:6-8, 810:20-22, 810:23-811:1 (Feb. 3, 2018) (admitting that JELD-WEN could have breached the pricing provisions of the Agreement even absent the merger). It also provides the jury with no legally sufficient basis for measuring damages.

With respect to his damages calculations for alleged defective doorskins, Mr. Tucker made clear that he did not attempt to compare the current world, which includes the merger that Steves as alleges is anticompetitive, against a "but-for" world in which the merger had not occurred. These are the specific questions Mr. Tucker was asked and answered on the subject:

> Q: Now, sir, you have not done any calculations to determine what percentage of door skins Steves would have claimed to be defective had the merger not happened; correct?

> A: That's correct. I didn't -- this was not a comparison before and after the merger. This was a comparison of what actually happened and whether or not Jeld-Wen reimbursed them."

Trial Tr. 1237:10-15 (Feb. 7, 2018).

> Q: Sir, you have not done any calculations to determine what percentage of claims defective door skins Steves would not have been reimbursed for had the merger not happened; correct, sir?
>
> A: That's true.
>
> Q: And, sir, you have not done any calculations comparing Jeld-Wen's defect rates pre-merger versus post-merger; is that correct?
>
> A: That's correct. I focused on the period that I described.

*Id*. at 1239:12-19.

Similarly, Mr. Tucker admitted under oath that when calculating his overcharge damages, he included key inputs from JELD-WEN's Towanda plant, which would not have been part of JELD-WEN if the CMI acquisition had not occurred. In other words, Mr. Tucker's overcharge damages, like his defects claims, simply did not compare the world in which the merger occurred against a world where the merger never happened. Specifically, Mr. Tucker's testimony was as follows:

> Q: Now, sir, your overcharge calculations, they include overcharges for Towanda; correct?
>
> THE COURT: You mean for door skins that were made in Towanda?
>
> MR. BUTERMAN: Yes.
>
> A: Yes. I would say it this way: I included all of Jeld-Wen's costs for their key inputs at all of their plants, and Towanda was one of their plants.
>
> Q: And we can agree that if the merger had never happened, Towanda would not have been part of Jeld-Wen; correct?
>
> A: That's my understanding.

*Id.* at 1269:12-22.

And, if there was any doubt that Mr. Tucker was not presenting the type of damages calculation the antitrust laws require—which compare the world with the merger to one where the merger never occurred, Mr. Tucker made the point even clearer:

> Q: So we also can agree that you are not offering an opinion on how much Jeld-Wen would have been required to pay Steves under this contract if the CMI acquisition had never happened; correct?
>
> A: Correct. This is based on what actually did happen which was the acquisition.

*Id.* at 1269:23-1270:3.

In light of this evidence, Steves has presented neither evidence that the merger, as opposed to JELD-WEN's alleged breach of contract, caused its injury, nor any measure of past damages that conforms to the requirements of Section 4 of the Clayton Act, because none presents a measure of damages based upon "a 'but-for' market, free of the restraints and conduct alleged to be anticompetitive." *Concord Boat*, 207 F.3d at 1055 (internal quotations and citation omitted).

## II. JELD-WEN IS ENTITLED TO JUDGMENT ON STEVES' CLAIM FOR FUTURE LOST PROFITS DAMAGES UNDER SECTION 4 OF THE CLAYTON ACT BECAUSE THE MEASURE OF DAMAGES THAT IT PRESENTED TO THE JURY IS NOT A PROPER MEASURE OF ANTITRUST DAMAGES

Mr. Tucker's future lost profits calculations suffer from the same fatal defect as his other Section 4 damages calculations. Again, any claim for antitrust damages must be based on a but-for world in which the challenged conduct (here, the acquisition of CMI by JELD-WEN) did not occur. *See* Part I, *supra*. While Mr. Tucker states in a conclusory manner that his lost profits calculations look at a world where the CMI acquisition never happened, his actual testimony shows that not to be the case. Rather than creating a but-for world where the merger never happened, Mr. Tucker made clear that his future lost profits analysis began with him performing calculations off of Steves' actual profits from 2015, 2016 and the beginning of 2017, and then making

projections into the future from those numbers. Trial Tr. 1318:23-1319:11 (Feb. 7, 2018). In the actual world, of course, the acquisition of CMI took place.

