**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

STEVES AND SONS, INC.,

     Plaintiff,

v.                          Civil Action No. 3:16-cv-545

JELD-WEN, INC.,

     Defendant.


**MEMORANDUM OPINION**

This matter is before the Court on DEFENDANT JELD-WEN, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND IV OF PLAINTIFF STEVES AND SONS, INC.'S COMPLAINT (ECF No. 375). For the reasons set forth below, the motion was denied, except on the issue of future lost profits damages under Count One, as to which the Court ordered further briefing. See ECF No. 578. The Court has considered that briefing in the context of JELD-WEN, Inc.'s ("JELD-WEN") motion for judgment as a matter of law on the future lost profits damages claim at trial, after Steves and Sons, Inc. ("Steves") had put on its fact witnesses. Accordingly, only the ripeness of that claim, and not its validity, is addressed in this opinion.

**BACKGROUND**

## A. Factual Background

### 1. Pre-2012 Interior Molded Doorskin Market

Steves and JELD-WEN are both participants in the interior molded doorskin market in the United States. That type of doorskin is used to make interior molded doors, which are built to resemble solid wood doors at a much lower cost. Interior molded doorskin manufacturers create and ship doorskins to assembly plants, where molded door manufacturers use the doorskins to build door slabs that are then sold to retailers or distributors. Steves is an independent door manufacturer that is currently unable to produce its own doorskins, and has never done so. As a result, it must purchase doorskins from doorskin manufacturers. JELD-WEN, however, is a vertically integrated door manufacturer, meaning that it both produces doorskins and uses those doorskins internally to manufacture and sell finished doors.

Before 2012, Steves and other independent door manufacturers purchased interior molded doorskins from three main suppliers: JELD-WEN, CraftMaster Manufacturing, Inc. ("CMI"),[1] and Masonite.[2] Like JELD-WEN, CMI and Masonite were

---

[1] CMI came into existence following the merger of Masonite and Premdor in 2002. After the Department of Justice ("DOJ") filed suit to block the merger, the parties entered into a consent

2

both vertically integrated manufacturers of interior molded doorskins and doors.

## 2. Execution of Supply Agreement

On May 1, 2012, Steves and JELD-WEN entered into a long-term supply agreement ("the Supply Agreement"), pursuant to which Steves would purchase, _inter alia_, interior molded doorskins from JELD-WEN. ECF No. 379-2 (Under Seal) § 1; JELD-WEN's Statement of Undisputed Material Facts (ECF No. 379) (Under Seal) ("Def. SUMF") ¶ 1. The Supply Agreement would be in effect through December 31, 2019, but would automatically renew for a successive seven-year term at that time unless either party terminated the contract. Supply Agreement § 2. The Agreement further provided that Steves could terminate it for any reason upon two-year written notice to JELD-WEN, and that

---

decree allowing the merger on the condition that Masonite divest its Towanda plant, which CMI subsequently purchased.

[2] JELD-WEN argues that the Court should not consider this fact and others referenced in this section because Steves presented them in narrative format, in violation of Local Rule 56(B). See Integrated Direct Mktg., LLC v. May, 129 F. Supp. 3d 336, 344-46 (E.D. Va. 2015) (refusing to consider new facts presented in narrative format in oppositions to motions for summary judgment because oppositions did not specifically state which undisputed material facts in motions were disputed). But Steves' opposition, besides stating narrative facts, specifically disputes or agrees to all of JELD-WEN's purportedly undisputed material facts. Moreover, JELD-WEN included an appendix to its reply disputing the narrative facts in Steves' opposition. Therefore, unlike in Integrated Direct Marketing, it is fairly easy to discern which facts are disputed and which are not.

JELD-WEN could likewise terminate it without cause upon seven-year written notice to Steves. Id. § 3(a)(2)(b); Def. SUMF ¶ 2; Steves' Statement of Additional Material Facts (ECF No. 452) (Under Seal) ("Pl. SAMF") ¶ 4.

Under the Supply Agreement, Steves had to purchase at least 80% of its interior molded doorskin requirements from JELD-WEN. Pl. SAMF ¶ 2. Steves could, however, purchase any quantity of doorskins from another supplier that offered a price at least 3% lower than JELD-WEN's purchase price, after JELD-WEN had the chance to match that lower price. Id. ¶ 3; Supply Agreement § 4. The prices that JELD-WEN would charge Steves for doorskins were variable and were calculated using a formula based on JELD-WEN's key input costs. Supply Agreement § 6(c). In addition, the contract obligated JELD-WEN to provide Steves with doorskin products of satisfactory quality. Id. § 8. Finally, if any disputes arose under the Agreement, the parties were required to participate in an alternative dispute resolution process before initiating litigation. That process began with an internal conference between the parties' senior executives, and then mediation if the conference was unsuccessful. Id. § 10.

### 3. JELD-WEN's Acquisition of CMI

On June 15, 2012, JELD-WEN and CMI announced that JELD-WEN was acquiring CMI and merging CMI's operations and assets into JELD-WEN ("the CMI Acquisition"), pending due diligence and the

4

signing of a definitive agreement. Def. SUMF ¶ 14. Although Steves knew before it executed the Supply Agreement that JELD-WEN was planning to purchase CMI, Steves and JELD-WEN did not condition the effectiveness of that contract on the occurrence or non-occurrence of the merger. Steves was aware at that time that the Acquisition would reduce the U.S.-based doorskin manufacturers to only JELD-WEN and Masonite. Id. ¶¶ 16-18.

On July 17, 2012, the DOJ's Antitrust Division notified JELD-WEN that it had opened a preliminary investigation into the proposed CMI Acquisition. Steves indicated to the DOJ that it did not oppose the merger. The Antitrust Division closed its investigation on September 28, 2012 without having taken any action to prevent the CMI Acquisition. Id. ¶¶ 19-21. The Acquisition was then completed on October 24, 2012. Id. ¶ 15.

