```
1                  IN THE UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF VIRGINIA

3                         RICHMOND DIVISION

4     ------------------------------
                                    :
5     STEVES AND SONS, INC.,        :    Civil Action No.
                                    :    3:16cv545
6     vs.                           :
                                    :    February 6, 2018
7     JELD-WEN, INC.                :
                                    :
8     ------------------------------

9


10            COMPLETE TRANSCRIPT OF TRIAL PROCEEDINGS

11             BEFORE THE HONORABLE ROBERT E. PAYNE

12                UNITED STATES DISTRICT JUDGE

13    APPEARANCES:

14    Lewis F. Powell, III, Esquire
      John S. Martin, Esquire
15    Maya M. Eckstein, Esquire
      Hunton & Williams
16    Riverfront Plaza, East Tower
      951 East Byrd Street
17    Richmond, Virginia 23219

18    Glenn Pomerantz, Esquire
      Ted Dane, Esquire
19    Munger Tolles & Olson, LLP
      355 South Grand Avenue
20    35th Floor                              VOLUME VI
      Los Angeles, California 90071

21

22

23

24

25
```

```
 1    APPEARANCES: (cont'g)

 2    Kyle Mach, Esquire
      Munger Tolles & Olson, LLP
 3    560 Mission Street
      27th Floor
 4    San Francisco, California 94105
      Counsel for the plaintiff
 5
      Margaret M. Zwisler, Esquire
 6    Allyson M. Maltas, Esquire
      Latham & Watkins, LLP
 7    555 11th Street NW
      Suite 1000
 8    Washington, D.C. 20004

 9    Alfred C. Pfeiffer, Esquire
      Latham & Watkins, LLP
10    505 Montgomery Street
      Suite 2000
11    San Francisco, California 94111

12    Lawrence E. Buterman, Esquire
      Latham & Watkins, LLP
13    885 Third Avenue
      25th Floor
14    New York, New York 10022

15    Michael W. Smith, Esquire
      Craig T. Merritt, Esquire
16    Christian & Barton
      909 East Main Street
17    Suite 1200
      Richmond, Virginia 23219
18    Counsel for the defendant

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 09:35:05 | 1 | THE CLERK:  Day five.  Case No. 3:16cv545. |
| 09:42:57 | 2 | *Steves and Sons, Inc. v. Jeld-Wen, Inc.* |
| 09:35:06 | 3 | The plaintiff is represented by Lewis Powell, III, |
| 09:35:06 | 4 | Maya Eckstein, Glenn Pomerantz, Kuruvilla Olasa, and Emily |
| 09:35:06 | 5 | Huberty. |
| 09:35:06 | 6 | The defendant is represented by Michael Smith, |
| 09:35:06 | 7 | Margaret -- Margaret Peggy Zwisler, Alfred Pfeiffer and |
| 09:35:06 | 8 | Jason Daniels. |
| 09:35:06 | 9 | Are counsel ready to proceed? |
| 09:35:33 | 10 | MR. POWELL:  Good morning, Your Honor.  Steves |
| 09:35:34 | 11 | is ready. |
| 09:35:35 | 12 | MS. ZWISLER:  Good morning.  We're ready as |
| 09:35:36 | 13 | well. |
| 09:36:05 | 14 | THE COURT:  We've been told that Juror Number 10 |
| 09:36:07 | 15 | called the jury clerk this morning, told her she's so sick |
| 09:36:10 | 16 | she can't get out of bed.  She didn't describe the illness |
| 09:36:14 | 17 | any further than that.  I think you all have been told |
| 09:36:16 | 18 | that.  I don't know what else to do other than to excuse |
| 09:36:20 | 19 | the juror and go forward.  That's Ms. D'Agostino, Number |
| 09:36:34 | 20 | 10.  I don't know what else to do. |
| 09:36:44 | 21 | MR. POWELL:  Nor do I. |
| 09:36:45 | 22 | THE COURT:  The only other choice is to hold up |
| 09:36:45 | 23 | the trial until she gets better.  We don't even know if |
| 09:36:50 | 24 | she's going to get better -- I mean when she's going to |
| 09:36:53 | 25 | get better.  Let's presume that she will. |

09:36:56 1          MS. ZWISLER:  Could we give her a day and see

09:36:56 2  if --

09:36:59 3          THE COURT:  No.

09:36:59 4          MS. ZWISLER:  No.

09:36:59 5          THE COURT:  I'm not going to stop this trial and

09:37:01 6  impose on those other people.  I just don't understand how

09:37:03 7  we can do that.

09:37:04 8      One of the things that you all have got to realize is

09:37:06 9  that these people are people of ordinary means, giving up

09:37:11 10  their time at a considerable sacrifice, and you all are

09:37:15 11  raking in money like it's going out of style and it's okay

09:37:20 12  for you to be here.  It's not okay for them to be here.

09:37:23 13      And in addition to that -- I mean, if I had been able

09:37:26 14  to do it, I would have had another judge come in here and

09:37:30 15  sit while I was sick, but I couldn't do that because of

09:37:33 16  the unusual evidentiary posture of things.  It wasn't an

09:37:37 17  option.  So -- and I'm sorry that we're losing her, but I

09:37:41 18  don't know what else to do.  The alternative is to give

09:37:44 19  another day.  Is that what you're saying?

09:37:48 20          MR. POWELL:  We completely agree, Your Honor.

09:37:49 21  We think we should press ahead without that juror.

09:37:53 22          THE COURT:  All right.  Tell the jury clerk.

09:37:59 23      Are we ready for the jury otherwise?

09:38:01 24          MR. POMERANTZ:  Your Honor, just one small

09:38:01 25  point.

```
09:38:02  1              THE COURT:  Come to the lectern.  Come to the
09:38:03  2   lecturn, please, so they can hear you.
09:38:12  3              MR. POMERANTZ:  We had inadvertently omitted 17
09:38:16  4   seconds of Mr. Lynch's testimony, the CEO of Masonite,
09:38:17  5   from the depo that we showed the jury.  We would to
09:38:20  6   show that 17 seconds so it's in front of the jury.  And we
09:38:23  7   are prepared to do it now or at any time during the day as
09:38:26  8   long as it's before we rest.
09:38:29  9              THE COURT:  Is the machinery ready?
09:38:32 10              MR. POMERANTZ:  I am told it is.
09:38:34 11              THE COURT:  Anybody object?
09:38:36 12              MS. ZWISLER:  No, Your Honor.  We've told them
09:38:37 13   we don't object.
09:38:39 14              THE COURT:  All right.
09:38:39 15              MR. POMERANTZ:  And then after that, we're
09:38:41 16   prepared to start with Professor Shapiro.
09:38:43 17              THE COURT:  All right.  Is this the most
09:38:44 18   critical 17 seconds in history?
09:38:47 19              MR. POMERANTZ:  Well, the only reason why it's
09:38:49 20   critical, Your Honor, is because I referred to it in the
09:38:51 21   opening.  And so I would very much like to play it to the
09:38:52 22   jury so that they see what I actually said in the opening.
09:38:55 23              THE COURT:  Do you know what Bear Bryant said
09:38:57 24   about that kind of thing?  He said, That and a nickel will
09:39:03 25   get you a Coke.
```

```
09:39:06  1            MR. POMERANTZ:  Those are the good old days
09:39:06  2   when --
09:39:06  3            THE COURT:  It will cost a nickel.  All right.
09:39:07  4   Play it now when they come in.
09:39:12  5            MR. POMERANTZ:  Thank you, Your Honor.
09:39:13  6            THE COURT:  All right.  Mr. Robertson.
09:39:18  7            MR. POWELL:  Your Honor, may I explain to the
09:39:20  8   jury why we're doing this?
09:39:22  9            THE COURT:  Sure.
09:39:23 10            MR. POWELL:  Thank you.
09:40:49 11         (The jury entered the courtroom.)
09:41:31 12            THE COURT:  Everybody have their book?  Good
09:41:33 13   morning, ladies and gentlemen.
09:41:34 14         All right.  Mr. Powell, you had something.
09:41:37 15            MR. POWELL:  Good morning, Your Honor.
09:41:38 16         You may remember we played the video deposition of
09:41:41 17   Fred Lynch, the CEO of Masonite.  We inadvertently left
09:41:45 18   off about 17 seconds.  And with the Court's permission,
09:41:46 19   and no objection from Jeld-Wen's counsel, we'd like to
09:41:51 20   play those 17 seconds for you now.
09:41:58 21         (Video Played.)
09:42:28 22            MR. POMERANTZ:  Your Honor, we now call
09:42:31 23   Professor Carl Shapiro.
09:42:33 24            PROFESSOR CARL SHAPIRO,
09:42:33 25   called at the instance of the plaintiff, having been first
```

Shaprio – Direct

09:42:33 1          duly sworn, testified as follows:

09:42:33 2

09:43:05 3          MR. POMERANTZ:  Your Honor, may I proceed?

09:43:07 4          THE COURT:  Please.

09:43:07 5                    **DIRECT EXAMINATION**

09:43:07 6   BY MR. POMERANTZ:

09:43:10 7   Q    Professor Shapiro, what is your profession?

09:43:12 8   A    I'm an economist.

09:43:13 9   Q    Do you have any graduate degrees in economics?

09:43:13 10  A    Yes.  I earned a Ph.D. in economics from MIT.

09:43:17 11  Q    And do you have any other degrees?

09:43:19 12  A    Yes.  I have bachelor's degrees in economics and

09:43:22 13  mathematics, and a master's degree in mathematics.

09:43:25 14  Q    And have you been a professor in the field of

09:43:26 15  economics?

09:43:27 16  A    For quite a while.  Yes.

09:43:29 17  Q    And when were you first hired as a professor?

09:43:31 18  A    That would be 1980 at Princeton University.

09:43:35 19  Q    And how long did you remain as their professor of

09:43:38 20  economics at Princeton?

09:43:39 21  A    Ten years at Princeton.

09:43:41 22  Q    And then where did you go after Princeton?

09:43:43 23  A    I took a faculty position at the University of

09:43:46 24  California at Berkeley.

09:43:47 25  Q    And how long have you remained as a professor at the

Shaprio – Direct

09:43:51 1  University of California?

09:43:52 2  A    Since 1990.  So that's 28 years.

09:43:54 3  Q    And what is your current position at the University

09:43:56 4  of California?

09:43:57 5  A    I'm now of a professor of the graduate school at the

09:43:59 6  University of California at Berkeley.

09:44:01 7  Q    And do you specialize in any particular area of

09:44:03 8  economics?

09:44:04 9  A    Yes.  My field of specialization is called industrial

09:44:08 10 organization economics.

09:44:10 11 Q    What is industrial organization economics?

09:44:12 12 A    It's the field within economics that studies firms,

09:44:16 13 how they compete, how the government regulates business,

09:44:22 14 including issues of innovation, competition, and looking

09:44:27 15 at different markets.  So instead of looking at the

09:44:30 16 economy as a whole, we look at individual markets and how

09:44:32 17 the companies compete in those markets.

09:44:35 18 Q    All right.  So in that answer, you said that you

09:44:36 19 looked at how firm compete.  What did you mean by "firms"?

09:44:42 20 A    Well, I use the word firms, companies, businesses.

09:44:44 21 They're all interchangeable.

09:44:46 22 Q    Okay.  And have you heard the term antitrust?

09:44:51 23 A    I certainly have.

09:44:52 24 Q    And what do you understand that to refer to?

09:44:55 25 A    Well, antitrust is, in the first instance, a body of

Shaprio - Direct

09:44:58  1  law that we have in the United States.  But I describe
09:45:00  2  myself as an antitrust economist, which is an applied part
09:45:04  3  of the industrial organization field where we take our
09:45:08  4  studies of markets and businesses and we use it to inform
09:45:14  5  the legal issues that surround competition, particularly
09:45:19  6  in the United States.
09:45:20  7  Q    So I want to focus specifically on your experience in
09:45:24  8  analyzing whether a particular merger or acquisition
09:45:27  9  substantially lessens competition.  What experience do you
09:45:30 10  have in analyzing whether a merger or acquisition
09:45:34 11  substantially lessens competition?
09:45:36 12  A    Well, I have two areas of expertise, I would say, or
09:45:40 13  experience.  One would be my academic work, research,
09:45:43 14  writings, publications, teaching.  And the other would be
09:45:47 15  work as a practitioner, as a consultant studying mergers
09:45:53 16  and offering opinions such as I am doing here today.
09:45:59 17  Q    And over the course of your career, how many
09:46:01 18  different mergers and acquisitions have you analyzed in
09:46:04 19  order to determine whether they substantially lessened
09:46:06 20  competition?
09:46:08 21  A    It's quite a few.  I'd say -- let's say 50 to 100
09:46:12 22  over a number of quite a few years.
09:46:14 23  Q    Have you authored any research papers or articles
09:46:17 24  that pertain to how one analyzes whether a merger or
09:46:22 25  acquisition substantially lessens competition?

Shaprio - Direct

09:46:24  1   A     Yes.  I've written a number of articles.  The mergers

09:46:28  2   areas is one of my particular areas of specialty in terms

09:46:32  3   of research.  Going back to 1990, I think, or 1989, a

09:46:38  4   series of articles about the economics of mergers and

09:46:42  5   their effect on competition.

09:46:45  6   Q     And as you are doing here today, have you testified

09:46:48  7   previously in court about whether a merger or acquisition

09:46:51  8   substantially lessens competition?

09:46:54  9   A     Yes, I have done that previously.

09:46:56 10   Q     Approximately how many times?

09:46:58 11   A     Half a dozen, I would say.

09:47:00 12   Q     And in the course of those six, or so, times that

09:47:03 13   you've testified in court about a merger, how many times

09:47:06 14   did you conclude that the merger did substantially lessen

09:47:10 15   competition?

09:47:12 16   A     I guess it's about equally split.  I mean, I should

09:47:17 17   clarify.  I get asked to look at mergers and then I offer

09:47:23 18   my opinion.  Then sometimes then I end up testifying about

09:47:25 19   them, and it's probably equally split.

09:47:27 20   Q     So equally split, meaning the times that you've

09:47:29 21   previously testified in court about a merger, about half

09:47:31 22   the time you find that the merger does lessen competition

09:47:34 23   and about half the time that you find that it doesn't.  Is

09:47:38 24   that what you're saying?

09:47:39 25   A     Roughly.  I think that's right.  Among this half a

Shaprio - Direct

09:47:40 1    dozen or so.  It's a small sample.

09:47:43 2    Q    And in that small sample, what was the difference

09:47:46 3    that led you to conclude that sometimes the merger did

09:47:49 4    substantially lessen competition and other times it did

09:47:51 5    not?

09:47:51 6    A    Well, it's a very fact-based inquiry, I would say.

09:47:56 7    Each -- one of the things that interests me, while I'm in

09:48:01 8    my field of industrial organization, is different markets

09:48:04 9    are very, very different, and so the mergers are very

09:48:07 10   different.  The companies, the markets it takes place in,

09:48:09 11   when it happens.  So it's fact-intensive.

09:48:13 12         And that's what I was trying to say before.  I get

09:48:14 13   asked to look at a merger.  I do an investigation or

09:48:18 14   research, study.  And then in some cases, I reach the

09:48:21 15   conclusion that it's problematic from the point of view of

09:48:24 16   competition.  In other cases, not.

09:48:28 17   Q    Now, you previously said that you had written a

09:48:30 18   number of articles that pertain to the economic analysis

09:48:32 19   of mergers and acquisitions, correct?

09:48:35 20   A    Yes.

09:48:35 21   Q    And have you written articles on other subjects of

09:48:38 22   economics?

09:48:39 23   A    Oh, yes.

09:48:40 24   Q    In total, how many different articles have you

09:48:42 25   written that pertain to the field of economics?

Shaprio – Direct

09:48:45  1    A    I would say 100 plus.

09:48:48  2    Q    And have you also served on the editorial boards of

09:48:52  3    economic journals?

09:48:53  4    A    Yes, I have.

09:48:54  5    Q    What is an economic journal?

09:48:56  6    A    Well, in most fields of academics, and certainly

09:49:01  7    economics, faculty members, when they have their research,

09:49:05  8    they publish it in journals.  So they're peer reviewed by

09:49:09  9    other scholars in the area.  And the editors oversee that

09:49:12 10    process.

09:49:13 11        And so these are journals that publish peer-reviewed

09:49:17 12    research, which is how the field advances, and I've edited

09:49:20 13    or coedited or been associate editor of several journals.

09:49:24 14    Q    And have -- can you give examples of any of the

09:49:27 15    editorial boards that you've served on?

09:49:31 16    A    Oh, sure.  One I'm particularly proud of was founding

09:49:34 17    the -- being the founding coeditor of the Journal of

09:49:37 18    Economic Perspectives, which was established by the

09:49:41 19    American Economic Association to communicate in a range of

09:49:47 20    areas of economics, the advances of economic thinking both

09:49:53 21    to economists and more broadly.  And that's had a lot of

09:49:56 22    impact.  It's been about 30 years now.  It's been very

09:50:02 23    successful.  I'm proud of that one.

09:50:03 24    Q    Have you served on something called the President's

09:50:04 25    Council of Economic Advisors?

Shaprio - Direct

09:50:06 1    A    Yes, I have.

09:50:07 2    Q    Could you explain to the jury what the President's

09:50:09 3    Council of Economic Advisors is?

09:50:11 4    A    Sure.  In 1946, Congress established the Council of

09:50:14 5    Economic Advisors to give advice to the President of the

09:50:19 6    United States regarding -- excuse me -- all matter of

09:50:23 7    economic -- a wide range of economic issues.  And there

09:50:27 8    are three members confirmed by the Senate.  I was one of

09:50:32 9    those members in 2011 and 2012.

09:50:36 10   Q    And so you -- during those two years, you provided

09:50:39 11   economic advice to the President of the United States?

09:50:42 12   A    That's correct.

09:50:43 13   Q    What -- what were the general subject matters?  If

09:50:46 14   you could give us a few examples of the kinds of things --

09:50:49 15   the kinds of subject matters that you provided advice to

09:50:52 16   the president on?

09:50:53 17   A    Well, one of the things that was exciting, but a

09:50:57 18   little daunting about that, was the range of issues.  So

09:51:01 19   we handled issues of trade with China, issues of

09:51:05 20   environmental regulation.  Just actually areas that I

09:51:07 21   specifically worked on.  There were other members working

09:51:10 22   on other topics.  The housing finance and dealing with the

09:51:14 23   Great Recession and the impact on the housing market, and

09:51:16 24   patents.

09:51:17 25       We -- we got a new patent law through in 2011.

Shaprio - Direct

| | | |
|---|---|---|
| 09:51:20 | 1 | That's an area of expertise of mine as well, economics of |
| 09:51:24 | 2 | patents and innovation.  That was an exciting piece.  We |
| 09:51:27 | 3 | had new major legislation.  So those are some examples. |
| 09:51:30 | 4 | Q    Now, I think you testified that you also work as an |
| 09:51:32 | 5 | economic consultant, correct? |
| 09:51:34 | 6 | A    I do. |
| 09:51:35 | 7 | Q    And are you affiliated with a particular economic |
| 09:51:37 | 8 | consulting firm? |
| 09:51:39 | 9 | A    Yes.  It's called Charles River Associates. |
| 09:51:41 | 10 | Q    And just in general terms, what do you do as a |
| 09:51:43 | 11 | consultant working with Charles River? |
| 09:51:46 | 12 | A    In general terms, we have clients -- in this case, |
| 09:51:50 | 13 | Steves -- that ask us to look -- ask me, usually, to look |
| 09:51:56 | 14 | at an economic issue.  And we do work for them.  There's a |
| 09:52:01 | 15 | number of employees at the firm, Charles River Associates, |
| 09:52:05 | 16 | who then support my work.  And I can't do it all myself. |
| 09:52:08 | 17 | They are employees at Charles River Associates.  So we |
| 09:52:11 | 18 | form a team to analyze these economic issues, and the |
| 09:52:15 | 19 | company is set up for that purpose. |
| 09:52:18 | 20 |         MR. POMERANTZ:  Your Honor, I would tender |
| 09:52:20 | 21 | Professor Carl Shapiro as an expert in economics with a |
| 09:52:22 | 22 | specialized expertise in industrial organization. |
| 09:52:25 | 23 |         THE COURT:  Any objection? |
| 09:52:26 | 24 |         MR. PFEIFFER:  No objection, Your Honor. |
| 09:52:27 | 25 |         THE COURT:  He's accepted as an expert in those |

Shaprio – Direct

09:52:30 1 areas.

09:52:30 2     Ladies and gentlemen, I'll give you instructions

09:52:32 3 about how to consider expert testimony a little bit later

09:52:37 4 because experts are allowed to do something that other

09:52:40 5 witnesses generally aren't allowed to do.  They can give

09:52:43 6 opinions if they are qualified by virtue of education and

09:52:47 7 training in some technical or specialized area.

09:52:52 8     He's been accepted as an expert in these areas and

09:52:55 9 will be permitted to give opinions.  I'll tell you later

09:52:59 10 the parameters of judging expert testimony.  As a general

09:53:04 11 proposition, you consider his testimony just like you do

09:53:07 12 anybody else's.  You're free to accept it, reject it in

09:53:11 13 whole or in part.  That's enough for now.

09:53:14 14         MR. POMERANTZ:  Thank you, Your Honor.

09:53:15 15 Appreciate that.

09:53:17 16 Q    Professor Shapiro, in preparing for your testimony

09:53:19 17 today, did you create some slides to help describe your

09:53:22 18 opinions to the jury?

09:53:23 19 A    Yes, I did.

09:53:24 20 Q    All right.  So let's turn to the first slide.  Could

09:53:27 21 you explain to the jury what this slide shows?

09:53:30 22 A    This slide poses the question that I am

09:53:35 23 investigating, or trying to answer:  "Does Jeld-Wen's

09:53:38 24 acquisition of CMI substantially lessen competition in a

09:53:41 25 relevant market?"

Shaprio – Direct

09:53:43  1          THE COURT:  Excuse me a minute.  Did somebody

09:53:45  2   re-sort that mess of papers I gave you yesterday to give

09:53:49  3   me a copy?

09:53:51  4          MR. POMERANTZ:  I'm sorry, Your Honor.  Yes.

09:53:52  5   And if I may approach, Your Honor, with --

09:53:59  6          THE COURT:  Mr. Martecchini has his own.  Thank

09:54:05  7   you.  Pardon on my interruption.

09:54:13  8   Q    All right.  So this was the question that Steves

09:54:15  9   asked you to study, correct?

09:54:16 10   A    Yes, sir.

09:54:17 11   Q    All right.  So let's turn to the first -- let's turn

09:54:20 12   to the next slide.  What basically happened when Jeld-Wen

09:54:23 13   acquired CraftMaster?

09:54:26 14   A    Well, we're focusing on door skins, interior molded

09:54:32 15   door skins.  And we'll talk more about that soon.  The

09:54:35 16   fundamental change that was caused by the merger, in terms

09:54:39 17   of the market, was a move from three suppliers, Jeld-Wen

09:54:44 18   CraftMaster and Masonite, just to two, since CraftMaster

09:54:48 19   has been acquired by Jeld-Wen.

09:54:50 20   Q    And in the way that economists talk, would they refer

09:54:54 21   to this as a three to two merger?

09:54:57 22   A    Sure.

09:54:58 23   Q    And what is your bottom-line conclusion as to whether

09:55:02 24   this merger initially lessened competition in the relevant

09:55:07 25   market?

Shaprio – Direct

09:55:07 1   A     I believe that this merger has substantially lessened

09:55:11 2   competition in the market for interior molded door skins

09:55:14 3   used in the United States, and I think it's likely that

09:55:19 4   lessening of competition will continue into the future.

09:55:23 5   Q     Now, what information did you rely upon to reach that

09:55:27 6   conclusion?

09:55:28 7   A     Well, I've been looking at this for somewhat over a

09:55:32 8   year.  We have a lot of information.  I say "we" because

09:55:35 9   I'm thinking of my team at Charles River Associates and

09:55:38 10  myself doing this together.  We have quite a bit of

09:55:42 11  information from the companies, Jeld-Wen and Steves, those

09:55:48 12  two companies.  Additionally, information from Masonite,

09:55:53 13  for example, in terms of documents.  We have testimony

09:55:56 14  from the witnesses, which was available to me earlier in

09:56:00 15  the form of deposition.  Those are the main sources.  Some

09:56:06 16  public sources of information that I used as well, such as

09:56:09 17  housing starts we'll talk about.  And, of course, applying

09:56:13 18  my expertise using that information.

09:56:16 19  Q     So you said that some of the information that you

09:56:18 20  relied upon were the documents that were in Jeld-Wen's and

09:56:22 21  Steves' and Masonite's files, correct?

09:56:26 22  A     Yes.

09:56:26 23  Q     Why do you consider those kinds of documents in doing

09:56:29 24  your analysis?

09:56:30 25  A     Well, it's very important, like I said, since markets

Shaprio - Direct

| | |
|---|---|
| 09:56:34 1 | are so different, to understand this market and, of |
| 09:56:36 2 | course, the companies that are participating in the |
| 09:56:39 3 | market, how they see things, who are they competing |
| 09:56:43 4 | against, what are their customers.  And so the documents |
| 09:56:48 5 | they create at the time -- we're going to spend a while |
| 09:56:52 6 | talking about back in 2012 because that's when the merger |
| 09:57:00 7 | happened.  Documents created then and later are very |
| 09:57:02 8 | informative to me about how the companies were thinking |
| 09:57:05 9 | about the markets and why they took the actions they did |
| 09:57:08 10 | that I'm trying to understand.  So that's a high-grade |
| 09:57:11 11 | source of information, in my view. |
| 09:57:13 12 | Q    And is it fair to say that when economists look at |
| 09:57:17 13 | mergers to assess their competitive effects, looking at |
| 09:57:20 14 | the company's internal documents are one of the primary |
| 09:57:23 15 | sources they use to evaluate whether the merger is going |
| 09:57:27 16 | to have anticompetitive effects? |
| 09:57:29 17 | A    Yes.  This is standard to have access to and use |
| 09:57:33 18 | those documents, together with the data. |
| 09:57:35 19 | Q    In the course of the last year, as you were doing |
| 09:57:37 20 | your work, did you prepare any written reports that |
| 09:57:40 21 | described your analysis in this case? |
| 09:57:43 22 | A    Yes.  I prepared three reports over the course of the |
| 09:57:45 23 | past year. |
| 09:57:46 24 | Q    And why did it come about that you prepared three |
| 09:57:49 25 | reports? |

Shaprio - Direct

09:57:50  1   A    Well, it's pretty common to do two.  I did one to
09:57:55  2   explain my opinion.  That was about a year ago now, based
09:58:01  3   on what was available to me, information then.
09:58:04  4        Then I did a second one, in part, to respond to
09:58:08  5   Professor Snyder, who is the economic expert that Jeld-Wen
09:58:11  6   has brought in, but also to update my own views based on
09:58:15  7   additional information that came in.  That was between
09:58:17  8   January and, I think, May of last year.
09:58:20  9        And then in this case, somewhat unusually, the
09:58:22 10   information kept coming in, significant information, and
09:58:25 11   so there was a third report that was, I think, in
09:58:30 12   September.  So mostly it was because information --
09:58:32 13   important information came in over time.
09:58:34 14   Q    And so you prepared reports and Professor Snyder
09:58:37 15   prepared reports, correct?
09:58:39 16   A    Yes.
09:58:40 17             MR. POMERANTZ:  Your Honor, may I approach to
09:58:41 18   hand those reports to Professor Shapiro so he has them in
09:58:45 19   the event he needs to refer to them?
09:58:47 20             THE COURT:  They haven't been admitted into
09:58:49 21   evidence.
09:58:50 22             MR. POMERANTZ:  And I'm not seeking to admit
09:58:50 23   them into evidence.  I'm just simply so that --
09:58:51 24             THE COURT:  Give him a copy in case he needs it.
09:58:54 25             MR. POMERANTZ:  Thank you.  Your Honor, I also

Shaprio - Direct

09:59:04 1   have copies for Your Honor.  Do you want them now?

09:59:07 2            THE COURT:  In case you refer to them.  Thank

09:59:11 3   you.

09:59:17 4            MR. POMERANTZ:  And, Your Honor, I've also

09:59:18 5   provided copies to Mr. Pfeiffer.

09:59:32 6   Q    All right.  Professor Shapiro, let's go to the next

09:59:36 7   slide that you created.  Could you explain to the jury

09:59:38 8   what these three steps describe?

09:59:41 9   A    Certainly.  So I think of my analysis and then my

09:59:46 10  conclusions as falling into three phrases; 1, 2, 3 here.

09:59:52 11  First one, October 2012, looking at market conditions

09:59:57 12  around the time of the merger.  So what was the market

10:00:01 13  like before the merger?  How did the merger change the

10:00:04 14  market?  That's the first phase.

10:00:06 15           And then the second phase is since, in this case, the

10:00:09 16  merger took place a little over five years ago, what's

10:00:13 17  happened in that period of time since the merger to now?

10:00:17 18  Obviously, one wants to see if we're understanding what

10:00:19 19  effect did the merger have.  We have five years of

10:00:22 20  experience.  What can we make of that?  That's the second

10:00:26 21  phase.

10:00:26 22           And then the third phase is what's likely to happen

10:00:30 23  going forward as a result of the merger?  Will things

10:00:33 24  change?  We have five years' experience, but the clock

10:00:36 25  keeps ticking.  We look ahead.

Shaprio – Direct

10:00:38 1   Q    All right.  So let's look at the first step of your

10:00:41 2   analysis here.  What did you conclude after evaluating the

10:00:44 3   market conditions at the time of the merger?

10:00:50 4   A    At the time of the merger, the merger, as I said, was

10:00:52 5   three to two.  We're going to measure that a little more

10:00:56 6   precisely.  And so the -- the merger substantially reduced

10:01:01 7   the choices for customers, basically the customers who are

10:01:05 8   buying these door skins in the United States, from three

10:01:08 9   to two.  And that's generally worrisome to an antitrust

10:01:14 10  economist in terms of reduced competition, that there are

10:01:18 11  only two suppliers instead of three.  So that kind of hits

10:01:21 12  you right away when you look at the merger at that time.

10:01:24 13  Q    All right.  And let's go to the second step of your

10:01:26 14  analysis.  What did you conclude after evaluating what

10:01:29 15  happened to the competition in the last five years?

10:01:33 16  A    So I have found that the effects of the merger have

10:01:37 17  been harmful to the customers, not just Steves.  Again,

10:01:40 18  when I say "customers" here, I mean the customers buying

10:01:44 19  interior molded door skins.  So you've heard of Lynden and

10:01:47 20  Haley.  That they have been harmed by this merger.  And

10:01:51 21  that's the main thing we look at to see whether the merger

10:01:54 22  lessened competition.

10:01:55 23  Q    All right.  And then let's go to the third step.

10:01:58 24  What did you conclude after evaluating how the merger is

10:02:00 25  likely to affect competition in the future?

Shaprio - Direct

10:02:03  1   A     I've concluded that these harms are likely to

10:02:05  2   continue.  Of course, the future is a bit harder to tell

10:02:10  3   than the past, but that is what the indications are.

10:02:13  4   Q     All right.  So let's go to -- in a little bit more

10:02:17  5   detail about step one of your analysis.  Did you examine

10:02:23  6   the business setting that existed at the time that this

10:02:27  7   merger took place?

10:02:28  8   A     Yes.

10:02:28  9   Q     And what did you find?

10:02:30 10   A     Well, the start of any merger analysis for an

10:02:34 11   economist is to understand the market and the context.

10:02:37 12   And so we -- I knew we were looking, in the first

10:02:43 13   instance, at interior molded door skins.  So you first

10:02:46 14   want to look at who are the suppliers, who are the

10:02:49 15   customers.  Okay.  And the first thing I learned, really,

10:02:51 16   was that there are three suppliers.

10:02:54 17   Q     Let me go to the slide that you created to help

10:02:57 18   explain this point, Professor Shapiro.  And let me get

10:03:00 19   myself back to the right place in the outline.  All right.

10:03:06 20        So using this chart, can you describe this business

10:03:09 21   setting that existed before the merger?

10:03:13 22   A     Yes.  So there were three door skin suppliers.  The

10:03:17 23   focus is on the United States and the -- those -- the use

10:03:21 24   of door skins in the United States.  And you've heard a

10:03:24 25   lot about these three.  So I think you know who they are.

Shaprio - Direct

10:03:29 1   Those are the only three.

10:03:30 2   Q    All right.  So now explain what we have here.

10:03:32 3   A    So this is depicting, at the lower level, the door

10:03:36 4   skin customers.  And you see there the door skin customers

10:03:40 5   are the companies that are making doors because that's how

10:03:42 6   you use the door skins.  And we have the three bigger

10:03:49 7   companies here.  Jeld-Wen, CraftMaster and Masonite are

10:03:53 8   also making doors.  So they are using the door skins.  So

10:03:57 9   they -- to an economist, they are also door skin

10:04:00 10  customers.  And we have a number of the -- as shown here

10:04:04 11  in yellow, the smaller door manufacturers who are buying

10:04:07 12  the door skins from these three suppliers shown at the

10:04:11 13  top.

10:04:12 14  Q    So, Professor Shapiro, you keep using the term door

10:04:16 15  skins.  I just want to make sure the jury is clear on

10:04:19 16  this.  When you use the term door skins, are you referring

10:04:20 17  to interior molded door skins?

10:04:22 18  A    Yes, I am.

10:04:22 19  Q    The kind that we see on, for example, these two doors

10:04:25 20  over here?

10:04:26 21  A    Yes.

10:04:27 22  Q    All right.  Now, you said that Jeld-Wen, CraftMaster

10:04:29 23  and Masonite also need door skins, correct?

10:04:32 24  A    Certainly.  They are making interior molded doors.

10:04:35 25  Q    All right.  So where do they get -- where were they

Shaprio - Direct

10:04:38 1 getting their door skins from before the merger?

10:04:42 2      THE COURT:  Who is "they"?

10:04:44 3 Q    I'm sorry.  Where was Jeld-Wen, CraftMaster and

10:04:47 4 Masonite getting door skins from?

10:04:49 5 A    Primarily from their own operations.  I think you've

10:04:50 6 probably -- you've heard the term they're vertically

10:04:54 7 integrated, which means they make the doors and they make

10:04:57 8 their own door skins.  They're at both levels.  So they

10:05:00 9 have their own internal sources of supply is another way

10:05:03 10 to put it.

10:05:04 11 Q    And does that vertical integration, that arrangement

10:05:07 12 there, does that affect your analysis of the business

10:05:09 13 setting that existed before and after the merger?

10:05:11 14 A    Yes.  It's very important for understanding the

10:05:14 15 economic incentives of the companies involved.

10:05:16 16 Q    And why is it important to -- to the economic

10:05:20 17 incentives of the parties?

10:05:22 18 A    Well, take Jeld-Wen for example.  When they are

10:05:26 19 considering selling door skins to Steves, they recognize

10:05:30 20 that Steves, in addition to being a customer of theirs for

10:05:35 21 door skins, it's also a competitor of theirs in selling

10:05:38 22 doors.  And so that's a dynamic that is important for an

10:05:41 23 economist to keep track of.

10:05:43 24 Q    So before the merger, was Jeld-Wen not only providing

10:05:46 25 door skins to itself, but also to those little yellow

Shaprio - Direct

10:05:50 1  circles there, the small door manufacturers?

10:05:54 2  A    Yes.  They were supplying door skins to all of these

10:05:58 3  independent door manufacturers.

10:06:00 4  Q    And was that true of CraftMaster and Masonite as

10:06:03 5  well?

10:06:04 6  A    Well, not necessarily to all of them.  But they were

10:06:07 7  doing -- they were selling the door skins, all three of

10:06:10 8  them, to some of the independent door manufacturers.

10:06:13 9  Q    So why would a company like Jeld-Wen sell any of its

10:06:17 10 door skins to someone like Steves who was competing with

10:06:20 11 them as a door manufacturer?

10:06:22 12 A    Well, that's an important point.  When Jeld-Wen is

10:06:26 13 thinking about -- so as an economist, that's kind of the

10:06:30 14 preface for when I say these things.

10:06:33 15      When Jeld-Wen is thinking about -- so I can't read

10:06:35 16 their minds, but I'm thinking about economic incentives.

10:06:38 17 When they are thinking, Should we sell a door skin to

10:06:41 18 Steves, well, they are competing with us in doors.  So

10:06:43 19 maybe you think not so much.  But they recognized right

10:06:47 20 before the merger that if they don't sell the door skins,

10:06:50 21 Steves is going to get the door skin from Masonite or

10:06:54 22 CraftMaster.  So it still makes sense to sell the door

10:06:57 23 skin to Steves because somebody is going to sell the door

10:07:01 24 skin to Steves.  So long as Jeld-Wen is making a profit

10:07:06 25 margin on that sale, it's better to do it even though

Shaprio - Direct

10:07:06 1   Steves is competing with them.  And that was the situation

10:07:09 2   prior to the merger.  We'll see some specific examples of

10:07:14 3   that.

10:07:14 4   Q    All right.  So let's complete the structure of the

10:07:16 5   industry.  What does this slide show?

10:07:19 6   A    So I've just filled out the further downstream, as an

10:07:22 7   economist would describe it.  The door skins get put into

10:07:27 8   the doors by the door manufacturers, and then the doors

10:07:28 9   are sold to retailers and home builders, the two main

10:07:31 10  channels.  And then in the end, they are purchased and put

10:07:35 11  into homes.  So the final user are homeowners.  That's

10:07:40 12  what it's showing.

10:07:41 13  Q    All right.  So as you say in the top of your slide

10:07:44 14  here, this is the industry structure that existed before

10:07:47 15  the merger, correct?

10:07:49 16  A    Yes.

10:07:50 17  Q    And did you look into the extent of competition

10:07:54 18  between the door skin manufacturers, the door skin

10:07:58 19  suppliers, before the merger?

10:08:00 20  A    Oh, yes.  Very much.

10:08:02 21  Q    In evaluating the effects of a merger on competition,

10:08:05 22  why would an economist look at the way competition was

10:08:09 23  working before the merger?

10:08:11 24  A    Well, remember, the ultimate -- the question I'm

10:08:13 25  trying to answer is did the merger substantially lessen

Shaprio - Direct

10:08:16 1  competition.  So we first see what did competition look

10:08:21 2  like beforehand and then compare that to after.  That's

10:08:24 3  the exercise.  So we -- that's our starting point is

10:08:27 4  competition before the merger.

10:08:28 5  Q    And what kind of information would an economist look

10:08:31 6  to to try to determine how competition was working before

10:08:35 7  the merger?

10:08:36 8  A    Well, there are a number of different things we look

10:08:39 9  at.  First, are the companies competing to win business?

10:08:45 10  You know, are they competing to win customers?  Are we

10:08:50 11  going to look at their -- how successful are they in doing

10:08:54 12  so?  Those are some of the things.

10:08:55 13  Q    And what kind of information would you look at to see

10:08:59 14  how they were competing with each other before the merger?

10:09:02 15  What's available to you, for example, in this case?

10:09:05 16  A    Well, we have information on prices.  We're going to

10:09:08 17  measure market shares.  We have -- we're looking for

10:09:11 18  episodes in which competition played out.  Those are some

10:09:16 19  of the major things.

10:09:17 20  Q    And did you find that information, for example, in

10:09:19 21  some of the documents that Steves and Jeld-Wen produced in

10:09:21 22  this case?

10:09:23 23  A    Certainly.  Yes.  There's a lot in there from that

10:09:25 24  era.  Now talking about 2011, 2012, leading up to the

10:09:30 25  merger.

Shaprio - Direct

10:09:30 1    Q    All right.  And so what did you discover regarding
10:09:34 2    competition before the merger and how it -- and what kind
10:09:39 3    of competition existed in the supply of door skins?
10:09:44 4    A    We -- I was able to detect or observe and study two
10:09:51 5    significant episodes of competition that I'm highlighting
10:09:55 6    here.  Competition for a long-term agreement with Steves,
10:09:58 7    again, to sell door skins, and second one, competition to
10:10:03 8    sell a particular type of door skins, CARB compliant, that
10:10:10 9    we'll explain in a moment.
10:10:11 10   Q    So let's start with your first example of competition
10:10:13 11   before the merger.  What evidence of competition did you
10:10:16 12   see in connection with Steves' efforts to get a long-term
10:10:19 13   supply agreement that culminated, I take it, in 2012?
10:10:25 14   A    Yes.  That's right.  So there was what I would call a
10:10:30 15   very informative -- I would say nice, to me as an
10:10:34 16   economist, nice episode of the companies competing.
10:10:40 17   Jeld-Wen, Masonite, CraftMaster competing to win Steves'
10:10:44 18   business.  Steves was interested in a long-term agreement,
10:10:45 19   and they all wanted that business.  That was around 2011,
10:10:48 20   into 2012.
10:10:51 21   Q    All right.  And so you said that all three of the
10:10:53 22   companies were competing for the long-term supply
10:10:55 23   agreement?
10:10:56 24   A    Yes.
10:10:57 25   Q    All right.  And so let's go to the next document.

Shaprio - Direct

10:11:00 1   Could you tell the jury what this document is?

10:11:03 2   A    This is the price list that Jeld-Wen sent to Steves.

10:11:06 3   You see the date January 1, 2012.  And there's different

10:11:12 4   types of door skins, sizes and models.  That was their

10:11:17 5   offer to Steves in terms of the prices for the long-term

10:11:22 6   agreement they were hoping to sign with Steves.

10:11:25 7   Q    So in January of 2012, these are the prices that

10:11:28 8   Jeld-Wen was offering to Steves?

10:11:30 9   A    Correct.

10:11:31 10  Q    And then what is this document?

10:11:33 11  A    This is Masonite's offer.  It was the next month.

10:11:38 12  You see the date February 23rd.  Again, the prices -- a

10:11:43 13  series of prices.  This is their offer.  And I have

10:11:45 14  highlighted in the red there, this was 6 percent lower

10:11:48 15  than Jeld-Wen's offer.

10:11:49 16  Q    By Jeld-Wen's offer, you're talking about this one

10:11:51 17  right here?  In other words, the January offer by Jeld-Wen

10:11:55 18  was basically responded to by Masonite in February?

10:11:58 19  A    The Masonite February offer was 6 percent less than

10:12:03 20  the Jeld-Wen January offer.

10:12:05 21  Q    All right.  And then let's go to the next document.

10:12:07 22  What is this telling us?

10:12:09 23  A    So this is Jeld-Wen's May -- well, it's an offer, but

10:12:14 24  this is the one that was accepted.  So this is actually

10:12:17 25  what they agreed upon.  And this was showing there

Shaprio – Direct

10:12:21  1  5.1 percent less than Jeld-Wen had initially offered.

10:12:24  2  They came back a few months later, after the Masonite

10:12:27  3  offer, with this lower set of prices.

10:12:29  4  Q    So if I understand what you're saying, this was --

10:12:30  5  right here, this was Jeld-Wen's initial offer to Steves --

10:12:33  6  or at least -- I don't know if it was initial, but the one

10:12:38  7  they made in January 2012, correct?

10:12:40  8  A    Yes.

10:12:40  9  Q    And then after Masonite made a competing and lower

10:12:44 10  bid, Jeld-Wen comes back and lowers their price, correct?

10:12:47 11  A    That's what happened.

10:12:47 12  Q    And they lowered it by 5.1 percent, compared to what

10:12:49 13  they had offered in January?

10:12:50 14  A    Yes.

10:12:51 15  Q    Okay.  Is that 5 percent decrease in price a big deal

10:12:55 16  to Steves?

10:12:56 17  A    Well, I calculated how much Steves would save as a

10:13:00 18  result of that.

10:13:01 19  Q    Okay.  So let's go to that calculation.

10:13:03 20  A    Okay.

10:13:03 21  Q    Could you explain to the jury what this is showing?

10:13:07 22  A    Yes.  So the title here, "Steves door skin purchase

10:13:10 23  cost."  So what I calculated was how much would it cost

10:13:14 24  Steves to buy all the door skins they need at the

10:13:16 25  different prices.  So you take the price list and you

Shaprio - Direct

10:13:18 1    apply it to their door skins quantities of the different

10:13:22 2    types.  You can see in the corner here, I used the 2011

10:13:26 3    quantities for this purposes.  Steves' 2011 quantities.

10:13:31 4        So following that, the first -- the January Jeld-Wen

10:13:34 5    offer, it would have cost Steves 19.87 million for the

10:13:39 6    door skins.  The Masonite offer, you see the lower

10:13:43 7    figures, 18.64.  And then the Jeld-Wen offer that was

10:13:48 8    accepted in May, 18.86 million.

10:13:51 9        And by comparing that 18.86 million on the right with

10:13:56 10   the 19.87 on the left, Jeld-Wen's first -- well, January

10:14:00 11   offer, the difference is 1.01 million.  That's the

10:14:04 12   5.1 percent drop I mentioned before.  So just to scale it,

10:14:07 13   that's a million dollars a year savings for Steves between

10:14:11 14   the two Jeld-Wen offers.

10:14:12 15   Q    All right.  And so the competition with Masonite led

10:14:16 16   to that price reduction, correct?

10:14:18 17   A    Yes.

10:14:18 18   Q    All right.  So let's go to your second example of

10:14:22 19   competition before the merger.  Could you explain to the

10:14:25 20   jury what you're referring to when you say competition to

10:14:28 21   sell CARB compliant door skins?

10:14:32 22   A    Yes.  So, first, what are CARB compliant door skins?

10:14:36 23   These are door skins that comply with certain

10:14:39 24   environmental regulations that were coming into force at

10:14:39 25   that time.  That is to say, around 2010 and '11.

Shaprio - Direct

10:14:42 1    And so Steves was looking to buy door skins that

10:14:46 2    complied with the environmental rules, and there was

10:14:49 3    competition among the three suppliers to win that

10:14:53 4    business.

10:14:54 5    Q    All right.  So let's talk about that competition.

10:14:58 6    Could you explain what you found?

10:14:59 7    A    Certainly.  So this is illustrating that Steves had a

10:15:05 8    choice between the three, exercised that choice and saved

10:15:11 9    some money.  So what's shown here on the left is Jeld-Wen.

10:15:14 10   And what I was able to calculate was how much higher

10:15:19 11   Jeld-Wen's prices were for these CARB compliant door skins

10:15:25 12   than the previous ones that hadn't been compliant.

10:15:28 13       I looked at the -- one of the more popular models

10:15:31 14   here just to illustrate, which are the 6-foot 8-inch door

10:15:35 15   skins.  And I found that Jeld-Wen was charging a premium

10:15:40 16   in 2010 of 13.5 percent -- that's what's shown up there in

10:15:46 17   the left corner -- for the CARB compliant door skins.

10:15:49 18   That's extra that they were asking Steves to pay for the

10:15:52 19   door skin that was CARB compliant versus the older one,

10:15:55 20   older model, that was not.  And that was 2010.

10:16:01 21       By 2011, Jeld-Wen had increased that premium to

10:16:06 22   27.6 percent.  Of course, Steves was unhappy about this.

10:16:12 23   And as a result, that's what these yellow arrows are meant

10:16:15 24   to depict.  Steves significantly moved its purchases of

10:16:19 25   these door skins away from Jeld-Wen and toward CraftMaster

Shaprio - Direct

10:16:23 1   and Masonite.

10:16:24 2       Now, how did that help them?  It helped them because

10:16:28 3   CraftMaster and Masonite were not charging a premium for

10:16:31 4   the CARB compliant door skins.  So there was -- there got

10:16:34 5   to be a big difference in price, and Steves avoided, to a

10:16:40 6   considerable extent, paying the Jeld-Wen premium by moving

10:16:43 7   their business.

10:16:43 8   Q    All right.  And let's look at how much business they

10:16:45 9   actually moved away from Jeld-Wen and to CraftMaster and

10:16:47 10  Masonite because they were offering lower prices.  Could

10:16:50 11  you explain this chart to the jury?

10:16:53 12  A    I'm happy to do so.  So if you look at the -- the

10:17:00 13  axis, the horizontal axis at the bottom, you'll see 2009,

10:17:03 14  '10, '11.  So we're tracking those three years.  The

10:17:08 15  vertical axis is measuring how much of Steves door skin

10:17:11 16  business they gave to each of the three suppliers.

10:17:14 17      So starting in 2009 -- Jeld-Wen is red here.  So

10:17:18 18  Jeld-Wen got 83 percent of the business from Steves in

10:17:22 19  2009, CraftMaster got the balance, and Masonite wasn't

10:17:27 20  selling to Steves that year in any significant amount.

10:17:32 21      And then after that, then we had the -- in 2010,

10:17:36 22  remember, that's when Jeld-Wen started to have the

10:17:39 23  13 percent, a significant premium for the CARB compliant

10:17:43 24  door skins.  Steves, I said, moved their business away.

10:17:46 25  They moved Jeld-Wen share from 83 percent all the way down

Shaprio – Direct

10:17:50 1   to 56 percent.  That's a big move in one year.  You can

10:17:53 2   see they were moving the business to CraftMaster.  It went

10:17:56 3   up from 17 percent to 44 percent.  That's the blue.

10:18:00 4       And then we go on to 2011.  Jeld-Wen's share went

10:18:04 5   further down, again substantially, all the way down to

10:18:08 6   27 percent.  And in that year, there was a big shift of

10:18:15 7   Steves purchasing Masonite.  So this is a very nice

10:18:19 8   example, in my view, of a customer moving their purchases

10:18:21 9   when one company tries to charge a higher price.  That's

10:18:25 10   competition in action.

10:18:27 11   Q    All right.  So, Professor Shapiro, these two

10:18:31 12   examples, the long-term supply agreement competition and

10:18:34 13   the CARB example, those are just examples of the way

10:18:38 14   competition existed before the merger, correct?

10:18:41 15   A    Yes.  That's right.

10:18:42 16   Q    So let's go look at the merger itself.  Could you

10:18:45 17   explain what changed when the merger occurred?

10:18:49 18   A    So this slide depicts the three suppliers of door

10:18:55 19   skins, and now we're focusing on the independent door

10:18:59 20   manufacturers below.

10:19:01 21   Q    So let me click to the next one and then you can use

10:19:05 22   this animation to explain what just happened.

10:19:08 23   A    So the acquisition reduces the number of door skins

10:19:14 24   suppliers from three to two, as we've talked about.  And

10:19:17 25   so this -- now the diagram shows the new market structure

Shaprio - Direct

10:19:21 1  and with the two suppliers.  I'm not drawing in here the

10:19:26 2  other -- Jeld-Wen and Masonite as door manufacturers.  We

10:19:29 3  had that before.  I'm focusing on the independent door

10:19:32 4  manufacturers because they are the ones who need to

10:19:34 5  purchase the door skins and now have only two choices.

10:19:38 6  Q    And as an economist, are you concerned that the

10:19:41 7  merger reduced the number of competitors from three to

10:19:44 8  two?

10:19:44 9  A    Well, as an antitrust economist, like I said before,

10:19:48 10 it jumps right out at you, that's substantially increasing

10:19:54 11 market concentration, as we would call it.  And so that

10:19:57 12 immediately raises concerns.  It doesn't answer the

10:20:00 13 question, but it immediately raises concerns.

10:20:02 14 Q    All right.  So have you heard of something called

10:20:06 15 market shares?

10:20:08 16 A    Of course.

10:20:08 17 Q    And did you consider market shares when you were

10:20:11 18 evaluating Masonite and Jeld-Wen and CraftMaster as

10:20:15 19 competitors before the merger and then looking at what

10:20:18 20 happened after the merger?

10:20:19 21 A    Yes, I did.

10:20:20 22 Q    So could you explain to the jury what market shares

10:20:23 23 refers to?

10:20:24 24 A    Just like it sounds.  A firm's -- a business' market

10:20:31 25 share is the share of the business during that market that

Shaprio - Direct

10:20:34 1   they get.

10:20:35 2   Q    Why does an economist look at market shares in order

10:20:38 3   to evaluate what happens when two companies merge?

10:20:43 4   A    Market share is usually the single, best measure of

10:20:45 5   how successful that company is and how important they are

10:20:49 6   as a competitor.  Again, there are other things to look

10:20:51 7   at, but it's one of the first things we look at.

10:20:54 8   Q    And does the size of the market shares of the

10:20:57 9   respective competitors matter to your analysis?

10:21:00 10  A    Absolutely.  We pay a lot of attention to market

10:21:03 11  shares when doing merger analysis because we're

10:21:06 12  particularly concerned if an important competitor has been

10:21:11 13  acquired as opposed to a minor one.

10:21:14 14  Q    So can you give us an example that the jury may be

10:21:15 15  familiar with of how market share can matter to

10:21:17 16  competition?

10:21:18 17  A    Well, the jury, I am betting, familiar with cell

10:21:23 18  phones in that we've got AT&T, Verizon, Sprint and

10:21:26 19  T-Mobile as the four major providers of cellular service

10:21:31 20  in the United States, and so if AT&T went to merge with

10:21:35 21  T-Mobile, they would be merging with a significant

10:21:39 22  competitor.  That would be a four to three type of merger.

10:21:44 23  And that would naturally raise concerns in my mind.  If

10:21:47 24  they acquired a tiny company that was just doing a little

10:21:51 25  amount of specialized cell service, it would be a lot less

Shaprio - Direct

10:21:55 1   concerning.

10:21:55 2   Q    And how do market shares tell you whether a

10:21:58 3   particular company is a meaningful choice for customers?

10:22:03 4   A    Well, it's -- it's simply the idea that a company

10:22:06 5   that has a healthy market share is winning a good amount

10:22:10 6   of business, and that is an indication that they are a

10:22:14 7   significant competitor.  Again, we're going to look at

10:22:17 8   other information, but that's a good -- very good starting

10:22:20 9   point.  A very important metric.

10:22:23 10  Q    All right.  So let's look at what the market shares

10:22:25 11  were in this particular market before the merger.  Could

10:22:29 12  you explain to the jury what this is showing?

10:22:31 13  A    Yes.  So what I did was look at all the use of

10:22:39 14  interior molded door skins in the United States, and I

10:22:44 15  measured, as best I could, which was quite well, I think,

10:22:47 16  who made those door skins.  Okay.  And this is in 2012.

10:22:54 17  And here's what I found and reported.  You can see the

10:23:01 18  shares.  Masonite slightly bigger than Jeld-Wen.

10:23:05 19  CraftMaster number three, but significant as well.

10:23:10 20  Q    And do these shares that you're reflecting here

10:23:13 21  reflect the door skins that Jeld-Wen, Masonite and

10:23:15 22  CraftMaster use themselves as well as the ones they might

10:23:19 23  sell to small door manufacturers?

10:23:21 24  A    Yes.  This includes the -- all uses of interior

10:23:26 25  molded door skins in the United States, including the ones

Shaprio - Direct

10:23:28  1  that Masonite and Jeld-Wen use themselves.  They are also

10:23:32  2  users -- or we can think of them as customers as well,

10:23:36  3  vertically integrated, like I said.

10:23:38  4  Q    And what conclusion do you draw from these market

10:23:41  5  shares?

10:23:43  6  A    Well, the -- CraftMaster -- I would focus on

10:23:51  7  16 percent, I guess, because that's the company that's

10:23:54  8  being acquired.  And that's a sizable market share.  And

10:23:58  9  also, that it's three to two, that you're just getting two

10:24:02 10  big companies left at the end.  So we have a way of doing

10:24:07 11  some metrics we're going to talk about.

10:24:10 12  Q    I'll get to that in a second.

10:24:12 13  A    I tend to go there as well.  But CraftMaster, as I

10:24:15 14  think I said before, is a significant player, but they are

10:24:18 15  number three.

10:24:19 16  Q    Let's focus a little bit more on the role that

10:24:22 17  CraftMaster was playing in the door skin market before the

10:24:24 18  merger.  Could you explain to the jury what this pie chart

10:24:26 19  is reflecting?

10:24:28 20  A    So this pie chart looks a lot different, right?  The

10:24:32 21  blue is a lot bigger.  This is measuring sales to

10:24:35 22  independent door manufacturers in the United States.  And

10:24:37 23  CraftMaster has got almost half of those sales.  So what's

10:24:41 24  going on here?  Why is CraftMaster so much bigger here?

10:24:45 25       Remember, Jeld-Wen and Masonite, they are much bigger

Shaprio - Direct

10:24:48  1   in terms of their downstream operations -- actually,

10:24:51  2   doors -- using their own door skins, that is.  And so

10:24:58  3   CraftMaster was selling almost half of the sales to the

10:25:02  4   independents, even though their overall share was only

10:25:05  5   16 percent.  So they had a particularly significant role

10:25:08  6   in terms of competing for business from Steves, Haley and

10:25:11  7   Lynden, getting about half of that business.  And that's

10:25:15  8   directly relevant for understanding the effects of this

10:25:17  9   merger.

10:25:17 10   Q    So I just want to make sure the jury is clear on

10:25:20 11   this.  If you look at where Steves and the other smaller

10:25:22 12   independent manufacturers are getting their door skins

10:25:25 13   from in 2012, that's this slide, correct?

10:25:29 14   A    That's exactly right.

10:25:30 15   Q    Okay.  Now, the jury has heard some testimony about

10:25:43 16   foreign imports, getting door skins from Turkey or

10:25:48 17   Romania.  Did you find any evidence that there were any

10:25:50 18   meaningful foreign imports at the time of the merger?

10:25:55 19   A    No.  I looked quite hard for that in all the

10:25:58 20   documents and other evidence available to me, and I did

10:26:00 21   not find any evidence of meaningful imports at this time.

10:26:04 22   Q    And has that changed from -- when you've reviewed all

10:26:08 23   the evidence, has that changed between 2012 and today?

10:26:12 24   A    Not materially.  There now are some imports coming

10:26:16 25   in.  A very small number, as far as I know.  But in terms

Shaprio - Direct

10:26:22 1  of significance of share of door skins, the imports remain

10:26:27 2  tiny.

10:26:28 3  Q    All right.  So in your view, did the acquisition of

10:26:34 4  CraftMaster by Jeld-Wen eliminate a meaningful choice for

10:26:38 5  door skin customers?

10:26:39 6  A    Absolutely.  I don't think there's any question about

10:26:42 7  that.

10:26:43 8  Q    Now, is there a particular way that economists use --

10:26:47 9  a method that economists use to evaluate whether a merger

10:26:52 10 has actually eliminated an important choice that existed

10:26:55 11 in the market?

10:26:56 12 A    Yes.  We have -- we have a measure of market

10:26:58 13 concentration that we use and apply to mergers.

10:27:02 14 Q    You've used the term "market concentration" a couple

10:27:05 15 times now.  Could you explain to the jury what you mean

10:27:08 16 when you say market concentration?

10:27:09 17 A    If we look at a market, we measure -- when we say

10:27:14 18 it's highly concentrated, we mean there's just a few

10:27:18 19 sellers who are getting most of the business.  A monopoly

10:27:23 20 would be the extreme case.  One company has all the

10:27:25 21 business.

10:27:26 22     The other extreme would be maybe a hundred or

10:27:29 23 hundreds of companies selling, and that would be very

10:27:31 24 unconcentrated.  So we have a way of measuring that called

10:27:32 25 the Herfindahl-Hirschman Index.  HHI Index.  That's our

Shaprio – Direct

10:27:38 1   standard method of measuring how concentrated a market is.

10:27:41 2   Q    All right.  So you said Herfindahl-Hirschman Index,

10:27:46 3   correct?

10:27:47 4   A    I did.

10:27:48 5   Q    Who's Herfindahl and Hirschman?

10:27:50 6   A    Well, the index is pretty old.  It's been used at

10:27:52 7   least 40 or 50 years.  So these are economists who

10:27:56 8   developed this in the past.

10:27:57 9   Q    And do economists tend to refer to the

10:28:00 10  Herfindahl-Hirschman Index as HHI for short?

10:28:04 11  A    That's a lot easier to say.

10:28:06 12  Q    Okay.  So let's look at what this index -- how it

10:28:10 13  works.  What do economists use this index for?

10:28:15 14  A    So as I think I hinted, or said, it's a way of

10:28:18 15  measuring how concentrated a market is.  That's the

10:28:22 16  purpose.

10:28:22 17  Q    All right.  So let's start understanding this.  I put

10:28:24 18  some more information on this slide.  Can you explain to

10:28:28 19  the jury what this is showing?

10:28:30 20  A    Okay.  So I just want to make sure you understand the

10:28:33 21  scale because it's specialized in my area.

10:28:38 22       Zero, if we got an index of zero -- let me start at

10:28:43 23  the top.  If we had a monopoly, it's 10,000.  That's the

10:28:46 24  very top of the scale.  I cut it off here just so we could

10:28:50 25  focus on the region of interest.  So a monopoly would be

Shaprio – Direct

10:28:54 1    10,000.  If we had hundreds of firms selling each with a

10:28:57 2    really a small share, we'd be very close to zero.  So

10:29:02 3    that's the range.  Monopoly, as concentrated as you can

10:29:06 4    get, 10,000.  Very unconcentrated, zero.

10:29:11 5        We've -- we place markets into three categories, as

10:29:15 6    shown here, that we generally call unconcentrated,

10:29:16 7    moderately concentrated or highly concentrated based on

10:29:21 8    this index.  So that's how it's used.  And below 1500 is

10:29:27 9    unconcentrated.  1500 is 2500 is moderately concentrated,

10:29:32 10   and then above that is highly concentrated.  And generally

10:29:36 11   speaking, just maybe jump a head a little bit, we're

10:29:40 12   certainly concerned, as antitrust economists, when markets

10:29:45 13   become highly concentrated, that they are not going to be

10:29:47 14   as competitive.  That's why we're doing all of this, okay,

10:29:50 15   to measure this.  And we're also, then, in a merger

10:29:52 16   context, concerned that a merger will increase the

10:29:54 17   concentration.  And that is generally linked, particularly

10:29:57 18   if it gets high, to a lessening of competition.

10:30:00 19       So, again, it's only one thing we do, but it's an

10:30:04 20   important part of the analysis of mergers.  And beyond

10:30:07 21   mergers, when we look at markets, we classify them this

10:30:11 22   way.  Whenever we're looking at markets, we can do this.

10:30:14 23   Q    So let's use some examples to explain what's going

10:30:17 24   on.  Can you explain to the jury what you're saying with

10:30:20 25   respect to 10 grocery stores?

Shaprio - Direct

10:30:22 1  A     So this is all just to get you comfortable with the

10:30:24 2  index so when we apply it in this case, it's

10:30:28 3  understandable.  The example is if we had 10 grocery

10:30:32 4  stores in town, each with 10 percent share, when we

10:30:35 5  calculate this index, it would be 1000.  And that's in the

10:30:40 6  unconcentrated range.  So we would generally think if they

10:30:47 7  are 10 firms equally sized, we got a pretty competitive

10:30:51 8  situation.  That's not generally worrisome.

10:30:53 9  Q     So, again, staying with the grocery store example.

10:30:56 10 If you have ten grocery stores all competing in the same

10:30:58 11 market, how is competition going to affect the customers

10:31:01 12 who shop at those grocery stores?

10:31:04 13 A     So behind -- thinking behind the metric is when

10:31:07 14 you've got ten of them, they are competing.  They are

10:31:09 15 going to compete on price.  They're going to compete on

10:31:11 16 store hours, service, freshest of food, you know, whether

10:31:14 17 the -- check-out time.  You know, all the things we care

10:31:18 18 about.  And when we think about competition, it's whatever

10:31:20 19 the customers want, the firms will be motivated to give it

10:31:24 20 to them in order to keep the business.  So that's what's

10:31:27 21 in the background here.

10:31:28 22 Q     All right.  So, now, let's assume two of these stores

10:31:34 23 merge.  So now there's nine stores, eight with 10 percent

10:31:39 24 and one with 20 percent.  How does this index work with

10:31:47 25 respect to that merger?

Shaprio - Direct

10:31:48 1  A     So we now recalculate the index with this new set of

10:31:52 2  shares, and it goes up to 1200.  So you might think two

10:31:56 3  supermarkets came under common ownership of the ten.  So

10:32:00 4  what we look at, then, in general, as antitrust

10:32:03 5  economists, we look at two things:  How high did it get,

10:32:06 6  the concentration, and how much did it go up?

10:32:09 7      And in this case, it didn't get all that high.  It's

10:32:12 8  still only at 1200.  Still unconcentrated.  So we're

10:32:16 9  not -- we tend to think probably not a real issue about

10:32:20 10 this merger.  It went up by 200, which is a moderate

10:32:25 11 amount, but it's still in the green zone.  So we -- just

10:32:28 12 looking at this, we would tend to say it doesn't look like

10:32:32 13 a problem.

10:32:33 14 Q     So, again, if you're thinking about it from the

10:32:35 15 customer's perspective and they now have nine choices of

10:32:39 16 grocery stores to go to, one a bit bigger than the other

10:32:42 17 eight, how does that affect competition between these nine

10:32:46 18 grocery stores?

10:32:47 19 A     So the idea is there will still be a lot of reason

10:32:50 20 for those grocery stores to continue on compete on price,

10:32:52 21 quality, service, because there's still nine of them.  And

10:32:57 22 we've refined the measure from nine to this metric.  We're

10:33:01 23 expecting competition to continue to be pretty healthy, or

10:33:05 24 very healthy, in this zone.

10:33:07 25 Q     All right.  So now let's go to another example that

Shaprio - Direct

10:33:09 1    you've had at least a little reference to before, which is

10:33:13 2    four cellular providers.  Could you explain to the jury

10:33:16 3    what you're doing with this example?

10:33:18 4    A    So this example is showing you how the index behaves

10:33:22 5    or how the numbers come out when you're going to go from

10:33:27 6    four to three.  We did ten to nine was the one with the

10:33:31 7    grocery stores.  So it's quite a different set of numbers

10:33:34 8    with four to three.  This is not actually AT&T and

10:33:35 9    Verizon, as they're not all equal.  So it's simplified.

10:33:39 10        But if you start with four, each with 25 percent, and

10:33:42 11   we can think of cell providers, the index would start at

10:33:47 12   2500.  So it's right at the boundary there of becoming

10:33:49 13   highly concentrated.  And then if they merge, two 25s to a

10:33:56 14   50, it gets up by quite a lot and well into the red zone

10:34:00 15   of highly concentrated.

10:34:03 16        So, again, we would look at the two things, how high

10:34:07 17   did the concentration get?  In this case, we'd say, whoa,

10:34:11 18   3750.  That's getting worrisome.  And how much did it go

10:34:15 19   up?  In this case, it went up by 1250.  And that's a very

10:34:20 20   large amount.  Okay.  That's very substantial.  So if I

10:34:24 21   were looking at a merger like that, the first thing you'd

10:34:28 22   say is, okay, this looks quite worrisome.

10:34:32 23        Now, again, there's more analysis to be done, but

10:34:34 24   this is a very important piece of it and a signal, if you

10:34:37 25   will, or an indication, strong indication, of whether

Shaprio - Direct

10:34:39 1  there's going to be a problem with competition.  And,

10:34:41 2  again, the idea would be with three providers instead of

10:34:46 3  two -- excuse me -- with three providers instead of four.

10:34:50 4  T-Mobile, for example, has been pretty much of a maverick

10:34:55 5  or aggressive in terms of pricing, maybe customers -- we

10:34:59 6  wouldn't get the benefit of that if they were acquired by

10:35:02 7  AT&T.  That would be the idea; that that type of

10:35:04 8  competition would be less with only three.  And that would

10:35:08 9  be the concern.  And this metric would point in that

10:35:11 10 direction in that type of example.

10:35:13 11 Q    And the way this HHI index works, you had said that

10:35:16 12 this increase of 1250 points is significant.  What is the

10:35:22 13 benchmark that economists use when they are applying the

10:35:26 14 HHI index?  What kind of an increase begins to raise alarm

10:35:31 15 bells?

10:35:32 16 A    So 200 points, once you're in the red zone.  So if

10:35:38 17 the merger -- if, after the merger, you end up in a highly

10:35:40 18 concentrated market and if it went up by 200 or more,

10:35:43 19 that's when we basically form an expectation, or

10:35:46 20 prediction, that the merger would be likely to

10:35:48 21 substantially lessen competition.  And this example here

10:35:55 22 would certainly quantify because it's in the red zone and

10:35:58 23 a way more than 200-point increase.

10:36:01 24 Q    So have you performed the HHI calculation for the

10:36:04 25 merger we're looking at, the acquisition of CMI by

Shaprio - Direct

10:36:11 1  Jeld-Wen?

10:36:11 2  A    It would be quite disappointing at this point if I

10:36:14 3  had not.

10:36:14 4  Q    All right.  So let's go ahead and look at that.

10:36:17 5  Could you explain to the jury what they're looking at?

10:36:19 6  A    So this is based on the market shares.  I had already

10:36:23 7  showed you the market shares of the three firms, 38, 16

10:36:27 8  and 46.  CraftMaster being number three.  And so the first

10:36:32 9  thing is to calculate the index with those market shares

10:36:35 10 before the merger, and that is 3820.

10:36:39 11 Q    So what does this number, 3820, tell you about

10:36:44 12 concentration and competition?

10:36:46 13 A    Well, the -- it's well into the highly concentrated

10:36:51 14 market zone.  That's pretty much inevitable when you only

10:36:57 15 have three firms.  Okay.  So we were already, before the

10:37:00 16 merger, in a situation where we would be somewhat

10:37:05 17 concerned about competition with just three.  And the

10:37:08 18 index is indicating that in a more detailed way with 3820.

10:37:13 19 Q    All right.  And so then the choices went from three

10:37:17 20 to two.  And so tell the jury what we're now showing here.

10:37:23 21 A    So this is the Herfindahl-Hirschman Index after the

10:37:26 22 merger with 54 and 46, with those shares.  We calculate

10:37:30 23 the index.  It's just around 5000.  And the increase is

10:37:34 24 about 1200.

10:37:36 25      So remember I told you a monopoly is 10,000?  If you

Shaprio - Direct

10:37:43  1  have two equal size firms, it's 5000.  And that's -- we're
10:37:46  2  pretty much at that.  It's a little above that because
10:37:49  3  they are not quite equal.  Okay.  But we've got two firms
10:37:52  4  at the 5000.  So this is just straightforward, I guess,
10:37:56  5  from the antitrust economist's point of view.  Huge
10:38:01  6  increase in concentration.  Very, very concentrated market
10:38:03  7  after the merger.  So it's sending a strong signal, strong
10:38:08  8  indication, that the merger is likely to substantially
10:38:11  9  lessen competition.
10:38:13 10      I want to be very clear.  We don't just look at the
10:38:16 11  numbers.  We do a lot of other stuff, but it's an
10:38:17 12  important, as I keep saying, indication or signal.  That's
10:38:22 13  how we use the numbers.  It doesn't give the answer alone,
10:38:26 14  but it's quite informative, in my view.
10:38:29 15  Q    All right.  So based upon these HHI numbers, and the
10:38:32 16  business documents that you reviewed and everything that
10:38:34 17  you analyzed regarding the market conditions at the time
10:38:37 18  of the merger, what did you find at the end of step one of
10:38:43 19  your analysis?
10:38:46 20  A    So we have a -- the conclusion is the expectation, or
10:38:52 21  the strong prediction, just looking at the information at
10:38:55 22  that moment, at that time that this merger would
10:38:59 23  substantially lessen competition.  And it's really the
10:39:01 24  high -- big increase in concentration, like I said, that's
10:39:05 25  important.  And also, we saw episodes of competition, even

Shaprio - Direct

10:39:08 1    though there were only three firms.  So the concern would

10:39:10 2    be the competition would be reduced after when there are

10:39:16 3    only two.  So as of that moment, if you just view it at

10:39:21 4    that stage of the analysis, there's a strong prediction

10:39:23 5    that the merger would substantially lessen competition.

10:39:28 6    Q    All right.  So let's go to step two.  Could you

10:39:30 7    remind the jury again what you're doing in step two of

10:39:34 8    your analysis?

10:39:35 9    A    So now we're going to look at what happened after the

10:39:38 10   merger.  Again, the merger was October 2012.  For

10:39:42 11   essentially the five years after that, leading up to about

10:39:45 12   now, to see whether we have indications did the merger

10:39:48 13   substantially lessen competition or not?  How would we

10:39:52 14   tell?  What do we look at?  That's what we're doing next.

10:39:55 15   Q    All right.  So let's go to this slide.  What did you

10:39:58 16   look at to see if this merger hurt customers who bought

10:40:02 17   door skins?

10:40:02 18   A    So the -- we want to translate substantially

10:40:08 19   lessening competition into something we can observe, to

10:40:11 20   test, whether it happened.  We focus on impact on the

10:40:15 21   customers.  Did the customers pay higher prices?  Did they

10:40:19 22   have reduced access to the product?  Was quality reduced?

10:40:23 23   Those are the sort of things we want to look at.

10:40:25 24        And here, that means focusing on the independent door

10:40:28 25   manufacturers because they are the ones who are buying the

Shaprio - Direct

10:40:33 1  door skins and not making their own.

10:40:37 2  Q    All right.  So you mentioned to look at the

10:40:40 3  customers.  Are these the customers that you were talking

10:40:42 4  about?

10:40:43 5  A    Yes.  I think -- hopefully, I think the jury is

10:40:46 6  familiar with most, if not all of them.  I would just flag

10:40:50 7  that Steves, obviously, is the plaintiff in this case.  My

10:40:56 8  analysis is not just looking at Steves.  It's looking at

10:40:58 9  the market and the impact on the market.  So I'm looking

10:41:01 10 at the other customers as well, and they can give me a lot

10:41:04 11 of information about what happened in the market.  So it's

10:41:05 12 not just Steves.

10:41:07 13 Q    All right.  And so what kind of things would an

10:41:10 14 economist look for to evaluate whether a merger has

10:41:13 15 lessened competition?

10:41:15 16 A    Well, like I said, lessened competition sounds a bit

10:41:20 17 abstract.  But higher prices, that's real.  Okay.  And

10:41:23 18 that's the primary concern that economists look at.  If

10:41:27 19 there's less competition, the firms -- the business won't

10:41:30 20 compete as much for the business.  They won't be forced to

10:41:33 21 lower the price.  We had that episode of price -- two

10:41:36 22 episodes of pricing to get Steves' business.  So we're

10:41:39 23 concerned that the merger will cause the prices to be

10:41:42 24 higher.  That's one.

10:41:44 25     But the same idea would apply to other things that

Shaprio – Direct

10:41:46 1 customers care about.  A merger could reduce quality or

10:41:51 2 lead to service that's not as good.

10:41:54 3 Q    And just so that we get this clear, how could a

10:42:00 4 merger result in higher prices?

10:42:03 5 A    So -- well, let's just take the AT&T/T-Mobile

10:42:10 6 example.  So you would at least worry -- that's not a

10:42:10 7 merger that happened.  I'm just using that an as example,

10:42:16 8 right.  That after that merger, AT&T could say, well, we

10:42:20 9 don't have to worry about T-Mobile competing with low

10:42:22 10 price plans or no contract or whatever, and so we won't

10:42:24 11 offer as good a deal just because they're not out there

10:42:27 12 independently competing.  So they would offer higher

10:42:31 13 prices than they would otherwise have.

10:42:34 14       In other words, the merger led to higher prices than

10:42:36 15 AT&T would have been forced to offer after the merger.

10:42:40 16 And Verizon might think the same thing, by the way.  They

10:42:43 17 might say, oh, T-Mobile has been bought by AT&T.  We don't

10:42:48 18 have to compete so hard with them either.

10:42:51 19       So that would be one way that the remaining suppliers

10:42:53 20 would see a competitor is no longer in the picture.  They

10:42:58 21 don't have to sharpen their pencil as much to offer a

10:43:02 22 lower price.

10:43:03 23 Q    And how could a merger result in less quality or

10:43:07 24 service or other things that customers care about?

10:43:10 25 A    It's the exact same idea.  However companies compete,

Shaprio - Direct

10:43:12 1   if they were competing on quality, let's say, in the

10:43:13 2   cellular service, how good the coverage is, they wouldn't

10:43:18 3   have to compete as much.  So it's the same idea.

10:43:22 4   Competitor has been eliminated.  They don't have to try as

10:43:25 5   hard.  They are not motivated to try as hard or fight as

10:43:28 6   hard for customers.  And that can show up on quality or

10:43:32 7   service side.

10:43:33 8   Q    All right.  So we're sitting here in which the

10:43:35 9   situation occurred five years ago, correct?

10:43:37 10  A    That's right.

10:43:38 11  Q    So what type of information or evidence would an

10:43:41 12  economist typically look at in that situation to determine

10:43:44 13  whether prices have gone up because of the merger?

10:43:47 14  A    Well, we want to, in the first instance, track the

10:43:51 15  prices.  Okay.  Just see what happened over time.  And

10:43:55 16  then see if they went up.  And then if they went up, we

10:43:59 17  want to see, was there some reason for it not the merger

10:44:07 18  or was it because of the merger.

10:44:09 19  Q    So, again, the same thing with quality.  What would

10:44:11 20  an economist look to to assess whether quality went down

10:44:20 21  because of a merger?

10:44:21 22  A    Well, again, since you have five years of experience,

10:44:21 23  you'd look at what happened to quality, and if quality

10:44:22 24  went down, you'd ask whether that was because of the

10:44:24 25  merger or some other reason.

Shaprio - Direct

10:44:25 1    Q    All right.  And so you -- have you looked at whether

10:44:28 2    the merger affected what happened to prices after the

10:44:31 3    merger?

10:44:32 4    A    Yes.  That's been my main focus here in this phase.

10:44:35 5    Q    And have you analyzed how the merger affected quality

10:44:39 6    after the merger?

10:44:40 7    A    No, I have not looked at quality.

10:44:42 8    Q    And what should the jury look to to figure out

10:44:45 9    whether quality was reduced after the merger?

10:44:48 10            MR. PFEIFFER:  Objection, Your Honor.  I don't

10:44:49 11   believe this witness is appropriately situated to tell the

10:44:52 12   jury who they should listen to.

10:44:54 13            MR. POMERANTZ:  I'll rephrase the question, Your

10:44:55 14   Honor.

10:44:56 15            THE COURT:  All right.

10:44:57 16   Q    What kind of evidence would be relevant to assess

10:44:59 17   whether quality went down after the merger?

10:45:04 18   A    Direct evidence on the quality, whether it changed,

10:45:06 19   and if so, why.

10:45:13 20   Q    Now, if, in fact, the loss of CraftMaster led to a

10:45:17 21   decline in quality or service, what would that tell you

10:45:21 22   about whether the merger has reduced competition?

10:45:25 23   A    Well, if a merger causes a reduction in quality,

10:45:31 24   because the firms don't have to -- are not competing as

10:45:35 25   much on that dimension, that is a harm, and that would

Shaprio – Direct

10:45:38 1   reflect a substantial lessening of competition.

10:45:41 2        I'm focusing on price because that's what I can

10:45:44 3   measure as an economist more accurately, but evidence

10:45:47 4   along any of these dimensions is relevant for the question

10:45:49 5   about impact of a merger on competition.

10:45:52 6   Q   All right.  So I'd like to now turn to price and look

10:45:55 7   at what happened to prices after the merger.  What did you

10:46:00 8   look at to determine Jeld-Wen's price -- I'm sorry.  Why

10:46:04 9   did you look at Jeld-Wen's prices?

10:46:06 10  A    Well, we are going to focus first on Jeld-Wen prices

10:46:12 11  because that's what I have the most information about.  So

10:46:15 12  naturally, we're going to want to see what were the prices

10:46:17 13  before the merger, what were the prices after the merger,

10:46:19 14  and we're going to track different customers.  And then

10:46:23 15  we're going to see -- we're going to find they went up.

10:46:25 16  And so then we're going to look into how much and why.

10:46:29 17  Q   So I take it, you just gave the jury the punch line

10:46:32 18  that Jeld-Wen's prices went up after the merger?

10:46:34 19  A    Sometimes my timing is just not that good.

10:46:36 20  Q   And how did you reach that conclusion that Jeld-Wen's

10:46:40 21  prices went up after the merger?

10:46:43 22  A    So I have available to me quite a lot of detailed

10:46:48 23  information about Jeld-Wen's prices from price lists, from

10:46:51 24  sales data, from Jeld-Wen's own documents regarding how

10:46:57 25  they were setting prices, announcing prices and what their

Shaprio – Direct

10:47:00 1    thinking was behind doing so.

10:47:02 2    Q    All right.  So let's go to some of those documents.

10:47:04 3    This is a document that the jury has seen earlier in this

10:47:06 4    case.  Is this one of the documents that you relied upon

10:47:09 5    in your analysis?

10:47:11 6    A    Yes.  This is one page out of a deck, a Jeld-Wen

10:47:16 7    internal slide deck.

10:47:17 8    Q    And why did you review and consider this particular

10:47:20 9    document?

10:47:21 10   A    Well, this was in the category of Jeld-Wen looking

10:47:25 11   back at 2014, as it happens, and describing the price

10:47:32 12   increases that they had announced and implemented.  So

10:47:35 13   it's directly relevant to my inquiry into what happened to

10:47:38 14   prices.

10:47:39 15   Q    All right.  Let's just pull up first the

10:47:41 16   noncontracted.  We'll go to the contracted in a second.

10:47:43 17   And what did this document tell you about what happened to

10:47:47 18   prices to Jeld-Wen's noncontracted customers?

10:47:51 19   A    So just to be clear again, these are Jeld-Wen's price

10:47:56 20   increases that are going to be effective in 2015 that were

10:48:01 21   announced in 2014.  So that's what we're talking about.

10:48:04 22   And you can see they range of price increases, for the

10:48:10 23   noncontracted customers, as shown there in the upper box.

10:48:13 24   So they are implementing significant price increases at

10:48:16 25   that time.

Shaprio - Direct

10:48:16  1    Q    And what do you understand the term noncontracted
10:48:18  2    customers to be referring to on this page?
10:48:21  3    A    These are customers who do not have a long-term
10:48:24  4    agreement with Jeld-Wen that gives them price protection.
10:48:28  5    So they are exposed to a price increase.  Put it
10:48:33  6    differently, Jeld-Wen can increase their prices.  It does
10:48:37  7    not have a contractual obligation to keep the prices.  So
10:48:42  8    Jeld-Wen has more flexibility with these customers.
10:48:45  9    Q    And what portion of Jeld-Wen's door skins prices are
10:48:49 10    covered by these noncontracted customers?
10:48:51 11    A    About 16 percent, I believe.
10:48:54 12    Q    Did you say 16?
10:48:55 13    A    Sixteen percent.  So one in six.  So most of their
10:48:59 14    sales are to customers who have contracts.  But we're
10:49:02 15    focusing here first on the ones who do not have these
10:49:06 16    contracts with price protection.
10:49:07 17    Q    And in your analysis, why did you examine price
10:49:12 18    changes for this particular portion of Jeld-Wen's
10:49:14 19    customers?
10:49:16 20    A    Right.  So remember, we're -- after the merger, we're
10:49:19 21    trying to see what happened to prices.  These customers
10:49:22 22    are the ones who -- where Jeld-Wen can increase the
10:49:26 23    prices.  These customers don't have contractual
10:49:29 24    protections.  So they are going to be the first place to
10:49:32 25    look.

Shaprio - Direct

10:49:32  1       The customers with contractual protections, Jeld-Wen

10:49:36  2   can't just increase the prices at least until --

10:49:39  3   willy-nilly, as it were, until the contract runs out.  So

10:49:44  4   this is the natural first place to look why Jeld-Wen had

10:49:46  5   the ability to raise price without -- without breaching

10:49:49  6   the contract.  We look there.  And that's these customers.

10:49:54  7   Q   So besides this one page that the jury sees here, did

10:49:58  8   you look for other evidence of what actually happened to

10:50:01  9   the prices charged to these noncontracted customers?

10:50:05 10   A   Yes.  Well, I have information on the actual price

10:50:08 11   lists that were applied, sales data and the like.  So I

10:50:12 12   have other information.  This is just an illustration of

10:50:17 13   how -- what they had announced and were planning -- were

10:50:21 14   implementing.

10:50:23 15   Q   And did you analyze the price increases for all of

10:50:24 16   the noncontracted customers that are listed on this page?

10:50:28 17   A   No.  I did not look at -- I don't know how you say

10:50:33 18   the name.  Boccam, Richelieu, Portes Veilleux.  I speak no

10:50:45 19   French.  Those are Canadian customers.  So I focused on

10:51:00 20   the customers in the United States.

10:51:03 21   Q   Now, in the bottom half of this page, there's a line

10:51:03 22   that says "Rebates Eliminated."  Do you see that?

10:51:07 23   A   I do.

10:51:07 24   Q   What's a rebate?

10:51:07 25   A   A rebate is when the customer pays a price, let's say

Shaprio - Direct

10:51:07 1   $5 for a door skin.  And then later they get money back,

10:51:10 2   say $1 a door skin.  So the net price is $4 in that case.

10:51:11 3   It's sort of a different timing for the way the money

10:51:11 4   goes.  You pay 5 and then you get a dollar back later.

10:51:15 5   Q    All right.  Is that --

10:51:16 6              MR. PFEIFFER:  Your Honor, may we approach?

10:51:18 7              THE COURT:  All right.

10:51:19 8              (Discussion at sidebar as follows:)

10:51:37 9              THE COURT:  Yes, sir.

10:51:38 10             MR. PFEIFFER:  Your Honor, I'm concerned that

10:51:39 11  we're starting to get into territory where this witness is

10:51:43 12  interpreting a document that has not been interpreted --

10:51:45 13  not been authenticated.

10:51:47 14             THE COURT:  Interpreting what document?

10:51:51 15             MR. PFEIFFER:  He was just asked what the rebate

10:51:53 16  what, and he's going to talk about what it means in this

10:51:54 17  document.

10:51:54 18             THE COURT:  Why can't he ask what a rebate is?

10:52:00 19             MR. PFEIFFER:  And that's why I asked before he

10:52:00 20  asked the question.  If he's going to get into what does

10:52:00 21  it mean when it says a rebate is eliminated, he's

10:52:03 22  interpreting this internal draft document.

10:52:08 23             THE COURT:  This is the text of the document,

10:52:09 24  right?

10:52:11 25             MR. PFEIFFER:  That's the text of the document,

Shaprio – Direct

10:52:12 1    yes, Your Honor.

10:52:13 2            MR. POMERANTZ:  I was going to ask him were

10:52:16 3    rebates eliminated.  And they can cross-examine him if

10:52:18 4    they want to say their rebates weren't eliminated, but

10:52:21 5    this slide says they were.

10:52:23 6            THE COURT:  It's your own document.  It says it

10:52:25 7    was.  Overruled.  He can testify to that.

10:52:28 8            MR. PFEIFFER:  Thank you, Your Honor.

10:52:28 9            (End of sidebar discussion.)

10:52:49 10   BY MR. POMERANTZ:

10:52:50 11   Q    Professor Shapiro, did Jeld-Wen eliminate rebates

10:52:52 12   after the merger?

10:52:55 13   A    Yes, they did.

10:52:56 14   Q    All right.  So let's go first -- I'm going to look at

10:52:57 15   some of these noncontracted customers.  Let's start with

10:53:00 16   Excel.  What did your research show about what happened to

10:53:03 17   Excel?

10:53:04 18   A    So this slide depicts the significant price increases

10:53:07 19   that Excel experienced in the purchases of door skins from

10:53:11 20   Jeld-Wen in 2015, 20 percent.  And then in 2016, another

10:53:18 21   6 percent on top of that.

10:53:23 22   Q    All right.  And how do you know that Excel's prices

10:53:26 23   actually went up by 20 percent in 2015 and another

10:53:30 24   6 percent in 2015?

10:53:31 25   A    Based on the price lists and the sales data and the

Shaprio - Direct

10:53:36 1    other information available to me.

10:53:37 2    Q    All right.  And let's look at a couple of other

10:53:39 3    noncontracted customers.  These are customers buying door

10:53:43 4    skins from Jeld-Wen but who didn't have contracts,

10:53:46 5    correct?

10:53:46 6    A    Yes.  That's correct.  Not a long-term agreement, I

10:53:51 7    would say, with price protection is how I would put it.

10:53:55 8    Q    Okay.  Fair enough.  Could you explain to the jury

10:53:59 9    what happened to ABS?

10:54:01 10   A    So they experienced price increases in 2015 and '17.

10:54:04 11   You can see 12 percent between the two.  And UniDoor

10:54:09 12   experienced price increases in those three years, '15, '16

10:54:15 13   and '17, with 20 percent in total.  This is what happened

10:54:18 14   to the prices.

10:54:19 15   Q    All right.  So we've been looking at the

10:54:22 16   noncontracted customers.  Now let's turn to the contracted

10:54:27 17   customers that are also reflected on this same page of

10:54:32 18   Jeld-Wen's document.  Who are contracted customers of

10:54:35 19   Jeld-Wen?

10:54:37 20   A    Well, you see the names here.  What's distinguishing

10:54:40 21   these customers from the others is that they all had

10:54:44 22   long-term agreements with Jeld-Wen that specified how the

10:54:48 23   prices would move over time.  So Jeld-Wen could not just

10:54:53 24   raise the price under the contract.  The prices were

10:54:57 25   specified according to different formulas.

Shaprio - Direct

10:55:02 1   Q     All right.  And does that -- because these price

10:55:05 2   increases are smaller, does that mean that the merger did

10:55:09 3   not hurt competition?

10:55:12 4   A     No.  This is an important point.  The prices that we

10:55:18 5   see here -- these are much smaller increases in price, and

10:55:23 6   they are basically governed by the contracts.  Competition

10:55:28 7   will arise when the contracts are up for renewal or

10:55:33 8   possibly if a customer threatens to move, if they have the

10:55:36 9   right under the contract, to move some of their business.

10:55:39 10  But these -- we need to wait in time until the contracts

10:55:44 11  expire, or other things happen, to see how competition --

10:55:48 12  a possible lessening of competition has affected the

10:55:51 13  prices for these customers.

10:55:53 14        Steves, for example, had years of protection with

10:55:56 15  prices moving, according to a formula, based on the

10:56:00 16  competition that took place before the merger.  We saw the

10:56:04 17  competition there.  So some of the impact on Steves will

10:56:08 18  be later.  And that's what we're seeing.  That's why these

10:56:13 19  price increases are small.  They don't really tell us yet

10:56:16 20  much about the question we're interested in because they

10:56:19 21  are governed by the contracts.

10:56:20 22  Q     All right.  So I want to make sure that the jury

10:56:22 23  understands what you just said.

10:56:26 24  A     Me too.

10:56:26 25  Q     Can you give the jury an example of how the existence

Shaprio - Direct

10:56:30  1   of a contract may delay but not eliminate the effects of a

10:56:35  2   loss of choice?

10:56:37  3   A    Okay.  So the example here involves a contract in the

10:56:45  4   form of a lease for an apartment.  So the idea here is --

10:56:48  5   it's just purely conceptual.  Over time, you've agreed to

10:56:53  6   pay a certain rent under your lease.  That's the green.

10:56:58  7   The lock there means the price is locked in for several

10:57:01  8   years.

10:57:02  9       If we imagine there's a merger that takes place,

10:57:05 10   let's say, between apartment owners while the lease is

10:57:08 11   running and maybe that reduces competition among the

10:57:11 12   apartment owners, the landlords, right.  But right away,

10:57:15 13   your rent is not going to go up.  You have a lease.  Okay.

10:57:19 14       So the pattern we would expect would be when the

10:57:23 15   lease ends, then you might have to pay a lot more because

10:57:26 16   you don't have as many choices.  Okay.  But you wouldn't

10:57:30 17   expect to see the rent to go up right away because you've

10:57:33 18   got a lease and assuming the landlord abides by the lease.

10:57:37 19   Q    And does the rent increase -- does it relate to the

10:57:40 20   merger in some way?

10:57:42 21   A    Well, the example would be if that merger lessened

10:57:47 22   competition, we would expect rents would go up because the

10:57:53 23   landlords don't have to compete.  It just won't happen

10:57:55 24   right away.  That's the title of the slide, "Contracting

10:58:00 25   delay effects of a merger."  So the effects, we would see

Shaprio - Direct

10:58:03 1    them, but not for some -- maybe two years to go on your

10:58:03 2    lease.  That's when you would be hurt by the lack of

10:58:07 3    choices about places to rent.  Not right away after the

10:58:13 4    merger takes place.

10:58:14 5    Q    So let's assume that the landlord is impatient.  He

10:58:23 6    doesn't want to wait until the end of the lease to

10:58:25 7    increase price, increase your rent.  Can the landlord

10:58:28 8    renegotiate early?

10:58:31 9    A    Well, the landlord could come to you and try to get

10:58:34 10   you to pay higher rent now.  But, of course, you're not

10:58:37 11   going to be very keen to do so.  You say, I got a lease.

10:58:40 12   Why would you want to pay more?

10:58:42 13   Q    And what would the landlord do if the landlord wanted

10:58:46 14   to try to get the tenant to pay more earlier?

10:58:51 15   A    Well, there are a number of things that could happen.

10:58:53 16   In my example -- and you don't see this, really, I don't

10:58:55 17   think so much in landlords, but in business setting you

10:58:58 18   could say -- they could say, I'll tell you what.  I want

10:59:02 19   you to pay more.  You say, No thanks.

10:59:05 20        The landlord says, Well, if you don't pay more,

10:59:07 21   you're out of here when your lease is up.  And you're

10:59:09 22   like, Well, I really don't want to move.  That's not very

10:59:12 23   good.  Landlord says, Tough luck.  But I'll tell you what.

10:59:13 24   If you want to stay, I'll renew you, but only if you start

10:59:16 25   paying more now.

Shaprio - Direct

10:59:17 1    Okay.  So the landlord could bring some of that

10:59:21 2  pressure on you now by threatening to terminate your lease

10:59:25 3  and force you to move later, which you don't want to do

10:59:28 4  because there aren't very many choices.  So we can have

10:59:31 5  this variation where you might agree to that.  You might

10:59:36 6  say, All right.  I don't like it, but I'll pay more now in

10:59:37 7  order to get my lease extended.  And the landlord then

10:59:40 8  will extend the lease.  That's what they are giving you in

10:59:42 9  exchange for you agreeing to pay more rent right now.

10:59:45 10  That could be a deal that you might agree to.

10:59:48 11  Q    And let's take the example you're using here one step

10:59:51 12  further.  Suppose that the merger ends up eliminating the

10:59:55 13  choice of all other apartment buildings.  There's no other

10:59:59 14  apartment building that the tenant can turn to when the

11:00:02 15  lease expires.  What -- how would that affect that

11:00:06 16  renegotiation of the lease that you were just talking

11:00:08 17  about?

11:00:09 18  A    Well, it just gives the landlord that much more

11:00:12 19  bargaining leverage over you.  If the landlord threatens

11:00:17 20  to terminate, your choices are poor.  Let's imagine you

11:00:20 21  have to move pretty far away to get a decent place.  That

11:00:24 22  landlord is in a stronger position, and you're more likely

11:00:27 23  to agree to something now in order to get the lease

11:00:29 24  extended.

11:00:30 25  Q    All right.  Did you look into the renegotiation

Shaprio - Direct

11:00:34 1    efforts by Jeld-Wen of its long-term supply agreements?

11:00:36 2    A    I did.

11:00:37 3    Q    Which ones did you look into?

11:00:39 4    A    Looked at Lynden and Steves --

11:00:43 5    Q    And did Jeld-Wen --

11:00:43 6    A    -- in particular.

11:00:44 7    Q    I'm sorry.  I didn't mean to interrupt.

11:00:47 8    A    Go ahead.

11:00:47 9    Q    Did Jeld-Wen demand a price increase during these

11:00:50 10   renegotiations?

11:00:55 11   A    I don't like to use the word "demand."  I would say

11:00:58 12   Jeld-Wen said that that would be -- they wanted a price

11:01:03 13   increase or they would terminate.

11:01:05 14   Q    All right.  So let's look at what Jeld-Wen said.

11:01:06 15   This is Mr. Hachigian, and the jury saw his deposition

11:01:20 16   testimony yesterday, some portions of it.  And this is one

11:01:24 17   portion of his testimony that they heard yesterday.  Was

11:01:25 18   this testimony and this conduct relevant to your analysis?

11:01:27 19   A    Yes.  It's just the pattern I've been describing;

11:01:32 20   that he would add this 46 cents per door skin charge in

11:01:42 21   order to -- if you wanted your contract renewed, you'd

11:01:48 22   have to pay that extra amount, basically.

11:01:51 23   Q    And this is other testimony that the jury heard

11:01:53 24   yesterday from Mr. Hachigian.  Is this also something that

11:01:58 25   you relied upon?

Shaprio - Direct

11:01:59  1    A    Yes.  That's right.

11:02:00  2    Q    So let's look --

11:02:02  3          THE COURT:  Were you in the courtroom listening

11:02:03  4    to the testimony?

11:02:04  5          THE WITNESS:  I was, Your Honor.

11:02:05  6          THE COURT:  The whole trial?

11:02:06  7          THE WITNESS:  No, sir.

11:02:07  8          THE COURT:  But just Hachigian's?

11:02:09  9          THE WITNESS:  Yes.  Yesterday afternoon, I was

11:02:11 10    here.  I managed to avoid the technical problems, and I

11:02:15 11    came for the last hour.  So --

11:02:18 12          THE COURT:  I wish I would have known your

11:02:25 13    secret.

11:02:26 14    Q    So let's first start with Lynden.  What happened when

11:02:29 15    Jeld-Wen wanted to renegotiate its contract with Lynden?

11:02:35 16    A    Well, we've heard Mr. Hachigian's approach to this.

11:02:38 17    The result was that Lynden did agree to the price

11:02:42 18    increase, which was -- this was in 2016, which was

11:02:47 19    7 percent.  And their contract was renegotiated.  That was

11:02:54 20    the deal.  They agreed to that.

11:02:56 21    Q    And how does this price increase relate to your

11:02:59 22    opinion about the loss of CMI as a choice in the market?

11:03:05 23    A    Well, Lynden was in a situation where they could not

11:03:12 24    turn to CMI anymore as a possible alternative when -- when

11:03:17 25    Jeld-Wen asked -- asked for a higher price.  So they

Shaprio - Direct

11:03:22 1  were -- had reduced bargaining leverage as a result of the

11:03:27 2  less fewer choices.

11:03:28 3  Q    All right.  So now let's look at what happened when

11:03:31 4  Jeld-Wen came to Steves.  Did Jeld-Wen attempt to raise

11:03:34 5  the price it was charging to Steves during the term of the

11:03:36 6  long-term supply agreement?

11:03:38 7  A    Yes, they did.

11:03:39 8  Q    All right.  So let's talk about what happened here.

11:03:42 9  What is this -- how does this document relate to your

11:03:45 10  analysis and opinions?

11:03:46 11  A    So this all happened in 2014, the episode we're

11:03:49 12  talking about now, where Mr. Hachigian communicated to Sam

11:03:54 13  and Edward Steves the -- that he wanted them to pay this

11:03:59 14  additional charge, which was 46 cents per door skin.

11:04:03 15  That's what he tells them.

11:04:06 16  Q    Okay.  And from an economist standpoint, is that 46

11:04:09 17  cents a price increase?

11:04:12 18  A    Of course.  Yes.

11:04:14 19  Q    All right.  And so did Steves agree to pay 46 cents

11:04:19 20  more per skin?

11:04:20 21  A    They did not.

11:04:21 22  Q    And what happened?

11:04:23 23  A    So then Jeld-Wen terminated -- well, sent them the

11:04:28 24  notice of termination.  This is in September 2014.  And

11:04:36 25  since their long-term agreement provides a seven-year

Shaprio - Direct

11:04:40  1    period during which the supply will continue, that's why

11:04:43  2    we're talking about September 2021 here.  But Steves was

11:04:50  3    sent the notice of termination.

11:04:52  4    Q    So let's go back to your lease example.  And we've

11:04:55  5    added one more portion to this chart, and that's that line

11:05:00  6    between merger and end of lease with a question mark.

11:05:04  7    What does that line and question mark represent?

11:05:07  8    A    Well, we're -- if you see the title here to the

11:05:11  9    slide, "Contract provides limited protection."  One of the

11:05:15 10    problems that -- in my example, the tenant would

11:05:18 11    experience, if there's no good choices of other apartments

11:05:22 12    to rent, even though you've got a lease, the landlord

11:05:25 13    would probably know -- suppose the landlord would realize

11:05:29 14    you don't have very good choices.  It's not the situation

11:05:32 15    that the landlord is necessarily going to go out of his

11:05:35 16    way to help you if something goes wrong.  So the dynamic

11:05:39 17    can change.

11:05:40 18    Q    All right.  So do you believe that there's -- is it

11:05:43 19    your view, and your analysis, that there's any way that

11:05:45 20    the reduction in competition caused by the CMI merger

11:05:49 21    could affect the contracted customers before the

11:05:53 22    expiration of their long-term supply agreement?

11:05:57 23    A    Well, we have two effects that we can look for on the

11:06:04 24    contracted customers.  One we've talked about, such as

11:06:05 25    Lynden paid a higher price in order to get the contract

Shaprio – Direct

11:06:08 1   extended and not be terminated.  So we have that.  And

11:06:11 2   then we can have other things where the contract may be

11:06:14 3   not completely clear.  There's a dispute about it.

11:06:17 4   There's a leak in the ceiling, and does the landlord come

11:06:22 5   very quickly to fix it?  Not necessarily so clear.

11:06:24 6        If you have that sort of thing, when I said the

11:06:26 7   dynamic can change, the customer, the tenant, or in this

11:06:31 8   case Steves, could be hurt during the contract by the loss

11:06:36 9   of options and choice of moving their business elsewhere.

11:06:39 10  Q    All right.  So the jury has heard a lot of testimony

11:06:42 11  already about something called the key input costs and

11:06:45 12  whether Jeld-Wen was supposed to increase or decrease its

11:06:49 13  prices when the key inputs changed.  Does that relate to

11:06:54 14  the point you're making with this slide?

11:06:58 15  A    Yes.  I think so.  So it seems to be where there's a

11:07:09 16  dispute changes, and the dynamics in such disputes changes

11:07:10 17  when the market is less competitive in favor of the

11:07:14 18  seller.  It's a general idea.

11:07:15 19  Q    And so if CMI was still out there as an option for

11:07:18 20  Steves, do you think that could have affected what

11:07:19 21  happened with these key input cost calculations?

11:07:23 22  A    I'll say could.  Okay.  I'm just making the general

11:07:25 23  economic point that when the seller doesn't have as much

11:07:30 24  competition to face, they are less likely to go out of

11:07:34 25  their way to help, or they might take a tougher stance

Shaprio - Direct

11:07:38 1    when there are ambiguities in the contract or other

11:07:41 2    day-to-day business issues.

11:07:42 3    Q    All right.  So let's go to another example of what

11:07:45 4    happened between Steves and Jeld-Wen under the contract

11:07:49 5    during the time after it was -- notice of termination was

11:07:54 6    sent.  Could you explain to the jury what this slide is

11:07:57 7    showing?

11:07:58 8    A    So this is Madison and Monroe pricing.  The Madison

11:08:03 9    and Monroe were two models that Jeld-Wen introduced after

11:08:09 10   the merger that are in the general category of

11:08:15 11   Craftsman-type style doors.  And Jeld-Wen charged

11:08:22 12   significantly higher prices for these newer models than

11:08:25 13   they had been charging Steves under their long-term

11:08:29 14   agreement for Craftsman door skins.  And the slide here

11:08:38 15   shows how much higher the prices that Jeld-Wen charged to

11:08:43 16   Steves were, 17 to 21 percent higher for the Madison, and

11:08:47 17   essentially two to three times as much for the Monroe, in

11:08:51 18   comparison with the Craftsman door skins that were priced

11:08:55 19   in their long-term agreement.

11:08:56 20   Q    All right.  So how does Jeld-Wen's pricing of the

11:09:00 21   Madison and Monroe door skins affect your opinions in this

11:09:03 22   case?

11:09:05 23   A    So this I see as an example of how Jeld-Wen set its

11:09:12 24   prices when it did not believe it was constrained by a

11:09:16 25   long-term agreement.  In this case, although it's Steves

Shaprio - Direct

11:09:20 1   who has a long-term agreement, Jeld-Wen's position, as I

11:09:23 2   understand it, is that that -- they had the right, under

11:09:26 3   that agreement, to set -- to set these prices and did not

11:09:29 4   have to set the same price as the earlier Craftsman doors.

11:09:33 5   So this is an indication, much like the noncontracted

11:09:38 6   customers, about how Jeld-Wen saw its pricing power after

11:09:43 7   the merger when not constrained by a long-term agreement.

11:09:47 8             THE COURT:  Are you saying -- what you said

11:09:49 9   earlier, that you think the pricing on the Madison and

11:09:57 10  Monroe doors is an example of using some contract issue

11:10:05 11  to -- as a springboard to claim higher prices?

11:10:10 12            THE WITNESS:  I didn't mean that, Your Honor.

11:10:12 13            THE COURT:  All right.  Thank you.

11:10:16 14  Q    All right.  So you --

11:10:18 15            THE WITNESS:  I'm sorry.  Let me -- I want to

11:10:19 16  make sure it's clear.

11:10:21 17            THE COURT:  You gave an example earlier -- I'm

11:10:24 18  sorry, I may have misunderstood you -- about service and

11:10:28 19  quality changes and the input costs and so forth.  And

11:10:32 20  that was because of some alleged ambiguity -- or provision

11:10:38 21  in the contract.  And I'm asking you whether you are also

11:10:41 22  saying, because of the lead-in to the question, that there

11:10:44 23  was the use of some kind of contract term, dispute over a

11:10:49 24  contract term, to get higher prices for the -- charge

11:10:52 25  higher prices for the Madison and Monroe?  Are you saying

Shaprio - Direct

11:10:55 1  that or not?

11:10:57 2         THE WITNESS:  I'm saying that if it was agreed

11:11:00 3  by Jeld-Wen and Steves that the Madison and Monroe were

11:11:05 4  covered by the long-term agreement at the prices specified

11:11:08 5  for Craftsman doors, they just wouldn't have been able to

11:11:13 6  do this price increase.  Jeld-Wen, as I understand it,

11:11:15 7  does not believe that these doors are covered by the

11:11:18 8  agreement.  And so it is informative regarding their

11:11:21 9  pricing when not constrained by an agreement.

11:11:24 10        THE COURT:  I see.  Okay.

11:11:28 11 Q   Professor Shapiro, you've just gone through, the last

11:11:34 12 15 minutes or so, showing various ways that Jeld-Wen

11:11:37 13 raised their prices after the merger, correct?

11:11:39 14 A   Yes.

11:11:40 15 Q   And have you reviewed Professor Snyder's analysis of

11:11:43 16 what happened to Jeld-Wen's prices after the merger?

11:11:45 17 A   I have.

11:11:46 18 Q   And sort of bottom line, how has -- how has Professor

11:11:51 19 Snyder's analysis affected your conclusion regarding

11:11:54 20 Jeld-Wen's prices?

11:11:56 21 A   Professor Snyder also finds that door skin prices

11:12:01 22 went up after the merger.  He found them going up about

11:12:05 23 11 percent over a period of time from 2012 into 2016.

11:12:11 24        So we agree they went up.  We disagree about how to

11:12:14 25 measure it.  But we do agree on that point.

Shaprio - Direct

11:12:20  1    Q    All right.

11:12:21  2              MR. POMERANTZ:  Your Honor, I'm about to turn

11:12:22  3    the page to a new subject, and I didn't know if you wanted

11:12:24  4    to take --

11:12:26  5              THE COURT:  I think we'll take the morning

11:12:30  6    recess at this time, 20 minutes, before we move into the

11:12:34  7    next thing.  Be seated while the jury is being excused.

11:12:37  8    Just take your pads with you.

11:12:41  9         (The jury exited the courtroom.)

11:12:57 10              THE COURT:  All right.  We'll take a 20-minute

11:12:59 11    recess.

11:13:00 12              MR. POMERANTZ:  Thank you, Your Honor.

11:13:01 13         (Recess taken.)

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

Shapiro - Direct

| | | |
|---|---|---|
| 11:38:16AM | 1 | THE COURT:  All right, Mr. Pomerantz. |
| 11:38:20AM | 2 | MR. POMERANTZ:  Thank you, Your Honor. |
| 11:38:22AM | 3 | Q    Just to reset where we are, we just went through showing |
| 11:38:25AM | 4 | that Jeld-Wen's prices went up -- for door skins went up after |
| 11:38:30AM | 5 | the merger; correct? |
| 11:38:30AM | 6 | A    Yes. |
| 11:38:31AM | 7 | Q    So I want to now turn to what caused those prices to go |
| 11:38:35AM | 8 | up.  Professor Shapiro, as an expert in antitrust economics, |
| 11:38:40AM | 9 | were Jeld-Wen price increases caused by the merger? |
| 11:38:44AM | 10 | A    I believe they were, although that requires some |
| 11:38:47AM | 11 | additional checking at this point in the analysis. |
| 11:38:49AM | 12 | Q    So what did you do to reach the conclusion that it was the |
| 11:38:53AM | 13 | merger that caused Jeld-Wen's prices to go up? |
| 11:38:56AM | 14 | A    So I would set the stage, we had the big increase in |
| 11:39:04AM | 15 | concentration with the Herfindahl index, the HHI.  We do see |
| 11:39:06AM | 16 | these price increases, and now -- but there are other things to |
| 11:39:10AM | 17 | check because, of course, prices can go up for other reasons, |
| 11:39:14AM | 18 | and so the main things to check were -- that economists would |
| 11:39:18AM | 19 | look at would be did costs go up.  That could cause prices to |
| 11:39:23AM | 20 | go up even if there was competitive market -- even in a |
| 11:39:25AM | 21 | competitive market, or what about increased demand. |
| 11:39:28AM | 22 | Those would be the possible alternative explanations that |
| 11:39:33AM | 23 | I wanted to look into to see if they would explain the price |
| 11:39:38AM | 24 | increase, and, if not, then what it looks like at this point, |
| 11:39:42AM | 25 | which is the merger is the cause, would be confirmed. |

Shapiro - Direct

| | |
|---|---|
| 11:39:46AM | 1 |
| 11:39:50AM | 2 |
| 11:39:54AM | 3 |
| 11:39:55AM | 4 |
| 11:39:57AM | 5 |

Q   All right.  So did you do analysis and study, studying to
determine whether either of these alternative explanations
would explain why prices went up?

A   I looked at both of them, yes.

Q   And we'll get to your analysis, but bottom line
conclusion, what did you find at the end of your analysis?

A   I found that neither of these explanations actually --
neither of these possibilities, in fact, explains the price
increases for the door skins that were observed starting in
2012 and going into 2016/'17 -- sorry, since the merger.

Q   Just so we get the time period, what data did you have
available to you, during what time period, in order to assess
the issues that are raised here on this slide?

A   Well, it's a bit different for the two, but I had quite a
lot of data eventually on Jeld-Wen's costs.  It took some time
for that to come, so that was in the later reports, but a lot
of data on Jeld-Wen's costs to see whether they went up or not.
That's what we're going to look at.  And then also data on
demand in the form of housing starts and total amount of doors
and door skins.  That data goes back even earlier in time, and
some of that is public data, but those are the two main sets of
data we'll be looking at.

Q   All right, so let's start with costs and whether that
could explain why Jeld-Wen's prices for door skins went up.
What did you -- did Jeld-Wen's costs increase or decrease after

Shapiro - Direct

| | | |
|---|---|---|
| 11:41:19AM | 1 | the merger? |
| 11:41:20AM | 2 | A    You can see the title here, they, in fact, decreased, and |
| 11:41:25AM | 3 | we have two different ways of measuring costs that I was able |
| 11:41:29AM | 4 | to perform.  See those key input costs and manufacturing costs |
| 11:41:35AM | 5 | per door skin?  Each of the measures went down from 2012 to |
| 11:41:41AM | 6 | 2016, and I think that's what we're about to show on the slide. |
| 11:41:43AM | 7 | Q    Before we get to what actually happened, I just want to |
| 11:41:46AM | 8 | make sure the jury understands these two different measures of |
| 11:41:49AM | 9 | costs. |
| 11:41:50AM | 10 | What's the difference between key input costs, which you |
| 11:41:55AM | 11 | have in the left-hand column, and manufacturing costs per door |
| 11:41:58AM | 12 | skin, for each door skin that you have on the right-hand side? |
| 11:42:02AM | 13 | A    Okay, so let me just explain what each one is.  Each one |
| 11:42:06AM | 14 | has its sort of pros and cons.  This key input costs are a |
| 11:42:12AM | 15 | specific measure of raw materials and energy costs that |
| 11:42:18AM | 16 | Jeld-Wen and Steves agreed to track over time, and the prices |
| 11:42:24AM | 17 | in their long-term agreement that Jeld-Wen would charge to |
| 11:42:27AM | 18 | Steves would move up or down over time based on those costs. |
| 11:42:33AM | 19 | It's wood, resin, energy, electricity, and so forth.  So |
| 11:42:40AM | 20 | that's specific input costs.  The advantage of that measure is |
| 11:42:45AM | 21 | the company's actually used it, it's very specific, and they've |
| 11:42:49AM | 22 | used it in their own business dealings to determine how price |
| 11:42:52AM | 23 | would move over time.  So that's key input costs. |
| 11:42:56AM | 24 | Q    And then what is manufacturing costs per door skin?  How |
| 11:42:58AM | 25 | does that differ from key input costs? |

Shapiro - Direct

11:43:01AM   1    A    So key input costs, for example, doesn't include labor,

11:43:04AM   2    okay.  So that's an important cost.  So it's not as complete.

11:43:09AM   3    So I measured the Jeld-Wen costs again over time using what

11:43:18AM   4    economists call average variable costs, but we've described for

11:43:23AM   5    the label as manufacturing costs per door skin, and this is the

11:43:27AM   6    standard way in which economists would look at costs for this

11:43:31AM   7    purpose.

11:43:31AM   8         So this includes a broader group of costs, including labor

11:43:37AM   9    and other items that Jeld-Wen tracks as variable costs.  What

11:43:42AM   10   variable means is, when you make more door skins, production

11:43:46AM   11   goes up, how much do your costs go up.

11:43:51AM   12        So some costs are fixed.  They just -- you're going to

11:43:54AM   13   bear those costs whether you are making an extra million door

11:43:57AM   14   skins or not.  Other costs are variable, and I'm tracking the

11:44:01AM   15   variable ones, which is the basis on which prices are marked up

11:44:06AM   16   from the variable costs in a competitive market.  And so that's

11:44:12AM   17   what we're tracking over time, those variable costs using the

11:44:16AM   18   Jeld-Wen cost data.

11:44:17AM   19   Q    So if I understand what you said, the manufacturing costs

11:44:20AM   20   per door skin includes some additional costs beyond the key

11:44:23AM   21   input costs; correct?

11:44:25AM   22   A    Yes, quite a few.  The substantial majority of Jeld-Wen's

11:44:28AM   23   costs are included in this concept of manufacturing costs per

11:44:33AM   24   door skin, all the ones that are variable that increase when

11:44:37AM   25   production increases over these periods of time.

Shapiro - Direct

| | | |
|---|---|---|
| 11:44:41AM | 1 | Q   So the costs would not -- Jeld-Wen's costs that would not |
| 11:44:44AM | 2 | be included in the right-hand column would be those costs that |
| 11:44:47AM | 3 | don't change because you manufacture additional door skins; |
| 11:44:51AM | 4 | right? |
| 11:44:51AM | 5 | A   That's right, and economists would call those fixed costs, |
| 11:44:54AM | 6 | and I'm not including those in this measure. |
| 11:44:56AM | 7 | Q   So, for example, Mr. Hachigian's salary, he gets paid that |
| 11:45:01AM | 8 | same amount whether they manufacture the next door skin or not. |
| 11:45:04AM | 9 | That would not be included in the manufacturing costs per door |
| 11:45:07AM | 10 | skin; correct? |
| 11:45:07AM | 11 | A   That's correct. |
| 11:45:08AM | 12 | Q   So let's look at what you actually then learned about |
| 11:45:13AM | 13 | Jeld-Wen's costs.  First, let's go to the key input costs. |
| 11:45:16AM | 14 | Could you tell the jury what you found after looking at |
| 11:45:18AM | 15 | Jeld-Wen's data. |
| 11:45:19AM | 16 | A   Yes.  So I have data year by year of this input cost |
| 11:45:24AM | 17 | measure.  There's a particular formula that the company used. |
| 11:45:28AM | 18 | I applied that, and from 2012 to 2016, I measured that this |
| 11:45:34AM | 19 | measure went down by between 13 and 15 percent.  There is some |
| 11:45:38AM | 20 | details about how you measure certain things.  That's why |
| 11:45:40AM | 21 | there's a range. |
| 11:45:41AM | 22 | Q   And what did you find about what happened to manufacturing |
| 11:45:44AM | 23 | costs per door skin? |
| 11:45:46AM | 24 | A   This also went down a significant amount from 2012 to |
| 11:45:51AM | 25 | 2016.  The decline was 7.9 percent. |

Shapiro - Direct

11:45:53AM   1   Q   So no matter which way you look at it, were your findings

11:45:58AM   2   that costs decreased, not increased?

11:46:01AM   3   A   That's correct.

11:46:02AM   4   Q   Did Jeld-Wen pass these cost savings on to its door skin

11:46:08AM   5   customers?

11:46:08AM   6   A   Well, we saw -- we had just seen before the break that the

11:46:14AM   7   door skin prices went up, and so the answer is no in that

11:46:18AM   8   sense, they did not lower the prices even though their costs

11:46:21AM   9   went down.

11:46:22AM   10   Q   Now, you said that Professor Snyder has also written

11:46:26AM   11   reports and given opinions in this case; correct?

11:46:28AM   12   A   Yes.

11:46:28AM   13   Q   Are you aware that Professor Snyder claims that Jeld-Wen's

11:46:32AM   14   input costs have increased, not decreased, since the merger?

11:46:36AM   15   A   I am aware of that.

11:46:37AM   16   Q   Can you explain why your conclusion on what happened to

11:46:40AM   17   costs is different from Professor Snyder's?

11:46:43AM   18   A   Yes, sure.  The main differences that -- I looked actually

11:46:48AM   19   at Jeld-Wen's costs, the two measures we've talked about, and

11:46:51AM   20   he did not look at their costs.  He looked at an index having

11:46:55AM   21   to do with wood that is not nearly as accurate for measuring

11:47:01AM   22   Jeld-Wen's costs.

11:47:02AM   23   Q   So when you say he looked at an index, does that mean that

11:47:05AM   24   he wasn't looking at Jeld-Wen's costs but rather some

11:47:08AM   25   industry-wide cost information?

Shapiro - Direct

| | | |
|---|---|---|
| 11:47:10AM | 1 | A    As I recall it, he was looking at a published index.  The |
| 11:47:17AM | 2 | government publishes all sorts of indexes about how much did |
| 11:47:21AM | 3 | car prices go up, how much did wood prices go up, and they have |
| 11:47:24AM | 4 | a lot of these.  They are called producer price index.  You've |
| 11:47:24AM | 5 | probably heard of consumer price index.  There's producer price |
| 11:47:29AM | 6 | index, too, and he looked at something in those categories as |
| 11:47:31AM | 7 | best I can remember sitting here right now. |
| 11:47:33AM | 8 | Q    If you're trying to figure out why Jeld-Wen's prices for |
| 11:47:38AM | 9 | door skins went up, why do you think it's better to look at |
| 11:47:41AM | 10 | Jeld-Wen's actual costs rather than some producer price index? |
| 11:47:45AM | 11 | A    It's just much more accurate and inclusive.  That is, the |
| 11:47:52AM | 12 | index he looked at doesn't include a range of costs, and we're |
| 11:47:56AM | 13 | not even sure that that's the inputs that Jeld-Wen used, and, |
| 11:48:01AM | 14 | in any event, this is just their actual costs we looked at, and |
| 11:48:05AM | 15 | he did not look at their actual costs. |
| 11:48:07AM | 16 | Q    So do the costs that you are measuring here, do they |
| 11:48:12AM | 17 | include the costs, let's say, of building or buying a door skin |
| 11:48:17AM | 18 | factory? |
| 11:48:19AM | 19 | A    No, they do not include that fixed cost. |
| 11:48:21AM | 20 | Q    And why do you not include those fixed costs? |
| 11:48:26AM | 21 | A    So, as I said, the way that prices are set in competitive |
| 11:48:34AM | 22 | markets is that firms compete, and this average variable cost |
| 11:48:41AM | 23 | is what's going to govern the prices or closely related measure |
| 11:48:46AM | 24 | called marginal cost, and so in looking over time at how prices |
| 11:48:53AM | 25 | changed, the correct measure to look at for costs is this |

Shapiro - Direct

| | | |
|---|---|---|
| 11:48:57AM | 1 | average variable cost.  That's the advantage of that cost |
| 11:48:59AM | 2 | measure.  It's economically the right one to look at.  The |
| 11:49:03AM | 3 | advantage of the key input costs is the company has used it in |
| 11:49:06AM | 4 | practice to govern price changes, so it's certainly important, |
| 11:49:10AM | 5 | too. |
| 11:49:11AM | 6 | The capital costs you've asked about, it's natural to |
| 11:49:13AM | 7 | think, of course -- they got to get a return on their capital; |
| 11:49:18AM | 8 | otherwise, they can't stay in business.  So that happens when |
| 11:49:23AM | 9 | its competitive conditions permit, the companies get a margin |
| 11:49:26AM | 10 | over their variable costs -- a margin just means the price is |
| 11:49:30AM | 11 | above the variable cost -- and that difference, that margin, is |
| 11:49:36AM | 12 | what gives a return on the capital investment and provides |
| 11:49:39AM | 13 | funds to make next year's investment as needed. |
| 11:49:43AM | 14 | So that's the way things work in competitive markets, and, |
| 11:49:46AM | 15 | in fact, Jeld-Wen got a good healthy margin above variable |
| 11:49:51AM | 16 | costs.  What we're tracking now is the change in the costs, |
| 11:49:56AM | 17 | because we're interested in the change in the prices over time |
| 11:49:58AM | 18 | after the merger, and this is the correct measure to track |
| 11:50:02AM | 19 | those changes. |
| 11:50:03AM | 20 | Q   All right, so let's make sure the jury follows what you |
| 11:50:06AM | 21 | just said.  The jury knows that Jeld-Wen built a door skin |
| 11:50:12AM | 22 | plant called Dodson in Dodson, Louisiana.  You are aware of |
| 11:50:17AM | 23 | that as well; correct? |
| 11:50:18AM | 24 | A   I am. |
| 11:50:19AM | 25 | Q   The jury knows that Jeld-Wen brought a door skin plant |

Shapiro - Direct

11:50:23AM 1   when it bought CMI.  It bought the Towanda plant?

11:50:27AM 2   A    I am.

11:50:28AM 3   Q    How does Jeld-Wen pay for building Dodson and buying CMI?

11:50:33AM 4   A    Right.  So let's start, when you build a plant, there are

11:50:37AM 5   a number of ways a company gets a return on that.  For one

11:50:40AM 6   thing, if it's more efficient than the other plants -- maybe

11:50:44AM 7   you have older plants -- you have lower variable costs.  Your

11:50:48AM 8   costs go down to operate it, and that gives you more of a

11:50:50AM 9   margin, and that's a reason, of course, you might retire an old

11:50:53AM 10  plant and build new one.

11:50:55AM 11      Another aspect is when you price in a competitive

11:50:59AM 12  situation, you hope to get a good margin above the variable

11:51:03AM 13  costs, sometimes called operating income -- they're different

11:51:06AM 14  concepts that businesses use -- and that will give you return

11:51:09AM 15  on capital.

11:51:10AM 16      It all depends on the competitive situation, though.

11:51:14AM 17  There's no guarantee it's in a competitive market.  If you

11:51:17AM 18  build a facility and it's in the wrong place or it wasn't

11:51:19AM 19  designed well or you operate it poorly, you won't get a very

11:51:23AM 20  good return.  There's no guarantee.  The price is going to be

11:51:26AM 21  set by what you can get in the market.

11:51:28AM 22      But if you're reasonably efficient and planning ahead

11:51:32AM 23  well, you will have a margin price over average variable costs,

11:51:36AM 24  and over the period -- which the facility is operating, if

11:51:40AM 25  demand is good enough, those margins will give you the return

Shapiro - Direct

| | |
|---|---|
| 11:51:44AM | 1 |

and pay the debt or whatever other costs there were that you

incurred in order to build the facility.

That's the way it all fits together, and the fact that a

company wants to get a higher return on its capital doesn't

mean it can if the competition doesn't allow it.

Q     So do you know if Jeld-Wen made a profit or a margin over

its per-unit manufacturing costs in 2012, the year it bought

CMI?

A     Yes, I was able to calculate that margin, and it was

around 35 percent.  So that's what I was talking about.  You

can think of that as a margin that gives them a return on the

investments they had made to be able to make the door skins and

can fund future investment if it's thought to be profitable

going forward.  They did earn a significant margin.

Q     So you said that margin was 35 percent back in 2012;

correct?

A     I did, yes.

Q     Has Jeld-Wen's margins for door skins changed since 2012?

A     Well, yes.  It's gone up because the price went up, as

we've talked about, and the costs went down as we've just been

demonstrating, so that widens the gap, the margin.  So the

margin has become higher.

Q     And were there documents produced in this case that

explain to you why Jeld-Wen -- how this margin analysis you are

talking about affected what Jeld-Wen was doing?

Shapiro - Direct

11:53:13AM   1   A     Well, you are showing here the capital charge, and I did

11:53:18AM   2   hear Mr. Hachigian yesterday -- this is an email to him --

11:53:21AM   3   about this capital charge, the additional price per door skin

11:53:29AM   4   around $0.46 or so that Jeld-Wen was seeking.

11:53:32AM   5       What this email shows is that that additional charge was,

11:53:40AM   6   from Jeld-Wen's perspective, a way they were hoping, expecting,

11:53:47AM   7   planning to get a return on the $220 million that they had

11:53:51AM   8   invested, roughly $80 million to purchase CraftMaster and

11:53:55AM   9   $140 million to build the Dodson plant, 220 million together.

11:54:02AM   10      So they had put that money out, they had made those

11:54:03AM   11  investments, and he was looking for a way to get the return,

11:54:06AM   12  and higher door skins prices was what -- one route, at least,

11:54:10AM   13  that we're talking about here to get that return.

11:54:13AM   14  Q     So are these the kind of costs that would explain a change

11:54:17AM   15  in the price of door skins?

11:54:19AM   16  A     Well, not if there's competition working.  If you have a

11:54:23AM   17  merger, a company buys its competitor -- so as I've said all

11:54:29AM   18  along, as an antitrust economist, we look and say, all right,

11:54:30AM   19  did that lessened competition lead to higher prices.  If the

11:54:34AM   20  company then says, well, now we want our customers to pay a

11:54:39AM   21  higher price to fund the fact that we bought our competitor,

11:54:44AM   22  that's a higher price, and it's not based on a cost increase.

11:54:51AM   23  So that's quite unjustified and reflects the lessening of

11:54:56AM   24  competition, the greater pricing power that the firm has as a

11:54:59AM   25  result of the acquisition.

Shapiro - Direct

11:55:01AM  1   Q    So these are the costs that you think matter to setting --

11:55:06AM  2   to Jeld-Wen setting prices; correct?

11:55:09AM  3   A    For how prices change over time, yes, the variable costs.

11:55:14AM  4   Q    And these costs went down, not up; correct?

11:55:16AM  5   A    Yes, sir.

11:55:17AM  6   Q    All right.  So what does that tell you about whether

11:55:21AM  7   increased costs explain Jeld-Wen raising its price after the

11:55:26AM  8   merger in 2012?

11:55:27AM  9   A    So I've ruled that out.  Remember, the whole path we're on

11:55:31AM  10  is we saw the merger increase concentration, higher prices.  I

11:55:35AM  11  wanted to check whether there was some other reason why the

11:55:38AM  12  price went up.

11:55:38AM  13       We've now ruled out increased costs as a reason, so we

11:55:41AM  14  have one more to consider before we would fairly conclude -- I

11:55:46AM  15  would fairly conclude that the merger is the cause of the price

11:55:50AM  16  increase.

11:55:50AM  17  Q    So let's look at increased demand and whether that

11:55:53AM  18  explains why Jeld-Wen raised its door skin prices.  Could you

11:55:59AM  19  tell the jury, has demand for door skins increased since the

11:56:02AM  20  merger?

11:56:03AM  21  A    Yes.  So this is why this is worthy of looking into,

11:56:07AM  22  because demand has gone up.  What we're showing you here is

11:56:12AM  23  housing starts, okay?  So that's the industry term for how many

11:56:17AM  24  new houses were -- constructions were started, and it's year by

11:56:21AM  25  year, and you can see here the dip for the great recession.  It

Shapiro - Direct

11:56:27AM 1    was very high in 2005 -- that was a peak -- and then hit the

11:56:32AM 2    low point in 2009 when things were really rough and has come

11:56:37AM 3    back modestly since then.

11:56:39AM 4        So we're focusing on the period from 2012 up to '15, or

11:56:43AM 5    you can see 2016.  So there's been a modest recovery over that

11:56:48AM 6    period of time, and since there are more housing starts, that

11:56:51AM 7    means more demand for doors and more demand for door skins.  So

11:56:56AM 8    there was an increase in demand over this period of time.

11:56:59AM 9        That's why I need to check, would that explain the

11:57:03AM 10   increased price in door skins.  So maybe it's not the merger.

11:57:07AM 11   Maybe it's the increase in demand.  That's what we're looking

11:57:10AM 12   into.

11:57:10AM 13   Q    So stepping back from door skins for a second, could an

11:57:13AM 14   increase in demand for a product explain higher prices for that

11:57:16AM 15   product?

11:57:17AM 16   A    Of course it can, right.  Just supply and demand tells you

11:57:21AM 17   sometimes demand goes up, the price goes up.  Of course, it

11:57:24AM 18   can -- that's why I'm looking into this -- but it doesn't have

11:57:27AM 19   to.

11:57:28AM 20   Q    Are there specific scenarios, specific situations in which

11:57:32AM 21   an increase in demand could lead to an increase in price?

11:57:35AM 22   A    Right.  So certainly, as an economist, there are really --

11:57:41AM 23   if you think about it, as we economists have thought about it,

11:57:44AM 24   there are two reasons why an increased demand tends -- can

11:57:49AM 25   cause price to go up, often does.

973

| | | |
|---|---|---|
| 11:57:52AM | 1 | One is the variable costs go up, the more demand -- |
| 11:57:57AM | 2 | there's a lot of demand for computer programmers, so there's |
| 11:58:02AM | 3 | only so many of them and their wages go up, okay.  So that |
| 11:58:09AM | 4 | could happen.  Therefore, the companies that hire them, their |
| 11:58:12AM | 5 | costs go up. |
| 11:58:13AM | 6 | So the variable costs could go up, or you could just get |
| 11:58:18AM | 7 | tight on capacity.  If you are running out of capacity, then |
| 11:58:22AM | 8 | prices are going to go up.  So those are really the two |
| 11:58:25AM | 9 | possibilities, the ways in which demand can pull up price that |
| 11:58:29AM | 10 | we need to consider here. |
| 11:58:30AM | 11 | Q    All right.  So, in this particular instance -- now let's |
| 11:58:32AM | 12 | go back to door skins -- did the increase in demand for door |
| 11:58:38AM | 13 | skins cause an increase in costs? |
| 11:58:40AM | 14 | A    No.  We've already checked that part actually, because we |
| 11:58:43AM | 15 | looked at the costs.  It's a little bit surprising.  You might |
| 11:58:46AM | 16 | think we had this period where the economy was recovering, |
| 11:58:50AM | 17 | there were more houses being built, and yet these key input |
| 11:58:52AM | 18 | costs went down; right? |
| 11:58:54AM | 19 | We have a period where the variable costs went down.  So |
| 11:58:59AM | 20 | that explanation is not going to do it.  Wasn't demand, they |
| 11:59:05AM | 21 | had made more for the inputs.  We already checked that out. |
| 11:59:07AM | 22 | Q    Okay, so, I'm sorry, go ahead.  I was going to go to |
| 11:59:08AM | 23 | the second -- |
| 11:59:09AM | 24 | A    So we need to -- me, too.  So we're going to check -- what |
| 11:59:14AM | 25 | about getting tight on capacity. |

Shapiro - Direct

| | | |
|---|---|---|
| 11:59:16AM | 1 | Q    So you've ruled out that an increase in costs related to |
| 11:59:20AM | 2 | demand might cause prices to go up.  So the other explanation |
| 11:59:24AM | 3 | you mentioned was capacity and whether there was a shortage of |
| 11:59:28AM | 4 | capacity.  Why does capacity matter? |
| 11:59:31AM | 5 | A    So if the supplies get tight and demand keeps going up, |
| 11:59:37AM | 6 | that is going to raise price.  Essentially the customers are |
| 11:59:41AM | 7 | bidding for the limited amount of supply that's available. |
| 11:59:44AM | 8 | That can happen, and I needed to check whether that was what |
| 11:59:47AM | 9 | was happening in this market. |
| 11:59:49AM | 10 | Q    So by capacity here in this particular market, what are we |
| 11:59:53AM | 11 | talking about? |
| 11:59:53AM | 12 | A    So we're talking about interior molded door skins used in |
| 11:59:57AM | 13 | the United States, so we're talking about capacity to make |
| 12:00:00PM | 14 | those door skins, and that's what we need to track.  We can |
| 12:00:06PM | 15 | look at Jeld-Wen, and we can look at Masonite.  Those are the |
| 12:00:08PM | 16 | companies.  We know more about Jeld-Wen.  So capacity to make |
| 12:00:13PM | 17 | interior molded door skins. |
| 12:00:14PM | 18 | Q    Just, again, to make sure we're all clear on this, let's |
| 12:00:18PM | 19 | take the Towanda plant that we've all heard about.  That has a |
| 12:00:22PM | 20 | capacity to make 25 million door skins a year.  You're aware of |
| 12:00:26PM | 21 | that? |
| 12:00:26PM | 22 | A    Okay.  I appreciate you giving me the number. |
| 12:00:29PM | 23 | Q    Okay.  So when we're talking about capacity, we're talking |
| 12:00:32PM | 24 | about how many door skins can Jeld-Wen's or Masonite's |
| 12:00:35PM | 25 | factories make; is that fair? |

Shapiro - Direct

| | | |
|---|---|---|
| 12:00:37PM | 1 | A    Yeah.  I think probably the term, it's how much can you |
| 12:00:41PM | 2 | make before you just can't make any more, and usually in |
| 12:00:45PM | 3 | manufacturing industries, there's something called a nameplate |
| 12:00:48PM | 4 | capacity which is like -- but you can't really operate at |
| 12:00:51PM | 5 | 100 percent.  So we'll be looking at realistic capacity of |
| 12:00:55PM | 6 | these plants, door skin facilities including Towanda and |
| 12:01:01PM | 7 | including Dodson. |
| 12:01:02PM | 8 | Q    As we look at this slide here in front of us of housing |
| 12:01:05PM | 9 | starts, did this increased demand for door skins exceed the |
| 12:01:09PM | 10 | available capacity? |
| 12:01:11PM | 11 | A    No.  So in a general picture, the way I -- what I would |
| 12:01:17PM | 12 | communicate, I believe, is there's -- throughout this whole |
| 12:01:19PM | 13 | period, since 2009, there's been plenty of available capacity |
| 12:01:25PM | 14 | to make door skins in North America.  That's, in part, because |
| 12:01:31PM | 15 | demand was so much higher back in 2005. |
| 12:01:33PM | 16 | You saw that picture, if you go back one, if you can do |
| 12:01:38PM | 17 | that, so the industry was able -- was tight then.  I can't |
| 12:01:45PM | 18 | remember exactly how tight, but that was two million houses a |
| 12:01:49PM | 19 | year, housing starts in 2005. |
| 12:01:52PM | 20 | With the recovery we've talked about now, we're up to more |
| 12:01:56PM | 21 | than half of that but not much more than half.  So there's |
| 12:02:00PM | 22 | still plenty of capacity, and that's what we find when we look |
| 12:02:04PM | 23 | at the situation in 2012, '13, '14.  So we measure capacity |
| 12:02:11PM | 24 | utilization which is how much are you producing compared to how |
| 12:02:20PM | 25 | much -- your capacity, and it's that ratio. |

Shapiro - Direct

| | | |
|---|---|---|
| 12:02:23PM | 1 | You can see the red at the top.  So the 100 percent would |
| 12:02:26PM | 2 | be the nameplate capacity, but that's not practical.  We have |
| 12:02:34PM | 3 | evidence that for these plants -- |
| 12:02:36PM | 4 | Q    Let me make sure the jury is clear about the red line on |
| 12:02:39PM | 5 | top.  What you are saying there is that if Jeld-Wen and |
| 12:02:43PM | 6 | Masonite ran their plants to the maximum capacity utilization, |
| 12:02:47PM | 7 | they wouldn't use 100 percent of the manufacturing capacity but |
| 12:02:50PM | 8 | just 91 or 92 percent; is that what you are saying? |
| 12:02:54PM | 9 | A    Let me put it this way:  This is just about Jeld-Wen's |
| 12:02:57PM | 10 | here.  That's where we have the detailed data here.  That's on |
| 12:02:59PM | 11 | the vertical axis, Jeld-Wen capacity utilization.  So it's not |
| 12:03:05PM | 12 | realistic to achieve 100 percent as a practice. |
| 12:03:08PM | 13 | THE COURT:  In any plant. |
| 12:03:11PM | 14 | THE WITNESS:  As a group.  I don't have this broken |
| 12:03:14PM | 15 | down plant by plant, at least in my memory.  So the realistic |
| 12:03:22PM | 16 | effective maximum is around 91 or 92 percent.  This is what I |
| 12:03:27PM | 17 | understand from the company's documents. |
| 12:03:28PM | 18 | So if they were getting close to that level, then |
| 12:03:32PM | 19 | things would be really tight.  It might look like there's eight |
| 12:03:35PM | 20 | percent left, but it's not really available.  So that's the |
| 12:03:38PM | 21 | thing to look at, are they getting close to the 91 and |
| 12:03:42PM | 22 | 92 percent, and the data showed that they are not. |
| 12:03:47PM | 23 | In 2012, they were at 67 percent capacity |
| 12:03:51PM | 24 | utilization, so that left 24, 25 percent available.  And later, |
| 12:03:59PM | 25 | when we're trying to test to see whether things got really |

| | | |
|---|---|---|
| 12:04:02PM | 1 | tight, they are a little bit higher, 70 to 73, depending how |
| 12:04:09PM | 2 | you measure some of these things, but there's still quite a bit |
| 12:04:12PM | 3 | of available capacity, and that's what their documents indicate |
| 12:04:15PM | 4 | as well, during this later period, that they -- they generally |
| 12:04:19PM | 5 | took the view that there was quite a bit of available capacity |
| 12:04:26PM | 6 | still in the later period of time here. |
| 12:04:28PM | 7 | Q    So in your opinion, in view of the available capacity that |
| 12:04:33PM | 8 | existed in both 2012 and 2016, is it your opinion that |
| 12:04:40PM | 9 | increased demand does or does not explain the price increases |
| 12:04:44PM | 10 | that we're seeing? |
| 12:04:45PM | 11 | A    So I am concluding that increase in demand does not |
| 12:04:49PM | 12 | explain the price increase.  I would have -- if I had seen very |
| 12:04:54PM | 13 | tight capacity, then that might have been an explanation, but I |
| 12:04:57PM | 14 | didn't see that.  So I can rule out increased demand as a cause |
| 12:05:01PM | 15 | of the prices going up. |
| 12:05:03PM | 16 | Q    So now that you've looked at the potential alternative |
| 12:05:07PM | 17 | explanations for price increases, in your opinion, what caused |
| 12:05:12PM | 18 | the Jeld-Wen prices for door skins to go up after the 2012 |
| 12:05:16PM | 19 | merger? |
| 12:05:17PM | 20 | A    So at this point, we've seen that prices did go up.  We've |
| 12:05:22PM | 21 | ruled out the other explanations that seem possible, and so we |
| 12:05:27PM | 22 | are back to the merger as the cause as we were so suspecting |
| 12:05:33PM | 23 | from earlier in the analysis based on the market concentration. |
| 12:05:36PM | 24 | Q    All right.  So now let's look at the remaining competitor |
| 12:05:43PM | 25 | to Jeld-Wen after the merger, and that is Masonite.  Did you |

Shapiro - Direct

978

12:05:49PM   1   examine Masonite's behavior after the merger?

12:05:52PM   2   A    Yes, I did.

12:05:53PM   3   Q    Why did you look at what Masonite was doing after the

12:05:56PM   4   merger?

12:05:57PM   5   A    Because I'm interested in what happened to the competition

12:06:00PM   6   in this market, and we spent a lot of time on one of the

12:06:04PM   7   suppliers, Jeld-Wen, but I also want to look at the other

12:06:07PM   8   supplier.  Just like I'm interested in all the customers, I'm

12:06:10PM   9   interested in all the suppliers to understand the market.  We

12:06:13PM  10   have one other supplier here, Masonite.  So we got to look at

12:06:16PM  11   them.

12:06:17PM  12   Q    Have you heard of the term incentives or economic

12:06:21PM  13   incentives used in connection with antitrust economics that you

12:06:25PM  14   work on?

12:06:26PM  15   A    It's a primary part of what we do.  We study how -- the

12:06:32PM  16   incentives firms have.  That is, we assume they're out to make

12:06:36PM  17   money, and what does that mean in terms of their pricing, in

12:06:39PM  18   terms of their other conduct.  That's the main approach that

12:06:43PM  19   antitrust economists take to the whole exercise.

12:06:45PM  20   Q    And did you look into how Jeld-Wen's acquisition of CMI

12:06:51PM  21   affected Masonite's incentives to compete?

12:06:54PM  22   A    Yes, I did.

12:06:55PM  23   Q    And in what ways could the merger affect Masonite's

12:07:00PM  24   competition with Jeld-Wen?

12:07:01PM  25   A    Well, antitrust economists, we generally categorize things

Shapiro - Direct

12:07:08PM   1   into two buckets to answer the question.  First, Masonite --

12:07:13PM   2   after the merger, they realized they only have one competitor

12:07:17PM   3   now, Jeld-Wen, instead of two.  So that changes their

12:07:21PM   4   incentives, just like I said Verizon might not compete as hard

12:07:26PM   5   if T-Mobile has been acquired by AT&T.

12:07:29PM   6        The same thing here, Masonite might not have an incentive

12:07:33PM   7   to compete as hard because they only have one competitor since

12:07:36PM   8   CraftMaster has been acquired.  So that three-to-two dynamic,

12:07:40PM   9   Masonite is very aware of it as well, and it affects what they

12:07:43PM  10   do.

12:07:43PM  11   Q    You said there was two ways that you looked at it.  I take

12:07:46PM  12   it that was one of the ways.  What's the other way that you

12:07:48PM  13   looked at how the merger might affect Masonite's competition

12:07:52PM  14   with Jeld-Wen?

12:07:52PM  15   A    The other concern we have when markets get concentrated is

12:07:56PM  16   that the firms will engage in some sort of coordination, and

12:07:59PM  17   that's a bad thing as we use the term.  That is, instead of

12:08:03PM  18   competing, the remaining firms, here, Jeld-Wen and Masonite,

12:08:07PM  19   will pull their punches, will signal to each other.

12:08:12PM  20        In the extreme case, which I'm not saying happened here,

12:08:16PM  21   extreme case you could have firms engage in some sort of

12:08:19PM  22   conspiracy or illegal conduct to set price, but falling short

12:08:23PM  23   that, they might just compete less vigorously with each other.

12:08:28PM  24   We call this coordinated effects, and it's long been one of the

12:08:31PM  25   major concerns with markets that are highly concentrated.  The

| | |
|---|---|
| 12:08:35PM | 1 |

firms would just be aware that it's better for both of them not

to compete very much and find a way not to do so.

Q    All right.  So in order -- the kind of coordination that

you were just referring to, does that require expressed direct

communication between, let's say, Jeld-Wen and Masonite?

A    No.  That would be some sort of communication, some

sort -- would be an extreme case of coordination, probably

would be illegal as I understand antitrust law.  I'm not

talking about that.  The other type of thing that can happen is

simply what we sometimes call tacit coordination or sometimes

call parallel accommodating conduct.

Basically, the firms watch each other, and so it might --

I have some customers, you have some customers, I won't go

after your customers, you don't go after my customers, and

we'll just let it sit like that, and if you start coming after

my customers I'm going to do the same, and you can see that can

kind of settle in.

That can happen with two firms.  It's much less likely if

there are five or six or ten firms, and that's why we worry

about concentration.  So there are a range of ways in which,

when you only have two firms, they can coordinate without any

express agreement or direct, you know, sort of shady

communication.  It's not what I'm talking about.

Q    So I think in one of your earlier answers, you used the

term signalling.  What does signalling mean to an antitrust

Shapiro - Direct

981

12:10:06PM   1    economist?

12:10:07PM   2    A    Well, in this context, take my example with the dividing

12:10:13PM   3    up customers, we call it, where you have your customers, I have

12:10:15PM   4    my customers. I might just say, you know, I'm -- I might make

12:10:20PM   5    a public announcement, I'm really happy with my customers, I'm

12:10:24PM   6    going to focus on them in my business activities; okay?

12:10:27PM   7    Well, you might get the message, okay, he's happy with

12:10:31PM   8    things. It might help to kind of live and let live situation,

12:10:34PM   9    so a communication that could facilitate this type of

12:10:38PM   10    coordination, we would call that a signal.

12:10:40PM   11    Q    How could a merger make it easier for the remaining

12:10:45PM   12    suppliers in the market to coordinate?

12:10:47PM   13    A    Well, simply because there's only two -- a smaller number

12:10:53PM   14    in general. I'm thinking the three to two, so it's -- if we

12:10:58PM   15    imagine this situation where we're not going aggressively after

12:11:02PM   16    each other's customers, if there's a third smaller player who

12:11:06PM   17    is picking away at the customers, I lose a customer.

12:11:09PM   18    Is it that third person, in which case, okay, I got to

12:11:12PM   19    deal with it, or is it you coming after my customers in which

12:11:15PM   20    case I have to go after your customers. I don't know if

12:11:17PM   21    there's a third player. So it's harder to pull off -- I don't

12:11:23PM   22    want to use that word. It's harder for this type of

12:11:26PM   23    coordinating behavior to stick if there are more players.

12:11:32PM   24    That's one of the main reasons we worry about

12:11:33PM   25    concentration and developed the whole Herfindahl index, was

982

12:11:38PM   1    based on just this type of logic, actually.  That's the

12:11:41PM   2    underlying theoretical -- theoretical underpinnings of that

12:11:43PM   3    index have to do with just this sort of oligopoly behavior.

12:11:49PM   4    Oligopoly means a market with just a few firms.

12:11:51PM   5    Q    If you want to look into whether coordination between

12:11:55PM   6    Jeld-Wen and Masonite increased after the merger, what kind of

12:11:59PM   7    evidence would you look for?

12:12:01PM   8    A    Well, I mean, we've already looked at prices, so the

12:12:06PM   9    concern, primary concern would be that prices would go up,

12:12:09PM   10   maybe because of coordination.  But you could also look at

12:12:12PM   11   whether there was this signalling going on and just were the

12:12:17PM   12   firms competing less, were they signalling each, and do prices

12:12:21PM   13   go up.  Those are the sort of things we're looking for.

12:12:24PM   14   Q    You have looked at evidence both from Jeld-Wen and

12:12:27PM   15   Masonite and Steves of what happened before the merger and

12:12:30PM   16   after the merger; correct?

12:12:31PM   17   A    Yes.

12:12:32PM   18   Q    Was Masonite and Jeld-Wen's conduct before the merger

12:12:37PM   19   consistent or inconsistent with coordination?

12:12:39PM   20   A    I don't see coordination before the merger.  So think of

12:12:46PM   21   the two episodes we went through before the merger.  Remember

12:12:50PM   22   the CARB episode where Jeld-Wen tried to raise the price, and

12:13:00PM   23   Steves managed to avoid that to a large degree by shifting

12:13:05PM   24   sales in a significant degree to Masonite.  So that's not

12:13:08PM   25   coordination, that's competition, and likewise in the

Shapiro - Direct                                                          983

12:13:11PM  1   competition to win Steves' business.  So those episodes were

12:13:16PM  2   illustrating competition.  That's not coordination.  I didn't

12:13:19PM  3   see coordination going on before the merger.

12:13:21PM  4   Q    And let's talk about after the merger.  Have you seen

12:13:24PM  5   evidence that's consistent with coordination after the merger?

12:13:27PM  6   A    I have.

12:13:28PM  7   Q    Let's look at some of that evidence.  Let me start with

12:13:31PM  8   this document.  How did this document inform your understanding

12:13:35PM  9   of coordination after the merger?

12:13:38PM  10  A    So this is May 2014.  We have Masonite making a public

12:13:44PM  11  statement that they will not sell molded door facings or door

12:13:49PM  12  skins to others in the North American space.  So they're

12:13:52PM  13  stating they're not going to be selling door skins to the

12:13:55PM  14  independent door manufacturers.

12:13:58PM  15  Q    And they're stating this publicly?

12:13:59PM  16  A    It's a public statement.

12:14:00PM  17  Q    Now, explain to the jury how this document informs your

12:14:03PM  18  understanding of coordination after the merger.

12:14:06PM  19  A    This is a document from Mr. Hachigian just a few days

12:14:11PM  20  after the previous one where he indicates he listened to that

12:14:16PM  21  call -- it was an earnings call, I think, or some sort of

12:14:19PM  22  public statement to analysts -- and he's listening to it, and

12:14:24PM  23  he's communicating to others within Jeld-Wen that he's taking

12:14:29PM  24  note of the statement that we highlighted on the Masonite not

12:14:34PM  25  selling door skins to other -- to independent door

Shapiro - Direct

12:14:38PM  1    manufacturers.

12:14:38PM  2    Q    So, to you, does this document show that Hachigian and

12:14:43PM  3    others at Jeld-Wen heard this message, the one that was stated

12:14:46PM  4    on May 8th?

12:14:47PM  5    A    Right.  So the first slide shows the message, the public

12:14:51PM  6    statement or message that Masonite sent.  The current slide

12:14:55PM  7    shows that message was received at Jeld-Wen.

12:14:58PM  8    Q    So now we're about a month later in June, and this

12:15:01PM  9    document is from their Laurel, Mississippi presentation.  Could

12:15:06PM  10   you say why this was relevant to your analysis of coordination?

12:15:09PM  11   A    So this is, again, a Masonite presentation or document, so

12:15:15PM  12   a reiteration, a repeating of the statement that they will not

12:15:19PM  13   sell door skins within the North American market.

12:15:24PM  14   Q    And then this document is now Mr. Hachigian on July 12th,

12:15:29PM  15   just a couple weeks after the Laurel presentation, sending that

12:15:34PM  16   presentation to Sam and Edward Steves.  How does this document

12:15:37PM  17   affect your analysis of coordination?

12:15:39PM  18   A    This indicates to me that Mr. Hachigian and Jeld-Wen are

12:15:48PM  19   taking note of this, what Masonite said, and introducing that

12:15:53PM  20   into their discussions with Steves where it's pretty plain to

12:15:59PM  21   me as an economist that the underlying point is Jeld-Wen has

12:16:06PM  22   more bargaining power, vis-a-vis Steves, because Masonite is

12:16:09PM  23   not so interested in selling to them.

12:16:11PM  24   Q    And then finally, then, this document, how does this

12:16:15PM  25   document relate to your assessment of coordination after the

Shapiro - Direct

985

12:16:19PM  1   merger?

12:16:20PM  2   A   So this is a document from Onex -- is that how you say

12:16:25PM  3   it? -- to Mr. Hachigian.  Also were there any discussions about

12:16:30PM  4   whether they might terminate their long-term agreement with

12:16:34PM  5   Steves, send a termination notice, and Masonite comes in.

12:16:39PM  6   They're noting -- at least this author here says, given what

12:16:47PM  7   Masonite has said, he's questioning whether Masonite would, in

12:16:52PM  8   fact, then be available to Steves given their statement that

12:16:55PM  9   they're not going to sell door skins in North America.

12:16:59PM  10  Q   Then, finally, just five days after this email, we have

12:17:03PM  11  this document, and how does this document affect your analysis

12:17:07PM  12  of coordination after the merger?

12:17:09PM  13  A   Well, this is the termination notice from Jeld-Wen to

12:17:14PM  14  Steves.  So in the context of a circumstance where Masonite has

12:17:20PM  15  indicated they're pulling back from selling door skins, and

12:17:25PM  16  that, I think, clearly gives Jeld-Wen the upper hand here, and

12:17:30PM  17  they've chosen to, at this point, send a notice of termination.

12:17:35PM  18  Q   So now putting all of these documents we just went through

12:17:38PM  19  together, how does Masonite's public announcements and

12:17:42PM  20  Jeld-Wen's conduct after those announcements affect your

12:17:47PM  21  analysis of whether the CMI/Jeld-Wen merger substantially

12:17:52PM  22  lessened competition?

12:17:53PM  23  A   So before the merger, Steves -- let's use them as an

12:17:58PM  24  example here of the customer -- they have three choices.  We

12:18:01PM  25  talked about that.  It went down to two.

Shapiro - Direct

| | | |
|---|---|---|
| 12:18:04PM | 1 | Now, when Masonite signals they're really not interested |
| 12:18:07PM | 2 | in selling, they say they're not going to sell -- we'll see |
| 12:18:11PM | 3 | they do a little sales, but they're clearly sending a signal |
| 12:18:13PM | 4 | we're not interested in making these sales.  Steves' choices |
| 12:18:18PM | 5 | have now narrowed, if you take that at face value, to one, |
| 12:18:22PM | 6 | Jeld-Wen.  And so that's a very dramatic lessening of |
| 12:18:26PM | 7 | competition, and so Masonite's behavior here is directly |
| 12:18:31PM | 8 | relevant for assessing the loss of competition that flowed from |
| 12:18:36PM | 9 | the merger. |
| 12:18:37PM | 10 | Q   All right, so you said that there was some small sales by |
| 12:18:42PM | 11 | Masonite of door skins after the merger.  Let's turn to that. |
| 12:18:45PM | 12 | Could you explain to the jury what this slide is showing. |
| 12:18:48PM | 13 | A   Yes.  So I would focus on the right-hand side, actually, |
| 12:18:55PM | 14 | since that's where we are really in the narrative, 2016.  By |
| 12:19:02PM | 15 | that time, Jeld-Wen had 95 percent of the sales of door skins |
| 12:19:09PM | 16 | to independent door manufacturers, external customers. |
| 12:19:12PM | 17 | So Masonite is still selling some, but it's a much smaller |
| 12:19:15PM | 18 | number.  The pie chart on the left is kind of a reminder of |
| 12:19:19PM | 19 | what things were like the year before the merger where |
| 12:19:23PM | 20 | CraftMaster was quite large in these sales. |
| 12:19:31PM | 21 | So my point of this is that I didn't just take as given |
| 12:19:37PM | 22 | Masonite said they were going to stop selling so they stopped |
| 12:19:40PM | 23 | selling.  I checked the data, and they did sell some, but you |
| 12:19:43PM | 24 | will see it's in a much more limited way, and we see that |
| 12:19:46PM | 25 | first, by looking at the data here, they're only making five |

Shapiro - Direct

12:19:50PM   1    percent.

12:19:50PM   2    Q    And I want to look at that five percent for a second.   Do

12:19:54PM   3    you recall, from your review of the evidence, what kinds of

12:19:57PM   4    sales and what kind of companies are actually comprising that

12:20:00PM   5    five percent?

12:20:01PM   6    A    I don't remember specifics.   I just know that if you -- go

12:20:05PM   7    back to those Masonite statements, they said they won't sell to

12:20:09PM   8    competition is what they're thinking.   So they're trying to

12:20:12PM   9    sell to companies that they don't see are really competing as

12:20:15PM  10    directly with them in the sale of doors.

12:20:17PM  11    Q    Do you recall that some of those customers, for example,

12:20:20PM  12    made closet doors?

12:20:21PM  13    A    That sounds right.

12:20:22PM  14    Q    All right.   So the jury has seen video testimony of Fred

12:20:29PM  15    Lynch, the CEO of Masonite, and I've put up just a little bit

12:20:34PM  16    of what the jury heard.   Does this testimony affect your

12:20:38PM  17    analysis in any way?

12:20:40PM  18    A    Yes.   Well, this confirms that the -- the change in

12:20:46PM  19    behavior at -- excuse me, at Masonite, from competing to get

12:20:51PM  20    Steves' business under a long-term agreement in 2011, and they

12:20:55PM  21    were no longer interested in that four years later.

12:20:58PM  22    Q    Is it your understanding that this five percent little

12:21:01PM  23    slice we have here of Masonite does not include sales under any

12:21:05PM  24    long-term supply agreements?

12:21:07PM  25    A    That is my understanding as I remember it right now.

988

| 12:21:10PM | 1 | Q    So if it's not a long-term supply agreement, then do you |

12:21:10PM 1  Q    So if it's not a long-term supply agreement, then do you
12:21:14PM 2  understand it's on a, quote, spot basis?
12:21:16PM 3  A    Yes.  That's more of the term for somebody comes with an
12:21:22PM 4  order, and you give a price and you fill it, or you may don't
12:21:25PM 5  fill.  That's what he's saying here.  He says they will
12:21:29PM 6  consider orders, and they may or may not fill them.
12:21:32PM 7       So this is a pretty big change in their behavior in that
12:21:37PM 8  -- I think you've seen evidence -- I've certainly seen evidence
12:21:40PM 9  -- that Steves, it's very important to them to have an assured
12:21:43PM 10 long-term source of supply of door skins.
12:21:46PM 11      Spot purchases, yes, they make them sometimes, but -- the
12:21:50PM 12 other independent door manufacturers make them sometimes, but
12:21:54PM 13 it's very desirable to have a long-term agreement, and Masonite
12:21:57PM 14 is not -- no longer going for that, no longer competing for
12:22:01PM 15 that.  That's a significant change and loss of competition.
12:22:05PM 16 Q    So when -- let's look at the prices that Masonite was
12:22:09PM 17 charging when it chose to fill a spot order as Mr. Lynch says
12:22:14PM 18 here.  Have you looked at this document in connection with your
12:22:17PM 19 studying an analysis of the merger?
12:22:19PM 20 A    Yes.  So you see the title Masonite Pricing After the
12:22:23PM 21 Merger.  It's a January 1, 2015, price list, as usual,
12:22:29PM 22 different types of door skins and different sizes, and I was
12:22:34PM 23 able to compare these prices with the prices that Masonite had
12:22:39PM 24 offered before the merger, and they are substantially higher.
12:22:43PM 25      The amount -- it varies from type of door skin to type,

Shapiro - Direct

| | |
|---|---|
| 12:22:48PM | 1 | but that's the range there.  They are 27 to 225 percent higher. |
| 12:22:53PM | 2 | So when they're willing to fill orders in the later period |
| 12:22:58PM | 3 | here, they were also charging a lot more.  So the whole |
| 12:23:03PM | 4 | discussion about did prices go up after the merger, we spent a |
| 12:23:07PM | 5 | long time talking about Jeld-Wen prices, but we can also see |
| 12:23:10PM | 6 | Masonite's prices went up substantially as well.  This shows |
| 12:23:14PM | 7 | that. |
| 12:23:15PM | 8 | Q    All right.  So let's go back to the industry structure |
| 12:23:18PM | 9 | after the merger.  In your view as an economist, does Masonite |
| 12:23:24PM | 10 | have an economic incentive to pull back from competing in the |
| 12:23:28PM | 11 | door skin market? |
| 12:23:29PM | 12 | A    Yes.  So one of the things that might seem odd is Masonite |
| 12:23:37PM | 13 | announcing we're not going to sell these door skins anymore. |
| 12:23:41PM | 14 | Just take that announcement.  Why would a company stop selling |
| 12:23:46PM | 15 | something they're making a profit on?  What's going on?  What |
| 12:23:49PM | 16 | sense does that make?  And a big part of it is that they're |
| 12:23:53PM | 17 | thinking about the profits from doors, and so they understood |
| 12:24:01PM | 18 | that if -- they might make less money selling some door skins |
| 12:24:06PM | 19 | but more than make it up on selling doors. |
| 12:24:08PM | 20 | So that's why it would -- could make sense, and, here, did |
| 12:24:12PM | 21 | apparently, from Masonite's point of view, make sense to pull |
| 12:24:15PM | 22 | back from selling door skins and look to make more money |
| 12:24:19PM | 23 | selling doors.  Otherwise, it's just odd.  Why would a company |
| 12:24:22PM | 24 | just withdraw like that?  But we have a very good reason here |
| 12:24:25PM | 25 | that is clearly consistent with their own economic incentives. |

Shapiro - Direct

| | | |
|---|---|---|
| 12:24:29PM | 1 | Q    Have you seen evidence showing that Masonite realized that |
| 12:24:34PM | 2 | it had this economic incentive? |
| 12:24:36PM | 3 | A    Well, yes.  Here we have an indication of Masonite's |
| 12:24:42PM | 4 | recognizing.  In the highlighted portion -- |
| 12:24:48PM | 5 | Q    Let me step back.  Can you explain to the jury what this |
| 12:24:53PM | 6 | C.L. King Conference is and who is speaking here? |
| 12:24:56PM | 7 | A    So this is another document that we have based on what |
| 12:25:01PM | 8 | Masonite executives were saying to investors. |
| 12:25:05PM | 9 | Q    Could you explain to the jury why the sentence that's |
| 12:25:08PM | 10 | highlighted here supports your opinions regarding Masonite's |
| 12:25:13PM | 11 | economic incentives? |
| 12:25:14PM | 12 | A    Right.  So this is during a period of time when Masonite |
| 12:25:18PM | 13 | becomes aware that Jeld-Wen has sent this termination notice to |
| 12:25:22PM | 14 | Steves, or is considering it, and they're trying to figure out |
| 12:25:28PM | 15 | what impact will that have on us, Masonite.  They're talking to |
| 12:25:31PM | 16 | their investors, and they're saying if Jeld-Wen is successful |
| 12:25:35PM | 17 | in terminating Steves and some of the other regionals, that's |
| 12:25:38PM | 18 | what we're calling independent door manufacturers, 20 percent |
| 12:25:41PM | 19 | of the marketplace is potentially up for a share grab |
| 12:25:44PM | 20 | effectively between two large players. |
| 12:25:47PM | 21 | So that is they're recognizing if the independents have |
| 12:25:51PM | 22 | trouble getting door skins, can't make as many doors, that |
| 12:25:57PM | 23 | makes more door sales for the two large players, Jeld-Wen and |
| 12:26:01PM | 24 | Masonite, to pick up more money selling doors.  So they |
| 12:26:06PM | 25 | clearly understand -- I mean, the economic incentive I |

Shapiro - Direct

12:26:09PM  1   identified, they get it, and then they happen to add -- in

12:26:12PM  2   thinking about this, they say, if Jeld-Wen terminates Steves

12:26:15PM  3   and the other guys, we're going to get more door sales, and the

12:26:19PM  4   last part here said, well, they're -- maybe Steves will find

12:26:23PM  5   another way to get the door skins.  They're saying, but, no, it

12:26:27PM  6   will be very difficult for Steves to import product, door

12:26:32PM  7   facings specifically.

12:26:33PM  8       So they're thinking, what's Steves going to do.  If

12:26:37PM  9   Jeld-Wen terminates them, they can't get door skins, they're

12:26:40PM  10  saying they're going to have some trouble, Masonite expects to

12:26:45PM  11  pick up sales, and Steves won't be able to solve the problem

12:26:48PM  12  through imports because it's very hard.

12:26:51PM  13      That's how they see it.  Also how I see it, okay?  The

12:26:57PM  14  incentives are clearly there for Masonite in terms of grabbing,

12:27:00PM  15  their word, but picking up more share of doors, and they've

12:27:04PM  16  specifically considered counterstrategies by Steves and imports

12:27:08PM  17  being very difficult, whatever the word is, very difficult.

12:27:11PM  18  Q   All right.  So now let's go back to your three-step

12:27:18PM  19  analysis.  I think we've now finished step two; is that

12:27:22PM  20  correct, Professor Shapiro?

12:27:23PM  21  A   I hope so.

12:27:24PM  22  Q   So let's go --

12:27:26PM  23  A   I think we have.

12:27:27PM  24  Q   -- to step three.  So after you've looked at the last five

12:27:33PM  25  years and what's actually happened in the last five years, what

Shapiro - Direct

12:27:36PM   1    did you do next?

12:27:37PM   2    A   So far, this analysis indicates that there has been harm

12:27:43PM   3    to the independent door manufacturers, lessened competition

12:27:47PM   4    over the past five years resulting from the merger.  Next

12:27:50PM   5    question is, is that going to continue, or will something

12:27:53PM   6    change in the future so that won't -- that these effects will

12:27:58PM   7    not continue.  That's the next question.

12:28:00PM   8    Q   So how did you go about evaluating whether this merger is

12:28:05PM   9    likely to harm competition in the future?

12:28:07PM   10    A   So this is what we would generally -- antitrust economists

12:28:10PM   11    call analysis of entry, because the big question now is, will

12:28:14PM   12    other suppliers come in to save the day, will there be new

12:28:19PM   13    choices that will be available to Steves or other independent

12:28:21PM   14    door manufacturers.  Since the three choices went to two and

12:28:26PM   15    it's not looking good, can they turn somewhere else.  So entry,

12:28:30PM   16    a new supplier.  So that's what we want to look into next.

12:28:34PM   17    Q   All right.  And what new sources of supply did you

12:28:38PM   18    consider?

12:28:39PM   19    A   So, basically, you build it or you buy it; okay?  You can

12:28:44PM   20    -- potentially Steves, or others, could build a door skin

12:28:50PM   21    plant, so they would get their own supply that way.

12:28:54PM   22    Alternatively, they could import, because there are production

12:28:57PM   23    facilities elsewhere in the world.

12:28:59PM   24    Q   And so the reason why you're looking at these options is

12:29:02PM   25    to figure out if something is going to happen in the future to

Shapiro - Direct

12:29:05PM  1    restore the competition that was lost when CMI was acquired;

12:29:09PM  2    correct?

12:29:09PM  3    A    Yes, that's right.  I think the words I like are will this

12:29:15PM  4    possible entry restore competition to where it was before the

12:29:18PM  5    merger, or will it cure the problems, is another way to think

12:29:23PM  6    about it, that the merger caused in terms of reduced

12:29:25PM  7    competition.

12:29:26PM  8    Q    So how does an economist evaluate whether a new potential

12:29:30PM  9    supply option will restore competition in a market?

12:29:33PM  10   A    So we have a three-part test that we use in thinking about

12:29:38PM  11   possible entry.  In order to restore competition, the entry has

12:29:44PM  12   to be timely, likely, and sufficient to -- for that purpose.

12:29:51PM  13        So there's these three things we look at:  Can it happen

12:29:56PM  14   soon enough, is it pretty likely to happen, and will it be

12:30:00PM  15   enough to make up for the fact that the company was acquired.

12:30:03PM  16   So those are our three tests, and that's where we're going to

12:30:07PM  17   go, and we could apply that way of thinking to building or

12:30:11PM  18   importing.  The test could apply to any type of entry.  We've

12:30:16PM  19   got two that we're considering here.

12:30:17PM  20   Q    At the end of step two of your analysis, just back up a

12:30:22PM  21   slide, so at the end of this step, you concluded that the

12:30:26PM  22   merger has already harmed competition; correct?

12:30:29PM  23   A    That's right.

12:30:30PM  24   Q    So how does this consideration of new options, how does

12:30:37PM  25   that affect the fact that the merger has already harmed

Shapiro - Direct

994

12:30:40PM   1   competition?

12:30:40PM   2   A    So from my point of view, I already know the answer that

12:30:45PM   3   the merger has caused a substantial lessening of competition in

12:30:50PM   4   the market for interior molded door skins used in the United

12:30:54PM   5   States.  The question, to me -- an additional question is will

12:30:57PM   6   that harm continue.  The fact that entry hasn't solved the

12:31:02PM   7   problem for five years so far makes me kind of skeptical, I

12:31:08PM   8   guess I would say, that it's going to solve the problem in the

12:31:11PM   9   future.

12:31:12PM   10        Now, it's possible, and we need to look at that, but we do

12:31:17PM   11   already have five years of experience, and entry has not, by

12:31:21PM   12   any means, solved the problem so far.

12:31:24PM   13   Q    By entry, you mean no one has built a new door skin plant

12:31:27PM   14   in the United States since 2012; correct?

12:31:30PM   15   A    Right.  So the two types of entry, nobody has built a new

12:31:34PM   16   door skin facility, and nor are imports coming in in

12:31:41PM   17   significant volumes in a way that would have prevented these

12:31:45PM   18   price increases.  It hasn't happened.

12:31:47PM   19   Q    So how did you go about analyzing whether building a door

12:31:52PM   20   skin plant was a realistic option going forward?

12:31:55PM   21   A    So never having built one myself, you basically turn to

12:32:00PM   22   the people in the industry.  The first thing an economist looks

12:32:04PM   23   at is, have plants been built recently, what's involved, how

12:32:09PM   24   long does it take, how much money.  Basically you look at what

12:32:12PM   25   the industry experts know about this from actual real-world

Shapiro - Direct

995

12:32:18PM    1    experience.  That's the first thing I did on the building side.

12:32:20PM    2    Q    When you say industry experts at building door skin

12:32:24PM    3    plants, who are the people in the industry who have experience

12:32:27PM    4    building door skin plants?

12:32:29PM    5    A    Well, we're talking North America now, the United States,

12:32:33PM    6    and we're talking about Jeld-Wen and Masonite.  Of course,

12:32:36PM    7    CraftMaster did have experience, but they're part of Jeld-Wen

12:32:38PM    8    now.  So the two of them.  They're the ones who have built and

12:32:42PM    9    owns these facilities, so we want to look to see what their

12:32:46PM   10    experience is doing that.

12:32:47PM   11    Q    So what did you learn when you looked at Jeld-Wen's

12:32:51PM   12    information regarding how easy or difficult it would be to

12:32:55PM   13    build a door skin plant?

12:32:57PM   14    A    So this is a slide deck from Jeld-Wen, barriers to entry.

12:33:03PM   15    They're talking about difficulties that somebody would have to

12:33:07PM   16    enter into the production of door skins, the very question

12:33:12PM   17    we're asking about, and we've highlighted some of the elements

12:33:16PM   18    here, significant capital investment.

12:33:21PM   19         The ones that I would highlight especially would be

12:33:25PM   20    technically challenging equipment, steep learning curve.  Those

12:33:29PM   21    are indications, to me, that in addition to getting the money

12:33:34PM   22    together, there's a lot of uncertainty and challenges.  It's

12:33:38PM   23    hard to do.  And it's even hard for the people who have done it

12:33:42PM   24    already, even harder for a company that's not done it before.

12:33:45PM   25    Q    And you understand Steves to be a company that has not

Shapiro - Direct

12:33:49PM  1    done it before?

12:33:50PM  2    A    They have not.

12:33:50PM  3    Q    So Jeld-Wen is one of those companies that has experience

12:33:54PM  4    building door skins plants; right?

12:33:56PM  5    A    Quite a bit.

12:33:57PM  6    Q    And are you aware that they have recently built a door

12:34:03PM  7    skin plant in the United States?

12:34:03PM  8    A    So that would be the next place, as I said, to look, at

12:34:06PM  9    actual plants that have come online or been built recently,

12:34:10PM  10   what happened, and so they have the Dodson facility in

12:34:12PM  11   Louisiana is their most recent addition, so very useful to look

12:34:17PM  12   at what happened there.

12:34:18PM  13   Q    And so the jury heard yesterday from Mr. Fedio about the

12:34:22PM  14   various problems that Jeld-Wen has experienced with Dodson and

12:34:26PM  15   from other witnesses as well.  Did Jeld-Wen's experience with

12:34:30PM  16   Dodson give you any information on whether building a new plant

12:34:35PM  17   would be a timely, likely, and sufficient opportunity to

12:34:37PM  18   restore competition?

12:34:39PM  19   A    Yes, I think it's highly relevant.  The main thing I take

12:34:43PM  20   away from the experience there was it took a long time.  Takes

12:34:50PM  21   many years to build, and even after you get it operating, it's

12:34:55PM  22   difficult to get it operating smoothly, the learning curve, the

12:34:59PM  23   technical challenge environment, and we're showing you here a

12:35:04PM  24   slide from Jeld-Wen about a year or so after Dodson has opened,

12:35:09PM  25   and they're experiencing a 40 percent scrap rate as well as

Shapiro - Direct

997

| | | |
|---|---|---|
| 12:35:13PM | 1 | some other gluing issues, but the scrap rate, my understanding |
| 12:35:18PM | 2 | is that's basically the percentage of products -- they're not |
| 12:35:23PM | 3 | good enough to be shipped and used.  That's very problematic |
| 12:35:30PM | 4 | even a year out.  So that's their experience. |
| 12:35:34PM | 5 | Q    Do you know if Jeld-Wen has fixed its problems at Dodson |
| 12:35:39PM | 6 | by 2017? |
| 12:35:41PM | 7 | A    Well, you can see here, according to Mr. Fedio -- this is |
| 12:35:44PM | 8 | from July of last year -- he still doesn't regard it as |
| 12:35:47PM | 9 | satisfactory. |
| 12:35:48PM | 10 | Q    Did you also look at Masonite's documents to evaluate |
| 12:35:52PM | 11 | whether building a new door skin plant is a timely, likely, and |
| 12:35:56PM | 12 | sufficient alternative here? |
| 12:35:57PM | 13 | A    Yes, I did. |
| 12:35:58PM | 14 | Q    And let's look -- do you recall this being the Laurel |
| 12:36:02PM | 15 | presentation? |
| 12:36:02PM | 16 | A    Yes, that's correct. |
| 12:36:03PM | 17 | Q    And did you consider this document as you evaluated the |
| 12:36:06PM | 18 | possibility of building a door skin plant? |
| 12:36:08PM | 19 | A    I did. |
| 12:36:09PM | 20 | Q    So let's turn to the -- what is this page -- this is a |
| 12:36:13PM | 21 | page from that presentation; correct? |
| 12:36:15PM | 22 | A    Yes.  And if you see up at the top, it says residential |
| 12:36:19PM | 23 | interior door facings, so we're talking about the door skins, |
| 12:36:23PM | 24 | and they're specifically asking the very same question I'm |
| 12:36:26PM | 25 | interested in, what would it take for new entrants to come into |

12:36:29PM 1    the market.  So I'm very interested in what they think about

12:36:33PM 2    that.

12:36:34PM 3         Again, market entry is here up at the top, and at the

12:36:38PM 4    bottom I've highlighted for you one of their takeaways here,

12:36:43PM 5    each step of production poses unique challenges.  And they've

12:36:48PM 6    got some details on that, what's behind that.  So they are

12:36:52PM 7    certainly emphasizing here that this is challenging, there are

12:36:57PM 8    technical difficulties of various sorts.

12:37:01PM 9    Q    As well as the cost of building it which is reflected on

12:37:04PM 10   this slide; correct?

12:37:05PM 11   A    Yes.  I think it's not disputed that it costs these --

12:37:10PM 12   these facilities cost 100 to 150 million -- it says there per

12:37:15PM 13   line.  Total cost depends on how big a facility you build, but

12:37:19PM 14   this is the range they're talking about, and that's -- at the

12:37:21PM 15   upper end of that is the range Jeld-Wen experienced for Dodson.

12:37:24PM 16   Q    As Masonite is using the term entry here, you understand

12:37:28PM 17   this to be saying, this is what it would cost someone to be a

12:37:32PM 18   meaningful entrant into the market?

12:37:35PM 19   A    I'd have to check their slides.  I'm not exactly sure.

12:37:38PM 20   Q    Let's go to the next slide.  You also reviewed this slide

12:37:42PM 21   as part of your analysis of building a door skin plant;

12:37:45PM 22   correct?

12:37:45PM 23   A    Right.  So this is the same deck, and this is confirmed in

12:37:53PM 24   other information.  It takes four years or so, and they explain

12:37:55PM 25   why, and they talk about the production hurdles, again the

12:37:58PM  1    technical challenges.

12:38:00PM  2        So I'm seeing that quite consistently from both two

12:38:04PM  3    suppliers, what's involved.  It's quite a bit of money, takes

12:38:07PM  4    time, and it's technically challenging.

12:38:10PM  5    Q    Now, do you know or have you seen any evidence as to

12:38:13PM  6    whether Steves has been exploring an option of building a new

12:38:17PM  7    door skin plant?

12:38:17PM  8    A    I have.

12:38:18PM  9    Q    Given that building a new door skin plant is both

12:38:21PM  10   expensive and very challenging, did it surprise you to see

12:38:25PM  11   Steves exploring this option?

12:38:26PM  12   A    No, not at all.

12:38:28PM  13   Q    Why not?

12:38:29PM  14   A    Well, Steves is in a tough spot.  They've been terminated

12:38:34PM  15   by Jeld-Wen.  Masonite has indicated they're not interested in

12:38:38PM  16   a long-term agreement.  It's completely predictable Steves

12:38:43PM  17   would be exploring alternative options for getting door skins.

12:38:49PM  18       In fact, we'll talk about imports as well.  They're

12:38:52PM  19   exploring that, too.  So I'm not at all surprised.  They've

12:38:57PM  20   been doing that for awhile.  It would seem completely, again,

12:39:02PM  21   predictable that the company, in circumstances they're in,

12:39:05PM  22   would do that.

12:39:05PM  23   Q    So based on all the evidence that you've seen in this

12:39:08PM  24   case, do you think that a new door skin plant is likely to be a

12:39:12PM  25   timely, likely, and sufficient entrant for a supply source for

Shapiro - Direct

12:39:17PM  1   independent door skin customers?

12:39:19PM  2   A    No, I don't think it is.  I mean, the timeliness, it still

12:39:23PM  3   takes four years, even if you pushed the button to start that

12:39:26PM  4   today, which is a long time.  And likelihood -- you know, I

12:39:34PM  5   haven't seen convincing analysis that this is all going to

12:39:38PM  6   work, all the pieces you have to do, all the hurdles you have

12:39:42PM  7   to clear.  I'm not saying it can't happen.  It's just if we're

12:39:45PM  8   trying to peer into the future, this is a tough path to take.

12:39:48PM  9   Q    All right.  So let's move on to importing door skins, the

12:39:57PM  10  other option that you looked into.  Are foreign imports of door

12:40:02PM  11  skins a timely, likely, and sufficient choice for independent

12:40:06PM  12  door manufacturers?

12:40:07PM  13  A    I don't think they are either, no.

12:40:10PM  14  Q    What evidence have you seen about the possibility of

12:40:13PM  15  foreign imports replacing all of the choices in competition

12:40:17PM  16  lost when CMI was acquired?

12:40:19PM  17  A    Well, I think it's important to remember that we're asking

12:40:24PM  18  will the possibility of imports cure the competitive problem,

12:40:28PM  19  restore competition to where it was when there were three

12:40:31PM  20  players instead of two.  And so I've looked at evidence -- with

12:40:36PM  21  that question in mind, looking at what I can, learn what I can

12:40:42PM  22  about imports which includes Steves' efforts to explore various

12:40:47PM  23  import options and what they might be able to achieve in that

12:40:52PM  24  regard and what the limitations are.

12:40:53PM  25  Q    If I can, quickly go back to slide 59 to remind the jury

Shapiro - Direct

12:40:58PM  1    of what Masonite said publicly about foreign imports.  How does

12:41:05PM  2    Masonite's views of whether foreign imports would work affect

12:41:10PM  3    your opinions about whether foreign imports really can replace

12:41:15PM  4    CMI?

12:41:15PM  5    A    Well, they're the other supplier here who knows the market

12:41:19PM  6    very well.  They say it's very difficult.  There's not a lot of

12:41:22PM  7    detail here behind that, but that's significant, and they seem

12:41:26PM  8    to have -- in saying that, they're saying that in the context

12:41:29PM  9    of, we think we're going to pick up some door sales here

12:41:33PM  10   because imports are difficult.  So they're relating it to their

12:41:36PM  11   own business.  I think it's worthy of attention.

12:41:38PM  12   Q    So now let's go back, if we can, skip through some slides

12:41:43PM  13   here and get me back to where we were.  Let's look at Steves

12:41:48PM  14   efforts to -- in looking at foreign imports.  If you can

12:41:51PM  15   explain to the jury what this slide is showing.

12:41:55PM  16   A    This slide depicts the idea that out of about 20 or so

12:42:00PM  17   different designs that Steves uses and gets door skins to make

12:42:10PM  18   these doors, as I understand it, only three are available that

12:42:15PM  19   they've been able to identify, at least through the Teverpan

12:42:18PM  20   discussions they've had, and that's a real problem for them.

12:42:23PM  21   That's a limited product line.  It's a limitation on imports in

12:42:28PM  22   terms of what they've been able -- what they're considering

12:42:32PM  23   right now.

12:42:33PM  24        This goes to the sufficiency part.  Remember I said

12:42:37PM  25   timely, likely, sufficient.  This is a real limitation, how the

Shapiro - Direct                                         1002

12:42:43PM   1   imports do not appear to be adequate to replace the competition

12:42:47PM   2   that was lost from the merger.  Even if figure, all right,

12:42:51PM   3   they'll go to Teverpan or some others, they'll import some door

12:42:54PM   4   skins, they'll do what they can with that, it does not seem

12:42:58PM   5   sufficient to cure the problem and replace the competition.

12:43:01PM   6   That's the question I have in mind.

12:43:03PM   7   Q    So here we're seeing three out of 20 designs.  You

12:43:07PM   8   understand that each of these designs comes in a whole range of

12:43:10PM   9   heights and widths; correct?

12:43:12PM  10   A    Yes.  And I believe -- yes, I understand there's been some

12:43:16PM  11   evidence about as many as 477 different models that result when

12:43:21PM  12   you do the multiplications.

12:43:23PM  13   Q    And you understand that a very small number of those 477

12:43:26PM  14   are available from all of the foreign suppliers combined?

12:43:30PM  15   A    Well, it's going to be a fraction as you've only got these

12:43:34PM  16   three -- again, we're talking about here these three designs.

12:43:38PM  17   Q    So what have you concluded regarding the possibility that

12:43:42PM  18   a new supply option will counteract any of the continued harm

12:43:47PM  19   that was caused when Jeld-Wen acquired CMI?

12:43:51PM  20   A    So I don't think these new supply options or entry will

12:43:57PM  21   cure the problem going forward.  It hasn't happened so far, and

12:44:02PM  22   there are some serious questions and limitations on either the

12:44:07PM  23   building or the importing.  Again, I'm not saying there won't

12:44:12PM  24   be some of the imports.  I think there will be some, but it

12:44:16PM  25   doesn't seem sufficient.

Shapiro - Direct

| | | |
|---|---|---|
| 12:44:18PM | 1 | Q    All right.  So let's go back to where we started.  This is |
| 12:44:22PM | 2 | the question that you were asked to answer in your testimony |
| 12:44:26PM | 3 | today; correct? |
| 12:44:26PM | 4 | A    Yes, sir. |
| 12:44:28PM | 5 | Q    And we've been spending a lot of time talking about the |
| 12:44:31PM | 6 | substantial lessening of competition; correct? |
| 12:44:33PM | 7 | A    We have. |
| 12:44:34PM | 8 | Q    So I want to go to the last part of this question which |
| 12:44:37PM | 9 | is, in a relevant market; do you see that term? |
| 12:44:40PM | 10 | A    I do. |
| 12:44:41PM | 11 | Q    And as an antitrust economist, you are familiar with the |
| 12:44:45PM | 12 | term "relevant market"; correct? |
| 12:44:47PM | 13 | A    Very familiar. |
| 12:44:49PM | 14 | Q    In your analysis, did you consider whether door skin |
| 12:44:54PM | 15 | customers have choices other than buying interior molded door |
| 12:44:58PM | 16 | skins used in the United States? |
| 12:44:59PM | 17 | A    I did. |
| 12:45:00PM | 18 | Q    And what kind of choices did you consider? |
| 12:45:02PM | 19 | A    Well, I asked myself whether Steves and other |
| 12:45:08PM | 20 | manufacturers of interior molded doors could use some other |
| 12:45:13PM | 21 | input, if door skin prices became too high, as a substitute for |
| 12:45:19PM | 22 | using the door skins, and there's no alternative that they |
| 12:45:25PM | 23 | could turn to. |
| 12:45:26PM | 24 | Q    And how does your analysis of these kinds of alternatives |
| 12:45:29PM | 25 | relate to the question you are being asked to analyze in this |

Shapiro - Direct

12:45:32PM   1   case?

12:45:33PM   2   A     Well, in terms of defining a relevant market, what

12:45:38PM   3   antitrust economists do is we ask whether the products in that

12:45:43PM   4   market, if they were monopolized, would that lead to higher

12:45:48PM   5   prices than with competition, and if a monopoly with a higher

12:45:53PM   6   price would lead people to just buy something else, then we've

12:45:57PM   7   ignored an important choice, and that grouping of products

12:46:00PM   8   would not be a relevant market.

12:46:02PM   9       Let me give an example.  If you want to fly from here to

12:46:05PM  10   Chicago, we'd say, is airline service from Richmond to Chicago,

12:46:12PM  11   is that a relevant market.  You'd say, well, what would be the

12:46:15PM  12   choice to flying?  You could take a bus, you could drive, take

12:46:19PM  13   the train.  Not a very good substitute.  Takes a long time.  So

12:46:22PM  14   we would probably conclude, pretty sure, that airline flights

12:46:27PM  15   from Richmond to Chicago would be a relevant market.

12:46:31PM  16       That's a product we would want -- we would want to protect

12:46:35PM  17   competition in that.  You wouldn't be so happy if there were

12:46:36PM  18   only one airline flying that route.  It's better to have two or

12:46:40PM  19   three or more.

12:46:40PM  20       If you said, what about going from Richmond to Washington,

12:46:43PM  21   D.C., well, now, a lot more choices; right?  The train is a

12:46:48PM  22   pretty good choice, driving, so it might be looking at the

12:46:51PM  23   airlines would be too narrow a look.  That's the sort of

12:46:54PM  24   exercise we do.

12:46:55PM  25       In this case, it's very easy, because there's no good

Shapiro - Direct

| | | |
|---|---|---|
| 12:46:59PM | 1 | substitute for an interior molded door skin if you want to make |
| 12:47:02PM | 2 | an interior molded door which is the situation Steves and the |
| 12:47:05PM | 3 | others are finding themselves in.  That's the gist of it. |
| 12:47:07PM | 4 | Q    So you analyzed what the relevant market is in this case; |
| 12:47:12PM | 5 | correct? |
| 12:47:12PM | 6 | A    Yes. |
| 12:47:13PM | 7 | Q    And what was your conclusion? |
| 12:47:15PM | 8 | A    There it is.  I believe there is a relevant market for |
| 12:47:18PM | 9 | interior molded door skins used in the United States. |
| 12:47:21PM | 10 | Q    And what are the components of this market? |
| 12:47:24PM | 11 | A    Well, we always have a product component and a geographic |
| 12:47:28PM | 12 | component, and it's obvious what they are here.  The product is |
| 12:47:32PM | 13 | interior molded door skins, and the geographic component is |
| 12:47:36PM | 14 | used in the United States. |
| 12:47:37PM | 15 | Q    All right, so when you say the geographic market is used |
| 12:47:41PM | 16 | in the United States, does that include, let's say, foreign |
| 12:47:47PM | 17 | imports that come into the United States? |
| 12:47:49PM | 18 | A    Yes.  Imports are included in the relevant market that I |
| 12:47:53PM | 19 | have defined. |
| 12:47:54PM | 20 | Q    How did you go about determining that the relevant market |
| 12:48:05PM | 21 | in the -- sorry, the relevant market is interior molded door |
| 12:48:09PM | 22 | skins used in the United States? |
| 12:48:10PM | 23 | A    We have a -- we, again, the antitrust economists, have a |
| 12:48:16PM | 24 | standard test to determine whether a group of product and |
| 12:48:23PM | 25 | geography is, in fact -- qualifies or meets the test of being a |

Shapiro - Direct

12:48:28PM    1    relevant market.  So we look at a candidate group, and then we

12:48:32PM    2    perform the test, and if it passes, that's a relevant market.

12:48:36PM    3    If it fails, it's not, and we have to look at something else.

12:48:39PM    4         So I was pretty sure right at the outset of this case,

12:48:44PM    5    actually, that the relevant market was interior molded door

12:48:48PM    6    skins used in the United States, but I performed this test.

12:48:50PM    7    It's call the hypothetical monopolist test -- sorry about

12:48:56PM    8    that -- and I performed this test as part of my analysis.

12:48:59PM    9         I did it three separate ways.  They're described here, and

12:49:04PM   10    all of them -- the test was passed which meant that this

12:49:09PM   11    grouping I was looking at, interior molded door skins used in

12:49:12PM   12    the United States, is a properly defined relevant antitrust

12:49:17PM   13    market as antitrust economists study these things.

12:49:21PM   14    Q    Is the hypothetical monopolist test a well-accepted test

12:49:25PM   15    among antitrust economists?

12:49:27PM   16    A    Very widely used for many years.

12:49:31PM   17    Q    And the three ways of applying this test that you have

12:49:35PM   18    here, direct evidence, recapture analysis, and critical

12:49:39PM   19    elasticity analysis, are they all well-recognized ways of

12:49:43PM   20    applying the hypothetical monopolist test?

12:49:46PM   21    A    Yes, they are.

12:49:46PM   22    Q    Just very briefly, if you could, could you go each one of

12:49:51PM   23    these and explain to the jury what you do in this and what you

12:49:55PM   24    found?

12:49:55PM   25    A    It's really the perfect thing right before lunch.  So the

Shapiro - Direct

12:50:01PM  1   direct evidence is that I -- we've talked about it, is that

12:50:06PM  2   competition among the suppliers of interior molded door skins

12:50:11PM  3   caused prices to be at least five percent lower than they would

12:50:17PM  4   otherwise have been without that competition.  We saw that in

12:50:20PM  5   the competition for Steves.  We saw aspects of that with the

12:50:24PM  6   CARB episode.  We've seen that.  That's one.

12:50:28PM  7        The second recapture analysis, we have a method of asking,

12:50:32PM  8   if one firm raises their price and they lose some customers, do

12:50:41PM  9   those customers go buy interior door skins -- interior molded

12:50:46PM  10  door skins from other suppliers, or do they do something else

12:50:49PM  11  when it's too expensive.

12:50:51PM  12       If they mostly shift to other interior molded door skins,

12:50:55PM  13  that's a high recapture, and that's going to confirm that this

12:50:59PM  14  is a good group to look at, and the test was easily passed

12:51:04PM  15  there.

12:51:04PM  16       And then the third one is critical elasticity analysis.

12:51:08PM  17  We asked if the price of all the interior molded door skins

12:51:12PM  18  went up, how much would the customers reduce their purchases,

12:51:17PM  19  and if that's not very much, then the test is going to be

12:51:20PM  20  passed.  And the data showed that as well here.

12:51:23PM  21       So this is not a close call.  We did it -- I did it the

12:51:27PM  22  three ways, and this is a properly defined relevant antitrust

12:51:30PM  23  market, the one I've put forward.

12:51:32PM  24  Q   And does Jeld-Wen's economist, Professor Snyder, take

12:51:36PM  25  issue with your market definition in any of his reports?

Shapiro - Direct

| | | |
|---|---|---|
| 12:51:39PM | 1 | A    I do not believe he does. |
| 12:51:41PM | 2 | Q    All right.  So let's get back down now to the summary of |
| 12:51:46PM | 3 | what you've done.  We've now gone through all these steps; |
| 12:51:49PM | 4 | correct? |
| 12:51:49PM | 5 | A    Yes. |
| 12:51:50PM | 6 | Q    Could you just summarize for the jury what you found after |
| 12:51:55PM | 7 | performing each of these three steps. |
| 12:51:58PM | 8 | A    So each step I've indicated what the study was and now in |
| 12:52:05PM | 9 | the blue at the bottom are the findings.  The first phase, the |
| 12:52:08PM | 10 | merger reduced choices from three to two.  We measured the |
| 12:52:11PM | 11 | concentration with the Herfindahl, the HHI.  It was a very |
| 12:52:15PM | 12 | large increase in concentration, well into the zone highly |
| 12:52:18PM | 13 | concentrated, big increase.  That was signalling that the |
| 12:52:22PM | 14 | merger would be likely to harm competition. |
| 12:52:25PM | 15 | Then we looked at the five years experience since the |
| 12:52:29PM | 16 | merger, see what actually happened.  We did see door skin |
| 12:52:33PM | 17 | prices going up.  My focus is on prices.  I considered whether |
| 12:52:36PM | 18 | there were reasons for that other than the merger, both demand |
| 12:52:40PM | 19 | and costs, and I ruled those out. |
| 12:52:43PM | 20 | We also have seen this type of coordinated behavior, |
| 12:52:47PM | 21 | signalling that is worrisome, in a market with two players, and |
| 12:52:51PM | 22 | that actually led to Steves being in a more difficult position. |
| 12:52:55PM | 23 | So those are effects that we've seen over the five years. |
| 12:52:59PM | 24 | Looking forward, I don't see any real reason why these |
| 12:53:02PM | 25 | conditions are going to change.  The harm to competition is |

Shapiro - Direct

12:53:06PM  1    likely to continue.  There may be some entry in the form of

12:53:10PM  2    imports.  I wouldn't rule that out, but it does not seem

12:53:14PM  3    sufficient to restore competition to cure the problem.

12:53:18PM  4    Q    Let's come back to the question.  Based on everything you

12:53:24PM  5    have analyzed, all the work you've done, how do you answer the

12:53:29PM  6    following question:  Does Jeld-Wen's acquisition of CMI

12:53:32PM  7    substantially lessen competition in a relevant market?

12:53:35PM  8    A    I believe it does.

12:53:36PM  9              MR. POMERANTZ:  I have no further questions.

12:53:38PM  10             THE COURT:  All right, ladies and gentlemen, we'll

12:53:40PM  11   have lunch at this time.  I think you all ordered some pizza or

12:53:46PM  12   whatever.  Unfortunately, I'm told that it came about

12:53:50PM  13   40 minutes ago, so I don't know it will be cold, but you need

12:53:56PM  14   to pop some of it in the microwave.

12:53:59PM  15             We'll take an hour for lunch, because I have

12:54:02PM  16   something to do with the lawyers.  You can just take those with

12:54:05PM  17   you, yes, thank you.

12:54:06PM  18

12:54:06PM  19             (Jury out.)

12:54:28PM  20

12:54:28PM  21             THE COURT:  Was it now that you proposed to argue the

12:54:34PM  22   issue of future lost profits, or was it after Shapiro -- Dr.

12:54:43PM  23   Shapiro finishes his testimony?

12:54:44PM  24             MR. POMERANTZ:  I think it was our view it didn't

12:54:47PM  25   matter.  We weren't going to be relying -- he didn't offer any

| | |
|---|---|
| 12:54:50PM | 1 |
| 12:54:53PM | 2 |
| 12:54:56PM | 3 |
| 12:54:59PM | 4 |
| 12:55:02PM | 5 |
| 12:55:07PM | 6 |
| 12:55:09PM | 7 |
| 12:55:11PM | 8 |
| 12:55:13PM | 9 |
| 12:55:15PM | 10 |
| 12:55:16PM | 11 |
| 12:55:17PM | 12 |
| 12:55:19PM | 13 |
| 12:55:20PM | 14 |
| 12:55:23PM | 15 |
| 12:55:29PM | 16 |
| 12:55:31PM | 17 |
| 12:55:34PM | 18 |
| 12:55:38PM | 19 |
| 12:55:42PM | 20 |
| 12:55:46PM | 21 |
| 12:55:50PM | 22 |
| 12:55:51PM | 23 |
| 12:56:03PM | 24 |
| 12:56:06PM | 25 |

new facts regarding the issues that are addressed in that, so we are ready to do it now if that's appropriate.

MR. PFEIFFER:  And we are as well, and I think it may be appropriate, Your Honor, only because Mr. Tucker is going to immediately follow Dr. Shapiro, and this would have potentially great relevance to the scope --

THE COURT:  You don't have any cross-examination for Dr. Shapiro?

MR. PFEIFFER:  He's going to follow after I'm done, too, Your Honor.

THE WITNESS:  Good.

THE COURT:  You thought you were out of here, didn't you?

THE WITNESS:  Good try.

THE COURT:  How are we are in the court reporter department?

MR. POMERANTZ:  Your Honor, Mr. Dane will be arguing the lost profits -- we can do it now --

THE COURT:  Dr. Shapiro can step down and go have lunch if he'd like to.  As a general rule, you can't discuss your testimony or the facts with anybody other than the lawyers in the case.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  I think structurally we agreed that on this issue, this will be a Rule 50 motion,

| | | |
|---|---|---|
| 12:56:15PM | 1 | because I did or have considered the trial testimony, and both |
| 12:56:20PM | 2 | sides are agreeable to that procedural construct, and that |
| 12:56:23PM | 3 | means, then, that the defendant has the first go. |
| 12:56:28PM | 4 | MR. PFEIFFER:  Thank you, Your Honor.  May I proceed, |
| 12:56:40PM | 5 | Your Honor? |
| 12:56:40PM | 6 | THE COURT:  Please. |
| 12:56:41PM | 7 | MR. PFEIFFER:  Under Rule 50, the issue is really |
| 12:56:45PM | 8 | still the same as it has always been as we've been considering |
| 12:56:49PM | 9 | this question:  Can a plaintiff in an antitrust case get to a |
| 12:56:53PM | 10 | jury with a multi-million-dollar damages claim based on |
| 12:56:57PM | 11 | injuries that everybody agrees have not happened yet, may never |
| 12:57:01PM | 12 | happen, and will depend on the outcome of several speculative |
| 12:57:05PM | 13 | contingent -- |
| 12:57:07PM | 14 | THE COURT:  Let's don't overstate the case here. |
| 12:57:09PM | 15 | There is evidence in the record that foreign imports are |
| 12:57:20PM | 16 | unlikely to restore competition or to provide the quantity that |
| 12:57:26PM | 17 | Steves needs and that the cost of building the plant -- the |
| 12:57:34PM | 18 | question is whether there's evidence that the cost of building |
| 12:57:37PM | 19 | the plant is beyond Steves' means. |
| 12:57:40PM | 20 | And it's not likely -- there's not anything likely to |
| 12:57:44PM | 21 | happen by 2021 that will change the circumstances that we have |
| 12:57:50PM | 22 | now.  And, in fact, if you ever wanted any confirmation of |
| 12:57:54PM | 23 | that, Dr. Shapiro just provided a basis for the jury to |
| 12:57:59PM | 24 | conclude those things as well as the factual basis.  I don't |
| 12:58:06PM | 25 | know that everybody agrees they may never happen. |

| | | |
|---|---|---|
| 12:58:12PM | 1 | MR. PFEIFFER:  Your Honor, I don't think I am |
| 12:58:15PM | 2 | overstating it -- |
| 12:58:16PM | 3 | THE COURT:  Maybe we just say it this way:  I think |
| 12:58:19PM | 4 | you're overstating it, so try to get me in the evidentiary |
| 12:58:22PM | 5 | posture that I can analyze it correctly, or an argument |
| 12:58:28PM | 6 | posture. |
| 12:58:28PM | 7 | MR. PFEIFFER:  Yes, Your Honor.  I think the evidence |
| 12:58:30PM | 8 | that has come in still relies, to an impermissible degree under |
| 12:58:36PM | 9 | the case law, under the Rule 50 case law, on speculation about |
| 12:58:40PM | 10 | future events and on contingent events that have to happen in |
| 12:58:44PM | 11 | the future for there to be a viable damages claim. |
| 12:58:49PM | 12 | THE COURT:  What are the future? |
| 12:58:50PM | 13 | MR. PFEIFFER:  So the future events, first, there are |
| 12:58:53PM | 14 | multiple steps.  One is, will Steves and Jeld-Wen work out a |
| 12:58:56PM | 15 | new deal sometime in the next three, over three and a half |
| 12:58:59PM | 16 | years. |
| 12:59:00PM | 17 | THE COURT:  The jury could conclude on the basis of |
| 12:59:02PM | 18 | the record here they will not; do you think yes or no? |
| 12:59:06PM | 19 | MR. PFEIFFER:  No, Your Honor.  I think the jury |
| 12:59:07PM | 20 | would have to speculate on what future contingencies will bear |
| 12:59:11PM | 21 | out in that regard. |
| 12:59:13PM | 22 | Second step, even if Jeld-Wen and Steves were not to |
| 12:59:16PM | 23 | work out a new deal, would Steves and Masonite work out a new |
| 12:59:21PM | 24 | deal sometime in the next 3.75 years.  And that one -- |
| 12:59:28PM | 25 | THE COURT:  What evidence is there that they would? |

| | | |
|---|---|---|
| 12:59:31PM | 1 | You have this guy Lynch, he and -- does everybody in the |
| 12:59:36PM | 2 | business have cowboys as heads of their companies?  He said, in |
| 12:59:42PM | 3 | words of one syllable, I'm not going to sell to them except on |
| 12:59:46PM | 4 | the spot market, and I'll do it if I have the capacity or not. |
| 12:59:50PM | 5 | MR. PFEIFFER:  Which Professor Shapiro said capacity |
| 12:59:52PM | 6 | is well below -- |
| 12:59:55PM | 7 | THE COURT:  And if I don't have the capacity, you're |
| 12:59:57PM | 8 | still not going to sell to them according to his deposition |
| 01:00:00PM | 9 | testimony. |
| 01:00:01PM | 10 | MR. PFEIFFER:  Which is a contingency, the answer |
| 01:00:03PM | 11 | to which we don't -- |
| 01:00:04PM | 12 | THE COURT:  That's always a contingency.  You see, |
| 01:00:06PM | 13 | the problem with your whole argument is you are trying to make |
| 01:00:08PM | 14 | contingencies out of everything when the evidence that you have |
| 01:00:13PM | 15 | doesn't make it contingent.  That's what I'm trying to |
| 01:00:17PM | 16 | understand, why you say each one of these alternatives is, in |
| 01:00:22PM | 17 | fact, contingent. |
| 01:00:24PM | 18 | MR. PFEIFFER:  Respectfully, Your Honor, I have to |
| 01:00:25PM | 19 | disagree with what you just said.  Each is contingent under the |
| 01:00:29PM | 20 | evidence as it came in. |
| 01:00:30PM | 21 | THE COURT:  Don't argue that.  I don't want to hear |
| 01:00:33PM | 22 | that conclusion.  I want you to explain it to me.  You keep |
| 01:00:38PM | 23 | saying the same conclusory argument, and it doesn't help me to |
| 01:00:42PM | 24 | have you repeat it.  I don't need to even hear you, because |
| 01:00:45PM | 25 | I've read your papers. |

01:00:47PM    1         What I need to hear from you is how you deal with the

01:00:49PM    2    evidence on the points so I can understand the structure of

01:00:52PM    3    your position.

01:00:53PM    4         MR. PFEIFFER:  So let's take them -- I think it was

01:00:57PM    5    Steves' counsel who put it into four categories.  Let's take

01:01:00PM    6    those four categories and look at what the evidence was that

01:01:03PM    7    came in at the trial.  Start with Jeld-Wen as an option.  Sam

01:01:07PM    8    Steves testified he admitted he does not know whether Jeld-Wen

01:01:11PM    9    will sell it door skins after September 10th, 201.  That's the

01:01:16PM   10    transcript of this trial at 439, lines 14 to 17.

01:01:20PM   11         Sam Steves admitted it is possible, still, that they

01:01:22PM   12    could sign a new supply agreement with Jeld-Wen, transcript

01:01:27PM   13    438, lines three through five.  Sam Steves admitted it would

01:01:30PM   14    not turn down a contract with Jeld-Wen if they could agree with

01:01:33PM   15    each other on reasonable terms, transcript 438, line six

01:01:38PM   16    through eight.

01:01:39PM   17         Let's turn to Masonite.  I think it's uncontradicted

01:01:45PM   18    that Masonite says it's willing to sell to Steves right now at

01:01:50PM   19    list prices.  Steves has testified, through Sam Steves, that it

01:01:56PM   20    doesn't know what price it could pay to a supplier and still be

01:02:00PM   21    profitable in 2021 and beyond.  So at this point, there's no

01:02:04PM   22    way to look at what the prices might be for Masonite and say

01:02:07PM   23    that they would be unfeasible, even at list.  That's at 439, 11

01:02:14PM   24    through 16.

01:02:14PM   25         While Sam Steves said that buying on the spot market

01:02:17PM   1   was not what they want to do, the evidence is that they've done

01:02:20PM   2   it before in millions of skins of volume, including with

01:02:23PM   3   Masonite and CMI.  And that's trial transcript at 425, lines

01:02:30PM   4   nine through 17 and also one of the exhibits they used.

01:02:35PM   5        Foreign supply, Sam Steves has testified that Steves

01:02:39PM   6   is still exploring the option of buying from companies in Asia

01:02:42PM   7   and Europe.  That's the trial transcript at 443, line 16

01:02:47PM   8   through 18.

01:02:49PM   9        Steves and Teverpan are negotiating a supply

01:02:51PM   10  agreement as recently as December of 2017, and they don't know

01:02:55PM   11  what the outcome of those negotiations will be.  That's at 451,

01:02:59PM   12  lines nine through ten.  Prior to 2012, prior to the merger,

01:03:05PM   13  Sam Steves admitted that Steves, itself, bought interior molded

01:03:09PM   14  door skins from foreign suppliers.  So it is feasible to do so.

01:03:13PM   15  They've done it in the past.  They're negotiating to do it at

01:03:16PM   16  future.  That's at trial transcript 442, line 23, through 443,

01:03:21PM   17  line one.

01:03:22PM   18       You saw the evidence from Mr. Ambruz and Mr. Wysock

01:03:26PM   19  about having supply options at all three Turkish suppliers.

01:03:30PM   20  That's 447, lines five through seven.  Teverpan indicated it

01:03:35PM   21  was willing to expand and add new molds and dies, 454, 21

01:03:41PM   22  through 23.  There's extensive Kastamonu testimony about them

01:03:47PM   23  having been willing or interested in selling doors to Steves

01:03:50PM   24  for more than a year, 459, 23, through 460, line one.  And

01:03:55PM   25  Kastamonu, as we heard, already has a presence and a facility

01:03:59PM  1   producing wood chips which are an input into door skins in the

01:04:03PM  2   United States in Florida.

01:04:05PM  3          THE COURT:  They don't make the skins in the United

01:04:07PM  4   States.

01:04:07PM  5          MR. PFEIFFER:  No, but they're interested, as Mr.

01:04:10PM  6   Steves testified at 467 and 469 of the transcript, they're

01:04:14PM  7   interested in building a door skin facility in the United

01:04:18PM  8   States.

01:04:18PM  9          As to Proteak, I think testimony on that one in terms

01:04:24PM  10  of building a facility, testimony on that, it was a highly

01:04:29PM  11  interested partner, they were an MDF, medium density fiber

01:04:35PM  12  board maker, which Sam Steves identified as the ideal

01:04:39PM  13  manufacturing partner.  Sam Steves testified that they held

01:04:40PM  14  them in high regard and testified that that deal broke down

01:04:44PM  15  over deal structure, not any concerns about the viability of

01:04:47PM  16  the project or the profitability of the project.

01:04:50PM  17         Sam Steves testified that Proteak cooled to the idea

01:04:54PM  18  of a partnership after Steves balked at a 33 percent share of

01:04:59PM  19  the project, because Proteak wanted to contribute more money to

01:05:03PM  20  the project than Steves was interested in.  That doesn't show

01:05:05PM  21  lack of feasibility.  That, in fact, shows feasibility but a

01:05:09PM  22  choice of different deal terms, and that's, among others

01:05:12PM  23  places, transcript at 510, 11 through 16.

01:05:17PM  24         The Dieffenbacher evidence indicated that a plant

01:05:19PM  25  could be built in less than two years, transcript at 498, seven

1017

01:05:24PM   1    through 24.  And, Your Honor, after hearing the testimony of

01:05:29PM   2    Sam Steves -- that's not all the testimony of Sam Steves, but

01:05:33PM   3    I'm trying to be brief here, you commented -- you asked as to

01:05:37PM   4    Edward Steves, is he going to testify about why the options

01:05:41PM   5    aren't viable.  The other witness, referring to Sam Steves,

01:05:44PM   6    didn't.  You said, he didn't say why they can't do it.  That's

01:05:48PM   7    at pages 687, 688 of the transcript.

01:05:52PM   8         Mr. Steves, with counsel having that admonition in

01:05:57PM   9    mind, then got up and testified.  What did he say about

01:05:59PM  10    Jeld-Wen?  Let's go through the four options again.  He

01:06:02PM  11    admitted Steves doesn't know even who will be the management of

01:06:05PM  12    Jeld-Wen come 2021.  They could have a different view of

01:06:08PM  13    supplying Steves under different management, again a

01:06:11PM  14    contingency yet to be realized.

01:06:14PM  15         And he admitted that Jeld-Wen has expressed interest

01:06:17PM  16    already in entering into a new long-term agreement with Steves

01:06:20PM  17    on terms that make good economic sense.

01:06:23PM  18         THE COURT:  How do you assess this contingency issue

01:06:28PM  19    if you take the view that there is evidence that a jury, a

01:06:36PM  20    finder of the fact, could reject every one of your theories and

01:06:40PM  21    find that these things are about as likely to happen as --

01:06:49PM  22    they're just not likely to happen at all?  If one assesses the

01:06:55PM  23    evidence and the jury could conclude that, then what does that

01:06:59PM  24    do to your contingency argument?

01:07:03PM  25         MR. PFEIFFER:  Nothing under the case law, Your

01:07:05PM 1   Honor.  If they have to project out the results of

01:07:09PM 2   contingencies that have not happened, and however the

01:07:11PM 3   likelihood may not happen, the case law says they cannot base a

01:07:15PM 4   verdict on that basis.  Again, that's true under Rule 50, not

01:07:19PM 5   just 56.  We haven't cited Rule 50 in a while.

01:07:23PM 6          THE COURT:  No.  You did not assume what I asked you,

01:07:26PM 7   and that is that a jury could find those things are not going

01:07:31PM 8   to happen, and, therefore, then what happens in this case?  If

01:07:37PM 9   a jury could your view of this is just wrong, what then

01:07:43PM 10  happens?

01:07:43PM 11         MR. PFEIFFER:  I'm not sure what to say other than

01:07:46PM 12  reversal on appeal.  The question can't go to the jury, Your

01:07:50PM 13  Honor.

01:07:50PM 14         THE COURT:  I didn't make my question very clear.  I

01:07:53PM 15  don't think I put that that way, but they don't agree with your

01:07:56PM 16  predicate that these four alternatives -- they agree they're

01:08:03PM 17  not likely to happen.  What does that do to the lost profits

01:08:09PM 18  analysis?

01:08:10PM 19         MR. PFEIFFER:  That is my point, Your Honor.

01:08:12PM 20  Nothing.  The fact that they --

01:08:13PM 21         THE COURT:  Why not?  And no case law.  Tell me

01:08:16PM 22  logically -- I understand the law.  I want to know what your

01:08:19PM 23  theory is tied to this case.

01:08:22PM 24         MR. PFEIFFER:  Because logically, the most the

01:08:24PM 25  evidence would say, viewed most favorably, was that Steves does

01:08:27PM  1    not think it's likely, but there's no reasonable certainty that

01:08:33PM  2    these outcomes, each of these predicate steps will work out the

01:08:37PM  3    way it has to for Steves to suffer this injury.  And the jury

01:08:41PM  4    can't close that gap and take it from, we don't think it's

01:08:44PM  5    likely to it is a reasonable certainty.

01:08:50PM  6         THE COURT:  You mentioned does the evidence permit a

01:08:52PM  7    finding to a reasonable certainty that these alternatives would

01:08:55PM  8    not happen; is that what you are saying?

01:08:57PM  9         MR. PFEIFFER:  Yes, Your Honor.

01:08:58PM  10        THE COURT:  Let's assume for the moment that a jury

01:09:02PM  11   can find, to a reasonable certainty, that these events will --

01:09:07PM  12   these alternatives will not come to a pass.  We submit it to

01:09:12PM  13   them on a special interrogatory, and they say, we find to a

01:09:16PM  14   reasonable degree of certainty this isn't going to happen, this

01:09:20PM  15   isn't going to happen.  Then where do we go with the lost

01:09:24PM  16   profits points?

01:09:24PM  17        MR. PFEIFFER:  Are you asking me procedurally?  I

01:09:28PM  18   apologize, Your Honor.  I'm not understanding the question

01:09:29PM  19   because I'm not supposed to address the law, and the facts are

01:09:32PM  20   contrary to that, so I'm not quite sure how to answer your

01:09:35PM  21   question.

01:09:38PM  22        THE COURT:  Do you want to think about that a little

01:09:40PM  23   bit?

01:09:40PM  24        MR. PFEIFFER:  I honestly don't know what you want me

01:09:43PM  25   to say.  Are you saying Mr. Tucker --

01:09:45PM  1          THE COURT:  I want you to get to the bottom line

01:09:47PM  2   issue here that the theory -- the lost profits is predicated on

01:09:55PM  3   them going out of business, and the contingencies are only a

01:10:00PM  4   step to the going out of business.  That's what I'm trying to

01:10:05PM  5   get you to address, and that's what I thought your whole theory

01:10:08PM  6   was in your papers, is that the big apple here is that the --

01:10:17PM  7   that the lost profits is predicated on is not the four

01:10:22PM  8   individual things that may or may not happen.  It is that even

01:10:28PM  9   if you assume that all of those things happen, don't happen,

01:10:34PM 10   you still can't reach the conclusion -- a jury can't reach the

01:10:37PM 11   conclusion that they would go out of business, and I haven't

01:10:40PM 12   heard anything about that being the central point of your

01:10:43PM 13   papers.

01:10:43PM 14          MR. PFEIFFER:  That's certainly true, Your Honor.  It

01:10:45PM 15   is both.  We are saying that even if they could establish all

01:10:49PM 16   four of those predicates, they don't have a basis to say that

01:10:52PM 17   they will go out of business.

01:10:54PM 18          THE COURT:  Let's assume that the jury has now

01:10:56PM 19   answered those four questions and answered them against you,

01:11:00PM 20   that, in fact, these contingencies will not come in and provide

01:11:05PM 21   an alternative.

01:11:06PM 22          MR. PFEIFFER:  Yes, Your Honor.

01:11:08PM 23          THE COURT:  What evidence is there, then, about them

01:11:11PM 24   going out of business?

01:11:13PM 25          MR. PFEIFFER:  I don't believe there's any evidence

01:11:14PM  1   whatsoever about them going out of business.

01:11:16PM  2           THE COURT:  Who testified that they would go out of

01:11:19PM  3   business?

01:11:19PM  4           MR. PFEIFFER:  No witness so far in this case, Your

01:11:23PM  5   Honor.  There's absence of evidence of that.

01:11:25PM  6           THE COURT:  Thank you.  I think I understand your

01:11:27PM  7   point.

01:11:28PM  8           MR. PFEIFFER:  Okay, Your Honor.  Do you want to hear

01:11:30PM  9   more, or should I sit down?

01:11:32PM  10          THE COURT:  I don't know I need any more.  That's the

01:11:34PM  11  nubbin of the whole case, it seems to me.  All right, Mr. Dane.

01:11:42PM  12  I mean of the whole case on future lost profits.

01:11:47PM  13          Your future lost profits claim is based on the

01:11:50PM  14  predicate that Steves will go out of business because there's

01:11:53PM  15  not going to be a source of supply; right?

01:11:55PM  16          MR. DANE:  That is correct, Your Honor.

01:11:56PM  17          THE COURT:  Who testified to that, and who said what

01:11:58PM  18  about it?

01:11:59PM  19          MR. DANE:  Your Honor, we had understood from your

01:12:03PM  20  statements at the outset of the case that our witnesses were

01:12:07PM  21  not to tell the jury before we had had this discussion about

01:12:10PM  22  the lost profits issues, that Steves would go out of business,

01:12:14PM  23  so we did not ask them that ultimate question.

01:12:16PM  24          They did testify that Steves would not have options

01:12:20PM  25  and they would not be able --

01:12:22PM 1    THE COURT:  Who is going to testify if I tell you to
01:12:25PM 2  put them on the stand after lunch?  What are they going to say
01:12:28PM 3  about going out of business?  They didn't say it here.  I don't
01:12:32PM 4  think I told you to do it that way, but if I did, I'm stuck
01:12:36PM 5  with it.
01:12:37PM 6    Given that that was your whole theory, I can't
01:12:40PM 7  imagine you wouldn't have put that evidence on, and the issue
01:12:44PM 8  was -- we were keeping out was not that they weren't going out
01:12:48PM 9  of business or that they were but whether these conditions were
01:12:54PM 10  sufficient to cause them to go out of business.
01:12:57PM 11    MR. DANE:  Yes, Your Honor.
01:12:58PM 12    THE COURT:  And that's different than whether they
01:13:00PM 13  were going out of business.  So I haven't heard anybody say
01:13:03PM 14  that if all these things come to pass, we're going out of
01:13:06PM 15  business.
01:13:07PM 16    MR. DANE:  That's correct, Your Honor.  If we
01:13:10PM 17  misunderstood, then I apologize in terms of how we limited our
01:13:12PM 18  examination, but let me speak to that point.  There is
01:13:15PM 19  certainly evidence in the record on that point.  We don't think
01:13:18PM 20  it's actually very controversial.
01:13:20PM 21    Mr. Tucker has expressed an opinion.  On the first
01:13:22PM 22  point about all the contingencies, he's not expressing an
01:13:26PM 23  opinion.  He's making an assumption.  He understands the jury
01:13:28PM 24  will decide the issue of those contingencies.
01:13:30PM 25    On the separate question of if Steves cannot get door

01:13:33PM 1    skins, can they serve, can they remain in business, he has

01:13:37PM 2    expressed an opinion.  He has reviewed the financial statements

01:13:40PM 3    of Steves, and he has expressed the opinion they could not

01:13:43PM 4    remain in business, because the only product that they sell

01:13:45PM 5    that makes any money are molded door skins.

01:13:48PM 6            So it's almost -- it seems self-evident to us that if

01:13:52PM 7    their one profit-generating product is not available to them,

01:13:56PM 8    they will go out of business.

01:13:56PM 9            THE COURT:  If I deny the motion at this stage, is

01:14:02PM 10   your only evidence on this point going to be from Mr. Snyder?

01:14:10PM 11   I mean Tucker.

01:14:11PM 12           MR. DANE:  Yes, Your Honor.

01:14:12PM 13           THE COURT:  Is it going to be from Mr. Tucker?

01:14:15PM 14           MR. DANE:  Yes.

01:14:15PM 15           THE COURT:  You're not going to put any other

01:14:18PM 16   evidence on.

01:14:18PM 17           MR. DANE:  Well, Your Honor, if Your Honor -- Mr.

01:14:22PM 18   Tucker has relied on review of the financial statements and the

01:14:26PM 19   information that was provided to him by the Steves.  If we

01:14:30PM 20   needed to recall the Steves, if this were actually an issue of

01:14:34PM 21   debate -- I really don't know that it is, because the other

01:14:37PM 22   product lines Steves has lose money.  It seems to us pretty

01:14:40PM 23   self-evident that the business is going --

01:14:43PM 24           THE COURT:  Nobody testified that the other products,

01:14:53PM 25   all the other product lines lose money, have they?

01:14:56PM  1      MR. DANE:  No, Your Honor.  We understood that we

01:14:58PM  2  needed to await discussion of this issue before we put on

01:15:00PM  3  evidence of that specifically, although it is in Mr. Tucker's

01:15:04PM  4  report, and he's prepared to testify to it today.

01:15:07PM  5      THE COURT:  Basically you just need Tucker to testify

01:15:10PM  6  is what it boils down to?

01:15:13PM  7      MR. DANE:  That's right, Your Honor.

01:15:16PM  8      THE COURT:  On the fact they will go out of business.

01:15:19PM  9      MR. DANE:  Yes.

01:15:19PM 10      THE COURT:  Go ahead.  I understand.

01:15:23PM 11      MR. DANE:  Your Honor, I won't belabor the other

01:15:26PM 12  points.  We do agree with Your Honor on the issues of the

01:15:29PM 13  various contingencies.  There certainly has been abundant

01:15:31PM 14  evidence in the record from which this jury could conclude that

01:15:34PM 15  none of those are reasonably likely.

01:15:36PM 16      We have -- the most compelling evidence on many of

01:15:40PM 17  these issues are the contemporaneous internal documents --

01:15:44PM 18      THE COURT:  Mr. Pfeiffer said that the test wasn't

01:15:48PM 19  whether they were reasonably likely.  It's whether there was a

01:15:51PM 20  reasonable -- you could have a finding to a reasonable

01:15:55PM 21  certainty that these alternatives would not occur.  Isn't that

01:16:02PM 22  what you were urging, Mr. Pfeiffer?

01:16:03PM 23      MR. PFEIFFER:  Yes, it was, Your Honor.

01:16:05PM 24      THE COURT:  Before you could get to the next point,

01:16:07PM 25  all right.  So could a jury do that?

01:16:13PM  1        MR. DANE:  Yes, Your Honor.

01:16:14PM  2        THE COURT:  Is that the proper standard?

01:16:16PM  3        MR. DANE:  Well, Your Honor, the case law use that

01:16:21PM  4   phrase, reasonable certainty.

01:16:23PM  5        THE COURT:  Yes, it does.  Pretty good basis to find

01:16:27PM  6   the standard unless you have something else, it seems to me.

01:16:31PM  7        MR. DANE:  I'm not disputing it's the standard, Your

01:16:33PM  8   Honor.  I do think that the phrase is not as precise as it

01:16:38PM  9   might be in that there's also case law that makes very clear

01:16:41PM  10  that when the law is referring to reasonable certainty, it's

01:16:45PM  11  understood it's not talking about scientific precision, it's

01:16:48PM  12  not talking about something that's 100 percent certain, and

01:16:50PM  13  that's mainly what Mr. Pfeiffer's argument was directed to.

01:16:53PM  14       He raised arguments to suggest that we can't prove to

01:16:57PM  15  an absolute certainty that none of these options would be

01:17:00PM  16  available in 2021.  We don't dispute that.

01:17:03PM  17       THE COURT:  I thought he was saying reasonable

01:17:05PM  18  certainty.  I don't think he said absolute certainty.  He may

01:17:09PM  19  have said it early on, but he retrenched to reasonable

01:17:13PM  20  certainty when he was making his argument, because that's the

01:17:15PM  21  standard in the case law.

01:17:17PM  22       MR. DANE:  And we do think, Your Honor, that there's

01:17:19PM  23  abundant evidence in the record from which this jury can take

01:17:22PM  24  each of those separate options that have been raised and can

01:17:25PM  25  reasonably evaluate each one of them, decide that they are all

01:17:30PM 1    extremely unlikely, and, therefore, that the most likely

01:17:35PM 2    result, to a reasonable certainty, is that in 2021 when the

01:17:38PM 3    Jeld-Wen long-term supply agreement expires, Steves will be

01:17:42PM 4    left with no source of supply, very consistent with what some

01:17:46PM 5    of the internal documents we've seen from Jeld-Wen themselves

01:17:48PM 6    contemplate and understand, including documents that say, if we

01:17:52PM 7    stop selling to Steves, Masonite has already announced they're

01:17:56PM 8    not going to sell, would they pick up the sales?  Probably not.

01:18:01PM 9         Jeld-Wen understands what would happen, and all of

01:18:03PM 10   this is litigation-created arguments about unlikely scenarios.

01:18:09PM 11   We've seen in all the internal information and all the internal

01:18:13PM 12   documents, how difficult it is to build a plant, how difficult

01:18:17PM 13   it would be to get foreign supply.  The fact that Jeld-Wen has

01:18:21PM 14   internal documents wanting to kill off Steves, the fact that

01:18:24PM 15   Masonite has announced that it doesn't want to sell to its

01:18:27PM 16   competitors, that it won't enter into long-term supply

01:18:30PM 17   agreements, from this evidence we think that certainly the jury

01:18:33PM 18   could very reasonably determine that none of these supposed

01:18:37PM 19   options that have been thrown out are reasonably likely and

01:18:41PM 20   that the reasonable certainty is that in 2021, Steves will be

01:18:46PM 21   without any source of supply.  And then the question is,

01:18:49PM 22   without that source of supply, could they survive.  Mr. Tucker

01:18:53PM 23   will be able to testify that they could not.

01:18:56PM 24        THE COURT:  Why is it appropriate to base that

01:18:58PM 25   judgment on what Mr. Tucker says?

01:19:01PM   1          MR. PFEIFFER:  Sorry, Your Honor, I'll wait my term.

01:19:07PM   2     There's a misunderstanding, I think, but I'll address it later.

01:19:12PM   3          THE COURT:  Why is it appropriate to base that

01:19:14PM   4     judgment on what Mr. Tucker says?  In other words, why don't

01:19:17PM   5     you to have some evidence in the record that we make these

01:19:22PM   6     things; of those things, here are two lines and the other lines

01:19:27PM   7     that we have, and they're not profitable, and we can't sell

01:19:34PM   8     enough door skins with the alternate source of supply without a

01:19:40PM   9     plant to stay in business?  Why don't you have to have some

01:19:45PM  10     evidence like that?

01:19:47PM  11          MR. DANE:  Mr. Tucker did -- he based his opinion

01:19:50PM  12     that was in his report about Steves not being able to remain in

01:19:54PM  13     business upon both discussions with the Steves and also his

01:19:59PM  14     analysis of the financial statements of the company, and that

01:20:02PM  15     included analysis of the profitability of the various product

01:20:06PM  16     lines.  And based upon that analysis, he concluded that all of

01:20:11PM  17     the profits for the company are attributable to molded door

01:20:15PM  18     skins.

01:20:16PM  19          And so if his assumption --

01:20:18PM  20          THE COURT:  Right, okay, I got you.  Stop there for a

01:20:22PM  21     minute.  The undisputed record here is that Teverpan, or from

01:20:27PM  22     Europe, the Middle East, you can get three of the models, three

01:20:34PM  23     out of 20 designs.  What is the evidence in the record about

01:20:38PM  24     what that will yield in terms of an ongoing business?  Is there

01:20:44PM  25     anything in there that tells me that?

01:21:09PM   1          MR. POWELL:  Your Honor, may I confer with Mr. Dane?

01:21:13PM   2          THE COURT:  Sure.

01:21:13PM   3

01:21:14PM   4          (Counsel conferring.)

01:21:37PM   5

01:21:37PM   6          MR. DANE:  Your Honor, I'm looking for particular

01:21:40PM   7   citations, but there was evidence given by Mr. Steves, also Mr.

01:21:47PM   8   Ambruz, and I believe also by Mr. Lynch, that in order for

01:21:50PM   9   someone to be viable as a door manufacturer, you can't just

01:21:56PM  10   have the limited number of models.  You have to have a broad

01:21:59PM  11   array of the number of models that are being offered.

01:22:02PM  12          Mr. Edward Steves -- this I specifically recall

01:22:05PM  13   because I asked him about it.  If Your Honor will remember, on

01:22:09PM  14   the Madison and Monroe styles, those were styles that Steves

01:22:13PM  15   was purchasing at a loss, and even though they were purchasing

01:22:17PM  16   them at a loss, they still did it because Mr. Steves testified

01:22:22PM  17   this is what our customers demand, and a Home Depot is not

01:22:26PM  18   going to buy from you if you say we can give you five percent

01:22:29PM  19   of the offerings.

01:22:30PM  20          THE COURT:  Sam Steves said he had 477, and there

01:22:34PM  21   were only 20 available from Europe and his customer line

01:22:39PM  22   required that.

01:22:40PM  23          MR. DANE:  Yes.

01:22:41PM  24          THE COURT:  But there's no evidence about what the

01:22:42PM  25   rest of the industry requires or whether that's what's required

01:22:46PM  1    for survivability.  That's what's required for their

01:22:49PM  2    profitability, it seems to me.  That's where the record is.  Am

01:22:54PM  3    I wrong about that?

01:22:55PM  4              MR. DANE:  The evidence, Your Honor, is I believe

01:22:58PM  5    that for Steves to be able to be competitive and service its

01:23:02PM  6    customers, including the retail customers such as Home Depot,

01:23:05PM  7    it needs that full range of designs.

01:23:07PM  8              We know that Jeld-Wen, obviously, does have that full

01:23:12PM  9    range designs.  I don't recall if Mr. Lynch testified to

01:23:16PM  10   exactly the number of designs that Masonite has.  I know he did

01:23:20PM  11   testify he agreed with the proposition that in order to be

01:23:24PM  12   competitive, a door company has to have a broad range of

01:23:28PM  13   designs.  I don't think he put a number on it.

01:23:30PM  14             That's the state of the evidence.  There has been no

01:23:32PM  15   evidence that there are specialty shops, for example, that only

01:23:36PM  16   sell two or three types of door skin designs.  All the evidence

01:23:41PM  17   in the record is that those of the companies that are

01:23:43PM  18   competitive have a broad array of designs they offered to the

01:23:46PM  19   customers.

01:23:46PM  20             THE COURT:  In order to be competitive?

01:23:48PM  21             MR. DANE:  Yes.

01:23:49PM  22             THE COURT:  All right, thank you.  Mr. Pfeiffer, do

01:23:51PM  23   you have anything else, sir?

01:23:52PM  24             MR. PFEIFFER:  Yes, Your Honor, please.  I want to

01:23:59PM  25   address the issue of Mr. Tucker, because, again, I think

01:24:02PM   1    there's a misunderstanding about what he actually did and

01:24:05PM   2    didn't do in his reports.  In his first report --

01:24:09PM   3            THE COURT:  Excuse me.  I have these excerpts up here

01:24:13PM   4    that you all gave me.  Are they in the excerpts that you can

01:24:20PM   5    help me out with?

01:24:21PM   6            MR. PFEIFFER:  Actually, I think the excerpts are

01:24:24PM   7    actually from the evidence, so this is not in evidence.

01:24:26PM   8            THE COURT:  I have a report, a report, a report,

01:24:31PM   9    proffer of amendment, report of Kaplan, report of Kaplan,

01:24:35PM   10   proffer --

01:24:36PM   11           MR. PFEIFFER:  Might we approach and give you a

01:24:38PM   12   copy -- it might be easier -- of the whole set of reports of

01:24:42PM   13   Mr. Tucker?

01:24:51PM   14           THE COURT:  Thank you.  What page?

01:24:57PM   15           MR. PFEIFFER:  If you start with the first report,

01:24:58PM   16   there's a couple different places to look.  Start with the

01:25:01PM   17   first report and go to page ten, paragraph 36, under the

01:25:06PM   18   heading D, Steves' future lost profits damages.

01:25:09PM   19           THE COURT:  Wait just a minute.  Sorry, I had the

01:25:14PM   20   wrong page ten.  Ten what?

01:25:16PM   21           MR. PFEIFFER:  Ten, paragraph 36, right under heading

01:25:19PM   22   D which should say Steves' future lost profits damages.

01:25:23PM   23           THE COURT:  Yes.

01:25:25PM   24           MR. PFEIFFER:  You'll see there that he's summarizing

01:25:28PM   25   his conclusion, and he says, even if Jeld-Wen does not

01:25:32PM 1    terminate the supply agreement until September 10th, 2021, I

01:25:37PM 2    understand that if Jeld-Wen, thereafter -- refuses thereafter

01:25:41PM 3    to sell door skins to Steves at competitive prices --

01:25:46PM 4        THE COURT:  Wait a minute.  Even if Jeld-Wen does not

01:25:49PM 5    terminate the supply agreement until September 10, 2021, I

01:25:54PM 6    understand that if Jeld-Wen refuses thereafter to sell door

01:25:57PM 7    skins to Steves at competitive prices and Steves has no other

01:26:01PM 8    viable source of door skins, Steves will be forced out of

01:26:05PM 9    business.

01:26:06PM 10       MR. PFEIFFER:  Yes, and he says there, he understands

01:26:08PM 11   that.  He doesn't say he did an analysis of that.  If you page

01:26:12PM 12   forward to page 24 in the same report where he gets into more

01:26:21PM 13   detail about his lost profits analysis under Roman VI --

01:26:25PM 14       THE COURT:  I got it.  What paragraph?

01:26:27PM 15       MR. PFEIFFER:  Paragraph 75, please.  It's the second

01:26:31PM 16   sentence.

01:26:31PM 17       THE COURT:  I understand Steves' view; is that right?

01:26:33PM 18       MR. PFEIFFER:  Yes, Your Honor, that's the one.

01:26:34PM 19       THE COURT:  Is that if we cannot secure -- if it

01:26:38PM 20   cannot secure an alternative source of supply by December 31,

01:26:43PM 21   2019, and Jeld-Wen stops supplying it with door skins at

01:26:47PM 22   competitive prices as of that date, it will be unable to

01:26:50PM 23   continue manufacturing and selling interior molded doors.  That

01:26:55PM 24   addresses the alternate date which I thought you all withdrew.

01:26:59PM 25       MR. PFEIFFER:  Sorry.  We did withdraw that, Your

01:27:02PM  1   Honor.  Then if you go down immediately below that, he's just

01:27:04PM  2   stating again his understanding.  Go down to paragraph 76, the

01:27:10PM  3   first sentence.  You'll see there he says based on the

01:27:22PM  4   foregoing, I have assumed that if Jeld-Wen does not have --

01:27:26PM  5              THE COURT:  What is your point?

01:27:28PM  6              MR. PFEIFFER:  That he did not render an opinion that

01:27:36PM  7   Steves would go out of business in his reports, and I have a

01:27:39PM  8   cite in the second report as well --

01:27:42PM  9              THE COURT:  Wait a minute.  Where, Mr. Dane, does he

01:27:45PM 10   render an opinion that they're going out of business?  He's

01:27:48PM 11   challenging you on that, so tell me where Mr. Tucker makes that

01:27:57PM 12   opinion, and then we can crystalize the argument, maybe get

01:28:00PM 13   some lunch.

01:28:01PM 14              MR. DANE:  Yes, Your Honor.

01:28:06PM 15              THE COURT:  Let's see if we've got this issue, or

01:28:10PM 16   else am I dealing with this as you've posited it.  Do you have

01:28:14PM 17   any other testimony on the topic other than what Mr. Pfeiffer

01:28:17PM 18   has pointed to, Mr. Dane?

01:28:18PM 19              MR. DANE:  I do, Your Honor.

01:28:20PM 20              THE COURT:  What page and what report?  I've got them

01:28:22PM 21   all up here now.

01:28:24PM 22              MR. DANE:  So it's both in Mr. Tucker's -- one of his

01:28:27PM 23   report and then in his deposition testimony.

01:28:29PM 24              THE COURT:  First let's take the report.

01:28:31PM 25              MR. DANE:  In the reply report dated May 5th, 2017.

| | | |
|---|---|---|
| 01:28:35PM | 1 | THE COURT:  May 5th, okay.  What page? |
| 01:28:38PM | 2 | MR. DANE:  Page 17. |
| 01:28:40PM | 3 | THE COURT:  Page 17? |
| 01:28:41PM | 4 | MR. DANE:  Yes. |
| 01:28:43PM | 5 | THE COURT:  Mr. Kaplan's opinion regarding Steves' |
| 01:28:46PM | 6 | ability to operate by offering only flush doors, et cetera? |
| 01:28:50PM | 7 | MR. DANE:  Yes, Your Honor. |
| 01:28:51PM | 8 | THE COURT:  Where in there? |
| 01:28:53PM | 9 | MR. DANE:  To give -- so in paragraph 51, Mr. |
| 01:29:00PM | 10 | Tucker -- so Mr. Kaplan took issue with the question of whether |
| 01:29:03PM | 11 | Steves would go out of business if it couldn't sell molded door |
| 01:29:07PM | 12 | skins, and he pointed to the other product line, and he said, |
| 01:29:11PM | 13 | perhaps Steve could stay in business with the other business |
| 01:29:14PM | 14 | lines. |
| 01:29:14PM | 15 | Responding to that, Mr. Tucker, in paragraph 51, |
| 01:29:17PM | 16 | stated that with respect to exterior doors, which is one of |
| 01:29:20PM | 17 | those other product lines, that that business is unprofitable |
| 01:29:23PM | 18 | and serves as a loss leader, and he did an evaluation of those |
| 01:29:28PM | 19 | two other product lines which have separate names. |
| 01:29:31PM | 20 | There's a Crestmill door subsidiary and a Premium |
| 01:29:35PM | 21 | door superior wood division, and based upon the financial |
| 01:29:38PM | 22 | statements, he showed that both of those were businesses that |
| 01:29:42PM | 23 | lost money. |
| 01:29:43PM | 24 | Then in his deposition, if Your Honor wants me to |
| 01:29:46PM | 25 | move to that? |

| | |
|---|---|
| 01:29:47PM | 1 |

          THE COURT:  He doesn't testify that they'll go out of
business.  He says he understands they'll go out of business in
the earlier paragraphs that Mr. Pfeiffer pointed to.

          MR. PFEIFFER:  May I point to one more, Your Honor?

          THE COURT:  Just a minute.  Paragraph 51 just says
these lines are unprofitable.  That's quite different than
saying they will go out of business if they can't make the
other lines.

          MR. DANE:  And, Your Honor, he clarified that in his
deposition which is what I wanted to speak to.

          MR. PFEIFFER:  Before we move to that deposition, can
I point you to one more place in the report, Your Honor?  In
that same report --

          THE COURT:  Which report?

          MR. PFEIFFER:  May 5th, 2017, report that Mr. Dane
was just addressing with you, if you actually go back to the
section that talks about the future lost profits damages, not
Mr. Kaplan's argument, which is page eight, page eight,
paragraph 25, under Roman IV.

          THE COURT:  And paragraph what?

          MR. PFEIFFER:  Paragraph 25, Your Honor.  Second
sentence.

          MR. DANE:  I apologize, Your Honor.  Could I ask
counsel which report this is?

          MR. PFEIFFER:  The same one, the May 5th, 2017 one.

01:31:11PM  1  The second sentence there says, Mr. Kaplan suggests that my

01:31:14PM  2  lost profits opinion, which is based upon the assumption that

01:31:17PM  3  Steves will not be able to remain in business after its supply

01:31:20PM  4  agreement with Jeld-Wen terminates on September 10th, 2021,

01:31:24PM  5  ignores other possible of sources of door skins to Steves

01:31:27PM  6  beginning on September 11, 2021.

01:31:30PM  7      Could not be more clear in that same report that

01:31:33PM  8  that's an assumption he's making.

01:31:35PM  9      THE COURT:  All right.  Is that all you wanted to

01:31:37PM 10  point me to?

01:31:38PM 11      MR. PFEIFFER:  Yes, Your Honor, that was.

01:31:41PM 12      THE COURT:  All right.  Where in the deposition is

01:31:44PM 13  it?  Come to the lectern so the court reporter can hear you.

01:31:48PM 14      MR. DANE:  Thank you, Your Honor.  Just so Your Honor

01:31:56PM 15  will understand the ordering of this, in his initial report,

01:32:00PM 16  Mr. Tucker said that this was his assumption.  Mr. Kaplan, in

01:32:03PM 17  his report, then challenged that and said, I don't buy that

01:32:08PM 18  assumption because of these other businesses.

01:32:09PM 19      When Mr. Kaplan challenged it, Mr. Tucker did the

01:32:13PM 20  analysis, and then he testified to it in his deposition, and he

01:32:16PM 21  testified to it as his opinion that he was expressing.  This is

01:32:20PM 22  at page 59 of Mr. Tucker's deposition.

01:32:28PM 23      THE COURT:  Do you have a copy of it that I might

01:32:31PM 24  read?  Do you have it, Mr. Pfeiffer?

01:32:34PM 25      MR. PFEIFFER:  Yes, we do, Your Honor.

01:32:37PM   1          THE COURT:  I've got one.

01:32:43PM   2          MR. DANE:  Thank you, Your Honor.

01:32:44PM   3          THE COURT:  Page what?

01:32:45PM   4          MR. DANE:  59.  So this begins on line seven, Your

01:33:00PM   5  Honor.  And Mr. Tucker says, well, it's also my opinion that if

01:33:07PM   6  they cannot purchase molded door skins in the quantities in the

01:33:11PM   7  assumption that I made, that then they would not be able to

01:33:15PM   8  continue in business.  Mr. Pfeiffer asked him, sure, yeah.  The

01:33:19PM   9  second assumption that's implicit or may be explicit in your

01:33:22PM  10  future lost profits analysis in bullet four is that Steves will

01:33:26PM  11  go out of business after the current supply agreement expires.

01:33:29PM  12  Mr. Tucker said, that's my opinion, yes.

01:33:33PM  13          Mr. Pfeiffer asked him for clarification.  Well,

01:33:36PM  14  that's your opinion or that's your assumption?  And Mr. Tucker

01:33:40PM  15  made clear.  He said that's my opinion with respect to that

01:33:43PM  16  latter half.  With respect to the first half -- and the first

01:33:46PM  17  half is these contingencies we're talking about, could they get

01:33:49PM  18  the skins, with respect to the first half, it is an assumption.

01:33:54PM  19          So --

01:33:56PM  20          THE COURT:  So then they say, hmm, the first half is

01:34:00PM  21  the assumption that they will be unable to buy in sufficient

01:34:03PM  22  quantity and at prices that will allow them to remain in

01:34:06PM  23  business and from -- from which you then conclude they then

01:34:10PM  24  would go out of business.  Answer:  That's true, although it's

01:34:14PM  25  slightly different.  The first part is an assumption.  And we

01:34:20PM 1  talked earlier about what I did with respect to assumptions.

01:34:23PM 2  With respect to the latter, it's not an assumption -- it's not

01:34:29PM 3  just an assumption but based -- excuse me.  Based on my

01:34:33PM 4  analysis of Steves, if they don't -- are not in the interior

01:34:39PM 5  molded door skin business, I do not believe they can remain in

01:34:43PM 6  business.  I mean, if they can't get -- if they cannot get

01:34:49PM 7  interior molded door skins, they would not be able to remain in

01:34:53PM 8  business; for example, to sell other products.

01:34:55PM 9       MR. DANE:  That's exactly right, Your Honor, and Mr.

01:34:58PM 10  Tucker was examined about those opinions at his deposition.

01:35:02PM 11       THE COURT:  Okay.  Anything else that you have to

01:35:06PM 12  say?

01:35:06PM 13       MR. DANE:  No, Your Honor.  The only thing I would

01:35:09PM 14  say is that -- and -- I apologize if this is our fault in the

01:35:13PM 15  way we presented the evidence, but if Your Honor felt that it

01:35:17PM 16  would be necessary to hear from the Steves on this issue of

01:35:21PM 17  whether they could remain in business without door skins, we

01:35:25PM 18  we'd certainly be willing to recall them to put in that

01:35:27PM 19  evidence before Mr. Tucker if Your Honor preferred that to

01:35:30PM 20  having him testify based upon his analysis of the financial

01:35:34PM 21  information and his having had prior discussions with them on

01:35:37PM 22  that issue.

01:35:37PM 23       THE COURT:  Well, you tell me that I told you you

01:35:40PM 24  couldn't put that evidence on, and is that what you want to do,

01:35:46PM 25  is to put it on?  If I did that, I didn't intend to do it that

| | |
|---|---|
| 01:35:51PM | 1 |
| 01:35:54PM | 2 |
| 01:35:59PM | 3 |
| 01:36:05PM | 4 |
| 01:36:10PM | 5 |
| 01:36:16PM | 6 |
| 01:36:23PM | 7 |

01:35:51PM   1   way.  I intended to stop you from talking about the

01:35:54PM   2   consequences of going out of business but allow you to say, we

01:35:59PM   3   would be -- if we couldn't get supply, we're out of business,

01:36:05PM   4   we don't have any other options to do it, because that also had

01:36:10PM   5   to do with -- the reason I'm sure I intended it as something

01:36:16PM   6   that you could do it, it has to do with the effects on your

01:36:23PM   7   damages apart from lost profits.

01:36:26PM   8           MR. DANE:  May I consult with Mr. Pomerantz?

01:36:28PM   9           THE COURT:  Yes, but Mr. Pfeiffer -- since it's his

01:36:33PM  10   motion, he has the last word.

01:36:34PM  11           Mr. Pfeiffer, the reason I'm not interested in the

01:36:37PM  12   law is because you have inundated me with it, and I've read it

01:36:40PM  13   and read it and read it.  So I know what it is.  I'm interested

01:36:43PM  14   in the factual part of it.

01:36:45PM  15           MR. PFEIFFER:  My apologies, Your Honor.  I didn't

01:36:48PM  16   mean to inundate you with that.  Mr. Tucker's testimony at the

01:36:51PM  17   deposition, the part that you were just directed to, is if you

01:36:56PM  18   read it so the first half is the assumption that they will --

01:36:59PM  19           THE COURT:  Excuse me.  Where are you?

01:37:01PM  20           MR. PFEIFFER:  Same page, starting at the bottom of

01:37:04PM  21   59, right where you were --

01:37:04PM  22           THE COURT:  You want me to reread the testimony that

01:37:06PM  23   we just went through; is that what you are saying?

01:37:09PM  24           MR. PFEIFFER:  Yes, Your Honor, for this purpose:  I

01:37:11PM  25   want to explain to you what he said and how that corresponds to

01:37:15PM  1    his report.  So the question is, you said, okay, so, um, so the

01:37:19PM  2    first half is the assumption that they will be unable to buy in

01:37:22PM  3    sufficient quantity and that prices that will allow them to

01:37:26PM  4    remain in business from which you then conclude that they will

01:37:30PM  5    then go out of business, and he says that's true although it's

01:37:33PM  6    slightly different.

01:37:34PM  7        At that point it's a tautology.  There is no benefit

01:37:38PM  8    to saying if I assume that they won't get enough to remain in

01:37:42PM  9    business, then they'll go out of business.

01:37:45PM  10       THE COURT:  I understand what you are saying, but the

01:37:50PM  11   next answer he says, that's true, although it's slightly

01:37:54PM  12   different, and then he goes and cures the very tautology that

01:37:59PM  13   you are -- about which you complain, I believe, if I read it

01:38:02PM  14   right.  I'll look at it and see.

01:38:04PM  15       MR. PFEIFFER:  I don't think under Rule 26 he can

01:38:07PM  16   cure that by saying something at his deposition that's contrary

01:38:11PM  17   to the analysis that he's laid out in his report, because

01:38:13PM  18   whatever he says here, he still has offered no analysis in any

01:38:17PM  19   of those three reports that says here's how I have concluded,

01:38:22PM  20   here's how I have actually used expertise to conclude that they

01:38:26PM  21   will go out of business other than through this tautology.

01:38:29PM  22       So it simply doesn't appear.  There's a serious

01:38:33PM  23   Rule 26 violation he can't cure by saying it on the fly.

01:38:36PM  24       THE COURT:  You are raising that now.

01:38:38PM  25       MR. PFEIFFER:  I was unaware before that they were

| | | |
|---|---|---|
| 01:38:40PM | 1 | going to say Mr. Tucker had said this.  We heard from Mr. Dane. |
| 01:38:44PM | 2 | That's why I stood up, because I was surprised to hear that. |
| 01:38:47PM | 3 | So, yes, this is the first we've had it. |
| 01:38:49PM | 4 | THE COURT:  Anything else? |
| 01:38:50PM | 5 | MR. PFEIFFER:  Well, Your Honor, to the extent that |
| 01:38:54PM | 6 | you are considering having the Steves testify about this, there |
| 01:38:59PM | 7 | is some deposition testimony on this subject by Edward Steves |
| 01:39:03PM | 8 | at his deposition where he characterized it as -- how did he |
| 01:39:07PM | 9 | say it?  Maybe it's an exaggeration to say we would go out of |
| 01:39:11PM | 10 | business immediately because there would still be value to the |
| 01:39:17PM | 11 | company afterward. |
| 01:39:19PM | 12 | THE COURT:  He said that -- I don't remember seeing |
| 01:39:22PM | 13 | anything about that in the papers -- |
| 01:39:25PM | 14 | MR. PFEIFFER:  No, this is again -- |
| 01:39:26PM | 15 | THE COURT:  One at a time, or you're going to get |
| 01:39:28PM | 16 | shot.  She's not going to shoot me. |
| 01:39:31PM | 17 | MR. PFEIFFER:  My apologies.  Sorry about that. |
| 01:39:34PM | 18 | THE COURT:  I don't remember that from the papers, |
| 01:39:36PM | 19 | but the papers are so voluminous, maybe I just don't have a |
| 01:39:40PM | 20 | good memory. |
| 01:39:41PM | 21 | MR. PFEIFFER:  I don't know.  I can give you the |
| 01:39:43PM | 22 | cite, Your Honor.  It wasn't part of the trial testimony.  It's |
| 01:39:47PM | 23 | part of a deposition, so I'm saying it would be kind of |
| 01:39:50PM | 24 | pointless to recall him when that would be the testimony that |
| 01:39:53PM | 25 | would be elicited. |

| | |
|---|---|
| 01:39:54PM | 1 |
| 01:39:56PM | 2 |
| 01:39:58PM | 3 |
| 01:40:02PM | 4 |
| 01:40:03PM | 5 |
| 01:40:06PM | 6 |
| 01:40:07PM | 7 |
| 01:40:10PM | 8 |
| 01:40:13PM | 9 |
| 01:40:16PM | 10 |
| 01:40:17PM | 11 |
| 01:40:18PM | 12 |
| 01:40:21PM | 13 |
| 01:40:22PM | 14 |
| 01:40:24PM | 15 |
| 01:40:26PM | 16 |
| 01:40:27PM | 17 |
| 01:40:30PM | 18 |
| 01:40:34PM | 19 |
| 01:40:36PM | 20 |
| 01:40:41PM | 21 |
| 01:40:45PM | 22 |
| 01:40:46PM | 23 |
| 01:40:47PM | 24 |
| 01:40:51PM | 25 |

1          THE COURT:  Well, I guess they call that

2     cross-examination.

3          MR. PFEIFFER:  Fair enough, Your Honor.  I shouldn't

4     have mentioned it.

5          THE COURT:  I believe I'd have held the powder on

6     that one.

7          MR. PFEIFFER:  Actually, since he's under

8     cross-examination, they wouldn't be allowed to talk to him.  I

9     think that's all I had to say, Your Honor, was the Tucker

10    point.

11         THE COURT:  Are you going to tag-team here?

12         MR. POMERANTZ:  Yes, Your Honor, if you permit me

13    to --

14         THE COURT:  Do you want to come in, too?

15         MS. ZWISLER:  My deposition.

16         MR. POMERANTZ:  So whether or not we understood the

17    line Your Honor was intending to draw, this is what we did at

18    the end of Sam Steves' direct testimony which we thought was

19    consistent with the line Your Honor had drawn.

20         Mr. Powell asks Mr. Steves, "When your contract with

21    Jeld-Wen expires in September of 2021, do you now have

22    something to replace it?

23         "We do not.

24         "Do you consider building your own door skin plant to

25    be a realistic solution?

01:40:52PM  1          "We do not.

01:40:55PM  2          "Did you consider importing molded door skins from

01:40:57PM  3  overseas manufacturers to be a realistic solution?

01:40:59PM  4          "Well, clearly, it is not.

01:41:00PM  5          "Do you consider buying from Masonite to be a

01:41:02PM  6  realistic solution?

01:41:03PM  7          "I do not.

01:41:04PM  8          "What about buying from Jeld-Wen, do you consider

01:41:07PM  9  that to be a realistic solution?

01:41:09PM  10         "I do not."

01:41:10PM  11         That line of questions was designed to send the

01:41:13PM  12  message to the jurors that Steves has no options in 2021.  I

01:41:19PM  13  think it's tantamount -- he didn't then say, we will go out of

01:41:24PM  14  business, but I'm not sure it would be necessary for him to say

01:41:27PM  15  that given this line of testimony, and this was our way of

01:41:31PM  16  going up to the line, but not crossing the line, that we had

01:41:35PM  17  understood Your Honor had drawn.

01:41:36PM  18         THE COURT:  All right.

01:41:37PM  19         MR. POMERANTZ:  That's what we did.

01:41:39PM  20         THE COURT:  That isn't the question on the table.  If

01:41:43PM  21  I drew -- I drew the line one way, and you thought I drew it

01:41:48PM  22  another.  I can't have the record be in the posture of you

01:41:53PM  23  operating under an erroneous instruction that wasn't clear from

01:41:57PM  24  me, and the time to deal with that is now, before you rest,

01:42:02PM  25  while they have a chance to cross-examine, while they have a

01:42:06PM   1    chance to consider what they want to do in their case.

01:42:13PM   2            So do you want to put your witnesses on to talk about

01:42:16PM   3    that topic before Mr. Snyder testifies?

01:42:22PM   4            MR. DANE:  Mr. Tucker, Your Honor.

01:42:24PM   5            THE COURT:  Honestly, I'll get them straight about

01:42:26PM   6    the time you get me reversed.

01:42:30PM   7            MR. POMERANTZ:  Your Honor, I think the answer is

01:42:31PM   8    probably yes, but I hate to say it without talking to my client

01:42:36PM   9    first.  Can we answer that question before the end of this

01:42:39PM   10   lunch break, and then if the answer is yes, we'll put Mr.

01:42:42PM   11   Steves on after Professor Shapiro is done and before Mr. Tucker

01:42:47PM   12   testifies?

01:42:48PM   13           THE COURT:  Yes.  We'll take a lunch recess.  Have

01:42:52PM   14   you all got lunch so we can do 45 minutes?

01:42:54PM   15           MS. ZWISLER:  Yes, Your Honor.

01:42:55PM   16           THE COURT:  Thank you.

01:42:56PM   17

01:42:56PM   18           (Luncheon recess.)

01:42:56PM   19

             20

             21

             22

             23

             24

             25

```
              1              THE COURT:  What did you decide you want to do,
02:37:43      2    Mr. Pomerantz, or Mr. Powell?  Whoever is going to address
02:37:47      3    it.
02:37:51      4              MR. POMERANTZ:  We will recall Mr. Sam Steves to
02:37:53      5    address the limited issues that we've been discussing.
02:37:56      6    The one issue that we have not yet agreed upon with
02:38:01      7    opposing counsel is whether we can talk to Mr. Steves
02:38:05      8    before he gets on the stand.  We think, because we would
02:38:08      9    have done this in our direct case, we'd like to at least
02:38:08     10    have a few minutes to talk to him about what questions we
02:38:10     11    would be asking.  But if Your Honor thinks that -- that's
02:38:13     12    the only issue.
02:38:14     13              THE COURT:  You can talk to him.
02:38:16     14              MR. POMERANTZ:  All right.  So what we will do
02:38:177    15    is we will --
02:38:18     16              THE COURT:  He's been sitting here in the
02:38:19     17    courtroom --
02:38:20     18              MR. POMERANTZ:  Right.
02:38:20     19              THE COURT:  -- listening to everything.
02:38:21     20              MR. POMERANTZ:  Right.  Exactly.  We will --
02:38:21     21    he'll testify after Professor Shapiro.  So that will
02:38:26     22    probably be after the next break.
02:38:27     23              THE COURT:  Okay.
02:38:28     24              MS. ZWISLER:  Your Honor, we think they should
02:38:31     25    recall also Edward Steves because if -- if you had made
```

02:38:35 1   this ruling prior to his testimony, I would have examined

02:38:38 2   him on their profits.

02:38:39 3              THE COURT:  Is Edward Steves here?

02:38:41 4              MS. ZWISLER:  He's in the city.

02:38:42 5              MR. POMERANTZ:  He's in the city.  He's not here

02:38:44 6   in the courtroom.

02:38:44 7              THE COURT:  Get him down here.

02:38:45 8              MS. ZWISLER:  Thank you, Your Honor.

02:38:46 9              THE COURT:  You can call him --

02:38:47 10             MS. ZWISLER:  Well, but I want to call him --

02:38:49 11             THE COURT:  -- in your case in chief.

02:38:49 12             MS. ZWISLER:  I certainly will do that for a

02:38:50 13  number of other reasons.  They have opened the door to a

02:38:54 14  number of issues.  But this issue is critical because

02:38:57 15  Dr. Tucker relies on Steves' profitability, and if they're

02:39:01 16  going to be able to testify they were going to go out of

02:39:04 17  business, they would have done that on direct.  That's

02:39:06 18  what he just said about Sam.

02:39:08 19      If Edward, despite telling me that he had no idea

02:39:12 20  what was going to happen in 2021, on Masonite, on

02:39:14 21  Jeld-Wen, on Teverpan, on all of those other suppliers --

02:39:17 22  it's an absolute, straight-up thing.  I'll tell the jury

02:39:20 23  that in closing.  If he had come on direct, he would have

02:39:22 24  said we would have gone out of business.

02:39:24 25      I get that I could cross him on the exaggeration that

02:39:27 1   he testified to in his deposition, and I certainly --

02:39:29 2            THE COURT:  I thought it was Sam.

02:39:31 3            MS. ZWISLER:  That's Edward.  Edward said, when

02:39:33 4   asked if he was going to go out of business, he testified

02:39:37 5   that's something --

02:39:38 6            THE COURT:  Well, they don't have to call him as

02:39:41 7   a witness.  They can bring him back here and you can ask

02:39:44 8   him question on direct or cross-examination if you want.

02:39:47 9            MS. ZWISLER:  If this had been played out before

02:39:50 10  the direct testimony, they took Edward through the same

02:39:52 11  issues -- in fact, you encouraged them.  You said, He

02:39:57 12  needs to tell me why these predicates are a problem.

02:39:59 13       So he testified to there, and they just came right

02:40:02 14  up.  And they did not ask him -- I agree.  They did not

02:40:05 15  ask him if he was going to go out of business.

02:40:07 16       If they can put Sam up there to say that, then -- and

02:40:11 17  this had happened during the direct, he would have said

02:40:14 18  that, and then pursuant --

02:40:15 19            THE COURT:  We can't reinvent that wheel.  You

02:40:17 20  can't put Humpty-Dumpty back together again.  But I can

02:40:23 21  have him over here and have him available for you to put

02:40:26 22  him on.  If they don't want to ask him questions, they

02:40:29 23  don't have to ask him questions.

02:40:30 24            MS. ZWISLER:  Okay.

02:40:31 25            THE COURT:  But you can ask him questions,

02:40:35 1    cross-examination of him as if you had before.

02:40:38 2            MS. ZWISLER:  Yes.  Okay.  And then that would

02:40:38 3    be before Mr. Tucker speaks?

02:40:40 4            THE COURT:  Yes.

02:40:41 5            MS. ZWISLER:  Yes.

02:40:41 6            THE COURT:  So get him over here, wherever he

02:40:43 7    is.

02:40:44 8            MR. POMERANTZ:  Your Honor, before -- let me

02:40:45 9    just -- we never asked Edward Steves the questions we're

02:40:47 10   talking about.  We did not open that door in our direct

02:40:50 11   examination, and we're not doing it now.  Your Honor has

02:40:53 12   said that he should be available for recall during their

02:40:56 13   case.  And that's the way the trial would work.

02:40:58 14       Had we known Your Honor's instruction, if we had

02:41:00 15   interpreted it correctly, we would have called Sam Steves

02:41:04 16   like we're doing now, but we would never asked the

02:41:07 17   question to Edward Steves.  And we didn't ask the question

02:41:09 18   to Edward Steves.  And so they should call Edward Steves

02:41:12 19   in their case, as you have told us to keep him available,

02:41:15 20   because that what's they want to do with him.

02:41:18 21           THE COURT:  Well, she said that he testified

02:41:20 22   that he didn't have any idea about something.

02:41:20 23           MR. POMERANTZ:  No.  I think what she said is

02:41:20 24   we -- I think she agreed that we did not raise this

02:41:23 25   particular topic, would you go out of business, with him.

Shapiro - Cross

02:41:26  1          MS. ZWISLER:  Oh, no.  I don't agree.

02:41:27  2          THE COURT:  She doesn't -- find me what it is.

02:41:28  3  Get the jury back in.  Let's get the expert.

02:41:32  4      Find me what you're talking about, Ms. Zwisler, and

02:41:34  5  then I'll look at it.  If I hadn't made the error I made,

02:41:37  6  we wouldn't be in this situation.  So I'll try to be as

02:41:42  7  fair as I can to both of you.  But I insist on seeing

02:41:46  8  where it is that he said anything that opens it up for you

02:41:48  9  to recross him.  If you can't do that, you can't have him.

02:41:54 10      But either way, get somebody to get him over here so

02:41:58 11  we don't have to wait for him.

02:42:00 12      All right.  Is Dr. Shapiro here?  Come on up and take

02:42:04 13  the witness stand, if you will, sir.

02:42:06 14          THE WITNESS:  Yes, Your Honor.

02:42:33 15          (The jury entered the courtroom.)

02:42:35 16          THE COURT:  All right.  Thank you.  Sorry,

02:42:36 17  ladies and gentlemen.  I had to take up something with the

02:42:38 18  lawyers.

02:42:41 19      All right.  Mr. Pfeiffer, cross-examination.

02:42:44 20          MR. PFEIFFER:  Thank you, Your Honor.

02:42:44 21                  **CROSS-EXAMINATION**

02:42:44 22  BY MR. PFEIFFER:

02:42:46 23  Q    Good afternoon, Doctor Shapiro.

02:42:48 24  A    Good afternoon, Mr. Pfeiffer.

02:42:50 25  Q    Now, you mentioned earlier today that you've written

Shapiro - Cross

02:42:52 1   a number of articles over the years dealing with the

02:42:55 2   subject of merger analysis, correct?

02:42:59 3   A    Yes.

02:42:59 4   Q    Okay.  And you've set out your views on how mergers

02:43:03 5   should be analyzed in a number of different pieces,

02:43:06 6   haven't you?

02:43:07 7   A    Yes.  That's correct.

02:43:08 8   Q    And it's fair to say you have espoused the view that

02:43:11 9   merger enforcement in the United States should be more

02:43:14 10  vigorous than it actually is in the real world, haven't

02:43:17 11  you?

02:43:18 12  A    I think -- yes.  We should -- I favor somewhat more

02:43:22 13  vigorous merger enforcement than we have had over the past

02:43:27 14  10 to 15 years.

02:43:28 15  Q    In fact, you told that just late last year to a

02:43:30 16  Congressional subcommittee, didn't you; that there should

02:43:31 17  be more vigorous horizontal merger enforcement in the

02:43:35 18  United States?

02:43:36 19  A    Yes.  That's right.  I testified before the Senate.

02:43:38 20          THE COURT:  Mr. Pfeiffer, I'm not sure what

02:43:39 21  we're doing, but we're -- you're coming close to an area

02:43:43 22  that I told you you're not going into.

02:43:46 23          MR. PFEIFFER:  We're not going anywhere near

02:43:48 24  that area.

02:43:49 25          THE COURT:  Yeah.  But you can't do what you're

Shapiro - Cross

02:43:52 1  doing without it, I don't think.  So you need to get

02:43:53 2  moving into something else instead of policy levels.  What

02:43:55 3  he thinks about Congress doesn't have anything to do --

02:43:57 4  what he's told Congress doesn't have anything to do with

02:43:59 5  what he's here to testify about.

02:44:03 6          MR. PFEIFFER:  Okay.  I'll stay out of Congress,

02:44:06 7  then, Your Honor.

02:44:07 8          THE COURT:  And move on to another area.

02:44:10 9          MR. PFEIFFER:  Yes, Your Honor.

02:44:14 10 Q    In your direct testimony, you recall that you talked

02:44:17 11 about how this was a three to two merger, as it's called?

02:44:21 12 A    Yes.

02:44:22 13 Q    Okay.  But you agree, even with what you have written

02:44:31 14 about mergers, you don't propose that all three to two

02:44:36 15 mergers are necessarily anticompetitive, do you?

02:44:39 16 A    No.  I said we have to look case by case at the

02:44:42 17 facts.

02:44:42 18 Q    You agree that buying a rival and, thereby,

02:44:47 19 eliminating the competition between the buyer and the

02:44:48 20 seller is not, by itself, anticompetitive, don't you?

02:44:52 21 A    Of course.  I mean, it's -- you have to look at the

02:44:55 22 case -- the facts of the case, like I said.

02:44:56 23 Q    Yeah.  In any case, you need to look at the specific

02:45:00 24 circumstances of the merger to analyze whether it's

02:45:03 25 anticompetitive, don't you?

Shapiro - Cross

02:45:05 1   A    I would say so.  The cases I can think of.

02:45:09 2   Q    And as you mentioned earlier today, you teach at

02:45:12 3   Berkeley, right?

02:45:13 4   A    University of California at Berkeley, yes.

02:45:16 5   Q    But you also work, on a frequent basis, as a paid

02:45:16 6   expert, don't you?

02:45:17 7   A    I do have a regular consulting business as well, yes.

02:45:20 8   Q    And you generally, at least, conduct your work in

02:45:22 9   partnership with Charles River Associates, as you said?

02:45:26 10  A    Yes.  I'm -- yes.  I am associated with them,

02:45:29 11  affiliated.

02:45:30 12  Q    That's not part of the University of California at

02:45:32 13  Berkeley, right?

02:45:33 14  A    No.  It's separate.

02:45:34 15  Q    It's a for-profit institution?

02:45:36 16  A    Yes.  That's right.

02:45:37 17  Q    Okay.  And Charles River Associates is being

02:45:39 18  compensated for your work in this case at a rate of $1200

02:45:43 19  an hour; is that right?

02:45:44 20  A    That's correct.  Yes.

02:45:45 21  Q    And you mentioned also that Charles River Associates

02:45:47 22  provided a team of support staff to help you prepare your

02:45:51 23  work in this case?

02:45:52 24  A    Yes.  That's correct.

02:45:53 25  Q    And Charles River Associates charges by the hour for

Shapiro - Cross

02:45:56  1   the time of all those people, too, doesn't it?

02:45:59  2   A    They do.

02:46:00  3   Q    Do you know approximately how many total people at

02:46:02  4   Charles River billed time to this engagement in the last

02:46:05  5   more than a year you've been doing it?

02:46:08  6   A    I'm not sure exactly, but probably around four or

02:46:12  7   five, six.  There may be some people who would do a small

02:46:14  8   task, like checking something, that would be more people.

02:46:17  9   But the main people working on it regularly would be three

02:46:19 10   or four.

02:46:20 11   Q    Is it three or four or four or five?

02:46:22 12   A    I'm not sure.

02:46:23 13   Q    Okay.  And all those people who have may have billed

02:46:27 14   smaller time to it, how many would that be?  Do you know?

02:46:31 15   A    I wouldn't know.

02:46:32 16   Q    Okay.  And do you know how many hours in total

02:46:34 17   Charles River has billed for the time that you and your

02:46:37 18   team have put into this case?

02:46:38 19   A    I do not know.

02:46:39 20   Q    Not even an approximation?

02:46:41 21   A    No.  I haven't done that.  No, I don't know.

02:46:44 22   Q    Fair to say, this is not a case where either Steves,

02:46:47 23   or somebody on its behalf, said to you, Don't spend more

02:46:50 24   than 50 hours on this case, or anything like that, right?

02:46:53 25   A    No.  I never heard that.

Shapiro - Cross

02:46:54 1    Q    Okay.  So -- and nobody that you can recall denied

02:46:58 2    you permission to undertake any kind of analysis that you

02:47:01 3    wanted to do, did they?

02:47:05 4    A    Denied me permission?  No.  I mean, sometimes we

02:47:07 5    couldn't get data, but no, no permission was denied.

02:47:10 6    Q    Right.  So, I mean, if you didn't do an analysis, it

02:47:13 7    was because you, for whatever reason, decided not to do

02:47:16 8    it, right?

02:47:18 9    A    Or it wasn't feasible.

02:47:19 10   Q    Which would be a reason you decided not to do it?

02:47:22 11   A    Okay.  If you want to put it that way, sure.

02:47:25 12   Q    Okay.  And you're not offering any legal opinions

02:47:27 13   here today.  We can agree on that?

02:47:29 14   A    Yes, sir.

02:47:29 15   Q    And you're not an accountant.  So you're not offering

02:47:32 16   any accounting positions either, are you?

02:47:35 17   A    That's fair.  I'm an economist.

02:47:37 18   Q    And you also aren't offering any opinion in any

02:47:39 19   capacity about the break-even price that Steves could

02:47:43 20   afford to pay for door skins and still remain profitable

02:47:46 21   or viable, are you?

02:47:49 22   A    No.  I don't -- I don't have an opinion on that

02:47:51 23   number.

02:47:51 24   Q    Okay.  And you do know that as part of this

02:47:54 25   litigation, Steves is claiming that Jeld-Wen breached

Shapiro - Cross

| | | |
|---|---|---|
| 02:47:57 | 1 | certain portions of the contract between the parties, |
| 02:48:00 | 2 | right? |
| 02:48:00 | 3 | A    I'm aware of that. |
| 02:48:01 | 4 | Q    But you're not offering any opinions about whether |
| 02:48:03 | 5 | Jeld-Wen actually breached any contract provisions, are |
| 02:48:06 | 6 | you? |
| 02:48:07 | 7 | A    No.  I'm just talking about competition issues. |
| 02:48:09 | 8 | Q    And in your work on those competition issues, you |
| 02:48:13 | 9 | agree that as an economist, you're supposed to be looking |
| 02:48:16 | 10 | at the effects of the merger both anti and pro |
| 02:48:20 | 11 | competitive, right? |
| 02:48:22 | 12 | A    Well, the overall effects, whether they are |
| 02:48:25 | 13 | anticompetitive -- whether the competition was harmed or |
| 02:48:28 | 14 | not. |
| 02:48:28 | 15 | Q    Yeah.  And in doing that, you look at both pro and |
| 02:48:31 | 16 | anticompetitive effects to figure out whether the effect |
| 02:48:35 | 17 | overall is anticompetitive, don't you? |
| 02:48:40 | 18 | A    Well, if there are claims of merger-specific |
| 02:48:41 | 19 | efficiences, then I would take that into account, yes. |
| 02:48:44 | 20 | Q    Okay.  You're not offering the opinion that -- |
| 02:48:45 | 21 | THE COURT:  Just a minute, please. |
| 02:48:46 | 22 | MR. PFEIFFER:  Yes, Your Honor. |
| 02:48:46 | 23 | THE COURT:  Wasn't there a ruling on that? |
| 02:48:52 | 24 | MR. PFEIFFER:  I'm not aware of a ruling. |
| 02:48:54 | 25 | MR. POMERANTZ:  Your Honor, can we approach? |

Shapiro - Cross

02:49:01 1           (Discussion at sidebar as follows:)

02:49:04 2           THE COURT:  I thought I ruled there wasn't going

02:49:07 3  to be any discussion on efficiencies because nobody

02:49:09 4  testified about it.

02:49:10 5           MR. PFEIFFER:  No, Your Honor.  In fact, I think

02:49:13 6  you said, actually, we can present evidence of

02:49:15 7  efficiencies.  We have witnesses who are prepared to do

02:49:17 8  so.  I'm pretty sure that was your ruling.

02:49:19 9           MR. POMERANTZ:  My recollection of the last

02:49:20 10  ruling was Your Honor strongly discouraged them from doing

02:49:23 11  so because of the burden on them and the lack of evidence.

02:49:26 12  But I don't believe Your Honor instructed them not to --

02:49:28 13  you did say that you would strike it if they didn't tie it

02:49:31 14  up.  That's my recollection.

02:49:32 15           THE COURT:  All right.  I think you're right.

02:49:34 16           MR. POMERANTZ:  Yeah.  I think that's what you

02:49:35 17  said, Your Honor.

02:49:38 18           THE COURT:  Okay.

02:49:38 19           (End of sidebar discussion.)

02:49:48 20  Q    I'm not sure we finished that question and answer.

02:49:50 21  So let me ask you again.  You're not offering the opinion

02:49:53 22  that no benefits resulted from the merger, are you?

02:49:56 23  A    Benefits to whom?

02:49:57 24  Q    To anyone.

02:49:58 25  A    Well, I think Jeld-Wen benefited because they were

Shapiro - Cross

02:50:02 1   able to raise prices.

02:50:03 2   Q    Okay.  Are you offering the opinion that there were

02:50:05 3   no benefits to any of Jeld-Wen's customers through the

02:50:08 4   merger?

02:50:10 5   A    Well, on net -- there might be some particular

02:50:13 6   benefits I'm not aware of.  But on net, there's a harm

02:50:17 7   I've described associated with higher prices.

02:50:20 8   Q    Let me bring you back to my question.  You're not

02:50:22 9   offering the opinion that no benefits accrued to customers

02:50:24 10  as a result of the merger, are you, whether you net them

02:50:27 11  out or not?

02:50:31 12  A    I am not aware of any benefits accruing to customers

02:50:37 13  resulting from the merger that meet the screen associated

02:50:41 14  with the merger-specific efficiencies.

02:50:44 15  Q    And to be clear, you haven't offered any analysis

02:50:48 16  quantifying any benefits, if there are any, have you?

02:50:55 17  A    I have not quantified benefits because I am not aware

02:50:58 18  of any claims of merger-specific efficiencies associated

02:51:02 19  with this merger.

02:51:03 20  Q    Okay.  Now, you know that Steves is just one of --

02:51:07 21  one of Jeld-Wen's door skin customers, right?

02:51:10 22  A    Of course.

02:51:11 23  Q    And you, in fact, mentioned some others in your

02:51:16 24  direct testimony, right?

02:51:18 25  A    I did.

Shapiro - Cross

02:51:18 1  Q    You recall, you even put up a list of the top several

02:51:20 2  of them?

02:51:21 3  A    I do.

02:51:21 4  Q    But you know that none of them is a witness in this

02:51:24 5  case, right?

02:51:26 6  A    I believe that's correct.

02:51:28 7  Q    Despite that, you never spoke to any of those other

02:51:31 8  door skin customers in connection with any of your work in

02:51:33 9  this case, did you?

02:51:34 10  A    I don't understand the "despite that."

02:51:38 11  Q    They are not here as witnesses, and you never --

02:51:40 12         THE COURT:  Why would he be talking to other

02:51:42 13  witnesses?  You don't -- witnesses don't talk to other

02:51:45 14  witnesses.

02:51:47 15         MR. PFEIFFER:  Experts conduct interviews, Your

02:51:48 16  Honor.

02:51:49 17         THE COURT:  That's a different issue.  That's

02:51:51 18  talking to somebody before they're a witness.  You're

02:51:54 19  asking the wrong question.  And it really doesn't make any

02:51:58 20  difference anyway.  So can you go on to something else?

02:52:03 21         MR. PFEIFFER:  Can I just clarify, then, Your

02:52:03 22  Honor?

02:52:06 23         THE COURT:  Just move on, please.

02:52:08 24         MR. PFEIFFER:  Okay.

02:52:09 25  Q    I think you clarified this earlier, but in analyzing

Shapiro - Cross

02:52:12  1    the effects of the merger, you're supposed to look at the

02:52:15  2    effects in the entire relevant market, right?

02:52:18  3    A    As much as you can, certainly.  You'd be interested

02:52:20  4    in all the customers in the market.

02:52:22  5    Q    Right.  Not just the effects on Steves.  That

02:52:25  6    wouldn't be an appropriate way to do it?

02:52:27  7    A    I'm interested in the effects on all the customers in

02:52:29  8    the relevant market, yes.

02:52:31  9    Q    And, Professor Shapiro, you agree that the demand for

02:52:36 10    interior molded door skins is driven primarily by new home

02:52:41 11    construction, don't you?

02:52:42 12    A    I think it's new home construction and renovation

02:52:46 13    together in the mix.  Depends on where we are in the

02:52:49 14    economic cycle.

02:52:51 15    Q    And you also agree that from 2007 to 2009, new home

02:52:55 16    construction fell to historic lows; isn't that right?

02:52:58 17    A    It was a deep recession.  So I would agree with that.

02:53:03 18    Q    Do you agree, as you said in your report, that new

02:53:06 19    home construction fell to historic lows during that time

02:53:09 20    period?

02:53:09 21    A    If I used that term, that sounds fine.

02:53:12 22    Q    Okay.  And you referred to that time period as the

02:53:14 23    Great Recession, didn't you?

02:53:15 24    A    I do.

02:53:16 25    Q    Okay.  Now, as I think we saw a chart of earlier,

Shapiro - Cross

02:53:20 1  during the course of your work, you looked at historical

02:53:22 2  housing start data.  Do you remember that chart that you

02:53:25 3  put up?

02:53:26 4  A    I do.

02:53:27 5  Q    Okay.  And based on that data, as of October of 2016,

02:53:35 6  housing starts were still at a level less than 60 percent

02:53:38 7  of their peak value of 2.3 million in January of 20 --

02:53:43 8  2006; isn't that right?

02:53:45 9  A    I don't think the peak was quite as high as you said.

02:53:47 10 I was using annual data.  Maybe you're using monthly data.

02:53:52 11 Q    Why don't you take a look at your supplemental

02:53:54 12 report, if you would, please.

02:53:56 13 A    Okay.  Where in particular, please?

02:54:02 14 Q    If you'd look in particular, please, at pages 16 to

02:54:06 15 17.

02:54:07 16 A    Okay.

02:54:08 17 Q    There aren't paragraph numbers.  So we'll have to

02:54:10 18 just get to it.

02:54:11 19 A    Okay.  I'm there.

02:54:13 20 Q    The last carry-over sentence from page 16 over on to

02:54:20 21 page 17 says, "Though housing starts are recovered from

02:54:25 22 the minimum of .48 million in April 2009 to .98 million in

02:54:30 23 December 2012 and 1.3 million in October 2016, they are

02:54:35 24 still less than 60 percent of the peak value of

02:54:39 25 2.3 million in January 2006."  That's what you said in

Shapiro - Cross

02:54:42  1   your supplemental report, correct?

02:54:44  2   A    Yes.  So that's correct.  The confusion before was

02:54:47  3   the data we were showing to the jury was annual.  And

02:54:49  4   these are broken down by month.  That was the peak month.

02:54:54  5   Somewhat higher.  This is exactly right.

02:54:57  6   Q    And as we saw, in 2000 housing starts were still less

02:55:03  7   than 1 million, by your calculation, right?

02:55:05  8   A    In what year?

02:55:06  9   Q    2012.

02:55:11 10   A    Well, here has the month.  I'd have to check the

02:55:14 11   chart for the annual, but that sounds about right.

02:55:20 12   Q    So while housing starts had increased from 2009 to

02:55:24 13   2012, housing starts were still, then, less than half what

02:55:31 14   they were prior to the Great Recession.  We can agree on

02:55:35 15   that, right?

02:55:36 16   A    Prior to the peak, I would say, which occurred a bit

02:55:37 17   before the recession started.

02:55:40 18   Q    Yes.  Exactly.  The peak was prior to the Great

02:55:42 19   Recession.

02:55:42 20   A    Well, the peak was in 2005, if I remember the data

02:55:46 21   right.  The recession, I believe, started in late 2007.

02:55:50 22   Q    And you know that companies in the construction

02:55:56 23   sector, in general, suffered greatly during that Great

02:56:01 24   Recession because of the dip in housing starts, right?

02:56:04 25   A    Yes.  That's right.  It's one of the more --

Shapiro - Cross

02:56:07  1  industries that's more affected by the business cycle

02:56:08  2  housing for construction.

02:56:10  3  Q    Right.  For example, you know that Masonite went into

02:56:13  4  bankruptcy during the Great Recession?

02:56:15  5  A    That sounds right.

02:56:16  6  Q    And you know that Jeld-Wen itself had to do a

02:56:19  7  financial restructuring during that time period?

02:56:21  8  A    I'm aware of that.

02:56:22  9  Q    Okay.  Now, you are not a door skin manufacturing

02:56:33 10  expert, are you, sir?

02:56:35 11  A    Thankfully, I am not.

02:56:36 12  Q    You don't have any prior experience evaluating

02:56:39 13  competitive conditions in the interior molded door skin

02:56:42 14  business either, do you?

02:56:43 15  A    No.  This is the first time I've looked at this

02:56:46 16  industry.

02:56:47 17  Q    Now, you do know that there was some testimony in

02:56:50 18  this case prior to you being here about Steves'

02:56:52 19  investigation into building a molded door skin

02:56:55 20  manufacturing plant.  Do you recall that?

02:56:57 21  A    Yes.  I'm aware of that.

02:56:59 22  Q    But you have not undertaken any independent economic

02:57:02 23  analysis of whether Steves could build or buy a door skin

02:57:05 24  plant, have you?

02:57:07 25  A    No.  I'm relying on the evidence that has been made

Shapiro - Cross

02:57:13 1 available to me about their explorations and also from

02:57:16 2 Jeld-Wen and Masonite on this issue.

02:57:19 3 Q    Yes.  But you have not done any kind of ground-up

02:57:22 4 analysis of what would be involved to build a door skin

02:57:24 5 plant, have you?

02:57:26 6 A    I have not.

02:57:26 7 Q    And during the course of your work in this case, you

02:57:29 8 never spoke to anyone who's owned or run a door skin

02:57:32 9 plant, have you?

02:57:34 10 A    No.  That would -- I did not.

02:57:36 11 Q    You haven't visited any door skin manufacturing

02:57:39 12 plants, have you?

02:57:40 13 A    No.  I visited Steves' plant.  But they don't make

02:57:44 14 door skins.

02:57:45 15 Q    And you're not an expert in the design of door skins,

02:57:47 16 are you?

02:57:48 17 A    I certainly am not.

02:57:49 18 Q    And you're not an expert in the quality of door

02:57:54 19 skins, are you?

02:57:55 20 A    I am not.  We can be very clear about those things.

02:57:58 21 Q    So we can agree, you're not offering any opinion

02:58:01 22 about the quality of any door skins that might be

02:58:03 23 available from foreign suppliers, for example?

02:58:06 24 A    I'm not offering an opinion on the quality.  I can

02:58:09 25 observe what is in the record on that, but I have no

Shapiro - Cross

02:58:12  1    opinion myself on the quality.

02:58:13  2    Q    Thank you.  You do have some familiarity with at

02:58:21  3    least the identities of some of the foreign suppliers that

02:58:24  4    Steves has looked into obtaining door skins from, right?

02:58:29  5    A    Certainly.

02:58:30  6    Q    You're aware of the door skin manufacturer Teverpan,

02:58:33  7    for example?

02:58:34  8    A    Yes.  I'm familiar with Teverpan.

02:58:38  9    Q    And you've heard of Kastamonu?

02:58:39 10    A    I have.

02:58:40 11    Q    Yildiz?

02:58:41 12    A    Yes, sir.

02:58:41 13    Q    Okay.  But, again, you haven't spoken, in the course

02:58:44 14    of your investigation in this case, with any of those

02:58:46 15    companies, have you?

02:58:47 16    A    No.  We have deposition testimony from a person from

02:58:50 17    Teverpan, for example.  So I'm aware of that.

02:58:52 18    Q    And with regard to Teverpan, you haven't done any

02:58:56 19    analysis to determine how feasible it would be, as a

02:58:59 20    financial matter, for Teverpan to expand its offerings to

02:59:04 21    meet more of Steves' needs than it currently does, have

02:59:10 22    you?

02:59:10 23    A    I've looked at what the record has on that.  I've

02:59:13 24    discussed it in my reports.  But I have not done a

02:59:15 25    separate financial analysis, which I think is requested.

Shapiro - Cross

02:59:19 1    Q    It is.  Yeah.

02:59:20 2    A    Okay.

02:59:21 3    Q    So you also haven't studied how long it would take

02:59:25 4    Teverpan or any other company to expand its offerings,

02:59:27 5    have you?

02:59:28 6    A    It's the same answer as previously.  I see what they

02:59:31 7    are saying about that and what they're in discussions with

02:59:34 8    from Steves and from other evidence, but I have not done a

02:59:36 9    separate analysis of the time to expand door skin

02:59:39 10   production in Turkey.

02:59:40 11   Q    Okay.  Now, it's correct to say that merger analysis

02:59:46 12   requires an assessment of what will likely happen if a

02:59:50 13   merger proceeds as compared to what will likely happen if

02:59:53 14   it does not proceed, right?

02:59:56 15   A    That sounds more framed for a merger that hasn't

03:00:00 16   happened yet.  But I take the basic idea.

03:00:03 17   Q    And that basic idea is what's referred to often as a

03:00:07 18   but-for analysis, right?

03:00:08 19   A    You could use that term.  I think I know what you

03:00:11 20   mean.

03:00:11 21   Q    Yeah.  It's sometimes referred to as constructing a

03:00:15 22   but-for world?

03:00:16 23   A    Yes.  I'm familiar with that term.

03:00:19 24             THE COURT:  Are you saying that's what you do

03:00:21 25   for a merger that hasn't happened yet or does it apply for

Shapiro - Cross

03:00:27 1  a merger that has happened?

03:00:29 2         THE WITNESS:  No.  Either way.  I think if

03:00:31 3  you're asking how the merger affected competition, you

03:00:35 4  want to compare the competition with and without the

03:00:39 5  merger.  And you're not going to see both of those.  So

03:00:41 6  you see one maybe and you try to figure out with the other

03:00:44 7  one, and you're comparing.  If the merger hasn't happened

03:00:49 8  yet, you don't know what's going to happen with the

03:00:50 9  merger.  You don't know what's going to happen without the

03:00:54 10 merger.  So it's even harder.  Here we see what happened

03:00:56 11 with the merger, but we're wondering would there have been

03:01:00 12 more competition without it.

03:01:01 13        MR. PFEIFFER:  You anticipated my next question,

03:01:02 14 Your Honor.

03:01:04 15 Q    So -- and that but-for analysis is, frankly, not even

03:01:08 16 unique to mergers.  Antitrust economists use that in other

03:01:12 17 type of antitrust analysis about challenged behaviors

03:01:16 18 besides mergers, don't they?

03:01:19 19 A    Yes.  I think that's fair.

03:01:20 20 Q    Okay.  Maybe we'll talk a little bit more about the

03:01:27 21 but for analysis in this case.  Professor Shapiro, you

03:01:29 22 aren't claiming that the 2012 merger between Jeld-Wen and

03:01:32 23 CMI caused the Great Recession in any way, are you?

03:01:36 24 A    Certainly not.  Particularly since the Great

03:01:38 25 Recession happened several years before that.

Shapiro - Cross

03:01:41  1  Q    Exactly.  And you also aren't claiming that the

03:01:43  2  merger caused housing starts, from 2012 to today, to be

03:01:47  3  any higher or lower than they would have been but for the

03:01:51  4  merger, are you?

03:01:52  5  A    No.

03:01:54  6  Q    So we can agree that the full effects of the Great

03:01:57  7  Recession and the housing crash on this marketplace have

03:02:02  8  to exist in an analysis of both the real observed world

03:02:06  9  and the but for world, right?

03:02:11 10  A    If the merger had not gone through, we would still

03:02:14 11  have had a modest recovery in housing starts, but we would

03:02:18 12  have had three suppliers of door skins instead of two.

03:02:23 13          MR. PFEIFFER:  I'm going to move to strike as

03:02:24 14  nonresponsive as to the part after "but," Your Honor.

03:02:31 15          THE COURT:  Anybody have anything to say?

03:02:34 16          MR. POMERANTZ:  I think it was responsive.

03:02:35 17          THE COURT:  I think it was responsive.  And I

03:02:36 18  think you need to get on with right to the bottom line,

03:02:39 19  you know.  There are a lot of things that didn't happen.

03:02:43 20  Just get into the points that you really are worried

03:02:47 21  about.

03:02:48 22          MR. PFEIFFER:  I'm working on it, Your Honor.

03:02:50 23  I'll work faster.

03:02:53 24  Q    Professor Shapiro, you mentioned earlier I think

03:02:55 25  today that to attribute a price increase to a merger, it's

Shapiro - Cross

03:02:58 1   necessary to rule out other explanations that might

03:03:01 2   account for that price increase, right?

03:03:04 3   A   It's desirable to explore other explanations as part

03:03:07 4   of determining the likely cause of the price increases.

03:03:11 5   Q   And other possible explanations, for a post-merger

03:03:15 6   price increase, could include quality improvements, shifts

03:03:20 7   in demand to favor higher price products and outward

03:03:24 8   shifts in demand, and increases in marginal cost, right?

03:03:32 9   A   In general, those are things that can cause prices to

03:03:36 10   go up.  That is true.  If that's the point as a general

03:03:41 11   concept, I would agree with that.

03:03:43 12   Q   You recall having actually written that in a piece

03:03:47 13   you did together with Professor Baker?

03:03:51 14   A   No.  But I know John, so I bet I wrote it.

03:03:59 15   Q   You do agree in this case that demand for interior

03:04:03 16   molded doors and, therefore, door skins has grown since

03:04:07 17   2012, right?

03:04:08 18   A   Yes.  I showed the housing starts, and that is a

03:04:12 19   factor in growing demand for door skins, yes.

03:04:15 20   Q   In fact, you're aware that Steves, in particular, has

03:04:18 21   purchased more than double the amount of door skins in

03:04:22 22   2017 than it did in 2011.  Do you recall that testimony in

03:04:25 23   this case?

03:04:27 24   A   I don't specifically recall that.  But I think the

03:04:29 25   data I have, through at least part of 2017, is right on

Shapiro - Cross

03:04:34 1  track with approximately a doubling as the market has

03:04:40 2  improved.

03:04:40 3  Q    You talked earlier today about I guess discounting

03:04:44 4  the impact of demand on door skin prices based on your

03:04:49 5  view that capacity utilization was -- was not sufficiently

03:04:53 6  high to have triggered the price increase.  Is that about

03:04:58 7  right?

03:04:59 8  A    I don't think I discounted it.  I considered it and

03:05:02 9  explained that the increase in demand does not explain the

03:05:05 10 price increase.

03:05:05 11 Q    Okay.  But you do agree that Jeld-Wen's capacity

03:05:08 12 utilization did increase since 2012, right?

03:05:11 13 A    Yes.  I showed a chart showing going up from

03:05:15 14 67 percent to between 70 and 73 percent.

03:05:18 15 Q    Right.  And I don't believe you've conducted any

03:05:22 16 independent analysis of Masonite's capacity utilization in

03:05:25 17 this case, have you?

03:05:27 18 A    I have information about their capacity utilization.

03:05:30 19 I did not independently study that.  But I do have

03:05:33 20 information about that, yes.

03:05:36 21 Q    Professor Shapiro, you didn't offer any analysis

03:05:38 22 showing by how much capacity utilization would need to

03:05:42 23 increase to justify any given level of price increase, did

03:05:47 24 you?

03:05:52 25 A    I don't have a quantification of how that would

Shapiro - Cross

03:05:55  1    occur.  When one gets really tight -- really tight

03:05:59  2    capacity, because the change in capacity utilization was

03:06:03  3    quite modest, I didn't need to get into that.

03:06:07  4    Q    And to be clear, you haven't offered any sort of

03:06:10  5    formulaic where if capacity utilization increases by

03:06:14  6    5 percent, then prices would be expected to increase by

03:06:17  7    whatever percent, have you?

03:06:18  8    A    No.  I don't have a formulaic approach like that.  I

03:06:23  9    do not.

03:06:24 10    Q    And you didn't offer any analysis in this case

03:06:26 11    showing what business steps it took at Jeld-Wen to achieve

03:06:31 12    the increase in utilization capacity -- capacity

03:06:34 13    utilization that you did observe, right?

03:06:39 14    A    Well, I looked quite a bit at plant by plant.  We

03:06:44 15    measured capacity utilization.  But if you mean -- I think

03:06:47 16    you mean by "business steps," more specific actions, I

03:06:50 17    don't know the details of that.  No.  To go up from 67 to

03:06:54 18    70 percent, I have not done a detailed study of those

03:07:00 19    actions in the plant, if you will.

03:07:02 20    Q    Right.  You don't know, for example, whether any

03:07:04 21    extra shifts were required at any of the plants to achieve

03:07:07 22    that increase in capacity utilization, do you?

03:07:10 23    A    I know I asked about that.  I can't remember the

03:07:12 24    answer right now.

03:07:13 25    Q    You -- you don't know whether any additional

Shapiro - Cross

03:07:16 1  supervisors needed to be hired to achieve that capacity

03:07:19 2  utilization increase, do you?

03:07:22 3  A    I don't know as I sit here.  I'd have to check my

03:07:25 4  reports on that one.

03:07:26 5  Q    And you didn't analyze how the integration of the

03:07:29 6  Towanda plant and the closing of other Jeld-Wen plants

03:07:33 7  impacted capacity utilization, did you?

03:07:36 8  A    Yes, I did.  I looked at that, because I had plant

03:07:38 9  level data.  So I was able to study those shifts.

03:07:43 10  Q    And, Professor Shapiro, do you know how many

03:07:45 11  employees would be needed to run any Jeld-Wen plant at

03:07:50 12  anywhere near the nameplate capacity you mentioned

03:07:54 13  earlier?

03:07:56 14  A    Not sitting right here, no.  I have data on the

03:07:59 15  direct costs, including labor.  So I'm including that

03:08:02 16  category.  But I don't know the head counts, no.

03:08:05 17  Q    And you don't know how many shifts would be required

03:08:07 18  to run at anywhere near nameplate capacity either, do you?

03:08:11 19  A    No, I don't know that specifically.

03:08:13 20  Q    Now, you also never conducted any analysis in this

03:08:17 21  case demonstrating that any point prior to the merger,

03:08:23 22  that door skin prices at Jeld-Wen increased or decreased

03:08:28 23  in relation to capacity utilization, did you?

03:08:40 24  A    I -- I don't know that I was able to do that prior to

03:08:44 25  2012, or so.  I don't think so.

Shapiro - Cross

03:08:46  1    Q    At any rate, you didn't set forth such an analysis in

03:08:53  2    any of your reports.  We can agree on that, can't we?

03:08:57  3    A    I think so.  That's right.  I want to make sure I'm

03:08:59  4    understanding.  So you're saying before 2012 --

03:09:02  5    Q    Yeah.

03:09:02  6    A    -- looking at changes in capacity utilization and

03:09:05  7    changes in price and how they might be related?

03:09:08  8    Q    Right.

03:09:08  9    A    Okay.  No, I don't think I was able to do that in my

03:09:12 10    reports.  I don't think I did.

03:09:13 11    Q    And you also didn't conduct any analysis comparing

03:09:16 12    how Steves' prices for any of its products correlated to

03:09:22 13    changes in its capacity utilization at its plants, did

03:09:25 14    you?

03:09:27 15    A    Now we're talking about doors rather than door skins?

03:09:29 16    Q    Any of their products.

03:09:30 17    A    I'm sorry.  I wasn't looking at doors.  I was looking

03:09:33 18    at door skins.  And they don't make door skins.

03:09:36 19    Q    So you didn't check to see whether there are any

03:09:38 20    changes in capacity utilization corresponded to changes in

03:09:41 21    prices at Steves.  We can agree on that?

03:09:45 22    A    We can agree I did not do that.  That is irrelevant

03:09:47 23    for the analysis at hand.

03:09:54 24    Q    Now, I think you mentioned earlier today that you are

03:09:57 25    aware that Jeld-Wen entered into a long-term supply

Shapiro - Cross

03:10:00 1  agreement to sell door skins to Steves back in 2012,

03:10:04 2  right?

03:10:05 3  A    Yes, sir.

03:10:05 4  Q    Okay.  And you do agree that the but-for world has to

03:10:10 5  legitimately include that contract between Steves and

03:10:14 6  Jeld-Wen in it, right?

03:10:17 7  A    Yes.  That's right.

03:10:18 8  Q    Because the contract took place before the merger,

03:10:21 9  right?

03:10:22 10  A    Yes.  I'm hesitating because my understanding is the

03:10:25 11  parties expected the merger to take place at the time the

03:10:29 12  contract was signed, but it did occur before the merger

03:10:31 13  was closed.

03:10:32 14  Q    And you're not aware of any provision in that

03:10:34 15  agreement that gave either party an out if the merger

03:10:37 16  didn't close, are you?

03:10:39 17  A    I don't think so.

03:10:40 18  Q    Okay.  And you do know the contract gave a seven-year

03:10:47 19  termination notice provision?

03:10:49 20  A    Yes.  The one that Jeld-Wen exercised sometime later.

03:10:52 21  Q    Yes.  But you're not offering the opinion that the

03:10:55 22  merger created that seven-year termination right, are you?

03:10:59 23  A    No.  My understanding is that was part of the

03:11:01 24  contract signed in May 2012, which was prior to the

03:11:04 25  merger.

Shapiro - Cross

03:11:04 1  Q    Right.  Now, I want to make sure I understood your

03:11:10 2  testimony earlier.  Are you offering any opinion in this

03:11:16 3  case that the merger increased Jeld-Wen's incentive to

03:11:21 4  breach the contract?

03:11:26 5  A    I don't think I'm offering an opinion about that, no.

03:11:30 6  Q    Save some questions.

03:11:32 7  A    The reason I hesitated, I did talk about how there

03:11:35 8  are ambiguities in the contract, where there's

03:11:40 9  disagreement, and the merger -- and the seller's power

03:11:42 10 that can result in the merger can affect conduct and,

03:11:45 11 therefore, could potentially lead to more disputes about

03:11:50 12 how to interpret the contract.  But I don't think of that

03:11:52 13 as talking about incentive to breach, which was your

03:11:55 14 question.

03:11:55 15 Q    Yeah.  That's what I want to be clear on.  I wanted

03:11:57 16 to make sure I understood you before.

03:11:59 17 A    Okay.

03:11:59 18 Q    So we are clear.  You're not offering the opinion

03:12:01 19 that the merger created an incentive to breach the

03:12:05 20 contract?

03:12:06 21 A    No, because I -- no, I'm not.  I'm not.  With the

03:12:10 22 distinction I made in the previous answer.

03:12:13 23 Q    Yes.  So I believe you said earlier this morning that

03:12:21 24 somewhere north of 80 percent of Jeld-Wen's external sales

03:12:25 25 of door skins are governed by price protected supply

Shapiro - Cross

03:12:30 1    agreements.  Did I understand you right?

03:12:32 2    A    Yes.  I think I gave the figure 84 percent.  It

03:12:34 3    varies from year to year.  But that was the range as of --

03:12:37 4    in that sort of 2014 era.

03:12:40 5    Q    And for the sales that are governed by long-term

03:12:44 6    agreements, the prices charged by Jeld-Wen are determined

03:12:48 7    by the contract, not by competitive conditions as they

03:12:52 8    currently exist, right?

03:12:55 9    A    Well, not entirely.  The contract will specify the

03:13:00 10   prices, but competitive conditions can come into play

03:13:06 11   because some customers, such as Steves, can get a lower

03:13:09 12   price by -- if they have an option to go outside.  Because

03:13:14 13   their contract specifies that if they get another offer

03:13:17 14   that's at least 3 percent below what Jeld-Wen is charging

03:13:20 15   them, they have the right to go to that other supplier,

03:13:23 16   notwithstanding their commitment to volume at Jeld-Wen.

03:13:27 17   They basically get an out.  So competitive conditions

03:13:30 18   still could very much affect the price that Jeld-Wen

03:13:34 19   charges Steves in that example in the context of a

03:13:37 20   long-term agreement.

03:13:41 21   Q    My apologies.  I thought you were done.  Are you

03:13:43 22   finished?

03:13:44 23   A    I am.

03:13:45 24   Q    You recall you had your deposition taken in this

03:13:47 25   case?

Shapiro - Cross

03:13:48  1   A     I do.

03:13:49  2           MR. PFEIFFER:  Your Honor, may we approach with

03:13:51  3   a copy of the deposition transcript for the witness and

03:13:53  4   the Court?  Thank you.

03:14:23  5   Q     If you would turn, within the deposition transcript

03:14:26  6   that you have there, please, to page 165, starting at line

03:14:36  7   18.  There's a question and answer there that goes on

03:14:42  8   until line 17 on page 166.  I'll direct you specifically

03:14:50  9   to lines 13 to 14 there.  This is your answer.  You gave

03:14:57 10   the answer there, didn't you?  "So the prices are

03:15:02 11   determined by contract, not by competitive conditions as

03:15:05 12   they currently exist.

03:15:06 13           Correct, sir?

03:15:08 14   A     That's the sentence in the longer answer about a

03:15:10 15   different topic.  That is what I said.

03:15:13 16           MR. POMERANTZ:  I'm sorry.  Could you just give

03:15:15 17   me the page and line numbers?

03:15:17 18           MR. PFEIFFER:  Yes.  The full sequence is 165-18

03:15:20 19   to 166-17.  And the specific sentence is at 13 and 14.

03:15:27 20           MR. POMERANTZ:  Thank you.

03:15:28 21   A     I stand by both answers.

03:15:32 22           THE COURT:  Mr. Pfeiffer, that's not -- you have

03:15:34 23   to have an impeachment, and that didn't do it.  Just make

03:15:39 24   sure it does.

03:15:40 25           MR. PFEIFFER:  Yes, Your Honor.

Shapiro - Cross

03:15:41 1        THE COURT:  If he -- you know, you took part of

03:15:43 2    it out of context, and part of it was right and part of it

03:15:52 3    amassed what he said.  Let's do it right.  Okay?

03:15:56 4        MR. PFEIFFER:  Yes, Your Honor.

03:15:57 5    Q    Now, in the but for world, sales to that same 84 or

03:16:04 6    90 percent, whatever it is, would, to the same extent, be

03:16:10 7    governed by contract rather than current competitive

03:16:12 8    conditions, right?

03:16:14 9    A    In the but for world, regarding Steves, for example,

03:16:18 10   the contract would still be in place, but we would have

03:16:24 11   CraftMaster as an alternative supplier, who might still

03:16:28 12   seek Steves' business.  But the contract and the prices --

03:16:30 13   the formula specified in the contract for the prices would

03:16:33 14   still be in place.

03:16:36 15   Q    So, yes, the contract would still be governing

03:16:39 16   pricing, right?

03:16:41 17   A    As I've described before, the contract specifies

03:16:44 18   certain prices.  And those will be the prices unless

03:16:48 19   Steves can get a lower price by exercising its right under

03:16:53 20   that contract --

03:16:55 21   Q    Sure.

03:16:55 22   A    -- to go outside if the discount is at least

03:16:58 23   3 percent from somebody else, such as CraftMaster.

03:17:02 24   Q    The prices charged under the contract will be

03:17:05 25   governed by the contract is what I'm trying to establish.

Shapiro - Cross

03:17:08 1   We agree on that, right?

03:17:09 2   A    I thought we were talking about the prices that

03:17:12 3   Steves would pay to Jeld-Wen.

03:17:15 4   Q    Yes.

03:17:15 5   A    Which are either the ones specified in the contract

03:17:17 6   or lower ones if they can get lower ones by exercising

03:17:21 7   another -- by having another choice.

03:17:22 8   Q    Okay.  I think I -- I think we're on the same page.

03:17:25 9   A    Good.

03:17:26 10  Q    Okay.  Now, the long-term agreement between Steves

03:17:31 11  and Jeld-Wen is quite specific about pricing, isn't it?

03:17:35 12  A    Yes.  You're referring to the key input costs and

03:17:38 13  the -- used as an index to govern changes in prices year

03:17:42 14  to year?

03:17:43 15  Q    Well, I'm actually referring to -- that's how you

03:17:46 16  characterized it.  Do you recall that?

03:17:47 17  A    That's my understanding of the contract, yes.

03:17:49 18  Q    Okay.  And because that long-term contract is quite

03:17:52 19  specific about pricing, that has given some protection to

03:17:55 20  Steves, hasn't it?

03:17:57 21  A    Absolutely.

03:17:57 22  Q    Okay.  In fact, you calculated, didn't you, that the

03:18:06 23  difference between the 2016 and 2012 average prices

03:18:12 24  charged to Steves is roughly 1.1 percent, didn't you?

03:18:19 25  A    Okay.  I -- that sounds right.  I can check it, but

Shapiro - Cross

03:18:22 1   that sounds right.

03:18:23 2   Q    Okay.  And those prices only changed about

03:18:27 3   1.1 percent between 2012 and 2016 because the existence of

03:18:33 4   the long-term supply agreement between Jeld-Wen and Steves

03:18:37 5   dampened any post-merger price increases, right?

03:18:44 6   A    Yes.  That's all correct.

03:18:45 7   Q    Okay.  Professor Shapiro, you're obviously familiar

03:18:51 8   with the concept of inflation, right?

03:18:53 9   A    Yes.  I think we all are, actually.

03:18:56 10  Q    We probably are all.  When doing the calculation

03:18:59 11  leading to the 1.1 percent price increase from 2012 to

03:19:03 12  2016, you didn't adjust for inflation, did you?

03:19:10 13  A    Well, it depends on what type of inflation.

03:19:12 14  Inflation refers to changes in prices over time.  We

03:19:15 15  normally think of prices going up.  In this case, since

03:19:18 16  the cost went down, Steves' price was supposed to go down

03:19:23 17  under the contract.  So actually, deflation is what I did

03:19:26 18  not adjust for.

03:19:27 19  Q    Let me be more clear.  You didn't adjust for any

03:19:31 20  consumer price index or any other general economic measure

03:19:34 21  of inflation, did you?

03:19:38 22  A    No.  That's not applicable here.  The relevant -- the

03:19:42 23  consumer price indexes talk about the prices that

03:19:44 24  consumers pay for things, which have been going up about

03:19:49 25  2, 3 percent a year.  The price index here is costs for

Shapiro - Cross

03:19:52 1   Jeld-Wen, which are going down.  That's what the key cost

03:19:54 2   is.  It's an index.  There was deflation at this time.

03:19:56 3   Q    No.  I understand about the contractual price.  I'm

03:19:59 4   just saying, relative to the consumer price index, or any

03:20:02 5   other measure, you didn't apply that inflation indicator

03:20:05 6   to your measurement.  We can agree on that?

03:20:08 7   A    No.  I did apply.  I applied the key cost index.

03:20:11 8   That's an index.  It happens to be going down.  So it's

03:20:14 9   deflation.  I looked at average variable cost.  I did not

03:20:17 10  apply a consumer price index because it's not appropriate

03:20:21 11  in this setting.  This is not about consumer prices.

03:20:25 12  Q    Okay.  One of the ways that antitrust economists

03:20:28 13  conduct merger analysis is to compare current market

03:20:33 14  prices with hypothetical competitive prices that would

03:20:37 15  have prevailed in the market if the merger hadn't taken

03:20:41 16  place.  Is that fair to say?

03:20:43 17  A    No.  I don't think I -- or maybe -- could you ask it

03:20:47 18  again?  It didn't sound quite right to me, no.

03:20:54 19  Q    Sure.  Let's take it a step back.  In looking at

03:20:57 20  what's called -- you're familiar with the concept of a but

03:21:00 21  for price generally, aren't you?

03:21:02 22  A    Yes.  That's fair.  Yes, I am.

03:21:05 23  Q    In looking at a but for price, you compare an

03:21:12 24  observed market versus what you called but for world, or

03:21:15 25  but for price, that would have prevailed in an alternative

Shapiro – Cross

03:21:19 1  reality where, for example, a merger didn't take place.

03:21:21 2  Does that sound right to you?

03:21:24 3  A    I'm with you so far.

03:21:25 4  Q    Okay.  We agree on that?

03:21:27 5  A    I understand you.

03:21:28 6  Q    Okay.  And you reviewed your reports and your

03:21:34 7  deposition in preparation for testifying here today,

03:21:36 8  didn't you?

03:21:38 9  A    I did not review the deposition.  I reviewed the

03:21:41 10 reports.

03:21:42 11 Q    Well, do you recall we discussed at your deposition

03:21:44 12 the topic of what the but for competitive price for door

03:21:48 13 skins would be in a hypothetical world in which the merger

03:21:51 14 did not take place?

03:21:54 15 A    No, I don't recall that.  I mean, I -- I can easily

03:21:57 16 believe we talked about it, but I don't recall specifics.

03:21:59 17 Q    Okay.  For example, do you recall specifically that I

03:22:04 18 asked you, Can you tell me what the but for competitive

03:22:07 19 price would be for the year 2017?

03:22:12 20 A    No, I don't recall your asking that specifically.

03:22:15 21 Q    Okay.

03:22:19 22       MR. PFEIFFER:  Your Honor, may I refresh the

03:22:21 23 witness' recollection by referring him to deposition

03:22:25 24 testimony?

03:22:26 25       THE COURT:  Yeah.

Shapiro - Cross

03:22:28 1  Q    So this is just to refresh your recollection.  You

03:22:30 2  don't have to read this into the record.  But will you

03:22:32 3  take a look at your deposition, please.

03:22:34 4  A    Okay.  Where?

03:22:35 5  Q    Page 31, starting at line 17.

03:22:46 6  A    Okay.  Okay.  I can start reading -- do you want to

03:22:52 7  give me a sense of how long I need to read?

03:22:55 8  Q    Yeah.  Well, there's two questions and answers.  So

03:22:57 9  the first question and answer goes from 31, line 17, over

03:23:01 10 to 32, line 1.  And then it also goes over from there,

03:23:05 11 from 32, line 2, to 33, line 11.  It might be useful to

03:23:11 12 refresh your recollection.

03:23:15 13 A    Okay.  May I take a moment to do that, then?

03:23:19 14 Q    Of course.

03:23:33 15         THE COURT:  Mr. Pfeiffer, can you point him to

03:23:35 16 some part of it that would help refresh his recollection

03:23:38 17 about what you're asking about?  I don't know that I'm

03:23:39 18 knowledgeable enough to understand it, but I have read

03:23:42 19 what you've asked and I don't even see anything that even

03:23:44 20 deals with it, except the general topic that begins in the

03:23:52 21 question, "Where in your reports do you set forth what you

03:23:55 22 consider to be the competitive price for door skins as of

03:23:58 23 2017?"

03:24:00 24         MR. PFEIFFER:  Yes.

03:24:00 25         THE COURT:  You all have a long discussion about

Shapiro – Cross

03:24:02 1  something that doesn't even appear to be that.

03:24:05 2          MR. PFEIFFER:  It's actually following -- the

03:24:06 3  next question and answer follow from that, and there will

03:24:10 4  be follow-up questions.  So I think it's better to have

03:24:12 5  him read the whole thing.

03:24:14 6          THE COURT:  Then ask him the question, not this

03:24:16 7  one.  Because he needs to read three pages and figure out

03:24:20 8  where in there you think it's something he needs to think

03:24:23 9  about again.

03:24:24 10          MR. PFEIFFER:  Okay.

03:24:25 11          THE COURT:  And that's wasteful of time.

03:24:29 12  Q    Do you recall now that I did ask you the question

03:24:30 13  about 2017 competitive price?

03:24:33 14  A    I've read the portion you asked me to read.

03:24:35 15  Q    Okay.  And do you recall, you said you said couldn't

03:24:39 16  point to any single sentence in your report that lays out

03:24:43 17  what you consider to be the competitive market price for

03:24:46 18  door skins as of 2017, right?

03:24:47 19  A    Yes.  I see that at the bottom of page 31 in the

03:24:50 20  deposition.

03:24:50 21  Q    You then took the position that the competitive price

03:24:53 22  for 2017 follows from your analysis, right?

03:25:00 23  A    I see that.  Yes.

03:25:01 24  Q    Okay.  We can agree, there isn't any recitation of

03:25:07 25  but for competitive prices that actually appears anywhere

Shapiro - Cross

03:25:10  1   in any of the reports you did in this case, right?

03:25:12  2   A    No.  I strongly disagree with that.  It's fundamental

03:25:16  3   to what I've done by looking at costs and showing that

03:25:21  4   costs went down.  So under competition, prices would go

03:25:24  5   down.  That's a fundamental point.

03:25:27  6   Q    And I get your fundamental point.  We're going to get

03:25:30  7   to that.  What I'm saying is you haven't laid out what

03:25:33  8   prices should have been, what the competitive price should

03:25:36  9   have been in any year?

03:25:38 10   A    I have not -- no.  I have not said a particular price

03:25:43 11   of what door skin prices would have been in 2016.  I'm not

03:25:46 12   going to predict things that are that a fine point that I

03:25:50 13   can't predict.  What I'm telling you is the prices would

03:25:52 14   have gone down under competition, and they went up after

03:25:56 15   the merger.

03:25:57 16   Q    And -- thank you.  That's what I wanted to clarify.

03:25:59 17   A    Okay.  Good.

03:26:00 18   Q    And you know that your counterpart, Mr. Tucker, is

03:26:06 19   handling the damages in this case, right?

03:26:08 20   A    I didn't know he was my counterpart.  But okay.  I

03:26:12 21   know who Mr. Tucker is, and he's handling damages.

03:26:18 22   Q    Did you check any of his work to see whether he set

03:26:21 23   out a competitive but for price?

03:26:24 24   A    I did not.

03:26:25 25   Q    Okay.  Would you agree, Professor Shapiro, that the

Shapiro - Cross

03:26:33 1    question in merger analysis is whether the merger made

03:26:36 2    things worse from a competitive point of view?

03:26:39 3    A    That's a good summary.  I would think that's fair.

03:26:42 4    Q    Okay.  And as I understand your testimony, if you

03:26:48 5    were going to determine the competitive price, you would

03:26:51 6    start with the 2012 price, right?

03:26:58 7    A    See, you use the term "competitive price," and I'm

03:27:00 8    taking a simpler approach.  So I'm not sure what you mean

03:27:05 9    when you just use that term alone.  I'm taking the

03:27:09 10   price -- what was the price before the merger?  What

03:27:14 11   happened later with competition -- without competition --

03:27:16 12   let me fix that -- with less competition?  What would have

03:27:17 13   happened with more competition?

03:27:21 14       I don't know what you mean when you say "competitive

03:27:21 15   price."  This is one of the reasons we had trouble in the

03:27:23 16   deposition.  You're not using the term in a way that I

03:27:25 17   think is accurate.

03:27:26 18   Q    Okay.  Well, your opinion here is that if Jeld-Wen's

03:27:30 19   costs went down, as you've measured them, then you would

03:27:34 20   expect the but for world price in which the merger didn't

03:27:39 21   take place to have gone down, right?

03:27:41 22   A    Yes.  Other things equal, that is correct.

03:27:44 23   Q    Okay.  So if I refer to it as the but for price,

03:27:47 24   you're more comfortable with that?

03:27:50 25   A    Just so long as we know what we're talking about,

Shapiro - Cross

03:27:52  1    that's fine.

03:27:53  2    Q    Sure.  And when you were referring to costs earlier

03:27:55  3    today, that had some intended -- let me start over.

03:28:02  4        You referred to what you designated average variable

03:28:07  5    cost earlier today.  Do you recall that?

03:28:08  6    A    Yes.  That's one of the concepts of cost.

03:28:10  7    Q    And you believe that as there were decreases in

03:28:13  8    average variable costs, as you measured it.  The but for

03:28:18  9    price in which the merger had not taken place should have

03:28:24 10    decreased if the average variable cost went down, right?

03:28:28 11    A    That's right.  I should clarify, I'm interested in

03:28:31 12    all the -- the costs of all the suppliers in the market.

03:28:35 13    I have the best information about Jeld-Wen.  And since

03:28:37 14    many of those costs are input costs, they would be

03:28:40 15    experienced by other suppliers.  So those are the sort of

03:28:43 16    costs that are variable costs in the market that would

03:28:45 17    lead -- cause prices to go down.  That's my opinion.

03:28:49 18    Q    But you didn't actually analyze Masonite's costs, for

03:28:52 19    example?

03:28:52 20    A    I did not have detailed information on their costs.

03:28:55 21    So that is correct.  I was unable to measure that in the

03:28:57 22    same way that I could measure Jeld-Wen's costs.

03:29:01 23    Q    And you talked about how, in a competitive market,

03:29:07 24    the prices should -- should decrease if average variable

03:29:13 25    cost decreases, right?

Shapiro - Cross

03:29:15  1   A    Well, that's what normally happens unless -- unless

03:29:18  2   there's capacity constraints come into play.  That was the

03:29:21  3   other possibility that I considered.

03:29:23  4   Q    Yes.  But, again, the context of that is that's what

03:29:27  5   happens in competitive markets, right?  That was your

03:29:30  6   terminology earlier today, wasn't it?

03:29:32  7   A    That's fair.  Yes.

03:29:32  8   Q    But you agree that even before the merger, the door

03:29:35  9   skins market, as you've defined it, was a highly

03:29:39 10   concentrated market, wasn't it?

03:29:41 11   A    That is true.

03:29:41 12   Q    In fact, I think you said earlier today that even a

03:29:44 13   market with a few competitors is considered oligopolistic,

03:29:49 14   right?

03:29:52 15   A    That is true.

03:29:52 16   Q    And this market only had three competitors before the

03:29:58 17   merger, didn't it?

03:29:59 18   A    That is true.

03:29:59 19   Q    One of whom was less than half the size of either of

03:30:01 20   the other two competitors, by your market share

03:30:04 21   calculations?

03:30:05 22   A    That is true as well.

03:30:06 23   Q    Okay.  So the but for world that we're assuming also

03:30:07 24   has to assume that it would be a highly concentrated

03:30:12 25   market, right?

Shapiro - Cross

03:30:13 1   A    Yes.  That's correct.

03:30:14 2   Q    Okay.  And we can agree, in highly concentrated

03:30:18 3   markets in the real world, companies don't set their

03:30:21 4   prices to correspond to changes in average variable cost;

03:30:25 5   isn't that true?

03:30:31 6   A    Well, it's a more complicated answer.  I would say

03:30:38 7   since -- in those concentrated markets, the firms tend to

03:30:42 8   have pricing power.  Prices don't necessarily track cost

03:30:49 9   changes in the same way as in a very competitive market.

03:30:52 10  So I agree with that.

03:30:53 11       And the implication here is that even with three

03:30:59 12  firms, we don't know that they would have fully passed

03:31:03 13  through the costs if there hadn't been the merger, because

03:31:07 14  there are only three.  They still might not have fully

03:31:10 15  passed them through.  The evidence before the merger

03:31:12 16  indicates they were quite competitive, particularly, for

03:31:15 17  example, to get Steves' business.  So I think it's

03:31:17 18  justified to think that a good portion of the cost savings

03:31:19 19  would have been passed through, but we can't be sure.

03:31:23 20  Q    And you haven't offered any qualitative analysis in

03:31:25 21  any of your work to show the degree to which the

03:31:29 22  participants in this market, CMI, Jeld-Wen and Masonite,

03:31:34 23  passed through to their customers changes in their average

03:31:38 24  variable cost before the merger, have you?

03:31:41 25  A    I do not know the pass-through rate.  But it doesn't

Shapiro - Cross

03:31:45  1   matter for my conclusions because we're just talking about
03:31:48  2   how much prices would have fallen if not for the merger,
03:31:51  3   even if it was only a little bit.  In fact, prices went up
03:31:54  4   substantially.  So we still reach the -- we still properly
03:31:58  5   reached the conclusion that the merger caused prices to go
03:32:01  6   up.
03:32:01  7   Q    But you don't know whether in the pre-merger highly
03:32:05  8   concentrated door skin market, whether there were
03:32:08  9   instances in which average variable cost changes were not
03:32:12 10   passed through at all; isn't that true?
03:32:14 11   A    I -- well, I -- I guess I really don't know enough
03:32:21 12   from earlier to know for sure.  But, again, even if they
03:32:25 13   weren't passed through at all, then we would have prices
03:32:27 14   be flat.  In fact, prices went up when we went from three
03:32:31 15   to two.  So, again, it's not going to change my opinion.
03:32:35 16   Q    Sir, average variable cost, the figure you're using
03:32:39 17   here, doesn't include fixed costs.  I think you said that
03:32:42 18   earlier today, right?
03:32:44 19   A    That's correct.
03:32:44 20   Q    But you agree that in industries with high fixed
03:32:47 21   costs, companies have to recover those fixed costs in the
03:32:53 22   long run to remain viable, don't they?
03:32:56 23   A    Yes.
03:32:57 24   Q    Okay.  And by the way, in this case you don't think
03:33:00 25   that there's a meaningful gap between average variable

Shapiro - Cross

03:33:04 1   cost and what's called marginal cost; isn't that correct?

03:33:09 2   A    I don't think I've offered an opinion about that gap.

03:33:15 3   Q    May I refresh your recollection by pointing you to

03:33:17 4   your deposition?

03:33:18 5   A    Sure.

03:33:19 6   Q    Take a look, please, at page 196.  If you'd look at

03:33:34 7   lines 12 through 17.

03:33:37 8   A    Okay.

03:33:38 9   Q    I think you'll see a typo in there, but take a look

03:33:41 10  at that and see if that refreshes your recollection about

03:33:44 11  whether you spoke to whether there was a meaningful gap?

03:33:50 12  A    This says depending on the industry involved.  It's

03:33:52 13  not even about this industry, the question.

03:33:57 14          THE COURT:  Mr. Pfeiffer, come here just a

03:33:59 15  minute, will you, please.

03:34:02 16          MR. PFEIFFER:  Yes, Your Honor.

03:34:03 17          THE COURT:  Put the white noise on.

03:34:09 18          (Discussion at sidebar as follows:)

03:34:12 19          THE COURT:  If you look at what you're pointing

03:34:13 20  him to --

03:34:15 21          MR. PFEIFFER:  Yes, Your Honor.

03:34:16 22          THE COURT:  -- it doesn't do what you're talking

03:34:17 23  about trying to do.  In fact, it sort of almost says the

03:34:21 24  opposite of what your question was.

03:34:23 25      Now, if you do that again, I'm going to ask you to

Shapiro - Cross

03:34:26  1   sit down.  When you get an impeachment question, you must

03:34:31  2   impeach.  You can't -- and then you change the question on

03:34:35  3   him and you change what you were asking.  And it wastes

03:34:39  4   time for us to go through this process.  And that's what's

03:34:42  5   going to happen if it keeps up.  So just -- if you do it

03:34:46  6   again, that's going to be it.

03:34:47  7            MR. PFEIFFER:  Yes, Your Honor.

03:34:47  8            THE COURT:  That's three times in a row you've

03:34:49  9   taken a swing and you've missed.

03:34:53 10            (End of sidebar discussion.)

03:35:13 11            THE COURT:  The question is off the table.

03:35:14 12            THE WITNESS:  Yes, Your Honor.

03:35:24 13   Q    Professor Shapiro, would you agree that it is an

03:35:26 14   error to infer genuine antitrust market power based on the

03:35:30 15   gap between price and marginal cost?

03:35:33 16   A    Taken in isolation, that is correct, as a matter of

03:35:36 17   levels.

03:35:49 18   Q    And I think you said this earlier, but the average

03:35:52 19   variable cost information that you are referring to here

03:35:54 20   is Jeld-Wen specific, right, not industry wide?

03:36:01 21   A    Yes, sir.

03:36:02 22   Q    Okay.  Have you done any analysis showing that before

03:36:11 23   the merger, CMI priced any of its products, door skins or

03:36:16 24   any other, in accordance with changes in its average

03:36:21 25   variable cost?

Shapiro - Cross

03:36:22 1    A    I don't have information on changes in their average

03:36:26 2    variable costs over time.  I can't do that.  I don't know.

03:36:29 3    Q    Okay.  Do you have any evidence that any door skin

03:36:32 4    manufacturer anywhere in the world currently sets its door

03:36:37 5    skin prices to correspond to changes in average variable

03:36:42 6    cost?

03:36:44 7    A    It's the changes in prices that are driven by the

03:36:47 8    changes in costs, not the levels, which is what your

03:36:51 9    question said.

03:36:51 10   Q    Okay.  And do you have any evidence that any door

03:36:54 11   skin supplier anywhere in the world changes its prices in

03:36:59 12   accordance with changes in its variable -- average

03:37:03 13   variable cost?

03:37:06 14   A    We see that in the general patterns of the industry.

03:37:08 15   But I don't have specific cost data on individual firms

03:37:12 16   other than Jeld-Wen.  So I cannot test that question.

03:37:17 17   Q    Right.  And -- I believe you testified earlier today,

03:37:27 18   at least to some extent, about prices that Jeld-Wen

03:37:29 19   charged to a door manufacturer called Lynden.  Do you

03:37:32 20   recall that?

03:37:32 21   A    I do.

03:37:33 22   Q    Okay.  And did you also mention pricing to Excel?  Am

03:37:38 23   I remembering that correctly?

03:37:40 24   A    I did.  Yes, sir.

03:37:41 25   Q    Thank you.  And as I understood it, you claimed that

Shapiro - Cross

03:37:43  1  both companies paid more in connection with their most

03:37:46  2  recent long-term contracts than they did under prior

03:37:50  3  agreements with Jeld-Wen, right?

03:37:52  4  A    Well, that would be true for Lynden.  Excel did not

03:37:55  5  have a prior long-term agreement.  So it's not quite right

03:37:59  6  for Excel.

03:38:00  7  Q    All right.  Let's stick with Lynden, then, to start.

03:38:10  8  Your understanding is that part of the reason for the

03:38:14  9  increased pricing to those two companies was to help pay

03:38:19 10  for some of Jeld-Wen's capital costs; is that right?

03:38:23 11  A    I understand that's Mr. Hachigian's rationale that he

03:38:29 12  presented to them in raising his prices.

03:38:33 13  Q    And especially in a market where there's been

03:38:38 14  historically low demand through an unprecedented event

03:38:42 15  like the housing crisis, you would expect to see companies

03:38:46 16  attempt to recover some of their long-term costs as a

03:38:49 17  recovery began to occur, wouldn't you?

03:38:53 18  A    What I would expect is that -- this is the normal

03:38:56 19  pattern in manufacturing industries that we've studied for

03:39:00 20  decades.  When capacity starts to become tight again, when

03:39:03 21  the economy gets to that point for a given industry,

03:39:06 22  that's when the margins go up, and that's when companies

03:39:09 23  say, okay, now I'm making some money.  Now I might need to

03:39:13 24  add capacity because it's getting full.  And that's the

03:39:16 25  signal to add more capacity.

Shapiro - Cross

03:39:17 1    Until that happens, they might want to get more

03:39:20 2 money, but they can't do it because if there's

03:39:23 3 competition, the other guy is going to try to sell

03:39:26 4 instead.  So it's got to be capacity to drive that getting

03:39:30 5 tight.

03:39:30 6 Q    In a situation, however, where there's only already a

03:39:35 7 highly concentrated oligopolistic market and there is some

03:39:42 8 pricing control, wouldn't you expect companies in that

03:39:44 9 industry coming out of an unprecedented crash to try to

03:39:48 10 recover some of the cost they may not have been able to

03:39:51 11 have recovered during the crash?

03:39:53 12 A    Well, again, each one would try to do that.  That's

03:39:54 13 right.  If there are a lot of them with excess capacity,

03:39:57 14 it's not going to happen.  They might want to, but they're

03:40:01 15 not going to be able to impose the price increases.

03:40:04 16    Once you get down to a smaller number, three, it's

03:40:09 17 more iffy.  Okay.  And that's why I can't give a stronger

03:40:12 18 prediction in theory.  What I can tell you is in 2012 with

03:40:16 19 three of them, there was some good competition going on

03:40:16 20 there, and we didn't see that later.  But -- no.  But I

03:40:19 21 agree with you that competition was already not as strong

03:40:23 22 as we would like in 2012.

03:40:25 23 Q    Back to Lynden and its renegotiation with Jeld-Wen.

03:40:29 24 Did you actually conduct any analysis of the 2012 contract

03:40:35 25 with the renegotiated contract?

Shapiro - Cross

03:40:38  1    A    Well, yes.  That was -- the price increase that I

03:40:41  2    showed to the jury was the comparison of the two.

03:40:43  3    Q    Apart from the pricing terms, did you do a comparison

03:40:46  4    of differences in any of the other terms of the agreement?

03:40:50  5    A    Oh, okay.  I did look at that, but I can't recall all

03:40:52  6    the details.

03:40:53  7    Q    Okay.  Do you recall having set forth such an

03:40:56  8    agreement in your reports -- such an analysis in your

03:41:00  9    reports?

03:41:01 10    A    No.  You just asked, I thought, if I looked at it.  I

03:41:05 11    don't remember what I found.  I don't know that it's in

03:41:07 12    the reports.  I'm not sure about that.

03:41:09 13    Q    And you're not offering any opinion about how many

03:41:14 14    nonmonetary benefit there was to Lynden in the

03:41:17 15    renegotiated contract relative to its prior contract, are

03:41:21 16    you?

03:41:22 17    A    I'm not aware of any particular nonmonetary benefit.

03:41:26 18    Is there something you're referring to?

03:41:28 19    Q    I'm asking you, did you do an analysis to determine

03:41:31 20    what benefits there were, leaving aside the price term?

03:41:35 21    A    So I -- I remember asking about what else happened in

03:41:39 22    that renegotiation where I was aware of the price increase

03:41:45 23    that Lynden agreed to.  Of course, they got the extension

03:41:49 24    of the -- they weren't terminated.  Okay.  So that was a

03:41:52 25    benefit, along the lines of the lease example with the

Shapiro - Cross

03:41:55 1  landlord I gave earlier.  But other changes, I just can't

03:42:01 2  remember right now between the two contracts.

03:42:03 3  Q    And when you said you asked about that, you didn't

03:42:05 4  talk to anybody from Lynden about that and get their view,

03:42:09 5  right?

03:42:10 6  A    No.  No.  No.  When I say that, I mean as part of my

03:42:12 7  investigation, I learned about this episode.  We had

03:42:15 8  access to some of these contracts, I believe, and -- or at

03:42:19 9  least some information from Jeld-Wen about the contracts.

03:42:22 10  I can't remember the details.  So I want to know as much

03:42:25 11  as I can about it.  That's what I mean when I say I asked.

03:42:28 12  Q    And you haven't cited in your reports to any evidence

03:42:31 13  from Lynden, or Excel for that matter, that they believe

03:42:34 14  they would have received lower prices absent the merger,

03:42:37 15  have you?

03:42:37 16  A    I have precious little information from them to work

03:42:41 17  with.

03:42:42 18  Q    Okay.  Now, in your discussion of price increases to

03:42:48 19  other door manufacturers besides Steves, you looked at a

03:42:54 20  slide, do you recall that, that had sort of a twisted

03:42:57 21  arrow in it?  Do you --

03:42:59 22  A    Yes.  I thought it was the screwdriver slide, or so

03:43:02 23  I've heard it referred to.  Maybe that's right, but yes.

03:43:06 24  Q    Don't know the answer to that.

03:43:07 25  A    Yes.  I'm aware of the slide.

Shapiro - Cross

03:43:09  1  Q    And that's -- did you actually look at the underlying

03:43:11  2  document from which that slide came?

03:43:13  3  A    I looked through that entire deck, if that's what you

03:43:16  4  mean.

03:43:16  5  Q    Yes.  So then you know that that deck is an

03:43:20  6  incomplete draft, not a final document, then, don't you?

03:43:24  7  A    I understand there's been some back and forth about

03:43:26  8  that.  I'm aware of that, yes.

03:43:28  9  Q    Yeah.  You're not disputing that that's an incomplete

03:43:31 10  draft, are you?

03:43:32 11  A    No.  It is what it is.  I thought there was like a

03:43:34 12  page with somebody's name on it.  Things like that.  Is

03:43:38 13  that right?

03:43:38 14  Q    Yeah.  And a page that just said --

03:43:41 15         THE COURT:  All right.  That's enough.  He's not

03:43:43 16  disputing it.

03:43:44 17  Q    And you know that at least some parts of that

03:43:46 18  document, besides being incomplete, are actually in error,

03:43:50 19  don't you?

03:43:51 20  A    There's one number I know that I think is not

03:43:54 21  correct.  If there are other errors, I'm not aware of

03:43:59 22  them.

03:43:59 23  Q    But even though this was an incomplete draft and

03:44:03 24  there's at least one error that you picked out, you're

03:44:05 25  still relying on that for your assessment of increased

Shapiro - Cross

03:44:09 1 pricing to a number of third party door manufacturers; is

03:44:14 2 that right, sir?

03:44:15 3 A    Well, along with the data I have to actually check

03:44:18 4 what the price increases were.  That's how I know one of

03:44:20 5 the numbers is in error, because I actually measured the

03:44:23 6 price increases.

03:44:24 7 Q    And did you actually go back and verify each of the

03:44:26 8 numbers that you looked at in that slide that was up

03:44:29 9 earlier today, the screwdriver slide, as you put it?

03:44:32 10 A    No, I don't know that each one.  For example, I'm

03:44:35 11 not -- no, not every number.  But the numbers that I

03:44:38 12 presented to the jury were ones that I separately checked

03:44:41 13 and verified with other information.

03:44:45 14 Q    Now, you know that part of this case turns on the

03:44:51 15 prices charged for two specific Jeld-Wen door skin models

03:44:56 16 called the Madison and the Monroe, right?

03:44:58 17 A    Yes.  We talked about those.

03:44:59 18 Q    Like I say, you had a slide up earlier about those,

03:45:03 19 as I recall?

03:45:04 20 A    I did.

03:45:04 21 Q    And you know that Jeld-Wen introduced both the

03:45:07 22 Madison and the Monroe door skin models after the

03:45:11 23 long-term agreement was signed with Steves, right?

03:45:13 24 A    Yes.

03:45:13 25 Q    And also after the merger was consummated in October

Shapiro - Cross

03:45:17  1    of 2012, right?

03:45:19  2    A    Yes.  I know that.

03:45:21  3    Q    So we can agree, you can't actually compare current

03:45:25  4    Jeld-Wen prices for the Madison or the Monroe to

03:45:29  5    pre-merger prices for those two door skins, right?

03:45:34  6    A    Because they weren't offered at the time of the

03:45:35  7    merger.

03:45:36  8    Q    Yes.

03:45:37  9    A    Agreed.

03:45:38 10    Q    And in assessing the difference in price, you refer

03:45:42 11    to what you -- at your deposition at least, referred to as

03:45:46 12    the equivalent Craftsman design door skin.  Does that

03:45:50 13    sound right?

03:45:51 14    A    I may have used that term.  I would -- I would now

03:45:54 15    just say comparing it to the prices that were in the

03:45:58 16    long-term agreement for Craftsman style door skins.

03:46:02 17    Q    Okay.  And I think we covered this, but you're not an

03:46:08 18    expert in the design of molded interior door skins, right?

03:46:12 19    A    I am not.

03:46:13 20    Q    Okay.  No one at Steves told you to assume that the

03:46:17 21    Madison and Monroe door skins are equivalent to other

03:46:20 22    Craftsman designs; isn't that right?

03:46:23 23    A    No.  They didn't tell me any such thing, no.

03:46:26 24    Q    Okay.  But you didn't conduct any analysis to

03:46:34 25    determine whether Madison and Monroe door skins are

Shapiro - Cross

03:46:39 1    reasonable substitutes for other door skins in the eyes of
03:46:42 2    consumers, did you?
03:46:47 3    A    I could -- they're Craftsman style doors.  Is there
03:46:50 4    any dispute about that?  I don't think there was a dispute
03:46:53 5    about that.
03:46:54 6    Q    Did you conduct any quantitative analysis to see
03:46:57 7    whether, in the eyes of consumers, they viewed Craftsman
03:47:00 8    and Madison and Monroe as interchangeable?
03:47:04 9    A    Interchangeable.  Okay.  That's a -- well, we know
03:47:09 10   that there's -- at least at that time, consumers were
03:47:12 11   evidently willing to pay a significant premium for
03:47:16 12   especially the Monroe.  So it seems like it had some style
03:47:21 13   advantages just based on market prices there that Jeld-Wen
03:47:25 14   was able to charge.  We know that much, within this group
03:47:30 15   of Craftsman style doors.
03:47:32 16   Q    Right.  That Jeld-Wen was able to charge and people
03:47:34 17   were able to charge --
03:47:39 18        THE COURT:  Dr. Shapiro, try to listen to the
03:47:39 19   question, because I think the question simply was did you
03:47:42 20   do a study about what the consumers actually thought.  And
03:47:45 21   the answer to that is no, you didn't; isn't that right?
03:47:47 22        THE WITNESS:  No study, but we do learn
03:47:50 23   something from the price differences.
03:47:57 24   Q    Have you studied the prices that independent door
03:47:59 25   manufacturers are able to charge for Madison and Monroe

Shapiro - Cross

03:48:05 1  relative to Craftsman doors?

03:48:06 2  A    I do think we looked at that, but I don't remember

03:48:08 3  what the price differences were.  I focused on the door

03:48:11 4  skin price differences.

03:48:16 5  Q    Did you do any analysis to determine whether Steves

03:48:20 6  or any other independent door manufacturer was pricing

03:48:28 7  Madison and Monroe doors -- sorry -- changing the price of

03:48:34 8  Madison and Monroe doors to correlate to any changes in

03:48:39 9  their average variable cost?

03:48:40 10 A    No.

03:48:41 11 Q    Okay.  Now, you mentioned earlier today some -- some

03:48:52 12 issues about Masonite and what Masonite did after the

03:48:55 13 merger.  Do you recall that?

03:48:56 14 A    Yes, I do.

03:48:57 15 Q    Okay.  You're not offering the opinion that Masonite

03:49:01 16 and Jeld-Wen actually agreed to do anything related to the

03:49:03 17 doors or door skin market after the merger, are you?

03:49:12 18 A    Agreed to do anything.  I don't think any of my

03:49:15 19 opinion involves agreements between those two companies.

03:49:19 20 Nothing I can think of.

03:49:20 21 Q    You talked about the level of door skins that

03:49:25 22 Masonite was selling after the merger, and I want to talk

03:49:29 23 to you some more about that.  You know that Masonite

03:49:33 24 didn't sell very many door skins to Steves even before the

03:49:37 25 merger, don't you?

Shapiro - Cross

03:49:40 1  A    Well, we had the chart I showed in the CARB episode

03:49:43 2  that showed there were I think zero Masonite door skins

03:49:49 3  sold for a couple years.  Then a substantial number were

03:49:52 4  sold to Steves as part of Steves balking at the Jeld-Wen

03:49:57 5  attempted price increase for the CARB compliant door

03:49:59 6  skins.

03:50:00 7  Q    Right.  The only year in which there was sales of a

03:50:04 8  million door skins a door, or more, was 2011 in all the

03:50:09 9  data you've studied; isn't that right?

03:50:11 10  A    From Masonite to Steves.

03:50:12 11  Q    From Masonite.

03:50:13 12  A    That's what you're talking about?

03:50:15 13  Q    Yes.

03:50:16 14  A    I could check the data, but I could believe that.

03:50:18 15  That sounds right.

03:50:19 16  Q    And then does it sound also right to you that there

03:50:21 17  were only about 115,000 door skins sold in 2007?

03:50:29 18          THE COURT:  From who?

03:50:31 19  Q    From Masonite to Steves?

03:50:32 20          MR. PFEIFFER:  My apologies, Your Honor.

03:50:33 21  A    I don't know back then one way or another.  I'd have

03:50:35 22  to look at the data.

03:50:36 23  Q    Let's -- and you are aware that Masonite is, in fact,

03:50:39 24  today selling door skins to other independent door

03:50:44 25  manufacturers besides Steves, aren't you?

Shapiro - Cross

03:50:48  1   A    Well, that's what that 5 percent slice is about.

03:50:52  2   Q    Yes.

03:50:53  3   A    So the answer is yes, at least as of those data.

03:50:57  4          MR. PFEIFFER:  Gail, do you have that 5 percent

03:50:59  5   pie chart available?  It would be that page 48.

03:51:14  6   Q    You talked about this slide earlier.  Do you recall

03:51:17  7   that?

03:51:17  8   A    Yes.  That's the one I was referring to, the

03:51:19  9   5 percent slice.

03:51:20 10   Q    Yes.  And you see there, you show Masonite's

03:51:25 11   percentage of door skin sales to independents going from

03:51:28 12   18 percent to 5 percent, right?

03:51:30 13   A    Correct.

03:51:34 14   Q    How much of that was the result of Steves taking away

03:51:39 15   the million plus door skins it had sold in 2011 and

03:51:44 16   transferring that volume to Jeld-Wen under the long-term

03:51:47 17   sales agreement?

03:51:48 18   A    I think a lot of it.

03:51:49 19   Q    And, in fact, don't you know that, in fact,

03:51:52 20   Masonite's sales to other independents besides Steves have

03:51:55 21   actually increased in volume since 2011; isn't that right?

03:52:01 22   A    Well, again, I can check I tell data.  But the market

03:52:04 23   has grown a lot, the overall numbers have grown a lot.  So

03:52:07 24   in terms of numbers, that would sound right.  In terms of

03:52:10 25   shares, I'd have to check.

Shapiro - Cross

03:52:15 1  Q     Toward the --

03:52:16 2          MR. PFEIFFER:  Thank you, Gail.  You can take

03:52:17 3  that down.

03:52:19 4  Q     Toward the end of your direct examination, you talked

03:52:23 5  about the concept of the relevant market.  Do you recall

03:52:25 6  that?

03:52:25 7  A     Yes, sir.

03:52:27 8  Q     And as you mentioned, there are two separate

03:52:29 9  components to that definition.  You need to define both

03:52:32 10 the geographic component and the product market component?

03:52:35 11 A     Yes.

03:52:35 12 Q     Okay.  Let's start with the geographic part.  I think

03:52:41 13 you said that was door skins used in the United States was

03:52:45 14 how you put that?

03:52:46 15 A     Yes, it is.

03:52:47 16 Q     Okay.  And you agree that all suppliers should be

03:52:51 17 included in the market regardless of their location, don't

03:52:54 18 you?

03:52:56 19 A     Yes.  Any imported door skins that are used in the

03:52:59 20 United States would be included in market shares.

03:53:05 21 Q     And do you agree that a firm that never even enters a

03:53:08 22 given market can, nevertheless, exert competitive pressure

03:53:12 23 on that market?

03:53:15 24 A     If you mean by "never enters," they don't actually

03:53:18 25 make sales, then in theory, that can happen, yes.

Shapiro - Cross

03:53:22  1  Q    Okay.  And when you're identifying market

03:53:26  2  participants, you also have to include suppliers that are

03:53:30  3  not current producers in a relevant market but that would

03:53:34  4  be very likely -- that would very likely provide rapid

03:53:38  5  supply responses with direct competitive impact in the

03:53:41  6  event of what's called a SSNIP?

03:53:44  7  A    I agree with that.

03:53:46  8  Q    Okay.  And a SSNIP is a term antitrust economists use

03:53:50  9  for a significant and non-transitory increase in price,

03:53:55 10  small but significant?

03:53:57 11  A    Yes.  That's right.

03:53:58 12  Q    Okay.  So in conducting an analysis of the

03:54:06 13  participants from the supplier side in a market, you want

03:54:11 14  to account for firms even if they have a very small share

03:54:15 15  today, but they could grow to become a larger player,

03:54:19 16  right?

03:54:21 17  A    So yes.  Although I want to be -- I want to be very

03:54:25 18  clear.  You say account for these firms, and I agree with

03:54:27 19  that.  And the way I am accounting for them is by

03:54:30 20  measuring the imports.  If there are imports coming in,

03:54:34 21  I'm going to count those in my market and in my market

03:54:37 22  shares.  If they simply have a facility in Turkey or

03:54:41 23  Romania and they are not sending anything over here, as I

03:54:44 24  look at the market in 2012, there's no adjustment to the

03:54:47 25  market shares needed by virtue of the presence of those

Shapiro - Cross

03:54:51 1   facilities elsewhere in the world.

03:54:53 2   Q    But in assessing whether a potential entrant can help

03:54:58 3   preserve effective competition, the key thing is not what

03:55:02 4   its market share is at the time you analyze it, but

03:55:04 5   whether the company has sufficient assets to compete

03:55:07 6   effectively.  Isn't that true, sir?

03:55:09 7   A    Well, for entry analysis, yes, we want to understand

03:55:12 8   what might happen if prices went up in the United States,

03:55:16 9   whether some imports would come in to help solve the

03:55:22 10  problem.  But for measuring market shares, we count the

03:55:24 11  imports that are coming in, and that's what I did.

03:55:27 12  Q    And you do know, in this case, in the industry that

03:55:29 13  we're talking about, door skin suppliers, do regularly

03:55:34 14  ship door skins across the oceans to customers, don't

03:55:38 15  they?

03:55:39 16  A    Well, Masonite, in particular, seems to take -- looks

03:55:44 17  at the worldwide capacity and they do bring in skins from

03:55:47 18  other parts of the world.  So the integrated suppliers,

03:55:52 19  there's definitely some -- some door skins moving around,

03:55:56 20  across the ocean, as it were.  We're just not seeing that,

03:56:01 21  particularly back in 2012, but even now, for independent

03:56:10 22  door manufacturers.

03:56:10 23  Q    Well, you're aware of Mr. Sam Steves' testimony in

03:56:14 24  this case that before 2012, Steves itself had bought

03:56:18 25  molded door skins from companies overseas.  You recall

Shapiro - Cross

03:56:20 1    that, don't you?

03:56:21 2    A    I do generally recall.  But in my mind, it's been

03:56:24 3    such a miniscule amount that it's not competitively

03:56:28 4    significant.  So I don't remember the details of what he

03:56:30 5    said.

03:56:30 6    Q    Well, I don't want to be confused.  I'm not talking

03:56:33 7    about Teverpan and things after the merger.  I'm talking

03:56:37 8    about before the merger happened.

03:56:39 9    A    Right.  And I don't remember what he said about

03:56:42 10   imports they might have made before then.  But my

03:56:47 11   recollection is that whatever imports were coming in, they

03:56:49 12   were miniscule.

03:56:50 13   Q    Do you offer any quantitative assessment of that in

03:56:53 14   any of the reports that you submitted in this case, sir?

03:56:56 15   A    No.  I don't have a number to offer.  I looked high

03:56:59 16   and low for evidence about actual imports, and I could

03:57:03 17   find no meaningful quantities of imports coming in prior

03:57:07 18   to -- at that time when I was looking at it.

03:57:10 19   Q    And you're aware, as you said, that Masonite imports

03:57:14 20   actually a significant volume of its skins from overseas

03:57:16 21   into the U.S. for use here, right?

03:57:20 22   A    At times.  I don't know the numbers off the top of my

03:57:24 23   head about the shipments.  But they definitely move skins

03:57:27 24   around, yes.

03:57:28 25   Q    Does about a third of its door skins coming in from

Shapiro - Cross

03:57:31  1  overseas sound right to you?

03:57:33  2  A    I actually don't know as I sit here.   No.

03:57:36  3  Q    Are you aware that Jeld-Wen has also imported door

03:57:39  4  skins into the U.S. from overseas?

03:57:42  5  A    Again, I think they have from some of their

03:57:45  6  facilities.  My recollection is they don't have a lot less

03:57:48  7  than Masonite, but I could be corrected on that.  I'm not

03:57:51  8  sure.

03:57:51  9  Q    And what about CMI?  Were you aware that CMI used to

03:57:55 10  export door skins from its Towanda facility to customers

03:57:59 11  overseas?

03:58:03 12  A    I do not remember that.  No.

03:58:04 13  Q    Okay.  And you know that Jeld-Wen considers its

03:58:07 14  competition to be global, not just limited to those with

03:58:12 15  market shares right now in the U.S., right?

03:58:14 16  A    Well, they compete in other industries.  Not just in

03:58:18 17  the United States.

03:58:18 18  Q    You recall in the exhibit that had the screwdriver

03:58:22 19  slide, as you referred to it, that there were multiple

03:58:24 20  slides in that deck that you say you reviewed that

03:58:28 21  referred to competition from a global perspective, right?

03:58:31 22  A    Yes, generally.  Again, they are a -- they have

03:58:36 23  facilities in other countries.  They compete in other

03:58:38 24  questions countries.  No question about that.

03:58:40 25  Q    Did you undertake any analysis of the either stated

Shapiro - Cross

03:58:45 1  or available capacity of any foreign suppliers as part of

03:58:49 2  your analysis in this case?

03:58:52 3  A    Nothing beyond the descriptions given in my reports,

03:58:56 4  what I learned about Teverpan and so forth that's

03:58:59 5  described there.

03:59:01 6  Q    In fact, you focused on Teverpan rather than any of

03:59:03 7  the other foreign suppliers in your reports, didn't you?

03:59:07 8  A    I wouldn't say that.  I mean, the various suppliers

03:59:11 9  are mentioned.  My understanding is Steves has been

03:59:13 10  farther along with Teverpan in terms of exploring the

03:59:18 11  possibility of imports.  So there's somewhat more detailed

03:59:21 12  information about Teverpan, but I discuss the other ones

03:59:24 13  as well.

03:59:24 14  Q    Do you recall having discussed the available capacity

03:59:26 15  of any other foreign supplier besides Teverpan, sir?

03:59:29 16  A    No.  I'd have to check my report on that detail.

03:59:32 17  Q    And as you sit here today, you certainly don't

03:59:34 18  remember what you said, if anything, about the available

03:59:37 19  capacity of any foreign supplier, right?

03:59:39 20  A    No.  I know -- the important concept, I think, is you

03:59:44 21  don't want to look at a foreign supplier's total capacity.

03:59:49 22  They have got to serve their whole market.  So you want to

03:59:52 23  look at some more notion of their available capacity and

03:59:54 24  then the extra cost of getting the skins over here and

04:00:00 25  whatever other issues.  So the key economic point is you

Shapiro - Cross

04:00:01 1  want to think about available capacity.

04:00:03 2  Q    And forgive me if I was imprecise.  You haven't set

04:00:06 3  forth any analysis of the available capacity of foreign

04:00:08 4  suppliers, have you?

04:00:09 5  A    I don't -- I can't -- I have not separately measured

04:00:12 6  that above and beyond what's in my reports about what's

04:00:15 7  available through the record.

04:00:18 8  Q    And you also haven't set forth any kind of analysis

04:00:22 9  about the minimum available capacity that a foreign door

04:00:26 10 skin maker would have to have to be an effective

04:00:30 11 competitor in this market, have you?

04:00:34 12 A    Effective competitor.  That's not the question I'm

04:00:36 13 asking.  So no, I haven't studied that.  I'm looking at

04:00:39 14 whether imports are sufficient to replace the lost

04:00:42 15 composition, not whether one importer could be an

04:00:46 16 effective of the United States.

04:00:55 17 Q    Professor Shapiro, you agree that to the extent that

04:00:58 18 the Jeld-Wen supply agreement provides Steves with

04:01:02 19 enforceable protections, the adverse effects of the

04:01:06 20 Jeld-Wen/CraftMaster merger would be moderated during the

04:01:11 21 term of the agreement, don't you?

04:01:12 22 A    I do.

04:01:12 23 Q    And you know that agreement is not set to expire

04:01:16 24 until September 10th, 2021, right?

04:01:19 25 A    I know the month.  I don't know the day.

Shapiro - Cross

04:01:21 1    Q    Okay.  September 2021?

04:01:24 2    A    Yes, sir.

04:01:24 3    Q    You also agree that the magnitude of future events

04:01:27 4    would be significantly influenced by the alternatives open

04:01:32 5    to Steves to obtain interior molded door skins, apart

04:01:37 6    Jeld-Wen, come September 2021, right?

04:01:41 7    A    I think the harm to Steves in the future will depend

04:01:45 8    on how effectively they could turn to other sources of

04:01:51 9    supply, including imports.

04:01:53 10   Q    The alternatives that may be available to them now --

04:01:57 11   or then?

04:01:58 12   A    Yes.  I agree with that.

04:01:59 13   Q    Okay.  And sitting here today, you can't say with

04:02:01 14   certainty what alternatives, in terms of supply of door

04:02:05 15   skins, will be available to Steves come September 2021,

04:02:08 16   can you?

04:02:08 17   A    I cannot say that with certainty.  It's unknown.

04:02:12 18   Future is uncertain.

04:02:14 19   Q    And you're aware that the Turkish door skin maker

04:02:18 20   Teverpan is already selling interior molded door skins to

04:02:22 21   some customers in the U.S., right?

04:02:25 22   A    Yes.  I believe Excel is purchasing some from them.

04:02:29 23   Q    And others as well besides Excel, right?

04:02:31 24   A    I don't remember that exactly, but I had Excel in my

04:02:34 25   head.

Shapiro - Cross

04:02:35 1   Q    Okay.

04:02:36 2   A    Small quantities, but yes.

04:02:40 3   Q    How about MJB Wood Group, Patrick Industries?  Does

04:02:43 4   that sound familiar?

04:02:44 5   A    I'm not sure.

04:02:45 6   Q    Okay.  Now, you understand that Teverpan is in

04:02:50 7   discussions currently about potentially selling millions

04:02:53 8   of door skins per year to Steves, don't you?

04:02:57 9   A    Yes, I am.

04:02:58 10  Q    You were here when Mr. Sam Steves testified about

04:03:01 11  that subject, right?

04:03:02 12  A    I was not in the courtroom for that.  No.

04:03:04 13  Q    Have you read that testimony?

04:03:06 14  A    I've looked over portions of it, yes.

04:03:10 15  Q    And you're also aware, aren't you, that Steves has

04:03:13 16  already, in the past, ordered a flush door skin product

04:03:17 17  from Teverpan?  Right?

04:03:18 18  A    I am aware of that.

04:03:20 19  Q    Okay.  And, in fact, were you aware that as of

04:03:25 20  December 21st, 2017, Steves and Teverpan had exchanged a

04:03:31 21  red line draft of a potential new long-term supply

04:03:34 22  agreement?

04:03:36 23  A    I understand that there's been discussions, and I

04:03:38 24  think that that's the most recent draft of which I'm

04:03:41 25  aware.

Shapiro - Cross

04:03:50  1   Q   And you never conducted any actual economic analysis
04:03:58  2   to determine the feasibility of Teverpan expanding to meet
04:04:01  3   more of Steves' needs, did you?
04:04:03  4   A   No -- no independent economic analysis.  What I have
04:04:06  5   on that is in my report.
04:04:08  6   Q   And you're not offering an opinion that it's unlikely
04:04:11  7   that Steves and Teverpan will reach and formalize an
04:04:15  8   agreement, are you?
04:04:16  9   A   That particular agreement?  I can't -- I think they
04:04:19 10   would know better than I about how likely that is.
04:04:21 11   Q   Okay.  And you haven't conducted any analysis showing
04:04:25 12   that Teverpan could not have made the same offer that it's
04:04:29 13   making today back in 2013, are you?
04:04:35 14   A   I do not know of Teverpan's situation four or five
04:04:39 15   years ago and how it's different today.  I don't know
04:04:41 16   about that.
04:04:42 17   Q   And bottom line, we can agree, you don't know what
04:04:45 18   the Teverpan/Steves relationship is going to look like
04:04:50 19   come September 2021, right?
04:04:53 20        THE COURT:  I think he said something to that
04:04:56 21   effect at least three times in about the last ten minutes.
04:04:57 22   Now, if you have anything else, go ahead and get into it.
04:04:59 23   Otherwise, I think it's about time to close it off.
04:05:04 24        MR. PFEIFFER:  Okay.  I do have more to cover,
04:05:06 25   Your Honor.

Shapiro - Cross

04:05:06 1          THE COURT:  Get going, please.  Asking the same
04:05:09 2   question three different way doesn't help us.  They're
04:05:10 3   paying -- the jury is paying attention.
04:05:12 4          MR. PFEIFFER:  Yes, Your Honor.
04:05:14 5   Q   Professor Shapiro, another European door skin maker,
04:05:18 6   Kastamonu, has also offered to sell millions of door skins
04:05:22 7   per year to Steves.  You know that, right?
04:05:24 8   A   I know those are discussions.  I'm not sure that's a
04:05:29 9   firm offer, but I've heard of it.
04:05:31 10  Q   And you haven't conducted any analysis showing that
04:05:32 11  Kastamonu could not have made the same offer, if asked,
04:05:35 12  back in 2013, have you?
04:05:39 13  A   I do not know particulars about their situation four
04:05:42 14  or five years ago.  Same as I said for Teverpan.
04:05:45 15  Q   And same as for Teverpan.  You haven't done any
04:05:47 16  analysis about how feasible it would be for Kastamonu to
04:05:50 17  expand its operations to meet more of Steves' needs, have
04:05:53 18  you?
04:05:54 19  A   Nothing more than what's in my report on what's
04:05:58 20  available to me in the record.
04:06:06 21  Q   And in the case of your work, you didn't look at any
04:06:08 22  information about the size or capitalization of Kastamonu,
04:06:12 23  did you?
04:06:14 24  A   I could look.  There's some information about them in
04:06:16 25  my report, but I don't have it memorized.

Shapiro - Cross

04:06:19 1  Q    Okay.  You're also familiar with the door skin maker

04:06:24 2  Yildiz?

04:06:25 3  A    I am.

04:06:26 4  Q    Okay.  And you're aware, then, that it has told

04:06:29 5  Steves that it's pretty eager to sell door skins in the

04:06:34 6  U.S., right?

04:06:35 7  A    I don't remember that word.  But I know there have

04:06:38 8  been some discussions.  I don't think they went as far as

04:06:43 9  the ones with Teverpan.

04:06:45 10 Q    And as with Teverpan and Kastamonu, you haven't done

04:06:48 11 any financial analysis of the feasibility of Yildiz

04:06:53 12 expending its operations to serve more of Steves' needs,

04:06:55 13 have you?

04:06:57 14 A    Again, some of this is in my report, but nothing more

04:07:00 15 than that.

04:07:02 16 Q    Did you conduct any analysis of the pricing

04:07:05 17 competition that CMI experienced from foreign suppliers

04:07:09 18 prior to the merger?

04:07:16 19 A    I do not believe that foreign suppliers were a

04:07:19 20 significant competitive influence prior to the merger.

04:07:21 21 Q    Okay.  And that's part of what you're assuming in

04:07:23 22 this case is that they were not having any pricing

04:07:26 23 influence on CMI prior to the merger.  Is that fair to

04:07:29 24 say?

04:07:29 25 A    Well, it's not an assumption.  I mean, I -- I

Shapiro - Cross

04:07:32 1   inquired about the presence of imports, and they were

04:07:37 2   nonexistent or negligible.  And I am not aware of imports

04:07:41 3   having a specific pricing pressure on CMI.  So not as I

04:07:45 4   sit here anyhow.  If that happened, I don't know about

04:07:50 5   that right now.

04:07:57 6   Q    One of the other topics that was discussed earlier

04:07:59 7   today was the subject of Steves potentially, either on its

04:08:05 8   own or with a partner, building a molded door skin

04:08:08 9   manufacturing facility.  Do you recall that?

04:08:10 10  A    I do.

04:08:11 11  Q    Okay.  And you have relied on information from Steves

04:08:17 12  and Sons that they believe it's unlikely that they'll be

04:08:22 13  able to build such a facility before the supply agreement

04:08:26 14  with Jeld-Wen expires, right?

04:08:30 15  A    Not really, no.  That's not right.

04:08:31 16  Q    Okay.  Is it not the case that you reported that

04:08:36 17  based both on the in-house evaluation and input from GPS,

04:08:43 18  Steves concluded that they are unlikely to be able to

04:08:45 19  build such a facility before the agreement with Jeld-Wen

04:08:49 20  terminates?

04:08:50 21  A    I understand that's their view.  But I am relying

04:08:53 22  more on Jeld-Wen and Masonite's information about how long

04:08:57 23  it takes to build such a facility and not on Steves'

04:09:02 24  current estimation.

04:09:04 25  Q    And did you take into account, in addition to the

Shapiro - Cross

04:09:08 1   information you say you looked at from Jeld-Wen and

04:09:11 2   Masonite, information prepared by a gentleman named

04:09:17 3   Mr. Ambruz and his company, Global Strategic Partners, in

04:09:22 4   connection with this project?

04:09:23 5   A    I'm aware of that, of their analysis.

04:09:25 6   Q    Okay.  And did you take that analysis into account in

04:09:28 7   your opinions in this case?

04:09:30 8   A    Yes, I did.

04:09:31 9   Q    Okay.  You wouldn't disregard that, would you?

04:09:33 10  A    No, not at all.

04:09:36 11  Q    Okay.  And you didn't conduct an independent analysis

04:09:38 12  of whether Steves can build a door skin facility, did you?

04:09:41 13  A    I did not.

04:09:42 14  Q    Okay.  You didn't do any financial analysis, for

04:09:47 15  example, of how much Steves could afford to borrow if it

04:09:50 16  was going to go forward with this plan, did you?

04:09:52 17  A    I did not.

04:09:53 18  Q    But you did hear the testimony from Edward Steves

04:09:55 19  earlier in this case that they have very little debt,

04:09:58 20  didn't you?

04:09:58 21  A    I do not hear that.

04:10:00 22  Q    Were you aware of the statement in Mr. Ambruz's

04:10:06 23  feasibility study that with financing and a partner,

04:10:13 24  Steves' contribution to a door skin plant could be as

04:10:17 25  little as $16 million?

Shapiro - Cross

04:10:18 1    A    How much?

04:10:19 2    Q    $16 million.

04:10:20 3    A    I looked through Mr. Ambruz's materials a while ago.

04:10:24 4    I do not remember that specific number.

04:10:37 5    Q    You talked earlier this morning in relation to a

04:10:42 6    slide that showed 20 door skin designs.  Do you remember

04:10:46 7    that?

04:10:46 8    A    I do.

04:10:47 9    Q    Okay.  And you haven't conducted any analysis showing

04:10:51 10   what door skin styles or sizes an independent door

04:10:55 11   manufacturer must offer to be competitive, have you?

04:10:59 12   A    I don't know about "must offer to be competitive."  I

04:11:01 13   have analyzed what they actually are purchasing in terms

04:11:06 14   of door skins and so what they're currently using.

04:11:12 15   Q    Yes.  But you haven't looked at what an independent

04:11:18 16   door manufacturer would need to offer to be competitive in

04:11:20 17   this marketplace, have you?

04:11:22 18   A    Well, you're not talking about competitive in the

04:11:24 19   doors market, in selling doors.  No, I have not looked at

04:11:29 20   that.  I'm just looking at how much of their needs --

04:11:31 21   their current needs could be met with these limited

04:11:34 22   models.  That's of the extent of it.

04:11:37 23   Q    Right.  And you haven't done any analysis, for

04:11:38 24   example, of what range of door skin designs other door

04:11:44 25   skin manufacturers are actually -- door manufacturers,

Shapiro - Cross

04:11:46 1  rather, are actually offering, right?

04:11:51 2  A    Oh, yes.  I have looked at that.

04:11:53 3  Q    So you have an understanding of how many of those 20

04:11:54 4  designs Excel offers?

04:12:00 5  A    I've looked at those numbers.  I don't have them

04:12:02 6  memorized.  But they -- in general, the other independent

04:12:05 7  door manufacturers have somewhat fewer designs than

04:12:08 8  Steves, but still far more than the three that seem to be

04:12:12 9  available.  More in the 15 to 18 range.

04:12:16 10 Q    In fact, doesn't Lynden buy the vast majority of its

04:12:19 11 doors in the Madison and Monroe lines?

04:12:24 12 A    Lynden is different in that respect.  They seem to be

04:12:25 13 more specialized in the Craftsman area.  That's correct.

04:12:28 14 So they would be different in that respect in terms of

04:12:32 15 their mix.

04:12:35 16 Q    And you're not offering the opinion that only a

04:12:40 17 supplier that could offer all of those 477 permutations of

04:12:48 18 door skins can be an effective competitor in the door

04:12:52 19 skins market, are you?

04:12:54 20 A    I think you mean in selling doors?

04:12:57 21 Q    No.  No.  I mean in the door skins market.

04:12:59 22 A    Oh, I misunderstood.  Oh, I see.  No, I'm not saying

04:13:03 23 that.

04:13:03 24 Q    Okay.  Have you done any analysis of how many of the

04:13:12 25 477 SKUs, or permutations, of door skins Jeld-Wen itself

Shapiro - Cross

04:13:23  1   would have been offer to sale if the merger had not

04:13:29  2   happened?

04:13:29  3   A    I don't know that.  I probably could get some of that

04:13:32  4   from the data we have, but I certainly don't know the

04:13:35  5   answer to that sitting here.

04:13:38  6   Q    That's not something you've offered any analysis or

04:13:40  7   opinion about so far?

04:13:42  8           THE COURT:  He doesn't know so he hasn't.  Let's

04:13:47  9   go ahead.

04:13:48 10   Q    And you do know that Steves itself bought door skins

04:13:52 11   from more than one manufacturer at various times prior to

04:13:53 12   the merger, don't you?

04:13:56 13   A    I emphasized that in the context of the CARB episode.

04:13:59 14   Q    Did you do an analysis to see which designs

04:14:01 15   overlapped between the manufacturer -- the different

04:14:03 16   manufacturers Steves bought from pre-merger and which did

04:14:07 17   not overlap?

04:14:09 18   A    No.  I did not separately analyze that.

04:14:11 19   Q    So you don't know whether Masonite, for example,

04:14:13 20   offered every one of those 477 that Steves buys now, do

04:14:18 21   you?

04:14:19 22   A    I don't know the answer to that.

04:14:21 23   Q    Okay.

04:14:29 24           MR. PFEIFFER:  Actually, I believe that's my

04:14:31 25   questions for now.  Thank you.

```
04:14:33   1                  THE COURT:  Would you all like to take a little
04:14:35   2    recess?  Okay.  We'll take a 15-minute recess.
04:14:43   3                  (The jury exited the courtroom.)
04:15:07   4                  THE COURT:  Take 15 minutes.
04:15:09   5                  (Recess taken.)
           6
           7
           8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25
```

| | | |
|---|---|---|
| 04:37:08PM | 1 | THE COURT:  I have a motion from counsel for the |
| 04:37:12PM | 2 | Kronospan, some fellow in Nashville, complaining about you all |
| 04:37:17PM | 3 | are using documents that are secret, confidential, protected, |
| 04:37:22PM | 4 | or whatever.  What's the situation on this?  Jeld-Wen, you are |
| 04:37:26PM | 5 | the ones -- they're pointing the fingers at you and saying you |
| 04:37:30PM | 6 | are doing it, you don't care about the protective order that |
| 04:37:34PM | 7 | they agreed to or whatever.  What's up? |
| 04:37:44PM | 8 | MS. RATHBUN:  Thank you, Your Honor.  I'm sorry.  I |
| 04:37:48PM | 9 | just walked in, so I didn't get a chance to hear everything |
| 04:37:51PM | 10 | that you had said, but my understanding is that we sent |
| 04:37:54PM | 11 | Kronospan the protective order at the time along with our |
| 04:37:57PM | 12 | request, our discovery request.  They understood that the |
| 04:38:00PM | 13 | protective order said that it applied during discovery, but for |
| 04:38:05PM | 14 | trial, the Court needed to decide what protections would be |
| 04:38:10PM | 15 | added at trial and that Jeld-Wen does not have the ability to |
| 04:38:13PM | 16 | do that.  We don't have the ability to close the court. |
| 04:38:17PM | 17 | THE COURT:  January 20th, 2018.  The guy slept on his |
| 04:38:22PM | 18 | rights, it looks to me like.  Jeld-Wen suddenly informed |
| 04:38:26PM | 19 | Kronospan that the parties to the litigation anticipated using |
| 04:38:31PM | 20 | Kronospan's confidential information at trial without |
| 04:38:33PM | 21 | restriction.  What are you doing? |
| 04:38:41PM | 22 | MS. RATHBUN:  Your Honor -- |
| 04:38:42PM | 23 | THE COURT:  Did you all work this out with them?  How |
| 04:38:44PM | 24 | to you want -- |
| 04:38:46PM | 25 | MS. RATHBUN:  We do not oppose the request, Your |

04:38:48PM  1    Honor, but we are not able to, ourselves, close the court.

04:38:51PM  2         THE COURT:  I'm not going to close the court.  What

04:38:53PM  3    is it that you all are thinking -- they seem to think that

04:38:57PM  4    their concern is that you are identifying people who own

04:39:01PM  5    Kronospan.  Do we care?

04:39:05PM  6         MS. RATHBUN:  Your Honor, my understanding is that

04:39:07PM  7    information is publicly available on the internet already.

04:39:12PM  8    Also, the deposition testimony that we have designated and

04:39:18PM  9    certain documents that we would like to show the jury, we are

04:39:22PM  10   not interested in making sure the jury knows the names of the

04:39:25PM  11   owners of the company.  We just want to convey that the owners

04:39:28PM  12   are interested in the project.

04:39:32PM  13        THE COURT:  So what?

04:39:34PM  14        MS. RATHBUN:  Because --

04:39:36PM  15        THE COURT:  Aren't owners always interested in

04:39:39PM  16   projects?

04:39:40PM  17        MS. RATHBUN:  Well, I mean, I think that's relevant

04:39:41PM  18   to this case as to whether or not there will be an option for

04:39:44PM  19   Steves in 2021.  If the owners of Kronospan are interested in

04:39:48PM  20   this project and would like to move forward in building a

04:39:52PM  21   plant, then that is an important fact that the jury should

04:39:54PM  22   hear.

04:39:54PM  23        THE COURT:  You get with this fellow and schedule a

04:39:57PM  24   hearing and tell him to get in here.  When are you going to put

04:39:59PM  25   this information on?

04:40:00PM   1          MS. RATHBUN:  I'm not sure.  Probably within the next

04:40:04PM   2   couple of days.

04:40:06PM   3          THE COURT:  Have you even read the motion and the

04:40:09PM   4   order and all that stuff yet?

04:40:11PM   5          MS. RATHBUN:  I have not.

04:40:12PM   6          THE COURT:  Read it, get in touch with them, work

04:40:15PM   7   something out.  If they want a hearing, tell them to be here

04:40:18PM   8   tomorrow.  I assume what they will do is retain local counsel,

04:40:22PM   9   or maybe Kronospan is going to fly them up here, but I'll deal

04:40:27PM   10  with it sometime tomorrow.  You can work with Ms. Hooper about

04:40:29PM   11  timing after you talk to him.  Thank you.

04:40:32PM   12         MS. RATHBUN:  Thank you.

04:40:33PM   13         THE COURT:  I will have her tell them that you are

04:40:34PM   14  going to be in touch, and you've got to forgive my mind.  Your

04:40:39PM   15  name is?

04:40:41PM   16         MS. RATHBUN:  Anna Rathbun, Your Honor.

04:40:44PM   17         THE COURT:  You tell Ms. Hooper that Ms. Rathbun will

04:40:48PM   18  be in touch with her about scheduling, and Ms. Rathbun is going

04:40:55PM   19  to take care of it with the other lawyers.  Are you putting on

04:41:01PM   20  Mr. Steves?

04:41:03PM   21         MR. POMERANTZ:  We will, Your Honor, Sam Steves.  We

04:41:04PM   22  have a few more questions for Professor Shapiro.

04:41:06PM   23         THE COURT:  Very few.

04:41:09PM   24         MR. POMERANTZ:  Less than five minutes.

04:41:09PM   25         THE COURT:  Are we ready for the jury?

| | | |
|---|---|---|
| 04:41:12PM | 1 | MR. POMERANTZ:  One housekeeping matter which is on |
| 04:41:14PM | 2 | the slides that I showed Professor Shapiro, they show exhibits, |
| 04:41:18PM | 3 | and you actually don't know from the record right now which |
| 04:41:21PM | 4 | exhibits we showed him.  They're on the slides, so I can either |
| 04:41:28PM | 5 | hand the slides to Your Honor and at least the slides can be |
| 04:41:30PM | 6 | part of the record so we know which exhibits we actually used. |
| 04:41:33PM | 7 | THE COURT:  Did you refer to the slides by number? |
| 04:41:35PM | 8 | MR. POMERANTZ:  Or I can read the exhibit numbers and |
| 04:41:37PM | 9 | say these are the ones we used during the course of Professor |
| 04:41:41PM | 10 | Shapiro's -- |
| 04:41:42PM | 11 | THE COURT:  You can do it off the record some other |
| 04:41:43PM | 12 | time. |
| 04:41:44PM | 13 | MR. POMERANTZ:  That would be fine. |
| 04:41:45PM | 14 | THE COURT:  Come in early in the morning and do it. |
| 04:41:50PM | 15 | Not too early, because the court reporter won't be here. |
| 04:41:52PM | 16 | MR. DANE:  With regard to Edward Steves, Your Honor |
| 04:41:55PM | 17 | had asked Ms. Zwisler if she would -- |
| 04:41:59PM | 18 | THE COURT:  Have you got what it is you were going to |
| 04:42:00PM | 19 | give me to read, Ms. Zwisler? |
| 04:42:02PM | 20 | MS. ZWISLER:  I'm about to make your life easy.  What |
| 04:42:05PM | 21 | we'd rather do is just call him adverse in our case, so we |
| 04:42:09PM | 22 | should just go ahead with Mr. Sam Steves. |
| 04:42:13PM | 23 | THE COURT:  That would be fine. |
| 04:42:32PM | 24 | Ms. Rathbun, this lawyer is about ready to have |
| 04:42:35PM | 25 | apoplexy.  Would you please get hold -- I think it's a him, and |

04:42:41PM  1   see if you can aleve his high blood pressure.

04:42:46PM  2           MS. RATHBUN:  I will try my best.

04:42:48PM  3           THE COURT:  That's why you have that magic telephone.

04:42:52PM  4           MS. RATHBUN:  Yes.

04:42:54PM  5           THE COURT:  And get a copy of his papers and see if

04:42:56PM  6   you can't work it out.  Come on up, Dr. Shapiro.

04:43:06PM  7           Thank you, Ms. Rathbun.

04:43:08PM  8

04:43:08PM  9           (Jury in.)

04:43:08PM  10

04:43:17PM  11          THE COURT:  All right.  Cross-examination is to be

04:43:20PM  12  brief, I'm told.

04:43:22PM  13          MR. POMERANTZ:  Thank you, Your Honor, less than five

04:43:23PM  14  minutes, I think.

04:43:23PM  15

04:43:23PM  16                  REDIRECT EXAMINATION

04:43:24PM  17  BY MR. POMERANTZ:

04:43:24PM  18  Q    Professor Shapiro, in the questioning by Mr. Pfeiffer, he

04:43:28PM  19  mentioned -- you mentioned that Masonite brings some door skins

04:43:32PM  20  in from outside the United States into THE United States.  Do

04:43:36PM  21  you recall that question and answer?

04:43:37PM  22  A    I do.

04:43:37PM  23  Q    Does Masonite bring those door skins in from its own

04:43:41PM  24  plants outside the United States?

04:43:42PM  25  A    Yes, that's my understanding.

Shapiro - Redirect                                                1126

04:43:44PM   1    Q    So they don't bring them in from Teverpan or Yildiz or

04:43:48PM   2    Kastamonu; is that correct?

04:43:49PM   3    A    That's correct.  Masonite has facilities abroad, and they

04:43:53PM   4    sometimes produce door skins there and ship them to the United

04:43:56PM   5    States for doors here.

04:43:58PM   6              MR. POMERANTZ:  Could we have slide 59 brought back

04:44:00PM   7    up.

04:44:06PM   8    Q    This is the slide where we have Masonite giving its views

04:44:09PM   9    as to whether Steves could import product.  Could you remind

04:44:13PM   10   the jury of what Masonite said here?

04:44:15PM   11   A    Masonite said, and this is 2016, that it would be very

04:44:19PM   12   difficult for Steves to import product, referring to door

04:44:22PM   13   skins.  It says door facings specifically.

04:44:25PM   14   Q    And you understand door facings to mean the same as door

04:44:29PM   15   skins?

04:44:29PM   16   A    Yes, sir.

04:44:31PM   17             MR. POMERANTZ:  Can we bring up slide 77, please.

04:44:34PM   18   Q    So these are the three steps of your analysis, and this is

04:44:38PM   19   your concluding slide where you set forth your conclusions in

04:44:41PM   20   blue with respect to the each of the steps; do you recall that?

04:44:45PM   21   A    I do.

04:44:46PM   22   Q    Is there anything that happened in your examination by Mr.

04:44:49PM   23   Pfeiffer that affects, in your view, any of the conclusions you

04:44:52PM   24   reached that are set forth on this slide?

04:44:55PM   25   A    No.

Shapiro - Redirect

04:44:56PM   1        MR. POMERANTZ:  And if we can turn to slide 78.

04:44:59PM   2   Q    Based on anything that happened in Mr. Pfeiffer's

04:45:01PM   3   examination of you, does your answer to this question change at

04:45:05PM   4   all?

04:45:05PM   5   A    No.

04:45:06PM   6   Q    And what is your answer?

04:45:08PM   7   A    I continue to believe that Jeld-Wen's acquisition of CMI

04:45:12PM   8   substantially lessens competition in the market for interior

04:45:17PM   9   molded door skins used in the United States.

04:45:20PM  10        MR. POMERANTZ:  Thank you.  I have no further

04:45:21PM  11   questions.

04:45:21PM  12        THE COURT:  Thank you.  Is he going to be excused, or

04:45:24PM  13   does he need to stay around, or what?

04:45:26PM  14        MR. POMERANTZ:  Your Honor, we might recall him as a

04:45:30PM  15   rebuttal witness, but we don't know that yet until we see that

04:45:34PM  16   case.

04:45:34PM  17        THE COURT:  That's between the two of you.  Thank you

04:45:37PM  18   for being with us and giving us your testimony, Dr. Shapiro.

04:45:37PM  19        THE WITNESS:  Thank you, Your Honor.

04:45:42PM  20        THE COURT:  Your next witness?

04:45:44PM  21        MR. POWELL:  Sam Steves, Your Honor.

            22

            23

            24

            25

| | | |
|---|---|---|
| 04:45:56PM | 1 | **SAM B. STEVES, II,** |
| 04:45:56PM | 2 | a witness, recalled at the instance of the plaintiff, having |
| 04:45:56PM | 3 | been first duly sworn, testified as follows: |
| 04:45:56PM | 4 | DIRECT EXAMINATION |
| 04:46:13PM | 5 | BY MR. POWELL: |
| 04:46:13PM | 6 | Q    Mr. Steves, just a couple of questions to cover a little |
| 04:46:31PM | 7 | territory that we didn't cover when you were last here; all |
| 04:46:33PM | 8 | right? |
| 04:46:33PM | 9 | A    Yes, sir. |
| 04:46:34PM | 10 | Q    Remind the jury, please, your position with the company. |
| 04:46:37PM | 11 | A    I'm president and chief operating officer of the company. |
| 04:46:41PM | 12 | Q    In those roles, sir, what is your primary responsibility |
| 04:46:46PM | 13 | insofar as running the company's business? |
| 04:46:48PM | 14 | A    My day to day is managing all of the sales and then all of |
| 04:46:55PM | 15 | the production of everything that we sell. |
| 04:46:57PM | 16 | Q    Are you familiar with each of the lines of business of |
| 04:47:01PM | 17 | Steves and Sons? |
| 04:47:02PM | 18 | A    I am. |
| 04:47:03PM | 19 | Q    What is your principal line of business? |
| 04:47:06PM | 20 | A    Molded interior doors. |
| 04:47:09PM | 21 | Q    I know you said this earlier in your testimony, but please |
| 04:47:12PM | 22 | remind the jury, of all the revenue, all the money that the |
| 04:47:16PM | 23 | company takes in on an annual basis, approximately what |
| 04:47:19PM | 24 | percentage of that comes from the sale of molded interior |
| 04:47:22PM | 25 | residential doors? |

Sam Steves - Direct

04:47:23PM  1   A    Approximately 70 percent of our total revenue.

04:47:27PM  2   Q    You have a few other lines of business, though; correct?

04:47:31PM  3   A    We do.

04:47:31PM  4   Q    What are they?

04:47:32PM  5   A    We have an exterior steel and fiberglass facility,

04:47:38PM  6   relatively small by industry standards.

04:47:40PM  7   Q    When you say exterior, you mean exterior door?

04:47:43PM  8   A    Right.  It would be, for instance, your front door or your

04:47:46PM  9   back door.

04:47:47PM  10  Q    What else?

04:47:48PM  11  A    And then we have as a separate division that also sells

04:47:52PM  12  molded interior doors what we call our home center division

04:47:56PM  13  that sells exclusively to Home Depot.

04:47:59PM  14  Q    Anything else?

04:48:01PM  15  A    That's it.

04:48:02PM  16  Q    Focusing on those, that is the lines of business other

04:48:06PM  17  than the sales of molded interior residential doors, over the

04:48:11PM  18  last few years, have they been profitable?

04:48:13PM  19  A    You are asking me to exclude whatever involves interior

04:48:20PM  20  molded doors?

04:48:21PM  21  Q    Yes, sir, exclude those.

04:48:22PM  22  A    They are not profitable.

04:48:25PM  23        THE COURT:  Your home center sales to Home Depot does

04:48:29PM  24  not include molded interior doors?

04:48:32PM  25        THE WITNESS:  No, sir, it does.

Sam Steves - Direct

1130

| | | |
|---|---|---|
| 04:48:36PM | 1 | Q    At the end of your testimony -- |
| 04:48:38PM | 2 | THE COURT:  Is that all you sell to Home Depot from |
| 04:48:41PM | 3 | your home center business? |
| 04:48:42PM | 4 | THE WITNESS:  The genesis of the business started |
| 04:48:45PM | 5 | with interior molded doors and, 15 years ago, even flush doors. |
| 04:48:50PM | 6 | That now has been taken out of the Home Depot, and that turned |
| 04:48:53PM | 7 | into door units, interior door units, again molded doors, and |
| 04:48:58PM | 8 | then in the last maybe two to three years, we've earned a |
| 04:49:04PM | 9 | significant -- by our standards -- amount of exterior door |
| 04:49:10PM | 10 | business at Home Depot.  These are exterior doors as I've |
| 04:49:14PM | 11 | described earlier for maybe a front or back door. |
| 04:49:19PM | 12 | Q    If, in September of 2021, Mr. Steves, you no longer have a |
| 04:49:24PM | 13 | supply of molded interior door skins, what happens to your |
| 04:49:28PM | 14 | business? |
| 04:49:29PM | 15 | A    Our -- we're done.  We will be out of business. |
| 04:49:35PM | 16 | MR. POWELL:  Your Honor, I may I confer with my |
| 04:49:39PM | 17 | colleagues for a moment? |
| 04:49:39PM | 18 | |
| 04:49:41PM | 19 | (Counsel conferring.) |
| 04:49:41PM | 20 | |
| 04:49:54PM | 21 | Q    One last question, Mr. Steves.  If you had only a limited |
| 04:50:01PM | 22 | supply of molded interior door skins such as those presently |
| 04:50:05PM | 23 | offered by Teverpan and the other foreign suppliers that we |
| 04:50:08PM | 24 | talked about, if that's all you had, what would happen to your |
| 04:50:12PM | 25 | business for the sale of molded interior residential doors? |

04:50:17PM  1   A    Well, it would be the same answer, and to put it into

04:50:21PM  2   context, I've heard a lot of testimony about Teverpan,

04:50:25PM  3   Kastamonu, and Yildiz.  The only supplier that we have

04:50:30PM  4   qualified, from a quality perspective, so far is Teverpan.  We

04:50:34PM  5   can't get an agreement from them.  And the only thing they have

04:50:39PM  6   of six-panel product, which is the part that the Home Depot

04:50:43PM  7   buys so much of, is five possible SKUs.  Those would be five

04:50:50PM  8   possible sizes out of the 11 we offer.  So if we only had those

04:50:56PM  9   five, there's no way anyone is going to continue to do business

04:51:01PM  10  with us, so we're through.

04:51:05PM  11  Q    Could you survive by selling only flush doors?

04:51:09PM  12  A    No, sir.

04:51:12PM  13         MR. POWELL:  Thank you, Mr. Steves.  That's all the

04:51:14PM  14  questions I have.  Mr. Pfeiffer may have a few for you.

04:51:18PM  15         MR. PFEIFFER:  Your Honor, may we approach briefly?

04:51:28PM  16

04:51:28PM  17         (Discussion at sidebar as follows:)

04:51:28PM  18

04:51:31PM  19         MS. ZWISLER:  In light of the fact that Mr. Pfeiffer

04:51:32PM  20  was getting ready to cross Carl Shapiro, I got ready to cross

04:51:37PM  21  Mr. Sam Steves very briefly.  So would you give us your

04:51:40PM  22  permission to tag-team the cross?

04:51:44PM  23         THE COURT:  Do what now?

04:51:45PM  24         MS. ZWISLER:  Well, I'm prepared to cross Mr. Sam

04:51:48PM  25  Steves because he was crossing Carl Shapiro after we decided

04:51:52PM  1    that we were going to have Sam come back.  So I'm asking

04:51:56PM  2    permission, if it's okay with them, or even if it isn't, that I

04:52:00PM  3    could cross Sam right now and not Mr. Pfeiffer.

04:52:05PM  4            THE COURT:  You mean because he cross-examined him

04:52:07PM  5    earlier?

04:52:08PM  6            MS. ZWISLER:  Yes.

04:52:09PM  7            THE COURT:  But you're not talking about doing two

04:52:11PM  8    people today.

04:52:12PM  9            MS. ZWISLER:  No, no.

04:52:13PM  10           THE COURT:  Sure.  Absolutely.

04:52:16PM  11           MS. ZWISLER:  Thank you, Your Honor.

04:52:17PM  12

04:52:17PM  13                       CROSS-EXAMINATION

04:52:17PM  14   BY MS. ZWISLER:

04:52:27PM  15   Q    Good afternoon, Mr. Steves.  I'm subbing for Mr. Pfeiffer

04:52:30PM  16   today.

04:52:31PM  17   A    Hello.

04:52:32PM  18   Q    As I understood your testimony, you said that because of

04:52:37PM  19   the limited supply, you would go out of business in 2021; is

04:52:41PM  20   that correct?

04:52:41PM  21   A    At the end -- when the supply agreement terminated and we

04:52:46PM  22   no longer had door skins to fill our orders, we would have no

04:52:51PM  23   choice but to go out of business.

04:52:53PM  24   Q    And your testimony on that subject takes into account the

04:52:57PM  25   idea that you can't build your own door skin plant; is that

Sam Steves - Cross

04:53:01PM  1    correct?

04:53:01PM  2    A    That's correct.

04:53:02PM  3    Q    Now, you are not saying you can't afford to build that

04:53:06PM  4    plant, are you?

04:53:07PM  5    A    That's an element of one of our concerns.

04:53:11PM  6    Q    Okay.

04:53:12PM  7          THE COURT:  Wait a minute.  I think the question was,

04:53:14PM  8    are you saying you can't afford it?

04:53:17PM  9          THE WITNESS:  The nuts and bolts of that would be no,

04:53:19PM  10   today, we cannot afford that.

04:53:21PM  11   Q    You had a business partner named Proteak, didn't you, sir?

04:53:24PM  12   A    They were not a business partner, no, ma'am.

04:53:28PM  13   Q    You had a deal, you testified on direct, with Proteak that

04:53:31PM  14   you -- on cross, rather, that you walked away from because they

04:53:34PM  15   wanted to be a majority shareholder and put more money into the

04:53:38PM  16   deal, and you would be a minority; isn't that true?

04:53:41PM  17   A    No, ma'am.

04:53:42PM  18          MR. POWELL:  Objection.  He did not say he had a deal

04:53:45PM  19   with Proteak.  She's mischaracterizing his direct testimony.

04:53:49PM  20          THE COURT:  Why don't you just ask the question

04:53:50PM  21   another way.  That's an objection to the form of the question

04:53:53PM  22   that's sustained.

04:53:54PM  23   Q    You came up to have an agreement -- you tried to make an

04:54:00PM  24   agreement with Proteak to have them be a partner with you in

04:54:03PM  25   building a door skin plant; isn't that true?

Sam Steves - Cross

04:54:05PM  1    A    We did.

04:54:06PM  2    Q    And Proteak was very interested, you testified; correct?

04:54:10PM  3    A    They were.

04:54:11PM  4    Q    And you hold them in high regard; correct?

04:54:13PM  5    A    Yes, we do.

04:54:14PM  6    Q    And the deal broke down over the deal structure, not any

04:54:19PM  7    concerns over the viability or profitability of the deal;

04:54:21PM  8    correct?

04:54:21PM  9    A    I think the deal broke down when we received an email from

04:54:25PM  10   Proteak telling them they wanted to pause any interest in this

04:54:30PM  11   program because of a subpoena from Jeld-Wen.  So that's what

04:54:33PM  12   broke the deal down.

04:54:34PM  13   Q    And you testified on direct they cooled to the idea of a

04:54:38PM  14   partnership only after you balked at the 33 percent share that

04:54:41PM  15   they wanted to assign in that arrangement; correct?

04:54:44PM  16   A    But I also testified in front of this jury that it wasn't

04:54:49PM  17   our not wanting to be a minority shareholder.  Of course we

04:54:54PM  18   wanted to maintain control, because we didn't want to find

04:54:57PM  19   ourselves, or I didn't want my great grandchildren to find

04:55:00PM  20   themselves in this same situation again.  So what I

04:55:02PM  21   testified -- if you'll allow me -- pardon me.

04:55:05PM  22          THE COURT:  Easy, easy, easy.  Settle down.

04:55:09PM  23          THE WITNESS:  What I want to say is, when Proteak

04:55:12PM  24   wanted -- and I testified to this effect.  When Proteak wanted

04:55:16PM  25   to invest more money, it wasn't as if they wanted a bigger

Sam Steves - Cross

04:55:20PM  1   share.  They wanted a bigger deal.  They wanted a bigger plant,

04:55:25PM  2   and we didn't want to make the plant as big as they wanted to

04:55:29PM  3   make it, because we didn't need to make it that large.  In that

04:55:32PM  4   way, we didn't need to have to afford that much money.

04:55:36PM  5   Q     They were a viable option initially; correct?

04:55:38PM  6   A     They certainly were.

04:55:39PM  7   Q     And you have no idea whether, after this lawsuit is over,

04:55:43PM  8   if indeed it is correct that they balked because we subpoenaed

04:55:46PM  9   them to find out what they were doing with you, whether they'll

04:55:48PM  10  come back and have another deal with you; right?

04:55:51PM  11  A     You happen to have an email that they supplied saying that

04:55:54PM  12  they wanted to pause this program because of your subpoena.

04:55:58PM  13  Q     They didn't say they would never do business with you at

04:56:04PM  14  all, did they?

04:56:07PM  15  A     They told us they did not want to discuss this deal

04:56:11PM  16  because of the subpoena that they had received from you.

04:56:15PM  17  That's when we stopped talking.

04:56:18PM  18          MS. ZWISLER:  Move to strike the answer as

04:56:19PM  19  nonresponsive.

04:56:20PM  20  Q     My question is --

04:56:20PM  21          THE COURT:  Just a minute.  Do you want a ruling on

04:56:23PM  22  it, or do you want to rule, too?

04:56:25PM  23          MS. ZWISLER:  Sorry, I'd like a ruling.

04:56:27PM  24          THE COURT:  Overruled, but listen to the question and

04:56:30PM  25  just relax.

Sam Steves - Cross

| | | |
|---|---|---|
| 04:56:32PM | 1 | Q    You have no idea whether, after this lawsuit is over and |
| 04:56:36PM | 2 | it's not hanging over the head of your company or them, whether |
| 04:56:40PM | 3 | they'll come back to the table and work with you again to think |
| 04:56:43PM | 4 | about whether you guys could be partners in a door skin plant; |
| 04:56:46PM | 5 | correct? |
| 04:56:47PM | 6 | A    I have no idea, that's correct. |
| 04:56:49PM | 7 | Q    Thank you.  Now, Masonite, your conclusion that you are |
| 04:56:57PM | 8 | going to go out of business is based upon your assessment that |
| 04:57:03PM | 9 | Masonite's willingness to sell to you is at too high a price; |
| 04:57:09PM | 10 | correct? |
| 04:57:10PM | 11 | A    Well, it's at too high a price and an unwillingness to |
| 04:57:15PM | 12 | enter into a long-term supply agreement with Steves and Sons. |
| 04:57:18PM | 13 | Q    So that's Mr. Fred Lynch's policy right now, isn't it? |
| 04:57:24PM | 14 | A    That's my understanding, yes, ma'am. |
| 04:57:26PM | 15 | Q    Now, in 2011, Fred Lynch had a different policy, didn't |
| 04:57:31PM | 16 | he? |
| 04:57:31PM | 17 | A    He did. |
| 04:57:32PM | 18 | Q    Yeah, because he was selling skins directly to you without |
| 04:57:36PM | 19 | a long-term supply agreement; correct? |
| 04:57:38PM | 20 | MR. POWELL:  Excuse me, Ms. Zwisler.  I object to |
| 04:57:41PM | 21 | this line of questioning.  It's beyond the scope. |
| 04:57:43PM | 22 | THE COURT:  I don't think it is. |
| 04:57:45PM | 23 | A    Will you ask the question again, please. |
| 04:57:49PM | 24 | Q    In 2011, you were buying 1.5 million door skins a year |
| 04:57:54PM | 25 | from Masonite without a long-term supply agreement; correct? |

Sam Steves - Cross

1137

| | | |
|---|---|---|
| 04:57:57PM | 1 | A    We did not have a long-term supply agreement with them at |
| 04:58:00PM | 2 | the time, that's correct. |
| 04:58:01PM | 3 | Q    And you bought 1.5 million skins from Masonite; correct? |
| 04:58:05PM | 4 | A    We did. |
| 04:58:06PM | 5 | Q    And then sometime later, apparently, Mr. Lynch changed his |
| 04:58:10PM | 6 | view about how to run Masonite's business with independents; |
| 04:58:14PM | 7 | correct? |
| 04:58:14PM | 8 | A    He did. |
| 04:58:15PM | 9 | Q    And that was sometime in 2014 when he decided to |
| 04:58:19PM | 10 | de-emphasize that business or something; correct? |
| 04:58:21PM | 11 | A    I believe that's what I've heard in this courtroom, yes, |
| 04:58:24PM | 12 | ma'am. |
| 04:58:24PM | 13 | Q    And you have no idea, do you, whether he will maintain his |
| 04:58:28PM | 14 | current policy or switch back to what he did in 2011, do you? |
| 04:58:33PM | 15 | A    That's what the scarecrow does. |
| 04:58:37PM | 16 |      THE COURT:  Wait a minute.  What's what the scarecrow |
| 04:58:40PM | 17 | does? |
| 04:58:43PM | 18 |      THE WITNESS:  (Indicating.) |
| 04:58:43PM | 19 | Q    Mr. Lynch might decide next year, I'm going to change my |
| 04:58:47PM | 20 | mind, I'm going to do what I did in 2011, I'm going to sell |
| 04:58:50PM | 21 | skins on the open market again; correct? |
| 04:58:52PM | 22 | A    He could. |
| 04:58:53PM | 23 | Q    And you know he's been a CEO for long time, hasn't he? |
| 04:58:57PM | 24 | A    He has. |
| 04:58:57PM | 25 | Q    And he might decide to retire; correct? |

Sam Steves - Cross

04:59:01PM 1   A    I have no idea -- the only thing I know about him is he's

04:59:05PM 2   a Villanova fan, and I'm from Virginia.  So that's it.

04:59:09PM 3   Q    But my point, to be serious, is he's not going to be CEO

04:59:14PM 4   forever, is he?

04:59:14PM 5   A    Ma'am, I know he's significantly younger than me, so I

04:59:17PM 6   just -- I have no idea how long he's going to be CEO.

04:59:21PM 7   Q    And Masonite could decide to change out CEOs; correct?

04:59:26PM 8   A    Of course.

04:59:27PM 9   Q    You have no idea whether, in 2021, either Mr. Lynch or

04:59:31PM 10  some new CEO of Masonite will decide to change its policy and

04:59:36PM 11  its entire business approach to the independents; isn't that

04:59:39PM 12  true?

04:59:39PM 13  A    That's true.

04:59:41PM 14  Q    Now, Teverpan and Kastamonu, I understand your testimony

04:59:45PM 15  that part of your -- your testimony that you're going to go out

04:59:52PM 16  of business without a supply is based on the fact that today,

04:59:55PM 17  Teverpan and Kastamonu have too few designs and the quality

04:59:59PM 18  isn't acceptable to you; is that correct?

05:00:01PM 19  A    I believe we've qualified Teverpan's on the last half a

05:00:07PM 20  container; however, we have not been able to qualify three

05:00:12PM 21  shipments so far from Kastamonu.

05:00:13PM 22  Q    So I'll take them separately then.  Right now, Teverpan

05:00:16PM 23  skins are acceptable to you; correct?

05:00:18PM 24  A    Yes, they are.

05:00:19PM 25  Q    So if they invested in more molds and had enough molds to

Sam Steves - Cross

1139

05:00:24PM   1    satisfy your needs right now, Teverpan would be a viable

05:00:28PM   2    option, and you wouldn't go out of business in 2021; correct?

05:00:32PM   3    A    To supply the over 10 million door skins that we purchased

05:00:36PM   4    in 2017?  Is that your question?

05:00:39PM   5    Q    July 2021.

05:00:40PM   6    A    So they're going to install another line in Turkey?

05:00:43PM   7    Q    My question is -- just stay with me on --

05:00:46PM   8    A    But you just asked me if they're going to buy more dies.

05:00:49PM   9    Q    If they buy more dies -- maybe the way to ask it is, you

05:00:52PM  10    have no idea what Teverpan is going to be selling in 2021, do

05:00:56PM  11    you?

05:00:56PM  12    A    I do not.

05:00:57PM  13    Q    You don't know if they're going to have three dies, five

05:01:00PM  14    dies, or seven; correct?

05:01:01PM  15    A    They may have zero.  I don't know.

05:01:03PM  16    Q    Right.  And Kastamonu, the same thing.  Your testimony

05:01:06PM  17    that you're going to go out of business in 2021 without a

05:01:10PM  18    supply is based on your evaluation of Kastamonu today; correct?

05:01:14PM  19    A    Well, the fact that they've gone backwards is disturbing.

05:01:18PM  20    They're down to two dies to be able to supply us the tests that

05:01:23PM  21    we need.  So I'm not putting a tremendous amount of faith in

05:01:27PM  22    their even being able to supply us a limited amount that we

05:01:30PM  23    were seeking.

05:01:31PM  24    Q    Thank you, but I'd like an answer to my question which is

05:01:31PM  25    --

Sam Steves - Cross

05:01:31PM  1   A    Okay.

05:01:34PM  2   Q    -- it's based upon your evaluation of the quality of

05:01:37PM  3   Kastamonu today; yes?

05:01:39PM  4   A    We have not been able to qualify Kastamonu.  That means

05:01:43PM  5   that their quality does not meet an acceptable standard.  We

05:01:48PM  6   heard that from Mr. Fancher.

05:01:49PM  7   Q    So to go back to my question, the evaluation that you're

05:01:53PM  8   going to go out of business because you don't have an

05:01:56PM  9   alternative supply is based on your assessment that today,

05:01:59PM  10  Kastamonu's quality is not sufficient; correct?

05:02:02PM  11  A    That's correct.

05:02:02PM  12  Q    And you have no idea what quality improvements Kastamonu

05:02:07PM  13  might make that would make them an acceptable source of supply

05:02:10PM  14  either before 2021 or after, do you?

05:02:13PM  15  A    It would require that their quality be certified and that

05:02:17PM  16  they have the right assortment for what our customers buy,

05:02:21PM  17  because we can't tell our customers what to buy.

05:02:24PM  18  Q    And you can't tell whether or not they're going to have

05:02:26PM  19  that or not.  I understand what you're saying, but you can't

05:02:29PM  20  tell whether or not they're going to have it or not right now,

05:02:32PM  21  can you?

05:02:32PM  22  A    No, ma'am.

05:02:33PM  23  Q    And you got the notice of termination from Mr. Hachigian

05:02:37PM  24  in September of 2014; correct?

05:02:39PM  25  A    Yes, ma'am.

Sam Steves - Cross

05:02:40PM   1   Q    At that time, you had seven years to figure out what to

05:02:43PM   2   do; correct?

05:02:43PM   3   A    Yes, ma'am.

05:02:44PM   4   Q    And one of the reasons that that seven years is in that

05:02:48PM   5   contract is so that you would have time if Jeld-Wen terminated

05:02:53PM   6   you to figure this out; right?

05:02:54PM   7   A    That was contemplated, yes, ma'am.

05:02:56PM   8   Q    And, now, you've still got three and a half more years;

05:03:00PM   9   correct?

05:03:00PM   10  A    That's correct.

05:03:01PM   11  Q    And your own studies have shown, for example,

05:03:05PM   12  Dieffenbacher thinks that they can build this thing for you in

05:03:09PM   13  a couple or three years; correct?

05:03:10PM   14  A    You've mischaracterized that.  They said they can build

05:03:13PM   15  the equipment in two years.  I testified under oath with Mr.

05:03:18PM   16  Pfeiffer that it would take over four years if all the die

05:03:21PM   17  manufacturers we were aware of in the world could manufacture

05:03:24PM   18  the dies starting tomorrow morning.

05:03:27PM   19       So I don't think that's true, and that's not even talking

05:03:30PM   20  about the design, the permits that are required, and we've seen

05:03:34PM   21  this testimony from folks that know a lot more about this than

05:03:37PM   22  I do, Ms. Zwisler.

05:03:38PM   23  Q    But you don't know where they're going to be in 2021

05:03:42PM   24  either, do you?

05:03:43PM   25  A    Unless there become more months in a year, I can't see it

Sam Steves - Cross

1142

05:03:48PM 1   happening in time.

05:03:48PM 2   Q    If you had started with some of this in 2014 -- well --

05:03:54PM 3   A    Would've, should've, could've --

05:03:56PM 4        THE COURT:  Wait a minute.  Think we don't need to go

05:03:59PM 5   there.

05:04:00PM 6   Q    I'll ask one final question which is, nobody can predict

05:04:04PM 7   the future; correct?

05:04:05PM 8   A    No, ma'am.

05:04:07PM 9   Q    And you don't have any basis, really, to tell this Court

05:04:11PM 10  that you are going to go out of business without being able to

05:04:14PM 11  predict what's going to be going on with building a door skin

05:04:17PM 12  plant, Masonite, Tever, and Kastamonu; correct?

05:04:21PM 13  A    Without this being a flippant answer, and I want to

05:04:24PM 14  qualify it this way, because I thought about it a lot.  I've

05:04:28PM 15  studied this as hard as I know how to study it.  It's critical

05:04:33PM 16  to my family, to my business, to my employees, some that have

05:04:38PM 17  been there for four generations, that we figure this out.

05:04:41PM 18       So I've learned a lot, and I feel as certain that we're

05:04:46PM 19  going to have a door skin supply after September 2021 as I am

05:04:52PM 20  that Disney is going to have a theme park in North Korea.  It's

05:04:57PM 21  just not going to happen.

05:04:58PM 22  Q    Well, you don't know that, because you don't know any of

05:05:01PM 23  the things that I just asked you.  You think so, but that's

05:05:05PM 24  based on your assessment of things today; correct, sir?

05:05:07PM 25  A    From what I know, yes, ma'am.

05:05:09PM   1   Q    Based on what the situation is today and not what it's

05:05:11PM   2   going to be in 2021; correct?

05:05:13PM   3   A    Based on what I know, and I know -- all I know is all I

05:05:18PM   4   know.

05:05:18PM   5   Q    You were at your brother's deposition in August, were you

05:05:22PM   6   not?

05:05:22PM   7   A    For parts of it, yes, ma'am.

05:05:23PM   8   Q    And would you agree with him that it's an exaggeration

05:05:26PM   9   that you would go immediately out of business in 2021?

05:05:29PM  10         MR. POWELL:  Objection, Your Honor.  Now she's --

05:05:32PM  11         THE COURT:  Overruled.

05:05:34PM  12   A    So reask the question, please.

05:05:36PM  13   Q    Yes.  You were at your brother's deposition in August of

05:05:40PM  14   2017; correct?

05:05:42PM  15   A    For parts of it.  I wasn't -- as you know, I wasn't there

05:05:45PM  16   the entire time.

05:05:46PM  17   Q    So you know he testified that you would not go out of

05:05:49PM  18   business immediately in 2021 even if you lost this lawsuit;

05:05:52PM  19   correct?

05:05:53PM  20         MR. DANE:  Objection, Your Honor.  That is a

05:05:54PM  21   mischaracterization of the deposition testimony she is

05:05:57PM  22   referring to.

05:05:58PM  23   Q    Do you remember that testimony, sir?

05:05:58PM  24         THE COURT:  May I see it?  I can't rule on it unless

05:06:03PM  25   I see it.

Sam Steves - Cross

05:06:22PM  1          (Discussion at sidebar as follows:)

05:06:22PM  2

05:06:39PM  3          THE COURT:  What line and page are you talking about?

05:06:41PM  4          MR. DANE:  I'm looking at 661.

05:06:44PM  5          THE COURT:  August 16th, 2017 deposition, page what?

05:06:48PM  6          MR. DANE:  661, Your Honor, and what Mr. Steves is

05:06:51PM  7  referring to, is he's saying that it would be an exaggeration

05:06:55PM  8  to say that they would go out of business immediately upon

05:06:58PM  9  losing the lawsuit, because they would still have the supply

05:07:01PM 10  agreement that would last for a few years, and the Court,

05:07:05PM 11  they're hoping, would protect them.

05:07:07PM 12          Ms. Zwisler said that he said that they would go out

05:07:09PM 13  of business immediately --

05:07:15PM 14          MS. ZWISLER:  September 21.

05:07:17PM 15          MR. DANE:  September 21, which is not what he said.

05:07:18PM 16  It's a complete mischaracterization, and to impeach a different

05:07:23PM 17  witness upon a mischaracterization --

05:07:23PM 18          THE COURT:  Easy, easy, big fellow.  You need to get

05:07:38PM 19  in here and say what you said so the court reporter can hear.

05:07:41PM 20          MS. ZWISLER:  I'll withdraw the question.

05:07:44PM 21          THE COURT:  The question is withdrawn.

05:07:46PM 22          MR. DANE:  Your Honor.

05:07:47PM 23          THE COURT:  I'll give an instruction.

05:07:48PM 24          MR. DANE:  Your Honor, I think that is extremely

05:07:50PM 25  improper behavior by Ms. Zwisler.  She knows that that

05:07:50PM 1   testimony is not anything close to what she said it was.  That

05:07:57PM 2   is improper behavior.

05:07:57PM 3           THE COURT:  All right, we'll deal with that off the

05:08:01PM 4   record -- I mean out of the presence --

05:08:03PM 5           MR. DANE:  The reason I will say this, Your Honor, is

05:08:05PM 6   they did it in briefing, and we pointed it out in briefing, and

05:08:07PM 7   she repeated it here at trial.  That is unconscionable.

05:08:10PM 8           THE COURT:  We'll deal with it later.

05:08:10PM 9

05:08:10PM 10          (End of sidebar discussion.)

05:08:18PM 11

05:08:18PM 12          THE COURT:  Ladies and gentlemen, the question has

05:08:19PM 13  with withdrawn, and the fact of the matter is that the

05:08:25PM 14  witness -- the fellow didn't say what it is that the question

05:08:30PM 15  was as it was presented in the question after having looked at

05:08:36PM 16  the question.  Counsel realized the error of her ways and

05:08:41PM 17  withdrew the question.  So there isn't any evidence of that

05:08:46PM 18  kind in here.

05:08:48PM 19          MS. ZWISLER:  Thank you, Mr. Steves.

05:08:50PM 20          THE WITNESS:  Thank you, Ms. Zwisler.

05:08:52PM 21          THE COURT:  All right, is there anything else?

05:08:53PM 22          MR. POWELL:  No, sir, not from me.

05:08:55PM 23          THE COURT:  All right, you may step down.

05:08:57PM 24          THE WITNESS:  Thank you.

05:09:08PM 25          THE COURT:  All right.

05:09:12PM 1      MR. POWELL:  We have Mr. Tucker ready to go, Your

05:09:15PM 2   Honor, if you're ready to go.

05:09:16PM 3      THE COURT:  Well, can you ask Mr. Tucker things that

05:09:20PM 4   we can productively use the jury's time for and I can deal with

05:09:25PM 5   the other aspects of it in a little bit?

05:09:29PM 6      MR. DANE:  We can, Your Honor.

05:09:30PM 7      THE COURT:  Let's do it that way then.

05:09:38PM 8

9                          **AVRAM TUCKER,**

10   a witness, called at the instance of the plaintiff, having been

11   first duly sworn, testified as follows:

12                       DIRECT EXAMINATION

13   BY MR. DANE:

05:11:18PM 14   Q    Good afternoon, Mr. Tucker.

05:11:19PM 15   A    Good afternoon.

05:11:20PM 16   Q    Can you tell the jury what you were asked to do in this

05:11:25PM 17   case?

05:11:25PM 18   A    Yes.  I was asked to focus on Steves' damages related to

05:11:29PM 19   some of the issues in this case, primarily focusing on

05:11:34PM 20   overcharges by Jeld-Wen for door skins to Steves and also

05:11:38PM 21   looking at the amount of damages related to quality issues.

05:11:42PM 22   Q    Now, let me ask you some background information.  Where

05:11:46PM 23   did you graduate from college, sir?

05:11:48PM 24   A    I graduated from George Washington University in

05:11:50PM 25   Washington, D.C.  I got a Bachelor of Business Administration

Tucker - Direct

1147

05:11:54PM 1    degree with a major in accounting, and I studied accounting,

05:11:58PM 2    economics, and finance.

05:11:58PM 3    Q    Can you briefly describe your professional background up

05:12:02PM 4    until your current position?

05:12:03PM 5    A    I started working in Washington, D.C., at an international

05:12:08PM 6    public accounting firm called Arthur Andersen.  I did what we

05:12:09PM 7    call financial statement audits, special purpose audits, and I

05:12:13PM 8    also consulted with companies on how to improve their

05:12:16PM 9    procedures and controls.

05:12:18PM 10       I then moved to the West Coast, and for the next 35 or so

05:12:22PM 11   years, I have focused on business and litigation consulting,

05:12:26PM 12   business consulting being working on matters helping companies

05:12:30PM 13   dealing with regulations or improving their procedures, and

05:12:33PM 14   then I do a substantial amount of litigation work like this

05:12:36PM 15   case.

05:12:37PM 16   Q    Do you have an occasion to do any teaching?

05:12:39PM 17   A    Yes.  I am an adjunct professor at Stanford University in

05:12:44PM 18   Palo Alto.  I teach every year, for the last 20 years, two

05:12:49PM 19   courses a year to graduate engineering students.  Although

05:12:52PM 20   they're engineering students, I focus on financial and

05:12:55PM 21   accounting and finance information.

05:12:58PM 22   Q    Do you serve on the boards of any institutions?

05:13:01PM 23   A    I'm on the board of trustees at George Washington

05:13:05PM 24   University in Washington, D.C.  The board there provides

05:13:08PM 25   governance over the operations of the university.

Tucker - Direct

| | | |
|---|---|---|
| 05:13:11PM | 1 | Q   Do you hold any professional certifications, sir? |
| 05:13:14PM | 2 | A   I have three certifications.  I've been a certified public |
| 05:13:18PM | 3 | accountant since 1978.  I've also -- I'm certified in financial |
| 05:13:22PM | 4 | forensics, which is what I do in my business, and I'm also a |
| 05:13:27PM | 5 | chartered global management accountant.  The later two |
| 05:13:30PM | 6 | designations are given by American Institute of Certified |
| 05:13:34PM | 7 | Public Accountants which is the regulatory body that oversees |
| 05:13:38PM | 8 | CPAs. |
| 05:13:40PM | 9 | Q   You used a term there, financial forensics.  What does |
| 05:13:43PM | 10 | that mean? |
| 05:13:43PM | 11 | A   I think I said forensic accounting, but either way, both |
| 05:13:47PM | 12 | work.  Forensic accounting are or financial forensics is the |
| 05:13:52PM | 13 | study of financial and operational information for |
| 05:13:55PM | 14 | investigative purposes, often in the context of litigation like |
| 05:13:59PM | 15 | this case. |
| 05:14:00PM | 16 | Q   When you refer to giving an opinion on damages, what do |
| 05:14:06PM | 17 | you mean by damages? |
| 05:14:07PM | 18 | A   Damages is the financial harm of a company that relates to |
| 05:14:13PM | 19 | the conduct of another company.  So in a case where a company |
| 05:14:16PM | 20 | says that some other company did something wrong, the financial |
| 05:14:20PM | 21 | harm is the increased costs that they might have spent or the |
| 05:14:24PM | 22 | lost profits that they might have incurred from the conduct. |
| 05:14:28PM | 23 | Q   Have you testified in court in other cases? |
| 05:14:32PM | 24 | A   I've testified many times on accounting, finance, and |
| 05:14:36PM | 25 | economic issues, particularly damages.  I've testified in civil |

05:14:41PM  1    courts like this, both federal and state courts.  I've

05:14:44PM  2    testified in various administrative proceedings.  I've

05:14:48PM  3    testified in the United States Bankruptcy Court in some of the

05:14:52PM  4    regulatory industry proceedings, and I've testified in

05:14:54PM  5    arbitrations throughout the United States and around the world.

05:14:57PM  6    Q    And in any of those other engagements, have you testified

05:15:01PM  7    on issues such as those involved in this case such as

05:15:05PM  8    overcharges or defect claims?

05:15:06PM  9    A    Yes.  A number of the cases that I've worked on have

05:15:09PM  10   involved defect of products and also other matters like breach

05:15:13PM  11   of contract where I would be studying companies' increased

05:15:17PM  12   costs related to a particular event or occurrence.

05:15:20PM  13   Q    And have you testified on behalf of both plaintiffs and

05:15:24PM  14   defendants?

05:15:24PM  15   A    I've regularly worked for both plaintiffs and defendants

05:15:28PM  16   and testified for plaintiffs and defendants.

05:15:29PM  17   Q    Can you estimate about how many times, over the years,

05:15:31PM  18   you've testified as an expert on damages issues?

05:15:34PM  19   A    I would say in what I call civil courts, like a state or

05:15:38PM  20   federal court like this, and jury trials, probably about 40

05:15:42PM  21   times, and then many other times in arbitrations and other

05:15:45PM  22   proceedings.

05:15:45PM  23   Q    And do you -- besides the litigation work that you do, do

05:15:51PM  24   you do other type of consulting work?

05:15:52PM  25   A    Yes.  The most recent years, there's been a lot of

05:15:55PM  1    litigation.  I spend a considerable amount of my time on

05:15:59PM  2    litigation, but I regularly perform general business consulting

05:16:02PM  3    including helping companies with strategic planning and helping

05:16:05PM  4    them improve their procedures and controls.

05:16:08PM  5              MR. DANE:  Your Honor, I would like to proffer Mr.

05:16:10PM  6    Tucker to the Court as an expert in the areas of accounting and

05:16:15PM  7    economic damages.

05:16:15PM  8              THE COURT:  Any objection?

05:16:17PM  9              MR. BUTERMAN:  No objection, Your Honor.

05:16:18PM  10             THE COURT:  All right, he's accepted as an expert in

05:16:20PM  11   those areas.

05:16:22PM  12   Q    Mr. Tucker, did you prepare some charts to help you,

05:16:25PM  13   assist you in explaining your testimony today to the jury?

05:16:28PM  14   A    Yes.

05:16:30PM  15   Q    So I've pulled up the first chart which is entitled Steves

05:16:35PM  16   Damages, and can you explain what these two categories here

05:16:39PM  17   that are reflected in this slide?

05:16:41PM  18   A    These are two categories of damages that I studied.  I

05:16:45PM  19   briefly mentioned them earlier, but the first relates to

05:16:49PM  20   Jeld-Wen's pricing of door skins that it supplied to Steves

05:16:52PM  21   under the terms of the 2012 supply agreement, and the second is

05:16:56PM  22   increased costs that Steves incurred related to defective door

05:17:02PM  23   skins and what I understand there was testimony about

05:17:04PM  24   inadequate packaging of the Jeld-Wen door skins and damage that

05:17:09PM  25   occurred at the Steves' plants.

05:17:11PM   1   Q    Now, do you understand, sir, that Steves, in this case,

05:17:15PM   2   has asserted claims both under the law of breach of contract

05:17:20PM   3   and under the law of antitrust?

05:17:22PM   4   A    That's my understanding.

05:17:23PM   5   Q    In connection with your analysis, are you expressing any

05:17:27PM   6   opinion as to which of those categories of claims your

05:17:31PM   7   calculations fall under?

05:17:33PM   8   A    No.  I've tried to identify the financial harm to Steves,

05:17:37PM   9   and I understand that decision will be made by the jury or the

05:17:41PM  10   Court.

05:17:42PM  11   Q    In general, can you explain to the jury how you went about

05:17:46PM  12   analyzing and determining Steves' damages?

05:17:48PM  13   A    Sure.  There's two different sets of records here.  The

05:17:51PM  14   first one involves Jeld-Wen's key input costs, and so a lot of

05:17:56PM  15   the analysis in the first one was based on very detailed

05:17:59PM  16   records from Jeld-Wen about how much they purchased for their

05:18:02PM  17   inputs like wood and other -- the energy and so on.

05:18:06PM  18       So that study involved a very detailed look at information

05:18:09PM  19   provided by Jeld-Wen down to the invoice level, how much did

05:18:13PM  20   they spend in each year for each of the inputs so I could

05:18:16PM  21   compare them, from year to year, to determine how their costs

05:18:19PM  22   had changed.

05:18:20PM  23       The quality was related to Steves' records, because it was

05:18:25PM  24   Steves that then incurred increased costs as a result of the

05:18:29PM  25   quality issues that they complained of, and so there I studied

Tucker - Direct

05:18:34PM   1    Steves' records.  During the work, as they were identifying

05:18:37PM   2    defects, they maintain what we call databases of information

05:18:40PM   3    where they would identify, here's a defect and here's who we

05:18:45PM   4    think is responsible for it.  If they thought Jeld-Wen was

05:18:47PM   5    responsible, they would mark it as such or identify a category,

05:18:51PM   6    and if they thought it was Steves, then it would be recorded

05:18:54PM   7    separately.

05:18:55PM   8    Q    Were you in court, sir, when Ms. Zwisler and Mr. Pomerantz

05:19:01PM   9    gave their opening statements?

05:19:02PM   10   A    Yes.

05:19:03PM   11   Q    And do you understand from those statements that there's a

05:19:06PM   12   dispute between the parties as to how certain terms of the

05:19:09PM   13   supply agreement should be interpreted and applied?

05:19:12PM   14   A    Yes, I understand there's a dispute.

05:19:14PM   15   Q    For example, you understand there's a dispute as to

05:19:17PM   16   whether the prices in the contract from year to year can go

05:19:21PM   17   down as well as up?

05:19:22PM   18   A    Yes, I understand.

05:19:24PM   19   Q    And a dispute as to whether the Madison and Monroe door

05:19:28PM   20   skin products that were introduced after the contract was

05:19:30PM   21   entered into, as to whether those are covered by the price

05:19:33PM   22   lists in the contract?

05:19:34PM   23   A    That's another dispute I understand between the parties.

05:19:37PM   24   Q    And just to be clear, are you offering any opinion, sir,

05:19:40PM   25   as to which side has the better of those arguments?

05:19:43PM  1    A    No.  That would be a legal issue which is not within my

05:19:46PM  2    area of expertise or testimony.

05:19:48PM  3    Q    How did you handle those disputes for purposes of doing

05:19:51PM  4    your damages calculation?

05:19:53PM  5    A    What we do as experts is we're given assumptions by our

05:19:57PM  6    counsel or the client as to their interpretation of the

05:20:00PM  7    agreement, and then I rely on those assumptions and then

05:20:04PM  8    perform the analysis based on those assumptions.

05:20:07PM  9    Q    Let's begin diving in a little bit of detail into the

05:20:11PM  10   specifics of your opinion, Mr. Tucker, and let's start out with

05:20:14PM  11   the overcharge issues.  So here in slide two, this is a

05:20:19PM  12   discussion of the overcharge analysis that you did.  Can you

05:20:23PM  13   explain what is reflected here?

05:20:25PM  14   A    I've identified two sort of categories of issues involved

05:20:30PM  15   in the overcharge damage calculation.  The first is, in looking

05:20:36PM  16   at the underlying Jeld-Wen records, along with my team, I

05:20:40PM  17   determined that Jeld-Wen made a number of errors when they

05:20:43PM  18   calculated their key input costs, and, therefore, I came up

05:20:47PM  19   with different numbers when I compared the key input costs from

05:20:50PM  20   year to year to see whether they increased or decreased.

05:20:53PM  21        The second is what I refer to as assumptions, and these

05:20:57PM  22   were two primary assumptions that I was asked to make.  The

05:21:00PM  23   first is that if Jeld-Wen's key input costs decrease, then

05:21:05PM  24   they're required to reduce the prices under the supply

05:21:08PM  25   agreement.  And the second is that the Madison and Monroe doors

Tucker - Direct

05:21:12PM 1    are covered by the portions of the supply agreement that deal

05:21:16PM 2    with similar designs or styles.

05:21:19PM 3    Q    And just here, again, to be clear so the jury understands,

05:21:25PM 4    so the items under number two on this slide, those are the

05:21:29PM 5    assumptions that you were asked to make for purposes of your

05:21:32PM 6    opinion, and you understand those relates to legal issues that

05:21:36PM 7    will be determined by others; is that correct?

05:21:38PM 8    A    Correct.

05:21:38PM 9    Q    But the first issue, the errors and how Jeld-Wen actually

05:21:42PM 10   calculated their key input costs, is that based on any legal

05:21:46PM 11   assumptions?

05:21:46PM 12   A    No.  That's based on my detailed analysis of Jeld-Wen's

05:21:50PM 13   records, my understanding, and also based on my experience

05:21:55PM 14   analyzing costs, such things as key inputs.

05:22:00PM 15   Q    And are you aware, Mr. Tucker, that Jeld-Wen has retained

05:22:05PM 16   its own expert on damages issues?

05:22:06PM 17   A    Yes, Mr. Kaplan.

05:22:08PM 18   Q    And did Mr. Kaplan challenge your calculation of the

05:22:13PM 19   errors with regard to the proper calculation of key input costs

05:22:17PM 20   based on the Jeld-Wen data?

05:22:18PM 21   A    I would say generally not.  He didn't perform a detailed

05:22:22PM 22   analysis of the costs at all.  What he did is he relied on my

05:22:27PM 23   analysis and my model, but then he applied different

05:22:30PM 24   assumptions that were given to him by Jeld-Wen's counsel.

05:22:33PM 25   Q    Turning to the next slide, and the jury has seen this

05:22:39PM   1   document quite a bit so far, this is Schedule 2 of the Jeld-Wen

05:22:44PM   2   supply agreement, and I wanted to ask you, did you use this

05:22:49PM   3   schedule for the analysis you did of the price overcharge

05:22:54PM   4   issue?

05:22:54PM   5   A    Yes.  This was the document which was the guide for

05:22:59PM   6   determining how to deal with changes in key input costs and the

05:23:03PM   7   impact that it would have on price which I then used in my

05:23:07PM   8   analysis.  So if you look -- I understand you've seen this

05:23:10PM   9   schedule before, but what I did is, if you look at the key

05:23:14PM   10  inputs on the left, like raw material, it has wood, and then it

05:23:18PM   11  has resin, wax, oil and sealer, and some other categories and

05:23:23PM   12  then also energy, when I said earlier that I did a detailed

05:23:26PM   13  analysis of the records, it was for all of these categories to

05:23:29PM   14  determine what the costs were in each year.

05:23:31PM   15      And then what this schedule calls for is that you compare

05:23:35PM   16  years to see if it increased or decreased, and then there's

05:23:39PM   17  what we call weightings.  It's how much should the change in

05:23:43PM   18  wood be weighted, is it more important than the change in

05:23:46PM   19  natural gas.  That allows you to come with one overall average

05:23:49PM   20  about how the costs change per year.

05:23:51PM   21      So I followed this formula, determined for each year what

05:23:55PM   22  the cost change was, and then I determined the price change

05:23:59PM   23  based on this Schedule 2 which says it would be 50 percent or

05:24:02PM   24  one half of the cost change.

05:24:05PM   25  Q    Where did you get the information or the data that enabled

05:24:09PM   1   you to perform your analysis of what should be the appropriate

05:24:12PM   2   cost changes under Schedule 2?

05:24:15PM   3   A    Since it was based on Jeld-Wen's key input costs, it was

05:24:21PM   4   based on the information that Jeld-Wen provided about its

05:24:25PM   5   costs, its accounting records, its lists of invoices, and so

05:24:29PM   6   on.  So it was information provided by Jeld-Wen in the

05:24:32PM   7   litigation.

05:24:33PM   8   Q    And did you understand whether Jeld-Wen had provided that

05:24:37PM   9   type of information to Steves prior to the litigation?

05:24:41PM   10  A    This was not information that was provided before.

05:24:44PM   11  Q    Let's look at the next chart, and this is headed Jeld-Wen

05:24:49PM   12  Key Input Cost Changes, and there's a column titled Tucker cost

05:24:54PM   13  calculations.  Can you explain to the jury what's reflected

05:24:57PM   14  here.

05:24:58PM   15  A    Yes.  After doing the detailed analysis of Jeld-Wen's

05:25:01PM   16  records for each of the key inputs, coming up with a weighted

05:25:05PM   17  average cost, and then comparing them between years, I

05:25:08PM   18  determined that for the purposes of each year, what the records

05:25:13PM   19  showed, how much the cost had increased or decreased.  And what

05:25:17PM   20  I found is that in each of the five years, the costs had

05:25:21PM   21  decreased, although to varying degrees.

05:25:23PM   22       So, for example, in 2014, I determined that Jeld-Wen's

05:25:28PM   23  cost of key inputs decreased by 5.36 percent.  And if you look

05:25:33PM   24  on a cumulative basis, I determined, along with my team, that

05:25:38PM   25  the Jeld-Wen key input costs decreased by a cumulative amount

05:25:42PM  1    of more than 15 percent.

05:25:44PM  2    Q    And that 15.28 percent, is that simply adding together all

05:25:49PM  3    the numbers that appear for each of the years?

05:25:51PM  4    A    Not exactly, because they compound.

05:25:54PM  5    Q    Okay.  So now we see a column that's called Jeld-Wen

05:25:58PM  6    Current Position, and can you explain what this reflects?

05:26:02PM  7    A    This is the position, if I could use that word, that

05:26:05PM  8    Jeld-Wen has said in this litigation is how its costs changed.

05:26:10PM  9    So it said that its costs also decreased in at least four of

05:26:16PM  10   the five years, and Jeld-Wen has said in this litigation that

05:26:20PM  11   it's cumulative -- or I calculated it, but its cumulative cost

05:26:23PM  12   increase was seven percent from the time of the signing of the

05:26:27PM  13   supply agreement to 2017.

05:26:31PM  14       If you look at the individual years, as I said, four of

05:26:34PM  15   the years show a decrease.  Jeld-Wen believes they had --

05:26:39PM  16   states that they had an increase in 2015.

05:26:42PM  17   Q    So it's your understanding, sir, that Jeld-Wen's current

05:26:46PM  18   position is that they acknowledge that there were cost declines

05:26:50PM  19   for four out of the five years, from 2013 through 2017, for

05:26:53PM  20   these key inputs?

05:26:54PM  21   A    Yes.  They've also taken the position that there were cost

05:26:58PM  22   decreases.

05:26:58PM  23   Q    And just so we have it in the record, I realize it's right

05:27:02PM  24   in front of the jury, but to put it into the record, the

05:27:06PM  25   cumulative cost decrease that is Jeld-Wen's position is

05:27:09PM 1    7.01 percent; is that correct?

05:27:12PM 2    A    Cost decrease, yes.

05:27:13PM 3    Q    And you calculated 15.28 percent?

05:27:21PM 4    A    Cost decrease.

05:27:22PM 5    Q    And so in the year that Jeld-Wen claims that costs

05:27:34PM 6    increased, what did you -- let me ask you instead, Mr. Tucker,

05:27:45PM 7    looking at some of these figures, so for the 2013 year, you

05:27:48PM 8    have the same cost reduction as -- under the Jeld-Wen column,

05:27:53PM 9    negative .30 percent.  Does that indicate that you have no

05:27:56PM 10   difference of opinion with Jeld-Wen as to what happened with

05:27:59PM 11   the costs in 2013?

05:28:01PM 12   A    Not exactly.  I did use the same number that Jeld-Wen has

05:28:05PM 13   for 2013.  That's based on what Jeld-Wen told Steves at the

05:28:11PM 14   time, but neither back then or now did they provide enough

05:28:14PM 15   information for me to be able to calculate to see whether it

05:28:17PM 16   was accurate or not.  So for the purpose of my analysis, just

05:28:20PM 17   for that year, I went ahead and accepted their .3 percent

05:28:25PM 18   decrease.

05:28:26PM 19   Q    Now, in these columns, there is a fairly significant

05:28:32PM 20   difference in the 2014 number between your negative

05:28:36PM 21   5.36 percent and the Jeld-Wen negative .46 percent.  Can you

05:28:41PM 22   explain the reason for the difference in your calculation from

05:28:45PM 23   the Jeld-Wen position?

05:28:45PM 24   A    Yes, there are a number of reasons why we differ so

05:28:48PM 25   significantly.  First, as I mentioned, the .46 percent was what

05:28:53PM 1    they provided to Steves or told Steves at the time, but they've

05:28:58PM 2    not been able to provide support then or in the litigation as

05:29:01PM 3    to how that was calculated.

05:29:04PM 4        The 5.36 percent is based on the records that they did

05:29:07PM 5    provide, their actual accounting records I, went through and

05:29:12PM 6    determined what their actual costs were and how much it

05:29:14PM 7    decreased.  So that was one major difference.

05:29:17PM 8        Another difference was that in calculating the cost in

05:29:22PM 9    2014, they elected not to include two of their plants, the

05:29:26PM 10   Towanda plant in Pennsylvania and the Dodson plant in

05:29:31PM 11   Louisiana.  So I believe that at least in their thinking about

05:29:35PM 12   this year, this calculation, they did not believe that certain

05:29:39PM 13   costs -- plants should be in there, and, in my mind, that

05:29:42PM 14   leaves us with just a subset of their costs.  And I believed it

05:29:46PM 15   was more appropriate to look at all of their costs for all of

05:29:49PM 16   their plants that make door skins to make the comparison.

05:29:53PM 17       There were also some other issues in one case related to

05:29:57PM 18   what we call wood chipping where they added costs on to have to

05:30:03PM 19   chip the wood.  They just made a calculation error and

05:30:05PM 20   overstated the amount of the wood-chipping costs.  I'm not

05:30:08PM 21   disagreeing that there shouldn't be an adder.  I just think the

05:30:12PM 22   percentage was too high.  They made a calculation error.

05:30:15PM 23       And then late in the litigation, they changed one of their

05:30:19PM 24   conversion factors when they took green wood and made it bone

05:30:25PM 25   dry wood to figure out what the tonnage of wood is, and they

Tucker - Direct

1160

| | | |
|---|---|---|
| 05:30:29PM | 1 | had been using one factor, and then they changed it.  It had a |
| 05:30:33PM | 2 | significant difference, and I haven't really been able to see |
| 05:30:36PM | 3 | an explanation of why it changed, why the conversion factor |
| 05:30:40PM | 4 | changed. |
| 05:30:41PM | 5 | So what I've done later is I've shown the analysis, both |
| 05:30:44PM | 6 | with the conversion factor that they had previously used and |
| 05:30:46PM | 7 | then the conversion factor that I'm not sure -- I don't |
| 05:30:50PM | 8 | understand why they changed.  There's some other, I would say |
| 05:30:57PM | 9 | more minor issues with respect to the calculation. |
| 05:31:01PM | 10 | THE COURT:  Is green wood wood that has moisture in |
| 05:31:04PM | 11 | it, and bone dry wood is that which has been dried out? |
| 05:31:08PM | 12 | THE WITNESS:  That's my understanding, sir. |
| 05:31:12PM | 13 | Q    Now, looking again at the 2014 number under the Jeld-Wen |
| 05:31:16PM | 14 | current position, the negative .46 percent, do you see that, |
| 05:31:19PM | 15 | Mr. Tucker? |
| 05:31:19PM | 16 | A    Yes. |
| 05:31:20PM | 17 | Q    And do you understand whether this was a cost reduction |
| 05:31:25PM | 18 | that Jeld-Wen communicated to Steves around the time of |
| 05:31:32PM | 19 | informing Steves of what the price reductions were for the 2014 |
| 05:31:37PM | 20 | prices? |
| 05:31:37PM | 21 | A    Yes, this is the amount that they told Steves at the time |
| 05:31:40PM | 22 | was how their costs had decreased. |
| 05:31:43PM | 23 | Q    Is that also true for the 2015 figure of the plus |
| 05:31:46PM | 24 | 2.85 percent? |
| 05:31:48PM | 25 | A    No.  That number has changed a number of times, and that |

05:31:52PM  1    number was not communicated to Steves at the time.  Different

05:31:56PM  2    numbers were communicated at the time.

05:31:58PM  3    Q    So let's take a look now at the next slide which indicates

05:32:08PM  4    what happened to prices over these years that you've been

05:32:12PM  5    discussing.  Can you walk through what's reflected in this

05:32:16PM  6    chart?

05:32:16PM  7    A    Yes, so the prior chart was talking about cost changes,

05:32:20PM  8    and this is now talking about price changes.  What I've done is

05:32:24PM  9    I've set up three columns, but -- there's going to be a lot of

05:32:28PM  10   numbers, so I showed the left column first.  This is in each

05:32:32PM  11   year what Steves -- excuse me, Jeld-Wen told Steves that the

05:32:37PM  12   price change would be.  So in 2013, the costs, they said, had

05:32:41PM  13   changed by .3.  One half of that is .15, and so Jeld-Wen

05:32:47PM  14   changed the prices by .15 percent.

05:32:50PM  15       In 2014, they had communicated the cost decrease and also

05:32:55PM  16   told Steves that the prices change would be .23 percent.

05:33:01PM  17       2015 gets a little more complicated.  They first told

05:33:05PM  18   Steves that it would change by 1.26 percent.  Then they sent

05:33:09PM  19   another letter saying it would be 1.71 percent, and then they

05:33:13PM  20   sent a third letter saying it would be 1.85 percent, and these

05:33:17PM  21   were increases as opposed to decreases.

05:33:22PM  22       And then in 2016 and 2017, nothing was provided by

05:33:26PM  23   Jeld-Wen to Steves.

05:33:29PM  24   Q    The next column here, referring to the price changes, is

05:33:33PM  25   entitled What Jeld-Wen Did, and how does that differ from the

Tucker - Direct

05:33:38PM 1    previous column that you just went through concerning what

05:33:40PM 2    Jeld-Wen told Steves?

05:33:41PM 3    A    The first one was their communication about what the price

05:33:45PM 4    change should be, and this one is how they actually changed the

05:33:48PM 5    prices.  So in 2013, they changed the price by 1.15 percent

05:33:54PM 6    which was the same as what they had told Steves it would be.

05:33:57PM 7         In 2014, they did not make the price reduction that they

05:34:02PM 8    had communicated to Steves, and so I indicated that by saying

05:34:06PM 9    kept the 2013 prices.

05:34:09PM 10        Then in 2015, they made a number of changes, but

05:34:13PM 11   ultimately they ended up with an increase of 1.26 percent, and

05:34:20PM 12   then in 2016 and 2017, they made no changes.  So the higher

05:34:26PM 13   2015 prices continued in 2016 and 2017.

05:34:31PM 14   Q    Just to go back for a second to those 2016 and 2017 years,

05:34:36PM 15   these years when they kept the prices at the 2015 levels, these

05:34:40PM 16   are years when Jeld-Wen, itself, acknowledges that the key

05:34:45PM 17   input costs declined by over four percent per year; is that

05:34:49PM 18   correct?

05:34:49PM 19   A    That's correct.

05:34:49PM 20   Q    And this last column is titled Corrected Price Changes.

05:34:57PM 21   Can you explain what that refers to?

05:34:59PM 22   A    These are the price changes that I believe are appropriate

05:35:02PM 23   based on the cost analysis and then applying the provision from

05:35:06PM 24   Schedule 2 that the price would change by 50 percent of the

05:35:09PM 25   cost change.  So each of these numbers is 50 percent of the

05:35:13PM    1    cost change I showed on the earlier chart.

05:35:16PM    2         And so I show, again, accepting their price change

05:35:20PM    3    reduction in 2013, a .15 percent, but I show the price

05:35:25PM    4    reductions that I believe would be appropriate in each of the

05:35:28PM    5    successive years such as 2.68 percent for 2014 on down to

05:35:34PM    6    2.32 percent for 2017.

05:35:38PM    7    Q    I want to go back just for a second, Mr. Tucker, just to

05:35:42PM    8    ask you about one other item.  So this 2015 figure with the

05:35:48PM    9    plus 2.85 percent that you understand to be Jeld-Wen's current

05:35:52PM   10    position as to what happened to the prices in that year, now,

05:35:59PM   11    do you understand that the equivalent price change under the

05:36:03PM   12    contract would be 50 percent of that or 1.42 or 1.43 percent?

05:36:08PM   13    A    That's what it would be under Jeld-Wen's current position.

05:36:11PM   14    Q    Now, if we look here at what Jeld-Wen told Steves in 2015,

05:36:16PM   15    there is no 1.43 percent figure; correct?

05:36:20PM   16    A    That's correct.

05:36:21PM   17    Q    So where did that 1.42 or .43 percent price change or the

05:36:29PM   18    2.85 percent cost change, where did that come from?

05:36:32PM   19    A    Well, during this litigation, Jeld-Wen had to provide an

05:36:37PM   20    update or what they believed to be their cost change, and so

05:36:42PM   21    the numbers changed during the litigation.

05:36:47PM   22         MR. DANE:  Phil, can we pull up PTX-842.

05:36:55PM   23    Q    And do you understand this, Mr. Tucker, to be a document

05:37:01PM   24    that Jeld-Wen provided in the course of this litigation

05:37:06PM   25    providing information to Steves?

Tucker - Direct

1164

| | | |
|---|---|---|
| 05:37:07PM | 1 | A   Yes, this is one of their responses. |
| 05:37:09PM | 2 | Q   And, for the record, this is defendant Jeld-Wen, Inc.'s |
| 05:37:12PM | 3 | objections and responses to plaintiffs Steves and Sons, Inc.'s |
| 05:37:17PM | 4 | seventh set of interrogatories and second set of request for |
| 05:37:19PM | 5 | admissions. |
| 05:37:19PM | 6 | MR. DANE:  And, Phil, if we could turn to page four. |
| 05:37:24PM | 7 | And if we can try to make that a little bigger at the bottom, |
| 05:37:28PM | 8 | that would be great. |
| 05:37:29PM | 9 | Q   Is this where that 2.85 percent cost increase that we saw |
| 05:37:36PM | 10 | for 2015 comes from? |
| 05:37:38PM | 11 | A   Yes.  This is the support for my number on the chart you |
| 05:37:41PM | 12 | showed. |
| 05:37:42PM | 13 | MR. DANE:  And, Phil, if we can turn to page 11 of |
| 05:37:44PM | 14 | this document. |
| 05:37:49PM | 15 | Q   And do you see here, sir, the date of this interrogatory |
| 05:37:53PM | 16 | response is August 4th, 2017; correct? |
| 05:37:56PM | 17 | A   Yes. |
| 05:37:57PM | 18 | Q   And so that was after this lawsuit was filed? |
| 05:38:00PM | 19 | A   Yes. |
| 05:38:01PM | 20 | Q   So this information that Jeld-Wen is now representing |
| 05:38:07PM | 21 | represents their correct change in costs for 2015 prices is not |
| 05:38:15PM | 22 | information that Jeld-Wen ever provided to Steves at the time |
| 05:38:19PM | 23 | they were setting those 2015 prices; is that correct, sir? |
| 05:38:22PM | 24 | A   That's correct.  This is a different number that was |
| 05:38:25PM | 25 | provided in the litigation. |

Tucker - Direct                                                                        1165

05:38:26PM   1    Q    And so if we go back --

05:38:30PM   2         MR. DANE:  Thanks.  You can take that down, Phil.

05:38:33PM   3    Q    So here we see what Jeld-Wen told Steves.  These three

05:38:39PM   4    cost increases, do you understand these were all cost increases

05:38:44PM   5    that Jeld-Wen did communicate to Steves as what the 2015 prices

05:38:50PM   6    should have been during that year?

05:38:51PM   7    A    At the time, this is what they communicated.

05:38:54PM   8    Q    And we just looked at that pleading that had another cost

05:39:00PM   9    increase position that Jeld-Wen took in this lawsuit; correct?

05:39:06PM  10    A    Yes.

05:39:07PM  11    Q    Was there another pleading that Jeld-Wen provided in this

05:39:13PM  12    lawsuit prior to the one we just looked at in which Jeld-Wen

05:39:17PM  13    also indicated what it thought its correct cost increase was

05:39:22PM  14    for 2015?

05:39:23PM  15    A    There was one before the 1.43 one that had a different

05:39:30PM  16    number before that that got adjusted to the 1.43.

05:39:35PM  17    Q    So the reason you have this 2.85 percent, is that because

05:39:39PM  18    the most recent thing we've heard from Jeld-Wen is what they

05:39:42PM  19    said in that August 2017 pleading?

05:39:44PM  20    A    Yes, that's what I wanted to rely on.

05:39:47PM  21    Q    So the jury knows, how many iterations have you seen from

05:39:51PM  22    Jeld-Wen as to what they claim is the correct change in prices

05:39:54PM  23    for 2015?

05:39:56PM  24         THE COURT:  You are flipping back and forth between

05:39:59PM  25    prices and costs, and the chart you are talking about is cost.

05:40:05PM  1   And you can't go back and forth between the two.

05:40:10PM  2          MR. DANE:  I'm sorry, Your Honor.

05:40:12PM  3          THE COURT:  It's confusing.  Ask it in a parallel

05:40:15PM  4   way, and if they're saying two or three things about the price,

05:40:19PM  5   deal with that in one set of questions.  If they're saying two

05:40:22PM  6   or three things about the cost, deal with that in another set

05:40:25PM  7   of questions.

05:40:26PM  8   Q    How many different iterations have you seen, Mr. Tucker,

05:40:30PM  9   that Jeld-Wen has taken with regard to what the appropriate

05:40:35PM  10  change in their costs for the key inputs were for 2015?

05:40:39PM  11  A    This is the fifth one for 2015.

05:40:46PM  12  Q    Now, you testified as to the reasons that you came up with

05:40:50PM  13  a difference in your own calculation of what the appropriate

05:40:53PM  14  reduction was in Jeld-Wen's costs for 2014.  Were those the

05:41:00PM  15  same reasons that explain the difference between your different

05:41:04PM  16  cost reduction calculations for 2015 compared to the

05:41:08PM  17  2.85 percent cost increase that Jeld-Wen has indicated is their

05:41:15PM  18  position as to what is the proper cost change?

05:41:17PM  19  A    2015, the difference is related to many of the same issues

05:41:22PM  20  but not all of them.  The issue of leaving out some of the

05:41:25PM  21  plants is not as significant in 2015 as it is in 2014, but the

05:41:30PM  22  same types of calculation errors occurred in in 2015.

05:41:36PM  23  Q    And with regard to the cost declines that Jeld-Wen has

05:41:46PM  24  indicated it believes it incurred for the key inputs for 2016

05:41:51PM  25  and 2017, were those cost decreases that Jeld-Wen communicated

| | | |
|---|---|---|
| 05:41:57PM | 1 | to Steves for those years? |
| 05:41:59PM | 2 | A   No.  There was no communication about cost decreases in |
| 05:42:04PM | 3 | 2016 or 2017 from Jeld-Wen to Steves. |
| 05:42:07PM | 4 | Q   Just to finish with this chart, and so for the years 2013 |
| 05:42:27PM | 5 | through 2017 -- let me focus on beginning in 2015.  For the |
| 05:42:35PM | 6 | year that shows the 2.85 percent cost increase, did Jeld-Wen |
| 05:42:41PM | 7 | increase its prices to Steves for that year? |
| 05:42:44PM | 8 | A   In 2015, Jeld-Wen increased the prices of its door skins. |
| 05:42:48PM | 9 | Q   And for the years 2016 and 2017 when Jeld-Wen is reporting |
| 05:42:54PM | 10 | that it had reductions in its input costs, did it decrease its |
| 05:43:00PM | 11 | prices to Steves? |
| 05:43:01PM | 12 | A   It did not. |
| 05:43:14PM | 13 | Q   The next chart, Mr. Tucker, you mentioned at the beginning |
| 05:43:18PM | 14 | that one of the assumptions that you have made in calculating |
| 05:43:22PM | 15 | your overcharge damage assessment is that when costs decline, |
| 05:43:28PM | 16 | the prices should also have declined under the contract; is |
| 05:43:31PM | 17 | that right? |
| 05:43:31PM | 18 | A   Yes. |
| 05:43:33PM | 19 | Q   And did you prepare this chart to show what the effect was |
| 05:43:36PM | 20 | of that assumption? |
| 05:43:39PM | 21 | A   Yes.  This shows the difference between making an |
| 05:43:43PM | 22 | assumption that the costs -- the price does not change if the |
| 05:43:47PM | 23 | costs decrease compared to if the price changes if the costs go |
| 05:43:53PM | 24 | down or up.  Excuse me, the price changes.  So on the left side |
| 05:43:59PM | 25 | what I've shown is under Jeld-Wen price changes, they showed |

05:44:03PM   1   price decreases in four years, but I understand their position

05:44:07PM   2   is that there should be no price change when the costs go down.

05:44:11PM   3   And, therefore, they would say there's only a price increase in

05:44:16PM   4   2015 when the prices went up.

05:44:20PM   5       Based on the assumption that I relied on that prices would

05:44:23PM   6   go down if there's cost decreases, then taking the proper price

05:44:29PM   7   change for each of the years, the price should go down by the

05:44:33PM   8   amounts in each of the years in a cumulative amount of

05:44:39PM   9   7.87 percent, or almost eight percent, and that's about half --

05:44:42PM   10  it is half of what I found to be the cost decreases in

05:44:45PM   11  Jeld-Wen's key inputs.

05:44:46PM   12  Q    And do you understand that based upon the information that

05:44:50PM   13  it's provided in this litigation, that for the overall

05:44:54PM   14  cumulative period of 2013 through 2017, Jeld-Wen agrees that

05:45:00PM   15  its input costs overall declined during that period?

05:45:04PM   16  A    Yes.  That's what we showed on the prior schedule about

05:45:07PM   17  seven percent.

05:45:08PM   18  Q    Yet, despite that decline, Jeld-Wen, as I understand it,

05:45:14PM   19  has taken the position that under the contract, they are

05:45:17PM   20  entitled to increase their costs by 1.43 percent.

05:45:21PM   21  A    That's my understanding.

05:45:21PM   22       MR. BUTERMAN:  Objection, Your Honor.  That misstates

05:45:27PM   23  Jeld-Wen's position throughout this litigation.

05:45:34PM   24       MR. DANE:  I don't believe it does, Your Honor.

05:45:36PM   25  They've taken the position that the prices only go down -- only

| | | |
|---|---|---|
| 05:45:41PM | 1 | go up or stay flat and don't go down. |
| 05:45:44PM | 2 | MR. BUTERMAN:  Your Honor, maybe we can approach and |
| 05:45:46PM | 3 | discuss this for a second. |
| 05:45:48PM | 4 | THE COURT:  All right. |
| 05:45:55PM | 5 | |
| 05:45:55PM | 6 | (Discussion at sidebar as follows:) |
| 05:45:58PM | 7 | |
| 05:45:58PM | 8 | MR. BUTERMAN:  Your Honor, the point is very much |
| 05:46:02PM | 9 | misleading.  Jeld-Wen has never taken the position that it |
| 05:46:05PM | 10 | cannot give a price decrease under the contract.  It, |
| 05:46:08PM | 11 | obviously, did give a price decrease under the contract -- |
| 05:46:11PM | 12 | THE COURT:  No, that wasn't the question.  The |
| 05:46:13PM | 13 | question was, do you understand your position is that the |
| 05:46:18PM | 14 | contract doesn't provide for any decreases, and that is your |
| 05:46:22PM | 15 | position.  It's been your position. |
| 05:46:25PM | 16 | MR. BUTERMAN:  That we're not obligated to provide |
| 05:46:27PM | 17 | any decrease. |
| 05:46:28PM | 18 | THE COURT:  He asked the question the right way.  It |
| 05:46:30PM | 19 | wasn't wrong.  Overruled. |
| 05:46:32PM | 20 | MR. BUTERMAN:  Thank you, Your Honor. |
| 05:46:32PM | 21 | |
| 05:46:32PM | 22 | (End of sidebar discussion.) |
| 05:46:35PM | 23 | |
| 05:46:42PM | 24 | THE COURT:  What's the -- I'm sort of confused in |
| 05:46:46PM | 25 | slide four.  You said the cumulative decrease was |

| | | |
|---|---|---|
| 05:46:48PM | 1 | 15.28 percent, and slide nine you say -- these are price -- |
| 05:46:55PM | 2 | MR. DANE:  Yes, Your Honor, it's 50 percent. |
| 05:46:57PM | 3 | THE WITNESS:  It's exactly half of the cost changes. |
| 05:47:00PM | 4 | THE COURT:  I misread the thing.  Sorry. |
| 05:47:02PM | 5 | MR. DANE:  I apologize, Your Honor.  I had them |
| 05:47:04PM | 6 | bouncing around between price and cost. |
| 05:47:07PM | 7 | THE COURT:  Excuse me.  At this juncture, we have |
| 05:47:09PM | 8 | some jurors who need to move their cars or else they'll be here |
| 05:47:12PM | 9 | for the night, and I think probably they don't need to be here |
| 05:47:15PM | 10 | for the night.  So we'll adjourn for the evening, resume at |
| 05:47:21PM | 11 | 9:30 in the morning, and thank you very much for your |
| 05:47:24PM | 12 | attention.  Please remember my previous admonitions about |
| 05:47:26PM | 13 | discussing the case and doing any research.  Thank you so much |
| 05:47:30PM | 14 | for your careful attention. |
| 05:47:49PM | 15 | |
| 05:47:49PM | 16 | (Jury out.) |
| 05:48:01PM | 17 | |
| 05:48:01PM | 18 | THE COURT:  All right, Dr. Tucker, you can step down, |
| 05:48:06PM | 19 | and don't discuss your testimony with anybody but the lawyers |
| 05:48:09PM | 20 | in the case. |
| 05:48:10PM | 21 | THE WITNESS:  Thank you. |
| 05:48:13PM | 22 | THE COURT:  Anybody have anything else you want to |
| 05:48:16PM | 23 | say on the issue of lost profits given the testimony that Mr. |
| 05:48:25PM | 24 | Steves gave and the cross-examination -- on direct and the |
| 05:48:31PM | 25 | cross-examination?  Anybody have any questions? |

05:48:35PM 1  　　　　MS. ZWISLER:  Well, Your Honor, the only thing I

05:48:37PM 2  would say for Jeld-Wen is --

05:48:40PM 3  　　　　THE COURT:  You better come up to the lectern.

05:48:44PM 4  　　　　MS. ZWISLER:  I won't belabor the point.  I think

05:48:50PM 5  that under the legal test of reasonable certainty, Mr. Sam

05:48:54PM 6  Steves' testimony and the other evidence that you've heard over

05:48:57PM 7  the last few days do not establish as a matter of law that the

05:49:02PM 8  recovery of lost profits is reasonably certain.

05:49:06PM 9  　　　　He has no idea what's going to happen.  He thinks

05:49:09PM 10  it's likely, it might change, might not.  That's not sufficient

05:49:13PM 11  under the law.

05:49:14PM 12  　　　　THE COURT:  Couldn't those questions be presented in

05:49:17PM 13  any future lost profits case the way you are arguing?

05:49:20PM 14  　　　　MS. ZWISLER:  No, not actually, because to me, the

05:49:26PM 15  way it normally works -- this is not a ripeness issue.  It's a

05:49:30PM 16  speculation issue.  If the injury has been suffered, then the

05:49:34PM 17  question is whether the measurement in the future is

05:49:40PM 18  reasonable, and that has to do with the reasonable certainty.

05:49:44PM 19  　　　　Here, we're not talking about measurement in the

05:49:47PM 20  slightest.  We're talking about is there a factual predicate,

05:49:50PM 21  and I think you've got the exact right predicate for this,

05:49:55PM 22  which, is do they have a factual predicate that permits them to

05:49:59PM 23  essentially opine that it's reasonably certain that they're

05:50:02PM 24  going to go out of business, and our position is they don't.

05:50:06PM 25  Thank you, Your Honor.

05:50:07PM   1          THE COURT:  All right.

05:50:09PM   2          MR. DANE:  Do you want to hear further --

05:50:11PM   3          THE COURT:  Anything you want to say.

05:50:18PM   4          MR. DANE:  Your Honor, just very briefly, I agree

05:50:21PM   5   with Your Honor that the logic of their position would mean

05:50:24PM   6   there's never such a thing as a future lost profits case, there

05:50:28PM   7   are never any damages based on future conduct, and that's not

05:50:30PM   8   the law.  And the situation with the *Arnott* case that we cited,

05:50:36PM   9   the cases involving incipient businesses, if it can reasonably

05:50:41PM   10  be concluded that it's likely certain events will occur, then

05:50:45PM   11  remedy can be provided for those future events occurring and

05:50:49PM   12  the damages --

05:50:50PM   13         THE COURT:  Their argument is that they're, in

05:50:55PM   14  essence, two big sets of ifs.  The first set of ifs is the four

05:51:02PM   15  contingencies, I guess we should call them.  The second if is

05:51:05PM   16  if -- and let's assume for the moment that you are correct,

05:51:09PM   17  that a jury reasonably could conclude that -- to a reasonable

05:51:15PM   18  certainty that any of the ifs -- that none of the ifs would

05:51:19PM   19  occur.

05:51:19PM   20         Then there's another if, and that is, assuming they

05:51:24PM   21  don't occur, assuming the lack of supply, they will go out of

05:51:28PM   22  business, and it's that second jump that is the biggest problem

05:51:34PM   23  for you, isn't it?  How do you get around that in the

05:51:41PM   24  *Vermiculite* case and the general principles applicable to lost

05:51:47PM   25  profits?

| | | |
|---|---|---|
| 05:51:47PM | 1 | MR. DANE:  Well, on that point, Your Honor, I think |
| 05:51:50PM | 2 | that the testimony of Mr. Steves is sufficient, because it |
| 05:51:54PM | 3 | establishes -- one way to simplify it, I think, Your Honor, |
| 05:52:00PM | 4 | would be, say that the Steves only sold door skins -- sorry, |
| 05:52:06PM | 5 | only sold interior molded doors.  It's the only thing they |
| 05:52:10PM | 6 | made.  They can't sell interior molded doors without door |
| 05:52:15PM | 7 | skins, and they can no longer get door skins.  That's pretty |
| 05:52:20PM | 8 | close to our case. |
| 05:52:21PM | 9 | Under that scenario, the question of can you still |
| 05:52:25PM | 10 | continue to run a business seems pretty self-evident.  Of |
| 05:52:31PM | 11 | course you can't.  If your only product is not something you |
| 05:52:37PM | 12 | can make because the supply of it has been taken away, you're |
| 05:52:41PM | 13 | not going to be able to stay in business. |
| 05:52:44PM | 14 | Their arguments have really -- they've thrown out, |
| 05:52:48PM | 15 | well, maybe that wouldn't happen, but they haven't articulated |
| 05:52:51PM | 16 | any reason -- |
| 05:52:52PM | 17 | THE COURT:  What they've said is you can't be sure |
| 05:52:55PM | 18 | it's not going to happen. |
| 05:52:58PM | 19 | MR. DANE:  Your Honor, if we don't have the source of |
| 05:53:02PM | 20 | the product that we need to make interior molded doors, we |
| 05:53:06PM | 21 | can't sell our product, and we can't be in business. |
| 05:53:09PM | 22 | THE COURT:  I understand that, but Ms. Zwisler was |
| 05:53:12PM | 23 | honing in on this point, and that is that you are measuring |
| 05:53:19PM | 24 | whether you're going out of business by your assessment of the |
| 05:53:23PM | 25 | four preceding ifs; Jeld-Wen, Masonite not supplying, no |

05:53:29PM 1    foreign supply adequate unto the day, and can't build.  You are

05:53:36PM 2    measuring all that based on the status of what you know today

05:53:39PM 3    and, from that, inferring you're going out of business because

05:53:42PM 4    they're not going to occur -- because those sources of supply

05:53:48PM 5    won't be available to you.  So you are assuming two ifs.

05:53:52PM 6    That's what she's saying.  What do you say to that?

05:53:54PM 7         MR. DANE:  There are two ifs, Your Honor, and not to

05:53:59PM 8    get too mathematical -- I know we just had a bunch more math

05:54:04PM 9    than anybody wants at 5:30, but if you imagine there are the

05:54:08PM 10   two ifs, and if the jury concludes that for each of those four

05:54:14PM 11   potential options -- say they conclude, well, based on the

05:54:18PM 12   evidence, we think that it's less than a ten percent

05:54:23PM 13   possibility that any of those would occur, so even if you

05:54:28PM 14   combine them together, they're still going to be very unlikely.

05:54:33PM 15   And then on the second part of it, which also comes into it, if

05:54:37PM 16   they say, well, there's some uncertainty that comes into play

05:54:43PM 17   about would Steves actually go out of business if they don't

05:54:46PM 18   have the source of supply.

05:54:47PM 19        Well, that's all they sell.  They don't make any

05:54:50PM 20   money selling anything else.  Maybe we discount the certainty

05:54:55PM 21   of their going out of business a little bit, say it's

05:54:58PM 22   90 percent instead of 100 percent.  That's still going to leave

05:55:01PM 23   them with a reasonable certainty, even considering those four

05:55:05PM 24   factors on the first part and the possibility of somehow

05:55:09PM 25   continuing to remain in business even when you can no longer

| | |
|---|---|
| 05:55:12PM | 1 |
| 05:55:16PM | 2 |
| 05:55:19PM | 3 |
| 05:55:22PM | 4 |
| 05:55:23PM | 5 |
| 05:55:27PM | 6 |
| 05:55:33PM | 7 |
| 05:55:38PM | 8 |
| 05:55:41PM | 9 |
| 05:55:45PM | 10 |
| 05:55:48PM | 11 |
| 05:55:53PM | 12 |
| 05:55:57PM | 13 |
| 05:55:59PM | 14 |
| 05:56:02PM | 15 |
| 05:56:07PM | 16 |
| 05:56:11PM | 17 |
| 05:56:15PM | 18 |
| 05:56:17PM | 19 |
| 05:56:20PM | 20 |
| 05:56:25PM | 21 |
| 05:56:29PM | 22 |
| 05:56:32PM | 23 |
| 05:56:35PM | 24 |
| 05:56:40PM | 25 |

make the only product that makes any money for you, they can combine all of that and still reasonably conclude that Steves would go out of business and incur lost profits.  That's our position.

THE COURT:  All right.  Thank you.  All right.  It's your motion, so if there's anything else, speak up.  We're under Rule 50 at this juncture.  Anybody else got anything?  Going, going -- oh.

MS. ZWISLER:  One more thing.  So if the jury guesses wrong, do we get the money back?  That's not a joke.  I think that's one real-world way to think about this.

THE COURT:  You know how I read that can be dealt with?

MS. ZWISLER:  No, I'm afraid to ask.

THE COURT:  It can be placed in a trust, earn interest, and if, in fact, they're wrong, you get it back.  I read that one time.  I never did figure out how it could occur, but I think the answer is you can't.

MS. ZWISLER:  One other way to think about this is Jeld-Wen has the right to mitigate its damages.  So if -- the Steves has to mitigate its damages.  Jeld-Wen -- one possibility to consider, and this is not so much a jury issue as it's trying to illustrate the problem we're all having here which is if Jeld-Wen loses this lawsuit and the jury awards a future lost profits, and assume the Fourth Circuit were to

| | | |
|---|---|---|
| 05:56:43PM | 1 | affirm, then there would be an incentive for Jeld-Wen, |
| 05:56:49PM | 2 | obviously, to avoid the future lost -- avoid -- to sign up |
| 05:56:55PM | 3 | another long-term supply agreement. |
| 05:56:56PM | 4 | So then what happens?  They don't go out of business, |
| 05:56:59PM | 5 | but Jeld-Wen is out one $150 million or whatever the jury gives |
| 05:57:03PM | 6 | them.  That's why this is a very practical matter, this is |
| 05:57:08PM | 7 | not -- it's so speculative that it can't happen, because we |
| 05:57:11PM | 8 | don't know what would happen if Jeld-Wen loses -- |
| 05:57:15PM | 9 | THE COURT:  Is there any difference between that and |
| 05:57:16PM | 10 | any other lost profit award when -- |
| 05:57:22PM | 11 | MS. ZWISLER:  You know, typically in these cases -- |
| 05:57:26PM | 12 | THE COURT:  Do you ever get it back? |
| 05:57:28PM | 13 | MS. ZWISLER:  No, because typically, in the cases |
| 05:57:30PM | 14 | that are in their brief, as Mr. Pfeiffer has argued, those |
| 05:57:34PM | 15 | businesses are already gone.  And so the issue is not what to |
| 05:57:39PM | 16 | do but what is the likelihood that they would have continued as |
| 05:57:44PM | 17 | a profitable business going forward. |
| 05:57:46PM | 18 | That's a very different question than this one.  So |
| 05:57:49PM | 19 | they're dead.  So then you get arguments about, well, they |
| 05:57:52PM | 20 | never would have survived anyway, they didn't have the right |
| 05:57:56PM | 21 | plant, they this, they that. |
| 05:57:58PM | 22 | So there is two questions for that jury.  One is |
| 05:58:01PM | 23 | question is, would they really have ever survived anyway even |
| 05:58:03PM | 24 | apart from what the defendant did, and the second question is, |
| 05:58:06PM | 25 | if they did survive, what's the reasonable measure of their |

05:58:09PM  1    damages.  We don't have question one here.  We have a very

05:58:13PM  2    different question.  We have it's a going concern, they haven't

05:58:16PM  3    proved anything about their finances that said anything about

05:58:19PM  4    anything so far.

05:58:22PM  5            THE COURT:  But the expert does.  That's what Mr.

05:58:26PM  6    Tucker does.

05:58:27PM  7            MS. ZWISLER:  He is just measuring if they're dead,

05:58:31PM  8    what's the future profitability.  He's not measuring -- so he's

05:58:35PM  9    measuring it with an assumption that the business is gone.

05:58:40PM  10           So in most future lost profits, in fact all the ones

05:58:44PM  11   that I know, the business is dead.  Not dead.  The plaintiff

05:58:48PM  12   has failed as a business, and so the reasonable approximation

05:58:52PM  13   is based on would it have survived and to what degree would it

05:58:56PM  14   have competed, how much revenues would it have had based on its

05:59:00PM  15   startup revenues and the other elements of its business, and

05:59:05PM  16   then, if it survived, how do you run out and how far do you run

05:59:08PM  17   out the damages.

05:59:09PM  18           That is a very different case than this one.  So

05:59:14PM  19   because we don't have that kind of case, it's not -- this is

05:59:18PM  20   not like every other future lost profits case.  I've never seen

05:59:21PM  21   a case where the plaintiff is saying that if the events that

05:59:31PM  22   are giving rise to the problem cause it to go out of business

05:59:35PM  23   maybe, that, then, it can get future lost profits today.

05:59:40PM  24   It's -- I do think it's a case of first impression, but I think

05:59:44PM  25   we have the better argument.

| | | |
|---|---|---|
| 05:59:45PM | 1 | THE COURT:  It is a case of first impression.  I've |
| 05:59:48PM | 2 | not found anything exactly on point.  All right, this comes to |
| 05:59:56PM | 3 | the Court on a motion under Rule 50(a) that got here by way of |
| 06:00:05PM | 4 | an undecided summary judgment motion pursuant to -- after which |
| 06:00:10PM | 5 | future -- further briefing was called for, and after reading |
| 06:00:17PM | 6 | that briefing, the Court determined that given the unusual |
| 06:00:21PM | 7 | nature of the evidentiary issues that had to be decided, it was |
| 06:00:25PM | 8 | preferable to decide the case -- the issue as a judgment -- as |
| 06:00:32PM | 9 | a matter of law under 50, Rule 50(a)(1) after having heard |
| 06:00:37PM | 10 | fully the plaintiff on the issue at trial. |
| 06:00:42PM | 11 | Under the rule, if a party has been fully heard on an |
| 06:00:46PM | 12 | issue during a jury trial and the Court finds that a reasonable |
| 06:00:50PM | 13 | jury would not have a legally sufficient evidentiary basis to |
| 06:00:54PM | 14 | find for the party on that issue, then the Court may resolve |
| 06:00:58PM | 15 | the issue against the party and grant a motion for judgment as |
| 06:01:03PM | 16 | a matter of law. |
| 06:01:03PM | 17 | I have worried over this whole issue and studied it, |
| 06:01:10PM | 18 | and I think it is correct, as Ms. Zwisler says, it is an issue |
| 06:01:20PM | 19 | that is unique in the way it comes to the Court.  I'm sorry, |
| 06:01:50PM | 20 | I've lost something here.  Give me a minute. |
| 06:01:59PM | 21 | Considering all of the evidence, including that |
| 06:02:05PM | 22 | from -- that has been presented in the plaintiff's case and Mr. |
| 06:02:09PM | 23 | Sam Steves, the evidence is that if there is no supply of |
| 06:02:19PM | 24 | interior molded door skins, Steves will be out of business at |
| 06:02:25PM | 25 | the conclusion of the contract in 2021.  The evidence at this |

06:02:33PM  1   juncture is also, if Steves had a limited supply of door skins,

06:02:40PM  2   as is evident by the kind of supply that, say, Teverpan could

06:02:46PM  3   supply, Steves will be out of business, because the people with

06:02:52PM  4   whom they do business will not do business with them because

06:02:55PM  5   they don't have sufficient range of product to do that.

06:03:03PM  6           A reasonable jury could find with a reasonable

06:03:09PM  7   certainty that Jeld-Wen will not be a source of supply after

06:03:16PM  8   September 2021, that Masonite will not be a source of supply

06:03:22PM  9   after September of 2021, that foreign supply will not be a

06:03:30PM  10  source of supply, or what Steves needs are after September of

06:03:37PM  11  2001, and that Steves cannot build a door skin plant by

06:03:40PM  12  September of September 2001.

06:03:43PM  13          On that basis and the basis of the evidence at this

06:03:50PM  14  stage of the proceeding, according to plaintiff all of the

06:03:55PM  15  inferences to which it is entitled on a motion made at this

06:04:00PM  16  stage, the motion for Rule 50 relief must be denied, because a

06:04:05PM  17  jury could reach a verdict on the issue of lost profits in

06:04:10PM  18  favor of Steves.

06:04:11PM  19          So on that issue, Dr. Tucker can testify about it

06:04:19PM  20  tomorrow, and the plaintiffs -- I mean the defendants can put

06:04:24PM  21  on whatever evidence they wish to put on about it.

06:04:27PM  22          MR. POWELL:  Your Honor, I may have misheard you, but

06:04:29PM  23  I think the last two times you said a date, you said 2001, and

06:04:33PM  24  I believe you meant to say --

06:04:35PM  25          THE COURT:  I mean September of 2021.  I don't know

06:04:38PM   1    how on earth it could have left my mind.

06:04:40PM   2          MR. POWELL:  Thank you, Your Honor.

06:04:42PM   3          THE COURT:  Thank you, though.  Ms. Rathbun, did you

06:04:45PM   4    get the lawyer who was so anxiously awaiting something, to hear

06:04:51PM   5    from you?

06:04:51PM   6          MS. RATHBUN:  Yes, Your Honor.  I read the motion,

06:04:53PM   7    and I did not want to get crosswise with Kronospan's counsel,

06:04:57PM   8    so I asked Ms. Maltas to call him.  She has been the point

06:05:00PM   9    person in discussions with him.

06:05:01PM   10          She spoke with Kronospan's counsel.  He is available

06:05:06PM   11    tomorrow at any time to discuss telephonically during a break.

06:05:12PM   12    He can also jump on a plane and be here by tomorrow afternoon

06:05:15PM   13    or Thursday for a hearing.

06:05:19PM   14          THE COURT:  Well, it depends on what you all are

06:05:22PM   15    going to do as to whether or not it's an appropriate kind of

06:05:26PM   16    thing to deal with by telephone.  I guess the skimming that I

06:05:32PM   17    did of the motion is that I don't understand, other than the

06:05:38PM   18    identity of the owners of Kronospan, what it is that's being --

06:05:45PM   19    that is sought to be protected.  Do you have an understanding

06:05:49PM   20    of that?

06:05:49PM   21          MS. RATHBUN:  I believe it is just the owners of

06:05:51PM   22    Kronospan.

06:05:52PM   23          THE COURT:  And do you need to put the names of THE

06:05:54PM   24    owners of Kronospan in the record at all?

06:05:56PM   25          MS. RATHBUN:  The difficulty here, Your Honor --

06:06:00PM  1          THE COURT:  Can't we just call them A and B?

06:06:03PM  2          MS. RATHBUN:  I think that something might be

06:06:04PM  3  possible for the document that we would like to use.

06:06:07PM  4  Unfortunately, for the deposition testimony, it's wrapped up in

06:06:11PM  5  the question, and we'll try to think of another creative

06:06:15PM  6  solution.

06:06:16PM  7          THE COURT:  How about redaction of the deposition?

06:06:18PM  8          MS. RATHBUN:  We can consider that.  I'll go back and

06:06:22PM  9  consider that.  I think we'll keep working on it, Your Honor.

06:06:28PM 10          THE COURT:  What is the import of having the owners'

06:06:33PM 11  names here?  You said something about showed they were

06:06:36PM 12  interested.

06:06:37PM 13          MS. RATHBUN:  To show they were interested in

06:06:40PM 14  partnering with Steves to build a molded door skin plant, Your

06:06:43PM 15  Honor.

06:06:43PM 16          THE COURT:  Is it that they're so substantial, such

06:06:46PM 17  substantial people or companies or something that it makes

06:06:54PM 18  Kronospan a more viable candidate or what --

06:06:59PM 19          MS. RATHBUN:  Correct, Your Honor.  My understanding

06:07:00PM 20  is Kronospan is a very large company, and their ownership is

06:07:05PM 21  interested in this project, and that, we feel, gives it some

06:07:08PM 22  more weight that the jury should hear.

06:07:11PM 23          THE COURT:  That wasn't quite what I was asking.  If

06:07:16PM 24  Robert and Ann Payne own Kronospan, and somebody were to go

06:07:21PM 25  look -- we inherited it or something, go to check us out, they

06:07:27PM  1   would find we couldn't put too much capital into it.

06:07:31PM  2         If British Petroleum and British Air or Stella Artois

06:07:41PM  3   owned Kronospan and they're willing to back it with their own

06:07:44PM  4   resources, maybe that gives more oomph to the matter.  I'm not

06:07:51PM  5   sure how relevant it is, to tell you the truth.

06:07:53PM  6         Okay, Ms. Curran-Huberty, you want to be heard, come

06:07:56PM  7   to the lectern.

06:08:01PM  8         MS. CURRAN-HUBERTY:  Just one point of clarification,

06:08:03PM  9   Your Honor.  My understanding regarding what Kronospan's

06:08:06PM  10  counsel seeks to seal, it's not just limited to the identity of

06:08:10PM  11  the owners of Kronospan.  There are also portions of Mr. Pack's

06:08:15PM  12  deposition in this case that simply go to -- they contain

06:08:19PM  13  statements regarding Kronospan's plans regarding future

06:08:25PM  14  business ventures in the United States.

06:08:29PM  15        THE COURT:  All right.  Well, then we better schedule

06:08:32PM  16  a little hearing for them, and given what we're doing, this is

06:08:39PM  17  going to be put on in your case, when did you say?

06:08:43PM  18        MS. RATHBUN:  Your Honor, I believe we're flexible on

06:08:46PM  19  that, so within the next couple days, but we can certainly move

06:08:50PM  20  it around a bit.

06:08:53PM  21        THE COURT:  Well, do you have a definition, or do you

06:08:57PM  22  have definition of specific things that they want to keep out

06:09:01PM  23  that you can -- from the deposition or the documents?

06:09:04PM  24        MS. CURRAN-HUBERTY:  Yes, Your Honor.  Kronospan's

06:09:05PM  25  counsel has identified specific pages and lines.

06:09:07PM    1          THE COURT:  Could you give me a copy of that so I can

06:09:10PM    2     look at it.

06:09:12PM    3          MS. CURRAN-HUBERTY:  Yes, Your Honor.  I also believe

06:09:13PM    4     it is in the filing that Kronospan's counsel filed today.

06:09:17PM    5     Perhaps at the very end.

06:09:19PM    6          THE COURT:  Well, I don't have the exhibits.  I think

06:09:22PM    7     that's the problem.  I don't have the exhibits.  You mean the

06:09:28PM    8     parts they want, they filed and attached to the brief or the

06:09:40PM    9     motion?  Because that's troublesome for them.  That's not under

06:09:49PM   10     seal.  It's in the public domain.

06:09:53PM   11          MS. CURRAN-HUBERTY:  I only have the briefing on my

06:09:54PM   12     phone, Your Honor.  I believe it was just a list of citations

06:10:01PM   13     to the deposition, not the text of the deposition.

06:10:04PM   14          THE COURT:  Oh.  How about you -- since I don't keep

06:10:07PM   15     these depositions back in the office, how about you giving

06:10:11PM   16     me -- you and Ms. Rathbun give me a conformed copy to look at

06:10:16PM   17     it, and tell the lawyer that he can do -- is it he or she?

06:10:22PM   18          MS. CURRAN-HUBERTY:  I believe it's a he, Your Honor.

06:10:23PM   19          THE COURT:  Tell him he can do one of two things.  He

06:10:26PM   20     can come up here and be here on Thursday, or he can hire local

06:10:31PM   21     counsel and have the local counsel take care of it, and we will

06:10:37PM   22     plug him in by telephone.  I guess you're going to put that

06:10:41PM   23     burden on Ms. Maltas now; is that correct?

06:10:44PM   24          MS. RATHBUN:  Absolutely.  I'll pull together the

06:10:47PM   25     deposition.

| | |
|---|---|
| 06:10:47PM | 1 |
| 06:10:50PM | 2 |
| 06:10:52PM | 3 |
| 06:10:55PM | 4 |
| 06:10:56PM | 5 |
| 06:10:59PM | 6 |
| 06:11:05PM | 7 |
| 06:11:09PM | 8 |
| 06:11:12PM | 9 |
| 06:11:16PM | 10 |
| 06:11:20PM | 11 |
| 06:11:23PM | 12 |
| 06:11:26PM | 13 |
| 06:11:28PM | 14 |
| 06:11:29PM | 15 |
| 06:11:32PM | 16 |
| 06:11:34PM | 17 |
| 06:11:36PM | 18 |
| 06:11:38PM | 19 |
| 06:11:40PM | 20 |
| 06:11:42PM | 21 |
| 06:11:45PM | 22 |
| 06:11:49PM | 23 |
| 06:11:50PM | 24 |
| 06:11:52PM | 25 |

1    THE COURT:  I thought you weren't talking to him.

2    MS. RATHBUN:  I don't want to get in between that.

3    MS. CURRAN-HUBERTY:  We have both been speaking with

4 him over the last week.

5    THE COURT:  We'll take it up on a break on Thursday

6 afternoon sometime.  I guess if he filed this -- the reason I

7 say he can come up here is he's qualified in person to be a

8 lawyer, a member of the court, because he didn't have any local

9 counsel with him, but I can understand -- I mean on his papers,

10 but I can understand that he might not, and that's okay.  He

11 can get somebody to kind of help him out.  We'll work with him

12 to try to do it in a reasonable way, but I just need to

13 understand.

14    MS. CURRAN-HUBERTY:  Yes, Your Honor.  Thank you.

15    THE COURT:  Are you going to wrap up tomorrow?

16    MR. POMERANTZ:  Yes, Your Honor, we will finish Mr.

17 Tucker and the rest.

18    THE COURT:  When will you rest?

19    MR. POMERANTZ:  It will be in the morning.

20    THE COURT:  Will you be ready to go in the afternoon?

21    MS. ZWISLER:  We are, Your Honor.  We have a witness

22 here.  We have more than one ready to go, roll -- they're all

23 live.

24    THE COURT:  You told me you wanted to make some

25 Rule 50 motions on everything else.

06:11:54PM  1          MS. ZWISLER:  Yes.

06:11:55PM  2          THE COURT:  I'll hear you after we hear the

06:11:58PM  3   testimony.

06:11:59PM  4          MS. ZWISLER:  Thank you, Your Honor.  We'll make it

06:12:01PM  5   orally, say to Your Honor we have a motion we'll reserve until

06:12:06PM  6   later today.

06:12:07PM  7          THE COURT:  That's fine.  They changed the rule.  You

06:12:10PM  8   don't have to make it at the close of all the evidence.  You

06:12:13PM  9   can make it at any time before it goes to the jury.  The old

06:12:17PM  10  rule preserving the rights were -- was changed, so you don't

06:12:24PM  11  have to make it to preserve it like you do still in the

06:12:27PM  12  criminal way.

06:12:29PM  13         But in any event, that's how you were able to make

06:12:31PM  14  the one that you made today, after they had been heard.  Any

06:12:36PM  15  time before the jury retired, you can make those motions.

06:12:41PM  16  Procedurally your position will be preserved.

06:12:44PM  17         MS. ZWISLER:  Thank you, Your Honor.  Tomorrow.

06:12:45PM  18         MR. POMERANTZ:  Your Honor, can I ask one question.

06:12:48PM  19  I just want to know when you wanted to get together to discuss

06:12:51PM  20  jury instructions given the schedule for the rest of the week

06:12:55PM  21  so we can slide into our availability schedule.

06:13:00PM  22         THE COURT:  I don't know yet.  I'm studying the jury

06:13:03PM  23  instructions.  I still think they're too convoluted.  They

06:13:12PM  24  are -- we have simplified them considerably, and some of the

06:13:20PM  25  problems have been eliminated, but it's -- there's a lot of --

06:13:30PM 1    there are a lot of things in the pattern instructions that just

06:13:33PM 2    don't apply here, and they need to be out, because if you give

06:13:37PM 3    the jury instructions on things that there's no evidence on, it

06:13:42PM 4    sort of makes it hard for them to do their job.  And then you

06:13:46PM 5    get a bunch of questions, and then you get the problem with how

06:13:50PM 6    do you answer the question.  Most of the time the answer is you

06:13:54PM 7    have to do the best you can.  So I'd rather take the bull by

06:13:59PM 8    the horns at the front end, but I guess you're going to rest.

06:14:06PM 9            Now, I didn't poll them about Saturday yet.  You've

06:14:11PM 10   got people you can put on Saturday even though Hachigian is not

06:14:15PM 11   here on Saturday; right?

06:14:17PM 12           MS. ZWISLER:  It would require the experts to go

06:14:21PM 13   before Mr. Hachigian which would be -- we just can't do that, I

06:14:24PM 14   don't think, but let me just say that even without Saturday, we

06:14:28PM 15   believe that we can close -- that we can -- our case would

06:14:33PM 16   close on Tuesday regardless.  So I'm still with Mr. Pomerantz

06:14:37PM 17   --

06:14:37PM 18           THE COURT:  Then they have rebuttal.

06:14:41PM 19           MS. ZWISLER:  At some point on Tuesday.  I still

06:14:44PM 20   think that we can close on Wednesday morning, even with a

06:14:48PM 21   rebuttal case, because it will be very short, and that

06:14:50PM 22   really -- we could do the charge conference Saturday, close

06:14:53PM 23   Wednesday morning, and the jury is going to give us a verdict

06:14:56PM 24   within that time.  I realize it's an imposition on them, but I

06:15:00PM 25   think they prefer to do that than come Saturday.

06:15:05PM   1         THE COURT:  You know, I agree with you.  I have your

06:15:09PM   2    telephone number, don't I?

06:15:11PM   3         MS. ZWISLER:  Yes, Your Honor.

06:15:12PM   4         THE COURT:  Do we have a direct number, because I'm

06:15:14PM   5    going to give that to my wife and let her talk to you.  All

06:15:20PM   6    right, thank you.  We'll be in adjournment.

             7

             8                     (End of proceedings.)

             9

            10

            11         I certify that the foregoing is a correct transcript

            12    from the record of proceedings in the above-entitled matter.

            13

            14

            15    _____/s/_____          _____
                  P. E. Peterson, RPR                Date
            16

            17

            18

            19

            20

            21

            22

            23

            24

            25