```
12:00:59  1              IN THE UNITED STATES DISTRICT COURT

12:00:59  2             FOR THE EASTERN DISTRICT OF VIRGINIA

12:00:59  3                    RICHMOND DIVISION

12:00:59  4    ------------------------------
12:00:59                                      :
12:00:59  5    STEVES AND SONS, INC.,         :   Civil Action No.
12:00:59                                      :   3:16cv545
12:00:59  6    vs.                            :
12:00:59                                      :   February 13, 2018
12:00:59  7    JELD-WEN, INC.                 :
12:00:59                                      :
12:00:59  8    ------------------------------

12:00:59  9


12:00:59 10        COMPLETE TRANSCRIPT OF TRIAL PROCEEDINGS

12:00:59 11         BEFORE THE HONORABLE ROBERT E. PAYNE

12:00:59 12             UNITED STATES DISTRICT JUDGE

12:00:59 13    APPEARANCES:

12:00:59 14    Lewis F. Powell, III, Esquire
12:00:59       John S. Martin, Esquire
12:00:59 15    Maya M. Eckstein, Esquire
12:00:59       Hunton & Williams
12:00:59 16    Riverfront Plaza, East Tower
12:00:59       951 East Byrd Street
12:00:59 17    Richmond, Virginia 23219
12:00:59
12:00:59 18    Glenn Pomerantz, Esquire
12:00:59       Ted Dane, Esquire
12:00:59 19    Munger Tolles & Olson, LLP
12:00:59       355 South Grand Avenue
12:00:59 20    35th Floor                          VOLUME XI
12:00:59       Los Angeles, California 90071
12:00:59 21

12:00:59 22

12:00:59 23

12:00:59 24

12:00:59 25
```

```
12:00:59  1    APPEARANCES: (cont'g)
12:00:59
12:00:59  2    Kyle Mach, Esquire
12:00:59       Munger Tolles & Olson, LLP
12:00:59  3    560 Mission Street
12:00:59       27th Floor
12:00:59  4    San Francisco, California 94105
12:00:59       Counsel for the plaintiff
12:00:59  5
12:00:59       Margaret M. Zwisler, Esquire
12:00:59  6    Allyson M. Maltas, Esquire
12:00:59       Latham & Watkins, LLP
12:00:59  7    555 11th Street NW
12:00:59       Suite 1000
12:00:59  8    Washington, D.C. 20004
12:00:59
12:00:59  9    Alfred C. Pfeiffer, Esquire
12:00:59       Latham & Watkins, LLP
12:00:59 10    505 Montgomery Street
12:00:59       Suite 2000
12:00:59 11    San Francisco, California 94111
12:00:59
12:00:59 12    Lawrence E. Buterman, Esquire
12:00:59       Latham & Watkins, LLP
12:00:59 13    885 Third Avenue
12:00:59       25th Floor
12:00:59 14    New York, New York 10022
12:00:59
12:00:59 15    Michael W. Smith, Esquire
12:00:59       Craig T. Merritt, Esquire
12:00:59 16    Christian & Barton
12:00:59       909 East Main Street
12:00:59 17    Suite 1200
12:00:59       Richmond, Virginia 23219
12:00:59 18    Counsel for the defendant

         19

         20

         21

         22

         23

         24

         25
```

| | |
|---|---|
| 09:39:16 1 | (The jury entered the courtroom.) |
| 09:40:17 2 | THE CLERK:  Day ten.  Case No. 3:16cv545, *Steves* |
| 09:42:57 3 | *and Sons, Inc. v. Jeld-Wen, Inc.* |
| 09:42:30 4 | The plaintiff is represented by Lewis F. Powell, III, |
| 09:42:30 5 | Ms. Maya Eckstein, Mr. Glenn Pomerantz, and Mr. Ted Dane. |
| 09:42:30 6 | The defendant is represented by Mr. Alfred Pfeiffer, |
| 09:42:30 7 | Jr., Mr. Lawrence Buterman, Mr. Ryan Andrews, and |
| 09:42:30 8 | Mr. Jason Daniels. |
| 09:42:30 9 | Are counsel ready to proceed? |
| 09:42:56 10 | MR. POWELL:  Good morning, Your Honor.  Steves |
| 09:42:57 11 | is ready. |
| 09:42:58 12 | MR. PFEIFFER:  Good morning, Your Honor.  Ready |
| 09:42:59 13 | for Jeld-Wen. |
| 09:43:00 14 | THE COURT:  May I see Mr. Pomerantz -- who put |
| 09:43:03 15 | on Shapiro?  Would you come up, please. |
| 09:43:10 16 | (Discussion at sidebar as follows:) |
| 09:43:18 17 | THE COURT:  Mr. Martecchini said something about |
| 09:43:21 18 | Mr. Shapiro will not be ready to talk until 1:00? |
| 09:43:26 19 | MR. POMERANTZ:  Yes.  That's right, Your Honor. |
| 09:43:27 20 | THE COURT:  Why is that? |
| 09:43:29 21 | MR. POMERANTZ:  He flew in last night, and I |
| 09:43:30 22 | haven't had a chance to work with him yet.  He'll be done |
| 09:43:33 23 | very quickly, Your Honor.  It's only going to be less than |
| 09:43:36 24 | an hour of testimony, we think. |
| 09:43:37 25 | THE COURT:  But you're wasting time in between |

09:43:39 1    if they're through at 11:30 and he's not ready until 1:00.

09:43:43 2         MR. POMERANTZ:  Well, we didn't know in

09:43:43 3    scheduling -- I had this earlier --

09:43:44 4         THE COURT:  You -- you run his schedule.  That's

09:43:47 5    your job.  You run his schedule, and he's to be here when

09:43:50 6    you tell him to be here.  That's what I told him when he

09:43:53 7    left here, that you all were to tell him when to be back

09:43:56 8    and he is to be back then.

09:43:58 9         MR. POMERANTZ:  Well, Your Honor --

09:43:59 10        THE COURT:  So maybe you ought to go start

09:44:01 11   getting him ready now.  Are you doing this -- you're doing

09:44:04 12   this witness?

09:44:05 13        MR. POMERANTZ:  No, I am not, Your Honor.

09:44:06 14        THE COURT:  Who is?

09:44:06 15        MR. POMERANTZ:  Mr. Dane.  Well, it's their

09:44:09 16   witness, and Mr. Dane is crossing.

09:44:10 17        THE COURT:  Yeah, I know.  Are you

09:44:10 18   cross-examining?

09:44:10 19        MR. POMERANTZ:  Mr. Dane is cross-examining him.

09:44:12 20        THE COURT:  I don't know why you can't go on

09:44:14 21   and we can get -- we've got jury instructions and verdict

09:44:17 22   forms and all kinds of things pending here.  All kinds of

09:44:20 23   motions and problems.

09:44:22 24        MR. POMERANTZ:  Well, what we had proposed is

09:44:24 25   that Your Honor take up those issues at 11:30, or whenever

Kaplan – Direct

09:44:26  1  we're finished with Mr. Kaplan.

09:44:27  2          THE COURT:  I don't want to be doing it then.

09:44:28  3          MR. POMERANTZ:  Okay.

09:44:28  4          THE COURT:  I want these people to have this

09:44:30  5  case over like we told them it was going to be over.

09:44:34  6          MR. POMERANTZ:  Okay.  I understand, Your Honor.

09:44:35  7  I will go back with Professor Shapiro now.

09:44:37  8          THE COURT:  All right.

09:44:38  9          (End of sidebar discussion.)

09:44:55 10          THE COURT:  Your next witness.

09:44:55 11          MR. PFEIFFER:  Your Honor, Jeld-Wen calls as its

09:44:57 12  next witness David Kaplan.

09:44:59 13

09:44:59 14                    **DAVID P. KAPLAN,**

09:44:59 15  called at the instance of the defendant, having been first

09:44:59 16          duly sworn, testified as follows:

09:45:30 17

09:45:30 18          MR. PFEIFFER:  Your Honor, with the Court's

09:45:31 19  permission, we have a small set of slides and potential

09:45:34 20  exhibits in a binder for the witness and the Court.

09:45:55 21          THE COURT:  Sure.  Are we ready?  Okay.

09:45:56 22          MR. PFEIFFER:  Thank you, Your Honor.

09:45:56 23

09:45:56 24                  **DIRECT EXAMINATION**

09:45:56 25  BY MR. PFEIFFER:

Kaplan – Direct

09:45:58 1   Q   Good morning.

09:45:59 2   A   Good morning.

09:45:59 3   Q   Would you please state your name for the jury?

09:46:02 4   A   David P. Kaplan.

09:46:03 5   Q   And are you here to testify in the capacity of an

09:46:06 6   expert witness today?

09:46:07 7   A   Yes, sir.

09:46:07 8   Q   Can you tell us what you do for a living?

09:46:11 9   A   I'm an economist, and I principally provide economic

09:46:14 10  consulting services to businesses.

09:46:16 11  Q   And do those economic consulting services specialize

09:46:19 12  in any particular areas?

09:46:20 13  A   Yes.  In the areas of antitrust economics and the

09:46:23 14  analysis of damages in antitrust, and also the analysis of

09:46:26 15  damages in commercial disputes, such as those involving

09:46:31 16  alleged breach of contract.

09:46:32 17  Q   How long have you been working in that field?

09:46:34 18  A   About 30 years.

09:46:35 19  Q   And where are you currently employed?

09:46:37 20  A   I work at a firm called the Berkeley Research Group,

09:46:41 21  which is an economic and financial consulting firm with

09:46:44 22  over a thousand employees and offices across the U.S. and

09:46:47 23  around the world.

09:46:48 24  Q   Now, does that mean you're based in Berkeley like

09:46:51 25  Professor Shapiro?

Kaplan – Direct

09:46:52 1  A    No.  I'm actually working out of the Washington,

09:46:55 2  D.C., office.

09:46:56 3  Q    And what is your position at that firm?

09:46:58 4  A    I'm the executive director and the vice chairman of

09:47:01 5  the company.

09:47:03 6  Q    So then what is it that you do at the -- at Berkeley

09:47:06 7  Research Group?

09:47:07 8  A    I provide economic consulting services in the areas

09:47:09 9  that I mentioned, antitrust and damage analysis.  I also

09:47:13 10 have administrative responsibilities in running the

09:47:15 11 company.

09:47:15 12 Q    Okay.  What were you asked to do in this case?

09:47:19 13 A    I was asked to review the damage analysis offered by

09:47:22 14 Mr. Tucker related to both the contract issue and the

09:47:27 15 alleged lost profits.

09:47:29 16 Q    Without going into what they are, have you formed any

09:47:32 17 opinions as a result of your work?

09:47:33 18 A    I have.

09:47:34 19 Q    And are you prepared to testify about those today?

09:47:36 20 A    I am.

09:47:37 21 Q    Would you please tell us about your educational

09:47:39 22 background.

09:47:40 23 A    Yes.  I have a bachelor's and a master's in economics

09:47:44 24 from George Washington University.  And I also have a law

09:47:47 25 degree from George Washington University.

Kaplan - Direct

| | | |
|---|---|---|
| 09:47:49 | 1 | Q   Now, you have a law degree.  Do you practice law? |
| 09:47:52 | 2 | A   No.  I've never practiced law. |
| 09:47:53 | 3 | Q   Are you here today to provide any legal opinions? |
| 09:47:56 | 4 | A   None whatsoever. |
| 09:47:57 | 5 | Q   Now, you mentioned being an economist.  Do you have |
| 09:47:59 | 6 | any experience teaching in the field of economics? |
| 09:48:02 | 7 | A   Yes.  I taught for about ten years at George Mason |
| 09:48:04 | 8 | University in Virginia, teaching a course in |
| 09:48:09 | 9 | microeconomics, which focused on the analysis of |
| 09:48:12 | 10 | competition.  I also lectured in antitrust as part of that |
| 09:48:16 | 11 | course that I taught for ten years. |
| 09:48:19 | 12 | Q   And in the course of your teaching experience, have |
| 09:48:21 | 13 | you touched on any areas that are related to the topic |
| 09:48:25 | 14 | areas you would discuss in this case? |
| 09:48:27 | 15 | A   Yes.  In my teaching at George Mason, I would |
| 09:48:30 | 16 | regularly teach about how changes in various business |
| 09:48:33 | 17 | conduct, like pricing practices or mergers, would affect |
| 09:48:36 | 18 | industries, markets and individual firms. |
| 09:48:39 | 19 | Q   Apart from the ten years that you spent teaching at |
| 09:48:43 | 20 | George Mason, do you have any other teaching experience? |
| 09:48:45 | 21 | A   Yes.  I taught for about ten years at Johns Hopkins |
| 09:48:48 | 22 | University.  I taught in the MBA program at Johns Hopkins. |
| 09:48:54 | 23 | Q   And what subject areas did you teach there? |
| 09:48:56 | 24 | A   I taught a course in business statistics for the MBA |
| 09:49:00 | 25 | students. |

Kaplan — Direct

09:49:00 1   Q    And for approximately how long did you teach at Johns

09:49:04 2   Hopkins?

09:49:05 3   A    About ten years.

09:49:07 4   Q    And were there aspects of what you taught at Johns

09:49:09 5   Hopkins that are related to the opinions you would render

09:49:12 6   in this case?

09:49:12 7   A    Yes.  The entire focus of the course that I taught

09:49:15 8   was how to utilize statistical techniques to analyze and

09:49:19 9   review data like sales, costs, and profits.

09:49:23 10  Q    Okay.  And apart from these longer term faculty

09:49:25 11  positions at George Mason and Johns Hopkins, have you also

09:49:30 12  served as a guest or visiting lecturer at other

09:49:34 13  universities?

09:49:34 14  A    Yes, I have.  I've served as a guest lecturer at

09:49:37 15  Columbia, at the University of Utah, and at George

09:49:41 16  Mason -- excuse me -- George Washington University.

09:49:44 17  Q    And have you ever had any of your academic work

09:49:46 18  published?

09:49:46 19  A    Yes.  I've published a book in antitrust economics, a

09:49:51 20  number of articles, including an article analyzing

09:49:56 21  overcharges in an antitrust case.

09:49:58 22  Q    Have you served as an economic consultant in the past

09:50:00 23  to any government agencies?

09:50:02 24  A    Yes, I have.

09:50:03 25  Q    And did any of that work involve the analysis of

Kaplan – Direct

09:50:06 1    damages?

09:50:06 2    A    Yes, it did.

09:50:07 3    Q    Have you ever testified before Congress?

09:50:09 4    A    Yes, I did, on antitrust issues.

09:50:12 5    Q    Okay.  Now, as a practicing economist, have you also

09:50:14 6    made any presentations concerning economic and economic

09:50:18 7    damages issues to any organizations?

09:50:20 8    A    Yes, I have.

09:50:22 9    Q    What types of organizations have you presented on

09:50:24 10   those subjects?

09:50:25 11   A    The American Bar Association, the Conference Board,

09:50:28 12   the Brookings Institute.  Places like that.

09:50:32 13   Q    And some of those presentations involve the topics of

09:50:36 14   damages?

09:50:36 15   A    Yes.  Four of them.

09:50:37 16   Q    Okay.  Now, have you ever testified previously in

09:50:39 17   federal or state court on the issue of damages in

09:50:42 18   litigation?

09:50:42 19   A    Yes, I have.

09:50:44 20   Q    How many times, approximately?

09:50:45 21   A    About ten.

09:50:46 22   Q    Okay.  And in each of those instances, were you

09:50:49 23   accepted by the Court as an expert on economic damages?

09:50:51 24   A    Yes.

09:50:52 25   Q    Now, did those cases include sometimes antitrust

Kaplan – Direct

09:50:55 1    damages?

09:50:56 2    A    Yes.

09:50:56 3    Q    Did they sometimes include contract damages?

09:50:59 4    A    Yes.

09:50:59 5    Q    Okay.  And were there some cases where you were

09:51:02 6    testifying on behalf of the plaintiff?

09:51:04 7    A    Yes.

09:51:05 8    Q    Other cases where you were testifying on behalf of

09:51:07 9    the defendant?

09:51:08 10   A    Yes.

09:51:09 11   Q    Have you also testified in arbitration proceedings on

09:51:12 12   issues related to damages?

09:51:13 13   A    Yes.

09:51:15 14   Q    Any other testimonial experience relevant to the

09:51:18 15   issue of economic damages that we haven't talked about

09:51:20 16   yet?

09:51:21 17   A    Yes.  I've also testified a fair number of times in

09:51:24 18   cases related to class actions concerning antitrust and

09:51:29 19   breach of contract.  And there, a significant focus of my

09:51:34 20   work is to analyze the proper methodologies to analyze

09:51:38 21   damages in these types of matters, antitrust and contract.

09:51:41 22   Q    Okay.  And have you been, in the past, qualified as

09:51:46 23   an expert on damages issues in that setting?

09:51:48 24   A    Yes.  I've testified in seven or eight trials.  And

09:51:51 25   these are trials in front of just a judge, without a jury,

Kaplan – Direct

09:51:54 1    where those judges have accepted me as an expert on the

09:51:58 2    issue of damages.

09:51:58 3    Q    And are there aspects of your work as an executive

09:52:03 4    director and vice chair of Berkeley Research Group that

09:52:06 5    also expose you, in the real world setting, to these kind

09:52:09 6    of financial and damages issues?

09:52:11 7    A    Yes.  At the Berkeley Research Group, I regularly

09:52:13 8    review in the real world, in my role as vice chairman,

09:52:18 9    income statements, sales data, cost data, profit data.

09:52:20 10   And I also analyze budgets and forecasts.

09:52:27 11       And before I joined the Berkeley Research Group, I

09:52:30 12   also was part of another company that I helped found and

09:52:33 13   build, took public and was an executive officer of the

09:52:36 14   public company where I regularly dealt with income

09:52:39 15   statements, cost data, profit data.

09:52:42 16       So not only is my academic expense and my practical

09:52:46 17   experience relevant to the issues here, but in the real

09:52:47 18   world as an executive, I've dealt with these issues many

09:52:50 19   times.

09:52:50 20            MR. PFEIFFER:  Your Honor, we tender Mr. Kaplan

09:52:52 21   as an expert on economics and economic damages in this

09:52:56 22   matter.

09:52:57 23            THE COURT:  Is he thusly accepted in that area?

09:53:01 24            MR. DANE:  Yes, Your Honor.

09:53:02 25            THE COURT:  All right.

Kaplan - Direct

09:53:03 1    Q   Mr. Kaplan, you testified earlier that you had

09:53:06 2    analyzed Mr. Tucker's opinions concerning damages and

09:53:10 3    future lost profits in this case.  Have you reached any --

09:53:14 4              MR. DANE:  I'm sorry, Your Honor.  I missed what

09:53:16 5    counsel had said.  We do not have an objection to

09:53:19 6    Mr. Kaplan as an expert on economic damages.  He's not

09:53:22 7    offering an opinion as an economist in this case, however.

09:53:27 8              MR. PFEIFFER:  I'm not sure I understand the

09:53:28 9    difference, Your Honor.  He's not offering opinions on

09:53:31 10   liability in this case, if that's the question.

09:53:34 11             MR. DANE:  Your Honor, he's not offering any

09:53:36 12   opinions on economics, such as the antitrust issues that

09:53:40 13   he testified were part of his background.

09:53:42 14             MR. PFEIFFER:  I agree with that, Your Honor.

09:53:43 15             THE COURT:  He'll be accepted -- he's just going

09:53:46 16   to testify about damages and the calculations respecting

09:53:49 17   damages?

09:53:50 18             MR. PFEIFFER:  I believe that's correct, Your

09:53:50 19   Honor.

09:53:51 20             THE COURT:  That's what he's accepted as an

09:53:53 21   expert, and the economics of the damage claims at issue in

09:53:57 22   this case.

09:53:57 23             MR. PFEIFFER:  Thank you, Your Honor.

09:54:01 24   Q   Sorry, Mr. Kaplan.  Back to --

09:54:03 25             THE COURT:  Start over again.

Kaplan - Direct

09:54:05 1      MR. PFEIFFER:  Yes.  Thank you, Your Honor.

09:54:06 2  Q    You mentioned earlier that you had been engaged to

09:54:09 3  look at the work that Mr. Tucker had done in this case in

09:54:12 4  terms of his assessment of damages and future lost profits

09:54:16 5  damages?

09:54:16 6  A    Yes.  I've analyzed that.

09:54:18 7  Q    Have you reached any opinions concerning what he did

09:54:20 8  on those two issues?

09:54:21 9  A    I have.

09:54:21 10 Q    Have you prepared some slides to help illustrate and

09:54:24 11 explain your testimony in this case?

09:54:25 12 A    Yes, sir, I did.

09:54:27 13      MR. PFEIFFER:  Gail, would you please call up

09:54:28 14 the first Kaplan slide.

09:54:32 15 Q    You have here a summary of your conclusions in this

09:54:34 16 case.  Would you please start with the first conclusion

09:54:38 17 and explain to the jury what your opinion is.

09:54:40 18 A    Yes.  Mr. Tucker presented a damage calculation

09:54:45 19 related to so-called defective door skins.  It was

09:54:51 20 approximately $3 million.  And that claim is based only on

09:54:57 21 Steves' interpretation of the supply agreement, and it may

09:55:02 22 well include -- improperly include the value of door skins

09:55:05 23 and doors that are not reimbursable under that contract.

09:55:09 24 Q    Okay.  What, then, is your --

09:55:11 25      THE COURT:  Wait just a minute.

Kaplan - Direct

09:55:13  1          MR. PFEIFFER:  Sorry, Your Honor.

09:55:14  2          THE COURT:  Because he can't testify about what

09:55:15  3  the meaning of the contract is.

09:55:16  4          MR. PFEIFFER:  He's not going to testify --

09:55:18  5          THE COURT:  He just did.  He said it may include

09:55:19  6  damages that may be -- not be reimbursable under the

09:55:25  7  provisions of the contract, which is essentially an

09:55:29  8  opinion that X damage, whatever X may end up being, is not

09:55:34  9  within the scope of the contract.  And no expert can

09:55:37 10  testify about that.

09:55:38 11          MR. PFEIFFER:  And we will make clear, he is not

09:55:40 12  going to testify about that.

09:55:42 13          THE COURT:  Well, then strike that answer and

09:55:43 14  don't pay any attention to it, ladies and gentlemen.

09:55:47 15      Try again, Mr. Pfeiffer.

09:55:48 16          MR. PFEIFFER:  Yes, Your Honor.

09:55:50 17  Q    Your assessment of Mr. Tucker's supply agreement

09:55:58 18  damages takes into account that Jeld-Wen has contended

09:56:04 19  that some claims are not reimbursable, correct?

09:56:07 20  A    That's correct.

09:56:08 21  Q    And you'll be explaining the value of those items,

09:56:12 22  correct?

09:56:13 23  A    Yes.  There's a difference of opinion between the two

09:56:16 24  sides about how to interpret the contract.

09:56:18 25          THE COURT:  Please.  Just yes was enough.

Kaplan – Direct

09:56:21 1          THE WITNESS:  Yes, sir.

09:56:21 2          THE COURT:  Please.  Just answer the question,

09:56:22 3  and you don't need to explain what the issues are between

09:56:27 4  the sides.  He'll ask you what he wants you to talk about.

09:56:33 5          THE WITNESS:  Yes, sir.

09:56:34 6          THE COURT:  Please confine your testimony to

09:56:36 7  that.

09:56:36 8  Q    Would you please describe your second opinion in this

09:56:39 9  case?

09:56:39 10 A    Yes.  That the overcharge claim is based, again, on

09:56:42 11 Steves' interpretation of the supply agreement.

09:56:46 12         MR. DANE:  Objection, Your Honor.

09:56:47 13         THE COURT:  What?

09:56:49 14         MR. DANE:  This raises the same issue, Your

09:56:51 15 Honor.

09:56:53 16         MR. PFEIFFER:  I don't believe it does, Your

09:56:54 17 Honor.

09:56:56 18         THE COURT:  It depends on what he says,

09:56:58 19 Mr. Dane.  It may.  He's saying he understands that

09:57:02 20 Shapiro's testimony is based only on Steves'

09:57:07 21 interpretation.  Is that right?

09:57:10 22         MR. PFEIFFER:  Yeah.  Mr. Tucker's.

09:57:13 23         THE COURT:  That isn't what this slide says.

09:57:15 24     This slide is a broader statement to which I think

09:57:18 25 the objection is lodged, and that is, the overcharge claim

Kaplan - Direct

09:57:21  1   is based on -- only on Steves' interpretation of the

09:57:27  2   contract.  It may be that other evidence besides Shapiro

09:57:32  3   comes into play in deciding what it's based on or not

09:57:36  4   based on.  But what he's doing is addressing what Shapiro

09:57:39  5   said, and I understood that that's what his opinion was,

09:57:43  6   that in Shapiro's overcharged calculations -- or not

09:57:48  7   Shapiro.

09:57:49  8              MR. PFEIFFER:  Tucker, Your Honor.

09:57:49  9              THE COURT:  Tucker.  I keep getting that wrong.

09:57:51 10   That Tucker's overcharge claim is based only on Steves'

09:57:55 11   interpretation, and he -- I think that's what he's saying.

09:57:58 12              MR. PFEIFFER:  Yes, Your Honor.  I think that

09:57:59 13   is --

09:57:59 14              THE COURT:  Let's keep it -- let's get it tight.

09:58:02 15              MR. PFEIFFER:  Yes, Your Honor.

09:58:02 16              THE COURT:  Because you can drift into waters

09:58:04 17   that are troubled.

09:58:06 18              MR. PFEIFFER:  Yes, Your Honor.  And I think

09:58:07 19   when we get into the more detailed questions, we won't be

09:58:11 20   anywhere near those waters.

09:58:15 21              THE COURT:  Well, I know.  But the problem is by

09:58:16 22   the time you get into those waters, you may have already

09:58:19 23   put some ink in big waters by the broad proposition.  So

09:58:25 24   that's why we need to be careful about the broad

09:58:27 25   proposition.

Kaplan - Direct

09:58:28 1          MR. PFEIFFER:  Yes, Your Honor.

09:58:29 2     Q    Would you address now the third conclusion that

09:58:31 3     you've reached in this case?

09:58:32 4     A    Yes.  In my opinion, Mr. Tucker's estimate of lost

09:58:36 5     future profits is speculative and unreliable.

09:58:38 6     Q    Now, to be clear, Mr. Kaplan, are you offering any

09:58:42 7     opinions about whether Jeld-Wen actually breached any

09:58:44 8     provision of its contract?

09:58:45 9     A    I am not.

09:58:46 10    Q    Are you offering any opinions about whether the

09:58:49 11    acquisition of CraftMaster by Jeld-Wen was

09:58:51 12    anticompetitive?

09:58:53 13    A    I am not.

09:58:54 14    Q    Did you prepare reports in the course of your work in

09:58:57 15    this case?

09:58:57 16    A    I did.

09:58:58 17    Q    When were those submitted?

09:59:00 18    A    I believe in April and in August.

09:59:05 19    Q    And in general terms, what information did you rely

09:59:08 20    on in forming the opinions that you reported in those

09:59:11 21    reports?

09:59:12 22    A    I obviously reviewed in detail Mr. Tucker's reports

09:59:16 23    and analysis.  I read all the depositions that were taken

09:59:20 24    in the case.  I looked at the documents that were produced

09:59:23 25    in the case.  I reviewed data produced in the case.  I

Kaplan - Direct

09:59:27 1    also reviewed publicly available information.

09:59:31 2    Q    And then during the course of this trial, have you

09:59:35 3    either listened to or read the trial testimony that has

09:59:38 4    occurred so far?

09:59:39 5    A    Everything except for yesterday.

09:59:42 6    Q    Now, Mr. Tucker also submitted a supplemental report

09:59:46 7    the same time as you in August of last year, right?

09:59:49 8    A    Yes.  On August 21st.

09:59:51 9    Q    So those were simultaneous?

09:59:53 10   A    Yes.

09:59:53 11   Q    Were you able, then, to respond, in a written report,

09:59:57 12   to Mr. Tucker's supplemental August report?

10:00:00 13   A    I was not.

10:00:02 14   Q    Have you reviewed that report?

10:00:03 15   A    Yes.

10:00:04 16   Q    Now, did he change some of his calculations from his

10:00:08 17   April report in his August report?

10:00:11 18   A    Yes, he did.

10:00:12 19   Q    In forming your opinions, did you consider those new

10:00:13 20   calculations presented by Mr. Tucker?

10:00:15 21   A    Yes.

10:00:15 22   Q    Were you also here in the courtroom when Mr. Tucker

10:00:19 23   testified last week?

10:00:21 24   A    I was here for the whole time.

10:00:24 25   Q    Now, in preparing your testimony today --

Kaplan - Direct

10:00:27 1      THE COURT:  Just so we're straight, the jury --

10:00:28 2  have you all admitted the reports of the experts?

10:00:31 3      MR. PFEIFFER:  No, Your Honor.  And we won't be.

10:00:32 4      THE COURT:  Well, the testimony about what he

10:00:33 5  testified about, then -- I mean the evidence on which he

10:00:36 6  based his testimony and the figures will be what he

10:00:38 7  testified to in court.

10:00:40 8      MR. PFEIFFER:  Yes, Your Honor.

10:00:40 9      THE COURT:  All right.

10:00:42 10     MR. PFEIFFER:  Yes.  That was merely to give

10:00:43 11 background as to what he had studied in the case.

10:00:46 12     THE COURT:  Well, I know, but it might confuse

10:00:48 13 the jury because the jury is wondering, then, where is the

10:00:49 14 report.

10:00:50 15     But you're not going to see any reports.  It's the

10:00:52 16 testimony that was given in court by Mr. Tucker and the

10:00:55 17 testimony that's given in court by Mr. Kaplan that counts.

10:01:01 18 Q   Has any of the additional information that you have

10:01:04 19 considered since the time you submitted your August 2017

10:01:08 20 report changed any of the opinions that you have in this

10:01:11 21 case?

10:01:11 22 A   None at all.

10:01:13 23 Q   Okay.  Could you remind us again what the categories

10:01:20 24 are and the damages numbers that Mr. Tucker presented on

10:01:23 25 the issue of the contract damages?

Kaplan - Direct

| | | |
|---|---|---|
| 10:01:26 | 1 | MR. PFEIFFER:  And, Gail, would you please put |
| 10:01:28 | 2 | up slide 2 for that purpose. |
| 10:01:30 | 3 | A    Yes.  Mr. Tucker provided two categories of damages |
| 10:01:34 | 4 | related to the alleged breach of the supply agreement. |
| 10:01:39 | 5 | One related to defect costs.  That's the $3,081,040.  And |
| 10:01:48 | 6 | on what he called contract overcharges that were |
| 10:01:51 | 7 | 8.6 million to 9.9 million. |
| 10:01:55 | 8 | Q    And what explains that range between 8.6 million and |
| 10:01:58 | 9 | 9.9 million on the overcharges? |
| 10:02:00 | 10 | A    An alternative calculation that Mr. Tucker provided |
| 10:02:03 | 11 | related to key input costs and a particular type of wood |
| 10:02:09 | 12 | at the Towanda plant. |
| 10:02:14 | 13 | Q    Let's start by taking a look at what Mr. Tucker says |
| 10:02:17 | 14 | about the unpaid defect cost damage claim. |
| 10:02:22 | 15 | MR. PFEIFFER:  Gail, would you put up |
| 10:02:24 | 16 | Mr. Tucker's slide 15, please, from when he was here. |
| 10:02:30 | 17 | Q    You recall that Mr. Tucker discussed this slide and |
| 10:02:32 | 18 | the numbers on it when he was here? |
| 10:02:34 | 19 | A    Yes. |
| 10:02:34 | 20 | Q    And does this reflect what Mr. Tucker said were the |
| 10:02:38 | 21 | damages he had calculated related to unpaid claims for |
| 10:02:42 | 22 | defective products? |
| 10:02:43 | 23 | A    Yes. |
| 10:02:44 | 24 | Q    Let's start with the first category up there, the |
| 10:02:46 | 25 | $441,000.  Does that calculation include claims for door |

Kaplan – Direct

10:02:53 1   skins that Jeld-Wen contends were not actually defective?

10:02:59 2   A    It does.

10:03:00 3   Q    And do you recall that there was testimony from

10:03:02 4   Mr. Gartner relating to that issue?

10:03:04 5   A    I do recall it.

10:03:06 6   Q    And what was the nature of that testimony?

10:03:07 7   A    Mr. Gartner testified that Steves would evaluate a

10:03:13 8   pallet of door skins, which would be 225 door skins, and

10:03:17 9   they would look at the just the top 4.  And if they

10:03:21 10  concluded that the top 4 were defective, they would send

10:03:25 11  the whole pallet back, claiming that the whole pallet was

10:03:30 12  defective, including the other 221 door skins even though

10:03:33 13  those door skins may not be defective at all.

10:03:38 14  Q    And do you recall that Mr. Tucker also testified

10:03:41 15  about claims being submitted for some door skins that

10:03:43 16  Steves determined could be used?

10:03:46 17  A    Yes.  I remember that testimony.

10:03:51 18  Q    If Mr. Tucker has included in his calculations of

10:03:55 19  defective door skins in that first item any amount of door

10:03:59 20  skins that were not actually defective, what impact does

10:04:02 21  that have on the reliability of that damages number?

10:04:07 22  A    The -- the title of the category is "Defective Door

10:04:12 23  Skins."  If it includes door skins that were not

10:04:15 24  defective, then it is an unreliable estimate of the

10:04:19 25  allegedly defective door skins.

Kaplan - Direct

10:04:23 1   Q    Has Mr. Tucker provided any alternative number to

10:04:27 2   take into account; for example, Mr. Gartner's testimony?

10:04:30 3   A    He has not.

10:04:31 4   Q    Okay.  Let's look at the next category that's listed

10:04:34 5   there, the Steves doors with defective Jeld-Wen door skins

10:04:37 6   category of approximately $1.7 million.

10:04:40 7   A    Yes, sir.

10:04:41 8   Q    Did you prepare a summary of your opinions with

10:04:43 9   respect to that category of damages?

10:04:45 10  A    I did.

10:04:48 11         MR. PFEIFFER:  Could we switch to slide 3,

10:04:50 12  please.  Thank you, Gail.

10:04:54 13  Q    What are the items that you have summarized here with

10:04:58 14  regard to issues with that category of Mr. Tucker's damage

10:05:02 15  claim?

10:05:03 16  A    I have four opinions related to this second category

10:05:07 17  of the $1.177 million.  The first one is that the

10:05:12 18  calculation is based not on the value of the door skin but

10:05:17 19  on the value of the entire door.  And I understand that

10:05:19 20  Jeld-Wen maintains that it's only responsible to reimburse

10:05:23 21  Steves for the value of the door skin, not the entire

10:05:27 22  door.  And if that conclusion is right, then the entire

10:05:30 23  calculation of the 1.177 million is irrelevant to a

10:05:36 24  damages analysis in this matter.

10:05:38 25  Q    And has Mr. Tucker provided an alternative number

Kaplan - Direct

10:05:41 1   that would be based on the value of the door skins rather

10:05:44 2   than the doors themselves?

10:05:45 3   A   He has not as part of this second category of damages

10:05:50 4   calculations.

10:05:51 5   Q   Would you turn to the second item that you've listed

10:05:53 6   there?

10:05:53 7   A   Yes.  There's testimony by Mr. Tucker and Mr. Gartner

10:05:57 8   that a significant number of the doors that are included

10:06:00 9   in this damage category were not actually submitted for

10:06:04 10  inspection to Jeld-Wen.  And, again, Jeld-Wen maintains

10:06:08 11  that unless they were submitted for inspection, that they

10:06:12 12  cannot be, and are not, reimbursable under the supply

10:06:17 13  agreement.

10:06:17 14  Q   And did Mr. Tucker provide any alternative number

10:06:20 15  that dealt with the issue of doors not being inspected?

10:06:23 16  A   He did not.

10:06:29 17  Q   If you'd turn to the third item on your list there.

10:06:31 18  A   Yes.

10:06:31 19  Q   What are you describing as a problem with

10:06:33 20  Mr. Tucker's analysis of the defective door claim there?

10:06:37 21  A   Yes.  Mr. Gartner also testified that Steves may well

10:06:41 22  miss defective door -- defective door skins when they're

10:06:46 23  making a door.  So the door skin is defective.  They don't

10:06:49 24  see it.  They don't recognize it but yet they make the

10:06:53 25  door.

Kaplan - Direct

10:06:54 1      And it's my understanding that Jeld-Wen maintains

10:06:57 2  that if Steves could have found the defective skin before

10:07:01 3  it got put on the door, that Jeld-Wen should not be

10:07:05 4  responsible to reimburse Steves for the entire value of

10:07:09 5  the door when Steves could have found the defect before

10:07:12 6  the door was made.

10:07:14 7  Q    And, again, has Mr. Tucker provided any alternative

10:07:17 8  calculation to his $1.7 million calculation that takes

10:07:22 9  into account the evidence of the ability to identify

10:07:25 10 defects before they're made into doors?

10:07:29 11 A    He did not.

10:07:30 12 Q    If you'd turn to the fourth item on your list, what

10:07:32 13 is that describing as a problem with Mr. Tucker's doors

10:07:36 14 damages analysis?

10:07:37 15 A    Yes.  Again, Mr. Gartner testified here at trial that

10:07:40 16 some of the doors included in this category could have

10:07:44 17 been damaged in the assembly process at Steves.  So it

10:07:48 18 wasn't a defective door skin.  It was actually damaged at

10:07:51 19 the assembly process at Steves, or it could have been

10:07:55 20 damaged -- the door could have been damaged at a customer

10:07:58 21 location for reasons like moisture and things like that.

10:08:01 22 Q    Did Mr. Tucker, in his damages calculations, provide

10:08:04 23 any quantification of how many such doors fell into that

10:08:07 24 category?

10:08:08 25 A    He did not.

Kaplan - Direct

10:08:09   1   Q      Did he provide a quantification of how many doors

10:08:12   2   fell into any of these categories?

10:08:14   3   A      He did not.

10:08:15   4   Q      What impact do these four criticisms have on the

10:08:18   5   reliability of his $1.7 million door damages claim?

10:08:23   6   A      If Jeld-Wen's interpretation of the contract is

10:08:26   7   accurate, then this category of damages is not reliable.

10:08:31   8   Q      In its entirety?

10:08:34   9   A      In its entirety.

10:08:36  10            THE COURT:  Well, wouldn't it be the case that

10:08:39  11   if Jeld-Wen's interpretation of the contract was correct

10:08:41  12   and if your understanding or recitation of what the

10:08:46  13   witness said was all that the witness said, then it would

10:08:50  14   be an error?

10:08:54  15            THE WITNESS:  Well, I --

10:08:56  16            THE COURT:  Because you testified about what a

10:08:58  17   witness said.

10:08:58  18       Now, why you didn't object to that, Mr. Dane, I don't

10:09:01  19   know, but -- so I think that's the limitation on your

10:09:04  20   testimony, is it not?  You're basing it on your

10:09:09  21   interpretation of what a witness testified, right?

10:09:13  22            THE WITNESS:  Not entirely, sir.

10:09:16  23            THE COURT:  I didn't ask you entirely.  Are you

10:09:18  24   basing it, period, on the interpretation of a witness at

10:09:22  25   all?

Kaplan - Direct

10:09:23 1          THE WITNESS:  Partially, sir.  Yes, sir.

10:09:24 2          THE COURT:  Yes.  That's exactly what I said you

10:09:25 3   were doing.  All right.  That's enough.  Go ahead.

10:09:29 4       Let's make sure it is proper expert testimony.  He

10:09:33 5   can't evaluate the testimony of other witnesses.  He

10:09:36 6   was -- what he was trying to do was to say X said Y and,

10:09:40 7   therefore, if that was wrong -- was right, then there

10:09:45 8   wasn't any accounting for it.  And that's okay.

10:09:47 9          MR. PFEIFFER:  Yes, Your Honor.

10:09:49 10         THE COURT:  But he drifted into evaluating the

10:09:52 11  testimony.  So that's where the problem was.

10:09:57 12  Q    Don't drift.

10:09:58 13  A    I'll do my best.

10:10:01 14         MR. PFEIFFER:  If we could turn back to

10:10:03 15  Mr. Tucker's slide 15, please, Gail.

10:10:07 16  Q    So we've looked at the first two items of the unpaid

10:10:11 17  defect cost claim.  The third item, would you describe

10:10:15 18  what that is -- is talking about, according to Mr. Tucker?

10:10:19 19  A    Yes.  I understand from Mr. Tucker's testimony, this

10:10:21 20  category related to the $862,769 relates to door skins

10:10:28 21  that were actually not defective when they were shipped by

10:10:32 22  Jeld-Wen but were damaged in Steves' facilities.

10:10:37 23  Q    And if that were the case, how would that affect the

10:10:41 24  reliability of that estimate according -- in Mr. Tucker's

10:10:45 25  sheet?

Kaplan - Direct

10:10:45  1    A    Again, I understand that it's Jeld-Wen's position

10:10:47  2    that if the door skin wasn't defective when it was shipped

10:10:51  3    by Jeld-Wen and Steves damaged it --

10:10:54  4            MR. DANE:  Objection, Your Honor.  This is

10:10:55  5    getting into the same area where the witness is simply

10:10:58  6    repeating testimony from a fact witness.

10:11:02  7            MR. PFEIFFER:  I don't think he was actually

10:11:03  8    repeating a fact witness.

10:11:04  9            THE COURT:  He's talking about what their

10:11:06 10    position is.  Just have him explain why he doesn't think

10:11:09 11    it's reliable.  That's what he needs to do is confine his

10:11:13 12    discussion to that.

10:11:14 13    Q    Would you explain why you believe that item of

10:11:15 14    Mr. Tucker's calculation is not reliable?

10:11:18 15    A    I understand that it's Jeld-Wen's position that if

10:11:20 16    the door skin was not defective when Jeld-Wen sent it to

10:11:25 17    Steves and Steves caused it to be injured -- damaged, that

10:11:29 18    it's not Jeld-Wen's responsibility to reimburse Steves for

10:11:33 19    a door skin that wasn't defective when they sent it.

10:11:36 20    Q    And did Mr. Tucker provide any quantification of how

10:11:39 21    many door skins were damaged in the manner that you just

10:11:46 22    described?

10:11:47 23    A    No.

10:11:48 24    Q    Okay.  Did he provide any alternative calculation

10:11:51 25    that would deduct out such door skins?

Kaplan - Direct

10:11:54 1    A    No.

10:11:54 2    Q    Okay.  If -- well, in summary, then, having gone

10:12:00 3    through each of these three categories, what is your

10:12:03 4    overall opinion regarding the reliability of this $3 plus

10:12:08 5    million in unpaid defect cost damages presented by

10:12:12 6    Mr. Tucker?

10:12:13 7    A    In my opinion, it -- if Jeld-Wen's interpretation of

10:12:16 8    the contract is correct, then these numbers are unreliable

10:12:19 9    and not a proper proxy for the alleged damages related to

10:12:23 10   the defects in the doors.

10:12:26 11   Q    Let's turn next to the contract overcharges component

10:12:31 12   of Mr. Tucker's calculations.

10:12:33 13          MR. PFEIFFER:  Gail, would you please put up

10:12:34 14   Mr. Tucker's slide number 10.

10:12:37 15   Q    You also recall having seen this slide used by

10:12:40 16   Mr. Tucker when he testified?

10:12:42 17   A    Yes.

10:12:42 18   Q    Okay.  Do you have an opinion on the reliability of

10:12:46 19   Mr. Tucker's calculations in this regard?

10:12:49 20   A    Yes.

10:12:49 21   Q    What is your opinion?

10:12:51 22   A    This calculation, again, is based on -- only on

10:12:55 23   Steves' interpretation of the supply agreement, not

10:12:58 24   Jeld-Wen's interpretation.

10:13:00 25   Q    What is the --

Kaplan - Direct

10:13:02 1          MR. DANE:  Objection, Your Honor.  That is not

10:13:03 2    an answer relating to the reliability of the calculations.

10:13:06 3    That is relating to the legal assumptions.

10:13:10 4          THE COURT:  Yeah.  Sustained.  He cannot talk

10:13:13 5    about this.  He can talk about the mathematical problems

10:13:16 6    with it and the economic underpinnings that he thinks are

10:13:21 7    frail, but he can't link it and argue it as part of the

10:13:27 8    theory of your case or the other side's case.  That's not

10:13:31 9    an expert's job.

10:13:33 10          MR. PFEIFFER:  Yes, Your Honor.

10:13:34 11          THE COURT:  And if he can't do that, if we have

10:13:37 12    to have that, then maybe we won't have his testimony at

10:13:40 13    all.  So maybe you can retool a little bit.

10:13:44 14        And, Dr. Kaplan, you're going to have to frame your

10:13:48 15    answers without arguing the case.  Do you understand, sir?

10:13:53 16          THE WITNESS:  Yes, sir.

10:13:55 17    Q    Mr. Kaplan, when Mr. Tucker calculated the changes in

10:14:01 18    Jeld-Wen's key input costs that you recall underlay these

10:14:05 19    calculations --

10:14:06 20    A    Yes.

10:14:06 21    Q    -- did he include key input costs associated with the

10:14:10 22    Towanda facility formerly owned by CMI?

10:14:14 23    A    He did.

10:14:14 24    Q    The one that Jeld-Wen acquired as part of the merger?

10:14:17 25    A    He did.

Kaplan - Direct

10:14:18 1  Q    What is the effect on his overcharges calculations of

10:14:21 2  including the Towanda facility in his analysis?

10:14:27 3  A    It substantially increases those numbers.

10:14:30 4  Q    Did you raise that issue in your report concerning

10:14:36 5  Mr. Tucker's decision to include Towanda in his overcharge

10:14:39 6  calculations?

10:14:40 7  A    I did.

10:14:41 8  Q    How did Mr. Tucker respond to that criticism of his

10:14:42 9  numbers?

10:14:44 10  A    He said that these numbers only relate to the

10:14:46 11  contract claim, not the antitrust claim.

10:14:49 12          MR. DANE:  Objection, Your Honor.  That is a

10:14:50 13  mischaracterization.

10:14:52 14          THE COURT:  Sustained.  He can't -- you can't

10:14:54 15  testify to what somebody else said.  You're trying to get

10:14:59 16  him to testify about what he said in a report that's not

10:15:03 17  in evidence, and you have to confine it to what was put on

10:15:09 18  in the courtroom to begin with.  But in that event, he

10:15:12 19  still can't testify without linking it to the economic

10:15:19 20  principles that are involved.  And I sustain the objection

10:15:24 21  because Mr. Dane is correct about it.

10:15:30 22          MR. PFEIFFER:  Gail, would you please put up

10:15:32 23  Mr. Tucker's slide 21.

10:15:37 24  Q    You remember Mr. Tucker described what he was

10:15:39 25  studying with this slide?

Kaplan – Direct

10:15:41  1    A     Yes.

10:15:41  2    Q     And this was his calculations of the lost future

10:15:44  3    profits damages claim?

10:15:46  4    A     Yes.

10:15:47  5    Q     Okay.  Now, in this calculation -- in presenting this

10:15:56  6    calculation, was there any suggestion that Steves had lost

10:15:58  7    a single dollar of profits as of today?

10:16:00  8    A     None.

10:16:01  9    Q     Okay.  Was there a suggestion that Steves would lose

10:16:05 10    a single dollar of profits between today and September of

10:16:08 11    2021?

10:16:09 12    A     No.  He actually calculated that Steves would earn

10:16:12 13    $60 million in before tax profits between today and

10:16:17 14    September 2021.  $60 million, in addition to another

10:16:23 15    $20 million in executive compensation paid to Edward and

10:16:27 16    Sam Steves.

10:16:27 17            MR. DANE:  Objection, Your Honor.

10:16:28 18            THE COURT:  Excuse me.  Yes.

10:16:31 19            MR. DANE:  Your Honor, the witness has just

10:16:33 20    testified to something that is not profits in this case.

10:16:35 21    He is attempting to inject argument into his answers.  I

10:16:38 22    would ask that the witness be instructed to please answer

10:16:42 23    the questions and limit himself to the issues in the case.

10:16:45 24            MR. PFEIFFER:  Your Honor, that evidence was

10:16:47 25    exactly what Mr. Tucker did testify to.  It is evidence in

Kaplan - Direct

10:16:49 1    the case.  It is part of the issue of his damages

10:16:51 2    calculation.

10:16:55 3           MR. DANE:  Your Honor --

10:16:57 4           THE COURT:  I am assuming, though, that you're

10:16:57 5    going to ask him what's wrong with that?

10:17:00 6           MR. PFEIFFER:  Yes, Your Honor.  We're going to

10:17:01 7    ask what's wrong with all of this.  Yes.

10:17:03 8           MR. DANE:  Your Honor, my objection is the

10:17:04 9    question related to profits.  His answer was not limited

10:17:08 10   to profits.  He talked about executive compensation.  That

10:17:12 11   has nothing to do with the profits of the party in this

10:17:13 12   case and nothing to do with the recovery that's being

10:17:19 13   sought here.

10:17:20 14          THE COURT:  He volunteered something you didn't

10:17:22 15   ask for.  You asked for profits.  Your question was

10:17:25 16   correct.  The answer, insofar as he gave it, as to profits

10:17:29 17   was correct.  Then he added executive compensation.

10:17:37 18      You are just instructed to disregard that testimony.

10:17:39 19   The objection is sustained as to that testimony.  As to

10:17:44 20   the testimony about what he understood Mr. Tucker

10:17:47 21   calculated the profits to be in the period of time he

10:17:50 22   testified to, you may consider that.

10:17:53 23          MR. PFEIFFER:  Thank you, Your Honor.

10:17:55 24   Q    Have you reached an overall conclusion about the

10:17:58 25   reliability of Mr. Tucker's claim that Steves will lose

Kaplan – Direct

10:18:03 1   future profits beginning in September of 2021?

10:18:06 2   A    I have.

10:18:07 3   Q    And have you prepared a summary of your conclusions?

10:18:09 4   A    Yes.

10:18:11 5         MR. PFEIFFER:  Gail, would you please put up

10:18:12 6   slide 4.

10:18:15 7   Q    Does this present the summary of your conclusions?

10:18:17 8   A    Yes.

10:18:18 9   Q    Okay.  Would you please explain the first

10:18:22 10  conclusion --

10:18:23 11        THE COURT:  Which is his slide number?  What

10:18:26 12  number is that?

10:18:27 13        MR. PFEIFFER:  This would be slide 4 in

10:18:29 14  Mr. Kaplan's slides, Your Honor.

10:18:31 15        THE COURT:  Excuse me.  Go ahead.

10:18:34 16  Q    Could you explain your conclusion number 1 listed

10:18:36 17  there?

10:18:36 18  A    Yes.  Mr. Tucker's calculation of lost future profits

10:18:41 19  is entirely based on an assumption that Steves will not

10:18:45 20  have a door skin supply in September 2021.  And if it does

10:18:52 21  have a supply, then the lost profit estimates are moot and

10:18:55 22  irrelevant.

10:18:58 23  Q    And when you say the lost profits are moot, what does

10:19:03 24  that mean?

10:19:04 25  A    It means that if Steves is able to obtain a supply of

Kaplan - Direct

10:19:10 1   door skins according to Mr. Tucker's analysis, they will

10:19:13 2   not go out of business and will not have any lost profits.

10:19:17 3   Q    And did Mr. Tucker provide any independent analysis

10:19:20 4   to assume -- to support, rather, his assumption that

10:19:24 5   Steves will not have a supply of door skins?

10:19:26 6   A    He did not.

10:19:28 7   Q    Did he testify about the basis for that assumption?

10:19:31 8   A    He did not.

10:19:33 9   Q    Have you reviewed evidence, without getting into it,

10:19:36 10  that is inconsistent with Mr. Tucker's assumption?

10:19:40 11            MR. DANE:  Objection, Your Honor.

10:19:43 12            THE COURT:  Basis for the objection is?

10:19:45 13            MR. DANE:  This was the assumption Mr. Tucker

10:19:47 14  made, Your Honor, precisely because this is a topic as to

10:19:52 15  which it would be improper for a damages expert to express

10:19:56 16  an opinion.  And Your Honor has already held that these

10:20:02 17  damages experts are not to vouch for or comment on the

10:20:06 18  evidence that relates to this issue, which is something

10:20:08 19  that the jury is going to be determining.

10:20:11 20            MR. PFEIFFER:  Your Honor, the reason --

10:20:12 21            THE COURT:  You're saying that the evidence that

10:20:14 22  supports these assumptions comes from the testimony of

10:20:20 23  other witnesses, and it's improper for any expert to

10:20:23 24  evaluate that evidence because that's not their line of

10:20:27 25  work and that's not that's not why he was -- a damage

Kaplan - Direct

10:20:31 1   expert was hired in the case?  They cannot -- he can't

10:20:35 2   attack the assumptions.  You can attack the assumptions

10:20:38 3   all you want to with other evidence, but this witness

10:20:41 4   can't.  Is that your objection?

10:20:43 5           MR. DANE:  Yes, it is, Your Honor.

10:20:45 6           THE COURT:  All right.  So you say what?

10:20:48 7           MR. PFEIFFER:  Your Honor, it is actually the

10:20:50 8   province of experts to determine whether there is any

10:20:53 9   reasonable basis for their assumptions.  They are not

10:20:55 10  merely supposed to take assumptions that are obviously

10:20:58 11  inconsistent with evidence in the record.  In fact, that's

10:21:02 12  a basis for striking testimony of experts when they do

10:21:05 13  that.  And so the question of --

10:21:07 14          THE COURT:  And none of this has anything to do

10:21:09 15  with what we're talking about.  So maybe you can go on and

10:21:12 16  get to the point.

10:21:14 17          MR. PFEIFFER:  Yes, Your Honor.

10:21:15 18          THE COURT:  Your testimony is that he can

10:21:17 19  evaluate the validity vel non of whether somebody else

10:21:22 20  actually is going to provide a supply?  Is that what you

10:21:24 21  want him to --

10:21:25 22          MR. PFEIFFER:  No, Your Honor.  That's actually

10:21:25 23  not what --

10:21:26 24          THE COURT:  No.  You cannot do that.

10:21:28 25          MR. PFEIFFER:  And that's not what I want him to

Kaplan – Direct

10:21:29 1   do.

10:21:29 2            THE COURT:  What do you want him to do?

10:21:30 3            MR. PFEIFFER:  I want him to offer the opinion

10:21:31 4   as an expert who has testified in numerous damages cases

10:21:32 5   whether --

10:21:33 6            THE COURT:  How about just, I want him to offer

10:21:35 7   an opinion on X.  Maybe you better come up here.

10:21:38 8            MR. PFEIFFER:  Yes, Your Honor.

10:21:39 9            THE COURT:  You don't need to argue the case and

10:21:41 10  make a response to the objection.

10:21:45 11            (Discussion at sidebar as follows:)

10:21:47 12            THE COURT:  What do you want him to do?  Because

10:21:48 13  he has a real penchant for running off the reservation.

10:21:52 14  And I'm troubled by it, and I don't want to get into

10:21:55 15  something that we have to strike.

10:21:59 16            MR. PFEIFFER:  He's an advocate, Your Honor.

10:22:01 17            MR. DANE:  Could I finish my position, please?

10:22:01 18            THE COURT:  What's the opinion you want to

10:22:02 19  elicit?

10:22:03 20            MR. PFEIFFER:  I want him to say that from the

10:22:05 21  perspective of a damages expert, it's not appropriate to

10:22:08 22  simply take assumptions and not test whether they match

10:22:11 23  the evidence in the case.

10:22:12 24            THE COURT:  But are you then going to ask him

10:22:14 25  whether he tested them?

Kaplan - Direct

10:22:15 1          MR. PFEIFFER:  No.

10:22:17 2          THE COURT:  He can ask him that.

10:22:18 3          MR. DANE:  Your Honor, that creates --

10:22:20 4          THE COURT:  Wait just a minute.

10:22:20 5          MR. DANE:  I'm sorry, Your Honor.

10:22:20 6          THE COURT:  Why can't he answer that -- ask that

10:22:22 7  question?

10:22:25 8          MR. DANE:  Because, Your Honor, it is suggesting

10:22:26 9  improperly to the jury that there's a deficiency in

10:22:29 10 Mr. Tucker's opinion because he -- first of all --

10:22:33 11         THE COURT:  I don't think it's suggesting it.  I

10:22:36 12 think it's pointing it out.

10:22:38 13         MR. DANE:  Yes.  Yes.

10:22:38 14         THE COURT:  That's the purpose.

10:22:39 15         MR. DANE:  This is exactly what Your Honor -- at

10:22:40 16 the pretrial conference, we had extended discussion about

10:22:43 17 this on the lost profits motion.  And we made clear

10:22:47 18 there's a distinction between the opinions as to the

10:22:49 19 amount of the lost profits, the performance of the

10:22:51 20 company, how you project those, which both damages experts

10:22:54 21 are expressing an opinion about, and the assumption of

10:22:57 22 alternate supply, which they are not qualified to express

10:23:01 23 an opinion about and where their only opinions would be

10:23:04 24 reviewing and vouching the evidence.

10:23:05 25     And Mr. Kaplan commented on this evidence in his

Kaplan – Direct

10:23:08  1   report.

10:23:09  2              THE COURT:  He's not going to here.

10:23:12  3              MR. DANE:  But if he testifies, Your Honor --

10:23:13  4   he -- he asked him -- I mean, this is extremely devious of

10:23:19  5   Mr. Pfeiffer.

10:23:20  6              MR. PFEIFFER:  I beg your pardon.

10:23:21  7              THE COURT:  Whoa.  Whoa.  Whoa.  Whoa.  Whoa.

10:23:23  8   You know, Mr. Pfeiffer may have done something that you

10:23:25  9   don't think is right --

10:23:26  10             MR. DANE:  I apologize.

10:23:27  11             THE COURT:  -- but the ascription of motivation

10:23:29  12   to him is not right.

10:23:31  13             MR. DANE:  Okay.  I'm sorry.

10:23:34  14             THE COURT:  And you owe him an apology.

10:23:34  15             MR. DANE:  I apologize.  I apologize.

10:23:34  16             MR. PFEIFFER:  Thank you.

10:23:36  17             THE COURT:  What?

10:23:36  18             MR. PFEIFFER:  I just said thank you, Your

10:23:36  19   Honor.  That's all I said.

10:23:38  20             THE COURT:  No.  I'm --

10:23:39  21             MR. DANE:  I apologized.

10:23:39  22        The original question, Your Honor, was now Mr. Tucker

10:23:43  23   didn't do any independent evaluation of whether or not

10:23:47  24   Steves would be able to get supply?

10:23:49  25             THE COURT:  Yeah.

Kaplan - Direct

10:23:50  1              MR. DANE:  Well, that's not an opinion he

10:23:51  2     properly should give, and he wouldn't be allowed to give

10:23:54  3     that opinion.  So to ask him first, Mr. Tucker didn't do

10:23:58  4     this -- didn't offer this opinion.  The question that

10:24:02  5     Mr. Pfeiffer asked that was pending on my objection was,

10:24:05  6     And have you reviewed evidence that's inconsistent with

10:24:08  7     Mr. Tucker's assumption?

10:24:09  8              THE COURT:  Yeah.  That's the problem.

10:24:11  9              MR. PFEIFFER:  I will reframe the question.

10:24:13 10              THE COURT:  He cannot do that.

10:24:14 11              MR. PFEIFFER:  I will not have him do that.

10:24:16 12              THE COURT:  All he can say is, in calculating a

10:24:18 13     damage for future lost profits, is it proper for an expert

10:24:26 14     to make assumptions about whether they are going to stay

10:24:33 15     in business or not, or whether there's a source of supply.

10:24:36 16     That's all.

10:24:38 17              MR. PFEIFFER:  Without assessing whether those

10:24:39 18     are reasonable under the circumstances.  Because that is

10:24:43 19     what experts are supposed to do, and the case law is

10:24:46 20     clear.

10:24:47 21              THE COURT:  Actually, that's not -- they can, in

10:24:49 22     fact, make assumptions.

10:24:54 23              MR. DANE:  It would also be very --

10:24:55 24              THE COURT:  They make assumptions.

10:24:56 25              MR. DANE:  It would also be very misleading if

Kaplan – Direct

10:24:58  1    that question were asked, Your Honor, because Mr. Tucker

10:25:02  2    testified, as Mr. Pfeiffer well knows, that he did -- he

10:25:12  3    wasn't expressing an opinion as to the availability of

10:25:14  4    alternative supply, but he did review the evidence

10:25:16  5    relating to that issue and that he felt confident that he

10:25:18  6    was making a responsible assumption.  So to ask this

10:25:21  7    witness a question to suggest that Mr. Tucker did not do

10:25:24  8    that would be extremely misleading when this is --

10:25:26  9              THE COURT:  Well, you can argue that.

10:25:28 10              MR. PFEIFFER:  And he's just said now that

10:25:33 11    Mr. Tucker has suggested that he conducted an analysis

10:25:34 12    when, in fact, he said I assumed it.

10:25:35 13              THE COURT:  He reviewed to assess whether the

10:25:37 14    assumptions were reasonable.

10:25:41 15              MR. PFEIFFER:  That's correct.

10:25:41 16              THE COURT:  And you want him to say that you

10:25:42 17    have to conduct an assessment as to whether they are

10:25:46 18    reasonable.

10:25:47 19              MR. PFEIFFER:  Yeah.  That takes into account

10:25:49 20    the evidence in the case.

10:25:51 21              THE COURT:  Objection overruled as to that

10:25:53 22    question and that question only.

10:25:57 23              MR. PFEIFFER:  Yes, Your Honor.

10:25:57 24              THE COURT:  And no more beyond that.

10:25:59 25              MR. PFEIFFER:  Yes, Your Honor.  Thank you.

Kaplan – Direct

10:26:01 1          (End of sidebar discussion.)

10:26:04 2          THE COURT:  All right.

10:26:05 3          MR. PFEIFFER:  May I proceed, Your Honor?  Thank

10:26:06 4 you.

10:26:08 5 Q    In your work as an expert in damages, is it

10:26:15 6 appropriate for an expert to assume certain facts without

10:26:23 7 looking to see whether the assumptions they are making are

10:26:27 8 reasonable in light of the evidence in the case?

10:26:30 9 A    Not in my opinion.

10:26:41 10 Q    Let's turn to the future lost profits claim that we

10:26:46 11 have up here.  You have your summary of conclusions.  The

10:26:52 12 first one we talked about, which is the assumption that

10:26:54 13 Steves will not have a supply.  And then item number 2

10:26:58 14 says based on the conclusion that Steves would go out of

10:27:01 15 business without a supply of door skins and receive no

10:27:04 16 value for its business?

10:27:05 17 A    Yes, sir.

10:27:05 18 Q    What are you referring to as "receive no value for

10:27:09 19 its business"?

10:27:09 20 A    Yes.  In Mr. Tucker's calculations, he projects

10:27:15 21 alleged lost future profits beginning September '21

10:27:18 22 through 2029.  But he does not consider that Steves, if it

10:27:23 23 were, in fact, forced out of business, could receive value

10:27:27 24 for assets that it had at the time that it could sell.

10:27:31 25 And that is actual real money to Steves that should be

Kaplan – Direct

10:27:34 1    offset against a damage claim.

10:27:37 2    Q    And when you say assets it could sell, what are you

10:27:41 3    referring to?

10:27:42 4    A    Well, Steves has three door plants.  It has a brand

10:27:45 5    name.  It has other assets that have value.

10:27:48 6    Q    And you're saying if it went out of business, as is

10:27:51 7    the assumption here, what would you expect to have happen

10:27:54 8    as an economist and a damages expert?

10:27:57 9    A    That Steves would attempt to sell those assets and

10:27:58 10   get the most for them that they could.

10:28:00 11   Q    And did Mr. Tucker include any value whatsoever for,

10:28:05 12   when the business going out of business, selling its

10:28:09 13   assets?

10:28:09 14   A    He did not.

10:28:17 15   Q    From an economics perspective -- economic damage

10:28:22 16   perspective, what would be the implications of awarding

10:28:25 17   future lost profits today if Steves were, in fact, able to

10:28:29 18   obtain a sufficient supply of door skins and remain in

10:28:32 19   business?

10:28:32 20   A    It would allow Steves to collect twice for the same

10:28:36 21   damages.

10:28:37 22   Q    And was this an issue that you raised in your reports

10:28:39 23   in this case?

10:28:40 24   A    Absolutely.

10:28:42 25   Q    Did Mr. Tucker respond to that?

Kaplan - Direct

10:28:43 1    A    He did not.

10:28:46 2    Q    If we turn back to your slide 4 here, and if you'd

10:28:52 3    look at the third bullet on slide 4?

10:28:54 4    A    Yes, sir.

10:28:55 5    Q    You say there that Mr. Tucker's actual calculations

10:28:58 6    are speculative and unreliable?

10:29:00 7    A    I do.

10:29:01 8    Q    Can you explain what you mean by that, sir?

10:29:03 9    A    That the numbers cannot be relied on from an economic

10:29:08 10   standpoint to reflect actual damage to Steves.  They are

10:29:13 11   simply too speculative.

10:29:14 12   Q    And have you looked at some of the key aspects of the

10:29:18 13   variables he used that were speculative?

10:29:20 14   A    Yes, I did.

10:29:22 15           MR. PFEIFFER:  Would you please put up slide 6,

10:29:24 16   Gail.

10:29:27 17   Q    These -- this slide represents what you think are the

10:29:29 18   key variables that create problems in the reliability and

10:29:35 19   speculativeness of his work?

10:29:37 20   A    Yes, these are.

10:29:37 21   Q    Would you start with the first one there, housing

10:29:39 22   starts?  What did you conclude with regard to Mr. Tucker's

10:29:42 23   use of housing starts to estimate Steves' future lost

10:29:46 24   profits?

10:29:46 25   A    Mr. Tucker uses housing starts as a predicate for

Kaplan - Direct

10:29:51 1  estimating what Steves' revenues will be in the future,

10:29:55 2  and the housing starts estimate that he provides through

10:29:58 3  2029 is itself speculative.  It's not reliable.

10:30:04 4  Q    So to be clear, as part of his analysis, he projected

10:30:09 5  what future levels of housing starts would be through a

10:30:12 6  period 12 years after he did those calculations in 2017?

10:30:15 7  A    Yes.

10:30:15 8  Q    Okay.  And why do you say those are unreliable?

10:30:19 9  A    Because the -- we could actually look at them.  That

10:30:23 10 would be quite helpful, Mr. Pfeiffer, but the --

10:30:26 11 Q    Let's do that, then.  Let's be helpful.

10:30:29 12         MR. PFEIFFER:  Would you please put up

10:30:30 13 Mr. Tucker's work paper 12D(s).

10:30:36 14 Q    This is one of Mr. Tucker's calculations in his

10:30:40 15 assessment of future lost profits, right?

10:30:43 16 A    Yes.  This work paper is the basis for Mr. Tucker's

10:30:46 17 estimate of both housing starts and Steves' sales for 12

10:30:51 18 years into the future.

10:30:52 19 Q    And so what's the relationship, as Mr. Tucker has

10:30:55 20 done this, between the housing starts and Steves' sales?

10:31:00 21 A    Mr. Tucker maintains that Steves' sales are related

10:31:04 22 to housing starts, and so he starts by first estimating

10:31:09 23 housing starts to get a basis to estimate Steves' sales.

10:31:13 24 Q    Could you show us where he projects housing starts on

10:31:17 25 this document?

Kaplan - Direct

10:31:17 1    A    Yes.

10:31:19 2            THE COURT:  You can actually draw on that, if

10:31:21 3    you put your finger on it and circle where you're talking

10:31:26 4    about, if you want to.

10:31:26 5            THE WITNESS:  Thank you, Your Honor.

10:31:28 6            MR. PFEIFFER:  Nice.  Thank you, Your Honor.

10:31:29 7            THE WITNESS:  I'm not sure my drawing is very

10:31:32 8    good, sir, but --

10:31:33 9            THE COURT:  You get an A.

10:31:36 10   A    So -- I'm sorry, Mr. Pfeiffer.

10:31:37 11   Q    So what is it that you've circled here in yellow with

10:31:41 12   your figures?

10:31:42 13   A    Yeah.  So these are projected housing starts

10:31:45 14   beginning in 2017.  So that you see the number there, the

10:31:48 15   1.2 million.  And they continue all the way through 2027.

10:31:54 16   The document has another page.  So 2028 and 2029 are in

10:31:59 17   the next page.

10:32:00 18       But what you see here is that Mr. Tucker is

10:32:03 19   estimating that the number of housing starts in the United

10:32:05 20   States as a whole is going to go up every single year, all

10:32:09 21   the way up through 2022 to 1.5 million housing starts and

10:32:16 22   then never go down for another 7 years.

10:32:20 23   Q    So for the 12-year period, he has it going up to a

10:32:23 24   certain point and then never ever going down?

10:32:26 25   A    Never ever going down.

Kaplan - Direct

10:32:27  1  Q    Do you believe that projection is a reliable estimate

10:32:30  2  of future housing starts?

10:32:32  3  A    Absolutely not.

10:32:33  4  Q    Why not?

10:32:34  5  A    Well, if we could, and if I could --

10:32:37  6              THE WITNESS:  Your Honor, if I could circle

10:32:38  7  another column?

10:32:39  8              THE COURT:  I think you can.

10:32:43  9  A    So what I've --

10:32:45 10  Q    What have you just circled now?

10:32:47 11  A    What I've just circled now is actual -- actual

10:32:50 12  housing starts for the 10-year period before Mr. Tucker

10:32:54 13  begins his projection of what they might be for 12 years.

10:32:58 14  And if we look at what happened to actual housing starts

10:33:01 15  based on Mr. Tucker's own calculations, what actually

10:33:05 16  happened in the real world, you see that the housing

10:33:07 17  starts to climb dramatically from 2007 from well over a

10:33:12 18  million dollars to around 500,000.  They stayed very low.

10:33:18 19  And all the way through 2016, every single one of those

10:33:22 20  numbers in the real world are below the numbers that

10:33:26 21  Mr. Tucker says are going to happen for the next 12 years

10:33:30 22  in the future.

10:33:31 23  Q    And is --

10:33:32 24              THE COURT:  Excuse me.  You said well over a

10:33:34 25  million dollars.  You mean well over a million starts?

Kaplan - Direct

| | | |
|---|---|---|
| 10:33:37 | 1 | THE WITNESS: Yes, sir. Thank you, Your Honor. |
| 10:33:39 | 2 | Q   And is the problem that housing starts tend to be |
| 10:33:42 | 3 | cyclical with ups and downs as the economy itself |
| 10:33:45 | 4 | experiences? |
| 10:33:46 | 5 | A   Absolutely. |
| 10:33:47 | 6 | Q   Okay.  And would you expect that to happen in the |
| 10:33:49 | 7 | future at some point over a 12-year period out? |
| 10:33:53 | 8 | A   Yes.  The concept of a business cycle in the American |
| 10:33:56 | 9 | economy where things go up or down, we have recessions, we |
| 10:33:59 | 10 | have good periods, that's what's reflected in the real |
| 10:34:02 | 11 | world.  It's not reflected in what Mr. Tucker projected is |
| 10:34:06 | 12 | going to happen in the future.  They are totally |
| 10:34:08 | 13 | inconsistent. |
| 10:34:11 | 14 | MR. PFEIFFER:  Gail, do you know how we get rid |
| 10:34:12 | 15 | of those little marks for now? |
| 10:34:14 | 16 | THE COURT:  I think we get -- yeah.  I think |
| 10:34:16 | 17 | there's a place up there at the top. |
| 10:34:22 | 18 | THE CLERK:  I can do it, Your Honor. |
| 10:34:23 | 19 | THE COURT:  Okay.  You did it.  Did you find it? |
| 10:34:26 | 20 | MR. PFEIFFER:  Yes.  Gail got it.  Thank you, |
| 10:34:28 | 21 | Your Honor. |
| 10:34:28 | 22 | THE COURT:  We can do it here and we can do it |
| 10:34:30 | 23 | there, but we'll let -- |
| 10:34:31 | 24 | Q   The reason I had those erased, as beautiful as your |
| 10:34:35 | 25 | artwork was, was because I want you to draw again.  Is |

Kaplan – Direct

10:34:38  1    there a similar problem, then, with Mr. Tucker's

10:34:43  2    projection of Steves' future revenues?

10:34:44  3    A     Yes.

10:34:45  4    Q     Would you explain that problem?

10:34:46  5    A     Yes.  So, again, remember that he first begins with

10:34:50  6    the housing starts as a basis to project the revenue that

10:34:54  7    Steves will earn.  Now, this is not their profits.  This

10:34:57  8    is their sales, when they sell doors.  But there's a

10:35:00  9    column here that I'll circle, and you'll see the column

10:35:08 10    heading is "Projected Steves' Revenues."

10:35:11 11          So what Mr. Tucker is doing here, beginning in 2017,

10:35:14 12    is he's saying that he can reliably predict what Steves'

10:35:20 13    sales are going to be year after year after year for the

10:35:24 14    next 12 years into the future.  And what he projects, as

10:35:29 15    you can see in this exhibit, is that their sales are going

10:35:32 16    to grow from 216 million up to well over 300 million.  And

10:35:38 17    the increase is consistently higher.  Every year is

10:35:43 18    higher.  No decline in sales.  No evening off of sales.

10:35:47 19    Every single year, he's projecting that Steves will have

10:35:51 20    good times and their sales will always go up.

10:35:55 21    Q     And, again, if you look at the historical data that

10:35:59 22    Mr. Tucker has himself presented in this very document, is

10:36:03 23    that assumption of always going up to a certain point and

10:36:07 24    never going down consistent with what was experienced in

10:36:11 25    the ten-year period immediately before he starts his

Kaplan – Direct

10:36:14 1  projection?

10:36:15 2  A     Absolutely not.

10:36:16 3  Q     Could you circle that and explain?

10:36:23 4  A     So just like I did with the housing starts, I looked

10:36:27 5  at Mr. Tucker's own data in his own work paper -- that's

10:36:31 6  the basis for his analysis -- and I said to myself, is it

10:36:35 7  reasonable to assume and predict that Steves' sales are

10:36:39 8  simply going to increase all the time and go up way over

10:36:43 9  $300 million?  And I said, let's look at what really

10:36:47 10 happened.  Let's look at the ten years before the

10:36:51 11 projection, what actually happened.

10:36:55 12       And, again, you can see, just like with housing

10:36:56 13 starts, that Steves' sales declined significantly between

10:37:00 14 2007 and 2009, 2010 to below a hundred million dollars.

10:37:05 15 And that decline is not reflected in any of the

10:37:10 16 projections that are also included here where he has the

10:37:14 17 sales going up every single year.  And their sales in the

10:37:18 18 real world, not only did they go down, but they never got

10:37:21 19 above 200 million.  They never got the $300 million.

10:37:25 20 That's the basis of Mr. Tucker's estimate.  So these

10:37:28 21 actual real world evidence, what actually happened, is

10:37:31 22 totally inconsistent with Mr. Tucker's projection of what

10:37:35 23 he thinks is going to happen.

10:37:37 24 Q     And Mr. Tucker used as his -- his formula,

10:37:44 25 essentially, is to take the number of housing starts as a

Kaplan - Direct

10:37:50 1   starting point for the sort of available market that

10:37:54 2   Steves would be able to sell to?

10:37:56 3   A    Yes.

10:37:57 4   Q    But he also had pricing assumptions that entered into

10:37:59 5   this revenue?

10:38:02 6   A    Yes, he did.

10:38:03 7   Q    And did he look, in connection with his work, at how

10:38:06 8   much Steves' pricing had increased since the merger up to

10:38:10 9   the present time?

10:38:12 10  A    Well, embedded in these actual sales numbers, if we

10:38:16 11  could look at 2012 to 2016, you see that their sales did

10:38:26 12  go up.  I'm not quarreling with that.  His projection

10:38:30 13  ignores the decline because his numbers keep going up.

10:38:34 14  But their sales did go up between 2012 and 2016.  And he

10:38:39 15  did look at that.

10:38:40 16  Q    And he also looked at when their sales went up, that

10:38:44 17  was, in part, because their pricing increased, correct?

10:38:47 18  A    Yes.  They substantially raised their price of doors

10:38:50 19  between 2012 and 2016.  They actually raised their price

10:38:54 20  of doors by 26 percent.  Between -- after the merger, they

10:38:59 21  substantially raised their price of doors 26 percent.  And

10:39:02 22  that's why these sales are -- one of the main reasons

10:39:05 23  these sales are going up.

10:39:10 24          MR. DANE:  I want to ask that that testimony be

10:39:12 25  stricken.

Kaplan - Direct

10:39:12  1              THE COURT:  Why is that?

10:39:13  2              MR. DANE:  May I approach?

10:39:15  3              THE COURT:  Yeah.

10:39:17  4              (Discussion at sidebar as follows:)

10:39:20  5              MR. DANE:  Your Honor, this is precisely the

10:39:21  6    Hanover Shoe issue.  He's testifying now about how they

10:39:24  7    increased prices of doors after the merger.  This is

10:39:27  8    completely improper.

10:39:28  9              MR. PFEIFFER:  Your Honor, this is a calculation

10:39:29 10    that Mr. Tucker did.  It's nothing to do with Hanover

10:39:32 11    Shoe.  We're not claiming they weren't injured.  It's a

10:39:36 12    basis for understanding how he gets to his higher revenue

10:39:37 13    numbers.  It's not simply housing starts.

10:39:41 14              THE COURT:  I think Tucker explained how he did

10:39:43 15    it the same way this guy did it.

10:39:46 16              MR. PFEIFFER:  I think so, too, Your Honor.

10:39:47 17              THE COURT:  Objection is overruled.

10:39:49 18              MR. PFEIFFER:  Thank you, Your Honor.

10:39:50 19              (End of sidebar discussion.)

10:39:55 20              THE COURT:  You may consider the evidence.  Go

10:39:59 21    ahead.

10:40:00 22              MR. PFEIFFER:  Thank you, Your Honor.

10:40:01 23    Q   Did you also, Mr. Kaplan, look at whether there were

10:40:05 24    any problems with Mr. Tucker's lost profits modeling from

10:40:09 25    the perspective of a sensitivity analysis?

Kaplan - Direct

10:40:12 1    A     Yes.  Yes, I did.

10:40:15 2    Q     And could you explain basically what a sensitively

10:40:19 3    analysis means?

10:40:19 4    A     Yes.  In addition to asking ourselves whether the

10:40:22 5    projections are consistent with the real world evidence,

10:40:25 6    what actually happened, the other thing we want to do in

10:40:29 7    evaluating the quality and the reliability of the

10:40:32 8    projection is to ask ourselves as to whether the

10:40:36 9    projection is sensitive.  Otherwise -- in other words,

10:40:39 10   does it change a lot if we make changes in various numbers

10:40:44 11   with respect to the projection?  Did the damage numbers

10:40:50 12   change a lot if we change cost, for example, a little bit?

10:40:56 13   If the numbers change a lot, it means that we can't have

10:40:59 14   high confidence that the number that actually is included

10:41:01 15   in the projection is reliable.  It shouldn't be sensitive

10:41:04 16   to small changes.

10:41:07 17          MR. PFEIFFER:  Gail, you can take that slide

10:41:09 18   down.

10:41:09 19   Q     And did you examine -- whoops.

10:41:15 20          THE WITNESS:  Can I keep that, Your Honor?

10:41:17 21          THE COURT:  If you can print it, you can have

10:41:20 22   it.  There's a section of the Virginia Museum that might

10:41:23 23   find it appropriate.

10:41:27 24          MR. PFEIFFER:  It would be helpful if

10:41:28 25   someone can -- oh, thank you.  Thank you very much.

Kaplan - Direct

10:41:32 1   A    I figured it out, Mr. Pfeiffer.

10:41:34 2   Q    So was there work done in this case that enabled you

10:41:38 3   to determine whether Mr. Tucker's work, in fact, suffered

10:41:42 4   from the flaw you just described that it was highly

10:41:45 5   sensitive to small changes in inputs?

10:41:48 6   A    Absolutely.

10:41:49 7   Q    And what was it that you looked at in that regard?

10:41:52 8   A    Well, I started by looking at Mr. Tucker's change in

10:41:56 9   numbers that he actually presented that prove how

10:41:59 10  sensitive his calculations are to small changes in

10:42:03 11  variables that are part of his model.

10:42:05 12  Q    When you say his change in numbers, can you explain

10:42:07 13  what you mean?

10:42:08 14  A    Yes.  In his first two reports, Mr. Tucker provided

10:42:12 15  estimates of the lost profits.  He said in those reports

10:42:17 16  that those estimates were conservative.  But then in his

10:42:21 17  lost report in August, he substantially changed those

10:42:24 18  numbers and had to reduce them.  In other words, the

10:42:27 19  numbers that he said were conservative were actually not

10:42:30 20  conservative.  They were too high.

10:42:32 21  Q    Let me take you back a step before we get to that.

10:42:35 22  What financial data was it that Mr. Tucker relied on in

10:42:39 23  his first report that he had said was conservative?  What

10:42:42 24  data set?

10:42:43 25  A    He used data from just the year 2015 from Steves'

Kaplan - Direct

10:42:47 1   financials to then project what Steves' costs and profits

10:42:52 2   are going to be from that one year for 12 years into the

10:42:55 3   future.

10:42:56 4   Q    Okay.  And that was in April of 2017?

10:42:58 5   A    Yes.

10:42:58 6   Q    Then in August of 2017, he used a different data set?

10:43:03 7   A    Yes.  He used --

10:43:05 8   Q    What did he use?

10:43:06 9   A    He had, in -- by August, he had received an

10:43:09 10  additional 14 months of actual cost in profit data from

10:43:14 11  Steves' financials that ended in February of 2017.  So

10:43:18 12  when he did his first report, he had data for 2015.

10:43:22 13  That's what he used, but then --

10:43:24 14         THE COURT:  Excuse me.  We're not grading the

10:43:26 15  reports.  The issue is what did he use in what he

10:43:30 16  testified to.  And it makes no difference if he gave three

10:43:34 17  different versions of things based on changing data that

10:43:37 18  he received.  We're not grading that process.  What we're

10:43:42 19  doing is looking at what he testified to in court.  And

10:43:44 20  that's all that you ask about.  Otherwise we're back into

10:43:49 21  the report problem again.

10:43:50 22         MR. PFEIFFER:  May we approach, Your Honor,

10:43:50 23  because I think this is something different?

10:43:52 24         THE COURT:  It's not something different.

10:43:54 25         MR. PFEIFFER:  It actually relates to the

Kaplan – Direct

10:43:55  1  sensitivity analysis, Your Honor.

10:43:57  2          THE COURT:  Take what sensitivity analysis he

10:43:59  3  applied to what was testified to in court.  That's what

10:44:03  4  makes the difference.  If he made -- suppose he made a

10:44:07  5  sensitivity analysis in the first process, or didn't, and

10:44:11  6  then in the second he did but he used a different figure.

10:44:14  7  It doesn't make any difference.  It's what he said in

10:44:17  8  court that counts.

10:44:17  9          MR. PFEIFFER:  And, Your Honor, if I may, this

10:44:19 10  goes directly to what he said in court.

10:44:21 11          THE COURT:  No, it doesn't.  You're talking

10:44:22 12  about -- you get there another way.  You're grading the

10:44:25 13  reports, and that's not available to the jury.  They are

10:44:28 14  not even -- they can't even look at them.  So it's unfair

10:44:32 15  to have the testimony talk about the reports when what he

10:44:36 16  ought to be talking about is what the man's testimony was

10:44:39 17  in court.

10:44:42 18          MR. PFEIFFER:  Well, Your Honor, I'd still like

10:44:44 19  to approach on this so I could explain.  May I approach?

10:44:51 20          THE COURT:  This is your last Ito approach.

10:44:54 21  Come on.

10:44:55 22          MR. PFEIFFER:  Thank you, Your Honor.

10:44:56 23          THE COURT:  I mean, really and truly, you've

10:44:59 24  just got to accept something as a result of the decision.

10:45:03 25          (Discussion at sidebar as follows:)

Kaplan - Direct

10:45:03  1                THE COURT:  What is it?

10:45:07  2                MR. PFEIFFER:  Your Honor, we are not grading

10:45:08  3  his reports.

10:45:10  4                THE COURT:  You are.

10:45:10  5                MR. PFEIFFER:  It's a sensitivity analysis that

10:45:12  6  he did that relates to the final figure that he presented.

10:45:15  7                THE COURT:  Then he can say he did sensitively

10:45:18  8  analyses and they changed over time.

10:45:20  9                MR. PFEIFFER:  Okay.

10:45:21 10                THE COURT:  And that's all you can say.

10:45:24 11                MR. PFEIFFER:  Okay.

10:45:25 12                THE COURT:  Because you need to apply to what

10:45:26 13  went on here.  You're making the issue was this report

10:45:29 14  good?  Was that report good?  Was that report good?

10:45:33 15                MR. PFEIFFER:  I'm not trying to do that.

10:45:35 16                THE COURT:  You were doing that.  So you can ask

10:45:37 17  the question that I told you.

10:45:45 18                MR. PFEIFFER:  Thank you.

10:45:45 19                (End of sidebar discussion.)

10:45:55 20  Q    In the course of your sensitivity analysis, did you

10:45:58 21  look at the number that Mr. Kaplan -- sorry -- Mr. Tucker

10:46:01 22  used that he entitled "Cost of Sales"?  Do you recall

10:46:04 23  that?

10:46:05 24  A    Yes.

10:46:05 25  Q    Okay.  And if you'd --

Kaplan - Direct

10:46:12 1        MR. PFEIFFER:  I guess, Gail, if you have

10:46:14 2   Schedule 12D(s) again.

10:46:22 3   Q    I believe -- so this is -- if I've got the right one,

10:46:25 4   this is from the supplemental August report, correct?

10:46:29 5   A    Yes.

10:46:29 6   Q    So you'll see Mr. -- oh, sorry.  That's your 12D(s).

10:46:37 7        MR. PFEIFFER:  Actually, let's take that down.

10:46:38 8   A    No.  That's Mr. Tucker's.

10:46:38 9   Q    This is Mr. Tucker's sheet?

10:46:41 10  A    Yes.

10:46:41 11  Q    Oh, okay.  So Mr. Tucker here, in his sheet with what

10:46:44 12  he finally reported, he used a cost of sales figure of

10:46:49 13  79 percent as his average, correct?

10:46:53 14  A    Yes.

10:46:54 15  Q    And that's what he testified about here in court,

10:46:56 16  that he used that figure?

10:46:58 17  A    Yes.

10:46:58 18  Q    Okay.  And if he had used a sensitivity -- a cost of

10:47:04 19  sales figure of 77.9 percent, how much difference would

10:47:08 20  that make to his calculation of damages?

10:47:13 21  A    If he had used the 2015 number, it would raise his

10:47:17 22  damage estimate by about $7 million.

10:47:21 23       MR. PFEIFFER:  Gail, could you put up Kaplan

10:47:24 24  slide 8, please.  No.  That's Tucker slide 8, I believe.

10:47:47 25  Q    This is a slide that you have prepared that shows the

Kaplan – Direct

10:47:50 1    effect on the amount of damages that Mr. Tucker's

10:47:55 2    methodology produces depending on how you change the cost

10:47:58 3    of sales that he uses?

10:48:01 4    A    It -- yes.

10:48:02 5    Q    Okay.  Would you explain how that works?

10:48:05 6    A    Yes.  So Mr. Tucker -- if you use the 2015 data

10:48:10 7    alone.

10:48:11 8    Q    Let's just use the numbers.  If you use a

10:48:13 9    77.2 percent figure, what amount of damages does his model

10:48:17 10   produce?

10:48:18 11   A    53.5 million for the period all the way through 2029.

10:48:23 12   Q    Okay.  And for that same time period through 2029, if

10:48:27 13   you make the relatively small adjustment in the cost of

10:48:31 14   sales to 79 percent, what happens to the amount of

10:48:35 15   damages?

10:48:36 16   A    They decline substantially to 46.5 million.

10:48:39 17   Q    And how about if you move from 79 percent to

10:48:42 18   79.8 percent?  What happens to his damages figures?

10:48:46 19   A    They fall another $6 and a half million.

10:48:48 20   Q    Okay.  To that 40.1 million that's referred to there?

10:48:52 21   A    Yes.

10:48:53 22   Q    And are you adopting the position that any of those

10:48:55 23   is an appropriate measure of damages?

10:48:58 24   A    No.  These are all -- these are all speculation.

10:49:00 25   Q    But what does this change, when you make small

Kaplan - Direct

10:49:03 1   adjustments to the cost of sales, tell you about the

10:49:06 2   reliability of Mr. Tucker's methodology?

10:49:09 3   A    What it means is that small changes in costs cause a

10:49:16 4   substantial change in the damage number.  As a result, it

10:49:21 5   means that we can't have confidence, economically reliable

10:49:27 6   numbers to project 12 years in the future.  When the

10:49:30 7   numbers change by such a small amount in terms of the

10:49:35 8   costs but then the damage estimate changes so

10:49:39 9   dramatically, it means that we can't have confidence in

10:49:42 10  the reliability of the numbers.

10:49:44 11       And this is particularly important because the costs

10:49:47 12  could change in 2018 and they could change in 2019 and

10:49:53 13  2020 and 2021 before we even begin to make the projection,

10:49:57 14  which doesn't start until 2021.  If those costs change,

10:50:03 15  these numbers could change again and again and again and

10:50:06 16  again.  We just can't have any confidence that we can

10:50:09 17  predict the future like Mr. Tucker says.

10:50:13 18  Q    So there's the problem of the small changes in cost

10:50:16 19  of sales causing big changes in damages.  And it sounds

10:50:19 20  like there's also a problem because these damages won't

10:50:22 21  even start for more than three and a half years from now;

10:50:25 22  is that right?

10:50:26 23  A    Yes.  And there are other costs that are changing

10:50:29 24  here.  This is an example of the most important cost.  But

10:50:32 25  absolutely.  If we had data from the next three and a half

Kaplan - Direct

10:50:35 1   years, that would educate us meaningfully about what's

10:50:39 2   actually going to happen to their costs. But the

10:50:42 3   projection doesn't begin until 2021. And so we're just

10:50:46 4   ignoring -- as part of this process, we're just ignoring

10:50:51 5   the real world evidence of what's actually going to happen

10:50:54 6   to their books and records. But we do know that when

10:50:57 7   their costs change from year to year, that the profit

10:51:00 8   changes are dramatic.

10:51:02 9   Q    Now, you recall, Mr. Kaplan, when Mr. Tucker was

10:51:07 10  here, he testified that he used a method called a discount

10:51:12 11  rate to account for uncertainties in his -- in his

10:51:16 12  methodology?

10:51:17 13  A    Yes.

10:51:17 14  Q    And does that solve the problems with the model that

10:51:21 15  you've identified here this morning?

10:51:25 16  A    It does not.

10:51:26 17  Q    Why not?

10:51:27 18  A    Well, number one is the discount rate doesn't have

10:51:30 19  anything to do with the possibility that they might be

10:51:34 20  able to obtain a supply of door skins, which would make

10:51:37 21  all these calculations irrelevant. If they get door

10:51:41 22  skins, they wouldn't go out of business.

10:51:42 23       But secondly is that Mr. Tucker used the same

10:51:45 24  discount rate when he estimated the damages were 53.5 and

10:51:49 25  said they were conservative but used the same discount

Kaplan – Direct

10:51:52  1  rate again to say that the 46.5 million number was

10:51:56  2  conservative.  In other words, it changed by $7 million.

10:51:59  3  And it's -- what that means is the discount rate for the

10:52:04  4  higher number can't be reliable to adjust for all the

10:52:07  5  uncertainty because we found another year of data and the

10:52:11  6  number changes by $7 million.  It's not adjusting properly

10:52:15  7  for uncertainty.  We have a proof positive in his own

10:52:19  8  analysis.

10:52:20  9  Q    So what is your ultimate conclusion about the

10:52:22 10  reliability of Mr. Tucker's future lost profit

10:52:27 11  calculation?

10:52:27 12  A    It's speculative and unreliable.

10:52:30 13          MR. PFEIFFER:  Thank you, Mr. Kaplan.

10:52:47 14          THE COURT:  Are you all all right to continue or

10:52:49 15  do you need a break?  Everybody all right now?  Okay.

10:53:12 16      Thank you.

10:53:18 17          MR. DANE:  May I proceed, Your Honor?

10:53:19 18          THE COURT:  I think she's got something she

10:53:21 19  wants to hand out there.

10:53:23 20          MR. DANE:  Sorry.  Those are just your reports.

10:53:34 21          THE WITNESS:  Thank you, Mr. Dane.

10:53:38 22          THE COURT:  I take it you're not going to get

10:53:39 23  into those either?

10:53:41 24          MR. DANE:  No, I don't think so.  Hopefully not,

10:53:43 25  Your Honor.

Kaplan – Cross

10:53:44 1          THE COURT:  Not after what you objected to.

10:53:58 2      One package of it is your deposition, Dr. Kaplan.

10:54:05 3          THE WITNESS:  I'm sorry, sir?

10:54:07 4          THE COURT:  One of those notebooks is a copy of

10:54:09 5  your deposition.

10:54:10 6          THE WITNESS:  Yes, sir.  Thank you.

10:54:12 7          THE COURT:  One is a copy of your reports.  The

10:54:14 8  black one is some exhibits, I gather.

10:54:19 9          THE WITNESS:  Yes, sir.  Thank you.

10:54:20 10         THE COURT:  Wait a minute.  We've got more.

10:54:25 11         MR. DANE:  Okay.  I think we're set to go, Your

10:54:26 12 Honor.

10:54:26 13                    **CROSS-EXAMINATION**

10:54:26 14 BY MR. DANE:

10:54:28 15 Q    Good morning, Mr. Kaplan.

10:54:30 16 A    Good morning, Mr. Dane.

10:54:31 17 Q    Let me start by asking you about your opinions

10:54:34 18 relating to the overcharge issues in the contract.  And I

10:54:38 19 noticed that in the slides that Mr. Pfeiffer showed you,

10:54:42 20 you called those contract damages.  But you're not

10:54:45 21 expressing an opinion as to whether those damages may also

10:54:49 22 be recoverable as antitrust damages, are you?

10:54:51 23 A    That sounds like a legal issue, sir.  I'm not

10:54:54 24 offering any legal opinions.

10:54:56 25 Q    Okay.  Now, you understand that Mr. Tucker did a

Kaplan - Cross

10:54:58 1    detailed analysis of Jeld-Wen's costs for the key inputs

10:55:02 2    in the supply agreement?

10:55:04 3    A    Yes, sir.

10:55:05 4    Q    And you're not offering any opinion that Mr. Tucker

10:55:08 5    incorrectly calculated the key input cost differences for

10:55:12 6    the various years under that agreement, are you?

10:55:14 7    A    I did not check his arithmetic.  I don't know whether

10:55:17 8    they are accurate or not.

10:55:19 9    Q    Okay.  And you actually -- in your analysis, you used

10:55:23 10   the calculations that Mr. Tucker had performed of what the

10:55:27 11   proper input cost data was and then applied different

10:55:30 12   presumptions that have been given to you by Jeld-Wen's

10:55:33 13   counsel; isn't that right?

10:55:34 14   A    Yes, sir.

10:55:35 15   Q    Okay.  And -- so you're not disputing the figures

10:55:40 16   that Mr. Tucker testified to with regard to, for example,

10:55:45 17   the amounts that Steves actually paid for door skins to

10:55:48 18   Jeld-Wen for the relevant years, or from 2013 through

10:55:52 19   May 2017?

10:55:53 20   A    The actual prices they paid?

10:55:55 21   Q    Correct.

10:55:56 22   A    I am not.

10:55:58 23         MR. DANE:  If we could pull up, Phil, Schedule

10:56:00 24   1F2S.

10:56:04 25   Q    And this should be in your binder, Mr. Kaplan.  I

Kaplan - Cross

10:56:07 1  think it's towards -- I think it might be the last one.

10:56:10 2  And so we see here, these are just figures.

10:56:15 3         MR. DANE:  They are, Your Honor, from

10:56:17 4  Mr. Tucker's report, but I am just interested in the

10:56:20 5  numbers.

10:56:20 6  Q    So, for example, from 2015, when Mr. Tucker

10:56:23 7  calculated that the total quantity of door skins that

10:56:26 8  Steves had purchased from Jeld-Wen was 7,372,275 units,

10:56:33 9  you don't disagree with that, right, sir?

10:56:35 10 A    I have not specifically checked that arithmetic.

10:56:38 11 Q    But you have no reason to believe that's incorrect,

10:56:40 12 correct?

10:56:41 13 A    I have no reason to believe one way or the other.

10:56:43 14 Q    You assumed -- you told me that you took, as a basis

10:56:47 15 for your own calculations, the calculations that

10:56:49 16 Mr. Tucker had done, which included these amounts of

10:56:52 17 quantity, correct?

10:56:53 18 A    I did some sensitively tests on -- to reflect

10:56:55 19 different assumptions, that's correct.

10:56:57 20 Q    Okay.  And you have no reason to dispute the average

10:56:59 21 door skin cost reflected here in 2015 of $.49, do you,

10:57:03 22 sir?

10:57:04 23 A    Again, I haven't specifically checked the arithmetic,

10:57:08 24 sir.  I'm sorry.

10:57:13 25 Q    And you were here during Mr. Tucker's direct

Kaplan - Cross

10:57:15  1    examination?

10:57:16  2    A    Yes, sir.

10:57:18  3            MR. DANE:  Okay.  Let me put up -- if we could

10:57:22  4    put up, Phil, slide 10, which was used during Mr. Tucker's

10:57:26  5    examination.

10:57:29  6    Q    And I think -- I think Mr. Pfeiffer may have shown

10:57:31  7    you this as well in your direct examination.

10:57:36  8            MR. DANE:  And, Your Honor, we had been asked to

10:57:38  9    mark the demonstratives just for the record that

10:57:40 10    Mr. Tucker used.  So we will mark this as PTX 903 and

10:57:45 11    provide it the Court subsequently.

10:57:47 12            THE COURT:  I thought last night you said you

10:57:48 13    weren't going to have demonstratives as exhibits.

10:57:52 14            MS. MALTAS:  That's exactly right, Your Honor.

10:57:54 15    The parties agreed that demonstratives are not exhibits.

10:57:58 16            MR. DANE:  I wasn't suggesting it was an

10:57:58 17    exhibit, Your Honor.  I thought Your Honor wanted it

10:58:01 18    marked just for purposes of the record, not to go to the

10:58:02 19    jury.  But if that's not necessary, that's fine.

10:58:05 20            THE COURT:  All right.

10:58:08 21    Q    So, again, looking at these figures, Mr. Kaplan, just

10:58:12 22    to be clear, you're not disputing the accuracy of

10:58:14 23    Mr. Tucker's calculation that the overcharge with regard

10:58:19 24    to door skins other than the Madison and Monroe door skins

10:58:24 25    for the 2013 through 2017 time period would be

Kaplan - Cross

10:58:27  1   $8,630,567 -- excuse me -- $8,630,567 if the jury

10:58:39  2   concludes that under the contract, prices could go down as

10:58:43  3   well as up?

10:58:45  4   A   I apologize, Mr. Dane, but I have not checked the

10:58:48  5   arithmetic.  I wasn't asked to do that as part of my work

10:58:51  6   in that matter.  So I can't tell you whether the numbers

10:58:54  7   are right or wrong.

10:58:59  8          MR. PFEIFFER:  Your Honor, in the interest of

10:59:00  9   expediting, I think that's been established now pretty

10:59:02 10   readily.  I don't think we need to do that as to every

10:59:05 11   figure in the case.

10:59:07 12   Q   And your answer -- we can short-circuit this.  Your

10:59:10 13   answer would be the same with regard to the $1,303,035

10:59:15 14   figure for Madison and Monroe?  You are not here in court

10:59:18 15   telling the jury that Mr. Tucker's calculation of that is

10:59:21 16   incorrect, are you, sir?

10:59:23 17   A   I am not.  I don't know one way or the other.

10:59:26 18   Q   Because you didn't look at that, did you?

10:59:28 19   A   I wasn't asked to look at that.  No, sir.

10:59:30 20   Q   And you didn't look at it?

10:59:31 21   A   I did not.

10:59:38 22   Q   And were you here in court when Mr. Mallard

10:59:42 23   testified?

10:59:43 24   A   I was not here, but I've read Mr. Mallard's

10:59:46 25   testimony.

Kaplan - Cross

10:59:47 1  Q    And did you hear him testify to Jeld-Wen's position

10:59:51 2  that if its key input costs went up by 2 percent in 2018,

10:59:56 3  that Jeld-Wen could take a 1 percent price increase from

11:00:00 4  the prices it charged in 2017?

11:00:02 5        MR. PFEIFFER:  Your Honor, I believe this is

11:00:04 6  actually the issue that Mr. Dane raised during direct

11:00:07 7  examination and that we are not supposed to go into.

11:00:11 8        MR. DANE:  I'll withdraw the question, Your

11:00:12 9  Honor.

11:00:13 10 Q    Okay.  You testified a little bit, Mr. Kaplan, about

11:00:23 11 Mr. Tucker having included Towanda in his overcharge

11:00:27 12 calculations.  Do you recall that?

11:00:29 13 A    Yes, sir.

11:00:29 14 Q    Okay.  And in your first -- I do have to -- okay.

11:00:38 15       THE COURT:  Ask him the question, and we're not

11:00:41 16 grading his reports.

11:00:44 17 Q    Now, you had the ability, didn't you, Mr. Kaplan, to

11:00:49 18 perform an alternative calculation based upon the final

11:00:55 19 figures in Mr. Tucker's final analysis of damages in which

11:01:02 20 you could have backed out the effect of Towanda on the

11:01:06 21 overcharge issue; isn't that right?

11:01:09 22       MR. PFEIFFER:  Your Honor, I believe that's

11:01:09 23 incorrect, given the scheduling of the expert reports.

11:01:13 24 There was no opportunity to do so.

11:01:19 25       THE COURT:  Mr. Dane, I don't think he said to

Kaplan - Cross

11:01:24 1    submit a report.  He said you could have before you --

11:01:27 2    basically anytime up to the time it was done, presumably

11:01:31 3    until he testified today, I guess.  I don't know.  There

11:01:33 4    wasn't any time limit put on it, and it wasn't linked to a

11:01:36 5    report.  So does your question have to do with --

11:01:41 6              MR. DANE:  Yes.  That's the question, Your

11:01:42 7    Honor.  I'm trying to be sensitive to the Court not

11:01:43 8    wanting us to get bogged up in the reports.  He had

11:01:44 9    done --

11:01:47 10   Q    You had done that calculation in an earlier report,

11:01:51 11   correct, sir?

11:01:52 12   A    I did do a calculation that showed if you removed

11:01:55 13   Towanda from Mr. Tucker's calculations, that Steves would

11:01:58 14   actually owe Jeld-Wen money.  There are no overcharges.

11:02:01 15   Q    That's actually not -- that's not the question that I

11:02:02 16   asked, sir.  So if you'd please just answer my question.

11:02:05 17   A    I apologize.

11:02:07 18   Q    And it's also not an accurate answer to my question,

11:02:07 19   sir.

11:02:08 20             THE COURT:  I'm going to strike the answer

11:02:09 21   because it wasn't responsive to the question.  Please get

11:02:13 22   the question up again.

11:02:15 23             MR. DANE:  Yes, sir.

11:02:16 24   Q    Now, in fact, when you said that Steves would have

11:02:19 25   owed Jeld-Wen money, Mr. Kaplan --

Kaplan - Cross

11:02:21 1          THE COURT:  I just struck that.

11:02:23 2          MR. DANE:  Okay.  I'll move on.

11:02:24 3          THE COURT:  Do you want it back in?

11:02:28 4          MR. DANE:  I --

11:02:29 5          THE COURT:  I struck it because it wasn't

11:02:31 6   responsive to the question, and I struck it in response to

11:02:33 7   your objection.  So I sustained your objection.  Now, what

11:02:37 8   are we going to do here?

11:02:39 9          MR. DANE:  I'll move on.

11:02:47 10  Q    The calculation that you actually did in your report,

11:02:51 11  Mr. Kaplan, was not only backing out Towanda, but also

11:02:56 12  assuming that Steves was not entitled to any negative

11:02:59 13  price reductions when costs went down; isn't that right?

11:03:02 14  A    Yes, sir.

11:03:02 15  Q    Okay.  And that's -- that calculation is one that you

11:03:09 16  did not do with regard to Mr. Tucker's final damages

11:03:13 17  calculations; isn't that right?

11:03:16 18  A    I didn't understand that I was allowed to.  I didn't

11:03:19 19  get his numbers -- his numbers came at the same time as my

11:03:23 20  last report.

11:03:25 21          MR. DANE:  Your Honor, could I ask that the

11:03:27 22  witness be instructed to answer the questions?  I just

11:03:29 23  asked him if he did it or not.

11:03:31 24          MR. PFEIFFER:  Your Honor, I think that was

11:03:33 25  responsive because of the time constraints.

                              Kaplan - Cross

11:03:35  1              THE COURT:  No.  He took a cue from you.

11:03:37  2    BY MR. DANE:

11:03:37  3    Q    You didn't do it, sir, did you?

11:03:40  4    A    No, sir.

11:03:40  5              THE COURT:  At any time?

11:03:41  6              THE WITNESS:  No, sir.

11:03:42  7              THE COURT:  All right.  That's the question.

11:03:44  8              THE WITNESS:  Yes, sir.

11:03:45  9              THE COURT:  Not whether you did it in a

11:03:46 10    responsive report that was allowed or not allowed.  It's

11:03:50 11    whether from then till now he's done it, and the answer is

11:03:54 12    no.  So let's go.

11:03:56 13    Q    And that's a calculation that you could have done,

11:03:57 14    sir, based on the information available to you, correct?

11:04:00 15              THE WITNESS:  I apologize, Your Honor.

11:04:02 16    A    I didn't know I was allowed to, given the schedule.

11:04:04 17    I'm sorry.

11:04:05 18    Q    Let me clarify my question, Mr. Kaplan.  I'm not

11:04:08 19    asking about issues of whether you'd be allowed to or not.

11:04:11 20    As a matter of the arithmetic, you could have performed

11:04:13 21    that calculation based on the information available to

11:04:19 22    you, correct?

11:04:20 23    A    Yes, sir.

11:04:21 24    Q    Okay.  And even without having performed that

11:04:33 25    calculation, sir, you understand, don't you, that if you

Kaplan - Cross

11:04:37  1   assume that the prices could go down as well as up, even

11:04:41  2   if you took Towanda out of that calculation, there still

11:04:45  3   would have been overcharges to Steves over the 2013

11:04:50  4   through 2017 period?

11:04:51  5   A    I haven't done the calculation.

11:04:53  6   Q    So you're not able to --

11:04:55  7          THE COURT:  I think he's made that clear.  I

11:04:57  8   don't know how much clearer he can make it --

11:04:59  9          MR. DANE:  All right, Your Honor.

11:05:00 10          THE COURT:  -- he hasn't done these

11:05:00 11   calculations.  I think he said he wasn't called upon to do

11:05:07 12   so.

11:05:07 13          MR. DANE:  Okay.

11:05:09 14   Q    So let me move on, Mr. Kaplan, to the defect claims.

11:05:18 15   And with regard to those claims, do you understand that

11:05:22 16   Mr. Tucker reviewed data in a database called Vendor Debit

11:05:28 17   Memo database at Steves?

11:05:31 18   A    Yes, sir.

11:05:31 19   Q    Okay.  You did not review the information in that

11:05:33 20   database, correct?

11:05:34 21   A    At some point I looked at it, but I didn't review it

11:05:37 22   carefully.

11:05:37 23   Q    Okay.  And I believe you testified in response to

11:05:42 24   Mr. Pfeiffer's examination that you understand that

11:05:46 25   Jeld-Wen disputes whether some of the defect claims are

Kaplan - Cross

11:05:50 1   justified; is that right?

11:05:51 2   A    Yes.

11:05:52 3   Q    And one of the examples you used is you referred to

11:05:57 4   trial testimony that, in some instances, Steves might only

11:06:01 5   test four door skins out of a large pallet and then claim

11:06:06 6   the rest of the pallet as defective.  Do you recall that?

11:06:10 7   A    Yes.

11:06:10 8   Q    And do you have an understanding of the particular

11:06:12 9   type of defect that is involved when that happens?

11:06:17 10  A    I -- not specifically.  No, sir.

11:06:19 11  Q    You have no idea, do you, sir?

11:06:21 12       THE COURT:  I think he just said he didn't.

11:06:29 13  Q    Do you have any understanding of the reason that, in

11:06:32 14  those instances, Steves only tests four door skins out of

11:06:38 15  an entire pallet?

11:06:40 16  A    I think Mr. Gartner testified about it, but I

11:06:42 17  didn't -- I can't recall it right now.

11:06:45 18  Q    And you have no opinion of your own as to whether or

11:06:51 19  not it would be appropriate, depending upon the particular

11:06:54 20  type of defect, to determine that an entire pallet of door

11:06:59 21  skins was defective based on testing the top door skins;

11:07:04 22  is that right?

11:07:05 23  A    No.  I am concerned about the reliability of an

11:07:08 24  estimate when the door skins aren't actually being tested.

11:07:13 25  Q    But I believe, as you said, sir, you don't even know

Kaplan – Cross

11:07:16 1  the type of defect that's involved when that type of

11:07:18 2  inspection is done; is that correct?

11:07:20 3  A    Again, I think Mr. Gartner testified about it.  I

11:07:22 4  don't recall it as I sit here.

11:07:24 5  Q    Okay.  Now, you also testified in Mr. Pfeiffer's

11:07:32 6  examination with regard to certain doors for which Steves

11:07:36 7  submitted claims not having been inspected by Jeld-Wen.

11:07:40 8  Do you recall that?

11:07:41 9  A    I think not having been submitted for inspection.

11:07:42 10 Yes, sir.

11:07:44 11 Q    And do you understand, based on the testimony that

11:07:47 12 you've heard in this case, that there was a change in

11:07:52 13 Jeld-Wen policy with regard to whether Jeld-Wen was

11:07:54 14 willing to reimburse the price of doors to its customers

11:07:59 15 where they had sold a door skin -- a defective door skin

11:08:04 16 that was placed in a door around the 2014 period?

11:08:08 17          THE COURT:  Don't answer the question.  There's

11:08:09 18 going to be an objection.

11:08:12 19          MR. PFEIFFER:  This is exactly what Mr. Dane

11:08:14 20 objected to and that we were not to do during the

11:08:17 21 examination was get into the evidence and what it showed.

11:08:20 22 This asks for exactly the same testimony.

11:08:24 23          MR. DANE:  But, Your Honor, he did get into it.

11:08:26 24 You asked me at the time why I did not object.  I planned

11:08:29 25 to cross him on it, which is the reason that I did not

Kaplan - Cross

11:08:31 1   object.

11:08:32 2          THE COURT:  It came in without objection.

11:08:34 3   So overruled.

11:08:39 4   Q   Okay.  Let me repeat the question, Mr. Kaplan.  Do

11:08:41 5   you understand that in 2014, Jeld-Wen adopted a change in

11:08:46 6   policy as to whether or not it was willing to reimburse

11:08:48 7   its customers for the sales price of defective doors

11:08:54 8   containing defective Jeld-Wen door skins?

11:08:57 9   A   I can't comment --

11:08:58 10         MR. PFEIFFER:  Sorry.

11:09:00 11  A   Can I answer?

11:09:02 12         THE COURT:  You can't comment.  Is that what you

11:09:04 13  said?

11:09:04 14  A   I can't comment on a policy issue.  But I did see

11:09:08 15  evidence that prior to 2014, on occasion, that Jeld-Wen

11:09:11 16  would reimburse Steves the value of a door.

11:09:14 17  Q   Okay.

11:09:14 18  A   But I don't know anything about change in policy.

11:09:17 19  Q   Okay.  Fair enough.  Did you hear testimony in

11:09:24 20  court -- you were here when Mr. Gartner testified,

11:09:26 21  correct?

11:09:27 22  A   No, I was not.  I read Mr. Gartner's testimony.

11:09:29 23  Q   Okay.  And were you here when Mr. Sam Steves

11:09:32 24  testified?

11:09:33 25  A   For part of his testimony.  Yes, sir.

Kaplan - Cross

11:09:35  1    Q    Do you understand from their testimony that around

11:09:38  2    the time of the REEB claim, that Jeld-Wen informed Steves

11:09:43  3    that going forward, it would no longer reimburse Steves

11:09:45  4    for the sales price of doors containing defective Jeld-Wen

11:09:50  5    door skins?

11:09:50  6    A    I don't know the particulars of the timing.  But I do

11:09:53  7    know that at some point in time, Jeld-Wen informed Steves

11:09:57  8    that it would not reimburse Steves for the value of the

11:10:03  9    entire door.

11:10:04 10    Q    Okay.  And you read or heard Mr. Gartner's testimony,

11:10:09 11    didn't you, sir, that when Jeld-Wen adopted this policy,

11:10:13 12    it was no longer economical for Steves to have the

11:10:17 13    customer ship the doors back to its plant so that it could

11:10:21 14    then make it available to Jeld-Wen if all that Jeld-Wen

11:10:23 15    was going to reimburse it for was the cost of the door

11:10:26 16    skin?

11:10:26 17    A    Again, I can't comment on the word policy.  But I do

11:10:31 18    remember testimony by Sam Steves concerning that issue.

11:10:36 19    Q    Okay.  I didn't use the word policy in my question,

11:10:41 20    sir, but I think you answered my question.

11:10:43 21    A    Okay.

11:10:46 22    Q    And with regard to the various issues that you

11:10:53 23    testified to concerning questions about the defect claims,

11:10:59 24    you didn't individually evaluate the merits of Jeld-Wen's

11:11:06 25    position with regard to whether some of the claims that

Kaplan - Cross

11:11:11  1    Steves submitted were not justified, did you?

11:11:14  2    A    I'm not offering an opinion about the legal

11:11:16  3    interpretation of the supply agreement.

11:11:18  4    Q    And you did not attempt to quantify the effect that

11:11:23  5    any of these issues may have had on Mr. Tucker's defect

11:11:28  6    damages, did you?

11:11:29  7    A    I disagree with that.

11:11:31  8    Q    Well, you did not offer any alternative defect damage

11:11:35  9    calculation of your own, did you, sir?

11:11:37 10    A    Well, I -- I just have to push back a little bit.  I

11:11:41 11    said, for example, that if Jeld-Wen's interpretation of

11:11:44 12    the supply agreement is correct and it's not required to

11:11:49 13    reimburse for the entire value of the door, then that

11:11:52 14    whole category of damages, the $1.77 million, would be

11:11:56 15    moot.  It would be zero.

11:11:59 16            THE COURT:  That wasn't the question, though.

11:12:01 17    The question was whether you did any alternate damage

11:12:05 18    calculations yourself?  In other words, to say instead

11:12:11 19    of -- just take a number.  Claim of $3 million.  I think

11:12:15 20    it's not 3 million.  I think it's 1.2 million.  You didn't

11:12:18 21    do that?

11:12:19 22            THE WITNESS:  Not with respect to the defective

11:12:21 23    doors in general.  But -- but I do have an opinion that

11:12:26 24    relates to Jeld-Wen's interpretation of the agreement that

11:12:28 25    would make the alternative number, Your Honor, zero.

Kaplan - Cross

11:12:36 1    Q    And there you're referring --

11:12:38 2            THE COURT:  But you can't give the

11:12:41 3    interpretation of the agreement so that's irrelevant.

11:12:43 4    Strike that.

11:12:46 5            But the -- nevermind.  Go ahead.

11:12:50 6    Q    And there was a slide -- I don't think we need to put

11:12:53 7    it up here.  But you -- you had, as one of your slides, I

11:12:59 8    believe, Mr. Kaplan, that Steves' claims with regard to

11:13:07 9    the defective doors was based on the value of the door?

11:13:10 10   Do you recall testifying to that?

11:13:14 11   A    Yes.

11:13:15 12   Q    What do you mean by the value of the door?

11:13:18 13   A    The cost to Steves when they had to replace a

11:13:22 14   defective door.

11:13:22 15   Q    Okay.  That's what I just wanted to clarify.  You

11:13:26 16   understand that the claim that Mr. Tucker was submitting

11:13:28 17   with regard to these doors, he subtracted out of Steves'

11:13:32 18   profit from the sale of the customer, correct?

11:13:34 19   A    Yes.  Yes, sir.

11:13:34 20   Q    So he was only looking for, essentially, the cost

11:13:38 21   that Steves incurred in making a defective door that it

11:13:42 22   ultimately had to dispose of, right?

11:13:44 23   A    Yes, sir.

11:13:52 24   Q    Okay.  Let's turn to the lost profits opinion that

11:13:57 25   Mr. Tucker gave and your testimony about that.  Now, once

Kaplan - Cross

11:14:03  1    again, Mr. Kaplan, with regard to this category of

11:14:07  2    damages, you did not do your own analysis and come up with

11:14:11  3    an alternative number for lost profits, correct?

11:14:14  4    A    I disagree.

11:14:23  5    Q    Did you present a lost profits estimate in your --

11:14:26  6              THE COURT:  You're talking about here in court?

11:14:27  7    You're talking about did he testify to a lost profits

11:14:32  8    analysis here?

11:14:34  9              MR. DANE:  Yes.

11:14:35 10              THE COURT:  Did you give an opinion as to what

11:14:37 11    the lost profits should be?

11:14:39 12              THE WITNESS:  It's speculative, Your Honor.

11:14:41 13    It's zero.

11:14:44 14    Q    So your only -- the only number that you're putting

11:14:47 15    forward for the jury with regard to lost profits is zero?

11:14:50 16    A    It's a speculative estimate.

11:14:52 17    Q    Okay.  Well, let me ask you about some of the aspects

11:14:56 18    of Mr. Tucker's opinion that you have described as being

11:14:59 19    speculative.  You mentioned housing starts.  And

11:15:02 20    Mr. Tucker, in his analysis, he assumed that housing

11:15:06 21    starts would increase at 5 percent per year in the years

11:15:13 22    going forward until they reached 1.5 million in 2022, and

11:15:17 23    then he assumed they would remain flat thereafter; is that

11:15:20 24    right?

11:15:21 25    A    Yes, sir.

Kaplan - Cross

11:15:21 1    Q    Okay.  And you haven't offered your own opinion of

11:15:26 2    what you think a reasonable estimate would be of housing

11:15:28 3    starts from 2021 through 2029, have you?

11:15:31 4    A    I -- based on the history that we actually just

11:15:34 5    looked at, I don't believe you can generate a reliable

11:15:38 6    estimate of housing starts for 12 years into the future.

11:15:41 7    There's just too much volatility in the actual data.

11:15:44 8    Q    Your view is that nobody could possibly make any

11:15:47 9    reasonable estimate of housing starts for that period; is

11:15:49 10   that right?

11:15:49 11   A    Not for purposes of estimating damages, no, sir.

11:15:51 12   Q    Okay.  And you noted, when Mr. Pfeiffer examined you,

11:15:55 13   that the projections that Mr. Tucker made of 5 percent

11:15:58 14   growth through 2022 would be very inaccurate if we looked

11:16:04 15   at the historical data beginning in 2007, right?

11:16:08 16   A    Yes.

11:16:09 17   Q    And 2007 was a special year in the housing market,

11:16:15 18   wasn't it, sir?

11:16:16 19   A    One of many.

11:16:17 20   Q    It was the beginning of the greatest housing

11:16:20 21   recession in the United States history, wasn't it?

11:16:22 22   A    It was the Great Recession.  I haven't looked at what

11:16:25 23   happened in the Great Depression and compared the two.

11:16:27 24   But it was a significant event.  I agree with you.

11:16:31 25   Q    Okay.  And in your analysis that you did for purposes

Kaplan - Cross

11:16:41 1 of this case, you also had occasion to look at estimates

11:16:46 2 of housing starts that were made by Fannie Mae; isn't that

11:16:49 3 right?

11:16:50 4 A    Yes.

11:16:50 5 Q    And Fannie Mae is a governmental mortgage loan

11:16:52 6 entity?

11:16:53 7 A    Yes, sir.

11:16:54 8 Q    And you also looked at estimates by the National

11:16:59 9 Association of Home Builders; is that right?

11:17:01 10 A    Yes.  Estimates that they were only for one or two

11:17:04 11 years.  Not 12 years.

11:17:05 12 Q    Okay.  And do you recall that you looked at the

11:17:07 13 estimates made in 2015 from both of those entities as to

11:17:12 14 what 2016 housing starts would look like?

11:17:14 15 A    Very generally, Mr. Dane.

11:17:17 16 Q    And do you recall that the projections that both of

11:17:22 17 those entities made were on the orders of 25 to 30 percent

11:17:27 18 of growth for that year?

11:17:29 19 A    What I remember is that in 2015, that those two

11:17:33 20 government agencies, when they tried to predict just 1

11:17:36 21 year into the future, not 12, they were wrong.

11:17:40 22 Q    That wasn't quite my question, sir.

11:17:42 23 A    I apologize.

11:17:45 24 Q    Do you recall that what both of these entities were

11:17:49 25 projecting for 2016 housing starts was growth from 2015 on

Kaplan - Cross

11:17:53 1  the order of 20 to 27, or so, percent?

11:18:00 2  A    I don't remember.

11:18:08 3  Q    Why don't we take a look at your deposition.  And if

11:18:10 4  I could ask you to look at page 190.

11:18:24 5  A    Yes, sir.

11:18:24 6  Q    And if you could just read to yourself the question

11:18:27 7  and answer that begins on page 190, line 4 through line

11:18:31 8  14?

11:18:48 9  A    Yes.

11:18:49 10 Q    And do you see here that the projections -- you

11:18:53 11 understand -- does this refresh your recollection that the

11:18:56 12 projections that the National Association of Home Builders

11:18:59 13 was making was from 1,054,000 housing starts in 2015 to

11:19:05 14 1.342 million housing starts in 2016?

11:19:10 15 A    I see the numbers.  Yes, sir.

11:19:12 16 Q    And that's an increase of approximately 27 percent?

11:19:19 17 A    Around there.

11:19:20 18 Q    Okay.  And if you can look in your binder at the

11:19:29 19 document that's labeled "Fannie Mae."

11:19:32 20 A    The black one?

11:19:34 21 Q    Yes.

11:19:46 22 A    There's nothing in it.  Behind "Fannie Mae," it's

11:19:50 23 blank.

11:19:50 24 Q    I can probably lend you mine, Mr. Kaplan.

11:19:53 25         THE COURT:  We've got one.

Kaplan - Cross

11:19:59 1    MR. DANE:  Thanks.

11:20:03 2    THE COURT:  I've got one.

11:20:07 3    MR. DANE:  Phil, why don't we also pull that up.

11:20:11 4  Q    Okay.  And do you recognize this to be the

11:20:14 5  projections from Fannie Mae that you had reviewed for

11:20:18 6  purposes of your work in this case?

11:20:20 7  A    Generally.  Yes, sir.

11:20:23 8  Q    Okay.  And if you look over in the right-hand column

11:20:30 9  underneath single -- under the third item under 2016, do

11:20:38 10  you see there that there was a projection of housing

11:20:41 11  starts of 20.4 percent?

11:20:48 12  A    Yes.  I think that Fannie Mae is trying to estimate

11:20:53 13  housing starts in 2016 in January of 2015.

11:20:58 14  Q    Okay.  And both of -- and both of these projections

11:21:05 15  from Fannie Mae and from NAHB were projections of

11:21:14 16  significantly higher growth than Mr. Tucker's 5 percent;

11:21:17 17  isn't that right?

11:21:18 18  A    Particularly -- they were both higher and both wrong.

11:21:20 19  They got it wrong.

11:21:24 20  Q    But the actual growths in those years were still

11:21:27 21  higher than Mr. Tucker's 5 percent projection, correct?

11:21:31 22  A    I'd have to look at the actual data.

11:21:44 23  Q    Let's go back to your deposition.  And if you look at

11:21:50 24  page 189, and this will just be about the National

11:21:54 25  Association of Home Builders projection, Mr. Kaplan.

                              Kaplan - Cross

11:22:08  1    A    Yes, sir.

11:22:08  2    Q    So if you first look at page 190, you see there that

11:22:11  3    the figure that was the 2015 actual housing starts was

11:22:17  4    1,054,000.  This is on line 6.

11:22:20  5    A    I see that.  Yes, sir.

11:22:22  6    Q    And then if we look back at page 189 in line 17, do

11:22:33  7    you see there that the actual housing starts were

11:22:36  8    1,173,800 for -- for 2016?

11:22:46  9    A    I'm sorry, Mr. Dane.  I'm -- I'm not following you.

11:22:49 10    I apologize.

11:22:51 11    Q    Sure.  If you could --

11:22:54 12              THE COURT:  Well, actual starts is 1,173,800.

11:22:59 13              MR. DANE:  Yes.

11:23:00 14    Q    All I'm trying to establish, Mr. Kaplan, is we

11:23:02 15    have -- and as I asked you in your deposition, 2015 was

11:23:04 16    1,054,000 starts, and then as reflected on page 189, line

11:23:09 17    17, that went to 1,173,800 starts for 2016 in actuality;

11:23:17 18    isn't that right?

11:23:19 19    A    My memory is that housing starts went up between 2015

11:23:22 20    and 2016.

11:23:23 21              THE COURT:  But is that the amount?

11:23:26 22              THE WITNESS:  I'm sorry, Your Honor.  I'd

11:23:28 23    actually have to look at the actual records.

11:23:30 24    A    Mr. Dane, if you tell me that's what it is, I'll

11:23:32 25    accept it.  I'm not quarreling that it went up between

Kaplan – Cross

11:23:36 1    2015 and 2016.

11:23:37 2    Q    And you'll see -- if you look at that testimony,

11:23:40 3    Mr. Kaplan, you see that you agreed with me that that was

11:23:42 4    what the data showed.  I'm looking at page 189, lines 15

11:23:47 5    through 19.  I don't think there's any dispute about the

11:23:52 6    numbers.

11:23:52 7    A    Okay.

11:23:53 8    Q    Okay.  And that increase from 1,054,000 housing

11:23:59 9    starts in 2015 to 1,173,800 housing starts in 2016, that's

11:24:07 10   significantly higher than a 5 percent increase; isn't that

11:24:10 11   right?

11:24:10 12   A    It's higher than 5 percent.  Yes, sir.

11:24:22 13   Q    Okay.  Let's turn to your testimony about future

11:24:25 14   sales.  And as you testified on direct, you understood

11:24:32 15   Mr. Tucker to have based his volume sales on projected

11:24:38 16   increases in housing starts; is that right?

11:24:40 17   A    Yes.

11:24:41 18   Q    Okay.  Did you understand that he started by using

11:24:44 19   the data for Steves' actual sales in 2016 and then he

11:24:48 20   built off of that based upon the housing starts

11:24:52 21   projections?

11:24:52 22   A    Yes, sir.

11:24:53 23   Q    Now, again, you haven't offered your own opinion of

11:24:56 24   what would be a reasonable estimate of Steves' volume

11:24:59 25   sales for these years, have you?

Kaplan - Cross

11:25:01 1   A    I disagree.  It's speculative.  We can't predict that

11:25:04 2   far in the future with any confidence.  I'm sorry.

11:25:07 3          THE COURT:  No.  The question is have you

11:25:09 4   offered your own estimate?  The answer is no because you

11:25:11 5   think it's speculative?

11:25:13 6          THE WITNESS:  Yes, sir.

11:25:19 7   Q    And with regard to costs, you understand that

11:25:21 8   Mr. Tucker projected future costs after 2021 based on the

11:25:27 9   assumption that Steves' costs would remain the same

11:25:31 10  percentage of their sales price as they were in Steves'

11:25:35 11  last two reported income periods; is that right?

11:25:37 12  A    Yes.  I understand Mr. Tucker assumed that for 12

11:25:40 13  years, that Steves would earn the same dollar amount on

11:25:43 14  every sale with no change whatsoever.

11:25:45 15  Q    And, once again, you have not offered your own

11:25:50 16  opinion of what you think would have -- would be a

11:25:53 17  reasonable estimate of Steves' costs for 2021 through

11:25:56 18  2029?

11:25:57 19  A    I absolutely have.  They are speculative.

11:26:00 20         MR. DANE:  Move to strike, Your Honor.  The

11:26:03 21  witness continues to avoid answering the question.

11:26:05 22         THE COURT:  The answer is no, you haven't made a

11:26:07 23  calculation for what you think each year would be, right?

11:26:10 24  The reason you haven't done it is because it's

11:26:14 25  speculative, in your view?

Kaplan - Cross

11:26:15  1            THE WITNESS:  Yes, sir, Your Honor.

11:26:16  2            THE COURT:  That's the way to answer that

11:26:19  3  question.

11:26:20  4            THE WITNESS:  Thank you, sir.  Can I adopt it,

11:26:22  5  Your Honor?

11:26:23  6            THE COURT:  Just no would be sufficient.  I

11:26:25  7  think that everybody has got the drift that you think all

11:26:29  8  of this is speculative.  If they haven't, they have been

11:26:33  9  asleep.  And these people over here haven't been asleep.

11:26:37 10  They are the ones that matter.

11:26:42 11  Q    And in determining --

11:26:44 12            THE COURT:  Okay, Mr. Dane.

11:26:46 13            MR. DANE:  Thank you, Your Honor.

11:26:47 14            THE COURT:  All right.  And we are now going to

11:26:48 15  try to get from zero to 60 in how fast?

11:26:53 16            MR. DANE:  I don't have too much left, Your

11:26:54 17  Honor.

11:26:55 18            THE COURT:  Good.

11:26:56 19            MR. DANE:  Okay.

11:26:56 20  Q    In determining the baseline for costs, did you

11:26:59 21  understand, sir, that Mr. Tucker had assumed that in the

11:27:03 22  scenario where Jeld-Wen did not acquire CMI, Steves would

11:27:09 23  not have incurred the damages that he claims under the

11:27:11 24  supply agreement?

11:27:14 25  A    Yes.  He adjusted costs for alleged overcharges and

Kaplan - Cross

11:27:18 1  defective door skins.

11:27:19 2  Q    Okay.  And so he took out -- he deducted the

11:27:34 3  overcharges under the supply agreement that he had

11:27:36 4  calculated and the amounts that he had calculated as

11:27:39 5  damages for the defective doors and the defective door

11:27:43 6  skins, correct?

11:27:43 7  A    Yes.  Not getting into whether they are reliable or

11:27:47 8  not, he did deduct them.

11:27:50 9  Q    And did you also understand that Mr. Tucker assumed,

11:27:52 10 for purposes of his lost profit analysis, that Steves

11:27:54 11 would not have incurred the legal expenses associated with

11:27:58 12 this lawsuit?

11:27:59 13 A    Yes, sir.

11:27:59 14 Q    Okay.  And you understood that to be a substantial

11:28:03 15 amount of money?

11:28:04 16 A    A nontrivial amount of money.  Yes, sir.

11:28:20 17 Q    And you understand that Mr. Tucker used a same profit

11:28:22 18 margin that was the same profit margin that Steves had

11:28:24 19 obtained for 2015 and the 14-month period ending

11:28:28 20 February 2017?

11:28:29 21 A    He averaged -- in his last report, he averaged 2015

11:28:32 22 and the 14-month period.  Yes, sir.

11:28:34 23 Q    Okay.  And, again, you have not put forward your own

11:28:38 24 estimate of what you think would be a reasonable estimate

11:28:41 25 of profit margin for 2021 through 2029, correct?

Kaplan - Cross

11:28:46 1   A    No, because it's speculative.

11:28:48 2            MR. DANE:  Move to strike that, Your Honor.

11:28:49 3            THE COURT:  I mean, he's going to say that

11:28:51 4   anyway.  I mean, everybody knows.  And everybody knows

11:28:53 5   what he's offered and what he's not offered.  So you can

11:28:56 6   argue what he's not offered.

11:29:01 7   Q    Now, I wanted to ask you a little bit about the

11:29:05 8   testimony you gave about the sensitively of Mr. Tucker's

11:29:07 9   analysis, and that related to modifications to the cost of

11:29:12 10  sale percentages that he used; is that right?

11:29:14 11  A    Not only that.  Those sensitivities involve all six

11:29:19 12  cost categories.  But cost of sales is the biggest one.

11:29:21 13  Q    Okay.  And he increased his estimate of cost of sales

11:29:24 14  as a percentage of sales based upon newer information,

11:29:28 15  correct?

11:29:29 16  A    The new information for the additional 14 months

11:29:32 17  caused the costs to go up --

11:29:34 18  Q    Okay.  And that --

11:29:35 19  A    -- and the profits to go down.

11:29:37 20  Q    And that had the effect of actually reducing his lost

11:29:40 21  profits calculation, right?

11:29:41 22  A    Yes.

11:29:41 23  Q    Okay.  And do you understand that among the reasons

11:29:57 24  for the differences in the cost of sale percentages for

11:30:01 25  the more recent period was that -- strike that.  Let me

Kaplan – Cross

11:30:09 1 withdraw that.

11:30:11 2      Now, Mr. Tucker did not adjust his figures for the

11:30:15 3 cost of sale percentages to take into account the March

11:30:20 4 through June 2017 financial information from Steves, did

11:30:23 5 he?

11:30:24 6 A   He did not.

11:30:25 7 Q   Okay.  And do you understand that the percentage of

11:30:28 8 cost of sales decreased during that time?

11:30:31 9 A   I do not.

11:30:34 10 Q   Have you looked at that financial information?

11:30:38 11 A   I -- not in any detail.  It's just four months.

11:30:43 12 Q   Okay.  And if the percentage of cost of sales

11:30:45 13 decreased during that time and Mr. Tucker had used that

11:30:49 14 information, then his profits would have increased,

11:30:52 15 correct?

11:30:52 16 A   I'd have to look at it.  I don't know.  There's too

11:30:55 17 many moving parts, Mr. Dane.

11:31:03 18 Q   Let me ask you a little bit about discount rate.  You

11:31:06 19 understand that Mr. Tucker applied a 15 percent discount

11:31:09 20 rate to his lost profit figures?

11:31:10 21 A   He did.

11:31:11 22 Q   And that means that he discounted his calculated

11:31:14 23 value of lost profits by 15 percent per year for every

11:31:18 24 year out into the future?

11:31:21 25 A   Yes, sir.

Kaplan - Cross

11:31:22 1    Q    And you understood that he -- did you understand from

11:31:26 2    his testimony that he used this rate in part to account

11:31:29 3    for the uncertainties of the variables that he used in his

11:31:33 4    calculations?

11:31:34 5    A    That's what he said he did.  That didn't work.

11:31:43 6            MR. DANE:  Let's pull up Schedule 12(s), Phil.

11:31:47 7    Q    And if you could look at that in your binder.

11:31:50 8            MR. DANE:  And it's the last time I'm going to a

11:31:54 9    schedule, Your Honor, but I'm just doing it to -- to give

11:31:58 10   us some comparison.

11:32:00 11   Q    And you reviewed this schedule in forming your

11:32:03 12   opinions; isn't that right?

11:32:04 13   A    Yes, sir.

11:32:04 14   Q    Okay.  And so just to understand, the effect of

11:32:07 15   Mr. Tucker applying his discount rate was that where for

11:32:11 16   the period of September 2021 through 2029 he calculated

11:32:19 17   actual lost profit dollars of 133,849,865, when he applied

11:32:28 18   his discount rate, the present value of that amount became

11:32:33 19   only 46,480,581, correct?

11:32:38 20   A    I'd push back on the only.  But I agree with the

11:32:41 21   calculations.

11:32:43 22   Q    Okay.

11:32:43 23   A    It sounds like a lot of money to me.

11:32:46 24   Q    And similarly, for the period -- shorter period that

11:32:48 25   he calculated, which was September 10, 2021, through

Kaplan - Cross

11:32:51 1    year-end 2024, the actual profit figures that he

11:32:54 2    calculated were $50,605,625, and when he applied the

11:33:01 3    discount rate, they became the $24,105,985 figure to which

11:33:08 4    he calculated here in trial, correct?

11:33:11 5    A    Yes, sir.

11:33:15 6    Q    And for both of those, that's an average of less than

11:33:19 7    $6 million a year in profits to Steves and Sons, correct?

11:33:30 8    A    I'm -- I'm sorry.  What period of time?

11:33:33 9         THE COURT:  For each period, is the average

11:33:35 10   approximately $6 million?

11:33:37 11        MR. DANE:  Yeah.  Let me break it up, Your

11:33:38 12   Honor.

11:33:38 13   Q    For the longer period through 2029, that $46 million

11:33:42 14   figure that Mr. Tucker testified to would work out to less

11:33:47 15   than $6 million a year over approximately an 8-year

11:33:52 16   period?

11:33:52 17   A    Okay.  I'll accept your math, Mr. Dane.

11:33:55 18   Q    Okay.  And as you've testified, you don't believe

11:33:58 19   that Mr. Tucker's discount rate reliably accounted for the

11:34:04 20   uncertainties in analysis?

11:34:06 21   A    It absolutely does not.

11:34:10 22   Q    And once again, you did not offer your own suggested

11:34:12 23   discount rate in this case, did you?

11:34:14 24   A    I did not because the foundation upon which the

11:34:16 25   discount rate is used, that -- those lost future profits

Kaplan - Cross

11:34:22 1  are based on housing starts and sales that are unreliable

11:34:25 2  and cost analysis and profit analysis that's unreliable.

11:34:29 3  Q    You don't think there's any discount rate that could

11:34:31 4  be used that would be reasonable; is that right?

11:34:33 5  A    Based on the facts in this case, trying to go out 12

11:34:36 6  years.

11:34:37 7          THE COURT:  Yes or no?

11:34:40 8  A    Absolutely not, Your -- absolutely no, Mr. Dane.

11:34:41 9  Q    And so just to be clear, and so it's clear to the

11:34:44 10 jury, your opinion is that if the jury concludes that

11:34:47 11 Steves will have no source of door skin supply in 2021 and

11:34:51 12 will be forced out of business, there is no amount that

11:34:53 13 you think it would be appropriate for the jury to award

11:34:57 14 Steves for that damage; isn't that right, sir?

11:35:00 15 A    For somebody who's been doing this for 30 years, what

11:35:03 16 I would say to the jury is that we simply don't know.

11:35:06 17         MR. DANE:  Your Honor.

11:35:07 18         THE COURT:  No.  Yes or no?

11:35:08 19 A    I'm sorry.  Ask the question again, Mr. Dane.  I

11:35:13 20 apologize.

11:35:14 21 Q    Your opinion is that if the jury concludes that

11:35:15 22 Steves will have no source of door skin supply in 2021 and

11:35:20 23 goes out of business, there is no amount that you think it

11:35:21 24 would be appropriate for the jury to award Steves in lost

11:35:25 25 profits; isn't that correct, sir?

Kaplan – Redirect

11:35:27 1  A    It's speculative.  Yes, sir.

11:35:29 2           MR. DANE:  Thank you.  I have no further

11:35:30 3  questions.

11:35:30 4           THE COURT:  Do you have any questions?

11:35:31 5           MR. PFEIFFER:  Briefly, Your Honor.

11:35:46 6           THE COURT:  If you all need a recess now, we'll

11:35:46 7  take one, but I'm hoping that --

11:35:47 8           MR. PFEIFFER:  This will be very short.

11:35:48 9           THE COURT:  How brief?

11:35:50 10          MR. PFEIFFER:  Five minutes.

11:35:53 11          THE COURT:  Five minutes.

11:35:54 12              **REDIRECT EXAMINATION**

11:35:54 13 BY MR. PFEIFFER:

11:35:55 14 Q    You were asked some questions about the Great

11:35:57 15 Recession.  Do you recall that?

11:35:58 16 A    I do.

11:35:58 17 Q    And about various government organizations, estimates

11:36:01 18 about future housing starts?

11:36:02 19 A    I do.

11:36:02 20 Q    And those government estimates, even though they had

11:36:05 21 the resources of the government behind them, were wrong,

11:36:08 22 weren't they?

11:36:09 23 A    They were not only wrong, but they were only willing

11:36:11 24 to estimate 1 year, not 12 years.  And when they did it,

11:36:17 25 they got it wrong.

Kaplan - Redirect

11:36:18 1  Q    And did any of those government organizations predict

11:36:21 2  the housing crash 12 years before it happened?

11:36:25 3  A    They all missed it.

11:36:27 4  Q    Now, recessions are a recurring cyclical feature of

11:36:28 5  the housing market, aren't they?

11:36:31 6  A    Absolutely.

11:36:32 7  Q    Even if not, each of them is the Great Recession?

11:36:35 8  A    Absolutely.

11:36:36 9  Q    Does Mr. Tucker's methodology take account of that

11:36:39 10 reality?

11:36:40 11 A    It absolutely does not.

11:36:41 12 Q    Does the fact that housing starts increased by more

11:36:45 13 than 5 percent in the one single year that Mr. Dane

11:36:46 14 discussed with you affect in any way your calculation that

11:36:49 15 it would be speculation for Mr. Tucker to project out

11:36:52 16 growth and then no declines ever for a 12-year period?

11:36:57 17 A    Absolutely not.

11:36:58 18 Q    You were asked some questions about cost of sales.

11:37:01 19 Briefly on that, the cost of sales that Mr. Tucker used

11:37:05 20 included costs related to Towanda, right?

11:37:07 21 A    It did.

11:37:08 22 Q    So they were based on -- and lower because Jeld-Wen

11:37:11 23 owned Towanda than if it hadn't?

11:37:13 24 A    Yes.  Absolutely.

11:37:14 25 Q    Now, finally, on the discount rate, to be clear, a

Kaplan - Redirect

11:37:19  1   change -- using the discount rate that Mr. Tucker already

11:37:23  2   used, a change in the cost of sales from 77.2 to 79 --

11:37:30  3   79.8 percent produced a $13 million swing in his

11:37:34  4   calculations; isn't that right?

11:37:36  5   A    Yes.  He said that the --

11:37:38  6          THE COURT:  Yes.  That's enough.

11:37:40  7   A    Yes.  That's absolutely right.

11:37:41  8   Q    What does that tell you about whether his discount

11:37:44  9   rate solves the sensitively problem that you discussed?

11:37:47 10   A    It absolutely does not.

11:37:48 11          MR. PFEIFFER:  Thank you, Mr. Kaplan.

11:37:49 12          THE COURT:  Can he be excused permanently?

11:37:51 13          MR. PFEIFFER:  Yes, Your Honor.

11:37:52 14          THE COURT:  Thank you very much for being with

11:37:53 15   us and giving us your testimony, Dr. Kaplan.  You may be

11:37:56 16   excused.

11:37:57 17          THE WITNESS:  Thank you, sir.

11:37:58 18          (Witness stood aside.)

11:37:58 19          THE COURT:  We'll take a 20-minute recess.  The

11:38:00 20   jury will go first.  Please be seated while the jury is

11:38:05 21   being excused.

11:38:06 22          (The jury exited the courtroom.)

11:38:09 23          THE COURT:  Get your next witness ready after

11:38:11 24   the recess, please.  You got your next witness?  Are you

11:38:17 25   through or what?

```
11:38:18   1              MR. PFEIFFER:  Your Honor, that is our last
11:38:20   2    witness.
11:38:20   3              THE COURT:  All right.  Then get your witness
11:38:22   4    ready after the recess.  We'll take 20 minutes.
11:38:25   5              (Recess taken.)
           6
           7
           8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25
```

| | | |
|---|---|---|
| 12:05:01PM | 1 | THE COURT:  Next witness, please.  I guess you need |
| 12:05:04PM | 2 | technically to do something on the record, don't you? |
| 12:05:07PM | 3 | MR. PFEIFFER:  That's correct, Your Honor.  I'll turn |
| 12:05:11PM | 4 | over those notes of Mr. Pomerantz's.  We are submitting, filing |
| 12:05:16PM | 5 | a short proffer.  Subject to that, we rest, Your Honor.  It |
| 12:05:21PM | 6 | will be on file very shortly. |
| 12:05:23PM | 7 | THE COURT:  Proffer of what? |
| 12:05:25PM | 8 | MR. PFEIFFER:  Relating to certain of the testimony |
| 12:05:27PM | 9 | of Professor Snyder. |
| 12:05:33PM | 10 | THE COURT:  You had him here.  You could have made |
| 12:05:35PM | 11 | the proffer while he was here. |
| 12:05:37PM | 12 | MR. PFEIFFER:  We wanted to make sure the record is |
| 12:05:39PM | 13 | clear -- |
| 12:05:40PM | 14 | THE COURT:  I told you, you do it while he's here. |
| 12:05:43PM | 15 | Do you want to put him on, put him on later during a break? |
| 12:05:47PM | 16 | That way, they have a chance to cross-examine, and they have a |
| 12:05:51PM | 17 | record. |
| 12:05:53PM | 18 | I told you before, and you said -- Ms. Zwisler, I |
| 12:05:59PM | 19 | think, said I had not made it clear when it came in for Bob |
| 12:06:04PM | 20 | Merrill.  There's one in for that, but I think I told you then |
| 12:06:10PM | 21 | the way you did proffers was you did it out of the presence of |
| 12:06:13PM | 22 | the jury so we had a complete record.  Have a seat. |
| 12:06:17PM | 23 | MR. PFEIFFER:  Thank you, Your Honor. |
| 12:06:22PM | 24 | MR. POMERANTZ:  Your Honor, I wanted to let you know |
| 12:06:24PM | 25 | that we filed a little while ago a Rule 50 motion relating to |

| | | |
|---|---|---|
| 12:06:27PM | 1 | the issue that was discussed yesterday, and that's on file now. |
| 12:06:31PM | 2 | THE COURT:  I was told that one was filed. |
| 12:06:34PM | 3 | MR. POMERANTZ:  Thank you, Your Honor.  We would |
| 12:06:36PM | 4 | recall Professor Shapiro. |
| 12:06:39PM | 5 | THE COURT:  All right, Professor Shapiro. |
| 12:06:43PM | 6 | |
| 12:06:43PM | 7 | **CARL SHAPIRO,** |
| 12:06:43PM | 8 | a witness, recalled at the instance of the plaintiff, having |
| 12:06:43PM | 9 | been previously duly sworn, testified as follows: |
| 12:06:54PM | 10 | |
| 12:06:55PM | 11 | THE COURT:  Dr. Shapiro, you were not permanently |
| 12:06:56PM | 12 | released, so you are under the same oath you took earlier in |
| 12:07:00PM | 13 | these proceedings.  Thank you, Mr. Robertson. |
| 12:07:08PM | 14 | MR. POMERANTZ:  Your Honor, may I proceed? |
| 12:07:09PM | 15 | THE COURT:  Please. |
| 12:07:09PM | 16 | |
| 12:07:09PM | 17 | DIRECT EXAMINATION |
| 12:07:11PM | 18 | BY MR. POMERANTZ: |
| 12:07:11PM | 19 | Q    Professor Shapiro, Professor Snyder testified yesterday in |
| 12:07:16PM | 20 | court.  Have you had an opportunity to review his testimony? |
| 12:07:18PM | 21 | A    Yes, I have. |
| 12:07:20PM | 22 | Q    I'd like to ask you a few questions about that testimony. |
| 12:07:24PM | 23 | Yesterday, Professor Snyder testified that the output of door |
| 12:07:30PM | 24 | skins had increased after the merger; do you recall reading |
| 12:07:32PM | 25 | that? |

Shapiro - Direct

| | | |
|---|---|---|
| 12:07:33PM | 1 | A    I do. |
| 12:07:34PM | 2 | Q    Did you analyze what happened to the output of door skins |
| 12:07:38PM | 3 | after the merger? |
| 12:07:38PM | 4 | A    I did. |
| 12:07:39PM | 5 | Q    And what happened to the output of door skins? |
| 12:07:42PM | 6 | A    It did go up.  We're talking now from roughly 2012 into |
| 12:07:47PM | 7 | 2016 or '17.  It went up.  And to be clear, output, we're just |
| 12:07:49PM | 8 | measuring the number of door skins used in the United States. |
| 12:07:53PM | 9 | Q    So to that extent, you agree with Professor Snyder; |
| 12:07:56PM | 10 | correct? |
| 12:07:56PM | 11 | A    Yes.  We agree it clearly went up, the output. |
| 12:07:59PM | 12 | Q    Now, Professor Snyder also testified that if the merger |
| 12:08:03PM | 13 | had actually caused anticompetitive effects, the door skin |
| 12:08:08PM | 14 | output would have decreased; do you recall reading that? |
| 12:08:10PM | 15 | A    I do. |
| 12:08:11PM | 16 | Q    Do you agree with him? |
| 12:08:12PM | 17 | A    I strongly disagree with that. |
| 12:08:15PM | 18 | Q    Why do you disagree? |
| 12:08:16PM | 19 | A    So we're now talking about what happened to the number of |
| 12:08:19PM | 20 | door skins used in the United States from 2012 to 2017. |
| 12:08:25PM | 21 | Professor Snyder makes the point that if the price went up by |
| 12:08:29PM | 22 | the law of demand, we'd expect fewer door skins to be used. |
| 12:08:33PM | 23 | That is a consideration.  But let's remember, as we've all |
| 12:08:38PM | 24 | heard, from 2012 and the subsequent years, we had a recovery of |
| 12:08:42PM | 25 | the housing market and, therefore, recovery in the number of |

Shapiro - Direct

| | | |
|---|---|---|
| 12:08:46PM | 1 | homes built and the number of doors used. |
| 12:08:49PM | 2 | So if you think about going from 2012 to 2017, let's first |
| 12:08:54PM | 3 | talk about the price increase of the door skins.  That's one |
| 12:08:57PM | 4 | factor to consider.  So door skins, let's say around $5 each, |
| 12:09:03PM | 5 | so -- and Professor Snyder found about a ten percent, |
| 12:09:06PM | 6 | 11 percent increase in the price of door skins, so that's about |
| 12:09:09PM | 7 | $0.50 a door skin.  You need two door skins to make a door, so |
| 12:09:13PM | 8 | that's about a dollar a door. |
| 12:09:14PM | 9 | So now we can ask ourselves, if you are building a house |
| 12:09:20PM | 10 | for $200,000, say, and somebody tells you, oh, each door costs |
| 12:09:25PM | 11 | a dollar extra, we just learned it's going to be a little more |
| 12:09:29PM | 12 | expensive -- I don't know, five or ten doors in a house, so |
| 12:09:32PM | 13 | it's an extra five or ten bucks.  Maybe there's some more |
| 12:09:36PM | 14 | markups along way, so as a final consumer, you're paying ten or |
| 12:09:40PM | 15 | 20 bucks more for your house. |
| 12:09:41PM | 16 | It's very unlikely that people would decide not to build |
| 12:09:46PM | 17 | homes because of the extra ten or 20 bucks.  So the increase in |
| 12:09:50PM | 18 | the price of the door skin is not going to cause any |
| 12:09:53PM | 19 | significant drop in the use of door skins in the United States, |
| 12:09:58PM | 20 | because it's a small piece of a home, and that's pretty much |
| 12:10:01PM | 21 | true for renovation projects, too.  It's not quite as extreme, |
| 12:10:05PM | 22 | but it's still a few dollar a door.  A dollar a door is not |
| 12:10:08PM | 23 | going to have any significant impact. |
| 12:10:10PM | 24 | So the factor that he asked us to look at, the increase in |
| 12:10:14PM | 25 | the price of door skins, we know, is not going to have any |

Shapiro - Direct

2371

12:10:17PM  1    material effect on the quantity, on the output for the reasons

12:10:21PM  2    I've explained.

12:10:22PM  3        Now, at the same time, we know the recovery of the housing

12:10:27PM  4    market is significant.  We went from, what, 800,000 housing

12:10:30PM  5    starts a year to 1.1 million, something like that.  So, of

12:10:35PM  6    course, the output is going to go up.  More doors are put in,

12:10:39PM  7    more door skins.  We agree on that.

12:10:41PM  8        What about the anticompetitive effects of the merger or

12:10:44PM  9    the effects of the merger?  I found the price increases.  He

12:10:48PM  10   did not dispute that.  To suggest that there's been no

12:10:52PM  11   anticompetitive effects, no harm to competition because more

12:10:57PM  12   homes were built, that doesn't make any sense; okay?

12:11:00PM  13       What I believe happened was there was a reduction in

12:11:04PM  14   competition, price of door skins went up, people who had to

12:11:08PM  15   build their homes paid more as a result, but, of course, more

12:11:13PM  16   door skins were used because of the housing recovery.  So I

12:11:16PM  17   think his analysis here is not correct.

12:11:19PM  18   Q   Let me go to another aspect of Professor Snyder's

12:11:22PM  19   testimony yesterday.  He testified that an economist would

12:11:26PM  20   expect companies to raise price as they come out of a

12:11:30PM  21   recession; do you recall reading that?

12:11:31PM  22   A   I do.

12:11:32PM  23   Q   And, by the way, I say reading that, because there's a

12:11:35PM  24   transcript of what's said in the court each day; you understand

12:11:38PM  25   that?

Shapiro - Direct

2372

| | | |
|---|---|---|
| 12:11:38PM | 1 | A    I certainly do. |
| 12:11:39PM | 2 | Q    And that's what you read? |
| 12:11:40PM | 3 | A    It is. |
| 12:11:41PM | 4 | Q    And do you recall -- thanks to our court reporter here. |
| 12:11:46PM | 5 | Do you recall that Professor Snyder described the increase in |
| 12:11:50PM | 6 | door skin prices as due to a recovery in demand? |
| 12:11:53PM | 7 | A    Absolutely. |
| 12:11:55PM | 8 | Q    Now, did door skin prices fall significantly when the |
| 12:12:00PM | 9 | housing crash occurred and demand went down? |
| 12:12:04PM | 10 | A    No, they did not. |
| 12:12:06PM | 11 | Q    What happened? |
| 12:12:07PM | 12 | A    So we looked at this in the data, both Professor Snyder |
| 12:12:13PM | 13 | and I.  So if you compare roughly the peak of the housing |
| 12:12:17PM | 14 | market, 2006 or so, 2007 to 2012, which is the time of the |
| 12:12:22PM | 15 | merger, we have the best data on prices for door skins paid by |
| 12:12:28PM | 16 | Steves, and they did go down but only by about one percent. |
| 12:12:32PM | 17 | You might have thought they'd go down a lot.  A lot of |
| 12:12:35PM | 18 | other prices did go down a lot during that period of time but |
| 12:12:38PM | 19 | not door skin prices.  So I understand Professor Snyder to be |
| 12:12:41PM | 20 | saying, well, the prices came way down, so, naturally, they |
| 12:12:44PM | 21 | would bounce back, door skin prices.  He didn't quite say that, |
| 12:12:50PM | 22 | but I took that to be the gist of his argument, and so -- but |
| 12:12:54PM | 23 | the assumption there or the predicate is not right.  The door |
| 12:12:59PM | 24 | skin prices were basically flat from 2006 or '07 to 2012.  They |
| 12:13:03PM | 25 | fell by one percent. |

| | | |
|---|---|---|
| 12:13:05PM | 1 | So it's not like we, you know, pulled the rubber band and |
| 12:13:09PM | 2 | had to bounce back.  The prices were flat, and so there's no |
| 12:13:13PM | 3 | necessary reason to think they're going to go up, because they |
| 12:13:16PM | 4 | didn't go down very much at all. |
| 12:13:17PM | 5 | Q    So the fact that the price of door skins didn't go down |
| 12:13:21PM | 6 | significantly during the housing crash, why is that relevant to |
| 12:13:27PM | 7 | Professor Snyder's opinion that door skin prices would |
| 12:13:29PM | 8 | automatically rise because we're having a housing recovery? |
| 12:13:33PM | 9 | A    So I take his basic argument to be the prices would |
| 12:13:39PM | 10 | inevitably have gone up, door skin prices, after 2012 because |
| 12:13:42PM | 11 | of the recovery, and I don't think that's right as a matter of |
| 12:13:47PM | 12 | economics, and I think we're going to talk about that more, but |
| 12:13:50PM | 13 | especially if you -- in posing that question, you think, well, |
| 12:13:54PM | 14 | the prices fell a lot, so they're going to go up.  They did not |
| 12:13:57PM | 15 | fall a lot.  I think that's important to know that fact in |
| 12:14:00PM | 16 | thinking about what happens after 2012, that the prices had not |
| 12:14:04PM | 17 | gone down in any significant way from 2006 to 2012. |
| 12:14:10PM | 18 | Q    Do you think that coming out of a recession necessarily |
| 12:14:13PM | 19 | causes companies to raise their prices? |
| 12:14:15PM | 20 | A    No.  It's not automatic.  This, I spent a fair bit of my |
| 12:14:20PM | 21 | time in my -- when I appeared here before asking whether the |
| 12:14:26PM | 22 | price increases that we did see for door skins from 2012 on |
| 12:14:31PM | 23 | were because of demand going up or not, and you do that |
| 12:14:37PM | 24 | inquiry, you look at the facts of the case, because it's not |
| 12:14:40PM | 25 | automatic.  Prices don't necessarily rise when you come out of |

2374

12:14:44PM 1   a recession.  Sure they do for a lot of things, but it's not

12:14:47PM 2   automatic.  You have to look at the facts of the case.

12:14:50PM 3   Q    Let's look at the facts as you saw them.  What factors do

12:14:53PM 4   you think could explain a price increase if it occurs when

12:14:56PM 5   there's an economic recovery going on?

12:14:58PM 6   A    So, the main things we look to are whether the costs of

12:15:03PM 7   making that product went up.  Again, we're talking about door

12:15:07PM 8   skins, so we'd look at the input costs such as the resin and

12:15:09PM 9   the wood and so forth.  Then we look at whether capacity got

12:15:12PM 10  tight.  So costs and capacity.  The two things I talked about

12:15:16PM 11  at some length when I was here before.

12:15:17PM 12  Q    What do those factors tell us about whether prices would

12:15:21PM 13  increase in the door skin industry following the recovery?

12:15:24PM 14  A    So my analysis indicates those -- neither of those factors

12:15:31PM 15  points to a price increase in the door skin industry market

12:15:36PM 16  after 2012.  So the point is, these price increases are not

12:15:42PM 17  inevitable when the economy recovers.  You need to look at

12:15:45PM 18  these factors, and in this industry in this case, I looked at

12:15:48PM 19  the key factors, and they were not indicating -- or do not

12:15:54PM 20  provide a basis to expect prices to go up.

12:15:57PM 21  Q    And so if an increase in costs or a tightening of capacity

12:16:02PM 22  is not the reason why prices went up, what did you conclude was

12:16:06PM 23  the reason why prices went up?

12:16:08PM 24  A    Well, again, I don't think it's going to be a big surprise

12:16:11PM 25  here for the jury.  So we have the substantial increase in

Shapiro - Direct

2375

12:16:15PM 1   concentration associated with the merger between Jeld-Wen and

12:16:18PM 2   CraftMaster is the cause, in my view, and, again, that was also

12:16:24PM 3   tied back to the market concentration analysis, and that was

12:16:29PM 4   the gist of my analysis that I presented last week.

12:16:34PM 5   Q    All right.  Let's go to another thing that Professor

12:16:39PM 6   Snyder testified to yesterday.  Do you recall Professor Snyder

12:16:41PM 7   testifying that you used the wrong pricing model in analyzing

12:16:45PM 8   the relationship between costs and prices?

12:16:47PM 9   A    I do.

12:16:49PM 10  Q    All right.  So I want to look at your original testimony

12:16:53PM 11  on this.

12:16:55PM 12          MR. POMERANTZ:  Mr. Nichols, can you bring up 902.55.

12:17:08PM 13  Q    All right, do you remember this slide from your direct

12:17:10PM 14  testimony?

12:17:11PM 15  A    I do.

12:17:12PM 16  Q    Do you recall testifying that after the merger, Jeld-Wen's

12:17:16PM 17  prices went up while its per-door-skin manufacturing costs went

12:17:21PM 18  down?

12:17:22PM 19  A    Correct.

12:17:22PM 20  Q    And that was a reason that you concluded that the price

12:17:26PM 21  increases after the merger cannot be explained based on cost

12:17:31PM 22  increases; right?

12:17:32PM 23  A    Exactly.

12:17:33PM 24  Q    Professor Snyder testified that you used a model for

12:17:37PM 25  unconcentrated markets instead of a model for concentrated

Shapiro - Direct

2376

12:17:40PM  1   markets; do you recall him testifying to that?

12:17:42PM  2   A    You mean the pricing model there you are referring to?

12:17:45PM  3   Q    Yes.

12:17:46PM  4   A    Yes, I recall him saying that.

12:17:48PM  5   Q    And he said that you made up your own pricing rules.  Do

12:17:52PM  6   you remember reading that?

12:17:53PM  7   A    Something to that effect.  I think he referred to the

12:17:58PM  8   Shapiro pricing model, which it's nice to have things named

12:18:01PM  9   after you, but, in this case, I don't think it's really

12:18:04PM  10  appropriate.

12:18:04PM  11  Q    Is the pricing model that you use something you created

12:18:08PM  12  especially for this case?

12:18:09PM  13  A    No, no.  So, first off, pricing model, all I'm doing here

12:18:15PM  14  is saying, when costs go down, we would expect price to go

12:18:22PM  15  down.  It's simple.  You can call it a model if you want.  If

12:18:26PM  16  you look at the economics textbooks, what we teach, not

12:18:30PM  17  surprisingly, this idea is there, and the manner in which --

12:18:35PM  18  let me put that differently.  When costs go down, prices tend

12:18:39PM  19  to go down.

12:18:41PM  20       The mechanism, what we call the pass-through rate, how

12:18:46PM  21  much of the cost decreases get reflected in price decreases

12:18:50PM  22  depends on the industry, how competitive it is, and I think I

12:18:55PM  23  indicated that when I was on the stand before, but all of the

12:18:59PM  24  models for different industries all have the same feature, that

12:19:04PM  25  when the costs go down, everything else equal, we expect price

Shapiro - Direct                                    2377

12:19:09PM  1   to go down.  And that is a general principle, and I certainly

12:19:15PM  2   did not create it for this case.

12:19:17PM  3   Q    What happened here when costs went down for Jeld-Wen's

12:19:22PM  4   manufacturing of door skins?

12:19:24PM  5   A    Well, the point being, the prices went up, their prices

12:19:29PM  6   went up for door skins, and we measured how much.  Again,

12:19:31PM  7   that's not in dispute as between myself and Professor Snyder.

12:19:35PM  8   Q    Now, do you recall Professor Snyder saying yesterday that

12:19:39PM  9   you applied a rule that applies to unconcentrated markets, but

12:19:43PM  10  this market that we're looking at, the door skin market, is a

12:19:47PM  11  highly concentrated market; do you recall him saying that?

12:19:50PM  12  A    Vividly.

12:19:52PM  13  Q    What is your response to that point?

12:19:54PM  14  A    So I think I partly responded earlier which is the

12:20:02PM  15  principle I'm applying reflects a number of different models

12:20:06PM  16  that economists have worked on, that when costs go down, it

12:20:11PM  17  tends to pull prices down.

12:20:14PM  18       That's true in highly competitive or unconcentrated

12:20:18PM  19  markets.  It's also true in monopoly markets.  It's also true

12:20:22PM  20  in tight-knit -- oligopolies like this one with two or three

12:20:26PM  21  firms.  So I disagree -- I just think it's not true -- I

12:20:33PM  22  disagree with him and specifically the principle I'm applying,

12:20:39PM  23  namely that when cost goes down, price goes down, applies to

12:20:44PM  24  markets whether they are concentrated or not and certainly

12:20:47PM  25  apply in this highly concentrated market.

12:20:51PM   1    Q     So let's go to another topic now.   Professor Snyder

12:20:55PM   2    testified yesterday that in the long run, firms need to set

12:21:00PM   3    prices high enough to recover all of their costs, not just

12:21:04PM   4    their average variable costs or, otherwise, they can't survive.

12:21:08PM   5    Do you recall him saying that?

12:21:09PM   6    A     I do.

12:21:10PM   7    Q     Does that mean, in your view, that it's wrong to look at

12:21:14PM   8    average variable costs when you are analyzing whether a merger

12:21:17PM   9    substantially lessens competition?

12:21:20PM   10   A     No.   It's what we do all the time in merger analysis.

12:21:23PM   11   Q     Why is it relevant to merger analysis?

12:21:25PM   12   A     Well, first I would say that, in this case, I looked at

12:21:33PM   13   Jeld-Wen's average variable costs, and I observed that at the

12:21:39PM   14   time of the merger, they had roughly a 35 percent margin above

12:21:45PM   15   that.

12:21:45PM   16         So I'm not saying -- I never said they were pricing equal

12:21:49PM   17   to that.   I just said they're pricing based on it.   That's what

12:21:54PM   18   you look at, and then you mark up, basically as much as you can

12:21:57PM   19   given the competition.   So their margin -- they already had a

12:22:02PM   20   margin, and so -- and Professor Snyder did not assert that the

12:22:09PM   21   margin was inadequate to cover their average total costs to

12:22:13PM   22   stay in business.

12:22:14PM   23         So then -- so that's looking at the merger.   Then over

12:22:18PM   24   time, all of these pricing models, rules, all of the principles

12:22:23PM   25   that economists look at would tell us that changes in prices

Shapiro - Direct

2379

12:22:28PM  1    over a period of time will track these changes in average

12:22:37PM  2    variable costs, and that's what I've done.

12:22:41PM  3        Then his point, well, wait a moment, what if firms aren't

12:22:45PM  4    covering their costs, they will eventually go out of business,

12:22:47PM  5    that can happen in the longer run; okay?  There's no suggestion

12:22:51PM  6    here that I've heard that the door skin suppliers are failing

12:22:56PM  7    to cover their average total costs with the margins they have.

12:23:00PM  8    So that principle is true, but it doesn't affect what we're

12:23:03PM  9    doing here, the analysis of price changes from 2012 into 2016

12:23:08PM 10    or '17.

12:23:10PM 11    Q    Professor Shapiro, I want to make sure the jury

12:23:13PM 12    understands what you mean by margin.  You said that Jeld-Wen

12:23:15PM 13    had a 35 percent margin in 2012.  What does that mean?

12:23:21PM 14    A    So this means the gap between the price and the variable

12:23:27PM 15    cost.  So you could think about prices significantly higher

12:23:32PM 16    than the variable cost, 35 percent, and that's a pretty healthy

12:23:38PM 17    margin in the manufacturing industry generally.

12:23:38PM 18    Q    Let's turn now to pricing and capacity.  You recall

12:23:44PM 19    reading the testimony by Professor Snyder where he said that

12:23:48PM 20    capacity doesn't matter -- I'm sorry, where he described your

12:23:51PM 21    testimony as being that capacity doesn't matter unless you run

12:23:55PM 22    out of capacity; do you recall reading that?

12:23:57PM 23    A    I do.

12:23:58PM 24    Q    Is that a fair representation of what you said?

12:24:00PM 25    A    I do not think it is a fair representation of what I said.

Shapiro - Direct

12:24:03PM  1    Q    What did you say about capacity?

12:24:05PM  2    A    I said that one needs to look at capacity utilization,

12:24:10PM  3    because if it gets tight due to increased demand, that can,

12:24:15PM  4    indeed, pull up prices, and that I looked here at capacity in

12:24:19PM  5    this industry, again comparing 2012 to '16, I think, 2016 I

12:24:26PM  6    think it is, and the increase in capacity utilization was quite

12:24:31PM  7    modest.

12:24:31PM  8    Q    Let me pull up a slide to help, Professor Shapiro.

12:24:34PM  9         MR. POMERANTZ:  Mr. Nichols, can you pull up 902.59.

12:24:41PM  10   Q    This is a slide that you used when you here previously

12:24:43PM  11   testifying; do you recall that?

12:24:44PM  12   A    I do.

12:24:45PM  13   Q    If you could use this slide to explain to the jury what

12:24:47PM  14   you're saying about capacity.

12:24:49PM  15   A    Okay.  So the big blue areas are the ones that I would

12:24:55PM  16   call your attention to.  On the left-hand side, 2012,

12:25:02PM  17   67 percent utilization.  This is, as you can see on the

12:25:06PM  18   vertical axis, Jeld-Wen's capacity utilization, and then in

12:25:10PM  19   2016 it went up a bit to between 70 and 73 percent.

12:25:15PM  20        So my testimony is, my opinion is that this is a modest

12:25:22PM  21   increase in capacity utilization, and I would not expect that

12:25:28PM  22   to cause a substantial increase in prices.  And I guess I would

12:25:35PM  23   add, Professor Snyder, so far as I can recall, did not look at

12:25:40PM  24   Jeld-Wen's capacity utilization.  Period, I'm done there.

12:25:45PM  25   Q    Did Professor Snyder, in any way, dispute that capacity

Shapiro - Direct

12:25:49PM 1   has not gotten tight for Jeld-Wen?

12:25:52PM 2   A    I'm sorry, I didn't hear the question.

12:25:52PM 3   Q    Did Professor Snyder ever dispute that capacity has not

12:25:56PM 4   gotten tight?

12:25:59PM 5   A    I can't remember what he said on that actually.

12:26:04PM 6   Q    We'll leave that for the record.  So given the current

12:26:08PM 7   demand in the housing market and comparing that to the 2005

12:26:13PM 8   peak, is it surprising, in your view, that capacity is not

12:26:16PM 9   tight at this point?

12:26:17PM 10  A    No.  After having studied this, and the jury has seen, I

12:26:24PM 11  think, the key numbers, the peak in the housing starts in 2005

12:26:29PM 12  was over two million.  It was really a boom time, and even now,

12:26:36PM 13  2016/2017, I think we're about 60 percent of that, 1.2 million

12:26:42PM 14  starts, something like that.

12:26:44PM 15       So this is an industry that, as far as I can see for the

12:26:48PM 16  foreseeable future, will have excess capacity, okay, unless --

12:26:53PM 17  eventually some plants might close, things could change, but

12:27:02PM 18  over this time period and right now, today, there is

12:27:09PM 19  considerable available capacity because the peak was so high

12:27:13PM 20  back in 2005 and '06.

12:27:15PM 21  Q    Let me turn to another witness who testified after you

12:27:19PM 22  testified here, and that's Mr. Bob Merrill.  Have you read Mr.

12:27:24PM 23  Merrill's testimony?

12:27:25PM 24       MR. PFEIFFER:  Your Honor, may we be heard on this?

12:27:32PM 25  I was of the understanding from earlier today that the experts

Shapiro - Direct                                    2382

12:27:35PM  1   were not to talk about the evidence that came in through other

12:27:38PM  2   witnesses.

12:27:40PM  3           THE COURT:  You weren't to comment on the testimony

12:27:42PM  4   of other witnesses.

12:27:44PM  5           MR. PFEIFFER:  As we're being -- as we're getting --

12:27:48PM  6           THE COURT:  Why don't we wait to hear the question.

12:27:51PM  7   Don't answer the question, because there may be an objection.

12:27:55PM  8           MR. POMERANTZ:  I am going to ask him to comment on

12:27:57PM  9   testimony of Mr. Merrill.  I thought that was permissible.

12:28:00PM 10           MR. PFEIFFER:  Your Honor, I think, as was clearly

12:28:02PM 11   established this morning, that's not what we're supposed to be

12:28:05PM 12   doing with the experts.

12:28:06PM 13           MR. POMERANTZ:  I wasn't here, I think, for that part

12:28:08PM 14   of it.

12:28:08PM 15           THE COURT:  Come up here, please.

12:28:14PM 16

12:28:14PM 17           (Discussion at sidebar as follows:)

12:28:15PM 18

12:28:15PM 19           THE COURT:  It depends on what the question and the

12:28:17PM 20   answer is.  What are you asking him?

12:28:20PM 21           MR. POMERANTZ:  Merrill said that CraftMaster did not

12:28:22PM 22   consider its capacity in raising prices when demand increased,

12:28:26PM 23   and he then went on and said that CraftMaster would increase

12:28:30PM 24   prices in response to demand when they could get away with it

12:28:34PM 25   given the competition they faced.

Shapiro - Direct

12:28:35PM   1          THE COURT:  So what are you going to ask this

12:28:37PM   2  witness?

12:28:37PM   3          MR. POMERANTZ:  I'm then going to ask him how does

12:28:41PM   4  that relate to your response to Professor Snyder's opinion on

12:28:45PM   5  capacity.

12:28:46PM   6          THE COURT:  I think he can do that, because he's not

12:28:48PM   7  commenting on the -- editorializing on the testimony.  He's

12:28:52PM   8  just saying how does that testimony affect your comment with

12:28:56PM   9  respect to Snyder.

12:28:57PM  10          MR. PFEIFFER:  So then am I allowed, basically, to do

12:29:00PM  11  the same thing on my cross, point to him, you are aware

12:29:04PM  12  so-and-so testified X?

12:29:05PM  13          THE COURT:  Until I see what you do, I don't know.

12:29:07PM  14          MR. PFEIFFER:  Okay, Your Honor.

12:29:08PM  15          THE COURT:  Conceptually you can do the same thing

12:29:11PM  16  he's doing, but whether you are doing it is a different issue.

12:29:14PM  17

12:29:14PM  18          (End of sidebar discussion.)

12:29:22PM  19

12:29:22PM  20  Q   All right, Professor Shapiro, I was referring you to Mr.

12:29:25PM  21  Merrill's testimony; do you recall that?

12:29:27PM  22  A   I do.

12:29:27PM  23  Q   And do you recall that Mr. Merrill testified that

12:29:30PM  24  CraftMaster did not consider its capacity in raising prices

12:29:34PM  25  when demand increased?

Shapiro - Direct

2384

| | | |
|---|---|---|
| 12:29:36PM | 1 | A   I recall he spoke to that issue, yes. |
| 12:29:38PM | 2 | Q   And do you recall him also testifying that CraftMaster |
| 12:29:42PM | 3 | would increase prices in response to demand when they could get |
| 12:29:47PM | 4 | away with it given the competition they faced?  Do you recall |
| 12:29:49PM | 5 | that testimony? |
| 12:29:50PM | 6 | A   I do, yes. |
| 12:29:51PM | 7 | Q   How does that testimony relate to your response to |
| 12:29:55PM | 8 | Professor Snyder about capacity? |
| 12:29:57PM | 9 | A   I think it's directly relevant.  As I understand Mr. |
| 12:30:03PM | 10 | Merrill's testimony, just what you just said, when they can get |
| 12:30:11PM | 11 | away with it -- was that the exact word? |
| 12:30:14PM | 12 | Q   I think what he said was when they could get away with it. |
| 12:30:17PM | 13 | A   That, I believe, is referring to competition -- |
| 12:30:21PM | 14 | MR. PFEIFFER:  Your Honor, now is he expressly |
| 12:30:23PM | 15 | interpreting what Mr. Merrill said. |
| 12:30:25PM | 16 | MR. POMERANTZ:  I'll complete the quote. |
| 12:30:27PM | 17 | Q   What Mr. Merrill said, and I have a quote -- |
| 12:30:30PM | 18 | THE COURT:  The question is not what -- without |
| 12:30:34PM | 19 | repeating it or judging it or anything else, how did what |
| 12:30:37PM | 20 | Merrill said affect your response to Snyder.  That's the only |
| 12:30:44PM | 21 | question on the table, and that's the one he can answer. |
| 12:30:46PM | 22 | MR. POMERANTZ:  Correct. |
| 12:30:48PM | 23 | THE WITNESS:  Okay.  Give me a moment.  I want to get |
| 12:30:58PM | 24 | it right.  When capacity utilization is relatively low, |
| 12:31:12PM | 25 | attempts by a company to raise price may well be unsuccessful |

Shapiro - Direct

2385

| | |
|---|---|
| 12:31:21PM | 1 |
| 12:31:29PM | 2 |
| 12:31:33PM | 3 |
| 12:31:37PM | 4 |
| 12:31:41PM | 5 |
| 12:31:42PM | 6 |
| 12:31:46PM | 7 |
| 12:31:50PM | 8 |
| 12:31:51PM | 9 |
| 12:31:54PM | 10 |
| 12:31:56PM | 11 |
| 12:32:01PM | 12 |
| 12:32:05PM | 13 |
| 12:32:05PM | 14 |
| 12:32:07PM | 15 |
| 12:32:09PM | 16 |
| 12:32:15PM | 17 |
| 12:32:19PM | 18 |
| 12:32:26PM | 19 |
| 12:32:31PM | 20 |
| 12:32:35PM | 21 |
| 12:32:38PM | 22 |
| 12:32:41PM | 23 |
| 12:32:45PM | 24 |
| 12:32:49PM | 25 |

1   if they face competition because their competitors will also

2   have extra capacity and will be keen to fill their plants.  So

3   the ability to raise price depends not just on capacity

4   utilization and demand but on the degree of competition the

5   company faces.

6   Q    All right.  And I want to direct you to another piece of

7   evidence that relates to Professor Snyder's opinion about

8   capacity.

9        MR. POMERANTZ:  Mr. Nichols, could you pull up

10  Exhibit 302.

11  Q    This is the Masonite May 8th presentation that we've seen

12  previously in this case.  You relied on this in your report,

13  didn't you?

14  A    Yes, sir.

15       MR. POMERANTZ:  Mr. Nichols, could you pull up page

16  12.  And I want to focus on the portion near the bottom with

17  the sentence that begins "I do not believe," kind of in the

18  middle there.  If you can highlight that whole sentence.

19  Q    What Masonite is saying here is, "I do not believe that

20  the pricing dynamics necessarily need to follow capacity

21  utilization, however, because if you think about the fact that

22  there's only two vertically integrated players that exist in

23  this space today, it's really more a matter of how one thinks

24  about the value they want to try and derive from their products

25  in the marketplace today."  Do you see that?

Shapiro - Direct                                                2386

| 12:32:51PM | 1 | A    I do. |
| 12:32:52PM | 2 | Q    How does the statement by Masonite relate to your response |
| 12:32:56PM | 3 | to Professor Snyder about capacity? |

12:32:51PM    1    A    I do.

12:32:52PM    2    Q    How does the statement by Masonite relate to your response

12:32:56PM    3    to Professor Snyder about capacity?

12:32:58PM    4              MR. PFEIFFER:  Your Honor, we have an objection to

12:33:03PM    5    this as hearsay, so it should not be considered by the jury for

12:33:06PM    6    the truth of what's asserted there.

12:33:10PM    7              THE COURT:  Which is this?  Which presentation is

12:33:13PM    8    this?

12:33:13PM    9              MR. POMERANTZ:  This is the May 8th, 2014,

12:33:14PM   10    presentation by Masonite, and, number one, we're not offering

12:33:18PM   11    it for the truth.

12:33:19PM   12              THE COURT:  I dealt with the hearsay objection at the

12:33:23PM   13    pretrial conference by using the -- and in connection with the

12:33:30PM   14    affidavit that some fellow presented, but did it relate to this

12:33:35PM   15    document?

12:33:37PM   16              MR. POMERANTZ:  This document is already in evidence.

12:33:39PM   17    We used it yesterday with Mr. Hachigian.

12:33:42PM   18              THE COURT:  The objection is overruled.

12:33:46PM   19    A    This is very consistent with my view of the market which

12:33:49PM   20    is -- and the role of capacity utilization in particular, which

12:33:55PM   21    is even if there's excess capacity, if you have only two

12:33:59PM   22    suppliers, they're likely to have significant pricing power,

12:34:04PM   23    and they may be able to raise price notwithstanding the excess

12:34:09PM   24    capacity.

12:34:09PM   25              But if you have more competition, it will tend to keep

Shapiro - Direct                                                    2387

| | | |
|---|---|---|
| 12:34:13PM | 1 | that from happening.  It will keep the prices from going up, |
| 12:34:17PM | 2 | because the different suppliers will be eager to fill their |
| 12:34:21PM | 3 | plants, and that will be good for customers. |
| 12:34:24PM | 4 | Q    All right.  I want to turn to a different subject, and |
| 12:34:29PM | 5 | that is the entry into the market by either a new door skin |
| 12:34:34PM | 6 | plant owner or by a foreign supplier. |
| 12:34:36PM | 7 |          MR. PFEIFFER:  Your Honor, if I may -- |
| 12:34:38PM | 8 |          MR. POMERANTZ:  I withdraw that.  Actually, you're |
| 12:34:42PM | 9 | right. |
| 12:34:44PM | 10 |          THE COURT:  A signal moment they agreed on something. |
| 12:34:49PM | 11 |          MR. POMERANTZ:  I am not going to ask you that |
| 12:34:51PM | 12 | question. |
| 12:34:52PM | 13 |          THE WITNESS:  I can live with that. |
| 12:34:54PM | 14 | Q    Did you see Professor Snyder's discussion in the |
| 12:34:58PM | 15 | transcript you read where he used the term but-for world? |
| 12:35:02PM | 16 | A    Yes, I did. |
| 12:35:03PM | 17 | Q    And did you understand what he meant by but-for world? |
| 12:35:05PM | 18 | A    I do.  I did.  I understand. |
| 12:35:08PM | 19 | Q    What do you understand that term to mean? |
| 12:35:10PM | 20 | A    It's referring to how things would have played out if the |
| 12:35:14PM | 21 | merger had not taken place. |
| 12:35:16PM | 22 | Q    Now, have you already analyzed the but-for world in this |
| 12:35:20PM | 23 | merger? |
| 12:35:21PM | 24 | A    Yes, I have. |
| 12:35:22PM | 25 | Q    Why did you do that? |

Shapiro - Direct

2388

12:35:25PM  1    A    Well, the question fundamentally I'm asking is did the

12:35:30PM  2    merger substantially lessen competition, and implicit in that

12:35:36PM  3    is compared with the merger not happening.  So the merger not

12:35:41PM  4    happening, that's another -- that's the but-for world, as his

12:35:46PM  5    term, which is a commonly used term, so, of course, I've been

12:35:50PM  6    thinking a great deal about that, and much of my testimony

12:35:55PM  7    related to how things would have played out if the merger had

12:35:59PM  8    not taken place.

12:36:00PM  9    Q    So the but-for world, in your view, is the market in which

12:36:04PM  10   Jeld-Wen never acquired CraftMaster; right?

12:36:08PM  11   A    That's right.  What we do is we go back to 2012.  We then

12:36:13PM  12   imagine the merger didn't take place, CraftMaster remains as an

12:36:18PM  13   independent supplier, what would happen as best we could tell,

12:36:24PM  14   and then we're comparing that to what actually happened when

12:36:27PM  15   the merger did occur.

12:36:28PM  16   Q    And so did you actually analyze then how competition would

12:36:33PM  17   have been different between the actual world with the merger

12:36:36PM  18   and the but-for world without the merger?

12:36:38PM  19   A    That's essentially all of my analysis, is to do exactly

12:36:43PM  20   that so I can determine the effect of the merger.

12:36:46PM  21   Q    So if Professor Snyder said you didn't do that, he's just

12:36:50PM  22   wrong?

12:36:51PM  23   A    That would be incorrect for him to say that.

12:36:55PM  24   Q    What was the first step of your analysis of the but-for

12:36:59PM  25   world?

Shapiro - Direct

2389

| | |
|---|---|
| 12:36:59PM | 1 |
| 12:37:03PM | 2 |
| 12:37:06PM | 3 |
| 12:37:12PM | 4 |
| 12:37:17PM | 5 |
| 12:37:20PM | 6 |
| 12:37:25PM | 7 |
| 12:37:29PM | 8 |
| 12:37:32PM | 9 |
| 12:37:36PM | 10 |
| 12:37:42PM | 11 |
| 12:37:44PM | 12 |
| 12:37:46PM | 13 |
| 12:37:52PM | 14 |
| 12:37:56PM | 15 |
| 12:38:02PM | 16 |
| 12:38:06PM | 17 |
| 12:38:11PM | 18 |
| 12:38:14PM | 19 |
| 12:38:15PM | 20 |
| 12:38:22PM | 21 |
| 12:38:26PM | 22 |
| 12:38:30PM | 23 |
| 12:38:36PM | 24 |
| 12:38:39PM | 25 |

A    Well, what we always do essentially is we look at the

market structure and the concentration.  So because -- the

merger went from three to two, and so the first step is to see

how big a change in market structure or concentration was

caused, and that's part of the analysis of the but-for world,

because the world without the merger, in this case without the

three firms, the market would be less concentrated.  So we're

comparing the market concentration with and without the merger.

Q    Let me help explain this to the jury.

        MR. POMERANTZ:  Phil, could you bring up 902.22.

Q    Could you remind the jury what this is and how it relates

to your analysis of the but-for world?

A    Certainly.  So the title again, Market Concentration:

Door Skin Sales in the United States.  So this is our HHI index

that we used to measure concentration.  The 3,820 was the

measure before the merger.  The merger caused concentration to

go up by 1,213 points up to a little over 5,000.  You can see

the market shares there which is what we used for this

calculation.

        We're in this highly concentrated zone.  So when we look

at the change in the Herfindahl, that's our way of saying how

much did the actual world, with the 5,000 index, compare with

the but-for world which was a 3,820 index.  So the reason we

focus on the increase, here 1,200, is because we're comparing

the actual and the but-for world.

12:38:42PM  1       So that's a starting point, and, again, to remind the

12:38:45PM  2  jury, when we have a merger like this, we're in the highly

12:38:48PM  3  concentrated zone with a very large increase, we have a strong

12:38:53PM  4  prediction right out of the box that without the merger, the

12:38:58PM  5  market would be significantly more competitive.  That's the

12:39:00PM  6  first step.

12:39:01PM  7  Q    I just want to make sure the record is clear.  So after

12:39:06PM  8  the merger, Jeld-Wen had a market share of 54 percent, and

12:39:10PM  9  Masonite had a market share of 46 percent; right?

12:39:12PM  10  A    That's correct.  Those are the numbers that lead to the

12:39:15PM  11  5,033 measure shown on the diagram.

12:39:18PM  12  Q    And the 3,820 on the index, that's because you are

12:39:22PM  13  counting the market shares before the merger where Jeld-Wen had

12:39:28PM  14  38 percent, CraftMaster had 16 percent, and Masonite still had

12:39:32PM  15  its 46 percent; correct?

12:39:33PM  16  A    That's correct.

12:39:34PM  17  Q    Now, how does analyzing market concentration in this

12:39:40PM  18  economist HHI world, how does that actually compare the actual

12:39:46PM  19  world with the but-for world?

12:39:48PM  20  A    So, again, let's talk about this but-for world.  We would

12:39:52PM  21  have, in this case, three firms competing independently:

12:39:59PM  22  Jeld-Wen, Masonite, and CraftMaster.  The market shares and the

12:40:03PM  23  concentration are one way of measuring how competitive.  It's

12:40:07PM  24  still highly concentrated, but it's a lot better than the

12:40:10PM  25  5,000.  So it's really a way of starting to track the

Shapiro - Direct                                       2391

12:40:14PM  1   significance of having CraftMaster in the market as an

12:40:18PM  2   independent competitor rather than acquired by Jeld-Wen, and

12:40:22PM  3   that's what this Herfindahl index is already directing us to,

12:40:27PM  4   the importance of CraftMaster as an independent competitor.

12:40:30PM  5   Q   Professor Snyder said yesterday that the door skin market

12:40:35PM  6   was highly concentrated before the merger and it was highly

12:40:39PM  7   concentrated after the merger and, therefore, I guess it

12:40:42PM  8   doesn't matter.  Do you agree with him?

12:40:46PM  9   A   Well, let me put it this way:  I think Professor Snyder

12:40:51PM 10   and I agree that the -- he didn't dispute any of the Herfindahl

12:40:57PM 11   calculations in the market definitions, and it's true.  Market

12:41:01PM 12   was highly concentrated before and after, but it became a lot

12:41:04PM 13   more concentrated.  That 1,200 bump-up, that's a lot.  Anything

12:41:10PM 14   above 200 gets our attention -- this is 1,200 -- in terms of

12:41:14PM 15   the bump-up.

12:41:15PM 16       So if he is suggesting that 3,800, 5,000, is high either

12:41:22PM 17   way, I strongly disagree.  There's a significant difference,

12:41:26PM 18   and that reflects the difference between two and three

12:41:29PM 19   competitors.

12:41:30PM 20   Q   All right.  So how would the ongoing presence of CMI in

12:41:36PM 21   the market have affected competition, in your view?

12:41:40PM 22   A   So in the -- without the merger in the but-for world, CMI

12:41:45PM 23   is an independent competitor.  They had about 16 percent share

12:41:50PM 24   prior to the merger.  So the but-for world, we have to imagine,

12:42:00PM 25   based on all the evidence we have, CraftMaster with that market

Shapiro - Direct

2392

| | |
|---|---|
| 12:42:04PM | 1 |

share owning the Towanda facility -- that's their main key

asset in this market, which is a large, relatively recent,

relatively efficient facility, they would be competing with

that, with that asset and their other assets, and that's a

significant factor in the market, having that third competitor,

and that's what was lost.

    And it's my view that in that world, with CraftMaster

continuing to compete, the door skin prices would have been --

come down as costs came down, and that's something we never

saw.  Instead, we saw prices go up.

        MR. POMERANTZ:  Professor Shapiro, I don't have any

further questions.  Thank you.

        THE COURT:  Mr. Pfeiffer.

        MR. PFEIFFER:  Thank you, Your Honor.


                    CROSS-EXAMINATION

BY MR. PFEIFFER:

Q    Hi.

A    Hello, Mr. Pfeiffer.

Q    Now, you agree that the but-for world you were just

talking about has to take into account all of the facts that

existed in the real world before the merger that didn't change

because of the merger; right?

A    It should reflect --

Q    Is that a yes, sir?

Shapiro - Cross

2393

12:43:24PM 1    A    No -- all of the facts sounds -- I can't take into account

12:43:29PM 2    all of the facts.  That's not a practical way to do things, so

12:43:32PM 3    I would not say yes to that.  I was going to explain what one

12:43:34PM 4    does.

12:43:34PM 5    Q    So the but-for world would not keep the same facts that

12:43:38PM 6    the merger didn't change; is that your testimony?

12:43:41PM 7    A    If things weren't going to change by the merger, then they

12:43:46PM 8    would be part of the but-for world --

12:43:48PM 9    Q    Thank you.  For example, however the evidence in this case

12:43:52PM 10   shows that companies in this door skin market priced relative

12:43:58PM 11   to their average variable costs before the market, you are not

12:44:01PM 12   assuming that the but-for world they would price any

12:44:05PM 13   differently relative to average variable costs, are you?

12:44:08PM 14   A    I'm not assuming some change in behavior of the merger.

12:44:14PM 15   I'm assuming the competition would have continued the way it

12:44:17PM 16   was.

12:44:17PM 17   Q    And however companies priced relative to their capacity

12:44:21PM 18   utilization in the door skins market before the merger, you

12:44:24PM 19   assume they would price the same way relative to capacity

12:44:27PM 20   utilization in the but-for world; right?

12:44:30PM 21   A    That's one factor to consider, capacity utilization.

12:44:34PM 22   Q    That wasn't my question.  My question is, your but-for

12:44:37PM 23   world would assume that companies in the door skin market would

12:44:39PM 24   price the same way relative to capacity utilization as they had

12:44:45PM 25   before the merger; yes or no?

Shapiro - Cross

| | | |
|---|---|---|
| 12:44:47PM | 1 | A    Everything else equal, that's fair enough. |
| 12:44:50PM | 2 | Q    And, again, as I think you said, you agree that in the |
| 12:44:53PM | 3 | but-for world, the door skins market would be highly |
| 12:44:57PM | 4 | concentrated still; correct? |
| 12:44:59PM | 5 | A    Yes. |
| 12:45:00PM | 6 | Q    Now, you mentioned earlier that from 2006 to 2012, door |
| 12:45:13PM | 7 | skin prices went down but only by a small percentage overall; |
| 12:45:18PM | 8 | is that correct? |
| 12:45:18PM | 9 | A    Well, I was able to look at the door skin prices paid by |
| 12:45:21PM | 10 | Steves.  That's what I believe I was referring to. |
| 12:45:24PM | 11 | Q    And that's the measure you used? |
| 12:45:26PM | 12 | A    Yes, that's the one I was testifying about. |
| 12:45:28PM | 13 | Q    And Steves, during that entire period, was subject to a |
| 12:45:36PM | 14 | long-term pricing agreement with Jeld-Wen for a substantial |
| 12:45:39PM | 15 | portion of its needs, for some years all of its needs; right? |
| 12:45:43PM | 16 | A    No -- well, that's misleading to say that there was an |
| 12:45:48PM | 17 | LTA, but remember we showed in the CARB episode how Steves |
| 12:45:52PM | 18 | moved a large share of their business away from Jeld-Wen even |
| 12:45:55PM | 19 | though they were under the LTA. |
| 12:45:57PM | 20 | Q    Sir, please don't characterize my question.  Let me take |
| 12:45:59PM | 21 | you back to my question.  You agree that Steves bought a |
| 12:46:01PM | 22 | substantial portion of its door skins, from the 2006 to 2012 |
| 12:46:09PM | 23 | period, under a long-term supply agreement with Jeld-Wen; |
| 12:46:13PM | 24 | correct? |
| 12:46:15PM | 25 | A    Depends on what you mean by substantial, because it was |

Shapiro - Cross

2395

12:46:18PM 1  very high, and then it declined quite a bit, but that's the

12:46:21PM 2  facts.

12:46:22PM 3  Q    Now, so you haven't actually analyzed what happened to the

12:46:28PM 4  price of door skins on a market-wide basis from 2006 to 2012,

12:46:33PM 5  have you?

12:46:33PM 6  A    Well, I don't think that I had reliable data on that.  I

12:46:39PM 7  do know that Professor Snyder has an exhibit where he purports

12:46:42PM 8  such numbers.

12:46:43PM 9  Q    Back to my question, sir.  Whether you think you had the

12:46:45PM 10 reliable data to do it, you did not do an analysis of

12:46:50PM 11 market-wide pricing of door skins from 2006 to 2012, did you,

12:46:54PM 12 sir?

12:46:54PM 13 A    That is correct, I did not.

12:46:56PM 14 Q    And, again, the pricing at that time, from 2006 to 2012,

12:47:01PM 15 that was pricing in a highly concentrated market, according to

12:47:05PM 16 you; right?

12:47:05PM 17 A    Yes, the market has been highly concentrated throughout

12:47:08PM 18 this period.

12:47:09PM 19 Q    And you have offered no analysis in this case to determine

12:47:18PM 20 the extent to which the highly concentrated nature of the door

12:47:23PM 21 skin market before the merger explains why prices didn't go

12:47:28PM 22 down by more than they did from 2006 to 2012, have you?

12:47:34PM 23 A    I don't think that particular point is addressed in my

12:47:37PM 24 reports.

12:47:37PM 25 Q    Thank you.  Now, you talked about capacity utilization.

Shapiro - Cross

2396

| | | |
|---|---|---|
| 12:47:44PM | 1 | You didn't look at how companies priced -- door skin companies |
| 12:47:51PM | 2 | priced in relation to their capacity utilization before the |
| 12:47:55PM | 3 | merger, did you? |
| 12:47:56PM | 4 | A    It was part of my line of inquiry.  I don't recall |
| 12:48:03PM | 5 | learning enough to put anything about that in my reports. |
| 12:48:06PM | 6 | Q    But we can agree, capacity utilization must have dropped |
| 12:48:09PM | 7 | quite a bit in the door skin industry as the housing market |
| 12:48:14PM | 8 | plummeted from that 2006 peak of over two million housing |
| 12:48:19PM | 9 | starts to roughly 500-something thousand at the bottom; right? |
| 12:48:23PM | 10 | A    I agree with that. |
| 12:48:24PM | 11 | Q    But as you said, although capacity utilization must have |
| 12:48:29PM | 12 | dropped substantially as a result of that, door skin prices, |
| 12:48:32PM | 13 | according to your analysis, what you could determine, didn't |
| 12:48:35PM | 14 | drop by very much at all from 2006 to 2012, did they? |
| 12:48:40PM | 15 | A    They did not. |
| 12:48:41PM | 16 | Q    Now, you talked about an analysis of average variable cost |
| 12:48:45PM | 17 | as part of your pricing analysis, but your calculation of |
| 12:48:50PM | 18 | average variable costs used Jeld-Wen's actual costs; right? |
| 12:48:55PM | 19 | A    Yes, that's fair. |
| 12:48:59PM | 20 | Q    When you looked at those costs, then, they included actual |
| 12:49:03PM | 21 | costs after Jeld-Wen had bought the Towanda facility as part of |
| 12:49:07PM | 22 | the CMI acquisition; right? |
| 12:49:09PM | 23 | A    The total did, although we had plant-level data, so not |
| 12:49:13PM | 24 | all of the components I looked at included Towanda. |
| 12:49:16PM | 25 | Q    But where they were part of what you looked at, they were |

Shapiro - Cross
2397

| | | |
|---|---|---|
| 12:49:19PM | 1 | in the mix; right? |
| 12:49:20PM | 2 | A    Yes. |
| 12:49:23PM | 3 | Q    And so then those costs that you looked at where they |
| 12:49:29PM | 4 | included Towanda, by definition, included any cost savings that |
| 12:49:33PM | 5 | Jeld-Wen realized by virtue of acquiring CMI; right? |
| 12:49:39PM | 6 | A    That's correct when I included Towanda, and that's why I |
| 12:49:42PM | 7 | also broke things out as well. |
| 12:49:45PM | 8 | Q    And so where you included the Towanda costs, we can agree |
| 12:49:49PM | 9 | those are not costs as they would have existed in the but-for |
| 12:49:53PM | 10 | world, can't we? |
| 12:49:53PM | 11 | A    I have no basis for thinking there were significant |
| 12:49:58PM | 12 | merger-specific efficiencies, so I think those would be similar |
| 12:50:03PM | 13 | to the costs in the but-for world. |
| 12:50:04PM | 14 | Q    You haven't studied that to be able to say, have you? |
| 12:50:07PM | 15 | A    I'm using their actual cost data, and I looked to see |
| 12:50:16PM | 16 | whether there were claims of merger-specific efficiencies, so |
| 12:50:22PM | 17 | in that sense, I did study the question, yes. |
| 12:50:24PM | 18 | Q    Well, you understand that there was testimony in this case |
| 12:50:28PM | 19 | from Jeld-Wen witnesses that went to the issue of efficiencies; |
| 12:50:31PM | 20 | have you read that testimony? |
| 12:50:33PM | 21 | A    Yes, I have. |
| 12:50:34PM | 22 | Q    You are not here to judge or dispute that testimony, are |
| 12:50:36PM | 23 | you? |
| 12:50:37PM | 24 | THE COURT:  He can't, so let's go on. |
| 12:50:40PM | 25 | MR. PFEIFFER:  Thank you, Your Honor. |

12:50:41PM  1          THE COURT:  He knows that, and you know it.

12:50:43PM  2     Q    Now, you talked about price increases in a post-recession

12:50:48PM  3     world not being automatic; is that basically what you said?

12:50:53PM  4     A    I did say that.

12:50:54PM  5     Q    But they are common, aren't they, price increases coming

12:50:58PM  6     out of a recession?

12:51:00PM  7     A    I think it just varies all over the place.  For example,

12:51:03PM  8     wage rates have not come up much at all, to the disappointment

12:51:07PM  9     of many, so I don't know that I would say it's common or it's

12:51:11PM  10    common and so is the opposite.

12:51:13PM  11    Q    You recall that Dean Snyder presented evidence of price

12:51:19PM  12    increases by a number of different measures in the building

12:51:23PM  13    products industry for products other than door skins after the

12:51:26PM  14    merger, don't you?

12:51:27PM  15    A    I saw that.

12:51:28PM  16    Q    And you didn't do a countervailing study showing price

12:51:32PM  17    decreases in any products in the building products industry,

12:51:35PM  18    did you?

12:51:36PM  19    A    I did not do that.  No, I don't think that's relevant,

12:51:39PM  20    because the costs and capacity conditions differ from industry

12:51:43PM  21    to industry.  I don't think it's a good benchmark.

12:51:46PM  22    Q    You didn't do any analysis, sir, to show that any of those

12:51:49PM  23    other sellers' products didn't increase their margins after the

12:51:53PM  24    recession, did you?

12:51:54PM  25    A    I did not look in detail at those industries, no, and

Shapiro - Cross                                                    2399

12:51:57PM   1   those are, by the way, aggregates of many different markets

12:52:03PM   2   anyhow.

12:52:03PM   3   Q    Well, there were also individual products listed, weren't

12:52:06PM   4   there?

12:52:06PM   5   A    The two indices that I believe were reported were not

12:52:10PM   6   specific markets.  They were broader than that, as I recall.

12:52:12PM   7   Q    And you recall there were other individual products

12:52:14PM   8   besides those indices that Dean Snyder talked about, didn't he?

12:52:17PM   9   A    I remember the windows going up one percent, and there

12:52:20PM  10   were some other products.  I thought you were talking about the

12:52:24PM  11   indexes though.  Yes, there were other products.

12:52:26PM  12   Q    On the issue of output, to be clear, you did no

12:52:30PM  13   quantitative analysis of what output would have been in the

12:52:35PM  14   but-for world in which Jeld-Wen had not acquired CMI; right?

12:52:40PM  15   A    No, that's not correct.

12:52:43PM  16   Q    You offered a quantitative analysis of what the level of

12:52:46PM  17   output would have been in the but-for world?

12:52:49PM  18   A    I have the pieces --

12:52:51PM  19   Q    It's not my question whether you could have assembled it.

12:52:53PM  20   Did you offer that quantitative analysis in your opinions in

12:52:56PM  21   this case?

12:52:57PM  22   A    It's not something I presented to the jury.  It was

12:53:00PM  23   something I did separately, that's fair.

12:53:03PM  24        MR. PFEIFFER:  Thank you, Dr. Shapiro.  That's my

12:53:06PM  25   questions.

| | | |
|---|---|---|
| 12:53:06PM | 1 | THE COURT:  Any redirect? |
| 12:53:08PM | 2 | MR. POMERANTZ:  No, Your Honor. |
| 12:53:08PM | 3 | THE COURT:  Can he be excused permanently? |
| 12:53:10PM | 4 | MR. POMERANTZ:  Yes, Your Honor, fine with us. |
| 12:53:13PM | 5 | THE COURT:  Thank you, Dr. Shapiro, for being with us |
| 12:53:15PM | 6 | and giving us your testimony.  You are now released to go about |
| 12:53:18PM | 7 | your business. |
| 12:53:19PM | 8 | Ladies and gentlemen, your lunch is here in the jury |
| 12:53:24PM | 9 | room.  We'll take 45 minutes for lunch, and then they will have |
| 12:53:34PM | 10 | another witness or two or something -- I don't know how many, |
| 12:53:38PM | 11 | and then we'll finish that testimony.  The case will then be |
| 12:53:43PM | 12 | over whenever the witnesses are over, and I have some things to |
| 12:53:46PM | 13 | do with the attorneys to get ready for tomorrow morning.  So |
| 12:53:49PM | 14 | you take your lunch recess at this time.  Just take your pads |
| 12:53:53PM | 15 | with you.  Thank you. |
| 12:54:01PM | 16 | |
| 12:54:07PM | 17 | (Jury out.) |
| 12:54:07PM | 18 | |
| 12:54:15PM | 19 | THE COURT:  How many more witnesses do you have? |
| 12:54:18PM | 20 | MR. POMERANTZ:  Just one, Your Honor.  Mr. Tucker |
| 12:54:20PM | 21 | will come back. |
| 12:54:22PM | 22 | THE COURT:  So -- then after lunch we will have time |
| 12:54:26PM | 23 | to go over these matters that pertain to the instructions and |
| 12:54:28PM | 24 | the verdict form without setting the new courthouse record for |
| 12:54:40PM | 25 | late stays for jury instruction conferences.  All right, thank |

| | | |
|---|---|---|
| 12:54:46PM | 1 | you very much.  We'll be in recess for 45 minutes. |
| 12:54:49PM | 2 | |
| 12:54:49PM | 3 | (Luncheon recess.) |
| 01:47:48PM | 4 | |
| 01:47:48PM | 5 | THE COURT:  We have some problem? |
| 01:47:54PM | 6 | MR. BUTERMAN:  Yes, Your Honor.  Just a moment ago we |
| 01:48:01PM | 7 | received from Steves the documents that they intend to use with |
| 01:48:06PM | 8 | Mr. Tucker in his upcoming examination. |
| 01:48:10PM | 9 | THE COURT:  Are you talking about demonstratives or |
| 01:48:12PM | 10 | exhibits? |
| 01:48:12PM | 11 | MR. BUTERMAN:  Exhibits, neither of which has been -- |
| 01:48:16PM | 12 | neither of which is part of this case.  One is a third-party |
| 01:48:20PM | 13 | transcript from February 23rd, 2017.  It's a Masonite |
| 01:48:26PM | 14 | transcript.  It's not part of anything that we've dealt with in |
| 01:48:29PM | 15 | this case.  It doesn't have a PX number.  Your Honor has never |
| 01:48:33PM | 16 | ruled on it, so it's completely hearsay.  It's nothing, |
| 01:48:38PM | 17 | frankly. |
| 01:48:38PM | 18 | THE COURT:  Is it being offered in evidence? |
| 01:48:41PM | 19 | MR. BUTERMAN:  No, Your Honor. |
| 01:48:43PM | 20 | MR. DANE:  No, Your Honor. |
| 01:48:43PM | 21 | MR. BUTERMAN:  We don't believe it should go in front |
| 01:48:45PM | 22 | of the jury because it's completely prejudicial -- |
| 01:48:49PM | 23 | THE COURT:  Must be really bad.  Let me see it. |
| 01:48:55PM | 24 | Can't wait to see this thing. |
| 01:48:57PM | 25 | MR. DANE:  It's not that exciting, Your Honor. |

01:49:05PM 1          THE COURT:  Edited transcript of the earnings call,

01:49:09PM 2     okay.  Is this one of the earnings calls that's been put into

01:49:13PM 3     evidence?

01:49:14PM 4          MR. BUTERMAN:  No, Your Honor.

01:49:14PM 5          MR. DANE:  If Your Honor would like, I can explain

01:49:16PM 6     what the intended use was of this document, and I can also

01:49:19PM 7     direct --

01:49:20PM 8          THE COURT:  Why don't you come to the lectern so the

01:49:23PM 9     court reporter can hear you, and tell me what's up and why this

01:49:28PM 10    thing is here.

01:49:29PM 11         MR. DANE:  This was simply -- Your Honor, this is a

01:49:30PM 12    document that Mr. Tucker did, in fact, cite in his expert

01:49:36PM 13    reports as one of the documents he had relied in support of his

01:49:38PM 14    opinions on housing starts, and I was just going to use it to

01:49:42PM 15    ask him about his supports since that was challenged by Mr.

01:49:46PM 16    Kaplan today in his testimony.

01:49:47PM 17         THE COURT:  You can ask him about it.  You can ask

01:49:50PM 18    him what he considered as long as it's part of what experts

01:49:54PM 19    usually consider, but that doesn't put the document into

01:49:57PM 20    evidence.

01:49:58PM 21         MR. DANE:  I was not going to seek to move it into

01:50:03PM 22    evidence.

01:50:03PM 23         THE COURT:  Does that solve your problem?

01:50:05PM 24         MR. BUTERMAN:  Respectfully, no, Your Honor.  We

01:50:09PM 25    believe that it's still prejudicial to put it in front of the

01:50:12PM 1    jury.  Clearly they're putting it in front of the jury for a

01:50:13PM 2    reason --

01:50:14PM 3         THE COURT:  I thought that he said he's not going to

01:50:17PM 4    display it to the jury.  He's going to ask him if he considered

01:50:21PM 5    a conference call and information about housing starts in

01:50:24PM 6    arriving at his conclusion.

01:50:25PM 7         MR. BUTERMAN:  If he's not planning on reading in the

01:50:29PM 8    testimony or reading out loud the testimony, then we don't have

01:50:32PM 9    a problem with this, Your Honor.

01:50:35PM 10        THE COURT:  I'm sure he's going to say did you get

01:50:38PM 11   some -- what are you going to ask him, Mr. Dane?

01:50:43PM 12        MR. DANE:  The relevant page is page 19, and there

01:50:48PM 13   are two page numbers here.  It's actually the smaller one, so I

01:50:56PM 14   guess it's page 35 if you look at the lower-down number.

01:51:00PM 15        THE COURT:  Wait a minute.  19 is smaller than 35?

01:51:04PM 16        MR. DANE:  I'm sorry, Your Honor.  Easier one to look

01:51:08PM 17   at is page 35 in the low right-hand corner.  It's the next to

01:51:13PM 18   the last page.

01:51:18PM 19        THE COURT:  Where on there are you talking about?

01:51:23PM 20        MR. DANE:  So there's a statement by a John Baugh

01:51:26PM 21   where he's asking for clarification on assumptions for 2019

01:51:31PM 22   regarding housing starts.  That's at the top of the page, and

01:51:36PM 23   the response from this Russ Tiejema is, "Our general view is

01:51:41PM 24   1.5 million units by the time that we get into 2019, and it's

01:51:45PM 25   just that evidence that we were planning -- I was planning to

| | | |
|---|---|---|
| 01:51:52PM | 1 | ask Mr. Tucker about, that this was something that he had |
| 01:51:55PM | 2 | relied on as part of forming his opinion that 1.5 million |
| 01:52:01PM | 3 | housing starts a year was reasonable. |
| 01:52:02PM | 4 | MR. BUTERMAN:  In his expert report, he simply does |
| 01:52:04PM | 5 | not state that at all, Your Honor.  It's not been -- his |
| 01:52:10PM | 6 | testimony about how he came up with the numbers -- |
| 01:52:13PM | 7 | THE COURT:  Let me see it.  Let me see what you are |
| 01:52:16PM | 8 | talking about.  I have to read it and see it before I can make |
| 01:52:20PM | 9 | a decision on whether you are right about it.  Your objection |
| 01:52:28PM | 10 | is that he didn't use this in his expert report.  Mr. Dane said |
| 01:52:34PM | 11 | he did.  Mr. Dane, where does he use it? |
| 01:52:44PM | 12 | MR. DANE:  Your Honor, if I can approach, I can show |
| 01:52:56PM | 13 | Your Honor where Mr. Tucker references -- |
| 01:52:58PM | 14 | THE COURT:  You need to show Mr. Buterman first. |
| 01:53:25PM | 15 | Your first objection was that he -- it wasn't in his report, |
| 01:53:29PM | 16 | and I want to know -- do you now agree that it is in his |
| 01:53:32PM | 17 | report? |
| 01:53:33PM | 18 | MR. BUTERMAN:  Yes, Your Honor.  He says based on |
| 01:53:36PM | 19 | available forecasts of housing starts, I estimated that housing |
| 01:53:40PM | 20 | starts would reach 1.5 million by 2022.  Then he cites to -- |
| 01:53:48PM | 21 | MR. DANE:  It's actually the previous sentence. |
| 01:53:50PM | 22 | Sorry.  It's this sentence. |
| 01:53:54PM | 23 | THE COURT:  Do you agree he cites to it in his |
| 01:53:56PM | 24 | report? |
| 01:53:57PM | 25 | MR. BUTERMAN:  Yes, in a footnote, Your Honor. |

| | | |
|---|---|---|
| 01:54:00PM | 1 | THE COURT:  So he does.  That objection is overruled. |
| 01:54:02PM | 2 | What's the next one? |
| 01:54:03PM | 3 | MR. BUTERMAN:  He didn't testify to this at all. |
| 01:54:05PM | 4 | THE COURT:  Testify when? |
| 01:54:06PM | 5 | MR. BUTERMAN:  Oh his direct examination about how he |
| 01:54:08PM | 6 | came up with his housing starts analysis. |
| 01:54:10PM | 7 | THE COURT:  Are you saying he can't testify to that |
| 01:54:12PM | 8 | topic now? |
| 01:54:13PM | 9 | MR. BUTERMAN:  I thought that -- |
| 01:54:16PM | 10 | THE COURT:  In response to what your man said?  This |
| 01:54:20PM | 11 | must really be painful to you all in these objections because |
| 01:54:24PM | 12 | they're not that good.  Objection overruled.  He can, in |
| 01:54:28PM | 13 | fact -- Mr. Dane can ask Mr. Tucker what materials he relied |
| 01:54:34PM | 14 | upon in coming up with 1.5 million housing starts in 2019, and |
| 01:54:42PM | 15 | he can say, including I relied on this, this, this and this, |
| 01:54:46PM | 16 | and if it includes the transcript of the call, that's fine. |
| 01:54:51PM | 17 | But you're not going -- you don't need to show him the document |
| 01:54:57PM | 18 | and talk about the text other than to say that's one of the |
| 01:55:03PM | 19 | things he relied upon; okay? |
| 01:55:05PM | 20 | MR. DANE:  Okay. |
| 01:55:06PM | 21 | THE COURT:  Is there anything else? |
| 01:55:07PM | 22 | MR. BUTERMAN:  There is, but let me just shortchange |
| 01:55:09PM | 23 | it. |
| 01:55:13PM | 24 | THE COURT:  Do I need this anymore? |
| 01:55:15PM | 25 | MR. BUTERMAN:  No.  In fact, if I could get it back. |

01:55:21PM  1        Your Honor, the other issue is Steves plans to

01:55:31PM  2   introduce some deposition testimony of Mr. Fancher.  This isn't

01:55:37PM  3   excerpts, as far as I'm aware of, that they had designated,

01:55:40PM  4   and, as far as I understand, this is not anything that Mr.

01:55:45PM  5   Tucker mentions in his report that he relied upon.

01:55:48PM  6        Mr. Fancher was here.  He testified at trial.  He

01:55:51PM  7   certainly did not testify about these topics, and it seems as

01:55:55PM  8   if what they're really trying to do is impeach Mr. Kaplan with

01:56:01PM  9   something that Mr. Fancher said during his deposition.  If

01:56:06PM 10   that's what they wanted to do, they should have done it when

01:56:10PM 11   Mr. Kaplan was testifying rather than now when Mr. Tucker is

01:56:14PM 12   here.

01:56:16PM 13        MR. DANE:  Your Honor --

01:56:19PM 14        THE COURT:  What is it?  Can somebody share it with

01:56:22PM 15   me?  It's another one of those things that's so secret, I can't

01:56:27PM 16   see it?

01:56:28PM 17        MR. BUTERMAN:  No, Your Honor.  I apologize.

01:56:32PM 18        MR. DANE:  Your Honor, the relevant testimony appears

01:56:34PM 19   on page 388, lines ten through 19.

01:56:56PM 20        THE COURT:  What are you going to do with this?

01:56:59PM 21        MR. DANE:  I was just going to ask him if, in forming

01:57:02PM 22   his opinion as to what were reasonable housing starts

01:57:05PM 23   estimates, he had relied upon testimony from any Jeld-Wen

01:57:09PM 24   representatives.

01:57:10PM 25        THE COURT:  And his answer is?

| | | |
|---|---|---|
| 01:57:12PM | 1 | MR. DANE:  His answer will be, yes, Mr. Fancher, and |
| 01:57:14PM | 2 | I provided this to counsel -- |
| 01:57:16PM | 3 | THE COURT:  This is another thing that experts can |
| 01:57:19PM | 4 | rely on, is deposition testimony.  We all agree on that. |
| 01:57:22PM | 5 | MR. BUTERMAN:  Yes, Your Honor, but as far as I |
| 01:57:25PM | 6 | understand, he does not say that anywhere in his report.  He |
| 01:57:28PM | 7 | doesn't cite to Mr. Fancher's deposition testimony as something |
| 01:57:33PM | 8 | he looked at in coming up with the reasonableness of his |
| 01:57:36PM | 9 | figures. |
| 01:57:36PM | 10 | THE COURT:  So this is a Rule 26 objection. |
| 01:57:38PM | 11 | MR. BUTERMAN:  Yes, Your Honor. |
| 01:57:39PM | 12 | THE COURT:  Where in his report does he cite Mr. |
| 01:57:41PM | 13 | Fancher's testimony? |
| 01:57:43PM | 14 | MR. DANE:  He doesn't cite to it in his report, Your |
| 01:57:45PM | 15 | Honor.  This was something that Mr. Tucker reviewed after his |
| 01:57:49PM | 16 | last report was served. |
| 01:57:51PM | 17 | THE COURT:  After what? |
| 01:57:52PM | 18 | MR. DANE:  After his last report was served. |
| 01:57:55PM | 19 | THE COURT:  Objection sustained.  You can't use that. |
| 01:57:59PM | 20 | Are we ready for the jury? |
| 01:58:01PM | 21 | MR. BUTERMAN:  Yes, Your Honor. |
| 01:58:04PM | 22 | THE COURT:  Mr. Dane, are we ready for the jury? |
| 01:58:06PM | 23 | MR. DANE:  Yes, Your Honor. |
| 01:58:08PM | 24 | THE COURT:  Bring them in, please, Mr. Robertson. |
| 01:58:20PM | 25 | It's been a long day, hasn't it? |

| | | |
|---|---|---|
| 01:58:25PM | 1 | MS. MALTAS:  Long month. |
| 01:58:36PM | 2 | THE COURT:  Me, too. |
| 01:58:42PM | 3 | |
| 01:58:42PM | 4 | (Jury in.) |
| 01:58:42PM | 5 | (Discussion off the record.) |
| 01:59:49PM | 6 | |
| 01:59:49PM | 7 | THE COURT:  All right, Mr. Tucker, come up, please. |
| 01:59:52PM | 8 | I believe, Mr. Tucker, you were not excused, so you are still |
| 01:59:56PM | 9 | under the same oath that you took when you first testified, |
| 01:59:59PM | 10 | sir.  If you'd go ahead and have a seat. |
| 02:00:07PM | 11 | MR. DANE:  Your Honor, if I can bring up two |
| 02:00:09PM | 12 | documents I may use with Mr. Tucker. |
| 02:00:11PM | 13 | THE COURT:  All right. |
| 02:00:12PM | 14 | |
| 02:00:12PM | 15 | **AVRAM TUCKER,** |
| 02:00:12PM | 16 | a witness, recalled at the instance of the plaintiff, having |
| 02:00:12PM | 17 | been previously duly sworn, testified as follows: |
| 02:00:12PM | 18 | DIRECT EXAMINATION |
| 02:00:16PM | 19 | BY MR. DANE: |
| 02:00:16PM | 20 | Q    Welcome back, Mr. Tucker. |
| 02:00:35PM | 21 | A    Thank you. |
| 02:00:36PM | 22 | Q    Now, your opinion in this case, sir, is based on a number |
| 02:00:40PM | 23 | of assumptions of facts that you understand that the jury will |
| 02:00:47PM | 24 | ultimately be deciding; is that right? |
| 02:00:49PM | 25 | A    Yes. |

Tucker - Direct                                                 2409

02:00:50PM   1    Q    Such as with regards to the issue of the availability of

02:00:53PM   2    alternative sources of door skins for Steves when the supply

02:00:57PM   3    agreement with Jeld-Wen terminates in 2021?

02:00:59PM   4    A    That's correct.

02:01:00PM   5    Q    Now, did you hear Mr. Kaplan testify this morning that it

02:01:03PM   6    is important for an expert to review the evidence underlying

02:01:07PM   7    the reasonableness of assumptions he's asked to make?

02:01:11PM   8    A    Yes, he said that.

02:01:12PM   9    Q    Did you do that here?

02:01:13PM   10   A    Absolutely.

02:01:14PM   11   Q    And what did you do?

02:01:16PM   12   A    I spent a lot of time reviewing documents.  I reviewed

02:01:21PM   13   depositions, I reviewed -- discussed this with Mr. Sam Steves,

02:01:26PM   14   and I also listened to the trial.

02:01:28PM   15   Q    And did you form a conclusion as to whether the

02:01:31PM   16   assumptions that you were asked to form were reasonable?

02:01:35PM   17   A    I believe they were reasonable --

02:01:37PM   18              MR. BUTERMAN:  Objection, Your Honor.

02:01:39PM   19              THE COURT:  And the objection is?

02:01:41PM   20              MR. BUTERMAN:  I think this is going into the area

02:01:43PM   21   that we talked about this morning.

02:01:47PM   22              THE COURT:  I think that Dr. Kaplan was permitted to

02:01:52PM   23   say you had to do this and he didn't do it, so the question is

02:01:55PM   24   whether he did it.  He's not going to vouch for any of the

02:01:59PM   25   evidence.  I'm going to give the jury a specific instruction on

Tucker - Direct                                                2410

02:02:02PM   1    that.   Objection overruled.

02:02:04PM   2          MR. BUTERMAN:   Okay.

02:02:05PM   3    Q    Did you form a conclusion, Mr. Tucker, as to whether the

02:02:08PM   4    assumption -- try that again.   Did you form a conclusion as to

02:02:14PM   5    whether the assumptions that you had been asked to make in

02:02:19PM   6    forming your opinions in this case were reasonable?

02:02:21PM   7    A    They were reasonable assumptions for the purposes of

02:02:23PM   8    measuring and estimating the damages that I claimed.

02:02:27PM   9          THE COURT:   Ladies and gentlemen, he's entitled to

02:02:30PM  10    assume -- to attest, for his purposes, whether the assumptions

02:02:34PM  11    are reasonable, because that's something he needs to do to do

02:02:39PM  12    what he did.   Whether they are, in fact, reasonable is your

02:02:45PM  13    job, and what he has to say about whether they're reasonable or

02:02:48PM  14    not is not evidence of the reasonableness.   It's evidence only

02:02:51PM  15    that he did what he's supposed to do in the method that he

02:02:56PM  16    followed.   Is that a satisfactory instruction?   All right.

02:03:04PM  17    Q    Let me ask you now, Mr. Tucker, a little bit about your

02:03:08PM  18    lost profits opinion and some of the estimates that you made in

02:03:11PM  19    arriving at that opinion.   I want to start with the issue of

02:03:16PM  20    housing starts.

02:03:17PM  21    A    Yes.

02:03:17PM  22    Q    Did you hear Mr. Kaplan testify that he considered those

02:03:22PM  23    to be speculative?

02:03:23PM  24    A    I did.

02:03:24PM  25    Q    Do you consider those estimates to be speculative?

Tucker - Direct

02:03:26PM    1    A    No.   The use of housing starts -- excuse me.

02:03:30PM    2    Q    Did you rely upon any information from Masonite in support

02:03:39PM    3    of your estimates of 1.5 million housing units per year growth?

02:03:44PM    4    A    I did.

02:03:45PM    5    Q    And what specifically did you rely on?

02:03:48PM    6    A    In February of 2017, Masonite had what we call an earnings

02:03:52PM    7    call where they tell the public and investors information about

02:03:55PM    8    their company, and in that document, they identified housing

02:04:00PM    9    starts would get to 1.5 million by 2019, which is earlier than

02:04:05PM   10    I estimated.   I thought it might take a little bit longer, so I

02:04:10PM   11    was conservative in relation to that Masonite statement.

02:04:13PM   12    Q    Turning from the issue of housing starts to door sales,

02:04:17PM   13    did you hear Mr. Kaplan's testimony about the projected

02:04:20PM   14    revenues that you had estimated?

02:04:22PM   15    A    Yes.

02:04:23PM   16    Q    And if I can ask you to pull out work paper 12D(S) which

02:04:30PM   17    is in front of you.

02:04:32PM   18              MR. DANE:   And, Phil, if we can put that up on the

02:04:35PM   19    screen.

02:04:38PM   20    Q    Do you recall him testifying to the figures that are

02:04:40PM   21    reflected in this work paper that you prepared?

02:04:43PM   22    A    Yes.

02:04:44PM   23    Q    And so it's clear to the jury, in the left column we see

02:04:55PM   24    housing starts, so that was one of the variables that entered

02:04:58PM   25    into your projections of revenues; correct?

Tucker - Direct

2412

| | | |
|---|---|---|
| 02:05:00PM | 1 | A     Yes. |
| 02:05:00PM | 2 | Q     And the housing starts, that would give you some way to |
| 02:05:04PM | 3 | estimate the units of doors that would be sold; is that right? |
| 02:05:07PM | 4 | A     Yes, since the units match generally with the Steves' |
| 02:05:11PM | 5 | sales of doors. |
| 02:05:11PM | 6 | Q     Then how did you get from that to the revenue figures that |
| 02:05:14PM | 7 | are reflected in the third column? |
| 02:05:16PM | 8 | A     Basically what I did was by starting what Steves had |
| 02:05:20PM | 9 | actually sold in recent years, the number of units, I increased |
| 02:05:23PM | 10 | them by five percent based on the housing start information per |
| 02:05:29PM | 11 | year until 2022, at which time I assumed no further increases |
| 02:05:33PM | 12 | in the units of sales of Steves.  And then based on an estimate |
| 02:05:37PM | 13 | of sales prices, that's how I generated the sales revenue. |
| 02:05:40PM | 14 | Q     And did you hear Mr. Kaplan's testimony that he considered |
| 02:05:44PM | 15 | these revenue figures as well to be unreliable? |
| 02:05:47PM | 16 | A     I did. |
| 02:05:47PM | 17 | Q     Do you consider your revenue projections to be reliable? |
| 02:05:51PM | 18 | A     I do. |
| 02:05:52PM | 19 | Q     And can you explain why. |
| 02:05:54PM | 20 | A     They're based on a reasonable estimate of housing starts, |
| 02:05:58PM | 21 | they're based on the prices that Steves was selling doors for |
| 02:06:02PM | 22 | in most recent years.  It includes small increases, basically |
| 02:06:06PM | 23 | for inflation, and also if you take a look at Steves' revenue |
| 02:06:11PM | 24 | over the past ten years compared to the revenue for the next |
| 02:06:15PM | 25 | ten years, it's quite reasonable because the percentage |

Tucker - Direct

2413

| | |
|---|---|
| 02:06:19PM | 1 |

increase -- can I draw on this?

02:06:21PM  2          THE COURT:  Yes.

02:06:25PM  3   A     Thank you.  If you look at the revenue growth from 2007

02:06:33PM  4   before the recession of 116 million and you see that it grew to

02:06:39PM  5   $198 million by 2016, that's about a 70 percent increase.

02:06:46PM  6          In my estimation, my projections, which are shown in the

02:06:51PM  7   next column, I show it going from 216 million, which is similar

02:06:59PM  8   to the recent sales, to 321 million.  That's less growth than

02:07:05PM  9   Steves actually incurred during the last ten years.  So I think

02:07:09PM  10  they're reasonable estimates of what the sales will be in the

02:07:11PM  11  future.

02:07:13PM  12  Q     And, again, to be clear on this, the figure that ends up

02:07:17PM  13  being the final revenue figure for 2027 of $321 million, is

02:07:24PM  14  that the figure that you used for purposes of calculating the

02:07:31PM  15  lost profits that should be awarded in this case?

02:07:33PM  16  A     It was part of the calculation, but, remember, once I

02:07:37PM  17  determined the profits on the 321 million, I then discounted it

02:07:42PM  18  every year by 15 percent.  So the amount I actually claimed is

02:07:47PM  19  substantially less than the profits on the 321 million.

02:07:51PM  20  Q     Did you also hear Mr. Kaplan testify about an adjustment

02:07:55PM  21  you made to your lost profit calculation with regard to cost of

02:07:59PM  22  sales to take into account information that you had reviewed

02:08:03PM  23  for the 14-month period ending February 2017?

02:08:06PM  24  A     Yes.

02:08:07PM  25  Q     And why did you make that adjustment?

Tucker - Direct                                                2414

02:08:09PM   1    A    So as I was doing my work, after I submitted my first

02:08:14PM   2    report, or one of my reports, Steves provided additional

02:08:18PM   3    information which was information I didn't have when I first

02:08:21PM   4    did my report.  It was audited financial statements for the

02:08:25PM   5    14 months ending February 2017.

02:08:28PM   6         When you are trying to come up with a reasonable estimate

02:08:30PM   7    of damages or projections for the future, it's really important

02:08:33PM   8    to use the most current information that you had.  So I went

02:08:37PM   9    ahead and used that and adjusted my damages based on the new

02:08:41PM   10   information.

02:08:42PM   11   Q    And you did that even though it lowered the total amount

02:08:45PM   12   of your lost profits; correct?

02:08:46PM   13   A    Yes.  I wanted to get whatever was the most reasonable

02:08:49PM   14   estimate at the time of trial.

02:08:51PM   15   Q    And your lost profits analysis was based upon a

02:08:56PM   16   hypothetical scenario that the CMI merger did not occur;

02:09:00PM   17   correct?

02:09:00PM   18   A    That's correct.

02:09:01PM   19   Q    And that was the basis for your backing out the damages

02:09:05PM   20   that you calculated that Steves has contended, at least, that

02:09:09PM   21   it has suffered from Jeld-Wen's conduct since the merger;

02:09:12PM   22   right?

02:09:12PM   23   A    Yes.

02:09:12PM   24   Q    But you didn't back out the costs related to Towanda, the

02:09:17PM   25   plant that Jeld-Wen had acquired from CraftMaster, in

Tucker - Direct

02:09:20PM  1   estimating Steves' costs of obtaining door skins for purposes

02:09:23PM  2   of your lost profits calculation; correct?

02:09:25PM  3   A    That's correct.

02:09:26PM  4   Q    Why not?

02:09:26PM  5   A    Because I thought that the actual costs in most recent

02:09:32PM  6   years was the best base to project the future, because the

02:09:37PM  7   prices that were paid by Steves were set in the long-term

02:09:41PM  8   supply agreement in 2012, before the merger, and when there was

02:09:45PM  9   competition.

02:09:47PM  10  Q    Lastly, sir, you heard Mr. Kaplan testify and criticize

02:09:52PM  11  you for offsetting your lost profit damage calculations by the

02:09:56PM  12  amounts that Steves could have obtained from selling all or

02:10:00PM  13  parts of its business?

02:10:01PM  14  A    Yes.

02:10:01PM  15  Q    And is it true that you did not discount your damages by

02:10:06PM  16  that amount?

02:10:06PM  17  A    Yes.

02:10:07PM  18  Q    Why not?

02:10:07PM  19  A    My lost profits were limited to lost profits.  I didn't

02:10:12PM  20  claim the higher value of Steves which would include other

02:10:16PM  21  things besides lost profits for a set period of years.  If I

02:10:21PM  22  had made a claim based on the overall value of Steves, then I

02:10:24PM  23  would have deducted anything that they could get now, but it's

02:10:27PM  24  not a necessary adjustment against lost profits for a certain

02:10:30PM  25  number of years.

Tucker - Direct                                                          2416

| | | |
|---|---|---|
| 02:10:31PM | 1 | Q    And, finally, Mr. Tucker, do you agree with Mr. Kaplan's |
| 02:10:35PM | 2 | view, as he testified to this morning, that any projection of |
| 02:10:39PM | 3 | lost profits in this case would be inherently speculative? |
| 02:10:43PM | 4 | A    I do not. |
| 02:10:44PM | 5 | Q    Why not? |
| 02:10:45PM | 6 | A    When you're preparing a claim, you're put in a position of |
| 02:10:49PM | 7 | trying to figure out what would have happened in the absence of |
| 02:10:52PM | 8 | someone's conduct, in this case what would have happened to |
| 02:10:55PM | 9 | Steves in the absence of conduct that Steves claims was |
| 02:10:58PM | 10 | improper by Jeld-Wen. |
| 02:10:59PM | 11 | When you do, you have to make a reasonable projection, and |
| 02:11:03PM | 12 | that, over the last 40 years, is what I've seen, I've done, and |
| 02:11:07PM | 13 | all experts have done.  You make reasonable projections based |
| 02:11:10PM | 14 | on reasonable assumptions, and that's what I believe I've done |
| 02:11:14PM | 15 | in this case. |
| 02:11:15PM | 16 | MR. DANE:  Thank you very much, Mr. Tucker. |
| 02:11:18PM | 17 | THE COURT:  Mr. Buterman? |
| 02:11:19PM | 18 | MR. BUTERMAN:  Thank you, Your Honor. |
| 02:11:21PM | 19 | |
| 02:11:21PM | 20 | CROSS-EXAMINATION |
| 02:11:23PM | 21 | BY MR. BUTERMAN: |
| 02:11:23PM | 22 | Q    Good afternoon, Mr. Tucker. |
| 02:11:40PM | 23 | A    Good afternoon. |
| 02:11:41PM | 24 | Q    Now, I believe you testified a few moments ago that with |
| 02:11:47PM | 25 | respect to Steves' revenues, you believe that your ultimate |

02:11:53PM  1    calculation of Steves' growth from 2017 to 2029 is reasonable

02:12:01PM  2    because you looked back at what happened to Steves' revenues

02:12:06PM  3    from 2007 to 2016; is that correct?

02:12:10PM  4    A    That was part of the reason I determined it was

02:12:12PM  5    reasonable.

02:12:12PM  6    Q    And what you said a moment ago was that if you looked at

02:12:15PM  7    the revenues in 2007 and compared them to 2016, and you look at

02:12:20PM  8    the growth there, well, then, that is actually a higher

02:12:27PM  9    percentage growth than you estimate will occur by 2029; is that

02:12:33PM  10   correct?

02:12:33PM  11   A    From now until 2029, that's correct.

02:12:36PM  12   Q    And if you look at the first set of numbers, the 2007 to

02:12:46PM  13   2016, you see that actually in the first several years, Steves'

02:12:49PM  14   revenues were decreasing; correct, sir?

02:12:52PM  15   A    Correct.

02:12:52PM  16   Q    And Steves' revenues only started to increase after, or

02:12:58PM  17   increase even a little -- or more than a trivial amount after

02:13:03PM  18   Jeld-Wen acquired CMI in 2012; do you see that, sir?

02:13:07PM  19   A    That's not correct.  They began to increase in 2010.  It

02:13:11PM  20   increased in 2011, then 2012, and then again in 2013.

02:13:16PM  21   Q    Where is the growth from, sir?

02:13:19PM  22   A    When you say the growth from, I --

02:13:21PM  23   Q    I mean, you said that the numbers went up from 116 million

02:13:26PM  24   to 198 million, sir, but, actually, the numbers only even

02:13:32PM  25   started to get close to 116 million again after the

Tucker - Cross

2418

02:13:36PM  1    acquisition; is that correct?  In 2013, the number is at 113

02:13:42PM  2    million?

02:13:42PM  3            MR. DANE:  Your Honor, may I approach?

02:13:46PM  4

02:13:46PM  5            (Discussion at sidebar as follows:)

02:13:53PM  6

02:13:53PM  7            MR. DANE:  Your Honor, he can ask the questions about

02:13:57PM  8    what were the profits, how did profits change over the years,

02:14:02PM  9    but linking it to the acquisition is exactly the *Hanover Shoe*

02:14:06PM  10   issue.  He's trying to create the inference that Steves had

02:14:09PM  11   benefited from the merger by increased profits, and that is

02:14:13PM  12   what you have said a dozen times in this case they cannot do,

02:14:16PM  13   and they try to do it every chance they get.

02:14:17PM  14           MR. BUTERMAN:  This is revenue.  I don't even know

02:14:19PM  15   where you are getting that.  It has nothing to do with it.

02:14:21PM  16   What I'm trying to establish --

02:14:23PM  17           THE COURT:  Ask your question in terms of time, not

02:14:25PM  18   in terms of reference to the merger.

02:14:28PM  19           MR. BUTERMAN:  Okay.  That's fine.

02:14:35PM  20

02:14:35PM  21           (End of sidebar discussion.)

02:14:37PM  22

02:14:37PM  23   Q    So, Mr. Tucker, you would agree with me that from 2013 to

02:14:43PM  24   2016, that's where you see the increase that you speak of?

02:14:49PM  25   A    No, sir.  I talked about the increase prior to the

Tucker - Cross                                                    2419

02:14:53PM    1    recession and the housing crisis in 2007 all the way to 2016.

02:14:58PM    2    It is true that you also see an increase starting in 2010 and

02:15:05PM    3    '11, but I didn't think it would be appropriate to use that

02:15:07PM    4    percentage, because that was impacted by the housing crisis and

02:15:10PM    5    the recession.

02:15:11PM    6    Q    So let's just see if we can cut through this.  Your

02:15:16PM    7    2007-to-2016 number shows certain years where revenue is

02:15:22PM    8    decreasing; correct, sir?

02:15:23PM    9    A    Yes.

02:15:23PM   10    Q    And then starting in 2011, we see the number having

02:15:33PM   11    increased from 2010; correct, sir?

02:15:35PM   12    A    Yes.

02:15:35PM   13    Q    And then you see more significant increases moving

02:15:41PM   14    forward?

02:15:41PM   15    A    That's correct.

02:15:42PM   16    Q    Now, if you look at your projected revenue for the years

02:15:49PM   17    of 2017 on, you do not have any years where revenue is

02:15:57PM   18    declining; correct, sir?

02:15:58PM   19    A    That's correct.  Would you like --

02:16:01PM   20               MR. BUTERMAN:  Actually --

02:16:02PM   21               THE COURT:  Wait just a minute.  That's correct,

02:16:05PM   22    period.

02:16:06PM   23               MR. BUTERMAN:  Thank you.

02:16:06PM   24    Q    And your assumption is that revenue is going to increase

02:16:10PM   25    year over year; is that correct, sir?

Tucker - Cross

| | | |
|---|---|---|
| 02:16:11PM | 1 | A    Yes, sir. |
| 02:16:13PM | 2 | Q    Okay.  Now, you mentioned -- |
| 02:16:24PM | 3 | MR. BUTERMAN:  Actually, Gail, can we put up Mr. |
| 02:16:27PM | 4 | Tucker's schedule 12B(S). |
| 02:16:39PM | 5 | Q    Mr. Tucker, this is your calculation of Steves' lost |
| 02:16:45PM | 6 | profits; correct, sir? |
| 02:16:46PM | 7 | A    Yes. |
| 02:16:47PM | 8 | Q    Let me just ask you one question to begin with. |
| 02:16:51PM | 9 | A    If I could clarify, this is one of the many schedules. |
| 02:16:56PM | 10 | Q    If you look at the first row here, that's the projected |
| 02:17:02PM | 11 | housing starts; correct, sir? |
| 02:17:03PM | 12 | A    Yes. |
| 02:17:04PM | 13 | Q    And to be clear, the numbers that appear from 2017 to |
| 02:17:14PM | 14 | 2022, those are all estimates that you have put together; |
| 02:17:18PM | 15 | correct, sir? |
| 02:17:18PM | 16 | A    Yes, based on my review of the evidence and my experience. |
| 02:17:21PM | 17 | Q    Yes.  And, sir, just picking 2017, since that's the most |
| 02:17:29PM | 18 | recent year, you didn't get it right, did you?  Housing starts |
| 02:17:36PM | 19 | were actually lower than what you estimated even for 2017, sir, |
| 02:17:41PM | 20 | on the report that you put together in August of 2017; correct, |
| 02:17:46PM | 21 | sir? |
| 02:17:46PM | 22 | A    I don't recall that specifically, but I don't recall |
| 02:17:49PM | 23 | anything that caused me to think that five percent, to get back |
| 02:17:53PM | 24 | to the long-term average of 1.5 million, was unreasonable. |
| 02:17:58PM | 25 | Q    Sir, are you testifying that you believe that housing |

Tucker - Cross

2421

| | | |
|---|---|---|
| 02:18:00PM | 1 | starts were 1.232 in 2017? |
| 02:18:04PM | 2 | A    No, I didn't say that. |
| 02:18:05PM | 3 | Q    You know that they're lower; correct, sir? |
| 02:18:07PM | 4 | A    I don't recall the specific amount. |
| 02:18:08PM | 5 | Q    Do you recall whether it was higher or lower? |
| 02:18:10PM | 6 | A    I don't actually recall.  I do recall studying this to see |
| 02:18:14PM | 7 | that I didn't think it would impact my estimate of five percent |
| 02:18:17PM | 8 | per year. |
| 02:18:17PM | 9 | Q    Did you consider -- let me ask you this question:  If this |
| 02:18:20PM | 10 | number is off, the 1,232, that number -- did you consider |
| 02:18:24PM | 11 | readjusting your numbers moving forward? |
| 02:18:27PM | 12 | A    I did not, although it would make a mathematical |
| 02:18:29PM | 13 | difference -- |
| 02:18:30PM | 14 | Q    When you say a mathematical difference, sir, what you |
| 02:18:33PM | 15 | actually mean is it would decrease Steves' future lost profits |
| 02:18:37PM | 16 | calculations; correct, sir? |
| 02:18:38PM | 17 | A    Only for that particular year -- |
| 02:18:40PM | 18 | Q    I'm sorry, sir.  If you could just answer my question. |
| 02:18:43PM | 19 | And what you are saying is that it would decrease the future |
| 02:18:47PM | 20 | lost profits -- excuse me, your calculations for 2017, and if |
| 02:18:50PM | 21 | you readjust it based on that number, that would impact the |
| 02:18:54PM | 22 | subsequent years, would it not, sir? |
| 02:18:56PM | 23 | A    It would, but it wouldn't be appropriate to do so. |
| 02:19:00PM | 24 | Q    That's your opinion, sir? |
| 02:19:02PM | 25 | A    Yes, sir. |

Tucker - Cross

2422

02:19:02PM  1    Q    Now, again, sir, you testified today that you believed

02:19:20PM  2    your lost profits calculations were conservative; is that

02:19:25PM  3    correct?

02:19:25PM  4    A    I would say it's a reasonable projection; if anything on

02:19:29PM  5    the conservative side, but a reasonable projection.

02:19:32PM  6    Q    And you believe that the projection that you had made

02:19:34PM  7    initially, which was $13 million higher at the top end, was

02:19:41PM  8    also a reasonable conservative estimate; correct, sir?

02:19:44PM  9    A    It was based on the information available at the time.

02:19:46PM  10   Q    And what happens was between the time of your first

02:19:50PM  11   report, the first lost profits calculation, and your

02:19:52PM  12   supplemental calculation, you received, I believe you

02:19:56PM  13   testified, these audited financial information?

02:19:58PM  14   A    Correct.

02:19:59PM  15   Q    And that caused your lost profits calculations at the top

02:20:05PM  16   end to go down 13 million?

02:20:06PM  17   A    I think that's the number, correct.

02:20:09PM  18   Q    Sir, if you were to get more information, that could cause

02:20:12PM  19   your lost profits calculations to go down even more

02:20:15PM  20   significantly; correct?

02:20:16PM  21   A    It could go down or up, depending on what the new

02:20:19PM  22   information is.

02:20:19PM  23   Q    And you just don't know, do you, sir?

02:20:22PM  24   A    Of course not.  I base it on what I have at the time.

02:20:25PM  25   Q    Now, sir, about your lost profits calculations -- and

Tucker - Cross

| | | |
|---|---|---|
| 02:20:30PM | 1 | there were some questions about what you included and did not |
| 02:20:33PM | 2 | include.  If we can look at your subtotal, this is the line |
| 02:20:43PM | 3 | that says subtotal pretax before executive comp all the way |
| 02:20:48PM | 4 | down. |
| 02:20:49PM | 5 | MR. BUTERMAN:  Gail, can you just blow up that line |
| 02:20:52PM | 6 | across. |
| 02:21:05PM | 7 | Q    I just want to make sure I understand what this includes, |
| 02:21:09PM | 8 | sir.  So you are estimating lost profits for Steves out through |
| 02:21:20PM | 9 | 2029; correct, sir? |
| 02:21:21PM | 10 | A    Correct, for the period 2021 to 2029. |
| 02:21:26PM | 11 | Q    Sir, did you include the cost of capital improvements in |
| 02:21:34PM | 12 | figuring out your lost profits analysis? |
| 02:21:37PM | 13 | A    Cost of capital of Steves? |
| 02:21:40PM | 14 | Q    Yeah.  For instance, how much money they have to invest |
| 02:21:43PM | 15 | into keeping their machinery up to date, how much money they |
| 02:21:47PM | 16 | invest in research and development, or in things like, you |
| 02:21:52PM | 17 | know, purchasing equipment or plants? |
| 02:21:55PM | 18 | A    No.  It wasn't necessary to do that. |
| 02:21:58PM | 19 | Q    So your assumption, sir, is that Steves will continue to |
| 02:22:05PM | 20 | make profits and increase profits all the way through 2029 |
| 02:22:09PM | 21 | without investing one penny in things like keeping its |
| 02:22:13PM | 22 | factories up to date, research and development, and all of |
| 02:22:20PM | 23 | their equipment running? |
| 02:22:21PM | 24 | A    That's correct, because I didn't claim the additional |
| 02:22:24PM | 25 | amounts that they've incurred.  That's a fixed cost you don't |

Tucker - Cross                                                    2424

02:22:28PM   1   typically include in a lost profits calculation.

02:22:30PM   2   Q    Sir, you've studied Steves' audited financials, have you

02:22:34PM   3   not, sir?

02:22:34PM   4   A    I have.

02:22:35PM   5   Q    You have; right?

02:22:36PM   6   A    Yes.

02:22:37PM   7   Q    And you are aware that actually Steves spent, as of

02:22:45PM   8   December 31st, 2015, over $3 million on those very things;

02:22:51PM   9   correct, sir?

02:22:52PM  10   A    Sir, I took all of that into consideration in the estimate

02:22:55PM  11   of costs.  The costs have what we call depreciation costs, and

02:22:59PM  12   that's the amount that the company incurs to pay for those

02:23:02PM  13   things.  So I've absolutely taken all of those things into

02:23:06PM  14   consideration, not separately, but because I considered all of

02:23:09PM  15   their costs which include the depreciation of the capital

02:23:13PM  16   assets.

02:23:14PM  17   Q    Only in the one year, sir, that you depreciated over the

02:23:17PM  18   time?

02:23:17PM  19   A    No.

02:23:18PM  20   Q    Sir, you did not --

02:23:20PM  21          THE COURT:  He said no.  Wait a minute.  Do you want

02:23:26PM  22   to ask him another question?

02:23:28PM  23          MR. BUTERMAN:  Yes, Your Honor.

02:23:28PM  24   Q    You did not include the three-plus million dollars that

02:23:32PM  25   Steves has invested in recent years each year in figuring out

| | | |
|---|---|---|
| 02:23:36PM | 1 | those numbers? |
| 02:23:37PM | 2 | A    I did.  It's included in the depreciation number, because |
| 02:23:40PM | 3 | I accepted all of their costs as a deduction from sales.  In |
| 02:23:44PM | 4 | those costs includes depreciation which is how a company |
| 02:23:47PM | 5 | expenses their investment in capital like the $3 million that |
| 02:23:51PM | 6 | you are talking about. |
| 02:23:52PM | 7 | Q    And, sir, did the number go up year over year? |
| 02:23:55PM | 8 | A    It went up as the revenue and costs that I estimated went |
| 02:23:58PM | 9 | up -- |
| 02:23:59PM | 10 | Q    Just so we're clear, sir -- |
| 02:24:02PM | 11 | THE COURT:  You are cutting him off -- |
| 02:24:04PM | 12 | MR. BUTERMAN:  Sorry. |
| 02:24:04PM | 13 | THE COURT:  Give him a chance, and he'll give you a |
| 02:24:09PM | 14 | chance. |
| 02:24:12PM | 15 | Q    Just so we're clear, sir, your testimony here today is |
| 02:24:15PM | 16 | that you accounted for the $3 million that Steves expended in |
| 02:24:20PM | 17 | capital costs for each year all the way out through 2029? |
| 02:24:25PM | 18 | A    I accounted for all capital costs through the depreciation |
| 02:24:29PM | 19 | that I included in the costs that reduced my sales to get to |
| 02:24:33PM | 20 | lost profits, yes. |
| 02:24:33PM | 21 | Q    Now, sir, Mr. Dane had asked you a bit about your |
| 02:24:42PM | 22 | inclusion of Towanda in your calculations. |
| 02:24:46PM | 23 | A    Yes. |
| 02:24:47PM | 24 | Q    To be clear, you included Towanda in all of your |
| 02:24:50PM | 25 | calculations; correct, sir? |

Tucker - Cross

02:24:52PM 1    A    To the extent it was relevant, yes.

02:24:54PM 2    Q    Let's just be clear.  You have three measures of damages:

02:24:57PM 3    You have damages relating to overcharges, you have damages

02:25:01PM 4    relating to defects, and then you have the future lost profits;

02:25:04PM 5    correct, sir?

02:25:04PM 6    A    Correct.

02:25:06PM 7    Q    And Mr. Tucker actually -- excuse me, Mr. Kaplan.  You

02:25:17PM 8    heard Mr. Kaplan testify that your overcharge damages included

02:25:21PM 9    Towanda; correct, sir?

02:25:23PM 10   A    Included Towanda as a cost of Jeld-Wen, yes.

02:25:27PM 11   Q    I'm sorry.  Maybe we're missing each other here.  When you

02:25:31PM 12   calculated the overcharge damages, you included overcharges

02:25:34PM 13   related to Towanda; correct, sir?

02:25:36PM 14   A    Well, indirectly if you mean I considered all of

02:25:39PM 15   Jeld-Wen's key input costs for all of their plants including

02:25:43PM 16   Towanda, that's correct.

02:25:43PM 17   Q    And when you did that, Mr. Kaplan criticized you for doing

02:25:49PM 18   that; correct, sir?

02:25:50PM 19   A    I don't know if it was a criticism.  He pointed it out.

02:25:54PM 20   Q    And your response to that was to say that his critique

02:25:57PM 21   appeared to confuse the antitrust aspects of this case with

02:26:02PM 22   Steves' claims that Jeld-Wen breached the supply agreement;

02:26:05PM 23   correct, sir?

02:26:05PM 24   A    That had to do with responding to one particular thing

02:26:08PM 25   that Mr. Kaplan had said.

| | | |
|---|---|---|
| 02:26:09PM | 1 | Q    And that was with respect to the overcharges; correct, |
| 02:26:12PM | 2 | sir? |
| 02:26:12PM | 3 | A    With respect to one part of his criticism about Towanda |
| 02:26:15PM | 4 | and the overcharges. |
| 02:26:17PM | 5 | Q    And to be clear, sir, in your defects calculations as |
| 02:26:24PM | 6 | well, you have calculated damages that include defective door |
| 02:26:29PM | 7 | skins from Towanda; correct, sir? |
| 02:26:31PM | 8 | A    If there were door skins that came from Towanda, that's |
| 02:26:35PM | 9 | correct, that were defective. |
| 02:26:36PM | 10 | Q    Are you saying that you don't know that there were? |
| 02:26:39PM | 11 | A    I believe there were. |
| 02:26:40PM | 12 |         THE COURT:  You're getting pretty far away from the |
| 02:26:42PM | 13 | direct examination, Mr. Buterman.  You are going back into |
| 02:26:45PM | 14 | plowing ground maybe you wanted to cover earlier but didn't. |
| 02:26:49PM | 15 | So let's confine it to what he was asked on direct. |
| 02:26:56PM | 16 |         MR. BUTERMAN:  Okay, Your Honor. |
| 02:26:59PM | 17 |         THE COURT:  We're not starting all over. |
| 02:27:01PM | 18 |         MR. BUTERMAN:  I'm not suggesting it, Your Honor. |
| 02:27:03PM | 19 | Mr. Dane had just talked about Towanda. |
| 02:27:05PM | 20 | Q    Let me just make sure that we're completely in agreement, |
| 02:27:08PM | 21 | sir. |
| 02:27:08PM | 22 |         THE COURT:  He already said that.  We're not going |
| 02:27:11PM | 23 | through that again.  We did the same thing with the preceding |
| 02:27:13PM | 24 | line of questions.  He answered the thing three times, and I |
| 02:27:17PM | 25 | think he was clear, and you were clear each time.  So the jury |

Tucker - Cross                                                    2428

| | | |
|---|---|---|
| 02:27:20PM | 1 | is paying attention.  This is not one of those army things, you |
| 02:27:25PM | 2 | know. |
| 02:27:33PM | 3 | Q    Sir, do any of your damages calculations involve comparing |
| 02:27:37PM | 4 | a world in which the CMI acquisition did not occur against a |
| 02:27:42PM | 5 | world where -- the actual world? |
| 02:27:45PM | 6 | A    I believe that my lost profits calculations considers a |
| 02:27:49PM | 7 | world in which the merger did not occur and there would be |
| 02:27:53PM | 8 | competition, yes. |
| 02:27:53PM | 9 | Q    But your overcharging defect claims do not; correct, sir? |
| 02:27:57PM | 10 | A    I think it would result in a similar amount, but it |
| 02:28:01PM | 11 | doesn't specifically adjust for those things that you |
| 02:28:03PM | 12 | mentioned. |
| 02:28:03PM | 13 | Q    Sir, if you could just answer my question.  Your |
| 02:28:06PM | 14 | overcharge calculations and defects do not compare a world in |
| 02:28:09PM | 15 | which the acquisition occurred versus the but-for world; |
| 02:28:15PM | 16 | correct, sir? |
| 02:28:15PM | 17 | A    If you mean by that that I included the cost of Towanda in |
| 02:28:18PM | 18 | my calculations, that's correct. |
| 02:28:20PM | 19 | Q    Sir, one last thing.  You do agree, though, that Towanda |
| 02:28:24PM | 20 | did factor into the cost of sales for 2015 that you used for |
| 02:28:29PM | 21 | your lost profits calculations; correct, sir? |
| 02:28:31PM | 22 | A    Yes, I considered all of the costs of Jeld-Wen. |
| 02:28:34PM | 23 | MR. BUTERMAN:  No further questions, Your Honor. |
| 02:28:36PM | 24 | THE COURT:  You don't have anything, do you? |
| 02:28:39PM | 25 | MR. DANE:  Two?  Could I have two? |

02:28:42PM  1              THE COURT:  Come on.

02:28:47PM  2              MR. DANE:  Just to clean up, Your Honor.

02:28:49PM  3              THE COURT:  Not clean up.  You can only address what

02:28:52PM  4    he's asked.

02:28:53PM  5              MR. DANE:  That's what I'm cleaning up, Your Honor.

02:28:53PM  6

02:28:53PM  7                      REDIRECT EXAMINATION

02:28:56PM  8    BY MR. DANE:

02:28:56PM  9    Q    Now, in your testimony in response to Mr. Buterman, Mr.

02:28:59PM  10   Tucker, when he asked you about the 2017 housing start

02:29:04PM  11   information and whether it would be appropriate for you, based

02:29:07PM  12   upon the fact that the 2017 figures may have been somewhat

02:29:11PM  13   different than your estimate included in your schedule 12(b)(6)

02:29:17PM  14   to have readjusted all the future years for housing starts, you

02:29:21PM  15   testified it would be inappropriate; correct?

02:29:23PM  16   A    Yes.

02:29:23PM  17   Q    He didn't ask you to explain why.  That's the only

02:29:26PM  18   question I want to ask you.  Could you please explain to the

02:29:30PM  19   jury why that would be inappropriate?

02:29:31PM  20   A    Sure.  I made an estimate of five percent per year to get

02:29:34PM  21   to the 1.5 million which, I believe, was a reasonable number,

02:29:38PM  22   based on my experience, of the long-term average of housing

02:29:42PM  23   starts and what Masonite reported in its earnings call.

02:29:44PM  24         And the five percent per year didn't mean that every year

02:29:47PM  25   it would be exactly five percent.  I just meant on average.  So

| | | |
|---|---|---|
| 02:29:49PM | 1 | some years it might be higher and some lower, and I felt it was |
| 02:29:52PM | 2 | still appropriate to use that as an average. |
| 02:29:55PM | 3 | MR. DANE:  Thank you, Mr. Tucker. |
| 02:29:56PM | 4 | THE COURT:  All right, thank you, sir.  You may step |
| 02:29:58PM | 5 | down. |
| 02:30:01PM | 6 | THE WITNESS:  Your Honor, Your Honor. |
| 02:30:01PM | 7 | THE COURT:  Anybody have anything to say at this |
| 02:30:03PM | 8 | juncture? |
| 02:30:04PM | 9 | MR. POWELL:  We're done with our case, Your Honor. |
| 02:30:07PM | 10 | THE COURT:  All right, ladies and gentlemen, the |
| 02:30:09PM | 11 | evidence is in.  I have some work to do with the lawyers to get |
| 02:30:14PM | 12 | ready for tomorrow morning and the instructions and their |
| 02:30:17PM | 13 | arguments and some motions that I need to deal with, so you get |
| 02:30:21PM | 14 | the afternoon off.  If you'll leave your pads here, we'll see |
| 02:30:30PM | 15 | you in the morning at 9:30.  Drive carefully, and we'll see you |
| 02:30:35PM | 16 | then. |
| 02:30:40PM | 17 | |
| 02:30:40PM | 18 | (Jury out.) |
| 02:30:55PM | 19 | |
| 02:30:55PM | 20 | THE COURT:  We will take 15 minutes because I need to |
| 02:30:58PM | 21 | collect some things to get ready for this process that is to |
| 02:31:01PM | 22 | follow, and then we will take up the instructions and the |
| 02:31:04PM | 23 | verdict form. |
| 02:31:07PM | 24 | |
| 02:31:07PM | 25 | (Recess taken.) |

1        THE COURT:  My objective is to get all the

03:05:33 2  instructions done as if we were sending everything to the

03:05:36 3  jury and then hear the motions.  And we'll cut out

03:05:42 4  whatever we're going to cut out.  We have revised the

03:05:59 5  instructions to at least take into account what we did

03:06:02 6  last night.

03:06:09 7        Now, Steves was to tell me what it wanted

03:06:11 8  to do about tends to create a monopoly.  I haven't

03:06:21 9  seen anything on that.

03:06:24 10       MR. MACH:  Your Honor, I apologize.  We had

03:06:26 11  understood that you had ruled on the issue, although we

03:06:30 12  objected to --

03:06:31 13       THE COURT:  I told you to go back to talk to

03:06:33 14  Mr. Pomerantz.  And I think the last thing I said is to

03:06:36 15  see if you've spent all this money, you wanted to try to

03:06:39 16  get that in front of the Fourth Circuit and get it

03:06:42 17  reversed on that ground.  I think that's precisely what I

03:06:44 18  said.

03:06:44 19       MR. MACH:  So we're not withdrawing the

03:06:47 20  objection, but we don't think it requires further

03:06:50 21  argument, Your Honor, if that answers your question.

03:06:51 22       THE COURT:  No.

03:06:51 23       MR. MACH:  Okay.

03:06:51 24       THE COURT:  Fish or cut bait is what they call

03:06:55 25  this time.  Do you know that expression?

03:06:56  1              MR. MACH:  I think I do.

03:06:58  2              THE COURT:  Okay.  Fish or cut bait?  Which are

03:07:01  3    you going to do?

03:07:02  4              MR. MACH:  So we continue to ask for the

03:07:04  5    instruction.

03:07:05  6              THE COURT:  What's your position?

03:07:06  7              MR. BUTERMAN:  Your Honor, our position is that

03:07:08  8    as of yesterday, there was no evidence.  No one had talked

03:07:12  9    about monopoly.  Nothing that came in today changed that.

03:07:16 10    There's no basis for the jury to even assess the issue,

03:07:22 11    and we believe that it would be wrong to include it.

03:07:26 12              THE COURT:  Anything else?

03:07:28 13              MR. MACH:  Not beyond the argument from

03:07:29 14    yesterday, Your Honor.

03:07:31 15              THE COURT:  I don't think this case presents a

03:07:33 16    case of tend to create a monopoly.  And if there ever was

03:07:38 17    any question as to the proposition, Steves never even

03:07:45 18    submitted an instruction on it.  So they obviously didn't

03:07:48 19    think it was an issue in the case.

03:07:49 20         The evidence doesn't -- it -- there is evidence in

03:07:52 21    the case from which somebody, conceptually, could argue

03:07:57 22    that the merger tended to create a monopoly, but it's not

03:08:00 23    been tried that way.  So it's out.

03:08:03 24              MR. MACH:  Thank you, Your Honor.

03:08:21 25              THE COURT:  All right.  The first place that I

03:08:23 1  recall -- or I believe we have anything to discuss is on

03:08:26 2  Number 12.  You were supposed to submit me proposed

03:08:29 3  limiting instructions about significance of the cost and

03:08:35 4  time to build a door skin facility and ability of foreign

03:08:40 5  supply under the heading of "Evidence Admitted for the

03:08:44 6  Limited Purposes," and I haven't gotten anything.  Has it

03:08:48 7  been filed and I've missed it?

03:08:56 8          MR. POWELL:  Your Honor, I'm sensing that there

03:08:58 9  may have been confusion between the parties as to who had

03:09:01 10 the responsibility for drafting that.  So I'll take half

03:09:04 11 the blame if Mr. Buterman will take the other half.

03:09:07 12          MR. BUTERMAN:  Regardless of the blame, Your

03:09:09 13 Honor --

03:09:09 14          THE COURT:  You mean to tell me that after you

03:09:10 15 all left here last night, you didn't sit down and caucus

03:09:15 16 and talk for hours?

03:09:18 17          MR. POWELL:  Obviously, we wish we had, Your

03:09:20 18 Honor.

03:09:21 19          MR. BUTERMAN:  Yeah.  Instead, we each went back

03:09:23 20 and wrote up some more paper to give you, Your Honor,

03:09:25 21 unfortunately.

03:09:26 22      Your Honor, we will caucus immediately upon exiting

03:09:30 23 and we will get you something -- can we say within two

03:09:33 24 hours of --

03:09:34 25          THE COURT:  Well, you don't know what time

03:09:35 1   you're leaving yet.

03:09:38 2           MR. BUTERMAN:  Fair enough, Your Honor.

03:09:40 3           THE COURT:  All right.  That's on the to-do

03:09:40 4   list.

03:09:41 5           MR. BUTERMAN:  Yes, Your Honor.

03:09:43 6           THE COURT:  All right.

03:09:59 7       The next thing that I have is the -- in Number 19, I

03:10:06 8   had told you I was going to add something about "nor

03:10:14 9   does" -- something about making the preceding

03:10:18 10  instruction -- the first part of the instruction

03:10:20 11  applicable to demonstrative exhibits.  And instead of what

03:10:24 12  I wrote, Mr. Martecchini actually put in in English,

03:10:30 13  proper grammar.  And so it says now the same instruction

03:10:32 14  applies for demonstrative exhibits used to aid testimony

03:10:39 15  in the evidence.  Does that suit?  Do you have a copy of

03:10:42 16  that?

03:10:43 17          MR. BUTERMAN:  Yes.  No objection.

03:10:44 18          THE COURT:  Is that okay?

03:10:45 19          MR. POWELL:  We're fine with that, Your Honor.

03:10:56 20          THE COURT:  All right.  Somebody wanted -- and

03:10:58 21  correctly so, pointed out and put in the right sections of

03:11:00 22  Section 4 and Section 7.  And we've done that in Number

03:11:06 23  23, indicating what is what.

03:11:11 24      In Number 28, on the second page at the top, we had

03:11:24 25  put in evidence, in the third line, "in assessing

03:11:30 1   competition," and I think Jeld-Wen asked for "the effect

03:11:37 2   on competition in the relevant market."  And I think

03:11:39 3   that's a more correct construction, and I put that in.

03:11:45 4   Everybody all right with that?

03:11:49 5          MR. MACH:  Sorry, Your Honor.  I'm a little bit

03:11:51 6   lost.  If it's the same language that we discussed

03:11:54 7   yesterday, then, of course, we don't have additional

03:11:56 8   objection.

03:11:58 9          THE COURT:  Well, I inserted -- I'm not quite

03:12:01 10  sure how it happened, but on the instruction, it's Number

03:12:04 11  28, third line from the top of the second page, you'll see

03:12:09 12  a highlight in your copy.  You'll see the highlighted

03:12:11 13  words "the effect on."  I've inserted that at Jeld-Wen's

03:12:16 14  request.  That's what they asked for, and I wrote

03:12:18 15  apparently -- I either told you I was not going to put

03:12:23 16  that in or inadvertently left that out, but I think it

03:12:29 17  belongs in.

03:12:31 18         MR. MACH:  We don't have further objection to

03:12:32 19  that, Your Honor.

03:12:33 20         THE COURT:  All right.  Next is Number 39,

03:12:45 21  second page.  We have to sort out this futility question.

03:13:00 22  And Steves wanted to add proposed 40-A.

03:13:07 23      Now, I'm not quite sure why that comes in, why that

03:13:13 24  would be a proper instruction.  Can somebody explain that

03:13:16 25  to me?

03:13:17  1              MS. ECKSTEIN:  Sure, Your Honor.  So that goes
03:13:26  2    to the notice requirement in the contract.  And under
03:13:30  3    Delaware law, we had cited the Reserves Development v. RT
03:13:34  4    Properties case, which held that notice is not required
03:13:38  5    where it would be futile.  And our position is certainly
03:13:43  6    with respect to doors, giving notice would have been
03:13:45  7    futile because of Jeld-Wen's unilateral position not to
03:13:49  8    pay for doors.
03:13:50  9        I recall Ms. Maltas' argument yesterday that we could
03:13:53 10    have at least provided notice to get reimbursement on the
03:13:57 11    door skins.  Considering that we're talking about doors
03:13:59 12    here, that costs between 25 and $125, as Doug Gartner
03:14:05 13    testified, and it would have cost upwards of $500 to
03:14:09 14    freight them back for the inspection and the notice, and
03:14:14 15    all we could get back, at most, it was a 4, 5, $6 door
03:14:18 16    skin.  We think that futility argument still applies.
03:14:26 17              MS. MALTAS:  And, Your Honor, as we explained
03:14:27 18    more fully in the reply in support of the motion for
03:14:31 19    judgment as a matter of law that we filed this morning, we
03:14:34 20    don't agree.  We don't think that the case that
03:14:36 21    Ms. Eckstein is citing can be stretched that far.
03:14:40 22        It actually explicitly talked about how it would be
03:14:43 23    futile in terms of reaching an agreement or a compromise.
03:14:46 24    It's clear that Steves presented evidence to the jury that
03:14:49 25    Jeld-Wen was willing to reimburse for defective door skins

03:14:55  1    that were assembled into doors, returned by Steves'

03:14:59  2    customers.  And, therefore, the notice would not have been

03:15:01  3    futile.  The notice would have resulted, in many cases, in

03:15:05  4    some reimbursement.

03:15:06  5        The only complaint that Steves has is the level of

03:15:08  6    the reimbursement, which, again, is not Jeld-Wen's

03:15:11  7    unilateral decision not to reimburse for doors.  It's the

03:15:15  8    actual limitation on recovery provided for and bargained

03:15:19  9    for in the supply agreement.

03:15:22 10            MS. ECKSTEIN:  And the promise to reimburse for

03:15:24 11    door skins in those situation is, frankly, illusory when

03:15:29 12    we're talking about the cost of the door.

03:15:31 13            THE COURT:  Well, it isn't illusory, I don't

03:15:35 14    think, within the meaning of the word "at law."  It seems

03:15:47 15    to me as if this whole issue is really -- has to be

03:15:51 16    resolved by whether or not Steves can proceed with the

03:15:56 17    claim for a door, to be reimbursed for doors.  I think

03:16:03 18    that's where the rubber meets the road on that

03:16:07 19    instruction.

03:16:22 20        And this -- and this instruction (b) relates to door

03:16:26 21    skins, not doors.  3(b) is, "Steves gave notice, thereof,

03:16:32 22    to Jeld-Wen and an opportunity to inspect those door

03:16:36 23    skins."  And there isn't any futility -- the futility

03:16:44 24    would apply to what?  The door skins that were on the

03:16:47 25    doors?

03:16:49 1          MS. ECKSTEIN:  So to the extent that we have

03:16:51 2  claims that are purely for door skins, not for doors,

03:16:53 3  right, door skins that were never made into doors, I'm not

03:16:57 4  aware that there's a lack of notice argument to those.

03:17:00 5      We've presented VDM reports and the like for those.

03:17:03 6          THE COURT:  There's not?

03:17:05 7          MS. MALTAS:  No.  Our understanding of Steves'

03:17:07 8  damages claim is that they are seeking reimbursement for

03:17:10 9  all unpaid VDMs following notice and inspection by

03:17:13 10 Jeld-Wen.  So, no, we are not arguing any notice or

03:17:16 11 inspection issues for the door skin claims.

03:17:41 12         THE COURT:  Well, then this -- see, this is the

03:17:43 13 problem with the theory of the case that you all have --

03:17:46 14 and in the proofs.  You have aggregated doors and door

03:17:50 15 skins in your proofs in your damages, and it's -- so it

03:17:57 16 really ought to be -- (a) ought to be that the shipped

03:18:02 17 molded door skins to Steves did not meet Jeld-Wen's

03:18:06 18 specifications or not of a quality satisfactory to Steves

03:18:16 19 or were not fit for their intended purpose.

03:18:19 20      That's the contract, isn't it?

03:18:21 21         MS. ECKSTEIN:  Yes, sir.

03:18:22 22         MS. MALTAS:  Yes, Your Honor.

03:18:26 23         THE COURT:  So much paper up here.

03:19:12 24         MS. ECKSTEIN:  Your Honor --

03:19:13 25         THE COURT:  The other thing is what about this

03:19:14 1    clause in 8?  There's a fourth provision, and that is,

03:19:24 2    "and subject to Jeld-Wen's standard written warranty

03:19:27 3    applicable to the product, paren, the specifications,

03:19:32 4    closed paren."

03:19:38 5        Now, did anybody testify to what, paren, the

03:19:41 6    specifications applied to?  Does it apply just to

03:19:46 7    Jeld-Wen's standard written warranty applicable to the

03:19:48 8    product or does it apply to all of the provisions

03:19:56 9    beginning with, "Be of a quality satisfactory to Steves"?

03:20:02 10           MS. ECKSTEIN:  You're referring to the

03:20:04 11   specifications with a capital S?

03:20:06 12           THE COURT:  I'm talking to 8, paragraph 8.  At

03:20:09 13   the end of that first sentence --

03:20:10 14           MS. ECKSTEIN:  Right.

03:20:11 15           THE COURT:  -- it says, paren, The, capital S,

03:20:15 16   specifications.  And does specifications mean -- what does

03:20:21 17   specifications refer to?

03:20:22 18           MS. ECKSTEIN:  We understood it --

03:20:23 19           THE COURT:  And what is the significance of the

03:20:25 20   subject to Jeld-Wen's standard written warranty applicable

03:20:29 21   to the product?  So my first question is what does the

03:20:33 22   parenthetical "the specifications" relate to?  What does

03:20:37 23   it -- does it short form?  Does it short form the entire

03:20:42 24   provision beginning with "of a quality satisfactory to

03:20:46 25   Steves, comma, meeting Jeld-Wen's specifications, comma,

03:20:50  1    fit for the intended purpose, comma, and subject to

03:20:54  2    Jeld-Wen's standard written warranty applicable to the

03:20:57  3    product"?

03:20:58  4              MS. ECKSTEIN:  Yes.

03:21:00  5              THE COURT:  Or does it apply to only, "and

03:21:02  6    subject to Jeld-Wen's standard written warranty applicable

03:21:05  7    to the product"?

03:21:06  8              MS. ECKSTEIN:  We read it as applying to all

03:21:09  9    four.

03:21:10 10              THE COURT:  Do you?

03:21:10 11              MS. MALTAS:  I have always applied it as just

03:21:11 12    applying to the latter, to the warranty.  I don't think

03:21:15 13    that Steves put in any testimony or evidence about the

03:21:17 14    meaning.  It's truly ambiguous.

03:21:22 15              MS. ECKSTEIN:  Well, whether it -- with respect

03:21:24 16    to the warranty itself, there is no evidence in the case

03:21:27 17    about a warranty.  We're not aware of one.

03:21:30 18              MS. MALTAS:  My understanding is that Jeld-Wen

03:21:31 19    provided a written warranty to Steves through the course

03:21:34 20    of the relationship, and Steves rejected it.

03:21:37 21              THE COURT:  Where is it?

03:21:38 22              MS. MALTAS:  Steves didn't introduce any

03:21:40 23    evidence about the warranty in the case.

03:21:42 24              MS. ECKSTEIN:  They haven't either.  We're not

03:21:43 25    aware of it.

03:21:45 1          THE COURT:  That's fine.  But, you know, you

03:21:46 2  have a contract here, and that's a term of the contract,

03:21:51 3  and we need to make sure the instructions match the

03:21:57 4  contract.

03:22:00 5      Now, so I'm taking it that there is no contention by

03:22:03 6  Steves that the breach of contract as to Section 8

03:22:12 7  included the breach of Jeld-Wen's standard written

03:22:18 8  warranty applicable to the product?

03:22:22 9          MS. ECKSTEIN:  Right.  It's the entire -- that

03:22:23 10  entire clause, which would include that phrase.

03:22:27 11          THE COURT:  No.  But the point is when you're --

03:22:30 12  you all told me yesterday that this is a situation where

03:22:36 13  you can charge in the -- you could plead in the

03:22:42 14  conjunctive and win if you prove the conjunctive.  And I'm

03:22:46 15  trying to figure out what conjunctives to put in here in

03:22:50 16  this first -- in (a).

03:22:53 17      And as I understand it, there is no evidence that the

03:22:59 18  breach, whatever it may have been, was of Jeld-Wen's

03:23:04 19  standard written warranty; is that correct?

03:23:08 20          MS. ECKSTEIN:  Yes.

03:23:09 21          THE COURT:  All right.  So that doesn't go in

03:23:12 22  the instruction.  So (a) -- 3(a) is right up to that

03:23:16 23  point.

03:23:17 24      Then we have to separate out, it seems to me, the

03:23:22 25  next issue, because there's no issue on notice for the

03:23:28  1   door skins, as I understand it now.  And -- so (c) would

03:23:39  2   become (b), and (c) -- and (b) would -- and so new (b),

03:23:48  3   old (c), would be, "Jeld-Wen did not reimburse Steves for

03:23:51  4   the price of those door skins."  And then "Jeld-Wen's

03:23:56  5   failure to reimburse Steves for those door skins caused

03:24:01  6   the loss claim."  Is that right?

03:24:04  7          MS. ECKSTEIN:  Yes.

03:24:05  8          MS. MALTAS:  Yes.

03:24:05  9          THE COURT:  Do you all agree?

03:24:06 10          MS. MALTAS:  Yes, Your Honor.

03:24:11 11          MS. ECKSTEIN:  For the door skins, yes.

03:24:13 12          THE COURT:  We're only doing the door skins now.

03:24:21 13       Then (e) would become (c).

03:24:27 14          MS. ECKSTEIN:  Yes.

03:24:38 15          MR. POWELL:  For (e) becoming (c), should it

03:24:40 16   say, "Failure to reimburse Steves for the price of those

03:24:45 17   door skins," just to be clear?

03:24:48 18          THE COURT:  I think that -- I was getting ready

03:24:49 19   to put something in there once I saw where it fit and how

03:24:54 20   it fit.  And I think that's the correct language.

03:25:16 21       And then there would be another provision, then, that

03:25:19 22   would say, "Also as to Section 8," and then we would pick

03:25:42 23   up what was old (d) as -- and we'll just call it (e) so as

03:26:01 24   to avoid confusion.  And that would be, "Jeld-Wen was

03:26:07 25   required to but did not reimburse Steves for the cost of

03:26:11  1  doors manufactured by Steves that incorporated defective

03:26:14  2  door skins sold to Steves by Jeld-Wen," right?  I mean,

03:26:19  3  that's another alleged breach of 8.  There are three

03:26:24  4  alleged breaches of 8.

03:26:26  5          MS. MALTAS:  Yes.

03:26:27  6          THE COURT:  One is the door skins.  One is the

03:26:29  7  doors.  The other is the in-plant damage, right?

03:26:34  8      Where is that chart from that damage expert?

03:26:37  9          MS. ECKSTEIN:  That's right.

03:26:40 10          MR. BUTERMAN:  That's correct, your Honor.

03:26:41 11          THE COURT:  All right.  And so we have to tell

03:26:43 12  them what it is they have to find to find a breach.

03:26:47 13          MS. MALTAS:  That's right, Your Honor.

03:26:48 14          THE COURT:  That's what I'm trying to do is to

03:26:50 15  construct the next section of this.

03:26:52 16          MS. MALTAS:  Yes.  I --

03:26:54 17          THE COURT:  Except I will hear you in just a

03:26:55 18  minute about whether the in-plant damage even should go in

03:27:00 19  here.  That, to me, is so far unproved and beyond the pale

03:27:05 20  that it's wasting our time even to put it in.

03:27:09 21          MS. MALTAS:  And, Your Honor, I would just

03:27:11 22  question whether we should repeat what was section (a)

03:27:14 23  again to confirm that Steves needs to prove that the --

03:27:19 24  what the defective door skins are incorporated in the

03:27:23 25  doors or if that just defective door skins naturally

```
03:27:27  1    incorporates the concept of the breach.
03:27:33  2             MR. DANE:  Your Honor, in that regard, I had a
03:27:35  3    similar thought as to Ms. Maltas, which is perhaps to have
03:27:39  4    two versions of (a).  The first would be as the Court as
03:27:43  5    written it, "Jeld-Wen shipped Jeld-Wen molded door skins
03:27:47  6    products to Steves, comma, which were not included in
03:27:49  7    doors, comma, that did not meet the specifications."  That
03:27:53  8    would be for this first set.
03:27:54  9        And then for the second set, repeat that and say,
03:27:57 10    "Jeld-Wen shipped Jeld-Wen molded door skins products to
03:28:00 11    Steves which were included in doors sold by Steves."
03:28:05 12             THE COURT:  Do you agree with that, Ms. Maltas?
03:28:08 13             MS. MALTAS:  Yes.  That's fine.
03:28:09 14             THE COURT:  I think that's a good -- I'm just
03:28:11 15    going to put, "shipped molded door skin products to
03:28:18 16    Steves, paren, not included in doors," right?
03:28:24 17             MR. DANE:  Yes.
03:28:35 18             MR. BUTERMAN:  Your Honor --
03:28:38 19             THE COURT:  "That Steves did not" -- yes.  What,
03:28:41 20    Mr. Buterman?
03:28:42 21             MR. BUTERMAN:  The only thing I'm concerned
03:28:44 22    about is the idea that the jury may think that that first
03:28:46 23    3(a) includes the in-plant damages, because those are --
03:28:52 24             THE COURT:  They ain't going to have to worry
03:28:54 25    about that because they're not going to go to the jury on
```

03:28:56 1   in-plant damages.

03:28:58 2          MR. BUTERMAN:  Okay.  Thank you, Your Honor.

03:28:59 3          THE COURT:  I mean, there's no evidence to

03:29:00 4   support that.  When you take the product, you take the --

03:29:04 5   you accept the risk.  Once you take delivery of it, you've

03:29:07 6   got the risk of delivery once you handle it and what

03:29:10 7   happens in a plant.  And the only way you can do that is

03:29:14 8   to somehow have some evidence that says that the standard

03:29:17 9   industry practice -- or there was a specific agreement

03:29:20 10  that it would come packaged in such a way as to protect,

03:29:24 11  et cetera, et cetera.  And there wasn't any evidence, and

03:29:31 12  it just -- but I -- let's see.

03:29:53 13     I don't think that's right.  I think that's a mistake

03:29:55 14  to put that in there.  Because it suggests -- they're just

03:30:00 15  free-floating door skins.  The language about they weren't

03:30:04 16  included in door skins, I don't think, doesn't -- so --

03:30:14 17          MR. DANE:  Your Honor, I do think that that is

03:30:16 18  an accurate statement, because Steves viewed these to be

03:30:19 19  defective door skins.  So they never did end up in any

03:30:22 20  doors sold by Steves.

03:31:10 21          THE COURT:  All right.  And then paragraph (e)

03:31:11 22  would be a repeat of (a) and -- except that the

03:31:19 23  parenthetical would be that Steves did include in doors.

03:31:32 24          MS. ECKSTEIN:  Correct.

03:31:41 25          THE COURT:  All right.  And then (f) would be

03:31:45  1   old (d).

03:31:48  2          MS. MALTAS:  Your Honor, I think (f) would be

03:31:50  3   old (b), because we do have an issue regarding notice and

03:31:53  4   opportunity to inspect the actual doors.

03:31:58  5          MS. ECKSTEIN:  And I think that's right.  I

03:31:59  6   would switch out the word "door" for "door skin" and add

03:32:04  7   the futility language.

03:32:06  8          MS. MALTAS:  And I would not add the futility

03:32:09  9   language.

03:32:19 10          THE COURT:  I don't think it's necessary to add

03:32:21 11   40-A, though.  Why should we have to add that?

03:32:26 12          MR. BUTERMAN:  I'm sorry, Your Honor?

03:32:27 13          MS. MALTAS:  40-A.

03:32:28 14          THE COURT:  If I add the futility language, why

03:32:31 15   do you add 40-A?  I don't have it.  I don't know where it

03:32:35 16   is.  Excuse me.  I've lost my copy of it.

03:32:45 17      Have you got 40-A?  Okay.  Because I don't know what

03:32:49 18   they did with it.  It came over with the new set.  We've

03:32:55 19   had so many iterations of this thing.  Yeah, that's what

03:32:59 20   it is.  That's it right there.  Yep.  Thank you.  40-A.

03:33:09 21      I don't think 40-A goes in there.  I just -- your

03:33:12 22   issue it would have been futile because -- because of the

03:33:17 23   notice -- because of the instruction that they weren't

03:33:20 24   going to pay for doors, right?

03:33:23 25          MS. ECKSTEIN:  Right.  That it would have been

03:33:25  1    futile to provide notice because they wouldn't pay for the

03:33:27  2    doors.

03:33:28  3              THE COURT:  That's all -- I'm not going to put

03:33:30  4    in 40-A, I don't think.  There's no reason for it.

03:33:33  5              MS. ECKSTEIN:  The second part of 40-A addressed

03:33:35  6    that futility issue.

03:33:37  7              THE COURT:  I know, but --

03:33:38  8              MS. ECKSTEIN:  Okay.

03:33:39  9              THE COURT:  -- see, we're going to load the jury

03:33:41 10    down with so much junk that they're never going to

03:33:44 11    understand anything and they're going to get tied up.

03:33:47 12    That's the problem with instructions that conceptually are

03:33:50 13    okay but that really don't fit what we're doing.  You'll

03:33:53 14    be able to make the argument about the futility.

03:33:57 15              MS. ECKSTEIN:  Thank you, Your Honor.

03:34:00 16              MR. DANE:  And, Your Honor, does that mean that

03:34:01 17    you'll include the language in 3(b) that proof to doing so

03:34:10 18    would be futile?

03:34:11 19              THE COURT:  Yes.

03:34:12 20              MS. ECKSTEIN:  That makes sense.  Thank you.

03:34:13 21              THE COURT:  And then (g) will be old (d).  And

03:34:17 22    then (h) will be the same as old (e) or new (c).

03:34:30 23    Jeld-Wen's failure to reimburse Steves for the price of

03:34:37 24    those doors caused the -- the loss claim.

03:34:50 25              MS. MALTAS:  Your Honor, if I can just clarify

03:34:52  1   one thing on the futility point, which I understand Your

03:34:57  2   Honor is going to include in what's now new (f).  My read

03:35:00  3   of the case law is that the futility argument only goes to

03:35:04  4   the actual notice, not to the requirement to inspect.  So

03:35:09  5   I think that that's two separate issues that Jeld-Wen has

03:35:11  6   with the doors.  And the inspection really only -- it

03:35:14  7   applies specifically to the REEB claim where notice was

03:35:17  8   given but the contractual requirement that Jeld-Wen

03:35:20  9   inspect was not provided.

03:35:23  10          THE COURT:  It may be, but I think this

03:35:25  11  instruction covers the situation.

03:35:28  12      All right.

03:35:31  13          MR. POWELL:  Your Honor, may I make a

03:35:33  14  grammatical point about this whole instruction, something

03:35:36  15  I just noticed, when you're finished writing?

03:36:01  16          THE COURT:  Yes.

03:36:02  17          MR. POWELL:  It has to do with the separation

03:36:05  18  between paragraphs 1, 2, and 3 and whether there should be

03:36:11  19  a period at the end of each of them.  If you'll notice, at

03:36:14  20  the end of paragraph 1, right after 1(d), there's a

03:36:17  21  semicolon, which then goes to number 2.  And then at the

03:36:21  22  end of paragraph 2, after 2(c), it says semicolon "and,"

03:36:26  23  which suggests to me that the jury might conclude that

03:36:29  24  Steves has to prove all three of these in order to recover

03:36:34  25  for breach of contract.

```
03:36:37  1              THE COURT:  I don't have my hands on my --
03:36:50  2              MR. POWELL:  My suggestion is there should be --
03:36:51  3              THE COURT:  Wait just a minute until I find my
03:36:54  4   paper.  There ought to be a period after "overcharges" on
03:37:00  5   the first thing, right?
03:37:05  6              MR. POWELL:  I think that's correct, Your Honor.
03:37:05  7   And then --
03:37:06  8              THE COURT:  Yeah.  And then as to the alleged
03:37:06  9   breach of Section 6, we go to another section, right?
03:37:09 10              MR. POWELL:  I agree about with that, Your
03:37:11 11   Honor.  So that ends with a period, and you strike "and"
03:37:14 12   then you go to paragraph --
03:37:17 13              THE COURT:  There isn't any "and" on my copy.
03:37:22 14              MS. ECKSTEIN:  I think Mr. Powell moved on to
03:37:24 15   the Section 6 paragraph as well.
03:37:25 16              THE COURT:  Oh.
03:37:25 17              MS. ECKSTEIN:  And at the end of that one,
03:37:27 18   there's a semicolon and an "and" that I think should be a
03:37:32 19   period.
03:37:32 20              THE COURT:  I agree with that.
03:37:33 21              MR. POWELL:  And strike the --
03:37:36 22              THE COURT:  Wait just a minute.  And then as to
03:37:37 23   Section 8.  And then instead of saying "also" --
03:37:54 24              MR. POWELL:  I lost track, Your Honor, of what's
03:37:56 25   happened to the Section 8 subparts and where --
```

```
03:38:02  1              THE COURT:  Do you know what Section 8 is in the
03:38:04  2    Army?
03:38:05  3              MR. POWELL:  Yes, I do, actually, Your Honor.
03:38:07  4    Maybe I should ask for one right now.
03:38:09  5              THE COURT:  That's where I feel like I ought to
03:38:10  6    be.
03:38:11  7              MR. POWELL:  Yeah.  Yeah.  I think maybe we've
03:38:12  8    all earned it, Your Honor.
03:38:15  9              THE COURT:  Wait just a minute.
03:38:53 10         At the end -- the second page of Instruction 39, at
03:38:56 11    the end of 2(c), put a period after "claimed" and delete
03:39:01 12    the word "and."
03:39:03 13         The beginning of 3, as to the alleged breach of
03:39:05 14    Section 8, paren, respecting door skins, closed paren.
03:39:14 15    And then -- we've made the changes.  And so as to the
03:39:28 16    doors part of it, there will be a parallel instruction
03:39:33 17    that says, "As to the alleged breach of Section 8, paren,
03:39:36 18    respecting doors."
03:39:39 19              MR. POWELL:  That would be --
03:39:40 20              THE COURT:  And then we will go into paragraphs
03:39:41 21    (e), (f), (g), (h) as we have discussed.
03:39:45 22              MR. POWELL:  So the doors section will be number
03:39:47 23    4?
03:39:49 24              THE COURT:  It will be the -- it will be -- yes.
03:39:51 25    It should be 4.  That's correct.
```

03:40:01 1   So then 3 will be, "As to the alleged breach of

03:40:04 2   Section 8, paren, respecting door skins, colon," and then

03:40:11 3   it will be as you have it.  And then in -- there will be

03:40:17 4   inserted in the second line of paragraph 3(a), after the

03:40:23 5   word "products," "that Steves did not include in doors,

03:40:31 6   closed paren."  And then old section -- subparagraph -- or

03:40:36 7   paragraph (c) will become (b), "Jeld-Wen did not reimburse

03:40:43 8   Steves for the price of those door skins."  And the word

03:40:47 9   "or" will come out.  And then old (e), which will become

03:40:53 10  (c), and it says, "Jeld-Wen's failure to reimburse Steves

03:40:56 11  for the price of those door skins caused the losses

03:40:59 12  claimed."

03:41:07 13      Then we will go to 4.  "As to the alleged breach of

03:41:10 14  Section 8, paren, respecting doors, colon."  And paragraph

03:41:14 15  (e) will be a repeat of (a) except that the parenthetical

03:41:22 16  will be, "That Steves did include in doors."  (f) will

03:41:28 17  become old (b), and the shaded area about the futility

03:41:33 18  will be put in.  (g) will become old (d), and (h) will be

03:41:42 19  a repeat of (c) except that it will say, "for the price of

03:41:48 20  those doors."

03:41:53 21          MR. POWELL:  That sounds right to me, Your

03:41:54 22  Honor.  It might be well for Mr. Martecchini, if he

03:41:57 23  wouldn't mind, with your permission, sending this one out

03:42:00 24  for us to look at this evening.

03:42:04 25          THE COURT:  I don't -- I think if you can't

03:42:06 1  memorize that stuff, you should just quit.

03:42:10 2          MR. POWELL:  That's why I earned a Section 8,

03:42:12 3  Your Honor.

03:42:12 4          THE COURT:  No.  We'll get this straight -- I'm

03:42:15 5  just trying to get it straight now.  And then we'll --

03:42:18 6  we'll give it to you and make sure that it does what we

03:42:21 7  intended it to do.

03:42:22 8          MR. POWELL:  The only other suggestion, Your

03:42:24 9  Honor, just for the benefit of the jury, where we've got

03:42:26 10 at beginning where we say "did not include" or "did

03:42:30 11 include," maybe to emphasize those in some fashion so the

03:42:34 12 jury appreciates the difference between 3 and 4?  That's

03:42:39 13 just an emphasis.

03:42:41 14         THE COURT:  What do you mean emphasize it?  What

03:42:43 15 do you mean?

03:42:43 16         MR. POWELL:  Much the way, in the verdict form,

03:42:45 17 we try to emphasize damages already incurred versus --

03:42:50 18         THE COURT:  You mean bolding them or something

03:42:51 19 like that?

03:42:52 20         MR. POWELL:  Yes, sir.  That was all my --

03:42:56 21         THE COURT:  What do you all say?

03:42:58 22         MR. BUTERMAN:  We have no problem with that,

03:42:59 23 Your Honor.

03:43:00 24         THE COURT:  Okay.

03:43:04 25         MR. DANE:  Your Honor, at the risk of the

```
03:43:06  1    incurring the Court's wrath, I --
03:43:08  2              THE COURT:  Why do you say that?
03:43:12  3              MR. DANE:  Because I'm --
03:43:12  4              THE COURT:  I mean, I stayed here until 9:00
03:43:15  5    last night.  Where were you?
03:43:17  6              MR. DANE:  I was here, Your Honor.
03:43:19  7              THE COURT:  Yeah.  Did we have any wrath going
03:43:21  8    on?
03:43:23  9              MR. DANE:  No.  It was just meant as a joke,
03:43:24 10    Your Honor.
03:43:25 11              THE COURT:  What have you got?
03:43:28 12              MR. DANE:  Just on 1(b), at the beginning of the
03:43:30 13    instruction where it's referring to the Craftsman issue
03:43:32 14    that we added yesterday -- or the Court added after the
03:43:36 15    conference yesterday, it says, "The Craftsman pricing
03:43:38 16    provisions in Schedule 1 apply to the Madison and Monroe
03:43:42 17    door skins because those styles are Craftsman door skins."
03:43:45 18    I would just suggest one modest amendment, which would be
03:43:48 19    to say "are Craftsman style door skins."
03:43:53 20              MS. MALTAS:  Your Honor, we don't agree with
03:43:54 21    that.  Craftsman is an actual style that's used as a term
03:43:58 22    of art by Jeld-Wen.  And that's what that is referring to.
03:44:03 23    Of course, anyone who's had any sort of home renovations
03:44:06 24    in the past five to ten years know that Craftsman cabinets
03:44:11 25    and doors are a popular style of doors.  So we don't want
```

03:44:15 1  the jury getting confused thinking that because that door

03:44:17 2  they're looking at is, indeed, a Craftsman style of door,

03:44:20 3  that makes it a, big C, Jeld-Wen Craftsman door.

03:44:27 4          MR. DANE:  Your Honor, the reason for this, our

03:44:30 5  whole argument on this always has been we understand the

03:44:32 6  name of the design is Monroe and Madison.  The name is not

03:44:36 7  Craftsman.  But our position is that the contract covered

03:44:40 8  the full Jeld-Wen line.  And when there's a later

03:44:43 9  introduced product, what you do is you look at the pricing

03:44:46 10 schedule and you find the closest match.  And the closest

03:44:50 11 match to the Madison/Monroe, because they are the smooth

03:44:55 12 panel designs, is it's a Craftsman style, even

03:44:58 13 if it's not -- it's obviously not called Craftsman and we

03:45:01 14 don't want them arguing just look at the word.  It's

03:45:04 15 Monroe or Madison.  Therefore, it can't be the Craftsman

03:45:08 16 price because it's not named Craftsman.  But that's not

03:45:08 17 our argument.

03:45:09 18          THE COURT:  What do you want to do?

03:45:11 19          MR. DANE:  I just want to put the word "style."

03:45:14 20 And Ms. Maltas admitted there's Craftsman style.

03:45:19 21          THE COURT:  Where?  Where?  The style -- you've

03:45:20 22 lost me.

03:45:21 23          MR. DANE:  In 1(b) where it says, "The Craftsman

03:45:23 24 pricing provisions in Schedule 1 apply to the Madison and

03:45:25 25 Monroe door skins because those styles are Craftsman style

03:45:29 1  door skins."

03:45:34 2       MS. MALTAS:  And, Your Honor, I am not aware of

03:45:37 3  any evidence being put into the record to the jury that

03:45:41 4  the jury can look at the sort of amorphous style of the

03:45:48 5  door skin in determining what pricing in the supply

03:45:51 6  agreement.  Nothing from any Jeld-Wen employee for sure.

03:45:55 7    And the way it was presented, I think by the Steves

03:45:57 8  employees, was referring to the term of art, the actual

03:46:00 9  style sold by Jeld-Wen that is Craftsman.  And so this is

03:46:05 10 very confusing.  I don't think it's supported by the

03:46:08 11 evidence, and it shouldn't be presented to the jury.

03:46:11 12       MS. ECKSTEIN:  There is evidence in the record

03:46:13 13 from Mr. Gartner, and I believe Mr. Steves, about these

03:46:15 14 doors being Craftsman style doors.  And I believe there's

03:46:18 15 also a brochure that was put in the record that -- from

03:46:21 16 Jeld-Wen that referred to these as Craftsman doors.

03:46:24 17       THE COURT:  I think the suggested change is a

03:46:29 18 correct change.  The word "styles" on the last line ought

03:46:36 19 to be deleted, and after "Craftsman," the word "style"

03:46:42 20 ought to be included before the word "door skins."

03:46:48 21       MR. DANE:  Thank you, Your Honor.

03:46:49 22       THE COURT:  All right.  Are we through with this

03:46:49 23 now?

03:46:50 24       MR. MACH:  There's just one small thing to flag

03:46:53 25 for --

```
03:46:55  1              THE COURT:  No.
03:46:56  2              MR. MACH:  I didn't say anything about wrath.
03:46:58  3              THE COURT:  Where is it?
03:46:59  4              MR. MACH:  I don't think this requires
03:47:00  5    resolution in the discussion, but I just want to flag that
03:47:03  6    Instruction 28 contains the efficiencies language that is
03:47:07  7    the subject of --
03:47:09  8              THE COURT:  Twenty-eight?  I'm on 39.
03:47:11  9              MR. MACH:  Yeah.  On 39, this is not --
03:47:16 10              THE COURT:  I asked is there anything else about
03:47:18 11    39, and you said yes.
03:47:18 12              MR. MACH:  I misheard you.  I apologize.
03:47:18 13              THE COURT:  Okay.
03:47:18 14              MS. ECKSTEIN:  He thought we were done with the
03:47:20 15    jury instructions altogether.
03:47:22 16              MR. MACH:  I did.  I was optimistic.
03:47:24 17              THE COURT:  All right.  Now, the let's see.  I
03:47:26 18    think there -- on 40 -- on 40, subparagraph -- or
03:47:35 19    paragraph 3, Steves proposed adding, "In considering the
03:47:41 20    history of negotiations, you should consider only evidence
03:47:43 21    of what both parties knew or should have known."  Is that
03:47:50 22    right?
03:47:51 23              MS. ECKSTEIN:  Yes, sir.
03:47:52 24              MS. MALTAS:  Yes.  And Jeld-Wen objects to that
03:47:55 25    being included.
```

03:47:56  1          THE COURT:  Well, the decision in United

03:47:59  2    Rentals, the judge did a very good job of explaining what

03:48:05  3    the situation is.  And I suppose that what you're trying

03:48:11  4    to do is to pick up the part of the decision on page 835

03:48:17  5    and 836 about how you consider extrinsic evidence.  There,

03:48:33  6    the judge explains from a recent decision that he made, a

03:48:39  7    letter decision, "Evidence" -- he cites from the earlier

03:48:45  8    decision in footnote 118.  "Evidence of one side's

03:48:50  9    undisclosed private mental impressions or understandings

03:48:54 10    is useless.  It is generally not the parties' unexpressed

03:48:58 11    intent or understanding that that is relevant."

03:49:00 12        And then up in the text, he says, "As I recently

03:49:05 13    explained to counsel in this case" -- I think maybe he

03:49:09 14    might have been frustrated, or she might have been

03:49:12 15    frustrated with the lawyers.

03:49:17 16        So anyway, "The private subjective feelings of the

03:49:22 17    negotiators are irrelevant and unhelpful to the Court's

03:49:27 18    consideration of a contract's meaning, footnote 118,

03:49:32 19    because a meaning of a properly formed contract must be

03:49:36 20    shared or common."  Footnote 119 citing the restatement

03:49:39 21    section of contracts.  "That is not to say, however, that

03:49:44 22    a party's subjective understanding is never instructive.

03:49:48 23    On the contrary, in cases where an examination of the

03:49:52 24    extrinsic evidence does not lead to an obvious objectively

03:49:55 25    reasonable conclusion, the Court may apply the forthright

03:50:00  1  negotiator principle."

03:50:02  2      I've heard the principle described but never
03:50:05  3  described as the forthright negotiator principle.

03:50:10  4      "Under this principle, the Court considers the
03:50:12  5  evidence of what one party subjectively believed the
03:50:16  6  obligation to be, coupled with evidence that the other
03:50:19  7  party knew or should have known of such belief."

03:50:24  8      And that, in my recollection, is a correct statement
03:50:27  9  of the law generally about the consideration of parol
03:50:33 10  evidence.

03:50:35 11      So I think that the instruction you're asking for is
03:50:38 12  correct.

03:50:40 13              MS. ECKSTEIN:  Thank you.

03:50:41 14              MS. MALTAS:  And, Your Honor --

03:50:42 15              THE COURT:  You object to it?

03:50:43 16              MS. MALTAS:  We do, Your Honor.  Having gone
03:50:45 17  through all of the testimony by Mr. Edward Steves and
03:50:48 18  Mr. Sam Steves, Mr. John Ambruz, and Mr. Philip Orsino, it
03:50:53 19  just doesn't seem that there's any place where the jury
03:50:56 20  would conclude that either party either didn't know or,
03:51:01 21  you know, should not have known what the other party's
03:51:06 22  intent was.

03:51:06 23      It's very clear that all -- Mr. Edward Steves,
03:51:10 24  Mr. Orsino, Mr. Ambruz were all involved.  Mr. Ambruz did
03:51:16 25  more direct negotiation, but he testified in his

03:51:18 1    deposition it was all at the direction of Mr. Orsino.  He

03:51:22 2    discussed the strategy with Mr. Orsino.  He would never

03:51:25 3    countermand any instruction provided to him by Mr. Orsino.

03:51:29 4    And so I think it will just unnecessarily confuse the jury

03:51:33 5    to be thinking back who is this possibility relating to

03:51:37 6    when there's nothing in the record that would suggest to

03:51:40 7    them that anyone was unaware of the subjective intention

03:51:44 8    of the other side.

03:51:48 9            MS. ECKSTEIN:  The jury has listened to a

03:51:50 10   significant amount of evidence regarding the history of

03:51:53 11   the parties' negotiations, the back and forth, including

03:51:56 12   testimony from Mr. Ambruz about discussions that he had

03:51:59 13   with Edward Steves that he then relayed to Mr. Orsino.

03:52:03 14   And then they went back and forth about what to do about

03:52:06 15   Mr. Edward Steves' position.

03:52:09 16           THE COURT:  You're referring to the keep it

03:52:13 17   silent?

03:52:14 18           MS. ECKSTEIN:  Yes, sir.

03:52:15 19           THE COURT:  Yeah.  I mean, that's where this

03:52:16 20   fits in.

03:52:17 21           MS. ECKSTEIN:  Yes, sir.

03:52:18 22           THE COURT:  This is -- but the question I have

03:52:19 23   is does this instruction capture the applicable law?

03:52:25 24           MS. ECKSTEIN:  I believe that it does,

03:52:26 25   absolutely, based on the case that you mentioned and the

03:52:29 1    language there.

03:52:32 2         MS. MALTAS:  And, Your Honor, Mr. -- I do know

03:52:34 3    what Mr. Ambruz testified to regarding that e-mail.

03:52:37 4    Mr. Orsino explicitly testified that he instructed

03:52:41 5    Mr. Ambruz to not add -- not add additional language to

03:52:48 6    the supply agreement.  That's what he meant by keep

03:52:51 7    silent.  He was not in any way --

03:52:53 8         THE COURT:  That's what he said he meant, but

03:52:55 9    one could interpret that language a little differently.

03:53:00 10        MS. MALTAS:  Exactly.

03:53:00 11        THE COURT:  I think you're going to hear an

03:53:03 12   argument to the contrary, shall I say.

03:53:06 13        MS. MALTAS:  Yeah.  And that's the province of

03:53:06 14   the jury, to weigh all of these recollections, Mr. Orsino,

03:53:06 15   who was the CEO, Mr. Ambruz, who's now employed by Steves,

03:53:10 16   and to decide who is more accurately recollecting what

03:53:13 17   happened.  But we don't need any additional language in

03:53:16 18   the jury instruction that will just confuse the jury.

03:53:19 19        MR. DANE:  Your Honor --

03:53:21 20        THE COURT:  I mean, I understand where we are.

03:53:24 21   Jeld-Wen objects to the proposed addition.  Steves is

03:53:28 22   satisfied with the language and -- and I believe that

03:53:32 23   if -- that's the language that you want to put in --

03:53:36 24        MR. DANE:  Your Honor, I was going to suggest

03:53:37 25   some other language, perhaps, in response to the Court's

```
03:53:40  1   comment.
03:53:41  2          THE COURT:  I'm going to keep my mouth closed.
03:53:45  3      What?
03:53:46  4          MR. DANE:  "The subjective understanding of one
03:53:48  5   party to a contract that was not communicated to the other
03:53:51  6   party during negotiations is irrelevant to contract
03:53:54  7   interpretation."  I believe that's the essence of the
03:54:00  8   case.
03:54:00  9          THE COURT:  It is, perhaps.  What does that do
03:54:04 10   to your side of the case, too?  What does that mean the
03:54:08 11   jury can considers?  That's what Ms. Maltas -- that's the
03:54:12 12   point I think Ms. Maltas was raising.  Are you not --
03:54:15 13          MS. MALTAS:  If that language --
03:54:17 14          THE COURT:  Were you not raising that point?
03:54:19 15          MS. MALTAS:  Exactly.  And having personally
03:54:20 16   read all of the testimony, there is very little that
03:54:22 17   anyone testified to that they conveyed to the other side.
03:54:26 18   And so with that language, they are not going to be
03:54:29 19   considering anyone's interpretation of the contract.
03:54:41 20          MS. ECKSTEIN:  We'll withdraw that
03:54:41 21   recommendation.
03:54:42 22          THE COURT:  Which recommendation?
03:54:43 23          MS. ECKSTEIN:  We'll go with the language that
03:54:44 24   you have in this proposed.
03:54:47 25          THE COURT:  It will be in.
```

03:54:50  1           Your objection is preserved, Jeld-Wen.

03:54:53  2                MS. MALTAS:  Thank you, Your Honor.

03:54:55  3                THE COURT:  All right.  Let's see.  All right.

03:55:02  4  That, I think, deals with all of the -- was that every

03:55:06  5  place that we needed to inform them or to talk about,

03:55:09  6  Mr. Martecchini?

03:55:11  7                MR. MARTECCHINI:  That's all I had.

03:55:14  8                THE COURT:  Okay.  That's all we have on these

03:55:16  9  instructions.

03:55:22 10      And it assumes that all of these will go to the jury,

03:55:34 11  these instructions, because it's easier to take things out

03:55:39 12  than it is to put them in late.  All right.

03:55:42 13                MR. MACH:  I think that's consistent, Your

03:55:43 14  Honor, with --

03:55:44 15                THE COURT:  Now, did you have something you

03:55:45 16  wanted to say about Instruction Number 28?

03:55:48 17                MR. MACH:  With your permission.  I was just

03:55:50 18  going to make the observation that Instruction 28 could be

03:55:54 19  impacted by our -- our motion for judgment as a matter of

03:55:58 20  law, which we filed shortly before noon today.  It doesn't

03:56:01 21  need to be resolved prior to the resolution of that

03:56:04 22  motion, but it concerns the efficiencies language in Rule

03:56:07 23  28.

03:56:09 24                THE COURT:  All right.  Now we need the verdict

03:56:12 25  forms.  Now, what we've done is to take the verdict forms

```
03:56:17  1    that -- the most recent that came to us, including the one
03:56:21  2    you did, and put it into the format that we have.
03:56:29  3         Now, I don't see any need -- do you have that in
03:56:36  4    front of you, both of you?
03:56:38  5              MR. BUTERMAN:  Yes, Your Honor.
03:56:39  6              THE COURT:  I don't see any need for two.
03:56:46  7              MR. BUTERMAN:  Your Honor --
03:56:48  8              THE COURT:  I think that you just go 3 becomes
03:56:50  9    2, et cetera, et cetera.
03:56:52 10              MR. BUTERMAN:  Your Honor, the -- the reason why
03:56:55 11    we believe that 2 is necessary, and I'll note, as I did in
03:56:59 12    the papers, that 2 is actually the verbatim of what the
03:57:02 13    Court had proposed in its longer verdict form initially.
03:57:07 14              THE COURT:  I had tendered it for
03:57:09 15    consideration --
03:57:10 16              MR. BUTERMAN:  Yes.  Sorry, Your Honor.
03:57:11 17              THE COURT:  -- based upon what you all had put
03:57:13 18    in -- put out.  I mean that's what I did.
03:57:16 19              MR. BUTERMAN:  Yes, Your Honor.  And the reason
03:57:17 20    why we believe that this is necessary --
03:57:19 21              THE COURT:  I think what I told you was I
03:57:21 22    preferred the shorter one where this language wasn't
03:57:24 23    included --
03:57:24 24              MR. BUTERMAN:  Well, Your Honor, what's --
03:57:27 25              THE COURT:  -- when I gave you that information,
```

```
03:57:29  1   gave you those alternatives.
03:57:32  2           MR. BUTERMAN:  Well, Your Honor, what Steves did
03:57:33  3   was they pulled some language into the breach of contract
03:57:37  4   section, which essentially makes the breach of contract
03:57:40  5   section more of a special verdict form.  The problem on
03:57:44  6   the -- on the antitrust side is that we believe it would
03:57:48  7   be wrong for the jury to leap from the fact that there's a
03:57:52  8   Section 7 violation to immediately go to calculating the
03:57:59  9   damages for that.  In an antitrust claim, as Your Honor
03:58:03 10   knows, there are three elements.
03:58:04 11           THE COURT:  They have been told this.  They --
03:58:07 12   you don't always have to make a finding on every element
03:58:11 13   of every claim.
03:58:12 14           MR. BUTERMAN:  I understand, Your Honor.  But
03:58:13 15   there is a concern here.  And it's something that we have
03:58:16 16   seen in other antitrust cases, which is part of the reason
03:58:19 17   why we're asking for it.
03:58:20 18           THE COURT:  You have not either seen that in any
03:58:23 19   other antitrust case tried to a jury under Clayton 7, have
03:58:29 20   you?  Because there haven't been any, according to what
03:58:33 21   you all have said.
03:58:36 22           MR. BUTERMAN:  In the Section 7 case, I'm not
03:58:38 23   sure, Your Honor.  I --
03:58:40 24           THE COURT:  Well, you all keep telling me this
03:58:41 25   is one --
```

03:58:43  1                 MR. BUTERMAN:  Your Honor, but --

03:58:45  2                 THE COURT:  One at a time.

03:58:46  3                 MR. BUTERMAN:  I apologize.  Your Honor, the

03:58:48  4    point is, though, that it still would be a -- we believe

03:58:52  5    it would be wrong for the jury to make that leap.

03:58:54  6    Antitrust injury is a necessary part of this.  It goes

03:58:59  7    violation, antitrust injury and then damages.  And that's

03:59:04  8    all we're asking for, to make sure that we have a finding

03:59:07  9    that the jury finds what's considered antitrust injury.

03:59:11 10    So that --

03:59:12 11                 THE COURT:  What's your position on this?  Any

03:59:14 12    objection to putting 2 in?

03:59:18 13                 MR. MACH:  We do object, Your Honor.

03:59:19 14                 THE COURT:  Why?

03:59:20 15                 MR. MACH:  Well, it's in the instructions and

03:59:21 16    the jury is capable of following the instructions.  It is

03:59:24 17    a predicate that they will resolve as they follow the

03:59:26 18    instructions and before they answer the question of

03:59:29 19    whether there are damages.  And I think what's -- what

03:59:33 20    we're seeing here is just a trend -- trend toward a

03:59:39 21    verdict form that is more complicated and potentially,

03:59:41 22    thus, more confusing for the jury than it needs to be.

03:59:45 23                 MR. BUTERMAN:  Your Honor, if I may just make

03:59:47 24    one additional point.  The --

03:59:48 25                 THE COURT:  I thought what you were going to do

03:59:50 1   was you were going to give me two little paragraphs.  And

03:59:57 2   what you gave me was three pages that converted a simple

04:00:00 3   verdict form into a very complex one, and I don't want

04:00:02 4   that.

04:00:03 5            MR. BUTERMAN:  I --

04:00:03 6            THE COURT:  I don't think it's helpful for the

04:00:07 7   jury.  I think you tell the jury the instructions and then

04:00:09 8   you put them to their task.

04:00:12 9            MR. BUTERMAN:  Except there are two separate

04:00:13 10  sections here that are relevant, Your Honor.  And that was

04:00:16 11  a change that Steves actually requested yesterday.  They

04:00:19 12  made us put in Section 7 and then Section 4.  And what

04:00:23 13  we're saying is that part 1 is the Section 7 analysis.

04:00:26 14  Part 2 is the Section 4 analysis, which they specifically

04:00:30 15  wanted to have called out for the jury in the jury

04:00:35 16  instructions.  And then we go to damages.  And that's all

04:00:38 17  we're suggesting, Your Honor, with respect to question 2.

04:00:43 18            THE COURT:  I understand.  What about 3?  Do you

04:00:46 19  agree with 3 or not?  Last night you said you agreed with

04:00:52 20  putting in over -- something about overcharges and

04:00:58 21  defects.  Now you all have got four or five different

04:01:04 22  things in here.

04:01:06 23            MR. BUTERMAN:  May I explain, Your Honor?

04:01:08 24            THE COURT:  Yeah.  Why?  Why did you do this?

04:01:11 25            MR. BUTERMAN:  Yes.  Your Honor, honestly, when

04:01:12  1    we went back, what we realized is that there are -- there

04:01:16  2    is this overlap between the breach claims and the

04:01:22  3    antitrust claims.  And what we do not want to happen, with

04:01:26  4    all due respect, is that if this issue goes to the Fourth

04:01:30  5    Circuit and the Fourth Circuit has to make a determination

04:01:32  6    on this, that they will not be able to decide whether a

04:01:39  7    portion of these damages shouldn't have been allowed.  If

04:01:42  8    they -- if they do not have this level of specificity,

04:01:47  9    then if -- they will be left without any way of actually

04:01:52 10    discerning whether there is a problem that requires

04:01:55 11    resolution.

04:01:57 12        So, for instance, Your Honor, if the Fourth Circuit

04:02:00 13    were to determine --

04:02:01 14              THE COURT:  We, the jury, find for the plaintiff

04:02:03 15    on this antitrust claim.  We award X damages total.

04:02:08 16    That's all.

04:02:09 17              MR. BUTERMAN:  Yes, Your Honor.

04:02:10 18              THE COURT:  They can do that.  That's a general

04:02:12 19    verdict form, and there's no issue for the Fourth Circuit,

04:02:15 20    or anybody else, to decide.  You don't have to break it

04:02:19 21    down.

04:02:20 22              MR. BUTERMAN:  Well, except for the fact, Your

04:02:21 23    Honor, that we know that there is duplication.  Steves has

04:02:24 24    admitted that they have to make an election of remedies,

04:02:26 25    and there's no way for that to occur without having some

04:02:31 1    level of particularities.

04:02:32 2        But what we're really concerned about, Your Honor, is

04:02:35 3    if, for instance, the Fourth Circuit were to say that the

04:02:40 4    overcharge claims could have been considered antitrust

04:02:46 5    violations, but the quality claims could not have been.

04:02:51 6    If you do not have that breakdown, Your Honor,

04:02:54 7    respectfully, what the Fourth Circuit is going to do is

04:02:56 8    send us back for a remand, as opposed to --

04:02:59 9            THE COURT:  No.  The Fourth Circuit will affirm

04:03:00 10   it on the basis, if there is a basis, to affirm it.

04:03:04 11   That's what generally happens.

04:03:06 12       Can they send it back for a remand?  Sure.

04:03:08 13           MR. BUTERMAN:  But this will avoid that.

04:03:08 14           THE COURT:  But in the case -- if you'll read

04:03:12 15   the Fourth Circuit cases on verdict -- if there's a basis

04:03:15 16   upon which to affirm the verdict, they're going to affirm

04:03:17 17   it if they find there's a basis to affirm it, even if

04:03:21 18   there's one basis that would not fly.  That's the general

04:03:24 19   approach the Court has taken over the years.

04:03:27 20           MR. BUTERMAN:  Absolutely, Your Honor.  But what

04:03:28 21   we're concerned about is a situation where they believe

04:03:31 22   that there is an infection.  And if you spell it out this

04:03:35 23   way --

04:03:36 24           THE COURT:  An inflection?

04:03:38 25           MR. BUTERMAN:  Infection.  Infection.  In other

04:03:38 1    words --

04:03:39 2                THE COURT:  That -- what?  That what infected

04:03:43 3    what?

04:03:44 4                MR. BUTERMAN:  That the antitrust claims include

04:03:46 5    breach claims that should not have been included.  By

04:03:48 6    doing it this way, it provides the -- excuse me, Your

04:03:53 7    Honor.  By doing it this way, it provides the Fourth

04:03:55 8    Circuit with a clear understanding of what happened and it

04:03:58 9    allows them to just excise the inappropriate damages, as

04:04:02 10   opposed to having to remand.

04:04:08 11               THE COURT:  All right.  What do you say?

04:04:11 12               MR. MACH:  We agree with the view that you

04:04:12 13   expressed Your Honor; that the general verdict form is

04:04:16 14   both simpler for the jury and actually less likely to

04:04:19 15   raise complications.

04:04:20 16         We don't understand -- we think the likelihood that

04:04:24 17   it would be necessary to divide overcharge damages other

04:04:29 18   than Madison and Monroe from overcharge damages for

04:04:33 19   Madison and Monroe, for example, to be extremely slim and

04:04:37 20   that the most likely outcome is that the jury is confused

04:04:39 21   by a more --

04:04:41 22               THE COURT:  Isn't your proof tied differently?

04:04:43 23   I mean, don't you have proof for the damages of Madison

04:04:48 24   and Monroe and proof for the other ones?

04:04:52 25               MR. MACH:  We do, Your Honor.

04:04:53 1        THE COURT:  Yeah.  I mean, that's how the case

04:04:55 2   was presented to the jury.  Mr. Buterman actually makes a

04:05:01 3   fairly reasonable point about making it clear what it is

04:05:05 4   that the jury did.  And I don't see any -- I don't -- I'm

04:05:11 5   not sure there's any harm in doing it that way.  What's

04:05:14 6   the harm?

04:05:15 7        MR. MACH:  The harm is simply in making the

04:05:17 8   verdict form more complicated and burdensome for the jury

04:05:21 9   than it needs to be, Your Honor.

04:05:27 10        MR. BUTERMAN:  Your Honor, it's essentially

04:05:28 11   creating two different verdict forms, one that's

04:05:31 12   specialized for the breach claims but one that's general

04:05:33 13   for the antitrust claims.

04:05:34 14        THE COURT:  That and a nickel will get you a

04:05:38 15   Coke.

04:05:38 16        MR. BUTERMAN:  I don't know where I can get a

04:05:40 17   Coke for a nickel anymore, Your Honor.

04:05:42 18        THE COURT:  That's the point.  That doesn't --

04:05:44 19   that doesn't make any difference.  Because the reason --

04:05:46 20   the reason that's the case is because the contract proofs

04:05:55 21   and claims are so convoluted -- I mean complex that -- and

04:06:00 22   the damage issues respecting them are somewhat different.

04:06:04 23   So as a contract issue, they have to be that way.

04:06:08 24      However, I don't know that there's any harm in doing

04:06:11 25   this, and I think probably it's just as well to go on and

```
04:06:14  1    get the record cleaned up and straight on it.  So I'm
04:06:17  2    inclined to agree to do what -- what Jeld-Wen suggests.
04:06:24  3        Is there any reason -- any other reason that's not
04:06:27  4    been said?  All right.  This will be the one we'll use,
04:06:33  5    then.
04:06:34  6              MR. BUTERMAN:  Thank you, Your Honor.
04:06:35  7              MR. DANE:  Your Honor, we might just suggest a
04:06:37  8    change in the formatting of this to simplify it.  Instead
04:06:40  9    of repeating each time as to Count I, et cetera, et
04:06:44 10    cetera, start out saying, "As to Count I, we, the jury,
04:06:49 11    find, by a preponderance of the evidence, that the
04:06:51 12    plaintiff is entitled to damages in the amount of X
04:06:55 13    dollars for antitrust injuries already sustained as a
04:06:58 14    result of, colon."  And then we could just have a list of
04:07:03 15    each of the conduct that's broken out here and a line next
04:07:09 16    to it.
04:07:09 17        So there would be, 1, Jeld-Wen is overcharging Steves
04:07:13 18    for door skins other than Madison and Monroe.  2, Jeld-Wen
04:07:16 19    is overcharging Steves for Madison and Monroe door skins.
04:07:16 20    3, Jeld-Wen shipping defective door skins to Steves,
04:07:22 21    failing to reimburse Steves for those door skins.  4,
04:07:25 22    Jeld-Wen is refusing to reimburse Steves for the cost of
04:07:29 23    doors that are incorporated -- that incorporate defective
04:07:33 24    door skins.  It just simplifies it.
04:07:35 25              MR. BUTERMAN:  Your Honor, I don't actually
```

04:07:36  1    think it does simplify it because --

04:07:38  2         THE COURT:  Well, then you have to have

04:07:39  3    something for we award damages for it.

04:07:42  4         MR. BUTERMAN:  Yeah.

04:07:42  5         THE COURT:  You have to repeat the whole thing

04:07:43  6    again for damages, it looks to me like.

04:07:47  7         MR. DANE:  Well, it would keep the damages in

04:07:49  8    the amount of the dollars -- yeah.  I'm sorry.  You're

04:07:53  9    right, Your Honor.  You're absolutely right.

04:07:55 10       It would be taken -- the blank space would be taken

04:07:59 11    out of the preamble, and it would be put next to each of

04:08:02 12    these.  And I didn't say this, and I meant to include

04:08:05 13    this, in the top part, it is entitled, "The damages in the

04:08:10 14    amount of" --

04:08:11 15         THE COURT:  Why don't you do this.  Why don't

04:08:13 16    you take what you think is a good idea and take it up with

04:08:15 17    Mr. Buterman.  And I think whatever makes it easier for

04:08:18 18    the jury is what we ought to do.  But the concept that is

04:08:22 19    expressed in Jeld-Wen's proffer I think is the right one.

04:08:28 20         MR. DANE:  Okay.  We'll do that, Your Honor.

04:08:31 21         MR. MACH:  Thank you, Your Honor.

04:08:31 22         THE COURT:  But if you want to, in the

04:08:33 23    morning -- I guess if you got something you can agree on

04:08:35 24    that -- or if you can't agree on it, then at least -- I

04:08:39 25    mean, here's what -- then at least let me have something.

04:08:43 1    But if I were the person arguing this case, I might

04:08:47 2   want to have certainty as to what the verdict form was

04:08:51 3   going to be so that I could use the verdict form in my

04:08:54 4   argument and say, I want you to fill it in -- I mean, I

04:08:58 5   don't -- I didn't really ever really use that technique.

04:09:03 6   But a lot of lawyers do use it.  And I don't know whether

04:09:06 7   they are going to be using it or not.  So I'd run this by

04:09:08 8   the people who are lawyering --

04:09:11 9        MR. DANE:  We'll do.

04:09:11 10        THE COURT:  -- arguing the case.  I know who's

04:09:14 11   lawyering.  All of you are.  Arguing the case.  Okay?

04:09:18 12        MR. MACH:  Yes, Your Honor.

04:09:19 13        MR. BUTERMAN:  Thank you, Your Honor.

04:09:20 14        THE COURT:  All right.  Now -- all right.

04:09:31 15   Mr. Martecchini will send this to you when we get -- when

04:09:37 16   we get -- can you work on these?

04:09:46 17        All right.  Do you want to do your Rule 50 motions

04:09:49 18   now?  Steves filed one.  Apparently they didn't think we

04:09:57 19   had enough to do so they wanted one.

04:10:01 20        MR. BUTERMAN:  I confess.  I don't have it, Your

04:10:02 21   Honor.

04:10:03 22        THE COURT:  Have you read it yet?

04:10:05 23        MR. BUTERMAN:  No.

04:10:06 24        THE COURT:  Why not?

04:10:08 25        MR. BUTERMAN:  Well, I've been with Your Honor.

04:10:09 1          THE COURT:  How do you propose that we proceed

04:10:10 2    on this, given that it would be a reasonable thing to do

04:10:14 3    to give them a chance to read it before they have to argue

04:10:16 4    it?

04:10:18 5          MR. MACH:  That sounds reasonable.

04:10:20 6          THE COURT:  Or prepare a response.  I mean,

04:10:21 7    it's -- how do you want to proceed, Mr. Buterman?  I have

04:10:26 8    a jury coming in here at 9:30 in the morning.

04:10:29 9          MR. BUTERMAN:  Yes, Your Honor.  I certainly

04:10:32 10   would like to read it, and then I think preparing a

04:10:38 11   response would be ideal.  I can probably get a response --

04:10:45 12   I can get a response in tonight.  That's for sure, Your

04:10:48 13   Honor.  But I don't know when we would have time to argue

04:10:52 14   this, if you want to do it --

04:10:56 15         THE COURT:  Well, I think we have to do this one

04:10:59 16   before because of the instructions on the efficiencies.

04:11:02 17         MR. BUTERMAN:  Yeah.

04:11:04 18         THE COURT:  That's the only -- I mean, the rest

04:11:06 19   of the things -- actually, you know, in the modern Rule 50

04:11:13 20   world, if you submit a motion and it's not ruled upon,

04:11:18 21   it's just taken under consideration so that it can be

04:11:22 22   dealt with later on, which is the practice that had come

04:11:28 23   to pass over the years anyway.  I don't know exactly when

04:11:32 24   that change was made, but it's not been too long ago.

04:11:38 25         So everything else we're doing could be done that

04:11:41 1   way.  I'm not saying that's the way to do it, but it could

04:11:45 2   be done that way.  But the efficiencies, I think, presents

04:11:48 3   a problem because of your defense.  Your people are going

04:11:52 4   to want to argue that, right?  And you want to know

04:11:55 5   whether -- and then I can't be in a position of later

04:11:58 6   telling the -- you know, the jury they can't do it, they

04:12:02 7   can't consider it.  So how do you think we ought to

04:12:04 8   proceed?

04:12:05 9          MS. ECKSTEIN:  One option is the jury is coming

04:12:07 10  in at 9:30.  We could come in at 9 and argue that before

04:12:10 11  we start and not take up their time.

04:12:15 12         MR. BUTERMAN:  That's fine with us, Your Honor.

04:12:17 13    I guess the only thing I'm wondering is do we take

04:12:20 14  that to mean that Your Honor is taking our entire Rule 50

04:12:24 15  motion under advisement?

04:12:26 16         THE COURT:  No.  I'm going to listen to it in

04:12:27 17  just a minute.

04:12:28 18         MR. BUTERMAN:  Oh, okay.

04:12:29 19         THE COURT:  I'm just saying there's a difference

04:12:31 20  between -- there's a difference in impact as to your

04:12:36 21  motion and theirs.

04:12:38 22         MR. BUTERMAN:  Yes, Your Honor.

04:12:40 23         THE COURT:  Because yours presents issues that

04:12:42 24  always could be presented to a jury and revisited in a

04:12:46 25  post -- when it's heard post trial.  Whereas theirs deals

04:12:49  1  with something that is something you really -- you say

04:12:54  2  you're going to argue and they say they're not going to

04:12:57  3  argue -- I mean they say it shouldn't go to the jury.

04:13:04  4      My inclination is to tell you that there has -- you

04:13:08  5  haven't made the case for efficiencies, based on my

04:13:12  6  understanding of the law of efficiencies.  So I would like

04:13:15  7  for you to be able to focus on that.  And we will -- I

04:13:21  8  think we'll just get here about quarter of 9.  I'll hear

04:13:26  9  you about quarter of 9 tomorrow.

04:13:28 10          MR. BUTERMAN:  Yes, Your Honor.

04:13:32 11          THE COURT:  Which one of you is taking my dog to

04:13:34 12  day care?

04:13:37 13      All right.  Then you're going to get me something

04:13:42 14  when?

04:13:43 15          MR. BUTERMAN:  We will get you something by --

04:13:46 16          THE COURT:  I'm not -- I'm trying to -- you want

04:13:49 17  to get it to me by 8 in the morning?

04:13:51 18          MR. BUTERMAN:  Oh, absolutely, Your Honor.

04:13:52 19          THE COURT:  I do think it's all right to sleep

04:13:54 20  once in a while.

04:13:56 21          MR. BUTERMAN:  Yeah.  That will be next week,

04:13:59 22  Your Honor.

04:14:04 23          THE COURT:  All right.  Let's consider the

04:14:12 24  motions at this juncture.  Are you going to argue?

04:14:18 25          MR. BUTERMAN:  I will be addressing parts of

04:14:19  1   this, and Ms. Maltas will be addressing parts of this as

04:14:23  2   well.

04:14:24  3              THE COURT:  All right.

04:14:25  4              MR. BUTERMAN:  Would Your Honor prefer that I go

04:14:26  5   to the podium or can I remain seated?

04:14:29  6              THE COURT:  No.  Come up here.  It's easier for

04:14:32  7   the -- you do you have the verdict form, the revised

04:14:39  8   verdict form that they tendered over there?  Did I give

04:14:42  9   that to you as well as the instruction?

04:14:46 10              MR. MARTECCHINI:  This one?

04:14:47 11              THE COURT:  Yes.  Okay.  I just -- all right.

04:14:57 12              MR. BUTERMAN:  Thank you, Your Honor.  As Your

04:15:01 13   Honor is aware, Jeld-Wen has presented a Rule 50 motion on

04:15:08 14   a number of issues.  I'm going to handle the first few in

04:15:12 15   order and then pass the baton to Ms. Maltas.

04:15:17 16              THE COURT:  All right.

04:15:17 17              MR. BUTERMAN:  The first issue, Your Honor, is

04:15:19 18   that we believe that at this point it is clear that

04:15:24 19   Jeld-Wen is entitled to judgment as a matter of law on

04:15:29 20   Steves' antitrust claims under Section 4 of the Clayton

04:15:32 21   Act.  And the reason that we believe that is so is because

04:15:37 22   Steves has not presented evidence that establishes that

04:15:41 23   the merger caused Steves' claimed injuries, nor that it

04:15:46 24   measured antitrust damages.

04:15:48 25        And so the issue here, Your Honor, is whether the

04:15:52  1  evidence demonstrates impact or a cognizable measure of

04:15:58  2  damages under Section 4.  And we submit that those are two

04:16:01  3  separate things, Your Honor, though very much closely

04:16:04  4  related.

04:16:06  5      The evidence is clear that Steves has not presented a

04:16:10  6  methodology that the jury could use to find that the

04:16:13  7  merger itself harmed Steves or to award antitrust damages.

04:16:21  8  And in that regard, Your Honor, I think that the evidence

04:16:24  9  that we saw earlier today from Mr. Tucker, actually right

04:16:29 10  at the end of his -- his rebuttal testimony, is the best

04:16:37 11  proof of that.  Mr. Tucker said, quite clearly, that he

04:16:41 12  did not consider, either in his overcharge damages or in

04:16:48 13  his quality damages, the defect claims, a consideration of

04:16:53 14  what the actual world is as compared to a but-for world

04:17:00 15  where the merger had never occurred.

04:17:03 16      And the reason that we know that is because both in

04:17:07 17  his -- because in his overcharge damages, for instance, he

04:17:12 18  includes Towanda.  His defects damages are infected by

04:17:18 19  this problem in two ways both because, again, he includes

04:17:22 20  defect from Towanda, but also because we asked him

04:17:27 21  specifically whether he had compared what the defect rate

04:17:32 22  would have been if the merger had never happened, what

04:17:36 23  Jeld-Wen would have reimbursed Steves for, in terms of

04:17:43 24  defective door skins, if the merger had never happened,

04:17:46 25  and there simply is no evidence whatsoever that he did

04:17:50 1   that.

04:17:52 2        Now, this also is an impact issue because we heard

04:17:55 3   the testimony of Professor Shapiro, and Professor Shapiro,

04:17:59 4   what he said is that he examined a pre-merger world and a

04:18:03 5   post-merger world.  But respectfully, Your Honor, that is

04:18:07 6   not an acceptable response to this issue.  And the reason

04:18:11 7   why it is not an acceptable response to the issue is

04:18:16 8   because at the end of the day here, all of Steves' damages

04:18:21 9   are -- the overcharge damages and the defective damages,

04:18:28 10  they are all damages under the contract.  That's what

04:18:30 11  we've seen from the jury form.

04:18:33 12       And because they are damages that flow from the

04:18:36 13  contract, you can't look and create a but-for world that

04:18:41 14  also includes Towanda in it.  That's the problem that

04:18:45 15  we've raised now a couple of times, and we think that the

04:18:48 16  evidence is clear that there just --

04:18:51 17            THE COURT:  You say that as if it's sort of a

04:18:54 18  foregone conclusion that I ought to understand why it's

04:18:58 19  so.  And I don't.  I don't understand why consideration of

04:19:06 20  Towanda necessarily leads -- in his calculations

04:19:13 21  necessarily leads to the result you're arguing for.  Can

04:19:16 22  you help me?

04:19:17 23            MR. BUTERMAN:  Absolutely, Your Honor.  So let's

04:19:19 24  focus on the overcharge damages.  I think that's the --

04:19:23 25  just a very simple, straightforward one.  And we heard

04:19:27  1   Professor Shapiro say earlier that in antitrust analysis,
04:19:32  2   you compare a but-for world, a world where there is no
04:19:38  3   merger, versus the world that exists today.  The problem
04:19:42  4   is that when Professor -- excuse me -- that when
04:19:45  5   Mr. Tucker went and looked at his but-for world, there
04:19:49  6   was -- he didn't do a but-for world.  What he examined was
04:19:53  7   just the difference between what Jeld-Wen should have
04:19:57  8   charged Steves under the contract versus what Jeld-Wen
04:20:01  9   actually charged Steves under the contract.  And in both
04:20:04 10   of those calculations, you have the inclusion of the
04:20:09 11   Towanda plant, meaning that the merger has occurred.
04:20:12 12   That's why these just cannot be considered antitrust
04:20:15 13   damages.
04:20:16 14       If Mr. Tucker wanted to calculate antitrust damages,
04:20:21 15   what he would have had to look at is the overcharges that
04:20:26 16   Jeld-Wen made under the contract versus the overcharges
04:20:30 17   that would have existed if the merger had never happened.
04:20:33 18   And so he would have had to have taken out Towanda.  And
04:20:37 19   he, by his own admission, did not do that.  Therefore,
04:20:41 20   these are not antitrust damages.
04:20:42 21       And so the jury -- the only number that the jury has
04:20:46 22   been presented with is this figure of antitrust -- is a
04:20:49 23   figure of contract damages, which cannot constitute
04:20:52 24   antitrust damages.
04:20:55 25       And, again, when we look at -- the same thing

04:21:00  1   occurs -- or the same problem occurs --

04:21:02  2            THE COURT:  Why do you say there's no impact?

04:21:05  3            MR. BUTERMAN:  Well, because --

04:21:07  4            THE COURT:  You're flipping a bunch of terms

04:21:09  5   around, and you're really not explaining to me why.

04:21:15  6   What's an antitrust impact?

04:21:16  7            MR. BUTERMAN:  Well, that's an effect of the

04:21:20  8   merger on Steves, Your Honor.

04:21:21  9            THE COURT:  Right.  And you're telling me

04:21:22 10   there's no evidence from which the jury could find that

04:21:26 11   the merger did not have -- or had an effect on Steves?

04:21:31 12            MR. BUTERMAN:  Yes, Your Honor, because of the

04:21:32 13   way that this has been done.  It's not that they couldn't

04:21:35 14   have.  I want to be very, very clear about this.

04:21:39 15            THE COURT:  Not that who couldn't have?

04:21:41 16            MR. BUTERMAN:  It's not that Steves couldn't

04:21:44 17   have presented an impact argument -- a sufficient impact

04:21:45 18   argument.  And, again, with damages, we're not saying that

04:21:48 19   Steves couldn't have made a proper damages calculation.

04:21:50 20   It's just that they did not do it.  They never said to the

04:21:54 21   jury, This is the level of defects of -- for instance,

04:21:58 22   quality.  This is the level of quality that existed --

04:22:01 23   that exists today, and here was before the merger, and

04:22:06 24   this change is attributable to the merger.

04:22:09 25        Professor Shapiro specifically testified under oath

04:22:12  1    that he actually did not calculate any difference -- do

04:22:17  2    any analysis of the effects of the merger on quality.  And

04:22:20  3    we could get that statement, but I don't think it's

04:22:22  4    contested.

04:22:23  5            THE COURT:  No.  He just did price.

04:22:25  6            MR. BUTERMAN:  Okay.  Well, then --

04:22:27  7            THE COURT:  I mean, that's what he said, wasn't

04:22:29  8    it?

04:22:30  9            MR. BUTERMAN:  Yeah.  So I think, then, we're in

04:22:32 10    agreement that they have not presented an expert opinion

04:22:34 11    on any antitrust impact with respect --

04:22:37 12            THE COURT:  Do they have to?

04:22:38 13            MR. BUTERMAN:  Your Honor --

04:22:39 14            THE COURT:  They can't rely on the testimony of

04:22:43 15    lay witnesses?

04:22:44 16            MR. BUTERMAN:  Well, how does it go to the jury?

04:22:46 17    How is the jury then supposed to calculate damages?

04:22:51 18            THE COURT:  No.  No.  No.  I'm talking about the

04:22:52 19    impact.  The fact of the impact and the quantum of the

04:22:57 20    damages are not the same thing.

04:22:59 21            MR. BUTERMAN:  I don't think that there's any

04:23:00 22    basis for the jury to conclude what Steves is trying to

04:23:03 23    have them conclude with respect to defects.  I don't think

04:23:06 24    that there's a basis for the jury to conclude that the

04:23:09 25    merger caused any problems.  I don't think there's any

04:23:13 1   evidence of that.

04:23:14 2       What we have is we have defects.  But who was the

04:23:17 3   witness who said, You know what.  Here's what happened.

04:23:20 4   The quality was good.  Jeld-Wen acquired CMI, and because

04:23:23 5   of that, the quality went down?

04:23:25 6       We don't have any evidence of that at all.

04:23:30 7           THE COURT:  Do you have to have direct testimony

04:23:31 8   of that or can it be presented by circumstantial evidence?

04:23:34 9           MR. BUTERMAN:  I'm not sure that they have

04:23:36 10  presented it either way, Your Honor.

04:23:37 11          THE COURT:  But would you like to answer that

04:23:39 12  question, though?

04:23:41 13          MR. BUTERMAN:  I'm sorry.  Could they present it

04:23:42 14  by --

04:23:43 15          THE COURT:  The question is do they have to have

04:23:45 16  direct evidence of that -- of the impact, or can it be

04:23:50 17  proved by circumstantial evidence combined with some

04:23:53 18  evidence?

04:23:54 19          MR. BUTERMAN:  I believe that it certainly --

04:23:56 20          THE COURT:  Excuse me.  Lay opinion evidence

04:24:02 21  of --

04:24:03 22          MR. BUTERMAN:  I mean, in theory, I don't see

04:24:04 23  why it couldn't be done by circumstantial evidence with

04:24:07 24  something else.  But, again, I'm just not sure that they

04:24:11 25  have done it either way.  But I -- this is an argument

04:24:16  1   that we've presented before, Your Honor, and Your Honor

04:24:19  2   has addressed it.  I think that what's the different part

04:24:23  3   now, though, is with respect to the -- the damages part of

04:24:26  4   this where I think the evidence now is very clear that

04:24:30  5   regardless of what anyone thinks about the impact

04:24:34  6   question, there is no damages figure to present to this

04:24:37  7   jury on either overcharge or on defects that constitutes

04:24:44  8   a -- a -- a measure of antitrust injuries.

04:24:49  9            THE COURT:  Right.

04:24:50 10            MR. BUTERMAN:  And, Your Honor, we --

04:24:51 11            THE COURT:  All right.  Are you finished with

04:24:52 12   that one?

04:24:53 13            MR. BUTERMAN:  Yes.

04:24:54 14            THE COURT:  All right.  Let me hear from the

04:24:55 15   other side, then.

04:25:47 16            MR. MACH:  So, Your Honor, this argument is

04:25:48 17   essentially a reprize of issues that were raised at the

04:25:51 18   motion to dismiss stage, and they should be addressed in

04:25:54 19   the same way now as they were then.

04:25:57 20            THE COURT:  Well, not quite, because one

04:26:00 21   considers evidence that's been presented at the trial at

04:26:03 22   this juncture and -- let's just go ahead and stop and

04:26:20 23   switch.

04:26:20 24            MR. MACH:  Thank you.

04:26:20 25            (Recess taken.)

04:28:22PM   1        THE COURT:  Where's the evidence that there was an

04:28:24PM   2    impact, antitrust impact?  What is that evidence?  Tell me what

04:28:29PM   3    you think it is.

04:28:29PM   4        MR. MACH:  So the analysis of whether there were

04:28:32PM   5    anticompetitive effects of the merger are put forth partly by

04:28:37PM   6    Dr. Shapiro and partly by Steves' fact witnesses, Your Honor.

04:28:41PM   7        THE COURT:  That's a general statement.  I want to

04:28:44PM   8    know exactly what proof you've got.

04:28:46PM   9        MR. MACH:  Professor Shapiro explained that he saw

04:28:50PM  10    anticompetitive impact in the form of increases in price, and

04:28:53PM  11    Steves' witnesses, including Sam Steves, Edward Steves, and Mr.

04:28:57PM  12    Gartner, talked about impacts that they saw in terms of quality

04:29:02PM  13    and in-plant damages due to the reduction in packaging, and

04:29:07PM  14    this goes, I think, to the fundamental flaw of the approach --

04:29:12PM  15        THE COURT:  How is in-plant damage possibly an impact

04:29:16PM  16    from an anticompetitive effect of the merger?  How could that

04:29:22PM  17    be?

04:29:22PM  18        MR. MACH:  It would be in the sense that the

04:29:25PM  19    elimination of the packaging, which contributes to the in-plant

04:29:29PM  20    damage, is an alternative way of increasing the price of the

04:29:34PM  21    product through a degradation of its quality --

04:29:37PM  22        THE COURT:  Who said that?  Who said that?  Nobody

04:29:39PM  23    said that.

04:29:41PM  24        MR. MACH:  I don't think anybody said precisely that.

04:29:44PM  25        THE COURT:  Then you're missing some evidence.  Do

04:29:47PM  1    you know what the general law is about taking delivery of a

04:29:52PM  2    product and what happens to the risk, loss, and damage?  Where

04:29:56PM  3    does it shift?

04:29:56PM  4          MR. MACH:  I believe it shifts upon delivery.

04:29:59PM  5          THE COURT:  And it can ship FOB.  There are a lot of

04:30:04PM  6    places, but at a bear minimum, once you're driving it around

04:30:09PM  7    your plant, how is that an antitrust impact?

04:30:13PM  8          MR. MACH:  It would be an antitrust impact in the

04:30:16PM  9    sense that there are negative results for Steves as a result of

04:30:19PM  10   the reduction in packaging if that originated from the merger.

04:30:23PM  11   Now, I will concede --

04:30:24PM  12         THE COURT:  What evidence is there it did originate

04:30:27PM  13   from the merger?

04:30:28PM  14         MR. MACH:  That would be testimony from Mr. Gartner,

04:30:31PM  15   for example.

04:30:32PM  16         THE COURT:  What did he say?

04:30:33PM  17         MR. MACH:  He said that the packaging was more

04:30:37PM  18   complete before the merger and that it was degraded and reduced

04:30:37PM  19   after the merger.

04:30:38PM  20         THE COURT:  That's temporal.

04:30:40PM  21         MR. MACH:  It's circumstantial, correct.  I will

04:30:45PM  22   concede, Your Honor, that these --

04:30:47PM  23         THE COURT:  Let's put the in-plant damage aside,

04:30:50PM  24   because I don't think there's any merit to the whole claim.

04:30:52PM  25         MR. MACH:  I was going to suggest the same thing.

| | | |
|---|---|---|
| 04:30:54PM | 1 | I'll do that, Your Honor. |
| 04:30:56PM | 2 | THE COURT:  Steves testified as to quality |
| 04:30:59PM | 3 | diminution. |
| 04:30:59PM | 4 | MR. MACH:  Correct, Your Honor. |
| 04:31:00PM | 5 | THE COURT:  And price? |
| 04:31:02PM | 6 | MR. MACH:  Correct, Your Honor. |
| 04:31:03PM | 7 | THE COURT:  Why was it caused by the merger? |
| 04:31:06PM | 8 | MR. MACH:  For the purposes of price, you look at the |
| 04:31:09PM | 9 | analysis that was provided by Professor Shapiro who analyzed |
| 04:31:14PM | 10 | changes in price and the potential causes of those changes in |
| 04:31:19PM | 11 | price, and under his economic analysis, he concluded that there |
| 04:31:23PM | 12 | were no other causes for those changes in price that he could |
| 04:31:27PM | 13 | identify. |
| 04:31:27PM | 14 | That is, of course, the subject of intense debate |
| 04:31:31PM | 15 | with their expert.  That is sufficient to establish antitrust |
| 04:31:37PM | 16 | injury.  What Jeld-Wen is raising really goes to the quantum of |
| 04:31:42PM | 17 | damages, and distinction between the two is important, because |
| 04:31:45PM | 18 | the proof necessary on the quantum of damages is greatly |
| 04:31:50PM | 19 | relaxed once the existence of injury is established. |
| 04:31:53PM | 20 | And Mr. Tucker and Mr. Kaplan can have disagreements |
| 04:31:58PM | 21 | about the proper quantum of those damages.  That question has |
| 04:32:02PM | 22 | been the subject of extensive testimony and cross-examination, |
| 04:32:07PM | 23 | and, ultimately, the issue that Jeld-Wen is raising is a very |
| 04:32:13PM | 24 | particular and small aspect of Mr. Tucker's overall |
| 04:32:16PM | 25 | presentation of his analysis, and an important observation is |

04:32:23PM  1   that I don't believe Mr. Kaplan, or anyone else from Jeld-Wen,

04:32:27PM  2   has ever explained why that supposed error would actually

04:32:32PM  3   impact the damages or how it would impact the damages that Mr.

04:32:35PM  4   Tucker is providing.

04:32:36PM  5          THE COURT:  What error are you talking about?

04:32:38PM  6          MR. MACH:  The inclusion of Towanda figures in

04:32:41PM  7   certain damages calculations.  Now, if it's -- if it's

04:32:46PM  8   possible, if they think they have evidence that that should

04:32:49PM  9   change the size of the damages that were presented by Mr.

04:32:52PM  10  Tucker, that's an issue to be addressed -- that should be

04:32:57PM  11  addressed through the examinations of Mr. Tucker, Mr. Kaplan,

04:32:59PM  12  and ultimately decided by the jury.

04:33:08PM  13         THE COURT:  Anything else, Mr. Buterman, on that

04:33:10PM  14  point?

04:33:13PM  15         MR. BUTERMAN:  Yes, Your Honor, very briefly.  I

04:33:18PM  16  don't think that there's any dispute here that in an antitrust

04:33:21PM  17  case, proof of impact must also include proof of the

04:33:26PM  18  competitive baseline that shows that the plaintiff paid higher

04:33:29PM  19  prices than it would have paid in the absence of the conduct

04:33:32PM  20  alleged to violate the antitrust laws.

04:33:34PM  21         Respectfully, I do not believe that there's any

04:33:37PM  22  evidence that shows that this antitrust violation that's being

04:33:42PM  23  alleged caused the impact that Steves is saying that they

04:33:48PM  24  suffered.  It's all tied to the contract, and they have not

04:33:51PM  25  presented anything.

04:33:52PM  1          As Your Honor said, what they have, at best, is

04:33:55PM  2     temporal, a temporal connection, but it's even weak at that,

04:33:59PM  3     because, as we know, almost all of Steves' allegations concern

04:34:03PM  4     what happened when Mr. Hachigian arrived.

04:34:05PM  5          If this was a plan to use a pricing power that was

04:34:11PM  6     gained from the merger in order to affect Steves, why, then, in

04:34:16PM  7     the first year, did Jeld-Wen lower prices to Steves?  It

04:34:20PM  8     doesn't -- it just doesn't make any sense, Your Honor.  This is

04:34:23PM  9     all about the contract.  It has always been all about the

04:34:26PM  10    contract, and, again, I think --

04:34:28PM  11         THE COURT:  Isn't their theory that Onex put in a

04:34:34PM  12    softy, and he cut a sweetheart deal for the Steves, and that

04:34:41PM  13    wasn't what they were looking for, so then they got the hatchet

04:34:45PM  14    man?  Hachigian.  Hatchet man.  I think that's how they said

04:34:53PM  15    it, too.

04:34:54PM  16         MR. BUTERMAN:  Your Honor, even if that is the

04:34:56PM  17    theory, I'm not sure how that explains how Steves --

04:35:00PM  18         THE COURT:  Explains the delay.

04:35:02PM  19         MR. BUTERMAN:  I'm not sure it explains the link to

04:35:06PM  20    the merger.  I think Mr. Hachigian's testimony on this was very

04:35:09PM  21    clear.

04:35:09PM  22         THE COURT:  They intended to do it all along.

04:35:11PM  23         MR. BUTERMAN:  Your Honor, I mean, if they --

04:35:14PM  24         THE COURT:  They just didn't implement it right.

04:35:17PM  25         MR. BUTERMAN:  I don't think there's any evidence of

04:35:19PM  1   that, Your Honor, and if they did, why didn't they do it right

04:35:22PM  2   away?  You're talking about effects of a merger years

04:35:25PM  3   afterwards.  Why weren't there effects immediately?

04:35:29PM  4            THE COURT:  I think the answer is because of the way

04:35:32PM  5   they interpreted the contract, isn't it?  They interpreted the

04:35:37PM  6   contract in such a way, while Orsino was there, that the

04:35:41PM  7   impacts could not be felt.  They were felt once Hachigian got

04:35:47PM  8   there.

04:35:50PM  9            MR. BUTERMAN:  Doesn't that suggest this is a

04:35:52PM  10  Hachigian issue and not an antitrust issue?  Again, what we

04:35:56PM  11  have to ask ourselves, and what the jury ultimately is looking

04:36:00PM  12  at, is whether anything that's been alleged in this case would

04:36:03PM  13  have happened any differently if the merger had never happened,

04:36:06PM  14  and I just don't think there's any evidence on that.

04:36:09PM  15           And, Your Honor, on the quality thing, I think that

04:36:12PM  16  Mr. Mach acknowledged that Professor Shapiro hasn't done this

04:36:17PM  17  but-for analysis on quality.  So we respectfully submit that

04:36:22PM  18  certainly that shouldn't be part of the antitrust claim.

04:36:25PM  19           THE COURT:  All right, the next point?

04:36:28PM  20           MR. BUTERMAN:  Your Honor, the next one I'll keep

04:36:33PM  21  very, very short.  That's on the claim for future lost profits,

04:36:40PM  22  and the point that we are making there is that that claim

04:36:44PM  23  suffers from the same defect that the other claims suffer from,

04:36:50PM  24  although I will acknowledge that it's more complicated with

04:36:56PM  25  respect to Mr. Tucker's lost profits analysis.

04:37:00PM  1          But, as Mr. Tucker said -- I believe it actually was

04:37:04PM  2   the last question that I asked him -- his costs of sales

04:37:08PM  3   included for 2015, which he uses as the baseline for his lost

04:37:14PM  4   profits calculation, that cost of sales included all of Steves'

04:37:20PM  5   costs of sales which included the Towanda plant.  And so,

04:37:24PM  6   therefore --

04:37:25PM  7          THE COURT:  Is your position that you cannot -- that

04:37:31PM  8   if you acquire a plant, somebody's assets, that it is

04:37:37PM  9   impossible, once you integrate those assets, to have a

04:37:46PM 10   violation of the Clayton Act?

04:37:48PM 11          MR. BUTERMAN:  Absolutely not, Your Honor.

04:37:50PM 12          THE COURT:  Because your argument basically seems to

04:37:53PM 13   me to be that because he considered -- because there was

04:38:01PM 14   consideration of the Towanda plant output in the costs and so

04:38:09PM 15   forth, which was obtained by virtue of the merger, that you can

04:38:15PM 16   never have an analysis about what the world would look like but

04:38:21PM 17   for the merger, before the merger, or after the merger, thereby

04:38:28PM 18   insulating you forever for proof of any anticompetitive effect.

04:38:35PM 19          MR. BUTERMAN:  Your Honor, we absolutely do not

04:38:37PM 20   believe that.

04:38:38PM 21          THE COURT:  What would he have had to do?  What would

04:38:42PM 22   Mr. Tucker had to have done; take out all of the Towanda

04:38:46PM 23   information from his data?

04:38:48PM 24          MR. BUTERMAN:  From his 2015 data that he used to

04:38:51PM 25   calculate lost profits if he was going to do it via lost

| | |
|---|---|
| 04:38:55PM | 1 |

profits.  There are -- and I believe Mr. Tucker testified to
this.  There are multiple ways to reach what he ended up
reaching.  He did it through a lost profits analysis.  You
could have done a discounted cash flow analysis.  There are
many ways to do it, some of which would have been much, much
easier in terms of stripping out Towanda.

But we do believe that with respect to the
overcharge, with respect to defects, and with respect to lost
profits, it was absolutely possible for Mr. Tucker to strip out
the effects of the merger.

THE COURT:  How?  What evidence is there from your
side about how that would have been done?  I didn't hear that,
and I confess that all those witnesses are a lot smarter than I
am, so I may have missed what they were saying.  I know you all
know antitrust law better than I do, but I didn't hear anybody
say that.

MR. BUTERMAN:  I think you are correct, Your Honor,
that nobody said, here's how you do the numbers and here's the
result if you do the analysis.  We have not presented that.  We
felt that if Steves hadn't presented the proper analysis and
one that should go to the jury, that it wasn't our
responsibility to fix the problems for them.

THE COURT:  But you all rolled the dice when you did
that.  You bear the consequences of doing it.  That's a
perfectly legitimate decision, but you bear the consequences of

04:40:22PM   1     it.

04:40:22PM   2             MR. BUTERMAN:  Well, I don't know that because we

04:40:25PM   3     pointed out the error in their ways of doing it but not fix the

04:40:29PM   4     error for them that that means that they can present what they

04:40:33PM   5     know to be an incorrect measure of antitrust damages to the

04:40:37PM   6     jury.  We believe that that would be wrong.

04:40:53PM   7             THE COURT:  He says it all boils down to the fact

04:40:58PM   8     that Towanda is considered in the midst of everything,

04:41:03PM   9     Shapiro's analysis and Tucker's analysis.

04:41:06PM  10             MR. DANE:  I'll address that, Your Honor.

04:41:08PM  11             THE COURT:  How on earth can you construct a but-for

04:41:12PM  12     world if you consider Towanda is his point; right?  He is

04:41:21PM  13     shaking his head yes.

04:41:23PM  14             MR. DANE:  I'll try to explain, Your Honor.

04:41:27PM  15             THE COURT:  Good.

04:41:27PM  16             MR. DANE:  First of all, as the Court heard, Mr.

04:41:31PM  17     Tucker was not attempting to say which buckets of the claims

04:41:34PM  18     his damages calculations went to.  He was just calculating the

04:41:38PM  19     damages.

04:41:39PM  20             With regard to the lost profits calculation, he

04:41:44PM  21     actually did take into account, and Mr. Buterman elicited this

04:41:48PM  22     from him on his cross-examination, and I had him further

04:41:52PM  23     testify to it today, he did take into account the merger, and

04:41:57PM  24     he created a but-for scenario.

04:41:59PM  25             That's the reason that when he conducted his

04:42:01PM  1    analysis, he subtracted out all of the damages that we claim

04:42:05PM  2    are attributable to the merger and that resulted from the

04:42:09PM  3    increased market power that Jeld-Wen had as a result of the

04:42:12PM  4    merger.  He subtracted out those costs from his analysis.  He

04:42:17PM  5    also subtracted out the legal fees for this case assuming that

04:42:21PM  6    in the but-for world where Jeld-Wen does not acquire

04:42:24PM  7    CraftMaster, there will be healthy competition, and instead of

04:42:28PM  8    the anticompetitive behavior of Jeld-Wen, there would have been

04:42:32PM  9    honoring of the contract, there would have been honoring of the

04:42:35PM  10   defect claims, and so he did take those costs out.

04:42:41PM  11        THE COURT:  Is it a matter of honoring the contract,

04:42:44PM  12   or is it a matter of somebody coming in and looking the

04:42:47PM  13   contract in the eye and saying, what on earth does this thing

04:42:51PM  14   provide, and, you know, we, in fact, have a different view of

04:42:57PM  15   the contract based on this, and it's a good-faith view

04:43:01PM  16   considering all the ambiguities?  Why is that an antitrust

04:43:04PM  17   issue as opposed to a simple

04:43:08PM  18   whether-or-not-somebody-is-reading-the-contract-right issue?

04:43:10PM  19        MR. DANE:  Your Honor, our position is that the

04:43:12PM  20   evidence in this case indicates that this was not just a

04:43:16PM  21   good-faith disagreement about the contract.  This was a party

04:43:19PM  22   that knew that it had the other contracting party between a

04:43:23PM  23   rock and a hard place, because an important part of this

04:43:27PM  24   contract, as Your Honor may recall, is when it was executed, if

04:43:31PM  25   Jeld-Wen served notice of termination, that immediately

04:43:33PM   1    triggered the right for Steves to terminate the contract

04:43:38PM   2    itself.

04:43:38PM   3              That was contemplating that there were other options,

04:43:42PM   4    and that if Jeld-Wen jerked Steves around or did something

04:43:47PM   5    inappropriate or served the notice of termination, that Steves

04:43:49PM   6    could then go somewhere else.  That didn't happen here.

04:43:53PM   7    There's only one reason it didn't happen here:  Because after

04:43:58PM   8    the contract was signed, Jeld-Wen acquired market power,

04:44:01PM   9    Jeld-Wen was the only possible source of door skins.  So

04:44:04PM   10   Jeld-Wen was able to do essentially anything it wanted to under

04:44:08PM   11   the contract --

04:44:09PM   12             THE COURT:  Did Jeld-Wen raise the prices after the

04:44:12PM   13   merger?

04:44:14PM   14             MR. DANE:  Yes, Your Honor.

04:44:15PM   15             THE COURT:  When?

04:44:16PM   16             MR. DANE:  It didn't do it immediately.  For the

04:44:21PM   17   first year, as Your Honor probably remembers, it had a very,

04:44:26PM   18   very minor decrease.  Second year it said it was going to

04:44:29PM   19   provide a minor decrease, but it didn't.  And then beginning

04:44:32PM   20   the third year, it raised the prices, and then -- then it kept

04:44:38PM   21   the prices flat which, in our view, when they had nine percent

04:44:42PM   22   decrease in costs, is essentially the same as raising the

04:44:46PM   23   prices, because under our interpretation of the contract and

04:44:49PM   24   consistent with the testimony of Mr. Ambruz, and there is

04:44:52PM   25   specific -- Ms. Maltas said there's no testimony about

04:44:55PM   1    discussions of the provisions.  There's specific testimony in

04:44:58PM   2    the record of Mr. Edward Steves saying he talked to Mr. Ambruz

04:45:02PM   3    about that provision and what it meant, those prices should

04:45:06PM   4    have gone down.

04:45:08PM   5         These are things that, in our view, the jury can

04:45:10PM   6    reasonably conclude would not have incurred but for the merger

04:45:13PM   7    and the enhanced market power that Jeld-Wen had.  So it's

04:45:16PM   8    incorrect to say, first of all, that Mr. Tucker did not back

04:45:19PM   9    out or take into account the but-for world, because he

04:45:23PM  10    certainly did.

04:45:24PM  11         The point that counsel is making is a different one.

04:45:29PM  12    It is -- with regard to the prices that Steves paid for door

04:45:37PM  13    skins, they're arguing that because Mr. Tucker looked at the

04:45:44PM  14    prices that he calculated under the supply agreement, that that

04:45:50PM  15    was somehow improper because, at the time, under the agreement,

04:45:56PM  16    the acquisition had occurred, so Towanda was one of the

04:45:58PM  17    facilities that was producing door skins for Jeld-Wen, and he

04:46:02PM  18    shouldn't have kept it in the mix.

04:46:04PM  19         They have no opinion from anyone saying that that's

04:46:09PM  20    inappropriate.  Mr. Kaplan testified today he did no

04:46:13PM  21    calculation or analysis of Mr. Tucker's numbers to show that

04:46:19PM  22    there would not be injury if Towanda were backed out.  The fact

04:46:24PM  23    is, there are still damages if Towanda is backed out.  They're

04:46:29PM  24    not identical damages to Mr. Tucker, but they're still there.

04:46:32PM  25    So as Mr. Mach said, this is absolutely not a question about

04:46:35PM  1    impact.

04:46:36PM  2              THE COURT:  How does a jury determine what they are

04:46:41PM  3    if they're backed out, if that's backed out?

04:46:43PM  4              MR. DANE:  Well, Your Honor --

04:46:45PM  5              THE COURT:  What exhibit has the figure on it, the

04:46:47PM  6    dollar figure for the jury to determine anything?

04:46:51PM  7              MR. DANE:  There is not one in the case, Your Honor.

04:46:53PM  8    In our view, it's not appropriate to do that, to back out

04:46:57PM  9    Towanda.  I'm just saying what their position is, but even for

04:47:00PM 10    their position, they don't have any evidence to suggest what

04:47:03PM 11    that number is, and the reason -- Mr. Tucker was never asked

04:47:08PM 12    why -- he testified that in his calculations, he thought that

04:47:12PM 13    it was appropriate to keep Towanda in, and all of what we've

04:47:17PM 14    heard here is just attorney argument from Mr. Buterman as to

04:47:22PM 15    why Towanda supposedly shouldn't be in, and I respectfully

04:47:27PM 16    disagree with Mr. Buterman.  Because even if the merger had not

04:47:31PM 17    occurred --

04:47:32PM 18              THE COURT:  There's no evidence from which to

04:47:35PM 19    conclude that it was error to keep Towanda in the mix.

04:47:41PM 20              MR. DANE:  That's correct, Your Honor.

04:47:42PM 21              THE COURT:  Nobody testified to that.

04:47:44PM 22              MR. DANE:  That's correct, Your Honor.  I think --

04:47:46PM 23              THE COURT:  Without that evidence, it's just

04:47:47PM 24    argument, and they can't even make it.

04:47:47PM 25              MR. DANE:  That's right, Your Honor.

04:47:52PM   1          THE COURT:  They need somebody to have said that, and

04:47:54PM   2   if somebody didn't say it, then that's it.

04:47:57PM   3          MR. DANE:  Right.

04:47:59PM   4          THE COURT:  All right, next issue.

04:48:02PM   5          MR. BUTERMAN:  Can I just make two points on that?

04:48:04PM   6          THE COURT:  I want to be at home tonight.

04:48:14PM   7          MR. BUTERMAN:  Your Honor, the only point I was going

04:48:15PM   8   to make is that I think when we look at this whole thing --

04:48:19PM   9          THE COURT:  What evidence do you have that anybody

04:48:22PM  10   testified to, as opposed to your view or some other lawyer's

04:48:27PM  11   view, that the inclusion of Towanda in the mix for lost

04:48:35PM  12   profits, or even antitrust injury for that fact, was wrong?

04:48:42PM  13          MR. BUTERMAN:  Mr. Kaplan testified to that today.

04:48:45PM  14   He didn't quantify it.  I want to say that Mr. Dane was

04:48:48PM  15   correct, Your Honor, and I may have over-spoken.

04:48:51PM  16          I completely agree with what he said regarding the

04:48:55PM  17   fact that Mr. Tucker did pull out the effects of the merger,

04:49:00PM  18   and what I was going to was just a much narrower point about

04:49:04PM  19   the calculations.  I think we actually are on the same page

04:49:07PM  20   about that, but Mr. Kaplan did testify to that issue, and we

04:49:12PM  21   believe it's not an evidentiary issue.  It's just a legal

04:49:16PM  22   issue.  That's why we've raised it.

04:49:19PM  23          The only point I want to make before I move on to the

04:49:23PM  24   next argument, Your Honor, is at some point, we need to think

04:49:26PM  25   about what happened here and why, and if this was such a

04:49:29PM 1    massive exercise of market power, really, I mean prices went up

04:49:35PM 2    1.1 percent, and I understand that Steves' claim is that they

04:49:39PM 3    should have gone down, but if you have the market power, why

04:49:42PM 4    aren't you trying to make more money?  It just doesn't make

04:49:46PM 5    sense that this is an antitrust issue.  It is just a contract

04:49:50PM 6    issue on a very, very complicated contract.

04:49:53PM 7            Now, Your Honor, the next argument relates to the

04:49:59PM 8    issue of lost profits and if lost profits is going to the jury.

04:50:04PM 9    Our position is that if lost profits is going to the jury, that

04:50:10PM 10   means that the divestiture claim cannot go to the jury --

04:50:15PM 11   excuse me, cannot --

04:50:17PM 12           THE COURT:  So we don't need to decide that now.

04:50:20PM 13           MR. BUTERMAN:  The only reason why I think that we

04:50:22PM 14   need to deal with this now, Your Honor, this is not an

04:50:25PM 15   election-of-remedies issue, and Steves has suggested that it

04:50:28PM 16   is.  We believe strongly that it is not.  The case law does not

04:50:32PM 17   support that this is an election of remedies.  It's a -- if

04:50:37PM 18   Steves is taking the position that their future harm can be

04:50:41PM 19   quantified, which is --

04:50:42PM 20           THE COURT:  It's adequacy-of-remedy issue.

04:50:48PM 21           MR. BUTERMAN:  That it's capable of being taken care

04:50:51PM 22   of --

04:50:51PM 23           THE COURT:  Is there an adequate remedy at law;

04:50:54PM 24   that's the issue.

04:50:55PM 25           MR. BUTERMAN:  That's correct, Your Honor.

04:50:56PM   1          THE COURT:  You raise that when we get to the

04:50:57PM   2     equitable part of it, and if they win, maybe we won't even get

04:51:04PM   3     there.  But if they win, at least you will know whether there

04:51:12PM   4     has been a remedy at law that is adequate.

04:51:15PM   5          MR. BUTERMAN:  Yes, Your Honor.  Our view would be

04:51:17PM   6     that they lose standing at that point --

04:51:19PM   7          THE COURT:  They might.  I don't know.

04:51:21PM   8          MR. BUTERMAN:  Okay.

04:51:23PM   9          THE COURT:  What else?

04:51:25PM   10         MR. BUTERMAN:  I think Ms. Maltas is going to take

04:51:27PM   11    over now, Your Honor.

04:51:30PM   12         THE COURT:  I don't think you need to address the

04:51:32PM   13    in-plant issue.  I'm fairly well satisfied that we are not

04:51:35PM   14    going to have -- they are entitled to judgment -- you are

04:51:40PM   15    entitled to judgment as a matter of law on that.  The real

04:51:44PM   16    issue for me, and I think the issue as to one and six go to the

04:51:53PM   17    jury.

04:51:54PM   18         MS. MALTAS:  I don't believe we moved --

04:51:58PM   19         THE COURT:  No, you didn't.  I think the issue is

04:52:00PM   20    eight.  The real issue is what does this contract say about it.

04:52:04PM   21         MS. MALTAS:  So, Your Honor, the contract is clearly

04:52:07PM   22    ambiguous.  That's been established as we've continued to sort

04:52:11PM   23    of grapple with how to even draft the jury instructions, but I

04:52:16PM   24    think that what we need to do in order to figure out if Steves

04:52:19PM   25    has established a breach of the contract of Section 8 is to

04:52:23PM 1   drill down into what their actual claims are.  And we had an
04:52:28PM 2   opportunity to file a reply this morning where we tried to do
04:52:30PM 3   that in a similar way to what we just did with the jury
04:52:35PM 4   instructions.
04:52:35PM 5         Steves is claiming a breach of contract that Jeld-Wen
04:52:39PM 6   supplied, in 2015 and 2016, door skins that it claims were
04:52:46PM 7   defective and that Jeld-Wen failed to reimburse Steves for
04:52:50PM 8   those specific door skins.
04:52:51PM 9         THE COURT:  That's the 441,000 --
04:52:54PM 10        MS. MALTAS:  That's the 441,000.  There was obviously
04:52:57PM 11   sort of general testimony by Mr. Gartner and by Mr. Sam Steves
04:53:02PM 12   about quality issues that they claim to have experienced by
04:53:06PM 13   Jeld-Wen door skins throughout the years, but no one provided
04:53:09PM 14   to the jury any evidence that any one of the door skins that
04:53:15PM 15   make up their actual claim are actually defective, and it fails
04:53:21PM 16   just as that general matter.
04:53:22PM 17        Whether you think of it as not qualifying for
04:53:26PM 18   Jeld-Wen's specifications or the warranty or even not being of
04:53:29PM 19   a quality satisfactory to Steves, there was no actual evidence
04:53:33PM 20   about any of the door skins that are being claimed here, and so
04:53:38PM 21   Steves can't prove a breach of contract for those door skins
04:53:42PM 22   without some evidence.
04:53:43PM 23        More to the point, the only evidence that actually
04:53:48PM 24   came in about the specific defects actually proves that they --
04:53:53PM 25   some of them were not defective, and Steves tries to say this

04:53:57PM  1    has something to do with the perfection of their proof, but

04:54:00PM  2    that's not it.  We looked at and introduced two documents

04:54:04PM  3    reflecting inspection reports by Jeld-Wen where Steves -- the

04:54:08PM  4    Steves inspector agreed that many of the door skins were usable

04:54:12PM  5    and they should not have been submitted.  Those door skins are

04:54:16PM  6    part of Steves claim.

04:54:18PM  7         So even thinking about this as being a quality not

04:54:21PM  8    satisfactory to Steves, they didn't prove that, and they

04:54:25PM  9    haven't even attempted to prove that as to any door skin.  It

04:54:28PM  10   would have been possible.  They have the VDMs, they have the

04:54:33PM  11   data, they could have grouped it.  Mr. Tucker could have

04:54:35PM  12   testified about it, Mr. Gartner could have testified about it,

04:54:39PM  13   but just the general vague claims that, at some point, they

04:54:42PM  14   received defective door skins is not sufficient to prove that

04:54:46PM  15   this $441,000 worth of damages is an actual breach of the

04:54:51PM  16   contract by Jeld-Wen.

04:54:52PM  17        The second major category is the doors, and these

04:54:56PM  18   doors fail for the exact same reasons.  Steves did not attempt

04:55:00PM  19   to prove that any of the doors that Jeld-Wen has not

04:55:06PM  20   reimbursed, which is either the REEB claim where Jeld-Wen

04:55:08PM  21   actually had the opportunity to inspect in some cases, or the

04:55:14PM  22   doors that have actually never even been submitted to Jeld-Wen,

04:55:17PM  23   are in any way actually defective.

04:55:20PM  24        And, again, the only testimony that came in to the

04:55:24PM  25   case about the defects that these doors could suffer indicates

04:55:28PM  1    that many of them most likely are not defective under the

04:55:32PM  2    contract.  And what I did when I cross-examined Mr. Gartner is

04:55:35PM  3    I walked him through all of the categories of door skin defects

04:55:41PM  4    that Steves claims in the REEB claim and also that make up the

04:55:45PM  5    other door claim in Mr. Tucker's report, and he confirmed for

04:55:50PM  6    many of them that they could be door skin defects caused by the

04:55:54PM  7    Steves' assembly process or by the installation in the customer

04:55:58PM  8    location.

04:55:59PM  9           And that's all the jury has.  They don't have any

04:56:01PM  10   information that any door was defective because of a defective

04:56:06PM  11   door skin.  The only evidence they have is that many of the

04:56:10PM  12   doors that have been claimed might not be Jeld-Wen's fault at

04:56:13PM  13   all.

04:56:14PM  14          The second issue with the doors is, again, notice and

04:56:17PM  15   inspection.  The REEB claim, Jeld-Wen was not given the

04:56:22PM  16   opportunity --

04:56:22PM  17          THE COURT:  Your point is that as to REEB, they have

04:56:25PM  18   a bunch of -- a claim of defect asserted by the purchaser,

04:56:33PM  19   REEB, return of the door skins by REEB to Steves, no proof that

04:56:44PM  20   anybody at Steves said they -- how many of them were defective,

04:56:50PM  21   and proof that there's all kinds of problems with the allegedly

04:56:56PM  22   defective doors including that the claim included doors that

04:57:22PM  23   weren't even Steves, doors that weren't defective.  And under

04:57:29PM  24   that proof structure, that's not enough to prove defect.

04:57:34PM  25          MS. MALTAS:  It's not enough to prove a defect, and

04:57:37PM 1   it's not enough to prove that Jeld-Wen breached the contract by

04:57:40PM 2   refusing to reimburse for those doors, because Jeld-Wen can't

04:57:46PM 3   breach the contract just by shipping out defective door skins.

04:57:50PM 4        There's no claim here for damages for the door skins

04:57:54PM 5   that Jeld-Wen reimbursed, because Steves has been made whole.

04:57:58PM 6   The breach has to occur by providing defective door skins and

04:58:02PM 7   then failing to reimburse.

04:58:04PM 8        With the REEB claim, all of the Lebanon doors were

04:58:08PM 9   destroyed, so Jeld-Wen never had the opportunity to put eyes on

04:58:12PM 10  even one of them.  For the Richmond doors, they only had the

04:58:16PM 11  opportunity to see fewer than half of those doors, and many of

04:58:20PM 12  them that they looked at, they rejected.  And that is not

04:58:24PM 13  necessarily a breach to look at a door -- and a crack is a

04:58:29PM 14  great example.

04:58:29PM 15       THE COURT:  Rejection, per se, is not a breach.

04:58:29PM 16       MS. MALTAS:  Exactly.

04:58:32PM 17       THE COURT:  There has to be a proof that that which

04:58:34PM 18  was rejected was, in fact, defective, and there's no evidence

04:58:38PM 19  of that.

04:58:39PM 20       MS. MALTAS:  Exactly.  And a defect caused by

04:58:42PM 21  Jeld-Wen, exactly.

04:58:44PM 22       THE COURT:  Or the product defines defect as a

04:58:47PM 23  product that does not meet Jeld-Wen specifications.

04:58:51PM 24       MS. MALTAS:  That's right, and it could not be a

04:58:55PM 25  defect that was caused by Steves.

2505

| | |
|---|---|
| 04:58:56PM | 1 |

THE COURT:  If Jeld-Wen ships products that do not
meet Jeld-Wen's specifications (hereinafter defective product).

MS. MALTAS:  That's right, Your Honor.

THE COURT:  How do you harmonize that sentence with
the preceding sentence in paragraph eight?  The product will,
at all times, be of quality satisfactory to Steves, meeting
Jeld-Wen's specifications, fit for the intended purpose, and
subject to Jeld-Wen's standard written warranty applicable to
the product (specifications).  How do you square those two
sentences?

MS. MALTAS:  It's an incredibly difficult task to try
to square the sentence that purports to define what a defective
product is in this case.

THE COURT:  It's incredibly difficult, but your job
and mine is now to do that.  How do you do it?  I stipulate
it's difficult.

MS. MALTAS:  I think that they have to meet that all
of those things did not occur, that it was not to Steves'
satisfaction, it was not to Jeld-Wen's specifications, it did
not meet Jeld-Wen's warranty, and it was not fit for the
intended use.

They haven't attempted to prove, for the actual door
skins and doors that they've claimed, any of that, and so
that's why for these --

THE COURT:  Wait just a minute.  Suppose that the

| | |
|---|---|
| 05:00:25PM | 1 |

product meets Jeld-Wen's specifications, is fit for the

limited -- intended purpose and is subject to Jeld-Wen's

written warranty but is not of a quality satisfactory to

Steves.  Doesn't that mean that it doesn't -- the product would

not fit the first sentence in paragraph eight?

MS. MALTAS:  It would not fit the first sentence in

paragraph eight, but then that can't be squared with the second

sentence in paragraph eight.  There's no reason why Jeld-Wen

would be provided the right of notice, inspection, and

verification solely to look at whether or not a door skin meets

Steves' quality standards.

THE COURT:  Sure they would as long as Steves had

some quality standards.  Is there any evidence in the record as

to what was quality satisfactory to Steves?

MS. MALTAS:  Steves did not put in any evidence.  I

introduced with Doug Gartner a document that was created in mid

2015 by Mike Wamsley who was the director of quality control.

Doug Gartner testified that that was the first comprehensive

training of standards for quality issues that Steves had ever

had, and that's the document that laid out the fact that for

out-of-tolerance door skins, it was going to be Steves' policy

to submit entire pallets for reimbursement even though they

hadn't tested them and it was possible they were submitting

pallets that were not defective.

So Jeld-Wen's point of view in terms of looking at

05:02:08PM  1   this contract, it absolutely has no right, no requirement to

05:02:11PM  2   reimburse Steves when Steves is knowingly sending nondefective

05:02:17PM  3   door skins for reimbursement but calling it part of Steves'

05:02:21PM  4   quality standards.

05:02:23PM  5          THE COURT:  Whose standards were those that -- that

05:02:27PM  6   was Jeld-Wen's standards, wasn't it?

05:02:29PM  7          MS. MALTAS:  Jeld-Wen's technical specifications were

05:02:32PM  8   provided to Steves in 2014.

05:02:34PM  9          THE COURT:  I thought it was 13 for some reason but

05:02:37PM  10  whatever it was.  It had three little sections in the back, on

05:02:44PM  11  the back of the page of an email or something.

05:02:47PM  12         MS. MALTAS:  That's right.  And, importantly,

05:02:49PM  13  Steves --

05:02:49PM  14         THE COURT:  My question was not that.  My question

05:02:51PM  15  is, what's the evidence of what is a quality satisfactory to

05:02:56PM  16  Steves?

05:02:56PM  17         MS. MALTAS:  Steves has not put forward any actual

05:03:00PM  18  evidence of what that is other than whatever we feel at the

05:03:03PM  19  time, whoever is looking at the door skins.

05:03:05PM  20         THE COURT:  Let's deal with the doors.  Quite clearly

05:03:08PM  21  the product -- the product is defined door skins, isn't it?

05:03:12PM  22         MS. MALTAS:  Yes.

05:03:23PM  23         THE COURT:  Where does it define product?

05:03:26PM  24         MS. MALTAS:  I believe it's in paragraph one.

05:03:32PM  25         THE COURT:  Shall be the full range of Jeld-Wen

| | |
|---|---|
| 05:03:36PM | 1 |
| 05:03:40PM | 2 |
| 05:03:45PM | 3 |
| 05:03:48PM | 4 |
| 05:03:52PM | 5 |
| 05:03:54PM | 6 |
| 05:03:57PM | 7 |
| 05:04:01PM | 8 |
| 05:04:05PM | 9 |
| 05:04:09PM | 10 |
| 05:04:13PM | 11 |
| 05:04:17PM | 12 |
| 05:04:19PM | 13 |
| 05:04:30PM | 14 |
| 05:04:33PM | 15 |
| 05:04:34PM | 16 |
| 05:04:37PM | 17 |
| 05:04:41PM | 18 |
| 05:04:45PM | 19 |
| 05:04:45PM | 20 |
| 05:04:46PM | 21 |
| 05:04:48PM | 22 |
| 05:04:51PM | 23 |
| 05:04:52PM | 24 |
| 05:04:57PM | 25 |

molded door skin products (the product).  So it's door skins.

So what's the effect of any additional costs over the price of

the defective product, which is door skins, shall be negotiated

by the parties on a case-by-case basis?  What's the evidence

about what that means?

MS. MALTAS:  I don't think that's an ambiguous term,

Your Honor.  It's a full representation of consequential

damages which is permitted under the UCC's explicit terms and

Delaware law.  We're looking at two highly sophisticated

commercial entities that entered into arm's-length negotiations

and bargained for a limitation on consequential damages.

THE COURT:  What was in the 2003 agreement on that

topic?

MR. BUTERMAN:  Your Honor, I think you stumped a lot

of people.

MS. MALTAS:  Their exhibit list is in chronological

order, so we should be able to find it fairly quickly.

THE COURT:  Is somebody going to get me the 2003

agreement?

MS. GLAZIER:  Yes, sir.

THE COURT:  Are you saying there wasn't any evidence,

testimony about what this sentence meant?

MS. MALTAS:  Edward --

THE COURT:  Wholly apart from whether you think it's

ambiguous, was there anybody who testified about what that

05:04:57PM 1    sentence meant?

05:04:58PM 2            MS. MALTAS:  Edward Steves testified that Jeld-Wen

05:05:00PM 3    was fully within its rights to refuse to reimburse Steves for

05:05:04PM 4    doors pursuant to that sentence of Section 8.

05:05:09PM 5            THE COURT:  So why doesn't that dispose of the doors

05:05:13PM 6    claim?

05:05:13PM 7            MS. MALTAS:  I believe it does.  Steves has raised a

05:05:15PM 8    latent defects claim which they have presented no evidence that

05:05:21PM 9    any of the doors they're claiming are actually latent defects.

05:05:25PM 10   In fact, the evidence proves that many of the doors did not

05:05:28PM 11   have latent defects, so we don't think it's applicable here.

05:05:33PM 12           THE COURT:  What does the 2003 Section 8 equivalent

05:05:37PM 13   say?

05:05:38PM 14           MR. POWELL:  May I show it to Ms. Maltas first, Your

05:05:41PM 15   Honor?

05:05:41PM 16           THE COURT:  That would be good form.

05:05:47PM 17           MS. MALTAS:  It's only one sentence, Your Honor.  It

05:05:50PM 18   doesn't speak to doors.

05:05:51PM 19           THE COURT:  What does it say?

05:05:52PM 20           MS. MALTAS:  It says, "Jeld-Wen will provide and

05:05:54PM 21   maintain minimum molded door skin product specifications for

05:05:58PM 22   those products sold to Steves as of the effective date of this

05:06:01PM 23   agreement."

05:06:01PM 24           THE COURT:  That's all it says?

05:06:03PM 25           MS. MALTAS:  Is there a reimbursement?  That's all it

05:06:06PM  1    says for quality.  This is really interesting, Your Honor.

05:06:25PM  2    There is no provision for reimbursement which means that

05:06:29PM  3    prior --

05:06:29PM  4            THE COURT:  You mean in the --

05:06:31PM  5            MS. MALTAS:  In the 2003.  So prior to 2012, the

05:06:34PM  6    parties were operating on a pure course of dealing, perhaps

05:06:37PM  7    dictated by the UCC, perhaps just dictated by how they wanted

05:06:41PM  8    to operate.  The change wasn't the CMI acquisition.  It was the

05:06:46PM  9    signing of an agreement in 2012 that gave some actual

05:06:49PM  10   provisions for how reimbursement would be handled.

05:06:53PM  11           THE COURT:  All right, thank you.

05:06:58PM  12           MS. MALTAS:  So Your Honor disposed of in-plant

05:07:00PM  13   damages.  There is a final category under breach of contract

05:07:04PM  14   which is some ancillary damages, most particularly Mr. Tucker's

05:07:09PM  15   claim that Jeld-Wen's quality problems forced Steves to hire

05:07:14PM  16   additional personnel.  I'm sorry, I've been informed that

05:07:21PM  17   Steves has withdrawn that.  So that's it.  Thank you.

05:07:29PM  18           THE COURT:  Do you all need a slight respite?  Are

05:07:32PM  19   you all right, or what?

05:07:33PM  20           MS. ECKSTEIN:  I'm okay if you're okay.

05:07:35PM  21           THE COURT:  Most important person is down here.

05:07:35PM  22           MS. ECKSTEIN:  I agree.

05:07:42PM  23           THE COURT REPORTER:  I'm okay.

05:07:42PM  24           MS. ECKSTEIN:  Your Honor, I'd like to start with the

05:07:45PM  25   quality satisfactory to Steves.  A couple of points about that.

2511

<table>
<tr><td>05:07:49PM</td><td>1</td><td>First of all, there is evidence in the record about what that</td></tr>
<tr><td>05:07:52PM</td><td>2</td><td>means.  It's the way that the parties had dealt with themselves</td></tr>
<tr><td>05:07:55PM</td><td>3</td><td>from the signing, even before the signing of the 2012</td></tr>
<tr><td>05:07:58PM</td><td>4</td><td>agreement, but let's start with the signing of the 2012</td></tr>
<tr><td>05:08:00PM</td><td>5</td><td>agreement, until Jeld-Wen's policy changed.</td></tr>
<tr><td>05:08:03PM</td><td>6</td><td>Up until then, Steves, the evidence shows from Mr.</td></tr>
<tr><td>05:08:07PM</td><td>7</td><td>Gartner, from Mr. Sam, and I believe Edward Steves as well,</td></tr>
<tr><td>05:08:11PM</td><td>8</td><td>that Steves would submit claims for doors, and sometimes</td></tr>
<tr><td>05:08:15PM</td><td>9</td><td>Jeld-Wen would inspect, sometimes they wouldn't, but they often</td></tr>
<tr><td>05:08:20PM</td><td>10</td><td>paid for the door.  And Mr. Gartner testified that they often</td></tr>
<tr><td>05:08:23PM</td><td>11</td><td>did so on the basis of goodwill.  He tried to say that wasn't a</td></tr>
<tr><td>05:08:27PM</td><td>12</td><td>policy, but, frankly, if you're doing it on the basis of</td></tr>
<tr><td>05:08:30PM</td><td>13</td><td>goodwill, that seems to be a policy, and he admitted that that</td></tr>
<tr><td>05:08:34PM</td><td>14</td><td>policy changed.</td></tr>
<tr><td>05:08:34PM</td><td>15</td><td>Now, the fact that the contract itself doesn't</td></tr>
<tr><td>05:08:39PM</td><td>16</td><td>specify what quality satisfactory to Steves means doesn't mean</td></tr>
<tr><td>05:08:43PM</td><td>17</td><td>that that phrase should be written out of the contract.</td></tr>
<tr><td>05:08:47PM</td><td>18</td><td>THE COURT:  But somebody has to testify to what it</td></tr>
<tr><td>05:08:50PM</td><td>19</td><td>means.  Nobody did.  The best that can happen is this is the</td></tr>
<tr><td>05:08:54PM</td><td>20</td><td>way the parties did business for the first two years, 18 months</td></tr>
<tr><td>05:09:02PM</td><td>21</td><td>to two years of the contract.</td></tr>
<tr><td>05:09:03PM</td><td>22</td><td>MS. ECKSTEIN:  Which, I think, is relevant to what</td></tr>
<tr><td>05:09:05PM</td><td>23</td><td>that phrase means, and what the case law says is that when you</td></tr>
<tr><td>05:09:09PM</td><td>24</td><td>have a phrase, such as quality to meet a buyer's requirements</td></tr>
<tr><td>05:09:14PM</td><td>25</td><td>or satisfaction guaranteed, without an explanation of exactly</td></tr>
</table>

| | |
|---|---|
| 05:09:17PM | 1 |

what that means, then you turn to Section 2311, Subsection 1,

which states, "An agreement for sale which is otherwise

sufficiently definite to be a contract is not made invalid by

the fact that it leaves particulars of performance to be

specified by one of the parties.  Any such specification must

be made in good faith and within limits set by commercial

reasonableness."

So, here, I think we can turn to that commercial

reasonableness based on the evidence that's in the record, and

I would turn Your Honor's attention to the *Simpkins Industry v.*

*Standard Group Incorporated* case.  It's from the Connecticut

Superior Court in 2002 interpreting the UCC -- the cite is 2002

WL 1446950.

There, the contract called for the buyer to purchase

recycled paperboard from the seller.  The buyer was to use that

recycled paperboard to make into cartons for packaging.  The

contract specified that the recycled paperboard would be of a

quality to meet Standard Group's requirements.

And the Court held that that phrase must be construed

in accordance with generally applicable principles governing

the construction of contracts, a reasonable person in the

buyer's position.  And that relates to the duty to act in good

faith and to deal fairly, and, therefore, the Court looked at

2311 and said that even though the contract did not state what

those requirements were, what the buyer's requirements were,

05:10:55PM 1   there was evidence of what was commercially reasonable.  And we

05:10:58PM 2   think that we have that evidence here.

05:10:59PM 3          THE COURT:  What was the evidence of what was

05:11:01PM 4   commercially reasonable?

05:11:05PM 5          MS. ECKSTEIN:  I would have to look at the case -- I

05:11:09PM 6   do have it with me -- to be able to recite that for you

05:11:11PM 7   specifically.

05:11:14PM 8          THE COURT:  Here, why is it commercially reasonable?

05:11:17PM 9   Why is it commercially reasonable?  You are saying that the

05:11:21PM 10  evidence of how they did things is proof of commercial

05:11:24PM 11  reasonableness.  Why is it -- why is that commercially

05:11:32PM 12  reasonable evidence of the specification as opposed to the

05:11:37PM 13  evidence that they were just doing things for goodwill which is

05:11:41PM 14  what the evidence is?

05:11:44PM 15         Why would anybody pay -- if you're selling somebody a

05:11:50PM 16  product that costs, what, $4, and then the door costs $125,

05:11:58PM 17  you're going to pay $125 as some kind of consequential damage

05:12:05PM 18  without a provision in the contract to do it?  Why would that

05:12:09PM 19  be commercially reasonable?  Why isn't that just simply, we're

05:12:14PM 20  doing this for goodwill, and it makes good sense for us, and we

05:12:18PM 21  don't want to have goodwill anymore.  We don't care.  We want

05:12:21PM 22  the money.

05:12:22PM 23         MS. ECKSTEIN:  To answer that question then, I think

05:12:23PM 24  you need to turn to the rulings in the *Crowell* case and *Viking*

05:12:28PM 25  *Yacht* case that I identified for you yesterday which would

05:12:30PM  1    apply here to that phrase the parties are to negotiate for any

05:12:34PM  2    additional costs beyond the door skin.

05:12:37PM  3            And that phrase fails for its essential purposes

05:12:41PM  4    under the circumstances as in those cases because of Jeld-Wen's

05:12:44PM  5    unilateral position not to negotiate and not to provide any

05:12:49PM  6    additional costs beyond the cost of the door skin.

05:12:52PM  7            In both of those cases, the situation was one which

05:12:55PM  8    the original product being sold was not one of high cost.  It

05:12:59PM  9    was a low-cost product.  In the *Viking Yacht* case, it was some

05:13:03PM 10    kind of a gel.  And the eventual harm in that *Viking Yacht* case

05:13:09PM 11    was to the actual ship, the yachts, that this gel was applied

05:13:13PM 12    to, and it was in the hundreds of thousands of dollars, and the

05:13:16PM 13    Court held that because that phrase, failed for its essential

05:13:22PM 14    purpose --

05:13:23PM 15            THE COURT:  What is its essential purpose?

05:13:26PM 16            MS. ECKSTEIN:  The essential purpose there is to

05:13:27PM 17    allow for additional remedies.

05:13:30PM 18            THE COURT:  No.  The essential purpose, it seems to

05:13:34PM 19    me, is to provide for negotiation, and inherent in the concept

05:13:39PM 20    of negotiation is there is not necessarily ever going to be an

05:13:44PM 21    agreement.  You're going to try, or there is going -- there

05:13:49PM 22    might be an agreement.  But why then -- is there a failure of

05:13:56PM 23    the initial -- of the intended purpose of the clause that you

05:14:00PM 24    are talking about here, i.e., shall be negotiated on a

05:14:05PM 25    case-by-case basis.

05:14:07PM   1         MS. ECKSTEIN:  And the problem here we have is that

05:14:09PM   2   Jeld-Wen simply refused to negotiate.  It said, this is our

05:14:14PM   3   policy now moving forward.  We are not paying for any cost of

05:14:16PM   4   the door, period.  There's no -- it essentially reads that

05:14:20PM   5   clause out of the contract with that decision, unilateral

05:14:24PM   6   decision on behalf of Jeld-Wen.

05:14:27PM   7         THE COURT:  Mr. Steves makes a demand for the door,

05:14:32PM   8   Mr. Orsino says, let's talk about it.  They talk about it.

05:14:40PM   9   Orsino says, no, I'm not paying for doors, I'm not paying for

05:14:45PM  10   this door.  Let's start with that one.  That's not a failure of

05:14:50PM  11   the essential purpose.  That is the purpose achieved, isn't it?

05:14:53PM  12         MS. ECKSTEIN:  So long as it's not done in bad faith,

05:14:57PM  13   yes.

05:14:58PM  14         THE COURT:  So now we need to go to a decision that

05:15:03PM  15   says, okay, you have to pay for the doors because you have paid

05:15:07PM  16   for them in the past, may have paid for them in the past.  Says

05:15:11PM  17   Mr. Hachigian, not paying for them anymore, period.  Why isn't

05:15:15PM  18   that a case-by-case basis; that is, now the case by case is the

05:15:22PM  19   doors are on the table, they have had a negotiation, the

05:15:25PM  20   negotiation has failed.  Why is that a failure of the purpose

05:15:31PM  21   of the negotiation clause?

05:15:32PM  22         MS. ECKSTEIN:  Because it's not on a case-by-case

05:15:35PM  23   basis.  Instead, it's a unilateral decision not to sit down and

05:15:39PM  24   negotiate on a case-by-case basis.  It's a unilateral decision

05:15:42PM  25   to say we are not negotiating.

| | | |
|---|---|---|
| 05:15:45PM | 1 | THE COURT: Have you alleged in your complaint that |
| 05:15:48PM | 2 | the breach of the contract was a bad-faith refusal to negotiate |
| 05:15:53PM | 3 | under -- any additional costs over the price of the defective |
| 05:15:57PM | 4 | product shall be negotiated by the parties on a case-by-case |
| 05:16:01PM | 5 | basis? I don't think that's in the complaint -- in the answer, |
| 05:16:04PM | 6 | is it? I mean the complaint, excuse me. |
| 05:16:08PM | 7 | MS. ECKSTEIN: Pull a copy of the complaint. |
| 05:16:18PM | 8 | THE COURT: She can get her hands on anything. |
| 05:16:24PM | 9 | MS. ECKSTEIN: We are lucky to have her. |
| 05:16:26PM | 10 | THE COURT: Listen, while you are getting your hands |
| 05:16:29PM | 11 | on it, do you have an extra copy for me? |
| 05:16:31PM | 12 | MS. GLAZIER: Yes, sir, of course. |
| 05:16:38PM | 13 | THE COURT: I'll give it back to you so you won't |
| 05:16:42PM | 14 | have to make more copies. Where is that allegation? |
| 05:18:14PM | 15 | MS. ECKSTEIN: Your Honor, starting at paragraph 128, |
| 05:18:20PM | 16 | we address there the credits that have been issued to Steves' |
| 05:18:23PM | 17 | customers after selling doors incorporating defective door |
| 05:18:28PM | 18 | skins with latent defects. And we state that in such instance, |
| 05:18:34PM | 19 | it has been commercially reasonable for Steves to issue credits |
| 05:18:37PM | 20 | to its customers, and that's Jeld-Wen, in 132, has refused full |
| 05:18:47PM | 21 | reimbursement for any such credits. |
| 05:18:55PM | 22 | THE COURT: The closest I see is in paragraph 172, |
| 05:19:04PM | 23 | and it refers to Jeld-Wen's unilateral decision to no longer |
| 05:19:10PM | 24 | sell certain door skins. |
| 05:19:12PM | 25 | MS. ECKSTEIN: To no longer offer -- I'm sorry, yes, |

| | | |
|---|---|---|
| 05:19:15PM | 1 | Your Honor. |
| 05:19:18PM | 2 | THE COURT:  That's door skin.  That's not doors.  I |
| 05:19:23PM | 3 | don't see anything in here about being a violation of the |
| 05:19:28PM | 4 | negotiation provision of paragraph -- Section 8 of the |
| 05:19:32PM | 5 | contract.  I have -- I don't think -- I read 128, I think it |
| 05:19:40PM | 6 | is, or 22? |
| 05:19:43PM | 7 | MS. ECKSTEIN:  And 132. |
| 05:19:47PM | 8 | THE COURT:  I don't think that does it. |
| 05:19:48PM | 9 | MS. ECKSTEIN:  So I think, Your Honor, this goes to |
| 05:19:50PM | 10 | whether Steves can be entitled to consequential damages.  I'm |
| 05:19:54PM | 11 | not sure it was something that was required to be alleged in |
| 05:19:57PM | 12 | the complaint, but it goes to whether -- |
| 05:19:59PM | 13 | THE COURT:  It's a breach.  It's a breach of the |
| 05:20:02PM | 14 | contract.  You are alleging -- in fact, the instructions say it |
| 05:20:05PM | 15 | is a breach of the contract to not give the doors, not pay for |
| 05:20:13PM | 16 | the doors.  You are alleging it as a breach, aren't you? |
| 05:20:18PM | 17 | MS. ECKSTEIN:  Yes, we are.  The question, though, it |
| 05:20:24PM | 18 | seems to me, is whether this is a limitation of remedy that |
| 05:20:26PM | 19 | fails for its essential purpose. |
| 05:20:28PM | 20 | THE COURT:  "This" meaning that paragraph? |
| 05:20:30PM | 21 | MS. ECKSTEIN:  That sentence. |
| 05:20:32PM | 22 | THE COURT:  But I don't think it fails of its |
| 05:20:36PM | 23 | essential purpose.  I don't think there's any evidence it fails |
| 05:20:39PM | 24 | of its essential purpose.  What's the other language in the UCC |
| 05:20:42PM | 25 | after fails of its essential purpose? |

05:20:44PM 1        MS. ECKSTEIN:  That one goes to unconscionability,

05:20:44PM 2  and we have not --

05:20:44PM 3        THE COURT:  It's not unconscionable.

05:20:44PM 4        MS. ECKSTEIN:  No.  We have not asserted that.  I

05:20:48PM 5  think that only goes to consumer goods as you mentioned

05:20:52PM 6  yesterday.

05:20:56PM 7        THE COURT:  All right, anything else?

05:20:57PM 8        MS. ECKSTEIN:  Just one other point regarding the

05:21:01PM 9  issue on the specifications, and the way that we read this

05:21:07PM 10  paragraph is there's a reference to specifications, little S,

05:21:11PM 11  and then specifications, capital S.  The little S would refer

05:21:16PM 12  to Jeld-Wen's specifications.  The capital S refers to the four

05:21:20PM 13  elements that are required under that first sentence of

05:21:23PM 14  paragraph eight.  And with respect --

05:21:26PM 15        THE COURT:  That doesn't refer to it.  It is

05:21:28PM 16  contained in it.

05:21:29PM 17        MS. ECKSTEIN:  The specifications little S is

05:21:32PM 18  contained with specifications capital S.

05:21:37PM 19        THE COURT:  In the first sentence, the words meeting

05:21:43PM 20  Jeld-Wen's specifications, the S is lower case.

05:21:46PM 21        MS. ECKSTEIN:  Correct.

05:21:47PM 22        THE COURT:  In the parenthetical after subject to

05:21:52PM 23  Jeld-Wen's standard written warranty applicable to the product

05:21:56PM 24  appears the word (the specifications), and it's capitalized,

05:22:01PM 25  and then the word -- Jeld-Wen's specifications appears in the

| | |
|---|---|
| 05:22:08PM | 1 |

next sentence where there's a definition of defective product.

If Jeld-Wen ships product that do not meet Jeld-Wen's

specification (herein after defective product) then Jeld-Wen,

after notice of inspection and verification of the defective

product, will be obliged to reimburse Steves for the price of

the defective product.  What's the significance of your talking

about the capitalization of S?

MS. ECKSTEIN:  The only point there was to make the

distinction between the non-capitalized S and the capitalized

S, because I think the capitalized S encompasses the four

elements, but separately, with respect to the lower case S, the

evidence is that Jeld-Wen provided to Steves technical

specifications in 2014.

I believe if you look at that exhibit, it refers to

those technical specifications as a draft, but, separately, the

majority of our defect claims do not go to technical issues but

to aesthetic specifications, and the evidence is that Jeld-Wen

never provided aesthetic specifications to Steves, and it seems

certainly unfair to require Steves to prove that Jeld-Wen's

door skins did not meet specifications that have never been

provided to Steves in the first place.  Thank you.

MS. MALTAS:  I just had one final point as to the

definition of what's defective product.  Ms. Eckstein pointed

out that if there is ambiguity in the definition of, for

example, quality that is sufficient for Steves, that you can

| | |
|---|---|
| 05:23:59PM | 1 |
| 05:24:02PM | 2 |
| 05:24:06PM | 3 |
| 05:24:09PM | 4 |
| 05:24:14PM | 5 |
| 05:24:18PM | 6 |
| 05:24:21PM | 7 |
| 05:24:23PM | 8 |
| 05:24:27PM | 9 |
| 05:24:31PM | 10 |
| 05:24:33PM | 11 |
| 05:24:37PM | 12 |
| 05:24:42PM | 13 |
| 05:24:47PM | 14 |
| 05:24:51PM | 15 |
| 05:24:54PM | 16 |
| 05:24:58PM | 17 |
| 05:25:02PM | 18 |
| 05:25:03PM | 19 |
| 05:25:06PM | 20 |
| 05:25:09PM | 21 |
| 05:25:13PM | 22 |
| 05:25:17PM | 23 |
| 05:25:21PM | 24 |
| 05:25:23PM | 25 |

look to the UCC and you can look at what's commercially

reasonable in order to define the defect, but even if that were

to be the standard that the Court applied, Steves did not

present any evidence that would allow the jury to conclude that

any door skins or doors are defective in terms of some

commercially reasonable standard.

THE COURT:  They say it's commercially reasonable

because of the way they've done business, the conduct for the

past -- first two years of the contract.

MS. MALTAS:  First of all, there's no actual evidence

that was put in other than just sort of general testimony that

that's how it was done.  Second of all, what their allegation

is is that Jeld-Wen just paid all claims sight unseen, and I've

not seen any case law showing that is a requirement to be

commercially reasonable, that a supplier has to pay every

single defective claim presented to it without looking at it

and confirming that it's really defective and it's really the

supplier's fault.

Moreover, Steves doesn't do that.  We had testimony

from Mr. Gartner that when Steves receives defect claims from

its customers, it inspects them, and it only pays the claims

that are actually defective.  So it's not reasonable to say

that Jeld-Wen has got to pay Steves for every claim.

THE COURT:  If there's evidence that they paid the

claims that were actually defective, isn't that proof as to the

05:25:27PM  1    REEB claims and all of the other claims that came back to them

05:25:30PM  2    that they had concluded they were defective?

05:25:34PM  3              MS. MALTAS:  Yes.  Jeld-Wen has paid, and --

05:25:37PM  4              THE COURT:  No, I mean that the claims that came

05:25:41PM  5    back to -- isn't that evidence, not dispositive proof but isn't

05:25:45PM  6    it evidence that Steves says they inspect and only pay that

05:25:51PM  7    which is defective, they paid their costs for the door to their

05:25:56PM  8    customers?  Isn't that evidence that the -- that Steves found

05:26:02PM  9    them to be defective and that that's proof that there's a

05:26:05PM  10   defect?

05:26:06PM  11             MS. MALTAS:  It's proof there's a defect in the door,

05:26:08PM  12   but that's not proof that it's a defect in the door skin or

05:26:12PM  13   that it's a defect in the door skin caused by Jeld-Wen,

05:26:18PM  14   because there's a --

05:26:19PM  15             THE COURT:  Stop there just a minute.  Is there any

05:26:21PM  16   evidence in this whole case that there's some defect in the

05:26:25PM  17   doors other than with the door skin?

05:26:30PM  18             MS. MALTAS:  Oh, sure.  You can have defects from the

05:26:32PM  19   assembly of the door.  So an example would be a crack.  So you

05:26:35PM  20   could get a door skin that has a crack in it, or you could

05:26:38PM  21   crack the door skin when you're pressing the door.  There can

05:26:41PM  22   also be a lot of different causes of delamination.

05:26:45PM  23             So there's a lot of discussion in this case about

05:26:47PM  24   cleavage which is a technical specification for a door skin.

05:26:51PM  25   If your cleavage is off, then you can have delamination of the

05:26:54PM  1    door, but door assembly issues like not having enough glue or

05:26:59PM  2    glue wipe-off can also cause delamination.  So there's a lot of

05:27:03PM  3    things that can cause a door defect.  Thank you.

05:27:08PM  4            THE COURT:  Anything else?

05:27:10PM  5            MR. MACH:  I have just one very minor point of

05:27:13PM  6    clarification if it would be helpful to Your Honor.

05:27:15PM  7            THE COURT:  All right.

05:27:17PM  8            MR. MACH:  The point, Your Honor, is that insofar as

05:27:22PM  9    the Court is inclined to dismiss certain contract claims for

05:27:27PM 10    failure to prove a breach of contract, I just want to make sure

05:27:30PM 11    it's clear that our view is that the elimination of such a

05:27:33PM 12    contract claim would typically not result in a corresponding

05:27:37PM 13    decrease in the antitrust claims relating to the same

05:27:40PM 14    underlying conduct.  You are looking at me like I should

05:27:46PM 15    elaborate, so I will do so.

05:27:49PM 16            THE COURT:  That was a very charitable

05:27:55PM 17    interpretation.

05:27:58PM 18            MR. MACH:  I hesitate to put words in your mouth, but

05:28:02PM 19    I feel that one worked out all right.

05:28:03PM 20            THE COURT:  You seized the moment.

05:28:05PM 21            MR. MACH:  So if you look at something like quality

05:28:07PM 22    or returns, for example, there is a question of whether the

05:28:13PM 23    defects or the change in the return practices represents a

05:28:16PM 24    breach of contract.  If it doesn't represent a breach of

05:28:20PM 25    contract, that doesn't have any bearing on whether a decrease

05:28:24PM 1    in quality or a change from a more generous to a less generous

05:28:29PM 2    return policy, which is a form of service, is or is not an

05:28:36PM 3    anticompetitive effect of the merger.

05:28:39PM 4            THE COURT:  We will take a 15-minute recess, and I'll

05:28:45PM 5    be back.

05:28:47PM 6            MS. ECKSTEIN:  Your Honor, would you like a copy of

05:28:49PM 7    the *Simpkins* case that I mentioned?

05:28:52PM 8            THE COURT:  Yes, please.

05:28:53PM 9            MS. MALTAS:  Your Honor, I'm sorry, before we break,

05:28:56PM 10   I have been deputized by the trade secrets team to ask if Your

05:29:01PM 11   Honor has a ruling on their motion for a ten-page extension for

05:29:05PM 12   the summary judgment opposition that's due tomorrow.

05:29:07PM 13           THE COURT:  Were you deputized to address it

05:29:10PM 14   substantively and why you need it?

05:29:13PM 15           MS. MALTAS:  Yes, I am.

05:29:15PM 16           THE COURT:  Come here and tell.

05:29:19PM 17           MS. MALTAS:  So, Your Honor, Steves has made a

05:29:23PM 18   broad-reaching motion against the trade secrets of which I know

05:29:26PM 19   that there are a number that has been asserted by Jeld-Wen.

05:29:30PM 20   Steves was able to make its arguments in more of a broad way

05:29:36PM 21   that attacks a number of different trade secrets at once.

05:29:40PM 22           In order to adequately respond to the precise trade

05:29:46PM 23   secrets, Jeld-Wen is just asking for ten additional pages so it

05:29:48PM 24   can address each trade secret.  I know that Ms. Eckstein had

05:29:52PM 25   raised yesterday the possibility that Jeld-Wen is going to be

| | | |
|---|---|---|
| 05:29:55PM | 1 | adding trade secrets in its opposition. |
| 05:29:57PM | 2 | THE COURT:  They wouldn't dare. |
| 05:30:00PM | 3 | MS. MALTAS:  They wouldn't dare, will not be adding |
| 05:30:03PM | 4 | any trade secrets.  I understand one may be removed.  So it's |
| 05:30:07PM | 5 | really just to provide sufficient space for Jeld-Wen to address |
| 05:30:12PM | 6 | Steves' arguments. |
| 05:30:13PM | 7 | THE COURT:  How many trade secrets are there now? |
| 05:30:17PM | 8 | MS. ECKSTEIN:  It depends on how you count them, Your |
| 05:30:20PM | 9 | Honor, which is one of our problems.  We don't know. |
| 05:30:23PM | 10 | THE COURT:  Just sort of like listening to testimony |
| 05:30:27PM | 11 | about what is the meaning of is.  On the high end, it is X, on |
| 05:30:35PM | 12 | the low end it is Y. |
| 05:30:37PM | 13 | MS. ECKSTEIN:  Low end, I think it's 28, 29.  On the |
| 05:30:40PM | 14 | high end, it's probably in the seventies. |
| 05:30:43PM | 15 | THE COURT:  Okay.  At least it's not 400.  All right, |
| 05:30:47PM | 16 | let me hear from Ms. Eckstein. |
| 05:30:49PM | 17 | MS. MALTAS:  Can I say that we would also be happy to |
| 05:30:51PM | 18 | have Steves have an extension on its reply in order to |
| 05:30:53PM | 19 | adequately address the arguments we'll make in the opposition. |
| 05:30:57PM | 20 | THE COURT:  Anything they want? |
| 05:31:00PM | 21 | MR. BUTERMAN:  Yes, Your Honor, please. |
| 05:31:02PM | 22 | MS. ECKSTEIN:  I'm going to hold them to that if you |
| 05:31:04PM | 23 | let them do this.  The reason -- |
| 05:31:07PM | 24 | THE COURT:  What do you need to reply? |
| 05:31:09PM | 25 | MS. ECKSTEIN:  I don't know.  Until I see their |

05:31:12PM   1   papers, I don't know what I need to reply.  The reason we

05:31:14PM   2   opposed -- and we don't typically oppose requests for

05:31:18PM   3   extension.  The reason we opposed it is because we've had this

05:31:20PM   4   problem all along in this case, what are the trade secrets, and

05:31:23PM   5   we still have that problem.

05:31:25PM   6          So our position is if they can't tell us what the

05:31:28PM   7   trade secrets are in a 30-page brief -- we filed a 30-page

05:31:32PM   8   brief.  They should be able to do the same as well.

05:31:35PM   9          THE COURT:  Why don't we give them 40 pages and give

05:31:37PM   10  you 40 pages, and one of the things you can do is if they dodge

05:31:40PM   11  the trade secrets in there, you can move to strike them or

05:31:44PM   12  something.  Does that give you enough -- he said anything.  Do

05:31:47PM   13  you want more?

05:31:48PM   14         MS. ECKSTEIN:  I'll take 40 then.

05:31:51PM   15         THE COURT:  Yes, it will be granted.  Just tell them

05:31:53PM   16  yes, to proceed accordingly.

05:31:56PM   17         MS. MALTAS:  Thank you, Your Honor.

05:31:56PM   18         THE COURT:  15 minutes, please.

05:31:58PM   19         MR. BUTERMAN:  Yes, Your Honor.

05:31:59PM   20

05:31:59PM   21         (Recess taken.)

05:52:34PM   22

05:52:34PM   23         THE COURT:  All right, on the motion -- motion for

05:52:41PM   24  judgment as a matter of law made by Jeld-Wen, the motion will

05:52:51PM   25  be denied as to the antitrust issues.  It will be held in

05:52:57PM 1  abeyance with respect to Section 8 issues.  All of this is
05:53:06PM 2  coming here under theories that I don't see in the papers, in
05:53:12PM 3  the pleadings, and under legal theories that haven't been
05:53:16PM 4  adequately briefed.
05:53:18PM 5       I think that probably, for your own purposes, there
05:53:21PM 6  won't be any -- that judgment as a matter of law ultimately
05:53:28PM 7  will be granted on behalf -- as to the doors claim.  I think
05:53:31PM 8  there is enough evidence for the door skins to go to the jury,
05:53:36PM 9  so that will be denied.
05:53:39PM 10      The motion as to the in-plant damages will be granted
05:53:45PM 11 because there isn't any way, under the law or the facts, that
05:53:50PM 12 that claim could be decided affirmatively for the plaintiff on
05:53:56PM 13 the record as it currently exists.
05:53:59PM 14      So you'll -- you might as well also tell your people
05:54:04PM 15 who are preparing their arguments that I am inclined -- that
05:54:10PM 16 the efficiencies issue will not be part of the case, but I need
05:54:15PM 17 to have that -- your reply on it and the cases.  I need to know
05:54:22PM 18 the cases you are relying on to match up with what they've
05:54:27PM 19 filed, and I'll hear you in the morning between quarter of 9:00
05:54:31PM 20 and 9:00.  There's a copy of the complaint back that Magic
05:54:42PM 21 produced back there.
05:54:49PM 22      I think that's all that needs to be done tonight.
05:54:53PM 23 You have the instructions.  And the instructions do not contain
05:55:02PM 24 anything about the in-plant damages.  We took that out right
05:55:06PM 25 then already.  Is there anything else you all need to take up?

```
05:55:16PM    1    No?

05:55:16PM    2              MS. MALTAS:  No, Your Honor.

05:55:18PM    3              THE COURT:  All right.  We'll see you in the morning,

05:55:23PM    4    and off we go.  Thank you.  We'll be in adjournment.

              5

              6                    (End of proceedings.)

              7

              8

              9              I certify that the foregoing is a correct transcript

             10    from the record of proceedings in the above-entitled matter.

             11

             12

             13    _____/s/_____        _____
                   P. E. Peterson, RPR              Date
             14

             15

             16

             17

             18

             19

             20

             21

             22

             23

             24

             25
```