**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

STEVES AND SONS, INC.,

    Plaintiff,

v.                              Civil Action No. 3:16-cv-545

JELD-WEN, INC.,

    Defendant.


**MEMORANDUM OPINION**

This matter is before the Court on PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR SUMMARY JUDGMENT ON JELD-WEN COUNTERCLAIMS (ECF No. 885). For the reasons set forth below, the motion was granted in part and denied in part, except to the extent that Steves & Sons, Inc. ("Steves") sought summary judgment on the basis that JELD-WEN, Inc.'s ("JELD-WEN") damages expert failed to apportion damages between specific misappropriated trade secrets, an issue on which the Court ordered further briefing because Steves raised it for the first time at oral argument. See ECF No. 1290. Those contentions will be addressed in a separate opinion.

## A. Factual Background[1]

### 1. Steves' Relationships with Pierce

Steves and JELD-WEN are both participants in the interior molded doorskin market in the United States. That type of doorskin is used to make interior molded doors, which are built to resemble solid wood doors at a much lower cost. Interior molded doorskin manufacturers create and ship doorskins to assembly plants, where molded door manufacturers use the doorskins to build door slabs that are then sold to retailers or distributors. Steves is an independent door manufacturer that is currently unable to produce its own doorskins, and has never done so. As a result, it must purchase doorskins from doorskin manufacturers. JELD-WEN, however, is a vertically integrated door manufacturer, meaning that it both produces doorskins and uses those doorskins internally to manufacture and sell finished doors. Steves currently purchases doorskins from JELD-WEN pursuant to a long-term supply agreement that the parties entered into in 2012 ("the Supply Agreement").

---

[1] Steves' Statement of Undisputed Facts ("SUF") focuses almost entirely on procedural details about the litigation of JELD-WEN's counterclaims, rather than the underlying facts. See Steves Br. (ECF No. 884) (Under Seal) at 2-9. Accordingly, this factual background relies mostly on JELD-WEN's narrative statement of facts, to which Steves has not responded.

In March 2015, Steves hired a former JELD-WEN employee, John Pierce ("Pierce"), as a consultant for two primary purposes. First, Steves wanted Pierce to provide it with certain information that would allow it to build its own doorskin manufacturing plant, as part of what Steves referred to as its "MDS project" ("the MDS Project"). Second, Steves believed that Pierce could help verify the accuracy of JELD-WEN's key input costs for doorskins that it manufactured. Those input costs were the basis for the prices that JELD-WEN charged Steves for doorskins under the Supply Agreement, and JELD-WEN was required to provide the costs to Steves on an annual basis.

When he worked at JELD-WEN, Pierce and JELD-WEN had entered into multiple employment contracts indicating that Pierce would be exposed to certain information that JELD-WEN considered confidential or trade secrets, or both. Under those contracts, Pierce could not disclose the confidential information or trade secrets to any third parties except as required by law. The confidentiality provision in the most recent employment contract applied even after Pierce retired from JELD-WEN in 2012. When Steves later hired Pierce, he notified Steves that the confidentiality agreement with JELD-WEN prevented him from disclosing JELD-WEN's trade secrets or confidential information.

Between March 2015 and June 2016, Pierce obtained information about JELD-WEN's doorskin manufacturing methods,

processes, and costs through interactions with five JELD-WEN employees: Ed Reed ("Reed"), Dale Williams ("Williams"), Bruce Fedio ("Fedio"), Greg Takes ("Takes"), and Jay Borrell ("Borrell"). The substance of the information given to Pierce and whether it is confidential or a trade secret is disputed. Reed did not recall giving Pierce any specific or confidential information, but also acknowledged that it was possible he did so. SUF ¶ 28; JELD-WEN's Response to the SUF ("SUF Response") (ECF No. 1008) (Under Seal) ¶ 28. Similarly, Williams did not remember telling Pierce any non-public information, but he conceded that Pierce could have confirmed confidential information that Pierce knew from his previous work with JELD-WEN. SUF ¶ 30; SUF Response ¶ 30. Fedio could only specifically recall saying to Pierce that JELD-WEN had received good news on favorable resin pricing, and did not realize that he had given Pierce any allegedly confidential information until he was told by counsel during this litigation. SUF ¶¶ 32-33. Takes also did not believe he ever gave Pierce JELD-WEN's confidential information or trade secrets, but was unable to respond fully allegedly because of the attorney-client privilege.[2] Id. ¶ 35;

---

[2] Why the attorney-client privilege would bar disclosure of the nature of the information passed on by Fedio defies imagination. And, the parties have not explained what information Borrell may have provided to Pierce.

SUF Response ¶ 35. None of the employees were fired for meeting with Pierce, but some received disciplinary communications that they could not elaborate on allegedly because of the attorney-client privilege.[3] See SUF ¶¶ 29, 31, 34, 36; SUF Response ¶¶ 29, 31, 34, 36.

In any event, Pierce conveyed to Steves some or all of the information that he acquired from those JELD-WEN employees. According to JELD-WEN, Steves specifically had requested that Pierce provide Steves with that information and, in fact, paid him to do so. In addition, Steves found that information helpful in furthering the MDS Project.[4]

## 2. Steves' Relationship with Ambruz and Use of JELD-WEN's Information

In or around July 2015, Steves then retained Global Strategic Partners LLC, a company managed by John Ambruz ("Ambruz"), as a consultant to assist with the MDS Project. Like Pierce, Ambruz was a former JELD-WEN employee who had entered into an employment agreement with JELD-WEN that prevented him from disclosing confidential information or trade secrets he viewed during his employment. That prohibition applied even

---

[3] It is difficult to conceive how the privilege would apply.

[4] Steves apparently disagrees with this characterization of its actions, given its claim that "disputed issues of material fact exist as to [the misappropriation] element" of JELD-WEN's claims. Steves Reply (ECF No. 1124) (Under Seal) at 9. However, Steves has not identified the particular facts that it disputes.

after his employment was terminated in April 2014. Steves became aware of Ambruz's confidentiality obligations at some point, although it is unclear when exactly that occurred.

In November 2015, Ambruz met with Pierce and Steves' principal officers, Edward Steves and Sam Steves II ("the Steves Brothers"), to discuss the possible construction of a doorskin manufacturing plant. Pierce subsequently prepared a detailed analysis for the Steves Brothers (and thereby Steves, too) concerning the effect of "die changes"[5] on doorskin manufacturing, which suggested ways to mitigate the cost of die changes in order to maximize doorskin production efficiency at a single doorskin manufacturing plant. Then, in or around March 2016, Ambruz incorporated parts of that analysis into a study assessing the feasibility of Steves building an independent doorskin manufacturing plant ("the Feasibility Study"). It is alleged that both the die change analysis and the Feasibility Study included information that was derived from information that Pierce obtained from JELD-WEN.

