
**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

STEVES AND SONS, INC.,

     Plaintiff,

v.                         Civil Action No. 3:16-cv-545

JELD-WEN, INC.,           **PUBLIC REDACTED VERSION**

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR SUMMARY JUDGMENT ON JELD-WEN COUNTERCLAIMS (ECF No. 885), to the extent that Steves and Sons, Inc. ("Steves") seeks summary judgment on JELD-WEN, Inc.'s ("JELD-WEN") federal and Texas trade secret misappropriation damages claims. The motion was denied as to those arguments made by Steves in its original briefing, but the Court ordered supplemental briefing as to Steves' request for summary judgment on the basis that JELD-WEN's damages expert failed to apportion damages between specific trade secrets. See ECF No. 1290. For the reasons set forth below, the motion was also denied on the grounds raised in the supplemental briefs. See ECF No. 1536.

## BACKGROUND

The background underlying this dispute is described at length in the Court's recent opinion concerning summary judgment

on other aspects of JELD-WEN's counterclaims. See Summary Judgment Op. (ECF No. 1424) at 2-16. However, some additional procedural details are relevant to this motion.

JELD-WEN retained a damages expert, John Jarosz ("Jarosz"), in connection with its counterclaims. JELD-WEN served Jaros'z opening report ("the Jarosz Report") on November 3, 2017. See ECF No. 1124-2 (Under Seal). The Report's calculations were based on JELD-WEN's then-operative statement of trade secrets to be asserted at trial, id. at 62 n.310, which had been filed on November 2, Summary Judgment Op. at 12. On November 29, JELD-WEN filed an amended statement of trade secrets to be asserted at trial ("the Amended Trial Statement"), which added two rows of information. Id. at 12-13. On December 22, JELD-WEN served Jarosz's rebuttal report ("the Jarosz Rebuttal Report"), which responded to the opinions expressed by Steves' damages expert, Michael Wallace ("Wallace"). See Jarosz Rebuttal Report (ECF No. 1124-3) (Under Seal). The Rebuttal Report relied on the information contained in the Amended Trial Statement.[1] Id. ¶ 13 n.10. Jarosz was then deposed about the substance of his reports on January 12, 2018, while the Amended Trial Statement was still in effect. Jarosz Dep. (ECF No. 884-18) (Under Seal) at 1.

---

[1] Jarosz's conclusions in the Rebuttal Report do not appear to have been affected much, if at all, by the additions in the Amended Trial Statement.

2

On March 21, 2018, in response to the Court's order, JELD-WEN filed an updated statement of trade secrets to be asserted at trial ("the Second Amended Trial Statement"), which separated the rows of information from the Amended Trial Statement into sixty-seven individual trade secrets. Summary Judgment Op. at 15. A redlined version of the Second Amended Trial Statement, provided by JELD-WEN at the Court's request, showed that information constituting approximately sixteen trade secrets that were in the Amended Trial Statement had been removed in the Second Amended Trial Statement.[2] See ECF No. 1304-3 (Under Seal). As a result, the trade secrets for which JELD-WEN will seek damages at trial are different than those underlying Jarosz's reports and testimony.

**DISCUSSION**

**I.   Legal Standard**

Under Fed. R. Civ. P. 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as

---

[2] One trade secret (which was one of the rows added in the Amended Trial Statement) had already been removed by JELD-WEN before it filed the Second Amended Trial Statement, see ECF No. 1081 (Under Seal), but the other fifteen had not. The exact number of trade secrets removed is hard to discern given the different organization of the Amended Trial Statement and the Second Amended Trial Statement, but the Court accepts the explanations provided in Steves' analysis of the redlined version of the Second Amended Trial Statement. See ECF No. 1304-4 (Under Seal). In any event, the number of removed trade secrets is not crucial to the Court's decision as to summary judgment on the damages claims.

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). For a court to enter summary judgment, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Id. at 323 (internal quotations omitted).

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017). To successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). However, "'[c]onclusory or speculative allegations do not suffice' to oppose a properly supported motion for summary judgment, 'nor does a mere scintilla of evidence.'" Matherly v.

4

_Andrews_, 859 F.3d 264, 280 (4th Cir. 2017) (quoting _Thompson v._
_Potomac Elec. Power Co._, 312 F.3d 645, 649 (4th Cir. 2002)).
"Where . . . the record taken as a whole could not lead a
rational trier of fact to find for the non-moving party,
disposition by summary judgment is appropriate." _United States_
_v. Lee_, 943 F.2d 366, 368 (4th Cir. 1991).

## II. Damages Claims for Trade Secret Misappropriation

Steves seeks summary judgment on JELD-WEN's damages claims
under the federal Defend Trade Secrets Act ("DTSA") and the
Texas Uniform Trade Secrets Act ("TUTSA") for two primary
reasons. First, Steves asserts that Jarosz's damages scenarios
are speculative and inconsistent with JELD-WEN's allegations and
Steves' conduct. Second, Steves contends that the removal of
numerous trade secrets in the Second Amended Trial Statement
makes Jarosz's calculations unreliable because he valued damages
collectively instead of allocating them between specific trade
secrets.[3]

### A. Legal Standard and Background

Damages are available under both the DTSA and the TUTSA.
The DTSA permits a plaintiff to seek damages: (1) "for actual
loss caused by the misappropriation," and (2) "for any unjust

---

[3] Steves also argued that the verdict in the antitrust trial
contradicted the assumptions underlying Jarosz's calculations,
Steves Reply (ECF No. 1124) (Under Seal) at 19-25, but that
argument has been stricken, see ECF No. 1207.

enrichment caused by the misappropriation . . . that is not addressed in computing damages for actual loss"; or (3) "in lieu of damages measured by [those] methods, the damages . . . measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret." 18 U.S.C. § 1836(b)(3)(B). The same damages are recoverable under the TUTSA. Tex. Civ. Prac. & Rem. Code § 134A.004(a).

As discussed, JELD-WEN initially sought damages for actual loss and/or unjust enrichment, and alternatively sought damages reflecting a reasonable royalty based on Steves' past use of the misappropriated trade secrets. However, Jarosz testified that, although JELD-WEN had suffered some actual loss, he did not have enough information to calculate those losses with a reasonable degree of certainty. Jarosz Dep. at 44:19-45:5. Accordingly, JELD-WEN now seeks damages only for Steves' unjust enrichment or, alternatively, a reasonable royalty based on Steves' use of JELD-WEN's trade secrets.

Because statutes adopting the Uniform Trade Secrets Act ("UTSA") (as the DTSA and the TUTSA do) allow for multiple types of damages that are based on different calculations, "[c]omputing damages in a trade secrets case is not cut and dry." Am. Sales Corp. v. Adventure Travel, Inc., 862 F. Supp.

1476, 1479 (E.D. Va. 1994). The Fourth Circuit has said little about damages in trade secrets cases, noting only that

> [t]here are two basic methods for assessing damages for misappropriation of trade secrets: one, the damages sustained by the victim (the traditional common law remedy), and the other, the profits earned by the wrongdoer by the use of the misappropriated material (an equitable remedy which treats the wrongdoer as trustee ex maleficio for the victim of the wrongdoer's gains from his wrongdoing).

