**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

STEVES AND SONS, INC.,

    Plaintiff,

v.                          Civil Action No. 3:16-cv-545

JELD-WEN, INC.,

    Defendant.


**MEMORANDUM OPINION**

This matter is before the Court on several evidentiary issues that are pertinent to the resolution of PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR EQUITABLE RELIEF (ECF No. 1191).

Before assessing the merits of the various equitable remedies requested by Steves, it is necessary to resolve motions filed by Steves seeking to preclude three categories of evidence to be offered by JELD-WEN. They are: (1) Steves' unclean hands in misappropriating JELD-WEN's trade secrets following the CMI Acquisition; (2) communications or other documents prepared by John Pierce ("Pierce"), a subset of the unclean hands evidence that Steves objected to on hearsay grounds; and (3) the steps that JELD-WEN would take if the Court ordered divestiture of Towanda. Steves objected to the Court's consideration of this evidence either before or at the Remedies Hearing, but the Court

received that evidence provisionally, subject to its potential exclusion after briefing.[1]

## I. Steves' Unclean Hands

Steves seeks to exclude two categories of evidence that relate to JELD-WEN's alleged defense of unclean hands: (1) documents and testimony concerning Steves' misappropriation of JELD-WEN's trade secrets through Pierce and John Ambruz ("Ambruz"); and (2) communications with possible hearsay statements by Pierce. These issues are presented in DEFENDANT JELD-WEN, INC.'S MEMORANDUM IN SUPPORT OF ITS UNCLEAN HANDS DEFENSE (ECF Nos. 1622, 1623) and PLAINTIFF STEVES AND SONS, INC.'S MOTION IN LIMINE REGARDING DX 303, 304, 306, 307, 308, 309, 313, 327, 328, 331, 355, 445, 452, 481, 759, AND 764 (ECF No. 1380).

### A. In General

At trial on the merits of the liability and damages case, the Court relied on Rule 402 to exclude the trade secrets evidence for the purpose of showing that Steves obtained certain

---

[1] Steves also sought to exclude evidence of CMI's financial condition in 2011 under Rule 402, see Apr. 10 Remedies Tr. at 155:10-162:4, 227:10-230:9, and the parties submitted post-hearing briefs on the issue, see DEFENDANT JELD-WEN, INC.'S MEMORANDUM REGARDING WHETHER THE COURT MAY CONSIDER EVIDENCE REGARDING CMI'S FINANCIAL CONDITION IN 2011 (ECF No. 1621). However, Steves withdrew that objection at oral argument on Steves' motion for equitable relief, see Aug. 3 Tr. (ECF No. 1752) at 261:18-21, so the Court can consider that evidence without issue.

information by misappropriating it from JELD-WEN. See ECF No. 776. That ruling flowed from the Court's earlier determination that unclean hands is not a defense to an antitrust damages claim. See Counterclaims Amendment Op. (ECF No. 239) at 15-18. After JELD-WEN noted its intent to introduce evidence in support of an unclean hands defense at the Remedies Hearing, the Court ordered further briefing. ECF No. 1612; see also Apr. 11 Remedies Tr. at 324:15-325:10.

JELD-WEN makes two broad arguments to show that evidence of Steves' trade secrets misappropriation is admissible here. First, it contends that unclean hands is a valid defense to a request for equitable remedies in an antitrust case, based primarily on a statement in California v. American Stores Co., 495 U.S. 271 (1990). Second, JELD-WEN asserts that there is a close nexus between Steves' misappropriation and JELD-WEN's anticompetitive conduct because Steves pursued its theft to avoid the anticompetitive effects of the CMI Acquisition, once it became aware of those consequences.

As a general rule, "he who seeks equity must do equity." Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr., 594 F.3d 285, 297 (4th Cir. 2010) (internal quotations omitted). Flowing from that maxim, the unclean hands doctrine "prevents a plaintiff from obtaining equitable relief if the plaintiff has been 'guilty of any inequitable or wrongful conduct with respect

to the transaction or subject matter sued on.'" <u>Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union</u>, 593 F. Supp. 2d 840, 847 (E.D. Va. 2008) (quoting <u>WorldCom, Inc. v. Boyne</u>, 68 F. App'x 447, 451 (4th Cir. 2003)). Section 16 of the Clayton Act, which authorizes courts to award injunctive relief to private plaintiffs, does not speak to the availability of that defense. <u>See</u> 15 U.S.C. § 26. In <u>American Stores</u>, the Supreme Court held for the first time that Section 16 permits courts to order divestiture and that, upon certain proofs, divestiture was an available remedy in cases brought by private litigants. 495 U.S. at 295-96. However, "equitable defenses such as laches, or perhaps 'unclean hands,' may protect consummated transactions from belated attacks by private parties when it would not be too late for the Government to vindicate the public interest." <u>Id.</u> at 296.

