IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEVES AND SONS, INC.,

    Plaintiff,

v.                          Civil Action No. 3:16-cv-545

JELD-WEN, INC.,

    Defendant.


## MEMORANDUM OPINION

This matter is before the Court on JELD-WEN, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST STEVES & SONS, INC. (ECF No. 968), to the extent that JELD-WEN, Inc. ("JELD-WEN") seeks judgment as a matter of law on Steves and Sons, Inc.'s ("Steves") breach of contract claim as far as that claim is based on: (1) JELD-WEN's failure to reimburse Steves for defective doorskins; and (2) JELD-WEN's failure to reimburse Steves for the cost of doors manufactured by Steves that incorporated defective doorskins (as pleaded in paragraph numbers 121 through 132 of the Complaint and in COUNT TWO, paragraph 181 and as reflected in the VERDICT FORM (ECF No. 1022), paragraphs 8, 9, 10 and 11. The Court previously took those issues under advisement when it resolved the rest of JELD-WEN's motion. See ECF No. 1042 at 2. For the reasons set forth below, JELD-WEN, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW

AGAINST STEVES & SONS, INC. (ECF No. 968) will be granted as to COUNT TWO on those specific issues and paragraphs 8, 9, 10, and 11 of the verdict will be vacated.

## BACKGROUND

Steves is an independent manufacturer of interior molded doors, and it relies primarily on JELD-WEN to supply it with the doorskins needed to make the doors. See Summary Judgment Op. (ECF No. 976) at 2. Accordingly, on May 1, 2012, Steves and JELD-WEN entered into a long-term supply agreement ("the Supply Agreement"), pursuant to which Steves would purchase interior molded doorskins from JELD-WEN. See Supply Agm't (ECF No. 1114-1) at 1. That Agreement contained a doorskin quality provision that stated:

> The [doorskins] will at all times be of a quality satisfactory to STEVES, meeting JELD-WEN's specifications, fit for the intended purpose, and subject to JELD-WEN's standard written warranty applicable to the [doorskins] (the "Specifications"). If JELD-WEN ships [doorskins] that do not meet JELD-WEN's Specifications (hereinafter "Defective Product") then JELD-WEN, after notice, inspection and verification of the Defective Product, will be obliged to reimburse STEVES for the price of the Defective Product. . . . Any additional costs over the price of the Defective Product shall be negotiated . . . on a case by case basis. JELD-WEN will not be liable for any claim by STEVES for Defective Product caused by STEVES' own negligence.

Id. § 8.

In COUNT TWO of the Complaint, Steves asserted that JELD-WEN violated this provision in two ways. First, JELD-WEN allegedly supplied Steves with defective doorskins and did not reimburse Steves for the price of those doorskins after notice and inspection. Second, Steves claimed that the Supply Agreement obligated JELD-WEN to reimburse Steves for the full cost of its interior molded doors that incorporated defective doorskins. According to Steves, even though Section 8 ostensibly permitted JELD-WEN to negotiate reimbursement for such costs on a case by case basis, JELD-WEN had consistently reimbursed Steves for the full door cost before JELD-WEN's 2012 acquisition of CraftMaster Manufacturing, Inc. ("the 2012 Merger"), but it unilaterally ceased such practice after that date in order to harm Steves.[1]

At trial, the jury agreed with both arguments. The jury first concluded that JELD-WEN breached Section 8 by supplying Steves with defective doorskins and failing to reimburse it appropriately. As a result of that breach, the jury found, Steves had suffered $441,458 in damages. Jury Verdict (ECF No. 1022) ¶¶ 8-9. As to the second alleged breach, the jury determined that the Supply Agreement required JELD-WEN to reimburse Steves for the cost of doors made using defective

---

[1] These contentions and theories were also presented as part of COUNT FIVE, wherein Steves sought declaratory relief on the same basis as asserted in COUNT TWO. That aspect of COUNT FIVE was not presented to the jury.

doorskins and that JELD-WEN refused to reimburse Steves for those costs. Consequently, the jury found that Steves was entitled to an additional $1,776,813 in damages. Id. ¶¶ 10-11. JELD-WEN now challenges the jury's determinations as to both theories of liability.[2]

## DISCUSSION

### I.   Legal Standard

A court may grant judgment as a matter of law against a party on a claim if the party "has been fully heard on an issue" at trial and "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," assuming that a "favorable finding on that issue" is necessary for the party to prevail on the claim. Fed. R. Civ. P. 50(a)(1). In other words, "[j]udgment as a matter of law 'is properly granted if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof.'" Russell v. Absolute Collection Servs., Inc., 763 F.3d 385, 391 (4th Cir. 2014) (quoting Wheatley v. Wicomico Cty., 390 F.3d 328, 332 (4th Cir. 2004)). To recover for breach of contract under Delaware law,

---

[2] Although JELD-WEN properly moved for judgment as a matter of law before the case was submitted to the jury, Fed. R. Civ. P. 50(a)(2), the Court took the motion under advisement as to these two issues so that it could reserve its decision on the pertinent legal questions and consider the parties' supplemental post-verdict briefing. See id. 50(b).

