**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

STEVES AND SONS, INC.,

Plaintiff,

v.                                          Civil Action No. 3:16cv545

JELD-WEN, INC.,

Defendant.

## MEMORANDUM OPINION

This matter is before the Court on COUNTERCLAIM DEFENDANTS
STEVES AND SONS, INC., AND EDWARD STEVES AND SAM STEVES' RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST JELD-WEN, INC.
(ECF No. 1627), and INTERVENOR JOHN G. PIERCE'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW AGAINST JELD-WEN, INC. (ECF No.
1629) ("the Renewed Motions").[1] These motions are addressed to
the trade secret counterclaims brought by JELD-WEN, Inc. ("JELD-
WEN"). For the reasons set forth below, COUNTERCLAIM DEFENDANTS

---

[1] Both motions incorporate by reference the papers filed in
support of: (1) the motions for judgment as a matter of law
filed by Edward Steves and Sam Steves ("the Steves Brothers")
and by John Pierce ("Pierce"; with the Steves Brothers, "the
Intervenors") before trial began, ECF Nos. 1522, 1524; and (2)
the motions for judgment as a matter of law filed by Steves and
Sons, Inc. ("Steves"; with the Intervenors, "the Counterclaim
Defendants") and the Steves Brothers, and by Pierce, after the
close of evidence, ECF Nos. 1571, 1576. Consequently, those
earlier motions will be denied as moot.

STEVES AND SONS, INC., AND EDWARD STEVES AND SAM STEVES' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST JELD-WEN, INC. (ECF No. 1627) will be granted in part and denied in part; and INTERVENOR JOHN G. PIERCE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST JELD-WEN, INC. (ECF No. 1629) will be granted in part and denied in part.

## A.  PROCEDURAL STATUS OF MOTIONS

Before addressing the motions, it is necessary to sort out an irregularity in each of them.  The movants in COUNTERCLAIM DEFENDANTS STEVES AND SONS, INC., AND EDWARD STEVES AND SAM STEVES' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST JELD-WEN, INC. (ECF No. 1627) are Steves and Sons, Inc. ("Steves") and Sam Steves and Edward Steves.  The movant in INTERVENOR JOHN G. PIERCE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST JELD-WEN, INC. (ECF No. 1629) is John G. Pierce.

Both motions (ECF Nos. 1627 and 1629) relate to trade secrets counterclaims filed by JELD-WEN.  Steves was the only defendant named in JELD-WEN's counterclaims.  Sam Steves, Edward Steves and John G. Pierce later intervened as defendants to the counterclaims.  Those three individuals will be referred to as the "Intervenors."

2

Both motions (ECF Nos. 1627 and 1629) seek judgment on the theory that JELD-WEN's damages case was inadequate as a matter of law. However, because no damages were assessed against the Intervenors, the only defendant that can get relief under that theory is Steves. Thus, the Intervenors are not implicated in JELD-WEN's damage award and cannot attack it. In both motions, the Intervenors (Sam and Edward Steves in ECF No. 1627 and John G. Pierce in ECF No. 1629) seek judgment because JELD-WEN did not pursue the counterclaims against them.

## B. SUMMARY OF FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural background underlying this dispute has been addressed in detail in the Court's previous summary judgment opinions. See First Summary Judgment Op. (ECF No. 1424) at 2-16; Second Summary Judgment Op. (ECF No. 1581) at 2-3. Thus, it is necessary only to provide a brief outline for context.

Steves is an independent manufacturer of interior molded doors, and it relies primarily on JELD-WEN to supply it with the doorskins needed to make the doors. To that end, the parties entered into a long-term doorskin supply agreement in 2012 ("the Supply Agreement"). First Summary Judgment Op. at 2.

In 2016, Steves filed an action against JELD-WEN, alleging a federal antitrust claim, breach of contract claims and other

3

claims. During discovery in that action, JELD-WEN discovered evidence that, in 2015 and 2016, Steves, through Sam and Edward Steves, worked with Pierce and John Ambruz—both former JELD-WEN employees—to obtain information from JELD-WEN that would help Steves: (1) to verify the accuracy of JELD-WEN's key input costs for doorskins that it manufactured, which the Supply Agreement required JELD-WEN to provide to Steves; and (2) to develop a doorskin manufacturing plant. See id. at 3-7. Based on that evidence, JELD-WEN asserted counterclaims against Steves for, inter alia, misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA"). Id. at 8. Steves' antitrust and contract claims were tried to a jury in January 2018. JELD-WEN's trade secret counterclaims were tried to a jury in May 2018.

## C. THE RECORD RELATED TO THE DAMAGES ISSUE ASSESSED BY STEVES

In its counterclaims, JELD-WEN sought damages for the alleged trade secret misappropriation.[2] The request for damages was based on the testimony of JELD-WEN's damages expert, John Jarosz ("Jarosz"), who calculated damages under three different

---

[2] JELD-WEN also sought injunctive relief. The request for injunctive relief is the subject of COUNTERCLAIMANT JELD-WEN, INC.'S MOTION FOR PERMANENT INJUNCTION AGAINST COUNTERDEFENDANT STEVES & SONS, INC. (ECF No. 1631) in which further briefing has been scheduled. That issue is not addressed in this Memorandum Opinion.

