**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**


STEVES AND SONS, INC.,

    Plaintiff,

v.                          Civil Action No. 3:16cv545
                                   **PUBLIC SEAL**

JELD-WEN, INC.,

    Defendants.


**MEMORANDUM OPINION**

This matter is before the Court on PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR EQUITABLE RELIEF (ECF No. 1191), which the parties addressed through briefs before and after the evidentiary hearing on equitable remedies ("the Remedies Hearing"). For the reasons set forth below, PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR EQUITABLE RELIEF (ECF No. 1191) will be granted in part and denied in part.


**GENERAL BACKGROUND**

On June 29, 2016, Steves and Sons, Inc. ("Steves") filed this action against JELD-WEN, Inc. ("JELD-WEN") by filing a COMPLAINT FOR INJUNCTIVE AND DELCARATORY RELIEF, DAMAGES AND SPECIFIC PERFORMANCE (ECF No. 1). The Complaint contained six counts, including COUNT ONE which alleged a violation of Section 7 of the Clayton Act, § 15 U.S.C. § 18, and sought damages under

Section 4 of the Clayton Act, and injunctive relief under Section 16 of the Clayton Act, all by virtue by an allegedly illegal merger that occurred in 2012 but that subsequently substantially lessened competition in the so-called molded interior doorskin market. COUNT TWO alleged various breaches of contract. Steves voluntarily dismissed COUNT THREE (Breach of Warranty), COUNT FIVE (Specific Performance), and COUNT SIX (Trespass to Chatels). In COUNT FOUR, Steves sought declaratory relief and that claim remains for decision by the Court.

COUNTS ONE and TWO were tried to a jury and the jury returned a verdict in favor of Steves on both the antitrust claim and the breach of contract claims. Steves' claim for equitable relief is based on the jury's finding of liability on the antitrust violations in COUNT ONE and arises by virtue of Section 16 of the Clayton Act.

By agreement of the parties, the record in the antitrust and breach of contract trial is part of the record upon which the decision respecting Steves' motion for equitable remedies will be decided. In addition, the Court conducted a three day evidentiary hearing during which the parties presented additional evidence on the issues of equitable relief.

Equitable relief under Section 16 of the Clayton Act must be tethered to the alleged violation of Section 7 of the Clayton Act found by the jury. It is therefore appropriate briefly to

summarize the evidence upon which the jury found that JELD-WEN had violated Section 7 of the Clayton Act.

The product at issue in this litigation is called an interior molded doorskin. It is created by pouring a moist, softened fibrous material (treated with resin and wax) into a mold and then subjecting it to heat and pressure. The doorskin is a component part of an interior molded door which is made with a four-sided wooden frame and certain filling material to which the molded doorskin is glued. The doorskin provides the decorative covering for the front and the back of the door. The end product resembles a solid wood door but is much lighter and can be made and shipped at a considerably lower cost than a solid wooden door.

Steves and JELD-WEN both sell interior molded doors. JELD-WEN also makes doorskins, some of which it uses to make its own doors, and some of which it sells to independent door manufacturers (the "Independents") of which Steves is one. Steves has never made its own doorskins and has to purchase doorskins from doorskins manufacturers.

From 2001 to 2012, there were three manufacturers from which the Independents, including Steves, could purchase doorskins: Masonite Corporation, JELD-WEN, and Craftmaster International ("CMI"). All three were vertically integrated manufacturers of doorskins and interior molded doors. In 2011,

Steves was negotiating for possible long-term supply contracts with all three manufacturers. In May 2012, JELD-WEN and Steves entered into a long-term supply agreement (the "Supply Agreement") that was to last for seven years and that contained an evergreen provision by which the contract was automatically renewed annually if notice of termination was not given in accord with the provisions of the Supply Agreement. In June 2012, JELD-WEN announced that it intended to acquire CMI and the acquisition was completed in October 2012.

The jury found that, as a consequence of the merger and JELD-WEN's conduct in 2014 and thereafter, competition was substantially lessened in the doorskin market and that, as a result, Steves sustained injuries of the type that the antitrust laws were designed to prevent. Thereupon, the jury awarded Steves $58,632,454.00 in antitrust damages which, when trebled as required by statute, amounts to antitrust damages in the amount of $175,897,362.00. The jury also found that JELD-WEN had breached Sections 1, 6, and 8 of the Long Term Supply agreement and awarded damages in the amount of $12,151,873.00 on account of those breaches. That award will be reduced by $2,188,271.00 because the Court granted JELD-WEN, INC'S MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST STEVES & SONS, INC. (ECF No. 1773).

As a primary equitable remedy, Steves asks the Court to order JELD-WEN to divest Towanda (formerly part of CMI) to

restore competition in the doorskin market. Steves also asks the Court to impose certain so-called "behavioral" or "conduct" remedies, including restrictions and obligations on JELD-WEN, to the end that the divested entity will be able to successfully operate as a stand-alone independent business or to be successfully combined with the assets of the acquiring party so as to become an effective competitor. To those ends, Steves contends that the equitable remedy of divestiture must be accompanied by the following conduct remedies:

(1) transfer of all tangible assets and likes necessary to develop, manufacture, and sell doorskins at Towanda;

(2) a transfer of licensing of all intangible assets used in the development, manufacturing, and sale of molded doorskins at the Towanda facility to include:

- Transfers or licenses to the purchasing entity of patents used to make doorskins, schematics or designs used to manufacture doorksins, customer lists, vendor lists, and know-how in trade secrets to operate the facility

(3) an Order assuring that the acquiring entity can retain the services of the employees currently operating the Towanda facility;

(4) an Order prohibiting JELD-WEN from hiring their employees for at least two-year transitional period;

(5) a provision requiring the divested entity to offer an eight-year long-term supply agreement to Steves at reasonable prices and terms (based on the LTSA);

(6) a provision allowing independent door manufacturers like Lynden, Haley, and Excel to terminate their supply agreements with JELD-WEN without penalty; and

(7) a provision allowing JELD-WEN to be allowed to buy doorskins from the divested entity for a period of two years, the so-called transition period.

At the trial on the merits, Steves proved, by a preponderance of the evidence that, before JELD-WEN acquired CMI in 2012, there was a competitive doorskin market with three vertically integrated suppliers. Indeed, the evidence showed, and the Court finds, that the competition among those three suppliers was vigorous and quite effective. The merger reduced the number of suppliers to two. Steves also proved that the merger substantially lessened competition in the doorskin market. The issue now to be decided is how competition can be restored, and whether divestiture of Towanda (without or along with the requested conduct remedies) is the correct, and, as Steves urges, indeed the only way to do that.

## I. FINDINGS OF FACT

In making the decision about equitable relief, it is necessary to respect and apply the jury's findings which are binding factual findings and then for the Court to make factual findings based on the trial record and the record at the Remedies Hearing.

**A.    Jury Findings**

The jury found that "JELD-WEN's acquisition of CMI violated Section 7 of the Clayton Act." (ECF No. 1022, ¶ 1). The jury also found that "JELD-WEN's violation of the Clayton Act caused an injury to Steves that was of the type that the antitrust laws were intended to prevent." (ECF No. 1022, ¶ 2). As to antitrust damages, the jury found:

>    3.    (a)    As to COUNT ONE, we, the jury, find by a preponderance of the evidence, that the plaintiff is entitled to damages for antitrust injuries ***already sustained*** as a result of the following conduct (if none, write "0"):
>
>    (1)    JELD-WEN's overcharging Steves for doorskins (other than Madison or Monroe)
>
>    $8,630,567
>
>    (2)    JELD-WEN's overcharging Steves for Madison and Monroe doorskins
>
>    $1,303,035
>
>    (3)    JELD-WEN's shipping defective doorskins to Steves and failing to reimburse Steves for those doorskins
>
>    $441,458
>
>    (4)    JELD-WEN's refusing to reimburse Steves for the cost of doors that incorporated defective doorskins
>
>    $1,776,813
>
>    (b)    As to COUNT ONE, we, the jury, find by a preponderance of the evidence, that the plaintiff is entitled to damages in the

amount of $46,480,581 for ***future lost
profits.*** If none, write "0."

Those findings are binding on the Court.

**B.    Factual Findings by the Court**

The Court finds the following facts that pertain to the
issues of equitable remedies as the parties have emphasized them
in the briefing.   Additional fact findings are set out along
with topics to which they relate in the Conclusions of Law.   All
findings of fact are proved by a preponderance of the evidence.

**1.    Interior Molded Doorskin Market in 2001**

As explained above, Steves and JELD-WEN were in 2012, and
are now, participants in the interior molded doorskin market in
the United States.   Steves is an independent door manufacturer
that has never produced its own doorskins. As a result, it must
purchase doorskins from doorskin manufacturers. JELD-WEN,
however, is a vertically integrated door manufacturer, meaning
that it both produces doorskins and uses them internally to
manufacture and sell finished doors.

Before 2001, JELD-WEN and Masonite were the only doorskin
manufacturers in the United States.   In the 1970s, Masonite had
built a manufacturing facility in Towanda, Pennsylvania
("Towanda"), the facility that is at the center of Steves'
request for equitable relief.

In 2000, Masonite was owned by a parent company, International Paper Company. Masonite primarily sold doorskins made at Towanda to Premdor, Inc., but it also sold to eleven other independent door manufacturers. Towanda, as a part of Masonite, did not have "standalone administrative departments" with research and development, accounting, or sales and marketing capabilities; those services were instead provided from separate locations by either Masonite or International Paper.

In 2000, Premdor agreed to buy all of Masonite, including Towanda, from International Paper. However, after Premdor's competitors expressed concerns to the Department of Justice ("DOJ") about the effect of the acquisition on the supply of doorskins, International Paper and Premdor reached a settlement with the DOJ. Pursuant to that settlement agreement, Towanda would be divested and set up as a separate entity to be known as Craftmaster International, Inc. ("CMI").

CMI was to serve as a doorskin supplier to Masonite and JELD-WEN and other customers among the Independents. CMI was then incorporated on September 1, 2001, after Premdor's purchase closed. In March 2002, following an auction sale, CMI was purchased by its new owners, who also owned two of the Independents, Haley and Woodgrain.

When CMI was incorporated, International Paper and Masonite also entered into certain agreements with CMI to enable it to function as an independent entity. First, International Paper and Masonite would provide administrative and technical support services to CMI until it could set up its own services—a process that eventually took longer than a year. Second, CMI and Masonite would be given three years to manufacture the dies needed to produce certain types of doorskins, so that both entities could offer the same complement of doorskins to their customers. Even though Towanda and Masonite's doorskin manufacturing plant in Laurel, Mississippi ("Laurel") were "very similar," certain products were made only at Towanda, and some were made only at Laurel. Similarly, CMI would sell doorskins to Masonite, and vice versa under set terms for three years to help assure that CMI would prosper going forwards. Finally, CMI received a royalty-free license to use such of Masonite's intellectual property as was necessary to manufacture doorskins at Towanda.

### 2. CMI's Performance as Independent Doorskin Supplier Before the Merger: 2002-2012

According to Bob Merrill ("Merrill"), the former CEO of CMI, and a current JELD-WEN executive, CMI did not become a "completely standalone entity" until a little more than two and a half years after it was divested from Masonite. CMI's initial

financial performance was strong because it could control costs and reduce overhead through the separation agreements, and the housing bubble increased demand for new homes and for doors, and in turn, component supplies like doorskins. For instance, in 2006—a year after the peak of the housing bubble—CMI's net sales were [    ], and its profitability was [    ], calculated as earnings before interest, taxes, depreciation, and allocations ("EBITDA").[1]  The Independents, including Steves, also benefitted from increased competition between CMI, Masonite, and JELD-WEN, each of which tried to create and sell new styles of doorskins as part of their efforts to win customers.

CMI also used Towanda to manufacture two so-called "trim board" products, MiraTEC and Extira.  Masonite had started the MiraTEC business in 1998, but it had yielded only about [   ] in revenue (and negative EBITDA) by the time Towanda was divested in 2001. However, CMI viewed both MiraTEC and Extira as undeveloped products that held considerable promise and "worked to grow [them] aggressively." As a result, those products' financial performance "grew rapidly," and they were responsible for over [   ] in revenue and more than [   ] of EBITDA at CMI's peak in 2006. Moreover, they were important contributors to CMI's overall business after the housing bubble burst; indeed,

_____

[1] EBITDA is a "surrogate . . . for cash flow" that investors use as an approximate measure of an entity's profitability.

Merrill testified that they were "the only thing that really kept [CMI] afloat."

Like Masonite, CMI initially sold doorskins to eleven Independents in the United States and Canada. But beginning in 2003, CMI's customer base contracted significantly because eight of those eleven customers were acquired by companies to which CMI did not sell doorskins. In addition, CMI had only one long-term doorskin supply agreement, which ended when that customer was acquired by Masonite. This customer consolidation significantly reduced the volume of doorskins that CMI could sell. Consequently, the company took a cue from JELD-WEN and Masonite and "forward integrat[ed]" from 2005 to 2010, buying two door manufacturers and building two door manufacturing plants to allow the company to more efficiently use the doorskin volume produced by Towanda—that is, by selling doorskins internally as well as externally. By 2011, CMI's internal doorskin sales constituted nearly 40% of its total doorskin sales.

There is a dispute respecting the performance of Towanda's doorskin business from 2009 to 2014. Steves relies on PTX 341 and PTX 342 to show that, looking only at the doorskin business, Towanda posted positive EBITDA annually from 2009 through 2013 and that there was positive, albeit not sizeable, EBITDA projected for 2014. And, that is what those documents show.

The record is not entirely clear as to the provenance of PTX 341 and 342, but the record does prove that JELD-WEN prepared these figures based both on historical CMI records (for 2009 through 2012) that were acquired in the merger and on JELD-WEN's own records thereafter. And, JELD-WEN used these documents to make business and strategy decisions. Thus, even though their provenance is not entirely clear, the record shows that they are reliable and probative of the state of the doorskin business at Towanda for the period involved.

JELD-WEN takes the view that the profitability of Towanda in 2011 and 2012 should be determined by CMI's audited financial statements, DTX 191, and by the information that JELD-WEN gave to the DOJ in August 2012, DTX 60. And, JELD-WEN says that the most important evidence on that point came from the testimony of Bob Merrill at the Remedies Hearing where Merrill testified that the figures in PTX 341 and 342 were not consistent with documents that he had seen.

The Court does not credit DTX 191 or DTX 60 on the issue of the profitability of the doorskin business at Towanda because those documents reflect information about CMI as a whole, not just Towanda's doorskin business. And, CMI had other businesses such as the door business and the trim business (MiraTEC and Extira) and locations other than Towanda.

Nor can the Court credit Merrill's testimony. If, as he said was the case, Merrill had documentary evidence to refute the proofs that appeared in PTX 341 and 342, those refuting documents would have, indeed should have, been produced. They were not. As a result, Merrill's testimony on the profitability of the doorskin business at Towanda for the time period involved is rejected as not reliable.

The evidence on this issue is probative in the remedial phase of these proceedings because, to find that divestiture is an appropriate remedy, the Court must be satisfied that a divested Towanda can operate competitively and profitably in the doorskin market. And, the fact that Towanda did that in the past, even in the face of adverse market conditions, is evidence that supports a finding that a divested Towanda could do so now.

In any event, it is not disputed that CMI, as an entity, was in difficult financial straits in 2011 and 2012 before the merger. CMI certainly was not profitable then, even with a slightly positive EDITDA from the doorskin business and a positive contribution from the Miratec and Exitera lines.

Indeed, by 2011, CMI's owners had been forced to invest their own funds into CMI to support its cash flow. Thus, after exploring several options, they decided to sell the company by putting it up for auction. As part of that process, they engaged an investment firm that worked with CMI's management to

prepare offering documents, send out teaser memos to prospective buyers, and solicit bids from interested entities. One such entity was Steves, which, in October 2011, offered to invest [  ] in CMI in exchange for a minority ownership stake in the company. See DX-462 at 6. CMI's owners rejected the offer, and Steves did not pursue that possibility any further. CMI then identified what management considered to be the "serious prospective buyers" (either four or five) that had submitted purchase bids, and selected JELD-WEN and Masonite as the finalists. JELD-WEN was ultimately chosen as the buyer because of concerns about Masonite's intentions for CMI's door manufacturing plants.

In sum, CMI's doorskin business was quite profitable, and CMI was a competitive factor in the doorskin market from the time of its creation until the housing crisis. Even during the housing crisis, the doorskin component of CMI's business (i.e., Towanda) fared adequately (with slightly positive EBITDA). But, by 2011, it was necessary to put the entirety of CMI up for sale. And, even under those conditions, there were several serious buyers.

### 3.  JELD-WEN's Acquisition of CMI and Execution of the Supply Agreement with Steves

JELD-WEN was interested in acquiring CMI for three main reasons: (1) the availability of doorskins of a certain height

that were made at Towanda; (2) the lower costs and higher efficiency of Towanda; and (3) the possibility of manufacturing MiraTEC and Extira (so-called "trim" products) at Towanda in addition to doorskins. JELD-WEN wanted to maintain CMI's doorskin volume, so it entered into long-term supply agreements with three of CMI's existing customers: Haley, Woodgrain, and Lynden Door ("Lynden"). The first two contracts were agreed to as part of JELD-WEN's acquisition of CMI ("the CMI Acquisition") because Haley and Woodgrain were also owned by CMI's owners. See PTX-115 ¶ 1.

In 2011, JELD-WEN and Steves were parties to a long-term doorskin supply agreement that they had executed in 2003. But, in 2011, JELD-WEN terminated that agreement. Later in 2011, Steves initiated discussions with JELD-WEN about another long-term supply agreement. And, as part of its plan to secure merger approval, JELD-WEN entered into the current Supply Agreement.

Thus, it was that, on May 1, 2012, Steves and JELD-WEN entered into the Supply Agreement, pursuant to which Steves would purchase doorskins from JELD-WEN on defined terms. Stipulation of Undisputed Facts (ECF No. 1003-1) ("Stip.") ¶ 10; see also Supply Agreement (PTX-149) at 1. Those terms applied to "the full range of JELD-WEN molded doorskin products." Supply Agreement § 1. The Supply Agreement would be in effect through December 31, 2019, but would automatically renew for a

successive seven-year term unless either party terminated the contract. Id. § 2. Steves could terminate the Supply Agreement for any reason upon two-year written notice to JELD-WEN, and JELD-WEN could likewise terminate it without cause upon seven-year written notice to Steves. Id. § 3(a)(2)(b).

The doorskin prices that JELD-WEN could charge Steves varied according to a contractually defined formula based on JELD-WEN's key input costs. The Supply Agreement, in fact, obligated JELD-WEN to give Steves annual notice of the prices and input costs for the coming year by November 30, and JELD-WEN could not impose any price increases if it failed to do so. Id. § 6(c). Although Steves had to purchase at least 80% of its interior molded doorskin requirements from JELD-WEN, Steves could purchase any quantity of doorskins from another supplier that offered a price at least 3% lower than JELD-WEN's purchase price, after JELD-WEN had the chance to match that lower price. Id. § 4. Beyond those pricing provisions, the contract required JELD-WEN to provide Steves with doorskin products of satisfactory quality. If any doorskins were defective, JELD-WEN would have to reimburse Steves for the cost of those doorskins, but only after JELD-WEN's inspection and verification of the defect. Id. § 8. Reimbursements for any other costs beyond the price of the doorskins were to be negotiated on a case-by-case

basis, Supply Agreement § 8, such that they were never mandatory.

Finally, any disputes under the Supply Agreement were to be resolved under a rather protracted alternative dispute resolution process. Only when that process was exhausted could a party begin litigation. That process would begin with an internal conference between the parties' senior executives. If they could not reach a resolution within thirty days of the dispute being submitted, the parties would have to proceed to mediation. A lawsuit could then be filed only where mediation had failed to yield a solution to the parties' disagreement. Id. § 10.

On July 18, 2012, soon after executing the Supply Agreement, JELD-WEN publicly announced the CMI Acquisition, Stip. ¶ 9, the completion of which was contingent on regulatory approval by government agencies, see PTX-115 ¶ 5; DX-50 § 6.1. Early in 2012, JELD-WEN and CMI had decided to preemptively request approval of the transaction from the DOJ because executives from both companies had been involved in Premdor's acquisition of Masonite, and were therefore aware of the problems that DOJ review could pose. The record is clear that JELD-WEN decided to approach the DOJ only after it had entered into long-term supply contracts with the Independents, knowing that this oft-used tactic would assuage the concerns of the DOJ

and the Independents about anticompetitive effects of the proposed merger.

After JELD-WEN approached the DOJ, the agency's Antitrust Division notified JELD-WEN that it had opened a preliminary investigation into the proposed CMI Acquisition. Representatives of CMI and JELD-WEN—Merrill and James Morrison ("Morrison"), respectively—then gave presentations to the DOJ about the Acquisition. See DX-60; DX-54. That presentation emphasized that JELD-WEN had entered into long-term supply contracts with the Independents. Thereafter, the DOJ also contacted Steves, which told the DOJ that it did not oppose the merger because it believed that the Supply Agreement would prevent JELD-WEN from taking any anticompetitive actions. The Antitrust Division subsequently closed its investigation on September 28, 2012, see DX-48, and the Acquisition was completed on October 24, 2012. Stip. ¶ 8. The final purchase price paid by JELD-WEN was [   ].

### 4. JELD-WEN's Integration of CMI's Operations

Following the merger, JELD-WEN made some general administrative changes. For instance, it closed CMI's head office in Chicago and two of CMI's four door manufacturing plants, and transitioned CMI's human resources, payroll, insurance, safety, environmental, and health and benefits functions into JELD-WEN's organizational structure. DX-933 at 2.

