

STEVES AND SONS, INC.,

Plaintiff,

v.                                              Civil Action No. 3:16cv545

JELD-WEN, INC.,

Defendant.

## MEMORANDUM OPINION

This matter is before the Court on COUNTERCLAIMANT JELD-WEN, INC.'S MOTION FOR PERMANENT INJUNCTION AGAINST COUNTERDEFENDANT STEVES & SONS, INC. (ECF No. 1631). For the reasons set forth below, the motion will be denied.

## BACKGROUND

### I.   Factual Background

JELD-WEN, Inc. ("JELD-WEN") has manufactured interior molded doorskins in plants located in the United States and abroad since the 1970s. It built six of the nine doorskin manufacturing plants that it has operated during that period. The experience with starting and operating those plants has helped JELD-WEN develop certain knowledge about, and best practices for, various aspects

of the doorskin manufacturing process. See Apr. 30 Trial Tr. at 258:20-264:13.

One of JELD-WEN's customers is Steves and Sons, Inc. ("Steves"), an independent manufacturer of interior molded doors. Steves competes in the interior molded doors market with other independent door manufacturers and vertically-integrated door manufacturers like JELD-WEN and Masonite, both of which also produce doorskins for their own use to manufacture and sell finished doors. Steves relies primarily on JELD-WEN to supply it with the doorskins needed to make the doors that Steves sells. May 7 Trial Tr. at 1555:22-1557:21. That supply occurs by virtue of a long-term doorskin supply agreement between Steves and JELD-WEN dated May 1, 2012 ("the Supply Agreement"). Id. at 1564:17-1565:17. The Supply Agreement, which is still in effect today, will terminate in September 2021, based on a notice of termination that JELD-WEN sent to Steves in September 2014. See id. at 1566:14-22; CDX-076.

That notice of termination followed a shift in JELD-WEN's business strategy that was put into motion following a management transition. Philip Orsino was JELD-WEN's CEO when the Supply Agreement was signed, but Kirk Hachigian ("Hachigian") became JELD-WEN's CEO in March 2014. With Hachigian as CEO, JELD-WEN began to take a quite aggressive approach with respect to supplying doorskins to independent door manufacturers, including Steves,

2

because, as Hachigian expressed to Steves, the Supply Agreement was too favorable to Steves. Consequently, when Sam Steves and Edward Steves, the principal officers of Steves, met with JELD-WEN executives to discuss the Agreement in August 2014, JELD-WEN insisted that Steves agree to add a capital charge (of $0.40 per skin) to the normal doorskin prices permitted under the Supply Agreement and to otherwise increase the price. Steves refused to accede to JELD-WEN's demands, and shortly thereafter, JELD-WEN sent a letter terminating the Supply Agreement. See May 7 Trial Tr. at 1568:8-1580:25.

At some point after receiving that letter and after unsuccessfully trying to arrange an alternate source of supply from Masonite, Steves started to investigate the possibility that Steves might build its own doorskin manufacturing plant ("the MDS Project") or obtain an alternate doorskin supply from foreign suppliers. Id. at 1581:23-1582:2. Two things caused Steves to take that approach more seriously. First, based on a Masonite presentation, Steves reasonably believed that Masonite was withdrawing from the interior molded doorskin market. As a result, independent door manufacturers like Steves could obtain doorskins on the domestic front only from JELD-WEN, which had a strained

3

relationship with Steves after Hachigian's arrival.[1] See id. at 1575:7-1576:15. Second, although, after receiving the notice of termination, Steves continued to work with JELD-WEN to resolve their differences. However, on March 26, 2015, JELD-WEN sent Edward Steves another letter stating that JELD-WEN would reserve the right to assert that the Supply Agreement terminated on December 31, 2019 instead of in September 2021 (the date originally set by JELD-WEN and the Supply Agreement). See id. at 1582:9-1583:23; CDX-089. This threat was more bullying by JELD-WEN and it "accelerated [Steves'] concern [about the termination of the Supply Agreement] dramatically." May 7 Trial Tr. at 1585:12-22.[2]

