UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEVES AND SONS, INC.,

    Plaintiff,

v.                              Civil Action No. 3:16cv545

JELD-WEN, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the request of Steves and Sons, Inc. ("Steves") for declaratory relief respecting the Doorskin Product Agreement (the "Supply Agreement") executed on May 1, 2012 between it and JELD-WEN, Inc. ("JELD-WEN"). The request for declaratory relief appears first in Steves' Complaint (ECF No. 1) wherein Steves sought a declaratory judgment on seven issues. Steves' original post-trial briefs persisted in, and supported, those requests. JELD-WEN opposed declaratory relief. Upon consideration of the Complaint, the Jury Verdict, and the briefing, the Court concluded that, although there appeared to be a basis for some declaratory relief, the briefing was inadequate to determine whether such relief ought to be granted and, if so, to what extent. Accordingly, the Court issued an Order requiring further briefing from both sides (ECF No. 1790). In response to that Order, Steves submitted PLAINTIFF STEVES AND SONS, INC.'S MEMORANDUM IN SUPPORT OF DECLARATORY RELIEF (ECF No. 1793) (the

"Decarlatory Relief Motion"). Therein, Steves specified that it now seeks declaratory relief only on four issues. They are:

(i) "the full range of JELD-WEN molded doorskin products" as set forth in Section 1 of the Supply Agreement means all doorskin designs currently manufactured by JELD-WEN or that may be manufactured by JELD-WEN during the remainder of the term of the Supply Agreement, such that the pricing provisions of the Supply Agreement shall apply to all doorskin designs currently manufactured by JELD-WEN or that may be manufactured by JELD-WEN during the remainder of the term of the Supply Agreement;

(ii) under Section 6 of the Supply Agreement, doorskin prices may increase or decrease as a percentage of the change in JELD-WEN's key input costs;

(iii) JELD-WEN is required to provide Steves with annual notice by November 30 of each year of the year-over-year percentage change (up or down) of the specified key input costs, and the resulting doorskin price increase or decrease to be charged for the following year (as JELD-WEN did in the price reduction notices sent by JELD-WEN in late 2012 and late 2013 (PTX-29, attached as Ex. 2, PTX-254, attached as Ex. 3)). Given the iterative nature of the method for calculating price changes under the Supply Agreement, and the fact that JELD-WEN has not provided Steves with key input cost change information for 2017, JELD-WEN must provide the accurate percentage changes in key input costs for 2017 in order to ensure accurate price changes as contemplated by the Supply Agreement going forward; and

(iv) in the first sentence of Section 8 of the Supply Agreement ("The [doorskins] will at all times be [1] of a quality satisfactory to STEVES, [2] meeting JELD-WEN's specifications, [3] fit for the intended purpose, and [4] subject to JELD-WEN's standard written warranty applicable to the [doorskins] (the 'Specifications').") , the term "Specifications" includes each of the four elements enumerated in the sentence, such that Steves is entitled to reimbursement pursuant to the terms of the Supply

2

>Agreement if doorskins do not meet any one of the four elements.

In their briefs, the parties have used shorthand designations to describe these four issues and the Court will make use of those designations in this Memorandum Opinion. For the reasons set forth below, the PLAINTIFF STEVES AND SONS, INC.'S MEMORANDUM IN SUPPORT OF DECLARATORY RELIEF (ECF No. 1793) will be granted in part and denied in part.

## DISCUSSION

The Declaratory Judgment Act permits a court to declare an interested party's rights where there is an "actual controversy" before the Court. 28 U.S.C. § 2201(a). A declaratory judgment under that statute is only "appropriate 'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" Centennial Life Ins. Co. v. Poston, 88 F.3d 255, 256 (4th Cir. 1996) (alteration in original) (quoting Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321, 325 (4th Cir. 1937)); see also Ross v. Reed, 719 F.2d 689, 694 (4th Cir. 1983) (facts underlying declaratory relief must show "'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment'" (quoting Golden v. Zwickler, 394 U.S. 103,

3

108 (1969)). Thus, "[w]here a declaratory judgment would not clarify future legal relations between the parties, the action serves no useful purpose and courts will not entertain it." Davison v. Plowman, 247 F. Supp. 3d 767, 782 (E.D. Va. 2017), aff'd, 715 F. App'x 298 (4th Cir. 2018). Moreover, the power to award declaratory relief is discretionary, even if a controversy exists. Poston, 88 F.3d at 256.

