STEVES AND SONS, INC.,

    Plaintiff,

v.                        Civil Action No. 3:16-cv-545

JELD-WEN, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on JELD-WEN, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST STEVES & SONS, INC. (ECF No. 1821) (the "Motion"). For the following reasons, the Motion will be denied.

## BACKGROUND

The factual and procedural background underlying this dispute has been addressed in detail in previous opinions. See First Summary Judgment Op. (ECF No. 1424) at 2-16; Second Summary Judgment Op. (ECF No. 1581) at 2-3. Thus, it is necessary only to provide a brief summary of the history for context.

Steves and Sons, Inc. ("Steves") is an independent manufacturer of interior molded doors, and it relies primarily on JELD-WEN, Inc. ("JELD-WEN") to supply it with doorskins, which are used to make the doors. In 2012, JELD-WEN acquired CraftMaster Manufacturing, Inc. ("CMI"). The proof about the doorskin market before the acquisition, and the substantial lessening of

competition in the doorskin market that the acquisition caused is set forth in the divestiture opinion. See generally Memorandum Opinion (ECF Nos. 1783 [redacted] and 1784 [under seal]). That Memorandum Opinion is incorporated herein by reference.

In 2016, Steves filed an action against JELD-WEN alleging, among other claims, a federal antitrust claim and several breach of contract claims. Those claims were tried to a jury in January 2018. The jury returned a verdict in favor of Steves on the antitrust and breach of contract claims. The Motion is directed only to the antitrust claims.[1]

## DISCUSSION

Motions for judgment as a matter of law are governed by Fed. R. Civ. P. 50. The question is whether a reasonable jury has "a legally sufficient evidentiary basis" to find in favor of the nonmoving party. Fed. R. Civ. P. 50(a). After a jury verdict has been returned, judgment as a matter of law shall be granted only when there is no legally sufficient evidentiary basis for a reasonable jury to find in favor of the nonmoving party. See Weisgram v. Marley Co., 528 U.S. 440, 453-54 (2000); Int'l Ground

---

[1] During discovery in this action, JELD-WEN discovered evidence that Steves worked with former JELD-WEN employees to obtain information from JELD-WEN that could possibly help Steves develop a doorskin manufacturing plant. Based on that evidence, JELD-WEN asserted counterclaims against Steves for misappropriation of trade secrets. JELD-WEN's trade secret counterclaims were tried to a jury in May 2018. The Motion is not directed to the verdict rendered in that trial.

Transp. v. Mayor of Ocean City, 475 F.3d 214, 218 (4th Cir. 2007); 9B Fed. Prac. & Proc. Civ. § 2524 (3d ed.).  The Court views all evidence in a light most favorable to the nonmoving party, drawing all legitimate inferences in that party's favor and in support of the jury's verdict.  Mayor of Ocean City, 475 F.3d at 218.  JELD-WEN presents three reasons[2] why judgment as a matter of law should be entered in its favor.  They are:

I.  JELD-WEN is entitled to judgment on Steves' antitrust claim because the evidence presented did not allow the jury to conclude that the 2012 acquisition caused Steves' claimed injury or provide a legally sufficient basis for measuring damages;

II.  JELD-WEN is entitled to judgment as a matter of law on Steves' Section 4 antitrust claim because Steves did not prove the required element of antitrust injury; and

III. Steves has not established a proper antitrust market, any injury to competition, or that any competitive harms outweighed the efficiencies from the acquisition.

Each will be considered in turn.

---

[2] JELD-WEN, INC.'S MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW (ECF No. 1822) at i (Table of Contents).

**I.   Steves Proved that the 2012 Acquisition of CMI Caused Steves'
Claimed Injury and Provided a Legally Sufficient Basis for
Measuring the Damages Sought by Steves**

The ORDER (ECF No. 1042), by denying the arguments presented
by JELD-WEN in JELD-WEN, INC.'S MOTION FOR JUDGMENT AS A MATTER OF
LAW AGAINST STEVES & SONS, INC. (ECF No. 968), held that: (1)
Steves had presented sufficient evidence from which a jury could
find that the acquisition of CMI in 2012 by JELD-WEN caused the
injuries asserted by Steves; and (2) Steves' evidence had provided
a legally sufficient basis for measuring damages.   Having
considered the entire record and the briefs addressed to the Motion
on the resurrection of that argument, the Court remains of the
view that Steves' proved both antitrust injury and its damages by
a preponderance of the evidence.

