UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| STEVES AND SONS, INC., )<br>                         Plaintiff, )<br>                         )<br>v.                              )<br>                              )<br>JELD-WEN, INC., )<br>                       Defendant. ) | Civil Action No. 3:16-cv-545 |

**REPORT AND RECOMMENDATION**

**I.   INTRODUCTION.**

There is a dispute between the parties over whether JELD-WEN may discontinue the manufacture and sale of three doorskin designs, specifically the Cashal, the Corvado, and the Coventry. Each are produced exclusively at the Towanda facility.[1] Steves and Sons, Inc. (Steves) contends that discontinuing the sale of these three designs violates the Court's Amended Final Judgment Order (ECF No. 1852) which requires JELD-WEN to "maintain the status quo at the Towanda facility" during the pendency of the appeal. Counsel for Steves presented argument opposing the discontinuation of these doorskin designs in letters to the Special Master dated April 29, 2019, and May 17, 2019. Counsel for JELD-WEN responded in a letter dated May 9, 2019. On July 11, 2019, the Special Master heard oral argument from counsel in a conference call.

---

[1] Initially, Steves also objected to the discontinuation of the Avalon doorskin design. Steves' Letter, 4/29/19, at 2. However, the Avalon doorskin design is not produced at the Towanda facility. Rather, the Avalon design is manufactured exclusively at JELD-WEN's Oregon facility. In light of this fact, Steves withdrew its objection to the discontinuation of the Avalon design during the parties' July 11, 2019 oral argument. Accordingly, this Report and Recommendation will only address the discontinuation of the Cashal, Corvado, and Coventry doorskin designs that are manufactured exclusively at JELD-WEN's Towanda facility.

For the reasons set forth below, I recommend the Court enter the attached order denying Steves' request to enjoin the discontinuation of the Cashal, Corvado, and Coventry designs as JELD-WEN has presented a legitimate business purpose to discontinue these three designs. The information illustrates that the cost and capacity savings associated with this discontinuation will not only raise JELD-WEN's EBITDA[2] but also will increase the Towanda facility's value to an acquiring company. Prior to the divestiture trial, JELD-WEN routinely evaluated its doorskin sales and regularly determined which of its designs should be discontinued due to lack of profitability. Simply stated, the proposed discontinuation is business as usual at Towanda. It is therefore beyond the purview of the Order and my Special Master duties (as outlined in ECF No. 1863) to prevent JELD-WEN from performing a similar function during the pendency of its appeal.

## II. BACKGROUND AND APPLICABLE COURT ORDERS.[3]

On December 14, 2018, the Court entered a Final Judgment Order in this antitrust case (ECF No. 1815). On March 13, 2019, the Court amended its Final Judgment Order (ECF No. 1852) (the "Order"). JELD-WEN appealed the Order to the United States Court of Appeals for the Fourth Circuit on April 12, 2019. This appeal is pending.

Under Paragraph (F)(2) of the Order and Fed. R. Civ. P. 53, this Court appointed a Special Master to oversee the divestiture of the Towanda facility to an acquiring company and "to assure that, until the divestiture is complete, the Towanda facility is preserved, operated, and

---

[2] A company's EBITDA accounts for its net income (or earnings) prior to the deduction of its interest, taxes, depreciation, and amortization expenses. This calculation is used to measure a company's operating performance.

[3] The background of this matter is well-known to the Court and parties and will not be reiterated except to the extent necessary for the disposition of the pending dispute.

2

maintained in good operating condition and in accord with applicable law." ECF No. 1852 at 6; *accord* ECF No. 1863 at 2. The Order states, in pertinent part:

> (a) JELD-WEN shall continue to maintain and operate the Towanda facility during the pendency of the appeal unless otherwise ordered by the Court; and
>
> (b) JELD-WEN shall not take any steps during the pendency of the appeal that would in any way reduce the value of the Towanda facility to a potential Acquiring Company or would make it more difficult or costly for the Acquiring Company to supply doorskins to Steves of the type, and in the quantity, that JELD-WEN supplies to Steves as of the date of the entry of this Order.

ECF No. 1852 at 8-9; *accord* ECF No. 1863 at 2-3.

