IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



STEVES AND SONS, INC.,

    Plaintiff,

v.                          Civil Action No. 3:16-cv-545

JELD-WEN, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the PLAINTIFF STEVE AND SONS, INC.'S MOTION FOR FURTHER RELIEF UNDER 28 U.S.C. § 2202 (ECF No. 1906) (the "Motion") wherein Steves and Sons, Inc. ("Steves") seeks a declaration of certain rights and obligations under the Doorskin Product Agreement (the "Supply Agreement") executed on May 1, 2012 between Steves and JELD-WEN, Inc. ("JELD-WEN").

The lengthy and complex history of this litigation is set out in full in previous opinions, including in the MEMORANDUM OPINION (ECF No. 1813) issued on December 7, 2018. (See also ECF No. 976; ECF No. 1424; ECF No. 1581.) In Count Two of its Complaint against JELD-WEN, Steves alleged, inter alia, that JELD-WEN had breached, among other things, Section 6 of the Supply Agreement; and Steves sought both damages for the alleged breach and a declaration of rights respecting the provisions of Section 6. The jury found for Steves on Count Two and awarded damages against JELD-WEN.

Thereafter, the Court issued an Amended Final Judgment Order (ECF No. 1852) in which it declared, among other things, that: (1) the Supply Agreement (ECF No. 5-1) provided for both price increases and decreases when JELD-WEN's Key Input costs increased or decreased, respectively; and (2) that the Supply Agreement required JELD-WEN to give Steves annual notice of changes in Key Input costs and doorskin prices. In the Motion, Steves requests further relief based on these two declarations. For the reasons set forth below, the Motion will be granted.

## I. Factual and Procedural Context

At trial, the jury found that JELD-WEN had breached Section 6 of the Supply Agreement by overcharging Steves for Madison and Monroe doorskins in the amount of $1,303,035 and in the amount of $8,630,567 for all other doorskins. (ECF No. 1022 ¶¶ 4-7.) Section 6 provides, in relevant part, as follows:

> a. The price for Product delivered to STEVES' facilities in effect on the date hereof will be as shown in Schedule 1 (the "Initial Price").
>
> b. The Initial Price shall remain in effect for the duration of this Agreement unless a price increase or decrease takes place in accordance with the terms hereof.
>
> c. The Initial Price may vary on an annual basis by an amount that is . . . the percentage increase in the JELD-WEN Key Inputs (shown in Schedule 2). The percentage of cost contributed as initially supplied by JELD-WEN in Schedule 2 is subject to verification by STEVES.

2

> JELD-WEN will calculate the variance
> utilizing production and shipments from
> JELD-WEN plant locations for the previous
> rolling twelve (12) month period October
> 31 to November 1 . . . . Once this baseline
> cost is established utilizing the correct
> percentage and defined input costs, a
> percent change will be established. The
> sales price will then be adjusted to 50%
> of the percent change in cost. By no later
> than [November 30] of each year, JELD-WEN
> shall provide notice to STEVES of the
> price to be in effect for the coming year
> (January 1 – December 31). In the event
> such notice is not received by STEVES by
> the close of business on November 30,
> STEVES will so notify JELD-WEN and JELD-
> WEN will have 15 days (through December
> 15) to cure such omission, failing which
> there shall be no price increase for the
> coming year. If such notice specifies a
> price to be in effect for the coming year
> that results in a 5% or greater increase
> over the then-existing price, however,
> STEVES may, upon written notice to JELD-
> WEN, terminate this Agreement effective
> immediately . . . .

(ECF No. 5-1 at 4.) Section 6 governs price increases over the course of the Supply Agreement. In sum, it provides for yearly adjustments to doorskin prices based on changes in JELD-WEN's costs of certain so-called "Key Inputs" related to the manufacture of doorskins that Steves was to purchase under the Supply Agreement.

The evidence showed that JELD-WEN had breached Section 6 by: (1) not properly calculating its year-to-year costs for the Key Inputs, resulting in inaccurate cost determinations; and (2) not reducing prices to reflect reduced Key Input costs in the years when those Key Input costs decreased. Based on the jury's verdict

3

and the record, the Court granted Steves' request for declaratory relief under Section 6 of the Supply Agreement in December 2018, (ECF No. 1813), and reiterated in its Amended Final Judgment Order that:

> (1) The pricing provisions of Section 6 of the Doorskin Product Agreement (the "Supply Agreement") (ECF No. 1793-1) apply to provide for price increases when JELD-WEN's Key Input costs increase and for price decreases when JELD-WEN's Key Input costs decrease; and
>
> (2) JELD-WEN is required to provide STEVES with annual notice by November 30 of each year of the year-over-year percentage change of the Key Input costs in the Supply Agreement, and the resulting doorskin price increase or decrease to be charged for the ensuing year.

(ECF No. 1852 at 12-13.)[1] The Amended Final Judgment Order, albeit in its discussion of Steves' antitrust claims, also noted that the Court "retains jurisdiction to enable any party to this Order to apply at any time for further orders and directions as may be necessary and appropriate to carry out or construe this Order, . . . to enforce compliance, to punish violations of its provisions, and to assure that the provisions of this Final Judgment Order are fully satisfied." (Id. at 9.)

---

[1] The Motion does not implicate any aspect of the verdict (ECF No. 1022) or the Amended Final Judgment Order (ECF No. 1852) respecting the jury's award of damages for JELD-WEN's violation of the antitrust laws or the requirement that JELD-WEN divest itself of the Towanda facility and business.

