IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


STEVES AND SONS, INC.,

    Plaintiff,

v.                           Civil Action No. 3:16-cv-545
                                  **PUBLIC VERSION**
JELD-WEN, INC.,

    Defendant.


## MEMORANDUM OPINION

This matter is before the Court on the EXPEDITED MOTION FOR INJUNCTION IN SUPPORT OF THE AMENDED FINAL JUDGMENT (ECF No. 2001) (the "Motion") filed by Steves and Sons, Inc. ("Steves"), pursuant to 28 U.S.C. § 2202. In particular, Steves sought an order enjoining JELD-WEN, Inc. ("JELD-WEN") as follows:

    (1)    requiring JELD-WEN to fill Steves' orders from Weeks 44-52 of 2019;

    (2)    requiring JELD-WEN "to immediately provide verification of the events and factors warranting the notice of allocation served by JELD-WEN on December 19, 2019, and to supply weekly updates on those events and factors while the impairment to its ability to meet demand continues";

    (3)    requiring JELD-WEN to "apply Steves' 2019 percentage number to the allocation period";

    (4)    prohibiting JELD-WEN from "deflating Steves' 2019 percentage number by refusing to include in its calculation doorskins that JELD-WEN failed to ship to Steves in 2019"; and

> (5)   requiring JELD-WEN "to comply with the Supply Agreement, including filling Steves' weekly orders that are commercially reasonable, properly applying allocation, and meeting its verification obligations."

(ECF No. 2001 at 1.)   The Court held an evidentiary hearing and heard oral argument on the Motion on February 13-14, 2020.   On February 14, 2020, the Motion was denied for lack of jurisdiction. (ECF No. 2036.)   This Memorandum Opinion explains that decision.

## I.   FACTUAL AND PROCEDURAL CONTEXT

The lengthy and complex history of this litigation is set out in full in previous opinions, including in the MEMORANDUM OPINION (ECF No. 1813) issued on December 7, 2018.   (See also ECF No. 976; ECF No. 1424; ECF No. 1581; ECF No. 1784.)   The Court assumes familiarity with this history, but will briefly summarize aspects of the history that are pertinent here.

### A.   The Complaint

To begin, it is helpful to recall that the Complaint asserted six counts.   Count One alleged that JELD-WEN's merger with Craftmaster International ("CMI") breached Section 7 of the Clayton Act.   (ECF No. 5 at 40-41.)   Count Two alleged that JELD-WEN breached the Doorskin Product Agreement (the "Supply Agreement") by not complying with its pricing provision, selling Steves defective doorskins, attempting to end the Supply Agreement earlier than allowed, and refusing to inspect and credit Steves for defective product.   (Id. at 41.)   Count Three alleged that

2

JELD-WEN breached its express warranty and implied warranty of merchantability by delivering and selling defective doorskins. (Id. at 41-42.)

In Count Four, Steves requested a declaratory judgment that, inter alia: the Supply Agreement was a lawful and binding contract; JELD-WEN could not change the Supply Agreement's terms and conditions; "JELD-WEN must sell to Steves any doorskin product ordered by Steves and made by JELD-WEN at any time during the life of the Supply Agreement, and must do so according to the prices and other terms and conditions of the Supply Agreement"; and "pursuant to the Supply Agreement, any price decrease driven by the pricing formula will be put into effect, and the formula adjusts downward as well as upward." (Id. at 42-44.)   In Count Five, Steves requested specific performance of the Supply Agreement. (Id. at 44.)   Lastly, in Count Six, Steves alleged trespass to chattels because JELD-WEN allegedly painted orange streaks on Steves' doors and refused to pay for the damages. (Id. at 45.)   Steves voluntarily dismissed Count Three (Breach of Warranty), Count Five (Specific Performance), and Count Six (Trespass to Chattels). (ECF No. 1784 at 2.)

3

## B.   The Jury's Verdict

The case was tried to a jury on Count One (Antitrust) and Count Two (Breach of Contract).[1]  The jury returned a verdict in Steves' favor on both counts and found as follows:

1.   As to Count One, "that JELD-WEN's acquisition of CMI violated Section 7 of the Clayton Act";

2.   As to Count One, "that JELD-WEN's violation of Section 7 of the Clayton Act caused an injury to Steves that was of the type that the antitrust laws were intended to prevent";

3.

