IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEVES AND SONS, INC.,

    Plaintiff,

v.                                               Civil Action No. 3:16cv545

JELD-WEN, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on STEVES AND SONS, INC.'S OBJECTIONS TO THE REPORT AND RECOMMENDATION REGARDING DIVESTITURE (ECF No. 2209) ("STEVES' Objections" or "the Objections") and Steves and Sons, Inc.'s ("STEVES") subsequent notice to the Court requesting that the Objections be treated as moot (ECF No. 2364). Having considered the Report and Recommendation and its Exhibit A (ECF Nos. 2189 & 2189-1), STEVES' objections, JELD-WEN, Inc.'s ("JELD-WEN") response (ECF No. 2222) and STEVES' reply (ECF No. 2227), and STEVES' notice requesting that its Objections be treated as moot and JELD-WEN's response (ECF No. 2370), the Court concludes, for the reasons set forth below, that the Report and Recommendation and STEVES' Objections have been overtaken by subsequent events. Accordingly, STEVES' Objections will be denied as moot and the Report and Recommendation will be vacated, and the divestiture process will begin afresh.

1

## BACKGROUND

This matter's extensive procedural history is recounted elsewhere[1] and familiarity with that history is assumed in what follows. Briefly, in 2016, STEVES brought this action against JELD-WEN alleging violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18. STEVES argued that JELD-WEN's 2012 acquisition of Craftmaster International ("CMI") and subsequent conduct were anticompetitive and illegal.

STEVES manufactures and sells interior molded doors. To manufacture its doors, STEVES must be able to purchase interior molded doorskins, which are a component of its doors. JELD-WEN manufactures both interior molded doors and interior molded doorskins. Before JELD-WEN's 2012 acquisition of CMI, there were three domestic doorskin manufacturers who sold doorskins to Independent[2] door manufacturers: JELD-WEN, CMI, and Masonite. JELD-WEN's acquisition of CMI thus reduced the number of sellers from three to two.

A jury found, *inter alia*, that JELD-WEN's acquisition of CMI violated the Clayton Act and substantially reduced competition in

---

[1] See 345 F. Supp. 3d 614 (E.D.V.A. 2018) ("the Divestiture Opinion").
[2] The "Independents," here and in what follows, refers to domestic door manufacturers who are not themselves manufacturers of doorskins, and hence, like STEVES, are reliant on a supply of reasonably priced doorskins to remain in business.

the domestic doorskins market. After a hearing on remedies, the Court ordered divestiture of the Towanda, Pennsylvania doorskin manufacturing facility that JELD-WEN acquired when it merged with CMI (the "Towanda facility," or "Towanda").

The United States Court of Appeals for the Fourth Circuit affirmed the Court's divestiture order, 988 F.3d 690 (4th Cir. 2021), and JELD-WEN announced that it would not seek certiorari from the Supreme Court of the United States. The divestiture process then began.

### THE SPECIAL MASTER'S REPORT AND RECOMMENDATION

The divestiture has been overseen by a Special Master in accordance with the Court's ORDER (ECF No. 1863) (the "Special Master Order"). As contemplated by that ORDER, the Special Master retained several advisors to assist with the divestiture process. Advisors from NERA Economic Consulting and Venable, LLP were retained to provide the Special Master assistance in assessing the suitability of each bidder by analyzing the antitrust issues that might arise if the bidder were to succeed in acquiring Towanda.

That antitrust analysis was set forth in a report ("the Venable/NERA Report"), attached as Exhibit A to that Report and Recommendation.[3] The Venable/NERA report was drafted after the

---

[3] Unredacted copies of the Report and Recommendation and Venable/NERA Report are filed under seal at ECF Nos. 2189 & 2189-1. Redacted public versions are filed at ECF Nos. 2213 & 2213-1.

Special Master had received initial bids ▮▮ ▮▮ ▮ ▮▮ ▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮▮▮ ▮ ▮▮ ▮▮▮ following a solicitation of bidders and a subsequent winnowing process. The Venable/NERA Report assessed each of ▮▮▮ ▮▮ bidders then under consideration with an eye to how their acquisition of Towanda might raise concerns related to vertical or horizontal integration in the domestic doorskins market. The Special Master then used the Venable/NERA Report in his analysis of the prospective bidders in the Report and Recommendation.

