IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEVES AND SONS, INC.,

    Plaintiff,

v.                                        Civil Action No. 3:16cv545

JELD-WEN, INC.,

    Defendant.

**MEMORANDUM OPINION**

This matter is before the Court on JELD-WEN, INC.'S PROPOSED DOORSKIN SUPPLY AGREEMENT WITH STEVES AND SONS, INC. (ECF No. 2294) and related documents (ECF Nos. 2295, 2310, and 2321) and on the NOTICE OF FILING STEVES' PROPOSED SUPPLY AGREEMENT (ECF No. 2296) and the related documents (ECF Nos. 2299, 2308, and 2318), which were filed in accord with the terms of a MEMORANDUM ORDER dated May 16, 2022 (ECF No. 2282), and pursuant to the agreement of the parties that the Court is to resolve the issues therein presented.

**BACKGROUND**

A full recitation of the factual and procedural background of this case and the issues now before the Court appears in the relevant decisions of this Court and the United States Court of Appeals for the Fourth Circuit.[1]   And, familiarity with those

---

[1] See Steves and Sons, Inc. v. JELD-WEN, Inc., 345 F. Supp. 3d 614 (E.D.V.A. 2018)("the Divestiture Opinion"); Steves and Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690 (4th Cir. 2021) (affirming the divestiture aspect of the Divestiture Opinion); ECF No. 2282

decisions and issues is assumed.   Nonetheless, an understanding of the pending issues and their resolution will be aided by the following summary.

In COUNT ONE of its Complaint against JELD-WEN, Inc. ("JELD-WEN"), STEVES AND SONS, Inc. ("STEVES") alleged a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, asserting that JELD-WEN's merger with CRAFTMASTER INTERNATIONAL ("CMI") in 2012 had substantially lessened competition in the molded interior doorskin market.   In addition to damages, STEVES sought equitable relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.   In particular, STEVES sought divestiture of the merged entity (the "Towanda facility" or "Towanda") as well as certain so-called "conduct remedies."   Divestiture (unwinding the merger) is referred to as a "structural remedy" because divestiture addresses the structure of the affected market.   Conduct remedies are those that help ensure the success of the divestiture in remedying the anticompetitive market that ensued the merger.   U.S. Department of Justice, Antitrust Division, <u>MERGER REMEDIES MANUAL</u> (September 2020) § III.B.1 (hereinafter "MRM").

A jury returned a verdict in favor of STEVES on its Clayton Act claim in COUNT ONE, finding that the challenged merger had substantially lessened competition in the molded interior doorskin

---

(granting in part JELD-WEN's motion (ECF No. 2235) to amend the Amended Final Judgment Order).

market.   Thereafter, an evidentiary hearing was held on STEVES'
request for equitable relief in the form of divestiture and certain
conduct remedies.   In the Divestiture Opinion, issued on October
5, 2018, the Court determined that divestiture was appropriate and
that, to help assure the success of the divestiture, certain
conduct remedies were also appropriate.   Steves and Sons, Inc. v.
JELD-WEN, Inc., 345 F. Supp. 3d 614 (E.D. Va. 2018) (the
"Divestiture Opinion").

Among the conduct remedies sought by STEVES was a request
that "the divested entity [be required] to offer an eight-year
long-term supply agreement to STEVES at reasonable prices and
terms." 345 F. Supp. 3d at 626.   Based on the trial record and
the evidentiary hearing respecting equitable relief, the Court
concluded that the divested entity would benefit from having a
long-term supply agreement with STEVES and that a provision
requiring the divested entity to agree to supply STEVES beyond
2021 would be a permissible, reasonable, and necessary measure to
implement the divestiture and to address the irreparable injury
that STEVES had proved.   Id. at 669.   As contemplated by the
Divestiture Opinion, the Amended Final Judgment Order entered on
March 13, 2019 (ECF No. 1852) ("AFJO") provided that:

> The Acquiring Company and STEVES shall enter
> into an agreement, which will assure STEVES a
> supply of molded interior doorskins of the
> kind and in the volume reflected in the
> current Supply Agreement with JELD-WEN for

3

> three years after September 10, 2021, at
> prices and terms to be negotiated between the
> Acquiring Company and STEVES.

AFJO, ¶ 4 (emphasis added).[2]

The "current Supply Agreement" referred to at Paragraph (4) of the AFJO was executed between JELD-WEN and STEVES in 2012, shortly before JELD-WEN announced the merger with CMI. ECF No. 2348-1. The Supply Agreement was for a seven-year term but it contained an evergreen provision by which the agreement was automatically renewed annually unless timely notice of termination was given. Id. at 2. In September 2014, JELD-WEN gave notice of termination; so, absent remedial intervention, the 2012 Supply Agreement would expire on September 10, 2021.[3] Because of the time that had passed between entry of the verdict and entry of the AFJO, and because appeal was a certainty, Section VIII of the AFJO provided that, if the case remained on appeal as of September 10, 2021, the 2012 Supply Agreement would remain in effect "for one year beyond conclusion of the appeal." ECF No. 1852 at 13-14, Section VIII.

The 2012 Supply Agreement was superseded by the "Amended Molded Doorskin Product Agreement," dated June 2, 2020 (ECF No. 2308-17) (the "2020 Supply Agreement"). The 2020 Supply Agreement

---

[2] The "Acquiring Company" is defined as the entity that purchases Towanda in the divestiture process.

[3] Divestiture Opinion at 635.

4



The 2020 Supply Agreement, ███ ██ ████ ██ ██ ████ ██ ████████ but JELD-WEN and STEVES later agreed, and the Court thus ordered, that it would remain in effect "until divestiture is complete pursuant to order of the Court and the new supply agreement set forth in Paragraph (4) of the [AFJO] between STEVES and the company that acquires Towanda is in effect." ORDER, ECF No. 2111 at 2, ¶ 2.

The parties later entered a stipulation which provided that Paragraph (4) of the AFJO was amended to state:

> The Acquiring Company and STEVES shall enter into an agreement, which will assure STEVES a supply of molded interior doorskins of the kind and in the volume reflected in the current Supply Agreement with JELD-WEN <u>for three years from the date divestiture is complete</u> pursuant to order of the Court, at prices and terms to be negotiated between the Acquiring Company and STEVES.



STIPULATION REGARDING AMENDED FINAL JUDGMENT ORDER (ECF No. 1852) (ECF No. 2181) (emphasis added).  That amendment to Paragraph (4) of the AFJO was made to make clear to prospective bidders for the Towanda facility that, as counsel for STEVES put it:



As counsel for JELD-WEN confirmed:



Because of circumstances that occurred during the first phase of the divestiture process, JELD-WEN filed a MOTION TO MODIFY THE AMENDED FINAL JUDGMENT ORDER AND MARCH 22, 2019 ORDER (ECF No. 2235) (the "Motion to Modify").  In the Motion to Modify, JELD-WEN sought amendment of Paragraph (4) of the AFJO to require "STEVES to negotiate and sign a new three-year supply agreement with JELD-WEN that takes account of current market realities for the benefit of the Towanda buyer."  ECF No. 2236 at 11.  As the Court previously has found:

> The principal reason for this requested amendment, from JELD-WEN's standpoint, is to ensure that potential bidders in the divestiture process will understand fully the

---

5 Tr., ECF No. 2179 at 42.

6 Id. at 43.

> contractual obligations that the Acquiring
> Company will undertake and that the Acquiring
> Company will have the benefit of knowing the
> terms on which STEVES, the largest purchaser
> of Towanda's output in 2020, will be
> purchasing from the Acquiring Company.

