# EXHIBIT 28

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

_____

# FORM 10-Q
_____

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2023

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 001-38000

_____

# JELD-WEN Holding, Inc.
(Exact name of registrant as specified in its charter)

_____

| Delaware | 93-1273278 |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**2645 Silver Crescent Drive**
**Charlotte, North Carolina 28273**
(Address of principal executive offices, zip code)

**(704) 378-5700**
(Registrant's telephone number, including area code)

_____

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock (par value $0.01 per share) | JELD | New York Stock Exchange |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The registrant had 85,215,086 shares of Common Stock, par value $0.01 per share, outstanding as of November 3, 2023.

interest rate swap agreements are designated as cash flow hedges and effectively fix the interest rate on a corresponding portion of the aggregate debt outstanding under our Term Loan Facility.

No portion of these interest rate contracts were deemed ineffective during the three and nine months ended September 30, 2023. We recorded pre-tax mark-to-market gains of $0.1 million and $1.1 million during the three and nine months ended September 30, 2023, respectively, and $4.8 million and $17.1 million during the three and six months ended September 24, 2022, respectively, in other comprehensive income. We reclassified gains of $4.6 million and $12.7 million previously recorded in other comprehensive income to interest income during the three and nine months ended September 30, 2023, respectively. We reclassified gains of $1.6 million and $1.7 million previously recorded in other comprehensive income to interest income during the three and nine months ended September 24, 2022, respectively.

As of September 30, 2023, approximately $4.6 million is expected to be reclassified to interest income until the instruments mature in December 2023.

**Other derivative instruments** – From time to time, we may enter into other types of derivative instruments immaterial to the business. Unless otherwise disclosed, these instruments are not designated as hedging instruments and mark-to-market adjustments are recorded in the statement of operations each period.

The fair values of derivative instruments held are as follows:

| | **Derivative assets** | | |
|---|---|---|---|
| (amounts in thousands) | **Balance Sheet Location** | **September 30, 2023** | **December 31, 2022** |
| Derivatives designated as hedging instruments: | | | |
| Interest rate contracts | Other current assets | $  4,570 | $  16,235 |
| Derivatives not designated as hedging instruments: | | | |
| Foreign currency forward contracts | Other current assets | $  2,512 | $  3,809 |
| Other derivative instruments | Other current assets | — | 73 |

| | **Derivative liabilities** | | |
|---|---|---|---|
| (amounts in thousands) | **Balance Sheet Location** | **September 30, 2023** | **December 31, 2022** |
| Derivatives not designated as hedging instruments: | | | |
| Foreign currency forward contracts | Accrued expenses and other current liabilities | $  1,065 | $  3,058 |
| Other derivative instruments | Accrued expenses and other current liabilities | $  160 | 288 |

## Note 20. Fair Value of Financial Instruments

We record financial assets and liabilities at fair value based on FASB guidance related to fair value measurements. The guidance requires fair value to be determined based on the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants at the measurement date. Three levels of inputs may be used to measure fair value:

Level 1 – Quoted prices in active markets for identical assets or liabilities.

Level 2 – Quoted market-based inputs or unobservable inputs that are corroborated by market data.

Level 3 – Unobservable inputs that are not corroborated by market data.

The recorded carrying amounts and fair values of these instruments were as follows:

| (amounts in thousands) | | September 30, 2023 | | | | |
|---|---|---|---|---|---|---|
| | Carrying Amount | Total Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets:** | | | | | |
| Cash equivalents | $ 57,931 | $ 57,931 | $ — | $ 57,931 | $ — |
| Derivative assets, recorded in other current assets | 7,082 | 7,082 | — | 7,082 | — |
| Deferred compensation plan assets, recorded in other assets | 1,701 | 1,701 | — | 1,701 | |
| **Liabilities:** | | | | | |
| Debt, recorded in long-term debt and current maturities of long-term debt | $ 1,240,715 | $ 1,186,465 | $ — | $ 1,186,465 | $ — |
| Derivative liabilities, recorded in accrued expenses and other current liabilities | 1,225 | 1,225 | — | 1,225 | — |

| (amounts in thousands) | | December 31, 2022 | | | | |
|---|---|---|---|---|---|---|
| | Carrying Amount | Total Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets:** | | | | | |
| Cash equivalents | $ 6,078 | $ 6,078 | $ — | $ 6,078 | $ — |
| Derivative assets, recorded in other current assets | 20,117 | 20,117 | — | 20,117 | — |
| Deferred compensation plan assets, recorded in other assets | 725 | 725 | — | 725 | |
| **Liabilities:** | | | | | |
| Debt, recorded in long-term debt and current maturities of long-term debt | $ 1,759,226 | $ 1,555,367 | $ — | $ 1,555,367 | $ — |
| Derivative liabilities, recorded in accrued expenses and other current assets | 3,346 | 3,346 | — | 3,346 | — |

Derivative assets and liabilities reported in level 2 primarily include foreign currency derivative contracts and interest rate swap agreements. See Note 19- *Derivative Financial Instruments* for additional information about our derivative assets and liabilities.

