IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEVES AND SONS, INC.,

        Plaintiff,

v.                         Civil Action No. 3:16-cv-545

JELD-WEN, INC.,

        Defendant.

## MEMORANDUM OPINION

This matter is before the Court on JELD-WEN'S OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION ("JELD-WEN OBJECTIONS"), ECF No. 2593, and STEVES AND SONS, INC.'S STATEMENT OF SUPPORT AND LIMITED OBJECTIONS TO THE SECOND REPORT AND RECOMMENDATION OF THE SPECIAL MASTER REGARDING OFFERS TO PURCHASE THE DIVESTITURE ASSETS ("STEVES OBJECTIONS"), ECF No. 2594. Those Motions raise substantive objections to the SECOND REPORT AND RECOMMENDATION OF THE SPECIAL MASTER REGARDING OFFERS TO PURCHASE THE DIVESTITURE ASSETS ("R&R"), ECF No. 2551-1. To address these Motions, the Court received and reviewed briefs from both parties and Intervenor, Woodgrain, Inc., ECF Nos. 2593, 2603, 2605, 2606, 2619, 2621, as well as heard oral argument in a seven-hour hearing on December 4, 2024. For the reasons set forth below, the JELD-WEN OBJECTIONS, ECF No. 2593, will be overruled and the STEVES OBJECTIONS, ECF No. 2594, will be overruled and sustained in part.

## I. FACTUAL & PROCEDURAL BACKGROUND[1]

The present matter arrives at the Court after a storied history of antitrust litigation and mediation between Steves and Sons, Inc. ("Steves") and JELD-WEN, Inc. ("JELD-WEN"). The Court need not rehash that entire history to resolve the Motions before it. Nonetheless, some context is necessary to today's ruling. Our story begins in 2012.

Steves and JELD-WEN are two of multiple U.S. interior-molded-door manufacturers. Before these doors are sold to customers for use, they are outfitted with an interior molded doorskin. While various companies compete in the market for finished doors, very few have the technical capability to create the necessary doorskin for the finished product.

In 2012, there were three U.S. doorskin manufacturers: JELD-WEN, Masonite Corporation ("Masonite"), and CraftMaster Manufacturing, Inc. ("CMI"). All three of these manufacturers were vertically integrated, meaning they could make both the interior molded door and the doorskin. All other door manufacturers at the time, including Steves, were not vertically integrated: While capable of manufacturing the doors, they were unable, for myriad

---

[1] Much of this factual background was already set out, in far greater detail, in the Court's previous MEMORANDUM OPINION in this case. Steves and Sons, Inc. v. JELD-WEN, Inc., 345 F. Supp. 3d 614, 624-47 (E.D. Va. 2018), aff'd, 988 F.3d 690 (4th Cir. 2021), reh'g en banc denied, No. 19-1397, 2021 U.S. App. LEXIS 8387 (4th Cir. 2021).

reasons, to manufacture the doorskins themselves. These independent door manufacturers ("Independents") could therefore only purchase doorskins—a necessary input into their manufacturing process—from JELD-WEN, Masonite, or CMI.

Later in 2012, JELD-WEN acquired CMI, including its doorskin business, which was operated solely out of a manufacturing facility in Towanda, Pennsylvania ("Towanda" or "Towanda plant" or "Towanda facility"). JELD-WEN purchased the entirety of CMI for ▮ million through a stock purchase agreement. ECF No. 2489, at 1. JELD-WEN's later analysis provided that the Towanda plant, including both its doorskin manufacturing capabilities and other unrelated product production capabilities, amounted to approximately ▮ percent of that ▮ million. Id. at 2-3. So, JELD-WEN paid approximately ▮ million for the Towanda facility.

Before JELD-WEN's acquisition of Towanda in 2012, Steves was a customer of JELD-WEN from which it purchased doorskins for use in its door manufacturing business. In the years immediately following JELD-WEN's acquisition of CMI, and despite a long-term supply agreement that should have indexed prices to input costs, Steves faced multiple never-before-encountered problems in its supply of doorskins from JELD-WEN, including increased prices, reduced quality, and a less generous reimbursement policy for faulty units. It was also unable to change doorskin suppliers as the only other U.S. doorskin supplier—Masonite—refused to sell

3

doorskins on anything other than a spot-sale basis to Independents, which was not economically viable for Steves due to its high production volume and consequent supply demands for doorskins. Foreign doorskin suppliers were also not viable alternatives for Steves for various reasons, including exceptionally high freight costs and extensive delivery delays compared to domestic suppliers.

After extensive private negotiations and mediation between Steves and JELD-WEN to address the issues Steves was facing, Steves sued JELD-WEN in federal court on June 29, 2016. ECF No. 1. In its Complaint, Steves alleged several breach-of-contract, breach-of-warranty, and antitrust violations. Only the antitrust claim is relevant here. Specifically, Steves alleged that JELD-WEN's 2012 acquisition of CMI violated Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, by substantially lessening competition in the molded-interior-doorskin market. It sought damages under Section 4 and injunctive relief, including a full divestiture of the Towanda plant, under Section 6 of the Clayton Antitrust Act. 15 U.S.C. §§ 15, 26.

In 2016, the Court held a jury trial to adjudicate Steves' antitrust claims against JELD-WEN. At that trial, Steves proved by a preponderance of the evidence that there were three vertically integrated doorskin manufacturers in a competitive interior-molded doorskin market before JELD-WEN's 2012 acquisition of CMI. JELD-

WEN's merger with CMI reduced the number of competitors in that market from three to two, leaving only JELD-WEN and Masonite as U.S. manufacturers of doorskins and suppliers of those doorskins to the Independents. The jury found that the 2012 merger, and JELD-WEN's conduct thereafter, substantially reduced competition in the doorskin market and that, as a result, Steves sustained injuries of the type that the antitrust laws were designed to prevent. To remediate the harm, the jury awarded damages to Steves to the tune of $58,632,454.00, which amounted to $175,897,362.00 when trebled as required by statute.

Following the jury trial, the Court still had to decide whether requiring JELD-WEN to divest Towanda was a necessary equitable remedy to restore competition to the U.S. doorskin market as it existed prior to JELD-WEN's 2012 acquisition of CMI. In a lengthy opinion, the Court determined that divestiture was indeed necessary to restore that competition. Steves and Sons, Inc. v. JELD-WEN, Inc., 345 F. Supp. 3d 614, 682 (E.D. Va. 2018), aff'd, 988 F.3d 690 (4th Cir. 2021) [hereinafter Div. Op.].

The decision was a first of its kind—never before had a court ordered divestiture in a case brought by private plaintiffs. In reaching the decision to order divestiture, the Court drew on longstanding antitrust doctrine and traditional equitable principles. Id. at 647-51, 663-65. It assessed the four traditional equitable factors to determine whether divestiture was warranted:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Id. at 651 (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (emphasis removed)). The Court found that all four factors favored Steves. Steves faced the irreparable injury of bankruptcy and closure after its supply agreement with JELD-WEN would expire in 2021. Damages were not able to remedy that harm. Id. at 655-57. While JELD-WEN did face its own harms from divestiture, those harms were dwarfed by the harm imposed on Steves. Id. at 657-62. Lastly, divestiture clearly favored the public interest. Id. at 667-68. Therefore, the Court ordered that JELD-WEN "divest itself of the Towanda facility" and "to the extent reasonably possible, that JELD-WEN receive[] a fair price for Towanda," and that the "divestiture produces a competitive entity that is likely to restore competition" to the U.S. doorskin market. Id. at 682. It appointed a Special Master to achieve these goals.

In rendering that order, the Court recognized the potential difficulty in attempting to conduct a forced sale of Towanda to remedy this antitrust injury while JELD-WEN could still appeal its divestiture decision. Consequently, it adopted the Supreme Court's approach to forced divestitures in Brown Shoe Co. v. United States,

6

370 U.S. 294 (1962). In that case, where the United States rather than a private plaintiff brought a Section 7 suit, the Supreme Court held that the district court's divestiture decision was "sufficiently final to enable appellate review even though the order only commanded divestiture without specifying the details of the divestiture sale or separation process." Div. Op., 345 F. Supp. 3d at 663 (citing Brown Shoe, 370 U.S. at 304, 308-10). Therefore, the divestiture decision in this case was an appealable final judgment as to the requirement of divestiture itself, but left to the Special Master to work out the intricacies and particularities of how—not if—Towanda would be divested after all appeals were finished. Id. at 668.

JELD-WEN did appeal to the Fourth Circuit, which fully affirmed the Court's divestiture decision and the procedure it adopted under Brown Shoe. Steves and Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 722, 729 (4th Cir. 2021). The Fourth Circuit affirmed this Court's holdings on each of the four eBay equitable remedy factors. Id. at 719-24. In doing so, it rejected JELD-WEN's arguments that a remedy less than full divestiture was appropriate because (1) any conduct remedy (such as another long-term supply agreement) would only ameliorate the short-term harm to Steves, not the long-term threat to its survival; and (2) divestiture aligned with the Clayton Act's core antitrust principles of "promoting competition" in the market as a whole—any remedy that

7

would only ameliorate Steves' harm would not "promote competition in the doorskin market," which "conflict[s] with the principle that antitrust law protects competition, not competitors." Id. at 720 (citing California v. Am. Stores Co., 495 U.S. 271, 284 (1990); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977)).

