IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEVES AND SONS, INC.,

     Plaintiff,

v.                                   Civil Action No. 3:16cv545

JELD-WEN, INC.,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on JELD-WEN, INC.'S MOTION TO MODIFY THE AMENDED FINAL JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5) (the "MOTION") (ECF No. 2456), the supporting, opposing, and reply memoranda (ECF Nos. 2457, 2464, and 2470) as well as the supplemental briefing (ECF Nos. 2538, 2581, and 2587). Having considered all of the briefing, the expert reports, the record, and the arguments of counsel, it is hereby ORDERED that, for the reasons set forth below, the MOTION (ECF No. 2456) will be denied.

## BACKGROUND FACTS

Before addressing the particulars of the MOTION, it is necessary briefly to recount the history and developments that have brought the case to this point.[1]  In 2016, Steves and Sons,

---

[1] The facts are found by a preponderance of the evidence found in the trial record, the divestiture hearing records, and the exhibits

Inc. ("Steves") filed a multi-count Complaint against JELD-WEN, INC. ("JELD-WEN").   ECF No. 1. Count One of the Complaint alleged a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, and sought, inter alia, injunctive relief under Section 6 of the Clayton Act. 15 U.S.C. § 26.

The antitrust claim contended that a merger effectuated by JELD-WEN in 2012 had substantially lessened competition in the market for a product known as doorskins.  A doorskin provides the decorative covering for the front and back of an interior molded door.  The doorskin is created by pouring a moist, solvent fibrous material (treated with resin and wax) into a mold and then subjecting it to heat and pressure.   The doorskin is then glued onto the frame.   The end product resembles a solid wood door but is much lighter and can be made and shipped at a considerably lower cost than a solid wooden door.   Steves and Sons, Inc. v. JELD-WEN, Inc., 345 F. Supp. 3d 614, 624 (E.D. Va. 2018) [hereafter referred to as the "Divestiture Opinion" and cited as "Div. Op. at ____."].

From 2001 to 2012, there were three independent manufacturers from which to purchase doorskins:    Masonite   Corporation ("Masonite"),   JELD-WEN,   and   CraftMaster   Manufacturing,   Inc. ("CMI").   All three were vertically integrated companies that made both doorskins and interior molded doors. Div. Op. at 625.   Each

_____

submitted with the briefs on the MOTION.

also sold doorskins to companies that made interior molded doors, but did not make doorskins (the "Independents"). CMI made its doorskins at a facility in Towanda, Pennsylvania (the "Towanda facility").

In June 2012, JELD-WEN announced that it intended to acquire CMI. That acquisition was completed in October 2012. The CMI merger reduced the number of U.S. doorskin manufacturers from three to two. Div. Op. at 626; Steves and Sons, Inc. v. Jeld-Wen, Inc., 988 F.3d 690, 700 (4th Cir. 2021) [hereinafter referred to as the "Appellate Decision" and cited as "4th Cir. Op. at ___."]. The jury in this case found that, as a consequence of JELD-WEN'S acquisition of CMI and JELD-WEN's conduct in 2014 and thereafter, competition was substantially lessened in the doorskin market and that therefore the merger had violated Section 7 of the Clayton Act.

Steves' Complaint sought both damages and the equitable remedy of divestiture to redress the Clayton Act violation. The jury awarded damages. Following the jury's verdict on Steves' antitrust claim, the Court conducted an evidentiary hearing to consider Steves' request that JELD-WEN divest itself of the Towanda asset acquired in the CMI acquisition, thereby undoing the merger that had substantially lessened competition in the U.S. doorskin market. The Court ordered divestiture.

The Court issued the <u>Divestiture Opinion</u> on October 5, 2018. <u>Div. Op.</u> at 682. The findings of the <u>Divestiture Opinion</u> were implemented by the Amended Final Judgment Order ("AFJO") (ECF No. 1852) which is the subject of the MOTION. In the AFJO, the Court provided that divestiture would proceed in accord with a two step procedure approved by the Supreme Court of the United States in <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 309-10 (1962). Under that procedure, the issue of divestiture was decided and JELD-WEN could appeal the divestiture decision. Then, if the divestiture remedy was affirmed on appeal, an auction of the Towanda facility would occur under the direction of a Special Master. <u>Div. Op.</u> at 663-65. On appeal, the Fourth Circuit approved that approach as well as the decision to order the remedy of divestiture. <u>4th Cir. Op.</u> at 722-24. In so doing, the Court of Appeals held that, "as it stands, this case is a poster child for divestiture." <u>Id.</u> at 724. That was because:

> A merger has resulted in a duopoly. Each doorskin supplier is vertically integrated. Evidence indicates that they've used their market power to threaten the Independents' [independent doormakers] survival. And it's reasonable to expect that a third supplier—one that is vertically integrated—will promote competition, as CMI did before the 2012 merger. Thus, the district court acted within its discretion by ordering divestiture.

<u>Id.</u>

4

After the Fourth Circuit approved the two-step process and affirmed the use of divestiture as a remedy,[2] a Special Master was appointed and the Special Master retained the services of an investment bank ("KeyBanc") and antitrust counsel ("Venable") to advise in the process of divestiture.   JELD-WEN was intimately involved in the process because it had to make information available to potential bidders during the Special Master's process of securing bidders for Towanda.