There is no dispute that Mr. Tucker did not attempt to construct a model of future lost profits based on an assessment of what Steves' profits would have been during the 2015-2017 period absent the merger. To the contrary, he based his future lost profits on Steves' real-world financial results during the 2015-2017 period, in which the merger actually occurred. Indeed, it is beyond dispute that Mr. Tucker never tried to back out any effects on Steves' real-world profits that occurred as a result of the merger; he admitted that he never even tried to calculate any profits that were attributable to the merger. *Id.* at 1324:25-1325:2 (THE COURT: "Did you ever try to calculate any profits that you thought were attributable to the merger? A: (Mr. Tucker): I did not."). He could not back out what he did not even calculate.

As a result, Steves has presented no measure of future lost profits damages that is based upon "a 'but-for' market, free of the restraints and conduct alleged to be anticompetitive." *Concord Boat*, 207 F.3d at 1055 (internal quotations and citation omitted).

## III. IF THE COURT PERMITS STEVES TO SUBMIT ITS CLAIM FOR FUTURE LOST PROFITS TO THE JURY, STEVES HAS AN ADEQUATE REMEDY AT LAW AND THUS JELD-WEN IS ENTITLED TO JUDGMENT ON STEVES' CLAIM FOR THE EQUITABLE RELIEF OF DIVESTITURE

As a private plaintiff seeking divestiture, Steves must prove that (1) remedies available at law, such as monetary damages, would be inadequate, (2) the balance of hardships militates clearly in favor of divestiture, and (3) the public interest would not be disserved by an order of divestiture. *Taleff v. Southwest Airlines, Co.*, 828 F. Supp. 2d 1118, 1122 (N.D. Cal. 2011). Divestiture is not available when the harm that plaintiffs allege has resulted from the merger is expressed in terms of monetary remedies. *See id.* at 1123 n.7 (holding that remedies at law were not inadequate when plaintiffs alleged that they would harmed by higher prices and diminished service). If the Court

submits a claim for future lost profits to the jury (and as described above, it should not do so) then it will have decided that Steves' harms may be remedied by monetary damages, and therefore JELD-WEN is entitled to the entry of judgment on its claim for the equitable relief of divestiture.

Permitting Steves' claims for future lost profits to proceed to the jury for resolution will be fatal for Steves' divestiture claim, regardless of the jury's verdict. First, the Court's ruling necessarily means that a monetary remedy for harm to Steves is possible. Indeed, Steves' damages expert, Mr. Tucker, testified that future harm to Steves can be remedied by awarding Steves damages in the form of future lost profits totaling $46,480,581.00. Trial Tr. 1211:3-14 (Feb. 7, 2018). It further means that, if the jury awards Steves damages for future lost profits, Steves will have no standing to claim injunctive relief since it will have been wholly compensated for its harm, and it has no standing to obtain relief for alleged competitive harms to others. *Cargill, Inc. v. Monfort of Colo., Inc*., 479 U.S. 104, 113 (1986) (holding that in order to seek injunctive relief under Section 16 of the Clayton Act, a private plaintiff must allege threatened antitrust injury); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217 (1974) (holding that generalized injury that all members of the public share is insufficient to confer standing). Seeking both future lost profits and divestiture simultaneously is not just inconsistent with the ancient principle that equitable remedies are unavailable when the plaintiff has an adequate remedy at law. It also violates the law's longstanding prohibitions against duplicative relief. Steves cannot simultaneously seek monetary compensation for a future injury and equitable relief that will prevent that injury from occurring.