Following the merger, JELD-WEN closed the head office of CMI in Chicago, as well as two of CMI's four door manufacturing plants, and transitioned CMI's sales staff into JELD-WEN's organizational structure. JELD-WEN also shut down its own doorskin manufacturing plants in Iowa and North Carolina. In addition to those broader changes, JELD-WEN consolidated the JELD-WEN and CMI doorskin dies into one portfolio, retired more than one hundred obsolete dies, and reduced the number of doorskin designs from 31 to 19. Id. ¶¶ 33-41.

JELD-WEN also acquired CMI's Towanda plant. JELD-WEN subsequently constructed a $1.6 million paint plant inside that building, and JELD-WEN's MiraTec and Extira products are now manufactured at the Towanda plant. Id. ¶¶ 42-43. The effect of this consolidation of operations at the Towanda plant is disputed. JELD-WEN contends that it cannot physically separate the manufacturing lines for the MiraTec and Extira products from the doorskin manufacturing lines that are also at the Towanda plant, id. ¶ 44, but Steves points to evidence that JELD-WEN has not conducted an extensive analysis of the effects of a divestiture order with respect to the plant, Pl. SAMF ¶¶ 37, 39.

### 4. Post-Merger Interactions Between Steves and JELD-WEN

After the merger, JELD-WEN's key input costs declined, and have continued to do so in most years since then. The parties disagree about whether these declining costs are the result of JELD-WEN having acquired the low-cost Towanda plant, or whether the input costs for JELD-WEN's "legacy" plants would have declined notwithstanding the CMI Acquisition. Id. ¶ 5. Despite these declining costs, however, Steves claims that JELD-WEN has increased the prices it charges Steves to purchase doorskins under the Supply Agreement. Id. ¶ 7. Steves also highlights documents indicating that JELD-WEN might have imposed price increases for certain doorskins that JELD-WEN believed were outside the scope of the Supply Agreement.

6

Some JELD-WEN employees also acknowledged quality problems with the company's doorskins after the CMI Acquisition, and Steves complained to JELD-WEN about the declining quality of the doorskins. Id. ¶¶ 10-11. Moreover, Steves cites evidence that JELD-WEN made it more difficult after the merger for external customers, such as Steves, to return defective products. It is unclear, however, whether these problems were caused by the CMI Acquisition. Indeed, JELD-WEN began internal testing of thinner doorskins in early 2012, and informed Steves before the Acquisition was consummated that it had reduced the target thickness of its doorskins. Def. SUMF ¶¶ 10-11.

The acrimony between Steves and JELD-WEN peaked in July 2014 when, according to Steves, JELD-WEN demanded that Steves agree to a new pricing structure for the Supply Agreement, including a "capital charge"—an 11% increase in the price of doorskins. JELD-WEN asserts that it never made this demand, noting that Steves has never paid any capital charge under the Agreement. Id. ¶ 8. In any event, shortly thereafter, on September 10, 2014, JELD-WEN provided Steves with notice of termination of the Supply Agreement. Consequently, the Agreement will terminate on September 10, 2021. Id. ¶¶ 3-4.

The parties present conflicting evidence about JELD-WEN's interest in continuing to sell doorskins to Steves after that date. Steves claims that JELD-WEN has refused to provide Steves

with any proposal for terms of a new long-term supply agreement, but JELD-WEN insists that it has told Steves it is interested in negotiating future doorskin sales after 2021. Notwithstanding this dispute, the parties agree that JELD-WEN has supplied doorskins to Steves since giving notice of termination. Id. ¶ 5.

## 5. Steves' Efforts to Obtain Alternative Doorskin Supply

After JELD-WEN notified Steves that it would terminate the Supply Agreement, Steves began to explore ways to produce or acquire interior molded doorskins without relying on JELD-WEN. Id. ¶ 32. One other supplier that Steves considered was Masonite. However, in July 2014, Masonite announced that it would no longer sell doorskins to third parties. Whether Masonite is, or ever was, amenable to selling doorskins to Steves at reasonable prices is highly disputed. Steves points to documents indicating that, after the merger, Masonite has not entered into long-term supply agreements with any third-party customers; will not negotiate the price of its doorskins; limits external sales of doorskins to customers or products with which Masonite does not compete; cannot sell Steves enough doorskins to meet Steves' needs; and has only offered Steves doorskins at prices much higher than prices Masonite offered in 2012, or prices JELD-WEN charged under the Supply Agreement in 2015. Pl. SAMF ¶¶ 16-22. JELD-WEN, however, claims that some evidence indicates that Masonite would sell doorskins to Steves at

standard prices; that Masonite has sold doorskins to external customers from 2010 to 2016; and that Steves has not determined whether the 2015 prices that Masonite quoted to Steves would be unprofitable for Steves. Def. SUMF ¶¶ 27-31.

Steves has also pursued relationships with foreign doorskin suppliers like Teverpan, Kastamonu, and Yildiz, although it is unclear whether those suppliers can provide Steves with the quantity and range of doorskins that Steves requires. Negotiations with those suppliers are at various stages. Pl. SAMF ¶¶ 24-27. Some evidence indicates that Steves could obtain doorskins from Teverpan at prices more than 3% lower than those JELD-WEN charges under the Supply Agreement, but other evidence suggests that the quality of doorskins from foreign suppliers is inadequate to satisfy Steves.

Finally, Steves has considered becoming vertically integrated by building its own doorskin manufacturing plant. The parties disagree about how long this process might take. JELD-WEN highlights evidence indicating that the timeline is closer to two years, and Steves has presented evidence showing that three to four years is a more realistic estimate. In any event, Steves has not yet identified a partner to help it build any manufacturing facility. Id. ¶ 29.