Sam Steves subsequently compiled the memoranda and e-mails that Pierce had sent to Steves about an independent doorskin plant, and sent those documents in June 2016 to Ambruz and

---

[5] A die is a device used to create a specific doorskin design during the manufacturing process. Because a plant cannot run all its dies simultaneously, the dies in service are rotated as required to meet a company's doorskin design needs.

Gregory Wysock ("Wysock")—a former employee of another vertically integrated doorskin manufacturer, Masonite. Steves hired Wysock to help with the MDS Project in July 2016. Shortly thereafter, he conducted another die analysis that was based on his review of Pierce's die change analysis. Other evidence reveals that Wysock was also aware of the configurations, capacities, productivity, and related processes for JELD-WEN's doorskin manufacturing plants, which JELD-WEN asserts that Pierce had obtained from JELD-WEN employees.

Since then, Steves has continued to work on the MDS Project and still is considering the feasibility of building its own doorskin manufacturing plant. For instance, Steves has informed customers who purchase its doors about the progress of the MDS Project at different stages. Steves has also had recent communications with manufacturing partners and equipment manufacturing partners about creating a doorskin manufacturing plant. Indeed, it was in the process of negotiating a deal with one partner, Proteak, when this litigation caused the deal to fall apart.

## B. Procedural Background

Steves initiated this action against JELD-WEN on June 29, 2016, asserting antitrust and contract claims against JELD-WEN related to JELD-WEN's 2012 acquisition of CraftMaster Manufacturing, Inc. and JELD-WEN's subsequent breaches of the

Supply Agreement. Complaint (ECF No. 5) (Under Seal). The parties then engaged in discovery.

On March 27, 2017, JELD-WEN sought leave to amend its Answer and to add counterclaims against Steves based on JELD-WEN's recent discovery, from documents produced by Steves during discovery, that Steves may have used JELD-WEN's confidential information and trade secrets—obtained by Pierce and Ambruz—in furtherance of the MDS Project. ECF No. 101 at 1-2. JELD-WEN asserted the following proposed counterclaims: FIRST COUNTERCLAIM FOR RELIEF, Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836; SECOND COUNTERCLAIM FOR RELIEF, Conspiracy to Violate Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(5); THIRD COUNTERCLAIM FOR RELIEF, Violation of the Texas Uniform Trade Secret Act, Texas Civil Practice & Remedies Code Annotated §§ 134A.001 – 134A.008; FOURTH COUNTERCLAIM FOR RELIEF, Tortious Interference with Contract Under Texas Common Law, relating to Pierce's employment contract with JELD-WEN; FIFTH COUNTERCLAIM FOR RELIEF, Tortious Interference with Contract Under Texas Common Law, relating to Ambruz's employment contract with JELD-WEN; SIXTH COUNTERCLAIM FOR RELIEF, Breach of the Implied Covenant of Good Faith and Fair Dealing Under Delaware Law; and SEVENTH COUNTERCLAIM FOR RELIEF, Breach of Contract. ECF No. 106 (Under Seal) ¶¶ 41-78. On May 17, 2017, the Court granted JELD-WEN's request, and JELD-

8

WEN filed the counterclaims. Counterclaims (ECF No. 252) (Under Seal).

Two other aspects of the Counterclaims are relevant here. First, the Fourth and Fifth Counterclaims were based on Steves causing Pierce and Ambruz, respectively, to breach their employment contracts with JELD-WEN by "providing trade secrets and confidential information to Steves." Id. ¶¶ 62, 68 (emphasis added). Second, JELD-WEN requested multiple types of relief for the First, Second, and Third Counterclaims. It primarily requested damages for its actual loss as a result of the trade secrets misappropriation, as well as Steves' unjust enrichment that was not accounted for in JELD-WEN's actual loss. Alternatively, JELD-WEN sought damages reflecting a reasonable royalty for Steves' past use of the misappropriated trade secrets. In addition, JELD-WEN sought an order: (1) enjoining Steves from acquiring any further trade secrets or confidential information from JELD-WEN and from using such trade secrets; and (2) requiring Steves to search its records and destroy any of JELD-WEN's trade secrets or confidential information. Alternatively, JELD-WEN requested an injunction requiring Steves to pay a reasonable royalty for every future use of the trade secrets. Id. at 47-49.

At the same time that it allowed JELD-WEN to add the Counterclaims, the Court also ordered that those claims be tried

separately from the antitrust and contract claims. ECF Nos. 239-240. Trial for the antitrust and contract claims began on January 29, 2018, and the jury returned a verdict in Steves' favor on all counts on February 15, 2018. ECF No. 1022. That verdict is not relevant to the Court's decision on Steves' summary judgment motion.

On June 19, 2017, Steves moved to dismiss the Second, Sixth, and Seventh Counterclaims for failure to state a claim. The Court granted the motion on September 13, 2017, dismissing those counterclaims with prejudice. ECF Nos. 353-354.

JELD-WEN then filed an action in Texas state court, alleging several trade secrets and related claims against the Steves Brothers and Pierce based on the same underlying facts as the Counterclaims. Shortly thereafter, JELD-WEN moved to voluntarily dismiss the Counterclaims, but the Court denied the motion, concluding that the trade secrets litigation had advanced to a stage where dismissal would prejudice the parties and that JELD-WEN's sole explanation for voluntary dismissal was lacking. ECF Nos. 579, 734.[6] The Court then granted motions by the Steves Brothers and Pierce to intervene as counter-defendants in this action. As a result, the Steves Brothers are

_____

[6] The Texas action has been stayed. This case is currently set for trial on April 30, 2018, but Steves has moved to continue the trial until July.

now counter-defendants to the First, Third, Fourth, and Fifth Counterclaims, and Pierce is a counter-defendant to the First and Third Counterclaims. ECF Nos. 832-833. However, those parties' status as co-defendants to Steves is immaterial here.

On April 19, 2017, the Court ordered JELD-WEN to list the misappropriated trade secrets to be presented at trial and to identify the witnesses who would prove that they were trade secrets. ECF No. 143. JELD-WEN responded by filing a statement of misappropriated trade secrets on April 26, 2017. ECF No. 185 (Under Seal). After Steves raised concerns about the vagueness of the descriptions and the Court noted that the trade secrets needed to be "specifically identified," Aug. 9, 2017 Transcript (ECF No. 350) at 131:17, JELD-WEN served Steves with an updated statement, ECF No. 357-2 (Under Seal). Steves then moved to strike portions of the updated statement that were imprecise, and the Court granted that motion in part on October 6. ECF No. 424. In addition, the Court urged JELD-WEN to "err . . . on the side of making [the statement] so crystal clear and so precise that there can be no room for contention that you are being vague and leaving the door open." Oct. 3, 2017 Transcript (ECF No. 420) (Under Seal) at 22:6-8. Following those instructions, JELD-WEN filed an amended statement of misappropriated trade secrets on October 9 ("the Amended Statement"). ECF No. 428 (Under Seal). The Amended Statement contained a number of rows

11

of trade secrets, but some rows contained more than one paragraph of information.