Sperry Rand Corp. v. A-T-O, Inc., 447 F.2d 1387, 1392 (4th Cir. 1971). However, Sperry Rand has been supplanted by the more elastic approach called for by the UTSA, which permits recovery of several types of damages. See Am. Sales, 862 F. Supp. at 1479; Sw. Energy Prod. Co. v. Berry-Helfand, 491 S.W.3d 699, 710-11 (Tex. 2016). This flexibility is not unlimited; one of the leading cases on damages for trade secret misappropriation, University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518 (5th Cir. 1974), recognizes that "[t]he law governing protection of trade secrets essentially is designed to regulate unfair business competition, and is not a substitute for criminal laws against theft or other civil remedies for conversion." Id. at 539. However, University Computing also "stressed that 'each case is controlled by its own peculiar facts and circumstances,' and that courts should remain 'flexible and imaginative'" when determining proper damages. Am. Sales, 862 F. Supp. at 1479

(quoting Univ. Computing, 504 F.2d at 539). For that reason, even where "damages are uncertain, . . . that uncertainty should [not] preclude recovery; the plaintiff should be afforded every opportunity to prove damages once misappropriation is shown"— assuming, of course, that the plaintiff "introduces evidence by which the jury can value the rights the defendant has obtained." Univ. Computing, 504 F.2d at 539, 545.

Consistent with this framework, Jarosz computed damages under three different scenarios. First, Jarosz calculated Steves' gains in the event that it uses the trade secrets to build a doorskin manufacturing plant ("Scenario One"). In that case, Jarosz theorizes, Steves' misappropriation would allow it to "to increase the plant's profitability through a reduction in its per skin costs." See Jarosz Report ¶ 157. This increased profit would result from Steves' possession of trade secrets about important manufacturing components like wood thickness, resin, and primer, which would allow Steves to spend less on each element than it would otherwise. To realize these cost savings without the misappropriation, Steves would need to devote years of research and development to doorskin manufacturing, as JELD-WEN has. See id. ¶¶ 159-65. Using this misappropriated information, a "hypothetical Steves plant" would save about $0.58 per doorskin, leading to between $11.8 million

8

and $13.3 million in increased profits, depending on how quickly such a plant reaches target productivity. See id. ¶¶ 166-71.

Second, Jarosz calculated the benefits that have accrued, and will continue to accrue, to Steves as a result of the misappropriation even if it never builds a plant ("Scenario Two"). Id. ¶ 172. For instance, Steves' actions allowed it "to avoid the expenditures necessary to learn of the feasibility of building a door skin plant" because it had a "comprehensive blueprint" to the doorskin industry, including information about factors like the profitability of certain doorskin sizes and configurations, viable and non-viable activities, input costs by location, and potential vendors. Id. ¶ 173. Similarly, Steves' acquisition of "plant-level cost information [and] plant capacity information" through Pierce may help Steves negotiate lower doorskin prices than it could have based solely on the information it was entitled to under its long-term doorskin supply agreement with JELD-WEN ("the Supply Agreement"). Id. ¶¶ 174-76. This price reduction would allow Steves to save between $10.8 million and $12.7 million over the next ten years, depending on its annual doorskin consumption. See id. ¶¶ 177-78.

Finally, Jarosz determined an appropriate reasonable royalty based on a number of factors applied in the course of a hypothetical negotiation between JELD-WEN and Steves at the time the misappropriation first occurred, in or around March 2015

9

("Scenario Three"). See id. ¶¶ 179-89. Scenario Three considered two possible quantitative methods for calculating the royalty. The first, the incremental benefits approach, determined a royalty based on the benefits to Steves from the misappropriation, whether it builds a doorskin manufacturing plant or not. The benefits were the same gains that Steve would make or has already made under Scenarios One and Two—reduced doorskin manufacturing costs and the ability to more easily assess the feasibility of building a plant or more effectively negotiate with doorskin suppliers, respectively. Valuing those benefits at between $0.12 and $0.58 per doorskin, this first approach leads to a royalty rate of between 2.8% and 13.4% per skin. See id. ¶¶ 191-201. The second, the licensing comparables approach, considered "the terms of actual . . . licenses[] involving similar technology." Id. ¶ 202. Jarosz identified only three comparable licensing agreements in the doorskin context, and several more in other manufacturing settings, all of which were based on future sales or uses of the licensed technology. See id. ¶¶ 203-22. The doorskin licenses suggested a royalty rate of up to 2% net sales, and the other licenses suggested a rate of between 2.5% and 10% of net or gross sales. Id. ¶¶ 223-26. Then, after applying a number of qualitative factors

detailed in <u>Georgia-Pacific Corp. v. U.S. Plywood Corp.</u>, 318 F. Supp. 1116 (S.D.N.Y. 1970),[4] Jarosz settled on a royalty rate of 3%. Applying that rate to Steves' "likely future revenues for 10 years from the start of production [at a hypothetical doorskin manufacturing plant], discounted back to March 2015, amounts to $9.9 million" in reasonable royalty damages, assuming the plant would reach a certain capacity. <u>See</u> Jarosz Report ¶¶ 228-65.

Steves makes several arguments as to JELD-WEN's damages claims. First, it contends that all of Jarosz's scenarios are flawed because they improperly calculate damages based on Steves' <u>future</u> use of the misappropriated trade secrets, instead of Steves' actual, <u>past</u> use of the trade secrets to assess the feasibility of building a doorskin manufacturing plant. Indeed, Steves says, Jarosz and JELD-WEN consciously avoided damages based solely on Steves' actual use because that harm was minimal. Second, Steves claims that JELD-WEN's unjust enrichment damages do not rely on Steves' actual benefits, as those damages must, but instead on gains that Steves might make if it takes

_____

[4] At oral argument on the supplemental briefing, Steves' counsel appeared to argue that the <u>Georgia-Pacific</u> analysis represented a third, independent approach for calculating a reasonable royalty. That is mistaken—Jarosz stated that the incremental benefits and licensing comparable approaches were the only quantitative methods being used to determine a reasonable royalty, whereas the <u>Georgia-Pacific</u> factors provided a purely qualitative framework that helped set the appropriate royalty within the range suggested by those quantitative approaches. <u>See</u> Jarosz Report ¶¶ 190, 228-71.

certain steps in the future. Third, given the need for speculation, Steves believes that Jarosz could not have applied either quantitative method to calculate a royalty rate with reasonable certainty. Fourth, Steves argues that JELD-WEN's current position effectively makes its damages claims duplicative of the injunctive relief that JELD-WEN is also seeking. Finally, its supplemental briefs, Steves contends that it is impossible to determine the amount of damages that JELD-WEN actually suffered because Jarosz's calculations are based on the misappropriation of some information that JELD-WEN no longer claims as trade secrets.

### B. **Nature of Use Underlying Damages Scenarios**

Steves' argument about the basis of Jarosz's damages calculations centers on an apparent inconsistency between Steves' use of the misappropriated trade secrets as alleged in the Counterclaims and the use that supports the damages figures proposed by Jarosz. JELD-WEN stated in the Counterclaims that:

> Steves has planned to use, and will continue to use, JELD-WEN's trade secrets and confidential information <u>to assess whether it is feasible for the company to develop a door skin manufacturing operation</u> in direct competition with JELD-WEN. . . . Steves either has used or may use this information <u>to develop such an operation</u>, and/or <u>to determine whether it wants to make the investment necessary to build a door skin plant itself</u>, or partner with another firm to do so.

Counterclaims (ECF No. 252) (Under Seal) ¶ 39 (emphasis added).
Consistent with these allegations, JELD-WEN sought relief for
its actual loss and unjust enrichment, which would necessarily
be based on Steves' actual misuse of the trade secrets, and a
reasonable royalty for Steves' past use of that information. See
id. at 47.