The Court has already addressed this language in the context of antitrust liability. When JELD-WEN moved to add counterclaims alleging Steves' trade secret misappropriation, it had sought to prevent the severance of the antitrust and trade secrets trials by arguing that unclean hands can be a defense to an antitrust violation. The Court noted that the above-quoted portion of <u>American Stores</u> was dicta because neither laches nor unclean hands arose in that case. <u>See</u> Counterclaims Amendment Op. at 15-16 (citing <u>Am. Stores</u>, 495 U.S. at 296). Moreover, the

Court observed, "the law in the Fourth Circuit is that unclean hands is not a defense to an antitrust claim." Id. at 16. Specifically, in Burlington Industries v. Milliken & Co., 690 F.2d 380 (4th Cir. 1982), the court found it "well settled that unclean hands is no bar to antitrust recovery." Id. at 388 (citing, inter alia, Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 214 (1951), overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752 (1984); Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 138 (1968), overruled on other grounds by Copperweld Corp., 467 U.S. at 765-66, 771). As a result, the defendants could not "avoid liability . . . for their own antitrust conspiracy by alleging that [the plaintiff] [wa]s culpable for a distinct infraction." Id.

The result in Burlington Industries derived in part from the Supreme Court's decision in Perma Life. That case concerned the defense of in pari delicto, which, unlike unclean hands, applies only if the plaintiff was involved in the same misconduct underlying the litigation. In re Derivium Capital LLC, 716 F.3d 355, 367 (4th Cir. 2013).[2] The Perma Life majority

---

[2] Although the distinct definitions of in pari delicto and unclean hands "may be useful analytically . . . ., courts have not been precise of careful in their designation, often using one term when the other is more appropriate. The outcome of the

opinion rejected _in pari delicto_ as a defense to an antitrust claim. 392 U.S. at 140. However, based on the disagreement of five Justices in the concurring and dissenting opinions, the Fourth Circuit "continues to recognize a narrow version of the defense." _Burlington Indus._, 690 F.2d at 387 n.6. In any event, _in pari delicto_ was not implicated in _Burlington Industries_ for procedural reasons, _see_ _id._ at 387, and is inapplicable here because Steves did not participate in JELD-WEN's wrongdoing in violating the Clayton Act.

Whether the bar on the unclean hands defense extends to the equitable remedies stage has not been definitely resolved. As an initial matter, _Burlington Industries'_ rejection of unclean hands rests on somewhat unstable ground, as the majority opinions in both _Kiefer-Stewart_ and _Perma Life_—the only two cases that _Burlington Industries_ cites in support of that holding—do not reference unclean hands. _See_ _Perma Life_, 392 U.S. at 139-40; _Kiefer-Stewart_, 340 U.S. at 214. Indeed, the only _Perma Life_ opinions that mention the doctrine at all are Justice Marshall's concurrence and Justice Harlan's partial concurrence and partial dissent, neither of which is binding here. _See_ _Perma Life_, 392 U.S. at 151 (Marshall, J., concurring); _id._ at 153 n.1, 156 (Harlan, J., concurring in part and dissenting in

litigation rarely turns on the term used." 11 Earl W. Kintner et al., _Federal Antitrust Law_ § 81.1 (2017).

part). Furthermore, <u>Burlington Industries</u> and <u>Perma Life</u> considered the respective defenses in the context of antitrust liability and damages, not injunctive relief. <u>See</u> <u>id.</u> at 139-40; <u>Burlington Indus.</u>, 690 F.2d at 388. And, most recently, <u>American Stores</u> left open the possibility that unclean hands could "perhaps" be asserted as a defense to the equitable remedy of divestiture. <u>See</u> 495 U.S. at 296. The Court previously highlighted that very ambiguity. <u>See</u> Counterclaims Amendment Op. at 18.

JELD-WEN argues that the Court, lacking any binding precedent, should defer to traditional equitable principles and allow evidence related to unclean hands. In support, JELD-WEN emphasizes the Supreme Court's recent instruction that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity." <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 394 (2006). That holding rests on the proposition that "'a major departure from the long tradition of equity practice should not be lightly implied.'" <u>Id.</u> at 391 (quoting <u>Weinberger v. Romero—Barcelo</u>, 456 U.S. 305, 320 (1982)). According to JELD-WEN, reading those statements together with <u>American Stores'</u> passing reference to unclean hands implies that the defense may still be used to oppose equitable remedies in antitrust cases.

7

JELD-WEN's position is squarely at odds with numerous cases that have relied on Perma Life to find that unclean hands is not a defense to antitrust injunctive relief. Although unclean hands "arose originally in the courts of equity, almost all decisions . . . conclude that the defense should be equally unavailable, whether the plaintiff is seeking monetary or injunctive relief." 11 Kintner et al., supra, § 81.1[b]. The central case among this group, Chrysler Corp. v. General Motors Corp., 596 F. Supp. 416 (D.D.C. 1984), considered a practically identical argument to JELD-WEN's: that Perma Life was distinguishable because "traditional principles of equity, which permit the unclean hands defense, should be held to apply in this case because [plaintiff] is seeking injunctive relief and not treble damages." Id. at 419. Yet the court rejected that contention for two reasons. First, antitrust actions are uniquely directed at protecting the public interest, such that "actions in equity," like actions at law, "must yield to the overall public policy of enforcing antitrust laws." Id. Second, in the wake of Perma Life, courts had "almost uniformly declined to permit the unclean hands defense" to antitrust claims seeking injunctive relief. Id. at 419-20 (citing Am. Motor Inns, Inc. v. Holiday Inns, Inc., 365 F. Supp. 1073, 1098 (D.N.J. 1973), modified on other grounds, 521 F.2d 1230 (3d Cir. 1975); Natcontainer Corp. v. Cont'l Can Co., 362 F. Supp. 1094, 1099

8

(S.D.N.Y. 1973); _Skil Corp. v. Black & Decker Mfg. Co._, 351 F.
Supp. 65, 66 (N.D. Ill. 1972); _Credit Bureau Reports, Inc. v._
_Retail Credit Co._, 358 F. Supp. 780, 796-97 (S.D. Tex. 1971),
_aff'd_, 476 F.2d 989 (5th Cir. 1973)); _see also Int'l Tel. & Tel._
_Corp. v. Gen. Tel. & Elecs. Corp._, 296 F. Supp. 920, 926 (D.
Haw. 1969) (reaching same conclusion in dicta). As a result, the
court struck defendants' affirmative unclean hands defense.
_Chrysler Corp._, 596 F. Supp. at 420.