4

Steves must prove, for each alleged breach: (1) the existence of a contractual obligation, (2) JELD-WEN's breach of that obligation, and (3) the resulting damage to Steves. Connelly v. State Farm Mut. Auto. Ins. Co., 135 A.3d 1271, 1279 n.28 (Del. 2016). Thus, if Steves did not provide sufficient evidence for the jury to conclude that JELD-WEN failed to reimburse Steves for defective doorskins or the cost of doors with defective doorskins, or if Steves failed to prove that JELD-WEN was contractually obligated to do so, then judgment as a matter of law on the two unresolved grounds underlying Count Two would be appropriate.

## II. Failure to Reimburse for Defective Doorskins

The witness on whom Steves relied to explain the defective doorskin reimbursement process in detail was Doug Gartner ("Gartner"). He explained that Steves employees generally discovered the defects in JELD-WEN's doorskins when the employees flip doorskins from a pallet into a stack for door construction. Feb. 2 Trial Tr. (ECF No. 1028) at 530:9-14. Defective doorskins were then sent to Steves' vendor debit memo ("VDM") department, where employees prepared a separate VDM for each product with numerous details—including the size and species of the product, its manufacture date, its die number, and the specific defect. Id. at 529:21-530:2. According to Gartner, the employees who are assigned to identify defects are

trained to detect specific defects and can differentiate between defects that are caused by JELD-WEN and those that are caused by Steves (which are not recorded in VDMs because Section 8 of the Supply Agreement precludes reimbursement for such defects). Id. at 530:25-532:11; see also Supply Agm't § 8 ("JELD-WEN will not be liable for any claim by S[teves] for Defective Product caused by S[teves]' own negligence."). Steves then submitted the VDMs to JELD-WEN to initiate the reimbursement process. Feb. 2 Trial Tr. at 529:4-10. From 2010 to 2011, JELD-WEN responded "very promptly" after receiving VDMs from Steves, sometimes inspecting the defective doorskin at Steves' plant and sometimes simply extending Steves a credit based on a picture of the defect. Id. at 529:11-17. After October 2012, however, Steves experienced more doorskin defects, and JELD-WEN became "much more stringent" in reimbursing for the defects described in the VDMs. Id. at 528:25-529:9, 532:12-17. Likewise, Edward Steves stated that, before the 2012 Merger, JELD-WEN would generally extend Steves credit after it submitted letters about doorskin defects. Feb. 3 Trial Tr. (ECF No. 1029) at 679:17-680:1. But, in 2014, there was a change in procedure. Following this change in procedure, JELD-WEN did not accept for reimbursement "a large portion of those [doorskins]" that Steves had identified as defective. Id. at 683:3-4.

The jury's award of $441,458 for unreimbursed defective doorskins was drawn directly from the identical VDM figures noted during the testimony of Steves' damages expert, Avram Tucker ("Tucker"). See Feb. 7 Trial Tr. (ECF No. 1032) at 1200:1-4. To calculate that figure, Tucker reviewed a database with Steves' VDMs from 2015 to 2017, subtracting the total amount reimbursed by JELD-WEN for defective doorskins from Steves' total purchase price for doorskins for which it submitted VDMs. Id. at 1199:6-14, 1200:1-4. He did not elaborate on Gartner's and Edward Steves' statements about the VDM process, or testify further about the specific details of the VDMs that he reviewed.

JELD-WEN argues that this evidence does not support the jury's conclusion that JELD-WEN violated the Supply Agreement by failing to reimburse for defective doorskins for two reasons. First, it contends that Section 8's reimbursement obligation is not implicated here because Steves presented no evidence that the defective doorskins did not meet JELD-WEN's specifications or were not subject to JELD-WEN's standard written warranty. Second, JELD-WEN says, Steves has failed to connect Tucker's general damages with particular VDMs, preventing the jury from being able to determine that any of the unreimbursed doorskins were actually defective in a way that would require reimbursement.

The construction of the Supply Agreement makes JELD-WEN's first argument unpersuasive. Section 8 only requires JELD-WEN to reimburse Steves for the price of the defective doorskins—after notice, inspection, and verification by JELD-WEN—"[i]f JELD-WEN ships [doorskins] that do not meet JELD-WEN's Specifications." Supply Agm't § 8 (emphasis added). The meaning of "Specifications" is unclear given the ambiguous structure of the preceding sentence: "The [doorskins] will at all times be of a quality satisfactory to S[teves], meeting JELD-WEN's specifications, fit for the intended purpose, and subject to JELD-WEN's standard written warranty applicable to the [doorskins] (the 'Specifications')." Given that the definition parenthetical follows a list of items, "Specifications" as used in the reimbursement provision could refer to one of three things: (1) the same "specifications" that are mentioned in the list; (2) the "standard written warranty applicable to the [doorskins]"; or (3) some collective standard that includes all four things in the list. Applying the first two definitions would, in JELD-WEN's view, compel the Court to grant judgment as a matter of law because Steves allegedly did not present evidence about JELD-WEN's specifications or standard written warranty. Steves, on the other hand, argues that the third definition is most appropriate based on the substance of the negotiations underlying the Supply Agreement.