4

scenarios. The first two measured: (1) unjust enrichment damages based on Steves' use of certain process-related trade secrets to achieve reduced costs for manufacturing doorskins in its own hypothetical doorskin plant ("Scenario One"); and (2) unjust enrichment damages based on Steves' use of certain financial trade secrets in negotiations for lower doorskin prices with JELD-WEN or other doorskin suppliers ("Scenario Two"). See Second Summary Judgment Op. at 8-9; May 4 Trial Tr. at 1423:11-1424:19. The third scenario computed reasonable royalty damages by combining two quantitative methods, the incremental benefits approach and the licensing comparables approach ("Scenario Three"). See Second Summary Judgment Op. at 9-11; May 4 Trial Tr. at 1426:2-24, 1449:6-17.

At trial, the jury was presented with a list of sixty-seven alleged trade secrets that JELD-WEN claimed to have been misappropriated. Jarosz testified that Scenario One was based on his quantification of the benefits provided by the misappropriation of trade secrets 4, 26, 27, and 47. May 4 Trial Tr. at 1432:17-1433-9. Of those four alleged trade secrets, only alleged trade secret 47 was found to be trade secrets by the jury.

Jarosz testified that Scenario Two was based on the benefits derived from trade secrets 36 to 38 and 44 to 52, id. at 1437:13-1438:3. Of those thirteen alleged trade secrets, only

5

alleged trade secrets 46 and 47 were found by the jury to be a trade secret.

Scenario Three, in contrast, reflected Jarosz's construction of a hypothetical negotiation between Steves and JELD-WEN for Steves' use of all of the trade secrets asserted. See id. at 1448:3-1449:5. According to Jarosz, the royalty rate ranges under the incremental benefits approach—which incorporated Scenario One and Two's figures—were 2.8% to 13.4% and 4.6% to 6%, respectively. See id. at 1449:20-1450:8. Jarosz then compared the hypothetical license that would have been negotiated in this case to other licenses for the use of intellectual property ("IP"), which had a royalty rate range of 2.5% to 10%. See id. at 1451:6-1454:18. He testified that a royalty rate under those comparable licenses would not "change[] with the size of the portfolio of IP"; that is, it would "stay[] the same" even "[i]f the portfolio got larger or smaller," because "what was being paid was access to a business. And it didn't matter precisely what the components of the IP . . . were." Id. at 1455:1-10. Judging those ranges in light of certain qualitative factors, Jarosz determined that the "correct" royalty rate for the hypothetical negotiation here was 3%. See id. at 1455:18-1461:4. He then multiplied that rate by the assumed selling price of doorskins manufactured by Steves with the license and the volume of production over a ten-year

6

period, and discounted the result to present value, yielding a lump-sum reasonable royalty of $9.9 million. Id. at 1461:5-11.

After considering the evidence, the jury determined that only eight of the sixty-seven alleged trade secrets (Nos. 9, 10, 11, 23, 31, 46, 47, and 59) constituted trade secrets. See Verdict Form (ECF No. 1609). It then concluded that, for the DTSA claim, seven trade secrets (all except 59) had been misappropriated, and that such misappropriation was neither willful nor malicious. See id. at 6-7, 14, 18, 27, 34. Then, the jury determined that JELD-WEN was entitled to an award of $1.2 million as a reasonable royalty for those eight secrets. Id. at 40. The only difference as to the TUTSA claim was the jury's finding that trade secret 59 had been misappropriated (but neither willfully nor maliciously). See id. at 46-47, 54, 58-59, 67-68, 74-75. As a result, the jury's TUTSA and DTSA reasonable royalty awards were identical. See id. at 80.

## D. THE MOTIONS FOR JUDGMENT AS A MATTER OF LAW FILED BY STEVES AND THE INTERVENORS

Steves and the Intervenors all moved for judgment as a matter of law before the case was submitted to the jury. See Fed. R. Civ. P. 50(a)(2). However, the Court did not rule on those motions, which presented several disputed issues that were eliminated or materially affected by the jury's verdict. Because the Counterclaim Defendants have now timely filed the Renewed

7

Motions, the Court must rule on those motions instead of the earlier ones. See Fed. R. Civ. P. 50(b). The Renewed Motions rest entirely on the same two arguments. See Steves & Steves Bros. Mem. (ECF No. 1628) at 1 n.2 ("Steves and the Steves Brothers do not renew any other argument made in their [original] Rule 50(a) motions."); Pierce Mem. (ECF No. 1630) at 1 n.2 (same).

First, the Intervenors assert that they should be granted judgment as a matter of law because JELD-WEN did not amend the counterclaims to seek judgment against them; JELD-WEN did not identify in the Final Pretrial Order any triable issues as to them; and JELD-WEN did not tender a verdict form requesting judgment against them. This theory does not implicate Steves.