Although JELD-WEN and CMI accounting managers were supposed to develop an integration plan, see DX-933 at 2, the accounting systems for Towanda and for JELD-WEN's "legacy plants" (the doorskin plants that it originally owned and developed) remain separate, with Towanda using different accounting software. Similarly, the consolidation of JELD-WEN's and CMI's operations has apparently not affected certain interactions with customers, at least from Steves' perspective. Steves still orders and pays for doorskins from Towanda in the same way it did before the CMI Acquisition; the same is true for Steves' orders of, and payments for, doorskins from JELD-WEN's legacy plants.

At the time of the merger, JELD-WEN operated a doorskin plant in Marion, North Carolina ("Marion" or "the Marion plant"). However, Marion's design prevented it from meeting environmental regulations, and bringing the plant up to standard was projected to be costly and time-consuming. In addition, Marion was both inefficient and unprofitable, with old equipment in poor condition. On the record as a whole, the Court finds that the Marion plant was closed because of the projected cost to bring it into compliance with environmental regulations, and the projected cost to improve its old and ill-maintained operational equipment, not because of the acquisition of CMI.

Nevertheless, the acquisition of CMI allowed JELD-WEN to move Marion's doorskin production to Towanda. Moving Marion's

doorskin production to Towanda—a very efficient and less cost-intensive plant—would therefore enable JELD-WEN to save around [   ] in manufacturing costs, and would eliminate [   ] in fixed costs associated with maintaining Marion as an operational plant.  JELD-WEN mothballed Marion in June or July 2013.

In 2011, JELD-WEN had determined that its Dubuque plant was "[i]mpaired," PTX-668 at JW-CIV-00369666, which is analogous to a decision to close the plant. Because Dubuque was situated in an urban environment that was not conducive to doorskin manufacturing, it was JELD-WEN's second-most expensive fiber facility. The location of the Dubuque plant restricted JELD-WEN's ability to perform necessary environmental control tasks. DX-935 at 2. Dubuque would have been closed in 2011, but closure in 2011 was not practical because of startup problems and doorskin quality issues that were occurring at JELD-WEN's newly-opened plant in Dodson, Louisiana ("Dodson"). PTX-668. Once JELD-WEN acquired CMI, it closed the Dubuque plant because the capacities of Dodson and Towanda together rendered Dubuque's doorskin production unnecessary to overcome the problems at the Dodson plant. See DX-935 at 2, 5. JELD-WEN sold Dubuque in or around August 2016.  Morrison, who recommended that Dubuque be closed and sold, testified that he would not have made that recommendation if the CMI acquisition had not occurred or if there was a reasonable chance that JELD-WEN would have to divest

Towanda. For reasons set forth later, the Court declines to credit Morrison's testimony, finding him to be an untruthful witness. But, apart from that, the record shows that JELD-WEN had determined to close Dubuque before the merger.

JELD-WEN also made certain process changes at the Towanda facility after the CMI Acquisition. It spent around [   ] to install its own manufacturing processes at Towanda by the end of 2013. Among other changes, JELD-WEN: switched the primer used to JELD-WEN primer instead of more expensive third-party primer; reduced the amount of petroleum wax and resin used to make doorskins; enabled Towanda to make lower density doorskins and thereby save on specific component costs; improved the humidization process; and reduced the thickness of doorskins. DX-933 at 3. The changes made by JELD-WEN to the manufacturing process also have resulted in annual savings on doorskin manufacturing costs. The record is that the [   ] expense yielded annual savings of approximately [   ]. See DX-190 at 2. On this record as a whole, the Court finds that, because all of these processes were useful, and used, in other facilities, they would have been implemented in any event and are not attributable to the merger.

After the merger and over time, JELD-WEN made capital improvements to Towanda in order to improve the state of the facility and to decrease the doorskin defect rate. These

22

investments included: (1) adding new doorskin dies, coating equipment, refiners, steam injection valves, a coating manufacturing plant to produce primer at Towanda, and a hydraulic commander to enhance doorskin fiber quality; DX-909 at 13; (2) replacing a line stacker that suffered from quality issues, the sprinkler system, malfunctioning mat separation conveyors, a fiber bin with water infiltration problems, and pressure pumps; DX-909 at 13-14; (3) repairing roofs to prevent water infiltration; DX-909 at 13; and (4) upgrading the doorskin coating process and boiler operating system. DX-909 at 14; DX-917.

These steps cost JELD-WEN around [  ] in 2015 and [  ] in 2016. DX-909 at 13-14.  All told, JELD-WEN estimates that it spent approximately [  ] in capital improvements from July 2014 to July 2017).  The investments have generated benefits for JELD-WEN. Many of the improvements noted above were deemed "high return on investment projects," meaning that their projected annual savings were only slightly less than their initial costs. DX-909 at 13-14. And, the record shows that the total returns from those projects to date exceed their total expense.

Through Morrison, JELD-WEN offered evidence that it would not have pursued them if there was a possibility that the CMI Acquisition would not be consummated or that divestiture would

be required.  As explained, the Court simply does not find Morrison to be a credible witness.

However, it is, of course, self-evident that JELD-WEN would not have made changes to Towanda if the CMI acquisition had not been consumated, because JELD-WEN simply could not have done that.  So that aspect of Morrison's testimony is disingenuous. And, the record is that JELD-WEN has known of the risk of divestiture since mid-2015 and still has made many changes to, and investment in, Towanda.  So the record disproves that aspect of Morrison's testimony.

JELD-WEN also asserts that, because it acquired CMI, it was able to modify the doorskin designs ("SKUs") manufactured at each of its doorskin plants. After acquiring Towanda, JELD-WEN had four operational plants, but each one does not produce all the different SKUs offered to customers—both because of increased demand for certain SKUs in different parts of the United States, and because of some plants' inability to make certain SKUs given their actual production capacity (which accounts for the die changes necessary to produce a specific quantity of doorskins in a given amount of time).[2] Instead, in

---

[2] A die is a tool used to create a specific doorskin design. Because a plant cannot run all its dies simultaneously, the dies in service are rotated as needed to meet JELD-WEN's doorskin design needs. However, die changes increase downtime, reducing production efficiency and, in turn, production capacity.

2013, the company began using a statistical tool called a mix model to examine, every quarter, which particular SKUs should be produced at specific doorskin plants—in other words, how the total "mix" of SKUs should be allocated so that each plant's capacity is utilized most efficiently. The mix model accounts for a number of variables, including the overall sales of specific SKUs externally, to independent door manufacturers, and internally, to JELD-WEN's door manufacturing plants; the current and required location of different doorskin dies; and a freight analysis, which measures the freight costs associated with shipping doorskins from the four plants to the buyers' locations.

The record shows that JELD-WEN would have developed the mix model whether or not it had acquired CMI. However, the record shows that having product from Towanda to use in the mix model provides some unquantified measure of savings to both JELD-WEN's internal customers and its external customers. That is because the model helps to balance doorskin production across four plants in different regions of the United States, thereby reducing transit times and freight costs. If one plant, such as Towanda, is closed or divested, then JELD-WEN's internal and JELD-WEN's freight-paying customers that received doorskins from that plant might pay higher freight costs because the doorskins would need to be shipped from another plant, from potentially

much farther away.[3]  Similarly, a customer who received its doorskins primarily from Towanda would not be able to receive every SKU from other plants without substantial changes to JELD-WEN's mix allocation.  JELD-WEN says that would cause production inefficiencies and reduced capacity that would inflate JELD-WEN's doorskin prices.  All of these apprehended consequences of divestiture were posited in general terms, but JELD-WEN offered no quantification of the apprehended cost increase.

The mix model also led to related changes in JELD-WEN's operations, such as a doorskin consolidation process that eliminated trade matches and redundant SKUs between JELD-WEN and CMI. That process cost around [   ] and took a year to complete. DX-917.  This modification affected SKU availability at both Towanda and JELD-WEN's legacy plants.  However, much like JELD-WEN's manufacturing process changes and capital improvements at Towanda, that project "paid for itself" within a relatively short period after it was finished.  And, the record is that the mix model would still be used and useful in the event of divestiture.  It would just operate differently.

_____

[3] JELD-WEN decides which plants will supply particular doorskins to customers. Accordingly, even if Steves orders doorskins from Towanda, JELD-WEN may supply those doorskins from Dodson or one of its West Virginia plants.  Because the mix model "balance[s] the mix across the group," the plant identified by the customer might not make the requested SKU, or might not have sufficient volume for supply from that location to be most efficient for all customers.

Finally, JELD-WEN improved the MiraTEC and Extira business, which is independent of JELD-WEN's doorskin manufacturing business at Towanda. According to Merrill, JELD-WEN is the only company that currently makes both trim and doorskin products.

JELD-WEN has devoted significant resources to growing the MiraTEC and Extira business, which was responsible for around [   ] of Towanda's [   ] EBITDA in 2017. Moreover, exterior trim and panel products like MiraTEC and Extira are "key anchor products" that have allowed JELD-WEN to pursue expansion into the general building products industry, which involves other exterior components that JELD-WEN does not yet make, like siding and fencing. Based on this planned development, JELD-WEN's current CFO, L. Brooks Mallard ("Mallard"), has projected 2018 revenues and EBITDA for JELD-WEN of [   ] and [   ], respectively. See Apr. 12 Remedies Tr. at 710:19-711:21; DX-928 at 2-4.

Nothing in the record suggests that, in the event of divestiture, MiraTEC and Extira products made by an entity other than JELD-WEN could not be sold to JELD-WEN's existing customers for those products. But, if that is the case, the new owner of Towanda, not JELD-WEN, would be receiving the net revenues and the EBITDA generated by those sales.

**5. Post-Merger Interactions Between Steves and JELD-WEN**

Pursuant to the Supply Agreement, JELD-WEN supplied doorskins to Steves in 2012 and 2013. It is helpful to understand certain provisions of the Supply Agreement that were central to the antitrust violations found by the jury and that are important to the conduct of the parties.

Section 6a of the Supply Agreement sets forth the Initial Price of the doorskins to be supplied to Steves by reference to Schedule 1. Section 6b of the Supply Agreement provides that the "Initial Price shall remain in effect for the duration of this Agreement unless a price increase or decrease takes place in accordance with the terms hereof." Compl. Ex. A. Section 6c sets out the adjustment mechanism for the price increases or decreases that are referred to in Section 6b.[4] Section 6c provides that price adjustments are to be made with references to what are called "key input costs" for Raw Material (wood; resin, wax, oil, and sealer; paint; and packaging) and for Energy (electric power prices, natural gas prices, boiler fuel. (Compl. Ex. A, § 6(c), Sch, 2.)

---

[4] By making the damage award in paragraph 3(a)(1) of the Verdict Form, the jury had to conclude, based on the evidence, that Section 6c operated to measure both price increases and price decreases. That is proved by the testimony of the negotiators and the evidence about how the parties administered the contract.

The record shows that, after the merger, JELD-WEN's key input costs declined every year. Steves' damages expert, Avram Tucker ("Tucker"), testified that, based on his assessment and calculations, JELD-WEN had not disclosed to Steves the full extent of the cost decreases.

And, notwithstanding these declining costs, JELD-WEN, in 2013, 2014 and 2015, increased the prices that it charged Steves to purchase doorskins under the Supply Agreement.[5] Tucker determined that JELD-WEN had overcharged Steves a cumulative amount of 7.87% in the years following the CMI Acquisition. Steves' antitrust expert, Carl Shapiro ("Shapiro"), testified that other JELD-WEN customers without a supply agreement, such as Excel, Unidoor, and ABS, experienced even greater price increases. Documentary evidence from JELD-WEN's files confirms that testimony. In addition, JELD-WEN charged Steves markedly higher prices for the Madison and Monroe styles of doorskins because JELD-WEN took the view that they were outside the scope of the Supply Agreement, a view that the jury rejected.

As Shapiro explained, JELD-WEN's pricing decisions were a consequence of JELD-WEN's enhanced market power after the CMI Acquisition. Following the merger, JELD-WEN and Masonite were

---

[5] JELD-WEN did not communicate with Steves about key input costs or price changes in 2016 or 2017, so the doorskin prices imposed in 2015 remained the same for those years.

the only two doorskin suppliers in the United States. Steves believed, as found above, that the Supply Agreement would protect it from any anticompetitive activity. Then, in July 2014, Orsino's replacement as JELD-WEN's CEO, Kirk Hachigian ("Hachigian"), sent Steves a presentation made by Masonite on a publically available telephone call for its investors in which Masonite's CEO made clear that Masonite would not sell doorskins to companies that competed with it in the North American door market, as Steves did. Shortly thereafter, in September 2014, Hachigian sent Steves a notice of termination of the Supply Agreement, effective September 10, 2021.[6] That letter followed Steves' rejection of Hachigian's demand to add to the normal doorskin prices permitted under Section 6b of the Supply Agreement a so-called "capital charge," which (according to Hachigian) was to help offset the cost of making capital improvements to JELD-WEN's facilities that made the doorskins sold to Steves. Nothing in the contractual pricing provisions

---

[6] Hachigian subsequently sent Steves a letter, in March 2015, stating that JELD-WEN reserved the right to assert that the Supply Agreement terminated on December 31, 2019 (at the end of its normal seven-year term) instead of in September 2021. PTX-521. JELD-WEN (through Hachigian) abandoned that position at trial. However, proposed acceleration of the termination date is further evidence that JELD-WEN was emboldened by the knowledge that, in 2014, the substantial lessening of competition caused by the merger allowed JELD-WEN to pressure Steves to accept JELD-WEN's new pricing demands.

30

of the Supply Agreement allowed a capital charge.[7]  Although these events made Steves concerned about its ability to obtain an adequate doorskin supply, Steves did not terminate the Supply Agreement (as it could have done) to seek a supply elsewhere because Steves believed that there was no viable supply alternative.

In 2014, Steves also experienced a change in the way that JELD-WEN dealt with doorskin defects under the Supply Agreement. Before late 2014, the procedure followed between Steves and JELD-WEN was as follows:

> If Steves discovers defects in JELD-WEN's doorskins after receiving them, it completes and submits a vendor debit memo ("VDM") to JELD-WEN to initiate the reimbursement process. From 2010 to 2011, JELD-WEN responded promptly after receiving VDMs, sometimes inspecting the defective doorskin at Steves' plant and sometimes extending Steves a credit based on a picture of the defect.

In mid-2014, JELD-WEN changed its approach and significantly limited reimbursements for those defects.

Likewise, in 2014-15, JELD-WEN changed the way that it compensated for defective doorskins that had been incorporated in the finished doors that Steves sold to its customers, for

---

[7] The record shows that JELD-WEN extracted new contracts from other independent manufacturers requiring them to pay the capital charge.  That was the result of lessened competition. It was either pay or face termination and the loss of doorskin supply.

which Steves could negotiate for reimbursement under the Supply Agreement. Beginning in 2012, if a Steves' customer rejected a door as defective because of a defective doorskin, Steves would give its customer credits for the purchase price of the doors (assuming that Steves agreed with the defect assessments). Steves would then seek reimbursement from JELD-WEN for the full cost of the doors which had defective doorskin (i.e., the sale price that Steves refunded to the customers) and JELD-WEN would typically pay that entire amount. In those situations, Steves would submit a VDM for the defective door to JELD-WEN, just as it did with the defective doorskins.

However, the record shows that JELD-WEN adopted a policy in late 2014 or early 2015, to reimburse Steves only for the defective doorskins, rather than for the full cost of the doors. In explanation, JELD-WEN told Steves that "[t]here was a specific change in their [door reimbursement] policy," which applied whether the doors with defective doorskins were sold to customers or remained in Steves' manufacturing plant. This shift followed what Fancher characterized as a "general direction" from JELD-WEN's management to "tighten" its door reimbursement process.

At trial, JELD-WEN took the view that, although it was never contractually required to reimburse Steves for the cost of the doors, JELD-WEN did so as a matter of customer relations.

However, it is clear that, because of the substantially lessened competition caused by the merger, JELD-WEN no longer felt that it was competitively necessary to extend this benefit to Steves in 2015 and thereafter.

The record establishes that JELD-WEN will continue to engage in this same sort of conduct respecting pricing and contract administration in the future. That is because, as Shapiro testified, the entry of another doorskin supplier besides JELD-WEN and Masonite into the U.S. market is unlikely. In addition, JELD-WEN is still charging Steves inflated prices for doorskins under the Supply Agreement, including Madison and Monroe doorskins. Likewise, JELD-WEN continues to disregard the price adjustment provisions of § 6c. Moreover, JELD-WEN has tried unilaterally to add labor costs as a key input cost under Schedule 2 and has refused to supply the backup information for the key input costs. The jury found that Steves sustained damages because JELD-WEN had violated Section 6c and other pricing provisions of the contract, including those for the pricing of Madison and Monroe doorskins. And, the jury rightly found that those damages were the consequence of the antitrust violation, i.e., the substantial lessening of competition caused by the merger.

### 6. Steves' Efforts to Obtain Alternative Doorskin Supply and the Consequences of Not Doing So

After receiving the original and the accelerated notices of termination from JELD-WEN, Steves, with knowledge that a reliable supply of doorskins was essential to its survival, began to explore ways to obtain doorskins without relying on JELD-WEN. Of course, between now and September 2021, Steves can purchase as many doorskins as it needs from JELD-WEN under the Supply Agreement. However, the record proves that JELD-WEN cannot be relied upon to supply Steves with doorskins after that point. Indeed, JELD-WEN has expressed the view that it might be necessary to "kill off" a few of the Independents. That, for Steves, is the predictable result of terminating the Supply Agreement.

Faced with loss of doorskin supply from JELD-WEN, Steves tried to arrange a supply contract with Masonite, even after Masonite's July 2014 announcement that it would no longer sell doorskins to independent door manufacturers such as Steves. Masonite's CEO, Fred Lynch, told Steves that Masonite will not enter into any long-term supply agreement with Steves. Lynch did advise that Masonite remains generally willing to sell doorskins to Steves on a spot sale basis, depending on availability and without a supply agreement. Nonetheless, the prices that Masonite has offered Steves are around 37% higher than the prices it pays under the Supply Agreement.

Unable to secure a reliable, competitively priced source of supply from either domestic supplier, Steves approached foreign doorskin suppliers like Teverpan, Kastamonu, and Yildiz to explore alternate sources of supply. And, those discussions continue today. But, the record shows that Steves could fill only a small part of its doorskin requirements from foreign supply sources. And, the record shows that foreign suppliers can supply only a limited number of the doorskin designs and sizes that Steves uses to manufacture its doors. Further, Steves has experienced serious quality deficiencies with doorskin samples that it has received from foreign suppliers.[8]

Finally, Steves has investigated the possibility of building its own doorskin manufacturing plant ("the MDS Project") so as to have a reliable source of supply after the Supply Agreement ends in September 2021. To that end, Steves hired former JELD-WEN employee John Pierce ("Pierce") in March 2015 to, among other things, provide information that Steves could use in furtherance of its MDS Project. Then, in July 2015, Steves engaged another former JELD-WEN employee, John Ambruz ("Ambruz"), for the primary purpose of completing a study about

---

[8] In opposing divestiture, JELD-WEN has asserted that it too has experienced quality problems with the products made by these foreign manufacturers. Indeed, JELD-WEN argues that product from foreign suppliers cannot help fill the short-fall in supply that would ensue a divestiture of Towanda.

the feasibility of Steves building a doorskin manufacturing plant ("the Feasibility Study"). On March 30, 2016, Ambruz e-mailed Sam and Edward Steves the completed Feasibility Study, which discussed the challenges associated with building a doorskin manufacturing plant—particularly the cost, time, and need for a manufacturing partner.

In early 2017, Steves reached an interim conclusion that it could not feasibly build its own doorskin plant. The record establishes that Steves has made no concrete progress toward building a doorskin manufacturing plant. However, Ambruz and Gregory Wysock—a former Masonite employee hired to work on the MDS Project in July 2016—are still employed by Steves. Moreover, Steves has not completely abandoned its plans to build a plant. Thus, Steves continues to look for a manufacturing partner that could help construct a plant, and it was in contact with several potential partners before trial. However, Steves has had no further communication with those entities since before the trial began. Considered as a whole, the record establishes conclusively that Steves cannot fulfill its doorskin requirements from foreign manufacturers or by building its own doorskin plant.

If Steves cannot repair its relationship with JELD-WEN (which, on this record, will not happen) or acquire doorskins another way (which, as of now, is not possible), it will go out

of business after the Supply Agreement expires in 2021. Steves'
success rises and falls with its door manufacturing business; in
2017 alone, its interior molded doors sales constituted around
70% of its total revenue. And Steves cannot make those doors
without interior molded doorskins. Consequently, if Steves
cannot obtain a reliable doorskin supply, its business will soon
fail.

That event would affect the 1,100 employees that currently
work for Steves, and the members of the Steves family, which has
run the company since it was founded in 1866. Steves' principal
officers, Edward and Sam Steves, are the fifth generation of the
Steves family to manage Steves. Moreover, Sam Steves' son and
Edward Steves' daughter are current employees of Steves, and Sam
Steves hopes to "pass[] on the reins" to them in the future.
Maintaining Steves as a family business is an important goal of
the entire Steves family.

### 7. The Discussions Between JELD-WEN and Steves; The Initiation of Alternative Dispute Resolution Process; The Filing of This Action: 2012-2016

JELD-WEN has presented the affirmative defense of laches, a
topic that is separately considered in Section II.C, infra. The
record contains considerable evidence about what Steves knew
when, and what Steves did (in addition to attempting to secure
an alternative source of supply as outlined in Section I.B.6).

Additional facts on those topics are set out below as well as in Section II.C below that addressed the laches defense.