However, even before JELD-WEN sent that second letter, Steves (also in March 2015) retained John Pierce ("Pierce"), a former JELD-WEN employee, as a consultant for two reasons. First, Steves asked Pierce to provide information that Steves could use in

---

[1] Whether Steves could have acquired enough doorskins from Masonite to sustain its molded door business notwithstanding the latter's refusal to enter into any long-term supply agreement was disputed at trial. But, it is not disputed that Masonite would not enter a long-term supply agreement. Instead, Masonite offered only spot sales which, of course, provided no reliable source of supply. And, even then the prices proposed by Masonite were quite high. This dispute is relevant here only because this background serves to show the factors motivating Steves' trade secret misappropriation.

[2] During the course of this case, JELD-WEN later abandoned that position and advised that it would not seek to terminate the Supply Agreement as of December 2019. May 7 Trial Tr. at 1668:11-21.

4

furtherance of its MDS Project. May 7 Trial Tr. at 1531:16-1532:1;
May 8 Trial Tr. at 1792:17-21. Second, Steves wanted Pierce to
"confirm[] the input costs" for JELD-WEN's doorskins, which
provided the basis for doorskin prices under the Supply Agreement.
May 7 Trial Tr. at 1530:3-11; May 8 Trial Tr. at 1770:25-1772:15,
1809:4-21. The Supply Agreement required JELD-WEN to give annual
notice of doorskin prices and related input costs for that year,
and also allowed Steves to verify those inputs, including by
requesting "back-up documentation" if an affidavit from JELD-WEN
did not settle the matter. See May 8 Trial Tr. at 1772:21-1774:16;
CPX-044 §§ 6(c), 21.[3] But, as a result of communications between
Edward Steves and JELD-WEN, Steves believed that JELD-WEN was not
providing accurate input costs, or enough information to verify
the accuracy of those costs. Accordingly, Steves requested that
Pierce confirm the costs given by JELD-WEN or, alternatively,
indicate what the input costs should be, based on his knowledge.
May 7 Trial Tr. at 1530:12-24; see also May 8 Trial Tr. at 1791:18-
1792:16.

When Pierce was hired, both Edward and Sam Steves knew that
he had left his employment with JELD-WEN in June 2012. See May 7

---

[3] Whether that information was required only if JELD-WEN increased
prices is subject to dispute that will be resolved in another
opinion. But that dispute is of no moment here because JELD-WEN
had raised prices so it owed Steves the information for the
increased prices.

5

Trial Tr. at 1531:9-15. And, when Pierce met with Steves in March 2015, Pierce disclosed to Edward Steves that he had a confidentiality agreement with JELD-WEN. See May 3 Trial Tr. at 1024:6-15. Nonetheless, Steves used Pierce to obtain confidential information from JELD-WEN. For instance, on March 19, 2015, after having talked to several JELD-WEN employees, Pierce e-mailed Edward Steves a report with extensive information about "important choices that would need to be made by anyone contemplating entering the business of molded door skin manufacturing." Id. at 1029:23-1030:25; see also CPX-101 at 1. That report contained, among other things, information about the optimal configuration and operation of a doorskin plant, see CPX-101 at 80-81; ECF No. 1633-2 at 9-11 (Trade Secret Nos. 9, 10, and 11), which could help a company like Steves—with no previous experience in doorskin manufacturing—build and run such a plant, see May 1 Trial Tr. at 636:25-637:14; May 4 Trial Tr. at 1331:2-9; May 9 Trial Tr. at 2023:13-23. After receiving the report, Edward Steves told Pierce that he found it "very informative." CPX-103.

Several days later, on March 23, Edward Steves sent Pierce a text message seeking information about JELD-WEN's "wood chip and resin pricing by location." CPX-105. On April 4, Pierce sent the Steves Brothers another report that contained, among other things, JELD-WEN's wood fiber and resin costs for each plant. See CPX-109 at 60-61; ECF No. 1633-2 at 51-52 (Trade Secret Nos. 46 and 47).