The declaratory relief that Steves requests is based on the jury's verdict wherein the jury decided certain disputes over provisions of the Supply Agreement. Contrary to JELD-WEN's contention, the fact that the resulting declaratory judgment would reiterate portions of the Verdict Form does not make Steves' request improper. Cf. Pitrolo v. Cty. of Buncombe, 589 F. App'x 619, 628-29 (4th Cir. 2014) ("Whether the declaratory relief requested restates the verdict . . . is not directly related to the question of whether an award of declaratory relief is warranted.")

A. The "Full Range" Issue

This issue arises under the term of Section 1 of the Supply Agreement which, in full, provides:

> PURCHASE AND SALE: JELD-WEN hereby agrees to sell to Steves and Steves hereby agrees to purchase from JELD-WEN, molded doorskin products according to the terms and provisions of this Agreement. *The products subject to this Agreement shall be the full range of JELD-WEN molded doorskins products (the "Products")*.

4

At trial, the jury was called upon to decide whether JELD-WEN breached Section 1 of the Supply Agreement by overcharging Steves for the Madison and Monroe styles of doorskins. (Complaint, COUNT TWO). The jury held that JELD-WEN had "breached the Supply Agreement by overcharging Steves for Madison and Monroe doorskins." Jury Verdict, ¶6 (ECF No. 1022). And, the jury awarded Steves damages of $1,303,035 on account of that breach. Id., ¶7.

Those verdicts were reached after the jury heard evidence and argument about the meaning of the phrase "full range of JELD-WEN molded doorskin products." Steves offered evidence that the phrase had been inserted to remedy the results of a disagreement that had arisen about the scope of products that were to be supplied by JELD-WEN under a previous agreement. JELD-WEN did not refute that evidence but, instead, contended that the phrase "full range of JELD-WEN molded doorskin products" referred only to products mentioned in Schedule 1 of the contract.

The evidence showed that JELD-WEN introduced the Madison and Monroe styles after the Supply Agreement was executed. However, the evidence proved that the Madison and Monroe styles were so-called "Craftsman" styles and that Schedule 1 reflected prices for Craftsman styles.

5

Steves also proved that, before trial, JELD-WEN had been charging considerably more for those two models of doorskin than called for by the Supply Agreement. The record is that JELD-WEN continues to charge the higher prices.

The issue that was submitted to the jury was whether or not JELD-WEN had overcharged Steves on those two products (see Jury Verdict, ¶¶ 6 and 7 (ECF No. 1022)). The jury was instructed on the point as follows:

> Section 1 of the Agreement provides that the terms of the agreement apply to the 'full range of JELD-WEN molded doorskin products.' Steves alleges that the Agreement requires JELD-WEN to sell all of its interior molded doorskin products current and future to Steves at the price that the Agreement requires, and that JELD-WEN breached the Agreement by refusing to sell two products introduced after the signing of the Agreement—the Madison and Monore styles-at the prices that the Agreement requires. JELD-WEN denies that it breached the Agreement because, it asserts, the Agreement only applies to the full range of doorskin products available at the time the parties entered into the agreement, and not any new products introduced subsequent to signing the agreement. JELD-WEN further contends that there was no price specified in the Agreement for future styles.

The jury resolved that issue against JELD-WEN. The evidence at trial demonstrated the Madison and Monroe doorskins fell within the scope of Section 1 of the Supply Agreement because they were Craftsman-style doors, and that Craftsman styles were included in Schedule 1 to the Supply Agreement. That, along with Edward Steves' testimony, was sufficient for the jury to find that the

6

Madison and Monroe styles were subject to the prices set out in Schedule 1.

However, the jury was not called upon to decide whether the "full range" language included all styles of non-Craftsman doorskins designed and made by JELD-WEN in the future. Therefore, even though there remains an actual controversy over the "Full Range" issue, the jury's verdict will not support a declaration of the sort requested by Steves. Accordingly, Steves, request for declaratory relief on the "Full Range" issue will be denied.