Steves presented substantial evidence that JELD-WEN doorskin
prices increased after the merger, which included prices charged
to Steves.[3]   Steves also showed convincingly that JELD-WEN,
Masonite, and CMI competed aggressively for Steves' business
before the merger[4] and that the pre-merger competition ended after
the merger.[5]   Additionally, Steves proved that JELD-WEN's price

---

[3] MEMORANDUM IN OPPOSITION TO JELD-WEN, INC.'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW (hereinafter "Steves' Opposition
at ___") (ECF No. 1834) at 3 & n.2.

[4] Steves' Opposition at 3 & n.2.

[5] Steves' Opposition at 3 & n.3.

4

increases were not caused by higher costs or by capacity shortages.[6] The evidence offered by Steves included internal documents showing that JELD-WEN fully understood how the acquisition had given it significant market power over its customers.[7] In a memorandum from Onex, the investment bank that owned JELD-WEN, Onex observed that the "acquisition of CMI made [JELD-WEN] and Masonite the only two manufacturers of [doorskins] in North America, which over time will improve our pricing power." PTX-206 at ONEX66413. An email exchange between JELD-WEN officials explained that, after the merger, JELD-WEN's customers had "few options." PTX-250.

JELD-WEN contends that Steves did not offer evidence of doorskin prices that it would have paid or the reimbursements that it would have received "but-for" the 2001 acquisition of CMI. That is incorrect. Professor Shapiro analyzed the way competition worked before the merger to identify a baseline against which the observed effects in the market could be judged. He explained fully how competition had occurred in the market before the merger, including price competition among JELD-WEN, CMI, and Masonite.

---

[6] Steves' Opposition at 3 & ns. 4 and 5.

[7] Steves' Opposition at 3.

Professor Shapiro then explained JELD-WEN's acquisition of CMI had affected competition. He began by analyzing the relevant market shares and market concentration information traditionally used by economists to compare the actual world (the world with the merger) to the "but-for" world (the world without the merger). Trial Tr. 2390:17-2391:4 (ECF No. 1036). He opined that the merger's effects on market shares and market concentration provided the strong prediction that merger would likely lessen competition substantially. Trial Tr. 934:15-935:5 (ECF No. 1031).

Professor Shapiro then explained how, after the merger, JELD-WEN had raised doorskin prices for all of its customers, including Steves. Trial Tr. 940:6-941:25, 945:14-946:14 (ECF No. 1031).[8] He noted that, even though JELD-WEN had a contract with Steves to set doorskin prices for the future, JELD-WEN sought to re-negotiate the agreement to obtain a higher price, Trial Tr. 951:9-951:22 (ECF No. 1031); then, it unilaterally imposed price increases inconsistent with the terms of the contract. Trial Tr. 954:18-957:7 (ECF No. 1031). Additionally, JELD-WEN terminated the agreement when Steves refused to give in to JELD-WEN's demand for additional price increases, the so-called "charge." Trial Tr. 953:11-954:3 (ECF No. 1031).

---

[8] There was substantial evidence of JELD-WEN's price increases to its doorskin customers.

6

Professor Shapiro then ruled out other plausible explanations for JELD-WEN's price increases. In so doing, he looked to see whether there were factors other than the merger that might have caused JELD-WEN's doorskin prices to increase, considering first whether the increases might have resulted from an increase in JELD-WEN's costs. Trial Tr. 973:11-977:23 (ECF No. 1031). JELD-WEN's costs, however, had decreased and therefore provided no basis for JELD-WEN's increased prices. Id. Professor Shapiro then considered whether increased demand for doorskins had caused the increases in JELD-WEN's prices but found that there was no such explanation. Professor Shapiro then confirmed that he had compared JELD-WEN's pre-merger prices with its post-merger prices to determine whether the difference was attributable to the loss of competition caused by the merger or to some other factor and concluded that, in fact, the merger was the cause of the higher prices. Id. Thus, Steves proved, by substantial evidence, that it paid a higher price than it would have paid absent the antitrust violation.

JELD-WEN offered counter evidence, but the jury rejected it. And, the Court is fully satisfied that the jury had a legally sufficient evidentiary basis to find in favor of Steves on this issue.