There is also language in Section VIII of the Order requiring JELD-WEN to maintain the "status quo" at the Towanda facility. ECF No. 1852 at 13-14. That section pertains to the current Supply Agreement between the parties and reads, in pertinent part:

> **VIII. The Supply Agreement's Terms Shall Extend One Year Beyond the Conclusion of the Appeal if This Case Remains on Appeal Until September 10, 2021.**
>
> ... [I]f, as of September 10, 2021, this case remains on appeal, the term and terms of the Supply Agreement ... shall be extended for one year beyond the conclusion of the appeal to assure that Steves does not suffer ... irreparable injury ...; and
>
> JELD-WEN shall maintain the status quo at the Towanda facility during the pendency of this appeal, and Steves has the right under Federal Rule of Civil Procedure 64(d) to request an injunction pending appeal to lengthen the period of Steves' Supply Agreement with JELD-WEN for a greater period than provided in the above-paragraph.

*Id.*

In a letter brief of April 29, 2019, Steves objected to JELD-WEN's announced decision to discontinue the sale and manufacture of three doorskin designs (the Cashal, Corvado, and

3

Coventry) that are produced exclusively at the Towanda facility.[4] Steves claims the proposed discontinuation violates the Order by: (1) reducing the value of the Towanda facility to an acquiring company; (2) making it more difficult or costly for an acquiring company to supply doorskins of the type and in the quantity that JELD-WEN supplied to Steves as of March 13, 2019, and (3) disrupting the status quo at the Towanda facility during the pendency of the appeal. Steves' Letter, 4/29/19, at 1-2. Steves also argues the discontinuation of these designs allows JELD-WEN to improperly influence the market into purchasing other JELD-WEN designs that are not manufactured at Towanda. Steves' Letter, 5/17/19, at 3. Steves requests an order enjoining JELD-WEN from discontinuing these doorskin designs. Steves' Letter, 4/29/19, at 8.

JELD-WEN provided the Special Master with a responsive letter on May 9, 2019. In that submission, JELD-WEN argues the Order does not preclude it from making the strategic business decision to discontinue these three slow-moving doorskin designs. JELD-WEN notes that these three designs are not selling at an acceptable rate relative to other doorskin designs and estimates the elimination of these three designs could save the company up to $2,700,000.00 annually. JELD-WEN Letter, 5/9/19, at 2. Further, elimination of these three doorskin designs will create capacity for the production of more profitable designs at the Towanda facility. *Id.* It also claims that the discontinuation of unprofitable or slow-moving doorskin designs is routine as illustrated by its 2017 discontinuation of four molded and nineteen flush doorskin designs. *Id.* Lastly, it submits the Court's decision to divest the Towanda facility relieved all of the competition concerns arising from its acquisition of that facility, and, accordingly, it is beyond

---

[4] Steves also submitted a reply letter brief on May 17, 2019. The crux of the arguments made in both of Steves' letters are addressed herein.

the Special Master's purview to make decisions based on the perceived effect on JELD-WEN's anticompetitive actions.

On July 11, 2019, the Special Master held oral argument in a conference call on this issue. At that time, counsel for Steves and JELD-WEN effectively presented their arguments and additional factual information in support of their respective positions and answered all of the questions posed by the Special Master.

### III. DISCUSSION.

JELD-WEN quite properly asserts its right and advocates for its ability to continue to operate its business in a productive and profitable way at the Towanda facility pending its appeal. Steves, also quite properly, asserts its concern that discontinuing three doorskin designs could detract from the value of Towanda's product line in the market. The parties also offer differing interpretations of the mandate, from the Court's Order, that JELD-WEN should not do anything to affect the "status quo" at Towanda.