### a. Steves' Evidence at Trial

Steves' expert, Avram Tucker ("Tucker"), testified at trial as to Steves' damages from the overcharges that JELD-WEN imposed on doorskin prices. (ECF No. 1910 at 3.) According to Tucker, JELD-WEN overcharged Steves by almost 8.88%. Tucker calculated the overcharge damages for the Madison and Monroe doorskins as $1,303,035 and for all other doorskins as $8,630,567. (ECF No. 1907-1 at 1195-96.) In its verdict on Count Two, the jury awarded Steves damages in the amounts to which Tucker testified. (ECF No. 1022 ¶¶ 4-7.) In the Motion, Steves argues that, by "awarding Steves 8.88% of its total relevant purchases from JELD-WEN, the jury established unequivocally that JELD-WEN overcharged Steves by 8.88%." (ECF No. 1910 at 4; see also ECF No. 1907-1 at 1195 (Tucker testifying that "[i]f you look on the right side, it says 7.87 percent, which is what I determined the price decrease should be. If you compare that to the just over 1 percent, you'll see that the overcharge is about 9 percent.").)

At trial, JELD-WEN chose not to present evidence about how to calculate Key Input costs or the issue of overcharge damages under Count Two. Instead, JELD-WEN defended Count Two by arguing that JELD-WEN was not required to reduce prices when Key Input costs decreased. (See generally ECF No. 1036.)

### b. JELD-WEN's Post-Trial Billing

In the Motion, Steves alleges that, after the jury's verdict in February 2018, JELD-WEN continued to charge for the rest of 2018 the same prices that it had charged in 2017. (ECF No. 1910 at 7.) It is beyond dispute that the Supply Agreement requires JELD-WEN to give Steves annual notice by November 30 of any year-over-year percentage changes in the Key Input costs and any consequent increases or decreases in doorskin prices. (ECF No. 1852 at 13.) In the Motion, Steves alleges that JELD-WEN "did not provide Steves with any such notification or comparative Key Input cost information in November 2017." (ECF No. 1910 at 7.) JELD-WEN does not say otherwise as to 2017. The following year, in November 2018, JELD-WEN informed Steves that:

> there will be a price change for JELD-WEN molded door skins for 2019. The change in the Key Inputs is 2.17%, of which Steves' portion is 1.09%. Effective January 1, 2019, the change in your molded skin pricing will be +1.09%.

(ECF No. 1910-1 at 2.)

After the Court granted declaratory relief to Steves in December 2018, (ECF No. 1813), JELD-WEN and Steves exchanged several letters about prices under Section 6, (see, e.g., ECF No. 1910 at 8-11). Steves took the position that JELD-WEN's failure to adjust its prices meant that it was continuing to overcharge Steves and that JELD-WEN was flouting the rulings in Steves' favor on the overcharge issue. (See ECF No. 1910-5 at 1-4; ECF No. 1910

at 9.) JELD-WEN's position was that "any reliance on statements or rulings from the [litigation], or the jury's verdict in that matter, to amend or add to the parties' obligations under the Agreement is, at best, premature." (ECF No. 1910-4 at 2.) In January 2019, JELD-WEN sent Steves a chart containing its 2019 prices. (ECF No. 1910-9.)

### c. Steves' § 2202 Motion

In the Motion, Steves asks the Court, pursuant to 28 U.S.C. § 2202, to award Steves damages from JELD-WEN's overcharges from February 15, 2018—the date of the jury verdict (ECF No. 1022)—to May 31, 2019—the date of Steves' § 2202 motion.[2] (ECF No. 1910 at 2.) The parties have stipulated that Steves' total purchases from JELD-WEN during this time period were: $3,351,192 for Madison doorskins; $2,996,241 for Monroe doorskins; $38,778,236 for all other types of doorskins; and $28,937,326 for doorskins from the Towanda plant. (ECF No. 1951 at 2.) They have also stipulated that Steves received a $2,332,984 credit for prompt payment and defective doorskins and that Steves' total net purchases, including the credit, were thus $71,730,011. (Id.)

At the September 10, 2019 evidentiary hearing on the Motion, Steves requested $7,083,013 in damages because of JELD-WEN's alleged failure to adjust post-verdict prices charged in 2018 and

---

[2]    Steves' counsel confirmed at oral argument that the requested relief ran only until May 31, 2019. (ECF No. 1966 at 4.)

2019 to comply with the jury's verdict and the Court's orders for declaratory relief, (ECF No. 1813; ECF No. 1852). (ECF No. 1966 at 42.) JELD-WEN had previously calculated the overcharge damages from 2018 to be only $1,722,452. (ECF No. 1910-12 at 3.) At the September 10, 2019 evidentiary hearing, JELD-WEN clarified that the total overcharge damages were $5,695,362, assuming that Tucker's 8.88% overcharge was correct. (ECF No. 1966 at 75-76, 138.) However, JELD-WEN also contended that, under its own methodology—*i.e.*, not using the 8.88% overcharge as a baseline—overcharge damages were instead $2,682,702. (Id. at 76, 138.)