(a)   As to Count One, that Steves was entitled to the following damages "for antitrust injuries *already sustained* as a result of the following conduct":

(1)  $8,630,567 for JELD-WEN's overcharging Steves for doorskins (other than Madison or Monroe);

(2)  $1,303,035 for JELD-WEN's overcharging Steves for Madison and Monroe doorskins;

(3)  $441,458 for JELD-WEN's shipping defective doorskins to Steves and failing to reimburse Steves for those doorskins; and

(4)  $1,776,813 for JELD-WEN's refusal to reimburse Steves for the cost of doors that

---

[1]   The Court decided Count Four by making declarations based on the jury's findings.

4

incorporated          defective
doorskins;

(b)  As  to  Count  One,  that  Steves  was
"entitled  to  damages  in  the  amount  of
$46,480,581 for **_future lost profits_**";

4.  As   to   Count   Two,   "that   [JELD-WEN]
breached   Section   6   of   the   Supply
Agreement  by  overcharging  Steves  for
doorskins  (other  than  Madison  and  Monroe
doorskins . . . .)'";

5.  As  to  Count  Two,  "that  [Steves]  is
entitled  to  damages  in  the  amount  of
$8,630,567 for the breach of Section 6";

6.  As   to   Count   Two,   "that   [JELD-WEN]
breached   Section   1   of   the   Supply
Agreement  by  overcharging  Steves  for
Madison and Monroe doorskins";

7.  As  to  Count  Two,  "that  [Steves]  is
entitled  to  damages  in  the  amount  of
$1,303,035  for  the  breach  of  Section  1
(overcharging  Steves  for  Madison  and
Monroe doorskins)";

8.  As   to   Count   Two,   "that   [JELD-WEN]
breached   Section   8   of   the   Supply
Agreement    by    shipping    defective
doorskins  to  Steves  and  by  failing  to
reimburse Steves for those doorskins";

9.  As  to  Count  Two,  "that  [Steves]  is
entitled  to  damages  in  the  amount  of
$441,458  for  the  breach  of  Section  8
(failing   to   reimburse   Steves   for
defective doorskins)";

10.  As to Count Two, "that Steves proved that
Section  8  of  the  Supply  Agreement
requires JELD-WEN to reimburse Steves for
the  cost  of  doors  made  using  defective
doorskins,  and  that  JELD-WEN  breached
Section 8 by refusing to reimburse Steves
for  the  cost  of  doors  that  incorporated
defective doorskins"; and

> 11. As to Count Two, "that [Steves] is entitled to damages in the amount of $1,776,813 for the breach of Section 8 (refusing to reimburse Steves for the cost of doors that incorporated defective doorskins)."

(ECF No. 1022 ¶¶ 1-11.)

For both Counts One and Two, the jury awarded Steves identical amounts in damages. (See generally id.) Additionally, Steves' claim for equitable relief was based on the jury's finding of liability on the antitrust violations in Count One. (ECF No. 1784 at 2.) The Court subsequently granted JELD-WEN, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST STEVES & SONS, INC. (ECF No. 968) to the extent that JELD-WEN sought judgment as a matter of law on Steves' breach of contract claim that was "based on: (1) JELD-WEN's failure to reimburse Steves for defective doorskins; and (2) JELD-WEN's failure to reimburse Steves for the cost of doors manufactured by Steves that incorporated defective doorskins . . . ." (ECF No. 1773 at 1.) As a result, paragraphs 8, 9, 10, and 11 of the jury verdict were vacated. (Id. at 1-2.)

### C. The Injunction and the Amended Final Judgment Order

The Complaint also sought injunctive and declaratory relief. Therefore, after the jury trial, the Court held an evidentiary hearing on Steves' request that JELD-WEN be required to divest itself of the Towanda facility and business relief that is permissible when a violation of Section 7 of the Clayton Act has

6

been proved. After considering the relevant evidence introduced in the jury trial and the evidence presented at the divestiture hearing, the Court entered the Amended Final Judgment Order (ECF No. 1852) (the "AFJO") in which the Court made several declarations (Count Four), including that: (1) the Supply Agreement provided for both price increases and decreases when JELD-WEN's Key Input costs increased or decreased, respectively; and (2) the Supply Agreement required JELD-WEN to give Steves annual notice of changes in Key Input costs and doorskin prices. (ECF No. 1852 at 12-13.) The AFJO required, *inter alia*, that JELD-WEN divest itself of the Towanda facility for the purpose of restoring competition to the doorskin market that had been substantially lessened as a result of JELD-WEN's violation of Section 7 of the Clayton Act.[2] The AFJO also established a number of other requirements the purpose of which was to facilitate the divestiture and the restoration of competition in the U.S. doorskin market, which is dominated by JELD-WEN and Masonite (the "Augmenting Requirements").[3] On April 12, 2019, JELD-WEN appealed the AFJO to the United States Court of Appeals for the Fourth Circuit.