The Venable/NERA Report noted that ▮▮ ▮▮ bidders would automatically satisfy a central aim of the divestiture process because each would, if chosen, add a third competitor to the domestic doorskin market. The bidders did, however, differ as to whether, and to what degree, acquiring Towanda would cause them to become vertically integrated. With respect to ▮▮▮▮ finalists in the initial round of bidding, the Venable/NERA Report drew the following conclusions:

[redacted]



The Venable/NERA Report emphasized that attentiveness to vertical foreclosure risks is particularly important in this case because JELD-WEN and Masonite have both indicated that they do not intend to sell doorskins to the Independents in the future. That is not at all a certainty. And, in fact, the Divestiture Opinion took the view that, post-divestiture, JELD-WEN and Masonite likely would be part of the source of supply for the Independents. 345 F. Supp. 3d at 667. But if JELD-WEN and Masonite do not sell to the Independents, the purchaser of Towanda will, post-divestiture, be the lone domestic source from which Independents will be able to acquire doorskins. It is therefore essential, the Venable/NERA Report concludes, that the prevailing bidder does not pose vertical foreclosure risks.

The Venable/NERA Report states that an appropriate framework "for assessing whether a bidder raises vertical concerns is similar to the framework for analyzing potential competitive concerns in a vertical merger." ECF No. 2189-1 at 11. This, in turn, means that the analysis must determine the risk of the merged entity pursuing a foreclosure strategy (limiting or ceasing sales to the

5

Independents) and measure that risk against any competitive benefits that might result from the merger.

Then, incorporating the Divestiture Opinion's analysis of the foreclosure risk,[4] and, given JELD-WEN and Masonite's representations that they do not intend to sell to the Independents going forward, the Venable/NERA Report concludes that pursuing a foreclosure strategy would be viable for a company with the appropriate set of incentives. This is contrasted with the status quo before JELD-WEN's acquisition of CMI. When three upstream manufacturers compete in the same area, no one manufacturer is likely to be able to execute a foreclosure strategy on its own: the foregone sales to downstream customers would not be transferred to the foreclosing company but would instead, at least in part, be diverted to the other two companies who were not engaging in a foreclosure strategy.

These foreclosure risks must be set against the benefits that would accrue to the relevant market if there were to be a vertically integrated firm. Some of these benefits are listed in the Venable/NERA Report. They are all various forms of efficiency obtained by the fact that a separate profit-seeking firm is not interposed at a mid-point in the supply chain. A further consideration identified in the Venable/NERA Report is that "the

---

[4] ECF No. 2189-1 at § VII.C.

aforementioned procompetitive efficiencies potentially gained by a vertically integrated manufacture would largely translate to a different market: the downstream market for doors." Id. at 18.

These analytic constructs were then applied to each of ▮▮ ▮▮ bidders. According to the Venable/NERA Report, ▮▮ would have the incentive and ability to pursue a foreclosure strategy if it acquired Towanda. Furthermore, the benefits that would be attributable to ▮▮ ▮▮ ▮▮ would be felt downstream, in the doors market, and not in the doorskins market. Therefore, the Venable/NERA Report concludes, the foreclosure risk would not be offset by competitive benefits in the market under consideration, i.e., the domestic market for interior molded doorskins.

In assessing ▮▮ risk of pursuing a foreclosure strategy, the Venable/NERA Report notes that "it is key to the analysis that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ ▮▮" Id. at 21. That is relevant because it means that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, could remain profitable even as it passed up the profits from sales to other Independents as part of a longer-term effort to eliminate them from competition.

In carrying out its analysis, the Venable/NERA Report does not credit ▮▮ ▮▮ ▮▮ ▮▮ ▮▮ ▮▮



---

[5] Id. at 24.
[6] JELD-WEN and STEVES will enter a supply contract that will be assigned, as part of the divestiture, to the Acquiring Company.

███████ ███████ ███████ █ █ ███████ ███████
█████████████████████████████████████ █
████████████████████████████████████████
████████████████████████████████████████
███ ███ █ ██████ ███ ██████ ███████ █ █
███████ █ ████ █████ █ ██ █ ██ ███ ████
████ ██ ██████ ██████ ██ █ ██████ ██████
██████

The Venable/NERA Report draws the additional conclusion that, ██ █ ██████ ████ █████ ██████ ██ ████ ██ █ ████
█████████████████████████████████████ █
██████ █████ █████ ███ █████ █ ██████ ██ ██████ ██
████ ██ ██ █████ █████ ██ ██ █████ ██ ██ ██

██████ Id. at 24. As JELD-WEN elaborates in its briefing in support of this analysis, ███ █████ ██████ ██ █████ ██ ████
██ ██ ██ █████ ██ ██ █ █████ █████ ████ █
████████ █████ █████ ██ ██████ ██ ██ █████
███ ██ ██ █████ █████ ██ █ █████ ██ █████

█████████ The Venable/NERA Report therefore concludes that: "[o]f ███ ███ bidders, ██████ █ █ █████ █████ has the greatest incentive to foreclose other Independents in the way that the Court found the Independents, █████████ ██████ to have been harmed in the underlying litigation." Id. at 26.