ECF No. 2282 at 3. Although STEVES initially argued against the

notion of negotiating its future supply agreement with JELD-WEN,

STEVES later revised its view and instead stated that it agreed

with a comment filed by the Department of Justice and with the

proposal that the STEVES supply agreement required by paragraph

(4) of the AFJO should be negotiated between STEVES and JELD-WEN

and then assigned to the Acquiring Company.

Moreover, STEVES proposed that "the Court should order STEVES

and JELD-WEN to undertake expedited negotiation of STEVES' long-

term supply agreement with the aim of securing . . . [a contractual

equivalent to the elimination of double marginalization], with

that contract to be assigned to the purchaser of Towanda." ECF

No. 2282 at 5. As a result of the briefing and the hearing on the

Motion to Modify, it became evident that STEVES and JELD-WEN

substantially agreed that:

> (1) they could negotiate with each other the terms
> of the supply agreement that would bind the
> future owner of Towanda and that having such
> an agreement in place would be conducive to
> the efficient conclusion of the divestiture
> process; and
>
> (2) the parties had good reason to believe that, on
> an expedited schedule, they would be able to
> come to terms on such an agreement.

ECF No. 2282 at 6.

At oral argument on the Motion to Modify, STEVES remained of the view that the new supply agreement ██████ ██ ███ ██████ ████ ██ three years contemplated by paragraph (4) of the AFJO, as modified. ███████ ██████ █████ ████ █████ ██████ ██ ██ ███████████ ████ █████ ██ █████ █ ████ ██████ ███ ███████ ██ ██ █████ ████ █████ ████ ██████ ███ ███████ ██████ ███ ██████ █████ █ ████ ████ ███████████ ██████ ███████████████ ███████ ██ ██ █████ ██ █████ ████ ██████ ███ ████████████████████████████████████████ ███████████████████

The parties agreed that the Special Master should attempt to mediate and help arrive at appropriate terms to be embodied in that supply agreement.  Further, the parties agreed that, if they were not able to reach agreement on the terms of the new supply agreement, the Court would determine what the terms of new supply agreement would be.  ECF No. 2282, ¶¶ 6-7.

Unfortunately, even with the aid of the Special Master, the parties were not able to come to terms on the Supply Agreement

---



contemplated by Paragraph (4) of the AFJO and by ECF Nos. 2181 and 2182.   Consequently, the Court is now tasked with settling the terms of the new Supply Agreement between JELD-WEN and STEVES that will be assigned to the Acquiring Company in the divestiture process.   Courts are ill-suited to devising commercial contracts, and, even though they may exercise the equitable power to do so in fashioning antitrust conduct remedies, district courts are cautioned to exercise restraint in so doing.   See, e.g., Verizon Commc'ns, Inc. v. Law Office of Curtis v. Trinko, LLP, 540 U.S. 398, 408 (2004) ("Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity and other terms of dealing—a role for which they are ill suited.").

The task at hand is informed by certain basic principles that have been developed to guide the structural antitrust remedy of divestiture and the formation of conduct remedies to help ensure the restoration of competition which the divestiture aims to achieve.   Those principles are set out in the MRM, which is limited in scope to "remedies addressing anticompetitive mergers."   Of course, neither the MRM nor its individual provisions have any "force or effect of law."   MRM at 1 n.2.   Nonetheless, the MRM and the principles that it reflects have been developed, and used, in guiding court-directed divestitures in cases initiated under the Clayton Act by the Government.   Thus, the MRM and its fundamental

principles are informative, and of use, in this privately instituted proceeding.

The basic principles that guide the forming and implementation of remedies are summarized as follows:

- "Remedies Must Preserve Competition"[8]

  - This, of course, includes restoring competition to the relevant market when unwinding a transaction.

  - This is a fact-intensive process.

- "Remedies Should Not Create Ongoing Government Regulation of the Market"[9]

  - Any conduct remedy presents this risk and should be tailored to facilitate effective structural relief [e.g. divestiture].

  - Temporary supply agreements may be useful conduct remedies.

  - The duration of a Supply Agreement is important as are the pricing terms.[10]

- "The Risk of a Failed Remedy Should Fall on the Parties, Not on Consumers."[11]

- "The Remedy Must Be Enforceable."[12]

- "The Remedy Should Preserve Competition, Not Protect Competitors"

---

[8] MRM at 3 & n. 8.

[9] MRM at 3, 14.

[10] MRM at 14 nn. 48 & 49.

[11] MRM at 5.

[12] MRM at 5.

Having examined the 2012 and the 2020 Supply Agreements, the various submissions made by the parties (identified in the opening paragraph), the record at trial and at the hearing on equitable remedies, having considered the Department of Justice's recommendations and guidance as articulated in the MRM, and having heard the argument of counsel, the Court concludes that the approach to be taken at this stage is for the Court to set out conclusions on the five major topics of dispute (price, duration, volume, kind, allocation) and what the parties call the "Other" issues.   Then the parties, under the guidance of the Special Master, must craft the actual contract terms of the conduct remedy at issue, *i.e.*, the Supply Agreement contemplated by Paragraph (4) of the AFJO, as amended.   Thereafter the Supply Agreement will be part of what is presented to the Justice Department and, of course, ultimately will have to receive Court approval.   Once approved, it will be binding on the Acquiring Company.

## DISCUSSION

JELD-WEN and STEVES have substantial differences respecting the terms of the new Supply Agreement.   When resolving those disputes, it is necessary to remain ever-mindful that the new Supply Agreement is a conduct remedy designed to help the divestiture remedy to succeed and thusly to help remedy the anticompetitive effects of JELD-WEN's  merger with CMI.

11

To that end, the specific purpose of the new Supply Agreement is to assure the divestiture buyer that it will have a desirable, commercially viable contract with the entity that ▬▬▬▬▬▬ ▬▬▬▬▬ of the doorskin product produced by the divestiture asset. Secondarily, the conduct remedy at issue is also directed more specifically at providing relief to the plaintiff in this case, STEVES, by ensuring that the divestiture process is carried out in such a way that the antitrust injury suffered by STEVES is actually ameliorated by the implementation of the remedy.

Conversely, it is necessary to remember that the purpose of this conduct remedy is not to afford commercial advantage to STEVES, or to help secure the best price for the Towanda facility, or to provide aid to JELD-WEN, which, after all, has been found to have effected an anticompetitive situation in the affected market. Finally, it is necessary to accept that the conduct remedy must operate within the confines of other agreements and orders in this case. In working toward all these goals, the Court is mindful of the Fourth Circuit's guidance that "conduct remedies are disfavored because they 'risk excessive government entanglement in the market." Steves and Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 720 (4th Cir. 2021) (quoting Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd., 778 F.3d 775, 793 (9th Cir. 2015)).

With these thoughts in mind, the task now is to assess and resolve the parties' differences as to the new Supply Agreement.