Deferred compensation plan assets reported in level 2 consist of mutual funds.

There are no material non-financial assets or liabilities as of September 30, 2023 or December 31, 2022.

## Note 21. Commitments and Contingencies

<u>Litigation</u> – We are involved in various legal proceedings, claims, and government audits arising in the ordinary course of business. We record our best estimate of a loss when the loss is considered probable and the amount of such loss can be reasonably estimated. When a loss is probable and there is a range of estimated loss with no best estimate within the range, we record the minimum estimated liability related to the lawsuit or claim. As additional information becomes available, we reassess the potential liability and revise our accruals, if necessary. Because of uncertainties related to the resolution of lawsuits and claims, the ultimate outcome may differ materially from our estimates.

Other than the matters described below, there were no proceedings or litigation matters involving the Company or its property as of September 30, 2023 that we believe would have a material adverse effect on our consolidated financial position or cash flows, although they could have a material adverse effect on our operating results for a particular reporting period.

*Steves & Sons, Inc. vs JELD-WEN, Inc.* – We sell molded door skins to certain customers pursuant to long-term contracts, and these customers in turn use the molded door skins to manufacture interior doors and compete directly against us in the marketplace. We gave notice of termination of one of these contracts and, on June 29, 2016, the counterparty to the agreement, Steves and Sons, Inc. ("Steves") filed a claim against JWI in the U.S. District Court for the Eastern District of Virginia, Richmond Division (the "Eastern District of Virginia"). The complaint alleged that our acquisition of CMI, a competitor in the molded door skins market, together with subsequent price increases and other alleged acts and omissions, violated antitrust laws, and constituted a breach of contract and breach of warranty. Specifically, the complaint alleged that our acquisition of CMI substantially lessened competition in the molded door skins market. The complaint sought

33

declaratory relief, ordinary and treble damages, and injunctive relief, including divestiture of certain assets acquired in the CMI acquisition.

In February 2018, a jury in the Eastern District of Virginia returned a verdict that was unfavorable to JWI with respect to Steves' claims that our acquisition of CMI violated Section 7 of the Clayton Act, found that JWI breached the supply agreement between the parties (the "Original Action"). The verdict awarded Steves $12.2 million for past damages under both the Clayton Act and breach of contract claims and $46.5 million in future lost profits under the Clayton Act claim.

During the course of the proceedings in the Eastern District of Virginia, we discovered certain facts that led us to conclude that Steves, its principals, and certain former employees of the Company had misappropriated Company trade secrets, violated the terms of various agreements between the Company and those parties, and violated other laws. On May 11, 2018, a jury in the Eastern District of Virginia returned a verdict on our trade secrets claims against Steves and awarded damages in the amount of $1.2 million. The presiding judge entered a judgment in our favor for those damages, and the entire amount has been paid by Steves. On August 16, 2019, the presiding judge granted Steves' request for an injunction, prohibiting us from pursuing certain claims against individual defendants pending in Bexar County, Texas (the "Steves Texas Trade Secret Theft Action"). On September 11, 2019, JELD-WEN filed a notice of appeal of the Eastern District of Virginia's injunction to the Fourth Circuit Court of Appeals (the "Fourth Circuit").

On March 13, 2019, the presiding judge entered an Amended Final Judgment Order in the Original Action, awarding $36.5 million in past damages under the Clayton Act (representing a trebling of the jury's verdict) and granted divestiture of certain assets acquired in the CMI acquisition, subject to appeal. The judgment also conditionally awarded damages in the event the judgment was overturned on appeal. Specifically, the court awarded $139.4 million as future antitrust damages in the event the divestiture order was overturned on appeal and $9.9 million as past contract damages in the event both the divestiture and antitrust claims were overturned on appeal.