The Fourth Circuit unequivocally held that divestiture was necessary in this case; indeed, stating explicitly that "this case is a poster child for divestiture." Id. at 724. To ensure that divestiture was successful, it affirmed, over JELD-WEN's objections, the two-step Brown Shoe approach, rendering a final judgment on the issue of divestiture, which, after resolution on appeal, would be followed by a Special Master overseeing how exactly a sale of Towanda would occur. Id. at 722. JELD-WEN sought en banc review, which was denied by the Fourth Circuit. Steves and Sons, Inc. v. JELD-WEN, Inc., No. 19-1397, 2021 U.S. App. LEXIS 8387 (4th Cir. 2021). After this denial, JELD-WEN never submitted a petition for certiorari to the Supreme Court, rendering final this Court's decision, affirmed by the Fourth Circuit, that JELD-WEN must divest Towanda and all of its related business. The Special Master's process of determining exactly how the divestiture of Towanda would occur began in earnest thereafter.

The Special Master's first and second R&R detail the extensive process and significant effort that he and the parties have taken

to ensure that Towanda is divested to a entity that will accomplish the goals of this Court and the Fourth Circuit's decisions in this case. That process began in 2021. At that time, the Special Master and his advisors informed potentially interested parties that the Towanda facility was for sale. They solicited bids from dozens of industry participants and financial investors for the assets. Two of those bidders, though unsuccessful, were Steves and Woodgrain. Once finalized, the bids ranged from approximately ███████ million. In his initial Report and Recommendation, the Special Master recommended that the Court approve ████████  ████████'s (████) bid of ████ for Towanda. ECF No. 2189, at 29; ECF No. 2457. Because of its position as a litigant in the matter, Steves was given the right to object to any recommendation made by the Special Master. It exercised that right and objected to the sale of Towanda to ██. Shortly thereafter, ██ withdrew its bid, and the first bidding process failed. ECF No. 2551-1, at 2-3.

During this process, the supply agreement that Steves had with JELD-WEN was set to expire. To ensure that Steves would maintain a supply of doorskins for its customers, the Court approved a new three-year supply agreement between the parties such that JELD-WEN would continue to sell doorskins to Steves. Id. at 3-4. In 2022, during these negotiations, Steves announced publicly that it had purchased a new facility in Athens, GA. Unlike the capabilities of its other facilities, Steves intended to

configure the Athens plant to have the ability to manufacture doorskins. Originally anticipated to begin producing doorskins in 2024, Steves later announced that the facility would not come online until 2025. Id. at 4 & n.5.

Once Steves and JELD-WEN had a new supply agreement in place, the Special Master reopened the bidding process for a second time. Id. at 6. The second bidding process again attracted dozens of initial bidders. Id. at 8. However, that field eventually narrowed to six, one of which was Woodgrain. Id. at 10. The price range of final bids had significantly reduced from the first bid round to a range of ███████ million. Id. However, of these six bidders, only two had taken the process seriously and completed their due diligence: ████████ and Woodgrain.

The Special Master initially recommended ███████ as the winning bidder. Serious efforts were made to decide the particulars of a deal between ███████ and JELD-WEN. However, JELD-WEN objected to multiple aspects of ███████, including its bid price and perceived commitment to continuing to operate Towanda post-purchase. Id. at 11. After weeks of mediated negotiations, discussions between ████████ and JELD-WEN began to sour and JELD-WEN rejected ██████████'s offer to enter into an exclusivity posture. Id. at 12-13. With negotiations between JELD-WEN and Plastpro faltering, the Special Master reengaged Woodgrain, which then began more intensive measures to secure a deal with JELD-WEN. Id.

at 13-15. These discussions resulted in Woodgrain entering into exclusivity with JELD-WEN, however, shortly thereafter Woodgrain withdrew its bid from consideration in the process. Id. at 15. Woodgrain cited multiple concerns about continuing to pursue purchasing Towanda, including "its chief concern [being] the profitability of Towanda given Steves' plans to construct its own doorskins plant and substantial[] withdraw from Towanda." Id. The Special Master determined then that "there was no ability at that juncture to salvage a sale to Woodgrain." Id. at 16.

By this time in the second bidding process, the ability to ascertain a final buyer for the assets looked difficult. Most of the remaining bidders, including ███████, were hesitant to continuing pursuing Towanda without additional information from Steves on its future intentions and capabilities at its forthcoming Athens facility. Id. at 16-17. Discussions with ██████ again stalled. Further, another final bidder—█████—withdrew, citing concerns about the "profitability of the Towanda facility, due to both market decline and concerns about Steves' substantial withdrawal on the opening of its own doorskins plant." Id. at 18. Woodgrain did reengaged, though it noted that it only intended to pursue negotiations if it could acquire Towanda at a "significantly lower" value than it originally bid. Id. Eventually, the second bidding process broke down without a designated winning bidder for Towanda.

The third bidding process began in early 2024. This time, Steves was able to share, once NDAs were in place, information to bidders on its upcoming Athens facility and to its requirements for doorskins to assuage fears over acquiring Towanda. Id. at 21. The Special Master engaged 18 potential bidders in March 2024 of which nine submitted final bids on April 15, 2024. Id. The price range of the bids decreased again compared to both the first and second rounds of bidding. This time, the bids ranged from approximately ███████ million. Woodgrain again submitted a bid, which equaled ████ million. Id. at 22.

Following the submission of these final bids, JELD-WEN filed its MOTION TO MODIFY, ECF No. 2456, with the Court on May 1, 2024. ECF No. 2551-1, 22 n.27. In the MOTION TO MODIFY, JELD-WEN asks the Court to set aside the divestiture order due to changed circumstances, citing both changing market conditions due to Steves purported future entry into the U.S. doorskin market and that the bidding process now resulted in an unreasonable price for Towanda. ECF No. 2456. Notwithstanding the MOTION TO MODIFY, JELD-WEN continued pursuing negotiations to sellin Towanda to potential bidders, including Woodgrain. The Special Master focused on Woodgrain as the best potential bidder for Towanda in this round. JELD-WEN and Woodgrain spent the following months negotiating, and completing, various ancillary agreements and a tentative Asset Purchase Agreement. ECF No. 2551-1, at 23-28. At present, most of

these agreements have been finalized, with minimal outstanding provisions in the Asset Purchase Agreement needing resolution.

On October 25, 2024, the Special Master submitted the R&R to the Court for consideration. It was accompanied by an antitrust analysis by the Special Master's retained antitrust counsel, Venable, which the Special Master took into account in making the R&R. ECF No. 2551-3. The Special Master also retained an investment expert ("KeyBanc") and an economic expert ("NERA") to assist in the process. The Special Master took into account all of their expert opinions and analyses in issuing the R&R.

The Special Master recommended Woodgrain as the purchaser of Towanda, stating that he "believe[s] that Woodgrain has the business acumen, experience, and financial ability to successfully operate the Towanda facility." ECF No. 2551-1, at 30. Furthermore, Woodgrain would be able to successfully operate Towanda and restore competition in the doorskin market "without raising horizontal or significant vertical competitive concerns." Id. (quoting ECF No. 2551-3). The Special Master's assessment and recommendation was made based on the following primary facts: (1) Woodgrain would be a third competitor in the doorskin market, resolving the adjudicated horizontal merger concerns; (2) Notwithstanding its vertically integrated position post-acquisition of Towanda, Woodgrain would still have "significant economic incentives" to supply doorskins to the Independents and not foreclose them because

of its relatively small share in the downstream market for interior-molded doors; (3) Woodgrain is incentivized to keep Towanda operational and profitable because of its own downstream door business; and (4) Woodgrain already has experience operating the Towanda facility as one of its prior owners, increasing the likelihood that Woodgrain can competitively operate Towanda in the doorskin market. Id. at 32 (quoting ECF No. 2551-3). Therefore, according to the Special Master, Woodgrain's purchase of Towanda accomplishes the Court's order to find a buyer that would restore competition to the doorskin market. Id. at 35; Div. Op., 345 F. Supp. 3d at 682.

The Special Master also addressed whether Woodgrain's ███ million offer for Towanda met the Court's second requirement in its Divestiture Opinion that "to the extent reasonably possible," JELD-WEN receive a "fair price for Towanda." Id. (emphasis added); ECF No. 2551-1, at 33-34. The R&R notes that the price being offered for Towanda unquestionably diminished with each new bidding round. Id. at 33. However, based on his experience and the analysis performed by KeyBanc, the Special Master determined that "Woodgrain's bid is within a reasonable range of what the market is currently commanding under the unique circumstances of this divestiture." Id. (emphasis added). Circumstances of the bidding process and background market conditions undeniably influenced what price the market—through industry participants' bids—thought

14

was reasonable to offer for Towanda. This includes the ever-present reality that JELD-WEN is being forced to sell Towanda, which is only occurring because a jury found that JELD-WEN illegally acquired Towanda in violation of federal antitrust laws. Id. at 34. Therefore, according to the Special Master, Woodgrain's purchase of Towanda satisfies the Court's order that JELD-WEN receive a reasonably fair price, to the extent possible under the present conditions, for Towanda in this forced sale. Div. Op., 345 F. Supp. 3d at 682; ECF No. 2551-1, at 33-35.