Working carefully with JELD-WEN, the Special Master and KeyBanc established a process by which the auction would proceed. The Special Master's Report and Recommendation (ECF No. 2551-1) explains that the process was a deliberate one and was calculated to achieve the maximum obtainable price under the forced-sale condition that is a divestiture sale.   JELD-WEN participated fully in the process and, until May 1, 2024, expressed the view that the process was a fair one.[3]

There have been three rounds of bidding, beginning in 2021. At the end of the first round, the Special Master recommended a

---

[2] JELD-WEN sought en banc review of the Fourth Circuit's decision which was denied.  Steves and Sons, Inc. v. JELD-WEN, Inc., No. 19-1397, 2021 U.S. App. LEXIS 8387.   JELD-WEN did not seek review by the Supreme Court.

[3] Although JELD-WEN, from time to time, made suggestions to the Special Master and the Court about how to modify the process, at no time did JELD-WEN object to the process as an unfair one before it filed the MOTION on May 1, 2024.

5

bidder who offered ▇▇ million for the Towanda facility. ECF. No. 2189, at 29. However, that bidder backed out after Steves filed an objection to the Special Master's recommendation.   Thereafter, in November 2022, a second round of bidding occurred.   Shortly after the second bidding process had begun, Steves announced that it had started building a doorskin plant of its own.   That was made possible because, by then, Steves had received a substantial payment from JELD-WEN in settlement of the jury's damages award, Steves' claim for attorneys' fees, and certain other claims.   That infusion of cash made it possible for Steves, unlike at trial and during appeal, to finance its own doorskin plant, thereby reducing its dependence on JELD-WEN.

The announcement by Steves raised concerns in the minds of bidders for Towanda because Steves was Towanda's largest customer. Nonetheless, the process produced thirteen bids, ranging from ▇▇ million to a range of ▇▇▇▇ million.   ECF No. 1551-1, at 7-8. For various reasons, five bidders either were eliminated or dropped out.   The initial bids submitted by the remaining eight bidders ranged from ▇▇▇▇ million at the low end to a range of ▇▇▇ ▇▇ million at the high end.   A due diligence process followed and six of the eight initial bidders submitted final bids.   <u>Id.</u> at 10.   Only two of those six bidders actually completed the due diligence process and their bids were the only ones regarded as

worthy of serious assessment. <u>Id.</u> at 10-11.  Those two bids were
████ million by Woodgrain and ████ million by a company called
████████. <u>Id.</u>

    As the Special Master explained:

> This second round of bidding resulted in
> substantially lower bids than were received in
> the first round in which the final bids of the
> four potentially viable contenders were ████
> million, ████ million, ████ million, and ████
> million.  The decreased amounts were the result
> of <u>many factors</u>, including but not limited to:
> (1) the <u>ongoing</u> and hard-fought nature of this
> <u>litigation</u>, (2) <u>Steves' decision</u> to open its own
> doorskins manufacturing facility and related
> uncertainties about the future of the doorskins
> industry and the Towanda facility, (3) <u>overall
> conditions in the housing market</u> and <u>declining
> sales volume</u>, (4) concerns about the terms of
> the Molded Doorskin Product Agreement,[4] and (5)
> concerns about the <u>age and condition of the
> Towanda plant</u> and the <u>perceived need for capital
> expenditures</u> to improve the facility.

<u>Id.</u> at 10 n.14 (emphasis added).  JELD-WEN raised objections to
████████'s bid and to certain aspects of ████████'s proposal to
continue due diligence which JELD-WEN considered to be excessively
burdensome.  So, the negotiations with ████████ came to an end.
<u>Id.</u> at 10-14.

---

[4] This is a supply contract by which the future owner of Towanda
will sell doorskins to Steves.  That contract was directed by the
Divestiture Order which also provided that it would be negotiated
between JELD-WEN and Steves and then assigned to the buyer of
Towanda.

That left Woodgrain's offer of ▆▆ million.  As a condition to proceeding further with due diligence and contract negotiations, Woodgrain sought a so-called "exclusivity" status, pursuant to which only it would continue to pursue further due diligence and negotiations for the purchase of Towanda.  Id. at 14.  Those negotiations were paused so that Woodgrain and JELD-WEN could negotiate the terms of the supply agreement for Steves that would be assigned to Woodgrain.

Then, on August 9, 2023, "Woodgrain withdrew itself from the bidding process."  Id. at 15.  "Woodgrain cited as its chief concern the future profitability of Towanda given Steves' plans to construct its own doorskins plant," which could reduce the quantity of doorskins by Steves from Towanda.  Id.  Woodgrain also cited concerns about the profitability of the ▆▆▆▆ product line (▆ ▆▆▆▆▆▆▆▆ ) made at Towanda.  Id.

Following Woodgrain's withdrawal, the Special Master and KeyBanc undertook efforts to gauge the interest of possible buyers, including ▆▆▆▆.  In that process, JELD-WEN and KeyBanc advised the Special Master that the process would be aided significantly by "obtaining additional information from Steves" about its "new plant and anticipated future needs from Towanda."  Id. at 16.

While that suggestion was under consideration, KeyBanc continued to communicate with two possible buyers, ▆▆▆▆ and

8

███. And, ███████ ██████ submitted a new bid of ████ million.[5] Months later, Woodgrain expressed renewed interest in buying Towanda, but advised that its bid would be significantly less than its withdrawn offer of ████ million. Id. at 17-18. Meanwhile, another purchaser, █████ submitted a bid for Towanda of ████ million.

The Court scheduled a status conference for February 14, 2024. At that conference, it was agreed, inter alia, that the divestiture process would be helped if potential buyers for Towanda could speak directly with Steves about the status of its doorskin plant, its capacity initially and when finally up and running, as well as Steves' anticipated needs for doorskins from Towanda. Id. at 20. The Court authorized those communications. ECF No. 2448.