If the jury rejects Steves' future lost profits claim, it will be because it finds that one or more of the factual premises underlying that claim is mistaken. It would be inappropriate for the Court to later award equitable relief on contrary factual premises. *Parsons v. Bedford, Breedlove*

& *Robeson*, 28 U.S. 433, 447-48 (1830). Consequently, if the Court permits the jury to resolve Steves' future lost profits claim, then regardless of the jury's verdict on Steves' claims for future lost profits, Steves cannot pursue its clam for divestiture.

**IV.    JELD-WEN IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON STEVES' SECTION 4 ANTITRUST CLAIM BECAUSE STEVES CANNOT PROVE THE REQUIRED ELEMENTS OF ANTITRUST INJURY OR CAUSATION OF IMPACT**

In order to establish antitrust injury, Steves must show that its injury "coincides with the public detriment tending to result from the alleged violation." *Orion Pictures Distribution Corp. v. Syufy Enter.*, 829 F.2d 946, 948 (9th Cir. 1987) (internal quotations and citation omitted); *see 2600 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 738-39, 743 (3d Cir. 2004) (plaintiff's claimed antitrust injuries were "inextricably intertwined with its awards on [its] breach of contract claims" and any alleged injury "was caused by a breach of contract" not the alleged antitrust violation); *Valley Prods. Co., v. Landmark, a Div. of Hosp. Franchise Sys., Inc.,* 128 F.3d 398, 403 (6th Cir. 1997) (rejecting claim that defendant terminated a vendor's contract only because of an antitrust violation, because antitrust injury principles "bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation."). Steves has presented no evidence from which a reasonable jury may conclude that Steves suffered any antitrust injury that is in any way distinct from its breach of contract claims. But harm measured by an alleged deviation from the terms of a private contract, which is idiosyncratic to Steves and does not benefit any other market participants, is not a harm that coincides with any public detriment that the antitrust laws were enacted to prevent.

Separately, Steves has failed to prove the required element of impact because the evidence it introduced at trial is not sufficient to prove that any harms Steves experienced were causally attributable to the acquisition.

Steves repeatedly bemoans that as a result of the merger it no longer has "choices," but Steves' own evidence shows that Steves and other doorskin manufacturers can and do turn to other doorskin manufacturers for supply. Trial Tr. 696:6-22 (Feb. 3, 2018) (conceding that Steves invoked Paragraph 4 of the Supply Agreement after the foreign supplier Teverpan offered to sell Steves doorskins for 3% less than JELD-WEN's price); PTX-000018 (showing that, apart from sales to Steves, Masonite sold 367,939 doorskins externally in 2012 and 820,891 doorskins externally in 2016, and sold to a new customer, Excel, after 2014); Trial Tr. 266:4-15, 271:13-18 (Jan. 29, 2018) (describing Excel as a "competitor" door manufacturer "on the same level" as Steves).

Even if a breach of contract could result in antitrust injury, Steves has not presented *any* evidence from which the jury may conclude that JELD-WEN breached the Supply Agreement *as a result of* the merger. *See, e.g., GPU*, 253 F.R.D. at 507 ("[I]n order to satisfy Section 4 of the Clayton Act, plaintiffs must demonstrate that they paid a higher price for their graphics card or computer than they otherwise would have paid in the absence of a conspiracy."); *Exhaust Unlimited*, 223 F.R.D. at 513 (showing of injury requires proof "that the plaintiff paid more than the price that would have existed 'but for' the alleged conspiracy").

First, Steves concedes that JELD-WEN had the right to terminate the Supply Agreement, and that JELD-WEN could have taken many of the same actions that Steves now complains about absent the merger. Trial Tr. 810:6-8, 810:13-15, 810:20-22, 810:23-811:1 (Feb. 3, 2018)

(conceding that JELD-WEN had the ability to breach the contract and reduce the quality of its doorskins even if the merger had not happened).