## 6. Initiation of Alternative Dispute Resolution Process

In January 2015, consistent with the Supply Agreement, Steves requested an affidavit from JELD-WEN supporting its announced price increases. Id. ¶ 33. Then, in March 2015, Steves demanded an internal conference to resolve its dispute with JELD-WEN over doorskin pricing and quality issues. When no resolution was reached, the parties participated in mediation, and then entered into a standstill agreement regarding Steves' claims under the Supply Agreement and "the antitrust laws." Even after mediation, the parties continued settlement discussions, and agreed to four extensions of the standstill agreement between September 2015 and April 2016. Id. ¶¶ 34-36.[3] However, that agreement did not at any point explicitly prevent Steves from filing an antitrust claim. Def. SUMF ¶ 26.

---

[3] JELD-WEN disputes these facts solely on the basis that they are inadmissible at trial because they reflect confidential settlement communications. See Fed. R. Evid. 408(a)(2). But even if this evidence concerns a "disputed claim" within the scope of Rule 408, Steves may offer this evidence at trial for purposes other than "prov[ing] or disprov[ing] the validity or amount" of that claim, or impeaching one of JELD-WEN's witnesses. Id. 408(a). The Court already recognized as much in denying JELD-WEN's related motion in limine. ECF No. 779. Thus, it is not true that this evidence "cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), so the Court can consider those facts here.

## B. Procedural Background

Following the failure of the parties' required dispute resolution process, Steves initiated this action on June 29, 2016, asserting antitrust and contract claims against JELD-WEN related to the CMI Acquisition and JELD-WEN's alleged breach of the Supply Agreement. Complaint (ECF No. 5) (Under Seal). The Complaint contained the following claims: COUNT ONE, a claim under the Clayton Act, Section 7, 15 U.S.C. § 18; COUNT TWO, Breach of Contract; COUNT THREE, Breach of Warranty; COUNT FOUR, Declaratory Judgment, concerning certain rights under the Supply Agreement and the putative termination of that contract; COUNT FIVE, Specific Performance, regarding the Supply Agreement; and COUNT SIX, Trespass to Chattels.[4] Id. ¶¶ 175-206. Count One sought two forms of relief. It primarily requested injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to force JELD-WEN to divest assets sufficient to: (1) create a doorskin manufacturer with the same market significance that CMI had before the Acquisition; or (2) restore the interior molded doorskin market to its competitive state before the CMI Acquisition. Alternatively, Steves sought treble damages pursuant to Section 4 of the Clayton Act,

---

[4] On October 2, 2017, the Court dismissed Count Six as moot after Steves notified the Court that it would not persist with that claim. ECF No. 409. All other claims remain here.

15 U.S.C. § 15, for injuries suffered by Steves as a result of the anticompetitive effects of the CMI Acquisition, including JELD-WEN's refusal to sell doorskins to Steves at prices consistent with the Supply Agreement and JELD-WEN's termination of the contract. Id. ¶¶ 177-78.

On August 5, 2016, JELD-WEN moved to dismiss Count One for failure to state a claim. ECF No. 20. The Court denied that motion on October 21, 2016, concluding that the Complaint plausibly alleged that the CMI Acquisition violated Section 7 by causing higher doorskin prices, lower doorskin quality, reduced doorskin output, and increased coordination between JELD-WEN and Masonite, and that these anticompetitive effects impacted both Steves and the broader doorskin market. ECF No. 64. At a pretrial conference on October 19, 2016, the matter was set for trial to begin on June 12, 2017, and a detailed schedule for the conduct of pretrial proceedings was thereafter implemented. ECF No. 65. Pursuant to that schedule, the parties engaged in extensive discovery.

On March 27, 2017, JELD-WEN sought leave to amend its Answer and to add counterclaims against Steves based on JELD-WEN's recent detection, from documents produced by Steves during discovery, of "Steves' theft of JELD-WEN trade secrets and confidential information." ECF No. 101 at 1-2. In relevant part, the counterclaims alleged that Steves and two former JELD-WEN

12

employees, John Pierce and John Ambruz ("Ambruz"), had engaged in a conspiracy to steal trade secrets from JELD-WEN concerning how to build and operate a doorskin plant that could produce the type of doorskins that Steves was buying from JELD-WEN under the Supply Agreement. Although the Court granted JELD-WEN leave to assert the counterclaims, the Court also ordered that they be tried separately from the antitrust and contract claims. ECF Nos. 239-240. Trial for the counterclaims is set to begin on April 9, 2018, and the parties are proceeding on a separate pretrial schedule for that case. ECF No. 374. Those counterclaims are not relevant to the Court's decision on summary judgment here.

After completing discovery, Steves and JELD-WEN both moved for summary judgment on September 22, 2017. Steves sought a ruling from the Court that it had established its prima facie case under Count One that the CMI Acquisition is likely to have anticompetitive effects in the interior molded doorskin market. ECF No. 381. The Court denied Steves' motion on November 21, 2017, based on the Court's finding at oral argument that there were genuine disputes of material fact as to whether Steves had satisfied the elements of its prima facie case. ECF No. 575.

JELD-WEN sought summary judgment on Count One, as to both the divestiture claim and the claim for future lost profits damages caused by the CMI Acquisition, and Count Four. On

November 27, 2017, the Court denied JELD-WEN's motion to the extent it sought summary judgment on Count One's divestiture claim and Count Four, for reasons to be explained in a forthcoming memorandum opinion. ECF No. 578. However, the Court ordered the parties to submit supplemental briefs on the question of whether JELD-WEN was entitled to summary judgment on Steves' future lost profits damages claim under Count One. ECF Nos. 574, 578.