Steves relied on the Amended Statement to conduct its subsequent Rule 30(b)(6) depositions of JELD-WEN through JELD-WEN's two corporate designees, Reed and Brooks Mallard ("Mallard"). During those depositions, Steves' counsel asked the witnesses whether they understood certain rows to contain a single combination trade secret or multiple trade secrets. Testifying about different rows in the Amended Statement, Reed and Mallard both responded that JELD-WEN considers each individual item in the row to be confidential and a trade secret, and that the cumulative information in the whole row is also confidential and a trade secret. SUF ¶¶ 10-11; SUF Response ¶¶ 10-11. Reed also explained, though, that JELD-WEN does not keep a list of trade secrets, considers all its information confidential, and does not separate that information into items or groups. SUF ¶ 10; SUF Response ¶ 10.

JELD-WEN then filed an updated statement of misappropriated trade secrets to be asserted at trial on November 2 ("the Trial Statement"). ECF No. 468 (Under Seal). Shortly thereafter, JELD-WEN moved for leave to add several trade secrets to the Trial Statement based on the declarations of two individuals, including JELD-WEN's industry expert and former employee James Morrison ("Morrison"), that they had discovered additional

misappropriated trade secrets and confidential information while reviewing documents produced by Steves. The trade secrets described by Morrison related to sales data from internal JELD-WEN documents that he viewed during his employment—which were reflected in Ambruz's Feasibility Study for Steves—and formulas Morrison created while working for JELD-WEN. ECF No. 511-2 (Under Seal). After the Court granted the motion, JELD-WEN filed its amended statement of misappropriated trade secrets for trial ("the Amended Trial Statement") on November 29. ECF No. 588 (Under Seal).

During Morrison's subsequent deposition, Steves' counsel questioned him about the trade secrets that were added in the Amended Trial Statement. As to the sales data information, Morrison could not identify specific data that he had seen in internal JELD-WEN documents as an employee, but stated that he had seen sales data in a number of databases to which he and Ambruz had access, and that the data in the Feasibility Study was "generally reflective" of JELD-WEN's data. SUF ¶ 18; SUF Response ¶¶ 17-19. He added that he did not need to research this recollection further because he was knew from his employment the number of shipments that customers were receiving. SUF Response ¶¶ 17-19.

Morrison also testified about the information in the Amended Trial Statement, having been retained by JELD-WEN to

13

express his expert opinion on whether that information was confidential, protected, and valuable to JELD-WEN. Id. ¶ 23; SUF ¶ 25. When asked whether certain information was a single trade secret, Morrison said that it was a trade secret "[s]eparately and in combination." SUF ¶ 22. Morrison evaded answering that line of questioning by responding that JELD-WEN had not retained him to give an opinion on whether particular information constituted a trade secret. SUF Response ¶¶ 21-22.[7] Morrison then numbered the rows in the Amended Trial Statement, showing that the document contained 28 rows of trade secrets. Id. ¶¶ 24, 26; see also Morrison Annotated Trial Statement (ECF No. 884-6) (Under Seal).

After expert discovery was completed, Steves moved for summary judgment on January 24, 2018. ECF No. 885. JELD-WEN filed its opposition on February 14. ECF No. 1005. Then, soon after the jury returned the verdict in Steves' favor on its antitrust and contract claims, Steves' counsel indicated that it would seek to amend its motion to incorporate relevant aspects of that verdict, and the parties agreed to have Steves move for

---

[7] JELD-WEN's lay witnesses also avoided similar questions upon instruction from JELD-WEN's counsel that witnesses (lay or expert) could not opine whether something was or was not a trade secret. Although that is correct, it is irrelevant. The witnesses were required to respond to whether they were testifying about a single alleged trade secret or an alleged combination trade secret.

leave to amend pursuant to an expedited briefing schedule. Feb. 20, 2018 Transcript (ECF No. 1039) at 13:14-18:16. However, Steves' counsel notified the Court the next day that it would not move for leave to amend. As a result, Steves filed its reply as scheduled on March 5, 2018. ECF No. 1124. JELD-WEN then moved to strike certain arguments in Steves' reply that pertained to the verdict and damages for JELD-WEN's tortious interference counterclaims—neither issue having been addressed in Steves' opening brief—and the Court granted the motion. ECF No. 1207.

Finally, on March 15, after JELD-WEN's counsel advised that JELD-WEN would not assert but one combination trade secret, the Court instructed JELD-WEN to submit an updated statement of trade secrets to be asserted at trial that delineated each trade secret and explained the source of the trade secret in more detail than in the Amended Trial Statement. In response, JELD-WEN filed an updated statement ("the Second Amended Trial Statement") on March 21, 2018. ECF No. 1218 (Under Seal). That statement removed generalized information from several rows in the Amended Trial Statement and also removed entirely the information constituting several trade secrets.

At oral argument, Steves again expressed concern about the specificity of certain trade secrets in the Second Amended Trial Statement and Steves' inability to examine the information therein as part of its summary judgment motion. During oral

argument, JELD-WEN's counsel confirmed that it would pursue at trial only one combination trade secret. The Court permitted Steves to move separately for sanctions under Fed. R. Civ. P. 37 based on JELD-WEN's purported failure to comply with the Court's earlier orders to define the trade secrets with specificity. The Court also allowed Steves to seek a continuance of the trial given JELD-WEN's modifications in the Second Amended Trial Statement. See ECF No. 1290.

## DISCUSSION

### I.   Legal Standard

Under Fed. R. Civ. P. 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). For a court to enter summary judgment, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Id. at 323 (internal quotations omitted).

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017). To successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). However, "'[c]onclusory or speculative allegations do not suffice' to oppose a properly supported motion for summary judgment, 'nor does a mere scintilla of evidence.'" Matherly v. Andrews, 859 F.3d 264, 280 (4th Cir. 2017) (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)). "Where . . . the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## II. First and Third Counterclaims

Steves seeks summary judgment on the First and Third Counterclaims on two grounds. First, it contends that JELD-WEN cannot satisfy all the elements of a trade secrets misappropriation claim under the federal Defend Trade Secrets Act ("DTSA") or the Texas Uniform Trade Secrets Act ("TUTSA"),

because JELD-WEN's inadequate description of the trade secrets in the Amended Trial Statement means that it cannot establish the existence of any trade secrets. Second, Steves asserts that JELD-WEN's DTSA and TUTSA damages claims must fail because the report and testimony of JELD-WEN's damages expert, John Jarosz ("Jarosz") reflect that the damages asserted are speculative and inconsistent with JELD-WEN's allegations and Steves' conduct.[8] As noted, the damages arguments will be addressed in a separate opinion when all those issues have been fully briefed.