Steves reads these statements to indicate that Steves' only
possible actual use of the misappropriated trade secrets was to
conduct the Feasibility Study[5] at a cheaper cost than it could
have without the trade secrets. Indeed, as Jarosz stated in his
Report, one of Steves' gains from the trade secret
misappropriation was "avoid[ing] the expenditures necessary to
learn of the feasibility of building a door skin plant." Jarosz
Report ¶ 68. Steves contends, however, that Jarosz's damages
scenarios "flow entirely from projected future activity of
Steves, i.e., uses that have not yet even occurred"—such as
building a doorskin manufacturing plant or negotiating with
doorskin suppliers for lower doorskin prices in reliance on
JELD-WEN's trade secrets. Steves Br. (ECF No. 884) (Under Seal)
at 26. In fact, Jarosz confirmed that his damages figures were
not based on costs saved by Steves in the Feasibility Study. See
Jarosz Dep. at 68:22-69:4 ("I haven't separately quantified the

---

[5] The background of the Feasibility Study is discussed in the
Court's original Summary Judgment Opinion. ECF No. 1424 at 6.

13

cost of that feasibility study. I would expect . . . that it was modestly costly, but I have not put a dollar amount on that."); id. at 69:16-17 ("No, I don't have a number just associated with the feasibility study.").

Steves' argument misstates the scope of JELD-WEN's damages claims and ignores evidence that Steves' actual use of the trade secrets has not been limited to the Feasibility Study. The Counterclaim allegation that Steves quotes clearly states that Steves may have used the trade secrets to assess the feasibility of building a doorskin manufacturing plant and "to develop such an operation." Counterclaims ¶ 39. Therefore, contrary to what Steves asserts, JELD-WEN's theory of misappropriation has always included Steves' use of the trade secrets both to conduct the Feasibility Study and to fulfill other aspects of Steves' doorskin manufacturing project ("the MDS Project"). Steves thus cannot credibly assert that JELD-WEN changed its damages theories on the fly to fit the evidence in the record. Furthermore, even if JELD-WEN had not specifically alleged that Steves' use included steps beyond completing the Feasibility Study, understanding that use in the extremely narrow way that Steves does would be illogical. The evidence is clear that Steves undertook the Feasibility Study because it was interested in building its own doorskin plant as part of the MDS Project. If Steves then actually built that plant, or even if it only

took steps towards doing so, that conduct would necessarily flow directly from the Feasibility Study. From this perspective, Steves' anticipated future use of the trade secrets based on the outcome of the Feasibility Study is part and parcel of the use of the trade secrets to complete that study, so those uses cannot be separated as neatly as Steves would like.

Consequently, and keeping in mind University Computing's instructions about the flexibility of trade secret misappropriation damages, Steves' use of the misappropriated trade secrets should not, for purposes of damages calculations, be limited to the use of the trade secrets to complete the Feasibility Study. That narrow construction might be appropriate if JELD-WEN had presented no evidence from which a jury could conclude that Steves had misused the trade secrets in other ways in furtherance of the MDS Project, or was likely to do so in the future. See Carbo Ceramics, Inc. v. Keefe, 166 F. App'x 714, 724 (5th Cir. 2006) (summary judgment granted because "[t]here [wa]s no sound and reliable evidence from which to derive a dollar value for the alleged trade secrets," such that plaintiff had not "demonstrat[ed] a triable issue of material fact as to actual damages recoverable under its trade secret misappropriation claim"). But JELD-WEN has highlighted evidence showing that Steves has continued to use the trade secrets even after finishing the Feasibility Study, relying on that

15

information to negotiate with potential partners that could help Steves build a manufacturing plant and, less clearly, to gain leverage in its doorskin pricing discussions with JELD-WEN. In addition, to the extent that Jarosz's calculations consider similar future uses of the trade secrets, that approach is justified by the evidence in the record, as discussed below. Accordingly, Jarosz's scenarios do not fail simply because he construes Steves' use of the trade secrets fairly broadly.

### C. Unjust Enrichment

Although the DTSA and the TUTSA permit recovery of unjust enrichment damages, neither statute precisely defines the scope of those damages. See 18 U.S.C. § 1836(b)(3)(B)(i)(II); Tex. Civ. Prac. & Rem. Code § 134A.004(a). Unjust enrichment generally "requires a showing that a plaintiff conferred a benefit on a defendant that the defendant knew about and that allowing the defendant to retain the benefit without payment would be unjust." Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co., 870 F.3d 1262, 1277 (11th Cir. 2017); see also Mowbray v. Avery, 76 S.W.3d 663, 679 (Tex. App. 2002) ("[Unjust enrichment] can be applied where . . . a benefit was wrongfully secured or passively received which would be unconscionable for the receiving party to retain."). Accordingly, in the trade secret misappropriation context, the proper measure of unjust enrichment damages is "the total gains

16

of [a defendant's] wrongdoing." Carter Prods., Inc. v. Colgate-Palmolive Co., 214 F. Supp. 383, 403 (D. Md. 1963); see also Univ. Computing, 504 F.2d at 536 ("[W]here the secret has not been destroyed and where the plaintiff is unable to prove specific injury. . . ., the appropriate measure of damages . . . is not what plaintiff lost, but rather the benefits, profits, or advantages gained by the defendant in the use of the trade secret." (internal quotations omitted)); Am. Sales, 862 F. Supp. at 1479 ("[A]mount of . . . profit . . . would be the real measure of defendant's unjust enrichment."). As a result, unjust enrichment awards can in some sense "serve a legitimate deterrent function," because "a misappropriation claim involves an allegation of theft, and it is not unknown to require a thief to return not only what was stolen, but any additional consequential profits he or she reaped as a result of his or her wrongful actions." Russo v. Ballard Med. Prods., 550 F.3d 1004, 1021 (10th Cir. 2008).

Jarosz's first two scenarios evaluate Steves' gains from JELD-WEN's trade secrets under different circumstances. Scenario One "examin[es] the gains to Steves under the belief that there's some probability that [it] will build a new door skin plant"—specifically, the costs saved per doorskin produced. Jarosz Dep. at 12:3-5; Jarosz Report ¶ 157. Scenario Two, on the other hand, "looks to Steves' potential gains from the use of

17

financial information misappropriated from JELD-WEN"—namely, the costs that Steves avoided having to commit "to understand exactly what is entailed in building a door skin plant and to develop a feasibility analysis," as well as the lower doorskin prices Steves has gained or will gain from its improved negotiating position. Jarosz Dep. at 12:7-10; Jarosz Report ¶¶ 172-74. These scenarios ostensibly reflect unjust enrichment damages because they focus on the benefits to Steves from the misappropriation. Nonetheless, Steves contends that neither scenario identifies any benefit that Steves has <u>actually</u> retained, as they are based only on Steves' speculative gains if certain events occur in the future.