JELD-WEN is right that the line of authority rejecting
unclean hands as a defense to antitrust injunctive relief is not
technically unbroken, as Steves claims. Several cases have not
applied the logic of _Perma Life_ and _Kiefer-Stewart_, instead
relying on evidence of unclean hands to prevent plaintiffs from
pursuing or obtaining equitable relief for antitrust violations.
_See Singer v. A. Hollander & Son_, 202 F.2d 55, 59-60 (3d Cir.
1953); _Heldman v. U.S. Lawn Tennis Ass'n_, 354 F. Supp. 1241,
1249 (S.D.N.Y. 1973); _Graham v. Triangle Publ'ns, Inc._, 233 F.
Supp. 825, 832 (E.D. Pa. 1964), _aff'd_, 344 F.2d 775 (3d Cir.
1965); _La. Petroleum Retail Dealers, Inc. v. Tex. Co._, 148 F.
Supp. 334, 336 (W.D. La. 1956). But these decisions are
unpersuasive compared to the opposing cases cited above—both
because three of the four preceded _Perma Life_, which is a clear
dividing line with respect to this issue, _see Chrysler Corp._,
596 F. Supp. at 419; and because the reasoning on the cases on

which JELD-WEN relies can very charitably be described as conclusory. Indeed, two of the cases cite no support for their statements about the availability of the unclean hands defense. See Heldman, 354 F. Supp. at 1249; La. Petroleum, 148 F. Supp. at 336. JELD-WEN therefore cannot use those cases to overcome more recent and well-reasoned decisions.

JELD-WEN's fallback argument—that the cases rejecting the unclean hands defense are unreliable because American Stores caused a sea change in the law—fares no better. The Supreme Court's reference to unclean hands as a possible defense to divestiture claims is remarkably tentative. Whatever the Supreme Court intended the word "perhaps" to mean, it almost certainly indicates that unclean hands does not necessarily exist as a defense to equitable remedies in antitrust actions, unlike laches (which is mentioned without hesitation). See Am. Stores, 495 U.S. at 296. Moreover, cases decided after American Stores, including one in this district, have continued to follow Chrysler Corp. and Perma Life, suggesting that the Supreme Court did nothing to unsettle those cases (or, for that matter, Burlington Industries). See Higgins v. Med. Coll. of Hampton Roads, 849 F. Supp. 1113, 1121 (E.D. Va. 1994); see also CSU Holdings Inc. v. Xerox Corp., No. CIV. A. 94-2102-EEO, 1995 WL 261158, at *3 (D. Kan. Apr. 5, 1995); In re Indep. Serv. Organizations Antitrust Litig., 161 F.R.D. 107, 109 (D. Kan.

1995); *cf.* <u>Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus</u>, 244 F.R.D. 49, 53 (D.D.C. 2007), <u>on reconsideration in part sub nom. Am. Soc. for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus</u>, 246 F.R.D. 39 (D.D.C. 2007).

Indeed, even the Supreme Court noted after <u>American Stores</u> that it has "rejected the unclean hands defense 'where a private suit serves important public purposes,'" <u>McKennon v. Nashville Banner Pub. Co.</u>, 513 U.S. 352, 360 (1995) (quoting <u>Perma Life</u>, 392 U.S. at 138)—thus reiterating the key point underlying <u>Chrysler Corp.</u> In light of this continued affirmation of the core of <u>Chrysler Corp.</u> and <u>Perma Life</u>, there is no reason to view <u>American Stores</u> as having validated an approach to the unclean hands doctrine that the majority of cases before that point had rejected. This is true notwithstanding the discussion of traditional equitable principles in <u>eBay</u>. That case simply repeated a general statement of law that does not contradict courts' longstanding approach to equitable defenses like unclean hands or <u>in pari delicto</u> in the antitrust context. Consequently, the Court concludes that unclean hands is not a valid defense to Steves' request for divestiture.

Evidence of Steves' trade secret misappropriation therefore cannot be relevant because of an unclean hands defense. However, that does not necessarily mean that the evidence is not relevant

for some other issue in the case. For example, it could be probative of Steves' lack of irreparable injury and the hardships that Steves will suffer if no divestiture is ordered, because Steves' misappropriation of particular trade secrets might have helped it build a doorskin manufacturing plant, and thereby avoid termination of its business. But the evidence presented at the Remedies Hearing and the trade secrets trial does not show a connection between the misappropriated trade secrets and any actual efforts to build a doorskin plant, and there is no evidence that Ambruz relied on those secrets while preparing the Feasibility Study (the only concrete step that Steves has taken towards building a plant). Thus, the probative value of the misappropriation evidence depends on speculative assessments about future actions that Steves may or may not take while in possession of the stolen trade secrets. As a result, that evidence does not satisfy the barrier for admissibility under Rule 402, E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 847 F. Supp. 2d 843, 860 (E.D. Va. 2012), and will not be considered for any purposes here.