8

Steves' interpretation of the meaning of "Specifications" is reasonable; without any clear guidance in Section 8, the definition could easily apply collectively to all four terms in the list. In addition, Steves presented sufficient evidence at trial to convince the jury to adopt its reading.

The Supply Agreement specifically prohibits resolving this definitional ambiguity against either Steves or JELD-WEN as the drafter of the contract. See id. § 17 ("No ambiguity shall be construed against any party based upon a claim that said party drafted any language in question."). Nonetheless, Delaware law allows extrinsic evidence (such as the parties' negotiations, industry custom, or course of performance) to be considered in deciding between competing reasonable interpretations. Salamone v. Gorman, 106 A.3d 354, 374 (Del. 2014); LSVC Holdings, LLC v. Vestcom Parent Holdings, Inc., No. CV 8424-VCMR, 2017 WL 6629209, at *6 (Del. Ch. Dec. 29, 2017); see also United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810, 834 (Del. Ch. 2007). Indeed, the Court instructed the jury that it could consider those factors to interpret the appropriate meaning of Section 8. See Jury Instructions (ECF No. 1025), Instruction No. 40; see also Del. P.J.I. Civ. § 19.15 (2000).

At trial, Edward Steves—who negotiated the terms of the Supply Agreement on Steves' behalf—testified: (1) that he was "primarily interested" only in the requirement that the

9

doorskins "be of a quality satisfactory to S[teves]"; and (2)
that Steves was not aware of doorskin specifications that JELD-
WEN may have had when executing the Supply Agreement in May
2012. Feb. 3 Trial Tr. at 622:16-623:18. Witnesses also
described aesthetic defects that made certain JELD-WEN doorskins
unsatisfactory to Steves. See Steves Suppl. Response (ECF No.
1282) at 1 (summarizing testimony). Consequently, even if Steves
presented no evidence that the doorskins did not meet JELD-WEN's
specifications[3] or were not subject to its standard written
warranty, the jury could have relied on the foregoing evidence
to conclude that "Specifications" included all four items in the
preceding list and that some doorskins did not satisfy Steves'
subjective quality expectations.[4] Accordingly, JELD-WEN would

---

[3] A JELD-WEN witness, Stephen Fancher ("Fancher"), stated that
JELD-WEN provided Steves with its technical specifications in
September 2014 at the latest, see Feb. 9 Trial Tr. (ECF No.
1034) at 1797:7-24, so Steves would have been aware of those
specifications when submitting its VDMs to JELD-WEN from 2015 to
2017. Nonetheless, Fancher also testified that reimbursement
claims typically concern "more aesthetic, physical
characteristics" that are not addressed in those technical
specifications, and that JELD-WEN has separate aesthetic
specifications that it never provided to Steves. Id. at 1824:5-
16, 1829:5-10. Accordingly, Steves' failure of proof would not
doom its defective doorskins claim were it based on aesthetic
defects not covered by JELD-WEN's technical specifications.

[4] Fancher indicated that whether doorskins are "of a quality
satisfactory to Steves" can be determined objectively by
assessing whether the doorskins "meet[] JELD-WEN's
specifications." See Feb. 9 Trial Tr. at 1826:6-1828:10. This
testimony appears to conflict with Steves' more subjective

10

have needed to reimburse Steves for doorskins that were not of a quality satisfactory to Steves because those doorskins would not have met all four elements of JELD-WEN's "Specifications."

JELD-WEN's second argument, however, makes the proper meaning of "Specifications" a moot point. Steves' claim essentially asks the jury to infer that JELD-WEN failed to reimburse Steves for $411,458 worth of doorskins with aesthetic defects based on the following general facts: (1) the quality of JELD-WEN's doorskins declined at some point after the 2012 Merger; (2) Steves' employees inspected the doorskins closely before preparing VDMs and submitting them to JELD-WEN; and (3) JELD-WEN consciously changed its course of performance under the Supply Agreement when Kirk Hachigian ("Hachigian") became JELD-WEN's CEO in 2014, insisting on pre-reimbursement inspections where before it had accepted Steves' representations that particular doorskins were not of satisfactory quality. These circumstances, Steves argues, were sufficient to permit the jury to decide that Steves had correctly identified defective doorskins that JELD-WEN could not refuse to reimburse, even after inspection and verification.

---

understanding of the phrase "satisfactory to Steves," but the jury could have weighed the evidence and interpreted the phrase based on which evidence it found persuasive.