Second, Steves argues that, because under Scenario Three of the damage calculations, Jarosz determined reasonable royalty damages collectively, based on the existence of sixty-seven trade secrets, and because the jury found that only eight of the alleged sixty-seven trade secrets were misappropriated, Jarosz's collective valuation did not provide an adequate basis to determine a reasonable royalty for the only eight trade secrets as to which a damage award could be made. As explained above, the theory is not available to the Intervenors even though they have advanced it as an alternative basis for judgment as a matter of law.

8

## DISCUSSION

### I. Legal Standard

A court may grant judgment as a matter of law against a party on a claim if the party "has been fully heard on an issue" at trial and "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," assuming that a "favorable finding on that issue" is necessary for the party to prevail on the claim. Fed. R. Civ. P. 50(a)(1). Thus, "[j]udgment as a matter of law 'is properly granted if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof.'" Russell v. Absolute Collection Servs., Inc., 763 F.3d 385, 391 (4th Cir. 2014) (quoting Wheatley v. Wicomico Cty., 390 F.3d 328, 332 (4th Cir. 2004)). However, the court must "view[] the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and draw[] every legitimate inference in that party's favor," and judgment as a matter of law is proper only if "the only conclusion a reasonable jury could have reached is one in favor of the moving party." Int'l Ground Transp. v. Mayor of Ocean City, 475 F.3d 214, 218 (4th Cir. 2007). Judgment as a matter of law may be entered on "purely legal issues unrelated to the sufficiency of the evidence at trial." 9 Moore's Federal Practice, § 50.05[3] (Matthew Bender 3d Ed.); K&T Enters., Inc.

9

v. Zurich Ins. Co., 97 F.3d 171, 175 (6th Cir. 1996); Chesapeake Paper Prod. Co. v. Stone & Webster Eng'g Corp., 51 F.3d 1229, 1236 (4th Cir. 1995).

## II.  Claims Against Intervenors: Consequences of Intervention

The Intervenors contend that judgment as a matter of law must be entered in their favor on the DTSA and TUTSA claims[3] because JELD-WEN did not identify in the Final Pretrial Order any triable issues as to them; and JELD-WEN did not tender a verdict form requesting judgment against them.  This contention requires a close look at the history of the case, an examination of the Intervenors' involvement in this action, and the legal principles that apply to intervention.

The case began when Steves filed claims against JELD-WEN for violation of the Clayton Act, for breach of contract, and several other claims, as well as a request for declaratory relief.[4]  During discovery in the case brought by Steves, JELD-WEN found evidence that Steves, Edward and Sam Steves, and

---

[3]  Sam and Edward Steves also intervened as Counterclaim Defendants to JELD-WEN's tortious interference counterclaims, see ECF No. 833 at 6. The Court granted summary judgment on those counterclaims as against Steves, ECF No. 1290, eliminating any interest Sam and Edward Steves may have had in those counterclaims.

[4]  Except for the antitrust claims, the claims for breach of contract, and the request for declaratory relief, all other claims made by Steves have been removed from the case for various reasons not here pertinent.

10

Pierce had misappropriated some of JELD-WEN trade secrets. So JELD-WEN filed the trade secrets Counterclaim.[5] The only named Counterclaim Defendant was Steves even though the text of the Counterclaims named Sam and Edward Steves and Pierce as the misappropriating individuals and outlined their allegedly culpable conduct in great detail. In fact, without the allegations pertaining to the conduct of Sam and Edward Steves and Pierce, the trade secrets counterclaims would not have been viable or plausible.

Steves sought transfer of the Counterclaims to Texas where all defendants were amenable to in personam jurisdiction. JELD-WEN opposed transfer. The Court agreed with JELD-WEN and kept the Counterclaims in this Court (ECF No. 240). However, after JELD-WEN received some adverse rulings in this Court, it filed a case in Texas alleging the same trade secrets violations that were asserted in JELD-WEN's Counterclaims in this case (the "Texas Case"). Then, in furtherance of its forum shopping, JELD-WEN moved voluntarily to dismiss its trade secret Counterclaims in this case with a view to pursuing the Texas Case. Because this case was already set for trial, Steves opposed that motion and the Court denied it (ECF No. 579).

_____

[5] JELD-WEN's other counterclaims were dismissed for reasons not relevant here.

The Intervenors moved to intervene in this case in late November 2017, after the Court had denied JELD-WEN's motion voluntarily to dismiss its Counterclaims. On January 18, 2018, the Court granted the Intervenors' motions to intervene and required the Intervenors to file answers to the Counterclaims. Also, JELD-WEN was allowed to amend its Counterclaims by January 31. ECF No. 832. Although the Intervenors immediately filed their answers, ECF Nos. 837-38, JELD-WEN never amended its Counterclaims. And, aside from an issue that was resolved at the beginning of trial by a motion in limine,[6] JELD-WEN did not identify in the Final Pretrial Order any triable issues that specifically pertained to liability of the Intervenors, even though its identified factual and legal issues as to Steves cited extensively the conduct of the Intervenors. Indeed, all identified factual contentions and triable issues related to Steves. See ECF No. 1586-11 at 2-3; ECF No. 1586-12 at 3-4.