Steves began noticing doorskin quality issues after the merger as soon as November 2012. However, at that time, it did not view those defects as a result of the merger. It is difficult to pinpoint the exact period when Steves connected the dots between the CMI Acquisition and the decrease in doorskin quality.[9] Similarly, Steves had concerns about JELD-WEN's doorskin prices when it received the first notification required by the Supply Agreement in late 2012, and had discussions with Orsino about accurate pricing throughout 2013. However, that initial disagreement concerned whether JELD-WEN's reduction of doorskin thickness should be reflected in doorskin pricing under the Supply Agreement, and it was not thought by Steves to be related to the CMI Acquisition. In fact, the problems with the key input costs provision that underlie Steves' pricing claims in this litigation did not arise until after Hachigian replaced Orsino as JELD-WEN's CEO in early 2014.

---

[9] Edward Steves stated during his deposition that he realized in early 2013 that the CMI Acquisition had caused the "degradation" of doorskin quality. Apr. 12 Remedies Tr. at 637:19-638:8. However, he later testified that he did not view the quality issues as related to the Acquisition. Id. at 685:6-17. Having heard the testimony and reviewed the deposition, the Court concludes that Edward Steves was speaking temporally, not causally.

The record shows that, as of August 2014, Sam and Edward Steves exchanged email messages that used the term "antitrust." For example, on August 12, 2014, Sam Steves e-mailed Edward Steves to ask whether Steves was "finished with exploring anti trust issues if J[ELD-WEN] terms [terminated] the supply agreement." DX-291. Then, on August 26, Sam Steves made reference to Steves' "claim on the overcharge" when considering how to respond to a Hachigian e-mail that discussed, in part, doorskin pricing under the Supply Agreement. Sam Steves noted that "the antitrust" was "perhaps the most important" issue at that point. DX-466.

Although the emails were offered in evidence, their meaning and context was not developed at trial. As explained more fully in Section II.C below, even though Steves was aware of potential antitrust ramifications of JELD-WEN's pricing pressure, changes in the treatment of defects, and arbitrary treatment respecting the key input costs, Steves reasonably focused its attention on finding alternative sources of doorskin supply in an effort to survive JELD-WEN's conduct, rather than place its hope for survival on pursuing a first of its kind antitrust action.[10]

_____

[10] As the parties so often observe, no previous case brought by a private party seeking divestiture under the Clayton Act had gone to verdict at the time so Steves had no precedents to inform whether to pursue such a course or, if pursued, what the likelihood of success might be.

Many of those efforts took place in the fall of 2014 and early 2015. In addition, Steves, quite reasonably, continued to meet with JELD-WEN in an effort to find some reasonable commercial solution. Indeed, JELD-WEN, largely through Hachigian, repeatedly told Steves that JELD-WEN wanted some commercial solution. Faced, as it was with losing the supply of a key component of its most important product, Steves was reasonable in continuing to try to work on a commercial solution with JELD-WEN.

In early 2015, it became obvious that negotiations with JELD-WEN would not work. Therefore, Steves formally initiated dispute resolution procedures under the Supply Agreement in March 11, 2015. See DX-243 at 1; see also PTX-149 § 10(a)-(b). The formal invocation of Section 10 did not, however, provide JELD-WEN with notice of Steves' possible antitrust claim. However, the dispute process was addressed to contractual matters that lay at the heart of Steves' antitrust concerns so resolution of those issues in the contractually required dispute process likely would mean that Steves would have no antitrust injury.

Steves asked JELD-WEN to meet for the initial dispute resolution conference called for by the Supply Agreement on March 23, DX-243 at 2, but JELD-WEN deferred the internal conferences required by Section 10 until May 2015. Although the

focus of those conferences was JELD-WEN's compliance with the key input costs and doorskin quality provisions of the Supply Agreement, Steves' attorney, Marvin Pipkin, also raised Steves' antitrust concerns at the second conference, and Bruce Taten responded on JELD-WEN's behalf. But, the record does not disclose the substance of the discussion about those antitrust concerns. After those conferences failed to yield a resolution to either the contract or antitrust issues, Steves requested, in July 2015, mediation, as is specified to be the next step under the Supply Agreement, see PTX-574 at 1. That occurred on September 4, 2015.

The mediation was also unsuccessful. At the end of it, Steves presented JELD-WEN with a draft complaint that raised both the contract and antitrust issues. The parties then chose to enter into a standstill agreement, which provided that Steves would not sue JELD-WEN on the date of the agreement, and that JELD-WEN would give Steves two days' notice before suing Steves, effective for thirty days. See PTX-591. The standstill agreement recited the mutual desire of Steves and JELD-WEN to continue efforts to work out a solution to their disputes, which then included both the contractual issues and the antitrust ramifications of JELD-WEN's conduct. Subsequently, Steves and JELD-WEN entered into standstill agreements with similar provisions on September 29, 2015; October 13, 2015; January 7,

2016; and April 25, 2016. See PTX-593; PTX-606; PTX-641; PTX-682. Sam Steves acknowledged that these agreements permitted Steves to file suit on any date other than the dates of the agreements themselves, but he said that Steves did not do so because it believed that the parties could resolve their dispute without litigation, as expressed in the standstill agreements.

As it was involved in this back-and-forth process with JELD-WEN, Steves, in December 2015, asked the DOJ to examine JELD-WEN's potentially anticompetitive conduct. Steves gave a presentation to the DOJ later that month, and then produced documents to the DOJ in January 2016, in response to a civil investigative demand. On April 7, 2016, JELD-WEN also made a presentation to the DOJ. See DX-45. On May 18, 2016, the DOJ closed its investigation without taking any action. See DX-182. Steves then asked JELD-WEN to execute another standstill agreement, and when JELD-WEN refused, Steves filed this action on June 29, 2016.

### 8. Current Status and Standalone Viability of Towanda

Whether divestiture is a viable remedy in this case depends, in part, on whether, if divested, Towanda would be able to operate as an effective competitor in the doorskin market and thereby restore the competition that the merger substantially

lessened.    The  parties  have  quite  different  views  on  the subject.

Towanda occupies 19 of the 275 total acres of land on which the  property  sits.  The  plant  consists  of  several  different areas: the main plant, which contains the main production lines; the  smaller  "die  form"  plant,  where  Masonite  originally manufactured doorskins and which still houses a production line today; the wood yard, which receives doorskin inputs like logs or chips; and the water treatment plant, which removes chemicals from water used in the manufacturing process before that water is  redistributed  to  the  environment  through  the  nearby  spray fields. All these areas existed when JELD-WEN acquired Towanda, and JELD-WEN purchased the entire property. Towanda's operations require more than 400 total employees, and around 300 in the main plant alone.

Towanda has a design capacity of [   ] doorskins per year. That figure reflects Towanda's maximum production capacity based on its design, which accounts for the number of openings in a press,  the  number  of  dies  that  can  be  produced  within  that opening, the number of times the press can go up and down in a specific  period  of  time,  and  some  scheduled  maintenance downtime.

However,  design  capacity  is  not  the  same  as  actual production capacity. The latter is more realistic for production

calculations because it also incorporates the downtime that is required to change dies in the press so that different styles (SKUs) can be manufactured. A die change requires waiting for the press to cool down, replacing the die (using a crane), and then reheating the press.

Towanda's two doorskin manufacturing lines are Line 1 (in the main plant) and Dieform (in the die form plant). Line 1 is a high-volume/low-mix press, meaning that it produces a large quantity of a lower variety of SKUs. It currently produces only 6'8" doorskins-the most common size for residential con-struction—and can only produce between 50-60 different SKUs at one time. Line 1 is intended to be the "main production line" at Towanda. Thus, Line 1 has fewer die changes and far less downtime.

Dieform, in contrast, is a high-mix/low-volume press, sacrificing doorskin quantity for SKU variety. It uses smaller dies that can be changed without causing as much downtime as die changes for Line 1. Consequently, Dieform can produce over 250 different SKUs, and it accommodates all of JELD-WEN's 7' and 8' doorskins, as well as its smaller orders for more niche doorskin designs. That line's production capacity is therefore lower.

Even with Line 1 and Dieform being designed to maximize efficiency, some unaccounted-for downtime is still needed to produce the many SKUs sold. This downtime reduces Towanda's

current actual production capacity to [   ] doorskins per year. In 2017, and for reasons not explained in the record, Towanda's actual production was [   ] doorskins. Towanda's current doorskin business is strong, generating EBITDA of [   ] in 2017.

These earnings are attributable to several factors. First, doorskin volume has increased because the housing market is performing well. There is evidence that the number of domestic "housing starts"—new homes for which construction is started—was approximately [   ] in 2001, and around [   ] in 2017. Thus, the current demand for doorskins is roughly similar to the demand in the early 2000s, when CMI achieved positive EBITDA (albeit not as high as 2006, when the number of housing starts was approximately [   ]). The market has also improved considerably since 2011, as reflected in the significantly higher volume of doorskins sold to JELD-WEN's external customers in 2016 ([   ] compared to 2011 ([   ]). Towanda's volume is also used to supply JELD-WEN's door manufacturing plants, which in 2017 purchased about [   ] of Towanda's [   ] doorskins.

Second, the increased demand has helped spread out Towanda's high fixed costs, reducing Towanda's cost per doorskin in 2017 to approximately [   ]. This expense is even lower than the [   ] that each doorskin cost CMI at its peak in 2006 (and substantially lower than the [   ] per-doorskin cost at CMI's nadir in 2011). That reduction is, in part, attributable to

JELD-WEN's changes to Towanda, which have lowered both variable and fixed production costs.

Third, doorskin prices have rebounded since 2011, so that JELD-WEN can now charge an average of [  ] per doorskin—only slightly lower than the peak average price of [  ] in 2006.

Finally, JELD-WEN's mix model allows it to allocate SKU demand across its four doorskin plants, increasing Towanda's production efficiency and helping it operate at the level needed to achieve a profit. As Towanda's design capacity is [  ] doorskins, Towanda therefore must sell around [  ] doorskins each year at prices ranging from [  ] doorskin to be profitable. Given the current state of the market, Towanda's actual capacity of [  ] doorskins in 2017 easily surpassed that threshold.[11]

The record proves, without dispute, that today Towanda is a profitable competitor in the doorskin market. And, the Court so finds. Also, the record shows, also beyond dispute, that

---

[11] Towanda's overall profitability is aided by its MiraTEC and Extira production. Towanda is the only facility in the world that makes those products. They are produced on Line 2, a sealed press that sits across from Line 1. However, the manufacturing process for doorskins and MiraTEC and Extira is intertwined in many respects, so those products share many of the same manufacturing facilities in the main plant. As a result, Line 2 and the production equipment needed for MiraTEC and Extira cannot be removed as part of divestiture, because doing so would make doorskin production impossible. Any acquisition of Towanda's doorskin business, then, must include the acquisition of its MiraTEC and Extira business.

Towanda was profitable from the formation of CMI in 2001 until the down turn in the housing market in 2006 and it was a competitor in the supply of doorskins to independent door manufacturers then as well. And, the Court so finds.

JELD-WEN argues that, if divested from JELD-WEN, Towanda cannot operate profitably or be a competitor in the doorskin industry. In support of that view, JELD-WEN makes several arguments.

First, JELD-WEN argues that divesting Towanda in its current state would be more complex than the successful divestiture from Masonite in 2001. That earlier process benefited from the relatively amicable relationship between Masonite and SMI and the existence of fewer doorskin designs. Towanda and Masonite's Laurel plant were also similar and the designs offered by each were "exact trade matches," so the companies simply needed time to duplicate dies at each plant. Here, however, says JELD-WEN, CMI and JELD-WEN had "completely different designs" when they merged, and that distinction has largely persisted. That, however, is really just an argument that JELD-WEN would need at least two years to replicate Towanda's design offerings at its legacy plants. And, thus, it relates not to Towanda's future as a competitive entity, but to JELD-WEN's.

Second, JELD-WEN says that Towanda's fixed costs would increase because it would have to set up its own departments to provide administrative and technology services. Those expenses are currently absorbed by JELD-WEN and thus not factored into Towanda's per-doorskin costs. That may well be true, but it hardly shows that a divested Towanda would not be profitable or competitive.

Third, says JELD-WEN, Towanda cannot adequately utilize its capacity without benefitting from JELD-WEN's other doorskin plants or internal door customers. It is true that JELD-WEN uses a good deal of Towanda's output. But, it is virtually certain that Steves alone would purchase [    ] doorskins from a divested Towanda. And, JELD-WEN would buy some of its requirements from the new owner of Towanda (at least [    ] doorskins) at least for two years while it seeks other sources of supply. And, JELD-WEN might well choose to continue buying from Towanda thereafter if, as JELD-WEN has argued, it will not likely make up any shortfall by buying from foreign suppliers or building another plant. Further, the Independents reasonably can be considered as other potential customers of a new owner of Towanda, especially considering (1) the higher prices recently extracted by JELD-WEN in requiring those companies to re-negotiate their contracts and (2) the higher prices sought by Masonite. Combined, (all three) the sales would exceed the 17-

18 million needed for profitable operation.[12] Thus, the record establishes that a divested Towanda likely would be able to sell at least as much doorskin product as it did in 2017.

Of course, the owner of a divested Towanda would find it necessary to supply a more diverse range of SKUs than CMI supplied in 2005 or 2006 because fewer SKUs existed at that time. Fancher opined that Towanda could not, as a standalone entity, supply all the SKUs needed to meet its external customers' needs—both because "the design mix that would run through [Towanda] couldn't support it," and because Towanda and JELD-WEN's legacy plants both make designs that the other does not.

However, the record contains no particularized evidence from JELD-WEN about which specific SKUs purchased by JELD-WEN's external customers would be implicated by divestiture, or about the effect on Towanda's production capacity and profitability of devoting its resources to meeting the SKU needs of its

---

[12] The record shows that, in the event of divestiture, JELD-WEN would continue to buy from Towanda at least until it could build a new plant which would take several years or until JELD-WEN could find a reliable source of foreign supply (which, like Steves, JELD-WEN has not deemed to be a viable solution). JELD-WEN's counsel have argued that JELD-WEN would not buy from divested Towanda. Because JELD-WEN's witnesses said otherwise and counsel's argument makes no sense if JELD-WEN is to meet its needs, the argument is rejected.

customers. The consequence of that evidentiary void is that no specific finding can be made.

Nonetheless, the record does permit the general conclusion that divestiture would restrict to some extent Towanda's ability to meet the needs of JELD-WEN's Independent customers because the die changes required to produce the requisite SKU variety would lead to increased downtime and reduced production capacity. This reduced capacity could also result in higher costs for Towanda, which could reduce profitability. There is no evidence that permits the Court to find whether those costs would increase or by how much.

From this record, the Court finds that a divested Towanda would be required to adjust product mix in a not insignificant way, but that the facility is capable of being operated to produce a mix of products that will allow Towanda to be profitable and competitive even if it must make substantial adjustments to do so.

Finally, JELD-WEN argues that it is not possible to conclude that a divested Towanda would be competitive because the existence of a potential buyer who could profitably sell doorskins from Towanda is unknown at this time. It is correct that the record does not identify entities, other than Steves, that are currently interested in buying Towanda and are capable

of operating the plant within the scope of their corporate structure or separately.

Steves is the only entity that has expressed interest in acquiring Towanda. However, Steves' executives admittedly lack knowledge about operating a doorskin plant. Of course, in the event of divestiture, Towanda's management and line employees would be retained, or at least given the opportunity to remain. That would be so for a new owner because the retention of its operating personnel would afford the greatest likelihood for success in restoring competition that was substantially lessened by the merger. And, that approach succeeded when CMI was created and divested in 2002 and when CMI was acquired by JELD-WEN in 2012. The record discloses no reason why that approach would not be successful again.

It is not surprising that, at this juncture in the case, potential buyers have not emerged. This is, after all, the first privately brought action under Section 16 of the Clayton Act to have gone to verdict and, in which, a private party has sought divestiture. And, as the Supreme Court of the United States explained in Brown Shoe Co. v. United States, 370 U.S. 294 (1962), there are not likely to be firm expressions of interest until after the issue of whether divestiture is an appropriate remedy is settled on appeal and the landscape is clear. But, the record shows that Towanda was a profitable

operation before the housing crisis and is once again and that its doorskin business produced small, but positive, EBITDA even during the housing crisis. And, even when CMI was up for sale in 2011, at a time when it was not profitable, there were several interested buyers. On this record, the Court concludes that buyers for this profitable operation can be expected to emerge again when the legal battles are ended.

### 9. Impact of Divestiture on JELD-WEN and Other Entities

Divestiture has been on the table in this action since it was filed in June 2016. Nonetheless, the record is that JELD-WEN has not examined how it would operate in the event that JELD-WEN is ordered to divest Towanda. Nor has JELD-WEN developed a plan for that eventuality. Thus, there is no well thought-out or documented support for how JELD-WEN would be affected by divestiture.

Of course, the absence of such a plan does not foreclose testimony from JELD-WEN's officers and employees giving their opinions about how divestiture might affect JELD-WEN"s overall operations in a general way and how a divestiture might affect JELD-WEN's customers. And that is how JELD-WEN has chosen to present evidence on those topics: by offering opinions of its executives. Those opinions may properly be considered even though they come from witnesses who admittedly have not studied

the subject and who are biased to present the worst case scenario.

The lack of concrete analysis and the inherent bias make the opinions of JELD-WEN employees about future events (such as the restructuring of JELD-WEN's company-wide manufacturing operations, potential layoffs, and ripple effects on customers) quite speculative and rather unreliable. Nevertheless, it is possible to conclude that, if Towanda's capacity is removed from JELD-WEN's orbit, JELD-WEN will encounter, in the short run, difficulty manufacturing in its other facilities the number of doorskins that it needs to supply its own needs for making JELD-WEN doors and the needs of its independent doorskin customers.

It is helpful to review JELD-WEN's most recent production figures as a benchmark. In 2017, JELD-WEN, company-wide, including Towanda, made approximately [   ] doorskins, consuming 30 million internally and selling [   ] to the Independents who are its customers, with [   ] of those going to Steves. If, after divestiture, Steves secured its requirements ([   ] doorskins) from the new owner of Towanda, JELD-WEN would need to produce [   ] doorskins to meet its needs and those of its external customers.

The record is not precise on the point, but it appears that divestiture would result in a short-fall of approximately [   ] doorskins in JELD-WEN's internal and external needs (excluding

Steves). However, that does not take into account that any divestiture order necessarily would make provision for JELD-WEN to purchase its short-fall from the new owner of Towanda for at least two years. That would be important to JELD-WEN, to its customers, and to the new owner of Towanda.

JELD-WEN also offered evidence that the "full production based on [m]ix" figures in [the record at PTX-1045] do not accurately reflect the effect of losing Towanda on JELD-WEN's doorskin capacity and production volume. That is because divestiture would make it necessary for JELD-WEN to redistribute to its legacy plants the SKUs that are currently manufactured at Towanda in order to provide the quantity and variety of doorskins that its customers desire. This change would cause two problems according to JELD-WEN. First, if those plants tried to accommodate those SKUs, their actual capacity would suffer, to some undefined extent, because the additional die changes needed would increase downtime, thereby reducing efficiency and lowering volume. Second, economics aside, producing the necessary quantity of the Towanda SKUs at the other plants is not possible without using the dies that are used at Towanda to produce those SKUs or making new dies of the same kind. Thus, those dies would have to be made for the legacy plants to use and that would require time.

The record does not show how much time or how much money that would require because JELD-WEN has not put "pen to paper" on that topic or any other relating to how to operate in the event of divestiture. That void notwithstanding, JELD-WEN has shown that divestiture would likely cause operational dislocations that would affect, to an undefined extent, its requirements for doorskins in the number of SKUs in its current line. However, because JELD-WEN has not analyzed how it would reallocate Towanda's SKUs, the degree of the resulting total capacity decrease at its legacy plants, like the degree of impact, is unclear.

It does appear from the record that it would be difficult to replace Towanda's production immediately. JELD-WEN's doorskin plant in Latvia currently has some excess capacity. However, that "excess" does not account for the reality that Latvia has never achieved close to its design capacity of [ ] doorskins per year. Furthermore, the Latvia plant is tailored to the European doorskin market and only produces a few doorskin designs that are usable in the U.S. market. Producing some of Towanda's SKUs in Latvia would also require the use of different dies than those used now in Latvia, and Latvia is currently running close to its total capacity, so that its production process could not be altered without consequences. The record

does not show what those consequences are or what their economic impact would be.

Notwithstanding those difficulties, JELD-WEN's contingency business plans outlining options in the event that a natural disaster shuttered one or more of its plants shows that JELD-WEN considers that its Latvian plant, or other domestic plants (including a restarted Marion plant), could be used to augment doorskin supplies until the shuttered plant was back on line. Thus, contrary to JELD-WEN's urgings, it is not possible to conclude that divesting Towanda would leave JELD-WEN without options, even in the short term. JELD-WEN's own business records show otherwise.

The record also leads to the conclusion that obtaining doorskins from alternate suppliers or building a replacement plant is not any more promising for JELD-WEN than it is for Steves. Because of the merger, the only other domestic supplier of doorskins is Masonite, purchase from which is conceptually possible but not considered viable by JELD-WEN. And, given Masonite's position on sales to the Independents, JELD-WEN is likely correct. JELD-WEN conceptually could also purchase doorskins from foreign suppliers, such as Teverpan. But JELD-WEN, like Steves, has concerns about the quality of doorskins made by foreign suppliers, and those suppliers offer fewer SKUs than Towanda. Considering the record as a whole, the Court

concludes that foreign suppliers cannot meet a significant part of JELD-WEN's requirements any more than they can meet a significant part of Steves' requirements.