These costs were specific to JELD-WEN and shed light on its cost structure and resulting doorskin prices, so they could benefit, in a general way, another company that used the same wood fiber or resin as JELD-WEN. See Apr. 30 Trial Tr. at 349:7-350:17; May 2 Trial Tr. at 791:4-14; May 4 Trial Tr. at 1366:23-1367:6. After receiving the report, both Edward and Sam Steves referred to the information as helpful. See CPX-110; CPX-111.

On June 1, 2016, in response to an e-mail from Sam Steves asking how to mitigate a condition known as "pre-cure"[4] on doorskins, Pierce provided a report detailing several manufacturing variables that can be controlled to mitigate pre-cure. See CPX-220; ECF No. 1633-2 at 26-28 (Trade Secret No. 23). Taken together, these variables comprise a unique piece of information that is only available to JELD-WEN. See May 1 Trial Tr. at 642:17-644:9; May 4 Trial Tr. at 1354:22-1355:20. After sending this report, Pierce did not perform any more tasks on Steves' behalf. See May 7 Trial Tr. at 6-15.

Steves also received some of the information about JELD-WEN's manufacturing process through another former JELD-WEN employee, John Ambruz ("Ambruz"). Steves engaged Ambruz as a full-time

_____

[4] Pre-cure is a condition wherein the surface of a doorskin is not properly consolidated with the rest of the skin before the doorskin is cured. As a result, the surface can separate from the rest of the doorskin, causing problems in the finished door. May 4 Trial Tr. at 1354:5-17.

7

consultant in July 2015, and still employed him in that position at the time of trial. May 7 Trial Tr. at 1540:3-15, 1586:21-25. Because Ambruz had considerable experience in the interior molded doorskin industry, Steves hired him to assist with the MDS Project, primarily by completing a study about the feasibility of Steves building a doorskin manufacturing plant ("the Feasibility Study"). See id. at 1587:1-11; May 3 Trial Tr. at 1066:2-14. On March 30, 2016, Ambruz e-mailed to Steves the completed Feasibility Study, which discussed the challenges associated with building a doorskin manufacturing plant—particularly the cost, time, and need for a manufacturing partner. See May 7 Trial Tr. at 1587:15-1591:9; CPX-200. By describing these problems in such detail, the Feasibility Study helped Steves decide whether it could build its own plant, apparently even more so than Pierce's reports. May 7 Trial Tr. at 1591:10-22, 1702:21-1703:6; see also May 8 Trial Tr. at 1836:17-1837:15. The extent to which the Feasibility Study incorporates JELD-WEN information acquired by Pierce was not proved at trial. See May 7 Trial Tr. at 1687:15-20. And, there is dispute whether any information provided by Ambruz was a trade secret.

Then, in June 2016, Sam Steves sent an e-mail to Ambruz and Gregory Wysock ("Wysock")—a former Masonite employee who was not hired by Steves until July 2016, id. at 1688:1-13, 1697:13-15—with an attachment that combined the various communications that Steves

8

had received from Pierce throughout his consultancy.[5] See id. at 1689:5-1693:23; CPX-231. Sam Steves believed that the compendium would help with the work on the MDS Project. May 7 Trial Tr. at 1694:2-23.

On July 20, 2016, Ambruz asked Sam Steves' assistant to scan and e-mail him a document with Pierce's "recommendation on the best way for J[ELD]-W[EN] to expand its production capacity," which Pierce had prepared as a JELD-WEN employee in 2006 ("the 2006 Pierce Proposal"). See Ambruz Dep. at 560:14-21; May 3 Trial Tr. at 1002:10-23. The Proposal included information about the proposed configuration, capacity, measurements, and projected efficiencies of JELD-WEN's Louisiana plant, see CPX-245; ECF No. 1633-2 at 36 (Trade Secret No. 31), which could help a potential competitor evaluate the possible construction of a new plant, see Apr. 30 Trial Tr. at 381:5-382:15; May 4 Trial Tr. at 1361:22-17. The scanned Proposal contained some handwriting in the margins. Although the provenance of those handwritten notes is uncertain, Wysock also attended a meeting at Steves' office on July 20, and, in deposition, Wysock said that the handwriting resembled his own. Wysock Dep. at 720:13-723:21.