## B. The "Price Decrease or Increase" Issue

The request for declaratory relief on this issue is based upon Section 6 of the Supply Agreement and the jury's verdict awarding damages to Steves for a breach of Section 6 by JELD-WEN.

Section 6 provides as follows:

> b.  The Initial Price shall remain in effect for the duration of this Agreement unless a price increase or decrease takes place in accordance with the terms hereof
>
> c.  The Initial Price may vary on an annual basis by an amount that is the the [sic] percentage increase in JELD-WEN Key Inputs (shown in Schedule 2). The percentage of cost contributed as initially supplied by JELD-WEN in Schedule 2 is subject to verification by STEVES. JELD-WEN will calculate the variance utilizing production and shipments from JELD-WEN plant locations for the previous rolling twelve (12) month period October 31 to November 1 (for purposes of a November 2012 adjustment, the October 31, 2010 to November 1, 2011 period shall be used).

7

> Once this baseline cost is established utilizing the correct percentage and defined input costs, a percent change will be established. The sales price will then be adjusted to 50% of the percent change in cost.

At trial the parties put on evidence respecting whether the price adjustment provisions in paragraph 6b and 6c provided for increases and decreases in price, as Steves asserted, or only to price increases, as JELD-WEN asserted. At trial, Sam and Edward Steves testified that they understood the pricing provision in Section 6 to require price increases and decreases depending upon decreases or increases in JELD-WEN's Key Input costs (as those costs were identified in Schedule 2 to the Supply Agreement). John Ambruz, JELD-WEN's principal negotiator of the Supply Agreement, testified that he also understood Sections 6b and 6c to provide for price decreases and increases based on fluctuations of JELD-WEN's Key Input costs as those costs were defined in Schedule 2. Ambruz acknowledged that he had discussed this topic with both Edward and Sam Steves during the negotiations. Further, the record showed that, in 2012 and 2013, JELD-WEN had announced and implemented price decreases under the Supply Agreement based on a decrease in JELD-WEN's Key Inputs costs.

The jury resolved this dispute in favor of Steves when it awarded damages in the exact amount of overcharge damages sought by Steves for breach of Section 6 of the Supply Agreement. The damage award was for the precise amount explained by Steves' expert

8

who calculated what the proper prices would have been if the prices had been decreased to reflect decreases in JELD-WEN's Key Input costs. (Jury Verdict, ¶¶ 4 and 5 (ECF No. 1022)). To reach that verdict the jury necessarily had to agree that Section 6 provided for both price increases and price decreases. And, that result is fully consistent with the text of Sections 6b and 6c read as a whole.

Notwithstanding the verdict and the rather clear evidence supporting Steves position on the issue and the lack of evidence supporting the position taken by JELD-WEN, JELD-WEN persists in applying its own interpretation of the Supply Agreement. Accordingly, declaratory judgment is appropriate to resolve the continuing actual controversy over the issue. Based on the evidence and the jury's verdict, the Court declares that the pricing provisions of Section 6 apply to provide for price increases when JELD-WEN's Key Input costs increase and for price decreases when JELD-WEN's Key Input costs decrease.[1]

C. **The "Key Input Costs" Issue**

This dispute also arises under Section 6 of the Supply Agreement which, after explaining the mechanism for determining price increases or decreases, provides as follows:

> By no later than [November 30] of each year JELD-WEN shall provide notice to Steves of the price to be in effect for the coming year [January 1 – December 31]. In the event such

---

[1] The mode of increase/decrease is addressed by Section 6c as well.

> notice is not received by Steves by the close of business on November 30, Steves shall so notify JELD-WEN and JELD-WEN will have fifteen days (through December 15) to cure such omissions, failing which there shall be no price increase for the coming year.