Steves also put in substantial evidence that, as a consequence of the merger by which JELD-WEN eliminated CMI has a competitor,

JELD-WEN was able to reduce the quality of its doorskins and to reverse its previous favorable reimbursement policy, imposing in its stead a "hard line" approach to dealing with Steves' claims for reimbursement for defective doorskins. Steves offered evidence that, before the merger, the quality of doorskins provided under the Supply Agreement was "really pretty good" and was "very consistent." Trial Tr. 520:17-24 (ECF No. 1028). And, Steves showed that it experienced few quality issues with Craftsman doors. JELD-WEN's key witness on this issue, Steven Fancher, observed, in a 2013 email, that after the merger, doorskins from all plants, including the Towanda plant that was acquired from CMI, were subpar and that "[t]hings [we]re really different from the CMI days." PTX-234; Trial Tr. 188:1-2 (ECF No. 1027). In fact, Fancher reported that all the independent doorskin manufacturers (of which Steves is one) "[we]re bitching." PTX-234; Trial Tr. 188:2 (ECF No. 1027). Moreover, Steves proved that, before the merger, JELD-WEN had honored most of Steves' claims for defective doorskins and had acted promptly to give Steves credit for the defective doorskins. However, after the merger, JELD-WEN became much more stringent in refusing to grant Steves' credit for defective doorskins, imposing onerous conditions that made it so costly for Steves to pursue claims for defective doorskins that it made no economic sense for Steves to assert those claims. In so doing, JELD-WEN's new reimbursement strategy effectively eliminated

reimbursements, which, before the merger, had been a necessary part of competition.

JELD-WEN offered evidence that quality did not decrease after the merger and that reduction in quality was not merger related. However, the jury was entitled to accept the evidence offered by Steves both as to the declining quality and the fact that the merger caused the decline.

JELD-WEN asserts that the evidence proved that JELD-WEN's acquisition of CMI did not injure Steves. That argument is largely based on the notion that the anticompetitive effects did not manifest themselves immediately after the merger. However, JELD-WEN cites no case holding that anticompetitive effects must manifest themselves immediately in order to be legally cognizable as the basis for a claim of substantial lessening of competition. Nor could the Court locate such authority.

In any event, the jury was free to conclude that, as Professor Shapiro testified and as JELD-WEN's own internal evidence showed, the merger gave JELD-WEN additional pricing power, and JELD-WEN took some time before exercising that power. Indeed, Onex, the owner of JELD-WEN, clearly made the point that it would take time to improve pricing power. And, there is substantial evidence that that is exactly happened.

In a related argument, JELD-WEN argues that its negotiating position with Steves before the merger—in connection to the

parties' 2003 Supply Agreement—was the same as it was after the merger—in connection with the 2012 Supply Agreement. That negotiation involved an attempt by JELD-WEN to obtain higher prices for so-called "CARB-compliant" doorskins. Considering Professor Shaprio's analysis—which showed that before the merger, JELD-WEN was unable to force Steves to pay the increased prices on CARB-compliant doorskins because Steves moved its business to CMI and Masonite—the jury was entitled to give no weight to JELD-WEN's position on that point.

Also, the evidence quite clearly showed that, after the merger, JELD-WEN began to charge higher prices for the Madison and Monroe doorskins (important styles to Steves) and that Steves had no choice but to submit to the higher pricing. So, in fact, the argument by JELD-WEN that its pricing of CARB-compliant doorskins before the merger undermines JELD-WEN's position on the issue. And, it was reasonable for the jury to have viewed this evidence as supporting Steves' contention that the merger gave JELD-WEN pricing power and the ability to impose price increases.

JELD-WEN next argues that the jury could not reasonably find that the merger caused issues with the doorskin quality because the issues had begun before JELD-WEN acquired CMI. To support that argument, JELD-WEN points to the testimony of Sam Steves that there were "some issues" in June and July 2012 (pre-merger). However, Steves also presented evidence about the significant

post-merger downturn in quality and the imposition of stricter and more limited reimbursement policies. The jury was entitled to accept that evidence and reject the counter-theory offered by JELD-WEN.

As the final aspect of the deficiency of the evidence about Steves' antitrust injury, JELD-WEN argues that Masonite had stopped selling doorskins to Steves months before the 2012 acquisition. However, Masonite's CEO, Fred Lynch, testified that Masonite did not cut off supply to Steves in 2012 and that negotiations between Steves and Masonite ended because Steves decided to sign a long-term contract with JELD-WEN.