#### A. **The discontinuation will not reduce the value of the Towanda facility.**

The information provided to this Special Master does not support Steves' claim that the discontinuation of the three designs will reduce the value of the Towanda facility. Rather, the evidence suggests that the discontinuation will be beneficial to the Towanda facility's EBITDA. Within its May 9, 2019 letter brief and during its oral argument, JELD-WEN identified the value that discontinuing the three designs would provide to the Towanda facility. JELD-WEN slated these designs to be discontinued because they were determined to be slow-moving and unprofitable. According to JELD-WEN's data, the four designs initially objected to amounted to approximately 4% of the doorskins it manufactured in 2018 and approximately 7% of Steves'

2018 doorskin purchases. As of the first 27 weeks of 2019, the three presently contested designs amounted to 7.4% of JELD-WEN's total doorskin sales and only 5.8% of JELD-WEN's doorskins purchased by Steves. Specifically, JELD-WEN provided the following valuation of the designs for the first 27 weeks of 2019:

| Design | Steves' purchases (%) | Total sales (%) |
|---|---|---|
| Corvado | 1.1 | 1.3 |
| Cashal | 1.8 | 3.0 |
| Coventry | 2.9 | 3.1 |
| TOTAL | 5.8 | 7.4 |

JELD-WEN established that the three designs are underperformers in the market when compared to other more popular designs.

In addition to lagging sales for the three designs, there is a cost savings to consider. JELD-WEN estimated that the elimination of these designs could save it $2,700,000.00 annually. The discontinuation will also result in capacity for JELD-WEN to produce greater quantities of its more profitable designs. The cost and capacity savings associated with this discontinuation would raise JELD-WEN's EBITDA at the Towanda facility — a fact that was not contested by Steves. JELD-WEN's discontinuation of the slow-moving designs will also create capacity for the production of a larger volume of its more profitable designs or the production of new designs, allaying Steve's concerns that the discontinuation will reduce the volume and capacity at Towanda.

Steves claims "any new buyer would almost certainly prefer that Towanda is able to make and sell [the discontinued designs] to compete against JELD-WEN's [comparable designs]." Steves' Letter, 4/29/19, at 5. This is no doubt a reference to the similarity in designs between two doorskin models produced by JELD-WEN, one at Towanda and one in another JELD-WEN plant. This may not necessarily be a problem. It would be difficult to predict the

6

doorskin style demand at the time the appeal in this case is decided. However, it is not difficult to envision that any acquiring company would prefer the Towanda facility remain profitable and produce larger quantities of highly sought after doorskin designs. The financial health of the Towanda plant will likely be the most important factor in an acquiring company's bid if the facility is divested. Concerns about which Towanda doorskin designs complement designs from other manufacturers or from other JELD-WEN plants will be a secondary factor, at best.

### B. The discontinuation will not make it more costly or difficult for an acquiring company to produce doorskins for Steves.

The information provided by the parties does not support Steves' claim that the proposed discontinuation will make it more costly or difficult for an acquiring company to produce doorskins for Steves of the type and in the quantity purchased by Steves in early 2019. Currently, JELD-WEN intends to discontinue the manufacture of three of its slow-moving designs at the Towanda facility. As witnessed by this Special Master during a recent tour of the Towanda facility and as confirmed by the General Manager of the facility during that tour, JELD-WEN does not destroy any of the dies used in production at the facility. Rather, the dies are placed on the lines, and subsequently removed, as supply and demand warrant. The dies that are not in use are stored and maintained in the facility for future use. No dies are destroyed. If the purchaser of the Towanda facility desires to resume production of the discontinued designs, the dies are available, and the new owner can place the discontinued designs back into production.

The only purported cost or difficulty associated with the discontinuation of a design would amount to the cost and time spent by an acquiring company to replace the die accompanying this design on the production line should it elect to reintroduce the design

following acquisition. Steves claims these potential reintroduction costs should prevent JELD-WEN's proposed discontinuation. It appears that Steves is speculating that an acquiring company would want to produce these three, presently slow-moving designs in an effort to directly compete with JELD-WEN following acquisition. Steves' Letter, 4/29/19, at 5-6. The information provided by JELD-WEN suggests otherwise.

The three designs at the subject of this dispute are slow-moving and account for only 7% of Steves' 2018 purchases and 5.8% of Steves' 2019 purchases (as of the first 27 weeks of the year). These values demonstrate that Steves is reducing its demand for doorskins of these designs on an annual basis. Projecting forward to the time of divestiture and the subsequent acquisition of the Towanda facility, neither Steves, JELD-WEN, nor this Special Master can predict the precise quantity of these designs that will be in demand. However, the current data, coupled with the basic knowledge that new doorskin designs will certainly be created and produced in the interim, suggests Steves will likely not acquire these designs in quantities matching its purchases in 2018 or 2019.