### 1. Steves' Proposed Method for Calculating Damages

At the September 10, 2019 evidentiary hearing, Tucker, Steves' expert who previously testified at trial, testified that, using the interpretation of Section 6 determined by the Court, in "2013, the corrected price change would be a negative .15 percent; 2014, negative 2.68 percent; 2015, negative .57 percent; 2016, negative 2.38 percent; 2017, negative 2.32 percent for a cumulative reduction in the prices of negative 7.87 percent." (ECF No. 1966 at 29; see also ECF No. 1907-2 at 9.) Tucker also explained that, instead of decreasing prices by 7.87%, JELD-WEN increased them by 1.11% such that there was an "approximate overstatement of nine percent in 2017." (ECF No. 1966 at 30.) Tucker "us[ed] 2017 as a baseline for what the prices should have been . . . for each door skin style and size" before comparing that baseline to what

JELD-WEN charged in 2018. (Id. at 33.) "[B]ecause [JELD-WEN] did not reduce its prices for the effect of [Tucker's] analysis and the jury decision, there was a similar overcharge in 2018." (Id.) Tucker determined that there was a "similar amount of overcharge in 2019" as well because, although the "should-have-been prices" should have gone up by 1.8%, JELD-WEN's "actual prices went up by 1.09 percent." (Id. at 33.) The baseline overcharge was 9.87%. (ECF No. 1910 at 4; see also ECF No. 1907-1 at 1195.)

JELD-WEN challenged this figure because Tucker had presented an overcharge percentage of 9.87%, whereas Steves had stated the overcharge was 8.88% in its briefing. Tucker explained that the difference occurred because of "some Jeld-Wen mis-pricing, not significant, and then the Madison and Monroe doors [which JELD-WEN prices differently] are higher than 8.8 percent." (ECF No. 1966 at 57-58.) The $7,083,013 figure Tucker calculated "includes the 8.8 percent, but there's these other issues including the Madison and Monroe doors that make it a little bit higher." (Id. at 59.)

Tucker then multiplied the overcharge per type of doorskin by the number of doorskins purchased to reach Steves' overall amount of damages. (See id. at 33-37.) He "determined the overcharge amounts [to be] 5,870,527 [dollars] for designs other than Madison and Monroe [doorskins], again for the period from February 15th, 2018, to May 31st, 2019. For Madison [doorskins], the overcharge

amount was $521,508, and for Monroe [doorskins,] it was $690,978."
(Id. at 42.) The total overcharge was consequently $7,083,013.
(Id.) Given that the Supply Agreement was "relatively silent" on
how to define costs for the Key Inputs, Tucker chose to use net
costs, as opposed to gross costs, because, in his view, "[g]ross
costs were not [JELD-WEN's] actual costs." (Id. at 46-47.)

Also, between 2012 and 2017, JELD-WEN closed its Marion and
Dubuque plants, acquired the Towanda plant, and "brought the Dodson
plant online." (Id. at 47-48.) The Supply Agreement did not
specify how to account for the opening and closing of the plants.
(See generally ECF No. 5-1.) Tucker testified that, if JELD-WEN
"didn't have the costs because [it] didn't own the plant, [Tucker]
didn't include any costs. If [JELD-WEN] had the plants because
[it] owned it, then [Tucker] included them." (ECF No. 1966 at
48.) Tucker specified that he looked at JELD-WEN's overall net
costs, not the changes in input costs on a plant-by-plant basis,
and noted that JELD-WEN's overall costs included the costs from
each plant. (Id. at 48-49.) In other words, Tucker calculated
JELD-WEN's Key Input costs from all of its plants together and did
not calculate costs associated with Towanda separately from other
plants' costs. (Id. at 51.)

## 2. JELD-WEN's Proposed Method for Calculating Overcharge Damages

JELD-WEN contends that the overcharge amount should be, at a maximum, $5,695,362. Curtis Hicks, of JELD-WEN's finance department, explained the basis for that amount.

To understand JELD-WEN's theory of overcharge damages and Hicks' testimony, it is important to keep in mind that JELD-WEN classifies plants as either a "legacy plant"[3]—a plant JELD-WEN owned before it acquired Craftmaster International ("CMI")—or as the Towanda plant ("Towanda" or the "Towanda facility"). (Id. at 49-50, 63-64.) Hicks testified that JELD-WEN uses different methodologies to determine costs at Towanda and costs at the legacy plants. The first methodology uses Towanda's system, known as the Integrated Financial System ("IFS"), that tracks all purchasing, manufacturing, and usage data to determine the "actual cost of materials used in manufacturing." (Id. at 63-64.) The second methodology, the Titan system, is used at the legacy plants to ascertain costs. (Id.) The Titan system does not track actual costs of materials used in the manufacturing process. Therefore, cost data at the legacy plants were discerned by ascertaining the cost of purchasing the materials (as determined from the invoices).

---

[3]    JELD-WEN's legacy plants include West Virginia, Louisiana, Oregon, Marion, and Dubuque, Iowa. (ECF No. 1966 at 64.) However, JELD-WEN sold and closed the Dubuque and Marion plants, respectively, before 2017. (Id. at 80-81.)

(Id. at 64-65.)  JELD-WEN then calculates the average cost of materials and the percentage change in the average cost by year for each plant separately.  (Id. at 63-64.)

After analyzing the plants' costs under the two methodologies and to incorporate Towanda's costs that it calculated separately from the legacy plants' costs, JELD-WEN subsequently "create[s] the weighted average" and, using a "conversion factor," combines the two calculated percentages from Towanda and the legacy plants' costs into a "total percentage."  (Id. at 64-65, 69, 73.) According to Hicks, JELD-WEN's legal counsel "found a conversion factor" that was a standard, publicly-available, and "acceptable or more widely acceptable" factor.  (Id. at 73.)  JELD-WEN subsequently adopted that conversion factor.  Then JELD-WEN "went back and applied that new conversion factor to all years" to ensure that there was "no impact to the price calculation" and that all years were calculated consistently.  (Id. at 73-74.)