---

[2]   The AFJO also entered judgment on so much of the jury's verdict as remained after part of the verdict was vacated pursuant to JELD-WEN, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST STEVES & SONS, INC. (ECF No. 968). (See ECF No. 1773; ECF No. 1852.)

[3]   (See ECF No. 1852 ¶¶ 1, 3-6, 8, 11-12.)

### D.   Events Precipitating the Motion

During the appeal, Steves and JELD-WEN have continued to operate, albeit not without dispute and difficulty, under the Supply Agreement.   To understand the current dispute and the Motion, it is useful to recite in some detail the events that gave rise to the Motion.

Since the parties entered into the Supply Agreement in 2012, Steves, as required by the Supply Agreement, has submitted annual and quarterly forecasts of its doorskin requirements.   (ECF No. 2005-1 ¶¶ 4-5.)   Also, Steves has submitted weekly doorskin purchase orders to JELD-WEN.   (Id. ¶ 2.)   Until Week 44 of 2019, JELD-WEN usually had confirmed those orders within two to three business days and usually had delivered the requested doorskins within thirty days of receiving the orders.   (Id. ¶¶ 2-3, 8-9.)[4]

On October 16, 2019, JELD-WEN informed its customers that it would increase prices on its interior molded doors by approximately 5-7 percent, effective December 16, 2019.   (ECF No. 2005-1 at 44-45.)   Two weeks later, on October 30, 2019, Masonite announced that, effective February 3, 2020, it would increase prices for its interior molded doors by approximately 25 percent.   (ECF No. 2015-3 at 2.)   On November 21, 2019, JELD-WEN again announced that it

---

[4]    In fulfilling these orders, JELD-WEN occasionally made "*de minimis* changes" to the quantity of doorskins to optimize truck freight.   (ECF No. 2005 at 3, 3 n.1.)

would increase its prices, this time by 17-20 percent, effective February 7, 2020. (ECF No. 2005-1 at 47-48.) In its announcement, JELD-WEN informed its customers, including Steves, that JELD-WEN "reserve[d] the right to reject or limit any orders that deviate from your historical weekly order size averages." (Id. at 47.) According to JELD-WEN, "[t]he price increases on interior molded doors by Masonite and JELD-WEN caused a spike in the demand for interior molded doors and doorskins. Customers wanted to purchase doors before the price increases took effect." (ECF No. 2015 ¶ 7.) That, in turn, caused a spike in the demand for doorskins, says JELD-WEN. JELD-WEN contends that "Steves reacted no differently than other customers of doorskins and, in fact, acted more aggressively with [its] requested orders." (Id. ¶ 8.) JELD-WEN informed Steves that its orders would not be entirely filled because the orders were "significantly disproportionate to both Steves' most recent forecast and [its] historical ordering patterns." (ECF No. 2005-1 at 25.) Steves disputed that assertion. But JELD-WEN nevertheless refused to fill all of Steves' orders.

Thus, according to Steves, as of February 10, 2020, JELD-WEN had not delivered 328,725 doorskins that Steves ordered in Weeks 48 through 52 of 2019 and had not confirmed 140,725 of these undelivered doorskins. (ECF No. 2030 ¶ 2.) Steves also alleges that JELD-WEN has not delivered 505,625 doorskins Steves ordered

9

in the first two weeks of 2020 and has not confirmed 325,675 of these orders.  (Id. ¶ 3.)