The Special Master's Report and Recommendation provides an antitrust analysis of each of the bidders, drawing in large part on the Venable/NERA Report's analysis described above. Of particular relevance, the Report and Recommendation concludes that ▆▆▆ should be disqualified as a bidder "due to antitrust concerns ▆▆▆ ▆▆▆ ▆▆▆ ▆▆ ▆▆▆▆ ▆▆ ▆▆▆ ▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆ ▆▆▆ ▆ ▆ ▆ ▆▆▆ ECF No. 2189 at 2. That conclusion, and its underlying analysis, is the target of STEVES' objection to the Report and Recommendation.

**THE PARTIES' BRIEFING ON THE REPORT AND RECOMMENDATION**

STEVES objected to the Report and Recommendation, arguing that it both relied on an inadequate factual record and misapplied core antitrust principles in reaching its conclusion.

First, STEVES argued that the Special Master did not ▆▆ ▆



STEVES also protested against the background assumption that the owner of Towanda will be a monopolist, arguing that that is true only if JELD-WEN and Masonite behave irrationally in foregoing profits from sales to Independents. STEVES based these aspects of

its objections on the Divestiture Opinion's view that JELD-WEN and Masonite likely would find it in their interest to offer supply to the Independents. 345 F. Supp. 3d at 667.

Second, STEVES argued that the Report and Recommendation and the Venable/NERA Report did not look to the right market in determining the competitive benefits that would result ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

Third, STEVES pressed the point that the Venable/NERA Report and the Report and Recommendation do not properly analyze the economic upshot of ▆▆▆▆ pursuing a foreclosure strategy. In particular, STEVES argued that, ▆▆ ▆▆▆ ▆▆▆▆ ▆ ▆▆ ▆▆▆ ▆▆▆ purely economic considerations would disfavor ▆▆▆▆ pursuit of a foreclosure strategy (as opposed to selling as many doorskins as possible to the Independents).[7]

JELD-WEN countered each of STEVES claims and argued in support of the findings in the Report and Recommendation.

JELD-WEN argued, first, that the Special Master did not err in the market definition used in performing the analysis, because his recognition of the efficiencies ▆▆▆▆ would gain were an acknowledgement of the fact that ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

---

[7] STEVES made assorted other arguments in support of ▆▆▆▆▆▆ ▆ ▆ ▆ ▆▆▆▆ ▆▆▆▆ ▆ ▆ ▆▆▆ ▆ ▆▆▆ It is not necessary further to comment upon those points.

11





---

[9] JELD-WEN's expert, Dr. John H. Johnson, models this in his declaration (ECF No. 2222-1 at 28).

To help address these competing views, the Court invited the United States Department of Justice ("DOJ") to submit a brief *amicus curiae*. ECF No. 2265. While acknowledging that it had only partial information about some details of the divestiture process because of extensive redactions in the record, the DOJ's brief endorsed the Special Master's analysis, noting in particular that claimed efficiencies that would result from vertically integrated merged entity should be treated with special skepticism in light of the anticompetitive risks such a merger may pose.

The foregoing summarizes the state of the divestiture process as of the Report and Recommendation and STEVES' Objections.

**Subsequent Developments in the Divestiture Process**

While the parties were briefing STEVES' objections to the Report and Recommendation, there were three quite significant further developments in the divestiture process.

First, 

Second, STEVES made clear its plans for building its own doorskin plant. That affected another component of the Report and Recommendation.

Third, ███ █████████ ███ █████████ ██ █ ███████ JELD-WEN submitted a motion for modification of the divestiture process. ECF No. 2235. JELD-WEN urged, *inter alia*, that the process would go more smoothly if JELD-WEN and STEVES were to negotiate the supply agreement called for by the Amended Final Judgment Order that would, upon completion of the divestiture, be assigned by JELD-WEN to the Acquiring Company. Though STEVES initially resisted this suggestion, it eventually agreed with JELD-WEN's proposal. ECF No. 2276. And, in so doing, STEVES further stated that, if it were able to secure an agreement that granted it a guaranteed supply of doorskins at a reasonable price, ██████████ █████████████████████████████ JELD-WEN's Motion was granted. ECF No. 2282.