## I.   DURATION

The starting point for the analysis is to settle upon the duration of the new Supply Agreement.   The parties are at significant odds over that point.   The two issues respecting duration that must be decided are: (1) how long the agreement should be; and (2) when the agreement should take effect.

### A.   STEVES' Position

STEVES argues that a 

At that point, STEVES argues, the market will no longer have the anticompetitive quality that would jeopardize STEVES' ability to negotiate a reasonable long-

---

[13] The "Independents," here and in what follows, refers to domestic door manufacturers who are not themselves manufacturers of doorskins, and hence, like STEVES, are reliant on a supply of reasonably priced doorskins to remain in business.

term supply agreement with the Acquiring Company.   ECF No. 2321 at 19.

STEVES further argues that ███████████ is reasonable in light of industry norms.  ███████████████████████ ███ ██ ███ ██ ████████ ██ ████████ ███████████, are, according to STEVES, as much a matter of JELD-WEN's eagerness to get out from the terms of the 2020 contract as anything to do with the merits of the issue.  In support of its claims about the industry norms, STEVES points to the fact that the other Independents' agreements with JELD-WEN all had, or still have, ███████ ███████ ████████████████████████████ ECF No. 2308-10.

## B.    JELD-WEN's Position

JELD-WEN argues that the presumption ought strongly to be in favor of █ ████████████████████████████████████████



ECF No. 2310 at 16.

15



**C.   Analysis and Conclusion**

The briefing is, on both sides, quite vague on the issue of the Court's authority—or lack of authority—to modify the 2020 Supply Agreement.  Adopting JELD-WEN's position would require the Court ████████████████████████████████████, which was set in the context of the parties' ███████  ████████  ████████  ███ ████ ██ ██ ███ ██ ██ ███ ██ █ █████ ████████ ██ █████ ██ and which has been extended by stipulation and Order of the Court implementing that stipulation.  STEVES argues that this context provides additional support for its position that the Court shouldn't follow JELD-WEN's proposal, but STEVES, as it concedes,[14] has not made the argument that to do so would be outside the scope of the Court's authority, even under equitable jurisdiction.

Neither did JELD-WEN very thoroughly address the issue whether, pursuant to the equitable power to craft a conduct remedy in STEVES I, the Court can alter the duration of the 2020 Supply Agreement that was part of ██ ████████ ████████ ██ █████ ██ ██ ████ ██ ████ ███████ ████████ ███████ ██ ████ ██ That

---

[14] Tr., ECF No. 2353 at 10.

question is further complicated by the fact that JELD-WEN stipulated that the 2020 Supply Agreement would be in effect until the divestiture is complete.  See STIPULATION, ECF No. 2110 at 2 ("[A]bsent further order of the Court, the Amended LTA shall be extended until divestiture is complete . . . .").

When asked about this issue in a July 13, 2022 telephone conference, JELD-WEN pointed to the language "absent further order of the Court,"[15] which it argued indicates that both parties understood the Court to have authority to modify the terms of the stipulation.  JELD-WEN further argued that its position is supported by ███████████████████  ██████████  ██████████ ███ ██ ███ ████ ████ ████ ████ ████ ██ ███ ████ ██ ██ ████ ██ ███ ████ ████ ███ ███ ███ ████ ███ ██ ██ ███ ████ ████ ███ ███ ███ ██ ███ ████ ██████████████ ████ ██ ███ ████ ████ ██ ████ ███ ███ ██ ███ █████████ ███ ███ ███ ███ ████ ████ ███ ███ ███ ██ █████ ██████████████████████ ███ ███ ███ ████ ███ ████ ████ ██ ████████████ █████████ Perhaps it can be understood to mean that, if changed circumstances invoke the equitable authority to

---

[15] In ECF No. 2111, ¶ (2), one of the ORDERS approving the parties' stipulation.

do so, the Court could so act.   But, the record here does not
demonstrate such changed circumstances.



As Steves emphasizes,

JELD-WEN invites the Court to undertake
the task of charting new terms without reference to any congruent
justification.   The Court declines that invitation.

Furthermore,   though   JELD-WEN   argues   that   STEVES   has
unreasonably delayed the divestiture proceedings, STEVES likewise
portrays   JELD-WEN   as   needlessly   delaying   completion   of   the
divestiture,   pointing   to   the   months-long   delay   caused   by   JELD-
WEN's professing intent to appeal the Fourth Circuit's affirmance

of the divestiture order to the Supreme Court, followed by an eventual withdrawal of the notice of appeal. STEVES points also to the fact that it was willing to waive its appeal rights with respect to the Court's decision as to these issues, while JELD-WEN declined to waive its right to appeal. These considerations, and others besides, according to STEVES, demonstrate that it is JELD-WEN that has engaged in unjustified and unreasonable delay tactics.

While there is no reason at all for the Court to come to any determination as to which party is more responsible for the pace at which the divesture has proceeded, it is assuredly the case that both parties have at different points been responsible for some degree of delay. It would therefore be unreasonable to use the structuring of the new Supply Agreement as a cudgel with which one or the other of the two parties could be brought into line. If either party were hereafter to engage in tactics for the purpose of causing delay, the other party's counsel certainly possesses the abilities needed to propose targeted solutions.

JELD-WEN's other arguments have more force. ██ ████████

████████████████████████████████████████████████████

██ ████████ Given market uncertainty, the added commitment of a rigid, long-term agreement might disincentivize a potential buyer who worried that changes in market conditions could result in many years' obligation to supply Towanda's largest customer on what

would have become unprofitable terms.  Even a small chance of such
an outcome could no doubt have a material effect on a potential
buyer's willingness to bid.  In a similar vein—and as STEVES itself
urges when discussing the pricing terms of the contract—the present
market for doorskins is not properly competitive because the
Towanda plant remains undivested, and JELD-WEN's ownership of the
Towanda plant was what led to the jury's finding in the first place
that the doorskin market was not competitive as a result of JELD-
WEN's acquisition of CMI.  There is therefore some reason to expect
that STEVES and the new owner of Towanda would be negotiating with
better information about the prices and terms a fair market will
support when they negotiate the next supply agreement.

     When JELD-WEN first proposed to modify paragraph (4) of the
AFJO so that STEVES' long-term supply agreement would be drawn up
and signed before the next divestiture bidding, its argument was



               On the other hand, STEVES initially opposed JELD-WEN's
proposal that the parties negotiate the contract that would be
assigned the purchaser of Towanda, with STEVES decrying the notion
of the "dead hand of today's uncompetitive market" controlling
future commercial relationships.  ECF No. 2244 at 10.  But now

STEVES not only endorses the idea of such a contract but also desires for it to be ██ ████████ ██ ████████ These various positions, while not strictly contradictory, indicate that the parties themselves may not have rigidly fixed views as to the optimal resolution to this issue. And, indeed, both parties' arguments have some merit, but neither side best serves the principal objective of the new Supply Agreement which, it must be remembered, is a conduct remedy whose purpose is to help the divestiture succeed and to restore competition.

The considerations canvased above lead to several conclusions. First, ███ ████████████ ██ █ █████████ ████████ ██ ███████ ███████ ████ ████████████ ████████ ███ ████ ██ ████████ and that, as explained in Section II, the Court has accepted. Second, JELD-WEN has not provided a divestiture-related reason why the new Supply Agreement (a complementary conduct remedy) ██████ ██ ███ ██████ █████ ██ ███ ████████████████ as the parties have agreed and the Court has ordered. ECF Nos. 2110 & 2111. Third, there is a middle ground between the parties' two proposals ████ ████████ that preserves elements of both views.