On April 12, 2019, Steves filed a petition requesting an award of its fees and a bill of costs, seeking $28.4 million in attorneys' fees and $1.7 million in costs in connection with the Original Action. On November 19, 2019, the presiding judge entered an order for further relief awarding Steves an additional $7.1 million in damages for pricing differences from the date of the underlying jury verdict through May 31, 2019 (the "Pricing Action"). We also appealed that ruling. On April 14, 2020, Steves filed a motion for further supplemental relief for pricing differences from the date of the prior order and going forward through the end of the parties' current supply agreement (the "Future Pricing Action"). We opposed that request for further relief.

JELD-WEN filed a supersedeas bond and notice of appeal of the judgment, which was heard by the Fourth Circuit on May 29, 2020. On February 18, 2021, the Fourth Circuit issued its decision on appeal in the Original Action, affirming the Amended Final Judgment Order in part and vacating and remanding in part. The Fourth Circuit vacated the Eastern District of Virginia's alternative $139.4 million lost-profits award, holding that award was premature because Steves has not suffered the purported injury on which its claim for future lost profits rests. The Fourth Circuit also vacated the Eastern District of Virginia's judgment for Sam Steves, Edward Steves, and John Pierce on JELD-WEN's trade secrets claims. The Fourth Circuit affirmed the Eastern District of Virginia's finding of antitrust injury and its award of $36.5 million in past antitrust damages. It also affirmed the Eastern District of Virginia's divestiture order, while clarifying that JELD-WEN retains the right to challenge the terms of any divestiture, including whether a sale to any particular buyer will serve the public interest, and made clear that the Eastern District of Virginia may need to revisit its divestiture order if the special master who has been appointed by the presiding judge cannot locate a satisfactory buyer. JELD-WEN then filed a motion for rehearing en banc with the Fourth Circuit that was denied on March 22, 2021.

Following a thorough review, and consistent with our practice, we concluded that it is in the best interest of the Company and its stakeholders to move forward with the divestiture of Towanda and certain related assets. Although the Company did not seek Supreme Court review of the Fourth Circuit's February 18, 2021 decision, the Company retains the legal right to challenge the divestiture process and the final divestiture order. We made estimates related to the divestiture in the preparation of our financial statements; however, there can be no guarantee that the divestiture will be consummated. The divestiture process is ongoing, and the special master is overseeing this process. Although the Company has decided to divest, we continue to believe that Steves' claims lacked merit and that it was not entitled to the extraordinary remedy of divestiture. We continue to believe that the judgment in accordance with the verdict was improper under applicable law.

During the pendency of the Original Action, on February 14, 2020, Steves filed a complaint and motion for preliminary injunction in the Eastern District of Virginia alleging that we breached the long-term supply agreement between the parties, including, among other claims, by incorrectly calculating the allocation of door skins owed to Steves (the "Allocation Action"). Steves sought an additional allotment of door skins and damages for violation of antitrust laws, tortious interference, and breach of contract. On April 10, 2020, the presiding judge granted Steves' motion for preliminary injunction, and the parties settled the issues underlying the preliminary injunction on April 30, 2020 and the Company reserved the right to appeal the ruling in the Fourth Circuit. The Company believed all the claims lacked merit and moved to dismiss the antitrust and tortious interference claims.

34

On June 2, 2020, we entered into a settlement agreement with Steves to resolve the Pricing Action, the Future Pricing Action, and the Allocation Action. As a result of the settlement, Steves filed a notice of satisfaction of judgment in the Pricing Action, withdrew its Future Pricing Action with prejudice, and filed a stipulated dismissal with prejudice in the Allocation Action. The Company also withdrew its appeal of the Pricing Action. The parties agreed to bear their own respective attorneys' fees and costs in these actions. In partial consideration of the settlement, JWI and Steves entered into an amended supply agreement satisfactory to both parties that, by its terms, ended on September 10, 2021. This settlement had no effect on the Original Action between the parties except to agree that certain specific terms of the Amended Final Judgment Order in the Original Action would apply to the amended supply agreement during the pendency of the appeal of the Original Action. On April 2, 2021, JWI and Steves filed a stipulation regarding the amended supply agreement in the Original Action, stating that regardless of whether the case remains on appeal as of September 10, 2021, and absent further order of the court, the amended supply agreement would be extended until the divestiture of Towanda and certain related assets is complete and Steves' new supply agreement with the company that acquires Towanda is in effect.

We continue to believe the claims in the settled actions lacked merit and made no admission of liability in these matters.