## II. JELD-WEN OBJECTIONS TO THE R&R

JELD-WEN lodges three principal objections to the Special Master's R&R. First, it largely rehashes the arguments that it has made in its separate JELD-WEN, INC.'S MOTION TO MODIFY THE AMENDED FINAL JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5), ECF No. 2456 ("MOTION TO MODIFY"); namely, it argues that market conditions have significantly changed since Steves' announcement that it is building, and plans to open by early 2025, a new facility capable of manufacturing its own doorskins. Consequently, JELD-WEN claims, the Special Master's recommendation that divesting Towanda is still necessary to restore competition exceeds the bounds of equity and the remedies available under the Clayton Antitrust Act. ECF No. 2593, at 15-19. The Court fully addresses the MOTION TO MODIFY in a separate Memorandum Opinion. Considering those same arguments here in the posture of objections to the

15

Special Master's R&R is procedurally improper under the <u>Brown Shoe</u> approach that the Court, with the approval of the Fourth Circuit, has adopted to resolve the issue of divestiture in this case. Therefore, the Court rejects this objection.

Second, JELD-WEN objects to the Special Master's recommendation to divest the Towanda facility to Woodgrain by arguing that such divestiture will in fact harm the public interest. ECF No. 2593, at 19. Much of this argument, however, is just a repackaging of JELD-WEN's objection to the divestiture itself, which, again, is foreclosed by the step-two <u>Brown Shoe</u> approach that this Court took to resolving this dispute. Nonetheless, the Court will substantively address JELD-WEN's two main arguments here in the appropriate, narrower, manner by focusing them as applied to Woodgrain. Those arguments include: (1) that divesting Towanda will harm competition because of the reduced operating efficiencies attendant outside of JELD-WEN's network; and (2) that Woodgrain would not be able to profitably operate Towanda, resulting in its closure and a loss of Towanda's doorskin production capacity in the market. <u>Id.</u> at 23-28. The Court holds that these concerns lack sufficient evidence to reject the Special Master's R&R and, instead, that the R&R sufficiently demonstrates that Woodgrain's acquisition of Towanda will likely restore competition to the U.S. doorskin market in accord with this Court's <u>Divestiture Opinion</u>. Therefore, the Court rejects

16

this objection to the Special Master's R&R.

Third, JELD-WEN objects to the Special Master's R&R because it does not result in a "reasonable price" being paid for Towanda, which, it argues, violates this Court and the Fourth Circuit's decisions in this case and unduly punishes JELD-WEN. ECF No. 2593, at 24. JELD-WEN relies heavily on its expert's analysis of what Towanda's estimated valuation would be absent the unique conditions of the ongoing forced-sale process. Id. at 29-31. Consequently, the Court does not find that JELD-WEN has provided sufficient evidence or convincing arguments that demonstrate that the price Woodgrain intends to pay for Towanda is unfair or unreasonable. Therefore, the Court rejects this objection to the Special Master's R&R.

## A.   IT IS PROCEDURALLY IMPROPER TO CONSIDER JELD-WEN'S ARGUMENT THAT DIVESTITURE OF TOWANDA TO WOODGRAIN WOULD VIOLATE EQUITABLE REMEDY PRINCIPLES.

JELD-WEN's initial objection to the R&R is that the Court should reject the Special Master's recommendation to sell the Towanda facility to Woodgrain because market conditions have substantially changed since the Court's 2018 Divestiture Opinion. Therefore, JELD-WEN claims that the Court should reject the Special Master's R&R, refuse to force a divestiture of Towanda to Woodgrain, and instead permit JELD-WEN to retain the Towanda plant and all of its business—the very assets that prompted the Fourth Circuit to call JELD-WEN's illegal acquisition of Towanda a "poster

17

child for divestiture." Steves, 988 F.3d at 724.

The Court declines JELD-WEN's invitation to entertain this collateral attack on the divestiture order that was affirmed by the Fourth Circuit under the guise of an objection to the Special Master's R&R. Div. Op., 345 F. Supp. 3d at 682, aff'd, Steves, 988 F.3d at 729. Making this argument as an objection to the Special Master's R&R is procedurally improper under the Court's Brown Shoe approach, which the Fourth Circuit endorsed and affirmed. Steves, 988 F.3d at 722. Instead, JELD-WEN must raise this argument in a Rule 60(b) Motion, which it has already done, ECF Nos. 2456 & 2457, as an exception to the Mandate Rule for final judgments. S. Atl. Ltd. P'ship of Tenn. v. Riese, 356 F.3d 576, 584 & n.9 (4th Cir. 2004); Turpin v. United States, No. 93-2342, 1994 WL 328275, at *2-*3 (4th Cir. July 11, 1994). The merits of the argument are considered in the separate Memorandum Opinion on the MOTION TO MODIFY, ECF No. 2456. Here, the Court reiterates the use of the Brown Shoe approach and why that approach forecloses JELD-WEN from raising this argument as an objection to the Special Master's R&R. Therefore, for the following reasons, the Court rejects this objection to the R&R.

In Brown Shoe, the Supreme Court heard an appeal from the Brown Shoe Co. to a district court's order, issued in response to a suit for injunctive relief brought by the United States, that it must divest certain assets due to violations of Section 7 of the

Clayton Antitrust Act. Brown Shoe, 370 U.S. at 296; 15 U.S.C. §§ 18, 25. As part of its review, the Supreme Court had to determine whether it possessed appellate jurisdiction to hear a challenge to the divestiture order because the district court's judgment did not contain a finalized specific plan for divestiture. Instead, the district court had "reserve[d] such a ruling pending the filing of suggested plans for implementing divestiture." Id. at 305. The Supreme Court noted that it takes a "pragmatic approach" to determine whether a judgment is final for the purposes of appeal and resolution. Id. at 306. In Brown Shoe, that pragmatic approach resulted in the holding that the district court's divestiture judgment "had sufficient indicia of finality . . . to hold that the judgment is properly appealable." Id. at 308.

The Supreme Court held that the district court's divestiture judgment was sufficiently final to consider on appeal notwithstanding that the judgment allowed the parties to "propose in the immediate future a plan for carrying into effect the court's order of divestiture." Id. It went on to affirm the divestiture judgment, which left the "sole remaining task for the District Court" to "accept[] a plan for full divestiture, and [] supervis[e] the plan so accepted." Id. (emphasis added). Therefore, once the Supreme Court issued its ruling affirming the divestiture judgment, the parties would be "foreclosed" from challenging it again. Id. at 309. It expressly forbid the "[r]epetitive judicial

19

consideration of the same question in a single suit." Id.

The Supreme Court found its approach appropriate on two primary rationales, the first practical, the second precedential.

First, it noted the challenging environment in which the formulation and implementation of a divestiture plan must necessarily occur—one that requires extensive negotiations, that involves changing market conditions, and that would be plagued by the "unsettling influence of uncertainty as to the affirmance of the initial, underlying decision compelling divestiture." Id. If the district court was required to first hammer out the details of how the divestiture would occur before approval and appealability of that divestiture had concluded, then the process would undermine the ability to enforce the antitrust laws and harm the public interest because "a change in market conditions [may be] sufficiently pronounced to render impractical or otherwise unenforceable the very plan of asset disposition for which the litigation was held." Id. (emphasis added).

Second, the Supreme Court held that this two-step approach of first resolving appeals of the divestiture judgment itself and then later resolving the particularities of how exactly that divestiture would occur was "settled . . . [judicial] practice." Id. Therefore, the Supreme Court affirmed this two-step approach to reviewing divestiture judgments, at least in suits brought initially by the Government.

This Court adopted this approach in the unique context of ordering a divestiture of JELD-WEN's illegally acquired Towanda facility in a suit brought by a private plaintiff. Div. Op., 345 F. Supp. 3d at 663-65. It found Brown Shoe's logic compelling and that no meaningful difference arose in adjudicating its divestiture judgment simply because this was a suit brought by a private party rather than the United States. Id. at 664-65. Therefore, the Court followed Brown Shoe's two-step approach to the equitable remedy of asset divestiture in antitrust cases: First, decide whether, in the first instance, divestiture itself was appropriate. Then, let the appeals process over that question play out. Second, once that appeals process concluded, create a process by which the particularities of how divestiture would occur can be resolved. As for the second step, the Court appointed the Special Master to decide how—not if—the required divestiture would occur to restore competition to the U.S. doorskin market and achieve a reasonable price of Towanda for JELD-WEN under the circumstances of a first-of-its-kind forced sale. Id. at 663, 668.

JELD-WEN exercised its right to appeal the Court's final judgment on Towanda's divestiture. The Fourth Circuit affirmed the Court's decision that divestiture of Towanda was warranted to resolve the antitrust injury suffered by Steves and restore competition to the U.S. doorskin market. Steves, 988 F.3d at 720. In doing so, the Fourth Circuit also affirmed this Court's approach

21

in applying the Brown Shoe two-step framework. Id. at 722 ("In both government and private suits, a court may order divestiture if it's needed to 'restore competition,' i.e., to 'protect the public interest.'" (quoting United States v. E.I. du Pont de Nemours & Co., 366 U.S. 316, 326 (1961))). The Fourth Circuit found the Brown Shoe approach appropriate in this case in particular because of the need to attract and keep interested potential buyers who would seriously pursue Towanda. Id. Any further delay due to uncertainty in the appeals process would jeopardize the entire divestiture itself. Id.