In those discussions, Steves explained that it expects to produce ████ million doorskins in the first year of operation (2025) and gradually increase the amount of production to ██████ million doorskins by 2027 if the new plant reaches capacity by then. However, as this record shows respecting JELD-WEN's newest doorskin plant in Louisana, many challenges attend the opening of a new plant and the ramping up to full manufacturing capacity. So, it is "more likely that the new plant will at best produce ███

---

[5] ████████ ████████ had submitted a bid of █████ million in the first round, but that was withdrawn.

million doorskins in 2026 and just over ██ million doorskins in 2027." ECF No. 2538-4, at 4-5 [hereafter the "Shapiro Rep."] (citing ECF No. 2538-3, ¶¶ 2, 15 [hereafter "SBS Decl."]).

Steves projects that it will need ██ million doorskins per year from 2026-2028. SBS Decl. at ¶¶ 2, 15. Accordingly, Steves will need to purchase ████ million doorskins (████████ ██ ████ ██████████) from other suppliers. SBS Decl. at ¶¶ 8, 14, 15; Shapiro Rep. at 4-5. Thus, as the undisputed record shows, "Steves will remain a significant net buyer of interior molded doorskins even once its new facility is fully operational." Shapiro Rep. at 5.

Also, following the February 2024 status conference, JELD-WEN provided 2023 financial results for Towanda, a forecast for 2024, and a financial presentation for potential buyers. KeyBanc then re-engaged with potential buyers, eighteen in all. Nine of those submitted final bids. The bids ranged from a low of ██████ million to a high ████████ million (a range itself). Id. at 22. Seven bids were eliminated upon consideration of:

> . . . the rationale offered for restoring competition, amount of due diligence conducted, perceived level of commitment to closing, closing demands, and consideration offered.

Id.

That left Woodgrain and ▆▆▆▆ as the last two potential buyers. Discussions with both proceeded simultaneously.  Id.  Both companies continued due diligence.

On May 1, 2024, while the third round of bidding was underway, JELD-WEN filed the MOTION, the object of which is to eliminate the remedy of divestiture.  ECF No. 2456.  Both Woodgrain and, to a greater extent, ▆▆▆▆, expressed concern over the fact that JELD-WEN had filed the MOTION.  Id. at 23.  And, ▆▆▆▆ subsequently withdrew from the process, citing the distance between it and JELD-WEN in the items being negotiated and the uncertainty created by the MOTION.  Id. at 29.

It is against this background and with these facts in mind that the Court analyzes the MOTION.

## DISCUSSION

The MOTION is made pursuant to Fed. R. Civ. P. 60(b)(5), which permits the Court to "relieve a party . . . from a final judgment" if "applying [the judgment] prospectively is no longer equitable." As JELD-WEN puts it, "[m]odifying a judgment is appropriate if a 'significant change in the factual conditions' renders 'compliance with the decree substantially more onerous, if the decree proves to be unworkable because of unforeseen obstacles, or if enforcement of the decree without the modification would be detrimental to the public interest.'"  ECF. No. 2457, at 18 (citing Thompson v. U.S.

11

Dep't of Hous. & Urban Dev., 404 F.3d 821, 827 (4th Cir. 2005)).
JELD-WEN contends that its MOTION should be granted because, in
its view:

(1) "Changed market conditions have rendered divestiture
unworkable and contrary to the public interest." ECF. No. 2457,
at 19-26; and

(2) "Because Steves is entering the doorskins market with
its own plant, it no longer faces a threat of irreparable harm and
lacks antitrust injury." Id. at 26-29; and

(3) "The balance of hardships no longer favors divestiture,"
a contention that is based on the theory that the purchase price
recommended by the Special Master is not reasonable or fair. Id.
at 29-34.

Steves' initial response to the MOTION was that JELD-WEN had
known for at least two years before filing the MOTION that Steves
was attempting to build its own plant and that, therefore, the
MOTION was untimely; that the lower bids for Towanda as the bidding
process unfolded were not changed circumstances; and that JELD-
WEN engaged in inequitable conduct that bars JELD-WEN from
equitable relief because (a) JELD-WEN filed the MOTION more than
two years after it was aware of Steves' plans to build a plant;
and (b) JELD-WEN publicly filed the MOTION and, at the same time,
publicly proclaimed in an SEC filing its efforts to have the

divestiture order component of the AFJO set aside, thereby adversely affecting the bidding results.   ECF No. 2464, at 29-30.

The Court heard argument on the MOTION after it was first briefed.   There is much to be said in favor of Steves' arguments on timeliness, for it is true that the MOTION was filed well after it became known that Steves disclosed plans to build its own doorskins plant and the public filing of the MOTION certainly had an adverse effect on the bidding process (███████ cited the MOTION as a reason for dropping out).   However, at the time, negotiations were ongoing between JELD-WEN and Woodgrain for the purpose of finalizing a final Asset Purchase Agreement by which the divestiture of Towanda would be accomplished.   The Court allowed that procedure to continue to ensure that an appropriate divestiture could occur.

Thereafter, beginning in October 2024, the Court received further briefing from Steves and JELD-WEN and further evidence from experts respecting the substantive aspects of the MOTION. For its part, in the substantive briefing, Steves argued that JELD-WEN had failed to meet its burden of demonstrating that a significant change in circumstances warranted revision of the judgment because neither the fact that Steves is about to open its new doorskins plant nor the asserted difficulties of selling Towanda (which are now moot) render divestiture "substantially

13

more onerous," "unworkable," or "detrimental to the public interest." ECF No. 2538, at 5.