Second, Steves' evidence shows that many of the issues that it alleges resulted from the acquisition actually took place before the acquisition, and by definition cannot be considered anticompetitive effects of the acquisition. *Id*. at 730:9-12 (quality issues began in June or July 2012); *id*. at 429:3-16 (Feb. 2, 2018); *id*. at 730:13-15 (Feb. 3, 2018) (JELD-WEN reduced skin thickness prior to the merger); *id*. at 798:4-12 (Masonite stopped selling to Steves before the merger). Even for those issues that presented themselves after the acquisition, Steves has introduced no competent evidence that the problems it complains of were *a result* of the acquisition as opposed to other factors. For example there is no evidence that the doorskin quality issues that Steves alleges had anything to do with the acquisition. Edward Steves admitted that the thinning and reduced packaging that Steves alleges caused quality problems occurred before the merger. Trial Tr. at 730:13-15. Further, Steves' experts did not provide an opinion that the quality issues were the result of the merger. *Id*. at 939:5-7. The evidence also shows that the increased negotiating conflict between the parties under the Supply Agreement coincided with Mr. Hachigian's tenure as CEO, not with the consummation of the merger. *Id*. at 625:11-14, 627:15-21, 628:19-24, 365:25-367:2.

Third, because JELD-WEN similarly raised prices and terminated a supply agreement with Steves before the merger, JELD-WEN's decision to raise prices and issue a notice of termination to Steves in 2014 do not support an inference that JELD-WEN would not have taken those actions in the absence of the acquisition. *Id*. at 864:11-18 (Feb. 5, 2018) (Steves and JELD-WEN had pricing disputes under the 2003 Long Term Agreement); *id*. at 418:5-419:14 (Feb. 2, 2018) (JELD-WEN took a "hard bargaining position" with Steves and issued a notice of termination in 2010, at

a time when CMI was selling doorskins); *id*. at 293:6-14, 293:24-294:1 (Jan. 29, 2018) (JELD-WEN's pre-merger conduct was a "bait and switch" that was so egregious that Steves was not even considering JELD-WEN as a possible partner for a new supply agreement in 2011); *id*. at 303:22-304:6, 311:12-20 (Steves only entered into the 2012 Supply Agreement with JELD-WEN because Philip Orsino had been installed as JELD-WEN's CEO).

## V.  STEVES CANNOT ESTABLISH ITS SECTION 7 CLAIMS AS A MATTER OF LAW

### A.  Steves Has Not Presented Evidence to Support Its Market Definition

Clayton Act Section 7 prohibits mergers and acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18. Steves bears the burden of proof on the issue of the relevant market.  *Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc*., 714 F.2d 351, 355 (4th Cir. 1983).  Steves has failed to carry its burden.

#### 1.  Steves' Evidence Confirms That Its Experts' Analysis of The Relevant Market Participants Is Flawed

The geographic market defines the region "in which the seller operates, and to which the purchaser can practicably turn for supplies."  *Tampa Elec. Co. v. Nashville Coal Co*., 365 U.S. 320, 327 (1961).  All firms that currently earn revenues in the relevant market, as well as firms that would likely enter the relevant market in response to increased prices, should be considered market participants.  Horizontal Merger Guidelines at 5.1.  The evidence that Steves presented in its case in chief confirms that its expert, Professor Shapiro, erred by failing to include foreign doorskin suppliers in his analysis of the relevant market participants.  Trial Tr. 1104:1-11 (Feb. 6, 2018) (conceding that market participants include suppliers that are not current producers in the relevant market, but that would likely provide rapid supply responses in the event of a small but significant and non-transitory

increase in price); *id*. at 1109:2-7 (conceding that he did not analyze the available capacity of foreign suppliers). Therefore, Professor Shapiro's definition of the relevant geographic market, and his market share calculations, are fundamentally flawed and should not be considered by the jury.