Shortly thereafter, on December 1, 2017, JELD-WEN notified the Court that Steves had recently produced to JELD-WEN more than two hundred pages of handwritten notes of Gregory Wysock ("Wysock"), a Steves employee whose testimony is relevant to certain aspects of Steves' claims. ECF No. 603. After allowing JELD-WEN to conduct a supplemental deposition of Wysock, the Court granted JELD-WEN's request to conduct limited additional discovery of Wysock, Sam Steves II, and Ambruz based on information obtained during that deposition. The Court also amended the briefing schedule for the supplemental briefs as to Steves' future lost profits damages claim under Section 7, to allow the parties to include evidence from Wysock's deposition and recently-produced notes. ECF No. 732. As a result, JELD-WEN's motion for summary judgment did not become ripe for decision on all issues contained therein until January 9, 2018.

The Court then heard further argument on the future lost profits damages claim at the Final Pretrial Conference on January 22 and 26, 2018. It did not, however, decide whether summary judgment should be granted on that claim before trial commenced. Instead, the Court allowed Steves to present evidence at trial to attempt to establish a factual predicate upon which the jury could determine the fact and amount of the future lost profits damages with reasonable certainty. On February 6, 2018, after Steves had introduced that evidence but before its damages expert presented his future lost profits damages estimates, JELD-WEN moved for a judgment under Federal Rule of Civil Procedure 50(a) on the future lost profits claim—effectively converting its motion for summary judgment on that issue to a motion for judgment as a matter of law. The Court denied that motion, but its reasons for doing so are irrelevant here. In any event, having entertained Steves' trial evidence about future lost profits damages, the Court will not consider in this opinion whether summary judgment on that claim would have been appropriate.

## DISCUSSION

### I.  Legal Standard

Under Fed. R. Civ. P. 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). Rule 56 requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). For a court to enter summary judgment, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Id. at 323 (internal quotations omitted).

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017). To successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). However, "'[c]onclusory or speculative allegations do not suffice' to oppose a properly supported motion for summary judgment, 'nor does a mere scintilla of evidence.'" Matherly v. Andrews, 859 F.3d 264, 280 (4th Cir. 2017) (quoting Thompson v.

Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)). "Where . . . the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## II. Count One

JELD-WEN seeks summary judgment on Count One on three grounds. First, it contends that Steves has not suffered any antitrust injury from the CMI Acquisition that is separate from the contract injury caused by JELD-WEN's alleged breach of the Supply Agreement. Moreover, JELD-WEN says, even if its breach of contract could have caused cognizable antitrust harm, Steves has not shown that any anticompetitive effects of the Acquisition impacted Steves by forcing it to pay higher prices or receive lower quality doorskins. Second, JELD-WEN asserts that Steves' claim for future lost profits damages is not ripe because those damages are based on speculation about future antitrust injury. Alternatively, those future damages depend on the occurrence of certain future events and are thus entirely speculative. Third, Steves' divestiture claim is barred by the doctrine of laches and because Steves cannot show a significant threat of antitrust injury.

## A. Antitrust Injury and Impact

"[A]ny person . . . injured in his business or property by reason of anything forbidden in the antitrust laws" can assert a private damages claim under Section 4 of the Clayton Act. 15 U.S.C. § 15(a). To prevail on that claim, the plaintiff must demonstrate three elements: (1) violation of the antitrust law, (2) direct injury to the plaintiff from such violation, and (3) damages sustained by the plaintiff. Windham v. Am. Brands, Inc., 565 F.2d 59, 65 (4th Cir. 1977). The "gravamen" of a Section 4 claim is not the antitrust violation itself, but rather the subsequent "individual injury." Id. Furthermore, the injury proven must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). In other words, "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." Id.

### 1. Existence of Antitrust Injury

JELD-WEN's first argument is that Steves' injuries do not satisfy the Brunswick definition of antitrust injury because those harms arose under the Supply Agreement, not because of any reduced competition from the CMI Acquisition. JELD-WEN compares this case to others in which courts rejected Section 4 claims based on injuries that were linked to defendant's breach of an

existing contract between the parties. See, e.g., Orion Pictures Distribution Corp. v. Syufy Enters., 829 F.2d 946, 949 (9th Cir. 1987) (movie theater owner's repudiation of guarantees owed to film distributor by contract, after owner acquired competitor, was not antitrust injury because "[owner]'s duties to [distributor] were fixed by its contractual commitment to pay guarantees," so "competition was no longer a factor in determining [owner]'s obligation to [distributor]"). Noting that the parties entered into the Supply Agreement five months before the CMI Acquisition closed, JELD-WEN argues that, as in those cases, Steves' injuries (JELD-WEN's price increases under the Supply Agreement and its refusal to reimburse Steves for claims of defective doorskins) stem from the contract rather than as a consequence of the lessening of competition as a result of the CMI Acquisition.

This argument mischaracterizes Steves' Section 4 claim and ignores key differences between this case and those cited by JELD-WEN. As JELD-WEN acknowledges, contractual harm can still constitute antitrust injury even if the parties' actions are bound by a contract. The relevant question is not whether the contract itself predated the anticompetitive effects at issue, but instead whether "the only competition alleged to be injured predated" the anticompetitive activity. Z Channel Ltd. P'ship v. Home Box Office, Inc., 931 F.2d 1338, 1342 (9th Cir. 1991)

(emphasis in original). In <u>Orion Pictures</u>, there was no antitrust injury because "the injury to competition in that case (allegedly acquiring monopoly power) had ended before the . . . injury (loss of revenue from the broken contract) occurred." <u>Id.</u> at 1345 n.10. Here, by contrast, competition was not eliminated by the time that the doorskin pricing and quality injuries occurred. To the contrary, Steves asserts that the Supply Agreement contained provisions intended to preserve competition: for instance, the requirement that Steves purchase only 80% of its doorskins from JELD-WEN, or the allowance of purchases from other suppliers if JELD-WEN could not match their low prices. Consequently, breaches of the Supply Agreement can also be considered antitrust injuries to the extent that they resulted from the reduced competition under that contract that was facilitated by the CMI Acquisition.