Under the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action [for damages or injunctive relief] . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1), (3)(A)-(B). Thus, to prevail on that claim, a plaintiff must establish that: "(1) it owns a trade secret; (2) the trade secret was misappropriated; and (3) the trade secret implicates interstate or foreign commerce." Space Sys./Loral, LLC v. Orbital ATK, Inc., No. 417CV00025RAJLRL, 2018 WL 701280, at *5 (E.D. Va. Feb. 2, 2018). And, of course, the plaintiff must prove damages. A trade secret is defined by the DTSA to mean

_____

[8] Steves also argued that the verdict in the antitrust trial contradicted the assumptions underlying Jarosz's damages calculations, Steves Reply at 19-25, but those arguments have been stricken, see ECF No. 1207.

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, . . . if—

> (A) the owner thereof has taken reasonable measures to keep such information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). Misappropriation is defined as "acquisition," "disclosure[,] or use" of a trade secret under certain circumstances. Id. § 1839(5).

The TUTSA similarly allows a plaintiff "to recover damages for misappropriation" "[i]n addition to or in lieu of injunctive relief." Tex. Civ. Prac. & Rem. Code § 134A.004(a). The statute's definitions of trade secret and misappropriation are nearly identical to their DTSA counterparts. See id. § 134A.002(3), (6). In effect, then, a DTSA and TUTSA claim require the same elements, except the latter need not involve any trade secrets that implicate interstate or foreign commerce.

Steves acknowledges that JELD-WEN has presented evidence creating a genuine dispute about whether Steves misappropriated any trade secrets. It also appears to concede that the trade

19

secrets relate to interstate or foreign commerce. Indeed, it must do so, as the trade secrets concern the manufacture of doorskins that were, according to Steves' Complaint, sold in interstate commerce. Compl. ¶ 31. As a result, Steves is only contesting the existence of trade secrets that JELD-WEN owns.

## A. Specific Description of Trade Secrets

Because the DTSA and TUTSA definitions of "trade secret" comprise multiple elements, it is necessary to clarify the nature of Steves' challenge. In this motion, Steves does not discuss whether JELD-WEN "has taken reasonable measures to keep [the] information [in its Amended Trial Statement] secret," 18 U.S.C. § 1839(3)(A), Tex. Civ. Prac. & Rem. Code § 134A.002(6)(A), so the Court need not address whether JELD-WEN has produced evidence that could satisfy that element. Steves has argued in this motion that information was not generally known or not readily ascertainable by other means, giving that information independent economic value. But, that argument is not addressed in detail. See 18 U.S.C. § 1839(3)(B); Tex. Civ. Prac. & Rem. Code § 134A.002(6)(B).

Instead, the core of Steves' argument is that JELD-WEN has not identified its trade secrets with enough specificity, such that Steves cannot apply the required elements to the trade secrets claimed. A plaintiff bears the burden of "describ[ing] the subject matter of its alleged trade secrets in sufficient

detail to establish each element of a trade secret." <u>Trandes Corp. v. Guy F. Atkinson Co.</u>, 996 F.2d 655, 661 (4th Cir. 1993). As such, the plaintiff must "'identify, with particularity, each trade secret it claims was misappropriated. This must be done to allow the finder of fact to distinguish that which is legitimately a trade secret from other information that is simply confidential but not a trade secret, or is publicly available information.'" <u>Kancor Ams., Inc. v. ATC Ingredients, Inc.</u>, No. 15-CV00589-GBL-IDD, 2016 WL 740061, at *14 (E.D. Va. Feb. 25, 2016) (quoting <u>MicroStrategy Inc. v. Bus. Objects, S.A.</u>, 331 F. Supp. 2d 396, 418 (E.D. Va. 2004)); <u>see also BladeRoom Grp. Ltd. v. Facebook, Inc.</u>, No. 5:15-CV-01370-EJD, 2018 WL 514923, at *3 (N.D. Cal. Jan. 23, 2018) ("The plaintiff must 'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" (alteration in original) (quoting <u>Imax Corp. v. Cinema Techs., Inc.</u>, 152 F.3d 1161, 1164-65 (9th Cir. 1998))). To satisfy this requirement, the plaintiff "must do more than produce lists of general information," and its claim may fail for lack of particularity if it "never singles out any particular trade secret, explaining how it created and safeguarded that particular bit of information." <u>PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod., Inc.</u>, No.

21

16 CV 11390, 2017 WL 7795125, at *15 (N.D. Ill. Dec. 9, 2017) (internal quotations omitted).[9]

The annotations by JELD-WEN's industry expert, Morrison, at his deposition indicated that the Amended Trial Statement contained 28 rows of trade secrets. See Morrison Annotated Trial Statement. Steves' industry expert numbered the rows in the same manner in his expert report. See Halton Report (ECF No. 1008-33) ¶¶ 48-198. Steves initially argued—before JELD-WEN filed the Second Amended Trial Statement—that the actual number of trade secrets that JELD-WEN might assert at trial was indecipherable because of statements by Morrison and JELD-WEN's two Rule 30(b)(6) designees at their depositions that JELD-WEN claimed these trade secrets, individually and in combination.

Steves also asserted that the Amended Trial Statement was vague because of how it was structured. Steves highlighted Rows 2 and 3 in support of this contention. Those rows, like many of the subsequent rows in the Amended Trial Statement, had a

---

[9] With one exception, these cases did not specifically concern DTSA or TUTSA claims. However, their statements concerned state statutes codifying the Uniform Trade Secrets Act ("UTSA"). As a result, those laws have almost identical definitions of "trade secret" to the DTSA and the TUTSA, so the logic of those cases applies equally here. See BladeRoom Grp., 2018 WL 514923, at *2 (California UTSA); PrimeSource Bldg., 2017 WL 7795125, at *13 (DTSA and parallel Illinois Trade Secrets Act); Kancor Ams., 2017 WL 740061, at *14 (Virginia UTSA); Trandes, 996 F.2d at 661 (Maryland UTSA).

similar format: a general statement about the trade secrets described in that particular row, followed by two or more sentences or paragraphs claiming specific information as trade secrets. See Morrison Annotated Trial Statement at 3-10 (Rows 4-5, 7-8, 10, 12-14, and 18-19); id. at 10-12 (Rows 21-23, 25-26, 28, and 30, as to financial data). Steves did not, however, describe the flaws of every trade secret, only making general statements about the ambiguity of "[m]any of the rows in the Amended Trial Statement." Steves Br. at 12.