This contention is somewhat persuasive as to Scenario Two. Even though Jarosz did not quantify the costs Steves saved in conducting the Feasibility Study, Scenario Two includes other gains from uses that Steves may have already made of the trade secrets. For instance, Jarosz notes that Steves has used JELD-WEN's financial information to avoid the research and development costs that would normally be necessary to thoroughly understand the requirements for building a doorskin plant, Jarosz Report ¶ 173, and he details those savings in elsewhere in the Report, <u>see</u> <u>id.</u> ¶¶ 122-53. Those avoided costs are appropriately considered as part of JELD-WEN's unjust enrichment damages. <u>See</u> <u>E.I. Dupont De Nemours & Co. v. Kolon Indus., Inc.</u>,

18

No. 3:09CV58, 2011 WL 13079484, at *1 (E.D. Va. June 15, 2011); Sw. Energy Prod., 491 S.W.3d at 711 ("Value to the defendant may be measured by the defendant's actual profits resulting from the use or disclosure of the trade secret . . ., the value a reasonably prudent investor would have paid for the trade secret, or development costs that were saved." (emphasis added) (citing, inter alia, Univ. Computing, 504 F.2d at 536, 538-39)).[6]

However, those present avoided costs appear to be a limited part of Scenario Two, which is primarily based on future activity, like Steves' negotiations with doorskin suppliers. JELD-WEN cites evidence suggesting that Steves recently pursued such negotiations with doorskin suppliers, and that the misappropriated trade secrets may have provided Steves with some "incremental value" in those and likely future negotiations. Russo, 550 F.3d at 1018. If the jury finds that to be the case, it could award JELD-WEN some appropriate percentage of Steves' savings from obtaining lower doorskin prices. See id. (portion of "present value of [defendant]'s expected net profits" from future use of misappropriated information recoverable as unjust enrichment damages); see also Univ. Computing, 504 F.2d at 539 (where defendant earns profits from misappropriation, plaintiff

_____

[6] Jarosz's quantification and consideration of these avoided costs in Scenarios One and Two is discussed in more detail below. See infra Section II.F.1.

can recover "the full total of defendant's profits or some apportioned amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success"). At the same time, the link between the misappropriated financial information and the doorskin pricing negotiations seems dubious at best; it is difficult to judge whether Steves used per-plant input cost information (which it misappropriated, and to which it was not entitled under the Supply Agreement) or other input cost information (to which Steves was entitled) to seek lower prices from JELD-WEN. Similarly, the contention that Steves could use such per-plant information to secure some ambiguous benefit in future negotiations that have not yet occurred is speculative. JELD-WEN's evidence is sufficient to prevent summary judgment because there is a genuine dispute about whether Steves has used and will use financial trade secrets in doorskin negotiations. But, considering the problems noted above, JELD-WEN will need to present compelling evidence of Steves' use at trial to avoid judgment as a matter of law as to Scenario Two damages.

Whether the unjust enrichment damages are impermissibly speculative is also uncertain as to Scenario One. Those damages undoubtedly reflect a benefit to Steves: increased profits for a hypothetical doorskin manufacturing plant, which would be facilitated by "a reduction in [Steves'] per skin costs" from

the trade secrets. Jarosz Report ¶ 157. But, as with Scenario Two, the damages in Scenario One are not clearly connected to Steves' present use or likely future use of the trade secrets. To determine the precise profits that Steves would gain under this scenario, Jarosz assumed a "hypothetical plant," with two lines, twelve openings, two dies per opening, and "a 76-second press cycle, which is the slowest press cycle that [] Ambruz considered in his model of a hypothetical Steves plant." This plant could produce about 16 million doorskins annually, giving Jarosz a base from which to calculate the total annual profits based on the savings per doorskin. He also assumed that this plant would reach its target productivity within two to three years. Id. ¶¶ 167-69.

In a sense, the damages in Scenario One are about as speculative as the future lost profits damages that Steves sought for its antitrust claim against JELD-WEN. Damages based on multiple predictions—like the production capacity of the plant and the operating profits Steves would earn—are not favored in misappropriation cases, as "defendant[s] [are] normally not assessed damages on wholly speculative expectations of profits." Univ. Computing, 504 F.2d at 536. Accordingly, in Carbo Ceramics, the court affirmed a grant of summary judgment on a trade secret misappropriation claim because

21

> [defendant]'s financial predictions, all of
> which serve as the foundation for
> [plaintiff]'s damage theory, are simply too
> speculative. [Plaintiff]'s revenue
> projections and operating profits for
> [defendant]'s business enterprise . . . are
> inadmissible because they are speculative
> projections based on uncertain or changing
> market conditions, or on chancy business
> opportunities, or on promotion of untested
> products or entry into an unknown or
> unviable market, or on the success of a new
> and unproven enterprise.

166 F. App'x at 724 (internal quotations omitted).

This case, however, is distinct because it does not involve untested products, an unknown market, or an unproven enterprise. To the contrary, Steves' hypothetical plant would be modeled on JELD-WEN's own manufacturing plants, which are successful and operate efficiently based on years of development. The time for Steves' plant to reach target productivity also has some basis in the evidence, as several witnesses have testified about that issue. Thus, in comparison to the projections in Carbo Ceramics, Jarosz's calculations are not very speculative, because they simply estimate Steves' expected profits within a business model mostly replicated from JELD-WEN's operations. There is some guesswork involved in deciding whether Steves will be able to build a plant that implements all of JELD-WEN's efficiencies from the trade secrets, but that minor uncertainty does not undermine the other, stronger assumptions on which Scenario One is based. Moreover, JELD-WEN's evidence suggests that Steves has

22

already taken steps to begin developing a manufacturing plant after finishing the Feasibility Study, such as negotiating with potential business partners. A jury could rely on this evidence to conclude that Steves is reasonably likely to actually build a plant, and that it would save certain costs in running that plant because of JELD-WEN's trade secrets. Consequently, JELD-WEN has presented enough evidence to avoid summary judgment on its unjust enrichment claim to the extent that it is based on Scenario One.

### D. Reasonable Royalty

As with unjust enrichment damages, the DTSA and the TUTSA are silent on what qualifies as a "reasonable royalty" for a defendant's use of a misappropriated trade secret. See 18 U.S.C. § 1836(b)(3)(B)(ii); Tex. Civ. Prac. & Rem. Code § 134A.004(a). The Fourth Circuit has also not addressed the issue. Consequently, courts within the Fourth Circuit have turned to University Computing, which "is a leading case on calculating a reasonable royalty." Check 'n Go of Va., Inc. v. Laserre, No. CIV.A.6:04 CV 00050, 2005 WL 1926609, at *5 (W.D. Va. Aug. 9, 2005); see also Am. Sales, 862 F. Supp. at 1479 ("University Computing . . . is especially helpful with damages in determining when to consider certain factors and in defining what a 'reasonable royalty' is.").

As that case explains, "a reasonable royalty is simply that amount which the trier of fact[] estimates a person desiring to use a [trade secret][7] would be willing to pay for its use and a [trade secret] owner desiring to license the [trade secret] would be willing to accept." Univ. Computing, 504 F.2d at 537 n.31. Calculations under this approach imagine a "hypothetical negotiation" between the plaintiff and defendant "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before [misappropriation] began." Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009). "The hypothetical negotiation tries, as best as possible, to recreate the ex ante licensing negotiation scenario and to describe the resulting agreement. In other words, if [misappropriation] had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme." Id. at 1325. The ultimate goal of this theoretical framework is to measure "the actual value of what has been appropriated." Univ. Computing, 504 F.2d at 537 (internal quotations omitted).

---

[7] Given the relatively small number of cases involving trade secret misappropriation damages, University Computing and other courts have looked to patent infringement cases for guidance in assessing reasonable royalty claims. Am. Sales, 862 F. Supp. at 1479. Those cases suggest that the terms "trade secret" and "patent" are interchangeable in this context.