## B. Pierce Hearsay Documents

Before the Remedies Hearing, JELD-WEN had identified several exhibits concerning Pierce's misappropriation of JELD-WEN's trade secrets on behalf of Steves and, at the final pre-hearing conference, Steves objected to them. At the Court's

direction, Steves filed PLAINTIFF STEVES AND SONS, INC.'S MOTION IN LIMINE REGARDING DX 303, 304, 306, 307, 308, 309, 313, 327, 328, 331, 355, 445, 452, 481, 759, AND 764 (ECF No. 1380). These documents are all e-mails between Pierce and Sam and/or Edward Steves. See Pl. Pierce Hearsay Br. (ECF No. 1382) (Under Seal) at 2-3. Although the exhibits are a subset of the unclean hands evidence discussed above, all of which Steves sought to exclude as irrelevant, Steves also objected to the Pierce communications under Rule 802. See id. at 1.

JELD-WEN admits that the Pierce exhibits are part of the broader body of unclean hands evidence, and thus subject to exclusion on the same basis. See Apr. 11 Remedies Tr. at 325:15-25 (statement by JELD-WEN's counsel that the unclean hands evidence "incorporates statements made by . . . Pierce in e-mails that Steves has objected to as hearsay"). Indeed, of the sixteen documents identified in Steves' motion in limine, only seven are mentioned directly or by implication in JELD-WEN's proposed findings of fact, and only in connection with Steves' trade secret misappropriation. See Def. FOF (ECF No. 1657) (Under Seal) ¶¶ 141-42.[3] In other words, JELD-WEN appears to have introduced the Pierce communications for the exact same purposes

---

[3] Four exhibits are explicitly referenced (DX-306, -308, -328, and -445), and three others (DX-452, -481, and -764) are duplicates of those documents. Pl. Pierce Hearsay Br. at 2-3.

as the other unclean hands evidence. Because unclean hands is not an available defense to a request for divestiture under Section 16, the Pierce e-mails should be excluded as irrelevant, just like the rest of the unclean hands evidence. Accordingly, PLAINTIFF STEVES AND SONS, INC.'S MOTION IN LIMINE REGARDING DX 303, 304, 306, 307, 308, 309, 313, 327, 328, 331, 355, 445, 452, 481, 759, AND 764 (ECF No. 1380) will be granted.

## II.  JELD-WEN's Post-Divestiture Operations

Finally, before the Remedies Hearing, Steves filed PLAINTIFF STEVES AND SONS, INC.'S MOTION TO EXCLUDE JELD-WEN'S EVIDENCE OF HOW IT WOULD OPERATE IN THE EVENT OF DIVESTITURE (ECF No. 1329). Steves initially challenged the admissibility of "evidence of how [JELD-WEN] would operate if ordered to divest the Towanda plant." Pl. Post-Divestiture Ops. Br. (ECF No. 1331) (Under Seal) at 2, 11. As JELD-WEN pointed out, that category is imprecise and does not track the language of the discovery that Steves relies on in support of the motion. Steves then clarified that its motion does not extend to evidence of JELD-WEN's hardships from divestiture, "unless such claimed hardships are themselves how [JELD-WEN] would operate if ordered to divest the Towanda plant." Pl. Post-Divestiture Ops. Reply (ECF No. 1398) at 2 (alteration in original) (quotation marks omitted). For example, Steves says, JELD-WEN should not be able to present evidence that it would have to: close a door manufacturing

plant; acquire new dies; retrofit existing dies; build a doorskin plant, or pursue other alternatives to obtain adequate doorskin volume; or modify JELD-WEN's legacy plants, such as by shifting Towanda's SKUs to those plants. See id. at 2-4.

Steves asserts two bases for excluding that evidence. First, it claims that JELD-WEN has run afoul of Rule 26(e), which requires parties to supplement incomplete interrogatory responses. Because the failure was not substantially justified or harmless, Rule 37(c)(1) makes exclusion appropriate. Second, Steves asserts that Bruce Fedio ("Fedio") did not explain during the company's Rule 30(b)(6) deposition how JELD-WEN would operate if divestiture occurred. Therefore, under Rule 37(d), JELD-WEN should be precluded from elaborating on its post-divestiture plans for the first time at the Remedies Hearing.

**A. Rule 37(c)(1)**

A party must supplement its interrogatory responses "in a timely manner if the party learns that in some material respect the . . . response is incomplete . . . , and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). If the party fails to do so, it cannot rely on the undisclosed information at a subsequent hearing "unless the failure was substantially justified or is harmless." Id. 37(c)(1). Courts consider five factors in

exercising their "broad discretion" to determine whether a nondisclosure is substantially justified or harmless: "'(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.'" Bresler v. Wilmington Tr. Co., 855 F.3d 178, 190 (4th Cir. 2017) (quoting S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003)).