Yet this inferential chain is undermined by trial evidence casting doubt on Steves' assessment of doorskin defects. Relying on circumstantial evidence about the VDM process instead of direct evidence about the specific VDMs supporting Tucker's damages figure is not inherently problematic; judgment as a matter of law may not be granted if the evidence puts a jury's inferences "'within the range of reasonable probability.'" Bennett v. CSX Transp., Inc., 552 F. App'x 222, 226 (4th Cir. 2014) (quoting Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982)). At the same time, "'the necessary inference [cannot be] so tenuous that it rests merely upon speculation and conjecture.'" Id. (quoting Lovelace, 681 F.2d at 241). Here, the inference proposed by Steves was that the VDMs for unreimbursed doorskins (that Tucker reviewed) actually contained genuine defects and thus they were improperly rejected for reimbursement after inspection. The jury obviously drew that inference. However, that inference was based on an unstable foundation. Whatever the detail involved in Steves' VDM process, the Supply Agreement preserves the possibility that JELD-WEN may refuse to reimburse Steves for defective doorskins "after notice, inspection and verification of the Defective Product." Supply Agm't § 8; see also Feb. 3 Trial Tr. at 776:25-777:4. Thus, general evidence about the VDM process would only suffice to support this claim if that evidence showed that the

12

procedure reliably identified defective doorskins. Yet Gartner conceded that Steves sometimes submitted claims for an entire pallet of doorskins where only some were actually determined to be defective, making it possible that some doorskins were wrongly claimed as defective. Feb. 2 Trial Tr. at 544:13-545:9. Similarly, Steves' internal documents suggest that some doorskins for which Steves had sent VDMs to JELD-WEN were determined to be usable after JELD-WEN inspected them. See ECF Nos. 1114-7, 1114-8. There is no doubt that the VDMs upon which Tucker based his calculation might pertain to doorskins with actual defects, but this evidence creates serious doubt as to the probability, or the extent, of such defects. Accordingly, the "mere possibility" that JELD-WEN failed to reimburse Steves for defective doorskins is not enough to sustain the jury's inference in that regard. See Bennett, 552 F. App'x at 226 (quoting Lovelace, 681 F.2d at 241).

Furthermore, JELD-WEN's changed course of performance does not make the existence of actual defects any more probable because the evidence does not show that JELD-WEN altered its course of performance under the Supply Agreement. Gartner's testimony about JELD-WEN's practically reflexive reimbursement of Steves' VDMs related to the period between 2010 and 2011, well before the Supply Agreement was executed in May 2012. During that period, the parties performed under a different

contract with a separate doorskin quality provision. See ECF No. 1192-3, § 8. Edward Steves' testimony also seems to pertain to the period before the 2012 Merger, and his testimony does not suffice to establish a course of performance under Section 8 during the short time between the execution of the Supply Agreement and the closing of the 2012 Merger in October 2012. See Summary Judgment Op. at 5. Accordingly, neither Gartner's nor Edward Steves' statements support Steves' assertion that JELD-WEN changed its doorskin reimbursement approach when Hachigian took over JELD-WEN.

Moreover, viewing JELD-WEN's doorskin inspection process as a changed course of performance instead of as an exercise of its contractual right would render the inspection clause in Section 8 mostly impotent. It would make little sense for JELD-WEN to inspect doorskins with claimed defects if Steves' VDM process was always to be accepted without challenge. Viewing the evidence in the way that Steves suggests thus produces a result that is contrary to a core principle of Delaware contract law. See O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 287 (Del. 2001) ("Contracts are to be interpreted in a way that does not render any provisions illusory or meaningless." (internal quotations omitted)). As a result, Steves' argument cannot be credited.

For these reasons, Steves did not present sufficient evidence to allow the jury to infer that JELD-WEN wrongfully failed to reimburse Steves for $411,458 because of defective doorskins. Therefore, judgment as a matter of law on COUNT TWO will be granted to the extent that the claim is based on that theory and paragraphs 8 and 9 of the verdict will be vacated.

## III. Failure to Reimburse for Cost of Doors That Incorporated Defective Doorskins

Gartner also provided the bulk of the testimony about reimbursement from JELD-WEN for Steves' doors that incorporated defective doorskins. As discussed above, Steves employees visually inspected doorskins for defects in the course of assembling a door. However, defective doorskins were included in finished doors that Steves sold to its customers, in some cases because the defects could not be identified until after the door is manufactured. Feb. 2 Trial Tr. at 536:17-537:12. When a customer rejected a door as defective, a Steves sales manager completed a field inspection report ("FIR") with the door description, the identifier number, and the specific defect. Id. at 535:11-20. If Steves determined that the door had a defect, the customer received a credit from Steves for the purchase price of the door. Id. at 535:20-23, 537:13-15. Although customers sometimes returned the defective doors to Steves, they were most often disposed of by the customers themselves because

15

of the shipping cost of returning the doors to Steves. Id. at 538:15-539:7. Sam Steves generally confirmed these details. See Jan. 29 Trial Tr. (ECF No. 1027) at 346:15-347:2.

According to Gartner, in 2010 and 2011, Steves sought reimbursement from JELD-WEN for the full cost of the doors with defective doorskins—i.e., the sale price that Steves refunded to the customers—because JELD-WEN would typically pay that entire amount.[5] In those situations, Steves would submit a VDM for the defective door to JELD-WEN, just as it did with the defective doorskins. Feb. 2 Trial Tr. at 537:16-25. Sam Steves testified that this practice continued after the Supply Agreement took effect. For example, he described a VDM submitted to JELD-WEN in June 2013 for doors with defective doorskins, which led to credits by JELD-WEN for the full sale prices of the doors. See Jan. 29 Trial Tr. at 349:2-350:2; ECF No. 1149-1. Gartner also testified that Steves sought a substantial reimbursement from JELD-WEN in 2014 for the full amount that Steves refunded one customer, REEB, for doors with defective doorskins. JELD-WEN only paid "a small portion" of that claim. Feb. 2 Trial Tr. at 533:21-535:10; see also ECF No. 1149-2.