Based on the fact that JELD-WEN had identified no triable issues against them, the Intervenors moved for judgment as a matter of law immediately before trial began. Those motions

---

[6] JELD-WEN posed as a triable issue "[w]hether John Pierce spoliated relevant evidence when he had a duty to preserve evidence because he reasonably expected future litigation." ECF No. 1586-11 at 3. However, the Court denied JELD-WEN's motion for spoliation sanctions, see ECF No. 1536, and JELD-WEN did not raise the issue at trial.

came on the eve of trial and they were not decided before trial began. Thus, the Intervenors participated at trial without prejudice to their request for such relief. See ECF Nos. 1522, 1524; Apr. 30 Trial Tr. at 126:24-127:14.

At trial, virtually all of the evidence presented by JELD-WEN about the misappropriation of its alleged trade secrets was about the conduct of, and actions taken by, Edward and Sam Steves and Pierce.[7] JELD-WEN could not have prevailed on any trade secret misappropriation without that proof because, according to JELD-WEN, the conduct of the Intervenors was at the core of the misappropriation. When, after the evidence was in, it came time to tender jury instructions and a proposed verdict form so that the jury could render judgment against culpable parties, JELD-WEN offered no instructions pertaining to the liability of the Intervenors and JELD-WEN's proposed verdict form did not call upon the jury to find the Intervenors liable.

The Intervenors contended then, and reiterate now, that judgment as a matter of law is appropriate because JELD-WEN did not amend its Counterclaims to seek relief against the Intervenors; that JELD-WEN did not identify any triable issues

---

[7] There was some testimony attributing some misappropriation to John Ambruz, a non-party here, but a party in the Texas case.

13

against the Intervenors;[8] that JELD-WEN did not attempt to modify the Final Pretrial Order to do so even though this allegedly fatal omission had been brought to their attention; that JELD-WEN tendered neither instruction nor a proposed verdict form that would allow for a finding of liability; and that JELD-WEN agreed to a verdict form that allowed the resolution of its trade secrets Counterclaims without judgment against the Intervenors. See Fed. R. Civ. P. (16)(e).

JELD-WEN's response is simple. It plainly concedes that it never amended its Counterclaims nor raised any triable issues against, nor sought judgment against, the Intervenors. However, JELD-WEN argues that this reality makes judgment as a matter of law entirely inappropriate because Rule 50(a), by its plain text, only permits judgment as a matter of law on "claim[s]" that a party has asserted. Fed. R. Civ. P. 50(a)(1)(B). Then, says JELD-WEN, because it has alleged no claims against the Intervenors, there is simply nothing on which the Court could enter judgment.

These arguments must be viewed against several basic principles applicable to intervention. First, it is settled that "an intervenor must generally 'take the case as he finds

[8] The Intervenors correctly point out that such failures normally operate as a waiver of a party's right to have the omitted issue tried. See McLean Contracting Co. v. Waterman Steamship Corp., 277 F.3d 477, 480 (4th Cir. 2002).

14

it.'" Liberty Mut. Fire Ins., 314 F.R.D. at 187 (quoting Newport News Shipbuilding & Drydock, 646 F.2d at 122) and that intervenors "cannot change the issues framed between the original parties, and must join subject to the proceedings that have occurred prior to [their] intervention." Wright & Miller, supra, § 1920 (internal quotations omitted).

Second, there is no dispute that, having intervened, the Intervenors are parties (Counterclaim Defendants) to the litigation. And, that status carries consequences because, in that posture, the Intervenors can, depending on the particular circumstances: participate in discovery, see Liberty Mut. Fire Ins. Co. v. Lumber Liquidators, Inc., 314 F.R.D. 180, 187 (E.D. Va. 2016); appeal judgments that may be adverse to them, see Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n, 646 F.2d 117, 123 (4th Cir. 1981); or demand a jury trial on any legal issues they present, see Campbell v. Plank, 133 F.R.D. 175, 176 (D. Kan. 1990) (citing Ross v. Bernard, 396 U.S. 531, 541 n.15 (1970)).

Third, it is settled that, "[u]nless conditions have been imposed, the intervenor is treated as if the intervenor were an original party." 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1920 (3d ed. 1998); see also League of United Latin Am. Citizens v. Wilson, 131 F.3d 1297, 1304 (9th Cir. 1997); Alvarado v. J.C. Penney Co., 997 F.2d 803,

15

805 (10th Cir. 1993); Brown v. Demco, Inc., 792 F.2d 478, 480-81 (5th Cir. 1986); Schneider v. Dumbarton Developers, Inc., 767 F.2d 1007, 1017 (D.C. Cir. 1985).[9] The only conditions imposed on intervention were that the trial would not be postponed and the Intervenors could not reopen discovery. (Memorandum Opinion, ECF No. 833). There were no conditions that would limit the Intervenors' exposure to liability on the trade secret claims.