Finally, the record is clear JELD-WEN could build its own doorskin manufacturing plant to replace Towanda's production. And, JELD-WEN is equipped to do that because it has extensive experience building such plants. However, that option would require considerable time and resources. The record shows that JELD-WEN would need at least two to two and a half years, more likely longer, to complete the project. The cost to JELD-WEN has been estimated to be between [  ] to set up a facility with production lines similar to Towanda's. That is a very wide range and thus is quite imprecise.

In sum, the Court finds that divestiture of Towanda would have significant, but not well-documented, consequences for JELD-WEN. However, nothing in the record permits the Court to conclude that divestiture would create the "disaster" that JELD-WEN's counsel urge the Court to find.

The record shows that limitations on JELD-WEN's total production capacity could have several collateral consequences. For instance, JELD-WEN has long-term doorskin supply agreements with several door customers. One of those contracts, with a U.K.-based company called Howdens, provides for certain penalties if JELD-WEN cannot meet Howden's supply needs, with

the precise consequences dependent on the size and frequency of the failure. See DX-943 §§ 3.3, 5.13. However, JELD-WEN's obligations with respect to those penalties are subject to a force majeure clause,[13] see id. § 22, which might apply to capacity reductions because of a divestiture order. See id. § 1.1, at 7. Although Howdens is a foreign customer that is supplied primarily by JELD-WEN U.K. and JELD-WEN Europe, see DX-943 § 3.3, JELD-WEN's contracts with domestic customers like The Home Depot and Lowe's contain similar provisions.

In addition, JELD-WEN argues that both its internal and external customers would have to deal with higher doorskin prices and a less streamlined purchasing process. Reduced doorskin capacity, says JELD-WEN, would force JELD-WEN to raise its prices where permitted. Whether that would, or could, be done with a competitive Towanda as a supplier was not addressed by JELD-WEN's witness.

Furthermore, if JELD-WEN's legacy plants cannot produce all of Towanda's SKUs, customers who previously received doorskins made only at Towanda would need to purchase from both Towanda and JELD-WEN (or another supplier). And, JELD-WEN projects that

---

[13] JELD-WEN's assertion to the contrary is mistaken. See Def. FOF ¶ 190. The contract states that the force majeure provision applies "[w]ithout prejudice to clauses 5.10 to 5.16"—that is, including the cited penalty provision for delivery failures. DX-943 § 22; see also id. § 5.13.

losing its external volume altogether would cause it to lose almost [ ] of revenue and [ ] in EBITDA. Finally, says JELD-WEN, its internal customers—its own door plants—would lose earnings without Towanda because they would lack the doorskins needed to make the current volume of doors. That loss is projected to be roughly [ ] decrease in JELD-WEN's EBITDA.

The Court is concerned that the foregoing figures were belatedly cobbled together for the Remedies Hearing and were not produced during discovery so that they could be tested. And, although the Court rejected Steves' motion to exclude this evidence from consideration in the remedies phase of the case, it is not the sort of evidence in which the Court can place much confidence. That said, the record shows that divestiture, if ordered, would result in some not insignificant collateral consequences.

Finally, says JELD-WEN, Towanda's purchase price in a divestiture auction sale would likely not capture Towanda's full value to JELD-WEN. JELD-WEN offered the opinion of its CFO that Towanda's current enterprise value[14] is approximately nine times its EBITDA. By applying that multiplier to Towanda's 2017 EBITDA of [ ], JELD-WEN contends that the plant's enterprise

---

[14] Enterprise value assesses how the stock market values an entity, taking into account the entity's market capitalization and its net debt.

value is around [  ]. That number, says JELD-WEN, is the minimum a purchaser would have to pay JELD-WEN in recognition of Towanda's worth. According to JELD-WEN, a divestiture sale is unlikely to yield this price.

Whether that multiplier (and hence the asserted enterprise value) is appropriate here is not a matter that has been supported by economic evidence. It is, at best, an unresearched, undocumented ball park figure. Nonetheless, as Shapiro testified, a forced sale always contains some "presumed detriments" for the seller. Id. at 808:16-21. There is nothing in the record to suggest otherwise here. However, it is both premature and improvident to conclude that a post-appeals bidding process would not yield a fair price for Towanda as it exists today. That assessment cannot, and should not, be made until there are bids made after the appellate process is ended and future buyers have a clear picture that they will not be engaged in a futile activity. But, the record is sufficient to find that Towanda, including its doorskin business, as well as the MiraTEC and Extira businesses, have value which potential buyers will recognize when it is clear whether divestiture is an appropriate legal remedy.

The jury findings and the foregoing factual findings made by the Court provide the framework for the legal analysis of Steves' request for equitable remedies. The legal analysis

reflects additional factual findings that are most appropriately made in context of the specific legal issues to which those additional findings relate.

## II.  LEGAL ANALYSIS AND CONCLUSIONS

The most significant form of requested relief is divestiture.  It will be assessed first.  Then, the opinion will consider the so-called "conduct" remedies sought by Steves.

### A.  Steves' Request for Divestiture

#### 1.  Legal Standard

Section 16 of the Clayton Act allows private parties to obtain injunctive relief "against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.  This injunctive relief may include an order requiring the acquiring company to divest the assets of the acquired firm. California v. Am. Stores, 495 U.S. 271, 295 (1990).

Given the lack of authority from private suits based on Section 7 of the Clayton Act that have reached the divestiture issue, the decisional law respecting the standard for injunctive relief must come mostly from decisions in cases brought by the Government under Section 15.  That provision allows the Government to institute proceedings "to prevent and restrain violations of [the Clayon] Act."  15 U.S.C. § 25.  Notwith-

standing the semantic difference between Sections 15 and 16, those provisions offer largely the same (and possibly identical) remedies. See Am. Stores, 495 U.S. at 281-82.

Whoever brings suit, the Government or private party, "[t]he relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'" Ford Motor Co. v. United States, 405 U.S. 562, 573 (1972) (quoting United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316, 326 (1961)); see also United States v. U.S. Gypsum Co., 340 U.S. 76, 88 (1950) (an antitrust remedy must, "so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance"). "Mergers come in a wide variety of shapes and sizes," so the remedy awarded should be "carefully tailored to the competitive harm" in the case. U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies § I(A) (2011) ("Merger Remedies Guide"). District courts are thus "clothed with large discretion to fit the decree to the special needs of the individual case." Ford, 405 U.S. at 573 (internal quotations omitted); see also Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 131 (1969) ("Section 16 should be construed and applied . . . with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice 'adjustment and reconciliation between the public interest and private needs as well as between competing

private claims.'" (quoting <u>Hecht Co. v. Bowles</u>, 321 U.S. 321, 329—330 (1944))).

The "most drastic, but most effective, of antitrust remedies" is divestiture. <u>E.I. du Pont</u>, 366 U.S. at 326, but complete divestiture is "the remedy best suited to redress the ills of a competitive merger." <u>Am. Stores</u>, 495 U.S. at 285; <u>see also</u> <u>Ford</u>, 405 U.S. at 573. For this reason, the DOJ seeks divestiture in "the vast majority of cases" like this one. <u>Merger Remedies Guide</u> § I(B)(1). Moreover, "[t]he relief which can be afforded [under Section 15] . . . is not limited to the restoration of the status quo ante" in the pre-acquisition market. <u>Ford</u>, 405 U.S. at 573 n.8; <u>cf.</u> <u>U.S. Gypsum</u>, 340 U.S. at 89 (equitable remedy for Sherman Act violation can affect "[legal] practices connected with acts actually found to be illegal," so that defendants are "denied future benefits from their forbidden conduct"). Consequently, divestiture may extend to assets that were unrelated to the antitrust violation if the divested entity would need those assets to become competitive, or if the integration of legally- and illegally-acquired assets makes their separation impossible. <u>See</u> <u>Utah Pub. Serv. Comm'n v. El Paso Nat. Gas Co.</u>, 395 U.S. 464, 469 (1969) (approving equal division between defendant and divested entity of gas reserves developed post-merger); <u>Polypore Int'l, Inc. v. FTC</u>, 686 F.3d 1208, 1218-19 (11th Cir. 2012) (affirming FTC's inclusion of a

foreign plant in divestiture order because it "needed to be divested to restore the competition eliminated by the acquisition and provide the acquirer with the ability to compete"); see also Malcolm R. Pfunder et al., Compliance with Divestiture Orders under Section 7 of the Clayton Act: An Analysis of the Relief Obtained, 17 **Antitrust Bull.** 19, 56-67 (1972) (detailing approaches to identifying divestiture assets).

Structural remedies like divestiture also can be coupled with—or replaced entirely by—conduct remedies that can "preserve a merger's . . . efficiencies" and limit anticompetitive conduct at the same time. Merger Remedies Guide § II. "Conduct relief can be a particularly effective option when a structural remedy would eliminate the merger's potential efficiencies, but, absent a remedy, the merger would harm competition." Id.; see also In re Evanston Nw. Healthcare Corp., 144 F.T.C. 1, 520 (2007). However, "conduct remedies risk excessive government entanglement in the market," Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd., 778 F.3d 775, 793 (9th Cir. 2015), so they should be "tailored as precisely as possible to the competitive harms associated with the merger." Merger Remedies Guide § II n.12. This approach is consistent with the general need for courts considering divestiture to avoid "impos[ing] sanctions . . . which ultimately create economic

havoc" in industries in which courts are not "well-versed." 5 Earl W. Kintner et al., <u>Federal Antitrust Law</u> § 40.9 (2017).

At the same time, courts have observed that divestiture is an "'extreme remedy.'" <u>Taleff v. Sw. Airlines Co.</u>, 828 F. Supp. 2d 1118, 1122 (N.D. Cal. 2011), <u>aff'd</u>, 554 F. App'x 598 (9th Cir. 2014) (quoting <u>Broadcom Corp. v. Qualcomm Inc.</u>, 501 F.3d 297, 322 (3d Cir. 2007)). It also has some drawbacks. One antitrust treatise highlights three particular problems:

> By and large, spinoffs of established businesses or subsidiaries are far more successful than the creation of new ones. Second, the merging firms have every incentive to make the divestiture work poorly, particularly if it calls for the creation of a competitive firm. Third, buyers who are not competitors or are not established in the business may start out at a very considerable disadvantage, which sometimes later proves fatal.

9G Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 990c2 (4th ed. 2016) (footnotes omitted); <u>see also</u> 5 Kintner et al., <u>supra</u>, § 40.12 (listing "potential hazards of divestiture").

Divestiture also operates somewhat differently in private suits. The Supreme Court has explicitly noted that a district court's ability to order divestiture does not "mean that such power should be exercised in every situation in which the Government would be entitled to such relief under [Section] 15." <u>Am. Stores</u>, 495 U.S. at 295. Also, Section 16 requires a plaintiff to establish standing to seek injunctive relief, and a

defendant can rely on equitable defenses and other equitable considerations to avoid divestiture. <u>Id.</u> at 295-96. And, in government actions, "the proof of the violation of law may itself establish sufficient public injury to warrant relief." <u>Id.</u> at 295. Thus, it is no surprise that, in cases brought by the government, Courts have viewed divestiture as "simple, relatively easy to administer, and sure," <u>E.I. du Pont</u>, 366 U.S. at 331, because hardships do not need to be balanced nor the public interest assessed in the same way as in Section 16 cases. <u>See</u> <u>Ford</u>, 405 U.S. at 575 ("'[O]nce the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor.'" (quoting <u>E.I. du Pont</u>, 366 U.S. at 334)); <u>El Paso Nat. Gas</u>, 395 U.S. at 472 ("[T]he pinch on private interests is not relevant to fashioning an antitrust decree, as the public interest is our sole concern."); <u>E.I. du Pont</u>, 366 U.S. at 326 ("[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests."). These differences do not make those precedents inapposite, but they do caution that, in a private action, divestiture is not as easy a remedy as it is in a government action.

It is also true that scholars have expressed doubt about the wisdom of divestiture under Section 16. Indeed, according

to one treatise, "private divestiture is to be avoided when other injunctive relief is effective" because "courts are in agreement that divestiture should be applied in a relatively limited number of private suits due to the wide-ranging repercussions of such action, and the possible adverse effect on interests of those who are not parties to the antitrust violation." 5 Kintner et al., supra, § 40.32 (citing, inter alia, Burkhead v. Phillips Petroleum Co., 308 F. Supp. 120, 127 (N.D. Cal. 1970) ("[D]ivestiture would appear to be appropriate only in a limited number of cases where no other form of preventative relief would suffice . . . ."); Schrader v. Nat'l Screen Serv. Corp., 1955 Trade Cas. ¶ 68,217, at 71,009 (E.D. Pa. 1955) ("[C]onsiderations of policy are against decreeing divestiture or the complete destruction of a nationwide business at the suit of an individual in a private action under the antitrust laws . . . .")); cf. Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic, 883 F. Supp. 1247, 1264 (W.D. Wis. 1995), aff'd in part, rev'd in part on other grounds, 65 F.3d 1406 (7th Cir. 1995) ("It is questionable whether divestiture of a long completed transaction is an appropriate remedy in a private action under the Sherman Act."). Similarly, Areeda and Hovenkamp take the view that "the Government's recommendation of divestiture deserves far more weight than a similar request from other litigants." 3D Areeda & Hovenkamp, supra, ¶ 326b. Because

67

divestiture can have "far-reaching effects on persons who are not parties to the litigation" and "can affect the viability of otherwise profitable companies, the status of preexisting contracts, and the fortunes of rivals," they recommend taking "great care" before ordering divestiture in private actions. Id.

American Stores, to some extent, has changed the Clayton Act landscape because most of the foregoing cases were decided and since the foregoing views were expressed by commentators. Nonetheless, the concerns expressed in the pre-American Store cases and comments teach that courts must rely on the facts of each case to decide whether divestiture is an appropriate remedy and that courts should resort to it in limited circumstances.

That said, it is still true that divestiture should be ordered when it is the most effective way of restoring the substantially lessened competition brought about by the merger at issue and where its collateral consequences can be mitigated. And, the appropriate remedy should be selected upon "determining (a) what competitive harm the violation has caused or likely will cause and (b) how the proposed relief will remedy that particular competitive harm." Merger Remedies Guide § I(A). Moreover, that remedy should be "calculated to minimize adverse economic effects upon the industry, the public, and the stockholders affected by the unlawful merger. . . . [C]aution, progressive enforcement, and remedy formulation on a case-by-

case basis are essential ingredients to effectively combat the effects of an antitrust violation, and to minimize the risk of economic dislocation." 5 Kintner et al., <u>supra</u>, § 40.9 (footnote omitted).

These general considerations should be kept in mind when assessing whether to award divestiture or alternate injunctive relief. However, the parties agree that "well-established principles of equity" establish the framework governing requests for injunctive relief, including divestiture, under the Clayton Act. <u>eBay Inc v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006); <u>see also</u> <u>Am. Stores</u>, 495 U.S. at 285 (Section 16 permits divestiture only "when appropriate in light of equitable principles"). Under that approach,

> a plaintiff . . . must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: <u>(1)</u> that it has suffered an <u>irreparable injury</u>; <u>(2)</u> that <u>remedies available at law</u>, such as monetary damages, are <u>inadequate</u> to compensate for that injury; <u>(3)</u> that, considering the <u>balance of hardships</u> between the plaintiff and defendant, a remedy in equity is warranted; and <u>(4)</u> that the <u>public interest</u> would not be disserved by a permanent injunction.

eBay, 547 U.S. at 391 (emphasis added).[15] Even where those factors are met, district courts still retain "equitable discretion" to grant or deny permanent injunctive relief. Id.

## 2. Section 16 Standing

Before considering the eBay factors, the Court must assess whether Steves has standing to seek divestiture. "[I]n order to seek injunctive relief under [Section] 16, a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 113 (1986) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). In other words, Steves must be able to demonstrate "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Zenith Radio, 395 U.S. at 130.

Steves contends that the likely loss of its business when the Supply Agreement expires in September 2021 gives it standing here. This "threatened loss" is linked to an antitrust injury

_____

[15] Although eBay applied that test to the Patent Act, the Supreme Court's concluding statement that such discretion also extends to "other cases governed by such standards" makes clear that the test applies in other cases arising under federal statutes. E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 894 F. Supp. 2d 691, 697 (E.D. Va. 2012) (citing eBay, 547 U.S. at 394).

that has already occurred: JELD-WEN's termination of the Supply Agreement in September 2014, which was enabled by its increased market power after the CMI Acquisition. See Summary Judgment Op. at 30-31. JELD-WEN disagrees that Steves will go out of business when the Supply Agreement ends. See Def. Post-Remedies Equitable Br. (ECF No. 1652) (Under Seal) at 25-27 (discussing issue in context of irreparable harm). If JELD-WEN is correct, then Steves would need to identify other threatened antitrust loss or damage to support its request for divestiture.

If JELD-WEN is asserting that Steves lacks standing because it will not go out of business in September 2021, that argument is unpersuasive. Steves' Section 7 claim sought both legal and equitable relief, and the Seventh Amendment entitled Steves to a jury trial on "all issues common to both claims." Davis v. Ampthill Rayon Workers, Inc., 446 F. Supp. 681, 683 (E.D. Va. 1978), aff'd, 594 F.2d 856 (4th Cir. 1979) (citing Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510-11 (1959)). "[A] jury verdict in such mixed law-equity cases is binding on the court as to all matters in law and as to all matters in equity where the facts found are common to the law and equity issues." Id. (citing Dairy Queen v. Wood, 369 U.S. 469, 479 (1962)); see also Bresler v. Wilmington Tr. Co., No. CIV. PJM 09-2957, 2015 WL 1402377, at *22 (D. Md. Mar. 25, 2015), amended in part, 2015 WL 4385994 (D. Md. July 10, 2015) ("'[W]here claims at law and

in equity are joined and the legal claims are tried separately by a jury, the jury's verdict operates as a finding of fact binding on the trial court in its determination of the equitable claims.'" (quoting Dybczak v. Tuskegee Inst., 737 F.2d 1524, 1526–27 (11th Cir. 1984))); Int'l Wood Processors v. Power Dry, Inc., 593 F. Supp. 710, 737 (D.S.C. 1984), aff'd, 792 F.2d 416 (4th Cir. 1986) ("The court is . . . bound by the jury verdict on its subsequent ruling on the equitable claims under the doctrine of collateral estoppel.").

Here, the Court instructed the jury that Steves' request for future lost profits was based on the claim that Steves "was harmed because, as a result of JELD-WEN's alleged antitrust violation, Steves will be unable to maintain a viable interior molded door manufacturing business when the contract between Steves and JELD-WEN terminates on September 10, 2021, and will therefore be unable to exist as a company." The Court further instructed the jury that it "must consider any factors that could affect the future success of Steves' business and any other factors affecting Steves' future performance." Jury Instructions (ECF No. 1025), Instruction No. 35. After receiving these instructions, the jury awarded Steves damages for future lost profits. Verdict Form ¶ 3(b). Any factual determinations that were necessary to award these damages are binding on the Court.

To show that Steves will not go out of business, JELD-WEN relies on evidence suggesting that it might continue to sell doorskins to Steves after the Supply Agreement expires; that, without JELD-WEN, Steves can satisfy its doorskin needs through domestic or foreign suppliers like Masonite, Kastamonu, or Teverpan; and that Steves could build its own doorskin manufacturing plant to replace the lost volume from JELD-WEN. But JELD-WEN presented virtually the same evidence to the jury at trial. The jury could not have awarded future lost profits without considering and rejecting that evidence, which is essential to an issue the jury was <u>required</u> to consider—"the future success of Steves' business and any other factors affecting Steves' future performance." Instead, the jury must have decided that Steves will go out of business because Steves cannot find any viable alternative means of doorskin supply. Furthermore, nothing from the Remedies Hearing or the trade secrets trial renders this jury's conclusions improper or unreliable.[16] Consequently, JELD-WEN's position about the

_____

[16] The parties dispute whether the Court may rely on the record in the trade secrets trial to help resolve the divestiture issue. See Aug. 2 Tr. (ECF No. 1751) at 90:15-91:20, 203:18-206:10. Assuming, without deciding, that the Court can, that record does not establish that Steves can prevent going out of business by building a doorskin plant by September 2021. At best, the evidence at the trade secrets trial indicates that Steves has preliminarily concluded that building a doorskin plant is not feasible, but is continuing to investigate the

likelihood of Steves going out of business is foreclosed by the verdict.

Moreover, given the factual overlay between the legal and equitable relief, the Court finds, by a preponderance of the evidence, that it is not likely that JELD-WEN will continue to supply Steves with doorskins after the Supply Agreement terminates. Indeed, part of JELD-WEN's pricing plan was to kill off some of the independent door makers that were its doorskin customers. And, the Court finds that JELD-WEN's conduct toward Steves (demanding price increases two years after the Supply Agreement was executed even though costs had decreased, engaging in evasive, sharp, and deceptive conduct over the calculation of input costs under Section 6 of the Supply Agreement, and in its general bullying conduct toward Steves) shows that JELD-WEN regarded Steves, a significant player in the interior door market, to be an independent to be killed off.

Further, the Court, as finder of the fact in the remedies phase of the case, finds that Steves has proved that, absent equitable relief, it will be forced out of business when the Supply Agreement terminates in 2021 (See Section II.A.3.(a), infra). And, as found above, JELD-WEN is still engaging in the conduct that led the jury to conclude that the merger had

---

possibility of doing so. That is no different than what the evidence at the antitrust trial showed. See Def. FOF ¶¶ 265-78.

substantially lessened competition and that had caused Steves antitrust injury.

In sum, for the foregoing reasons, Steves has standing to seek injunctive relief under Section 16 that would remedy the threatened loss, and damage presented by the merger.