---

[5] Sam Steves had also sent the compilation to Ambruz in November 2015. May 7 Trial Tr. at 1694:2-14.

The most recent misappropriation happened on February 17, 2017, when, in the course of discovery in the antitrust case, Sam Steves viewed several confidential JELD-WEN documents without JELD-WEN's consent. Stipulation of Undisputed Facts (ECF No. 1586-1) ¶ 15. He took and saved a screenshot of one document that contained the capital charge that JELD-WEN charges Lynden Door, an independent door manufacturer. May 7 Trial Tr. at 1708:20-25; see also CPX-206; ECF No. 1633-1 at 64 (Trade Secret No. 59). If it builds a doorskin manufacturing plant, Steves could use this information to determine prices or premiums to charge customers; if it does not, it could still use the number to gain an advantage in doorskin price negotiations with JELD-WEN or other doorskin suppliers. May 2 Trial Tr. at 899:20-900:4; May 4 Trial Tr. at 1368:21-1369:11. However, on April 28, 2017, the Court enjoined Steves and the Steves Brothers from using that information "for any business purpose whatsoever," ECF No. 192, and on October 6, found no evidence that it had been used, ECF No. 422 at 1. There was also no evidence at trial that the trade secret had been used after that point.

In early 2017, Steves reached an "interim conclusion" that it could not feasibly build its own doorskin plant because it lacked the time, money, and manufacturing partners needed to do so before the Supply Agreement was to terminate. May 7 Trial Tr. at 1591:23-1592:17. There was no evidence that Steves has, to date, actually

used any JELD-WEN trade secrets to build a doorskin manufacturing plant or to negotiate with JELD-WEN or other suppliers for more favorable doorskin prices. However, at the time of trial, Ambruz was still working on the MDS Project, and Wysock was still employed by Steves. May 7 Trial Tr. at 1696:21-1697:17; May 8 Trial Tr. at 1836:7-12. In addition, although Steves has informed some customers with which it had discussed a possible doorskin manufacturing plant that such a plant is unlikely, Steves has not completely abandoned its plans to build a plant. See May 7 Trial Tr. at 1696:9-1699:8. In fact, it continues to look for a manufacturing partner, and remains in contact with several potential partners that responded positively to Steves' earlier communications. Id. at 1699:9-1702:20.

## II. Procedural Background

Based on these facts, JELD-WEN asserted counterclaims against Steves for, inter alia, misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA"). It sought both damages and injunctive relief for both claims.

At trial, the jury was presented with a list of sixty-seven trade secrets asserted by JELD-WEN. After considering the evidence, the jury determined that only eight alleged trade secrets—Nos. 9, 10, 11, 23, 31, 46, 47, and 59—constituted trade secrets. See Verdict Form (ECF No. 1609). It then concluded that,

11

for the DTSA claim, seven trade secrets (all except 59) had been misappropriated. Finally, the jury found that the misappropriation of those eight trade secrets was not willful and malicious. See id. at 6-7, 14, 18, 27, 34. Consequently, and based on the expert testimony of John Jarosz, the jury determined that JELD-WEN was entitled to reasonable royalty damages of $1.2 million. Id. at 40. The only difference as to the TUTSA claim was the jury's finding that trade secret 59 had been misappropriated, but not willfully and maliciously. See id. at 46-47, 54, 58-59, 67-68, 74-75. The jury's TUTSA and DTSA reasonable royalty awards were identical. Id. at 80.

## DISCUSSION

## I. Availability of Permanent Injunctive Relief

The DTSA allows courts to supplement damages awards by granting injunctions "to prevent any actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A)(i). The TUTSA similarly permits injunctions against "[a]ctual or threatened misappropriation," so long as the injunctions do not prevent persons "from using general knowledge, skill, and experience . . . acquired during employment." Tex. Civ. Prac. & Rem. Code § 134A.003(a).