Steves takes the view now, as it did at trial, that JELD-WEN is required to provide Steves with annual notice (by November 30 of each year) of the year-over-year percentage change, whether up or down, of the specified Key Input costs. JELD-WEN takes the view that it is not obligated under Section 6c to provide these Key Input costs to Steves in the event that it does not notify Steves of a price increase. And, JELD-WEN is correct that the text of Section 6c does not specify that JELD-WEN must provide notice when the Key Input costs decrease. However, Steves presented evidence at trial that it was important that Steves understand the year-over-year changes in the Key Input costs so that it could determine whether a price change was justified by changes in the Key Input costs; or whether decreases in the Key Input costs should be reflected in a price decrease that was not tendered by JELD-WEN. The record showed, that when there were price decreases in 2012 and 2013, JELD-WEN provided Steves with information about the changes in the Key Input costs (Trial Tr. 615:6-617:12; PTX-29; PTX 254). Moreover, the Supply Agreement provides for adjustments according to cumulative Key Input decreases, and it is important to understand the year-over-year

10

changes to understand the compounding price change methods that the Supply Agreement requires. Trial Tr. 1156:11-1157:4).

JELD-WEN has provided no Key Input costs information of any kind for 2017 or thereafter.[2] The record shows that JELD-WEN's costs have gone down so that a price decrease should occur under the terms of Section 6, as it was interpreted by the jury in arriving at its verdict.

Thus, there is an actual controversy between the parties on this issue, and declaratory relief is appropriate. JELD-WEN's position on this question depends solely on the theory that Section 6c obligates JELD-WEN to provide the changes in Key Input costs to Steves only if it gives notice of an increased price. It is correct that, if JELD-WEN increases the price, it is obligated to provide Steves with the year-over-year changes in Key Input costs.

That, however, is not the end of the matter because JELD-WEN's position cannot be squared with the finding made by the jury that, based on the understandings of the parties and their actual performance under Section 6 of the Supply Agreement, prices to be charged under Section 6 depend on increases and decreases in the Key Input costs. The undisputed evidence is that, without knowledge of the Key Input costs, Steves is unable to assess whether the pricing mechanism specified by Section 6 is satisfied

---

[2] Changes in Key Input costs for 2014, 2015 and 2016 were obtained during discovery and used by Steves' damage expert, Mr. Tucker to calculate overcharge damages.

11

by the prices that JELD-WEN is charging Steves. Therefore, if adopted, JELD-WEN's position respecting when it is required to provide the information respecting changes (increases or decreases) in its Key Input costs would set at naught the jury's findings that Section 6 provides for price increases and decreases dependent upon fluctuation in the Key Input costs, would be inconsistent with the jury's finding on that issue, would render meaningless the language of Section 6c respecting how price adjustments are to be made, and would be contrary to JELD-WEN's performance under Section 6 in 2012 and 2013.

An actual controversy exits between the parties on this issue, and it is appropriate to enter judgment declaring that Steves is entitled to year-over-year changes in the Key Input costs from JELD-WEN by virtue of Section 6 of the Supply Agreement.

JELD-WEN's argument that this aspect of Steves' request for declaratory relief is barred by its unclean hands in misappropriating JELD-WEN'S trade secrets is without merit. In support of its "clean hands" argument JELD-WEN relies on evidence presented at the trade secrets trial. However, JELD-WEN's argument ignores the fact that of the 67 alleged trade secrets, the jury found that 59 of them were not trade secrets and that among the 59

alleged trade secrets that were found not to have been trade secrets were all the variable costs information.³

D. **The "Quality" Issue**

This request is based upon Section 8 of the Supply Agreement. The Court previously has issued a decision addressing the quality provision in Section 8 of the Supply Agreement (ECF No. 1773), and vacating the jury's verdict (¶¶ 8 and 9, and ¶¶ 10 and 11, ECF No. 1022) based on Section 8. It appears that there is an actual controversy between the parties respecting Section 8. However, considering the trial record, the way the "Quality" issue was tried and presented to the jury, and the findings in the Memorandum Opinion, there is no predicate in the jury verdict upon which the Court could issue a declaration of the sort sought by Steves, and therefore the request for declaratory relief respecting the "Quality" issue must be denied.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: December 7, 2018

---

³ Trade Secret No. 46 identified a transfer cost that is not a Key Input cost. Trade Secret No. 47 identifies an initial projected cost, but it has no effect on Key Input cost as defined in Schedule 2 of the Supply Agreement.

13