The record also shows that, before the merger, Masonite sought to secure Steves' business and had been in competition with JELD-WEN and CMI for that business, but Masonite had refused to negotiate for a long-term supply agreement after the merger. Of course, before the merger there were three suppliers: Masonite, JELD-WEN, and CMI. After the merger, there were only two suppliers, and the record shows that there is virtually no significant competition between the two surviving entities, Masonite and JELD-WEN. The jury was entitled to rely on the evidence to conclude that Masonite's behavior towards Steves changed as a result of the elimination of CMI as a competitive alternative source from which Steves could acquire supply of doorskins.

The next component of JELD-WEN's argument is that Steves could not provide a legally sufficient basis for measuring damages. Steves asserted damages that were caused by JELD-WEN's high prices. The testimony of Professor Shapiro established that the Supply Agreement was a reasonable baseline against which to measure pre-merger prices because his testimony established that the Supply Agreement was a product of pre-merger competition and that the merger caused price increases and that other explanations (such as increased demands or costs) did not explain those price increases. It was therefore reasonable for the jury to conclude that Steves would not have incurred higher prices absent the merger.

Mr. Avram Tucker was the expert who provided the calculation of Steves' damages. His testimony established that the calculation was made in accord with standard and accepted methods and was based on the proofs in the case. JELD-WEN chose not to offer evidence of that sort and thus it did not provide its own calculation. Having made that decision, JELD-WEN must bear the consequences of failing to give the jury an alternative form of evidence from which to choose.

The evidence also established that JELD-WEN's reduced quality and the change in its reimbursement policy (changing from a customer-friendly policy of granting most of Steves' claims to a very strict policy) were caused by the merger. Tucker calculated the value of the reimbursement claims made by Steves that JELD-

12

WEN refused to accept. The jury was entitled to conclude from the evidence that was presented that, absent the merger, JELD-WEN would have continued to honor reimbursement claims as it had before in order to maintain customer good will, which was the reason for the initial lenient policy to begin with.[9]

JELD-WEN next seeks judgment as a matter of law on Steves' claim for future loss profits. On that theory, Steves presented persuasive evidence that, as a result of JELD-WEN's anticompetitive acquisition of CMI, Steves would go out of business in 2021. And, the jury accepted that evidence and awarded future lost profits based on the estimates that had been provided by Mr. Tucker. In the Motion, JELD-WEN makes the same arguments that it made when it presented its Motion for Judgment as a Matter of Law (ECF No. 968) earlier, and the Court has already decided the issue in denying that motion. See Memorandum Opinion (ECF No. 1042). Mr. Tucker provided proof that Steves stood to lose $46,480,581.00 in profits from the termination of the contract in 2021 through

_____

[9] JELD-WEN erroneously contends that the decision to set aside the jury's verdict with respect to quality related breach of contract damages—through JELD-WEN's reimbursements for defective doorskins and for doors incorporating defective doorskins, which is set out in a prior Memorandum Opinion (ECF No. 1773)— necessitates setting aside the verdict with respect to the quality related antitrust damages. However, the Memorandum Opinion setting aside the verdict with respect to the contract damages was based on the finding that Steves had not proved a breach of contract where the quality related antitrust damages had been shown to be caused by the merger. And that ground is not a proper one for setting aside the antitrust verdict.

2029. Trial Tr. 1209:14-1211:10 (ECF No. 1032). JELD-WEN's principal attack seems to be that Mr. Tucker failed to reduce his projections of Steves' future lost profits by backing out the effect of the merger. However, that argument is presented only in a general sense, and JELD-WEN does not point to what it believes Mr. Tucker failed to take into account or why Mr. Tucker should have taken those effects into account. Here too, JELD-WEN had an opportunity to present expert evidence at trial on this point. It did not do so. It cannot now make an argument when it failed to offer evidence at trial.[10]

---

[10] If JELD-WEN's argument on this point is that there were higher prices in the doors market caused by the merger and that Steves therefore earned higher profits from 2015 through 2017 and that Tucker should have accounted for those higher profits in his projections, the argument is an invalid one. Indeed, it is directly foreclosed by Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 493-94 (1968). See also Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc., 783 F.2d 159, 165 (10th Cir. 1986) (upholding a district court's exclusion of similar evidence about profitability and market share under Rule 403 as irrelevant because the presentation would have been time consuming and confused the issues); In re Cathode Ray Tube (CRT) Antitrust Litig., No. MDL 1917, 2016 WL 7800819, at *8 (N.D. Cal. Nov. 15, 2016) ("If the evidence is irrelevant or prohibited by Hanover Shoe, it should be excluded."); Columbus Drywall & Insulation, Inc. v. Masco Corp., No. 1:04-cv-3066, 2012 WL 12540321, at *1 (N.D. Ga. July 17, 2012) (stating that using an antitrust plaintiff's financial information and other downstream data when a defendant is not asserting a pass-on defense would be "an impermissible end-run around the rule announced in Hanover Shoe.").