During oral argument, all parties agreed that the production of doorskins cannot remain stagnant during the course of the appeal. Rather, the doorskin production must fluctuate monthly in relation to customer demands. This normal fluctuation will likely result in greater profitability and increased EBITDA. Therefore, the discontinuation of these designs will likely support the profitability of the Towanda facility, which will benefit any acquiring company.

### C.     The discontinuation will not disrupt the status quo of the Towanda facility.

The discontinuation of these designs is consistent with maintaining the status quo of the Towanda facility. The "status quo" language cited by Steves does not control the

8

discontinuation issue. This language is found in the section of the Order that pertains to the parties' existing Supply Agreement. Specifically, the Order states, if the appeal is still pending on September 10, 2021: (1) the Supply Agreement should be extended for one year; (2) the status quo should be maintained at the facility, and (3) Steves may petition the Court to extend the Supply Agreement beyond this one-year period. ECF No. 1852 at 13-14. Since the discontinuation issue does not impact the Supply Agreement and it is not yet September 10, 2021, the "status quo" language does not apply to the issue presently pending before the Special Master.

To the extent the Court deems that provision of the Order to be applicable to this dispute, the discontinuation of these designs is entirely consistent with the status quo of the Towanda facility. Evidence reveals that JELD-WEN discontinued the sale of four molded and nineteen flush doorskin designs in 2017. The discontinuation (or retirement) of these designs also coincides with the 2014 skin rationalization slides attached to Steves' May 17, 2019 submission to the Special Master. Steves' Letter, 5/17/19, Ex. 1, at 61-62. These skin rationalization slides were a portion of an internal JELD-WEN PowerPoint presentation that outlined its 2014 molded skin strategy. *Id.* at 1. These slides identified various doorskin designs that were going to be "retired" and replaced with similar models. *Id.* at 61-62. The evidence illustrates that JELD-WEN habitually evaluates and discontinues doorskin designs.

Since the status quo of a business constitutes the circumstances and parameters surrounding its business practices, the routine discontinuation of slow-moving designs certainly coincides with the status quo of the Towanda facility. Similar to the rationale that undercuts Steves' prior arguments, the status quo of a manufacturer cannot simply be a static moment in time. Since it was the routine and practice of JELD-WEN to evaluate its doorskin sales and

determine which of its designs were slow-moving, unprofitable, and should be discontinued, JELD-WEN should not be precluded from performing similar functions during the pendency of its appeal.

### D. The Order mandating divestiture has cured the concerns about anticompetitive behaviors in the doorskin market.

Steves has argued throughout its submissions that JELD-WEN should be precluded from discontinuing these designs in light of the Court's finding that JELD-WEN has already engaged in anticompetitive acts with respect to the Towanda facility. This Special Master believes that the Order mandating the divestiture of the Towanda facility has adequately remedied any anticompetitive actions taken by JELD-WEN with respect to the Towanda facility.

This Special Master's duties are limited by the Order and the Court's subsequent appointment order. In accordance with those orders, this Special Master recommends that the Court deny Steves' request to enjoin JELD-WEN's discontinuation of the manufacture of the Cashal, Corvado, and Coventry designs.

### IV. CONCLUSION.

For the reasons outlined above, I recommend that the Court enter the proposed order that is attached as Exhibit A.

It is hereby ORDERED that Steves and Sons, Inc., file this Report and Recommendation with the Court via Electronic Case Filing on or before Wednesday, September 4, 2019.

This Report and Recommendation is filed pursuant to Fed. R. Civ. P. 53(e). The parties may serve and file specific written objections to this Report and Recommendation within twenty-one (21) days from this date. Fed. R. Civ. P. 53(f).

BY THE COURT,

Dated: September 3, 2019

Hon. Lawrence F. Stengel (Ret.)
Special Master

cc: Hon. Robert E. Payne (via email)
Lawrence E. Buterman, Esquire (via email)
Kyle W. Mach, Esquire (via email)

11