To explain why JELD-WEN calculated Towanda and the legacy plants' costs separately, Hicks testified that "the formulation of the products, of the skins, the chemical composition, is significantly different and uses raw materials that are significantly different.  Part of that difference is they have significantly different costs."  (Id. at 66.)  The "predominant difference" between Towanda and the legacy plants is the resin they use.  (Id. at 66-67.)  Towanda uses linseed oil and phenol

12

formaldehyde resin, which costs half as much as the resin the legacy plants use; meanwhile, the legacy plants use an MDI resin and do not use linseed oil. (Id.)

Hicks believed that, because of the differences between Towanda and the legacy plants, to calculate their costs together in one calculation would "greatly skew the results of the calculation." (Id. at 66.) Hicks explained that "Towanda coming into the calculation with [its], in some cases, considerably lower costs, . . . artificially lowers the average cost of the raw materials." (Id. at 87.) However, Hicks acknowledged that JELD-WEN did not use this weighted average calculation for any purpose other than the contract with Steves in part because the calculation "completely ignores usage." (Id. at 68, 70.) Instead, when making its business decisions, JELD-WEN typically looks at the total overall manufacturing cost. (Id. at 68.)

Using the weighted-average, plant-by-plant approach, Hicks testified that JELD-WEN's Key Input costs from 2016 to 2017 increased by 0.94%. (Id. at 74.) However, JELD-WEN did not increase Steves' prices in 2018. (Id.) Hicks testified that costs changed in 2019 and that JELD-WEN increased Steves' prices by 1.09% that year. (Id. at 74-75.) When first calculating the overcharges for 2018 and 2019, Hicks assumed that Tucker's calculation that the overcharge in 2017 was 8.88% was correct. (Id. at 75.) Because JELD-WEN did not "pass [the 0.94% increase in costs in 2018] on to

13

Steves, [JELD-WEN] felt that should be netted off the total increase," even though JELD-WEN had not given Steves the requisite notice of that increase. (See id.) In contrast, JELD-WEN passed the increase in costs to Steves in 2019, meaning that the increase in costs that year "has no effect" and that the overcharge JELD-WEN calculated for 2018 remained the same in 2019. (Id.) Thus, accepting Tucker's calculations to be true, Hicks concluded that "the net analysis . . . should be a 7.94 percent overcharge [in both 2018 and 2019,] instead of the 8.88 [percent overcharge Tucker calculated]." (Id.)

To determine what JELD-WEN believed the baseline price for doorskins should have been in 2018 (putting aside Tucker's baseline overcharge of 8.88%), Hicks looked at JELD-WEN's Key Input costs from 2013 onward and redid all of the calculations using JELD-WEN's "methodology of separating the plants." (Id. at 76.) The result was that the overcharge (using JELD-WEN's methodology) from 2018 was 3.74%. (Id. at 76, 79-80, 82.) This 3.74% overcharge accounted for JELD-WEN's 0.94% increase in Key Input costs about which JELD-WEN did not give notice or pass on to Steves. (Id. at 82-83, 85.) Hicks also estimated that the overcharge for 2017 would have been 0.94% higher than it was in 2018 because Key Input costs had not yet increased. (Id. at 83.)

To explain the sharp difference between his calculated overcharge and Tucker's, Hicks cited: (1) how JELD-WEN calculated

14

Towanda's costs separately so that Towanda's costs did not "artificially lower" JELD-WEN's overall costs; and (2) how a Louisiana plant similarly skewed the calculations under Tucker's methodology because the plant began operating in 2013 or 2014 and ran inefficiently until its productivity curve "normalized" in approximately 2017. (Id. at 87-88.) In other words, as the plant became more efficient over time, it used fewer raw materials, which "reduce[d its] share of the calculation" under Tucker's methodology and presented as a "price change to the key inputs even though there may really not be one. In many cases, that change also skews the price lower, the calculation lower." (Id. at 88.)

Another difference between Tucker and JELD-WEN's methodology was that Tucker used net costs when calculating prices and JELD-WEN used gross costs for each year to ensure that the "year-over-year change calculation is consistent." (Id. at 70.) Hicks explained that using net costs, as Tucker did, would not account for potential changes in JELD-WEN's business practices, such as JELD-WEN's decision to accept, or not to accept, discounts when making purchases from vendors. (Id. at 70-72.) However, he also noted that using gross costs, instead of net costs, would have a "very minimal impact on the calculation." (Id. at 87.)

## II. 28 U.S.C. §§ 2201 and 2202 Standards

To begin, it is appropriate briefly to keep in mind the animating principles in applying the Declaratory Judgment Act. The statute, in § 2201, allows a court to declare an interested party's rights when there is an "actual controversy" before it. 28 U.S.C. § 2201(a). More specifically, § 2201(a) provides that a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." Id. A declaratory judgment under § 2201 is only "appropriate when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."[4] Consequently, "[w]here a declaratory judgment would not clarify future legal relations between the parties, the action serves no useful purpose and courts will not entertain it." Davison v. Plowman, 247

---

[4] Centennial Life Ins. v. Poston, 88 F.3d 255, 256 (4th Cir. 1996) (quoting Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321, 325 (4th Cir. 1937)) (internal quotation marks and alterations omitted); see also Ross v. Reed, 719 F.2d 689, 694 (4th Cir. 1983) (explaining that facts underlying declaratory relief must show "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" (quoting Golden v. Zwickler, 394 U.S. 103, 108 (1969)) (internal quotation marks omitted)).