On December 19, 2019, JELD-WEN issued a notice of allocation, effective January 1, 2020.  (ECF No. 2005-1 at 39.)   This allocation applies to all of JELD-WEN's contract doorskin customers, including Steves.[5]  (ECF No. 2015 ¶ 15.)  In the notice of allocation, JELD-WEN informed Steves that JELD-WEN's annual production capacity was "approximately ▮▮▮▮▮ doorskins" and that Steves would be able to purchase up to ▮▮[6] of these doorskins. (ECF No. 2005-1 at 39.)  However, Steves alleges that, because the Supply Agreement specifies that the allocation percentage is based on the number of doorskins shipped in the preceding year—i.e., 2019—Steves' allocation percentage should be ▮▮▮▮ based on the number of doorskins that JELD-WEN shipped or ▮▮▮▮ based on the number of doorskins that Steves ordered.  (ECF No. 2005 at 8.)  At oral argument, JELD-WEN represented that it was applying an allocation percentage based on the percentage of JELD-WEN's North American doorskin production shipped to Steves in 2019, rather

---

[5]   The allocation applies also to JELD-WEN's own door manufacturing operations, which purchase doorskins from JELD-WEN's fiber manufacturing operations.

[6]   Although Steves initially contested this figure, the parties have since agreed that Steves is entitled to ▮▮▮▮ of JELD-WEN's production. (See Steves & Sons, Inc. v. JELD-WEN, Inc., No. 3:20-cv-98, ECF No. 121 at 50 n.26.)

than in 2018, (ECF No. 2039 at 198), so that, during allocation, Steves was entitled to receive ███ of JELD-WEN's production.

Steves alleges that JELD-WEN's production capacity is not ███ ██████ doorskins, but is instead either ████████ or ██████████ doorskins. (ECF No. 2005 at 7.) Because of these discrepancies, Steves asked JELD-WEN to verify JELD-WEN's production capacity and Steves' allocation percentage. (Id. at 8-9.) Steves also requested that JELD-WEN send information on a weekly basis as to the extent to which JELD-WEN's actual doorskin production exceeded demand. (Id. at 9.) JELD-WEN did not respond to these requests. (Id. at 8-9.)

JELD-WEN initiated the so-called "mix methodology" to implement the allocation. Steves contests JELD-WEN's mix methodology and alleges that "JELD-WEN's methodology did not provide Steves the mix of doorskins that it actually needs to fill its customers' needs." (See ECF No. 2030 ¶ 13.) Steves also alleges that "JELD-WEN is varying the quantities of its various doorskin styles that it produces week-to-week" and that "JELD-WEN is not abiding by its own mix methodology." (Id. ¶¶ 15-16.) Because of JELD-WEN's alleged breaches, ███████████████████ ██████████████████████████████████████████████████ ██████████████████. (ECF No. 2005 at 10-11.)

According to the Motion, JELD-WEN has used the market power that resulted from the illegal acquisition of CMI by: (1) refusing

to confirm and deliver Steves' doorskin orders for Weeks 44-52 of 2019; (2) not correctly calculating Steves' allocation percentage under Section 20; and (3) not responding to Steves' request for good-faith verification. (ECF No. 2005 at 3-4, 7-9.) Steves also asserts that the same conduct constitutes a breach of the Supply Agreement.

### E.  The Motion

According to Steves, the foregoing conduct by JELD-WEN is in violation of the AFJO. As Steves sees it, the Motion seeks further relief that is both necessary and proper under 28 U.S.C. § 2202. Section 2202 provides that:

> Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

28 U.S.C. § 2202 (emphasis added). The further relief sought, says Steves, is necessary to enforce the AFJO. To that asserted end, Steves seeks an order enjoining JELD-WEN as follows:

(1)   requiring JELD-WEN to fill Steves' orders from Weeks 44-52 of 2019;

(2)   requiring JELD-WEN "to immediately provide verification of the events and factors warranting the notice of allocation served by JELD-WEN on December 19, 2019, and to supply weekly updates on those events and factors while the impairment to its ability to meet demand continues";

(3)   requiring JELD-WEN to "apply Steves' 2019 percentage number to the allocation period";

(4) prohibiting JELD-WEN from "deflating Steves' 2019 percentage number by refusing to include in its calculation doorskins that JELD-WEN failed to ship to Steves in 2019"; and

(5) requiring JELD-WEN "to comply with the Supply Agreement, including filling Steves' weekly orders that are commercially reasonable, properly applying allocation, and meeting its verification obligations."

(ECF No. 2001 at 1.)

## II.  JURISDICTION

JELD-WEN asserts that the Court lacks jurisdiction to interpret or amend the AFJO to allow the specific relief sought in the Motion.  According to JELD-WEN, the Motion is actually unrelated to the AFJO and is, in fact, a separate suit.  (See, e.g., ECF No. 2015; ECF No. 2039 at 186-87, 192-200.)