However, the parties were not able to come to a resolution on all terms to the supply agreement. Thus, pursuant to the parties' earlier agreement, the Court issued a MEMORANDUM OPINION, ECF NO. 2354, which resolved the major points of contention. ████████ ███ █████ ████ ████ █████ ████████ ██ █ █████ ██ █████ █████ ██ ██ █████ █████████ █████ ██ █ ████ ████ ████ ████ ████ ████ █████ ████ ████ ████ █████ █████ █████ █████ █████ █████ █████ █████ █████ █████ █████ ████ ████ ████ █████ ████ █████ █████ ████ █████ █████ ████████████████████████████████████████ ████████████████████████████████████████████



JELD-WEN thus

15

concludes that there is no basis for refraining from ruling on STEVES' objections and urges that doing so now will create greater certainty and efficiency in the divestiture process going forward.

**ANALYSIS**

There are three ways in which the future divestiture proceedings might play out. The Court finds that, no matter which scenario comes to pass, it would be ill-advised to rule on STEVES' objections and the Report and Recommendation now rather than addressing the issue of ████████ ████████ ██ ████████ ██ ██ ████████ if or when that issue were actually to present itself.

In the event that STEVES and JELD-WEN agree to contract terms and there is a qualified bidder, ████████ ████████ ██ ██ ████████ ████████ ██ ██ ████████ ████████ ██ ██ ████████ ████████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ ██ ██ ████████ ████████ ████████ ████████ ██ ████████ ████████ ████████ ██ ████████ ██ ████████ ██ ██ ████████ ██ ████████████████████████████████████████████████████████ ██ ████████ ████████ ████████ ████████ ████████ ██ ████████ ██ ████████ That decision, however, would be made in circumstances that have changed since the Venable/NERA Report was written and the Report and Recommendation was issued. The change in circumstances is sufficiently significant that new analysis would be needed. In addition to the change in circumstances as a result

16

of the different array of bidders, the Special Master, in that scenario, would also have the benefit of information not previously available, including:

(1) Substantially more information about STEVES' prospects of building an Athens, Georgia doorskin manufacturing plant; and

(2) STEVES' expert's modeling and analysis, which aim to show that ▇▇▇▇ would have no incentive to pursue a foreclosure strategy if it were to acquire Towanda; and

(3) JELD-WEN's expert's response to Steve's expert's modeling and analysis, showing that the Report and Recommendation was correct in its assessment that ▇▇▇▇ acquisition of Towanda would create anticompetitive conditions; and

(4) The government's brief *amicus curiae* addressing STEVES' objections and the Special Master's earlier Report and Recommendation.

While it may be the case that, taking the changed circumstances and all of this additional information into account, the Special Master's earlier analysis would still fully apply, that conclusion is not fully determined by the first Report and Recommendation because that question was not presented when the Report and Recommendation was prepared. Consequently, the Court's consideration of the matter would benefit from the Special Master analyzing ▇▇▇▇ ▇▇▇▇▇▇ in light of the identities of the new bidders and the additional information mentioned above in order to determine what difference *vel non* the changed circumstances and additional information make to the analysis.



████████ in that specific scenario would therefore be aided by a Report and Recommendation from the Special Master that was drafted with that very specific and unforeseen context in mind. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

However, the Court must deal with extant circumstances and the actual arguments that the parties make with regard to those circumstances, and does not decide questions with reference to hypothesized motives or strategies. While nothing requires the Court to adopt a contrived naivete that would allow a party to abuse procedural safeguards, that is a long way from the present circumstance. Moreover, the fact that STEVES' objections to the first Report and Recommendation were directed at its analysis of ████████ ████████████ ██ █ ████████ tells against JELD-WEN's theory.

Though STEVES argued that ███ ██ ██ ██ ██ ██ ████ ██ ██ ██ ██ ██ ██ ██ ██ ████ ██ ██ ██ ████ ██ ████ ██ ██ ██ ██ ████ ██ ████ ████ ██████ ████████ JELD-WEN's theory thus relies on the premise that ██ ██ ████ ██████ ██████ ██████ ████ ██ ██ ████████████████████████ ██ ██ ████ ██ ██████ ██████ ██ ██████ ████ ██ ██ ██ ██ ████ ██ ██ ██ ██ ██ ████ The Court finds no reason to credit this prediction.

In sum, STEVES indicates that it expects the resolution of the terms for the supply agreement ██ ██████ ██ ██████ ██ ████████████████████████ If that is what happens, and if a suitable bidder is identified and awarded the purchase of Towanda, STEVES Objections would indisputably be moot. If some other scenario arises and ██████ ██████ ██████ ██ ████████████████ the Special Master, at that point, will no doubt offer the Court his view as to what effect, if any, the intervening circumstances and additional information have had, and the Court will decide the matter then.

## CONCLUSION

For the reasons set forth above, the Report and Recommendation will be vacated and STEVES' Objections to it will be denied as moot. The divestiture process will resume afresh.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March 20, 2023
*nunc pro tunc* August 4, 2022

20