On that approach, which the Court adopts, the term of the agreement will be ████ ██████ ██████ █████ █████ ███████ ████████ ██ ████████ ██████ █████ █████ ██ ██████ ████ ██████ █████ ████████████████████████████████



This approach allays STEVES' concerns that, ████████ ████████

On the other hand, ████ ████████ ████ ████████ ██

## II.   PRICE

### A.   STEVES' Position

STEVES' position as to price begins with the premise that the current doorskin market is warped by the anticompetitive conditions created by JELD-WEN's acquisition of CMI.   Thus,

according to STEVES, JELD-WEN's market power renders the current prices that STEVES and the Independents pay for doorskins unusable as an anchor point from which to derive an appropriate pricing term for the new supply agreement.

STEVES argues that the way to calculate a fair price is for price to be ███ ██████ ██ ████████ █████ ████ ██ ████████ ████████ Any other approach, STEVES says, "would wrongly allow JELD-WEN to cash out the spoils of its own illegal transaction [*i.e.*, its 2012 purchase of CMI and the ensuing anticompetitive conduct found by the jury]." ECF No. 2308 at 11. STEVES thus proposes that the most effective way to restore competitive conditions is for the new Supply Agreement to ███ ███████████

████████████████████████████████████
███ ████ ████ ████ █ ████ ████ ████ ████ ████ ████
████ ██ ████ ████ ████████ ████ ████ ██ ███
████ ████ ██████ ████ ████ ████ ████ ██ ████
████ █████████ ████ ████████████████ ███
███ ████ ████ ████ ████ ████ ████ ████ ████
███ ██████ ███████ STEVES argues that: (1) ███ ██ ████████

---

[16] Contrary to STEVES' repeated assertions, *e.g.*, ECF No. 2321 at 5, the Court did not <u>require</u> the parties to adopt this approach to determining price but merely acknowledged that this was approach that STEVES had advocated when it expressed willingness to negotiate a supply agreement with JELD-WEN.

[17] <u>See</u> ECF No. 2308-12. STEVES provides the EBITDA margins for calendar years 2019-2021 for JELD-WEN, Masonite, and 10 "General



ECF No. 2308 at 12.  STEVES observed in its initial briefing that

Id. at 12;  Tucker Decl., ECF No. 2308-11 at 5.

JELD-

Building Products" companies.  STEVES does not say how those companies were selected for inclusion but neither does JELD-WEN challenge the selection of companies as being somehow unrepresentative or misleading.  STEVES' figures show that, in the calendar years 2019-2021, the 12 companies on the list had mean EBITDA margins of 14.2%, 16.2%, and 18.7% and median EBITDA margins of 12.3%, 14.1%, and 14.2%.  With the exception of one outlier (Louisiana-Pacific) in one year (a 2021 EBITDA margin of 42.9% and current rolling 12-month EBITDA margin of 43.5%), no company in the table STEVES provided has had an EBITDA margin above 30.3%.

WEN's initial proposal, ████████████████████████

██ ███   ECF No. 2310 at 7. ████ ████ ████ ████ ██ ████

████████ ████████ ████████ ████████ █ ████ ████ ██ ████

████████ ██ ████ ████ ████ ████ ████ ██ ████████

████████ ██



Since the initial round of briefing, however, JELD-WEN has

submitted additional data that provides ████████ ████████████

██████ ████ ██ ██ ██ ██ ██ ████ ███ ████ ████████

████████ ██ ████████ ████ ████ ████████ ████ ██ ████

████████████████████████████████████████████████████████

████████████████████

██████ ████ ██ █ ██ ████ ████ ████ █████

████████ ████ ██ ████ ████ ████ ████ ████ ███ ██

████ ████ ████ ████ ████ ██ ████ ████ ████████

There is, STEVES argues, "no authority for the bizarre idea that

the Court should ensure that divestiture equally hobbles all of

JELD-WEN's competitors in the finished door market." ECF No. 2321

at 9.  JELD-WEN's proposed pricing, STEVES concludes, would have



the effect of improperly cementing JELD-WEN's already-unfair degree of market power.

**B.    JELD-WEN's Position**

JELD-WEN proposes a ███████████████████ █████████ ████████ ████████ █████████ ECF No. 2310 at 7. JELD-WEN argues that █ ████████ ██ ████████ ████████ █████ █████





Id.

ECF No. 2310 at 10.

████████████████████████████████████████████

### C.   Analysis and Conclusion

Setting prices too high or too low creates a risk to the divestiture.  Prices that are too low would depress the value of Towanda, make divestiture more difficult, and present a threat to the future owner's ability to remain in business.  Prices that are too high would drive up the purchase price for the facility, discouraging potential bidders, while also failing to alleviate one of the core problems created by the original antitrust violation.  See MRM at 14 n.49.

The parties' briefing describes two approaches to price-setting. ████ █████ ██████ ████ ████ ████ █████ ██████ ███ ██ ███

████████ ██████ ████ █████ █████ █████ ████ ████ ████ ██ ████

███ ██ ████████ ███ ████ ████ ██████ ████████ ████

████████ █████ ████ ████ █████ ████ ███ ██ █████

██████████████████████████████████████████████

████ ██████ ████ █████ ████ ██ ████ ████ ████

████ ██████ ████ █████ ████ ████ ██ ████ █████

█████████████████████████████████████████████

---

22 JELD-WEN additionally argued that STEVES ██████ ████ ██ ██
████ ████████ ████ █████ █████ ████ ████ ███ ████ ██ ███████
██████████████████████████ ECF No. 2318 at 3.  But STEVES'
expert declaration (ECF No. 2308-11 at 6) █████ ████ ██ ███
██████ ████ █████ ████ ████ ████ ████ █████ ████ ████ ████
████ ██ █████ ████ █████ ████ ████ ████ █████ ████ ██ ██
██████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██ ████ ████ █████ ████ ████ ███ █ ████████

████ ████ ███ ████ █ ████ ███ ████ ██ ███████

███ ██ ████ ██ ████ ████ ██ ████     Thus, for all of

their disagreements, the parties do at least agree that a fair

price term ████ ████ ████ ██ █ █████ ██ █████ ██ ████

████████████████████████████████████

     As is evident from the 2012 and the 2020 Supply Agreements,

either party's approach requires ██████████████████████

████ █████ ████ █ ██████ ██████ █████ █████ ████ ███ ████

███████████████████████████████████████

████ ██ ████ ██████ ████ ████ ████ ███ ██

████████ ████ ██████ ████ ██     And, indeed, at least at a

general level, the parties agree █████ █ ████ ███████ ██████ ██ █

████████████████████████████ They

differ in terms of how they integrate those considerations into

their preferred price functions.

     As part of the divestiture process, JELD-WEN identified

██████████████████████████ ████████████████

████ ███ ███ ████ █████ █████████ ██ ████[23] JELD-

---

[23] These figures were integrated into the calculations in the first
Declaration by Avram Tucker. ECF No. 2308-11.