On October 7, 2021, we entered into a settlement agreement with Steves to resolve the following: (i) Steves' past and any future claims for attorneys' fees, expenses, and costs in connection with the Original Action, except that Steves and JWI each reserved the right to seek attorneys' fees arising out of any challenge of the divestiture process or the final divestiture order; (ii) the Steves Texas Trade Secret Theft Action and the related Fourth Circuit appeal of the Eastern District of Virginia's injunction in the Original Action; (iii) the past damages award in the Original Action; and (iv) any and all claims and counterclaims, known or unknown, that were asserted or could have been asserted against each other from the beginning of time through the date of the settlement agreement. As a result of the settlement, the parties filed a stipulated notice of satisfaction of the past antitrust damages judgment and a stipulated notice of settlement of Steves' claim for attorneys' fees, expenses, and costs against JWI in the Original Action, and Steves filed a notice of withdrawal of its motion for attorneys' fees and expenses and bill of costs in the Original Action. The Company also filed a notice of dismissal with prejudice and agreed to take no judgment in the Steves Texas Trade Secret Theft Action, and the parties filed a joint agreement for dismissal of the injunction appeal in the Fourth Circuit. On November 3, 2021, we paid $66.4 million to Steves under the settlement agreement.

*Cambridge Retirement System v. JELD-WEN Holding, Inc., et al.* – On February 19, 2020, Cambridge Retirement System filed a putative class action lawsuit in the Eastern District of Virginia against the Company, current and former Company executives, and various Onex-related entities alleging violations of Section 10(b) and Rule 10b-5 of the Exchange Act, as well as violations of Section 20(a) of the Exchange Act against the individual defendants and Onex-related entities ("Cambridge"). The lawsuit sought compensatory damages, equitable relief, and an award of attorneys' fees and costs. On May 8, 2020, the Public Employees' Retirement System of Mississippi and the Plumbers and Pipefitters National Pension Fund were named as co-lead plaintiffs and filed an amended complaint on June 22, 2020.

On April 20, 2021, the parties reached an agreement in principle to resolve this securities class action. The agreement contemplated a full release of claims through the date of preliminary court approval of the settlement in exchange for a payment of $39.5 million, primarily funded by the Company's D&O insurance carriers, except $5.0 million which was provisionally funded by the Company and remains subject to dispute with insurance carriers. On November 22, 2021, the Court granted final approval of the settlement agreement. The deadline to appeal the entry of the final approval order and judgment was December 22, 2021, and no party or class member filed an appeal. The Company continues to believe that the plaintiffs' claims lacked merit and has denied any liability or wrongdoing for the claims made against the Company.

*In re JELD-WEN Holding, Inc. Derivative Litigation* – On February 2, 2021, Jason Aldridge, on behalf of the Company, filed a derivative action in the U.S. District Court for the District of Delaware against certain current and former executives and directors of the Company, alleging that the individual defendants breached their fiduciary duties by allowing the wrongful acts alleged in the Steves and Cambridge actions, as well as violations of Section 14(a) and 20(a) of the Exchange Act, unjust enrichment, and waste of corporate assets among other allegations (the "Aldridge Action"). The lawsuit sought compensatory damages, equitable relief, and an award of attorneys' fees and costs. The plaintiff filed an amended complaint on May 10, 2021.

On June 21, 2021, prior to a response from the Company in the Aldridge Action, Shieta Black and the Board of Trustees of the City of Miami General Employees' & Sanitation Employees' Retirement Trust, on behalf of the Company, filed a derivative action in the U.S. District Court for the District of Delaware against certain current and former executives and directors of the Company and Onex Corporation ("Onex"), alleging that the defendants breached their fiduciary duties by allowing the wrongful acts alleged in the Steves and Cambridge actions, as well as insider trading, and unjust enrichment among other allegations (the "Black Action"). The lawsuit sought compensatory damages, corporate governance reforms, restitution, equitable relief, and an award of attorneys' fees and costs. The court granted the Black and Aldridge plaintiffs in motion to consolidate the lawsuits on July 16, 2021.

On June 20, 2022, the parties entered into a settlement agreement of the consolidated matters, which was approved by the Court on approval of the December 20, 2022, and the cases were dismissed with prejudice. As part of the settlement, the Company, as putative plaintiff, received approximately $10.5 million after attorneys' fees and costs were deducted in January 2023.

*In re Interior Molded Doors Antitrust Litigation* – On October 19, 2018, Grubb Lumber Company, on behalf of itself and others similarly situated, filed a putative class action lawsuit against us and one of our competitors in the doors market, Masonite Corporation ("Masonite"), in the Eastern District of Virginia. We subsequently received additional complaints from and on behalf of direct and indirect purchasers of interior molded doors. The suits were consolidated into two separate actions, a Direct Purchaser Action and an Indirect Purchaser Action. The suits alleged that Masonite and JELD-WEN violated Section 1 of the Sherman Act, and in the Indirect Purchaser Action, related state law antitrust and consumer protection laws, by engaging in a scheme to artificially raise, fix, maintain, or stabilize the prices of interior molded doors in the United States. The complaints sought ordinary and treble damages, declaratory relief, interest, costs, and attorneys' fees.