After the Fourth Circuit's ruling, JELD-WEN sought en banc review in front of the full Fourth Circuit, which was denied. Steves, 2021 U.S. App. LEXIS 8387. It further decided to not submit a writ of certiorari for the potential of Supreme Court review. Therefore, the Fourth Circuit's ruling requiring JELD-WEN to divest Towanda is final. Steves, 988 F.3d at 729.

Where does that leave the Court, and the parties, in the process of considering the divestiture of Towanda? The answer is simple: at Brown Shoe's second step. With the question of whether Towanda must be divested concluded (step one), and answered in the affirmative, all that remains is how exactly the divestiture of Towanda will take place (step two). See Brown Shoe, 370 U.S. at 306-09. The Court ordered, and the Fourth Circuit affirmed, that the Special Master recommend how JELD-WEN would divest Towanda.

That includes who should purchase Towanda—such as Woodgrain—but it does not include a reexamination of whether Towanda must be divested. Steves, 988 F.3d at 724.

Now, this does not mean that JELD-WEN lacks no recourse to object to the decisions of the Special Master in how exactly Towanda must be divested. This Court recognized that possibility back in 2018. Div. Op., 345 F. Supp. 3d at 669. The Fourth Circuit upheld that decision, noting that JELD-WEN could still object to the Special Master's recommendations for at least two reasons: (1) "the special master can't locate a satisfactory buyer"; and (2) "when a buyer is selected . . . a sale to that particular buyer will serve the public interest." Steves, 988 F.3d at 724 (emphasis added). The emphasized language demonstrates the limits of JELD-WEN's objection power: It cannot object, via the R&R process, to the underlying divestiture decision itself, but only to the particular buyer chosen by the Special Master in its analysis. Id.[2]

As it stands today, the Special Master has located an entity that he has found to be a satisfactory buyer—Woodgrain. The Special

---

[2] While there is no indication that these are the only bases upon which JELD-WEN can permissibly object to the Special Master's R&R, it is certainly clear based on the reasons set forth above that one such basis to object is not to the underlying divestiture decision itself. Brown Shoe, and this Court and the Fourth Circuit's decisions applying it, unquestionably foreclose such an objection in this posture at this juncture. Supra.

Master recommends Woodgrain because he believes that divestiture to Woodgrain would serve the public interest by restoring competition to the U.S. doorskin market. ECF No. 2551-1, at 34-35. JELD-WEN can object, and indeed has objected, to the Special Master's recommendation to divest Towanda to Woodgrain based on the grounds stated by the Fourth Circuit. ECF No. 2593, at 23-33. However, at this stage of the litigation and divestiture process, JELD-WEN cannot exploit its right to object to the Special Master's recommendations on how to consummate the divestiture of Towanda by objecting to the very divestiture of Towanda itself. That, if permitted, contradicts the decisions of this Court, the Fourth Circuit, and the Supreme Court. Therefore, while the Court will address the merits of JELD-WEN's other objections to the R&R _infra_, it will overrule JELD-WEN's objection to the R&R that it need not divest Towanda.

**B. DIVESTITURE TO WOODGRAIN WILL NOT HARM THE PUBLIC INTEREST.**

In its opinion affirming this Court's Divestiture Opinion, the Fourth Circuit stated that at least one basis upon which JELD-WEN could object to the Special Master's R&R on how to effectuate Towanda's divestiture was: "when a buyer is selected, JELD-WEN may challenge whether a sale to that particular buyer will serve the public interest." Steves, 988 F.3d at 724 (emphasis added). Therefore, as discussed _supra_, JELD-WEN is procedurally barred from objecting to the divestiture of Towanda itself during the

24

Special Master process, which accords with the Brown Shoe approach. However, JELD-WEN clearly may object to the particular buyer, here, Woodgrain, that the Special Master chooses as an acceptable purchaser of Towanda if it can show that divestiture to that buyer (Woodgrain) would harm the public interest. JELD-WEN makes that objection here, arguing that ordering divestiture to Woodgrain will harm the public interest. ECF No. 2593, at 23. However, while some parts of this objection by JELD-WEN are proper, most of the objection is procedurally barred under Brown Shoe and the Fourth Circuit's decision in this case because JELD-WEN's claims of impending public harm simply restate its objection to the divestiture itself. The Court has considered this broader public-interest-based objection, and the subsidiary objections within it, and will overrule them for the reasons set forth below.

JELD-WEN encapsulates its primary public-interest objection in the following excerpt from its supporting brief:

> Although the Special Master purported to perform an 'antitrust analysis' and to consider 'antitrust questions and concerns related to the transaction agreements,' the Special Master did not actually address whether competition and customers would be better off if Towanda is divested . . . Had he done so, he would have been forced to recognize that ordering divestiture now, in this current market, will affirmatively harm the public interest by increasing the cost of doorskins and potentially risking the viability of Towanda.

Id. at 23-24 (emphasis added) (JELD-WEN's emphasis removed) (internal citations omitted) (quoting ECF No. 2551-1, at 31). While

ostensibly contextually situated in a discussion about divestiture to Woodgrain, JELD-WEN is again just attempting to argue that the entire divestiture of Towanda should not be approved—regardless of whom the Special Master identifies as a suitable acquirer. Brown Shoe forecloses objecting to the divestiture in this posture—regardless of how JELD-WEN packages and wraps those arguments. Supra. JELD-WEN may contest the divestiture under Fed. R. Civ. P. 60(b) on this ground, which is has done, ECF No. 2456, but not here. JELD-WEN knows as much. Immediately following the herein-reproduced language, JELD-WEN rehashes the same arguments and evidence it puts forth in support of its MOTION TO MODIFY, ECF No. 2456. ECF No. 2593 ("As JELD-WEN has previously explained, see, e.g., JELD-WEN Rule 60(b) Reply . . . the harms from divestiture are serious . . . ." (emphasis added)). JELD-WEN, perhaps unwittingly, drops the pretense of objecting "to that particular buyer" (Woodgrain) identified by the Special Master to acquire Towanda, Steves, 988 F.3d at 724, and merely objects to the divestiture as a whole, arguing that the entire divestiture harms the public interest. This is impermissible. Therefore, the Court will overrule JELD-WEN's public-interest-based objection to the extent that it argues that the entire divestiture of Towanda would harm the public interest.

Aside from JELD-WEN's generalized harm-to-the-public-interest argument that attacks the divestiture itself, JELD-WEN

has two additional, more particularized, objections to the Special Master's recommendation to allow Woodgrain to acquire Towanda. The first is based on efficiencies. The second relates to Towanda's potential profitability post-acquisition. The Court discusses each in turn.

JELD-WEN argues that the Special Master failed to adequately assess the efficiencies experienced by Towanda under JELD-WEN's operation because of its network of facilities and manufacturing capabilities that reduces freight costs and minimizes doorskin-die changes necessary to the manufacturing process. ECF No. 2593, at 24-26. Specifically, JELD-WEN asserts that the "Special Master did not consider <u>whether the efficiencies that JELD-WEN now realizes outweigh any possible competitive harms from JELD-WEN retaining Towanda</u>." <u>Id.</u> at 25 (emphasis added). This broader efficiencies argument is simply yet another attempt by JELD-WEN to collaterally attack the underlying divestiture of Towanda. JELD-WEN is correct that the Special Master did not assess whether efficiencies in the hands of JELD-WEN outweigh the potential anticompetitive harms if JELD-WEN retained Towanda. If he had, it would have been inappropriate because the question of <u>whether</u> divestiture itself is justified is not up for debate. Therefore, JELD-WEN lacks any foundation to object to the R&R on the basis that it does not contemplate or analyze a scenario where JELD-WEN <u>retains</u> Towanda—regardless of the reason. JELD-WEN may only object

that the "particular buyer" chosen by the Special Master, here Woodgrain, would harm the public interest. <u>Steves</u>, 988 F.3d at 724.

Now, to JELD-WEN's credit, it does make some attempt in its efficiencies argument to claim that divesting Towanda to Woodgrain <u>specifically</u>, as the Special Master's recommended buyer of Towanda, would harm the public interest. In particular, JELD-WEN argues that Woodgrain acquiring Towanda will harm the public interest because production costs at the plant will increase because "Woodgrain does not have a network of doorskin[] plants and because Woodgrain will produce fewer doorskins once Seves withdraws or substantially cuts its purchase volume." ECF No. 2593, at 25. It also presents opinions from a report by its expert, Dr. Loren Smith, which stated that, due to diminished scale, Woodgrain will likely have "higher average costs as the owner of Towanda than does JELD-WEN and thus [will likely] be less profitable than JELD-WEN." <u>Id.</u> (quoting ECF No. 2593-3, at 9). From these arguments, JELD-WEN concludes that Woodgrain will face increased costs and be incentivized to pass those costs onto Independents via higher prices for doorskins. <u>Id.</u>[3]

---

[3] JELD-WEN also submits an affidavit from ██████—an Independent and JELD-WEN's ████████ doorskin customer other than Steves—which expresses the opinion that divesting Towanda, <u>at all</u>, will harm ██████ because it will experience increased freight costs and reduce ██████'s ability to easily access the network effects provided by JELD-WEN and its other manufacturing facilities. ECF

Comparing efficiencies between Woodgrain and JELD-WEN is simply irrelevant for that is just another argument that JELD-WEN should not be forced to divest Towanda in the first instance. As an already integrated facility in JELD-WEN's network, it is highly likely that JELD-WEN has greater efficiencies than many other competitors. But that is not the relevant question. The relevant question, if we take the frame of efficiencies seriously, is whether Woodgrain could not efficiently operate Towanda to the same extent that a _different acquirer_ could operate Towanda. And, on that point, the Special Master and his advisors did opine.