As the matter has progressed through briefing, JELD-WEN's arguments have taken on a somewhat different emphasis than in its initial briefing. And, in so doing, JELD-WEN has presented new arguments that were, for the first time, raised in its reply brief. By right, they should not be considered at all simply because courts generally do not consider arguments raised for the first time in a reply brief. Nonetheless, because Steves has been able to file a surreply to the new arguments, and because the issue of divestiture is so significant an application of the Court's equitable authority, it is appropriate to consider even these belatedly raised points.

A.   **THE GOVERNING LEGAL PRINCIPLES**

Rule 60(b)(5) permits a Court to relieve a party from a judgment where "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The relief provided by Rule 60(b)(5) is extraordinary and "is only to be invoked upon a showing of exceptional circumstances." United States v. Welsh, 879 F.3d 530, 536 (4th Cir. 2018) (quoting Compton v. Alton S.S. Co., 608 F.2d 96, 102 (4th Cir. 1979)). To secure relief under Rule 60(b)(5), JELD-WEN must first demonstrate "a significant change in circumstances." Thompson, 404 F.3d at 827 (quoting Rufo v.

<u>Inmates of Suffolk Cnty.</u>, 502 U.S. 367, 383 (1992)).  Then, if the changed circumstances are established, a modification of the judgment might be appropriate "if the changed conditions 'make compliance with the decree substantially more onerous' if the decree 'proves to be unworkable because of unforeseen obstacles,' or if 'enforcement of the decree without the modification would be detrimental to the public interest.'"  <u>Id.</u> (quoting <u>Rufo</u>, 502 U.S. at 384).  And as a general proposition, it is true that, "[i]n most cases, the antitrust defendant should be prepared to demonstrate that the basic purposes of the [judgment]—the elimination of monopoly and unduly restrictive practices—have been achieved."  <u>United States v. Eastman Kodak Co.</u>, 63 F.3d 95, 101 (2d Cir. 1995).  Put another way, a central question in the Rule 60(b)(5) inquiry is "whether the objective of the judgment [under attack] has been achieved."  <u>Horne v. Flores</u>, 557 U.S. 433, 450 (2009).  And, in the antitrust context, it is generally correct that a judgment "<u>may not</u> be changed in the interest of the defendants if the purpose of the litigation as incorporated in the [final] decree (the elimination of monopoly and restrictive practices) have not been fully achieved."  <u>United States v. United Shoe Mach. Corp.</u>, 391 U.S. 244, 248 (1968).[6]

---

[6] Rule 60(b)(5) does not provide an opportunity to relitigate the judgment at issue.  Therefore, where called upon in Rule 60(b)(5) to exercise the "same discretion it exercised in granting or

These principles guide the resolution of the MOTION.  To that task we now turn.

### B.  The First Asserted Changed Circumstance: Changed Market Conditions Have Rendered Divestiture Unworkable and Contrary to the Public Interest

The premise of this argument is that "[t]he 'structure' of the [doorskin] market has now changed" because Steves has built, and is about to open, its own doorskin plant and that, therefore, even without divestiture, there will again be three doorskin suppliers in the domestic market:  Masonite; JELD-WEN; and Steves. ECF No. 2457, at 20.  In other words, the number of suppliers will be the same when Steves opens its new plant as it was before JELD-WEN unlawfully acquired CMI in 2012.  ECF No. 2457, at 20-21.

It is settled that, from 2001 to 2012, there were three domestic doorskin suppliers:  JELD-WEN, Masonite, and CMI.  That number went from three to two when JELD-WEN acquired CMI.[7]  That situation has not changed and will not change when Steves starts producing doorskins.

---

denying injunctive relief in the first place . . . a court may modify a final or permanent injunction only where conditions have so changed as to make such relief equitable. . . ."  Sierra Club v. U.S. Army Corps of Engineers., 732 F.2d 253, 256 (2d Cir. 1984).

[7] Shortly after JELD-WEN acquired CMI, Masonite started to sell doorskins to the Independents only on a spot basis.  Spot sales are a more uncertain source of supply for a door manufacturer than are long-term supply contracts and usually occur at higher prices than obtained in long-term supply contracts.

It is true that Steves has built a plant that makes doorskins, but the record here demonstrates that Steves will require ■ million doorskins per year from 2026-2028. The record also shows that, assuming Steves has its plant up and running in 2025, it will produce only ■ million doorskins in 2025 and, assuming that all goes well,[8] in 2026 and 2027, Steves expects to produce ■ million and ■ million doorskins, respectively. As demonstrated by Professor Shaprio, even then Steves will remain a net buyer of doorskins because it will need ■ to ■ million more doorskins annually to meet its own doormaking requirements than its forthcoming plant is capable of producing.

The facts presented in Sam Bell Steves II's declaration and Dr. Shapiro's report stand unrebutted. So, as Dr. Shapiro explained, Steves will be a net buyer of doorskins for years to come; and, as such, Steves will not be a supplier to the other Independents. In other words, without divestiture, Independents will still only have JELD-WEN and Masonite to turn to as suppliers of doorskins. No evidence counters what Mr. Steves and Dr. Shapiro have said on that score.[9]

---

[8] That is to say that Steves does not experience the many difficulties that can significantly delay reaching production capacity at a new doorskin plant such as those that JELD-WEN experienced at its Dodson, Louisiana plant.