> **2.** **Steves' Evidence Confirms That Its Product Market Definition Is Flawed**

To determine the relevant product market, courts consider whether two products serve the same purpose, are reasonably interchangeable, and whether and to what extent purchasers substitute one product for another. *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962); *U.S. v. E.I. du Pont de Nemours & Co*., 351 U.S. 377, 404 (1956). To establish a relevant product market, a plaintiff must present evidence that the products contained in the market are interchangeable for "'the consumer's purpose[]" or "the responsiveness of the sales of one product to price changes of the other.'" *Berlyn, Inc. v. Gazette Newspapers*, *Inc.*, 223 F. Supp. 2d 718, 726 (D. Md. 2002) (*quoting E.I. du Pont de Nemours & Co*. 351 U.S. at 400). It is well settled that the relevant product market cannot be limited to only the products of one manufacturer. *Nobel Sci. Indust., Inc. v. Beckman Instruments, Inc*., 670 F. Supp. 1313, 1323 (D. Md. 1986) (collecting cases). Steves has presented no evidence from which the jury may reasonably conclude that that relevant product market can be defined simply as all of the doorskin designs and sizes that JELD-WEN sells to Steves. Trial Tr. 1118:16-23 (Feb. 6, 2018) (conceding that Steves' liability expert has not offered the opinion that only a supplier that can offer 477 SKUs of doorskins can be an effective competitor in the doorskin market); *id*. at 1099:6-15 (Steves' liability expert concedes that different doorskins styles have different levels of consumer demand). Steves' proposed product market definition therefore fails as a matter of law, economics, and common sense because it assumes, wrongly, that two suppliers cannot be selling in the same market—and constraining each others' prices—unless each has the ability to sell the exact range of products purchased by one particular customer.

**B.      Steves Has Not Presented Any Evidence That Anticompetitive Effects Of The Acquisition Outweigh Its Efficiencies**

Section 7 requires a holistic examination of an acquisition's effects on competition in order to assess whether the acquisition genuinely is likely to substantially lessen competition in any relevant market.  That holistic evaluation must include consideration of efficiencies and other procompetitive *benefits* flowing from the acquisition, in addition to any alleged harms.  JELD-WEN is entitled to judgment as a matter of law in this case because Steves and its experts have not even attempted the required holistic evaluation of this acquisition.

It is not the case that Steves can carry its ultimate burden of persuasion in a case like this one purely by presenting market share statistics.  *NBO Indus. Treadway Cos., Inc. v. Brunswick Corp.*, 523 F.2d 262, 275 (3d Cir. 1975), *vacated on other grounds by Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977); *U.S. v. Syufy Enters.*, 903 F.2d 659, 656-66 (9th Cir. 1990) (affirming decision of district court where government placed too much reliance on market share evidence and ignored real-world evidence of entry); *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Lukes Health Sys., Ltd.,* 778 F.3d 775, 786 (noting that evidence of market share and market concentration are not conclusive indicators of anticompetitive effects and that plaintiffs generally present other evidence to establish anticompetitive effects, citing Professor Shapiro for the proposition that the trend in merger enforcement is to consider factors in addition to market share when evaluating a merger); *Fed. Trade Comm'n* ("*FTC*") *v. H.J. Heinz, Co.,* 246 F.3d 708, 717 n.11 (D.C. Cir. 2001) (noting that evidence of market concentration on its own is not enough to establish the governments' prima facie case).  Even if Steves *could* carry its initial prima facie burden with market share statistics alone, that would only shift to JELD-WEN a burden of production to come forward with evidence that the concentration statistics do not fully and accurately reflect actual competitive dynamics in the market.  The ultimate burden of persuasion

remains on Steves. Courts have recognized, therefore, that when significant evidence of efficiencies is presented, the plaintiff has the burden to rebut that evidence. *See, e.g.,*. *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 62 (D.D.C. 1998) (finding that FTC expert sufficiently rebutted efficiencies evidence). It is already clear that Steves has defaulted on that burden or will default on it. Steves has not presented any evidence that would allow the jury to conclude that the efficiencies of the acquisition are outweighed by anticompetitive effects. Trial Tr. 1056:2-19 (Feb. 6, 2018) (conceding that Steves' liability expert was not aware of and did not quantify any benefits to customers of the merger). Steves has no other witnesses that will testify that JELD-WEN's acquisition of CMI did not result in substantial, merger-specific efficiencies that were passed on to consumers. Thus, JELD-WEN's evidence of efficiencies will come into the case unrebutted, and prove fatal to Steves' claim.