Steves has produced sufficient evidence to create a genuine dispute of fact on this issue. It has shown at least that the Acquisition may have allowed JELD-WEN to raise prices under the Supply Agreement or provide lower quality doorskins because the merger undercut Steves' ability to seek favorable prices or higher-quality doorskins from other suppliers. JELD-WEN claims that there is no evidence to support these theories, but the post-merger availability of alternate supply—from either Teverpan or Masonite, both of which JELD-WEN focuses on—is a

subject of intense dispute. In addition, Steves has presented evidence indicating that the merger permitted JELD-WEN to raise prices on Madison and Monroe doorskins, to coordinate with Masonite to limit doorskin supply to the market, and to terminate the Supply Agreement in September 2014 because of JELD-WEN's enhanced market power. A jury could conclude that these steps were "anticompetitive acts made possible by the [CMI Acquisition]." See Brunswick, 429 U.S. at 489. As a result, even if is not extensive, this evidence raises a genuine dispute about whether Steves has suffered an antitrust injury.

### 2. Impact from Anticompetitive Effects

JELD-WEN further contends that, even if JELD-WEN's breaches of the Supply Agreement could establish antitrust injury, Steves has not shown that those injuries are causally linked to the CMI Acquisition. In the antitrust context, the injury element "is often referred to as impact or fact of damage. It is the causal link between the antitrust violation and the damages sought by plaintiffs[,] [and] thus requires both injury-in-fact and a showing that the injury is the result of the antitrust activity." In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 19 (1st Cir. 2008) (internal citations and quotations omitted). To show "fact of damage" or impact, "[i]t is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible

alternative sources of injury in fulfilling his burden of proving compensable injury." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9 (1969) ("Zenith Radio I"). Thus, for example, proof of impact in a Section 4 case can be shown by proof of what price the plaintiff would have paid had the merger never occurred. See Robinson v. Tex. Auto. Dealers Ass'n, 387 F.3d 416, 422 (5th Cir. 2004) ("[I]mpact may be shown simply by proof of purchase at a price higher than the competitive rate." (internal quotations omitted)); In re Graphics Processing Units Antitrust Litig., 253 F.R.D. 478, 507 (N.D. Cal. 2008) ("GPU") ("[I]n order to satisfy Section 4 of the Clayton Act, plaintiffs must demonstrate that they paid a higher price for their graphics card or computer than they otherwise would have paid in the absence of a conspiracy.").[5] JELD-WEN argues that Steves has not met its burden because it has not shown what doorskin prices or quality would have been without the CMI Acquisition.

---

[5] As Steves notes, both Robinson and GPU discussed impact at the class certification stage, so evidence of a higher price that every class member would have had to pay would be the only way to satisfy the commonality and predominance requirements under Rule 23. See Robinson, 387 F.3d at 422; GPU, 253 F.R.D. at 507. Therefore, these cases do not necessarily indicate that an individual plaintiff must demonstrate a precise competitive benchmark to show impact, as causation could be shown through other individualized proof of harm.

Here too, however, JELD-WEN fails to account for certain evidence that supports Steves' theory of antitrust injury. Steves asserts that its liability expert, Carl Shapiro ("Shapiro"), did not conduct an empirical analysis of the prices that JELD-WEN would have charged absent the Acquisition because he did not need to: the Supply Agreement set the competitive benchmark of prevailing doorskin prices before the merger. JELD-WEN certainly disagrees that the Agreement is an accurate benchmark, but the weight of Shapiro's analysis is a question for the jury, not the Court. Moreover, evidence indicates that JELD-WEN increased doorskin prices from pre-merger levels even as key input costs at JELD-WEN's legacy plants declined.[6] Similarly, there is genuine evidence that the decrease in JELD-WEN's doorskin quality was exacerbated by the CMI Acquisition—even if JELD-WEN had begun to thin its doorskins before the merger—and that customers other than Steves suffered from quality issues. This circumstantial evidence is sufficient to create a dispute about whether the Acquisition caused anticompetitive effects that impacted Steves. See Zenith Radio I, 395 U.S. at 114 (circumstantial evidence was sufficient to

---

[6] This evidence can therefore show antitrust impact even without considering the cost reductions allowed by JELD-WEN's acquisition of CMI's Towanda plant because JELD-WEN still would have owned the legacy plants in the absence of the merger.

"sustain the inference" of impact). Consequently, summary judgment on Count One cannot be granted on this basis.

## B. Future Lost Profits Damages Claim

JELD-WEN makes two separate arguments as to Steves' Section 4 claim for future lost profits damages.[7] First, it asserts that the claim is not ripe, as Steves' future damages relate to an antitrust injury that Steves may never suffer. Second, JELD-WEN contends that even if those damages are based on an existing antitrust injury, Steves cannot recover them because they are unreasonably speculative. As noted, the Court reserved its decision on the second argument until Steves had presented evidence at trial, so the validity of Steves' future lost profits damages claim is not discussed in this opinion. However, because the ripeness contention calls into question the Court's jurisdiction over that claim at trial, the Court will address it here.