This structure would not, by itself, make summary judgment for lack of specificity appropriate. After all, it is clear that information may be considered a trade secret in isolation or in combination with other information, even if the individual components of a combination trade secret are not identified with enough specificity to constitute trade secrets when read individually. See Decision Insights, Inc. v. Sentia Grp., Inc., 311 F. App'x 586, 593 (4th Cir. 2009); Trandes, 996 F.2d at 661-62. Thus, it might be the case that JELD-WEN grouped particular pieces of information together in the same row because that information constituted a trade secret only when read in conjunction with all the other information in the paragraph. Moreover, if Steves' objection concerns the substance of the information in any of the rows, each row described the trade secret or secrets therein with more specificity than in the

cases cited by Steves. See Trandes, 996 F.2d at 661-62
(plaintiff asserted only that it possessed "secret 'formulas'"
and "refused to provide any information whatsoever about the
formulas" at trial, and, similarly, "presented evidence that the
Tunnel System had both a structure and an organization, but
explained neither how the program was structured nor how it was
organized"); Kancor Ams., 2016 WL 740061, at *14-15 (summary
judgment granted where counter-plaintiff gave "merely conclusory
identification of its alleged trade secrets," such as "[a]ll
target samples obtained by [counter-plaintiff] from its
potential customers," and did not explain what "target sample"
meant); see also PrimeSource Bldg., 2017 WL 7795125, at *15
(plaintiff was unlikely to succeed on merits of its claim where
it "pointed only to general categories of marketing and
budgeting information it assert[ed] amount[ed] to trade
secrets"). Unlike the plaintiffs in those cases, JELD-WEN has
provided a significant amount of detail about its asserted trade
secrets. And, even where the introductory sentence in a row in
the Amended Trial Statement was somewhat generalized, the
subsequent sentences or paragraphs provided the necessary
specificity. For instance, Row 7 stated that JELD-WEN "has
developed processes and know-how for manufacturing refined fiber
in a way that ensures that the resin can properly bond fiber

bundles together," and then described the precise nature of that know-how. Morrison Annotated Trial Statement at 4.

However, the facial ambiguity of the Amended Trial Statement was only compounded, not resolved, by the deposition testimony of relevant JELD-WEN witnesses. For example, asked whether the information in Row 5 constituted several individual trade secrets, one combination trade secret, or both, Reed stated that JELD-WEN considers "[a]ll of the multiple individual items . . . to be confidential," and that JELD-WEN does not specify that "these things are considered individual, these things are considered a group or a cluster." Reed Dep. (ECF No. 884-2) (Under Seal) at 99:5-100:10. In response to the same question about Row 21, however, Mallard said that "while each of these [paragraph] are . . . confidential and a trade secret, it's the . . . compilation of all these together that give[s] the picture, so to speak, that's the real trade secret." Mallard Dep. (ECF No. 884-3) (Under Seal) at 331:9-13. Finally, Morrison testified that he understands JELD-WEN to consider the information in Row 2 a trade secret "[s]eparately and in combination." Pressed for an explanation on what this phrase meant, Morrison responded that he could not testify about the existence of information as a separate or combination trade secret, and noted only that "all of this information is

considered by JELD-WEN to be confidential." Morrison Dep. (ECF No. 884-5) (Under Seal) at 94:18-97:10.

Those explanations confounded the description of the trade secrets in the Amended Trial Statement. As Steves pointed out, Row 2, for instance, could have contained: (1) a single combination trade secret; (2) 12 separate, individual trade secrets (based on the number of sub-paragraphs), which may or may not combine to also form a single combination trade secret; or (3) some third alternative in between those two.[10] Even if one conclusion might have appeared more likely based on the plain language of the Amended Trial Statement, the testimony of JELD-WEN's witnesses made it virtually impossible to tell. Consequently, if JELD-WEN were relying on the Amended Trial Statement, some of its trade secrets might fail for lack of specificity. In sum, as of the date that Steves filed this motion for summary judgment, JELD-WEN had materially obfuscated the identification of the trade secrets to be tried, and this was accomplished deliberately.

---

[10] Steves also contended that certain sub-paragraphs with multiple details in Row 2 could themselves have contained multiple trade secrets. But the Amended Trial Statement clearly indicated that "the plant configuration and capacity for each of its door skin facilities" are each an individual trade secret. Morrison Annotated Trial Statement at 1. The details that JELD-WEN provided about those configurations did not increase the ambiguity of those trade secrets; they only added to the particularity of those secrets.

For that reason the Court ordered JELD-WEN to file the Second Amended Trial Statement which, along with counsel's representation that JELD-WEN will pursue only one combination trade secret, has cured the structural problems obscuring the trade secrets in the Amended Trial Statement. JELD-WEN has separated each trade secret into its own row and identified the source of the trade secret. Furthermore, where the Amended Trial Statement contained numerous rows with multiple paragraphs, the Second Amended Trial Statement contains only a few, in which a general statement about "know-how" or "knowledge" is followed by several sub-paragraphs explaining that know-how or knowledge in detail. See, e.g., Second Amended Trial Statement at 6-8 (Nos. 15, 18). These changes have mostly removed any doubt about whether information constitutes an individual trade secret or a combination trade secret.

The explanations of JELD-WEN's counsel at oral argument further clarified the matter. Steves' counsel contested the specificity of several trade secrets in the Second Amended Trial Statement—15, 18, 22, 23, 62, 63, 66, and 67—on the same grounds it raised with respect to the Amended Trial Statement. Like many of the rows in the Amended Trial Statement, the descriptions for those eight trade secrets consist of a general statement about the category of information in the trade secret, followed by several sub-paragraphs detailing that general description. See

id. at 6-7, No. 15 ("know-how" consisting of six elements); id. at 7-8, No. 18 ("negative know-how" consisting of four elements); id. at 9-10, No. 22 ("unique combination of knowledge" about the interaction of six factors); id. at 10-11, No. 23 ("knowledge" of the need to "regularly monitor and adjust [eight] factors"); id. at 23, No. 62 ("projected costs and return on investment" and associated "negative know-how" for certain processes at JELD-WEN's West Virginia plant); id. at 23-24, No. 63 ("projected costs and return on investment" for certain things at JELD-WEN's Louisiana plant); id. at 25, No. 66 ("projected volumes" of doorskins shipped to third-party customers in certain years); id. at 25-26, No. 67 ("projected percentages" of doorskins shipped to third-party customers in certain years). JELD-WEN's counsel indicated that Nos. 15, 18, 22, 62, 63, 66, and 67 are trade secrets in their "entirety," such that the information therein does not constitute a trade secret if JELD-WEN cannot prove at trial that each sub-paragraph does not meet the statutory elements of a trade secret. Mar. 26, 2018 Transcript (ECF No. 1295) at 70:24-71:5. She also stated that the last trade secret, No. 23, is a combination trade secret, because none of the sub-paragraphs are trade secrets individually but qualify as a trade secret when read as a whole. Id. at 71:8-21. Notwithstanding any ambiguity on the face of the Second Amended Trial Statement, these statements make JELD-WEN's

position clear and thereby enable Steves to defend itself at trial. Therefore, Steves' motion will be denied to the extent that it seeks summary judgment on specificity grounds.