The threshold requirement for obtaining reasonable royalty damages is a showing that the defendant "actually put the trade secret to some commercial use." Id. at 539. "Employing the confidential information in manufacturing, production, research or development, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information, all constitute use." O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 399 F. Supp. 2d 1064, 1072 (N.D. Cal. 2005), amended sub nom. O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 420 F. Supp. 2d 1070 (N.D. Cal. 2006); see also Bishop v. Miller, 412 S.W.3d 758, 775 (Tex. App. 2013) (commercial use includes uses where defendant "seeks to profit from the use of the secret," even if those efforts are unsuccessful (emphasis in original)). Assuming the plaintiff can show such use, to calculate the "fair licensing price" that constitutes the reasonable royalty,

> the trier of fact should consider such factors as the resulting and foreseeable changes in the parties' competitive posture; that prices past purchasers or licensees may have paid; the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; the nature and extent of the use the defendant intended for the secret; and finally whatever other unique factors in the particular case which might have affected the parties' agreement, such as the ready availability of alternative processes.

Univ. Computing, 504 F.2d at 539. These general factors are consistent with the recognition that reasonable royalty damages—like all trade secret misappropriation damages—should "accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use the defendant put the trade secret to after misappropriation." Id. at 538.[8]

Steves' arguments as to Jarosz's reasonable royalty calculations in Scenario Three are unpersuasive. The first—that the reasonable royalty is improperly based on Steves' future use of the trade secrets instead of its actual, past use—has been addressed above, both independently and in the context of unjust enrichment damages. Steves emphasizes that Jarosz's royalty calculations do not focus on "the nature and extent of the use the defendant intended for the secret," as they should, because the Counterclaims allege only that Steves intended to use the trade secrets to conduct the Feasibility Study, and not for anything else. Univ. Computing, 504 F.2d at 539. As discussed, this assertion misreads the Counterclaims' allegations, and disregards evidence that creates a genuine dispute about Steves'

---

[8] Texas courts interpreting reasonable royalty damages available under the TUTSA have applied University Computing in the same way that federal courts have. See Sw. Energy Prod., 491 S.W.3d at 711-12; TMRJ Holdings, Inc. v. Inhance Techs., LLC, --- S.W.3d ---, 2018 WL 326421, at *5-6 (Tex. App. Jan. 9, 2018).

intentions for using the misappropriated trade secrets, as well as the actual uses to which they have put those trade secrets.

Moreover, by focusing on this factor above all others, Steves asks the Court to ignore University Computing's recommendation to take a "flexible and imaginative approach to the problem of damages" and account for a variety of factors. Id. at 538-39. If anything, considering Steves' future uses is even more appropriate for Scenario Three than it is for Scenarios One or Two, since University Computing explicitly states that "the likely future consequences of the misappropriation" should be considered in deciding on the proper measure of reasonable royalty damages. Id. at 538; see also W.L. Gore & Assocs., Inc. v. GI Dynamics, Inc., 872 F. Supp. 2d 883, 893 (D. Ariz. 2012) (denying summary judgment because reasonable royalty calculation accounted in part for future product development but did "not rely on a series of fortuitous coincidences," and because "future risk was priced into the [present] value of the secrets"); TMRJ Holdings, 2018 WL 326421, at *5 (affirming reasonable royalty award that was based on expert testimony that "contemplated the use of the misappropriated technology into the future"). A reasonable royalty is by definition forward-looking because it contemplates a negotiation based on how the licensee will use the licensed information. Accordingly, it is appropriate to "incorporate both

the future earnings of the tortfeasor and the loss of revenue and future worth to the owner in determining the present value of the technology" for royalty purposes. TMRJ Holdings, 2018 WL 326421, at *6. Because the likelihood of Steves' future uses is supported by the evidence and is a clear factor in the reasonable royalty analysis, Scenario Three could properly rely on those potential uses as part of its calculations.

Steves' second assertion, that Jarosz cannot assess the royalty rate with reasonable certainty, is mostly a retread of its first argument. This argument is somewhat misplaced to begin with, because determining a reasonable royalty is "by nature an approximation because [JELD-WEN] did not offer its [trade secrets] for sale" to Steves. Check 'n Go, 2005 WL 1926609, at *4. Both of the quantitative methods used in Scenario Three account for what the parties likely would have focused on during a negotiation at the time the misappropriation began: other comparable licenses; the substantial value of the trade secrets to JELD-WEN, including the development costs it expended to learn those secrets and the measures it took to ensure their secrecy; and Steves' intended uses for the misappropriated information, in connection with both the Feasibility Study and other potential uses, like negotiating with doorskin suppliers or taking steps towards actually building a manufacturing plant. Jarosz Rebuttal Report ¶ 111; see also Univ. Computing, 504 F.2d

at 539. Moreover, Steves is already a close competitor of JELD-WEN in the doors market, and their competition would only increase if Steves eventually began operating its own doorskin plant based on the trade secrets. This "competitive posture" justifies a higher royalty rate than Steves might prefer. Univ. Computing, 504 F.2d at 539. Finally, Jarosz applied a 12% discount rate in recognition of uncertainty about Steves' future use of the trade secrets. Jarosz Rebuttal Report ¶¶ 60-61; see also W.L. Gore & Assocs., 872 F. Supp. 2d at 891 (possibility that product would never be brought to market did not render trade secrets valueless, since "[a] product that would be worth a billion dollars were it to reach the marketplace, but which has only a 20% chance of reaching the marketplace, may still be valued at $200 million by discounting the chance of failure from the present value of a marketable product"). Jarosz and Wallace may disagree about the appropriate discount rate to be applied here, see Jarosz Rebuttal Report ¶ 60, but that dispute does not make summary judgment appropriate.

In addition, that the incremental benefits approach combines the different circumstances underlying Scenarios One and Two does not undermine Jarosz's calculations. Both scenarios are supported by evidence, so Jarosz could calculate unjust enrichment and reasonable royalty damages under each. To the extent that the scenarios are inconsistent, the jury is well

29

equipped to decide which one is more consistent with the evidence that is presented at trial, or to apportion them according to their likelihood of occurrence, as JELD-WEN suggests. Steves contends that Jarosz's failure to disclose this possibility in the Report is a violation of Fed. R. Civ. P. 26(a)(2)(B)(i), but that argument is difficult to follow. That provision requires that expert reports contain "a complete statement of all opinions the witness will express and the basis and reasons for them." But there would be no reason for Jarosz to have indicated in his Report which scenario is more likely, and it would be improper for him to replace the factfinder as the one tasked with doing so. Therefore, Steves' argument fails.

Finally, Steves appears to criticize Jarosz for concluding that a lump-sum reasonable royalty is most appropriate here. See Jarosz Report ¶ 265. A reasonable royalty can be paid out in different ways, including a "lump-sum royalty based on expected sales or a running royalty based on a percentage of actual sales." LinkCo, Inc. v. Fujitsu Ltd., 232 F. Supp. 2d 182, 188 (S.D.N.Y. 2002). However, "the proper form of the royalty is dependent upon what would have been the most likely agreement during the hypothetical negotiation." Id. Evidence of Steves and JELD-WEN's competitive relationship indicates that a lump-sum payment is a possible outcome of their hypothetical negotiations. Jarosz Rebuttal Report ¶ 91 ("'In some

negotiations the two parties . . . are adversaries and do not want to work with each other because of a lack of trust or other issues. This situation would favor a lump sum agreement.'" (quoting Richard Razgaitis, **Valuation and Pricing of Technology-Based Intellectual Property** 297 (2003))); see also InfoSpan, Inc. v. Emirates NBD Bank PJSC, No. SACV111062JVSANX, 2016 WL 8849699, at *13 (C.D. Cal. June 8, 2016) ("[A] one-time arrangement would avoid the necessity of monitoring an ongoing relationship given the evident distrust which had grown up."). Jarosz also identified several comparable licenses that resulted in lump-sum payments. See Jarosz Report ¶ 226. Given these disputes, the jury must decide what the proper payment method for any royalty should be. See LinkCo, 232 F. Supp. 2d at 188.