If Rule 37(c)(1) has been violated, "[i]n addition to or instead of" excluding the nondisclosed information, a court: "(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions." Fed. R. Civ. P. 37(c)(1); see also id. 37(b)(2)(A). Courts must consider four factors when deciding on an appropriate sanction: "'(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective.'" Law Enf't All. of Am., Inc. v. USA Direct, Inc., 61 F. App'x 822, 830 (4th Cir. 2003) (quoting Anderson v. Found. for Advancement, Educ. and

16

Emp't of Am. Indians, 155 F.3d 500, 504 (4th Cir. 1998)).

The dispute here centers on JELD-WEN's responses to Steves' second set of interrogatories. See Interrogatory Responses (ECF No. 1331-1) (Under Seal) at 1. Interrogatory No. 17 asked JELD-WEN to "[i]dentify each action JELD-WEN asserts it would take, or likely would take, in order to effectuate the divestiture of any active or inactive doorskin plant . . . pursuant to an order in this action requiring any such divestiture." Id. at 4-5. In its first response, JELD-WEN objected to that interrogatory as "call[ing] for JELD-WEN to speculate about what it would be required to do in response to a hypothetical order . . . for which there is no basis whatsoever under the law." Moreover, it pointed out that the "steps JELD-WEN would need to take in response to an order in this action 'requiring divestiture' of Towanda would depend on the scope and content of the order." Nonetheless, JELD-WEN stated that "as a general matter, CMI has been fully integrated into JELD-WEN over the past four-and-a-half years since being acquired by JELD-WEN, and neither CMI nor the Towanda plant exist in the form they did back in 2012—making 'divestiture' impossible." Id. at 5.

Were this JELD-WEN's only response, the hardship evidence that it could present at the Remedies Hearing might have been restricted. Yet, several weeks later, JELD-WEN served supplemental responses. See Suppl. Interrogatory Responses (ECF

No. 1331-2) (Under Seal). The supplemental response to Interrogatory No. 17 reiterated the objections in the original response, adding that "[n]o business plan currently exists, by definition, for how to comply with an order of divestiture that does not exist and, by the framing of this interrogatory might be directed to any number of different plants." Id. at 3. JELD-WEN also stated:

> In the four-and-a-half years since JELD-WEN acquired CMI, the Towanda facility has been completely integrated into JELD-WEN. That process has involved significant efforts costing the company millions of dollars that it spent on reliance of the fact that no one, including Steves, was challenging the acquisition. Efforts that were undertaken at Towanda by JELD-WEN included retooling, updating the facility and fixing structural issues, and integrating Towanda into JELD-WEN's technology, support services and human resource systems. In addition, JELD-WEN invested well over a million dollars in order to begin manufacturing certain products in-house in the Towanda facility. By virtue of acquiring Towanda and the capacity in that facility, JELD-WEN was able to shut down two of its other plants: Dubuque and Marion. As a result of shuttering those plants, dozens of employees were let go. In addition, since acquiring Towanda, JELD-WEN has been able to rationalize its product lines; it has ceased to sell certain doorskins and moved the manufacture of certain types of doorskins to different facilities.

> In the event the Court ordered some sort of divestiture of Towanda, JELD-WEN would have to unscramble all those eggs. While that might not have been as significant an issue had Steves brought suit in 2012 when the

merger was announced . . ., Steves' choice
to wait over four years to bring suit means
that undertaking that process
now . . . would severely harm JELD-WEN and
cost the company tens of millions of dollars
if not more. Indeed, it is quite possible
that a divestiture would require JELD-WEN
for a period of time to purchase doorskins
from another entity, and/or limit the number
of doorskins it sold to third parties—all of
which could severely harm not only JELD-WEN
but its doorskin customers.[4]

Id. at 3-4. JELD-WEN did not further supplement its response,
nor did Steves serve any other interrogatories about the effects
of divestiture on JELD-WEN's operations.

Steves then deposed Hachigian. Asked if JELD-WEN had
"analyze[d] the effects of an order requiring the divestiture of
the Towanda plant," Hachigian indicated that he was
"not . . . aware of" any such efforts, and that JELD-WEN "ha[d]
not put the engineers or the manufacturing team to that."
Hachigian Dep. Tr. (ECF No. 1372-2) (Under Seal) at 469:14-21.
Pressed on why JELD-WEN had not "develop[ed] a contingency plan
on how it would operate if the court orders the divestiture of
the Towanda plant," Hachigian conceded that "to date [JELD-WEN]
ha[s]n't put the resources together." Id. at 470:2-9. He then
explained why JELD-WEN could not compensate for Towanda's lost

_____

[4] The portion of the response that discussed the effect of
divestiture on JELD-WEN's MiraTEC and Extira business is omitted
here because Steves does not seek to exclude any MiraTEC and
Extira-related evidence. Pl. Post-Divestiture Ops. Br. at 4 n.1.

capacity by building a doorskin plant, emphasizing that Towanda has "capacity around 8-foot doors" and "different styles and designs," which are "impossible to separate" because they were "integrated into the core business." Id. at 470:11-22. Similarly, Hachigian briefly described the "environmental issues" and "technical changes with regards to resins and clean air" that would make restarting the Marion plant costly. Id. at 471:12-472:7. Although he testified that a member of JELD-WEN's engineering team could better explain the cost of restarting Marion, he noted that the plant is not a viable alternative because it "make different products [than Towanda]. These things are not interchangeable." Id. at 472:8-474:8.