---

[5] Fancher explained that JELD-WEN "never [had] a policy . . . to pay on doors," but did so "[a]s goodwill." Feb. 9 Trial Tr. at 1809:21-1810:4.

However, according to Sam Steves, JELD-WEN adopted a policy in 2015 to reimburse Steves for the defective doorskins only, rather than the full cost of the doors. Thus, even "[i]f one skin causes an entire door to fail, [JELD-WEN] will only credit for one skin." Jan. 29 Trial Tr. at 350:3-23. JELD-WEN apparently told Steves that "[t]here was a specific change in their [door reimbursement] policy," which applied whether the doors with defective doorskins were sold to customers or remained in Steves' manufacturing plant. Id. at 351:3-23. This shift followed what Fancher characterized as a "general direction" from JELD-WEN's management to "tighten" its door reimbursement process. Feb. 9 Trial Tr. at 1810:5-22. Indeed, e-mails between JELD-WEN employees in late 2014 and early 2015 stated that JELD-WEN, largely at Hachigian's instruction, had to "take a very hard line" and "get tough" on all claims; require "complete data [and] photos" before paying claims on doors, ECF No. 1149-4; and avoid the "full refund[s]" that JELD-WEN had previously given to Steves. ECF No. 1149-5.

After JELD-WEN started taking that approach, Steves decided in early 2015 to stop submitting VDMs to JELD-WEN for doors with defective doorskins. Feb. 2 Trial Tr. at 538:1-4. Gartner explained that giving JELD-WEN the opportunity to inspect the doors with defective doorskins, which JELD-WEN required as a predicate to reimbursement, was financially impractical for

17

Steves. The cost of the customer's refund plus return shipping for the door far outweighed the potential reimbursement from JELD-WEN: "If a door sells for [$]25 to $125, and we're able to get five or $6 back on a skin, it doesn't pay to pay maybe [$]500 to $1,000 in freight to bring that product back." Id. at 538:5-10.

As with the defective doorskins claim, the jury's award of $1,776,813 for unreimbursed doors was identical to Tucker's damages figure. See Feb. 7 Trial Tr. at 1200:22-25. Tucker calculated those damages by reviewing a database with Steves' FIRs and VDMs from 2014 to 2017 for doors with defective doorskins, subtracting the small amount reimbursed by JELD-WEN for the REEB doors claim[6] from the total cost to Steves of making those defective doors. Id. at 1200:8-1201:13. He did not testify about the particular defects identified in the FIRs and VDMs that he reviewed.

JELD-WEN asserts that judgment as a matter of law should be granted because, considering this evidence, Steves has not proven: (1) that the Supply Agreement required JELD-WEN to reimburse Steves for the cost of doors with defective doorskins; or (2) that, even if some obligation existed, JELD-WEN breached

---

[6] Steves did not reimburse the cost of doors beyond the doorskin prices for any doors from 2015 to 2017. Feb. 7 Trial Tr. at 1201:9-13.

it with respect to the unreimbursed doors used in Tucker's calculation. These arguments are addressed in turn below.

## A. Existence of Contractual Obligation

Whether Steves should have been reimbursed for doors with defective doorskins depends on the effectiveness of the additional costs provision in Section 8 of the Supply Agreement. Under that provision, "[a]ny additional costs over the price of the Defective Product shall be negotiated by [Steves and JELD-WEN] on a case by case basis." Supply Agm't § 8. Edward Steves acknowledged that this clause gives JELD-WEN "the right to not pay [Steves], if that's [JELD-WEN's] position." Feb. 3 Trial Tr. at 779:10-11. Consequently, if the provision is valid, the jury could not award damages for the full cost of the doors because JELD-WEN was not required by Section 8 to reimburse Steves for anything more than the price of defective doorskins, and thus that JELD-WEN's failure to do so was not a breach of contract.

Delaware law clearly permits damages limitations like the provision in question. The Delaware Code notes that "the effect of provisions of the Uniform Commercial Code may be varied by agreement." Del. Code tit. 6, § 1-302(a). Moreover, an agreement "may provide for remedies in addition to or in substitution for those provided in this Article [concerning contract damages] and may limit or alter the measure of damages recoverable under this Article." Id. § 2-719(1)(a). The additional costs provision in

the Supply Agreement operates as a restriction on the damages available to Steves, effectively protecting JELD-WEN from liability for costs beyond the price of defective doorskins. Section 2-719 allows the limitation in Section 8 unless it "fail[s] of its essential purpose" or is "unconscionable." Id. § 2-719(2)-(3).