Fourth, intervenors can "litigate fully on the merits once intervention has been granted." Id. Similarly, courts have recognized that, "[b]y successfully intervening, . . . part[ies] make[] [them]sel[ves] vulnerable to complete adjudication . . . of the issues in litigation between the

---

[9] It is worth noting that almost all of the cases cited by Wright and Miller in support of that general proposition concerned intervention as of right, not permissive intervention. See Wilson, 131 F.3d at 1302; Alvarado, 997 F.2d at 804; Schneider, 767 F.2d at 1017; District of Columbia v. Merit Sys. Prot. Bd., 762 F.2d 129, 132 (D.C. Cir. 1985); Donovan v. Oil, Chem., & Atomic Workers Int'l Union & Its Local 4-23, 718 F.2d 1341, 1350 (5th Cir. 1983); United States v. Oregon, 657 F.2d 1009, 1014 (9th Cir. 1981); Campbell, 133 F.R.D. at 176; Sec. Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys., 628 F. Supp. 1438, 1440 (D.D.C. 1986). This makes sense, because the stricter requirements of Rule 24(a) show that intervenors as of right usually have a more substantial interest at stake than permissive intervenors. However, other courts have extended the principle to permissive intervention, and neither Rule 24 nor Wright and Miller distinguish between the rights of mandatory and permissive intervenors. See Ecee, Inc. v. Fed. Energy Regulatory Comm'n, 645 F.2d 339, 351 (5th Cir. 1981); Conseco v. Wells Fargo Fin. Leasing, Inc., 204 F. Supp. 2d 1186, 1193 (S.D. Iowa 2002). Thus, the Court will assume for the sake of the Intervenors' argument that this broad statement applies here.

16

intervenor and the adverse party." Merit Sys., 762 F.2d at 132
(emphasis added). Likewise, it has been held that, if
intervenor-defendants file answers or motions, or otherwise
participate in a case, plaintiffs can seek to hold them liable
in the same way as normal defendants, whether or not the
plaintiff amends the complaint to seek such relief. See
Schneider, 767 F.2d at 1017 ("As an intervenor, the defendant
subjected itself to the plaintiff's claims against the
[original] defendant, notwithstanding plaintiff's failure to
amend his complaint to include reference to [the intervenor].")
(emphasis added); Merit Sys., 762 F.2d at 132 (where intervenor
"filed a substantial motion to dismiss and assumed an active
role in defending his interests in the underlying controversy,"
plaintiff could "obtain relief against the intervenor-defendant
even if the original defendant [wa]s eliminated from the
lawsuit"); Ctr. for Envtl. Sci. Accuracy & Reliability v. Nat'l
Park Serv., No. 114CV02063LJOMJS, 2016 WL 4524758, at *9 (E.D.
Cal. Aug. 29, 2016) (plaintiffs' "failure to name [intervenor]
in an amended complaint [w]as not fatal" to plaintiffs' claim
where intervenor filed answer addressing claim) (emphasis
added). Indeed, that potential exposure is "the 'price'
of . . . intervention" as a defendant. Merit Sys., 762 F.2d at
132 (emphasis added).

Finally, intervenor-defendants can also force the resolution of certain issues. In Alvarado, for example, two manufacturers intervened as defendants to disclaim their liability to both the plaintiff and their co-defendant, which could possibly assert an indemnification claim against the manufacturers in the future. The court affirmed the grant of summary judgment in favor of the manufacturers as against the plaintiff and co-defendant, even though the co-defendant had not asserted any claim against the manufacturers, reasoning that the manufacturers had clearly raised adverse issues against both parties. See Alvarado, 997 F.2d at 805 ("[W]here the intervenor claims an interest adverse to both plaintiff and defendant he or she is entitled to have the issues raised thereby tried and determined." (internal quotations omitted)).

The Intervenors argue that they are in the same position as the intervenor-defendants in Alvarado, Schneider, and Merit Systems, but they are not in exactly the same posture as the intervenor-defendants in those cases. In Schneider and Merit Systems, the plaintiffs made concerted efforts to assert their claims or obtain a judgment against the intervenor-defendants, who were trying to use their position as intervenors to avoid liability. Here, JELD-WEN did not amend its Counterclaims to name the Intervenors as defendants or to seek relief against them.

Alvarado is not on point either. Once the manufacturers in that case intervened, they could "make their claims known" to the other parties. Alvarado, 997 F.2d at 805. Through an answer and a motion for summary judgment, "the manufacturers did just that, requesting a declaratory judgment of sorts to resolve the ultimate issue [in the case] as a basis for liability." Id. That was not what happened here.