### 3. Equitable Factors Analysis

#### (a) Irreparable Injury & Absence of Adequate Remedy at Law

To obtain equitable relief in the form of an injunction here, and an order mandating divestiture and conduct remedies, Steves must prove that, absent such relief, it will suffer irreparable injury. Generally, "'[i]rreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.'" Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc., 193 F. Supp. 3d 556, 574 (E.D. Va. 2016) (quoting Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994)). Whether a plaintiff has an adequate remedy at law "inevitably overlaps" with whether it has suffered irreparable harm. MercExchange L.L.C. v. eBay, Inc., 500 F. Supp. 2d 556, 582 (E.D. Va. 2007).

Most courts to have confronted the question have found that the permanent loss of a business constitutes irreparable injury. See, e.g., Warren v. City of Athens, 411 F.3d 697, 711 (6th Cir. 2005) ("financial ruin" that would happen without injunction is

irreparable injury); Am. Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1474 (9th Cir. 1985) ("The threat of being driven out of business is sufficient to establish irreparable harm."). This is particularly true where a company has operated as a family business for a substantial period of time. Judge Friendly recognized long ago that "the right to continue a business in which [a father] had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms" because "the [family] want[s] to sell automobiles, not to live on the income from a damages award." Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970). This "seminal decision" has been cited often, including by the Fourth Circuit. Auto. Elec. Serv. Corp. v. Ass'n of Auto. Aftermarket Distribs., 747 F. Supp. 1483, 1514 (E.D.N.Y. 1990) ("This is not a case of mere lost profits, but rather the basic existence of a seventy year old business may be threatened."); see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 38 (2d Cir. 1995) (threat to "the very viability of the plaintiff's business" is irreparable injury); Wells Am. Corp. v. Ziff-Davis Pub. Co., 900 F.2d 258, 1990 WL 33532, at *2 (4th Cir. 1990) ("harm to plaintiffs' [sic] goodwill, its business reputation, business opportunities, or its continued existence" may be irreparable); Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y., 749 F.2d 124,

125–26 (2d Cir. 1984) ("The loss of [plaintiff]'s distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm."); Fed. Leasing, Inc. v. Underwriters at Lloyd's, 650 F.2d 495, 500 (4th Cir. 1981) (plaintiff showed irreparable harm where it "s[ought] to preserve its existence and its business").

There is no reason for the Court to deviate from that majority approach here. The termination of a plaintiff's business might not constitute irreparable harm if the entity has only been in business for a "short period of time," DFW Metro Line Servs. v. Sw. Bell Tel. Co., 901 F.2d 1267, 1269 (5th Cir. 1990) (per curiam); see also HCI Techs., Inc. v. Avaya, Inc., 446 F. Supp. 2d 518, 521 (E.D. Va. 2006) (citing DFW Metro in dicta), or if that injury could be fully remedied by money damages, see Hardin v. Houston Chronicle Pub. Co., 426 F. Supp. 1114, 1117-18 (S.D. Tex. 1977), aff'd, 572 F.2d 1106 (5th Cir. 1978); Lamarca v. Miami Herald Publ'g Co., 395 F. Supp. 324, 328 (S.D. Fla. 1975), aff'd, 524 F.2d 1230 (5th Cir. 1975). But, Steves has been in business for more than 150 years, making the 1.5-year existence of the plaintiff in DFW Metro seem fleeting in comparison. 901 F.2d at 1269 n.7. In addition, as in several of the cases described above, there is independent value to continuing Steves as a family operation: Edward and Sam Steves

described at the Remedies Hearing their family's deep connection with Steves' business, in which their children have begun to continue and, neither Hardin or Lamarca involved the facts that Steves has proved in this case.

JELD-WEN tries to distinguish Semmes Motors and subsequent cases in three ways. First, it argues that Steves' business is not at risk because it has several viable doorskin supply alternatives when the Supply Agreement terminates. This line of reasoning has been addressed in connection with Steves' Section 16 standing. See supra Section I.A.2. In sum, the Court finds, as did the jury, that, after 2021, purchases from JELD-WEN, Masonite, or foreign suppliers do not provide viable alternative supplies of doorskins in the quantity and quality required by Steves. Indeed, it is disingenuous of JELD-WEN to suggest that Steves can turn to foreign suppliers when JELD-WEN itself will not do so. Further, as set out in Section II.B.6 above, the Court finds that building a doorskin plant of its own is not a viable alternative way to supply Steves' doorskin needs after 2021.[17]

---

[17] JELD-WEN's claim that Steves should be held accountable here for delaying its efforts to build a doorskin plant is unpersuasive, especially where that factor did not affect the jury's future lost profits award. Intentionally engaging in conduct that contributes to an irreparable injury may undermine a plaintiff's irreparable harm showing. See Cone v. Randolph Cty. Schs. Bd. of Educ., No. 1:06CV00579, 2006 WL 3000445, at

Second, JELD-WEN argues that Steves' claimed injury is merely harm to members of the Steves family, which does not justify permanent injunctive relief for Steves. But the only two cases that JELD-WEN cites in support, Moody v. Michigan Gaming Control Board, No. 12-CV-13593, 2013 WL 1664380 (E.D. Mich. Apr. 17, 2013) and Law v. National Collegiate Athletic Association, No. 94-2053-KHV, 1996 WL 104328 (D. Kan. Jan. 5, 1996), are distinguishable. In Moody, the only harm underlying the plaintiff's emergency preliminary injunction motion was his nephew's and son's inability to obtain their harness racing training licenses—an injury not suffered by the plaintiff, whose occupational license had been suspended. 2013 WL 1664380, at *1-2. Similarly, in Law, the plaintiff coaches sought a classwide injunction under the Clayton Act to prevent the NCAA from enforcing a restricted earnings rule against any coach. However, each named plaintiff had to demonstrate a threat of antitrust

*5, *7 (M.D.N.C. Oct. 20, 2006) (child's loss of educational services was not irreparable injury, in part because it was caused by parents' intentional obstruction of school placement plan). However, the minimal, and unpersuasive, evidence cited by JELD-WEN does not establish that Steves ceased efforts to build a doorskin plant in order to improve its position in this litigation. Moreover, the record shows that Steves would not have made any notable progress towards building a plant had it devoted its full attention during these proceedings to finding a manufacturing partner. Steves' irreparable injury thus cannot be traced back to its decision to stop negotiations with manufacturing partners. In any event, the record shows that Steves simply cannot afford to build its own doorskin plant so JELD-WEN's position is academic at best.

injury because the class had not been certified, and just two were employed under the rule in question. As a result, those two coaches could seek injunctive relief only for themselves, not for the whole class. See Law, 1996 WL 104328, at *3-4.

Steves, on the other hand, is not seeking divestiture to remedy some harm suffered by individuals in the Steves family rather than Steves itself. Instead, Steves' irreparable injury is the loss of its business. That the business also has a family character is relevant to the irreparable injury analysis. See Semmes Motors, 429 F.2d at 1205; Auto. Elec. Serv., 747 F. Supp. at 1514. Moody and Law might be applicable if Steves had only identified as an irreparable injury the effect of the loss of Steves' business on, for instance, Edward and Sam Steves, but Steves has not made that claim here. Accordingly, the references to the Steves family in Steves' papers do not lessen the irreparable nature of the company's antitrust injury.

Finally, JELD-WEN insists that Semmes Motors and its progeny, most of which deal with preliminary injunctions, are meaningless where, as here, a plaintiff has obtained future lost profits damages. To obtain equitable relief, a plaintiff must show that its harm cannot be compensated by money damages. Dairy Queen, 369 U.S. at 478; Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp., 17 F.3d 691, 694 (4th Cir. 1994). Tucker, however, told the jury that his lost profits calculation

was a "reasonable," "conservative," and non-speculative estimate of Steves' future harm.  As Tucker proposed, the jury awarded damages of $46,480,581 in loss profits.  Trebling that part of the award under the Clayton Act yields total future lost profit damages of around $139 million. See 15 U.S.C. § 15(a).[18] In JELD-WEN's view, Steves' "strategic decision to calculate its future harm in money damages" at trial precludes it from now claiming that those damages are inadequate. Def. Post-Remedies Equitable Br. at 24.

A plaintiff's presentation of a future damages number may influence the irreparable injury and legal remedy inadequacy analysis. In SAS Institute, Inc. v. World Programming Ltd., 874 F.3d 370 (4th Cir. 2017), the plaintiff sought and received damages for lost profits, almost half of which was based on expected future losses. The court rejected the plaintiff's request for permanent injunctive relief because it found that the "fact that [the plaintiff] already asked for and received these future damages undermines its claim of irreparable injury moving forward." Id. at 386. Likewise, in International Wood Processors, the court determined that the plaintiff had an adequate remedy at law because it "requested and received

_____

[18] There were other antitrust damages that also were trebled. Those that survived judgment as a matter of law also will be trebled.

prospective damages" at trial, and under its own damages theory, could "suffer no further future harm" after receiving future lost profits damages. 593 F. Supp. at 737. And, in <u>Taleff</u>, the court denied plaintiff's request for a post-merger divestiture order under Section 16 because the only alleged harm was "expressed in terms of monetary damages." 828 F. Supp. 2d at 1123. Thus, the plaintiff had not shown that legal remedies would be inadequate.

Nonetheless, a plaintiff is not prohibited from seeking alternate injunctive relief merely because it tries to quantify its future harm in front of the jury. The purpose of the Remedies Hearing was, in part, to allow Steves to present further evidence about the inadequacy of its future lost profits award. <u>See</u> Order (ECF No. 1127) at 2.[19] Steves then put on

_____

[19] JELD-WEN continues to assert that Steves' quantification of damages must have been an election of legal over equitable remedies. But this wrongly assumes that Steves was required to make an election at some point before now. "Generally, a party is not required to elect between inconsistent remedies or rights or theories of recovery during the trial or at the pleading stage or prior to the jury's verdict; election is generally made after the verdict is entered prior to the entry of judgment." 28A C.J.S. <u>Election of Remedies</u> § 6 (2018). In any event, "a decision as to the time of election rests within the sound discretion of the trial court." <u>Id.</u>; <u>see also</u> <u>Rahemtulla v. Hassam</u>, No. CIV.A.3:05-0198, 2008 WL 2247195, at *1 (M.D. Pa. May 30, 2008) (collecting cases). Further, the cases present the so-called "election of remedies" issue as a question of how to preclude double recovery and how to proceed with entry of judgment where the principles of <u>Brown Shoe Co.</u> operate as they do under the facts of this case.

compelling evidence of the incalculable value of its business, which the Court (like the jury) finds would not survive without injunctive relief restoring competition. None of the cases cited by JELD-WEN involved this same sort of loss. See SAS Inst., 874 F.3d at 386 ("[Plaintiff]'s claims of difficult-to-calculate damages in the form of lost business relationships, market share, and goodwill were largely unsupported by evidence."); Taleff, 828 F. Supp. 2d at 1123 n.7 (plaintiff alleged harm in terms of higher ticket prices and less cost-effective service); Int'l Wood Processors, 593 F. Supp. at 737 (plaintiff would "suffer no further future harm" after receiving future lost profits). And, Steves has consistently asserted that JELD-WEN's Section 7 violation threatens the very existence of its business, so its current position cannot be characterized as some sort of opportunistic about-face. Consequently, Steves' representations to the jury do not prevent it from arguing here that future lost profits damages are inadequate.

The Court finds that, with an adequate supply of doorskins, Steves would, as it has for 150 years, continue in business and prosper. There is nothing in the record to suggest otherwise. The lost profits award would not provide a supply of doorskins. Rather, the Steves shareholders would, like the Semmes family, just live off of the damages award, a choice which, as explained in Semmes, it does not have to make. Were it otherwise, well-

heeled companies, like JELD-WEN, would never have to face the undoing of an illegal merger but, instead, could simply pay the damages and finance their way out of the violation of the Clayton Act, leaving in place a merger that has been proved to have substantially lessened competition.

For these reasons, JELD-WEN's arguments fall short, and Steves has shown that the likely, if not certain, loss of its business is an irreparable injury that cannot be adequately remedied by the future lost profits damages it has been awarded.[20]

### (b)  Balance of Hardships

Under the third eBay factor, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (quoting Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987)). Before undertaking that assessment, the Court must address Steves' assertion that the hardships claimed by JELD-WEN should be disregarded because the jury has already found that JELD-WEN violated the Clayton Act. See Pl. Post-Remedies Equitable Br. (ECF No. 1606) (Under Seal) at 20 (divestiture is appropriate even if it entails "harsh consequences" for JELD-WEN). That

---

[20] Steves has agreed that it is not entitled to both remedies.

argument necessarily affects the weight given to JELD-WEN's harms.

Steves cites three cases in support of its position, including E.I. du Pont and El Paso Natural Gas. See El Paso Nat. Gas, 395 U.S. at 472 ("[T]he pinch on private interests is not relevant to fashioning an antitrust decree, as the public interest is our sole concern."); E.I. du Pont, 366 U.S. at 326 ("[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests."). But Steves' reliance on those cases is misplaced. As noted above, in those cases, the Supreme Court was discussing divestiture in the context of Government actions, which, unlike Section 16 suits, do not implicate private hardships. The third case cited similarly involves an FTC enforcement action and, more importantly, relies on E.I. du Pont. See FTC v. Whole Foods Mkt., Inc., 548 F.3d 1028, 1033 (D.C. Cir. 2008) ("Even remedies which 'entail harsh consequences' would be appropriate to ameliorate the harm to competition from an antitrust violation." (quoting E.I. du Pont, 366 U.S. at 327)). Notwithstanding what Steves believes about the perfect applicability of Government cases in the Section 16 setting, the differences between Government and private cases limit the relevance of the Government case principles on the balance of hardship factor because, in Government cases, there

is no balance of hardships. See Am. Stores, 495 U.S. at 295-96; supra Section II.A.1.

Moreover, assigning less, or no, weight to JELD-WEN's hardships would contradict Supreme Court and Fourth Circuit precedent. Steves' argument essentially reduces a court's role to rubber-stamping divestiture based on a jury verdict finding a Section 7 violation. The Supreme Court, however, "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed," instead requiring the hardships to be balanced in every case. eBay, 547 U.S. at 392-93. The Fourth Circuit found it "impossible to square this directive with the idea that hardship to the losing party should simply be ignored," "even in cases involving clear wrongdoing." SAS Inst., 874 F.3d at 388. This statement echoes its earlier determination that courts may not "conclude that any harm that would be suffered by a defendant was self-inflicted and thus entitled to lesser weight in the balancing-of-the-harms portion of the preliminary injunction calculus." Scotts Co. v. United Indus. Corp., 315

F.3d 264, 285 (4th Cir. 2002). Thus, the Court must consider JELD-WEN's hardships in assessing the balance of hardships.[21]

Turning then to the balancing of hardships, the Court finds that Steves will suffer irreparable injury without permanent injunctive relief. If the Court does not order an equitable remedy to restore competition, Steves will likely lose its entire business when the Supply Agreement expires. This effect looms large in the balance of hardships. See Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc., 601 F.2d 48, 58 (2d Cir. 1979) (balance would have been "amply passed" if plaintiff had "shown a significant possibility that it would be driven out of business" by defendant's anticompetitive actions); Auto. Elec. Serv., 747 F. Supp. at 1514 (highlighting "ruinous financial hardship" that would result if no equitable relief imposed); cf. SAS Inst., 874 F.3d at 387-88 (noting that permanent injunction "would likely be ruinous" for defendant (internal quotation marks omitted)). Furthermore, as Steves

---

[21] That is not to say that all harms that JELD-WEN might allege are cognizable here. For example, loss of profits obtained through anticompetitive conduct is not a valid hardship because it is a product of doing what the antitrust laws require—that is, competing with other firms. See New York v. Actavis, PLC, No. 14 CIV. 7473, 2014 WL 7015198, at *45 (S.D.N.Y. Dec. 11, 2014), aff'd sub nom. New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638 (2d Cir. 2015); see also Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824, 830 (9th Cir. 1997). Yet JELD-WEN does not rely much on any such harm, and the instances where it does will be appropriately disregarded without affecting the hardship balancing.

argues, the relative impact of all the hardships cited by JELD-WEN would be less severe on JELD-WEN than the hardship that will befall Steves. JELD-WEN is a much larger business than Steves, and it is a very diversified company. And, as Steves argues, the record shows that the impact of divestiture on JELD-WEN would not be as a serious a hardship on JELD-WEN as would the loss of doorskin supply. Nevertheless, it is necessary to assess the hardship that likely will befall JELD-WEN in the event of divestiture. Of course, it is JELD-WEN's burden to prove the hardships that it will face.

JELD-WEN's chief witness on this topic was its CFO, Brooks Mallard, who testified to numerous speculative consequences of divestiture which the Court will not consider because of their speculative nature. Nonetheless, other witnesses have testified, at least generally, about the hardship that divestiture would visit upon JELD-WEN. Chief among those are the costs associated with separating Towanda as an independent entity. JELD-WEN and CMI integrated numerous functions when they merged in 2012, and it takes time and resources to "unscramble all those eggs" now. Suppl. Interrogatory Responses at 4. Courts have found that the "obvious hardship" of splitting up entities that have "combined . . . assets and operations" after a merger weighs heavily in the equitable analysis. Ginsburg v. InBev NV/SA, 623 F.3d 1229, 1235-36 (8th Cir. 2010); see also Taleff,

828 F. Supp. 2d at 1123 & n.8. That hardship is real, but it can be reduced by divestiture conditions that, for instance, allow current Towanda employees to remain at the plant and require the new owner and JELD-WEN to work together to effectuate an orderly transition of administrative support services. But JELD-WEN would still need to spend money to effect that transition, and there is no obvious way to eliminate that expense. And, of course, "[a] long time has elapsed between the closing of the merger and the conclusion of the litigation," and that presents "greater risks of unforeseen costs and failure." In re Evanston Nw. Healthcare, 144 F.T.C. at 521. The record does not permit quantification of those costs, but they are present in some measure, and must be considered in the balance of hardships.

As discussed in Section I.A.9, divestiture would also affect JELD-WEN's ability to meet its customers' doorskin demands. As explained previously, the mix model allocates SKU production across all four of JELD-WEN's plants, and Towanda's Dieform line permits the manufacture of many SKUs that JELD-WEN's legacy plants do not currently produce. Even if Steves shifts its entire doorskin volume to the divested Towanda entity (thereby freeing capacity in JELD-WEN's plants that supply much of Steves requirements), JELD-WEN would still need to satisfy its other customers' demands for different doorskin varieties. JELD-WEN says that it could not fully accomplish this goal by

simply increasing the number of SKUs produced by its legacy plants because those plants are already running close to full production capacity.  But, there is present some unquantified additional capacity.  Also, JELD-WEN says that attempting to produce more SKUs would add downtime because of die changes, thereby decreasing total production capacity.

The extent of this capacity decrease is not shown by the record because JELD-WEN has not studied how it would reallocate SKUs among its legacy plants if Towanda was divested, and thus the extent of the decrease must be considered as speculative and unproven. However, the Court can still consider that there will be some shortfall and that can be considered as a hardship. See SAS Inst., 874 F.3d at 387-88 (examining hardships in general manner); Ginsburg, 623 F.3d at 1235-36 (same).

JELD-WEN's alternatives for obtaining doorskins present their own hardships. JELD-WEN's Latvia facility only produces a few doorskin designs that are usable in the U.S. doorskin market.  Other foreign suppliers do not offer as many SKUs as Towanda and, as Steves knows from experience, the quality is not consistent.  But, JELD-WEN's "disaster plan" includes supply from Latvia and foreign suppliers as short-term options. However, based on the record, the Court cannot conclude that all SKUs lost to JELD-WEN by virtue of the divestiture of Towanda could be replaced by Latvia and foreign suppliers. In contrast,

also as considered on JELD-WEN's disaster plan, restarting operation of the Marion plant would go much further in remedying JELD-WEN's doorskin deficit. Marion has a low-volume/high-mix line that could serve a similar function to Towanda's Dieform line, even if the total production capacity is lower. It is estimated that to restart the Marion plant would cost [    ] because of the need to replace old equipment and comply with environmental relations. And it would take about two years to activate Marion.[22]

Of course, Steves' current divestiture proposal would prevent JELD-WEN from incurring any immediate deficit in doorskin supply. That proposal includes a condition by which JELD-WEN can purchase from the divested entity, for a period of two years, enough doorskins "to ensure that JELD-WEN will be able to fulfill orders of its door and doorskin customers" that exist at the time any divestiture order is entered, as long as those doorskins "cannot reasonably be manufactured as one of its remaining doorskin manufacturing facilities." Proposed Divestiture Order § VI(J). This provision would, in theory, permit JELD-WEN to meet its customers' doorskin needs through Towanda while setting up another long-term solution during that proposed two-year transition period. That approach would

---

[22] The record teaches that building a new doorskin plant is not realistic in the short run, even with JELD-WEN's experience.

ameliorate the doorskins shortfall hardship identified by JELD-WEN and could even eliminate it, particularly if some of JELD-WEN's other independent customers choose to exit their contracts and buy from the new owner of Towanda. Of course, in that event, JELD-WEN would lose the profits from those sales.

The new owner of a divested Towanda might choose to supply JELD-WEN for longer than the two-year period proposed by Steves. Based on JELD-WEN's claim of hardship, that would seem to be an attractive proposition to JELD-WEN. And, a new owner likely would prefer the stability that would ensure a longer term supply contract with JELD-WEN. Thus, there are ameliorating measures for an even longer term hardship (beyond the first two years after divestiture).

The collateral effects of any sustained drop in doorskin volume are hard to predict on this record. JELD-WEN emphasizes the penalties that might be imposed under certain long-term supply agreements if those customers' needs cannot be met, but the language of the force majeure clauses in those contracts suggests that supply failures because of a divestiture order would not give rise to any fines. At the same time, JELD-WEN says that its door manufacturing plants would produce fewer doors based on the doorskins available, thereby reducing the company's EBITDA.