Steves agrees that, as a general matter, courts are empowered to grant injunctive relief in addition to damages. It contends, however, that JELD-WEN's request for injunctive relief is

12

foreclosed by its evidence and arguments at trial that provided
the basis for the jury's reasonable royalty award. In Steves' view,
the reasonable royalty was based on evidence that the award of
damages would permit future use of the eight misappropriated trade
secrets by Steves, with the result that an injunction predicated
on use would constitute a double recovery for the same injury.
JELD-WEN, on the other hand, agrees that it cannot have a double
recovery, but argues that the reasonable royalty and its proposed
injunction address two different types of harm. The former, it
says, is based on the present value of the misappropriated trade
secrets at the time of the hypothetical negotiation, which
incorporates in part the potential of those secrets' future use,
whereas the latter prevents actual future use. Consequently,
according to JELD-WEN, it can have injunctive relief without
effecting a double recovery.

The parties rightly agree that a party may not receive a
double recovery—that is, "more than one recovery for the same
injury."[6] TMRJ Holdings, Inc. v. Inhance Techs., LLC, 540 S.W.3d

---

[6] Steves asserts that Section 134A.003(b) of the TUTSA "recognizes
the prohibition against a double recovery." Steves Opp. (ECF No.
1663) (Under Seal) at 9. This reading is difficult to comprehend.
That TUTSA provision permits courts to impose running royalties—
in which the defendant pays the plaintiff for future uses of the
misappropriated trade secret—instead of prohibitive injunctions
when such injunctions are inequitable or impractical. See Tex.
Civ. Prac. & Rem. Code § 134A.003(b); see also 18
U.S.C. § 1836(b)(3)(A)(iii). However, the royalty in this case was

13

202, 208 (Tex. App. 2018); see also Artis v. Norfolk & W. Ry. Co.,
204 F.3d 141, 143 (4th Cir. 2000) (citing 18B Charles A. Wright &
Arthur R. Miller, Federal Practice and Procedure § 4476 (3d ed.
2004)).[7] In light of this principle, courts have found double
recoveries where plaintiffs have been awarded "damages for future
use and . . . a permanent injunction barring such use." Home Pride
Foods, Inc. v. Johnson, 634 N.W.2d 774, 784 (2001). In Home Pride
Foods, for instance, the trial court had awarded the plaintiff a
reasonable royalty for "the value of future sales generated by"
the trade secret misappropriation, but also enjoined the
defendants from any future use of the trade secrets. Id. Without

---

awarded by the jury under an entirely different provision, which
allows for a reasonable royalty as a form of compensatory damages.
See Tex. Civ. Prac. & Rem. Code § 134A.004(a); 18
U.S.C. § 1836(b)(3)(B)(ii). Steves would have a very strong
argument if the Court awarded the royalty under Section
134A.003(b), but that is simply not the case here.

[7] Steves also cites Sperry Rand Corp. v. A-T-O, Inc., 447 F.2d 1387
(4th Cir. 1971) and DSC Communications Corp. v. Next Level
Communications, 107 F.3d 322 (5th Cir. 1997) as supporting this
proposition. However, as the Court has already recognized, Sperry
Rand's statement that a plaintiff cannot recover both its actual
losses and a defendant's unjust gains from trade secret
misappropriation is no longer correct in light of the plain
language of the DTSA. See Second Summary Judgment Op. (ECF No.
1581) at 7 (citing Am. Sales Corp. v. Adventure Travel, Inc., 862
F. Supp. 1476, 1479 (E.D. Va. 1994)); see also 18
U.S.C. § 1836(b)(3)(B)(i). Similarly, DSC Communications never
addressed the double recovery issue, holding that the plaintiff
had not suffered any irreparable injury because it was adequately
compensated by its damages for lost sales. See 107 F.3d at 328.
Thus, neither case helps Steves here.

14

explanation, the court reached the obvious conclusion that, based on the evidence in that case, the reasonable royalty was "inconsistent with the issuance of a permanent injunction," and therefore reversed the award of such damages. Id. Similarly, in Robert L. Cloud & Associates, Inc. v. Mikesell, 82 Cal. Rptr. 2d 143 (1999), the court found that the trial court's reasonable royalty award would give plaintiff a double recovery, whether that award was given as a form of damages (under the California Uniform Trade Secrets Act's counterpart to Section 134A.004(a) of the TUTSA) or as a form of injunctive relief (under the counterpart to Section 134A.003(b)). The first approach was improper because the jury had already awarded damages for its actual losses and defendants' unjust enrichment, and the second could not have been valid because the trial court had also enjoined the future use of trade secrets. See id. at 1149-50. Accordingly, the court held that the reasonable royalty award improper. Id. at 1151.