## II. Steves Demonstrated Cognizable Antitrust Injury

JELD-WEN argues that Steves has not established antitrust injury because, according to JELD-WEN, Steves has shown only idiosyncratic harm to Steves that resulted from a breach of a private contract. The argument being made by JELD-WEN is the same argument that it made in its Memorandum in Support of its Motion for Partial Summary Judgment (ECF No. 376), and it cites the same decisional law as recited in that memorandum. That argument was rejected. Memorandum Opinion (ECF No. 976) at 18-24. Nothing has changed since then except that Steves has proved the injury. And, as was true in arguing for partial summary judgment, JELD-WEN "mischaracterizes Steves' Section 4 claim and ignores key differences between this case and those cited by JELD-WEN." Id. at 19. And, as the Court previously has held, "contractual harm can still constitute antitrust injury even if the parties' actions are bound by a contract." Id.

That is especially true where "the anticompetitive activity" injures competition that still exists notwithstanding the contractual agreement. See id. at 19-20. And, Steves introduced evidence showing that the merger injured competition that still existed notwithstanding the contract. See id. at 19-20; see also Trial Tr. 696:7-696:22 (ECF No. 1029) (discussing these contractual provisions); PTX-149. Further, JELD-WEN erroneously argues that other market participants were unaffected by the

anticompetitive effects of the merger. The evidence quite clearly showed, for example, that JELD-WEN increased doorskin prices to other doorskin customers, such as Excel, ABS, and Unidoor, and did so to an even greater extent than it raised prices to Steves. That those customers did not have supply agreements pre-dating the merger does not diminish the effect of the evidence that JELD-WEN raised prices.

## III. Steves Established a Relevant Antitrust Market

To begin, JELD-WEN contends that Steves did not properly define a relevant geographic market because Professor Shapiro did not include foreign doorskin suppliers in his analysis of relevant market participants. That position is wrong. Professor Shapiro agreed that the market shares of foreign suppliers who sell doorskins in the United States should be included. Trial Tr. 1005:15-1005:19 (ECF No. 1031). However, as Professor Shapiro testified, market shares of the foreign suppliers are nonexistent or negligible because he did not find any evidence of meaningful imports at the time. Trial Tr. 1114:25-1115:5 (ECF No. 1031). The entirety of the record established that Professor Shapiro was right. Although the evidence showed that other foreign suppliers have indicated an interest in entering the United States market, the record shows that none has done so in any significant way, even as of the time of trial. Indeed, JELD-WEN, when making this

argument, identified no foreign supplier whose current United States market share was overlooked by Professor Shapiro.

JELD-WEN then argues that the definition of product market used in Steves' case was flawed because Steves defined the market "as all of the doorskin designs and sizes the JELD-WEN sells to Steves." That is also wrong. Professor Shapiro defined the product market as "interior molded doorskins." Trial Tr. 1005:8-1005:9 (ECF No. 1031). He used the "hypothetical monopolist test" to ascertain whether buyers of interior molded doorskins would shift their purchases to other products in response to a nontransitory price increase of at least five percent in interior molded doorskins. Trial Tr. 1006:7-1007:23 (ECF No. 1031). In that analysis, he considered direct evidence of actual price competition resulting in price decreases of at least five percent, id.; he also considered the so-called "recapture analysis" that asks whether, when one manufacturer of interior molded doorskins raises its prices, purchasers shift to a different manufacturer of that same product. Id. He also applied the "critical elasticity analysis," which asks how much a price increase of all interior molded doorskins would reduce customers' purchases of certain products. Id. In each instance, Professor Shapiro expressed the opinion that it was not a close call that interior molded doorskins are a properly defined relevant antitrust market. Id.