F. Supp. 3d 767, 782 (E.D. Va. 2017), aff'd, 715 F. App'x 298 (4th Cir. 2018). Even if a controversy exists, the power to award declaratory relief is discretionary. Centennial Life Ins., 88 F.3d at 256.

Under 28 U.S.C. § 2202, courts may grant "[f]urther necessary or proper relief based on a declaratory judgment or decree . . ., after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment [a declaratory judgment under 28 U.S.C. § 2201]." 28 U.S.C. § 2202 (emphasis added). "This [further necessary or proper] relief need not have been demanded or even proved in the original action for declaratory relief." Ins. Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co., 966 F.2d 847, 851 (4th Cir. 1992) (quoting Edward B. Marks Music Corp. v. Charles K. Harris Music Pub. Co., 255 F.2d 518, 522 (2d Cir. 1958)) (internal quotation marks and emphasis omitted) (stating that "district court clearly had the power to hear the issue of damages after deciding the issue of liability and declaring the parties' rights in an equity action"). Because courts "retain jurisdiction to give complete and effectual relief[, they] . . . may make such further orders to give effect to a declaratory judgment as shall seem meet and proper." Id. at 852 (quoting Walter H. Anderson, Actions for Declaratory Judgments § 451 (2d ed. 1951 & Supp. 1991)).

As other circuits have held, § 2202 allows "the prevailing party in a declaratory judgment action [to] seek further relief in the form of damages or an injunction." See, e.g., United Teacher Assocs. Ins. v. Union Labor Life Ins., 414 F.3d 558, 570 (5th Cir. 2005) (quoting Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc., 575 F.2d 530, 537 (5th Cir. 1978)) (internal quotation marks omitted) (also noting that "[o]ther circuits that have addressed the type of relief available under § 2202 have reached similar conclusions" and listing cases); see also Gant v. Grand Lodge of Tex., 12 F.3d 998, 1002 (10th Cir. 1993) (explaining that Declaratory Judgment Act "permits the original judgment to be supplemented either by damages or by equitable relief even though coercive relief might have been available at the time of the declaratory action" (quoting 10A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure, § 2771, at 765-67 (2d ed. 1983))). The Fourth Circuit has "long recognized the discretion afforded to district courts in determining whether to grant declaratory relief" and consequently reviews decisions under the abuse-of-discretion standard. See Travelers Indem. v. Miller Bldg. Corp., 221 Fed. App'x 265, 267 (4th Cir. 2007) (discussing 28 U.S.C. § 2201). However, before deciding whether to grant such relief under § 2202, the court must hold a hearing (which it did on September 10, 2019). Ins. Servs. of Beaufort, Inc., 966 F.2d at 853.

18

**III. Steves Properly Moved for Further Relief Under 28 U.S.C. § 2202 Because It Requests Damages, Not a Declaration that Tucker's Methodology Is Correct.**

Steves acknowledges that, to be eligible for relief under § 2202, it must have previously received, under § 2201, a declaratory judgment or decree related to the relief sought under § 2202. See, e.g., 28 U.S.C. § 2202; see also ECF No. 1910 at 17. The further relief that the party seeks need not have been demanded or proved in the original action for declaratory relief. Ins. Servs. of Beaufort, Inc., 966 F.2d at 851-52 (holding that "district court clearly had the power to hear the issue of damages after deciding the issue of liability and declaring the parties' rights in an equity action"); see also United Teacher Assocs. Ins. v. Union Labor Life Ins., 414 F.3d 558, 571 (5th Cir. 2005) (holding that, "as is clear . . . from the language of § 2202, a party can file a motion for further relief requesting monetary damages under § 2202 to effectuate a prior declaratory judgment"); Horn & Hardart Co. v. Nat'l Rail Passenger Corp., 843 F.2d 546, 548 (D.C. Cir. 1988) (noting that "even though [the party's] present request may not be 'necessary' to effectuate the lease termination ruling, the plain language of the Declaratory Judgment Act does not require this degree of stringency. The relief need only be proper."); Edward B. Marks Music Corp. v. Charles K. Harris Music Pub. Co., 255 F.2d 518, 522 (2d Cir. 1958) (interpreting § 2202 to mean that "the further relief sought—[in that case,]

19

monetary recompense—need not have been demanded, or even proved, in the original action for declaratory relief. The section authorizes further or new relief based on the declaratory judgment . . . .").

JELD-WEN opposes the Motion first by describing it as a request for a declaration that Section 6 of the Supply Agreement requires the use of Tucker's calculation method and by then arguing that Steves withdrew a request for a declaration that Tucker's methodology was required. (ECF No. 1916 at 2, 6-10.) Thus, says JELD-WEN, the Motion is not proper under § 2202, but is instead a motion to amend the Amended Final Judgment Order. (Id. at 1-2.)

The first step in analyzing the Motion, and JELD-WEN's opposition, is to examine the relevant declarations as set forth in the Amended Final Judgment Order:

> (1) The pricing provisions of Section 6 of the Doorskin Product Agreement (the "Supply Agreement") (ECF No. 1793-1) apply to provide for price increases when JELD-WEN's Key Input costs increase and for price decreases when JELD-WEN's Key Input costs decrease; and
>
> (2) JELD-WEN is required to provide STEVES with annual notice by November 30 of each year of the year-over-year percentage change of the Key Input costs in the Supply Agreement, and the resulting doorskin price increase or decrease to be charged for the ensuing year.