Steves asserts that the Court has ancillary jurisdiction in that it has inherent authority to interpret and enforce the AFJO because there is a factual interdependence between the AFJO and the Motion.  (See, e.g., ECF No. 2021 at 1-5; ECF No. 2038 at 128-141, 143-45.)

Also, Steves asserts that there is jurisdiction under Fed. R. Civ. P. 62(d) which provides that:

> While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights.

According to Steves, the Court can, under that rule, modify the injunctive relief component of the AFJO to preserve the status quo pending appeal. (See, e.g., ECF No. 2021 at 4-5; ECF No. 2038 at 141-45.)

Whether there is jurisdiction, either ancillary or under Rule 62(d), is a threshold question. Those issues will be addressed each in its own turn.

## A.   Ancillary Jurisdiction

The doctrine of ancillary jurisdiction "recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." Kokkonen v. Guardian Life Ins., 511 U.S. 375, 378 (1994). Courts may "assert[] ancillary jurisdiction (in the very broad sense in which that term is sometimes used) for two separate, though sometimes related, purposes: (1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." Id. at 379-80 (internal citations omitted). "Ancillary jurisdiction may extend to claims having a factual and logical dependence on 'the primary lawsuit,' but that primary lawsuit must contain an independent basis for federal jurisdiction." Peacock v. Thomas, 516 U.S. 349, 355 (1996)

14

(quoting Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 376 (1978)) (internal citation omitted).

"The court must have jurisdiction over a case or controversy before it may assert jurisdiction over ancillary claims." Id. And, courts should not exercise ancillary jurisdiction over "entirely new and original" proceedings or proceedings in which the relief sought is "of a different kind or on a different principle than that of the prior decree." Id. at 358 (quoting Dugas v. Am. Sur. Co., 300 U.S. 414, 428 (1937); Krippendorf v. Hyde, 110 U.S. 276, 285 (1884)) (internal quotation marks omitted). The burden of establishing ancillary jurisdiction lies with the party asserting jurisdiction. Kokkonen, 511 U.S. at 377.

In Peacock, 516 U.S. 349 (1996), the plaintiff filed an ERISA class action in federal court against Tru-Tech and Grant Peacock, one of Tru-Tech's officers and shareholders. Id. at 351. Thomas alleged that both defendants breached their fiduciary duties; the district court found that Tru-Tech had breached its fiduciary duties but found that Peacock was not a fiduciary. Id. The Fourth Circuit affirmed the district court's decision. Id. Thomas subsequently unsuccessfully attempted to collect the judgment from Tru-Tech and sued Peacock in federal court, alleging, inter alia, that Peacock was involved in a civil conspiracy to siphon Tru-Tech's assets to prevent the ERISA judgment from being satisfied. Id. at 352. Thomas also asked the district court to pierce the

15

corporate veil and enter judgment against Peacock, which the district court did.  Id.

The Fourth Circuit held that the district court properly exercised ancillary jurisdiction over Thomas's suit.  Id.  However, the Supreme Court reversed the Fourth Circuit's decision in principal part because Thomas's second suit was not factually dependent on his first suit.  Id. at 355-56.  The Supreme Court explained that:

> Thomas'[s] factual allegations in [the second] suit are independent from those asserted in the [first] ERISA suit, which involved Peacock's and Tru-Tech's status as plan fiduciaries and their alleged wrongdoing in the administration of the plan.  The facts relevant to this complaint are limited to allegations that Peacock shielded Tru-Tech's assets from the ERISA judgment long after Tru-Tech's plan had been terminated.

Id. (emphasis added).  Because the claims involved in both cases had "little or no factual or logical interdependence" and would not create greater efficiencies "by the exercise of federal jurisdiction over them," the Court held that ancillary jurisdiction was not appropriate.  Id. at 356.

The Fourth Circuit, applying the principles in Peacock, reached a similar conclusion in Alexandria Resident Council, Inc. v. Alexandria Redevelopment & Hous. Auth. ("ARC"), 218 F.3d 307 (4th Cir. 2000).  In ARC, the Alexandria Redevelopment and Housing Authority ("ARHA") had offered to sell a development to another

16

entity.  Id. at 308.  The Alexandria Resident Council, Inc. ("ARC")
filed suit in a federal court, seeking a declaration and order
that ARC was entitled to receive the sale offer.  Id.  The district
court granted the requested relief, which the Fourth Circuit
affirmed in a different opinion.  Id.