WEN has now ████████████████████████████████████████

████████████████ ████████[24]  STEVES posits ████████████████████████

███████████ ██████ ████ ████ ████ ██████ ████████ ████

████████ ████████ ████████   ECF Nos. 2308 & 2308-11.  JELD-WEN has

not disputed ███████████████████████████████████████████

████████████████████████████████████

    The  record  supports ████████ ████████ ████████████ ████ ████ ██████ ████

████████████████████████████████████████████████ ████████

████████████████████████████████████████████████████

████████████████████████████████████████

    The  record  establishes  that ████ ████████ ████ ██ ████ ██████

████████████████  were  the  result  of  the  diminished  competition  that

followed  JELD-WEN's  acquisition  of  CMI.    Thus,  it  is  neither

sensible  nor  consistent  with  the  objective  of  restoring

competition ████ ██ ████████ ████████ ██ ████ ████████ ████ ██ ████

████████████  in  the  conduct  remedy  here  at  issue. ██████ ██ ████████

████████████████████████████████████████████████  is

the  best  available  option  for  restoring  competition.    Thus, ████

████████████████████████████████████████████████

████████████ ██████ ████ ██████ ████████ ████████████ ██████ ██████████  as

explained  more  fully  below.

───────────────

[24] These  figures  were  submitted  to  the  Court  in  the  form  of
Declarations  by  Brian  Cox  (ECF  No.  2345-1)  and  Dr.  Johnson  (ECF
No.  2345-10)  in  response  to  the  Court's  July  6,  2022  ORDER  (ECF
No.  2340).

The next issue that must be considered is ████ ██████ ███████ ██ ███████ ██ ███ The first major difference between the parties lies in the manner in which they propose ██████████ ██████ ██ ████ ██ ████ Whereas JELD-WEN advocates █████ ████████ STEVES' approach would ████████████████ ████████████████████

████████████ ████ ████ ████ ██ ████ ████ ████ ██████ ████ ██████ ████ ████ ████████ ████ ████ ████ ████ ████ ████ ████ ████ ████ ████ ████ ████ █ ████ ████ ██ █ ████ ████ ████ ██ ████ ████ ████████

JELD-WEN, by contrast, ███████████████ ████ ██████ ████ ██ ██████ ████ ██████ ████ ████ ███████████████████████

The core of JELD-WEN's argument is that, ████████ ████ ████ ████ ████ ████ ████ ██████ ████ ████ ████████ ████ ████ ██ ████ What is more, ████ ████ ████ ████ ██ ████ ████ ████ ████ ████ ████ ██ ████ That, according to JELD-WEN, is strong *prima facie* evidence that ████████ ██ ████ ███████████ ████ But STEVES persuasively rebuts these points.

As previously observed, STEVES has shown that ██████████ ████ ████ ██ ████ █ ████ ████ ████ ██████ ████ ██████ ██ ██████ ████████ ██████ STEVES has

also shown that 

Whether it is reasonable, and whether it is the best of the available options, are separate questions.

The objection JELD-WEN pressed at the hearing is that ███. ███ ███ ██ ███ ███ And, indeed, the Department of Justice's Merger Remedies Manual warns of just such a risk. MRM at 14 ("The Division will scrutinize supply agreements to confirm that they prevent the flow of competitively sensitive information between the parties."). But that problem is easily avoided here.

---

[25] ECF No. 2348-1, ¶ ███████████ ███ ██ ███ ███ ███ ██ ███ ███ ██ ███ ███ ██ ███ ███ ███ ██ ███ ███ ██ ███ ███████

Under STEVES' proposal, ███████████████



JELD-WEN argues repeatedly that the reasonableness of using ████████████████████████████ And, indeed, JELD-WEN substantiated the claim that ████████████████████ ████████████████████████ which predated JELD-WEN's anticompetitive acquisition of CMI, and STEVES has shown that ████████████████

██████████████████████████████████ So while it may be
that ████████████████████████████████████████████████

████ █████ ██████ ████ █ ███████ ██████ ████ ████ ██
████ ████ ███ █ ████ ██████ ███ ████ █ ████████ █████
████ ███ █████ ███ ██████ ████ ████ ████ ████ ██ ███
████████████████

    JELD-WEN also does not explain satisfactorily ███████
█ ██████ ████ ████ █████ ████ ████ ████████ ███ ████ The
question,  in  effect, ███ █████████ ██ ██ █ █████ █████ ██
████████████████████ And to ask the question is to answer it,
because no persuasive reason has been given for ███ ███████ ██████
████ ████ ████ ███ ████ ████ ██ ████ ███████ ████ ████ ████
███████████████████ █████ ████████████████████████
█████████████████████████████████████████████
████ █████ ████ █████ ██ ████ ████ ████ ███████ █ ███████
██ ██ ████ ██████ █████████ Many of JELD-WEN's arguments
charge STEVES ████ ████████ ██████ █ █████ ██ ████████
█████████████████████████████████████
███████████████████████████ These disagreements were
effectively  resolved  by ███████████ █████ ████████ ██ ██████
████████████████████████████████████ Using the
same methodology as Steves had relied on in the Tucker Declaration,
JELD-WEN showed that █████████████████████████████████
████████ ██ ██ ███ on which JELD-WEN had relied in its prior

briefing.   2d Johnson Decl., ECF No. 2345-10.

However, as the second Tucker Declaration states, ██████████

████ ██████ ████████ ██ ████ ████ ████████ ████████ ██████ ██████

█████████████████████████████████████████████████████████

████ ████ ████ ██████ ██████ ████████ ██████ ████ ████ ████ █

████ ████ ██████ ████ ██████ ████ ██ ████ ████ ████ ████████

████ ██████ ████ ████ ████████ ████████ ██████ ████████ ████ ████

████████████████████████████████████████████████████████████

██████████████ ████████████   2d Tucker Decl., ECF No. 2321-

2 at 7.  These points suffice to show that, ████████████████████

████████████████████████████████████████████████████████████

████████████ and fairly protecting both parties' interests.

On this record, ████████ ██ ████ ████ ██ ████████ ████████

██████████████████████████████████████████████████████████████

████████████ ████████████████████████████████████

██ ████████ the influence of the anticompetitive merger is best

mitigated.

The analysis now turns to ████ ████████ ████████ ████████ ██

████████ Steves, notably, did not alter its endorsement of ██ ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ ████████ ████████ ████████ ██ ████ ██ ██ ████████ ████████ ██

████████████ It therefore appears that Steves remains content

with its original proposal.  JELD-WEN, in turn, did not revise the

████ ███ ████ █ ████ █ ████ ██ ████ ████ ██ ████

██ █ ████ ███ JELD-WEN does say that ██ ███████ ██████

████ █ █ ████ but it does not press the point.   In

any case, JELD-WEN assuredly was aware of ██ ███ ██ ██

████████ █████ ██ █ █ ████ ██ ████ ██

████ ███ ████ ████ █ ████ ████ ██ ████

████████████████████

Put differently, ████ ████ █ ████ ██ ██

███ ██ ███ ████ ████ █ ████ ████ ██ ██

████ █ ████ ██ ████ ██ ████ ██ ████

██ ██ ███ ████ ████ ████ ████ As it turns out, Steves

proposal ████████ ████████████

████ ██████ ████ █ ████ ████ ████, while JELD-WEN's

proposal ██ █ ████ ██ ████ ████ ████ ██ ████

████████████████.[27]  It thus appears

that the parties are not so far apart as it first seemed, and, in

fact, that they have shown themselves to be reasonable in

moderating their views ████████ have clarified how

things presently stand.