On August 31, 2020, JELD-WEN and Masonite entered into a settlement agreement with the putative Direct Purchaser
class to resolve the Direct Purchaser Action. Each defendant agreed to pay a total of $30.8 million to the named plaintiffs and the settlement class in exchange for a full release of claims through the date of preliminary approval of the revised settlement, which the court granted on February 5, 2021. In addition, on September 4, 2020, JELD-WEN and Masonite entered into a separate settlement agreement with the putative Indirect Purchaser class to resolve the Indirect Purchaser Action. Each defendant agreed to pay $9.75 million to the named plaintiffs and the settlement class in exchange for a full release of claims through the execution date of the settlement agreement. The final fairness hearing in the Direct Purchaser Action was held on June 2, 2021, and the court entered a final approval order and judgment on June 3, 2021. On June 17, 2021, the Company made the settlement payment to the named plaintiffs and the settlement class in the Direct Purchaser Action. The deadline to appeal the entry of the final approval order and judgment was July 7, 2021, and no party or class member filed an appeal. The final fairness hearing in the Indirect Purchaser Action was held on July 26, 2021 and the court issued a final approval order and judgment on July 27, 2021. On August 10, 2021, the Company made the settlement payment to the named plaintiffs and the settlement class in the Indirect Purchaser Action. The deadline to appeal the entry of the final approval order and judgment was August 26, 2021, and no party or class member filed an appeal. The Company continues to believe that the plaintiffs' claims lacked merit and has denied any liability or wrongdoing for the claims made against the Company.

*Canadian Antitrust Litigation* – On May 15, 2020, Développement Émeraude Inc., on behalf of itself and others similarly situated, filed a putative class action lawsuit against the Company and Masonite in the Superior Court of the Province of Quebec, Canada, which was served on us on September 18, 2020 ("the Quebec Action"). The putative class consists of any person in Canada who, since October 2012, purchased one or more interior molded doors from the Company or Masonite. The suit alleges an illegal conspiracy between the Company and Masonite to agree on prices, the distribution of market shares and/or the production levels of interior molded doors and that the plaintiffs suffered damages in that they were charged and paid higher prices for interior molded doors than they would have had to pay but for the alleged anti-competitive conduct. The plaintiffs are seeking compensatory and punitive damages, attorneys' fees and costs. On September 9, 2020, Kate O'Leary Swinkels, on behalf of herself and others similarly situated, filed a putative class action against the Company and Masonite in the Federal Court of Canada, which was served on us on September 29, 2020 (the "Federal Court Action"). The Federal Court Action makes substantially similar allegations to the Quebec Action and the putative class is represented by the same counsel. In February 2021, the plaintiff in the Federal Court Action issued a proposed Amended Statement of Claim that replaced the named plaintiff, Kate O'Leary Swinkels, with David Regan. The plaintiff has sought a stay of the Quebec Action while the Federal Court Action proceeds. We anticipate a hearing on the certification of the Federal Court Action in 2023. The Company believes both the Quebec Action and the Federal Court Action lack merit and intends to vigorously defend against them. On July 14, 2023, the Company entered into a preliminary agreement with class counsel to resolve both actions for an immaterial amount, which the Company recorded in the second quarter of 2023. The proposed settlement remains subject to final documentation and court approval. The Company continues to believe the plaintiffs' claims lack merit and denies any liability or wrongdoing for the claims made against the Company.

We have evaluated the claims against us and recorded provisions based on management's judgment about the probable outcome of the litigation and have included our estimates in accrued expenses in the accompanying balance sheets. See Note 8 - *Accrued Expenses and Other Current Liabilities*. While we expect a favorable resolution to these matters, the dispute resolution process could be lengthy, and if the plaintiffs were to prevail completely or substantially in the respective matters described above, such an outcome could have a material adverse effect on our operating results, consolidated financial position, or cash flows.

**Self-Insured Risk** – We self-insure substantially all of our domestic business liability risks including general liability, product liability, warranty, personal injury, auto liability, workers' compensation, and employee medical benefits. Excess insurance policies from independent insurance companies generally cover exposures between $5.0 million and $200.0