After an extensive, years-long bidding process, the Special Master determined that Woodgrain was the only serious bidder who remained by the end of the bidding process. It assessed Woodgrain's ability to competitively operate Towanda compared to other bidders and determined that Woodgrain has the competitive incentive to vigorously compete in the doorskin market and "will be able to competitively _operate_ Towanda for the manufacturing and sale of doorskins in the future." ECF No. 2551-1, at 32 (emphasis added). Woodgrain's experience as a prior owner of the facility is a unique consideration that strongly negates the concerns of harm to the public interest advanced by JELD-WEN. Woodgrain has experience

---

No. 2593, at 24 (ECF No. 2457-3, at 3-4) Dr. Smith opines that Lynden will face increased freight costs of approximately ▮ million annually, though does not provide an economic analysis of how he arrived at that conclusion. _Id._ (citing ECF No. 2581).

with the facility and operating it alongside its existing facilities. Id. Consequently, it is logical to conclude that Woodgrain is better suited, compared to other potential acquirers, to efficiently operate and quickly integrate Towanda's capabilities alongside the rest of its suite of facilities and products. That is exactly what the Special Master found. ECF No. 2551-1, at 35.

Efficiency arguments are more common when assessing the question of whether a divestiture is the best way to restore competition to the market resulting from a merger. In that context, the potential divestor may rebut that, notwithstanding evidence that a merger may lessen competition, "evidence of procompetitive efficiencies [may] show[] that no substantial lessening of competition is in fact threatened by the merger." U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines § 3.3 (2023). In this fashion, the efficiencies rebuttal argument essentially asserts that the merger will "not substantially lessen competition in any relevant market in the first place." Id.

This case inhabits a completely different posture because a jury has already held that JELD-WEN violated the Clayton Act by acquiring Towanda in 2012 and this Court subsequently ordered its divestiture to ameliorate the competitive harm to Steves and the U.S. doorskin market. Div. Op., 345 F. Supp. 3d at 624, 626, 682. JELD-WEN made the efficiency argument to the jury, which did not

find the argument convincing. The Court too considered JELD-WEN's efficiency arguments in issuing its divestiture ruling. Id. at 633-36. The Fourth Circuit affirmed that decision. Steves, 988 F.3d at 724. Therefore, it has already been adjudicated that JELD-WEN violated federal antitrust laws by acquiring Towanda, notwithstanding any purported efficiencies that the merger brought to the market. "Possible economies cannot be used as a defense to illegality. Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition." Fed. Trade Comm'n v. Procter & Gamble Co., 386 U.S. 568, 580 (1967) (citing Brown Shoe, 370 U.S. at 344); United States v. Phila. Nat'l Bank, 374 U.S. 321, 371 (1963) ("We are clear, however, that a merger the effect of which 'may be substantially to lessen competition' is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial . . . Congress determined to preserve our traditionally competitive economy. It therefore proscribed anticompetitive mergers, the benign and the malignant alike, fully aware, we must assume, that some price might have to be paid."); Merger Guidelines, supra, § 3.3. JELD-WEN has presented no evidence that demonstrates that the efficiencies it purportedly brings to the market by owning Towanda alongside its other assets are in any way different today than they were in 2016 through 2018 when a trial was held on these matters or when the Court issued

its <u>Divestiture Opinion</u>. Instead, it is reviving an already-rejected defense to a divestiture adjudicated as necessary to resolve anticompetitive harm and restore competition to the U.S. doorskin market. Therefore, the Court will overrule JELD-WEN's objection based on the same efficiencies argument and holds that JELD-WEN has failed to make a showing that Woodgrain acquiring Towanda would harm the public interest sufficient to reject the Special Master's R&R.

JELD-WEN's second argument that divesting Towanda to Woodgrain <u>specifically</u> would harm the public interest rests on post-acquisition profitability concerns. Namely, JELD-WEN argues that the Special Master fails to fully address the theory that Woodgrain would not be able to profitably operate Towanda, at least in part, because Woodgrain would not be able to rely on Steves' current demand for doorskins. ECF No. 2593, at 26-28. It points to Woodgrain's own concerns, expressed to the Special Master during the second bidding round and reflected in the Special Master's R&R, about Towanda's potential profitability due to Steves' new doorskin facility. <u>Id.</u> at 26 (referencing ECF No. 2551-1, at 15). It also cites to Dr. Smith's Report wherein he explains that "[b]asic economics indicates that Towanda's higher costs and lower scale under potential Woodgrain ownership would place it at an elevated risk of failure, which may incentivize Woodgrain to close the doorskin plant or to shift production to other goods." <u>Id.</u>

(citing ECF No. 2593-3, at 72). JELD-WEN therefore concludes that divesting Towanda to Woodgrain would likely result in complete foreclosure and would harm the public interest. Id. at 28.

JELD-WEN's arguments about profitability, however, are not supported by the data. Steves' current capacity demands for doorskins total approximately ■ million per year. It projects that, once its facility is fully operational and at maximum capacity (which will take time), it will be able to produce approximately ■ to ■ million doorskins per year. ECF No. 2642, at 32. The record reflects that, currently, Steves sources all of its doorskins from JELD-WEN (other than those on a spot-sale basis). Therefore, even if Steves internalized all of its doorskin demand with its own production capacity at its new plant, it would still have to purchase at least ■ to ■ million doorskins from the other vertically integrated doorskin manufacturers. Masonite refuses to sell doorskins to Steves. ECF No. 2643, at 45. Therefore, Steves' only options for its additional doorskin demand are either JELD-WEN or Woodgrain, via Towanda, post-divestiture. See also ECF No. 2538-4, at 13 ("Steves [will] remain[] a net buyer of doorskins, [so] there will be at most two domestic supply options, JELD-WEN and Masonite, which is exactly the situation the Court sought to remedy [by ordering divestiture]." (expert report of Dr. Carl Shapiro)). It is possible that Steves leaves substantially all of its current remaining ■ to ■ million supply

with Woodgrain at Towanda, or switches that supply over to JELD-WEN post-divestiture.[4] That is the essence of competition. And that supports the Special Master's determination that Woodgrain would be incentivized to vigorously compete in the doorskin market—the intended outcome of the divestiture. ECF No. 2551-1, at 32.

Steves submitted data, which the Court and Special Master considered at a conference meeting with the parties on February 14, 2024, demonstrating Towanda's production capacity, including breakeven and profitability benchmarks. ECF No. 2457-1, at 8; ECF No. 2551-1, at 20. JELD-WEN has not rebutted the data that demonstrates that Towanda financially breaks even when it produces approximately ███ million doorskins and becomes profitable for the year when it reaches approximately ██ million doorskins. Id. Furthermore, JELD-WEN projects that, currently, the Independents' doorskin demand—excluding Steves—totals at least ██ million doorskins annually. ECF No. 2587-8, at 11. Therefore, based on the

---

[4] Dr. Shapiro also notes that Woodgrain would lack any profitability incentive to foreclose Independents—unlike JELD-WEN's past adjudicated illegal conduct. The Court finds Dr. Shapiro's analysis credible and that it strongly refutes Dr. Smith's opinions. Dr. Shapiro demonstrates that not only is it likely that Woodgrain will profitably operate Towanda post-divestiture under present circumstances, but that Woodgrain is also incentivized to vigorously compete to remain profitable. ECF No. 2538-4, at 14-18. That starkly differs from JELD-WEN's incentives, as demonstrated from its past conduct operating Towanda that led this Court to order divestiture as the only remedy that would adequately restore competition to the U.S. doorskin market.

most recent data that JELD-WEN has submitted (which is based on
JELD-WEN's internal records, and which is not challenged by
Steves), Woodgrain would be able to profitably operate Towanda
post-divestiture even completely absent any capacity dedicated to
Steves because it would cross the ▮ million profitability
threshold. If Steves dedicates any of its doorskin demand to
Woodgrain, which could total upwards of ▮ to ▮ million doorskins,
that would garner Woodgrain even greater profit.[5] The Special
Master considered all of this information in crafting the R&R and
in making the recommendation that Woodgrain purchase Towanda. ECF
No. 2551-1, at 20. JELD-WEN has never disputed this data; indeed,
it produced it.

Perhaps for these reasons, JELD-WEN's expert, Dr. Smith,
could only go so far as to state that Towanda "may be at greater
risk of failure" in Woodgrain's hands compared to JELD-WEN's
control. ECF No. 2581-3, at 23 (emphasis added). "May" does not
carry the day. So, JELD-WEN'S proffered proof is inadequate.
Moreover, the Special Master and his advisors project that
Woodgrain would be able to operate Towanda profitably post-
divesture. ECF No. 2551-1, at 28-35; ECF No. 2551-3, at 7-11.
Indeed, Woodgrain would be incentivized to heavily compete to fill

---

[5] Notably, JELD-WEN's data in the "Estimated Newco Profitability
Based on Doorskins Sold," ECF No. 2457-1, at 8, does not include
profits from other product lines sold at the Towanda facility that
JELD-WEN is also divesting such as MircaTEC and Extira.

any excess capacity from Steves' potential supply internalization, particularly because it only has a small upstream door manufacturing business.