[9] In support of the MOTION, JELD-WEN cites the Venable report as saying that divestiture will produce a market with four domestic

JELD-WEN's position rests on the views of its expert, Dr. Loren Smith.   However, as Dr. Shapiro explains, "Dr. Smith does not address the relevant question:  will the competition lost due to the merger of JELD-WEN and Craft-Master be restored simply by virtue of Steve[s'] entry into the doorskin market, such that divestiture is no longer needed?"  ECF No. 2538-4, at 12.   And, as Dr. Shapiro further explained, "this question cannot be answered by simply counting the number of domestic doorskin suppliers as Dr. Smith does."  Id.

The question is whether "Steves will become a supply option for the independent door manufacturers (the Independents)."  Id. The undisputed record is that, for the foreseeable future, Steves will be a net buyer of doorskins.  As Dr. Shapiro explains, that means that "there will be at most two domestic supply options, JELD-WEN and Masonite, which is exactly the situation that the

---

doorskin manufacturers.   JELD-WEN argues that allowing such a market is beyond the power of the Court to order and hence is not equitable.   Although Venable did make a reference to a fourth doorskin supplier, that reference was just a headcount of manufacturers and did not take into account the fact that, for the foreseeable future, Steves will be a net buyer of doorskins.  So, the Court does not find Venable's comment to be convincing and relies instead, as explained by Dr. Shapiro, on the undisputed record that, as a net buyer of doorskins, Steves cannot be considered as a source of supply for the other Independents when addressing the configuration of the U.S. doorskin market.

Court sought to remedy [by ordering divestiture]." Id.[10]

In sum, JELD-WEN has not established that the building and operation of Steves' doorskin plant is a circumstance that has changed the domestic market for interior-molded doorskins subsequent to the AFJO. Accordingly, that theory fails at the threshold for failure to prove a changed condition.

That failure to prove the premise of this asserted changed condition, of course, forecloses without further analysis JELD-WEN's argument that the changed market renders divestiture unworkable and contrary to the public interest.

Now, ordinarily, it is preferable to articulate a single reason for decisions and thus refrain from making alternate holdings. Karsten v. Kaiser Found. Health Plan of the Mid.-Atl. States, Inc., 36 F.3d 8, 11-12 (4th Cir. 1994). However, given the prospects of an appeal and considering the unusual nature of the alternative arguments about the public interest, the Court will address JELD-WEN's contentions about incentives to foreclose

---

[10] The Declaration of a JELD-WEN official, Brian Cox, contends that a Woodgrain official advised him in 2023 that Woodgrain was purchasing over ▮▮ million doorskins a year from Masonite. ECF. No. 2457-9. That is hearsay. There is no confirmation on the record of the sales or any indication that Masonite has changed course. But even it is assumed that Masonite might be willing to sell doorskins to the Independents, the best that could be said based on the record is that the sales will be on a spot-sale basis and at high prices, which was the case when divestiture was ordered. Div. Op. at 34-35.

and efficiencies because they seem to be made as part of JELD-WEN's public interest argument.  If we assume that JELD-WEN has shown a changed market, it would be necessary to address the argument that the changed market renders divestiture unworkable and contrary to the public interest.

> ### (1)   The Effect On The Public Interest Argument: Foreclosure

JELD-WEN first argues that it has no incentive to foreclose Independents, as was its bent before the litigation.  The Court's analysis begins by recalling that JELD-WEN's original plan was to "kill off" the Independents by depriving them of doorskins.  Div. Op. at 34.  But, says JELD-WEN, "there is [now] no material risk that JELD-WEN will foreclose the independents if it retains Towanda because it cannot do so profitably." That being the case, says JELD-WEN, the public interest is no longer served by divestiture. ECF No. 2457, at 25.

Considering JELD-WEN's past conduct and the fact that, without divestiture, the domestic market for doorskins will remain as it was at the time of trial, JELD-WEN's position on foreclosure must be viewed skeptically.  Moreover, the record indicates that JELD-WEN is in error when it claims that it cannot profitably foreclose the Independents.  That assertion is based upon the view of Dr. Smith who examined only whether JELD-WEN would find it

profitable to engage in total foreclosure.   He did not analyze whether, absent divestiture, JELD-WEN would have incentive to pursue a strategy of partial foreclosure by other means such as raising prices, lowering quality, or limiting the availability of particular doorskin styles.   The record establishes that these are all forms of foreclosure in which JELD-WEN previously has engaged. It cannot be assumed that, where the market remains the same, JELD-WEN would not have incentive to once again engage in such conduct.

Further, Professor Shapiro explains that JELD-WEN and Dr. Smith are mistaken in asserting that JELD-WEN would not have an incentive for total foreclosure if it retains Towanda.   Professor Shapiro demonstrates that Dr. Smith's foreclosure calculation assumes that, if JELD-WEN forecloses the Independents, Masonite and Steves will recapture lost door sales.   ECF No. 2538-4, at 16; ECF No. 2457-19.   However, Steves could recapture any of those lost door sales only if it has doorskins to make more doors than it needs to meet its own requirements.   The undisputed record is that Steves will not have enough doorskins to capture any lost door sales because its projected demand for doorskins will exceed the projected capacity at its new plant.

When his erroneous assumption to the contrary is corrected, Dr. Smith's foreclosure analysis establishes that JELD-WEN would have an incentive to completely cut off the remaining Independents

21

were it of a mind to do so or find it profitable to do so.   ECF
No. 2538-4, at 16.   Considering JELD-WEN's past record, including
an attempt to curtail doorskins supplied to Steves in early 2020
(during this case and well after the jury's verdict),[11] the Court
finds that Dr. Smith's conclusions respecting total foreclosure
are not credible.