## VI. NO REASONABLE JURY COULD FIND THAT JELD-WEN BREACHED SECTION 8 OF THE CONTRACT OR ANY EXPRESS OR IMPLIED WARRANTY BY SELLING DEFECTIVE DOORSKINS TO STEVES

To prove breach of contract under Delaware law, Steves must prove for each alleged breach, (a) the existence of a contractual obligation, (b) a breach of that obligation by JELD-WEN, and (c) resulting damage to Steves. *Connelly v. State Farm Mut. Auto. Ins. Co*., 135 A.3d 1271, 1279 n.28 (Del. 2016). Steves also must demonstrate that it substantially complied with all of the material provisions of the contract. *BioLife Sols., Inc. v. Endocare, Inc*., 838 A.2d 268, 278 (Del. 2003). To establish a breach of an express or implied warranty, Steves must prove: (1) that JELD-WEN sold goods; (2) which were defective at the time of sale; (3) causing injury to Steves; (4) the proximate cause of which was the defective nature of the goods; and (5) that JELD-WEN received notice of the injury. *Reybold Grp., Inc. v. Chemprobe Techs., Inc*., 721 A.2d 1267, 1269 (Del. 1998). Because Steves failed to establish that any doorskins it submitted

for reimbursement (1) failed to meet JELD-WEN's specifications; (2) were actually defective; or (3) that it provided JELD-WEN with notice of the defects, Steves claims fail as a matter of law.

### 1. Steves Presented No Evidence of JELD-WEN's Specifications

Steves' quality claims arise under Section 8 of the Supply Agreement. Supply Agreement, DX-262. That section provides that products "will at all times be of a quality satisfactory to STEVES, meeting JELD-WEN's specifications, fit for the intended purpose, and subject to JELD-WEN's standard written warranty . . .". *Id.*

Steves has adduced no evidence of JELD-WEN's specifications or standard written warranty. Steves adduced no evidence as to which of the doorskins that it submitted to JELD-WEN for reimbursement actually did not meet JELD-WEN's specifications. Steves focused its evidence of breach on repeated claims that JELD-WEN shipped doorskins that were not "of a quality satisfactory to Steves." Trial Tr. 586:2-5, 622:16-623:4 (Feb. 3, 2018). But that is not the definition of "defective" under the Supply Agreement. Instead, Section 8 defines "defect" as product that "does not meet JELD-WEN's Specifications," and that is "JELD-WEN's standard written warranty applicable to the Product." Supply Agreement, DX-262. As this Court pointed out, Steves did not present any evidence that any doorskin provided to Steves did not meet JELD-WEN's specifications, or even what those specifications are. Trial Tr. 861:4-11 (Feb. 5, 2018). Steves cannot proceed to the jury without any evidence on this point.

### 2. Steves Has Presented No Reliable Evidence That The Doorskins For Which It Is Claiming Damages Were Actually Defective

Even if Steves had adduced evidence of JELD-WEN's specifications, the evidence presented in Steves' case in chief establishes that Steves does not have reliable evidence that the doorskins for which it is claiming damages are actually defective. This failure is fatal to Steves'

quality claims. 6 Del. C. § 2–607(4) ("The burden is on the buyer to establish any breach with respect to the goods accepted.").

- Doug Gartner testified that Steves' defect claims may include claims for doorskins that were not tested for defects and may not actually be defective. Trial Tr. 544:1-545:9 (Feb. 2, 2018).

- Doug Gartner testified that certain defects, such as light primer, are subjective and there is not unity within Steves as to what constitutes a primer defect. *Id*. at 545:25-547:14.

- Doug Gartner admitted that some doorskin damage could have been caused by Steves. *Id*. at 547:15-21.

- Steves submitted defect claims to JELD-WEN for doorskins that could have and should have been used in doors. *Id*. at 550:9-13, 551:6-18.