Article III of the Constitution limits federal courts to deciding actual "cases" and "controversies." Doe v. Obama, 631 F.3d 157, 160 (4th Cir. 2011). JELD-WEN's motion pertains to two intertwined aspects of the justiciability requirement, standing

---

[7] Steves seeks these damages only under Count One because it concedes that JELD-WEN's September 2014 notice of termination of the Supply Agreement did not breach the contract.

and ripeness.[8] See Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006) ("Analyzing ripeness is similar to determining whether a party has standing."). Although a plaintiff must satisfy three requirements to establish standing to seek particular relief, the only one relevant here is that the plaintiff must have suffered an injury in fact—"an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992) (internal citations and quotations omitted). However, "the standing doctrine only answers the question of who may sue, not the question of when a party may sue, which properly is addressed by the doctrine of ripeness." Hispanic Leadership Fund, Inc. v. Fed. Election Comm'n, 897 F. Supp. 2d 407, 424 (E.D. Va. 2012) (emphasis added) (citing Miller, 462 F.3d at 319).

The ripeness doctrine "prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" Miller, 462 F.3d at 318-19 (quoting Rescue Army v. Mun. Ct. of L.A., 331 U.S. 549, 584 (1947)). Under that inquiry, a court must "balance the fitness of the issues for

---

[8] JELD-WEN does not assert that Steves lacks standing to seek future lost profits damages. However, the elements of Article III standing provide helpful context for JELD-WEN's ripeness argument; indeed, JELD-WEN referenced those elements when introducing the ripeness challenge in its supplemental brief.

judicial decision with the hardship to the parties of withholding court consideration." Id. at 319 (internal quotations omitted). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." Id. In other words, "'[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Scoggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 270 (4th Cir. 2013) (alteration in original) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)). "The hardship prong," on the other hand, "is measured by the immediacy of the threat and the burden imposed on the [plaintiff]," including "the cost to the parties of delaying judicial review." Miller, 462 F.3d at 319 (internal quotations omitted). The plaintiff bears the burden of proving ripeness. Id.

The parties' arguments focus almost entirely on the first element—the fitness of Steves' future damages claim for judicial review. The disagreement on this issue concerns whether to characterize the injury causing the future damages as a present injury or a future injury. Steves contends that those damages stem from JELD-WEN's 2014 termination of the Supply Agreement. That injury, says Steves, is a consequence of the CMI Acquisition, which enhanced JELD-WEN's power in the interior

molded doorskin market and allowed it to make long-term decisions that would limit the ability of competing door manufacturers to obtain a stable doorskin supply. As a result, whatever damages Steves incurs when the Supply Agreement terminates in September 2021 will relate to a previous anticompetitive act that impacted Steves long before 2021.

JELD-WEN, on the other hand, concedes that claims for *some* injuries from the CMI Acquisition may be ripe—such as, presumably, increased door prices. Nonetheless, it insists that Steves will only incur lost profits damages if it suffers another antitrust injury in 2021, when JELD-WEN stops providing Steves with doorskins and Steves cannot obtain an alternate doorskin supply. JELD-WEN asserts that even if that harm could be linked to the CMI Acquisition, its occurrence necessarily requires speculation about whether certain intervening events will come to pass. Specifically, the parties must fail to enter into another long-term doorskin supply agreement, JELD-WEN must refuse to supply doorskins to Steves on commercially viable terms, Steves must be unable to find any other source of doorskin supply, and Steves must go out of business or suffer a substantial loss.

This framing of the injury relies on the Supreme Court's discussion of antitrust injury and damages in Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321 (1971) ("Zenith Radio

II"). In that case, the court noted that, for purposes of the statute of limitations for Section 4 damages claims, the general rule is that "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." Id. at 338; see also 15 U.S.C. § 15. In the specific context of "a continuing conspiracy to violate the antitrust laws . . . this [rule] has usually been understood to mean" that each injury suffered gives rise to a separate cause of action that is subject to its own limitations period. Zenith Radio II, 401 U.S. at 338; see also Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997) ("Antitrust law provides that, in the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again . . . ." (internal quotations omitted)).

In those circumstances, damages must be connected to the discrete injuries that caused them:

> [E]ach separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial. Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all

28

> damages incurred by that date and all
> provable damages that will flow in the
> future from the acts of the conspirators on
> that date.

Zenith Radio II, 401 U.S. at 338-39 (emphasis added) (internal

citations omitted). By extension, then, "refus[ing] to award

future profits as too speculative is equivalent to holding that

no cause of action has yet accrued for any but those damages

already suffered. In these instances, the cause of action for

future damages, if they ever occur, will accrue only on the date

they are suffered." Id. at 339. Applying this rationale here,

the "particular invasion" that Steves' future lost profits

damages relate to is, in JELD-WEN's view, the eventual

expiration of the Supply Agreement in 2021. To the extent that

such damages are linked to an antitrust injury that has already

occurred, they are too speculative because so many intervening

acts could change Steves' doorskin supply by that future date.

Consequently, if Steves can obtain those damages at all, it can

only do so when it actually loses JELD-WEN's doorskin supply and

goes out of business in 2021.[9]

---

[9] To preserve the viability of this potential claim, JELD-WEN
reiterates its earlier representation to the Court that—should
Steves actually go out of business in 2021—JELD-WEN will not
seek dismissal of a Section 4 damages claim on the basis that
the claim accrued earlier and is barred by the statute of
limitations. Nor, says JELD-WEN, will it assert any time-related
defense.

JELD-WEN's reading of Zenith Radio II misunderstands the scope of that case. Other courts have held that the "continuing violations doctrine" described in Zenith Radio II and Klehr can only be applied in "conspiracy and monopolization cases not involving mergers or acquisitions." Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 599 (6th Cir. 2014) (citing, inter alia, Klehr, 521 U.S. at 189 (emphasizing that the case involved "a price fixing conspiracy"); Zenith Radio II, 401 U.S. at 338-39 (discussion confined to "the context of a continuing conspiracy to violate the antitrust laws")); see also Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1052 (8th Cir. 2000) ("Continuing violations have not been found outside the RICO or Sherman Act conspiracy context . . . because acts that simply reflect or implement a prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations." (internal quotations omitted)).