## B. Elements of Specific Trade Secrets

Even if JELD-WEN can identify its trade secrets with particularity, Steves argues that summary judgment should be granted as to some of the trade secrets in the Second Amended Trial Statement because JELD-WEN cannot establish that the information therein constitutes a trade secret.[11] Where a plaintiff has identified specific information that might qualify as a trade secret, whether a trade secret exists is generally "'a fact-intensive question to be resolved at trial.'" Decision Insights, 311 F. App'x at 592 (quoting Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 419 (4th Cir. 1999)); see also Trandes, 996 F.2d at 661 ("The existence of a trade secret is a conclusion of law based upon the applicable facts."); MicroStrategy, 331 F. Supp. 2d at 416 ("The question is whether the facts present . . . serve to elevate . . . information to the status of trade secrets."). However, summary judgment may be

---

[11] Steves' arguments pertained to the Amended Trial Statement, given that the Second Amended Trial Statement was only recently filed, but Steves presumably has the same problems with the latter to the extent that the challenged information is still claimed as a trade secret.

appropriate if JELD-WEN has failed to present enough evidence to satisfy the required elements under the DTSA and the TUTSA.

As noted, the only trade secrets elements that Steves appears to challenge in this motion are (1) whether the information in question was not generally known to, and (2) not readily ascertainable through proper means by, "another person who can obtain economic value from the disclosure or use of the information," such that the information has independent economic value. 18 U.S.C. § 1839(3)(B). The "generally known" requirement refers not to knowledge by the public at large, but rather "to the knowledge of other members of the relevant industry—the persons who can gain economic benefit from the secret." MicroStrategy, 331 F. Supp. 2d at 416. In addition, the "readily ascertainable" requirement asks whether the claimed trade secret can be acquired "through legitimate means. If a competitor could easily discover the information legitimately, the inference is that the information was either essentially 'public' or is of de minimus economic value." Id. at 416-17. The "proper means by which one could learn a trade secret" include "observ[ing] the product on public use or display or . . . review[ing] publicly available literature." Id. at 417; see also A.M. Castle & Co. v. Byrne, 123 F. Supp. 3d 909, 915 (S.D. Tex. 2015) ("Obtaining information by observation, experimentation, or general inquiry is lawful, but information is unlawfully obtained if it is

gained through a breach of confidence." (internal quotations omitted)). "What constitutes readily ascertainable through proper means is heavily fact-dependent and simply boils down to assessing the ease with which a trade secret could have been independently discovered." MicroStrategy, 331 F. Supp. 2d at 417 (emphasis in original).

As an initial matter, it is important to highlight the information to which Steves' arguments do not apply. For instance, Steves makes the sweeping statement that "much of the information in the Amended Trial Statement is generally known or readily ascertainable by proper means" simply because that information was given to Steves by Pierce, an "industry expert." Steves Br. at 16. Even if Pierce is such an expert, however, it is not necessarily true that he acquired the claimed trade secrets from that position, instead of through his employment at JELD-WEN. Moreover, Steves has not identified any information that was "generally known" to industry experts like Pierce, so it has not demonstrated the absence of a genuine dispute about that element. Likewise, Steves' assertions about JELD-WEN's failure to discipline employees who disclosed information to Pierce and JELD-WEN's lack of a written record of its trade secrets are only marginally relevant to whether the information possessed by JELD-WEN constitutes trade secrets. These overbroad contentions do not influence the Court's determination of

whether trade secrets exist, and the Court will focus only on the specific trade secrets attacked by Steves.

Steves points to only three rows from the Amended Trial Statement that purportedly contain information that is generally known or readily ascertainable by proper means. But Steves' assertions are misguided. Two rows are no longer at issue here: (1) Row 29, because JELD-WEN withdrew its claim that the formulas noted in that row constitute a trade secret, see JELD-WEN Opp. (ECF No. 1008) (Under Seal) at 10 n.12; and (2) Row 3, because JELD-WEN no longer claims as a trade secret the list of factors to consider in deciding on "the optimal location of a door skin plant," Morrison Annotated Trial Statement at 2; Second Amended Trial Statement at 4-5. And, as to Row 30—now Nos. 64-67 in the Second Amended Trial Statement—the substance and the source of the sales data highlighted are contested. Steves cites Morrison's testimony to establish that the data is not confidential, reflects something other than what is asserted, and was not found in internal JELD-WEN documents. JELD-WEN, however, notes that Morrison recalled viewing the underlying information in confidential JELD-WEN documents when he worked there.[12] Indeed, the Court allowed JELD-WEN to add Row

_____

[12] Whether that recollection is admissible has not been pressed in this motion.

30 to the Amended Trial Statement based on Morrison's declaration to that effect. See Morrison Decl. (ECF No. 1008-29) ¶ 10. These disagreements are not surprising, given that the secrecy elements of trade secrets are highly fact-dependent. See MicroStrategy, 331 F. Supp. 2d at 416-17. But because JELD-WEN has shown a genuine dispute as to whether the information in those rows is not generally known and readily available through proper means, summary judgment cannot be granted.

## III. Fourth and Fifth Counterclaims

Steves moves for summary judgment on the Fourth and Fifth Counterclaims on the sole basis that those tortious interference with contract claims are preempted by the Third Counterclaim for trade secrets misappropriation under the TUTSA.[13]

The TUTSA generally "displaces conflicting tort, restitutionary, and other law of [Texas] providing civil remedies for misappropriation of a trade secret." Tex. Civ. Prac. & Rem. Code § 134A.007(a). However, the TUTSA does not affect certain claims, including: "(1) contractual remedies, whether or not based upon misappropriation of a trade secret; [or] (2) other civil remedies that are not based upon misappropriation of a trade secret." Id. § 134.007(b).

---

[13] Steves also argued that JELD-WEN has presented insufficient evidence to obtain damages on either claim, Steves Reply at 12-14, but the Court has stricken that argument, see ECF No. 1207.

The parties dispute whether JELD-WEN's tortious interference claims are "based upon misappropriation of a trade secret."[14] Resolving that issue requires the Court to consider "whether the facts relied on to support the [tortious interference] claim[s] differ from those supporting the TUTSA claim." AMID, 241 F. Supp. 3d at 826. Steves contends that all three claims arise from the exact same conduct—the alleged acquisition of trade secrets and confidential information by Pierce and Ambruz, who conveyed the information to Steves. Thus,