### E. Effect of JELD-WEN's Request for Injunctive Relief

Steves asserts that the injunctive relief sought by JELD-WEN precludes it from also seeking damages that incorporate any harm from Steves' future uses of the trade secrets. As noted, the primary relief sought by JELD-WEN is damages for Steves' actual use of the trade secrets, as well as injunctive relief to prevent Steves from using the trade secrets in the future. If that injunctive relief is infeasible, JELD-WEN alternatively requests a running royalty for Steves' future uses of the trade secrets. According to Steves, JELD-WEN's stance here completely changes the relief sought, and—besides violating Rule 26(a)(1)—

would allow JELD-WEN to recover damages based on future uses that, if injunctive relief is granted, would never occur. This sort of double recovery, Steves says, is unprecedented.

This argument merely repackages Steves' contentions about the basis of Jarosz's calculations, which the Court has rejected above. The crux of Steves' assertions here is that the unjust enrichment and reasonable royalty damages are both based entirely on future uses of the trade secrets, so they are related to harm that would only occur in the absence of injunctive relief. But, again, this characterization misunderstands the evidence in the record and the scope of JELD-WEN's counterclaims. Significant portions of Jarosz's scenarios are predicated on uses that have already occurred, including Steves' work beyond the Feasibility Study to build a manufacturing plant or investigate the possibility of doing so; its avoidance of expensive research and development costs to learn the doorskin industry; and its possible use of pricing information to negotiate better doorskin prices.[9] All three scenarios consider potential future uses. However, they do so

---

[9] The disconnect between how JELD-WEN has framed its damages theories and what Steves perceives also undermines its challenge based on Rule 26(a)(1). The scope of damages that JELD-WEN is seeking has not changed from its Rule 26(a)(1) disclosures; Steves just understands "past use" in a much narrower way than JELD-WEN does, even though Steves' reading is mostly inconsistent with the evidence.

not as the foundation for their calculations, but rather for the purpose of calculating the present value of the misappropriated trade secrets, which is affected by potential future uses that may or may not occur. Thus, although Jarosz's scenarios "contemplate[] the use of the misappropriated [information] into the future," the resulting damages are "not based on actual future use of the trade secret. Instead, they compensate purely for the misappropriation of the [information], which has a present value based in part on potential for future use, regardless of whether that use c[o]me[s] to fruition." TMRJ Holdings, 2018 WL 326421, at *5-6. As a result, particularly because JELD-WEN "never intended [its trade secrets] to be licensed, sold, or otherwise used by a third party," id., injunctive relief is not duplicative of the damages sought because those two forms of relief will remedy different types of harm here. Thus, the Court will not grant summary judgment on this basis.

### F. Effect of Second Amended Trial Statement

Steves contends as a last resort that Jarosz's damages calculations are now worthless to the jury because the removal of trade secrets in the Second Amended Trial Statement has made JELD-WEN's actual damages impossible to decipher using Jarosz's methods. This argument depends entirely on which trade secrets Jarosz considered in assessing damages, and whether those trade

33

secrets remain in the Second Amended Trial Statement. Accordingly, the Court must examine Jarosz's reports with some scrutiny to decide if summary judgment on these grounds is justified.

Before describing his damages scenarios, Jarosz stated his general understanding that

> there is a "critical mass" to the utility the Trade Secrets provide. While each Trade Secret does provide some value individually, once the user has a sufficient number of Trade Secrets, in aggregate, they provide a significant level of knowledge and know-how to derive meaningful and substantial benefits. In other words, the value of an individual Trade Secret often depends on what the other important variables are, and therefore, awareness of a sufficient number of them provides Steves with that "critical mass" of knowledge and know-how.

Jarosz Report ¶ 74 (footnotes omitted). Steves views this statement as practically dispositive, but it is important to note that Jarosz made this observation in the background section of his Report, and not in reference to any particular unjust enrichment or reasonable royalty calculations.

The Report is vague about which trade secrets support Scenario One. However, context makes clear that those trade secrets relate to manufacturing information that would allow Steves to reduce its per-skin input costs. See id. ¶ 158 ("The Trade Secrets cover, among other things, decreasing the skin thickness without reducing quality, the exact resin content that

should be used, the exact primer volume that should be used, and cost savings from producing primer in-house."); id. ¶¶ 169-70. Moreover, Jarosz clarified that Scenario One "quantifie[s] the gains associated only with the <u>process-oriented</u> Trade Secrets," which "relate to door skin thickness, resin, and primer." Jarosz Rebuttal Report ¶ 118 (emphasis added). Subsequent paragraphs identified the contents of those exact "process-oriented" trade secrets. <u>See</u> <u>id.</u> ¶¶ 119-21; <u>see also</u> <u>id.</u> ¶ 122 ("[M]y analysis does not quantify the gains from other process-oriented Trade Secret information related to wood, resin, and primer. Nor does it quantify the gains from other process-oriented Trade Secret information unrelated to wood, resin, and primer. And it does not quantify the gain from the financial Trade Secrets information."). Given this description, the parties agree that Scenario One relies on four trade secrets, all of which are in the Second Amended Trial Statement: Nos. 24, 26, 27, and 47. <u>See</u> ECF No. 1304-4 at 18-20, 29.

The Report is similarly ambiguous about which trade secrets provide the foundation for Scenario Two. For example, Jarosz stated that "[t]he Trade Secrets provided Steves with a comprehensive blueprint to the door skin business," but cited the entire Amended Trial Statement in support. Jarosz Report ¶ 173 & n.344. Nonetheless, he indicated that the theory depends on "the <u>financial</u> Trade Secret information." Id. ¶ 174

(emphasis added). He used an identical phrase in discussing Scenario Two in the Rebuttal Report, and listed the specific trade secrets in the same way as with Scenario One. See Jarosz Rebuttal Report ¶ 123; id. ¶ 124 ("[M]y analysis does not quantify the gains from other financial Trade Secret information related [to] per skin plant specific costs. Nor does it quantify the gains from other financial Trade Secret information unrelated to per skin plant specific costs. And it does not quantify the gains from the process-oriented Trade Secrets information."). Consequently, the parties agree that Scenario Two relies on twelve trade secrets that remain in the Second Amended Trial Statement: Nos. 36, 37, 38, 44, 45, 46, 47, 48, 49, 50, 51, and 52. See ECF No. 1304-4 at 25-26, 28-30; JELD-WEN Suppl. Opp. (ECF No. 1351) (Under Seal) at 6 & n.2.

As JELD-WEN points out, Jarosz also considered three other trade secrets—Nos. 1, 2, and 3—in calculating Scenario Two. Jarosz noted that Steves could use the misappropriated information, which included per-skin costs (in the trade secrets noted above) and plant-by-plant capacities (in trade secrets Nos. 1-3), to argue that JELD-WEN should allow Steves to purchase doorskins under the Supply Agreement using the per-skin cost of the plant that was producing doorskins most cheaply. Jarosz Report ¶ 176; see also Jarosz Rebuttal Report ¶ 74.