Steves subsequently deposed Fedio, as JELD-WEN's corporate representative. One of the deposition topics on which he was examined was "[t]he status of Your plants in Towanda, Marion, and Dubuque, including: their physical condition; products manufactured there; any actions that would be required to produce doorskins at these plants; all actions You would take if order[ed] to divest any of these plants; and the effect any such divestiture would have on Your business." JELD-WEN 30(b)(6) Dep. Notice, Sched. A (ECF No. 1372-4) (Under Seal) ¶ 12. Fedio testified about the challenges and costs associated with restarting Marion, including the time and equipment replacement needed. He also noted that a "significant" number of Marion's

doorskin dies had been moved to other plants. Fedio Dep. Tr. (ECF No. 1372-3) (Under Seal) at 300:7-302:11. In addition, Fedio said that JELD-WEN did not have a "comprehensive" or "formally documented plan" for "how it would maintain production of interior molded doorskins in the event of a disaster at one of its plants," aside from one for its plant in Latvia. However, he acknowledged that JELD-WEN could probably use excess capacity from other plants to cover the lost capacity at a plant affected by a disaster. Id. at 322:17-324:1. He then answered questions about the cost and hardship of building a doorskin manufacturing plant to replace Towanda's doorskin supply, as well as the possibility of purchasing doorskins from Masonite or Teverpan. Fedio stated that JELD-WEN would likely buy from the new owner of Towanda instead of either of those suppliers. Id. at 338:8-342:17. Finally, he agreed with Hachigian that, outside of the Supplemental Interrogatory Responses, JELD-WEN had not examined the effects of a divestiture order. See id. at 334:5-337:3.

After Steves prevailed at trial, the parties submitted briefs concerning the scope of Steves' divestiture request. In its opening brief, Steves proposed for the first time that the Court impose several conditions in addition to the sale of Towanda, including an order that JELD-WEN not purchase doorskins from Towanda for five years. In response, JELD-WEN argued that the loss of Towanda and Steves' conditions would cause JELD-WEN

hardship because, among other things, it would have to recreate doorskin dies that are used solely at Towanda, and it could not meet its customers' demand without purchasing doorskins from Towanda. JELD-WEN also outlined the viability of replacing Towanda's lost capacity by reopening Marion, using excess capacity from Latvia, building a new doorskin plant, or buying doorskins from Masonite or foreign suppliers. As noted in the factual background, JELD-WEN then presented considerable evidence on these issues at the Remedies Hearing. Steves appears to oppose the admission of most, if not all, of this evidence. See Pl. Post-Divestiture Ops. Reply at 2-4.

Whether JELD-WEN has even violated Rule 26(e) is dubious. The Court may look at both the original Interrogatory Responses and the Supplemental Interrogatory Responses to judge the adequacy of JELD-WEN's disclosures. See Aug. 3 Tr. at 311:18-25. Most of the evidence that Steves seeks to exclude was disclosed, either directly or by implication. The supplemental response to Interrogatory No. 17 indicated that, after acquiring CMI, JELD-WEN "beg[a]n manufacturing certain products in-house" at Towanda, "rationalize[d] its product lines," "ceased to sell certain doorskins[,] and moved the manufacture of certain types of doorskins to different facilities." JELD-WEN further stated that divestiture would force JELD-WEN to undo these changes and, at least temporarily, "purchase doorskins from another entity,

22

and/or limit the number of doorskins it sold to third parties."
Suppl. Interrogatory Responses at 4. Putting these two
statements together, it is readily inferable that JELD-WEN
allocated its doorskin designs to different plants after the CMI
Acquisition, which necessarily means that the dies used to make
particular designs would be stored at those plants. Those dies
might need to be moved or recreated to allow JELD-WEN's legacy
plants to produce doorskins that they had not made since the
merger. Furthermore, by noting the impacts on doorskin purchases
and sales, the response makes clear that divestiture would cause
JELD-WEN to lose doorskin volume at its legacy plants. These
conclusions are not opaque; indeed, Steves' questions to
Hachigian and Fedio suggest that Steves relied on those same
deductions in the depositions. Accordingly, the evidence
presented at the Remedies Hearing does not meaningfully exceed
the substance of the Supplemental Interrogatory Responses.

Even if that evidence was not disclosed with enough
specificity, Rule 26(e)(1) is an improper vehicle for Steves'
challenge. Interrogatory No. 17 asks only what actions JELD-WEN
might take "to effectuate the divestiture of any active or
inactive doorskin plant." Id. at 2. Like any responding party,
JELD-WEN had to use "'reason and common sense to attribute
ordinary definitions to terms and phrases utilized in [the]
interrogatories.'" Deakins v. Pack, No. CIV.A. 1:10-1396, 2012

WL 242859, at *12 (S.D.W. Va. Jan. 25, 2012) (quoting McCoo v. Denny's Inc., 192 F.R.D. 675, 694 (D. Kan. 2000)). The plain meaning of "effectuate" is to bring about or put something into effect. Thus, JELD-WEN likely understood Steves' interrogatory to be asking about the steps that JELD-WEN would take before or at the time of the actual separation of Towanda to accomplish that result, not about the effects of divestiture after the separation—the information that Steves apparently intended to elicit. Even though a responding party cannot avoid disclosing information by reading language in a formalistic or narrow way, words have meaning, and "there are limits to how accommodating th[a]t party must be in trying to understand and respond to a poorly worded . . . and ambiguous interrogatory." Lynn v. Monarch Recovery Mgmt., Inc., 285 F.R.D. 350, 359 (D. Md. 2012). Given the vagueness of Interrogatory No. 17, JELD-WEN's response provides even more than was requested, so it should not be penalized for failing to supplement that response further.