Steves does not argue that the provision is unconscionable. Instead, Steves contends that the limitation fails of its essential purpose because the doorskins that were incorporated into doors contained latent defects that Steves could not have discovered during a reasonable inspection. In support of this argument, Steves points to Crowell Corp. v. Himont U.S.A., No. 86C-11-125-JEB, 1996 Del. Super. LEXIS 400 (Del. Super. Ct. Sept. 4, 1996), in which a contract provision limited plaintiff's damages to the purchase price of a laminate sold by defendant that plaintiff used in its sealing tape (which was in turn used by plaintiff to manufacture cardboard cartons). See id. at *1, *3-4. The court found that the laminate contained a latent defect, which became apparent when the tape began to delaminate after it was manufactured. Id. at *4-5. As a result, the damages limitation failed of its essential purpose because the defect "presented changed circumstances" between the parties and, more importantly, "operated to deprive [plaintiff] of the substantial value of its bargain" given the substantial

20

additional expenses caused by the defect. Id. at *9. Here, apparently relying solely on Gartner's testimony, Steves asserts that the doorskin defects that led customers to reject doors were latent because they could not have been discovered through Steves' inspection during the skin-flipping process. Thus, says Steves, here, as in Crowell, the doorskin defects deprived Steves of the value of its bargain with JELD-WEN because it was forced to incur unexpected losses by refunding customers for the purchase price of full doors, which are exponentially higher than doorskin prices. Therefore, in Steves' view, JELD-WEN must pay any consequential and incidental damages that flow from the latent defects, see Del. Code tit. 6, §§ 2-714, 2-715, which would include the cost of doors that JELD-WEN knew Steves would use the doorskins to manufacture.

This argument is appealing in theory but is unsupported by the evidence at trial. Numerous courts other than Crowell have noted that contractual limitations of remedy to the purchase price of defective goods alone fail of their essential purpose if those goods contain latent defects. See, e.g., Viking Yacht Co. v. Composite One LLC, 385 F. App'x 195, 208 (3d Cir. 2010) ("'[W]hen goods have latent defects which are not discoverable upon receipt and reasonable inspection, a limitation of remedy to return of the purchase price fails of its essential purpose.'" (alteration in original) (quoting Fiberglass

Component Prod., Inc. v. Reichhold Chems., Inc., 983 F. Supp. 948, 960 (D. Colo. 1997))); Lutz Farms v. Asgrow Seed Co., 948 F.2d 638, 646 (10th Cir. 1991) ("'[O]ne situation in which a limitation of remedy to return of the purchase price has been held to fail of its essential purpose is when goods have latent defects which are not discoverable upon receipt and reasonable inspection . . . .'" (alteration in original) (quoting Leprino v. Intermountain Brick Co., 759 P.2d 835, 837 (Colo. App. 1988))). But that situation only arises where the defect at issue is clearly latent. In Crowell, for instance, trial evidence established that the defect in the laminate was caused by "a sudden shift in viscosity at temperatures below the application temperature," and thus could not have been discovered by reasonable inspection or observation. 1996 Del. Super. LEXIS at *4-5. Here, in contrast, the only evidence concerning latent doorskin defects is Gartner's statement that "[s]ome defective doorskins literally can't be identified through the plant where they're going to manifest themselves with the problem once they're in the field," followed by a brief discussion of moisture content issues as an example. Feb. 2 Trial Tr. at 536:21-537:12. No witnesses—including Gartner, Fancher, Sam Steves, Edward Steves, and Tucker—stated whether those moisture content problems affected the particular doors for which Steves issued refunds to customers and is now seeking

22

damages. Nor did any of those witnesses testify about the particular defects associated with each door. The doors may have been inadequate because of latent doorskin defects, but it is equally possible that the defects in those doors were defects that Steves' skin-flippers could (and should) have noticed. The record provides no evidence that the jury could have used to decide between these alternatives.[7] Consequently, the record does not establish that the additional costs limitation in Section 8 fails of its essential purpose.

Alternatively, Steves contends, JELD-WEN committed to a course of performance under Section 8 by consistently reimbursing Steves for the full cost of doors with defective doorskins, essentially rendering the additional costs provision meaningless. A course of performance between parties to a transaction exists if: "(1) [t]he agreement of the parties . . . involves repeated occasions for performance by a party; and (2) [t]he other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." Del. Code tit. 6, § 1-303(a). Citing Gartner's and Sam Steves'

---

[7] In fact, Gartner also testified—in the same answer quoted above—that defects that could not be discerned through visual inspection were only "[o]ccasional[]." Feb. 2 Trial Tr. at 536:19. This statement suggests that few, if any, of the doors involved in these claims actually had doorskins with latent defects.

testimony about JELD-WEN's "practice" of reimbursing Steves for the full costs of doors with defective doorskins without inspection by JELD-WEN, Steves argues that JELD-WEN's conduct constituted a course of performance from which JELD-WEN could not deviate, no matter what Section 8 says.

This assertion is flawed in two respects. First, the record that purportedly shows a course of performance does not satisfy both elements of Section 1-303(a). Based on the clear language of Section 8, and the Supply Agreement in general, it seems clear that the Supply Agreement contemplates "repeated occasions for performance" by JELD-WEN, id. § 1-303(a)(1)—both by supplying doorskins, and by reimbursing Steves for at least the cost of doorskins where they do not meet a certain quality. So the first part of § 1-303(d) is satisfied.