However, the Intervenors' motion is not disposed of because it differs from Alvarado, Schneider, and Merit Systems in those ways.   The critical principle here is that JELD-WEN, in its Counterclaims and in its evidence at trial, made this case about the conduct of the Intervenors.   In so doing and by virtue of the intervention, the Intervenors were exposed to judgment even though JELD-WEN failed to amend the counterclaim to specifically name them as defendants.   Schneider, 767 F.2d at 1017; Ctr. for Envtl. Sci. Accuracy & Reliability, at *9.   That is the price of intervention.   Merit Sys., 762 F.3d at 132.

This case is governed by the principle that, once intervention is allowed, the Intervenor is a full party to the case and once a party intervenes as a defendant, it is exposed to liability on the plaintiff's claims (here JELD-WEN's Counterclaims) even if the complaint or counterclaim is not amended to name the intervenor as a defendant.   Because that is so, the plaintiff (counterclaim plaintiff) is able to recover

19

from the Intervenor if the claim is proven by evidence and the jury is asked to return a verdict against the intervening defendant.

The consequences of failing to identify a triable issue, or to seek a verdict, against the Intervenors rests on JELD-WEN. That is because, by virtue of the intervention, the claims are asserted against the Intervenors by operation of law. That is the teaching of Schneider and Merit Systems. The failure of JELD-WEN to comply with Rule 16(e) or to ask the jury to assess liability operates to relieve the Intervenors of liability just as would be the case if the plaintiff had identified no triable issues, or had not sought judgment, against a named defendant.

JELD-WEN asserts that it did not need to amend its Counterclaims to include the Intervenors as Counterclaim Defendants under the principles that: (1) the Intervenors must take the case as they find it; and (2) JELD-WEN is master of its claims. But that theory elevates form over substance and it puts more weight on those two precepts than they can carry.

It is true that, here, the Intervenors found a counterclaim that did not name them as defendants, but they also found a counterclaim that charged them, specifically and in graphic detail, with committing the acts of misappropriation that were the gravamen of the Counterclaims. The Intervenors asked to intervene so that they could defend against those charges. They

20

were allowed to do that. And, thereafter, they fully participated in the pretrial and trial proceedings. And, under the law, in so doing, they exposed themselves to judgment on both the DTSA and the TUTSA claims. Having done that, they are now told by JELD-WEN that their effort was for naught because you must take the case as you find it and we are the masters of our Counterclaims.

That position actually sets at naught the legal system that allows intervention of the decision allowing intervention, and all of the other principles that apply when intervention is allowed. If accepted, that position would result in the waste of judicial resources and sanction the needless duplication of litigation. For example, under JELD-WEN's "mastery of its pleading" and "take the case as you find it" theory, JELD-WEN can litigate against the Intervenors in the Texas Case the exact same misappropriation of all the trade secrets that the jury found not to be trade secrets. That is the consequence of adopting JELD-WEN's theories here. That, of course, would mean another multi-week trial involving the same evidence that the jury heard here. And, it would give JELD-WEN another bite at the apple as to the alleged trade secrets that the jury in this case found not to be trade secrets at all.

It is, of course, possible that a finding of collateral estoppel could (and should) foreclose that result in the Texas Case. But, because this matter has been decided by a jury in this case, there is no warrant to subject the parties, or the courts, to any further trial preparation or trial on issues that were fully tried and decided in this case. Moreover, a second trial is not legally appropriate because Sam and Edward Steves and Pierce intervened in this case as defendants, participated in the trial in which their conduct was the linchpin of the case against Steves, and, by operation of law, exposed themselves to judgment on JELD-WEN's DTSA and TUTSA claims, and JELD-WEN chose not to ask the jury to adjudicate the claims.

That, of course, is the consequence of JELD-WEN's own decision not to add the Intervenors as Counterclaim Defendants, not to identify any triable issues against them, and not to ask the jury to find them liable and award damages against them. Those were deliberate choices made by JELD-WEN. Under this record, JELD-WEN must bear the consequences of its choices and the Intervenors are entitled to judgment as a matter of law on the DTSA and the TUTSA counterclaims.

**III. The Attack on DTSA and TUTSA Damages Award Against Steves and Sons, Inc.[10]**

JELD-WEN satisfies "its burden of proving damages by showing the misappropriation," and "the subsequent commercial use," and by "introduc[ing] evidence by which the jury can value the rights the defendant has obtained." Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 545 (5th Cir. 1974); see also Sw. Energy Prod. Co. v. Berry-Helfand, 491 S.W.3d 699, 711-12 (Tex. 2016) ("The fact finder must have sufficient evidence to determine the value a reasonably prudent investor would pay for the trade secret, and to meet that standard, the plaintiff need only demonstrate the extent of damages as a matter of just and reasonable inference, even if the extent is only an approximation." (internal citations and quotations omitted)). Thus, to obtain judgment as a matter of law on the DTSA and TUTSA reasonable royalty claims, Steves must show that JELD-WEN did not provide sufficient evidence for the jury to reach its $1.2 million award for reasonable royalty.