It is also reasonably inferable that JELD-WEN would lose some external customers, both because of the limited doorskin quantities and if JELD-WEN increases prices to cope with lower production capacity. Counting this loss as a hardship is questionable because, in most cases, it would be impossible to tell whether customers left because of the fallout from JELD-WEN's doorskin deficit or because of increased competition, which is an appropriate result of injunctive relief. See Actavis, 2014 WL 7015198, at *45. That issue aside, loss of any customers would lower JELD-WEN's total revenue and EBITDA to some extent. But, if customers shift because of increased competition, that is a hardship that is expected to accompany divestiture and it does not weigh heavy in the balance of hardships.

JELD-WEN also claims hardship because the reallocation of production could cause loss of employment in its legacy plants. That assertion is pure speculation. And, it is contrary to the assertion made by JELD-WEN that, after divestiture, its legacy plants would be operating at near capacity.

JELD-WEN also contends that divestiture would cause loss of employment at Towanda. That contention is illogical because a new owner would need the experience offered by Towanda's current management and employees. And, the contention is at odds with history because when JELD-WEN bought CMI, the Towanda management

and employees came along with the facility. And, in any event, that apprehended harm will be lessened, or eliminated, by requiring the acquiring entity to allow Towanda's management and employees to remain. And, it is logical that those people would benefit from such a requirement.

Finally, JELD-WEN would lose the value of the improvements it has made at Towanda, as well as the MiraTEC and Extira business that it has developed there. JELD-WEN made total investments of around [  ] in manufacturing installations and capital improvements at the plant between 2014 and 2017, which it expected would pay dividends in the form of company-wide savings well into the future. Even if the loss of those investments can be discounted somewhat because they would not have been possible without the anticompetitive merger, they may still be considered as a hardship. See Smith & Nephew, 955 F. Supp. 2d at 79; W. Watersheds Project v. Salazar, No. CV 11-00492, 2011 WL 13124018, at *20 (C.D. Cal. Aug. 10, 2011). But, the record also shows that JELD-WEN has recouped (and then some) its investments in Towanda so they will not be lost.

JELD-WEN's acquisition of CMI's MiraTEC and Extira business, on the other hand, has never posed any antitrust concerns, so the loss of that business weighs more heavily in the hardship analysis. As detailed above, JELD-WEN has structured its business so that MiraTEC and Extira are important

parts of its future trajectory, and divestiture would force the company to change course. The record establishes that the manufacturing of these lines could not be removed from Towanda.

Whether the new owner would be willing to pay an appropriate value for the MiraTEC and Extira lines is unknown. And, any sale of those lines would involve licensing of intellectual property necessary to make those products. But, here too, the existing management and employees know how to operate the lines and make the product, and there is no reason on the record to believe that the end products would not be bought by those who are buying them now. Certainly, JELD-WEN offered no evidence to that effect. And, if, as JELD-WEN says, the lines are good products, then a buyer of Towanda could be expected to place value on them.

As the foregoing discussion reflects, the consequences of divestiture on JELD-WEN cannot be discerned with certainty in large measure because JELD-WEN has chosen not to internally assess those effects, except in broad and somewhat speculative terms. Nonetheless, from the showing that JELD-WEN has made, the record proves that all of its claimed hardships can be ameliorated by allowing time for an orderly divestiture, by imposing terms to assure JELD-WEN a reliable source of doorskin supply to satisfy its external and internal requirements for at least two years, by assuring that divestiture occurs in an

environment and under circumstances that will produce a reasonable purchase price. Steves, on the other hand, has presented forceful evidence to show a more certain and far more serious harm: permanently going out of business. Therefore, even though the scales are not so one-sided as Steves contends, the balance of hardships tips decidedly in Steves' favor.

### (c)  Public Interest

#### (1)  Legal Standard

The final eBay factor requires the Court to find "that the public interest would not be disserved by a permanent injunction." eBay, 547 U.S. at 391. "'The public interest inquiry primarily addresses impact on non-parties rather than parties.'" Inst. of Cetacean Research v. Sea Shepherd Conservation Soc., 725 F.3d 940, 946 (9th Cir. 2013) (quoting Bernhardt v. L.A. Cnty., 339 F.3d 920, 931 (9th Cir. 2003)). Courts are reluctant to cause any "concrete harms to innocent third parties." If those potential effects exist, the public interest asserted must rely on more than "broad, abstract rule of law concerns." SAS Inst., 874 F.3d at 388.

That is not an issue here because the public interest in this case has been firmly established by Congress which is responsible not only for passing laws, but also "establish[ing] their relative priority for the Nation," priorities which courts

must respect. Tenn. Valley Auth. v. Hill, 437 U.S. 153, 194 (1978). Accordingly, "[w]here a valid law speaks to the proper level of deference to a particular public interest, it controls." Inst. of Cetacean Research, 725 F.3d at 946; see also 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.4 (3d ed. 1998) ("The public interest . . . may be declared in the form of a statute."). Here, by enacting Section 7 of the Clayton Act, Congress has explicitly indicated that preserving competition is in the public interest. United States v. Ivaco, Inc., 704 F. Supp. 1409, 1430 (W.D. Mich. 1989). Consequently, divestiture would serve the public interest here, assuming that such relief would "'restore competition'"— the central aim of any injunctive relief under the Clayton Act. Ford, 405 U.S. at 573 (quoting E.I. du Pont, 366 U.S. at 326).

Nonetheless, divestiture is not always the ideal equitable relief for the public interest. In some cases, the divested entity might not actually restore competition, depending on the circumstances in which the entity would operate. In others, divestiture might restore competition, but other injunctive relief might also do so with fewer impacts on the public interest. Before ordering divestiture, then, the Court must consider two questions: (1) whether Towanda would be "a willing, independent competitor capable of effective production" in the doorskin market, White Consol. Indus., Inc. v. Whirlpool Corp.,

781 F.2d 1224, 1228 (6th Cir. 1986); and (2) even if Towanda would be a viable entity, whether less intrusive injunctive relief can restore competition just as well as divestiture, see E.I. du Pont, 366 U.S. at 327-28 (equitable relief should cause "as little injury as possible to the interest of the general public" (internal quotations omitted)). Courts have not clearly addressed these issues before ordering divestiture. However,

> [t]here is . . . no doubt that the antitrust court may and should assess the propriety of equitable relief in each particular case . . . and that the judge <u>may decline to restructure a firm where there are serious doubts as to feasibility or a likelihood that other remedies are likely to be sufficient to restore effective competition</u>.

3A Areeda & Hovenkamp, <u>supra</u>, ¶ 303e3 (emphasis added). <u>See also</u> Pfunder et al., <u>supra</u>, at 54 ("In order to achieve the goal of restoring or restructuring competition, a careful economic analysis must be undertaken of the particular assets or entity to be divested. In order for divestiture to achieve procompetitive structural relief, the assets to be divested must comprise an economically viable going concern—that is, <u>the entity must have the economic capability of surviving and competing effectively in the market</u>." (emphasis added)).

The parties vigorously dispute what showing Steves must make to enable the Court to answer these questions. JELD-WEN says that <u>before</u> deciding Steves' request for divestiture,

Steves must prevail on five factors:

> (1) whether the divestiture assets are sufficient to create a business that will replace lost competition;
>
> (2) whether the divestiture buyer has the incentive to compete in the relevant market;
>
> (3) whether the divestiture buyer has the business acumen, experience, and financial ability to compete in the relevant market in the future;
>
> (4) whether the divestiture itself is likely to cause competitive harm; and
>
> (5) whether the asset sale is structured to enable the buyer to emerge as a viable competitor.

These factors are used by the DOJ in assessing the remedy of divestiture. Gov't Equitable Relief Statement (ECF No. 1640) at 1-2, 7; see also 5 Kintner et al., supra, § 40.12 (identifying similar "crucial factors considered when framing divestiture order or decree"). This approach, says JELD-WEN, is necessary because it is the approach that the DOJ takes before ordering divestiture. Treating this analysis as a threshold requirement would be dispositive. Although the first and fourth DOJ factors are included in the public interest framework set out above, and will be addressed here, Steves has provided practically no information that would inform the other three factors.

Steves, on the other hand, argues that Towanda's viability as a successful competitor be assessed quite differently. This

type of assessment, Steves says, would be more in line with the public interest because the results of the analysis urged by JELD-WEN could be made worthless by changed market conditions and the outcome of future appeals. Moreover, as Steves asserts, the Supreme Court has approved of the method that it urges in Brown Shoe Co. v. United States, 370 U.S. 294 (1962), another Section 7 case. There, the Supreme Court found that the trial court's divestiture order was sufficiently final to enable appellate review even though the order only commanded divestiture without specifying the details of the divestiture sale or separation process, which would be the subject of a proposed divestiture plan to be filed by the defendant. See id. at 304, 308-10. According to Steves, the Court can conclude now that divestiture is appropriate, and then work out the particulars by appointing a special master to supervise divestiture after JELD-WEN appeals the order and if the remedy of divestiture is affirmed. The Fourth Circuit (and perhaps the Supreme Court) would then be able to affirm the liability and remedy decisions before the divestiture process moves to fruition. Only then, says Steves, would capable and serious buyers be willing to offer realistic prices for Towanda.

Steves is correct on this point. Neither JELD-WEN nor the DOJ cites any cases in which courts declined to order divestiture because the party seeking divestiture failed to

provide the details that the DOJ uses in making its decisions.
In fact, the general resources that address the issue teach that
divestiture specifics are typically worked out in the compliance
process by the court, the parties, or some other monitor. One
treatise explains:

> Divestiture decrees rarely contain
> provisions specifying the details of
> satisfactory compliance with the order to
> divest; however, usually courts include
> continuing supervision provisions to ensure
> that the acquiring company divests itself of
> the offending assets and that they are
> divested in such a manner as to assure
> restoration of the competitive balance.
> Tribunals also retain jurisdiction to
> approve or reject the method of compliance,
> and to modify its decree or order if the
> prescribed remedy proves incapable of being
> carried out according to its terms. . . .
>
> Once the order to divest is entered, the
> defendant is required to propose within a
> specified time a plan of compliance
> indicating the method by which it proposes
> to locate a purchaser acceptable to the
> court. These plans are subject to the
> government's approval, and in instances
> where disagreements cannot be resolved at
> this late stage, the government must
> challenge the plan before the court. Some
> orders leave the defendant considerable
> discretion to choose the assets to be
> divested. Even broader is the defendant's
> discretion to negotiate with parties
> interested in purchasing the assets to be
> divested, and to accept the most lucrative
> offer that will not be attended by
> anticompetitive consequences.

5 Kintner et al., _supra_, § 40.12 (footnotes omitted); _see also_
Pfunder et al., _supra_, at 95-111. The administrative law judge

in one recent FTC case cited by JELD-WEN took this exact approach. See In re Evanston Nw. Healthcare, 144 F.T.C. at 335-45, 356-73. Although the FTC reversed that initial decision on substantive grounds, nothing in its opinion suggests that the ALJ's procedural methods were improper. See id. at 519-23.

Brown Shoe does not make it a hard and fast rule that courts must approach divestiture in this way. That case addressed the finality of a particular divestiture order under the Expediting Act, which would not provide the basis for any appeal here. See Brown Shoe, 370 U.S. at 306-08. Nonetheless, the Supreme Court's guidance about the substance of general divestiture orders is both helpful and persuasive. In Brown Shoe, the district court's divestiture order only required the defendant to "divest itself completely of all stock, share capital, assets or other interests it held in [the divested entity], so that the "remaining task for the District Court [after appeal] w[ould] be its acceptance of a plan for full divestiture, and the supervision of the plan so accepted." Id. at 304, 308. The Supreme Court found the broader divestiture order ripe for review because it had "consistently reviewed antitrust decrees contemplating either future divestiture or other comparable remedial action prior to the formulation and entry of the precise details of the relief ordered." Id. at 309-10. The Supreme Court also instructed that policy interests

supported that approach:

>[A full divestiture] order requires careful,
>and often extended, negotiation and
>formulation. This process does not take
>place in a vacuum, but, rather, in a
>changing market place, in which buyers and
>bankers must be found to accomplish the
>order of forced sale. <u>The unsettling
>influence of uncertainty as to the
>affirmance of the initial, underlying
>decision compelling divestiture would only
>make still more difficult the task of
>assuring expeditious enforcement of the
>antitrust laws</u>. The delay in withholding
>review of any of the issues in the case
>until the details of a divestiture had been
>approved by the District Court and reviewed
>here could well mean a change in market
>conditions sufficiently pronounced to render
>impractical or otherwise unenforceable the
>very plan of asset disposition for which the
>litigation was held. The public interest, as
>well as that of the parties, would lose by
>such procedure.

<u>Id.</u> at 309 (emphasis added).

JELD-WEN's sole response to the compelling logic set out by the Supreme Court is to argue that <u>Brown Shoe</u> is inapposite because it was a Government case, and the Government was presumed to be acting in the public interest. Following that logic, there was no need for that district court to have considered the identity and intention of the buyer of the divested assets. There are undoubtedly distinctions between Government actions and private suits for injunctive relief under the Clayton Act. However, those differences do not compel the

Court to decide the propriety of divestiture in a manner that is directly contrary to the forceful logic of the Supreme Court.

JELD-WEN's "fear of piecemeal appeals" may be real, id. at 310, but that alone cannot dictate a result that Brown Shoe observed makes no sense. Those practical concerns apply equally here. Moreover, the Court can decide whether divestiture is in the public interest without knowing the identity of the buyer. And, if divestiture is ordered and affirmed, and no buyer expresses interest in Towanda, then divestiture will simply not occur. If it turns out that the divestiture process yields a buyer that lacks the incentive or the means to operate Towanda competitively, the Court can decline to divest the plant to that buyer. Finally, if the Court orders a divestiture plan that directs the sale of Towanda to an unsatisfactory buyer, JELD-WEN could presumably appeal that order. That last issue remains unresolved. See id. ("No instance has been found in which the Court has reviewed a case following a divestiture decree such as the one we are asked to consider here, in which the party subject to that decree has later brought the case back to this Court with claims of error in the details of the divestiture finally approved."). But, as this case has repeatedly shown, there is a first time for everything.

## (2)    The DOJ's Statement of Interest

Pursuant to 28 U.S.C. § 517, the DOJ submitted a Statement of Interest (ECF No. 1640) after the jury returned its verdict that the merger had substantially lessened competition and that Steves had sustained antitrust injury as a consequence. To begin, the DOJ expressed, in general, a strong preference for the structural relief of divestiture to restore competition. The DOJ then suggested that the Court should use the same analytical framework that the DOJ employs. That framework will be quite useful later.

The DOJ also expressed reservation about ordering divestiture, noting that a potential buyer (other than Steves) had not been identified. And, as to Steves, the DOJ expressed concern that,if Steves were to acquire Towanda, there would be three vertically integrated doorskin suppliers whereas before the JELD-WEN/CMI merger there had been two vertically integrated suppliers and one (CMI) that was not. On that point, the DOJ was in error because CMI was vertically integrated well before the merger.

The DOJ's other concern-the absence of an identified buyer at this state-is, as explained earlier, premature for the reasons set out by the Supreme Court in Brown Shoe. Moreover, it is unrealistic to think that the divestiture process in a private party case could proceed in the same way as the

Government would proceed until the validity of the divestiture remedy has been affirmed on appeal. Certainly that is so here because appeal has been promised, and it is unrealistic to expect that potential buyers will come forth and be vetted while an appeal looms. However, once the legal battles have ended, the Court fully expects that the Special Master will be able to proceed within much the same framework as used by the DOJ.

### (3)    Standalone Viability of Towanda

The record here shows that a divested Towanda would provide significant competition in the doorskin market and restore competition that the merger lessened. The analysis begins with the undisputed evidence that, from its formation in 2002 until the housing crisis started in 2007, CMI, including Towanda's doorskins, was profitable. In this case, both parties agree that EBITDA is an appropriate measure of profitability. And the Court finds from PTX 341 and PTX 342 that, looking only at Towanda's doorskin business, the EBITDA was positive in every year from 2009 to 2013 and that it was projected to be profitable on that basis in 2014. That is to say, in the doorskin aspect of its business, Towanda's EBITDA in 2009, 2010, 2011 and 2012 was positive even though overall finances for that

same period showed a loss.[23]

It is also clear from the record that CMI was losing money in 2011 and that made it necessary for the owners of the company to put it on the market.  But, the record also shows that the situation has changed.  In particular, the record establishes that:

- since the merger in 2012, demand for doorskins has increased substantially so that Towanda's most recent annual output was [  ] doorskins;

- from the time it was created CMI (through Towanda) was an important supplier of doorskins to all the Independents. Towanda is a low cost plant;

- Towanda has been significantly improved;

- the new owner could expect Steves to order [   ] doorskins per year under a long term supply contract.

Likewise the new owner would be able to count on contracts to supply JELD-WEN with [  ] doorskins per year.  Given the high prices that JELD-WEN charges the other independent doormakers, it is likely that a new competitor would be able to attract

---

[23] The record is not entirely clear why that is so but it appears to be that the losses largely occurred in the door manufacturing businesses of CMI at the time because the EBITDA for the doorskin business was positive and, according to JELD-WEN and the record, the MiraTec and Extira business was also profitable during that period of time.

business from JELD-WEN's Independent doormaker manufacturer customers other than Steves. And, the new owner of Towanda would have every incentive to try to attract business from the Independents, who are now customers of JELD-WEN's by offering lower prices than the high prices they are now paying to JELD-WEN.[24]

The events of 2011 and 2012 also provide some evidence probative of whether Towanda could be a viable competitor in the doorskin market after divestiture. In particular, when the company was last on the market in 2011, there were approximately five serious buyers for the company. It is fundamentally correct that companies are not prepared to invest in other companies unless they believe they can make a profit in so doing. And, the new buyer will be bidding on a far more successful entity than were the five serious buyers in 2011.

Further, the record shows that the margins at Towanda, which is a way of measuring profitability, were strong. The margin is the difference between the cost of manufacturing the doorskin against the selling price of the doorskin. Professor Shapiro testified that, as far back as 2012, the margin for doorskins made at Towanda was approximately 35%. Since then,

_____

[24] Further, as did JELD-WEN in 2012 when it acquired CMI, the new owner will also have the MiraTec and Extira lines and will make those products available to the customers who now buy them from JELD-WEN.

JELD-WEN's costs have gone down because improvements have been made at Towanda, thereby lowering the cost of manufacturing the doorskins. Further, the evidence establishes that the key input costs at Towanda have declined. The ultimate conclusion from this information is that the margin has gone up.

Accordingly, there are three substantial reasons for concluding that a divestiture of Towanda is likely to be competitive and profitable. First, there is the fact that Towanda was profitable before the significant housing downturn and that it has returned significantly to profitability. Second, the EBITDA numbers show that, even during the rough periods during the housing crisis, Towanda's EBITDA for doorskins was positive, albeit not large. Third, the margin figures indicate that a substantial profit can be made.

### (4) Divestiture Will Remedy the Lessened Competition Found by the Jury

Here, as the jury found, and the record shows, the merger substantially reduced competition in the doorskin industry. Less than two years after the merger reduced the number of suppliers from three to two, one of those suppliers essentially withdrew from the market, thereby depriving the Independents of that key component of a reliable supply source. Masonite made that decision known to its investors and to JELD-WEN in a public telephone conference. Not long thereafter, the other supplier,

JELD-WEN, embarked upon a plan to raise doorskin prices, and, in so doing, emphasized that it was then the only game in town.  At the same time, JELD-WEN felt free to disregard existing contract obligations respecting pricing and to engage in bullying tactics to get increased prices even if that would kill off some of the Independents who were its customers.

Also, the quality of JELD-WEN's doorskins declined as the lessened competition took hold.  And, by the beginning of 2015, the manner in which JELD-WEN dealt with defective products changed because competition had lessened.

None of that was possible when, in 2011 and 2012, CMI had been a competitor.  Divestiture will once again restore three competitors who make and sell doorskins.  The record does not show whether Masonite can be expected to increase its participation in selling to the Independents.  But, it does permit the finding that JELD-WEN and divested Towanda can be expected to compete in selling doorskins.

Divestiture is stiff medicine.  Therefore, it is important to assess whether an alternative equitable remedy, or a combination thereof, can effectively restore the competition that was substantially lessened by the merger.  This assessment starts by remembering that, in the spring of 2012, there were three vertically integrated doorskin suppliers:  Masonite; JELD-WEN; and CMI.  The record shows that these three companies

competed vigorously in selling doorskins to Steves and the other independent (non-integrated) door manufacturers. That is pointedly illustrated by the fact that, in 2011 and 2012, Steves was in negotiations for a new long-term supply contract, and there was significant price competition for Steves' business. The favorable terms were reflected in the Supply Agreement that JELD-WEN and Steves executed in May 2012, a few months before the merger closed.

Divestiture would once again place three domestic doorskin suppliers in the doorskin market. Nothing in the record points to how that could be accomplished short of divestiture. Neither party has posited an alternative.

Although the Court could solve Steves' supply problem by ordering JELD-WEN to supply Steves' requirements for a long term, that alternate remedy would not restore competition in the industry as a whole. And, the record proves that the lessened competition has adversely affected the Independents other than Steves. So simply securing a long-term supply for Steves would not aid those manufacturers.

Even if the Court could order JELD-WEN to sell, for a period of time, to Steves and the other Independents at the prices that prevailed before JELD-WEN secured new prices in 2014 and 2015, there still would be only one domestic supplier willing to sell to the Independents other than on a spot basis.

And, there would be no structure in place to foster competition after the Court-ordered prices expired.

Based on this record, the Court can discern no alternative to divestiture that would restore competition that the merger substantially lessened.