Both the DTSA and the TUTSA plainly permit courts to award damages and to enjoin defendants who are found liable for misappropriating trade secrets. See 18 U.S.C. § 1836(b)(3)(A)-(B); Tex. Civ. Prac. & Rem. Code § 134A.004(a). Thus, several courts have concluded that reasonable royalties and permanent injunctions can co-exist without running afoul of the one-satisfaction rule. See RKI, Inc. v. Grimes, 200 F. Supp. 2d 916, 926 (N.D. Ill. 2002); TMRJ Holdings, 540 S.W.3d at 209-10; Sonoco Prods. Co. v. Johnson,

15

23 P.3d 1287, 1290 (Colo. App. 2001). Those courts reasoned that the royalties were permissible because they arose from some "use of the misappropriated information prior to the issuance of the injunction." RKI, 200 F. Supp. 2d at 926 (emphasis in original); see also TMRJ Holdings, 540 S.W.3d at 210 ("The reasonable-royalty damages . . . were not based on actual future use of the trade secret. Instead, they compensate[d] purely for the misappropriation of the technology, which has a present value based in part on potential for future use, regardless of whether that use came to fruition."); Sonoco Prods., 23 P.3d at 1290 (royalty was based on "development costs of the information misappropriated" rather than "future gains" related to that information).

These general principles, of course, are applicable dependent upon the facts of particular cases. In this case, the record establishes that an injunction against the use of the trade secrets would constitute a double recovery and would run contrary to the testimony that JELD-WEN presented in order to secure a reasonable royalty damage award from the jury. In particular, Jarosz, JELD-WEN's expert witness on damages, testified that:

> A lump sum agreement would allow the user of the intellectual property -- in this case the presumed user, or the assumption that I've made is that it's Steves. They would be able to use this information for as long as they want in any way that they want. So they wouldn't be limited to a time frame that would

16

> be constrained in a license.  A lump sum fee
> would allow them to use the trade secrets as
> long as those are valuable -- or the alleged
> trade secrets as long as they are valuable to
> Steves.

TS Trial Tr. at 2208:8-17.    That testimony quite clearly establishes in the mind of a reasonable juror that an award of a reasonable royalty would allow Steves to use any information found to be a misappropriated trade secret without restraint either time or circumstance.  And that point was pursued in JELD-WEN's closing argument when counsel, commented upon Jarosz' testimony and said that:

> Mr. Jarosz explained that what he did was look
> at reasonable royalty really in two different
> ways.   First, he took into account the fact
> that Steves could use the trade secrets either
> to build a doorskin plant in the future or to
> negotiate better pricing in the future . . .
> [H]e concluded that a reasonable royalty here
> would cost $9.9 million.

TS Trial Tr. at 2355:25-2356:24.

It could not be clearer from Jarosz's testimony that the jury was informed that if, as to any misappropriated trade secret, Steves was assessed with a reasonable royalty damage that Steves would be enabled to use the misappropriated information "for as long as they want in any way that they want."  Put another way, a lump sum royalty "would allow them [Steves] to use the trade secrets as long as those are valuable – or the alleged trade secrets as long as they are valuable to Steves."  Having elected

17

to leave that testimony intact, and having elected to press the theory in closing argument, JELD-WEN established a factual scenario that is unlike any of the decisions on which it relies to argue that, under appropriate circumstances, a court may award both damages by way of reasonable royalty and an injunction against future use. Not one of those cases involved a jury verdict of reasonable royalty damages that was obtained upon the presentation to the jury of testimony that an award of reasonable royalty damages would allow the misappropriator to use the misappropriated information for as long as it wanted in any way that it wanted.