Significantly, JELD-WEN's expert, Professor Snyder, did not dispute that conclusion. Trial Tr. 1007:24-1008:1 (ECF No. 1031).

Nor in the Motion papers has JELD-WEN identified any evidence that it offered at trial to refute the product market defined by Professor Shapiro. And, JELD-WEN (even in the Motion) never actually defines what it thinks should be the relevant product market, implying instead that "each size and style of doorskin is a separate relevant market." That, however, is wrong because it is settled that a single market can encompass a number of different products or services where the combination reflects commercial realties. United States v. Grinnell Corp., 384 U.S. 563, 572 (1966); see also, e.g., Brown Shoe Co. v. United States, 370 U.S. 294, 326 (1962); Image Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1204 (9th Cir. 1997); FTC v. Sysco Corp., 113 F. Supp. 3d 1, 26 (D.D.C. 2015). Those authorities all disprove the implicit assertion made by JELD-WEN in its argument that a product market was not properly defined.

As part of its last argument, JELD-WEN often says that the evidence shows that foreign doorskin suppliers and Masonite are potential sources of doorskins for Steves and others and that the jury's decision to the contrary was against the weight of the evidence. Those contentions invite the Court to weigh the evidence, which, of course, cannot be done. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 569 (4th Cir. 2015).

Moreover, Steves introduced substantial evidence that, after the merger, Masonite withdrew from the market except in a very limited fashion. The evidence also showed that neither Masonite nor Teverpan nor any other foreign suppliers are viable alternative suppliers of doorskins to Steves or anyone else in the United States market. Business documents from around the time of the merger and thereafter showed the inadequacy of foreign suppliers and Masonite as alternative sources of doorskins. The Court reached the same conclusion in the divestiture opinion. See Memorandum Opinion (ECF Nos. 1783 [redacted] and 1784 [under seal]) at 73.[11]

As part of the last argument, JELD-WEN argues that the jury did not hear any evidence that would allow it to conclude that any anticompetitive effects of the acquisition outweighed its efficiencies. But, JELD-WEN was permitted to present any evidence respecting the purported deficiencies generated by its acquisition of CMI. And it did present such evidence. That evidence, however, did not convince the jury that the merger did not lessen competition substantially. As the Court has previously held and

---

[11] What is more, when arguing the issue of divestiture, JELD-WEN itself argued that neither foreign suppliers nor Masonite could make up for the loss of supply to its internal customers and external customers that JELD-WEN would sustain if divestiture were ordered. Under those circumstances, and on the basis of the entire record, it does not lie in the mouth of JELD-WEN to make a contrary assertion.

as JELD-WEN itself has acknowledged, the possibility that potential efficiencies outweighed the anticompetitive effects is part of the defendant's rebuttal to the plaintiff's *prima facie* case. See JELD-WEN, Inc.'s Memorandum Regarding Efficiencies (ECF No. 865), at 2-3 (stating that whether an acquisition led to potential efficiencies is "an appropriate part of the defendant's rebuttal to the plaintiff's prima facie case—one way, among others, for the defendant to show that the concentration statistics alone do not tell the full story of an acquisition's likely effects" (emphasis added)). The decisional law is quite clear on that point. United States v. Anthem, Inc., 855 F.3d 345, 354-55 (D.C. Cir. 2017); FTC v. Penn State Hershey Med. Ctr., 838 F.3d 327, 347 (3d Cir. 2016); St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd., 778 F.3d 775, 790-91 (9th Cir. 2015); FTC v. Univ. Health, Inc., 938 F.2d 1206, 1222 (11th Cir. 1991). It was then JELD-WEN, not Steves, that had the burden on this issue, and the jury quite clearly concluded that JELD-WEN failed to meet its burden. Moreover, Steves presented significant evidence that the merger had actually resulted in higher prices and lower quality goods and that the merger actually reduced competition. The jury was free to accept the evidence offered by Steves and to reject

the positions put forward by JELD-WEN on the efficiencies issue. It did so.[12]

## CONCLUSION

For the foregoing reasons, JELD-WEN, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST STEVES & SONS, INC. (ECF No. 1821) will be denied.

/s/     _R E P_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March ___, 2019

---

[12] Nor did JELD-WEN meet the burden of proving that its asserted efficiencies benefited the customers in any meaningful way by way of lower prices or improved competition. And, indeed, JELD-WEN made no serious effort to present such a case.