(ECF No. 1852 at 12-13.)

Relatedly, before entering the Amended Final Judgment Order, the Court granted Steves' requests for declaratory relief on the following points on December 7, 2018:

> Based on the evidence and the jury's verdict, the Court declares that the pricing provisions of Section 6 [of the Supply Agreement] apply to provide for price increases when JELD-WEN's Key Input costs increase and for price decreases when JELD-WEN's Key Input costs decrease.
>
> * * *
>
> [I]t is appropriate to enter judgment declaring that Steves is entitled to year-over-year changes in the Key Input costs from JELD-WEN by virtue of Section 6 of the Supply Agreement.

(ECF No. 1813 at 9, 12.)

These Orders (ECF No. 1813; ECF No. 1852) make quite clear that, under § 2201, the Court issued declarations upon which Steves now relies in requesting further relief under § 2202. Although Steves asks for a specific amount in damages (the $7,083,013 from Tucker's calculations), the Motion is merely a request for damages, not a request that the Court declare Tucker's methodology to be the proper methodology for applying Section 6 of the Supply Agreement. Indeed, as discussed *infra*, in resolving the overcharge-damage issue, the Court is free to use JELD-WEN's proposed methodology when determining damages.

As previously explained, it was "declare[d] that the pricing provisions of Section 6 [of the Supply Agreement] apply to provide

for price increases when JELD-WEN's Key Input costs increase and for price decreases when JELD-WEN's Key Input costs decrease." (ECF No. 1813 at 9.) This declaration established the parties' respective rights. In other words, Steves is entitled to decreased prices when Key Input costs decrease, and, conversely, JELD-WEN is entitled to increased prices when Key Input costs increase. Consequently, because the alleged overcharges are caused by JELD-WEN's conduct in not adjusting prices for decreases in its Key Input costs, (ECF No. 1910 at 7-8, 11-14; ECF No. 1916 at 5), the Motion is based on an existing declaration made under § 2201 and is appropriate under § 2202. Steves' use of Tucker's methodology in calculating its requested overcharge damages does not turn its request for further relief into a request for a new declaration that the parties are required to use Tucker's methodology. Accordingly, JELD-WEN's argument that Steves' motion is in fact an untimely motion to amend the Amended Final Judgment Order is unpersuasive. Therefore, Steves is entitled to pursue further relief—*i.e.*, damages for the alleged overcharges in violation of Section 6 of the Supply Agreement. Of course, Steves must prove the amount of the overcharges on which it seeks further relief under § 2202.

## IV. Using Tucker's Methodology To Calculate Steves' Damages Is Appropriate.

Both parties agree that JELD-WEN owes Steves for overcharges. (See ECF No. 1910 at 21; ECF No. 1910-12 at 3.) However, the parties disagree as to how to calculate those damages. (See ECF No. 1910 at 21; ECF No. 1910-12 at 3; ECF No. 1966 at 75-76, 138.) Steves contends that the total overcharge is $7,083,013 and JELD-WEN contends that it is $2,682,702 or, at a maximum, $5,695,362. As explained below, because the jury implicitly accepted Tucker's methodology when it granted damages after the jury trial and because JELD-WEN's evidence on the proper methodology to calculate the amount of the overcharge is neither convincing nor reliable, the Court concludes that Steves' request for $7,083,013 in damages for the overcharges that occurred between February 15, 2018 and May 31, 2019 will be granted.[5]

### a) The Jury Implicitly Accepted Tucker's Methodology When It Granted Steves Its Requested Damages After the Jury Trial.

At trial, Steves' expert, Tucker, testified that JELD-WEN overcharged Steves by $9,933,602 for doorskins from 2013 to 2017.

---

[5]    In its MEMORANDUM IN SUPPORT OF STEVES' MOTION FOR FURTHER RELIEF UNDER 28 U.S.C. § 2202, Steves requested only $4,453,924.97 in damages from overcharges in 2018 and "further damages to be determined at a hearing to address overcharges resulting from doorskin purchases by Steves from JELD-WEN from January 1, 2019 until the date of this motion." (ECF No. 1910 at 17.) At the September 10, 2019 evidentiary hearing, Tucker testified that the overcharges from February 15, 2018 to May 31, 2019 were $7,083,013 in total. (ECF No. 1966 at 41-42.)

(ECF No. 1907-1 at 1195; ECF No. 1907-2 at 10.) Tucker explained to the jury that, "[b]ased on the price decreases that [he] determined, [he] then went and looked at every purchase and determined what the price was charged at the time and compared what the price should have been, based on these cost decreases, for every single purchase." (ECF No. 1907-1 at 1195.) This method led Tucker to reach the $9,933,602 figure of which $1,303,035 represented overcharges from damages for Madison and Monroe doorskins and $8,630,567 represented overcharges for all other doorskins. (Id. at 1195-96.) At trial, JELD-WEN did not offer any evidence about how to calculate damages and instead argued that it had no obligation to reduce prices when Key Input costs decreased.[6] (See generally ECF No. 1036; see also ECF No. 1036 at 2336-41; ECF No. 1916 at 11.)