ARC subsequently filed two motions in the district court,
requesting that the court order ARHA to accept ARC's purchase
offer.  Id.  The Fourth Circuit held that ARC's initial suit was
"entirely independent from the legal question raised in the 1998
and 1999 motions" in part because resolving the subsequent motions
required the district court to consider issues that "were entirely
irrelevant to the resolution of the underlying complaint."  Id. at
309.  The Fourth Circuit further concluded that, "[a]s to the
second category of ancillary jurisdiction recognized in *Peacock*—
the court's power to effectuate its decrees—the relief sought in
the 1998 and 1999 motions, that ARHA be ordered to accept ARC's
purchase offer, simply was not necessary to the effectuation of
the initial judgment . . . ordering that [ARC] receive a sale
offer."  Id.

As in Peacock and ARC, ancillary jurisdiction is not
appropriate here because the breach of contract claims asserted in
the Motion are not factually interdependent with the breach of
contract claims previously adjudicated either in their own right
as contract breaches or as part of the Clayton Act claim, both of

17

which are the subject of the AFJO.  That is shown by comparing the allegations that were tried (and decided in the AFJO) with the allegations in the Motion.  In the Motion, Steves alleges that JELD-WEN has violated Sections 4, 20, and 21 of the Supply Agreement by: (1) not confirming and delivering Steves' doorskin orders for Weeks 44-52 of 2019 under Section 4, (ECF No. 2005 at 3-4); (2) not correctly calculating Steves' allocation percentage under Section 20, (id. at 7-9); and (3) not responding to Steves' request for good-faith verification under Section 21, (id. at 8-9).  In contrast, at trial, the jury considered Sections 1, 6, and 8 of the Supply Agreement.  (ECF No. 1022 ¶¶ 4-11.)  The sections at issue in the Motion—Sections 4, 20, and 21—were thus not the sections of the Supply Agreement implicated in the Complaint or the sections that the jury considered at trial.

To the extent that the parties dispute what the Supply Agreement requires, the Court would have to interpret Sections 4, 20, and 21 and make any relevant factual findings anew. Consequently, the issues that Steves alleges, and the relief that it seeks, in the Motion are not grounded in the jury's verdict, and the Court may not assert ancillary jurisdiction to resolve these new issues.

Although there is some overlap between the Motion and the underlying action—namely, the parties and their long history of disputes—the alleged breaches in the Motion are also not factually

18

or logically dependent on the primary lawsuit because they involve an entirely separate set of facts, in addition to different portions of the Supply Agreement.  To resolve the breach of contract issues alleged in the Motion, the factfinder would have to make additional findings of fact on a number of issues, including, but not limited to, JELD-WEN's production capacity, whether allocation is necessary or appropriate, and whether JELD-WEN's mix methodology is appropriate.  These issues are neither factually nor logically dependent on the issues that were resolved upon trial of the underlying complaint.

It is true that the relief sought in the Motion depends, in part, on the Clayton Act antitrust violation alleged, and adjudicated, in the underlying case.  In particular, the Motion depends upon the finding that the acquisition of CMI substantially lessened competition in the doorskin market.  However, the exercise of that power in the underlying case implicated different contractual provisions than are said to be implicated in the Motion.

The only overlap the Court can find between Steves' underlying complaint and the Motion is Steves' claim that JELD-WEN has been able to withhold doorskins and improperly impose and administer allocation because of the market power it retains from its unlawful merger with CMI.  That may well be true.  However, the overlap between that contention and the predicate acts at issue in the

19

Motion is not sufficient to allow for ancillary jurisdiction because Steves' underlying complaint only concerned how JELD-WEN used its market power to raise prices and reduce quality and output, not whether JELD-WEN used this market power to withhold ordered doorskins and impose allocation. (See ECF No. 5 at 1-2, 7-8, 19-21, 24-25, 27-41.)