As to the comparison with prices paid by the Independents,

---

[26] ████ ████ ████ ███ ███ █████ ██ ███ ████
████ ████

[27] ████████████

█████ ████ ████████████ ████████ ██ ██████ ███████████,[28] one point

bears mentioning.   JELD-WEN does not explain ████ ███████ ███ ██

███████████████████████████████████████████████████████████

████ ████████ █████████ ██ ██████ ███ ████████ ██ ████ ██████ ██ ████ █

████████████████████████████ set in an uncompetitive market.   It

does not, of necessity, follow that ████ ████████ ██ ████████████████

█████ ████ ████ ██ ████████ ██ █ ███ ███ ███ ███████ That showing

has not been made.   Instead, JELD-WEN treats ████ ███████ ███ ██

████ ████ ███████████ ████ █████ ███████ ██████ ████ ██ ██ ████████

███████████████████████████████████████████████████████████

████ ████████ ████ ███ ██ ████ If anything, however, there is

a presumption against JELD-WEN's view that as part of an equitable

remedy for anticompetitive behavior the Court should ████████

████████████ ██████ █████ ████████ the conditions of the

anticompetitive market in question.





To the extent that STEVES' calculations were ████████████████

████████████████████████████████████████████

████████ █ █ ████████ ████ ████ █ █ ███████ ██████

████ and is no objection to STEVES' general methodology.  JELD-

WEN at one point also refers to the ████████████ ████████ ██

████████████ ████████████ ████████████ ██████  ECF NO. 2318 at

5.  But no evidence has been presented that supports that claim.

And to the extent that ███ █████ █████ █████ ██ ████████████

---

[29] JELD-WEN could perhaps ask why STEVES' comparison ██ ████
████████████████████████████████████████ ████████
████ ██ ██ ████     But the discussion above does not conclude that ████
██ ██ ███ ████████████ ; it concludes only ████ ██ ██
████████ ████████ ██ █ ████ ██ ██
████████ .    Because there are no direct comparators to the
████████ ████████ ████ ██ ████████ (because there are no other
sellers of doorskins to the Independents), the ████████ ██
████ ████ appears to be as relevant a measure as is available.
In any case, JELD-WEN has not pointed to any ████████████ ████
that could be used to ████ █ ██ ████████ ████████ ████
████ ████ ██ ██ ████ ████████████ , the unsuitability of
which has already been discussed.

38



Finally, JELD-WEN makes the generalized argument that STEVES'
███████████ ████████ is "arbitrary."  Id. at 7.  The arbitrariness,
according to JELD-WEN, stems from the fact that STEVES' ██████████
████ ████████ ███████ █ ██ ████████ ███ ██████ ██ █ ███████
██████████████████████████████████████████████████████████████
██ █████████ ████████ ███████████ ███████.  This argument would,
however, be more convincing if JELD-WEN's own proposal were itself
less arbitrary.  Instead, JELD-WEN's proposal ████████████████████

none



In his third declaration, ECF No. 2348-7, Avram Tucker argues that a more appropriate ███████ as Dr. Johnson did for JELD-WEN.

Id. at 4. Tucker thus argues—and the Court agrees—that a better methodology

JELD-WEN, of course, had access to all of this information in its calculations in the earlier rounds of briefing. JELD-WEN initially proposed that Steves'



Taking all of these factors and the record into account, the Court concludes that, ████████████████████ ████████████ ████████ ██ ███ ████████ ██ █ ████████ ████████ ████ ██ ████████████████████████

████ The Court agrees with both parties that ████████████ ████ ██ ██ ████████ ████ █ ████████ ████████ ████████ The Court is persuaded that STEVES' proposal on this score, *i.e.*, to ████████████████████████████████████████████ ████ ████ is commercially reasonable and will best assist in

helping the divestiture to succeed in the long run.

By the conclusion of briefing, the parties' stances on what constitutes ■ ▬▬▬▬▬ ▬▬▬▬ ▬▬▬ were not so far apart as they first seemed.  STEVES stuck to its initial proposal ▬▬▬▬ ▬▬▬ even as it acknowledged that its initial ▬▬▬▬▬▬▬ ▬▬ ▬▬▬ ▬▬▬ ▬ ▬ ▬▬▬▬—was no longer defensible. Meanwhile, JELD-WEN did not abandon its initial ▬▬ ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, and when run through Steves' ▬▬▬▬ ▬▬▬▬ ▬▬▬ ▬▬ ▬▬▬ ▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.[33]

There is not adequate evidence before the Court to distinguish the intrinsic merits of a ▬▬ ▬▬▬ ▬▬▬ ▬▬ ▬ ▬▬ ▬▬▬ ▬▬▬▬   Both are derived from labor-intensive, good-faith attempts by the parties to determine reasonable terms on which STEVES and the Acquiring Company can do business with one another. Absent sufficient justification to select one party's proposal over the other, and assured by the smallness of the spread between the figures that they both represent reasonable pricing terms, the

---

[33] As acknowledged above, there are ▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ ▬▬▬▬▬ ▬▬▬▬ ▬▬▬ ▬▬▬▬▬ ▬▬▬▬ ▬▬ ▬▬▬▬ ▬▬ ▬▬▬▬ ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬

Court finds that it is best to resolve the parties' disagreement on this point ██ ████ ██ ████ ██ ██ ███ █ █ ████

████ ██ ████ █ ████ ████ ███ █ ████

████ ████ ██ ████ █ ██ ████ ██ ████ █ ██ ██

████████████████████████

██████ ██████

The ██████████████████████

████ ████ ████ ██ ████ ████ ██ ████ ████

████████████████ ████

██████████████████████████

████ ████ ████ ██ ████ ████ ██ ██

████████████████████████

██████████████

As to STEVES' ██████ ████ ██████, it is, as explained above, a reasonable mechanism for ensuring that STEVES can be confident it is paying an appropriate price for the doorskins it purchases ██ ██ ██ █ ██ █ ████ ████ ██ ████ ██ █
██████████ This term, though not one of the four terms explicitly assigned to the parties to negotiate, has a clear nexus to the price term because it is a mechanism by which the Court's chosen pricing term can best be put into effect. Moreover, the reasonableness of the term is evident from the fact that the parties' ████████████████████

███████ .

## III. Volume and Kind

The AFJO specifies that:

> The Acquiring Company and STEVES shall enter into
> an agreement, which will assure STEVES a supply of
> molded interior doorskins of the kind and in the
> volume reflected in the current Supply Agreement
> with JELD-WEN[.]

ECF No. 1852 at 7.

The parties agree that, under the AFJO, STEVES has the contractual right ██ ████████ ██ ██ ████ ████████ ████████ ██ ██████ Tr., ECF No. 2239 at 84.17-19, 95.19. They disagree as to ████████████████████ ████████████ ████████████ ██████████ ████████████ ████████████████ The parties also disagree also as to ███ ████████ ████████ ████ ████████████████████ ████████████ Finally, the parties disagree as to ████████████████████ ████████████████████ ██ ████████ ██ ████ ████████ ██ ████████ ██ ████████ ████████ ██ ████████████████████ All of these issues implicate the "volume and kind" provision of the AFJO.