For its own part, Woodgrain shares this view. Woodgrain represents to the Court that JELD-WEN's objections regarding its purported inability to profitably operate Towanda post-divesture are unfounded. ECF No. 2603, at 1. It said:

> JELD-WEN suggests that Woodgrain would not be able to operate Towanda profitably. Woodgrain is well aware of the business risks associated with the operation of the Towanda facility and has not pursued the acquisition of the Towanda facility without doing its own due diligence. Woodgrain would not purchase the Towanda facility if it did not believe it could operate the facility successfully and profitably.

Id. at 1-2. Indeed, Woodgrain was one of the few bidders present at all three rounds of bidding over this years-long process. ECF No. 2189, at 2; ECF No. 2551-1, at 8, 35. It submitted serious bids in each round, reasonably updating those bids based on changing market conditions, and was considered one of the top three contenders for the assets in each round by the Special Master. ECF No. 2189, at 2; ECF No. 2551-1, at 10-11, 35. It was thoroughly vetted by the Special Master and his advisors who conducted "substantial due diligence regarding Woodgrain's business acumen, experience and financial abilities" before concluding that it should acquire Towanda. ECF No. 2551-1, at 30.

Woodgrain has aggressively pursued Towanda, has conducted

extensive due diligence in this pursuit, and has previously operated the very facility it now seeks to acquire for ▮▮▮ million. JELD-WEN has not established that Woodgrain would be unable to profitably operate Towanda post-divestiture. The record supports the Special Master's view that Woodgrain will likely be able to profitably operate Towanda post-divestiture. ECF No. 2551-1, at 29-35; ECF No. 2551-3, at 7-11. For the foregoing reasons, the Court will overrule JELD-WEN's objection to the R&R that Woodgrain could not profitably operate Towanda post-divestiture and that divestiture would therefore harm the public interest.

### C. TOWANDA'S SALE PRICE IS FAIR AND REASONABLE.

In the Divestiture Opinion, this Court held that a Special Master would oversee a process to "assure, to the extent reasonably possible, that JELD-WEN receives a fair price for Towanda, and to assure that divestiture produces a competitive entity that is likely to restore competition." Div. Op., 345 F. Supp. 3d at 682 (emphasis added). The Court adopted the Brown Shoe approach to "assure that the divestiture is conducted in a realistic setting that is conducive to attracting qualified buyers who will pay a fair price for Towanda." Id. (emphasis added).

Following the Court's Divestiture Opinion, it issued an ORDER specifying the duties and role of the Special Master ("Special Master Order"). ECF No. 1863. That ORDER added greater context and detail to the Special Master's goals and how to achieve them. It

stated that the Special Master shall "proceed with the process of divesting the Divestiture Assets to an Acquirer that demonstrates the ability to competitively manufacture and sell molded interior doorskins in the United States with a view to restoring competition in the doorskins market and securing a reasonable price for the Divestiture Assets." Id. at 4. On the question of fair acquisition price more specifically, the Court required that the Special Master choose a purchaser who would acquire the assets at "such price and on such terms . . . that are then obtainable upon reasonable effort by the Special Master." Id. (emphasis added). Lastly, it ordered the Special Master to consider various factors in determining whether a fair price was offered:

> [I]n arranging the divestiture, the Special Master shall consider JELD-WEN's investment in the Divestiture Assets and the fair market price thereof, as well as any other factors that any retained professionals may recommend, being mindful that the purpose of the divestiture is to restore the competition that was substantially lessened by the acquisition at issue in the case.

Id. at 5-6 (emphasis added).

The Divestiture Opinion and the Special Master Order demonstrate that two goals animate the Court's order to divest Towanda, one primary and one subsidiary: (1) restore competition to the U.S. doorskin market (primary), and (2) ensure JELD-WEN achieves a "fair" or "reasonable" price under the circumstances for Towanda (subsidiary). The Court's measured language used to describe this second goal, compared to its unequivocal description

of the first, demonstrates that the overarching goal of this divestiture is to ensure that the harm that JELD-WEN has imposed on the U.S. doorskin market through its illegal 2012 acquisition of CMI is ameliorated. That is, after all, the primary purpose in remedying violations of the antitrust laws. See Steves, 988 F.3d at 720 ("The [Clayton] Act authorizes injunctive relief in private suits 'not merely to provide private relief, but to serve as well the high purpose of enforcing the antitrust laws'—i.e., protecting competition." (quoting Am. Stores, 495 U.S. at 284)).

JELD-WEN's objection to the Special Master's R&R would have the Court subjugate the public purpose of protecting competition to JELD-WEN's private interest of receiving the maximum payout conceivable for Towanda. Furthermore, there is some question as to whether JELD-WEN's fairness objection on price is truly yet just another collateral attack on the underlying divestiture itself, which would, of course, undermine the Brown Shoe framework adopted by this Court.

Putting these considerations aside, however, and considering that the Court has instructed that JELD-WEN is to obtain a "fair" price for Towanda, the Court fully addresses JELD-WEN's objection to the Special Master's R&R that Woodgrain's offered price of ███ million is not a "fair" price for Towanda. After fully considering the merits of that objection, the Court holds that JELD-WEN has not sufficiently established that Woodgrain's offered price for

Towanda, recommended for adoption by the Special Master, is unfair or unreasonable under the unique circumstances of this forced sale. It therefore will overrule JELD-WEN's objection.

JELD-WEN objects to the Special Master's recommendation that the Court accept Woodgrain's ███ million bid for the divestiture assets because it views that price as unreasonable and unfair. ECF No. 2593, at 28. JELD-WEN relies principally on its expert, Professor Drew Pascarella, ECF No. 2581-4, to argue that the Special Master's recommendation is unsubstantiated and unjustified. ECF No. 2593, at 29-31. Professor Pascarella performed a "discounted cashflow analysis" that purports to demonstrate that the ███ million bid is "substantially less than Towanda's fundamental or intrinsic value." Id. at 29. He calculates that intrinsic value to be within a range of approximately ███ to ███ million based on different potential future production volumes and sales at Towanda. Id. at 30 (citing 2581-4, at 12, 20-21). Based on this calculation, Professor Pascarella concludes that Towanda is worth "approximately 2.3 to 5.5 times more than Woodgrain's ███ million offer." Id. (emphasis in original). JELD-WEN contends that the latter is such a low price and is thus unreasonable and therefore the Special Master's recommendation that the Court accept Woodgrain's bid, particularly without doing his own valuation analysis, violates the Court's directives.

The Court finds Professor Pascarella's analysis incomplete

and unpersuasive. The reasons for its insufficiency are set out well in a declaration by Steves' expert, Mr. Avram S. Tucker. ECF No. 2605-5. The crux of Mr. Tucker's view is that Professor Pascarella does not fully account for the unique circumstances inherent to the process in this first-of-its-kind forced sale. Id. ¶ 5. Indeed, it appears to the Court that Professor Pascarella's estimation of Towanda's "intrinsic" or market value does not account for the fact that JELD-WEN is being made to sell Towanda by force due to its illegal acquisition of CMI that severely harmed the U.S. doorskin market. That context is critical. As Mr. Tucker explains, without considering the unique circumstances of the forced divestiture in his value estimation, comparing Woodgrain's $115 million offer for Towanda to Professor Pascarella's estimated "intrinsic values [of Towanda is] not a like-for-like comparison and [is] largely meaningless." Id. ¶ 6.

Professor Pascarella does opine that the "significant difference" in Woodgrain's bid and his valuation of Towanda "highly likely reflects uncertainties for bidders beyond those inherent in a typical sales or divestiture process." ECF No. 2581-4, at 45. The uncertainties he mentions include: (1) those related to the influential and multifaceted role of Steves; (2) those due to the "prospect of encountering legal and regulatory hurdles beyond what is typical"; (3) those related to any "reputational taint on the process and asset"; and (4) others not specified. Id. So, Professor

41

Pascarella acknowledges that Towanda's divestiture is occurring under atypical circumstances, see also ECF No. 2605-6 ("I would say in the general scope of [merger and acquisition] sell sides, [which this is,] court-ordered divestitures . . . in private litigations are highly atypical . . . It's highly atypical to have a court order [ordering divestiture]." (statement by Professor Pascarella)), but does not incorporate or account for the atypical circumstance into his valuation-range estimation. See also ECF No. 2605-5, at 4-5 (stating the same). Instead, Professor Pascarella bases his Towanda estimations on the best-case, or "typical," valuation that Towanda would receive if JELD-WEN simply wanted to sell Towanda to another company in a run-of-the-mill transaction. Then, he takes that normal-circumstances valuation and compares it to Woodgrain's bid, which necessarily incorporates all the perceived uncertainties and business risks inherent in acquiring an asset within the context of a first-of-its-kind forced sale. That is far from a reliable comparison because it does not fit the facts or this case and it fails to amount to persuasive evidence to justify rejecting the Special Master's recommendation.