> **(2)  The Effect On The Public Interest Argument: Efficiencies**

JELD-WEN next argues that the public will benefit by lower
prices because JELD-WEN realizes greater efficiencies from
operating Towanda than would a Towanda owned and operated by
Woodgrain.   This is essentially the same efficiency argument that
JELD-WEN made at trial and that was rejected by the jury and by
the Court's previous findings of fact.   JELD-WEN has not shown
that the claimed efficiencies have changed in a material way.
Indeed, Dr. Smith agrees that he did not compare the efficiencies
(in the form of lower freight costs or fewer die changes) that
JELD-WEN claimed to have achieved from owning Towanda in 2018 to
the efficiencies claimed to exist today.   So, for this reason
alone, JELD-WEN's burden on this argument has not been met.[12]

---

[11] Steves and Sons, Inc. v. JELD-WEN, Inc., No. 20-cv-98, ECF Nos.
122 and 123, a Memorandum Opinion and Order granting preliminary
injunction.

[12] For efficiencies to be such as to preclude a reduction in
competition, they must create cost savings that are passed to

Dr. Shapiro explains in detail why Dr. Smith's efficiency opinions fail the basic principles that allow for consideration of efficiencies as a factor in deciding on divestiture. ECF No. 2587-5, at 14-19. Every point made by Dr. Shapiro is correct and the Court credits that section of his report and rejects Dr. Smith's efficiencies analysis.

Most importantly, before JELD-WEN's efficiencies argument can be credited, JELD-WEN must show that "cognizable efficiencies must be of a nature, magnitude, and likelihood that no substantial lessening of competition" can occur in the relevant market. Shapiro Rep., at 15 (citing U.S. Dep't of Just. & Fed. Trade Comm'n, 2023 Merger Guidelines § 3.3 (2023)). That showing has not been made.

As Dr. Smith explains, the proffered efficiencies are not cognizable. Id. at 15-19. Nor has Dr. Smith sought to balance the proven harms of lessened competition against the asserted benefits of the asserted efficiencies. Id. at 20-21.

Moreover, JELD-WEN's papers suggest that the efficiencies produce cost reductions that are passed to the consumers, but there is no evidence or analysis offered to support that suggestion. And, Dr. Smith testified at his deposition that he did not quantify

---

consumers. F.T.C. v. Sykco Corp., 113 F. Supp.3d 1, 82 (D.D.C. 2015).

any pass-through cost savings to consumers, either in the past or
in the present.  In this case, the record is that, even though
JELD-WEN did achieve some efficiencies from reduced freight costs
and die changes after the 2012 merger, it raised, rather than
lowered, doorskin prices.  This is yet another reason why, on this
record then, the Court cannot conclude that JELD-WEN met its burden
to show the claimed efficiencies would prevent or offset the
lessened competition.[13]

### (3)  The Unworkable Argument

Again, assuming that a changed circumstance (the allegedly
changed market) had been shown (and it has not), the record here
demonstrates that JELD-WEN has not shown that the imposed remedy—
divestiture—is unworkable because of that changed condition.  The
contract with Woodgrain, an undisputably appropriate buyer, puts
JELD-WEN's suggestion to the contrary to rest.

The Special Master found, and the record fully supports, that
Woodgrain is well-positioned to assume operations at Towanda based

---

[13] JELD-WEN relies on the declaration of ▬▬ ▬▬▬, a Board of
Directors member of ▬▬ ▬▬ ▬▬ (▬▬), JELD-WEN's ▬▬
▬▬ customer, as evidence that divestiture does not serve the
public interest.  ECF No. 2457-3.  To begin, ▬▬'s declaration
is an opinion that is addressed to what ▬▬ thinks best for ▬▬
and because ▬▬ is a large customer of JELD-WEN and one of the
▬▬ Independents, what is best for the industry as a whole.
But, what is best for ▬▬ is not the issue.  And, there is no
evidence that what is best for LDI is best for the doorskin
industry.  So, ▬▬'s view is not helpful on any issue.

on its experience and success in the building products industry,
including "door manufacturing; its prior ownership of Towanda; the
vast amount of diligence it has undertaken; and its commitment
through a turbulent and uncertain bidding process to acquiring the
divestiture assets." ECF No. 2551-1, at 35. Having combed the
record, the Court has found no evidence to the contrary.

And, the Court finds that JELD-WEN's pot-shots at Woodgrain
in JELD-WEN's reply, ECF No. 2581, at 11, 16, are entirely without
merit. The Special Master found that Woodgrain has "the business
acumen, experience, and financial ability" to successfully operate
the Towanda facility. ECF No. 2551-1, at 30. The record fully
supports the Special Master's finding and puts to rest JELD-WEN's
ill-considered and unfounded criticism of Woodgrain as a suitable
buyer of Towanda.

**C.  The Asserted Balance of Hardships Argument**

In reality, the balance of hardships argument (like the
unworkability argument) boils down to the contention that the price
that Woodgrain is prepared to pay for Towanda, as reflected in the
Asset Purchase Agreement, is too small. The analysis of that
contention begins with the obvious fact that the ▮▮▮ million
purchase price offered by Woodgrain for Towanda far exceeds the
▮▮ million that JELD-WEN paid for the entirety of CMI. It is
uncertain exactly what part of the purchase price was attributable

25

to Towanda.   However, JELD-WEN has offered evidence that it
allocated ███ of the CMI purchase price to Towanda.  That would
make the purchase price of Towanda approximately ███ million.
So the divestiture price exceeds JELD-WEN's purchase price by
approximately ███ million or 62.5%.