### 3. Steves Presented No Evidence That It Provided Notice Of The Defects For Which It Is Claiming Damages to JELD-WEN

Steves' failure to provide notice to JELD-WEN further dooms its breach of contract and warranty claims. Supply Agreement, DX-262; 6 Del. C. § 2–607(3)(a) and 6 Del. C. § 2–714(1) (Failure to give notice of a breach of an implied or express warranty invalidates a purchaser's claim). General complaints by plaintiffs which would not give the supplier the opportunity to cure the defect do not constitute notice as a matter of law. *In re Lumber Liquidators Chinese-Manufactured Flooring Durability Mktg. & Sales Practice Litig.*, No. 1:16md2743 (AJT/TRJ), 2017 WL 2911681, slip op. at *13-14 (E.D. Va. July 7, 2017).

Nor can Steves complain that JELD-WEN's insistence on inspecting and verifying Steves' defect claims is itself a breach of contract. On its face, Section 8 only requires JELD-WEN to reimburse Steves for defective product following "notice, inspection and verification of the

Defective Product." Supply Agreement, DX-262. Steves cannot complain that JELD-WEN breached the contract by exercising its unambiguous right to inspect allegedly defective doorskins.

### 4. Steves Did Not Establish That It Is Entitled to Reimbursement For the Full Cost of Doors Manufactured With Allegedly Defective Doorskins

The unambiguous terms of Section 8 also do not require JELD-WEN to pay for the full cost of doors. Section 8 states that "[a]ny additional costs over the price of the Defective Product shall be negotiated by the Parties on case by case basis." Supply Agreement, DX-262. Edward Steves testified that the Agreement does not require JELD-WEN to reimburse Steves for the cost of doors. Trial Tr. 779:1-13 (Feb. 3, 2018). Steves adduced no evidence that JELD-WEN did not negotiate in good faith when Steves claimed that doors that it had sold to its customers were defective because the skins were defective. Because the unambiguous terms of the contract do not require JELD-WEN to reimburse Steves for the price of doors, JELD-WEN did not breach the contract by refusing to do so.

Nor can Steves rely on its warranty claims to recover damages for doors made with allegedly defective doorskins. Steves cannot claim compensatory damages in the amount of the full cost of doors assembled using allegedly defective doorskins because there is no evidence that Steves inspected the doorskins before incorporating them into doors. 6 Del. C. § 2–607(3)(a) ("Where a tender has been accepted the buyer must within a reasonable time after he or she discovers or *should have discovered* any breach notify the seller of breach or *be barred from any remed*y.") (emphasis added); *see Pfizer Inc. v. Advanced Monobloc Corp.*, No. 97C-04-037-WTQ, 1999 WL 743927, at *12 (Del. Super. Ct. Sept. 24, 1999), *opinion corrected on denial of reconsideration*, No. 97C-04-037-WTQ, 1999 WL 1240864 (Del. Super. Ct. Sept. 24, 1999); *see also Telit Wireless Sols., Inc. v. Axesstel, Inc.*, No. 15-cv-5278 (KBF), 2016 WL 1587246, at *7 (S.D.N.Y. Apr. 18, 2016) (finding that a buyer was liable for purchased products regardless of

whether they were nonconforming when the buyer had an opportunity to inspect goods upon delivery and the buyer was using the goods with its own products).

## CONCLUSION

For the foregoing reasons, JELD-WEN respectfully requests that this Court grant judgment as a matter of law in JELD-WEN's favor due to Steves' failure to present sufficient evidence to sustain a verdict on multiple elements of its antitrust, breach of contract and breach of warranty claims and its claim for equitable relief.

Dated: February 8, 2018                    Respectfully submitted,

                                            JELD-WEN, Inc.