This action is predicated on a "single act," the CMI Acquisition, that—based on the disputed evidence—caused injury to Steves by allowing JELD-WEN to raise doorskin prices, decrease the quality of its doorskins with no risk of losing customers, and give notice of termination for the Supply Agreement without concern that Steves could obtain a steady

30

doorskin supply elsewhere.[10] Those injuries appear to be the very

"unabated inertial consequences (of a single act)" that do not

implicate the continuing violations doctrine underlying JELD-

WEN's argument. Concord Boat, 207 F.3d at 1052. JELD-WEN does

not explain why that doctrine applies in this situation, such

that Steves' future damages are necessarily separate from the

injury suffered when JELD-WEN gave notice of termination for the

Supply Agreement in 2014.[11] Therefore, JELD-WEN's claim that the

Court must assess ripeness injury-by-injury is irrelevant here.[12]

Steves has shown that whether it suffered antitrust injury when

---

[10] JELD-WEN's counsel claimed at the Final Pretrial Conference
that its notice of termination could not be considered an
antitrust injury because the parties had so stipulated. However,
JELD-WEN provided no evidence of that stipulation, and Steves'
counsel indicated that the stipulation likely reflected that
JELD-WEN's notice could not give rise to contractual liability—
which Steves has agreed is not the case.

[11] It may well be true that Steves could suffer some other future
antitrust injury from the CMI Acquisition that the parties have
not identified, and that the act causing that injury could be of
the type that implicates the continuing violations doctrine.
However, the Court cannot resolve that hypothetical issue here.

[12] The only cases that JELD-WEN cites as purportedly establishing
this principle involved challenges to rules or standards that
were either completed and being enforced, and thus ripe for
review, or were in "early stages of development," and thereby
unripe. See Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis
Council, 857 F.2d 55, 64-65 (2d Cir. 1988); Plant Oil Powered
Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 801 F. Supp. 2d
1163, 1183-84 (D.N.M. 2011). The harms that Steves suffered
because of the CMI Acquisition are not as easily separable in a
temporal or causal sense. As a result, it is uncertain whether
the rationale of those cases would hold for Steves' injuries.

JELD-WEN provided that notice is a triable factual issue, and it is clear that a claim based on an existing injury is ripe. See Miller, 462 F.3d at 319.

Moreover, the only other relevant case cited by JELD-WEN, SureShot Golf Ventures, Inc. v. Topgolf Int'l, Inc., No. CV H-17-127, 2017 WL 3658948 (S.D. Tex. Aug. 24, 2017), is inapposite. There, plaintiff alleged that it suffered an antitrust injury following defendant's acquisition of a third party because defendant refused to give plaintiff assurances that it would exercise its option to renew the parties' contract for plaintiff's license to proprietary technology developed by the third party when that contract expired in five years. Id. at *3-4. The court dismissed plaintiff's Section 4 damages claim as unripe because defendant's "perceived threats of monopolistic behavior [we]re speculative and d[id] not confer standing." Id. at *4. But, in reaching that conclusion, the court specifically noted that plaintiff had not pled that defendant had "denied it access to the [proprietary technology]." Id. In addition, "none of the antitrust actions which [plaintiff] allege[d] ha[d] actually occurred (i.e. controlling prices, foreclosing competitors from access to technology, sending less qualified personnel for installation and service requests, licensing the technology only to companies outside of golf entertainment centers)." Id.

In contrast, this case has advanced well past the pleading stage, and the record demonstrates that JELD-WEN's conduct after the CMI Acquisition amounts to considerably more than just "threats of monopolistic behavior." Indeed, Steves has presented evidence creating a genuine dispute of fact as to whether it suffered antitrust injury when JELD-WEN gave notice of termination of the Supply Agreement. Accordingly, Steves might have suffered the present antitrust injury that the SureShot Golf plaintiff could not even plead. Steves has therefore met its burden in proving that its future damages claim is ripe for presentation to the jury.

### C. Divestiture Claim

Section 16 of the Clayton Act allows private parties to obtain injunctive relief "against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. "[I]n order to seek injunctive relief under [Section] 16, a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 113 (1986) (quoting Brunswick, 429 U.S. at 489). The injunctive relief authorized by this statute may include an order requiring the acquiring company to divest the assets of the acquired firm, even when the plaintiff is a private party. See California v. Am. Stores Co., 495 U.S. 271,

295-96 (1990). However, "equitable defenses such as laches . . . may protect consummated transactions from belated attacks by private parties." Id. at 296. JELD-WEN argues that Steves' divestiture claim under Count One must be dismissed because laches applies here, and because Steves has failed to show any threatened antitrust injury from the CMI Acquisition.

### 1. Laches

"Laches imposes on the defendant the ultimate burden of proving '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" White v. Daniel, 909 F.2d 99, 102 (4th Cir. 1990) (quoting Costello v. United States, 365 U.S. 265, 282 (1961)). The defense "generally applies to preclude relief for a plaintiff who has unreasonably 'slept' on his rights," barring "claims where a defendant is prejudiced by a plaintiff's unreasonable delay in bringing suit after the plaintiff knew of the defendant's violation." PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 121 (4th Cir. 2011); see also Kloth v. Microsoft Corp., 444 F.3d 312, 325 (4th Cir. 2006) (noting that laches involves an "equitable balancing of a plaintiff's delay with prejudice to a defendant" (internal quotations omitted)). JELD-WEN contends that the undisputed evidence establishes that Steves unreasonably delayed suit after it became aware that the CMI Acquisition might violate Section 7, and that the delay

harmed JELD-WEN because it completely integrated CMI's operations into its own business following the merger.