---

[14] The Court would not even need to decide this question if JELD-WEN's tortious interference with contract claims can be construed as "contractual remedies" under the TUTSA. See 360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc., No. A-14-CA-00847-SS, 2016 WL 900577, at *7 (W.D. Tex. Mar. 2, 2016) (finding breach of contract and tortious interference with contract claims not preempted under TUTSA preemption provision concerning "contractual remedies," because both claims "depend[ed] on the existence and content of a written agreement"). JELD-WEN has implicitly adopted this assertion by citing 360 Mortgage Group on that point. See JELD-WEN Opp. at 36 n.36. However, 360 Mortgage Group's conclusion on the tortious interference preemption issue appears to be mistaken. Most courts applying the TUTSA or similar statutes to tortious interference claims recognize that tortious interference is a tort claim, not a contract claim—making the question of whether the claim is "based upon the misappropriation of a trade secret" relevant. See, e.g., Downhole Tech. LLC v. Silver Creek Servs. Inc., No. CV H-17-0020, 2017 WL 1536018, at *3 (S.D. Tex. Apr. 27, 2017); AMID, Inc. v. Medic Alert Found. U.S., Inc., 241 F. Supp. 3d 788, 826-27 (S.D. Tex. 2017) (citing cases involving other Uniform Trade Secrets Acts). Moreover, preemption "is not avoided simply because a claim requires different elements of proof than a [TUTSA] claim." AMID, 241 F. Supp. 3d at 826 (internal quotations omitted). Therefore, it is immaterial that JELD-WEN must demonstrate the existence of a contract for its tortious interference claims but not its TUTSA claim.

the tortious interference claims are necessarily based upon the misappropriation of a trade secret, and JELD-WEN is only using those claims as a backstop in case they cannot establish that certain information qualifies as a trade secret. JELD-WEN, on the other hand, asserts that it is premature to resolve the preemption issue at this stage given the parties' disagreement about whether JELD-WEN can establish that any of its information is a trade secret. Furthermore, says JELD-WEN, it has produced evidence that its tortious interference claims rely on Pierce's and Ambruz's disclosure of some confidential information that JELD-WEN does not assert is a trade secret, so those claims are not premised <u>entirely</u> on trade secret misappropriation, as they must be to be preempted.

The scope of the TUTSA is a question of Texas law. Because the TUTSA was so recently enacted, few Texas courts have interpreted the scope of its preemption provision. The only one to have done so in detail, in <u>Super Starr International, LLC v. Fresh Tex Produce, LLC</u>, 531 S.W.3d 829 (Tex. App. 2017),[15] acknowledged that the TUTSA "'was intended to prevent

---

[15] The Court may look to this decision for guidance here because the precise question presented here—whether a tortious interference claim based on the misappropriation of both trade secrets <u>and</u> confidential information is preempted by a TUTSA claim—has not been addressed by the Texas Supreme Court. <u>See</u> <u>Webb v. City of Dallas</u>, 314 F.3d 787, 795 (5th Cir. 2002).

inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret.'" Id. at 843 (quoting Smithfield Ham & Prod. Co. v. Portion Pac, Inc., 905 F. Supp. 346, 348 (E.D. Va. 1995)).[16] As a result, the court found that a distributor's TUTSA claim preempted its separate breach of fiduciary duty claim because the latter was alleged in such a way that the breaches of fiduciary duty could not have occurred "without the use of alleged trade secrets." Id.

The effect of this holding on JELD-WEN's tortious interference claims is unclear. JELD-WEN notes that Super Starr might not apply to this case, where the potentially preempted claims are founded on the use of both trade secrets and confidential information. Indeed, a Texas federal court pointed out that Super Starr "did not conclusively preclude [the] position that a . . . claim based on confidential information is not preempted by TUTSA because the holding was premised on the finding that alleged trade secrets (not merely confidential information) were a necessary component of the facts supporting the breach of fiduciary duty claim." Embarcadero Techs., Inc. v. Redgate Software, Inc., No. 1:17-CV-444-RP, 2018 WL 315753, at

---

[16] Although Smithfield was discussing the preemption provision of the Virginia UTSA ("VUTSA"), that provision is nearly identical to the TUTSA's preemption provision. Compare Va. Code § 59.1-341 with Tex. Civ. Prac. & Rem. Code § 134A.007.

*3 (W.D. Tex. Jan. 5, 2018). JELD-WEN takes this silence to mean that TUTSA preempts only those claims that are based entirely on trade secret misappropriation—that is, claims that could not also be based on confidential information misappropriation.

Super Starr does not itself offer any support for that assertion. Its statement that, "[w]here a claim is based on a misappropriation of a trade secret, then it is preempted by the T[UTSA]" simply repeats the TUTSA's language. See Super Starr, 531 S.W.3d at 843. However, JELD-WEN's reading is consistent with two Texas federal court cases preceding Super Starr, both of which refused to dismiss as preempted certain tort claims, including tortious interference, that relied on the alleged misappropriation of both trade secrets and confidential information. See Downhole Tech., 2017 WL 1536018, at *4 ("[Plaintiff]'s tortious interference claim . . . also alleges the misuse of 'confidential information,' which may or may not include trade secrets."); AMID, 241 F. Supp. 3d at 827 ("[Plaintiff] sought relief on the theory that [defendant] misappropriated information protected as trade secrets, and alternatively under the theory that the misappropriated information was not a trade secret but was confidential.").

Those cases observed, as many have, that it is premature to decide whether an alternative theory of relief is preempted before a plaintiff has shown, or it is not disputed, that the

misappropriated information constituted trade secrets. See AMID, 241 F. Supp. 3d at 826-27 ("'Where courts have found preemption on a motion to dismiss, they repeatedly establish that the information in issue as alleged constitutes trade secrets before reaching the preemption question.'" (quoting Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co., 191 F. Supp. 2d 652, 658-59 (E.D. Va. 2002))); see also AWP, Inc. v. Commonwealth Excavating, Inc., No. 5:13CV031, 2013 WL 3830500, at *7 (W.D. Va. July 24, 2013) (defendant's preemption argument was premature where "although [plaintiff] ha[d] sufficiently alleged the existence of a trade secret, it ha[d] not yet proven its entitlement to relief under the VUTSA"); Stone Castle Fin., 191 F. Supp. 2d at 659 ("[U]nless it can be clearly discerned that the information in question constitutes a trade secret, the [c]ourt cannot dismiss alternative theories of relief as preempted by the VUTSA."); Thomas & Betts Corp. v. Panduit Corp., 108 F. Supp. 2d 968, 972 (N.D. Ill. 2000) (breach of fiduciary duty claim was preempted where "[t]he evidence [wa]s substantial that the confidential sales data and related information that [defendant] allegedly took from [plaintiff] constitute[d] trade secrets"). Furthermore, this Court has read the VUTSA's preemption provision in the same way, finding that "conjunctive" allegations about misuse of "confidential information and trade secrets" precluded preemption because they

"reveal[ed] that [plaintiff]'s claims [we]re not solely predicated on the misappropriation of trade secrets." E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 688 F. Supp. 2d 443, 453 (E.D. Va. 2009) (emphasis in original).