Finally, as to Scenario Three, the incremental benefits approach is derivative of Scenarios One and Two, and Jarosz detailed how that approach depends on the same "process improvements" and "financial Trade Secret information" noted above. Jarosz Report ¶¶ 195, 201. The trade secrets underlying the licensing comparables approach are not apparent from the Report. See id. ¶ 202. However, in the Reply Report, Jarosz stated that the total reasonable royalty calculation (reached after merging the incremental benefits and licensing comparable analyses) is "based on the value of the process-related Trade Secrets that [he] could quantify, the process-related Trade Secrets that [he] was unable to quantify, and financial-related Trade Secrets"—in other words, all (or some significant portion of) the trade secrets. Jarosz Rebuttal Report ¶ 125. He noted that "[a]ssigning economic value to individual secrets in an IP license covering multiple IP assets is extremely difficult" because "a party is typically paying for access to a field of knowledge," not specific IP assets. Id. ¶ 126. As a result, agreements often "treat the terms of the license, including the royalty rate, as constant, even as some of the portfolio of IP expands or contracts over time." This reality was consistent with Jarosz's "critical mass" framework, at least with respect to Scenario Three. Id. ¶¶ 131-32. However, Jarosz also explained that the reasonable royalty can be allocated "between the

37

process-oriented and financial Trade Secret information. Since the gains to Steves related to the process-oriented and financial Trade Secret information is roughly equal, the Reasonable Royalty would be apportioned equally between the two categories." Id. ¶ 133.

### 1. Unjust Enrichment

To the extent that Steves' supplemental briefing touches on the effect of the removal of trade secrets on the viability of Scenarios One and Two, those arguments do not demand significant attention.[10] As noted, Jarosz indicated in his reports that those two theories were based solely on a total of fifteen specific trade secrets, all of which are still part of the case. Even if those underlying trade secrets were not clearly disclosed in the Report, Jarosz clarified any ambiguity in the Rebuttal Report, and Steves' analysis of the redlined Second Amended Trial Statement reflects its understanding of Jarosz's guidance. See generally ECF No. 1304-4 (correctly identifying, with one

_____

[10] JELD-WEN is right that Steves asserted its disaggregation arguments only as to Scenario Three. Nonetheless, Steves' assertions about collective valuation bear on both reasonable royalty and unjust enrichment, and its opening supplemental brief hints at the possibility that Jarosz's failure to allocate damages between trade secrets could affect Scenarios One and Two. See Steves Suppl. Br. (ECF No. 1304) (Under Seal) at 4. Moreover, the supplemental briefing implicates other pertinent aspects of Jarosz's unjust enrichment theories. Accordingly, the Court will address these arguments despite Steves' failure to clearly raise the issue in its briefing.

exception, the trade secrets underlying Scenarios One and Two). Consequently, the filing of the Second Amended Trial Statement has not "left [the jury] without sufficient evidence, or a reasonable basis, to determine [JELD-WEN's] unjust enrichment damages." 02 Micro Int'l, 399 F. Supp. 2d at 1077. Assuming JELD-WEN can establish that all the information underlying Scenarios One and Two is a trade secret and was misappropriated, Jarosz's analysis will allow the jury to determine unjust enrichment damages.

Steves makes two last-ditch attempts to undermine these damages scenarios, but neither is convincing. First, it contends that JELD-WEN has conceded that the information in trade secret Nos. 1, 2, and 3—which Jarosz relies on in part for his Scenario Two calculations—does not, in fact, constitute trade secrets. In support of this assertion, Steves points to a statement by JELD-WEN's counsel at the recent post-trial remedies hearing in the antitrust case about the design capacities of JELD-WEN's doorskin plants. See Apr. 11 Transcript at 328:9-13 ("There [is] design capacity, which is . . . almost a theoretical number of what a plant is capable of doing. That number, we believe, is out in the ethos partially because you have companies . . . like Dieffenbacher who build these lines."). However, Steves ignores the difference between the capacities asserted as trade secrets in Nos. 1 through 3 and the capacities discussed at the remedies

hearing. The remark at the remedies hearing explicitly referred to the general knowledge of design capacities that are "almost a theoretical number of what a plant is capable of doing," id. at 328:9-11 (emphasis added), which is not the same as the "actual capacity that [JELD-WEN's plants] have been running at," id. at 329:19-20 (emphasis added). JELD-WEN's counsel reiterated that the latter was claimed as a trade secret. Accordingly, the statement at the remedies hearing does not operate as a waiver of JELD-WEN's claim to design capacities as trade secrets.

Second, recycling arguments from its original summary judgment briefing, Steves insists that Jarosz did not quantify or rely on Steves' avoided costs for Scenarios One and Two. The Court has already addressed this issue above. See supra Section II.C. However, even considering Steves' contentions here, the Court does not find them any more compelling than it did the first time around. Jarosz's Report explains in detail how the misappropriated trade secrets would allow Steves to avoid certain capital and operating expenditures. With respect to the latter type of expense, Jarosz sought to quantify the savings associated with, for instance, doorskin thickness, resin content and percentage, primer application, and optimal plant inventory. See Jarosz Report ¶¶ 132-51. His calculations in Scenarios One and Two are replete with citations to key developments based on JELD-WEN's research, necessarily implying that Steves avoided

40

the costs it would have otherwise incurred to realize these advances. See, e.g., id. ¶ 160 ("With JELD-WEN's knowledge that door skins ███████████████████████████████ ███████ without compromising quality, Steves can █████████████ ████████████████████████████████████████████ ███████."); id. ¶ 161 ("Through R&D trials, JELD-WEN ███████████ █████████████████████████████████████████. With this knowledge, Steves would achieve ████████████████████ by beginning its production ███████████████████████████ █████████████████████████."); id. ¶ 163 ("[W]ithout knowledge of the target, Steves would likely █████████████████████████ █████████████████████████. . . . Steves would [therefore] be able to start its production at ██████████████ ████████████████████████████████████████."); id. ¶ 173 ("Steves learned the exact profitability of door skin plants of various sizes and configurations, the costs of various inputs by location, which activities have worked and which have not, potential avenues for cost savings, potential vendors, and much more."). JELD-WEN admits that Steves' avoided costs are not identical to the development costs expended by JELD-WEN to discover its trade secrets. Compare id. ¶¶ 79-119 with id. ¶¶ 126-51. Yet Steves cites no cases requiring a perfect correlation between a plaintiff's development costs and a defendant's avoided costs, and Jarosz's calculations can still

be seen as incorporating Steves' unjust gains even if those figures are different. Thus, given the Report's references to avoided costs, Steves is wrong to claim that Jarosz neither quantified nor considered such costs in calculating unjust enrichment damages. Consequently, summary judgment on Scenarios One or Two is not appropriate.

### 2. Reasonable Royalty

Unlike with those two scenarios, Steves says, the removal of trade secrets has a more noticeable impact on Scenario Three. Steves argues that Jarosz's calculations under that theory, whether applying the incremental benefits or licensing comparables approaches, depend on Steves having misappropriated some "critical mass" of trade secrets that provided a certain utility to Steves as an aggregate unit, even if each trade secret lacked significant individual value. See Jarosz Report ¶ 74. However, because some trade secrets have been eliminated in the Second Amended Trial Statement, according to Steves, there is no way to determine with any certainty whether the remaining sixty-seven trade secrets establish the "critical mass" underlying Jarosz's $9.9 million reasonable royalty calculation.

Steves relies almost entirely on two cases, 02 Micro International and E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc., No. 3:09CV58, 2011 WL 4625760 (E.D. Va. Oct.