Moreover, if JELD-WEN's conduct can be seen as a Rule 26(e) violation, that infraction was substantially justified or harmless. Exclusion of undisclosed evidence is an appropriate sanction when a party introduces a new theory of liability or damages or a new defense shortly before trial, even though that information had been requested in earlier interrogatories. See MicroStrategy Inc. v. Bus. Objects, S.A., 429 F.3d 1344, 1356-58

24

(Fed. Cir. 2005); Precision Fabrics Grp., Inc. v. Tietex Int'l, Ltd., 297 F. Supp. 3d 547, 559-61 (D.S.C. 2018); Contech Stormwater Sols., Inc. v. Baysaver Techs., Inc., 534 F. Supp. 2d 616, 624 (D. Md. 2008). Here, however, the Southern States factors weigh overwhelmingly in JELD-WEN's favor. Any surprise from JELD-WEN's nondisclosure of evidence of the effect of divestiture on doorskin dies, SKU allocation, and doorskin volume is limited. The response to Interrogatory No. 17 strongly implies that JELD-WEN would suffer such hardships, and any specific effects that were not disclosed are closely related to those that were. See Baker v. United States, 645 F. App'x 266, 270 (4th Cir. 2016). Moreover, Steves could explore the particular divestiture consequences in more detail at the depositions of JELD-WEN fact witnesses, as demonstrated by Steves' questions to Hachigian and Fedio about, inter alia, replacing Towanda's volume by reopening Marion or building a new plant. That Steves chose to pursue some lines of questioning and not others does not prevent JELD-WEN from introducing evidence unrelated to those questions. In addition, the evidence is vitally important to JELD-WEN's arguments on the balance of hardships factor, and allowing that evidence at the Remedies Hearing did not cause any notable disruption.

Finally, JELD-WEN's explanation that it did not understand what Steves was asking is highly plausible, for the reasons

noted above. JELD-WEN's reliance on undisclosed information was also forced by Steves' proposal of certain conditions, like the limitation on JELD-WEN's purchases from Towanda, for the first time before the Remedies Hearing. That condition led JELD-WEN to highlight evidence that, without Towanda, it will lack adequate doorskin volume and be unable to produce the full range of SKUs that its customers need. That evidence may be less important now given Steves' updated divestiture proposal, which allows JELD-WEN to buy enough doorskins from Towanda to satisfy its customers' needs for a period of two years. Proposed Divestiture Order § V(J). However, Steves only modified its proposal <u>after</u> the Remedies Hearing, and JELD-WEN could not have anticipated that concession. Thus, any discovery violation was substantially justified or harmless, precluding Rule 37(c)(1) sanctions.

### B. Rule 37(d)

Depositions of a corporate entity are conducted through designees chosen by the company, who "must testify about information known or reasonably available to the organization" that relates to the deposition topics noticed by the party taking the deposition. Fed. R. Civ. P. 30(b)(6). Designees must know the corporation's position on a wide range of issues, so the company's "duty to present and prepare . . . goes beyond matters personally known to that designee or to matters in which that designee was personally involved." <u>United States v. Taylor</u>,

166 F.R.D. 356, 361 (M.D.N.C. 1996). A court can impose the same range of sanctions noted above if a corporate designee "fails, after being served with proper notice, to appear for th[e] . . . deposition." Id. 37(d)(1)(A), (3).

There is no dispute that Fedio was literally present for JELD-WEN's Rule 30(b)(6) deposition. However, "[p]roducing an unprepared witness is tantamount to a failure to appear." Taylor, 166 F.R.D. at 363; see also Resolution Tr. Corp. v. S. Union Co., 985 F.2d 196, 197 (5th Cir. 1993) ("If th[e] agent is not knowledgeable about relevant facts, . . . then the appearance is, for all practical purposes, no appearance at all."). Rule 37(d) sanctions are therefore "mandatory for a 'failure to appear by means of wholly failing to educate a Rule 30(b)(6) witness, unless the conduct was substantially justified.'" Robinson v. Quicken Loans, Inc., No. 3:12-CV-00981, 2013 WL 1776100, at *3 (S.D.W. Va. Apr. 25, 2013) (quoting Int'l Ass'n of Machinists and Aerospace Workers v. Werner-Masuda, 390 F. Supp. 2d 479, 489 (D. Md. 2005)).

Steves contends that Fedio was unprepared to testify about Topic No. 12 to the extent that topic was directed at "the effect any . . . divestiture would have on [JELD-WEN's] business." It emphasizes Fedio's acknowledgements that JELD-WEN lacks a "contingency plan on how it would operate" in the event of divestiture, and that it has not "put [its] engineering

or . . . manufacturing team to the question of the effects of a potential order" requiring divestiture. Fedio Dep. Tr. at 336:18-337:3, 337:22-338:5. These statements, according to Steves, prevent the Court from considering evidence at the Remedies Hearing that JELD-WEN has a contingency plan for losing Towanda and will suffer certain effects because of divestiture.