However, the record sheds very little light on the motivation underlying JELD-WEN's earlier reimbursement of the full door costs, or how it understood those actions with respect to the additional costs provision. JELD-WEN might have believed—as Steves suggests—that the provision effectively required JELD-WEN to negotiate reimbursement for the door costs in every situation, or it might simply have been negotiating "on a case by case basis" as Section 8 demands, deciding more often than not that full reimbursement was justified. The paucity of information about the frequency and context of door

reimbursements, aside from Gartner's and Sam Steves' general statements, makes it difficult to distinguish between the two options here. Thus, Steves' assertions about course of performance rest on a weak foundation.

Second, and more problematic for Steves, the clear meaning of the additional costs provision makes any JELD-WEN course of performance irrelevant. "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[8] Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997). And,

> a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Ambiguity does not exist where the court can determine the meaning of a contract without any other guide than a

---

[8] In some cases, extrinsic evidence about course of performance may help reveal a latent ambiguity, which exists when contractual language that is unambiguous on its face becomes ambiguous when applied. Motors Liquidation Co., Dip Lenders Tr. v. Allianz Ins. Co., No. CVN11C12022FSSCCLD, 2013 WL 7095859, at *4 (Del. Super. Ct. Dec. 31, 2013). But no apparent latent ambiguities exist here, and neither party has suggested one. In addition, a course of performance may be "relevant to show a waiver or modification of any term inconsistent with the course of performance." Del. Code tit. 6, § 1-303(f). However, Steves has never argued that JELD-WEN waived its right to negotiate additional costs on a case by case basis. Even if Steves had, the record contains minimal evidence to allow the Court to evaluate whether JELD-WEN's performance was inconsistent with the additional costs provision. Thus, these possible uses for course of performance evidence are inapplicable here.

> knowledge of the simple facts on which, from
> the nature of language in general, its
> meaning depends.

*Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (internal citations and quotations omitted). Nothing about the additional costs provision in Section 8 is ambiguous: the terms all have common-sense definitions, and the parties do not dispute that the only marginally ambiguous phrase, "additional costs," can be construed to include door costs. That Steves believes the clause to be ambiguous does not make it so. Given the absence of any uncertainty, JELD-WEN's previous actions with respect to reimbursement for doors with defective doorskins cannot change the plain meaning of the additional costs provision. Accordingly, the Supply Agreement did not obligate JELD-WEN to reimburse Steves in every instance for the refunded price of defective doors that Steves paid to customers, and JELD-WEN could not have breached the contract by failing to do so. In other words, the jury could not properly have awarded damages for a breach of a non-existent obligation. Judgment as a matter of law can, therefore, be granted as to the unreimbursed doors claim on this basis alone.

### B. JELD-WEN's Breach

Even assuming that the Supply Agreement required JELD-WEN to reimburse Steves for the full door costs, there was not

enough evidence for the jury to conclude that JELD-WEN breached that obligation. JELD-WEN contends that the evidence does not establish a breach of the additional costs provision for two reasons. First, it asserts that Steves' failure to give JELD-WEN notice of the purported defect and an opportunity to inspect prevented JELD-WEN from performing consistent with Section 8. Second, repeating an argument regarding the doorskins claim, JELD-WEN says that Tucker's calculations are fundamentally unsound because Steves has not shown that the doors on which those damages are based had doorskins that were actually defective.

The first argument relies on another part of Section 8 that is discussed in more detail above, which states that JELD-WEN must reimburse the cost of defective doorskins only after "notice, inspection and verification." As JELD-WEN points out, without the opportunity to inspect the allegedly defective product, it cannot verify that the defect is attributable to JELD-WEN. This is equally true for doors with defective doorskins as it is for the defective doorskins themselves. Moreover, evidence at trial indicated that JELD-WEN was not able to inspect some of the doors included in the REEB claim. And, of course, JELD-WEN had no notice of defective doorskins in non-REEB doors after early 2015, given that Steves stopped submitting door reimbursement VDMs to JELD-WEN.

Nonetheless, Steves' lack of notice is not an insurmountable obstacle because the jury considered evidence that any door reimbursement claims would have been futile. Delaware courts have recognized that "the law does not require a futile act." Reserves Development LLC v. R.T Props., L.L.C., No. CIV.A. S07C-11034RFS, 2011 WL 4639817, at *7 (Del. Super. Ct. Sept. 22, 2011) (citing, inter alia, Morgan v. Swain, No. CIV.A. 08A04003 RFS, 2009 WL 3309173, at *4 (Del. Super. Ct. Sept. 17, 2009); State v. Hearn, 697 A.2d 756, 758 (Del. Super. Ct. 1997)). Steves notes that there was no point in making the defective doors available for inspection after a certain date because JELD-WEN, according to Gartner and Sam Steves, had made clear that it would not reimburse Steves for defective doors under any circumstances. E-mails from Fancher and Hachigian that were presented at trial reiterated JELD-WEN's uncompromising stance.