Steves' assertions about Jarosz's collective valuation of the trade secrets essentially restate Steves' corresponding argument in its motion for summary judgment. Notwithstanding the decision denying summary judgment on that basis, Steves

---

[10] Because the motions for judgment as a matter of law will be granted in favor of the Intervenors, this issue now pertains only to Steves.

reiterates that Scenario Three should not have been presented to the jury because Jarosz calculated those damages while including sixteen alleged trade secrets that JELD-WEN later chose not to assert as trade secrets. Moreover, says Steves, the concerns raised at the summary judgment stage are heightened here because the jury found that only eight trade secrets were misappropriated—far fewer than the sixty-seven on which Jarosz based his figures.

Before addressing these contentions, the Court must first consider whether Steves waived any collective valuation challenge by failing to raise it in their original Rule 50(a) motions. JELD-WEN is correct that, generally, "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." Fed. R. Civ. P. 50(b) advisory committee's note to 1991 amendment; see also Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 501 n.1 (4th Cir. 2001) ("[A] Rule 50(b) motion may only be made as a renewal of a motion previously made on the same grounds under Rule 50(a)."). However, the specificity requirement should be "construed liberally," and the earlier Rule 50(a) motion need only "provide[] the court and the nonmoving party sufficient notice of any alleged deficiencies in evidence." Liberty Mut. Fire Ins. Co. v. JT Walker Indus., Inc., 554 F. App'x 176, 185 (4th Cir. 2014) (citing Singer v. Dungan, 45 F.3d 823, 829 (4th Cir.

24

1995)). Here, Steves initially argued that both damages claims failed because "Jarosz's Scenario Three modeled aggregate damages based on alleged trade secrets no longer at issue in the case by the time of trial, thus his testimony gives the jury no basis for determining damages with respect to the alleged trade secrets actually at issue in the trial." ECF No. 1572 at 6; see also ECF No. 1576 at 1 (adopting arguments for Pierce). They did not elaborate on this assertion, but cited to multiple other briefs that did so. Although cursory, this statement and supporting citations gave JELD-WEN enough notice to preserve Steves' collective valuation argument for their subsequent Rule 50(b) motions. See Liberty Mut. Fire Ins., 554 F. App'x at 185 & n.5.

Nonetheless, neither argument about Jarosz's calculations is persuasive. First, to the extent that Steves is asking the Court to reconsider its previous denial of summary judgment on JELD-WEN's damages claims, that request has no foundation. "A motion for reconsideration is appropriate where the Court has patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." Paasch v. Nat'l Rural Elec. Coop. Ass'n, No. 115CV01638GBLMSN, 2016 WL 10519130, at *2 (E.D. Va. May 27, 2016) (citing Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va.

25

1983)). But motions that simply "ask[] a court to 'rethink what the Court had already thought through—rightly or wrongly' should not be granted." TomTom, Inc. v. AOT Sys. GmbH, 17 F. Supp. 3d 545, 546 (E.D. Va. 2014) (quoting Above the Belt, 99 F.R.D. at 101). After the Court entered an order denying summary judgment, ECF No. 1536, it issued an opinion that discussed and rejected Steves' collective valuation argument, see Second Summary Judgment Op. at 42-49. Steves points to no new evidence making that analysis improper, or any errors of apprehension. They clearly disagree with the Court's decision, but complaining about earlier decisions with no new arguments does them no good here. See TomTom, 17 F. Supp. 3d at 546.

Second, if Steves believes that the situation here is meaningfully different than on summary judgment because of the lower number of misappropriated trade secrets to support Scenario Three, it is mistaken. Before trial, the Court held that JELD-WEN's removal of sixteen alleged trade secrets on which Jarosz had relied "d[id] not prevent the jury from determining the applicable reasonable royalty." Second Summary Judgment Op. at 46. To the contrary, as stated in Jarosz's rebuttal expert report, "the exact number of trade secrets was not critical to Scenario Three, as a party paying for an intellectual property license like the theoretical one here is typically paying for access to a field of knowledge, not knowing

which IP assets will be most important." Id. (internal quotation marks omitted). At worst for JELD-WEN, the removal of those trade secrets raised "doubts about particular damages figures [that] should be resolved by the jury, not the Court, as long as Jarosz's . . . testimony gives the jury enough direction" to calculate damages. Id. at 47.

Jarosz's trial testimony, by all appearances, gave the jury the necessary direction. Although Jarosz acknowledges that the calculations in Scenarios One and Two were tied to specific misappropriated trade secrets, he testified that the reasonable royalty figure in Scenario Three was based on "[a]ll of the trade secrets" discussed during the hypothetical negotiation. May 4 Trial Tr. at 1449:3-5. He then stated that one analytical framework underlying Scenario Three, the licensing comparables approach, resulted in a broad range of royalty rates, from 2.5% to 10%. In particular, he described a similar license—"perhaps the most useful" comparable license—for the "knowledge and know-how and experience" related to a product used in particle board and fiberboard, which "commanded a royalty rate of 3[%]." That rate, Jarosz said, would not fluctuate based on the size of the IP portfolio, because the licensee was paying for its "access to a business," not the precise IP components. Id. at 1454:7-1455:10. In addition, he explained that the 3% rate that he applied to the negotiation between JELD-WEN and Steves was

further supported by the several qualitative factors that he considered. See id. at 1456:23-1460:15. Finally, Jarosz testified that his recommended reasonable royalty of $9.9 million could be reached by multiplying that rate by the expected sale price and production volume of the doorskins that Steves could manufacture after having acquired that license. See id. at 1460:18-1461:11.