### (5)  Use of Special Master

JELD-WEN also contests the potential appointment of a special master to assist with divestiture. JELD-WEN claims that using a special master exceeds the boundary defined in La Buy v. Howes Leather Co. See 352 U.S. 249, 256 (1957) ("The use of masters is to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause, and not to displace the court." (internal citation and quotation marks omitted)).

JELD-WEN is mistaken. Fed. R. Civ. P. 53 governs when a special master may be appointed. The cases cited by JELD-WEN discussed a version of Rule 53 that required an "exceptional condition" to justify special master referrals. See id. at 250, 256; Beazer E., Inc. v. Mead Corp., 412 F.3d 429, 440 (3d Cir. 2005); United States v. Microsoft Corp., 147 F.3d 935, 954 (D.C. Cir. 1998); Burlington N. R. Co. v. Dep't of Revenue of State of Wash., 934 F.2d 1064, 1071 (9th Cir. 1991). The current Rule 53 is very different, allowing special masters to, as relevant

here, "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). This provision accounts for courts' increased reliance on masters "to assist in framing and enforcing complex decrees." In particular, it permits appointment of a special master "when a complex decree requires complex policing, particularly when a party has proved resistant or intransigent . . . . The master's role in enforcement may extend to investigation in ways that are quite unlike the traditional role of judicial officers in an adversary system." Fed. R. Civ. P. 53(a)(1) advisory committee's note to 2003 amendment.

Courts have frequently used Rule 53(a)(1)(C) to appoint special masters to oversee compliance with complex injunctive relief and make appropriate recommendations to those courts, see, e.g., RLI Ins. Co. v. Nexus Servs., Inc., No. 5:18-CV-00066, 2018 WL 3244413, at *13-14 (W.D. Va. July 2, 2018); Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC, No. CV 2:13-16044, 2016 WL 3190255, at *14 (S.D.W. Va. June 7, 2016), or to conduct sales of disputed assets in foreclosure cases. See, e.g., Stearns Bank Nat'l Ass'n v. Come Again, Inc., No. 8:15-CV-322-T-30JSS, 2016 WL 695990, at *2 (M.D. Fla. Feb. 22, 2016). Here, divestiture compliance involves extraordinarily complex issues that, given the state of the Court's docket and its limited

knowledge about asset sales in the building products industry, "cannot be effectively and timely addressed by" the Court or any judge in this district. Fed. R. Civ. P. 53(a)(1)(C). And, even if Rule 53(a)(1)(C) did not confer appointment authority here, the Fourth Circuit has approved of special master appointments "based on [a court's] inherent authority to fashion appropriate post-verdict relief." <u>Trull v. Dayco Prods., LLC</u>, 178 F. App'x 247, 251 (4th Cir. 2006). As a result, the Court has ample grounds for appointing a special master if it determines that divestiture is appropriate.

Finally, the parties will be afforded an opportunity to comment on and object to the order appointing the Special Master because the Court does not contemplate adopting the order proposed by Steves, and the Special Master would not be allowed to take significant action without the approval of the Court.

### B.   <u>The Requested Ancillary Conduct Remedies</u>

To assure that the requested divestiture is effective in restoring competition, Steves proposes several forms of so-called "conduct remedies." Some are appropriate. Others are not.

First, Steves says that JELD-WEN should divest to a new owner not only the Towanda facility, but also the equipment used

to develop, manufacture, and sell doorskins there.  That is a rather obvious requirement.  Section II.A.1, <u>supra</u>.

Second, Steves would require transfer or licensing of all intangible assets used in the development, manufacturing, and sale of doorskins at Towanda (to include patents, schematics, designs, customer lists, vendor lists, trade secrets, and the know-how necessary to operate the facility).[25]  A requirement of that sort is also permissible and appropriate.  Section II.A.1, <u>supra</u>.

Third, Steves asks for an order affording the new owner a reasonable opportunity to retain the services of current Towanda employees.  That too is permissible and appropriate so as to afford the divested entity an opportunity to succeed.  Section II.A.1, <u>supra</u>.

Fourth, Steves asks that JELD-WEN be prohibited from rehiring those employees for two years.  That is permissible and appropriate to afford the divested entity an opportunity to succeed.  Section II.A.1, <u>supra</u>.

Fifth, to help assure the divested firm's success, Steves seeks an order requiring the divested entity to offer Steves an eight-year doorskin supply contract at prices based on the

---

[25] If the buyer should be Steves, it will be necessary to make provisions that secure to JELD-WEN the benefits of the jury verdict and any relief granted in the trade secrets trial.

current Supply Agreement.  Certainly, a provision requiring the new owner to agree to supply Steves beyond 2021 is a permissible, and necessary, step to remedy the irreparable remedy proved by Steves.  And, the divested entity would benefit from a long-term supply agreement with Steves.  However, fixing the duration of that agreement and specifying the prices to be based on the current supply agreement would be too great a restriction on the new owner which must be allowed to negotiate its own contract terms if it is to succeed.  Section II.A.1, supra.

Sixth, Steves seeks a provision that would allow JELD-WEN's independent customers-such as Lynden, Haley, and Excel-to terminate, without penalty, their supply agreement with JELD-WEN to help alleviate the effect of the lessened competition on them (the high prices recently extracted by JELD-WEN). Considering that the lessened competition from the merger allowed JELD-WEN to extract high prices from its independent customers, a provision of this sort would help restore competition.  Section II.A.1, supra

Lastly, Steves asks that the Court limit JELD-WEN's ability to buy doorskins from the new owner of Towanda to a period of two years.  A provision of that sort would not help the new owner to succeed.  And, JELD-WEN, like Steves, would be a natural customer for the new owner because JELD-WEN already uses

some of Towanda's output.  On the other hand, JELD-WEN cannot be allowed to limit the quantity of doorskins that are available to the Independents by buying up all of the output of Towanda. Therefore, it would be appropriate to allow JELD-WEN to buy from the new owner of Towanda, but to require that, after the first two years following divestiture, the new owner satisfy the requirements of the Independents before supplying more than [   ] doorskins to JELD-WEN.  Section II.A.1, supra.

For the foregoing reasons, and to the extent recited above, the ancillary provisions and conduct relief will be granted and denied.

### C.    JELD-WEN's Equitable Defenses

As noted in a separate opinion, unclean hands is not a valid defense to a Section 16 request for injunctive relief on the facts of this case. See Divestiture Evidentiary Issues Op. (ECF No. 1759) at 14. Accordingly, laches is the only pleaded equitable defense remaining to JELD-WEN here.  Laches is an available equitable defense to divestiture.  See Am. Stores, 495 U.S. at 296.  The defense also can bar the proposed ancillary remedies.

Laches "operates throughout the entire remedial portion of equity jurisprudence." 2 John Norton Pomeroy, A Treatise on

Equity Jurisprudence § 418, at 169 (5th ed. 1941). According to the eminent English chancellor, Lord Camden:

> A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, <u>and reasonable diligence</u>.

Id. § 419, at 171 (emphasis added) (internal quotation marks omitted). Laches is thus defined as "such neglect or omission to assert a right as, taken in conjunction with lapse of time, more or less great, and other circumstances caus[es] prejudice to an adverse party." Id. at 171-72 (internal quotation marks omitted). Each case turns on its own facts because, as explained by the Supreme Court,

> what might be inexcusable delay in one case would not be inconsistent with diligence in another, and unless the nonaction of the complainant operated to damage the defendant, or to induce it to change its position, there is no necessary estoppel arising from the mere lapse of time.

N. Pac. R. Co. v. Boyd, 228 U.S. 482, 509 (1913) (citing Townsend v. Venderwerker, 160 U.S. 171, 186 (1895)).

In Townsend, the Supreme Court considered the assertion of laches where the defendant's dead and intestate relative ("Marvin") had agreed to convey to the plaintiff a one-half interest in a house on a lot owned by Marvin in exchange for the

plaintiff contributing funds to build the house and supervising the construction. The plaintiff superintended the job from 1879 to 1880, and made the required payments from 1879 to 1884. But, he did not file a bill in equity until 1889, after Marvin had died. See Townsend, 160 U.S. at 172-73. The Supreme Court held that, this delay notwithstanding, the defense of laches was not available, and thus that plaintiff could treat the property as subject to a lien in his favor and could have it sold to satisfy his claim for half of its original value. Id. at 182-83.

In making its decision, the Supreme Court examined the circumstances of the house payments and the relationship between Marvin and the plaintiff. As the Supreme Court explained, those individuals had lived together in the house after it was built. Moreover, Marvin regarded the plaintiff as a foster child, and had stated that she would include him in her will and intended the house to be his when she was done with it. Mindful of these circumstances, the Supreme Court held that laches did not preclude the equitable relief sought because,

> [d]ealing with the person who stood in this relationship with him and whom he had always been upon friendly, and even intimate, terms, the same diligence could not be expected of [the plaintiff] as would have been if he had been treating with a stranger.

Id. at 185-86. In other words, what constitutes reasonable diligence depends upon the particular facts of the case, including the relationship between the parties.

The Supreme Court was confronted with another ten-year delay in Northern Pacific Railway Company. In that case, a railroad reorganization pursuant to bankruptcy proceedings had been completed in 1896, and the plaintiff attacked that reorganization by filing a bill in equity in 1906. Noting that background, the Supreme Court held that:

> [t]he fact that improvements are put upon the property—that the stocks and bonds of the new company almost immediately became the subject of transactions with third persons-calls for the special application of the rule of diligence. But the doctrine of estoppel by laches is not one which can be measured out in days and months, as though it were a statute of limitation. For what might be inexcusable delay in one case would not be inconsistent with diligence in another, and unless the nonaction of the complainant operated to damage the defendant, or to induce it to change its position, there is no necessary estoppel of laches arising from the mere lapse of time.

N. Pac. R., 228 U.S. at 508-09 (emphasis added). The Court went on to assess the plaintiff's diligence and concluded that he had made reasonable, albeit time-consuming, efforts to put himself in the position of a judgment creditor of the railroad so that he could proceed in equity to collect his debt. See id. at 509. As does Townsend, this decision teaches that the determination

of laches must be made in perspective of the facts of each case respecting the circumstances of the delay and the effects thereof.

The Fourth Circuit's approach to the doctrine of laches is consistent with that foundation. "Laches imposes on the defendant the ultimate burden of proving '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" White v. Daniel, 909 F.2d 99, 102 (4th Cir. 1990) (quoting Costello v. United States, 365 U.S. 265, 282 (1961)). The defense "applies to preclude relief for a plaintiff who has unreasonably 'slept' on his rights," barring "claims where a defendant is prejudiced by a plaintiff's unreasonable delay in bringing suit after the plaintiff knew of the defendant's violation." PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 121 (4th Cir. 2011); see also Kloth v. Microsoft Corp., 444 F.3d 312, 325 (4th Cir. 2006) (laches involves an "equitable balancing of a plaintiff's delay with prejudice to a defendant" (internal quotation marks omitted)). The laches analysis is highly fact-dependent. See White, 909 F.2d at 102.

Before addressing the elements of the laches framework, it is necessary to address Steves' contention that JELD-WEN must overcome the "strong presumption" that laches does not apply because Steves initiated this litigation within the Clayton

Act's statute of limitations for damages claims. <u>Synergistic</u> <u>Int'l, L.L.C. v. Korman</u>, No. CIV. 2:05CV49, 2007 WL 517677, at *8 (E.D. Va. Feb. 8, 2007). Both cases that Steves cites as establishing this "presumption" are trademark infringement suits, so their principles do not necessarily control in an antitrust case. <u>See</u> <u>Elvis Presley Enters., Inc. v. Elvisly</u> <u>Yours, Inc.</u>, 936 F.2d 889, 894 (6th Cir. 1991) (citing <u>Tandy</u> <u>Corp. v. Malone & Hyde, Inc.</u>, 769 F.2d 362, 365 (6th Cir. 1985)); <u>Synergistic Int'l</u>, 2007 WL 51767, at *8 (citing <u>Reno Air</u> <u>Racing Ass'n, Inc. v. McCord</u>, 452 F.3d 1126, 1138-38 (9th Cir. 2006)).

Section 4B of the Clayton Act imposes a four-year statute of limitations for damages claims by any private plaintiff or by a government entity. <u>See</u> 15 U.S.C. § 15b. Section 16, on the other hand, contains no statute of limitations. <u>See</u> <u>id.</u> § 26; <u>New York ex rel. Spitzer v. Saint Francis Hosp.</u>, 94 F. Supp. 2d 399, 421-22 (S.D.N.Y. 2000). Nonetheless, because Section 4 and Section 16 provide different remedies for the same antitrust violations, <u>Cargill</u>, 479 U.S. at 113, several courts have used Section 4B's limitations period as a <u>guideline</u> for analyzing laches defenses to Section 16 claims. <u>See</u> <u>Oliver v. SD-3C LLC</u>, 751 F.3d 1081, 1086 (9th Cir. 2014); <u>Midwestern Mach. Co. v. Nw.</u> <u>Airlines, Inc.</u>, 392 F.3d 265, 277 (8th Cir. 2004); <u>Duty Free</u> <u>Ams., Inc. v. Estee Lauder Cos., Inc.</u>, No. 12-60741-CIV, 2014 WL

1329359, at *14 (S.D. Fla. Mar. 31, 2014), <u>aff'd</u>, 797 F.3d 1248 (11th Cir. 2015); <u>KFC Corp. v. Marion-Kay Co.</u>, 620 F. Supp. 1160, 1168 (S.D. Ind. 1985); <u>Argus Inc. v. Eastman Kodak Co.</u>, 552 F. Supp. 589, 600 (S.D.N.Y. 1982); <u>Farbenfabriken Bayer, A. G. v. Sterling Drug, Inc.</u>, 197 F. Supp. 627, 629 (D.N.J. 1961), <u>aff'd</u>, 307 F.2d 210 (3d Cir. 1962).[26] Moreover, one of the first cases to adopt that approach was <u>International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.</u>, 518 F.2d 913 (9th Cir. 1976). <u>IT&T</u>'s conclusion was supported in part by the existence of what the court referred to as a "double standard" for calculating the laches period:

> If relief is sought, not on the theory that past or present actions or behavior constitute actual violations of the substantive antitrust law, but because the plaintiff is threatened with an <u>impending</u> violation, then laches should normally run from the time when the plaintiff was first confronted with an enjoinable threat and thus could have obtained injunctive relief. <u>If the threat later matures into an actual violation and the plaintiff sues to prevent recurrence or continuation of the violation, then laches should be recomputed from the time of the subsequent actual violation.</u>
>
> This 'double standard' for laches reflects the fact that there are two basic theories of relief for actions under [Section] 16. Injunctions may be obtained against (1)

---

[26] Although the Fourth Circuit implicitly approved of that approach, it has not directly addressed the question. <u>See Weinberger v. Retail Credit Co.</u>, 498 F.2d 552, 556 (4th Cir. 1974).

> impending violations of the substantive law,
> and (2) past or present violations likely to
> continue or recur.

Id. at 928-29 (emphasis added) (citing Zenith Radio, 395 U.S. at 130). In IT&T, the plaintiff sought to restrain certain actual violations of the Sherman and Clayton Acts, and the court held that "the proper starting point for computation of the laches period is the time when the alleged violations occurred." Id. at 929 (emphasis added). In doing so, it noted that "[t]he four-year limitation of . . . Section 4B for private antitrust actions for damages is long enough to enable potential plaintiffs to observe the actual effects and the possible antitrust violation and to calculate its potential defects." Id. That approach comports with the common sense understanding that the actual competitive effects of a merger may be delayed as they were in this case.

Examining the laches period in this flexible manner is consistent with how laches operates in copyright infringement suits. See Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962, 1977-78 (2014). More importantly, it comports with longstanding Fourth Circuit law:

> In the application of the doctrine of
> laches, the settled rule is that courts of
> equity are not bound by, but that they
> usually act or refuse to act in analogy to,
> the statute of limitations relating to
> actions at law of like character. The
> meaning of this rule is that, under ordinary

> circumstances, a suit in equity will not be
> stayed for laches, before, and will be
> stayed after the time fixed by the analogous
> statute of limitations at law; but if
> unusual conditions or extraordinary
> circumstances make it inequitable to allow
> the prosecution of a suit after a
> briefer . . . period than that fixed by the
> statute, the [court] will not be bound by
> the statute, but will <u>determine the</u>
> <u>extraordinary case in accordance with the</u>
> <u>equities which condition it</u>.

<u>King v. Richardson</u>, 136 F.2d 849, 862 (4th Cir. 1943) (emphasis added) (internal quotation marks omitted). Using Section 4B's limitations period as a guideline (as posited by ITT) and not a firm rule better serves the purposes of the Fourth Circuit's settled laches approach because it accounts for the alternate ways in which the laches period may start running under Section 16.

As a result, although Steves' initiating this action within Section 4B's limitations period does not necessarily lead to a strong presumption against laches (as it would in trademark infringement suits), it is appropriate to rely on that four-year period as a guideline to determine whether Steves unreasonably delayed here.

### 1.   Reasonableness of Steves' Delay

"An inexcusable or unreasonable delay may occur only after the plaintiff discovers or with reasonable diligence could have discovered the facts giving rise to his cause of action." <u>White</u>,

909 F.2d at 102. This factor thus requires the Court to decide when Steves knew or should have known that it was facing "threatened loss or damage" from a Section 7 violation, as needed to establish Section 16 standing. 15 U.S.C. § 26. The laches period would have started running only at that time. See Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc., 673 F.3d 294, 301 (4th Cir. 2012) ("Logic dictates that 'unreasonable delay' does not include any period of time before the [plaintiff] is able to pursue a claim . . . ." (internal quotation marks omitted)). And, of course, Steves could not have been aware of any Section 7 violation until it was reasonably knowable that "the effect of [the CMI] [A]cquisition may be substantially to lessen competition." 15 U.S.C. § 18.

JELD-WEN argues that Steves should have known of a threatened Section 7 violation as early as April 2012, when Steves became aware of the planned CMI Acquisition, and at the latest on October 24, 2012, when the merger was consummated. But accrual principles for Section 4 damages claims help show why that is not correct. Section 4B's limitations period "starts to run at 'the point the act first causes injury.'"[27] Concord Boat

---

[27] Steves did not need to suffer actual antitrust injury to bring a Section 16 claim, which requires only "threatened" injury. However, based on the facts in the record, it is not clear that this distinction is relevant to the outcome here.

Corp. v. Brunswick Corp., 207 F.3d 1039, 1051 (8th Cir. 2000) (quoting Klehr v. A.O. Smith Corp., 521 U.S. 179, 190-91 (1997)). Because Section 7 makes the acquisition itself illegal, and the antitrust harm from the acquisition is usually known when the merger is consummated, Section 4 claims often begin accruing on that date. See id. at 1050. But a Section 7 violation "may occur 'at or any time after the acquisition, depending upon the circumstances of the particular case.'" Midwestern Mach., Inc. v. Nw. Airlines, Inc., 167 F.3d 439, 443 (8th Cir. 1999) (quoting United States v. E.I. du Pont de Nemours & Co., 353 U.S. 586, 597 (1957)); see also United States v. ITT Cont'l Baking Co., 420 U.S. 223, 242 (1975) (violation may occur post-consummation if there was "no realistic threat of restraint of commerce or creation of a monopoly" when acquisition completed).

Areeda and Hovenkamp's example of this sort of situation is particularly apt here:

> One might imagine a merger that occurred in 1980 but with no immediate price increase, perhaps because the firm at that point lacked the power. But suppose the firm thereafter augmented its power and finally exacted a monopoly price increase in 1990 . . . and the plaintiff brings its action in 1993. In such a case the statute of limitation would not begin to run until the post-merger price increase occurred.

12 Areeda & Hovenkamp, supra, ¶ 1205b.

With these principles in mind, the first task is to ascertain the period of delay that is involved here. This action was filed on June 29, 2016, slightly more than four years after JELD-WEN announced that it was going to acquire CMI and a few months before the fourth anniversary of the consummation of the merger. Therefore, at its maximum reach, the period of delay was equivalent to the four-year statute of limitations set by Section 4B for damages claims. Thus, the filing of the antitrust action was within the guideline period as outlined in <u>ITT</u> and <u>King v. Richardson</u>. That does not, however, resolve the reasonable delay analysis.

To begin, as explained below, the period from April 2012 to August 2014 cannot be included in the period of delay in the laches calculus. Thus, it is necessary to remember that JELD-WEN was aware at the time of the merger that the antitrust issues associated with the CMI Acquisition were significant. PTX-90. Indeed, having calculated market concentration as a consequence of the forthcoming acquisition and the Herfindahl-Hirschman indices for markets impacted by the merger, JELD-WEN retained highly-qualified antitrust counsel from one of the nation's largest law firms, O'Melveny & Myers. In sum, and as the record shows, JELD-WEN knew full well of the merger's antitrust implications.

Mindful of those implications, JELD-WEN pursued an established merger strategy to assuage any possible concerns from the DOJ, from CMI's customers, and from JELD-WEN's own customers (including Steves). Specifically, JELD-WEN developed a plan to enter into long-term supply agreements with independent door manufacturers in the United States (notably Steves, Lynden, and Haley), see PTX-93; PTX-139. As part of its strategy, JELD-WEN deliberately decided not to approach the DOJ about the proposed CMI Acquisition until those long-term agreements had been entered. In fact, JELD-WEN's internal documents show that the company considered it a "tactical error to even call [the DOJ]" before entering into those supply agreements, and that JELD-WEN was fully aware that having those contracts in place would "be very positive for us [at the DOJ] if we ever go." PTX-160. As Shapiro explained at trial, acquiring firms often enter into long-term contracts with customers in order to prevent a challenge to the merger. That tactic limits the DOJ's ability to secure evidence necessary to block a merger because customers with supply agreements are less willing to oppose a merger proposed by their supplier and because customers do not have reason to be threatened.