Following the initial briefing on JELD-WEN's request for permanent injunction, the Court called upon the parties to explain further the significance of Jarosz's most unusual testimony and the theory that it put to the jury in support of a claim for reasonable royalty. JELD-WEN did not really address that testimony or explain why it did not bar injunctive relief, notwithstanding having been given a second opportunity to make such an explanation. Instead, JELD-WEN sought to present a revised version of what Jarosz actually had said. Thus, JELD-WEN says that:

> Mr. Jarosz responded that it would be a matter of economic efficiency: the parties hypothetically might prefer a lump sum payment that would cover payments over time, rather than hypothetical royalty based on a percentage of certain revenues, which would require the parties to engage in continual monitoring and accounting.

18

COUNTERCLAIMANT JELD-WEN'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR PERMANENT INJUNCTION AGAINST COUNTERDEFENDANT STEVES & SONS, INC., p. 29. That simply does not address the actual testimony that JELD-WEN (through Jarosz) used to secure an award of a reasonable royalty. Nor can JELD-WEN alter the impact of Jarosz's testimony at trial by citing to what he had said in depositions or in an earlier report. Those materials were not made available to the jury and thus the jury had no way of using them to frame an understanding of what Jarosz actually told the jury in explaining why an award of reasonable royalty damages was appropriate and what it should be.

JELD-WEN next argues that the testimony on which Steves relies is merely part of Jarosz's explanation of the hypothetical negotiation in which a royalty rate would be agreed. However, when Jarosz's testimony is viewed in its entirety, the testimony is far more than JELD-WEN posits.

First, Jarosz acknowledged that he knew of no evidence that Steves had used the trade secrets either to build a doorskin plant or to secure favorable terms in negotiating the purchase of doorskins. TS Tr. 1481, l. 6-9; TS Tr. 1492, l. 12-15. Thus, past use was not a predicate for the royalty rate that Jarosz urged the jury to adopt. To the contrary, future use was the predicate for the requested damage award, and the royalty damage that Jarosz proposed was a lump sum. Thus, considered as a whole, Jarosz urged

19

the jury to assess as JELD-WEN's damage a lump sum of $9.9 million for the future use of sixty-seven trade secrets. It was in that context that he told the jury that, if a lump sum of $9.9 million was assessed: "They [Steves] would be able to use this information for as long as they want in any way that they want." He underscored that point by telling the jury that: "A lump sum fee would allow them [Steves] to use the trade secrets as long as those are valuable – or the alleged trade secrets as long as they are valuable to Steves." TS Tr. 2208.

Whether inadvertently or intentionally, JELD-WEN put forth Jarosz's view of things to entice the jury to award royalty damages. Indeed, Jarosz's testimony that, if JELD-WEN received a reasonable royalty (in the amount that he posited), Steves could use the misappropriated trade secrets for as long as it wanted in any way that it wanted was reasonably calculated to be the predicate of a damage award in the amount that Jarosz postulated. Having secured a reasonable royalty award based on what Jarosz told the jury, JELD-WEN cannot now be heard to argue that Steves should be enjoined permanently from using the misappropriated trade secrets that Jarosz said that Steves could use for as long

as it wanted in any way that it wanted if the jury would award damages in the amount of $9.9 million.[8]

Moreover, in pursing that strategy and presenting that evidence, JELD-WEN also made the case that it had an adequate remedy at law if it was awarded damages. For that additional reason, JELD-WEN has failed to prove entitlement to an injunction.

For the foregoing reasons, COUNTERCLAIMANT JELD-WEN, INC.'S MOTION FOR PERMANENT INJUNCTION AGAINST COUNTERDEFENDANT STEVES & SONS, INC. (ECF No. 1631) will be denied. Having disposed of the request for injunctive relief in this fashion, there is no need to analyze JELD-WEN's arguments in support of injunctive relief under eBay.

It is so ORDERED.

/s/  *REP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: November 30, 2018

_____

[8] Because the jury found that fewer than sixty-seven alleged trade secrets had been misappropriated, it made a reduced award. (Memorandum Opinion, ECF No. 1779, p. 29).

21