Although the jury was not called upon to state whether it accepted Tucker's methodology in awarding the $9,933,602 in overcharges,[7] it found that JELD-WEN had overcharged Steves by $1,303,035 for Madison and Monroe doorskins and by $8,630,567 for all other doorskins, precisely the amounts to which Tucker had

---

[6]    By JELD-WEN's own admission, the jury, consequently, "was never asked to choose between competing accounts of how the Key Input costs should be calculated, since JELD-WEN's entire defense was that the Supply Agreement called for price increases but not price decreases." (ECF No. 1916 at 11.)

[7] (See ECF No. 1022 at 2.)

testified. (ECF No. 1022 at 2.) And, there was no other evidence on the amount of the overcharge or how to calculate it. Thus, to return its verdict on Count Two and to award the damages that it awarded, the jury necessarily had to agree with Tucker's calculations and the method by which he arrived at the amount awarded. That conclusion is underscored because JELD-WEN did not present an alternative methodology for the jury to consider, so Tucker's methodology, and the results thereof, was the only evidence before the jury on the amount of the overcharges. Those facts and common sense necessitate the conclusion that, in making the award for Count Two, the jury accepted Tucker's methodology. And, when the Court issued a declaration in December 2018 that Section 6 of the Supply Agreement provided for price increases and decreases when Key Input costs increased and decreased, respectively, the Court held that:

> The jury resolved this dispute in favor of Steves when it awarded damages in the exact amount of overcharge damages sought by Steves for breach of Section 6 of the Supply Agreement. The damage award was for the precise amount explained by Steves' expert who calculated what the proper prices would have been if the prices had been decreased to reflect decreases in JELD-WEN's Key Input costs. To reach that verdict **the jury necessarily had to agree** that Section 6 provided for both price increases and price decreases.

(ECF No. 1813 at 8-9 (emphasis added) (internal citation omitted).) Similarly, the Court previously explained that "[a]ny factual

25

determinations that were necessary [for the jury] to award these damages are binding on the Court." (ECF No. 1783 at 72.) The Court will therefore use the jury's implicit determination that Tucker's methodology, including Tucker's decision not to calculate JELD-WEN's costs on a plant-by-plant basis, was the appropriate method to use when calculating overcharge damages.

This is in keeping with decisions from both the Supreme Court and the Fourth Circuit that have concluded that often juries may necessarily make findings on underlying facts when reaching a verdict. See, e.g., Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 629 (1959) ("By returning a verdict in [the plaintiff's] favor, the jury necessarily found that [the plaintiff] had not in fact been guilty of contributory negligence 'even in the slightest degree'"); Barnes v. Danner, No. 95-8556, 1996 WL 733139, at *1 (4th Cir. Dec. 23, 1996) (noting that, in qualified immunity case, "the jury's verdict indicates that the jury necessarily found the witness credible and [the police officer's] reliance on the witness's statement therefore reasonable"); see also Celeritas Techs., Ltd. V. Rockwell Int'l Corp., 150 F.3d 1354, 1359 (Fed. Cir. 1998) ("By adopting [the expert's] lump-sum amount as the proper measure of damages, the jury implicitly accepted the expert's methodology.").

Additionally, notwithstanding that the parties have extensively discussed the law-of-the-case doctrine[8] in their briefs, the doctrine does not apply here. In fact, the parties agree on this point and noted during a conference call on October 2, 2019 that the law-of-the-case doctrine does not apply because the Court already entered its Final Judgment Order in December 2018, (ECF No. 1815). (ECF No. 1977 at 7-8.)

Although Steves acknowledges that collateral estoppel also does not apply in this case, Steves presented at the September 10, 2019 hearing several cases discussing collateral estoppel. (ECF No. 1966 at 96.) Collateral estoppel applies when the party seeking estoppel establishes: "(1) that the issue sought to be precluded is identical to one previously litigated ('element

---

[8] The "law-of-the-case doctrine recognizes that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Graves v. Lioi, 930 F.3d 307, 318 (4th Cir. 2019) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)) (internal quotation marks omitted). Once the law of the case has been established, "it must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal unless: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." Sejman v. Warner-Lambert Co., 845 F.2d 66, 69 (4th Cir. 1988) (quoting EEOC v. Int'l Longshoremen's Ass'n, 623 F.2d 1054, 1058 (5th Cir. 1980)) (internal quotation marks and alteration omitted). However, even assuming that jury verdicts constitute the law of the case, the law-of-the-case "doctrine does not involve preclusion after final judgment. Instead, it regulates judicial affairs prior to the entry of final judgment." Hill v. Pitt & Greene Elec. Membership Corp., No. 97-1257, 1998 WL 482784, at *1 (4th Cir. Aug. 11, 1998).

one'); (2) that the issue was actually determined in the prior proceeding ('element two'); (3) that the issue's determination was a critical and necessary part of the decision in the prior proceeding ('element three'); (4) that the prior judgment is final and valid ('element four'); and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the previous forum ('element five')." Westmoreland Coal Co. v. Sharpe ex rel. Sharpe, 692 F.3d 317, 331 (4th Cir. 2012) (quoting Collins v. Pond Creek Mining Co., 468 F.3d 213, 217–23 (4th Cir. 2006)). "Collateral estoppel bars relitigation in subsequent proceedings of those determinations of fact, and mixed fact and law, that were essential to the original decision." United States v. Woods, 484 F.2d 127, 137 (4th Cir. 1973) (emphasis added). As JELD-WEN points out in its sur-reply, (ECF No. 1973 at 2-3), collateral estoppel applies in subsequent proceedings, not in subsequent motions filed within the same proceedings. See, e.g., Woods, 484 F.2d at 137.