Relatedly, in large part because there is no factual interdependence, asserting ancillary jurisdiction will not enable the Court to function successfully in managing its proceedings, vindicating its authority, or effectuating its decrees. The AFJO does not govern the parties' conduct concerning, *inter alia*, the supply and allocation provisions of the Supply Agreement, verification, and JELD-WEN's mix methodology. By its own terms, the Amended Final Judgment entered judgment:

> (1) on the Jury Verdict (ECF No. 1022) in favor of [Steves] against JELD-WEN . . . on STEVES' antitrust and breach of contract claims; (2) on the MEMORANDUM OPINIONS (ECF Nos. 1759 and 1784) addressing STEVES' request for equitable remedies on STEVES['] antitrust claims; (3) on the Jury Verdict (ECF No. 1609) in favor of JELD-WEN against STEVES on JELD-WEN's trade secret counterclaims; (4) on the MEMORANDUM OPINION (ECF No. 1773) addressing JELD-WEN's motion for judgment on certain of STEVES' breach of contract claims [concerning allegations that JELD-WEN failed to reimburse Steves for defective doorskins and for the cost of doors Steves manufactured that incorporated defective doorskins]; (5) on the MEMORANDUM OPINION (ECF No. 1811) addressing JELD-WEN's motion seeking injunctive relief on its trade secret counterclaims; (6) on

[STEVES'] request for declaratory relief as
set out in the Complaint but modified in
PLAINTIFF STEVES AND SONS, INC.'S MEMORANDUM
IN SUPPORT OF DECLARATORY RELIEF (ECF No.
1793); (7) on the MEMORANDUM OPINION (ECF No.
1779) and ORDER (ECF No. 1780) addressing
Edward Steves, Sam Steves, and John Pierce's
motions for judgment as a matter of law on
JELD-WEN's trade secret counterclaims; and (8)
to extend the terms of the Supply Agreement
for one year beyond the conclusion of any
appeal if this case remains on appeal until
September 10, 2021.

(ECF No. 1852 at 1-2.) Asserting ancillary jurisdiction over the

parties' current dispute will do nothing to help manage the Court's

proceedings, vindicate the Court's authority, or effectuate the

Amended Final Judgment because the Amended Final Judgment is almost

entirely unrelated to the present dispute.

In sum, for the Court to assert ancillary jurisdiction, there

must be a close nexus between the underlying suit and the Motion.

There is no such nexus here. The contention that JELD-WEN's recent

breaches are a continuation of JELD-WEN "flexing the muscle it

gained when it unlawfully acquired CMI [in violation of Section 7

of the Clayton Act]," (ECF No. 2005 at 21), is not sufficient to

establish that nexus. Nor is it necessary to exercise ancillary

jurisdiction to manage the proceedings that remain in the case, to

vindicate the Court's authority, or to effectuate its decrees.

Therefore, because the Motion is, in effect, a new and original

proceeding, the Court lacks ancillary jurisdiction over the

Motion.

**III.   Even if the Court Has Jurisdiction, The Court Will Not Grant an Injunction Under Rule 62(d).**

Fed. R. Civ. P. 62(d), formerly Rule 62(c), governs injunctions pending appeals and provides that:

> While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights.

Rule 62(d) is "merely expressive of a power inherent in the court to preserve the status quo where, in its sound discretion, the court deems the circumstances so justify." McClatchy Newspapers v. Cent. Valley Typographical Union No. 46, 686 F.2d 731, 734 (9th Cir. 1982) (quoting 7 J. Moore, Moore's Fed. Prac. P. 62.05, at 62-19-20 (2d ed. 1979)) (internal quotation marks omitted); see also Eli Lilly & Co. v. Arla Foods, Inc., 893 F.3d 375, 384 (7th Cir. 2018) ("The civil rules allow the district court to modify an injunction to maintain the status quo pending appeal.").

The Court will not grant an injunction under Rule 62(d) because the breaches alleged in the Motion are not factually dependent on the primary lawsuit or the AFJO. The rights that Steves seeks to secure—the right to receive doorskins Steves ordered before allocation took effect, the right to receive allocation verification and weekly updates, the right to receive the "proper number of doorskins" under the Supply Agreement, apart

22

from any allocation (which, according to Steves, was not properly declared), and the elimination of the mix methodology, (ECF No. 2005 at 3)—are not rights contained either explicitly or implicitly in the AFJO.   Rule 62(d) does not operate to the extent necessary to allow the Court to grant the relief sought by Steves in the Motion.[7]   And, that is true, even as Steves asserts, if JELD-WEN is collaterally estopped on the Clayton Act violation.

### CONCLUSION

For the foregoing reasons, Steves' EXPEDITED MOTION FOR INJUNCTION IN SUPPORT OF THE AMENDED FINAL JUDGMENT (ECF No. 2001) was denied.

It is so ordered.

_____ /s/   _REP_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  May _5_ , 2020

---

[7]   If Steves wishes to pursue the claims that it makes in the Motion and the relief therein sought, it must do so in a separate suit.