### A.    STEVES' Position

#### Volume

While the parties agree that STEVES has the right to purchase

███ ██ ███ ██████ █████ ████ ██████ ██████ ██ ██ ██

███ ███ ███ ██ ██ ██████     Specifically, the parties

differ as to ██████████████████████████████████████████

████████ ████ ██ ██ ██ ██ ████████ ██████ ████     STEVES

believes that ███ ███████ ████ ██ ████ █████ ████ ████

███ ██ █████ █████ ██ ██ █████ ██ ██ ███ ██ ████

███ ██ ████ ████ ████ ████ ██ ████ ██ ██ █

████ ██ ████ ████ ████ ████ ██ ████ ████ ██ █

██ ██ ██████ ████ ██ ██ ████ ██ ████ ████ ██ ██

████ ████ █████ ████ ██████ ██████ ██ ████ █████ ████

████ ██ ████ ██ ██ ████ ████ ████ ██ ████

██████ ██ ████ ████ ████ ████ ████ ████ ██

██ ██ ████ ████ ██ ██ ████ ██ ████ ████ ██ ██

████ ████ ████████ █████████████████████████

          JELD-WEN argues, among other things, ██ ██ ██████

███ ██████ ██████ ████ ████ ██ ██ ████ ██ ████ ████

██████████████████████████████████████ ██

███ ████ ██ ██ ████ ████ ████ ████ ██ ██ ██

████████████████████████████████████████████

███ ████ ██ ████ ████ ████ ████ ████ ████

████████████████████████████████████████████

███ ████ ██ ████ ████ ████ ██ ████ ████

███ ████ ██ ██ ██ ██ ████ ██ ████ ████ ██

███ ██ ████ ████ ██ ████ ████ ████ ██ ████ ██ ██

██████████████

The parties' sharpest disagreement as to the issue of volume concerns ████ ████ █████████  STEVES argues that this is █





**Kind**



STEVES

submitted evidence in support of these contentions.

ECF No. 2308-7.

48



STEVES argues that, given these considerations, the plain text of the AFJO should be controlling and JELD-WEN should be required ██████████████████████████
██████████████████████

## B.    JELD-WEN's Position

### Volume

JELD-WEN does not dispute STEVES' contractual entitlement to



As to ██ ███████████ ███████, JELD-WEN stated at the June 30, 2022 hearing that it did not regard itself as having a substantial stake in the issue given that ██ ██ ███ ████████████ ███████████ ███████████████████. JELD-WEN's reservations instead concerned



**Kind**

JELD-WEN argues that the AFJO's language is compatible with

JELD-WEN's justification for its position

In both cases, JELD-WEN argues, enforcing the text of the
AFJO would impose



Finally, JELD-WEN also offers something like a course-of-conduct argument, not based on STEVES' behavior but on a decision made by the Special Master and approved by the Court.  ECF No. 1953.   JELD-WEN observes that

JELD-WEN also observes that

████████████████████████████████

### C.    Analysis and Conclusions

**Volume**

At the June 30, 2022 hearing, it became clear that the parties did not actually substantively differ on one of the key issues ████████ ████████ ████████ ████████████ Whereas STEVES' initial briefing had operated on the assumption that ████████████████ ████ ██ ██ ██ ██ ██ ████ ██ ██ ████ ████ ██ ████ ███ ██ ████ ██ ██ ████ ██ ██ ███ ███ ████ ████ ██ ███ ████ ██ ███ █████ ████ ████████████████████████ ████████████████████████████ ████ ████ ████ ████ ██ ████ ██ ██ ████ ████ ██ ████ ███ ████████████████████████████ ████████████████ ███ ██████████ ████████████████████████████ ████████████████████████████ ████████████████████

██ ██ ████ ██ ██ ██ ████ ████ ████ ██ ████ ████ ██ ██ ██ █ █ ████████████ █████████ Thus, it is another form of conduct remedy.  And the context of this dispute explains why the ██████ ████ ██ ██ ████ ████████ ██ █████████. STEVES prevailed in its aim of seeking divestiture of the Towanda facility because it successfully showed that money damages would

53

be inadequate compensation for the harms it faced if JELD-WEN continued to take advantage of the anticompetitive consequence of its acquisition of CMI. As discussed above, the new Supply Agreement is ancillary to the divestiture order and can be considered a different part of a single and unified grant of equitable relief.[36]   However, a contract ██████ ██ ██ ██████

██ ██ ██████ ██ █████ ████ ██████ ███████ ██ ██ ██████

████████████████████████████████████████████████████

████████████████   If STEVES is correct that, ████████████

██ ██████ █████ ████ ████ ██████ ███████ ██ ██ ██

█ ██████ ██████ █ ██ █████ █████ ██ ██████ ██ ██████

████████████████████████████████████████████████████

███ ██████ ██ ███ ████ ██ █████ ███ ██ ███ ██ ██ ██

████   And, in this context, money damages have already been found to be inadequate.  A requirement that ██████████████████████

████████████████████████████████████████████████████

██ ███ █ ██ ██████ ██ ██ █████ ███ ██ ██ ██

██ ████ ██ ███ █ ██████ ███ ██ ██ ██ ██

███ ████ ██ ███ ████ ██ ██████ ███ ██ ██

---

[36] See W. Hudson R. Unger, Equity Delights to Do Justice and Not by Halves, 33 Dick. L. Rev. 248, 248 (1929) ("The principle of the [titular] maxim embraces the well-established doctrine that when equity once acquires jurisdiction it will retain it so as to afford complete relief."); MRM at 14 ("Tailored conduct relief may be useful in certain circumstances to facilitate effective structural relief.") (emphasis added).

██████████████████████

It is no answer to these considerations to suggest that STEVES' worries are overblown:  if that proves to be the case, ████

████████ █████████ ██████ ██████ ██████ ████████████ █████ ███ ███

█████████████████████████████████████████████████████████

██████ █████████ ██████ ████ ███ ███ ████████ █████████ ███ ███

███ ████ █ ████████ ██████ ████ ████████████ ████████ ████ ███

█████████ ██████ ████ ████████ ███ ███ ███ ███ ████████

█████████████████████

JELD-WEN suggested a████████████ ████ ███ ███ ████████ █████████

█████ ███ ███ ███ ████████ ████ █ ████████ █████████ █████████ ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████ █████████ ██████ ██████ ████████████ ██████████ ███ ███ ████████

█████████ ████████ ██ ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███ ███ ████████ ██████ ████ ███ █████████ ██████ ███ ███ ████████

████████ █████████ ██████ █████████ █████████ █████████ █████████ ███

█████████ █████████ ████████████ █████████████████

██████ █████ ██████ ██████ ████ ███ ███ █████████ █████████ ███

_____

37 █████ ███ █████████ █ █████████ ███ ███ ████████████ ████ ███ █████████
████████████████████████████████████████████
███████████████████████████████████

55

███████████████████████

### Kind

Like the volume provision, the kind provision is explicitly addressed in the AFJO, which states that STEVES is to be provided with the "kind" and "volume" of doorskins that it had available from Towanda under the 2012 Supply Agreement. The default assumption must therefore be that the language of the order means what it rather clearly says.