JELD-WEN addresses this argument in its Reply Brief. ECF No. 2621, at 9. JELD-WEN states that "Pascarella's analysis is entirely about the atypical uncertainties that arose following a divestiture order that mandated a forced sale." Id. Although Pascarella's analysis may be "about" those uncertainties (i.e.,

includes a discussion of them), that does not refute the fact that Professor Pascarella did not account for those uncertainties in his underlying estimation of Towanda's value—which is critical to any meaningful comparison to Woodgrain's bid under present circumstances. Furthermore, JELD-WEN claims that the "winning first-round bid of ███ million was also obtained from a 'forced sale' process, which means the dramatic price decline of ███ million since then must be attributable to circumstances beyond the downward pressure of a forced sale." Id. This argument simply fails to understand what exactly is entailed in the context of a forced sale—at least in the present case.

The actual consummation of a sale of Towanda to a successful bidder is not an event in isolation. JELD-WEN's forced sale of Towanda is the result of a process, ordered by this Court, affirmed by the Fourth Circuit, and managed by the Special Master, to sell that asset. See also id. (stating that these bids were incurred during a "'forced sale' process" (emphasis added)). Inherent within that price, then, is certainly the "downward [pricing] pressure" of the forced sale itself. See id. But it also necessarily includes circumstances and events that occurred overtime before achieving finalized bids submitted by Woodgrain and the other bidders throughout the process. Those circumstances include judicially uncontrollable changing market conditions that are traditional to all markets, such as declining supply or demand

for goods, effects of changing interest rates on capital and investment, and market participants choosing to enter or leave a market. At least some of these normal market conditions occurred in this case and were considered by the Special Master in making his recommendation. ECF No. 2551-1, at 18 (describing JELD-WEN's "financial updates" that showed Towanda experiencing "market softness"); id. at 4 (discussing Steves' announcement of building a new plant with the intent of manufacturing doorskins). More importantly, these circumstances include unescapable factors unique to the judicially-created nature of the sale. Some of those factors include what Professor Pascarella mentions, such as Steves' role as a bidder, at least in the first round of the process, as well as a litigant by virtue of it sufficiently demonstrating to a jury that JELD-WEN violated federal antitrust laws. Also, unlike a traditional sale, it includes Special Master and judicial oversight and management of the entire bidding process. This includes hiring consultants to solicit bids, vet those bidders, and bridge communications between JELD-WEN, Steves, and the bidders to reach a deal aimed not only at achieving a fair price for JELD-WEN, but, most importantly, to ensure that the purchaser of Towanda ameliorates the anticompetitive harm imposed by JELD-WEN on the U.S. doorskin market by its illegal acquisition of CMI. Div. Op., 345 F. Supp. 3d at 682.

The Court cannot look at the price that JELD-WEN was ready to

accept at the close of the first bidding round and the price that Woodgrain offers today in isolation for its comparison. To do so ignores the circumstances and events that have transpired over this almost four-year-long bidding process, which are themselves part of the forced-sale process.[6] The Special Master's recommendation accounts for that storied history. ECF No. 2551-1, at 7-29, 33. In doing so, he notes that bids for Towanda "diminished over time." Id. at 33. He goes on, however, to note that his investment experts at Keybanc ascertained that this bid was within the same "general range" of bids made by others viewed as "serious about the process and [who] had done a significant amount of due diligence." Id. Furthermore, the Special Master and Keybanc noted that they conducted the process "in light of numerous factors" that affected bid prices, including a changed industry landscape due to Steves' new plant announcement, "broader macro-economic concerns," and "limited buyer appetite and patience to

---

[6] JELD-WEN lays much of the blame for Woodgrain's lower price at Steves' feet. ECF No. 2593, at 31-32. However, JELD-WEN is not completely innocent for the position it finds itself in. For example, had it not objected to ████'s bid price of ████ million in the second bidding round, which was just barely outside of Professor Pascarella's estimated valuation range of Towanda, JELD-WEN may very well have received more money for Towanda than it looks to receive today. As the Special Master details in his R&R, at least in part due to JELD-WEN's posturing towards ████, negotiations between the companies chilled and faltered. ECF No. 2551-1, at 11-13. Those failed negotiations are but just one additional event in the history of this process that likely had some impact on the price Woodgrain felt comfortable offering for Towanda.

participate in a court-mandated bidding and approval process."
Id.; see also id. at 10 n.14. After considering all of those
factors, the Special Master determined that Woodgrain's ███
million bid for Towanda was fair and reasonable under the
circumstances. Id. at 33-35.

The Court accepts that recommendation because it directly
complies with the Divestiture Opinion, as affirmed by the Fourth
Circuit, and the Court's Special Master Order setting out the
directives of the Special Master and the goals of the divestiture.
The Special Master ran this process in a "realistic setting" under
the circumstances of JELD-WEN being forced to divest Towanda. That
realistic setting was "conducive to attracting qualified buyers,"
like ██, ████████, and Woodgrain along with dozens of others, who
offered to pay serious, substantial, and reasonable prices for
Towanda. Div. Op., 345 F. Supp. 3d at 682. The ultimate price
offered by Woodgrain was a price on terms that were "then
obtainable upon reasonable effort" by the Special Master. ECF No.
1863, at 4 (emphasis added); ECF No. 2551-1, at 33-34 ("Woodgrain's
bid is within a reasonable range of what the market is currently
commanding under the unique circumstances of the divestiture."
(emphasis added)).[7] The Special Master and his advisors exhibited

---

[7] The Court also notes that Woodgrain's ███ million bid far
surpasses what JELD-WEN originally paid for all of CMI when it
illegally acquired those assets in 2012. JELD-WEN purchased CMI
for ██ million then of which approximately ███ million was

extraordinary, not merely reasonable, effort to get to where we are today. At the end of that process, the obtainable—fair and reasonable—price for Towanda is Woodgrain's bid of ███ million. The Special Master properly considered the current "fair market price" as well as "any other factors," including those atypical to this particular divestiture, in reaching that conclusion. ECF No. 1864, at 6. The Court agrees with the Special Master that this is a fair price for Towanda and will overrule JELD-WEN's objections to the contrary.

### III. STEVES OBJECTIONS TO THE R&R

For its own part, Steves also puts forth limited objections to the Special Master's R&R. ECF No. 2605. Steves does not object to Woodgrain as the purchaser of Towanda. Indeed, it states that "Woodgrain is an excellent buyer" and notes its "overwhelming support" for this divestiture. Id. at 3. Instead, Steves raised limited objections to proposed revisions of its 2022 Supply Agreement with JELD-WEN, as well as other agreements between the parties, which came about in JELD-WEN's negotiations with Woodgrain. Id. at 3-4. Steves raises six objections to these

---

designated toward Towanda. ECF No. 2489, at 2-3. That difference in value alone marks an approximately 62.5% return on investment for JELD-WEN. Further, in its time since illegally acquiring these assets, JELD-WEN has pocketed ill-gotten gains totaling over ███ million. Id. at 4. So, to say that JELD-WEN is unjustifiably getting the raw end of the deal in this divestiture, or that divestiture is somehow punitive today, defies logic and is just plain wrong.

agreements. However, as it stands currently, Steves, JELD-WEN, and Woodgrain have resolved all of Steves' objections. The Court details each of the objections below. The Court accepts the parties' compromise positions and agreements. Therefore, the Court will sustain in part and overrule in part the STEVES OBJECTIONS, ECF No. 2594.

First, Steves objects to the inclusion of ¶ 6(d) in the Amended and Restated Molded Doorskin Product Agreement ("Proposed Amended Steves Agreement"), ECF No. 2551-2, Exh. F, at 142. ECF No. 2594, at 19. Steves argues that this provision would require Steves to provide confidential business information to JELD-WEN and Woodgrain post-divestiture. Id. JELD-WEN responds by stating that it does not oppose Steves' objection. ECF No. 2606, at 11. Woodgrain also does not object and defers to the Court's judgment. ECF No. 2603, at 3; ECF No. 2619, at 5. With Steves and JELD-WEN in agreement on this matter, and Woodgrain not expressing a position or preference on an outcome, the Court sees no reason to disturb the parties' understanding. Therefore, the Court will sustain Steves' objection to strike the relevant provision.

Second, Steves objects to unclear language in ¶ 6(a) of the Proposed Amended Steves Agreement, ECF No. 2551-2, at 140-41, and ¶ 6(a) of the Molded Doorskin Product Agreement ("Steves Agreement"), ECF No. 2392, at 5-6, compared to language in ¶ 18.2 of the Transition Supply Agreement ("TSA"), ECF No. 2551-2, Exh.