Where, as here, the transaction is a forced sale and not one
between a willing buyer and willing seller, it can hardly be said
that a divestiture price that exceeds the purchase price by 62.5%
is either unreasonable or unfair. That certainly is so considering
that JELD-WEN has profited more than ███ million from owning the
Towanda facility since it acquired it in 2012.   Here, the
acquisition is an unlawful one and the question is whether the
monetary consequence of divestiture on the divesting entity is
equitable.  In deciding whether the monetary cost of divestiture
offends fundamental equity principles, it is appropriate to look
at what benefit JELD-WEN has secured as a consequence of the
unlawful acquisition of the asset to be divested.

JELD-WEN's contention that the price it is to receive under
the Asset Purchase Agreement for Towanda is unfair and that,
therefore, divestiture is inequitable, is based on the opinion of
its expert, Professor Drew Pascarella.  ECF No. 2581-4.  However,
the record reflects that Professor Pascarella's valuation method
is not reliable because it does not fit the circumstances of this

case at all.  To begin, that valuation does not take into account
that the sale here is a forced sale, not one that is to be measured
by what a willing buyer and a willing seller, neither acting under
compulsion, would pay for the asset.  Quite clearly, JELD-WEN is
not a willing seller.  And, it is acting under compulsion.  The
effect of that fatal flaw in Professor Pascarella's analysis is
explained fully in the Declaration of Mr. Avram Tucker.  ECF No.
2587-2, ¶¶ 15-21.  When the Court provided that divestiture should
be at a price that was fair to JELD-WEN, it did not suggest that
the willing buyer/willing seller model should govern what was quite
clearly a court-ordered forced sale and one as to which there was
no willing seller.  Professor Pascarella's analysis neither
confronts nor addresses the fact that divestiture is a forced sale.
And, his analysis does not take into account that the divestiture
purchase price is the product of a fair bidding process, a fact
that JELD-WEN did not contest until it filed the MOTION.  Nor does
Professor Pascarella address the several factors identified by the
Special Master that affected the negotiations and the purchase
price.  ECF No. 2551-1, at 10 n.14.  For the foregoing reasons,
the Court finds that Mr. Pascarella's evaluation does not fit the
facts of record and is unreliable and without force.[14]  ECF No.
2587-2, ¶¶ 8-14.

---

[14] In fact, albeit in a different context, the Supreme Court has

27

That is not to say that Steves building and opening its own doorskin plant did not have an effect on the price that bidders were willing to pay.  The Special Master's Report explains in detail the concerns that were raised.  But mindful of those concerns and of the fact of Steves' change of position in the marketplace, bidders did emerge and Woodgrain offered what the Special Master concluded was a fair price, taking into account the several factors that attended the forced sale.  As previously noted, the price offered by Woodgrain, ███ million, is ███ million (approximately 62.5%) more than the price allocated to the Towanda component of the CMI acquisition by JELD-WEN.  And, while it has operated the Towanda facility acquired through an unlawful merger, JELD-WEN has secured more than ███ million worth of profit.  On balance, the record as a whole teaches that the purchase price is, as the Special Master found, a fair one.

### D.   The Final Asserted Changed Circumstance: Steves Will Not Be Driven Out Of Business

The other changed circumstance on which JELD-WEN predicates the MOTION is the assertion that, "[b]ecause Steves is entering the doorskin market with its own plant, it no longer faces a threat

---

explained that "market value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very antithesis of forced-sale value."  BFP v. Resol. Tr. Corp., 511 U.S. 531, 537 (1994).

of irreparable harm and lacks antitrust injury." ECF No. 2457, at 22. In reality, the irreparable harm assertion and the antitrust injury assertion are the same. As JELD-WEN puts it: "Steves' new plant also undercuts two other conclusions necessary for divestiture: (i) that Steves faces irreparable harm because it will go out of business absent divestiture, and (ii) that Steves suffered an antitrust injury for the same reason." Id. As the briefing has progressed, and as evinced by JELD-WEN'S emphasis at the oral argument on the MOTION, the asserted absence of irreparable injury has become a significant basis upon which the MOTION rests.

As explained previously, Steves received a multimillion dollar payment from JELD-WEN because it prevailed at trial and on appeal, and it used that as a means to fund the building of its own doorskin plant. And the record shows that, even when Steves' new plant is producing at full capacity, Steves will be a net buyer of doorskins. Accordingly, Steves will be exposed to competitive conditions as a buyer in the market for interior molded doorskins, meaning that, without divestiture, Steves, like the other Independents, will be forced to buy doorskins from JELD-WEN or Masonite. And, as explained, Masonite sells to Independents only on a spot sale basis. Under these circumstances, absent divestiture, JELD-WEN will continue to possess the market power

29

that animated the jury's verdict finding that JELD-WEN's acquisition of CMI, and its conduct thereafter, substantially lessened competition in violation of the Clayton Act. ECF No. 2538-4, at 8. And, without divestiture, the other Independents who do not have their own internal source of supply of doorskins will continue to be subject to JELD-WEN's exercise of the market power that the jury found offended the Clayton Act.

The record here establishes that JELD-WEN has, and will continue to have, an incentive to foreclose Steves and the Independents, JELD-WEN's expert, Dr. Loren Smith, acknowledges that foreclosure can include cutting off supply, degrading the quality of doorskins, increasing doorskin prices, or imposing more difficult contract terms. ECF No. 2538, at 21. Accordingly, notwithstanding the existence of Steves' doorskin plant when it comes into operation, JELD-WEN retains the power and incentive to adversely affect Steves in serious ways by depriving it of the ability to meet its existing customer demand or to compete with JELD-WEN and others for new business. ECF No. 2538-4, at 11-14.