                                            By counsel

                                            /s/Ryan T. Andrews
                                            Ryan T. Andrews (VSB# 90519)
                                            Margaret M. Zwisler *(pro hac vice)*
                                            J. Scott Ballenger *(pro hac vice)*
                                            Allyson M. Maltas *(pro hac vice)*
                                            Latham & Watkins LLP
                                            555 Eleventh Street, N.W., Suite 1000
                                            Washington, D.C., 20004
                                            (202) 637-2200 – Tel.
                                            (202) 637-2201 – Fax
                                            margaret.zwisler@lw.com
                                            scott.ballenger@lw.com
                                            allyson.maltas@lw.com
                                            ryan.andrews@lw.com

                                            Alfred C. Pfeiffer (*pro hac vice*)
                                            Sarah M. Ray (*pro hac vice*)
                                            Latham & Watkins LLP
                                            505 Montgomery Street, Suite 2000
                                            San Francisco, CA 94111
                                            (415) 391-0600 – Tel.
                                            (415) 395-8095 – Fax
                                            al.pfeiffer@lw.com
                                            sarah.ray@lw.com

                                            Lawrence E. Buterman *(pro hac vice)*

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200 – Tel.
(212) 751-4864 – Fax
lawrence.buterman@lw.com

Michael W. Smith (VSB #01125)
Craig T. Merritt (VSB #20281)
Harrison M. Gates (VSB #80385)
R. Braxton Hill, IV (VSB # 41539)
Christian & Barton, L.L.P.
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
(804) 697-4100 –  Tel.
(804) 697-4112 – Fax
msmith@cblaw.com
cmerritt@cblaw.com
hgates@cblaw.com
bhill@cblaw.com

*Attorneys for Defendant*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 8th day of February 2018, I will electronically file a copy of the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the registered participants as identified on the NEF to receive electronic service, including:

Lewis F. Powell III
John S. Martin
Alexandra L. Klein
Maya M. Eckstein
Paul T. Nyffeler
Douglas M. Garron
R. Dennis Fairbanks, Jr.
William H. Wright, Jr.
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200 – Tel.
(804) 788-8218 – Fax
lpowell@hunton.com
martinj@hunton.com
aklein@hunton.com
meckstein@hunton.com
pnyffeler@hunton.com
dgarrou@hunton.com
dfairbanks@hunton.com
cwright@hunton.com

Ted Dane
Glenn Pomerantz
Gregory Sergi
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9288 – Tel.
(213) 683-4088 – Fax
ted.dane@mto.com
glenn.pomerantz@mto.com
gregory.sergi@mto.com

Kyle Mach
Joshua Patashnik
Emily C. Curran-Huberty
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000 – Tel.
(415) 512-4077 – Fax
kyle.mach@mto.com
josh.patashnik@mto.com
emily.curran-huberty@mto.com

*Attorneys for Plaintiff*

Marvin G. Pipkin
Kortney Kloppe-Orton
Pipkin Law
10001 Reunion Place, Suite 6400
San Antonio, TX 78216
(210) 731-6495 – Tel.
(210) 293-2139 – Fax

*Of Counsel*

/s/Ryan T. Andrews
Ryan T. Andrews (VSB# 90519)
Margaret M. Zwisler *(pro hac vice)*
J. Scott Ballenger *(pro hac vice)*
Allyson M. Maltas *(pro hac vice)*
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C., 20004
(202) 637-2200 – Tel.
(202) 637-2201 – Fax
margaret.zwisler@lw.com
scott.ballenger@lw.com
allyson.maltas@lw.com
ryan.andrews@lw.com

Alfred C. Pfeiffer (*pro hac vice*)
Sarah M. Ray (*pro hac vice*)
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600 – Tel.

(415) 395-8095 – Fax
al.pfeiffer@lw.com
sarah.ray@lw.com

Lawrence E. Buterman *(pro hac vice)*
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200 – Tel.
(212) 751-4864 – Fax
lawrence.buterman@lw.com

Michael W. Smith (VSB #01125)
Craig T. Merritt (VSB #20281)
Harrison M. Gates (VSB #80385)
R. Braxton Hill, IV (VSB # 41539)
Christian & Barton, L.L.P.
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
(804) 697-4100 –  Tel.
(804) 697-4112 – Fax
msmith@cblaw.com
cmerritt@cblaw.com
hgates@cblaw.com
bhill@cblaw.com

*Attorneys for Defendant*