As the Court has previously recognized, "the equitable defense of laches has been used to bar antitrust claims in other circuits." Steves & Sons, Inc. v. JELD-WEN, Inc., 252 F. Supp. 3d 537, 545 & n.7 (E.D. Va. 2017) (citing Ginsburg v. InBev NV/SA, 623 F.3d 1229, 1235 (8th Cir. 2010); Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc., 392 F.3d 265, 277 (8th Cir. 2004); Taleff v. Sw. Airlines Co., 828 F. Supp. 2d 1118, 1122-25 (N.D. Cal. 2011); Garabet v. Autonomous Tech. Corp., 116 F. Supp. 2d 1159, 1172-73 (C.D. Cal. 2000)). JELD-WEN relies on several of those cases here. But the fact that divestiture is an extreme remedy, as JELD-WEN points out, is not pertinent here. Rather, the relevant question is whether JELD-WEN has shown that there is no genuine dispute about the reasonableness of Steves' delay or the prejudice to JELD-WEN.

The evidence in the record shows that JELD-WEN has not met that burden. The application of laches is generally a fact-intensive analysis. See White, 909 F.2d at 102 ("[W]hether laches bars an action depends upon the particular circumstances of the case."). And here, unresolved factual questions remain as to both prongs of the laches inquiry. First, with respect to Steves' delay, it is unclear when Steves believed that the CMI Acquisition would have anticompetitive effects, given the

possibility that doorskin prices and quality might have been protected by the Supply Agreement.[13] See PBM Prods., 639 F.3d at 121. Moreover, evidence suggests that Steves acted promptly once it learned of JELD-WEN's anticompetitive conduct, initiating the requisite dispute resolution procedure under that Agreement. Second, even assuming JELD-WEN's burden is lower in light of the length of Steves' delay, see White, 909 F.2d at 102, the degree of prejudice is uncertain, as the parties dispute the costliness of integrating JELD-WEN's and CMI's operations.[14] Given that these issues are unresolved, summary judgment on the basis of laches is inappropriate.

### 2. Threat of Antitrust Injury

Of course, to prevail on its divestiture claim, Steves still must be able to demonstrate "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Zenith

---

[13] Steves argues that its filing suit within the Clayton Act's four-year statute of limitations for damages actions is relevant to this factor. It cites a recent Supreme Court case, Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962 (2014), as holding that laches cannot be applied when a plaintiff has filed suit within the limitations period imposed by a statute. Id. at 1977. Even if that holding applies to Clayton Act claims, the four-year statute of limitations applies to Section 4 damages claims, not Section 16 divestiture claims. See 15 U.S.C. § 15(b).

[14] Although JELD-WEN may be right that the consummation of the merger is sufficient prejudice to implicate laches, the cost of any divestiture order is still relevant to the Court's balancing of the equities. See Ginsburg, 623 F.3d at 1235-36.

36

Radio I, 395 U.S. at 130; see also Garabet, 116 F. Supp. 2d at 1170 ("Section 16 requires a threatened loss or injury cognizable in equity . . . proximately resulting from an antitrust violation." (internal quotations omitted)). JELD-WEN asserts that Steves cannot do so because its speculative claims of future injury are belied by evidence that Steves can obtain alternative doorskin supply once its contractual relationship with JELD-WEN ends.

This argument fails for the same reasons as JELD-WEN's assertions regarding Steves' damages claim. JELD-WEN's contention that potential future injury could be prevented by Steves' efforts to find another doorskin supplier or manufacture doorskins itself is mistaken, because the evidence of Steves' ability to do either is disputed. Moreover, there is a genuine disagreement—supported by evidence on both sides—about whether the CMI Acquisition has already caused anticompetitive effects that are likely to continue or recur. See supra Section II.A. Just as with Steves' Section 4 damages claim, these factual disputes preclude summary judgment on Steves' Section 16 divestiture claim.

## III. Count Four

JELD-WEN also moves for summary judgment on Count Four, arguing that it does not present a case or controversy required by Article III because the termination date of the Supply

Agreement is not in dispute. A declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, is only proper if the facts show "'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" Ross v. Reed, 719 F.2d 689, 694 (4th Cir. 1983) (quoting Golden v. Zwickler, 394 U.S. 103, 108 (1969)). JELD-WEN contends that there is no controversy about the termination date of the Agreement because, notwithstanding its previous position, it now agrees that the termination date is September 10, 2021, and that it will supply Steves with doorskins until that date.

However, disputes about the credibility of JELD-WEN's current stance prevent summary judgment on Count Four. As recently as March 2015, JELD-WEN asserted that the proper termination date under the Supply Agreement was ambiguous, and reserved the right to argue that the Agreement terminated on the original December 31, 2019 date, rather than seven years after JELD-WEN gave notice of termination—that is, September 10, 2021. ECF No. 452-64 (Under Seal) ¶ 13. JELD-WEN now claims that its position has changed and it believes that the later date is correct. But where a defendant seeks to moot a claim through its voluntary conduct, it bears the "'heavy burden'" of "'ma[king] it absolutely clear [to the court] that the allegedly wrongful behavior could not reasonably be expected to recur.'" Friends of

the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968)). JELD-WEN has done nothing to convince the Court that its apparent change of heart is genuine beyond listing the termination date as an uncontroverted fact in its motion. This minimal step is insufficient to satisfy JELD-WEN's substantial burden. Accordingly, JELD-WEN's motion will be denied to the extent that it seeks summary judgment on Count Four.

### CONCLUSION

For the foregoing reasons, DEFENDANT JELD-WEN, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND IV OF PLAINTIFF STEVES AND SONS, INC.'S COMPLAINT (ECF No. 375) was denied, except as to Steves' future lost profits damages claim under Count One, the validity of which the Court decided at trial in the context of JELD-WEN's motion for judgment as a matter of law.

It is so ORDERED.

_____ /s/  _REP_
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 9, 2018

39