If that logic can be applied here, then summary judgment would be improper, because JELD-WEN has presented enough evidence to create a genuine dispute of material fact about Steves' misappropriation of JELD-WEN's confidential information in addition to its trade secrets. JELD-WEN clearly alleged that Steves' actions caused Pierce and Ambruz to breach their employment contracts with JELD-WEN by "providing trade secrets and confidential information to Steves." Counterclaims ¶¶ 62, 68 (emphasis added). And, contrary to what Steves asserts, JELD-WEN cites multiple pieces of evidence that establish that Pierce and Ambruz may have misappropriated confidential information that JELD-WEN does not consider a trade secret. See ECF Nos. 1008-6 (Under Seal), 1008-31 (Under Seal). Moreover, even if JELD-WEN had not cited that evidence, it could still—under the cases discussed above—use confidential information that is also asserted as a trade secret to show tortious interference if it cannot establish at trial that such information constitutes a trade secret. Although those cases concerned preemption on motions to dismiss, their common principle still applies at the summary judgment stage, given that there are genuine disputes

about the categorization of the misappropriated information at issue here. Dismissing JELD-WEN's tortious interference claims on preemption grounds would reward Steves for asserting inconsistently that JELD-WEN's alleged trade secrets are <u>not</u> trade secrets for purposes of deciding the TUTSA claim, but <u>are</u> trade secrets for purposes of deciding the tortious interference claims. That result makes little sense.

Nonetheless, a closer examination of Super Starr shows that the TUTSA's preemption provision should not be read so narrowly. Even though Super Starr found the breach of fiduciary duty claim at issue was preempted because the claim necessarily depended on "the use of alleged trade secrets," the misappropriated information underlying that claim was alleged to be "<u>confidential</u> and proprietary information." 531 S.W.3d at 843 (emphasis added). Consequently, notwithstanding its specific reference to trade secrets, Super Starr is properly understood as requiring preemption both where a tort claim depends on the misappropriation of trade secrets alone, and where such a claim is dependent on the misappropriation of either trade secrets or confidential information.

Indeed, Embarcadero Technologies has read Super Starr in precisely that way, finding that "TUTSA's preemption provision encompasses all claims based on the alleged improper taking of confidential business information." Embarcadero Techs., 2018 WL

315753, at *3. Concluding otherwise would frustrate the underlying purpose of the TUTSA's preemption provision to preclude "'inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret.'" Id. (quoting Super Starr, 531 S.W.3d at 843). Moreover, "'[m]ost courts considering this question have determined [that the] UTSA was intended to preempt all claims based upon the unauthorized use of information,'" whether or not that information constitutes a trade secret. Id. (quoting 360 Mortg. Grp., 2016 WL 900577, at *8); see also New S. Equip. Mats, LLC v. Keener, 989 F. Supp. 2d 522, 534 (S.D. Miss. 2013) ("Most of the courts that have considered this issue hold that UTSA preemption extends to claims for the misappropriation of confidential or proprietary information that does not qualify as trade secrets."); Mattel, Inc. v. MGA Entm't, Inc., 782 F. Supp. 2d 911, 987 (C.D. Cal. 2011) ("[T]he . . . UTSA supersedes claims based on the misappropriation of confidential information, whether or not that information meets the statutory definition of a trade secret."); Ethypharm S.A. France v. Bentley Pharm., Inc., 388 F. Supp. 2d 426, 433 (D. Del. 2005) ("Because all claims stemming from the same acts as the alleged misappropriation are intended to be displaced, a claim can be displaced even if the information at issue is not a trade

41

secret. Thus, a determination of whether the information at issue constitutes a trade secret . . . need not be addressed prior to making a determination of displacement."); <u>Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.</u>, 270 F. Supp. 2d 943, 948-49 (W.D. Mich. 2003) ("[T]he disputed status of information as a trade secret does not preclude a court from determining whether a claim or claims are displaced by the [Michigan] UTSA."). This approach is the majority one. <u>See Embarcadero Techs.</u>, 2018 WL 315753, at *3 (citing Richard F. Dole, Jr., <u>Preemption of Other State Law by the Uniform Trade Secrets Act</u>, 17 **SMU Sci. & Tech. L. Rev**. 95, 109 (2014)).

Here, just like the plaintiff in <u>Embarcadero Technologies</u>, JELD-WEN wants "to have a TUTSA claim for all of [its] information taken by [Steves] that qualifies as a trade secret and a [tortious interference] claim for all of the information taken by [Steves] that does not qualify as a trade secret." <u>Id.</u> But JELD-WEN cannot escape the fact that its tortious interference claims are based on exactly the same conduct as its TUTSA claim—namely, Steves' inducement of Pierce and Ambruz to acquire confidential information from JELD-WEN employees and give it to Steves for use in the MDS Project. The tortious interference claims might not be preempted if they also relied on some other factual predicate besides the taking of confidential information. <u>See, e.g.</u>, <u>Kolon Indus.</u>, 688 F. Supp.

2d at 453 (complaint alleged facts that did not involve misappropriation but could establish tortious interference, such as defendant sending representatives to recruit plaintiff's employee to commit tortious acts); Smithfield, 905 F. Supp. at 349 (even "without considering misappropriation allegations," defendant's "exploitation of [plaintiff's] knowledge through the direct solicitation of [a third party] might still constitute tortious interference with contractual relations"). JELD-WEN has not, however, presented evidence of any other non-misappropriation basis for its tortious interference claims.

JELD-WEN's attempts to reconcile the cases it cites with the contrary conclusion in Embarcadero Technologies are unavailing. Although Downhole Technology and AMID suggest that the TUTSA preemption provision should not be applied to dismiss claims prematurely, those courts lacked the guidance of Texas courts in how to interpret that provision. In contrast, Embarcadero Technologies could rely on Super Starr to determine the proper breadth of the preemption provision, so that recent case is far more persuasive here. Likewise, although JELD-WEN insists that the Court must reach the same result here as it did in Kolon Industries, the Court specifically noted in that case that it was discussing "the prevailing . . . interpretation of the VUTSA in the Eastern District of Virginia." 688 F. Supp. 2d at 452 (emphasis added). That analysis would certainly be

helpful in interpreting the analogous TUTSA provision if no Texas courts had spoken on the issue. But those courts have not read the TUTSA to allow dismissal on the basis of preemption only if a claim is "solely predicated on the misappropriation of trade secrets." Id. at 453. The Court's reading of a statute from one state cannot be applied to overcome a different interpretation of another state's statute by the courts in that state, no matter the similarity between those statutes. As a result, considering the TUTSA preemption provision in the broad manner suggested by Super Starr and Embarcadero Technologies, JELD-WEN's tortious interference claims will be dismissed on preemption grounds.

**CONCLUSION**

For the foregoing reasons, PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR SUMMARY JUDGMENT ON JELD-WEN COUNTERCLAIMS (ECF No. 885) was granted as to the Fourth and Fifth Counterclaims and denied as to the First and Third Counterclaims, except to the extent that the motion concerned JELD-WEN's damages claims for trade secret misappropriation, which will be addressed in a separate opinion.

It is so ORDERED.

                       /s/ _____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April 16, 2018