3, 2011), in support of this argument. In the first, the plaintiff's expert calculated unjust enrichment damages based on the misappropriation of twelve trade secrets, but the jury found that only five trade secrets were misappropriated and awarded unjust enrichment damages for only one trade secret. Considering the expert's aggregate calculations, the court granted judgment as a matter of law because "the jury's award of unjust enrichment damages was based on speculation and guesswork, not on evidence." O2 Micro Int'l, 399 F. Supp. 2d at 1077. Similarly, in Kolon Industries, the plaintiff's damages expert—coincidentally, also Jarosz—had concluded that the unjust enrichment damages for plaintiff's conversion claim would be identical to the same damages for its trade secret misappropriation claim, even if the jury found that certain confidential information did not constitute trade secrets. 2011 WL 4625760, at *9. The Court rejected the underlying premise of Jarosz's approach—that misappropriated information will have the same value whether or not it is a trade secret—because the Court recognized that, "if the jury finds that all, or some of, the information obtained by [defendant] is not a trade secret, then it will necessarily have concluded that, even if the converted information is confidential, it has been stripped of some, or all, of its value as a trade secret." Id. Given this fundamental problem with Jarosz's analysis, the Court granted judgment as a

matter of law because the jury would "simply be guessing" at the proper damages amount for conversion of information that did not qualify as a trade secret. Id.

As an initial matter, it is not certain that Steves' argument even applies to both approaches in Scenario Three. The "critical mass" language that Steves cites prominently appears in the background section of the Report, and not in any of the Report's calculations. Jarosz may have had that idea in the back of his mind as a general proposition, but that would not necessarily make summary judgment appropriate if his detailed description of Scenario Three presented a more concrete reasonable royalty analysis. This contrast is relevant to the incremental benefits approach, which plainly depends on Jarosz's calculations in Scenarios One and Two. For instance, when discussing the "process improvements related to the Trade Secrets" in the context of an incremental benefits analysis, Jarosz stated that "the Trade Secret information will allow Steves to reduce its operating expenses once it enters the business," and cites to the same tab of his Report that calculates Scenario One cost savings. See Jarosz Report ¶¶ 194-94 & n.373 (emphasis added). Likewise, Jarosz used identical language from Scenario Two to describe how "the financial Trade Secret information has given Steves negotiating leverage in dealing with its suppliers." See id. ¶¶ 199-200 (emphasis

44

added). Given these similarities, it is reasonable to infer that Jarosz simply imported Scenarios One and Two into the reasonable royalty context and used the same fifteen trade secrets from those theories to calculate a royalty rate. If this reading is proper, then the incremental benefits approach should survive summary judgment for the same reason as Scenarios One and Two.

However, Jarosz's reports do not lend themselves to such a straightforward interpretation. In the Rebuttal Report, Jarosz—discussing the total reasonable royalty figure reached after combining the incremental benefits and licensing comparables approaches—said that he "quantified the appropriate Reasonable Royalty based on the value of the process-related Trade Secrets that [he] could quantify, the process-related Trade Secrets that [he] was unable to quantify, and financial-related Trade Secrets." Jarosz Rebuttal Report ¶ 125. He did not specify which trade secrets this statement included, and it can be fairly read as including most, if not all, of the trade secrets in the Amended Trial Statement. Several paragraphs later, Jarosz reiterated that his "approach"—again, possibly the licensing comparables approach, the incremental benefits approach, or both—was "consistent with the 'critical mass' analysis" from the Report. Id. ¶ 132. This is the only other reference to a "critical mass" besides in paragraph 74 of the Report, but it renders uncertain the foundation of both approaches in Scenario

45

Three. Even though the incremental benefits approach could be based only on the fifteen trade secrets given the language of the Report, no reasonable reader could be confident in that conclusion after seeing the two paragraphs above in the Rebuttal Report. As a result, the Court will consider the incremental benefits approach in the same light as the licensing comparables approach for purposes of resolving Steves' motion.

Despite this ambiguity, Steves' contentions are unpersuasive. Even assuming that Jarosz considered all or most of the trade secrets in the Amended Trial Statement when conducting the incremental benefits and licensing comparables analyses, the removal of some of the trade secrets does not prevent the jury from determining the applicable reasonable royalty. As Jarosz explained, the exact number of trade secrets was not critical to Scenario Three, as a party paying for an intellectual property license like the theoretical one here "is typically paying for access to a field of knowledge, not knowing which IP assets will be most important." Id. ¶ 126. Thus, the terms of that license would stay fixed even as the IP assets subject to the license change over time. See id. ¶ 131. Using this logic, the removal of trade secrets—which, by virtue of their removal, are presumably of minimal value to JELD-WEN—is unlikely to affect the royalty rate or anything else about the reasonable royalty calculated in Scenario Three.

This uncertainty is not nearly as problematic in the reasonable royalty context as it would be with unjust enrichment damages. Indeed, "[w]hen damages are based upon a reasonable royalty, the calculation 'necessarily involves an element of approximation and uncertainty.'" W.L. Gore & Assocs., 872 F. Supp. 2d at 893 (quoting Unisplay, S.A. v. Am. Elec. Sign Co., 69 F.3d 512, 517 (Fed. Cir. 1995)). Moreover, doubts about particular damages figures should be resolved by the jury, not the Court, as long as Jarosz's reports and testimony gives the jury enough direction. See Univ. Computing, 504 F.2d at 545; W.L. Gore & Assocs., 872 F. Supp. 2d at 892-93. Jarosz has done just that. His reports show that his two reasonable royalty approaches are based on process and financial trade secrets that he could quantify, and are supplemented by process-related information that he could not quantify. See Jarosz Rebuttal Report ¶ 125. In addition, Jarosz even suggested that the reasonable royalty could be apportioned equally between the process and the financial trade secrets, "[s]ince the gains to Steves related to the process-oriented and financial Trade Secret information is roughly equal." Id. ¶ 133. Accordingly, even if JELD-WEN could not show at trial that all of its process-related information constituted trade secrets or was misappropriated, the jury could still apply Scenario Three to

calculate damages if the financial information qualified as trade secrets, or vice versa.

02 Micro International and Kolon Industries do not support a different conclusion. Indeed, in 02 Micro International, the court rejected the exact argument pressed by Steves: that an expert's collective valuation dooms a reasonable royalty estimate if some trade secrets cannot be established at trial. The court noted that the expert had "determined that the parties in a hypothetical negotiation would agree to a $900,000 paid-up reasonable royalty for any one group of trade secrets," apparently including a group that the jury found had been misappropriated. 02 Micro Int'l, 399 F. Supp. 2d at 1077-78. Here, as in that case, the standard with respect to reasonable royalty damages is considerably more lenient,[11] and Steves fails to recognize Jarosz's well-defined process and financial categories as the "groups" they are. Therefore, notwithstanding the removal of trade secrets in the Second Amended Trial Statement, Jarosz has provided an adequate framework to allow

_____

[11] For this reason, the Court's holding in Kolon Industries is also inapposite, as the unjust enrichment damages in that case had to be proved with more certainty than the disputed reasonable royalty damages here.

the jury to calculate an appropriate reasonable royalty at trial, and summary judgment on those grounds will be denied.[12]

## CONCLUSION

For the foregoing reasons, PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR SUMMARY JUDGMENT ON JELD-WEN COUNTERCLAIMS (ECF No. 885) was denied as to those arguments about JELD-WEN's trade secret misappropriation damages claims made by Steves in its original briefing and in its supplemental briefing.

It is so ORDERED.

_____ /s/    REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May _10_, 2018

---

[12] Having declined to grant summary judgment on damages sought under Scenario Three, the Court will not address JELD-WEN's arguments about the independent relevance of the fifty-two trade secrets that Jarosz considered as part of Scenario Three but not as part of Scenarios One and Two.