The bar for obtaining sanctions under Rule 37(d) is high. "[C]ases that award [such] sanctions . . . involve extreme obfuscation and unpreparedness." Chapman v. HHCSC, LLC, No. 2:14-CV-00051-RMG, 2014 WL 12615705, at *4 (D.S.C. Dec. 9, 2014) (internal quotations omitted); see also 7 James Wm. Moore et al., Moore's Federal Practice § 30.72[1] (3d ed. 2018) (sanctions appropriate where designee "knows nothing" or cannot "participate meaningfully in the deposition"). For instance, in Resolution Trust, a corporate designee stated that he had no knowledge of any topic in the Rule 30(b)(6) deposition notice. 985 F.2d at 196-97. Similarly, in International Association of Machinists & Aerospace Workers, an exchange revealed that the corporation had failed to provide its designee with even basic knowledge about the subjects of the deposition. See 390 F. Supp. 2d at 489. As these examples suggest, courts generally "need to be cautious before finding a violation" of Rule 30(b)(6), Moore et al., supra, § 30.72[1], and sanctions should not be imposed where a witness "rendered substantial testimony concerning the

subject areas of their designations," Wilson v. Lakner, 228 F.R.D. 524, 530 (D. Md. 2005) (internal quotations omitted).

Viewed through this lens, Fedio's answers were not inadequate enough to support the exclusion of evidence about divestiture's effects on JELD-WEN. His statement about the absence of a contingency plan for Towanda's divestiture was a direct answer to a simple question, and Steves has not pointed to any evidence at the Remedies Hearing indicating that JELD-WEN has a plan that Fedio should have mentioned. Similarly, he gave complete answers when asked if JELD-WEN had formally analyzed the effects of divestiture, and when asked about specific consequences of divestiture. Fedio incorporated JELD-WEN's responses to Interrogatory No. 17, Fedio Dep. Tr. at 335:11-337:3, which, as noted above, can be fairly read as disclosing the evidence that Steves wants to exclude. Any lack of knowledge about particular issues appears to have been the product of genuine disagreement between the parties about the scope of Topic No. 12. See id. at 313:11-323:10. And, Steves' current complaints are particularly bold given that it did not seek any further 30(b)(6) depositions on that topic after questioning Fedio, and has not challenged his answers until now.

Moreover, Steves misunderstands Fedio's remarks. His general statement about the engineering or management team's consideration of the effects of divestiture does not mean that

no JELD-WEN employee has any idea how divestiture would impact the company. Indeed, Fedio himself testified about the possibility of reopening Marion or building a replacement doorskin plant. Consistent with that approach, at the Remedies Hearing, several JELD-WEN witnesses described the likely effects of divestiture based on their experience with the company's manufacturing processes. Steves fails to grasp the difference between reaching a definite conclusion after "put[ting] [the] engineering or the manufacturing team to the [effects] question," which Fedio testified to, and making an informed judgment about specific harm based on changes that JELD-WEN has made since the CMI Acquisition, as JELD-WEN's witnesses did at the Remedies Hearing. Fedio's answer would likely prevent JELD-WEN from using the Remedies Hearing to put on evidence of, for example, a formal JELD-WEN study about the effects of divestiture. Nothing like that has happened here.

Finally, accepting Steves' assertion that JELD-WEN's evidence goes beyond or diverges from what Fedio indicated, total exclusion of that evidence is an excessive sanction. Courts confronted with far more flagrant non-responsiveness at Rule 30(b)(6) depositions have only imposed monetary sanctions. See Resolution Tr., 985 F.2d at 197; Int'l Ass'n of Machinists & Aerospace Workers, 390 F. Supp. 2d at 489. In contrast, Steves wants to wield Rule 37(d) like a sword, cutting out any evidence

that may be related to what is at worst a minor discovery violation. But, as the Fourth Circuit has observed, "exclud[ing] that which is competent and relevant by mechanistic application of an exclusionary rule is exceedingly dangerous to the . . . trial process" when no jury is involved. <u>Multi-Med. Convalescent & Nursing Ctr. of Towson v. NLRB</u>, 550 F.2d 974, 977 (4th Cir. 1977). The Court is more than capable of looking at JELD-WEN's evidence as to the effects of divestiture and distinguishing the real hardships from the speculative or unsupported ones. Consequently, Rule 37(d) does not justify exclusion here.

Because Steves thus cannot show any basis for excluding the evidence at issue, PLAINTIFF STEVES AND SONS, INC.'S MOTION TO EXCLUDE JELD-WEN'S EVIDENCE OF HOW IT WOULD OPERATE IN THE EVENT OF DIVESTITURE (ECF No. 1329) will be denied.

### CONCLUSION

For the foregoing reasons, the Court will exclude evidence of Steves' unclean hands in deciding PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR EQUITABLE RELIEF (ECF No. 1191), so PLAINTIFF STEVES AND SONS, INC.'S MOTION IN LIMINE REGARDING DX 303, 304, 306, 307, 308, 309, 313, 327, 328, 331, 355, 445, 452, 481, 759, AND 764 (ECF No. 1380) will also be granted. However, PLAINTIFF STEVES AND SONS, INC.'S MOTION TO EXCLUDE JELD-WEN'S EVIDENCE OF

HOW IT WOULD OPERATE IN THE EVENT OF DIVESTITURE (ECF No. 1329) will be denied.

It is so ORDERED.

_____ /s/ _____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 30, 2018