Considering this evidence, the facts of this case do not seem so different from those in Reserves Development, where notice of default was not required because it "would not have led to agreement or compromise." 2011 WL 4639817 at *9. To the contrary, the parties here appear to have been similarly unable to resolve their dispute about reimbursing costs beyond the defective doorskins. For that reason, the Court instructed the jury that, to prevail on its defective doors claim, Steves had

to prove, among other elements, that it "gave notice [of the defective doorskins in the doors] to JELD-WEN and an opportunity to inspect those doors, or . . . that doing so would have been futile." See Jury Instruction, Instruction No. 39 (emphasis added). JELD-WEN's belief that Steves' futility argument merely goes to the amount of reimbursement Steves might receive, not the ability to be reimbursed at all, is irrelevant. The jury had more than enough evidence to assess the strength of Steves' futility argument, and obviously found it compelling. The Court cannot second-guess that determination or weigh the evidence after the fact. As a result, Steves' failure to give notice and an opportunity to inspect cannot subject its defective doors claim to judgment as a matter of law.[9]

Nonetheless, the unreimbursed doors claim suffers from the same problem as the defective doorskins claim: a lack of evidence about the defects affecting the doors. Of those doors that were inspected as part of the REEB claim, JELD-WEN offered evidence that a significant percentage were either not defective to the point where they were unusable, or they had defects that

---

[9] This conclusion is not influenced by Steves' brief argument that its lack of notice was excused by JELD-WEN's "unilateral change in [its] course of performance" under the additional costs provision, which Steves asserts was a breach of the Supply Agreement. Steves Suppl. Opp. (ECF No. 1149) at 23. As detailed above, JELD-WEN's earlier conduct is immaterial to the proper interpretation of the additional costs provision, and as such, cannot be considered as an independent breach of contract.

were caused by Steves. Steves' only response—that its doorskin inspection procedure was commercially reasonable in the absence of any specifications in the Supply Agreement, see Del. Code tit. 6, § 311—is unpersuasive. Steves is free to employ whatever inspection procedure is reasonable, but where that process has such a high rate of error, Steves must put forth more than generalized evidence to prove that the damages it seeks relate to doors with actual defects. Tucker's broad testimony about doors is inadequate in that regard. Moreover, Steves misinterprets the problem when it characterizes the issue as one of certainty in damages estimates. It is clear that there must only "be a sufficient evidentiary basis for making a fair and reasonable estimate of damages, rather than absolute certainty." Vianix Del. LLC v. Nuance Commc'ns, Inc., No. CIV.A. 3801-VCP, 2010 WL 3221898, at *6 (Del. Ch. Aug. 13, 2010) (citing Henne v. Balick, 146 A.2d 394, 396 (Del. 1958)). But, given the record evidence that many doorskins were not defective as defined by Section 8, Steves has not put forth enough other evidence to be able to prove that the doors for which it is seeking damages were probably defective. See Bennett, 552 F. App'x at 226. Consequently, the absence of evidence showing that JELD-WEN breached the Supply Agreement as to the unreimbursed doors provides an additional reason to grant judgment as a matter of law on that claim.

As a last resort, Steves claimed for the first time at oral argument that, even if JELD-WEN did not breach the Supply Agreement by failing to reimburse for doors with defective doorskins, it did so by failing to negotiate in good faith pursuant to the additional costs provision. The Complaint allegations cited by Steves do not reference any failure to negotiate. See Compl. (ECF No. 5) ¶¶ 118-20, 128-32, 179-82. Undeterred, Steves seeks leave to amend the Complaint to conform to the evidence presented at trial. See Fed. R. Civ. P 15(b)(2). However, Rule 15(b)(2) "requires that a party expressly or impliedly consent to trial on an unpled claim and not be prejudiced by doing so." Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc., 783 F.3d 976, 983 (4th Cir. 2015). Although Edward Steves noted JELD-WEN's refusal to negotiate, Feb. 3 Trial Tr. at 779:4-6 ("[T]hey also didn't negotiate. . . . [T]he contract says you shall be negotiated by the parties on a case-by-case basis. And that did not happen."), more is needed to show JELD-WEN's implied consent to trial on an unpled claim than failing to object to a single remark. See Dan Ryan Builders, 783 F.3d at 983 ("[A party]'s single reference to a breach of the slope fill contract in its pre-trial memorandum does not constitute consent."); Feldman v. Pro Football, Inc., 419 F. App'x 381, 390 (4th Cir. 2011) ("[A]lthough a party's failure to object to evidence regarding an unpleaded issue may be evidence

of implied consent to trial of an issue, it must appear that the party understood the evidence was introduced to prove the unpleaded issue." (internal quotation marks omitted)). The _Feldman_ predicate is not present here. As a result, there is no justification for Steves to conform its Complaint to include this unpled claim, and Steves cannot rely on the refusal to negotiate claim to somehow save its damages for the unreimbursed doors claim.

For the foregoing reasons, Steves' claim for damages in the amount of $1,776,813 because of JELD-WEN's failure to reimburse for the cost of doors that incorporated defective doorskins fails as a matter of law.

## CONCLUSION

For the foregoing reasons, and to the extent set out above, JELD-WEN, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST STEVES & SONS, INC. (ECF No. 968) will be granted and, the verdict on COUNT TWO, paragraphs 8 through 11, will be set aside and vacated.

It is so ORDERED.

/s/ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September 28, 2018