Because the incremental benefits approach incorporated Scenarios One and Two, that part of Scenario Three was made unreliable by the jury's conclusion that only four of the trade secrets supporting the quantification in Scenarios One and Two qualified as trade secrets. But, as Jarosz explained, the incremental benefits and licensing comparables approaches merely "[l]ook at the [reasonable royalty] problem from different angles." Id. at 1452:14. Therefore, even though the jury could not have relied fully (or at all) on the incremental benefits approach in assessing damages for the only eight trade secrets it found to have been proved, the jury could still reasonably have considered Jarosz's licensing comparables and qualitative approaches to determine a royalty rate here.

Furthermore, although Jarosz's $9.9 million lump-sum royalty was based on sixty-seven trade secrets, and he did not provide the jury with an exact methodology for calculating a royalty if fewer trade secrets were found to have been

misappropriated, JELD-WEN was not required to "show damages with absolute precision or certainty." W.L. Gore & Assocs., Inc. v. GI Dynamics, Inc., 872 F. Supp. 2d 883, 893 (D. Ariz. 2012). It unquestionably presented evidence relevant to the general factors used to evaluate a reasonable royalty: "the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use the defendant put the trade secret to after misappropriation." Univ. Computing, 504 F.2d at 538; see also Jury Instructions (ECF No. 1614), Instruction No. 36 (outlining factors for the jury to consider in determining reasonable royalty). Based on that evidence, the jury could have made a common-sense inference based on the number of trade secrets that it found had been misappropriated. The jury appears to have settled on a $1.2 million reasonable royalty by determining that the eight misappropriated trade secrets represented approximately 11.94% of the sixty-seven trade secrets underlying Scenario Three, and then multiplying Jarosz's reasonable royalty by that percentage.[11] This calculation obviously assumes that each of the

---

[11] If, as appears to be the case, the jury took this approach, then the damages figure for the DTSA claim should in theory be slightly lower, since the jury found that only seven trade secrets were misappropriated for purposes of that claim. However, given the evidence in the record, the jury might have simply decided that the non-misappropriated trade secret, 59, did not have much value compared to the other misappropriated

29

sixty-seven trade secrets would have a roughly equivalent value for Steves in a hypothetical license negotiation. But Jarosz's testimony, combined with the other evidence pertinent to the reasonable royalty assessment, allowed the jury to "value the rights [Steves] has obtained" in that manner. Id. at 545. Although Steves also introduced evidence to contest that valuation, the jury was well-equipped to weigh all the evidence before it. As a result, the jury reasonably could have determined JELD-WEN's reasonable royalty damages with sufficient certainty, so that judgment as a matter of law on the DTSA and TUTSA claims will not be granted.[12]

## CONCLUSION

For the foregoing reasons and as described herein, with respect to COUNTERCLAIM DEFENDANTS STEVES AND SONS, INC., AND EDWARD STEVES AND SAM STEVES' RENEWED MOTION FOR JUDGMENT AS A

---

trade secrets. Whatever the case, the Court cannot second-guess the jury's damages approximation.

[12] Steves continues to rely on 02 Micro International Ltd. v. Monolithic Power Systems, Inc., 399 F. Supp. 2d 1064 (N.D. Cal. 2005) and E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc., No. 3:09CV58, 2011 WL 4625760 (E.D. Va. Oct. 3, 2011), but those cases are no more compelling here than they were in the summary judgment context. See Second Summary Judgment Op. at 48-49. Although the jury did not rely on the value of "any one group of trade secrets" here, as in 02 Micro International, see 399 F. Supp. 2d at 1078, it properly made a reasonable inference based on Jarosz's collective valuation of the sixty-seven trade secrets and his testimony about the relative value of individual trade secrets in IP licenses.

30

MATTER OF LAW AGAINST JELD-WEN, INC. (ECF No. 1627), judgment as a matter of law will be denied as to Steves' attack on the trade secrets damage award. Judgment as a matter of law on the trade secrets damage award will be denied as moot as to Sam Steves and Edward Steves because no damage award was made as to them and because judgment as a matter of law will be granted in their favor on account of JELD-WEN's failure to pursue the trade secret counterclaims to judgment against them. INTERVENOR JOHN G. PIERCE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST JELD-WEN, INC. (ECF No. 1629) on the trade secrets damage award will be denied as moot as to him because no damage award was made as to him and because motion for judgment as a matter of law will be granted in his favor on account of JELD-WEN's failure to pursue the trade secret counterclaims to judgment as against him.

It is so ORDERED.

                                    /s/    _____

                        Robert E. Payne
                        Senior United States District Judge

Richmond, Virginia
Date:  October 4, 2018