And, when JELD-WEN did approach the DOJ about the CMI Acquisition, it emphasized its long-term supply agreements with Steves, Lynden, and others. And Morrison, who led the company's

presentation to the DOJ, admitted that the purpose of entering into such contracts was "to alleviate" customer concerns about not having a supply and "to assure the customers of CMI, who might eventually become customers of JELD-WEN, that JELD-WEN was committed to their continued supply." <u>See</u> PTX-139.

Based on these facts, the Court finds that before, and at the time of, the merger in 2012, Steves had no reason to believe that there would be anticompetitive effects from the merger because JELD-WEN designed its pre-merger strategy to create that state of mind. To the contrary, Steves had a positive relationship with JELD-WEN through its CEO, Phillip Orsino, and had a recently signed long-term contract with JELD-WEN which Orsino described as a lifetime arrangement. And, although Steves did not take that assurance literally, under all the known circumstances, it was reasonable for Steves to believe that the merger would not produce a substantial lessening of the competition that had produced the favorable terms in the Supply Agreement.

The record here establishes, and the Court finds, that Steves did not know, and could not reasonably have known, that JELD-WEN's conduct violated Section 7 until August 2014 at the earliest. JELD-WEN is right that Steves learned of the CMI Acquisition in April 2012, and it knew that the merger would reduce the number of doorskin suppliers from three to two. But

that did not mean much to Steves because it reasonably believed that the prices that JELD-WEN could charge were constrained by the Supply Agreement. Applying Section 4 accrual rules here, any claim would have been dead in the water in April or October 2012 because there was no existing or threatened antitrust injury, and antitrust damages would have required speculation about JELD-WEN's future acts.

Although, in November 2012, Steves subsequently noticed some decline in doorskin quality, it did not associate those problems with the CMI Acquisition then. The same is true of the doorskin pricing issues arising in late 2012 through 2013, which Steves perceived as a purely contractual issue that could be, and eventually was, worked out through communications with Orsino. There was no reason for Steves to believe that these issues were anticompetitive effects from the merger; both sides treated Steves' concerns as essentially contract disputes. In any event, Steves could have tried to shift its doorskin purchases to Masonite if it was dissatisfied with JELD-WEN. In other words, even though JELD-WEN had acquired excess market power through the CMI Acquisition, it did not use that power before 2014.

However, the record establishes that, in May 2014, Hachigian, who had taken over from Orsino as JELD-WEN's new CEO, informed Steves that it would be necessary to renegotiate the

Supply Agreement to secure higher prices, including a so-called "capital charge" (to help defray JELD-WEN's cost of capital invested in the business) because Hachigian thought that the Supply Agreement was mispriced and unfair to JELD-WEN. At that time, Hachigian also told Steves that he intended to invoke the termination provisions of the Supply Agreement to bring the parties to the bargaining table.

In retrospect, that conduct represented the first of a series of events wherein JELD-WEN exercised the market power brought about by the substantial lessening of competition effected by the merger (as found by the jury). However, Steves was reasonable in believing that the purpose of the threatened termination was, as Hachigian had represented, to bring the parties to the negotiating table to try to get a more favorable agreement for JELD-WEN. Then, in July 2014, Hachigian sent Sam Steves a Masonite presentation stating that Masonite would not sell doorskins to competing door manufacturers like Steves. Hachigian sent that presentation to Steves, not for mere informational purposes, but as a message from JELD-WEN that Steves had to deal with JELD-WEN because the only other supplier (Masonite) was not to be a future source of supply. That conduct, combined with the termination notice and Hachigian's actions in May 2014, portended that the JELD-WEN might now be

using the increased market power that it had gained as a result of the merger.

Sam and Edward Steves appear to have recognized that possibility in mid-August 2014. Thus, on August 12, 2014, Sam Steves e-mailed Edward Steves to express his concerns about Masonite's statements that it and JELD-WEN were the only vertically integrated doorskin manufacturers and that the barrier to entry in the doorskin market was "prohibitive." Sam Steves then asked whether Steves was "finished with exploring anti trust issues if J[ELD-WEN] term[inate]s the [S]upply [A]greement." DX-291. Then, on August 26, Sam Steves sent Edward Steves another e-mail that proposed a response to an e-mail from Hachigian about various issues under the Supply Agreement, including the proposed capital charge. In that e-mail to his brother, Sam Steves suggested that Steves send a "VERY strong response" and "tee up [its] claim on the overcharge." His proposed response also included this suggested language: "We remain troubled that you continue to threaten termination of the agreement if we don't consent to . . . a price increase! Finally, and perhaps most important—the antitrust." DX-466.

Neither Sam nor Edward Steves were called upon to explain the comments made in those emails. So, it is difficult to discern their meaning. Nonetheless, those e-mails show that Steves should have been alerted to the possibility that the

threatened price increases and the contract termination were effects of the merger. That possibility would have become more concrete when Hachigian sent the Supply Agreement termination letter on September 10, 2014. Accordingly, the record permits the conclusion that Steves should have known that it faced threatened or actual antitrust injury by August 12, 2014,[28] and that Steves did know by September 10, 2014.

Therefore, the question becomes whether JELD-WEN has proven that the time between August 12, 2014 and June 29, 2016 (when this action was filed) constitutes unreasonable delay for purposes of laches. As previously explained, that is a case-specific inquiry that depends on the particular facts at hand.

In this case, the inquiry begins with the understanding that Steves needs a reliable supply of doorskins to survive, a fact known by both Steves and JELD-WEN. The inquiry also must take into account that, in August 2014, there were only two domestic doorskin manufacturers, and that one, Masonite, recently had announced that it would not sell doorskins to

_____

[28] At least one case has suggested that the continuing violations doctrine might apply to extend the laches period each time a new anticompetitive act occurs. See IT&T, 518 F.2d at 929. However, the Court already noted that this doctrine usually does not apply in Clayton Act cases, and held that the anticompetitive effects here were "unabated inertial consequences" of the CMI Acquisition, not independent Section 7 violations. See Summary Judgment Op. at 30-31 (internal quotations omitted). Therefore, any doorskin price increases or quality reductions after August 2014 did not change the beginning date of the laches period.

134

independent door manufacturers like Steves. The reasonableness assessment must also consider that the other supplier, JELD-WEN, had just given notice to Steves that the Supply Agreement would end in 2021 unless Steves agreed to JELD-WEN's demands for a substantial price increase. Also, in August 2014, there was virtually no decisional law around which to measure the viability of a private party antitrust lawsuit, much less one in which the substantial lessening of competition had been brought about under the circumstances presented by this record. Finally, the assessment must keep in mind that JELD-WEN was a far bigger and far better-heeled company than Steves. The question then becomes whether it was reasonable for Steves, confronted with these realities in August 2014, to have instituted a costly, protracted, and novel antitrust litigation to attempt to solve a supply dilemma that was then seven years in the future. The record teaches that such a course was not reasonable.

Instead, as the record here shows, when confronted with contract termination, Steves reasonably elected to try to find another reliable source of supply. To that end, in October 2014, the Steves Brothers met with Masonite's CEO, Fred Lynch who informed them that Masonite would not sell doorskins to Steves except on a spot basis, and at prices that were so high that Steves could not make a profit. Faced with that position by

Masonite, it became both necessary and reasonable for Steves to treat further with JELD-WEN. So, in January 2015, Sam and Edward Steves met with Hachigian, Merrill, and other JELD-WEN representatives in an effort to resolve the differences between the two companies, and thereby to secure the reliable source of supply on which Steves' survival depended.

However, in that meeting, Hachigian threatened that JELD-WEN would be "total pricks" over the remaining term of the Supply Agreement if Steves did not agree to renegotiate the contract to pay higher doorskin prices. See PTX-514. And, from January 2015 to the middle of that year, JELD-WEN informed Steves about a series of greater price increases, which JELD-WEN conceded at trial were actually prohibited by the Supply Agreement. During that same period, JELD-WEN refused to provide Steves with the contractually required information that would allow Steves to determine whether the proposed price increases were legitimate under the controlling provisions of the Supply Agreement.

With those developments, Steves again approached Masonite, the only other domestic supplier, about a supply of doorskins. It was reasonable to make the last ditch effort with Masonite. Lynch again informed Edward Steves that Masonite would not supply Steves with doorskins on a long-term basis, offering to

sell Steves' doorskins only on a spot basis at prices that would be unprofitable for Steves.

Therefore, at about the same time, Steves found it necessary to explore the possibility of buying doorskins from foreign manufacturers or building its own doorskin plant. Steves ultimately determined that neither option was likely to provide an adequate source of supply by the time that the Supply Agreement would expire. Nonetheless, it was reasonable for a small company like Steves to explore securing a doorskin supply by purchasing from foreign suppliers or building its own plant rather than instituting a novel antitrust lawsuit against its much larger and more powerful supplier. The record shows that the process of assessing the viability of foreign manufacturers as a source of supply, like the process of evaluating whether it was possible or sensible to build a plant as the source of supply was complicated and time-consuming. Here, the record shows that, once Steves had determined that it could rely on neither of the two domestic doorskin suppliers (Masonite or JELD-WEN), it timely and diligently pursued the only other conceivable alternatives to filing an antitrust suit. Accordingly, the record here shows, and the Court finds, that Steves proceeded with reasonable diligence to consider the viability of these alternate sources of supply rather than

starting a lengthy, costly,and novel antitrust lawsuit against its vastly better-financed supplier.

By early 2015, Steves had concluded that its future was at serious risk because the Supply Agreement with JELD-WEN would expire in 2021, and neither Masonite nor foreign suppliers offered a reasonable alternative mean of supply. Moreover, it was entirely uncertain whether Steves could afford to build a doorskin plant, either on its own or with a partner.

However, there was available to Steves another means to try to resolve the problems that both threatened Steves' existence and that, if not solved, would present antitrust injury: the alternative dispute resolution provision ("ADR") in the Supply Agreement. That process required Steves and JELD-WEN, as a first step, to hold an internal conference among senior executives. PTX-149 § 10(a). If that step was unsuccessful, the contract the required the parties to engage in mediation as a second step. Id. § 10(b).

On March 11, 2015, Steves invoked the ADR provisions of the Supply Agreement, and it requested an internal conference among senior executives to occur on March 23. DX-243 at 2. However, the two internal conferences did not take place until May 2015. At one of those meetings, Steves' attorney, Marvin Pipkin, expressed Steves' concern about antitrust issues arising out of JELD-WEN's conduct. The record does not reflect the exact

details of Pipkin's statements or JELD-WEN's response. But it is clear that, by May 2015, JELD-WEN was aware of the risk of an antitrust claim if it persisted to exploit, in its dealings with Steves, the substantially lessened competition that the merger had produced. Of course, Steves too was aware of that potential antitrust claim.

After the internal conferences were unsuccessful, on July 2, 2015, Steves requested the mediation required by the Supply Agreement. That mediation took place in September 2015. The parties' disputes were not resolved then, but Steves presented JELD-WEN with a draft Complaint that raised both contract and antitrust claims.

Thereafter, on September 4, 2015, the parties entered into the first of several standstill agreements, which were extended on September 29, 2015; October 13, 2015; January 27, 2016; and April 25, 2016. Those agreements contained provisions reciting the parties' "desire to continue to discuss their differences in an effort to resolve these differences without litigation." See PTX-591; PTX-593; PTX-606; PTX-641; PTX-682.

While the standstill agreements were in effect, Steves, in December 2015, gave a presentation to the DOJ complaining of antitrust violations, after which the DOJ initiated a civil investigative demand. JELD-WEN subsequently gave a presentation to the DOJ on April 7, 2016. The investigation was closed by the

DOJ on May 18, 2016. In June 2016, Steves requested JELD-WEN to agree to another extension of the standstill agreements, which JELD-WEN rejected. Immediately thereafter, on June 29, 2016, Steves filed this action.

On this record, the Court holds that JELD-WEN has not met its burden to prove that the delay between September 10, 2014 and June 29, 2016 was unreasonable. To the contrary, the record shows that, during that period, Steves took every reasonable step to try to secure a reliable supply of doorskins that was essential for its survival. It was reasonable for a small purchaser, like Steves, to try all reasonable measures to avoid litigation with the supplier of an ingredient essential to its core product line. That is especially so where, as here, the supplier is a vastly larger company that can afford costly litigation and where, as here, that supplier indicates a continued desire to attempt to work things out short of litigation. Public policy supports efforts by parties to work out difficult issues respecting their business relationships without resorting to litigation. See Essilor Int'l v. Nidek Co., 217 F.3d 857, 1999 WL 989071, at *5; (Fed. Cir. 1999); NAACP v. NAACP Legal Def. & Educ. Fund, Inc., 753 F.2d 131, 137 (D.C. Cir. 1985); Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925, 932 (7th Cir. 1984); cf. Petrella, 134 S. Ct. at 1976. Furthermore, common sense teaches that antitrust litigation

would be lengthy and exceedingly expensive. And, in this case, the kind of antitrust case that Steves would have to bring would be the first of its kind. So there was no reliable way to predict what such litigation might cost or whether it would even be concluded before Steves would lose its source of supply in 2021.

Nor was it unreasonable for Steves to use the contractually-required ADR process to try to work out a business compromise to the contract-related problems that actually produced its antitrust injury, instead of immediately commencing antitrust litigation. Even after those procedures failed, the parties, both mindful of the potential for antitrust litigation, agreed to standstill agreements with a view to solving their differences. Considering the representations in those agreements that both parties wanted to resolve their differences without litigation, Steves reasonably avoided filing an antitrust suit until JELD-WEN refused to continue the process.

Considering the record as a whole, JELD-WEN has not proven that the delay from August 2014 to June 2016 was unreasonable. That, of course, defeats JELD-WEN's laches defense, because it has failed to prove the first element of that defense. Thus, the inquiry respecting the application of laches to the equitable remedies is at an end.

## 2.  Prejudice to JELD-WEN

Ordinarily, it is preferable to articulate a single basis for decision, and thereby refrain from making alternative holdings. See Karsten v. Kaiser Found. Health Plan of Mid-Atl. States, Inc., 36 F.3d 8, 11 (4th Cir. 1994). However, this case presents an exception to that rule, given that it presents issues of first impression on which appeal is virtually certain, and considering the nature of the relief sought. Therefore, in the interest of judicial economy, it is appropriate to consider the prejudice element of JELD-WEN's laches defense so that the entire picture will be available for consideration in the likely event of appeal.

Even unreasonable delay does not animate the bar of laches if that delay does not cause harm to the defendant. Ray Commc'ns, 673 F.3d at 305. Prejudice is shown by "a disadvantage on the part of the defendant in asserting or establishing a claimed right or some other harm caused by detrimental reliance on the plaintiff's conduct," White, 909 F.2d at 102, including economic prejudice. Ray Commc'ns, 673 F.3d at 305. In addition, a defendant is always "'aided by the inference of prejudice warranted by the plaintiff's delay.' . . . [T]he greater the delay, the less the prejudice required to show laches, and vice versa." White, 909 F.2d at 102 (quoting Giddens v. Isbrandtsen Co., 355 F.2d 125, 128 (4th Cir. 1966). But, in every case, "the

defendant is ultimately required to prove prejudice (given the defendant's burden to plead and prove laches under Fed. R. Civ. P. 8(c))." Id.

Here, there is no contention that JELD-WEN suffered any disadvantage in asserting or establishing a claimed right. Instead, JELD-WEN relies on the presence of "some other harm caused by detrimental reliance on [Steves'] conduct." In particular, JELD-WEN asserts various economic disadvantages that it says constitute prejudice.

JELD-WEN contends that, beginning immediately after the merger and continuing through 2016, it took numerous steps to integrate Towanda into its overall manufacturing operation. It claims that it closed CMI's Chicago headquarters, consolidated administrative functions, mothballed the Marion plant in 2013, sold Dubuque in 2016, and otherwise integrated Towanda into its general manufacturing plans but for Steves' delay in initiating suit. Those positions are based almost exclusively on the testimony of Morrison, and the Court declines to accept his testimony.

Morrison, who also served as JELD-WEN's trade secrets expert in the liability phase of the trade secrets case, was shown at the trade secrets trial to be a witness who could not be believed. He lied on his resume, which was offered into evidence, stating that he had graduated from Louisiana State

University when in fact he had attended but one semester. He lied again, at his deposition and trial, when asked about his resume and his education, and he allowed JELD-WEN to publicly tout him as a graduate of Louisiana State University for years. A person who will lie about something of that nature is not to be believed. Moreover, having observed Morrison's conduct when testifying in the Remedies Hearing, the Court notes that he was more advocate than witness, and regrettably concludes that he would say anything to support JELD-WEN's cause whether it was supported by facts or not.

Accordingly, the Court does not believe his testimony that, in reliance on the absence of an antitrust suit, JELD-WEN would not have mothballed the Marion plant, closed the Dubuque plant, made the modifications in its system, and effectuated the integration of the Towanda plant into JELD-WEN's operations. Wholly apart from Morrison's lack of credibility, the record shows that the Marion plant was mothballed because of the expense of meeting environmental regulations and updating antiquated equipment. And, the record also shows that the decision to close the Dubuque plant was made in 2011, before the merger. Thus, the record also shows that Morrison's testimony is not credible.

Putting aside Morrison's testimony, the evidence is generally undisputed that JELD-WEN expended significant funds installing capital improvements and manufacturing processes in Towanda and integrating Towanda into its operation. But, the preponderance of the evidence does not establish that JELD-WEN relied on the absence of an asserted antitrust claim by Steves, in taking those steps. To the contrary, JELD-WEN made substantial investment in Towanda even after it was told by Pipkin in May 2015 that Steves had antitrust concerns and after Steves presented a copy of an anti complaint in September 2015. That JELD-WEN continued to invest in Towanda with that knowledge materially undercuts JELD-WEN's contention that it would not have made investments in Towanda had it been aware of a possible antitrust claim.

Further, the Court finds that JELD-WEN was fully aware that an antitrust action could be filed at any time within four years after the merger and, in any event, it is charged with that knowledge. And, mindful of that possibility, JELD-WEN made its investments in Towanda, integrated Towanda into its operational system, and took all the actions it now uses to prove the prejudice component of its laches defense.

The record shows that JELD-WEN relied not on Steves' inaction but on having successfully lulled Steves and the DOJ into action by entering into long-term contracts with the

independent doorskin customers, including Steves.  JELD-WEN thus relied on that tactic to insulate it going forward after the merger, not on Steves' inaction.  Accordingly, JELD-WEN has not met its burden of proof on the component of detrimental reliance.

But, even if JELD-WEN can be said to have made the requisite showing of detrimental reliance, it has nonetheless failed to show prejudice that would suffice to establish laches. For example, the record is clear that JELD-WEN has more than recovered the capital investments (plant modifications and new equipment) that it made in Towanda after the merger, the making of which JELD-WEN asserts as prejudice.  And, its operation of Towanda has yielded considerable profit.  JELD-WEN, of course, will not have to disgorge that profit.

As discussed fully in Section II.A.3.(b) (Balance of Hardships), the operational changes that, of necessity, will be made in the event of divestiture will no doubt be troublesome to achieve, will entail significant expense, and will have some detrimental collateral consequences.  However, the making of the changes necessary to restore competition is not such prejudice as will call into operation the equitable defense of laches into play.

JELD-WEN's position on laches is founded principally on the decisions in _Antoine L. Garabet M.D., LLC v. Antomonous Techy. Corp._, 116 F. Supp.2d 1159 (C.D. Ca. 2000) and _Taleff v. Southwest Airlines Co._, 828 F. Supp. 2d 1118 (N.D. Ca. 2011). In both cases, the plaintiffs sued under Section 7 of the Clayton Act, alleging that the merger itself would substantially lessen competition. In both cases, the plaintiffs were aware of the proposed merger and the threat to competition for several months before the merger. In _Gabaret_, the plaintiffs filed suit after the merger (one day in _Taleff_, the same day in _Gabaret_). In _Gabaret_, the court held that the plaintiffs lacked anitrust standing for each antitrust injury and the court sustained a defense of laches. _Gabaret_, 116 F. Supp.2d at 1165-71. In _Taleff_, the court did not actually decide the applicability of laches, but it held that the delay in filing suit until after the merger tipped the balance of hardship against the plaintiffs. 828 F. Supp. 2d at 1123-24.

Neither _Gabaret_ nor _Taleff_ apply here because the facts of this case are different. Here, unlike _Gabaret_ and _Taleff_, there was no reason for the plaintiff to apprehend a lessening of competition before or at the time of the merger. To the contrary, JELD-WEN's strategy was intended to give Steves comfort. And, as explained above, the conduct causing antitrust injury occurred well after the merger.

Accepting JELD-WEN's theory would mean that where, as here, the lessening of competition occurs after the merger, a party thereby injured simply could never seek equitable redress to restore competition. For the reasons previously explained, the rules of antitrust injury and antitrust standing as well as the fundamental principles of equity foreclose such a result.

## CONCLUSION

For the reasons, and to the extent, set forth above, PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR EQUITABLE RELIEF (ECF No. 1191) will be granted in part and denied in part. The motion will be granted to require that JELD-WEN divest itself of the Towanda facility and, to the extent set out in Section II.B, to grant the conduct remedies necessary to the success of the divested entity as a manufacturer of interior molded doorskins. The motion will be denied as to the requested conduct remedies not necessary to that purpose.

To assure, to the extent reasonably possible, that JELD-WEN receives a fair price for Towanda, and to assure that divestiture produces a competitive entity that is likely to restore competition, the process specified by the Supreme Court in Brown Shoe, will be followed so as to assure that the divestiture is conducted in a realistic setting that is conducive to attracting qualified buyers who will pay a fair

price for Towanda.    To assure the success of that process, a Special Master will be appointed.

It is so ORDERED.

/s/    *REP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  October  5 , 2018