For the foregoing reasons, the Court holds that, in awarding Steves the precise amount of damages on Count Two to which Tucker testified during the jury trial, the jury necessarily adopted Tucker's methodology. Applying that methodology and the previous declaration of rights, Steves is entitled to $7,083,013 in overcharge damages.

**b) Even if the Jury's Verdict Is Not Dispositive, JELD-WEN's Evidence on the Overcharge Amount is Neither Convincing nor Reliable.**

Even if the jury's verdict with its implicit acceptance of Tucker's methodology were not dispositive on the amount of overcharges at issue and the amount of the overcharges had to be determined *de novo*, the result would be the same. As required by § 2202, an evidentiary hearing was held on the amount of the overcharges. At that hearing, both JELD-WEN and Steves presented evidence about the proper method of calculating the overcharges. The Court also had Tucker's trial testimony. Based on the record, the Court accepts Tucker's methodology for calculating the overcharge damages at issue here because it is logical and reliable and because JELD-WEN did not effectively rebut it or offer an appropriate alternative.

As a preliminary matter, because JELD-WEN did not change its prices in 2018 or give Steves notice of any increase in Key Input costs, JELD-WEN is not entitled to retroactively increase its costs when calculating the overcharge, and the established baseline overcharge of 9.87% in 2017 stands for 2018 as well. (See ECF No. 1907-1 at 1195-96; ECF No. 1022 at 2; ECF No. 1910 at 4; ECF No. 1966 at 85.) Likewise, because Steves is not contesting the price increase that took place in 2019, the baseline overcharge remains 9.87%. (See ECF No. 1966 at 22.)

To begin, it is significant that JELD-WEN failed to rebut Tucker's methodology by failing to sufficiently explain why Tucker's methodology was incorrect and by failing to present an appropriate alternative. As previously explained, Tucker calculated the Key Input costs for all plants, and JELD-WEN calculated Towanda and the legacy plants separately and used a weighted average to combine the two calculated percentages. However, nothing in the Supply Agreement suggests that the parties should use a weighted average with respect to the different plants. (See generally ECF No. 5-1.) Indeed, Schedule 2 is the only portion of the Supply Agreement to reference weighted averages, and it uses weighted percentage changes only in the context of Key Input costs, not plants. (See id. at 13.) And, the rest of the Supply Agreement is silent with respect to how to calculate Key Input costs. (See generally id.; see also ECF No. 1966 at 45-46.)

Moreover, when asked why Tucker's approach of calculating changes in Key Input costs together was inappropriate, Hicks testified that not calculating the plants separately would "skew" the calculations. (ECF No. 1966 at 69-70.) Yet, calculating the percentage changes for the plants separately and combining them with a weighted average chosen by JELD-WEN skews the calculations in JELD-WEN's favor. For instance, under the method Hicks explained, JELD-WEN is able to minimize the effect of an inefficient plant by isolating it and assigning it a certain

weighted average. (See id. at 87–88.) More specifically, under JELD-WEN's methodology, if the inefficient plant became more efficient, the increased efficiency and consequent reduction in raw material usage would not reduce Key Input costs, as it does under Tucker's methodology. (See id.) This result is illogical, even with Hicks' defense that a plant reducing its raw material usage does not necessarily involve a "price change to the key inputs." (Id. at 88.) A plant using fewer materials because it became more efficient, ceteris paribus, necessarily implies that JELD-WEN's costs decreased when the plant stopped purchasing as many Key Inputs, even if the price per unit of Key Input remained constant. Tucker's methodology accounts for this possibility and prevents any "skewing" from occurring by examining JELD-WEN's Key Input costs on a firm-wide basis and using them at face-value, as opposed to evaluating costs on a plant-by-plant basis and assigning arbitrary weights to each plant.

Third, the weighted average, plant-by-plant approach to which Hicks testified is not JELD-WEN's usual business practice. Hicks explained that JELD-WEN does not use the combined weighted averages "because it completely ignores usage." (Id. at 68.) Instead, JELD-WEN typically uses the total manufacturing cost when making business decisions. (Id.) That is another reason to conclude that the method JELD-WEN urges is unreliable.

Hicks also took the view that it was necessary to use gross costs when calculating year-over-year changes in Key Input costs to ensure that the calculation was consistent. (Id. at 70.) As support, Hicks explained that JELD-WEN did not always "take discounts" when purchasing from its vendors, which "would impact this price calculation." (Id.) For example, according to Hicks, accepting a discount one year and not taking a discount the following year would look like an increase in Key Input costs, and vice versa, "which . . . in [his] mind, it's really not." (Id. at 71-72.) However, Hicks failed to explain why accepting a discount one year and not the following year would not "really" be an increase in Key Input costs, instead responding that "the business decision for [JELD-WEN] to take that discount or not is a cash management decision." (Id. at 72.) And, in any event, there was no proof that the discounts were passed along to Steves. Consequently, the methodology used by Hicks encourages the very skewing that it claims to prevent. For the foregoing reasons, and because the Supply Agreement does not call for the plants to be calculated separately with weighted averages and because common sense supports the approach taken by Tucker, the Court finds that Tucker's methodology is the appropriate methodology to use.

**CONCLUSION**

For the foregoing reasons, PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR FURTHER RELIEF UNDER 28 U.S.C. § 2202 (ECF No. 1906) will be granted.

It is so ORDERED.

_____ /s/ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  November _19_, 2019