JELD-WEN's arguments for ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

████████████ But as arguments for why the Court ought to release JELD-WEN from its obligations under the AFJO, they are unavailing.

STEVES has presented evidence—which JELD-WEN has not rebutted or otherwise cast into doubt—that ██████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

JELD-WEN has also not rebutted STEVES' assertion that ████████████████████████████████████████



████████ While there may be other explanations for JELD-WEN's
decision, JELD-WEN has not offered any. ███████████████████

███████████ ECF No. 2318 at 13. The meaning of this
sentence, and what legal or metaphysical principles it aims to
invoke in support of JELD-WEN's conclusion, are not apparent.

As has already been mentioned, this is not the first occasion
on which the parties have argued ████ ██ ████ ██ ████ █
████████ ██ ████ ████████ ██ ███████ ███████ █
████████████████ ████████████
█ ████████ ████ █████ █████ ████ ████ █
████ ██ █████ ██████ ██ ███ █████████ ECF No.

1957 at 2. ███████████████████████████████

██ ██ ██████████ ██ █████████ ████ █████ ██████ █████ ██ ███ █████

█████████████████████████████████████████ ████████

     The parties' arguments centered on two portions of the AJFO.

The first portion states:

    (a)   JELD-WEN shall continue to maintain and operate the Towanda facility during the pendency of the appeal unless otherwise ordered by the Court; and

    (b)   JELD-WEN shall not take any steps during the pendency of the appeal that would in any way reduce the value of the Towanda facility to a potential Acquiring Company or would make it more difficult or costly for the Acquiring Company to supply doorskins to Steves of the type, and in the quantity, that JELD-WEN supplies to Steves as of the date of the entry of this Order.

ECF No. 1852 at 2-3. The second relevant portion states:

    JELD-WEN shall maintain the status quo at the Towanda facility during the pendency of this appeal, and Steves has the right under Federal Rule of Civil Procedure 64(d) to request an injunction pending appeal to lengthen the period of Steves' Supply Agreement with JELD-WEN for a greater period than provided in the above-paragraph

Id.

    Neither party focused their argument squarely on ████

█████████ ██████ ██ ██████████ ███████ ██████ █████ ██ ██

█████████ ██████ ████████ ██ ██████ █████ ██ ███ ██

████████ ██████ █████ ██████████ █████████ █████████ ██

██████ ████ ██████ █████ ████████ █████████ ██████ ██████

███████ ██ ██████ █████ ██████ █████ █████ ██ ██ ██████

██ ███ ████ ████ ███ ████ ████ ██ ████ ██ ███ ████ ████ ██

████ ███ ███ ████ ████ ██ ████ ██ ██ ████ ████ ████

ECF No. 1953 at 3-4.

The Special Master's Report and Recommendation, ECF No. 1953, which was adopted by the Court, reasoned that ████████████ ██

███ ███ ████ ████ ████ ███ ████ ███ ███ ████ ████

████████████████████████████████████████████████████

██ ███ ███ ████ ███ ██ ██ ████ ████ ████ ████ ████

███ ████ ███ ███ ████ ████ ████ ██ ██ ███ ████

████████████████████████████ ECF No. 1953 at 2.

The consequence of this ruling was that ███ ████ ██

███ ███ ████ ███ ████ ████ ████ ████ ████ ████ ███

████████████████ ████████████████████████

███ ███ ████ ██ ████ ████ ██ ██ ███ ████ Steves

Decl., ECF No. 2308-4 at 1.

Now the parties are again disputing ████████████████████

████████████, and the Court finds itself in the curious position of a sort of Coasean planner.  It is certainly true, as JELD-WEN argues, that STEVES could ████████████████████████████

███ ████ ████ ████ ████ ████ ████ ██ ██ ██ ████ ██ ██

████████████████████████████████████████████████████

███ ██ ███ ████ ███ ████ ████ ████ ████ ████ ████

███ ███ ████ ███ ███ ████████████ A determination in favor of either party thus leaves open the door for the parties to

renegotiate a different resolution against the changed landscape of obligations.     The question is therefore which initial assignment better fits the principles guiding this case.



That is the kind of leverage that the Court sought to ensure JELD-WEN would not have when it

stated in the AFJO that STEVES was to be assured in its supply agreement of access to the kinds of doorskins it had been ordering.

JELD-WEN's argument regarding the Special Master's ███

████████████████████████████████████████████████████

███ ███ ███ ███ ███ ███ ███ ███ ███ ████ ███

███ ███ ██ ████ ███ ███ ███ ███ ██ ████ ███

███ ██ ████ ███ ████ ████ ██ █ ██ ████

████████████████████████████████████████████████████

█████████████████████████

███████████████████████████████████

███ ███ ██ ███ ████ ██ ███ ██ ████ ███ ███

████████████████████████████████

## V.   Other

JELD-WEN's proposal for the new Supply Agreement ███ ███

████████████████████████████████████████████████████

███ ███ ██ ████ █████ ██ ██ ████ ██████ █████

███ ███ ██ ███ █████ █████ ██ ███ █████

███ ████ ██ █████ ██ █████

███ ████ █████████ ███ █████████████

████████████████████████████████████████████████████

███   JELD-WEN, INC.'S RESPONSE TO STEVES AND SONS, INC.'S MEMORANDUM IN SUPPORT OF PROPOSED SUPPLY AGREEMENT TERMS, ECF No. 2318 at 16.

Upon examination, it appears that ██████ ████████ ███

61

███████ ███ ██ ███████ ██████ ██ ██ ████ ████████  And,
it is true that the Court has previously found the Quality
provision in the 2012 Supply Agreement to be both unclear and, to
some extent, ambiguous.  ECF No. 1773 at 8.  ████ ████ █████████
███████████████████████████, and the Court is confident that, with
the help of the Special Master, that can be accomplished.

The Court previously has addressed the so-called
████████████████████████████████████ ███
████████████████████████████████████████████
█████████████████

STEVES' proposals for ████████████████████████
███ ██ ███ ████████ ████ ████ ████████ ████████ ████████ ████████
████████████████████████████████████████████
███ ██████ ██████ ██████ ████ ██ ██ █████ ████████ ██
████████████████████████████████████████████
███████████████

All that said, the Court concludes that resolution of these
points is best left to good faith and negotiations between the
parties with the aid of the Special Master.  Those negotiations
should proceed mindful of the precepts that it is unwise to
perpetuate ambiguity in contract terms or to ignore previous
experience.

## CONCLUSION

For the reasons set forth above, the Court finds that the foregoing resolution of the disputes over the provisions of the new Supply Agreement required by Paragraph (4) of the AFJO, as amended, relating to duration, price, volume, and kind best serves the interest of restoring competition in the molded doorskin market adversely affected by JELD-WEN's acquisition of CMI. With this MEMORANDUM OPINION in mind, the parties must complete the task of concluding the new Supply Agreement. That task must be concluded as soon as possible. The Court will confer with the Special Master and counsel and issue an appropriate ORDER to achieve that objective.

It is so ORDERED.

_____ /s/ _____ REP _____

Robert E. Payne

Senior United States District Judge


Richmond, Virginia

Date: March _20_, 2023

*nunc pro tunc* July 18, 2022


63