E, 123-24, dealing with the issue of triggering JELD-WEN's ████ ██████████ to Woodgrain. ECF No. 2594, at 20. Steves notes its uncertainty on whether the language in ¶ 6(a) of both the Steves Agreement and Steves Proposed Amended Agreement (which requires JELD-WEN to ████████████ "████████████████████████████ ████████████████") differs in a significant manner from the language in ¶ 18.2 of the TSA (which requires JELD-WEN to ███ ██ █ █████ if Woodgrain "████████████ ██ ██████ ████████ ████████ ████████████████████████████████████████ ████ ████ ████ ██ ████████ ████ ████ ██ ████████ ████ ████ ███ ███ ████████") such that the provisions could be interpreted differently. Id. (quoting ECF Nos. 2392 & 2551-2, Exhs. E & F). However, Steves states that, if all parties agree that the TSA's language means the same as in the Steves Agreement, then the Court need not edit the TSA to conform to the already executed Steves Agreement, which itself would control. ECF No. 2594, at 20; ECF No. 2619, at 6. JELD-WEN does not oppose Steves' objection, stating its belief that "these two provisions have the same meaning: both mean that JELD-WEN will ████████████████████████ ████████████████████████████████." ECF No. 2606, at 20. Woodgrain takes a similar position and has no objection if the Court interprets the provisions identically. ECF No. 2603, at 3. The Court is of the view that these provisions have the same meaning. With all the parties in agreement with that position, the Court

will overrule Steves' objection, finds that it need not amend the language of the TSA, and holds that the language in the Steves Agreement controls.

Third, Steves objects to potentially conflicting language in the force majeure clauses of the Steves Agreement and the TSA. ECF No. 2594, at 21-22. JELD-WEN opposes this objection, arguing that there is no conflict between the provisions and that its understanding of the meaning of the TSA's provision—which is where Steves' primary concern lies—is identical to that of the provision in the Steves Agreement. ECF No. 2606, at 25-26. In reply, Steves reiterates its concern, ECF No. 2619, with which Woodgrain agrees. ECF No. 2603. At a hearing held on December 4, 2024, the Court received an update that the parties had all agreed to acceptable language to resolve Steves and Woodgrain's concerns regarding JELD-WEN's commitments under the TSA's force majeure clause in ¶ 18.2. The parties jointly submitted an edited version of this provision. ECF No. 2651-4, at 11. With all three parties in agreement on this matter, the Court sees no reason to reject the revised language in the proposed TSA. Therefore, the Court will overrule Steves' objection as moot and will adopt the parties' proposed revisions to the TSA ¶ 18.2 as stipulated in ECF No. 2651-4.

Fourth, Steves objects to JELD-WEN's attempt to ███ █ ███ █ ██ ████ ████████ during the transition of Towanda to

Woodgrain. ECF No. 2594, at 9. Steves argues that ███ ███ would threaten the divestiture because it would permit JELD-WEN to "refuse to ████████ ████████ ██ ████████ ██ ███ ████." Id. at 10. Steves goes on to explain why it believes that ███ ███ is inequitable, violates the Court's prior orders, and violates federal antitrust law. Id. 10-19. In response, JELD-WEN disputes Steves' argument at each instance. ECF No. 2606, at 12-23. JELD-WEN expresses concern that, without ██████, it would be required to support its competitors, primarily Woodgrain, by ████████ ████████████████████████████████████████████ "██████ ██████." Id. at 13. In reply, Steves continues to disagree with JELD-WEN and offers proposed compromise language that, it argues, should address some of JELD-WEN's concerns and would ameliorate its own concerns. ECF No. 2619, at 6-17. For its own part, Woodgrain expresses reluctant agreement with ██████ itself, which it notes resulted from "negotiating with an unwilling and unmotivated seller" that required compromise. ECF No. 2603, at 2. Instead of agreeing with either JELD-WEN or Steves, Woodgrain acquiesces to what the Court believes is the correct outcome. Id. At the December 4, 2024, hearing that followed the submission of all the briefs on this matter, the parties informed the Court that they were now all in agreement: They have decided to adopt Steves' proposed compromise language put forth in its Reply Brief. ECF No. 2642, at 3-5 (referencing ECF No. 2619, at 13). The parties jointly

submitted their agreed-to revised version of the provision, TSA ¶ 2, that included this language. ECF No. 2651-4, at 3. With all three parties now in agreement on this matter, the Court sees no reason to reject the revised language in the proposed TSA. Therefore, the Court will overrule Steves' objection and will adopt the parties' proposed revisions to the TSA ¶ 2 as stipulated in ECF No. 2651-4, at 3.

Fifth, Steves objects to language in ¶ 5.2 of the TSA that allows either JELD-WEN or Woodgrain to ███████ ███████ the TSA if either ██████ ███ ███ ██████. ECF No. 2594, at 21. Steves argues that this provision would impermissibly allow JELD-WEN to ████████████████████ even absent a material breach in the contract. Id.; ECF No. 2619, at 17. JELD-WEN responds by arguing that the ███████████ ███████████ in ¶ 5.2 is reasonable and typical in commercial agreements. ECF No. 2606, at 24. It also notes that a ███████ ███████ exists in the Steves Agreement between Steves and JELD-WEN. Id. at 24-25. Therefore, JELD-WEN argues that Steves has no basis to object and that the Court need not require deletion or modification of the relevant language in ¶ 5.2. Id. at 25. In reply, Steves argues that the Steves Agreement was negotiated as part of typical business relations rather than by judicial decree resulting from JELD-WEN's antitrust violations. ECF No. 2619, at 17. That different context, Steves contends, justifies the difference, which would better protect Woodgrain

during its transition to owner of Towanda. Id. at 17-18. Woodgrain agrees with Steves' reading of ¶ 5.2, stating that it was not its intent to give JELD-WEN the power to ██████████ ██████████ the contract under these circumstances. ECF No. 2603, at 3. It asks the Court to grant Steves' objection and either delete or modify the language in ¶ 5.2 of the TSA. Id. At the December 4, 2024, hearing, the parties notified the Court that they had mutually agreed to language that would modify the "████ ██ ███" ████████ in ¶ 5.2. ECF No. 2642, at 5-6. The parties jointly submitted a revised version of the TSA with the agreed-to amended language in ¶ 5.2. ECF No. 2651-4, at 4. With all three parties now in agreement on this matter, the Court sees no reason to reject the modified language in ¶ 5.2. Therefore, the Court will sustain Steves' objection to modify this provision and will adopt the parties' proposed revisions to the TSA ¶ 5.2 as stipulated in ECF No. 2651-4, at 4.

Sixth, Steves objects to purported restrictions in ¶¶ 2.2-2.3 in the Intellectual Property License Agreement ("IP Agreement") that is part of the proposed APA. ECF No. 2594, at 23 (citing ECF No. 2551-2, Exh. B, at 83-84). Steves argues that these restrictions unduly limit Woodgrain's ability to sublicense to-be-acquired intellectual property, which would undercut Woodgrain's ability to fully compete in the U.S. doorskin market. Id. at 23-24. JELD-WEN opposes Steves' objection, arguing that

Woodgrain is already receiving substantial IP and licensing (and sublicensing) rights to that IP in the divestiture and that the restrictions are not inequitable. ECF No. 2606, at 26-28. JELD-WEN also argues that lifting these restrictions would allow Woodgrain to somehow license or sublicense JELD-WEN's own, independent, intellectual property. Id. at 27-28. In reply, Steves reiterates its objection and states that the limitations put Woodgrain in a lesser position with respect to intellectual property than was CMI when it was acquired by JELD-WEIN in 2012. The point of the divestiture is to unwind that illegal transaction and that includes all intellectual property from that transaction, argues Steves. ECF No. 2619, at 18-19. Woodgrain does not explicitly take a position in support or opposition of either Steves or JELD-WEN. Instead, Woodgrain expresses a "strong preference" to have full sublicensing rights to the IP, but notes that the IP Agreement came about through compromise with an unwilling and unmotivated seller. ECF No. 2603, at 4. Therefore, Woodgrain defers to the Court's decision. Id. At the December 4, 2024, hearing, the parties noted that, of Steves' six objections recounted here, this objection was the only one the parties had not yet resolved. ECF No. 2642, at 37-38. The Court heard oral argument on this objection and found that even the parties were not clear individually, or collectively, about what exactly the disputed language in the IP Agreement meant, what its impacts would

be, or what limitations it imposed on what intellectual property.

Id. at 38-47. The Court instructed the parties to continue negotiations and attempt to come to a resolution before it decided to rule on the matter. Id. at 46-48. The Court ordered the parties to propose language to the IP Agreement acceptable to all parties. ECF No. 2644. Following that ORDER, the parties jointly submitted proposed language to the IP Agreement in the APA that they mutually agree resolves all issues related to intellectual property and the licensing and sublicensing thereof. ECF No. 2651-8. This includes specific revisions to address Steves and Woodgrain's expressed concerns in ¶¶ 2.2 and 2.3. Id. at 3-4. With all three parties now in agreement on this matter, the Court sees no reason to reject the modified language in the IP Agreement. Therefore, the Court will overrule Steves' objection and will adopt the parties' proposed revisions to the IP Agreement as stipulated in ECF No. 2651-8.

## IV. CONCLUSION

For the foregoing reasons, the JELD-WEN OBJECTIONS, ECF No. 2593, to the Special Master's R&R will be overruled. Furthermore, the STEVES OBJECTIONS, ECF No. 2605, to the Special Master's R&R will be sustained in part and overruled in part in accordance with the findings of this Memorandum Opinion supra. For the reasons and

to the extent set forth herein, the Court will accept and adopt the Special Master's R&R, ECF No. 2551-1, pursuant to Fed. R. Civ. P. 53(f).

It is so ORDERED.

_____ /s/ _RER_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: December 13, 2024