The record at trial indicated that quality of product issues were among the anticompetitive consequences of the challenged merger. Steves has shown that recently it has "found that more than ■■■ of all JELD-WEN doorskins and ■■■■ of doorskins made at Towanda are defective," meaning that in 2024 alone, Steves has

30

identified more than ███████ defective JELD-WEN doorskins.  If that rate continues, it is anticipated that approximately ███ ███████ of JELD-WEN's doorskins that Steves hopes to use in 2024 would be deemed defective.  ECF No. 2538, at 26 (citing ECF No. 2538-3, 36-38, 41, 77 (emphasis removed)).

Steves acknowledges that JELD-WEN has credited Steves for defective doorskins, but credits, as Steves points out, "do nothing to help Steves fill its customers' orders and are effectively meaningless to Steves and its customers if Steves cannot obtain additional doorskins (from JELD-WEN or elsewhere) to meet customer demand for doors."  ECF No. 2538, at 26.

As Steves has shown, the quality problems have created harm to the reputation of Steves and portends a loss of good will, threatening a loss of both former and potential customers.  Loss of good will and the difficulty of calculating ensuing damages constitute irreparable harm.  Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552-53 (4th Cir. 1994); Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992).

More importantly, JELD-WEN's focus on the fact that Steves no longer faces the threat of extinction proven at trial simply ignores the fact that, at this stage of the proceedings, the Court is not determining whether equitable relief is warranted in the

31

first instance.  Rather, the Court, at this stage, is tasked with
determining whether JELD-WEN has carried its burden to show that
divestiture would be so inequitable as to require the Court to
eliminate that remedial aspect of the AFJO.

JELD-WEN's premise (that Steves no longer faces extinction
and that, therefore, divestiture is no longer a proper remedy)
cannot be squared with the decision of the Fourth Circuit in
affirming the order of divestiture.  As the Fourth Circuit
explained:

> In JELD-WEN's view, the availability of a less
> drastic remedy forecloses divestiture, and the
> court erred by considering what would best
> promote competition.

4th Cir. Op. at 720. The Fourth Circuit responded: "We disagree
with JELD-WEN for two independent reasons."  Id. (emphasis added).

The first independent reason involved an assessment of the
threat to Steves' survival were the district court to have imposed
only conduct remedies rather than divestiture.  The second
independent reason for affirming divestiture was that "JELD-WEN's
argument conflicts with Clayton Act principles."  Id.  On that
point, the Court instructed as follows:

> The Act authorizes injunctive relief in
> private suits 'not merely to provide private
> relief, but to serve as well the high purpose
> of enforcing the antitrust laws'—i.e.,
> protecting competition.

* * *

> Indeed, private enforcement of antitrust laws
> is an 'integral part of the congressional plan
> for protecting competition,' so courts may
> fashion equitable remedies with that broader
> purpose in mind. A remedy that helped only
> Steves wouldn't promote competition in the
> doorskin market, conflicting with the
> principle that antitrust law protects
> competition, not competitors.

Id. (emphasis added) (citations omitted).  The Fourth Circuit

continued to explain that fundamental animating principle:

> Further, if courts were required to choose the
> remedy least burdensome to the defendant—
> rather than the one that best promotes
> competition—conduct remedies would be the norm
> because they generally burden defendants less.
> But that would go against Congress's policy
> judgment that divestiture is 'the remedy best
> suited to redress the ills of an
> anticompetitive merger,' . . . as well as the
> principle that conduct remedies are disfavored
> because they 'risk excessive government
> entanglement in the market.'

Id. (emphasis added) (citations omitted).

That independent reason for affirming the remedy of

divestiture is based upon fundamental principles found in the

Clayton Act as expressed by the Supreme Court of the United States

and by our Court of Appeals in this case.  As applied here, and

as explained previously, without divestiture, the market for

interior molded doorskins would today be much the same as it was

33

as a consequence of the merger that the jury found violated the Clayton Act and that warranted divestiture.

A critical purpose of the action filed by Steves was to undo that unlawful merger, i.e., to secure the remedy that "best promoted competition" and one that would be in accord with "Congress's policy judgment that divestiture is 'the remedy best suited to redress the ills of an anticompetitive merger.'" 4th Cir. Op. at 721 (quoting California v. Am. Stores Co., 495 U.S. 271, 285 (1990)).

When Steves filed this case, it faced the serious risk of going out of business as a consequence of an anticompetitive merger. Steves proved that the merger was unlawful and anticompetitive. It secured damages and divestiture. It used the monetary damages to insulate itself from ever again having to face the serious risk that necessitated this case: it created a source of supply for a goodly part of its doorskins requirements.

Does that warrant depriving Steves and the Independents of the benefit of "the remedy best suited to redress the ills" of a proven anticompetitive merger? For the reasons explained above, the Court thinks not. Indeed, without divestiture, Steves and the Independents face the same market for interior molded doorskins that the jury found to be anticompetitive. And, the Special Master secured a highly qualified buyer that the record shows will restore

34

the competition lost as a consequence of JELD-WEN's violation of the Clayton Act.  So, notwithstanding that Steves no longer faces the risk of extinction, divestiture remains an appropriate remedy and the one that, in this case on this record is "best suited to undo the ills of an anticompetitive merger." Id.  As the Court has acknowledged, "[d]ivestiture is stiff medicine." Div. Op. at 667.  It's time for JELD-WEN to take that medicine.

### CONCLUSION

For the foregoing reasons, JELD-WEN, INC.'S MOTION TO MODIFY THE AMENDED FINAL JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5) (ECF No. 2456) will be denied.

It is so ORDERED.

/s/ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: December 13, 2024